# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| M.A.*<br>c/o National Immigrant Justice Center<br>224 S. Michigan Ave., Suite 600<br>Chicago, IL 60604;<br><br>R.S.*<br>c/o National Immigrant Justice Center<br>224 S. Michigan Ave., Suite 600<br>Chicago, IL 60604;<br><br>M.P.*<br>c/o National Immigrant Justice Center<br>224 S. Michigan Ave., Suite 600<br>Chicago, IL 60604;<br><br>J.P.*<br>c/o National Immigrant Justice Center<br>224 S. Michigan Ave., Suite 600<br>Chicago, IL 60604;<br><br>E.B.*<br>c/o National Immigrant Justice Center<br>224 S. Michigan Ave., Suite 600<br>Chicago, IL 60604;<br><br>M.N.*<br>c/o National Immigrant Justice Center<br>224 S. Michigan Ave., Suite 600<br>Chicago, IL 60604;<br><br>K.R.*<br>c/o National Immigrant Justice Center<br>224 S. Michigan Ave., Suite 600<br>Chicago, IL 60604;<br><br>M.R.*<br>c/o National Immigrant Justice Center<br>224 S. Michigan Ave., Suite 600<br>Chicago, IL 60604;<br><br>B.H.*<br>c/o National Immigrant Justice Center<br>224 S. Michigan Ave., Suite 600 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) No. 1:23-cv-01843-TSC<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Chicago, IL 60604;                              )
                                                )
L.A.*                                           )
c/o National Immigrant Justice Center           )
224 S. Michigan Ave., Suite 600                 )
Chicago, IL 60604;                              )
                                                )
R.V.*                                           )
c/o National Immigrant Justice Center           )
224 S. Michigan Ave., Suite 600                 )
Chicago, IL 60604;                              )
                                                )
Y.F.*                                           )
c/o National Immigrant Justice Center           )
224 S. Michigan Ave., Suite 600                 )
Chicago, IL 60604;                              )
                                                )
M.S.*                                           )
c/o National Immigrant Justice Center           )
224 S. Michigan Ave., Suite 600                 )
Chicago, IL 60604;                              )
                                                )
F.C.*                                           )
c/o National Immigrant Justice Center           )
224 S. Michigan Ave., Suite 600                 )
Chicago, IL 60604                               )
                                                )
D.M.*                                           )
c/o National Immigrant Justice Center           )
224 S. Michigan Ave., Suite 600                 )
Chicago, IL 60604                               )
                                                )
J.S.*                                           )
c/o National Immigrant Justice Center           )
224 S. Michigan Ave., Suite 600                 )
Chicago, IL 60604                               )
                                                )
R.E.*                                           )
c/o National Immigrant Justice Center           )
224 S. Michigan Ave., Suite 600                 )
Chicago, IL 60604                               )
                                                )
S.U.*                                           )
c/o National Immigrant Justice Center           )
224 S. Michigan Ave., Suite 600                 )
Chicago, IL 60604                               )

LAS AMERICAS IMMIGRANT ADVOCACY )
CENTER )
1500 East Yandell Drive )
El Paso, TX 79902; )
)
REFUGEE AND IMMIGRANT CENTER FOR )
EDUCATION AND LEGAL SERVICES )
5121 Crestway Drive, Suite105 )
San Antonio, TX 78239; )
)
*Plaintiffs*, )
)
v. )
)
ALEJANDRO MAYORKAS, Secretary of the )
Department of Homeland Security, in his official )
capacity, )
245 Murray Lane, SW )
Washington, DC 20528; )
)
U.S. DEPARTMENT OF HOMELAND )
SECURITY, )
245 Murray Lane, SW )
Washington, DC 20528; )
)
UR JADDOU, Director of U.S. Citizenship and )
Immigration Services, in her official capacity, )
245 Murray Lane, SW )
Washington, DC 20528; )
)
U.S. CITIZENSHIP AND IMMIGRATION )
SERVICES, )
5900 Capital Gateway Drive )
Camp Springs, MD, 20746 ; )
)
TROY A. MILLER, Acting Commissioner of U.S. )
Customs and Border Protection, in his official )
capacity, )
1300 Pennsylvania Ave, NW )
Washington, DC 20229; )
)
U.S. CUSTOMS AND BORDER PROTECTION, )
1300 Pennsylvania Ave, NW )
Washington, DC 20229; )
)
)

PATRICK LECHLEITNER** , Senior Official )
Performing the Duties of Director of Immigration )
and Customs Enforcement, in his official capacity, )
500 12th Street, SW )
Washington, DC 20536; )
 )
U.S. IMMIGRATION AND CUSTOMS )
ENFORCEMENT, )
500 12th Street, SW )
Washington, DC 20536; )
 )
MERRICK GARLAND, Attorney General of the )
United States, in his official capacity, )
950 Pennsylvania Avenue, NW )
Washington, DC 20530; )
 )
U.S. DEPARTMENT OF JUSTICE, )
950 Pennsylvania Avenue, NW )
Washington, DC 20530; )
 )
DAVID NEAL, Director of the Executive Office for )
Immigration Review, in his official capacity, )
5107 Leesburg Pike )
Falls Church, VA 22041; )
 )
EXECUTIVE OFFICE FOR IMMIGRATION )
REVIEW, )
5107 Leesburg Pike )
Falls Church, VA 22041; )
 )

*Defendants.*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(Violation of Immigration and Nationality Act and Administrative Procedure Act)

* Plaintiffs proceeding under a pseudonym are indicated with an asterisk.

** Automatically substituted pursuant to Fed. R. Civ. P. 25(d).

**INTRODUCTION**

1.      This case challenges the government's sweeping new asylum bar, Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023) (the "Rule"), and several contemporaneously implemented expedited removal policies that dramatically alter the screening interview process that Congress mandated for individuals who express a fear of removal. Together, these policies effectively eliminate access to asylum at the southern border for most people in expedited removal proceedings.

2.      As part of the United States' longstanding commitment to protect people fleeing persecution, Congress has guaranteed that any noncitizen who is physically present or arrives in the United States may apply for asylum, irrespective of that person's manner of entry or immigration status.  *See* 8 U.S.C. § 1158(a)(1).

3.      Even when it created the expedited removal process that permits the rapid removal of certain noncitizens who arrive without immigration documentation, Congress took critical steps to ensure that this process would not wrongfully return people to potential persecution.  In particular, Congress established the "credible fear interview" threshold screening process.  *See* 8 U.S.C. § 1225(b)(1).

4.      To establish a credible fear, asylum applicants must show only a "significant possibility" that they could later establish eligibility for asylum after a full hearing in immigration court.  *Id.* § 1225(b)(1)(B)(v).  Congress intentionally set a low credible fear interview screening threshold to ensure that noncitizens with potentially meritorious claims for asylum would be protected from wrongful removal and allowed to fully develop and present their asylum claims.

1

5.      The Rule upends this system.  It both eliminates access to asylum for entire categories of people and unlawfully jettisons the threshold screening standard.

6.      The Rule applies to all non-Mexican adults and families who seek to enter at the southern land border or adjacent coastlines.  It renders anyone subject to the Rule ineligible for asylum unless the person satisfies one of three conditions: presenting at a port of entry after securing one of a limited number of appointments through the CBP One smartphone app; applying for and being denied protection in a transit country; or obtaining advance permission to travel to the United States through an approved parole program.

7.      Those conditions are not consistent with 8 U.S.C. § 1158, which requires access to asylum for people arriving at the border regardless of whether they enter at ports of entry; permits denial of asylum based on access to protection in third countries only when, at a minimum, those countries are genuinely safe options; and cannot be replaced by a system of seeking parole from abroad.  Moreover, in reality, the latter two conditions are available to almost no one who comes to the border to seek asylum, and the Rule thus amounts to a requirement that noncitizens seek asylum at ports.  And the CBP One app is riddled with problems and provides only a limited number of appointments, rendering access unavailable for many if not most asylum seekers.

8.      The Rule provides for certain narrow exceptions to its sweeping bar.  People who present at ports but without CBP One appointments will be eligible for asylum if they can show that they were unable to "access or use the [CBP One app] due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle."  8 C.F.R. § 208.33(a)(2)(ii)(B).  The Rule also allows access to asylum based on "exceptionally compelling circumstances," including an "acute medical emergency," an "imminent and extreme

threat to life or safety," or being a "victim of a severe form of trafficking in persons."  *Id.* § 208.33(a)(3)(i).  Those exceptions do not bring the Rule into compliance with the statute.

9.      The extreme new eligibility bar applies to asylum adjudications generally, including those presented to immigration judges in full removal proceedings.  The Defendant agencies ("the agencies") have gone further by choosing to also apply this bar in expedited removal credible fear interviews.

10.      Critically, in doing so, the agencies have eliminated the key "significant possibility" standard that Congress established to safeguard a person's opportunity to fully present potentially viable claims.  In laying out the process for applying the bar in credible fear interviews, the Rule requires a person to show that they are not *in fact* barred from asylum under the Rule.  *See* 8 C.F.R. § 208.33(b)(1) (adjudicators must "determine whether the [noncitizen] *is* covered by the presumption [of ineligibility] and, if so, whether the alien *has rebutted* the presumption") (emphases added).  That is, the new regulations do not ask whether there is a "significant possibility" that a noncitizen could later demonstrate that the bar is inapplicable by satisfying one of the conditions or exceptions noted above.  Rather, the regulations require noncitizens to defeat the bar *on the merits* at the time of the credible fear interview, without the benefit of the statutorily mandated "significant possibility" screening standard.

11.      Additionally, the agencies' choice to apply the bar at all in credible fear interviews is an inadequately reasoned break from their own longstanding practice.  Previously, credible fear interviews involved only a decision about the asylum seeker's fear of persecution or torture.  The applicability of any asylum eligibility bar, which bans relief even where a noncitizen can show a well-founded fear of persecution, was assessed only after a full hearing.  Indeed, in keeping with decades of prior practice, in 2022 the agencies formally concluded that

eligibility bars should *not* be applied in credible fear interviews, citing, among other reasons, concerns about unfairness to asylum seekers.  Nevertheless, the agencies then proceeded to issue the Rule, breaking from both their own recent conclusion and decades of their prior practice.

12.     The Rule likewise changes the screening standard for claims to other forms of protection—withholding of removal and protection under the Convention Against Torture ("CAT")—by applying a higher "reasonable possibility" standard to these claims in place of the "significant possibility" standard that has previously been used for these claims in the credible fear process.  Again, the Rule failed to adequately explain that change.

13.     Other contemporaneous policy changes exacerbate the Rule's impact on expedited removal proceedings.  For example, the Department of Homeland Security ("DHS") has also reduced the pre-interview time period to just 24 hours following a person's initial screening into immigration custody.  This change, applicable to credible fear interviews that DHS now conducts, in some cases, in short-term detention facilities run by Customs and Border Protection ("CBP"), rather than facilities run by Immigration and Customs Enforcement ("ICE"), leaves virtually no time or ability for noncitizens to consult with anyone or meaningfully prepare for these often life-or-death interviews.

14.     DHS has also instituted a new policy of carrying out expedited removals of certain non-Mexicans to Mexico.  For these people, the credible fear interview process bears even less resemblance to the system Congress created.  If they are barred from asylum under the Rule, the credible fear interview becomes an inquiry into the heightened "reasonable possibility" of persecution or torture *in Mexico*, rendering their experiences and fears regarding their home countries irrelevant.  Yet DHS does not clearly notify these asylum seekers that it intends to remove them to Mexico.  As a result, they have no way of knowing that they must prove the

dangers they will face if sent to Mexico, nor any meaningful opportunity to prepare for an interview that will focus entirely on dangers in Mexico.

15.     The intersecting effects of these and other new policies and procedures are causing a sharp decline in the number of people who pass their credible fear interviews and are able to pursue asylum.  Indeed, a core justification offered for the Rule is that, in the agencies' view, it is a problem that some noncitizens who pass credible fear do not ultimately prevail on their asylum claims, and so the credible fear interview pass rate should be driven down.  But Congress decided on and established the low screening standard, which requires a full hearing for any *potentially* meritorious asylum claims.  Faithfully applied, that standard should produce a disparity between the credible fear pass rate and the ultimate asylum grant rate.

16.     The Rule and these other related changes to the credible fear process violate the Immigration and Nationality Act ("INA") and are thus contrary to law under the Administrative Procedure Act ("APA").  In addition, the Rule and each change is arbitrary and capricious in violation of the APA, and the agencies promulgated the Rule in violation of the APA's procedural requirements.

## JURISDICTION AND VENUE

17.     This case arises under the APA, 5 U.S.C. § 701 *et seq.*; the INA, 8 U.S.C. § 1101 *et seq.*, and its implementing regulations; and the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231), and its implementing regulations.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331, and 8 U.S.C. § 1252(e)(3) as to all claims.

18.     Venue is proper under 28 U.S.C. § 1391(e)(1), because Defendants are agencies of the United States and officers of the United States acting in their official capacity, many

Defendants reside in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.  Venue is also appropriate under 8 U.S.C. § 1252(e)(3)(A).

## PARTIES

19.     The Individual Plaintiffs are noncitizens who came to the United States to seek asylum.[1]  They were either unlawfully issued expedited removal orders to their home countries or to Mexico because of the Rule, or they were subjected to "voluntary" return to Mexico under the Rule's implementation.  The Organizational Plaintiffs are organizations that serve asylum seekers.

### I.    Individual Plaintiffs

20.     Plaintiff M.A. is an asylum seeker from Guatemala who fears persecution in that country from her husband, a member of the MS-13 gang, and his associates.  Soon after M.A. married, her husband became abusive—raping, beating, and threatening to kill her.  He even stabbed her in the stomach.  M.A. separated from him and demanded a divorce, but her husband refused.  Instead, he and his gang associates tracked her down when she tried to move away from him, threatened to kill her, and gang raped her.  M.A. fled Guatemala.  M.A. entered the United States without authorization and without a CBP One appointment, and turned herself into immigration officials on or about May 14, 2023.  At her credible fear interview, M.A. was deemed ineligible for asylum because she did not overcome the Rule's bar.  She was denied the opportunity to seek withholding of removal and CAT protection after the officer concluded that she did not demonstrate a reasonable possibility of persecution or torture.  An immigration judge upheld that decision.  M.A. was deported to Guatemala.

---

[1] The Individual Plaintiffs are seeking leave to proceed under their initials in this case in a motion contemporaneously filed as to that issue, with declarations, filed under seal, setting forth the details provided here.  They are referred to in this complaint using their initials.

21.     Plaintiff R.S. is an asylum seeker from El Salvador who fears persecution in that country.  Her brother was murdered by the powerful MS-13 gang, and she faced severe violence, including broken bones and sexual abuse, at their hands.  When she fled El Salvador, she initially went to Guatemala, but she could not stay in that country because her ex-partner and the father of two of her children lived there and was violently abusive toward her.  When she traveled through Mexico, she faced extortion and threats to her safety.  R.S. entered the United States on or about May 19, 2023, without presenting at a port of entry and without obtaining an appointment on CBP One.  In her credible fear interview, the asylum officer found R.S. ineligible for asylum because she did not overcome the Rule's bar.  She was denied the opportunity to pursue withholding of removal and CAT protection after the officer concluded that she did not demonstrate a reasonable possibility of persecution or torture.  An immigration judge upheld that decision.

22.     Plaintiff M.P. is an asylum seeker from Guatemala who fears persecution in that country.  M.P. fled Guatemala in May 2023 after he witnessed an attack and was threatened with death for helping the victim report it.  He entered the United States on or about June 4, 2023, without presenting at a port of entry and without obtaining an appointment on CBP One.  Once in the United States, M.P. was detained in a facility run by CBP and had his credible fear interview almost immediately, without counsel present.  On or around June 7, 2023, he received a negative credible fear determination, which an immigration judge affirmed.  In M.P.'s credible fear interview, the asylum officer found M.P. ineligible for asylum because he did not overcome the Rule's bar.  He was denied the opportunity to pursue withholding of removal and CAT protection after the officer concluded that he did not demonstrate a reasonable possibility of persecution or torture.  M.P. has been removed to Guatemala.

23.     Plaintiff J.P. is an asylum seeker from Venezuela who fears persecution in that

country.  J.P. is a political activist who fled Venezuela after he was threatened, beaten, and

forced to leave school because of his political activism.  J.P. approached the U.S.-Mexico border

at a port of entry without obtaining an appointment on CBP One.  After J.P. was forced to wait to

seek asylum, he was processed on May 12, 2023.  J.P. later spoke to an immigration officer and

tried to express his fear of returning to Venezuela**.**  Instead, he was asked only about Mexico.

J.P. explained that he also feared return to Mexico, because he had been robbed and threatened

there.  On or about June 1, 2023, J.P. was coerced into signing a paper agreeing to "voluntarily"

depart the United States.  He was returned to Mexico.

24.     Plaintiff E.B. is an asylum seeker from Venezuela who fears persecution in that

country.  E.B. is a former government worker who fled after being threatened for his refusal to

participate in or condone government corruption.  He entered the United States on or about May

23, 2023, without presenting at a port of entry and without obtaining an appointment on CBP

One.  He was detained by CBP and had his credible fear interview almost immediately, without

counsel present.  The officer focused on his potential to return to Mexico, and not on his fear of

persecution in Venezuela.  The officer told E.B. that he would be removed, or he could

"voluntarily" return to Mexico, in which case he would remain eligible to seek admission by

obtaining an appointment on CBP One.  He was returned to Mexico.

25.     Plaintiff M.N. is an asylum seeker from the Dominican Republic who fears

persecution in that country.  She fled in May 2023 after a male relative beat her viciously, raped

her, and put a gun to her head and threatened to kill her.  M.N. immediately tried to hide from

him by moving to stay with a friend who lived several hours away.  When her relative tracked

her down and showed up with his gun at her friend's house, she knew she had to leave the

country.  She flew to El Salvador where she began traveling north to the United States.  While in Mexico, she was assaulted and robbed.  M.N. didn't know that she was supposed to use CBP One, and on or about May 15, 2023, she entered without presenting at a port of entry or obtaining a CBP One appointment.  In M.N.'s credible fear interview, the asylum officer found M.N. ineligible for asylum because she did not overcome the Rule's bar.  She was denied the opportunity to pursue withholding of removal and CAT protection after the officer concluded that she did not demonstrate a reasonable possibility of persecution or torture.  An immigration judge upheld that decision.

      26.    K.R. is an asylum seeker from Honduras who fears persecution in that country. She fled with her teen children because a gang was trying to recruit her son and force her daughter to become a girlfriend of the gang.  K.R. refused the gang's demands, so gang members beat and sexually abused her on multiple occasions, including multiple times in front of her children.  In February 2023, the gang members said it was their last warning and threatened to kill K.R., so she and her children fled.  In April 2023, K.R. and her children tried to enter the United States, but they were separated.  After that attempt, K.R. entered the United States on or about May 19, 2023, without presenting at a port of entry and without obtaining an appointment on CBP One.  In her credible fear interview, the asylum officer found K.R. ineligible for asylum because she did not overcome the Rule's bar.  She was denied the opportunity to pursue withholding of removal and CAT protection after the officer concluded that she did not demonstrate a reasonable possibility of persecution or torture.  An immigration judge upheld that decision.

      27.    M.R. is an asylum seeker from Ecuador who fears persecution in that country.  He fled Ecuador after members of Los Choneros, who are affiliated with police officers, kidnapped

and tortured him until his mother paid a ransom. M.R. tried to report the kidnapping, but the prosecutors refused to accept the complaint. After his attempts to report them, Los Choneros and the police followed him and threatened him. While near the U.S.-Mexico border, M.R. was kidnapped by cartel members, and his family was again forced to pay his ransom. He did not seek asylum in any of the countries through which he transited because they were not safe for him. M.R. spent about 12 days attempting to get a CBP One appointment, but on May 25, 2023, he crossed the border without authorization and without an appointment. He was denied a chance to seek asylum after a credible fear interview because the officer determined he did not overcome the Rule's bar. He was also denied the opportunity to pursue withholding of removal and CAT protection after the officer concluded that he did not demonstrate a reasonable possibility of persecution or torture. An immigration judge upheld that decision.

28.    B.H. is an asylum seeker from Peru who fears persecution in that country. She fled Peru after members of Los Malditos del Centro beat and threatened her with death after she participated in political events in their organization's territory. After the group of men beat her repeatedly and threatened her with guns, B.H. attempted to report it to the police. Finding no assistance there, she gathered resources to be able to flee. She flew to Mexico in May, where she was robbed of her belongings. B.H. made her way to the U.S.-Mexico border and entered the United States without authorization or a CBP One appointment on or around May 25, 2023, near Eagle Pass. B.H. turned herself into immigration authorities and was detained for about 12 days at the CBP facility in Laredo. After about five days at Laredo, without receiving any guidance about the asylum process or access to an attorney, B.H. had her credible fear interview. The officer determined that B.H. did not meet an exception to the Rule's bar, so she was denied the opportunity to seek asylum. She was also denied the opportunity to seek withholding of removal

and CAT protection after the officer concluded that she did not demonstrate a reasonable
possibility of persecution or torture.  An immigration judge upheld that determination.

29.     Plaintiff L.A. is an asylum seeker from Nicaragua who fears persecution in that
country.  He fled Nicaragua in June 2022 with his two sons after supporters of the ruling party
threatened him at gunpoint for supporting the opposition.  In Mexico, L.A. and his two sons were
attacked, and his sons were kidnapped.  He has not heard from his sons since.  When he decided
to flee Mexico, L.A. tried to get an appointment with CBP One for nearly three weeks, without
success.  Eventually he decided it was too dangerous to continue waiting, so L.A. entered the
United States without authorization or a CBP One appointment in early June 2023.  L.A. had his
credible fear interview while he was in CBP custody and without his counsel present.  The
officer asked L.A. only about Mexico and pressed him to withdraw his application and return to
Mexico to seek parole.  L.A. repeatedly stated that he did not want to go to Mexico and offered
his belief that he was not eligible for the parole program.  The officer determined that L.A. did
not meet an exception to the Rule's bar, so he was denied the opportunity to seek asylum.  L.A.
was also denied the opportunity to seek withholding of removal and CAT protection after the
officer concluded that he did not demonstrate a reasonable possibility of persecution or torture as
to his fear of return to Mexico, not Nicaragua.  After this suit was filed, an immigration judge
vacated the asylum officer's decision.

30.     Plaintiff R.V. is an asylum seeker from El Salvador who fears persecution in that
country.  He was arrested, beaten, and shot at by police for participating in a protest against the
policies of the Salvadoran government.  After he tried to report the unlawful attack to other
police officers, they took a picture of his ID and told him they could not help him.  R.V. and his
wife decided to flee El Salvador after their home was broken into and neighbors told them police

had been looking for them.  R.V. did not seek asylum in a transit country due to the poor treatment of migrants and fears those countries would deport him and his wife back to El Salvador.  In Mexico, R.V. and his wife were nearly kidnapped by a group of armed men.  At the end of May, R.V. and his wife entered the United States without authorization or a CBP One appointment.  R.V. was separated from his wife by CBP and had his credible fear interview separately.  The officer determined that R.V. did not meet an exception to the Rule's bar, so he was denied the opportunity to seek asylum.  He was also denied the opportunity to seek withholding of removal and CAT protection after the officer concluded that he did not demonstrate a reasonable possibility of persecution or torture.  An immigration judge upheld that determination.

31.     Plaintiff Y.F. is an asylum seeker from El Salvador who fears persecution in that country.  She fled to the United States after she witnessed a gang murder and was attacked in order to dissuade her from going to the police.  During the approximately six weeks she was in Mexico, Y.F. was robbed multiple times.  Y.F. tried to use CBP One to obtain an appointment to enter the United States, but received nothing but error messages after multiple tries.  She entered without authorization and without a CBP One appointment on or around May 25, 2023, and turned herself in at the first opportunity.  While in CBP custody, Y.F. had a credible fear interview, but the officer determined that she did not meet an exception to the Rule's bar, so she was denied the opportunity to seek asylum.  She was also denied the opportunity to seek withholding of removal and CAT protection after the officer concluded that she did not demonstrate a reasonable possibility of persecution or torture.  An immigration judge upheld that determination.

32.     Plaintiff M.S. is an asylum seeker from Brazil who fears persecution in that country.  He had to flee after receiving threats for his participation in a police investigation of a crime involving a powerful local gang.  M.S. could not seek safety on his way to the border, particularly in Mexico, where he is easily identifiable as a migrant because he speaks Portuguese.  M.S. entered the United States on or around May 12, 2023, without obtaining an appointment on CBP One, an app that does not accommodate Portuguese speakers.  In his credible fear interview, the asylum officer found M.S. ineligible for asylum because he did not overcome the Rule's bar.  He was denied the opportunity to pursue withholding of removal and CAT protection after the officer concluded that he did not demonstrate a reasonable possibility of persecution or torture.  An immigration judge affirmed that decision.

33.     Plaintiff F.C. is an asylum seeker from Ecuador who fears persecution in that country.  He fled his home after he cooperated with a police investigation of Los Lobos, a criminal organization that is prominent in Ecuador.  People shot up his house yelling "snitch," and approached him on the street about talking to the police.  F.C. fled Ecuador.  He did not seek asylum in the countries he passed through because Los Lobos has a presence or reach in each of them.  In Mexico, F.C. learned about CBP One, but after attempting to get an appointment without success, he decided, given the risks, that he had to leave Mexico.  F.C. entered the United States on or about May 28, 2023, without authorization or a CBP One appointment, and turned himself in to immigration officials.  On or about June 11, 2023, F.C. had a credible fear interview. In his credible fear interview, the asylum officer found F.C. ineligible for asylum because he did not overcome the Rule's bar.  He was denied the opportunity to pursue withholding of removal and CAT protection after the officer concluded that he did not

demonstrate a reasonable possibility of persecution or torture.  An immigration judge affirmed that decision on or about June 27, 2023.

34.     Plaintiff D.M. is an asylum seeker from Venezuela who fears persecution because of his political opinion and because of violence he endured from criminal gangs.  He was attacked by government actors for participating in protests, and gang members threatened his life and the lives of family members.  D.M. fled Venezuela.  In Mexico, D.M. unsuccessfully attempted to obtain an appointment with CBP One, and after he was robbed and extorted, he feared he could be injured or killed if he continued to wait.  D.M. entered the United States on or about May 27, 2023, without authorization or a CBP One appointment.  D.M. had a credible fear interview and was denied the opportunity to seek asylum because the officer determined he did not meet an exception to the Rule's bar.  He was denied the opportunity to pursue withholding of removal and CAT protection after the officer concluded that he did not demonstrate a reasonable possibility of persecution or torture.  During the interview, the asylum officer told D.M. that he could accept voluntary return to Mexico, but D.M. declined because he could not live safely in Mexico.  The asylum officer also asked D.M. why he did not seek parole to come to the United States, but he explained his understanding that he does not qualify.  An immigration judge affirmed the decision of the asylum officer on or about June 26, 2023.  On June 28, 2023, D.M. was removed to Mexico, where he remains.

35.     Plaintiff J.S. is an indigenous asylum seeker from Ecuador whose primary language is Shuar.  She fled Ecuador after she faced sexual abuse, assault, and racism as an indigenous woman.  Once she arrived in Mexico, J.S. attempted to use the CBP One app, but it did not work on her cell phone.  When she attempted to use CBP One on another phone, it was not available in her primary language, and she did not understand enough English or Spanish to

use the app.  On or about May 15, 2023, J.S. entered the United States without authorization or a

CBP One appointment.  J.S. had a credible fear interview on or about May 25, 2023.  Despite her

statements that she speaks Shuar as her best langauge, the asylum officer went forward with the

interview in Spanish and got impatient when J.S. said she did not understand.  J.S. was denied

the opportunity to seek asylum because the officer determined she did not overcome the Rule's

bar.  She was denied the opportunity to pursue withholding of removal and CAT protection after

the officer concluded that she did not demonstrate a reasonable possibility of persecution or

torture.  At her immigration judge review, J.S. again tried to explain that she needed a Shuar

interpreter.  The immigration judge went forward in Spanish and affirmed the asylum officer's

determination on or about June 5, 2023.

　　　36.　　Plaintiff R.E. is an asylum seeker from Cuba who has faced harm in that country.

R.E. entered the United States without authorization and without a CBP One appointment on or

about June 10, 2023, and turned himself in to immigration authorities.  He was detained in the

custody of CBP, and he had his credible fear interview within days of his initial screening into

immigration custody.  During his credible fear interview, R.E. told the asylum officer that he had

applied for asylum in Mexico and received a denial.  Despite that statement and despite finding

R.E.'s testimony credible, the asylum officer denied R.E. the opportunity to seek asylum after

determining that he did not overcome the Rule's bar.  He was denied the opportunity to pursue

withholding of removal and CAT protection after the officer concluded that he did not

demonstrate a reasonable possibility of persecution or torture.  An immigration judge affirmed

that determination on June 20, 2023, and R.E. was removed to Mexico on June 24, 2023.  R.E. is

currently in Mexico but the Mexican government has ordered him to leave the country within 15

days.

37.     Plaintiff S.U. is an asylum seeker from Venezuela who fled that country after being extorted and receiving death threats from corrupt government officials and after he saw these same authorities follow through on a similar threat levied against a colleague.  S.U. did not seek asylum in any of the countries he transited through because it was not safe or possible to stay in those countries.  Once in Mexico, S.U. attempted to use CBP One, but he was unable to obtain an appointment.  Then, he was kidnapped and the last of his money was stolen.  Once he managed to get released from his kidnappers, S.U. entered the United States on or about June 8, 2023, without authorization or a CBP One appointment.  At a credible fear interview held on or about June 22, 2023, an asylum officer denied S.U. the opportunity to seek asylum because he determined S.U. did not overcome the Rule's bar.  S.U. was denied the opportunity to pursue withholding of removal and CAT protection after the officer concluded that he did not demonstrate a reasonable possibility of persecution or torture.  An immigration judge affirmed that determination, and S.U. was later removed to Mexico, where he remains.  Since his removal, S.U. has secured an appointment using CBP One, but he is unsure if he will be permitted to seek asylum.

## II.     Organizational Plaintiffs

38.     Organizational Plaintiff Las Americas Immigrant Advocacy Center ("Las Americas") is a nonprofit legal services organization based in El Paso, Texas, dedicated to serving the legal needs of low-income immigrants, including asylum seekers.  An essential part of Las Americas' mission is to provide immigration counseling and legal services to asylum seekers subjected to expedited removal.  This work includes assisting asylum seekers to prepare for credible fear interviews, representing them during those interviews, and representing them throughout the process of obtaining immigration judge review of negative credible fear

determinations.  Las Americas also counsels people in Mexico who are trying to enter the United States so that they are aware of the circumstances that await in a credible fear interview.

39.     Organizational Plaintiff Refugee and Immigrant Center for Education and Legal Services ("RAICES") is a nonprofit, non-partisan organization headquartered in San Antonio, Texas.  RAICES's mission is to defend the rights of immigrants and refugees; empower individuals, families, and communities of immigrants and refugees; and advocate for liberty and justice.  RAICES provides free and low-cost immigration legal services to underserved immigrant children, families, and individuals, and is the largest immigration legal services provider in Texas.  RAICES also conducts social services programming for immigrants, engages in advocacy work, and provides bond assistance to individuals seeking release from DHS custody.  A central piece of RAICES's work with detained people involves helping them prepare for and succeed in the credible fear process.

## III.    Defendants

40.     Defendant Alejandro Mayorkas is the Secretary of Homeland Security.  He is sued in his official capacity.  Defendant Mayorkas directs each of the component agencies within the Department of Homeland Security ("DHS").  In his official capacity, Defendant Mayorkas is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum or other relief.

41.     Defendant DHS is a cabinet-level department of the United States federal government.  Its components include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE").

42.     Defendant Ur Jaddou is the Director of USCIS.  She is sued in her official capacity.

43.     Defendant USCIS is the sub-agency of DHS that, through its asylum officers, conducts interviews of individuals seeking asylum.

44.     Defendant Troy A. Miller is the Acting Commissioner of CBP.  He is sued in his official capacity.

45.     Defendant CBP is the sub-agency of DHS that is responsible for the apprehension, detention, and processing of individuals seeking asylum or other relief at or near the U.S. border.

46.     Defendant Patrick Lechleitner is the Senior Official Performing the Duties of the Director of ICE.  He is sued in his official capacity.

47.     Defendant ICE is the sub-agency of DHS that is responsible for carrying out removal orders and overseeing immigration detention.

48.     Defendant Merrick Garland is the Attorney General of the United States.  He is sued in his official capacity.  Defendant Garland directs each of the component agencies within the Department of Justice.  In his official capacity, Defendant Garland is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum or other relief.

49.     Defendant U.S. Department of Justice ("DOJ") is a cabinet-level department of the United States federal government.

50.     Defendant David Neal is the Director of the Executive Office for Immigration Review ("EOIR").  He is sued in his official capacity.

51.     Defendant EOIR is the sub-agency of DOJ that, through its immigration judges and appellate immigration judges, conducts limited review of negative credible fear determinations in expedited removal proceedings and adjudicates regular removal proceedings and appeals.

## FACTS

### I.     Background

#### A.     Forms of Protection for Individuals Fleeing Persecution and Torture

52.     The modern U.S. asylum system was established by the Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102.  The Act reflects "one of the oldest themes in America's history—welcoming homeless refugees to our shores," and "gives statutory meaning to our national commitment to human rights and humanitarian concerns."  S. Rep. No. 96-256, 1st Sess. at 1 (1979), *reprinted in* 1980 U.S.C.C.A.N. 141.  One of Congress's "primary purposes" in enacting the statutory provisions governing asylum, codified at 8 U.S.C.§ 1158, was "to bring United States refugee law into conformance" with international refugee treaties.  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987).

53.     To that end, federal law provides three primary forms of protection for individuals fleeing persecution and torture: asylum under 8 U.S.C. § 1158; withholding of removal under 8 U.S.C. § 1231(b)(3); and protection under the Convention Against Torture ("CAT"), *see* 8 C.F.R. §§ 1208.16-18.

### 1.     Asylum

54.     Asylum affords protection from removal to individuals who have a "well-founded fear of persecution" on account of one or more of five protected grounds: race, religion, nationality, political opinion, or membership in a particular social group, if their country is unable or unwilling to protect them from this harm.  8 U.S.C. § 1101(a)(42)(A).

55.     A "well-founded fear of persecution" is established if there is a ten percent chance that the applicant will be persecuted based on a protected characteristic.  *Cardoza-Fonseca*, 480 U.S. at 430, 440.  Past persecution gives rise to a presumption of a well-founded fear of future persecution and thus of asylum eligibility.

56.     In crafting the asylum statute, Congress plainly and explicitly ensured that noncitizens already within the United States or arriving at the border would be able to apply for asylum, regardless of their status upon entry or manner of arrival.  Under 8 U.S.C. § 1158(a)(1), "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival …), irrespective of such [noncitizen's] status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C. § 1225(b)]."

57.     The statute also includes a handful of carefully crafted bars to asylum eligibility. Two specifically address when asylum can be denied based on a person's ability to seek refuge in a third country.  Under 8 U.S.C. § 1158(b)(2)(A)(vi), a noncitizen is ineligible for asylum if he or she "was firmly resettled in another country prior to arriving in the United States."  And under 8 U.S.C. § 1158(a)(2)(A), asylum is not available to a noncitizen "if the Attorney General determines that the [noncitizen] may be removed, pursuant to a bilateral or multilateral agreement, to a country" where, among other things, "the [noncitizen's] life or freedom would

not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the [noncitizen] would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection."

58.     Congress narrowly tailored these two bars to ensure that applicants could be barred from asylum in the United States only if residing elsewhere is "genuinely safe." *East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 977-79 (9th Cir. 2020).  Although the agencies may create additional eligibility restrictions on asylum, they must be "consistent with" the overall scheme of 8 U.S.C. § 1158.  *See* 8 U.S.C. § 1158(b)(2)(C).

59.     There are three principal ways to seek asylum.  First, a noncitizen not in removal proceedings may file an "affirmative" application with USCIS and complete an interview with an asylum officer.  8 C.F.R. §§ 208.2(a), 208.9.

60.     Second, a noncitizen in regular removal proceedings under Section 240 of the INA, 8 U.S.C. § 1229a, may submit a "defensive" asylum application to the immigration judge as a form of relief from removal.  8 C.F.R. § 208.2(b).

61.     Third, as discussed more fully below, a noncitizen who has been placed in "expedited removal"—a truncated removal process that may be applied to certain noncitizens who arrive at the border or enter without inspection, 8 U.S.C. § 1225(b)(1)—may also raise an asylum claim through the credible fear screening process.  If the noncitizen is found to have a credible fear, the government puts the noncitizen into regular removal proceedings, where they can submit a defensive asylum application.

## 2.     Withholding of Removal and CAT Protection

62.     Like asylum, withholding of removal protects individuals facing persecution on account of a protected ground.  The withholding provision, 8 U.S.C. § 1231(b)(3), prohibits the

government from removing a noncitizen "to a country if . . . the [noncitizen's] life or freedom would be threatened in that country because of the [noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion."

63.     Whereas asylum can be won based on a ten percent chance of persecution, being granted withholding requires showing that persecution is more likely than not—a much higher standard. *INS v. Stevic*, 467 U.S. 407, 429-30 (1984).  The withholding statute bars removal to any country as to which this showing is made, not just an individual's home country.

64.     Immigration regulations implementing the Convention Against Torture likewise prohibit the removal of a noncitizen to any country where "it is more likely than not that he or she would be tortured."  8 C.F.R. § 208.16(c)(2).

65.     Withholding of removal and CAT protection are available to individuals who do not qualify for asylum.  But the denial of asylum has major implications for noncitizens, notwithstanding the availability of these other forms of protection.  In addition to a higher burden of proof for withholding and CAT, these protections can be granted only after a person is ordered removed, and the grant of protection simply prevents the government from executing the removal order.  By contrast, people granted asylum do not receive a removal order and can become lawful permanent residents, 8 U.S.C. § 1159(b), and eventually U.S. citizens, *id.* § 1427. In addition, the spouse and children of a person granted asylum can become derivative beneficiaries of asylum, whether or not they accompanied the principal applicant to the United States.  8 U.S.C. § 1158(b)(3).  By contrast, withholding of removal and CAT protection do not permit derivative beneficiaries.  Instead, spouses or children must be present in the United States, apply separately, and be granted withholding of removal or CAT protection independently, which can result in long-term family separation.

**B.**     **The Expedited Removal System and Credible Fear Screening Interviews**

66.     In 1996, Congress established expedited removal to "substantially shorten and speed up the removal process" for certain noncitizens arriving without immigration documents. *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020); *see* 8 U.S.C. § 1225(b)(1). Expedited removal may be applied to certain noncitizens who arrive at the border or enter without inspection, typically those who lack valid travel documents.  8 U.S.C. § 1225(b)(1)(A)(i).  Absent further proceedings to assess any fear claims, noncitizens subjected to expedited removal are ordered removed by an immigration officer "without further hearing or review." *Id*.

67.     But Congress's interest in "efficient removal" was balanced against "a second, equally important goal: ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution."  *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020).  Thus, Congress took care to safeguard access to asylum, most notably by establishing a low screening standard for noncitizens with a fear of persecution or torture.

68.     A noncitizen in expedited removal who expresses a fear of persecution or torture, or an intention to apply for asylum, is entitled to a "credible fear" screening interview.  8 U.S.C. § 1225(b)(1)(B).

69.     Because the credible fear interview is only a threshold screening device, a noncitizen "need not show that he or she *is in fact eligible* for asylum."  *Grace*, 965 F.3d at 888 (internal quotation marks omitted, emphasis in original).  Instead, they need only show a "credible fear," defined by the statute as a "significant possibility" that the individual "could establish eligibility for asylum" in removal proceedings.  *See* 8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. §§ 208.30 (e)(2)-(3).

70.     Under this "low screening standard for admission into the usual full asylum process," Congress intended that "there should be no danger that [a noncitizen] with a genuine asylum claim will be returned to persecution." *Grace*, 965 F.3d at 902 (quoting legislative history).

71.     If the asylum officer finds a credible fear, the individual is taken out of the expedited removal process. 8 U.S.C. § 1225(b)(1)(B)(v). Their case, including claims for asylum and other forms of protection, is then considered in regular removal proceedings.

72.     In regular removal proceedings, noncitizens have the right to counsel, to present evidence, to cross-examine witnesses, and to appeal, if necessary, to the Board of Immigration Appeals and a federal court of appeals. 8 U.S.C. §§ 1229, 1229a, 1252(a), (b); 8 C.F.R. §§ 1003.12-1003.47. They also have substantially more time to gather evidence, consult with counsel, develop arguments, and otherwise prepare.

73.     By contrast, if the asylum officer finds no credible fear, the noncitizen is entitled only to review before an immigration judge, who likewise assesses whether there is a "significant possibility" of eligibility for protection in full removal proceedings. 8 C.F.R. § 1208.30. If the immigration judge finds a credible fear, the noncitizen is placed in full removal proceedings before an immigration judge. *Id.* If, however, the immigration judge affirms the asylum officer's adverse finding, the applicant is subject to removal "without further hearing or review." 8 U.S.C. §§ 1225(b)(1)(B)(i), (iii); *see* 8 U.S.C. §§ 1252(a)(2)(A), (e).

74.     In addition to screening for asylum, the credible fear interview is also used to screen claims for withholding of removal and CAT relief. Prior to the Rule, the regulations instructed that those claims must also be screened under the "significant possibility" standard. *See* 8 C.F.R. §§ 208.30(e)(2)-(3).

24

C.      **Previous Asylum Bans**

75.     In 2018, DHS and DOJ ("the agencies") barred asylum eligibility for those who

crossed the southern border between designated ports of entry.  This "entry ban" was enjoined,

and the Supreme Court denied the government's request to stay that injunction.  *See East Bay*

*Sanctuary Covenant v. Biden*, 993 F.3d 640, 658 (9th Cir. 2021); *Trump v. East Bay Sanctuary*

*Covenant*, 139 S. Ct. 782 (2018); *see also O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019)

(vacating rule), *appeal pending sub nom O.A. v. Biden*, No. 19-5272 (D.C. Cir.).

76.     Then, in 2019, the agencies issued a "transit ban" rendering almost all noncitizens

who transited through another country prior to reaching the southern U.S. border ineligible for

asylum unless they had applied for and been denied protection in a transit country.  The Supreme

Court entered a summary order staying a preliminary injunction of the transit ban, *Barr v. East*

*Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019), but the ban was subsequently vacated,

promulgated as a final rule, and again enjoined.  *Cap. Area Immigrants' Rights Coal. v. Trump*,

471 F. Supp. 3d 25 (D.D.C. 2020) (vacating interim final rule); *East Bay Sanctuary Covenant v.*

*Barr*, 519 F. Supp. 3d 663, 665 (N.D. Cal. 2021) (enjoining final rule); *see East Bay Sanctuary*

*Covenant v. Garland*, 994 F.3d 962, 982 (9th Cir. 2020).  During the nearly year-long period the

transit ban was in effect, it barred asylum in more than 98% of the 25,000 cases in which it was

invoked.

77.     In March 2020, DHS began enforcing a series of orders issued by the Centers for

Disease Control and Prevention, known as "Title 42," under which people seeking asylum were

immediately expelled from the United States as a temporary measure, purportedly justified by

public health.  Title 42 was the subject of substantial litigation, and there were several points at

which the policy almost ended but was kept in place by court decisions.  *See Huisha-Huisha v.*

*Mayorkas*, 27 F.4th 718, 731-33 (D.C. Cir. 2022) (affirming injunction against policy in part); *Huisha-Huisha v. Mayorkas*, ___ F. Supp. 3d ___, 2022 WL 16948610, at *13-*14 (D.D.C. Nov. 15, 2022) (vacating and enjoining policy as arbitrary and capricious); *Arizona v. Mayorkas*, 143 S. Ct. 478 (2022) (staying judgment to review intervention issue).  Eventually, Title 42 terminated when the national public health emergency declaration concerning COVID-19 expired on May 11, 2023.

## II.     The New Rule and Related Expedited Removal Policies

78.     Because Title 42 nearly ended on several occasions before its ultimate termination, the agencies had years to prepare for the resumption of normal Title 8 processing under the INA.  Yet the agencies issued the Rule at issue here on a truncated timeline tied to May 11, 2023, the end date for Title 42.

79.     The agencies had issued a Notice of Proposed Rulemaking, providing for a 32-day comment period (30 days plus a weekend).  88 Fed. Reg. 11,704 (Feb. 23, 2023).  The agencies received more than 50,000 public comments, the vast majority of them in opposition.

80.     On May 10, 2023—the day before Title 42 expired—the agencies issued the Rule at issue here, "Circumvention of Lawful Pathways," 88 Fed. Reg. 31,314 (May 16, 2023).

81.     The Rule imposes a new bar on asylum eligibility that broadly denies asylum to non-Mexican asylum seekers at the southern border and adjacent coastal areas, irrespective of the merits of their persecution claims.  In addition, it imposes that bar in expedited removal proceedings without applying the statutorily mandated "significant possibility" screening standard.  Indeed, the Rule is explicitly designed to reduce the number of people who pass their credible fear interviews and are able to pursue their claims in full removal proceedings.  *See* 88 Fed. Reg. at 31,363; *see also* 88 Fed. Reg. at 11,737.

A.      **The Rule's New Asylum Eligibility Bar**

82.     The Rule applies to anyone who arrives at the southern land border or adjacent coastlines after traveling through a third country en route to the United States, except unaccompanied children.  8 C.F.R. §§ 208.33(a)(1), (2)(i).  In other words, it applies to all non-Mexican adults and families who seek asylum at the southern U.S. border.

83.     The Rule bars asylum unless a covered person (1) presents at a port of entry after obtaining one of a small number of border port appointments through a complicated smartphone application called CBP One, 8 C.F.R. § 208.33(a)(2)(ii)(B) (the "Port-Of-Entry/CBP One condition"); (2) applies for asylum or similar relief in a transit country, and receives a final denial before coming to the United States, 8 C.F.R. § 208.33(a)(2)(ii)(C) (the "transit condition"); or (3) applies for parole through a government-approved program and receives advance permission to travel to the United States, 8 C.F.R. § 208.33(a)(2)(ii)(A) (the "parole condition").  People who do not fall into one of these three categories are (absent qualifying for an exception, as described below) ineligible for asylum, no matter the strength of their claims to refugee protection.

84.     The Rule also contains two narrow exceptions.  The first allows a person to avoid the bar in "exceptionally compelling circumstances," including an "acute medical emergency," an "imminent and extreme threat" to life or safety, or being a "victim of a severe form of trafficking in persons."  8 C.F.R. § 208.33(a)(3)(i).  The Rule's preamble indicates that "generalized concerns about safety" or "a prior threat that no longer poses an immediate threat" are insufficient.  88 Fed. Reg. at 31,318 n.36.

85.     The second exception is only for individuals who present at a port of entry.  They can avoid the CBP One appointment requirement if they "demonstrate [] by a preponderance of

the evidence that it was not possible to access or use the [CBP One app] due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle."  8 C.F.R. § 208.33(a)(2)(ii)(B).  The Rule's preamble indicates that the exception should apply only where it is "truly not possible" for an applicant to use CBP One.  *See* 88 Fed. Reg. at 31,406.

86.     The conditions the new Rule places on asylum are not "consistent with" the overall scheme of 8 U.S.C. § 1158.  *See* 8 U.S.C. § 1158(b)(2)(C).  The asylum statute requires access to asylum for noncitizens at the border "whether or not" they enter "at a designated port of arrival."  8 U.S.C. § 1158(a)(1).  But the Port-Of-Entry/CBP One condition, 8 C.F.R. § 208.33(a)(2)(ii)(B), only allows for asylum at ports of entry, and even then only with one of a limited number of appointment slots available only through a flawed smartphone app.

87.     The asylum statute permits the denial of asylum based on firm resettlement in a third country or pursuant to a bilateral Safe Third Country agreement, but only if, at a minimum, residing elsewhere is "genuinely safe."  *East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 977 (9th Cir. 2020).  But the transit condition, 8 C.F.R. § 208.33(a)(2)(ii)(C), is in no way limited to genuine safety or meaningful access to protection in third countries.

88.     The asylum statute was enacted specifically to provide access to refugee protection for people who arrive in the United States, and as a congressional rejection of ad hoc use of parole.  *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1060 (9th Cir. 2017) (en banc) (detailing the history).  But the parole condition, 8 C.F.R. § 208.33(a)(2)(ii)(A), requires noncitizens to apply for a parole process from abroad as a precondition to applying for asylum. None of these conditions is consistent with the asylum statute, and neither is their combination in this Rule.  The possibility of narrow exceptions does not change that flaw.

89.    In practice, moreover, the Rule preserves far less asylum eligibility than the text might suggest because two of its three conditions—the parole and transit conditions—are unavailable to almost all asylum seekers who are subject to the Rule.

90.    Under the Rule, people who "[s]ought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application" are not barred.  8 C.F.R. § 208.33(a)(2)(ii)(C).  But this purported condition is virtually meaningless. The administrative record, produced in other litigation challenging the Rule, demonstrates that many transit countries lack a functioning asylum system, others have systems that are stretched to the breaking point, and most are not remotely safe enough for asylum seekers to find refuge. *See* Mem. in Supp. of Pls.' Mot. for Summ. J. at 21-23, *East Bay Sanctuary Covenant v. Biden*, No. 18-cv-6810 (N.D. Cal. June 5, 2023), ECF No. 169-1.  It is not possible or advisable for many asylum seekers to seek protection while in transit to the United States.  *Id*. at 19-23. Indeed, the prior transit ban barred asylum in more than 98 percent of cases in which it was invoked.  *Id*. at 12.

91.    The parole condition, 8 C.F.R. § 208.33(a)(2)(ii)(A), is likewise illusory.  The Rule points to a handful of nationality-specific parole processes as qualifying for this condition. *See* 88 Fed. Reg. at 31,316 n.19; 31,339 n.86; 31,445 n.380 (collectively citing 87 Fed. Reg. 63,507 (Oct. 19, 2022) (Venezuela), 88 Fed. Reg. 1243 (Jan. 9, 2023) (Haiti), 88 Fed. Reg. 1255 (Jan. 9, 2023) (Nicaragua), 88 Fed. Reg. 1266 (Jan. 9, 2023) (Cuba), and 87 Fed. Reg. 25,040 (Apr. 27, 2022) (Ukraine)).  The parole criteria are not tied to the criteria for asylum in any way. Even if they *are* seeking asylum, nationals of these countries can obtain parole only if they have a financial sponsor in the United States, can afford a plane ticket, and are able to obtain a passport.  People are ineligible for these programs if, en route to the United States, they entered

either Mexico or Panama without permission to do so, as is the case for almost all migrants who travel through those countries.  *See* 87 Fed. Reg. at 63,515 (Venezuela); 88 Fed. Reg. at 1252 (Haiti); 88 Fed. Reg. at 1276 (Cuba); 88 Fed. Reg. at 1263 (Nicaragua).  And nationals of other countries are entirely ineligible for these parole programs.

92.     More fundamentally, the Rule's supposed condition for these parolees will encompass almost no one, because the Rule only applies to people who enter at the southern U.S. border, while these parole programs grant permission to fly to U.S. airports, rather than enter at the border.  *See, e.g.,* 87 Fed. Reg. at 63,515 (requiring participants to "provide for their own commercial travel to an air [port of entry]").  In other words, this supposed "option" for preserving asylum eligibility generally only applies to people who are not subject to the Rule in the first place.  Indeed, the agencies themselves concede that parole is not "an alternative to or replacement for asylum."  88 Fed. Reg. at 31,408.

93.     Even the Port-Of-Entry/CBP One condition—the only condition that is possible for a significant number of people—is unavailable to many, if not most, asylum seekers.  The agencies offer only a limited number of appointments per day, and people must enter a daily lottery to try to get them.  The app is available in just three languages and can be used only in Northern and Central Mexico.  And the app is plagued by many errors, including problems with its facial recognition technology's ability to recognize people with darker skin tones.

94.     The Rule therefore functions like an even more restrictive version of the prior administration's unlawful asylum entry ban.  People are exempt from the bar only if they enter at a designated port of entry—even though asylum is available "whether or not [sought] at a designated port of arrival," 8 U.S.C. § 1158(a)(1)—and even then only if they are able to obtain

a CBP One appointment.  People who enter the country via the southern border in any other way are generally barred from asylum.

**B.      The Rule's Expedited Removal Provisions**

95.      In addition to creating a new asylum bar inconsistent with 8 U.S.C. § 1158, the Rule also establishes specific procedures for adjudicating cases covered by the new asylum bar in expedited removal credible fear interviews.  *See* 8 C.F.R. §§  208.33(b), 1208.33(b).  Those procedures unlawfully upend the statutory credible fear screening process.

96.      Critically, the Rule directs adjudicators to apply the new bar in the credible fear interview process *without* the benefit of the statutory screening standard.  Rather than determining whether there is a "significant possibility" that a noncitizen could later establish eligibility for asylum by showing that they satisfied one of the conditions or exceptions to the bar, as the statute requires, 8 U.S.C. § 1225(b)(1)(B)(v), under the new regulations asylum officers must "determine whether the [noncitizen] *is* covered by the presumption [of ineligibility] and, if so, whether the alien *has rebutted* the presumption."  8 C.F.R. § 208.33(b)(1) (emphases added).  The same is true for immigration judges reviewing credible fear findings.  *Id.* § 1208.33(b)(2).  Only after assessing the bar's applicability and only after determining that the bar does not in fact apply (for example, because the person has met one of the exceptions), are officers directed to determine "whether the [noncitizen] has established a significant possibility of eligibility for asylum."  8 C.F.R. § 1208.33(b)(2).

97.      The agencies' refusal to apply the statutorily mandated screening standard deprives people seeking asylum of a key protection of the expedited removal system.  For example, there is an exception to the bar for "exceptionally compelling circumstances."  8 C.F.R. §§ 208.33(a)(3)(i), 1208.33(a)(3)(i).  Under the correct standard, a credible fear adjudicator must

consider whether there is a "significant possibility" that the future immigration judge (whoever that may be), the Board of Immigration Appeals, or the applicable federal court of appeals will deem the circumstances sufficiently compelling. Instead, the regulation directs adjudicators in the credible fear process to decide for themselves whether the circumstances are compelling enough, depriving the noncitizen of the benefit of potential differences of opinion, perspective, and interpretation in full removal proceedings.

98. Likewise, there is an exception to the bar if it was "not possible to access or use" the CBP One app. 8 C.F.R. § 208.33(a)(2)(ii)(B). Under the correct standard, a credible fear adjudicator must consider whether the noncitizen has a "significant possibility" of mustering sufficient evidence of the unavailability of CBP One given the preparation time and access to counsel available in full removal proceedings. Such evidence might include, for example, expert testimony regarding a "significant technical failure" in the CBP One app. 8 C.F.R. § 208.33(a)(2)(ii)(B). But the regulation directs adjudicators to assess the exception on the merits at the time of the credible fear interview, when noncitizens will in all likelihood have no evidence at all about technical CBP One problems beyond their own experiences of the app simply not working.

99. Various comments pointed out the inconsistency of the proposed regulations with the expedited removal statute's "significant possibility" standard. *See* 88 Fed. Reg. at 31,379-80. But the agencies refused to make any relevant changes to the regulatory text. They likewise failed to adequately explain their choice not to do so, and instead merely paid lip service to the applicability of a "significant possibility" standard in the preamble, while promulgating regulations that do not apply that standard. 88 Fed. Reg. at 31,380.

100.     Moreover, in deciding to apply the bar in expedited removal proceedings at all, the agencies have abruptly departed from a decades-long practice of *not* applying bars to asylum at the credible fear stage, a practice they explicitly *reaffirmed* in 2022.  Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18,078, 18,084 (Mar. 29, 2022) ("2022 Asylum Rule").  In that rulemaking, the agencies concluded that "not applying mandatory bars at the credible fear screening stage both preserves the efficiency Congress intended in making credible fear screening part of the expedited removal process and helps ensure a fair process."  *Id.* at 18,135.  The agencies also cited the need to "afford noncitizens potentially subject to the mandatory bars a reasonable and fair opportunity to contest their applicability."  *Id.* at 18,094.

101.     The Rule does not adequately explain why the agencies reached a directly contrary conclusion only a year later.  It does not address the agencies' prior observation about the lack of a fair opportunity to contest bars in a credible fear interview, and wrongly asserts that applying this complex bar (with its various conditions and exceptions) is a simple inquiry that will not involve significant factual or legal questions.  88 Fed. Reg. at 31,380.

102.     A core justification for the Rule is the agencies' assessment that there is a "significant disparity" between positive credible fear determinations and ultimate relief in full removal proceedings and that the credible fear passage rate should thus be driven down.  88 Fed. Reg. at 11,716; 88 Fed Reg. at 31,329-30 (reaffirming reliance on the disparity); *see also* 88 Fed. Reg. at 31,363; 88 Fed. Reg. at 11,724 (discussing application in expedited removal).  Of course, the whole point of Congress's low credible fear interview screening standard was to ensure that people would be allowed to pursue asylum claims because they *might* later establish asylum eligibility, even though a significant number of applicants would not ultimately prevail.

Congress intended this margin of safety to prevent the United States from denying full hearings to people who could be subject to persecution if removed.

103.    The Rule also makes other harmful changes to the credible fear interview process to reduce the number of individuals who pass credible fear screenings and similarly fails to provide adequate explanations for these decisions.  For example, if a person cannot show credible fear, the Rule instructs asylum officers to assess whether the person has shown a "reasonable possibility" of persecution or torture, for purposes of withholding of removal or CAT protection.  8 C.F.R. § 208.33(b)(2)(i).  The Rule's preamble states that "[t]his 'reasonable possibility' standard is a change from the practice currently applied for statutory withholding of removal and CAT protection in the credible fear process" and represents a "higher" standard.  88 Fed. Reg. at 31,337.  But the agencies failed to adequately explain or justify applying that higher standard.

104.    Likewise, the Rule alters the procedures for obtaining an immigration judge's review of an asylum officer's negative credible fear determination, newly requiring noncitizens to expressly request such review.  8 C.F.R. § 208.33(b)(2)(v).  But in the 2022 Asylum Rule, the agencies recently reaffirmed their longstanding practice of providing immigration judge review where the noncitizen does not expressly either request or decline such review.  87 Fed. Reg. at 18,094.  As they noted at that time, "there may be numerous explanations for a noncitizen's refusal or failure to" affirmatively request immigration judge review, so providing review unless it is actually declined "is fairer and better accounts for the range of explanations."  *Id.*  The agencies did not adequately explain this reversal.

105.    The Rule also eliminates the ability of noncitizens or their counsel to seek reconsideration by USCIS of negative credible fear determinations in cases subject to the Rule.

88 Fed. Reg. at 31,419, 31,450.  The agencies explained in the 2022 Asylum Rule that such USCIS reconsiderations are consistent with Congress's intent in creating expedited removal, are not unduly burdensome for the agency, and are necessary because "there should be some recourse for the noncitizens who are affected" by errors in the credible fear process that are not addressed by immigration judge review.  87 Fed. Reg. at 18,133-34.  They do not adequately explain the reversal in the Rule.

106.    As discussed below, the agencies have implemented a number of other expedited removal policies contemporaneously with the Rule.  The agencies failed to provide the public with a meaningful opportunity to comment on the combined effect of these interlocking policies. To the contrary, the agencies announced these changes (if at all) only after the comment period for the Rule had closed.  Despite that lack of notice, some commenters anticipated the practice of conducting credible fear interviews in CBP custody and raised concerns about the combined impact of these policies.  The Rule dismissed these concerns as being "outside the scope" of the rulemaking.  88 Fed. Reg. at 31,363.

### C.    Adoption of Additional Contemporaneous Expedited Removal Policies

107.    The agencies have made at least four other contemporaneous expedited removal policy changes that exacerbate the Rule's harmful effects.  Each of these changes standing alone undermines the credible fear process and interferes with its statutory purpose of operating as a threshold screening device.  Each is arbitrary and capricious, and each violates the INA and/or its implementing regulations.  Taken together and combined with the Rule, they gut access to protection in expedited removal proceedings at the southern border.

108.    On information and belief, all of these changes are reflected in written policy directives, written policy guidelines, or written procedures issued by Defendants, which are in the sole possession and control of Defendants.

### 1.    Rapid Credible Fear Interviews in CBP Custody Policy

109.    The agencies have established a policy of conducting highly expedited credible fear interviews in CBP custody, generally within 24 hours after an individual is screened into immigration custody and without minimally acceptable access to consultation with legal counsel. *See* DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023) (announcing that credible fear interviews would be scheduled within just 24 hours).[2]  On information and belief, this policy was implemented on or around May 11, 2023.

110.    By statute and regulation, a noncitizen "who is eligible for [a credible fear] interview may consult with a person or persons of the [noncitizen's] choosing prior to the interview or any review thereof."  8 U.S.C. § 1225(b)(1)(B)(iv); *see* 8 C.F.R. § 208.30(d)(4).  A noncitizen must therefore be afforded meaningful access to a consultation and time to prepare for the interview.  *See id.*; *see also, e.g.*, 8 C.F.R. § 208.30(d)(2) (requiring noncitizen to be provided "relevant information regarding the fear determination process" in advance of the interview). The new Rule does not alter these requirements.

111.    CBP facilities are meant for short-term processing and, as a result, people held there are subject to significant restrictions on their ability to consult with anyone before their credible fear interview.  Those restrictions are severely exacerbated by the 24-hour deadline. Attorneys cannot visit these facilities, and if they call a particular facility, they cannot get

---

[2] https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.

confirmation that a person is there, much less speak to the person on the phone. While a noncitizen can call out from CBP custody, people they call are not able to return missed calls. And given the 24-hour window before a screening interview, most applicants will not have a chance to even try to speak to one of the small number of lawyers available for consultation via a "hotline" before their credible fear interviews. Likewise, given the truncated timeline, it is extremely difficult for both the noncitizen and their legal representative to physically sign a form that the agencies require for attorney representatives to participate in credible fear interviews.

112.    The result of these restrictions is that virtually no asylum seeker subject to this policy can meaningfully consult with a person of their choosing in advance of a credible fear interview, as Congress required. Indeed, this was the case for plaintiffs, including M.P., E.B., D.M., and S.U. These restrictions and the truncated time period also make meaningful preparation for a credible fear interview in CBP custody nearly impossible, particularly in conjunction with the other policies challenged in this action.

113.    Because this policy has not been made public, its specific reasoning is not yet available. On information and belief, that reasoning is arbitrary and capricious because, among other things, it fails to adequately account for the intersecting effects of the various policies challenged in this suit and fails to adequately address the impact of the policy on access to consultation and preparation for credible fear interviews.

### 2.    Third Country Removal Policy

114.    The agencies have established a policy of systematically carrying out expedited removals of people who are not Mexican—including people from Cuba, Haiti, Venezuela, and Nicaragua—to Mexico. The U.S. government has announced an agreement under which Mexico will accept removals of noncitizens at least from those countries. *See* 88 Fed. Reg. at 31,317

n.21 (citing White House statement).  Immigration documentation the agencies have provided to particular noncitizens in expedited removal proceedings indicates that Mexico was designated as their country of removal.  Indeed, Plaintiffs D.M., R.E., and S.U. were all removed to Mexico even though none of them is Mexican.  On information and belief, this policy was implemented on or around May 11, 2023.

115.    The INA establishes procedures for the removal of noncitizens, including to third countries under certain circumstances.  *See* 8 U.S.C. § 1231(b).  For example, under 8 U.S.C. § 1231(b)(2), noncitizens have the opportunity to initially designate the country to which they will to be removed.  But in cases of noncitizens facing removal under this new policy, noncitizens are simply ordered removed to Mexico or another third country.  On information and belief, the policy does not comply with the requirements of § 1231(b).

116.    In addition, the INA and the Convention Against Torture and its implementing regulations prohibit removal to any country where a noncitizen is likely to face persecution or torture.  8 U.S.C. § 1231(b)(3); Note to 8 U.S.C. § 1231; 8 C.F.R. §§ 1208.16-18.  But noncitizens facing removal under this new policy are not informed that they are facing removal to Mexico rather than their home countries, and so do not even understand the need to prepare for and present their claims of fear as to Mexico.  The agencies similarly do not account for the risk of removal by the Mexican government to the applicant's home country following removal to Mexico.  For example, Plaintiff R.E. was removed to Mexico and has since received a letter directing him to leave that country within 15 days.  The result will be removal to situations in which noncitizens are likely to face persecution or torture.

117.    Never before has DHS systematically used expedited removal to remove noncitizens to third countries.  Given the truncated timeline for expedited removal, particularly

in light of the other new policies, the Third Country Removal Policy creates substantial complications and heightens the danger of removing noncitizens to grave harm.  In conjunction with the Rule, the result of this Third Country Removal Policy is that the credible fear interview becomes entirely focused on potential dangers in Mexico—rendering dangers in the noncitizen's home country largely irrelevant.  But the agencies fail to properly inform applicants that Mexico is the designated country of removal until after their credible fear interviews are complete.  By leaving noncitizens uninformed in advance about the intended country of removal and the actual purpose of the dramatically altered credible fear interview, the agencies deny noncitizens any meaningful opportunity to prepare for the interview, much less meaningfully advocate for protection.  *See* 8 U.S.C. § 1225(b)(1)(B)(iv); 8 C.F.R. §§ 208.30(d)(2), (4).

118.    Because this policy has not been made public, its specific reasoning is not yet available.  On information and belief, that reasoning is arbitrary and capricious because, among other things, it fails to adequately account for the intersecting effects of the various policies challenged in this suit and fails to adequately address the impact of the policy on access to consultation and preparation for credible fear interviews and the danger of removal to persecution or torture.

### 3.    "Voluntary Return" Policy

119.    The agencies have established a policy under which DHS offers noncitizens, again primarily nationals of Cuba, Haiti, Venezuela, and Nicaragua, the chance to "voluntarily" return to Mexico without receiving a removal order.  Immigration documentation the agencies have provided to particular noncitizens indicates that officers are directed to provide "Voluntary Withdrawal Advisal[s]."  On information and belief, this policy was implemented on or around May 11, 2023.

120.    By preexisting regulation, a noncitizen facing expedited removal may be offered the choice to leave the United States rather than pursue claims for protection.  8 C.F.R. § 235.4. The noncitizen's decision to do so "must be made voluntarily."  *Id*.  The new Rule does not alter this requirement.

121.    The new policy is designed to work with the other policies challenged in this action.  Noncitizens are informed that they are very unlikely to be eligible for asylum under the Rule.  They are encouraged or coerced to forego even the limited opportunities for protection afforded under the Rule by accepting voluntary return to Mexico in the hope of being able to return to the United States to access the asylum system.

122.    The agencies encourage people to select this option by misleadingly telling them that choosing voluntary return will allow them to maintain eligibility to return to the United States, particularly pursuant to the country-specific parole programs discussed above, *supra* Part II.A, without advising them that there are additional eligibility criteria that will likely prevent them from using those programs.

123.    For example, an advisal included on a standardized form and read to noncitizens, including for example Plaintiffs E.B. and L.A., during their credible fear interview states: "You may choose to depart the United States voluntarily a single time and still be eligible for the parole process.  You are being given an opportunity now to withdraw your application for admission to the United States and return to Mexico so that you remain eligible for that parole process."  But individuals are ineligible for the parole programs if they entered Mexico or Panama (through which many noncitizens travel to reach North America and eventually the United States) without authorization, as nearly all asylum seekers necessarily do.  And the

programs require applicants to have a U.S. sponsor and a passport issued by their country of origin, both of which many asylum seekers lack.

124.    The result is that asylum seekers are misled into accepting return to extremely dangerous conditions in Mexico based on a false promise of access to the U.S. asylum system through parole.  Because noncitizens are misled into accepting voluntary return, those returns are not "made voluntarily."  8 C.F.R. § 235.4.

125.    Additionally, some people, like Plaintiff J.P., are coerced to sign documents incorrectly stating that they do not have a fear of harm in their home countries and giving up their right to a hearing.

126.    Because this policy has not been made public, its specific reasoning is not yet available.  On information and belief, that reasoning is arbitrary and capricious because, among other things, it fails to adequately account for the intersecting effects of the various policies challenged in this suit and fails to adequately address the misleading information provided to noncitizens and that information's impact on the validity of "voluntary" returns.

### 4.    Non-Asylum Officer Policy

127.    The agencies have established a policy of assigning USCIS employees who are not asylum officers to undertake the complex screening interviews required by the Rule.  In information provided to immigrant advocacy organizations, USCIS has confirmed that credible fear interviews will be conducted by USCIS employees who are not asylum officers.  On information and belief, this policy was implemented on or around May 11, 2023.

128.    Credible fear interviews must be conducted by a "USCIS asylum officer."  *See* 8 C.F.R. § 208.30(b), (d); *see also* 8 U.S.C. § 1225(b)(1)(B)(i) ("An asylum officer shall conduct [credible fear] interviews . . . .").

129.    The new policy violates that requirement, which the new Rule did not alter.  It permits credible fear interviews to be conducted by USCIS employees who are not asylum officers.  On information and belief, those USCIS employees do not have the same training as USCIS asylum officers.  Having insufficiently trained officers conduct these interviews increases the risk of improper negative findings and return of noncitizens to persecution and torture.

130.    Because this policy has not been made public, its specific reasoning is not yet available.  On information and belief, that reasoning is arbitrary and capricious because, among other things, it fails to adequately account for the intersecting effects of the various policies challenged in this suit and fails to adequately address the impact of the policy on the ability of officers to fairly and accurately screen for fear of persecution and torture.

### III.    The Rule and the Other Challenged Policies Cause Serious, Irreparable Harms to Plaintiffs.

131.    Absent relief, Plaintiffs will be severely and irreparably harmed by the Rule and related policy changes.

### A.    Harm to Individual Plaintiffs

132.    Absent relief, Plaintiffs will be severely and irreparably harmed by the Rule and related policies.  First and foremost, the Individual Plaintiffs will be severely limited in their ability to access protection from persecution and torture.  Plaintiffs have claims to asylum.  Some claims, like those of J.P., E.B., L.A., R.V., D.M., and S.U., are based on anti-government political opinions.  The claims of M.P., Y.F., M.S., and F.C. are based on their status as witnesses to violent crime perpetrated by gangs, which resulted in threats on their own lives.  Other claims, including those of M.N., M.A., and J.S., are based on gender-based violence, and J.S.'s claim is compounded by her status as an indigenous woman.  Claims from people like R.S., K.R., and M.R., turn in large part on past opposition to gang or criminal activity, as a result

of which they suffered significant harm, including severe sexual violence.  Plaintiffs, including M.P. and M.A., have already been removed to their home country of Guatemala where they face significant danger.  With the exception of L.A., who received an immigration judge's vacatur of his negative credible fear determination after the filing of the initial complaint, none of these individuals has the opportunity to seek asylum because they were subjected to the new asylum bar and were found not to have demonstrated satisfaction of a condition or exception.

133.    In addition, some plaintiffs, including J.P., E.B., D.M., R.E., and S.U., face irreparable harm because they have been or will be removed or "voluntarily" returned to Mexico where they face grave dangers and serious barriers to obtaining protection.  In general,  they have not been able to secure CBP One appointments or protection in Mexico.  Rather, Mexico has denied protection to Plaintiff R.E.  And while plaintiff S.U. has secured a CBP One appointment, he is uncertain if he will be permitted to seek asylum because he already has a removal order. Mexico is extremely dangerous for asylum seekers, as DHS has acknowledged.  Nearly 13,500 instances of kidnapping, rape, torture, murder, and other violent attacks on asylum seekers expelled from the United States to Mexico were documented in 2021 and 2022.

B.    Harms to Organizational Plaintiffs

134.    Plaintiff Las Americas is a nonprofit legal services organization dedicated to serving low-income immigrants, including asylum seekers.  A core component of Las Americas' mission is to provide immigration counseling and legal services to asylum seekers detained by DHS in the El Paso area and subjected to expedited removal proceedings.  Normally, Las Americas fulfills its mission by counseling or representing detained asylum seekers in preparation for credible fear interviews, representing individuals during those interviews, and, when necessary, seeking immigration judge review of negative credible fear determinations.  Las

Americas also engages in ongoing representation of detained noncitizens in their ordinary removal proceedings.  In each of these categories of representation, Las Americas' capacity is limited.

135.    By complicating the credible fear process, creating barriers to passing the credible fear interview, and relying on CBP One, the Rule and other challenged policies frustrate Las Americas' mission of providing legal services to detained asylum seekers, especially those subjected to expedited removal proceedings.  The Rule and related policies also require Las Americas to divert resources away from other critical functions, including providing complete representation in full removal proceedings to as many people as possible.  This diversion is necessary because, now, Las Americas must spend additional time advising people about the Rule and trying to minimize the harm it and the related policy changes cause.  Additionally, these policies jeopardize Las Americas' funding streams.  Some of Las Americas' funding is aimed at decreasing the amount of time spent per case, while other funders expect to see a growth trajectory in terms of volume of clients.  Because the Rule and other policies make the asylum process more complicated and cumbersome, Las Americas will have less capacity to serve the same volume of clients, which will jeopardize funding streams that require provision of a certain amount of legal services.

136.    Plaintiff RAICES is a nonprofit organization that defends the rights of immigrants and refugees.  As part of that mission, RAICES provides free and low-cost immigration legal services to underserved immigrants, including detained people and people placed in expedited removal proceedings.  RAICES is the largest legal-services provider in the state of Texas. RAICES fulfills its mission by counseling detained asylum seekers in preparation for credible fear interviews, representing individuals during those interviews, and, when necessary, seeking

immigration judge review of negative credible fear determinations.  In particular, RAICES maintains a hotline to serve detained asylum-seeking clients, and has dedicated staff members who are focused on serving detained individuals facing expedited removal.  Despite its large size, RAICES's capacity is limited.

137.    The Rule and the other challenged policies have compromised RAICES's ability to serve clients.  Among other things, the Rule and other policies have made it exceptionally difficult to communicate with clients in expedited removal, dramatically increasing the time required for each pre-credible fear interview preparation.  The added time necessary to complete this work has required a diversion of staff resources from various teams at RAICES, including significantly from the team usually devoted to providing removal defense to detained noncitizens in full removal proceedings.  That diversion is significant because, as time goes on, the harm caused by the Rule for people in detained full removal proceedings will also increase, so unless RAICES is able to grow its staff, it will have to serve fewer clients across these related but distinct lines of work and will have to make choices about how to allocate resources that run contrary to its overall mission.

## CLAIMS FOR RELIEF

**I.**    **Challenges to the Circumvention of Lawful Pathways Rule**

### FIRST CLAIM FOR RELIEF
**(Violation of Immigration and Nationality Act and Administrative Procedure Act,
Contrary to Law – 8 U.S.C. § 1225(b))**

138.    The INA requires that any noncitizen subjected to expedited removal procedures who "indicates either an intention to apply for asylum . . . or a fear of persecution" must be referred for a credible fear screening interview with an asylum officer.  8 U.S.C. § 1225(b)(1)(A)(ii).

139.    In that screening interview, the asylum officer is to determine whether the noncitizen does or does not have a "credible fear of persecution."  *Id.* § 1225(b)(1)(B)(ii), (iii).

140.    A credible fear of persecution is defined by statute as "a significant possibility, taking into account the credibility of the statements made by the [noncitizen] in support of the [noncitizen's] claim and such other facts as are known to the officer, that the [noncitizen] could establish eligibility for asylum under [8 U.S.C.] section 1158."  *Id.* § 1225(b)(1)(B)(v).

141.    The Rule improperly requires asylum officers to apply factors not relevant to whether a person has a "credible fear of persecution" and to apply standards other than the "significant possibility" standard.

142.    The APA provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" [or] "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. §§ 706(2)(A)-(C).

143.    The Rule is contrary to law, including 8 U.S.C. §§ 1225(b)(1)(B)(ii), (iii), (v).

144.    The agencies lack the authority to apply factors not relevant to whether a person has a "credible fear of persecution" and to refuse to apply the "significant possibility" standard.

## SECOND CLAIM FOR RELIEF
### (Violation of Immigration and Nationality Act and Administrative Procedure Act, Contrary to Law – 8 U.S.C. § 1158)

145.    The INA provides, with certain exceptions not relevant here, that "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such [noncitizen's] status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title."  8 U.S.C. § 1158(a)(1).

146.    The INA further provides that a noncitizen is ineligible for asylum if he or she "was firmly resettled in another country prior to arriving in the United States." 8 U.S.C. § 1158(b)(2)(A)(vi).

147.    In addition, the INA provides that asylum is not available to a noncitizen "if the Attorney General determines that the [noncitizen] may be removed, pursuant to a bilateral or multilateral agreement, to a country" where, among other things, "the [noncitizen's] life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the [noncitizen] would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection."  8 U.S.C. § 1158(a)(2)(A).

148.    Any additional condition or limitation on asylum established by regulation must be "consistent with" § 1158.  *See* 8 U.S.C. §§ 1158(b)(2)(C), 1158(d)(5)(B) (providing that any "conditions or limitations on the consideration of an application for asylum" established by regulation must be "not inconsistent with this chapter").

149.    The Rule is not consistent with § 1158 because it imposes conditions on asylum inconsistent with §§ 1158(a)(1), (a)(2)(A), and (b)(2)(A)(vi).

150.    The Rule is contrary to law, including 8 U.S.C. §§ 1158(a)(1), (a)(2)(A), and (b)(2)(A)(vi).

151.    The Rule exceeds the authority delegated to the agencies by Congress in 8 U.S.C. §§ 1158(b)(2)(C) and (d)(5)(B).  The agencies lack the authority to issue asylum bars that conflict with the asylum statute.

**THIRD CLAIM FOR RELIEF**
**(Violation of the Administrative Procedure Act, Arbitrary and Capricious)**

152.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

153.    The Rule is arbitrary and capricious because, in adopting it, Defendants failed to articulate reasoned explanations for their decisions, which represent changes in the agencies' policies; considered factors that Congress did not intend to be considered; entirely failed to consider important aspects of the problem; failed to respond to significant comments; and offered explanations for their decisions that run counter to the evidence before the agencies.

154.    Accordingly, the Rule is arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A).

**FOURTH CLAIM FOR RELIEF**
**(Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D) – Failure to Observe Required Procedures)**

155.    The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  Specifically, the APA provides that agencies must "give interested persons an opportunity to participate in the rule making," *id.* § 553(c), which requires a meaningful opportunity to comment.

156.    Defendants failed to comply with the APA's requirement of an adequate opportunity to comment by imposing a 32-day comment period; staggering policies so that commenters were unable to speak to the policies' interactions and combined effects; and failing to disclose studies and data critical to their decision-making process.

## II.   Challenges to Other Expedited Removal Policies Implemented Contemporaneously With The Circumvention of Lawful Pathways Rule

*Rapid Credible Fear Interviews in CBP Custody Policy*

### FIFTH CLAIM FOR RELIEF
**(Violation of Immigration and Nationality Act and Administrative Procedure Act, Contrary to Law – 8 U.S.C. § 1225(b) and implementing regulations)**

157.    The INA provides that a noncitizen "who is eligible for [a credible fear] interview may consult with a person or persons of the [noncitizen's] choosing prior to the interview or any review thereof."  8 U.S.C. § 1225(b)(1)(B)(iv); *see also* 8 C.F.R. § 208.30(d)(4).

158.    The statute and implementing regulations require meaningful access to a consultation and time to prepare for the credible fear interview.  8 U.S.C. § 1225(b)(1)(B)(iv); 8 C.F.R. §§ 208.30(d)(2), (4).

159.    The Rapid Credible Fear Interviews in CBP Custody Policy makes meaningful access to a consultation and time to prepare for the credible fear interview effectively unavailable.

160.    Accordingly, the Rapid Credible Fear Interviews in CBP Custody Policy is contrary to law.  *See* 5 U.S.C. § 706(2)(A).

### SIXTH CLAIM FOR RELIEF
**(Violation of the Administrative Procedure Act, Arbitrary and Capricious)**

161.    The Rapid Credible Fear Interviews in CBP Custody Policy is arbitrary and capricious because, in adopting it, Defendants failed to articulate reasoned explanations for their decisions, which represent changes in the agencies' policies; considered factors that Congress

did not intend to be considered; entirely failed to consider important aspects of the problem; and offered explanations for their decisions that run counter to the evidence before the agencies.

162.     Accordingly, the Rapid Credible Fear Interviews in CBP Custody Policy is arbitrary and capricious.  See 5 U.S.C. § 706(2)(A).

*Third Country Removal Policy*

**SEVENTH CLAIM FOR RELIEF**
**(Violation of Immigration and Nationality Act and Administrative Procedure Act, Contrary to Law – 8 U.S.C. § 1231, Convention Against Torture)**

163.     The INA establishes procedures for the removal of noncitizens, including to third countries under certain circumstances.  8 U.S.C. § 1231(b).

164.     The INA and the Convention Against Torture and its implementing regulations prohibit removal to any country where a noncitizen is likely to face persecution or torture.  8 U.S.C. § 1231(b)(3); Note to 8 U.S.C. § 1231; 8 C.F.R. §§ 1208.16-18.

165.     The Third Country Removal Policy fails to comply with the required procedures and protections because, among other things, a noncitizen is not given an opportunity to designate a country of removal, is not advised in advance of the risk of removal to a third country or informed about how removal to that country might result in indirect return to their home country, and is thus not given an appropriate opportunity to contest removal to a third country.

166.     Accordingly, the Third Country Removal Policy is contrary to law.  *See* 5 U.S.C. § 706(2)(A).

**EIGHTH CLAIM FOR RELIEF**
**(Violation of the Administrative Procedure Act, Arbitrary and Capricious)**

167.     The Third Country Removal Policy is arbitrary and capricious because, in adopting it, Defendants failed to articulate reasoned explanations for their decisions, which

represent changes in the agencies' policies; considered factors that Congress did not intend to be considered; entirely failed to consider important aspects of the problem; and offered explanations for their decision that run counter to the evidence before the agencies.

168.     Accordingly, the Third Country Removal Policy is arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A).

<u>*Voluntary Return Policy*</u>

### NINTH CLAIM FOR RELIEF
### (Violation of 8 C.F.R. § 235.4 and Administrative Procedure Act, Contrary to Law)

169.     Any decision to forego access to protection pursuant to "voluntary" return "must be made voluntarily."  8 C.F.R. § 235.4.

170.     The Voluntary Return Policy misleads or coerces acceptance of return in lieu of seeking protection.

171.     Accordingly, the Voluntary Return Policy is contrary to law.  *See* 5 U.S.C. § 706(2)(A).

### TENTH CLAIM FOR RELIEF
### (Violation of the Administrative Procedure Act, Arbitrary and Capricious)

172.     The Voluntary Return Policy is arbitrary and capricious because, in adopting it, Defendants failed to articulate reasoned explanations for their decisions, which represent changes in the agencies' policies; considered factors that Congress did not intend to be considered; entirely failed to consider important aspects of the problem; and offered explanations for their decisions that run counter to the evidence before the agencies.

173.     Accordingly, the Voluntary Return Policy is arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A).

*Non-Asylum Officer Policy*

## ELEVENTH CLAIM FOR RELIEF
### (Violation of Immigration and Nationality Act and Administrative Procedure Act, Contrary to Law 8 U.S.C. § 1225(b))

174.  Credible Fear Interviews must be conducted by USCIS asylum officers.  8 U.S.C.

§ 1225(b)(1)(B)(i), (E); 8 C.F.R. §§ 208.30(b), (d).

175.  The Non-Asylum Officer Policy provides that credible fear interviews may be

conducted by persons who are not USCIS asylum officers and who do not have the same training

as USCIS asylum officers.

176.  Accordingly, the Non-Asylum Officer Policy is contrary to law.  *See* 5 U.S.C.

§ 706(2)(A).

## TWELTH CLAIM FOR RELIEF
### (Violation of the Administrative Procedure Act, Arbitrary and Capricious)

177.  The Non-Asylum Officer Policy is arbitrary and capricious because, in adopting

it, Defendants failed to articulate reasoned explanations for their decisions, which represent

changes in the agencies' policies; considered factors that Congress did not intend to be

considered; entirely failed to consider important aspects of the problem; and offered explanations

for their decisions that run counter to the evidence before the agencies.

178.  Accordingly, the Non-Asylum Officer Policy is arbitrary and capricious.  *See* 5

U.S.C. § 706(2)(A).

*Combination of Challenged Policies*

## THIRTEENTH CLAIM FOR RELIEF
### (Violation of Immigration and Nationality Act and Administrative Procedure Act, Contrary to Law 8 U.S.C. § 1225(b), 8 U.S.C. § 1231, Convention Against Torture)

179.  The Rule and the other policies challenged in this suit individually and in

combination violate the credible fear screening process required by 8 U.S.C. § 1225(b)(1)(A)(ii).

180.     The Rule and the other policies challenged in this suit individually and in combination violate the obligation not to return noncitizens to persecution and torture codified in the INA and the Convention Against Torture and its implementing regulations.  8 U.S.C. § 1231(b)(3); Note to 8 U.S.C. § 1231; 8 C.F.R. §§ 1208.16-18.

181.     Accordingly, the Rule and the various policies challenged in this suit individually and in combination are contrary to law.  *See* 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

a. Declaratory, injunctive, and vacatur relief against the Rule;

b. Declaratory, injunctive, and vacatur relief against the Rapid Credible Fear Interviews in CBP Custody Policy;

c. Declaratory, injunctive, and vacatur relief against the Third Country Removal Policy;

d. Declaratory, injunctive, and vacatur relief against the Voluntary Return Policy;

e. Declaratory, injunctive, and vacatur relief against the Non-Asylum Officer Policy;

f. An order vacating the removal orders issued to each of the Individual Plaintiffs;

g. For any Individual Plaintiffs who have been removed prior to the Court's Order, an order paroling those Individual Plaintiffs into the United States for the duration of their removal proceedings so that they may apply for asylum, withholding of removal, and/or CAT protection in the United States;

h. An order awarding Plaintiffs costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable law;

i. Such other and further relief as the Court deems equitable, just, and proper.

Dated: July 10, 2023

Respectfully submitted,

Katrina Eiland*
Cody Wofsy (D.D.C. Bar No. CA00103)
My Khanh Ngo*
Morgan Russell*
American Civil Liberties Union Foundation
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
*keiland@aclu.org*
*cwofsy@aclu.org*
*mngo@aclu.org*
*mrussell@aclu.org*

Judy Rabinovitz**
Omar C. Jadwat*
Lee Gelernt (D.D.C. Bar No. NY0408)
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*jrabinovitz@aclu.org*
*ojadwat@aclu.org*
*lgelernt@aclu.org*

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
915 15th Street, NW, 2nd floor
Washington, D.C. 20005
(202) 457-0800
*aspitzer@acludc.org*
*smichelman@acludc.org*

s/ Keren Zwick
Keren Zwick (D.D.C. Bar. No. IL0055)
Richard Caldarone (D.C. Bar No. 989575)*
Mary Georgevich**
Mark Feldman**
National Immigrant Justice Center
224 S. Michigan Avenue, Suite 600
Chicago, IL 60604
(312) 660-1370
*kzwick@heartlandalliance.org*
*rcaldarone@heartlandalliance.org*
*mgeorgevich@heartlandalliance.org*
*mfeldman@heartlandalliance.org*

Melissa Crow (D.C. Bar. No. 453487)
Center for Gender & Refugee Studies
1121 14th Street, NW, Suite 200
Washington, D.C. 20005
 (202) 355-4471
*crowmelissa@uchastings.edu*

Anne Dutton**
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA  94102
(415) 581-8825
*duttonanne@uchastings.edu*

*Attorneys for Plaintiffs*
*\*Appearing under certificate of pro bono representation*
*\*\*Certificate of pro bono representation forthcoming*