**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| M.A., et al., | ) | |
| | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | No. 1:23-cv-01843-TSC |
| v. | ) | |
| | ) | |
| ALEJANDRO MAYORKAS, Secretary of the | ) | |
| Department of Homeland Security, in his official | ) | |
| capacity, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

    A.    Asylum, Related Relief, and the Expedited Removal System ......................................... 3

    B.    The New Asylum Bar and Its Application in Expedited Removal ................................. 5

    C.    The Collateral Expedited Removal Policies ................................................................. 7

LEGAL STANDARD ........................................................................................................... 9

ARGUMENT ...................................................................................................................... 10

    I.    THE RULE'S EXPEDITED REMOVAL PROVISIONS ARE UNLAWFUL. ............... 10

        A.    The Expedited Removal Provisions Violate the Credible Fear Statute. .................... 10

        B.    The Expedited Removal Provisions Are Arbitrary and Capricious. ........................ 15

        i.    The agencies failed to address the inconsistency between their regulations and the significant-possibility standard. ........................................................................... 16

        ii.    The agencies offered an illogical and inadequate justification for applying the bar in credible fear proceedings. ........................................................................... 17

        iii.    The agencies relied on a flawed analogy to justify applying the reasonable-possibility standard to withholding and CAT screenings. ................................ 22

        iv.    The agencies refused to consider the interacting effects of the various expedited removal policies they established at the same time. ......................................... 25

        v.    The agencies relied on an impermissible factor: disagreement with Congress's low credible fear screening standard. ..................................................................... 28

    II.    THE COLLATERAL POLICIES ARE UNLAWFUL. ................................................. 31

        A.    The Third Country Removal Policy Violates Statutory Procedures and Exposes People to Persecution and Torture. ....................................................................... 31

        B.    The 24-Hour CFI Policy Effectively Eliminates the Right to Consult. ................... 37

        C.    The "Voluntary" Return Policy Misleads People into Acceptance. ........................ 40

    III.    THE COURT SHOULD GRANT VACATUR AND OTHER RELIEF. ...................... 42

CONCLUSION .................................................................................................................. 43

# TABLE OF AUTHORITIES

**Cases**

*Alonso-Juarez v. Garland*,
__ F.4th ___, 2023 WL 5811043 (9th Cir. Sept. 8, 2023) ...................................................... 24

*Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*,
25 F.4th 1 (D.C. Cir. 2022) ................................................................................... 17, 23, 39

*Am. Wild Horse Pres. Campaign v. Perdue*,
873 F.3d 914 (D.C. Cir. 2017) ....................................................................... 26, 28, 37, 42

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) ............................................................................................ 18

*Andriasian v. INS*,
180 F.3d 1033 (9th Cir. 1999) .............................................................................................. 32

*ANR Storage Co. v. FERC*,
904 F.3d 1020 (D.C. Cir. 2018) ........................................................................................... 28

*Brown v. Gardner*,
513 U.S. 115 (1994) .............................................................................................................. 12

*City of Phoenix v. Huerta*,
869 F.3d 963 (D.C. Cir. 2017) ............................................................................................. 21

*Council of Parent Att'ys & Advocs., Inc. v. DeVos*,
365 F. Supp. 3d 28 (D.D.C. 2019) ........................................................................ 10, 18, 22, 38

*Del. Dep't of Nat. Res. & Env't Control v. EPA*,
785 F.3d 1 (D.C. Cir. 2015) ...................................................................................... 17, 22

*East Bay Sanctuary Covenant v. Biden*,
___ F. Supp. 3d ___, 2023 WL 4729278 (N.D. Cal. July 25, 2023) ......................................... 1

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .............................................................................................................. 22

*\*Grace v. Barr*,
965 F.3d 883 (D.C. Cir. 2020) ............................................................................... *passim*

*\*Grace v. Whitaker*,
344 F. Supp. 3d 96 (D.D.C. 2018) ........................................................................ 12, 13, 20, 43

*Gustavsen v. Alcon Lab'ys, Inc.*,
   903 F.3d 1 (1st Cir. 2018) ................................................................................................. 13

*Hispanic Affairs Proj. v. Acosta*,
   901 F.3d 378 (D.C. Cir. 2018) ......................................................................................... 40

*Huisha-Huisha v. Mayorkas*,
   27 F.4th 718 (D.C. Cir. 2022) ............................................................................................ 9

*Ibarra-Flores v. Gonzales*,
   439 F.3d 614 (9th Cir. 2006) ........................................................................................... 41

*Idaho Sporting Congress, Inc. v. Rittenhouse*,
   305 F.3d 957 (9th Cir. 2002) ........................................................................................... 30

*Indep. U.S. Tanker Owners Comm. v. Dole*,
   809 F.2d 847 (D.C. Cir. 1987) ................................................................................... 30, 33

*INS v. Cardoza-Fonseca*,
   480 U.S. 421 (1987) .................................................................................................... 3, 23

*Int'l Ladies' Garment Workers' Union v. Donovan*,
   722 F.2d 795 (D.C. Cir. 1983) ......................................................................................... 25

*Jama v. ICE*,
   543 U.S. 335 (2005) .................................................................................................... 31, 32

*Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*,
   88 F.3d 1191 (D.C. Cir. 1996) ......................................................................................... 16

*Kiakombua v. Wolf*,
   498 F. Supp. 3d 1 (D.D.C. 2020) ............................................................................... *passim*

*Kossov v. INS*,
   132 F.3d 405 (7th Cir. 1998) ...................................................................................... 34, 35

*Lin Ming Feng v. Sessions*,
   721 F. App'x 53 (2d Cir. 2018) ....................................................................................... 11

*Louisiana v. Salazar*,
   170 F. Supp. 3d 75 (D.D.C. 2016) ................................................................................... 10

*Make The Rd. N.Y. v. McAleenan*,
   405 F. Supp. 3d 1 (D.D.C. 2019) ............................................................................... 35, 39

*Make the Rd. N.Y. v. Wolf*,

962 F.3d 612 (D.C. Cir. 2020) ............................................................. 4, 35

*Marincas v. Lewis*,
   92 F.3d 195 (3d Cir. 1996) .............................................................. 34

*Mejia-Velasquez v. Garland*,
   26 F.4th 193 (4th Cir. 2022) ........................................................... 13

*Motor Veh. Mfrs. Ass'n v. State Farm Ins.*,
   463 U.S. 29 (1983) ............................................................... *passim*

*Nasrallah v. Barr*,
   140 S. Ct. 1683 (2020) ........................................................... 3, 23, 34

*Nat. Res. Def. Council, Inc. v. Daley*,
   209 F.3d 747 (D.C. Cir. 2000) ......................................................... 29

*Nat'l Ass'n of Broadcasters v. FCC*,
   39 F.4th 817 (D.C. Cir. 2022) ...................................................... 28, 30

*Nat'l Lifeline Ass'n v. FCC*,
   921 F.3d 1102 (D.C. Cir. 2019) ..................................................... 37, 39

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
   145 F.3d 1399 (D.C. Cir. 1998) ........................................................ 42

*Nat'l Wildlife Fed'n v. EPA*,
   286 F.3d 554 (D.C. Cir. 2002) ......................................................... 13

*Nat'l Women's L. Ctr. v. Off. of Mgmt. & Budget*,
   358 F. Supp. 3d 66 (D.D.C. 2019) ............................................... 17, 18, 39

*Newman v. FERC*,
   27 F.4th 690 (D.C. Cir. 2022) ......................................................... 15

*Petroleum Commc'ns, Inc. v. FCC*,
   22 F.3d 1164 (D.C. Cir. 1994) ...................................................... 25, 28

*Portland Cement Ass'n v. EPA*,
   665 F.3d 177 (D.C. Cir. 2011) ................................................... 26, 27, 28

*Ramsameachire v. Ashcroft*,
   357 F.3d 169 (2d Cir. 2004) ........................................................... 11

*Sierra Club v. EPA*,
   964 F.3d 882 (10th Cir. 2020) ......................................................... 13

*Texas Child.'s Hosp. v. Burwell*,
    76 F. Supp. 3d 224 (D.D.C. 2014) ................................................................. 13

*United States v. Mendoza-Alvarez*,
    No. 13CR1653 WQH, 2013 WL 5530791 (S.D. Cal. Oct. 4, 2013) ....................... 42

*United States v. Wilson*,
    503 U.S. 329 (1992) ..................................................................................... 14

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019) ..................................................................... 43

*W. Deptford Energy, LLC v. FERC*,
    766 F.3d 10 (D.C. Cir. 2014) ........................................................................ 21

*Yusupov v. Att'y Gen. of U.S.*,
    518 F.3d 185 (3d Cir. 2008) .......................................................................... 14

*Zhang v. Holder*,
    585 F.3d 715 (2d Cir. 2009) .......................................................................... 11

**Statutes**

5 U.S.C. § 706(2) ............................................................................................. 10, 42

8 U.S.C. § 1158 ...................................................................................................... 3

8 U.S.C. § 1225 ............................................................................................... *passim*

8 U.S.C. § 1229 ...................................................................................................... 5

8 U.S.C. § 1229a .................................................................................................... 5

8 U.S.C. § 1231(b)(2) ................................................................................ 7, 31, 32, 33

8 U.S.C. § 1252 ............................................................................................. 4, 5, 24

**Regulations**

8 C.F.R. § 208.2(a) .................................................................................................. 3

8 C.F.R. § 208.9 ...................................................................................................... 3

8 C.F.R. § 208.30 ........................................................................................... 4, 34, 38

8 C.F.R. § 208.33 .................................................................................................... *passim*

8 C.F.R. § 235.3 ............................................................................................... 34, 38

8 C.F.R. § 235.4 ............................................................................................... 40, 42

8 C.F.R. §§ 1003.12-1003.47 ................................................................................. 5

8 C.F.R. § 1208.16 ................................................................................................... 3

8 C.F.R. § 1208.17 ................................................................................................... 3

8 C.F.R. § 1208.18 ................................................................................................... 3

8 C.F.R. § 1208.30 ................................................................................................... 4

8 C.F.R. § 1208.31 ................................................................................................. 24

8 C.F.R. § 1208.33 .................................................................................................. *passim*

8 C.F.R. § 1240.10(f) ............................................................................................... 8

85 Fed. Reg. 82,260 (Dec. 17, 2020) ................................................................... 36

85 Fed. Reg. 84,160 (Dec. 23, 2020) ................................................................... 35

86 Fed. Reg. 46,906 (Aug. 20, 2021) ................................................................... 25

87 Fed. Reg. 18,078 (Mar. 29, 2022) .................................................................. *passim*

88 Fed. Reg. 11,704 (Feb. 23, 2023) ............................................... 17, 25, 28, 29

88 Fed. Reg. 18,227 (Mar. 28, 2023) ................................................................... 35

88 Fed. Reg. 31,314 (May 16, 2023) .................................................................. *passim*

**Other Authorities**

142 Cong. Rec. 25 (1996) ...................................................................................... 11

H.R. Rep. No. 104-469, pt. 1 (1995) ....................................................................... 4

S. Rep. No. 96-256 (1979) ....................................................................................... 3

## INTRODUCTION

In May 2023, the Departments of Homeland Security and Justice ("DHS" and "DOJ") rolled out dramatic changes to the expedited removal system. That system allows rapid border removals of certain noncitizens. But it includes the vital safeguard of "credible fear" interviews, which Congress designed to ensure that anyone with potential claims for protection can pursue those claims in the United States. The new changes, individually and collectively, eviscerate that safeguard for many noncitizens arriving at the southern border. Plaintiffs, who are a group of individuals seeking safety in this country and two organizations representing asylum seekers, challenge the new expedited removal regulations, policies, and procedures.

The new policies are all connected to Defendants' sweeping new bar to asylum eligibility for most noncitizens at the southern border who enter without a port-of-entry appointment. *See* Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023) (the "Rule"). The substance of that bar has been held unlawful in other proceedings. *See East Bay Sanctuary Covenant v. Biden*, ___ F. Supp. 3d ___, 2023 WL 4729278 (N.D. Cal. July 25, 2023), *appeal pending*, No. 23-16032 (9th Cir.). This case focuses on the Rule's operation in expedited removal proceedings.[1] Among many other flaws in the Rule, Defendants implemented the bar through

---

[1] In a contemporaneously filed motion, the parties have jointly moved that certain of Plaintiffs' claims against the Rule be held in abeyance pending further proceedings in *East Bay Sanctuary Covenant*, 2023 WL 4729278. Plaintiffs in that case prevailed in the district court on claims that, *inter alia*, the bar violates the asylum statute, 8 U.S.C. § 1158, and notice-and-comment procedures; that judgment is stayed pending the government's appeal. Plaintiffs respectfully submit it would be in the interest of judicial economy to hold in abeyance the analogous claims asserted in this case, as any appellate decisions in *East Bay Sanctuary Covenant* would likely inform future possible briefing and decision, if necessary, on the substantially similar claims here. But this case also advances various claims that are *not* at issue in the *East Bay Sanctuary Covenant* appeal and unlikely to be affected by any resulting analysis in that case—including Plaintiffs' claim that the bar, even if generally permissible, has been unlawfully implemented in expedited removal. Proceeding to judgment in a timely manner on the claims unique to this case will best

1

regulations that violate the expedited removal statute by abandoning the "significant possibility" screening standard Congress adopted. And, contemporaneously with the Rule, Defendants implemented several other expedited removal policies that work in concert with the new bar to block noncitizens from obtaining protection.

The result is an expedited removal process entirely unlike the one Congress designed to protect against rapid removal of noncitizens "to countries where they could face persecution." *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020). Noncitizens are now barred from asylum in rapid proceedings without the benefit of Congress's "low screening standard." *Id*. Non-Mexicans are slated for removal to Mexico without complying with statutory procedures, and are surprised to learn they must establish fear of persecution and torture *as to Mexico* rather than their home countries. Noncitizens held in restrictive border facilities are afforded just 24 hours to prepare for this dramatically transformed interview process. And, facing all these barriers, non-Mexicans are repeatedly pushed to instead accept "voluntary" return to Mexico under false pretenses.

This concerted effort to drive down the rates at which noncitizens pass the credible fear screening has succeeded—as Defendants are touting in other litigation. For asylum seekers, the overall effect is a betrayal of the congressional promise that everyone, including people subject to expedited removal, is entitled to a real chance to seek protection in this country. These policy changes are unlawful and should be vacated.

---

allow the parties and the Court to focus their attention and resources on the expedited-removal-specific issues set forth in this motion, and to address the urgent need for relief for vulnerable people being subjected to the unlawful policies challenged in this case.

## BACKGROUND

**A.     Asylum, Related Relief, and the Expedited Removal System**

People fleeing persecution and torture can seek three primary forms of protection: asylum under 8 U.S.C. § 1158; withholding of removal under 8 U.S.C. § 1231(b)(3); and protection under the Convention Against Torture ("CAT"), *see* 8 C.F.R. §§ 1208.16-18. These protections reflect "one of the oldest themes in America's history—welcoming homeless refugees to our shores." S. Rep. No. 96-256 at 1 (1979) (Refugee Act), *as reprinted in* 1980 U.S.C.C.A.N.141, 141. Asylum affords protection from removal to individuals who have a "well-founded fear of persecution"— which can be satisfied by showing a ten percent chance of persecution—on account of one or more of five protected grounds. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428, 430, 440 (1987). Withholding of removal and CAT offer more limited protections and require applicants to meet a higher standard by proving that they are more likely than not to be persecuted or tortured. *See id.* at 430; *Nasrallah v. Barr*, 140 S. Ct. 1683, 1687 (2020). These forms of protection implement the United States' international humanitarian treaty obligations. *Cardoza-Fonseca*, 480 U.S. at 435.

Congress took care to ensure that noncitizens already within the United States or arriving at the border would be able to apply for asylum. Any person "who arrives in the United States" may apply for asylum "whether or not" they arrived "at a designated port of arrival." 8 U.S.C. § 1158(a)(1). The asylum statute includes a handful of carefully crafted bars to eligibility, two of which specifically address the circumstances where an individual may be denied asylum because protection is available to them in a third country. 8 U.S.C. §§ 1158(a)(2)(A), (b)(2)(A)(vi).

Asylum, withholding, and CAT protection are available in regular removal proceedings conducted under 8 U.S.C. § 1229a, called "defensive" proceedings; individuals not in removal proceedings can also submit an "affirmative" application for asylum. 8 C.F.R. §§ 208.2(a), 208.9.

In 1996, Congress created the "expedited removal scheme to substantially shorten and speed up the removal process" for certain noncitizens arriving without valid immigration documents. *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020). The process "lives up to its name." *Id.* at 619. Absent an indication of fear of persecution or torture, a noncitizen may be removed almost immediately. *Id.* But Congress balanced the interest in "efficient removal" against "a second, equally important goal: ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution." *Grace*, 965 F.3d at 902; *see id.* ("'Under this system, there should be no danger that [a person] with a genuine asylum claim will be returned to persecution.'") (quoting H.R. Rep. No. 104-469, pt. 1, at 158 (1995)).

Thus, noncitizens in expedited removal who express fear of removal, or an intention to apply for asylum, are entitled to a credible fear interview ("CFI") with an asylum officer—an employee of United States Citizenship and Immigration Services ("USCIS"), which is part of DHS. 8 U.S.C. § 1225(b)(1)(B). If noncitizens demonstrate a "significant possibility" that they "could establish eligibility for asylum," they are taken out of the expedited removal process and can pursue asylum and other forms of protection in regular removal proceedings. *See* 8 U.S.C. § 1225(b)(1)(B)(v). If a noncitizen does not establish a significant possibility of asylum eligibility, the asylum officer will also screen for withholding and CAT protection, with a positive finding likewise leading to regular proceedings. 8 C.F.R. § 208.30(e)(2)-(3). A negative finding by the asylum officer is reviewable by an immigration judge—a DOJ employee—but not subject to further review. 8 U.S.C. §§ 1225(b)(1)(B)(iii); 1252(a)(2)(A), (e)(2); 8 C.F.R. § 1208.30.

When noncitizens are placed in regular removal proceedings following a CFI, they have the rights to counsel, to present evidence, to examine the government's evidence and witnesses, and to appeal to both the Board of Immigration Appeals and a federal court of appeals. 8 U.S.C.

§§ 1229, 1229a, 1252(a), (b); 8 C.F.R. §§ 1003.12-1003.47. They also have substantially more time to gather evidence, consult with counsel and experts, develop arguments, and prepare. The CFI's significant-possibility standard asks whether noncitizens could prevail on their claims under those circumstances.

Historically, asylum officers have not applied any bars to asylum at the CFI screening stage. *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18,078, 18,084 (Mar. 29, 2022) ("2022 Asylum Rule"). Likewise, under longstanding regulations, asylum, withholding of removal, and CAT protection have all been assessed under the significant-possibility standard. *Id.* at 18,091. Both of these historical practices were briefly suspended under the prior administration, but Defendants reaffirmed them in the 2022 Asylum Rule. *See* 87 Fed. Reg. at 18,084.

## B. The New Asylum Bar and Its Application in Expedited Removal

On May 11, 2022, DHS and DOJ implemented their new Rule, 88 Fed. Reg. 31,314, upending the carefully balanced system described above by establishing a drastic new bar on asylum and implementing it in expedited removal proceedings.[2]

The Rule covers all non-Mexican adults and families who enter without authorization at the southern land border or adjacent coastlines. 8 C.F.R. § 208.33(a)(1), (2)(i). These noncitizens are barred from asylum unless they (1) arrive at a port of entry after obtaining one of a limited number of border port appointments through a smartphone application called CBP One, 8 C.F.R. § 208.33(a)(2)(ii)(B); (2) apply for asylum or similar relief in a transit country, and receive a final denial before coming to the United States, 8 C.F.R. § 208.33(a)(2)(ii)(C); or (3) receive advance

---

[2] Defendants in this case are these Departments, various of their sub-components, and their officers in their official capacities. Plaintiffs refer to the various governmental entities as the "agencies" or "agency" depending on the context.

permission to travel to the United States through a government-approved parole program, 8 C.F.R. § 208.33(a)(2)(ii)(A).

The Rule contains certain exceptions for those who fail to satisfy one of these conditions. It allows access to asylum for those who can demonstrate "exceptionally compelling circumstances," including an "acute medical emergency," an "imminent and extreme threat to life or safety," or "a severe form of trafficking in persons." *Id.* § 208.33(a)(3)(i). And people who arrive at ports of entry can avoid the appointment requirement if they can show it "was not possible to access or use the [CBP One app] due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle." 8 C.F.R. § 208.33(a)(2)(ii)(B).

The Rule's asylum bar applies to both affirmative and defensive asylum applications. Central to this case, the Rule also applies to expedited removal proceedings. 8 C.F.R. § 208.33(b). In choosing to apply the new bar at the CFI stage, the agencies broke with their conclusions in the 2022 Asylum Rule. 88 Fed. Reg. at 31,390.

The Rule eliminates Congress's significant-possibility standard as applied to the new bar, by requiring adjudicators to determine whether the noncitizen is *in fact* barred from asylum. Under the new regulations, credible fear adjudicators must "determine whether the [noncitizen] *is* covered by the presumption [of ineligibility] and, if so, whether the [noncitizen] *has rebutted* the presumption." 8 C.F.R. § 208.33(b)(1) (emphases added); *id.* at § 1208.33(b)(2) (same). In other words, the new regulations do not ask whether there is a significant possibility that an asylum seeker could later defeat the bar by satisfying one of the conditions or exceptions noted above in regular removal proceedings. Rather, the regulations require noncitizens to defeat the bar at the time of the CFI, without the benefit of the significant-possibility standard.

The Rule also departs from the agencies' conclusion in the 2022 Asylum Rule by imposing a higher reasonable-possibility standard to assess withholding and CAT relief for noncitizens deemed ineligible for asylum under the new bar. 88 Fed. Reg. at 31,336-37, 31,381.

### C.     The Collateral Expedited Removal Policies

The agencies also made a raft of other changes to the expedited removal system contemporaneous with the Rule. Three new policies are at issue in this motion.[3]

*24-Hour CFI Policy*. First, the agencies shortened the consultation period that precedes CFIs. Asylum officer guidance from 2019 explained that the purpose of this period is to allow the noncitizen "an opportunity to rest, collect his or her thoughts, and contact" an attorney or other person. Statement of Undisputed Facts ("SUF") ¶ 37. This consultation period has generally been no shorter than 48 hours. SUF ¶ 38. On May 10, 2023, USCIS implemented a policy shortening the minimum period to "24 hours after the noncitizen's acknowledgment of receipt of" a CFI informational form. SUF ¶¶ 34-35.

*The Third Country Removal Policy*. Second, the agencies contemporaneously implemented a new policy of removing nationals of Cuba, Haiti, Nicaragua, and Venezuela *to Mexico*. SUF ¶¶ 17-18. In contravention of the mandatory, multi-step statutory process governing the determination of the country of removal, 8 U.S.C. § 1231(b)(2), the new policy directs CBP agents that limitations on Immigration and Customs Enforcement ("ICE") deportation flight capacity permit the expedited removal of certain non-Mexican nationals to Mexico. SUF ¶¶ 19, 23-26.[4] Nothing

---

[3] Challenges to certain other collateral policies were previously held in abeyance pursuant to the parties' stipulation. ECF No. 30 ¶ 2 (addressing challenges to conducting CFIs in Customs and Border Protection ("CBP") custody, and utilizing non-Asylum Officers to conduct CFIs).

[4] The third country removal policy is reflected in several agency documents. SUF ¶ 20. The May 10, 2023 memorandum from Assistant Homeland Security Secretary Blas Nuñez-Neto contains the most detailed discussion of the new policy. *See* SUF ¶ 22. This memorandum does not

in the policy directs officers to notify noncitizens that the government intends to remove them to Mexico, SUF ¶ 28, leaving noncitizens unable to prepare for protection interviews that unexpectedly focus on dangers in Mexico rather than their home countries, *see, e.g.*, SUF ¶¶ 72, 81, 106.

*The "Voluntary" Return Policy.* Third, the agencies also have implemented a new policy aggressively encouraging nationals of those same four countries to "voluntarily" return to Mexico. Under this policy, individuals are pressed up to three times during their expedited removal processing to withdraw their applications for admission to the United States. SUF ¶¶ 43-45. The policy directs both CBP and USCIS officers to give "advisals" emphasizing country-specific processes the government has established to allow nationals of these four countries to apply for parole and permission to travel to the United States from abroad. SUF ¶ 46. These statements indicate that noncitizens will "remain eligible" for the parole programs if they accept voluntary return, *id.*, but in reality almost all noncitizens subject to this policy are barred from those programs, SUF ¶¶ 48-49.

The impact of the Rule and these other contemporaneous policies has already proven devastating. The passage rate for CFIs has dropped precipitously, from 83% to 56%. SUF ¶ 11. Plaintiffs include individuals denied access to protection under these various policies, as well as organizations serving similar asylum seekers affected by these policies. SUF ¶¶ 55-144 (Individual Plaintiffs); ¶¶ 145-205 (Organizational Plaintiffs). Plaintiffs' declarations illustrate how the new

---

specifically refer to expedited removal but provides guidance to CBP agents, the officers who prepare expedited removal orders and determine the country of removal under the policy. SUF ¶¶ 19, 23-24. By contrast, in ordinary removal proceedings, an immigration judge decides the country of removal. 8 C.F.R. § 1240.10(f).

Rule and the associated expedited removal policies unfairly limit and deny protection to asylum seekers.

Plaintiffs' declarations also exemplify the types of extraordinary harms facing noncitizens returned to their home countries under these policies, including persecution by their governments; gender-based and intimate partner violence; sexual assault and torture by gangs; and other grave dangers. *See, e.g.*, SUF ¶¶ 55, 58, 62, 68, 75, 83, 89, 93, 98, 102, 109, 113, 120, 123, 126, 131, 134, 140 (describing harms the Individual Plaintiffs previously suffered). Likewise, noncitizens removed or returned to Mexico under these policies face the violence, extortion, and other dangerous conditions that are endemic there—particularly for migrants. *See* SUF ¶ 33 (comments documenting nearly 13,500 instances of kidnapping, rape, torture, murder, and other violent attacks on asylum seekers in Mexico in 2021 and 2022, and describing how cartels "prey upon people migrating through Mexico"); *see also, e.g.*, SUF ¶¶ 59, 69, 84, 94, 99, 103, 110, 114, 127, 141 (describing Plaintiffs' similar past experiences in Mexico). When asylum seekers were expelled to Mexico under a previous policy, the D.C. Circuit emphasized the "stomach-churning evidence of [resulting] death, torture, and rape." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022); *see* id. at 734 (noting government's recognition as to an earlier policy of "'unacceptable risks' of 'extreme violence'" for asylum seekers in Mexico). The new policies challenged here impose those same harms on people seeking safety under the humanitarian protections Congress established.

## LEGAL STANDARD

"When a plaintiff challenges an agency's final action under the Administrative Procedure Act ("APA"), summary judgment 'is the mechanism for deciding whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the APA

standard of review.'" *Council of Parent Att'ys & Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 47 (D.D.C. 2019) (quoting *Louisiana v. Salazar*, 170 F. Supp. 3d 75, 83 (D.D.C. 2016)). "The APA requires courts to 'hold unlawful and set aside' an agency's action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting  5 U.S.C. § 706(2)(A)).

## ARGUMENT

Plaintiffs move for summary judgment on two sets of claims. *First*, the expedited removal provisions of the Rule are unlawful. Those regulations violate the expedited removal statute by abandoning the required significant-possibility standard, and the agencies' reasoning and explanation suffer from numerous flaws making them arbitrary and capricious. *Second*, the collateral policies are also unlawful. They violate the immigration statutes and regulations, and are likewise arbitrary and capricious. The Court should grant summary judgment, vacate the policies, and provide other appropriate relief.

## I.      THE RULE'S EXPEDITED REMOVAL PROVISIONS ARE UNLAWFUL.

### A.      The Expedited Removal Provisions Violate the Credible Fear Statute.

Congress established an intentionally low screening standard for asylum seekers facing expedited removal: Whenever there is "a significant possibility" that a noncitizen "could establish eligibility for asylum" in regular removal proceedings, the noncitizen must be taken out of the expedited removal system. 8 U.S.C. § 1225(b)(1)(B)(v). The Rule, however, contravenes this congressional mandate by directing adjudicators to decide whether an asylum seeker "*is* covered by the" bar to asylum eligibility, not whether there is a significant possibility that the noncitizen

will ultimately defeat the bar. 8 C.F.R. §§ 208.33(b)(1), 1208.33(b)(2) (emphasis added). Because the new regulations contradict Congress's standard, they are unlawful.

      1.      The significant-possibility standard is the cornerstone of the expedited removal system's "design" to "ensur[e] that individuals with valid asylum claims are not returned to countries where they could face persecution." *Grace*, 965 F.3d at 902. Congress directed that asylum eligibility must be assessed through a "low screening standard for admission into the usual full asylum process." *Id.* (quoting 142 Cong. Rec. 25,347 (1996) (statement of Sen. Hatch)). Thus, the statute requires that noncitizens with "a significant possibility" of success in future removal proceedings—where they would be able to fully prepare and marshal legal arguments as well as factual evidence, including potential expert testimony, to support their claims for protection—must be given the opportunity for that full hearing.

      Congress's choice reflects the reality of credible fear assessments, which are "'often rushed'" and "can occur under 'tense conditions.'" *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 39 (D.D.C. 2020) (quoting *Lin Ming Feng v. Sessions*, 721 F. App'x 53, 55 (2d Cir. 2018)). As then-Judge Jackson explained:

> As a practical matter, a noncitizen "appearing at a credible fear interview has ordinarily been detained since his or her arrival in the United States and is therefore likely to be more unprepared, more vulnerable, and more wary of government officials than an asylum applicant who appears for an interview before immigration authorities well after arrival." *Zhang v. Holder*, 585 F.3d 715, 724 (2d Cir. 2009). Moreover, the interviewee "is not represented by counsel, and may be completely unfamiliar with United States immigration laws and the elements necessary to demonstrate eligibility for asylum." *Ramsameachire v. Ashcroft*, 357 F.3d 169, 179 (2d Cir. 2004) (Sotomayor, J.).

*Id*. The low significant-possibility standard is a key safeguard against erroneous return to persecution and torture under these difficult conditions.

The new regulations remove that safeguard. They direct credible fear adjudicators to ask whether the noncitizen before them "*is covered*" by the new bar, and "*has rebutted*" the bar—i.e., whether the noncitizen in fact "*has*" established one of its conditions or exceptions. 8 C.F.R. § 208.33(b)(1) (emphases added). Thus, although the Immigration and Nationality Act ("INA") requires a noncitizen to be placed in regular removal proceedings if she "*might* be able to establish the elements of her claim" in full removal proceedings, the new regulations permit her rapid removal unless she has actually "established" a defense or exception to the bar "at the time of her credible fear interview." *Kiakombua*, 498 F. Supp. 3d at 45. In this way, the regulations direct adjudicators to deny asylum to noncitizens who *can* show a significant possibility of eligibility, directly contrary to Congress's instructions. *See Brown v. Gardner*, 513 U.S. 115, 116 (1994) (invalidating regulation as not "consistent with the controlling statute").

This conflict between the Rule and the statute has serious practical consequences for people seeking asylum. For example, there is an exception to the bar for "exceptionally compelling circumstances." 8 C.F.R. §§ 208.33(a)(3)(i), 1208.33(a)(3)(i). Under the correct standard, a credible fear adjudicator must consider whether there is a significant possibility that a future immigration judge, the Board of Immigration Appeals, or a federal court of appeals could deem the circumstances—as illuminated by the applicant's full testimony and any additional evidence— sufficiently compelling to warrant an exception. *See Grace v. Whitaker*, 344 F. Supp. 3d 96, 139-40 (D.D.C. 2018), *aff'd in relevant part on other grounds*, 965 F.3d at 900-03.

The likelihood of a disagreement about the scope or application of "exceptionally compelling circumstances" is significant, particularly given that the exception was drafted to "preserve[] flexibility" regarding what it might cover. 88 Fed. Reg. at 31,394; *see, e.g.*, *id*. at 31,352 (discussing possible application of exception to climate change). Under the statutory

standard, noncitizens must be afforded "the benefit of that disagreement," *Grace*, 344 F. Supp. 3d at 140, and afforded regular removal proceedings based on claims that *could* be held to fall within this exception. The Rule, by contrast, instructs adjudicators making rapid judgments based on minimal evidence to decide for themselves whether the circumstances are compelling enough. That deprives noncitizens of the benefit of potential differences of opinion, perspective, and interpretation—thus denying access to asylum even to noncitizens who have a significant possibility of establishing exceptionally compelling circumstances, and therefore asylum eligibility, in regular removal proceedings.

2.     Notably, the Rule's preamble concedes that the significant-possibility standard must be applied in credible fear proceedings, including when determining whether the new asylum bar applies. *See* 88 Fed. Reg. at 31,380 (conceding the standard "is required by statute" when assessing the bar in a CFI). The preamble claims, however, that the Rule complies with this legal requirement because credible fear adjudicators will in fact apply the correct threshold screening standard. *Id.* Those assertions do not cure the regulations' conflict with the statute.

"[I]t is the language of the regulatory text, and not the preamble, that controls." *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 570 (D.C. Cir. 2002); *Texas Child.'s Hosp. v. Burwell*, 76 F. Supp. 3d 224, 237 (D.D.C. 2014) ("[A] preamble does not create law; that is what a regulation's text is for."); *accord Mejia-Velasquez v. Garland*, 26 F.4th 193, 202 (4th Cir. 2022); *Sierra Club v. EPA*, 964 F.3d 882, 893 (10th Cir. 2020); *Gustavsen v. Alcon Lab'ys, Inc.*, 903 F.3d 1, 13 (1st Cir. 2018). And here the regulatory text is clear.

The new regulations do not say or remotely suggest that credible fear adjudicators must apply the significant-possibility standard to the asylum bar. To the contrary, as explained above, the plain regulatory text directs credible fear adjudicators to "*determine* whether the [noncitizen]

*is covered* by the presumption [against asylum eligibility under the Rule and], if so, whether the [noncitizen] *has rebutted* the presumption." 8 C.F.R. § 208.33(b)(1) (emphasis added); *id.* § 1208.33(b)(2). But, as the agencies concede, "[t]he 'significant possibility' standard asks a predictive question: whether there is a 'significant possibility' that the noncitizen '*could* establish' asylum eligibility at a merits hearing" in regular removal proceedings. 88 Fed. Reg. at 31,380 (emphasis added). The new regulations do not ask that predictive question; they ask whether a noncitizen *is* subject to the ban.

"[T]here is no doubt that the word 'is' connotes 'a more certain determination' than 'could'"; thus, the only court to previously address the question has rejected the imposition in credible fear guidance of a "requirement of certainty, as conveyed by the use of the present tense 'is.'" *Kiakombua*, 498 F. Supp. 3d at 41 (quoting *Yusupov v. Att'y Gen. of U.S.*, 518 F.3d 185, 201 (3d Cir. 2008)). "Congress' use of a verb tense is significant in construing statutes," and here Congress employed both "significant possibility" and "could establish" to make clear that credible fear adjudicators may not make the actual eligibility determination. *Id.* (quoting *United States v. Wilson*, 503 U.S. 329, 333 (1992)) (cleaned up).

The regulatory context underscores the plain meaning of the text. The new regulations direct immigration judges reviewing CFIs to apply the significant-possibility standard to assess other asylum issues, like whether a noncitizen has a well-founded fear—but only *after* they have finished determining whether the new asylum bar applies. Immigration judges "shall first determine whether the [noncitizen] *is*" ineligible for asylum under the new bar. 8 C.F.R. § 1208.33(b)(2) (emphasis added). Only where they conclude a noncitizen "is not" barred for that reason do the regulations invoke the significant-possibility standard by directing immigration judges to "further determine . . . whether the [noncitizen] has established a significant possibility

of eligibility for asylum . . . ." *Id.* § 1208.33(b)(2)(i). That is, the regulations use both terms—"is" and "significant possibility"—in the same breath. "Where drafters use a term in one provision but not another, 'it is generally presumed' that the drafter acted 'intentionally and purposely in the disparate inclusion or exclusion.'" *Newman v. FERC*, 27 F.4th 690, 698 (D.C. Cir. 2022).

Here, the agencies easily "could have used" the same significant-possibility language in addressing the application of the bar, but "did not" do so. *Id.* Indeed, commenters specifically pointed out that the proposed regulations violated the significant-possibility standard. 88 Fed. Reg. at 31,379-80; *see* SUF ¶ 6. And the agencies made clarifying edits to other parts of the proposed regulations. *See, e.g.*, 88 Fed. Reg. at 31,321. Yet they declined to amend the proposed regulations to address their inconsistency with the statutory significant-possibility standard. Regardless of the preamble's assertions, the regulations are unlawful and cannot stand.

**B.  The Expedited Removal Provisions Are Arbitrary and Capricious.**

Even if the expedited removal provisions of the Rule were not invalid for inconsistency with the statute, they would remain arbitrary and capricious for multiple reasons. First, the agencies never explain how they could interpret the regulatory text discussed above to be consistent with the significant-possibility standard. Second, the Rule provides no reasoned explanation for departing from the longstanding policy against applying asylum bars in expedited removal, which the agencies reaffirmed just last year. Third, the agencies similarly fail to justify raising the significant-possibility standard to a reasonable-possibility standard when evaluating claims for withholding or CAT protections. Fourth, the agencies failed to consider the impact of the Rule operating in conjunction with other drastic changes to the CFI process that the agencies concurrently adopted. Finally, all of these flaws trace back to the agencies' reliance on an

impermissible factor: their ultimate disagreement with Congress's choice to adopt the low significant-possibility standard.

> ### i.  The agencies failed to address the inconsistency between their regulations and the significant-possibility standard.

As an initial matter, the Rule's choice to jettison the significant-possibility standard is not only contrary to the statute, as discussed above, but also arbitrary and capricious. Conceding that the significant-possibility standard is required, the agencies' preamble asserts that credible fear adjudicators *will* apply that standard to the new bar. 88 Fed. Reg. at 31,380. That assertion is, however, contrary to the actual text of the regulations. And even if there were a question as to the regulations' proper interpretation, the agencies do not attempt to explain how they can interpret the regulatory text to mean what they claim. Such an "inconsistency between the language of the regulations and the preamble's explanation of what [the agency] did" reflects a "failure [to] adequately explain [the agency's] action," rendering "the action arbitrary and capricious." *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1220 (D.C. Cir. 1996). At a minimum, this disparity is likely to engender confusion and misunderstanding among credible fear adjudicators—yet the agencies did not acknowledge that obvious problem.

That failure of explanation is amplified here because the original Notice of Proposed Rulemaking ("NPRM") and the Final Rule articulate opposite views of what the materially identical regulatory text means. In the NPRM, the agencies contended that the proposed regulations were "consistent with" the statute by offering the following statement:

> If a noncitizen is subject to the lawful pathways condition on eligibility for asylum and not excepted and cannot rebut the presumption of the condition's applicability, there would not be a significant possibility that the noncitizen could establish eligibility for asylum.

88 Fed. Reg., 11,704. 11,742 (Feb. 23, 2023). Under the NPRM's stated understanding, adjudicators would not apply the significant-possibility standard to the ban: Doing so would be unnecessary because if a person *is* ineligible for asylum, they can have no *significant possibility* of establishing eligibility. That reasoning flouts the whole idea of the low credible fear standard, which, as already explained, was crafted to *not* require proof of actual eligibility at the screening stage. *Kiakombua*, 498 F. Supp. 3d at 45. When the agencies converted the NPRM into a Final Rule, they shifted ground, contending in the preamble that the same regulatory language actually *would* require adjudicators to apply the significant-possibility standard. 88 Fed. Reg. at 31,380. Even if these two views could be reconciled—which they cannot—here, the agencies neither acknowledged nor explained their own shifting understandings of the same regulatory language.

The agencies also failed to "respond to 'relevant and significant comments'" about this issue. *Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 15 (D.C. Cir. 2015). Commenters pointed out the flaw in the NPRM's justification, and the inconsistency of the regulatory language with the significant-possibility standard. SUF ¶ 8. The agencies made no material changes in response. Instead, the Final Rule's preamble simply asserted that adjudicators would in fact apply the significant-possibility standard to consideration of the ban. That conclusory assertion is the antithesis of reasoned decision-making.

### ii. The agencies offered an illogical and inadequate justification for applying the bar in credible fear proceedings.

Even more fundamentally, the agencies' decision to apply the new asylum bar at all in credible fear proceedings is arbitrary and capricious. "While agencies are free to change their existing policies, in doing so they must provide a *reasoned explanation* for the change." *Nat'l Women's L. Ctr. v. Off. of Mgmt. & Budget*, 358 F. Supp. 3d 66, 89 (D.D.C. 2019) (emphasis added) (cleaned up); *see Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*, 25 F.4th 1, 5 (D.C.

Cir. 2022) (change "was not sufficiently reasoned"); *Council of Parent Att'ys*, 365 F. Supp. 3d at 50 (similar). Here, the application of the bar in CFIs contradicts the agencies' longstanding policy to not apply asylum bars in CFIs, which the agencies explicitly reaffirmed just last year in the 2022 Asylum Rule. 87 Fed. Reg. at 18,084. In that rule, the agencies recognized that devoting adjudicators' time to eliciting testimony, conducting analysis, and making decisions about asylum bars in the credible fear screening undermines the efficiency of that process and is unfair to applicants. *Id.* at 18,093. The new Rule's attempt to reconcile those conclusions with its application of the new bar in CFIs is illogical and insufficiently reasoned. Thus, it represents an inadequately explained departure from prior policy.

1.      The agencies contend that this Rule is consistent with the 2022 Asylum Rule because the new bar is "less complex" than other asylum bars and will "involve a straightforward analysis." 88 Fed. Reg. at 31,390, 31,393. But that conclusory statement is not an adequate explanation given the many complexities evident on the face of the Rule itself. "An agency must explain why it chose to do what it did. And to this end, conclusory statements will not do; an agency's statement must be one of *reasoning*." *Nat'l Women's L. Ctr.*, 358 F. Supp. 3d at 89 (quoting *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014)) (cleaned up). Merely asserting that the new bar is simple, when plainly it is not, does not satisfy the agencies' obligation to engage in reasoned decision-making.

For example, the "exceptionally compelling circumstances" exception to the bar includes "an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder." 8 C.F.R. § 208.33(a)(3)(B). But that list of specific threats is "not exhaustive." 88 Fed. Reg. at 31,393. Whether the particular dangers facing noncitizens—and such dangers are rife for asylum seekers in Mexico, SUF ¶ 33—qualify as "imminent and extreme threats of severe

pain and suffering" is a matter that calls for substantial judgment on a "case-by-case basis," *id*. at 31,352. There is nothing simple about this inquiry. Indeed, it requires a detailed examination of a noncitizen's basis for fear. Further, the general terms of the exception are open to interpretation, and the preamble's commentary on it seems to point in different directions—at some points urging that it be construed narrowly, 88 Fed. Reg. at 31,380, and at others suggesting a more capacious meaning, *id*. at 31,352 (addressing climate change).

Likewise, the regulations provide an exception to the requirement to obtain a CBP appointment where it "was not possible to access or use the [CBP One app] due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle." 8 C.F.R. § 208.33(a)(2)(B). The agencies "decline[d] to specify" how this exception could be met, and explained they left this gap in order "to preserve flexibility and account for . . . unique circumstances," 88 Fed. Reg. at 31,406. In doing so, they invited more judgment calls. Applying this exception is anything but simple, either legally or factually.

Even as to the bar's threshold questions, there are interpretive and factual complexities. For example, the Rule permits asylum if the noncitizen has "received a final decision denying" protection in another country, *see, e.g.*, 8 C.F.R. § 208.33(a)(2)(C), but that condition might well be subject to factual and legal dispute, as it was for Plaintiff R.E. He was in fact denied asylum in Mexico but was nevertheless barred from asylum in the United States under the Rule—apparently because of what the asylum officer deemed evidentiary uncertainties. SUF ¶¶ 137-138.

In many situations, these complexities may be magnified by the application of the congressionally mandated significant-possibility standard. As the agencies concede in the preamble, the ban and its exceptions must be examined through the lens of that standard. *Supra* Part I.A. While a given asylum officer might not, for example, think the particular threats facing a

noncitizen are enough to legally qualify as exceptionally compelling circumstances, the correct question is whether there is a significant possibility an immigration judge in removal proceedings, or the BIA, or the (as yet unknown) applicable court of appeals could think so. *See Grace*, 344 F. Supp. 3d at 139-40. The very open-endedness of the inquiry can make that predictive question about success following an evidentiary hearing in regular removal proceedings and appellate review even more complex.

2.     The agencies offer the additional claim that, unlike other bars, "most of the facts relevant to" the new bar "involve circumstances at or near the time of the noncitizen's entry," and that noncitizens therefore "will have a sufficient opportunity to provide testimony regarding such events and circumstances." 88 Fed. Reg. at 31,390-91. That conclusory assertion is, like the agencies' claim of simplicity, belied by the terms of the bar and thus inadequately reasoned.

For example, under the regulations, a noncitizen arriving at a port is excused from making an appointment if there was a "significant technical failure" in CBP One. 8 C.F.R. § 208.33(a)(2)(B). But most noncitizens will be unable to marshal *any* evidence about the operation of the app at the credible fear stage beyond the personal experience of it simply not working. Indeed, even the asylum officer is unlikely to have relevant information about the internal technical workings of the app at that stage—and certainly would have no access to the kind of independent investigation and assessment that a noncitizen could bring to bear in full proceedings, given the opportunity of procuring counsel and marshaling expert evidence or reports documenting the experiences of numerous individuals.

Similarly, "exceptionally compelling circumstances" include "an acute medical emergency." 8 C.F.R. § 208.33(a)(3)(i), (i)(A). Medical conditions and judgments are a classic example of factual questions that often call for expert opinions and technical analyses. A medically

untrained noncitizen interviewed by a medically untrained asylum officer is very unlikely to possess key evidence relevant to the exception's applicability. That is particularly so because this exception "could include mental health emergencies," 88 Fed. Reg. at 31,348—but people experiencing such emergencies are even less likely to be able to adduce evidence substantiating their condition during the hurried credible fear process. And while the agencies suggest that opinions from CBP medical officials will sometimes be available to credible fear adjudicators, *id*. at 31,392, the point is that noncitizens are almost certain to lack the evidence they need to rebut those opinions (if such opinions exist at all) during the CFI.

3.      These issues are no less complicated, and no less dependent on facts unavailable during CFIs, than other bars that the agencies have previously concluded should not be applied at the hurried CFI stage. Those bars include questions like whether an individual has "firmly resettled" in a third country before arriving in the United States, 88 Fed. Reg. at 31,390, an inquiry that—unlike the new bar—relates to facts that *are* generally available to the noncitizen at or near the time of entry. The agencies' justification for applying the Rule thus ultimately rests on conclusions that are facially incorrect or highly implausible given the Rule's terms. Yet the agencies never acknowledged those problems with their conclusions, or explained why they nevertheless believed this ban to be categorically different from other bans which, in the agencies' own view, are inappropriate for the credible fear process. Such an about-face "without giving a 'reasoned explanation for . . . treating similar situations differently'" is arbitrary and capricious. *City of Phoenix v. Huerta*, 869 F.3d 963, 972 (D.C. Cir. 2017) (quoting *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014)).

4.      In any event, in deciding to apply the new bar in CFIs, the agencies failed to consider an "important aspect of the problem": the fairness concerns that they previously

emphasized in the 2022 Asylum Rule. *Motor Veh. Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 43 (1983). The agencies previously "recognize[d] that considerations of procedural fairness counsel against applying mandatory bars that entail extensive fact-finding during the credible fear screening process." 87 Fed. Reg. at 18,093; *see also id*. at 18,134-35. Because the agencies needed to balance the efficiency of the credible fear screening with ensuring fairness to the noncitizen, the agencies determined that these twin statutory goals could "be accomplished by returning to the historical practice of not applying mandatory bars at the credible fear screening stage." *Id*. at 18,135. However, the new Rule failed to acknowledge the fairness concerns implicated in applying the bar here. Where, as here, agencies have previously identified a factor as important to their consideration of an issue, and did so only a year ago, they cannot simply ignore that factor in later changing their position. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("a reasoned explanation is needed for disregarding facts and circumstances that underlay . . . the prior policy"); *Council of Parent Att'ys*, 365 F. Supp. 3d at 50 (agency reversal "either did not address" important aspects of earlier rulemaking "or responded to them in an inadequate or cursory manner"). Moreover, the agencies also failed to address comments raising those concerns. *See* 88 Fed. Reg. at 31,390; SUF ¶ 5. Again, this failure to meaningfully engage with comments "is not good enough." *Del. Dep't of Nat. Res.*, 785 F.3d at 16.

### iii. The agencies relied on a flawed analogy to justify applying the reasonable-possibility standard to withholding and CAT screenings.

In addition to jettisoning the significant-possibility standard in applying the new bar, the Rule improperly changes the screening standard for withholding of removal and CAT claims, which are available even if someone is ineligible for asylum. Instead of applying the significant-possibility standard as before, the Rule adopts the reasonable-possibility standard to assess withholding and CAT, which is a "higher" and "more demanding" standard. 88 Fed. Reg. at

31,336-37, 31,381. The agencies had long applied the significant-possibility standard to withholding and CAT claims assessed in CFIs. Indeed, in the 2022 Asylum Rule, the agencies specifically rejected the use of the higher reasonable-possibility standard in CFIs. 87 Fed. Reg. at 18,092. Yet this Rule adopts that very standard. *See* 88 Fed. Reg. 31,336-38. Although the agencies acknowledged the change, they failed to provide a justification that was "sufficiently reasoned." *Am. Fed'n of Gov't Emps.*, 25 F.4th at 5.

In applying a protection screening standard, the risk of error—that is, of removing people even if they *will* likely be persecuted or tortured—is unquestionably "an important aspect of the problem" for the agencies' consideration. *State Farm*, 463 U.S. at 43. Unlike asylum, which is discretionary, both withholding of removal and CAT protection are mandatory obligations, stemming from treaty commitments to "non-refoulement," i.e., refraining from sending people to probable persecution or torture. *See Cardoza-Fonseca*, 480 U.S. at 440, 444; *Nasrallah*, 140 S. Ct. at 1687. Thus, in elevating the screening standard, it was incumbent on the agencies to meaningfully assess whether more people would be wrongfully removed to persecution and torture. Indeed, in rejecting the reasonable-possibility standard, the 2022 Asylum Rule specifically examined whether imposing a higher standard would adequately "ensur[e] the United States complie[s] with its non-refoulement obligations." 87 Fed. Reg. at 18,092. "[B]ased on the Departments' experience implementing divergent screening standards," they found "no evidence" that applying the reasonable fear standard in CFIs "resulted in more successful screening out of non-meritorious claims while" safeguarding against refoulement. *Id.*

In the new Rule, the agencies categorically rejected the concern, raised in comments, that applying the reasonable-possibility standard "will result in errors" and thus wrongfully return people to persecution and torture. 88 Fed. Reg. at 31,420. The agencies' position is insufficiently

examined and explained. Their core assertion was an analogy: Because the reasonable-possibility standard has been used in screenings applicable to *other* immigration contexts—principally reinstatement of prior removal orders under 8 U.S.C. § 1231(a)(5)—the agencies concluded that the standard can also be applied to expedited removal proceedings without erroneous denials of protection. 88 Fed. Reg. at 31,420.

That analogy is unsound. Reinstatement proceedings involve important procedures and circumstances that safeguard against refoulement but are absent under the Rule. For example, where an asylum officer finds no reasonable possibility of persecution or torture in the reinstatement context, the noncitizen may seek review not only by an immigration judge, but also by a federal court of appeals. *See, e.g.*, *Alonso-Juarez v. Garland*, __ F.4th ___, 2023 WL 5811043 (9th Cir. Sept. 8, 2023). By contrast, with very limited exceptions, there is no judicial review of expedited removal proceedings. *See* 8 U.S.C. §§ 1225(b)(1)(B)(iii); 1252(a)(2)(A), 1252(e)(2). Thus, quite unlike the reinstatement context, erroneous denials of withholding and CAT protection in expedited removal will never be reviewed and corrected by Article III courts. And the Rule further amplifies the risk of uncorrected erroneous denials by simultaneously eliminating the option to seek reconsideration by USCIS of credible fear denials. 8 C.F.R. § 208.33(b)(2)(v)(C). There is no similar restriction in the reinstatement context. *See* 8 C.F.R. § 1208.31.

Likewise, reinstatement applies to a very different population: People subject to reinstatement of removal "by definition ha[d] prior experience with the U.S. immigration system" because they were previously in removal proceedings, and many of these individuals will have "lived in the United States for extended periods of time." SUF ¶ 10. Noncitizens in reinstatement proceedings thus often have more of an opportunity to find legal representation and are better able to prepare for the interview. By contrast, individuals in expedited removal generally have little to

no opportunity to consult counsel or gather evidence. SUF ¶ 9.[5] Indeed, as previously explained, those realities are reflected in Congress's design of the expedited removal system. Thus, as these agencies previously acknowledged, the significant-possibility standard better "align[s] with Congress's intent that a low screening threshold standard apply" in expedited removal proceedings. 88 Fed. Reg. at 11,745-46 (citing 2022 Asylum Rule).

In nevertheless applying the reasonable-possibility standard in expedited removal, the agencies never acknowledged the critical differences between the expedited removal context and reinstatement proceedings. *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994) (agency must consider "circumstances that appear to warrant different treatment"); *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 824 (D.C. Cir. 1983) (failure to consider "obvious and substantial differences" was arbitrary and capricious). Moreover, the agencies were well aware of the use of the reasonable-possibility standard in reinstatement when they rejected that standard for CFIs in 2022, but were obviously not then persuaded by the analogy. *See* 86 Fed. Reg. 46,906, 46,914 n.37 (Aug. 20, 2021) (NPRM for 2022 Asylum Rule). Besides that flawed analogy, the agencies offered essentially no basis for asserting, contrary to their earlier conclusion, that the reasonable-possibility standard adequately protects against erroneously removing people to persecution or torture. 88 Fed. Reg. at 31,420. Thus, their conclusion that reasonable-possibility can safely be applied to CFIs is inadequately examined and explained.

### iv. The agencies refused to consider the interacting effects of the various expedited removal policies they established at the same time.

The agencies violated a core APA requirement because they "entirely failed to consider an important aspect of the problem"—namely, how the Rule, and the agencies' justifications for the

---

[5] That is particularly so given the other contemporaneous changes at issue in this case. *See infra* Part II.B (discussing 24-hour CFI policy).

Rule, interact with contemporaneous and interrelated policy changes. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017). An agency has an "obligation to acknowledge and account for a changed regulatory posture the agency creates," especially when the change is "contemporaneous and related." *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011). Here, the agencies made a number of interrelated policy changes to asylum processing close in time to the Rule's effective date. *See infra* Part II.

Each of these changes makes it more difficult for a person to pass a CFI. Take the decision to conduct CFIs in CBP custody. *See* SUF ¶ 40.[6] That custody involves horrific conditions of confinement including the use of frigid, bare concrete holding cells and sleep deprivation. SUF ¶ 41. CBP custody also imposes more highly restrictive access to contact with the outside world than even ICE custody. SUF ¶¶ 156, 159-160, 189-190. As a result, people held in CBP custody find it extremely difficult to consult with counsel before or during their CFIs. *See, e.g.*, SUF ¶¶ 42, 66, 116, 118, 156, 159-60, 189-90. Worse still, Defendants reduced the pre-credible fear consultation period to just 24 hours, effectively eliminating the statutory right to consultation for those subject to expedited removal. *See infra* Part II.B.

The agencies' own data—collected during an earlier use of CBP custody for CFIs—demonstrate that these policies impair noncitizens' ability to present their claims and pass the CFI. 88 Fed. Reg. at 31,362 (summarizing comment). The impact is illustrated by Plaintiffs' experiences. For example, Plaintiff Y.F. explains that she was not able to communicate with a lawyer prior to her interview, which occurred while she was in CBP custody. SUF ¶ 116. When she finally was afforded a supposed opportunity to consult, it was *after* her interview and after she

---

[6] While the parties agreed to hold in abeyance any "*challenge [to]* the use of [CBP] facilities to conduct credible fear interviews," ECF No. 30 ¶ 2 (emphasis added), the agencies' decision to pursue CFIs in CBP custody is relevant to various other claims in this case, including this one.

had already received a negative determination. SUF ¶ 118. Even then, the consultation slot CBP offered her was on a Sunday night at around 9:00 p.m. *Id.* Y.F. tried to call every organization on the list she was given but, unsurprisingly given the day and hour, no one answered. *Id*. An immigration judge affirmed the negative CFI determination the next day. SUF ¶ 119.

The third-country removal policy further depresses credible fear passage rates, because it switches the focus of the interview to Mexico for those slated for removal to that country. *See infra* Part II.A (addressing this policy). And the new policy does not even require notice of the government's intent to remove to Mexico, so noncitizens are not made aware of the need to prepare for such a Mexico-focused interview. *See id*.; SUF ¶ 28. For example, Plaintiff L.A. is from Nicaragua but, to his surprise, his entire CFI was focused on Mexico. SUF ¶¶ 102, 106. Even under the best of circumstances, a person from a third country will have difficulty substantiating a fear of persecution on a protected ground or torture in a country in which they have spent little time. Without preparation or counsel, success becomes yet more unlikely—despite the extremely dangerous conditions in Mexico.

The agencies then take advantage of this stacked deck by pushing certain noncitizens to give up even the severely limited access to immediate protection that remains by accepting so-called "voluntary" returns to Mexico. People are urged to accept such returns based on deeply misleading information, making them not voluntary at all. *See infra* Part II.C.

The policy changes enacted alongside the Rule therefore individually and collectively make it more difficult for people with colorable or even strong claims to protection to pass initial screening interviews. The Rule, however, ignores the impact of these "contemporaneous" and "closely related" policy changes. *Portland Cement Ass'n*, 665 F.3d at 187. Indeed, when confronted with questions about the impact of the ban in conjunction with possible other

limitations on the credible fear process, such as CFIs in CBP custody, limited consultation periods, and barriers to accessing counsel, the agencies' only response was to assert that these concerns were "beyond the scope of this [R]ule." 88 Fed. Reg. at 31,355, 31,362. But agencies must consider comments arguing that, "*given*" other policies, a rule should not be adopted. *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1173 (D.C. Cir. 1994). And they have duties to "account for [the] changed regulatory posture [the agencies] create[d]," *Portland Cement Ass'n*, 665 F.3d at 187, and to "examine all relevant factors," *Am. Wild Horse*, 873 F.3d at 923. The agencies' abandonment of those duties renders the credible fear portions of the Rule arbitrary and capricious.

This same flaw likewise infects the agencies' reasoning as to all of other the policies challenged in this case. Plaintiffs will not repeat these arguments elsewhere, but assert them as to each of the policies discussed in Part II, *infra*.

> **v.     The agencies relied on an impermissible factor: disagreement with Congress's low credible fear screening standard.**

Ultimately, all of these changes trace back to an overarching flaw in the Rule. The agencies emphasized, as a key problem to be solved, the existing "significant disparity" between the number of people found to have a credible fear and the number ultimately granted asylum or other protection. *See, e.g.*, 88 Fed. Reg. at 11,716; 88 Fed. Reg. at 31,329-30. But such a disparity is the point of the statutory significant-possibility standard. As discussed above, Congress deliberately chose a low screening standard. It follows from that choice that a significant proportion of people who pass Congress's low screening standard will not prevail under the higher ultimate standards for relief. The agencies therefore overstepped their authority in relying on a rationale that contradicts the core premise of the credible fear process. *See Nat'l Ass'n of Broadcasters v. FCC*, 39 F.4th 817, 820 (D.C. Cir. 2022) ("The [agency] cannot alter Congress's choice."); *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1026 (D.C. Cir. 2018) (invalidating agency action whose

"justification" was not "reasonable"); *see Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000) (rejecting policy that "completely diverges from any realistic meaning" of the statute); *Kiakombua*, 498 F. Supp. 3d at 46 (same for policy that conflicted with "the goals of the [credible fear] statute") (quotation marks omitted).

The agencies offered the following reasoning in the NPRM: (1) there is "a significant disparity between the number of noncitizens who are found to have a credible fear and the number of noncitizens whom an IJ ultimately determines" should be granted asylum or other protection; and (2) regular removal cases can take years to conclude; so (3) noncitizens who pass credible fear but are "ultimately found ineligible for asylum or another form of protection are likely to spend many years in the United States prior to being ordered removed," imposing "costs to the system in terms of resources and time" and incentivizing migration. 88 Fed. Reg. at 11,716. Then, in the final Rule, they endorsed this reasoning, emphasizing that "the number of individuals who are referred to an IJ at the beginning of the expedited removal process greatly exceeds the number who are granted asylum or some other form of relief or protection." 88 Fed. Reg. at 31,330.

That is a key policy rationale for the Rule; indeed, in other litigation the government is now touting that, "*[a]s intended*, the rule has significantly reduced [credible fear] screen-in rates." SUF ¶ 12 (emphasis added); *see* SUF ¶ 11. (stating that the CFI pass rate has decreased from 83 to 56 percent); 88 Fed. Reg. at 11,737 ("the Departments expect that fewer noncitizens would ultimately be placed in section 240 proceedings as fewer will pass the screening process").

But that reasoning is ultimately premised on a *disagreement with Congress*. When it created expedited removal, Congress understood that screening people out of the rapid process and into regular proceedings would have consequences. Regular removal proceedings would necessarily take more time, not only because of the greater safeguards to ensure noncitizens could adduce

testimony and make arguments with assistance of counsel, but also because adverse decisions would be subject to administrative and judicial review which could take years. And to the extent Congress intended expedited removal as a deterrent to migration, taking more people out of the rapid process could be expected to impact any deterrent effect. But Congress nevertheless expressly chose to adopt a "low screening standard," selected to ensure that "individuals with valid asylum claims are not returned to countries where they could face persecution." *Grace*, 965 F.3d at 902 (internal quotation marks omitted). By setting the screening standard low, Congress necessarily chose to place significantly more noncitizens into ordinary proceedings than could be ultimately expected to prevail on their protection claims—that is the essence of a low screening standard. Congress made that choice despite the possible countervailing costs.

The agencies' treatment of this "significant disparity" as a problem the Rule is designed to solve is just another way of disagreeing with the low screening standard *Congress chose*. The agencies can make their case to Congress for new legislation, but they cannot use regulations to "alter the specific choices Congress made." *Nat'l Ass'n of Broadcasters*, 39 F.4th at 820. Nor can they rely on factors that contradict Congress's policy choices. *See, e.g.*, *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 971 (9th Cir. 2002) (invalidating rule whose "justification" was "directly contrary to one of [Congress's] fundamental purposes"). At a minimum, the agencies failed to acknowledge this contradiction or even attempt to explain how the Rule's rationale could coexist with the diametrically opposed congressional policy conclusions codified in the significant-possibility standard. *Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 854 (D.C. Cir. 1987) (agencies are "not free to substitute new goals in place of the statutory objectives without explaining how these actions are consistent with . . . the statute"). For all these reasons, the credible fear portions of the Rule are arbitrary and capricious.

II.     **THE COLLATERAL POLICIES ARE UNLAWFUL.**

The other policies implemented alongside the Rule are likewise contrary to the governing statutes and regulations, and arbitrary and capricious.

### A.     The Third Country Removal Policy Violates Statutory Procedures and Exposes People to Persecution and Torture.

Contemporaneous with the Rule, the agencies also established a new, policy of conducting expedited removals to third countries—in practice, to Mexico. SUF ¶¶ 17-18. This policy is premised on a misapplication of the statute governing permissible countries of removal, rendering the policy both contrary to law and arbitrary and capricious. It also runs afoul of, and inadequately considered, the agencies' obligations to avoid returning noncitizens to persecution and torture.

1.     Defendants assert that limits on their ability to remove nationals from Cuba, Haiti, Nicaragua, and Venezuela justify the routine removal of those nationals to *Mexico*. In particular, a May 10, 2023 memorandum repeatedly invokes an exception allowing for removal to a third country—where removal is otherwise "impracticable, inadvisable, or impossible"—and directs officers to assess that standard with reference to "current removal flight capacity." SUF ¶¶ 22-26. This directive contravenes the statute Congress enacted to regulate the selection of a country of removal.

Under that statutory scheme, removal being "impracticable, inadvisable or impossible" is *not* an exception to the core provisions governing the country of removal. 8 U.S.C. § 1231(b)(2). The INA obligates immigration officials to follow a specific four-step procedure to designate a noncitizen's country of removal. *See Jama v. ICE*, 543 U.S. 335, 341 (2005). In the overwhelming majority of cases, removal must be made to a country of citizenship, or another country of the noncitizen's choice. *See* 8 U.S.C. § 1231(b)(2)(A), (D). Officials may move on to other countries in particular situations, but removal being "impracticable, inadvisable, or impossible" is not a

general-purpose exception allowing removal to third countries of the government's choosing. *See Jama*, 543 U.S. at 341-42.

By nevertheless hinging its directives on the "impracticable, inadvisable, or impossible" standard, the agencies' policy runs afoul of the statute. Consider how the statute works in the context of this policy. A noncitizen arriving at the border and placed into expedited removal designates their home country for removal, or, if they decline to designate, the agency is generally required to select the country of their citizenship (or, equivalently, nationality or subjecthood). *See* 8 U.S.C. § 1231(b)(2)(A), (C)(i), (D). Absent some unusual circumstance like dual citizenship, these steps are simple—the country of citizenship is the only choice—and the government "shall remove" the noncitizen to that country. 8 U.S.C. § 1231(b)(2)(A), (D). Its options for disregarding the country of citizenship (whether designated or not) are limited—for example, if the country "is not willing to accept the [noncitizen] into the country." 8 U.S.C. § 1231(b)(2)(C)(ii), (iii), (D)(i).[7] The government cannot reject the country of citizenship (or designation) by relying on the "impracticable, inadvisable, or impossible" clause because that clause is not among the exceptions to these provisions. *See* 8 U.S.C. § 1231(b)(2)(C) (setting forth limited situations in which the government "may disregard a designation," not including that language); *id.* § 1231(b)(2)(D) (similar for country of citizenship).

In the event that it has exhausted the two previous steps, the government must examine a list of countries with which the noncitizen may have a lesser connection, such as a prior country of residence. 8 U.S.C. § 1231(b)(2)(E)(i)-(vi). It is only when removal to each of the countries in this lesser-connections list would be "impracticable, inadvisable or impossible" that the

---

[7] Even if it is unlikely that the designated country of deportation would accept a noncitizen, the government cannot rely on such a prediction—it must actively seek acceptance, and the decision lies with the designated country. *Andriasian v. INS*, 180 F.3d 1033, 1041 n.12 (9th Cir. 1999).

government may, as a last resort, consider removal to a different third country like Mexico that is willing to accept the noncitizen. *Id.* § 1231(b)(2)(E)(vii).

The new policy directs officers to remove non-Mexicans to Mexico under the premise that removal to their home country is "impracticable, inadvisable or impossible" because of the U.S. government's removal flight capacity. SUF ¶ 26. But Congress provided that the government generally *must* remove to the country a noncitizen designates or, in the primary alternative, to that person's country of citizenship. Even assuming flight capacity limits were enough to render it "impracticable, inadvisable or impossible" to effectuate removals to the specified countries, the statute does not permit the country of designation or citizenship to be set aside on that basis. The policy is contrary to law.

At a minimum, the third country removal policy is arbitrary and capricious. Even if it could be reconciled with a proper interpretation of § 1231(b)(2), the policy fails to explain *how* that reconciliation can occur. Where, as here, an agency's directives are in such stark tension with the governing statute, the agency must demonstrate that it understood and considered the correct statutory requirements, and "explain" how, in its view, "these actions are consistent with [its] authority under the statute." *Indep. U.S. Tanker Owners Comm.*, 809 F.2d at 854. Defendants failed to do so here.

2.     The third country removal policy is also contrary to law and arbitrary and capricious because it fails to provide adequate notice to nationals of the covered countries that they face removal to Mexico, leaving them unable to meaningfully prepare and present claims of fear as to that country. Additionally, the policy is arbitrary and capricious because it fails to consider the risk of return to an applicant's home country *from Mexico* following removal—a process known as "chain refoulement"—further putting people at risk of being returned to harm.

The mandatory non-refoulement duty applies regardless of the country to which the government intends to remove a person. *Nasrallah*, 140 S. Ct. at 1687. The agencies have not only acknowledged that duty in the context of expedited removal, 8 C.F.R. §§ 208.30, 235.3, but also specifically required those protection screenings in the third country removal policy, SUF ¶ 27. Yet the agencies seriously undermine those screenings by failing to provide notice to noncitizens of their risk of being removed to Mexico, SUF ¶ 28, thus depriving people of the ability to prepare to explain how they might be endangered by that removal—either because of threats in Mexico itself or because of the danger of chain refoulement.

Ensuring that an affected noncitizen has a basic understanding of the CFI is obviously necessary to comply with the non-refoulement obligation. The CFI regulations thus recognize that a noncitizen seeking protection from persecution and torture must be afforded information about the fear determination process, and an opportunity to prepare for their interview. *See* 8 C.F.R. § 235.3(b)(4)(i); 8 C.F.R. § 208.30(d)(2); *see also* 8 U.S.C. 1225(b)(1)(B)(iv). These "basic procedural rights . . . are particularly important" because an applicant erroneously denied withholding or CAT relief could be subject to grave harm if forced to return to an unsafe third country. *See Marincas v. Lewis*, 92 F.3d 195, 203 (3d Cir. 1996) (addressing asylum).

Clear notice of the intended country of removal is a basic, but key, prerequisite for understanding the CFI, and therefore for any meaningful ability to pursue protection from refoulement. Noncitizens who do not know they are slated for removal to Mexico, as opposed to their home countries, will not understand the nature of the interviews they are walking into and will have no opportunity to prepare to answer questions about their fear of return *to Mexico. See Kossov v. INS*, 132 F.3d 405, 408-09 (7th Cir. 1998) (notice of intended removal country at outset of hearing was insufficient). Indeed, these very agencies have previously acknowledged the basic

principle that noncitizens "should be informed of the identity of a prospective country of removal" in advance of their screening interviews. 85 Fed. Reg. 84,160, 84,179 (Dec. 23, 2020), *effective date stayed,* 87 Fed. Reg. 79,789 (Dec. 28, 2022).

The third country removal policy fails to ensure this basic notice of the intended country of removal. Nowhere does it require immigration officers to inform applicants, in advance of their screening interview, that they face removal to Mexico. SUF ¶ 28. Notably, when these agencies intend to provide notice of the designated removal country, they know how to include clear language to that effect. For example, in a promulgated rule that never went into effect, the agencies explicitly required that applicants be "notified of the identity of the prospective third country of removal and provided an opportunity to demonstrate" that they face persecution in that country. 85 Fed. Reg. at 84,179, 84,194; *see also* 88 Fed. Reg. 18,227, 18,240 (Mar. 28, 2023) (noncitizen "shall be provided written notice" regarding "prospective receiving country" to allow fear claim).

Indeed, the first time that many noncitizens learn about their anticipated removal to Mexico is *during* the interview itself, when the questions focus on harm in Mexico—questions they have thus had no opportunity to prepare for. *See, e.g.*, SUF ¶¶ 72, 81, 106. "It is too much to expect that [noncitizens] should have the expertise to adapt instantaneously to such an unexpected turn of events." *Kossov*, 132 F.3d at 409.

In any event, the third country removal policy is arbitrary and capricious because it fails to acknowledge or consider the inevitable problems created by not requiring clear notice to noncitizens of the intended country of removal. *See Make The Rd. N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 55 (D.D.C. 2019) (Jackson, J.), *rev'd on other grounds*, 962 F.3d 612 (D.C. Cir. 2020). Given the truncated timeline for expedited removal, the failure to give clear notice substantially heightens the risk that noncitizens will be removed to harm. As explained above, noncitizens are confused

and unprepared when the CFI abruptly shifts to focusing on dangers they face in Mexico. *Supra*

Part I.B.iv. Their fears as to their home country—the reason they are seeking protection in the first

place—are rendered largely irrelevant, and applicants are ultimately prevented from meaningfully

advocating for protection from Mexico. *See, e.g.*, SUF ¶¶ 72, 81, 106.

The policy is additionally deficient because the agencies "entirely failed to consider an

important aspect of the problem"—namely, the risk that noncitizens will be sent back to their home

countries *from Mexico*. *State Farm*, 463 U.S. at 43. In evaluating fear-based protection claims, the

likelihood of chain refoulement following removal to a third country is an important consideration.

*See, e.g.*, SUF ¶ 30 (U.N. High Commissioner for Refugees, Advisory Opinion on the

Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating

to the Status of Refugees and its 1967 Protocol (Jan. 26, 2007)) ("The prohibition of refoulement

. . . applies not only in respect of return to the country of origin . . . but also to any other place

where a person has reason to fear threats to his or her life . . . *or from where he or she risks being

sent to such a risk.*") (emphasis added). In fact, the agencies have previously considered chain

refoulement concerns. *See, e.g.*, 85 Fed. Reg. at 82,260, 82,273 n.27. However, they neglected to

consider this same risk when issuing the third country removal policy, despite being on notice of

the fact that refoulement from Mexico is an all-too-real possibility. *Cf. id.* at 82,270-73; SUF ¶ 32

(U.N. High Commissioner for Refugees explaining that the Rule may place noncitizens "at risk of

chain refoulement to territories where their life or safety is in peril"); *id.* (Human Rights Watch

explaining that removals to Mexico may lead to "chain refoulement," meaning "onward returns to

persecution in an individual's country of origin"). Here, the third country removal policy and its

record are bereft of *any* mention of the dangers of chain refoulement for people removed to

Mexico. The failure to consider an important aspect of the problem renders this policy arbitrary and capricious. *See Am. Wild Horse*, 873 F.3d at 923.

**B. The 24-Hour CFI Policy Effectively Eliminates the Right to Consult.**

Defendants also issued a contemporaneous new policy reducing the consultation period preceding CFIs to 24 hours. SUF ¶¶ 34-35. That time period is so short that, particularly given the extreme communication challenges posed by CBP holding facilities, the policy effectively forecloses the ability to prepare for interviews, rendering it both contrary to law and arbitrary and capricious.

This policy must be understood in context—namely, what the 24-hour limit means for people *in CBP custody*, where it is most likely to be applied and where the resulting consequences will be most severe. *See, e.g.*, *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1113-14 (D.C. Cir. 2019) (examining policy change in context of "key aspects of the program," including its likely consequences in practice). Conditions in CBP facilities are not only deplorable but also highly restrictive, dramatically curtailing noncitizens' ability to contact the outside world. SUF ¶¶ 41-42, 156, 159-60, 189-90. And access to phones and legal services for noncitizens in custody is so heavily restricted that contacting anyone in a 24-hour window is often impossible. *See* SUF ¶¶ 156, 162, 164-167, 189, 191. For example, Plaintiff M.P. was held in CBP custody had no opportunity to consult with an attorney before his CFI, which occurred the day after he was served with his credible fear paperwork. *See* SUF ¶¶ 65-66; *see also supra* Part I.B.iv (discussing Plaintiff Y.F.'s similar experience).

The 24-hour policy violates the statutory and regulatory right to a consultation. By statute, a noncitizen is entitled to "consult with a person or persons of the [noncitizen's] choosing prior to the [credible fear] interview." 8 U.S.C. § 1225(b)(1)(B)(iv). Implementing regulations provide that

the person "shall be given time to contact and consult with any person or persons of the [noncitizen's] choosing," 8 C.F.R. § 235.3(b)(4)(ii), shall be informed of that right, *id.* § 235.3(b)(4)(i), and may have the person they consult "present at the interview," *id.* § 208.30(d)(4). There can be no reasonable dispute that these provisions impose a limit on how short the agency can lawfully cut the consultation period; an unduly short consultation window is no different from denying consultation altogether. This policy falls on the wrong end of that line. Twenty-four hours (which might occur entirely during holidays or weekends) to consult with an attorney before a life-or-death interview would be extraordinarily limiting under the best of circumstances; in the context of restrictive CBP facilities where this policy applies, it is tantamount to denying access to any consultation for many noncitizens. *See* SUF ¶¶ 162-163, 164-167, 191. Moreover, the policy also restricts rescheduling of CFIs to "extraordinary circumstances," exacerbating the impact of the 24-hour limitation on access to consultation. SUF ¶ 39.

The policy is also arbitrary and capricious. The agencies did not adequately consider the important fairness considerations that the consultation period is meant to protect. As explained above, the credible fear statute strikes a balance between speed of removals and ensuring access to protection, so whether the waiting period provides a fair opportunity to consult and prepare is plainly an "important aspect of the problem." *State Farm*, 463 U.S. at 43. Indeed, USCIS previously explained that the earlier 48-hour waiting period was in place to allow a noncitizen "to rest [and] collect his or her thoughts" in addition to contacting a person of one's choosing." SUF ¶ 37. The new policy neither addresses this factor nor grapples with the emphasis the agency previously placed on the need for time to rest and prepare. *See Council of Parent Att'ys*, 365 F. Supp. 3d at 50 (it is arbitrary and capricious to address an important consideration underlying a prior policy "in an inadequate or cursory manner").

More specifically, the agency never attempted to explain how 24 hours would be sufficient to permit meaningful preparation or comply with Defendants' statutory and regulatory obligations. *Am. Fed'n of Gov't Emps.*, 25 F.4th at 5 (change in course insufficiently reasoned). And nothing in the policy reflects any acknowledgement of the severe limitations on communication imposed in CBP facilities, another "important aspect of the problem," *State Farm*, 463 U.S. at 43, much less any attempt to explain how 24 hours could be considered an adequate waiting period under those circumstances, *see Make The Rd. N.Y.*, 405 F. Supp. 3d at 55 ("[A]n agency cannot possibly conduct reasoned, non-arbitrary decision making concerning policies that might impact *real* people and not take such *real life circumstances* into account.").

Indeed, the record is entirely bereft of any evidence—or even speculation—suggesting that 24 hours is sufficient. There is simply nothing from which a policymaker could conclude that people in CBP custody (or in general, for that matter) will have an *actual* opportunity to contact a person of their choosing within 24 hours. *See Am. Fed'n of Gov't Emps.*, 25 F.4th at 5 (court is "not bound by the [agency]'s conclusory and counterintuitive assertions . . . especially when the record contains no factual basis"); *Nat'l Women's L. Ctr.*, 358 F. Supp. 3d at 90 ("Courts 'do not defer to an agency's conclusory or unsupported suppositions.'"). If Defendants reached that conclusion—and, again, they never said so—they had no factual basis to do so.

The justification for the 24-hour policy that the agencies did advance is likewise entirely unsupported by the record. *Nat'l Lifeline Ass'n*, 921 F.3d at 1113 (arbitrary reasoning where agency "pointed to no record evidence" on key issues); *Nat'l Women's L. Ctr.*, 358 F. Supp. 3d at 89 ("conclusory statements will not do"). USCIS stated that the policy would "more quickly provide relief to those who are eligible [for asylum] while more quickly removing those who are not." SUF ¶ 36. The assumption underlying that claim is that reducing the waiting period will speed up

proceedings without impairing their accuracy—that is, without wrongfully removing people to danger. But the agency never stated or examined that premise and failed to cite any evidence to support it. *See Hispanic Affairs Proj. v. Acosta*, 901 F.3d 378, 389 (D.C. Cir. 2018) ("Agencies always bear the affirmative burden of examining a key assumption[.]") (cleaned up). And that premise is highly doubtful, to say the least: The policy shoves everyone through the process at breakneck speed, effectively eliminating the opportunity to consult with an attorney regardless of the strength of one's claims to protection. The predictable result will be that people who should pass their CFI will be denied and removed because they lack a fair opportunity to consult and prepare before their interview. Because the agency failed to explain and justify its contrary assumption, the policy is arbitrary and capricious.

## C.  The "Voluntary" Return Policy Misleads People into Acceptance.

Having dramatically limited access to protection in the United States through the policies described above, the agencies adopted a new policy of repeatedly urging noncitizens to withdraw their applications for admission to the United States and return to Mexico. *See* 8 U.S.C. § 1225(a)(4); 8 C.F.R. § 235.4; SUF ¶¶ 43-44. Plaintiffs have no disagreement with the availability of voluntary return in general, but the decision to withdraw an application for admission "must be made voluntarily." 8 C.F.R. § 235.4. Here, the new policy provides incorrect and misleading information to noncitizens about their eligibility for country-specific parole processes. That flaw renders the choice to return involuntary; the policy is thus contrary to law and arbitrary and capricious.

This policy directs both CBP agents and Asylum Officers to read specific "advisal" statements to noncitizens to encourage them to accept return. SUF ¶ 46. These statements focus their "pitch" on parole programs the government has established, through which nationals of Cuba,

Haiti, Nicaragua, and Venezuela may apply from abroad to come to the United States. SUF ¶¶ 43, 47. Noncitizens are offered the chance to voluntarily return to Mexico with the promise of returning to the United States through the parole programs applicable to these nationalities. SUF ¶ 47. The statements leave no doubt that, if noncitizens accept voluntary return, they will—so long as they have a "supporter in the United States" and satisfy the other requirements that the "advisal" specifies—"*remain eligible* for that parole process." SUF ¶ 47 (emphasis added).

That is simply not true. Any noncitizen who entered Panama or Mexico after the effective date of the relevant parole program without authorization in the course of their journey to the United States is categorically ineligible for the country-specific parole programs. SUF ¶ 48. And the overwhelming majority of nationals of Cuba, Haiti, Nicaragua, and Venezuela arriving at the southwest border entered at least one of those countries irregularly—as do nearly all non-Mexican asylum seekers at the border. *See* 88 Fed. Reg. at 31,444 (noting "recent surges in irregular migration" into Panama and Mexico); *see also* SUF ¶ 49 (comment noting that, in a study, 98.3% of asylum seekers indicated having entered Mexico irregularly); *id.* (comment discussing irregular entry into Panama). This policy thus constitutes a trap: Applicants are invited to accept voluntary return in order to "remain eligible" for the parole program, SUF ¶ 47, only to discover after arriving in Mexico that they are not in fact eligible for the program.

The omission of that crucial fact is deeply misleading. When noncitizens agree to withdraw their applications for admission based on misleading or inaccurate information, that choice is not made "voluntarily." *See, e.g.*, *Ibarra-Flores v. Gonzales*, 439 F.3d 614, 619-20 (9th Cir. 2006) (voluntary departure procured through "misrepresentation" was invalid). Noncitizens desperate to find safety who are misled in this way cannot be said to be voluntarily choosing to return to Mexico.

The consequences can be dire. For one thing, as previously explained, conditions in Mexico are extremely dangerous. For another, noncitizens are required to sign a form disclaiming fear in order to be eligible for voluntary return. *See* SUF ¶ 50. Such concessions are sometimes deployed against noncitizens in future proceedings. *Cf., e.g.*, *United States v. Mendoza-Alvarez*, No. 13CR1653 WQH, 2013 WL 5530791, at *2 (S.D. Cal. Oct. 4, 2013).[8] Because the withdrawal agreements obtained under the "voluntary" return policy are not made voluntarily, they are void, and the policy is contrary to law. *See* 8 C.F.R. § 235.4.

The policy is also arbitrary and capricious. The misleading presentation of the parole eligibility requirements contradicts prior agency policy, which repeatedly emphasized that "[w]ithdrawal is strictly voluntary and should not be coerced in any way." SUF ¶ 54. Defendants offer no justification for this change, which is an unexplained departure from longstanding agency practice. *See Am. Wild Horse*, 873 F.3d at 923. Nor do they attempt to explain how such a misleading process could be voluntary.

## III.   THE COURT SHOULD GRANT VACATUR AND OTHER RELIEF.

Where, as here, agency action is unlawful, "the ordinary result is that the rules are vacated." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see also Kiakombua*, 498 F. Supp. 3d at 54 (finding vacatur appropriate for credible fear policies); 5 U.S.C. § 706(2). That remedy is particularly appropriate here. As Plaintiffs' declarations illustrate, with

---

[8] This risk is particularly acute for those who were required to sign an old version of this form. That older form used for withdrawals, I-826, stated "I do not believe I face harm if I return to *my country*." SUF ¶ 51 (emphasis added). On or around May 18, 2023, agents were directed to use an updated version I-826M, which instead states "I do not believe I face harm if I return to *Mexico*." SUF ¶ 52 (emphasis added). That is far more appropriate as to voluntary removal to *Mexico*. But many people have been required to sign the old form, both before and since May 18, 2023, including Plaintiffs J.P. and E.B. SUF ¶¶ 51, 74, 82. In such situations, it is particularly illogical and unfair to require people who have *already* indicated fear of harm in their own country, triggering a CFI, to turn around and disclaim any such fear.

every day that passes, noncitizens fleeing persecution are being returned to harm without a fair assessment of their protection claims. And for all the reasons discussed above, the policies are both contrary to the governing statutes and regulations, and riddled with serious failures of reasoned decision-making. The Court should therefore follow "the normal course and vacate" the policies. *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019).

In particular, Plaintiffs seek vacatur of the expedited removal regulations established by the Rule, 8 C.F.R. § 208.33(b); the 24-hour CFI policy; the third country removal policy; and the misleading "advisals" in the "voluntary" return policy. In addition, the Individual Plaintiffs request the Court vacate their negative credible fear and reasonable fear determinations, removal orders, and/or voluntary return documents, and order that Defendants return Plaintiffs who are abroad back to the United States. *See Grace,* 344 F. Supp. 3d at 144; Order at 3, *Grace*, No. 18-cv-1853 (D.D.C. Dec. 19, 2018), ECF No. 105. Plaintiffs also request that the Court enter appropriate declaratory relief. *See* Proposed Order.

## CONCLUSION

The Court should grant summary judgment to Plaintiffs.

Dated: September 28, 2023

Respectfully submitted,

Keren Zwick (D.D.C. Bar. No. IL0055)
Richard Caldarone (D.C. Bar No. 989575)*
Mary Georgevich*
Mark Feldman*
National Immigrant Justice Center
224 S. Michigan Avenue, Suite 600
Chicago, IL 60604
(312) 660-1370
*kzwick@heartlandalliance.org*
*rcaldarone@heartlandalliance.org*
*mgeorgevich@heartlandalliance.org*
*mfeldman@heartlandalliance.org*
Melissa Crow (D.C. Bar. No. 453487)
Center for Gender & Refugee Studies

*/s/ Cody Wofsy*                              .
Cody Wofsy (D.D.C. Bar. No. CA00103)
Katrina Eiland*
My Khanh Ngo*
Morgan Russell*
American Civil Liberties Union Foundation
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
*cwofsy@aclu.org*
*keiland@aclu.org*
*mngo@aclu.org*

43

1121 14th Street, NW, Suite 200
Washington, D.C. 20005
(202) 355-4471
*crowmelissa@uclawsf.edu*

Anne Dutton*
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA 94102
(415) 581-8825
*duttonanne@uclawsf.edu*

*mrussell@aclu.org*

Noor Zafar*
Sidra Mahfooz*
Judy Rabinovitz*
Omar C. Jadwat*
Lee Gelernt (D.D.C. Bar No. NY0408)
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*nzafar@aclu.org*
*smahfooz@aclu.org*
*jrabinovitz@aclu.org*
*ojadwat@aclu.org*
*lgelernt@aclu.org*

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union
Foundation of the District of Columbia
915 15th Street, NW, 2nd floor
Washington, D.C. 20005
(202) 457-0800
*aspitzer@acludc.org*
*smichelman@acludc.org*

*Attorneys for Plaintiffs*

*\*Appearing under certificate of pro bono
representation*

44