**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| M.A., et al.,<br><br>*Plaintiffs*,<br>v.<br>ALEJANDRO MAYORKAS, Secretary of the<br>Department of Homeland Security, in his official<br>capacity, et al.,<br><br>*Defendants.* | )<br>)<br>)<br>)<br>)<br>)  No. 1:23-cv-01843-TSC<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7(h), Plaintiffs submit the following Statement of Material Facts Not in Genuine Dispute in support of their motion for summary judgment. Relevant portions of the administrative records will be submitted in a joint appendix pursuant to Local Rule 7(n).

**I.      The Rule**

1.      On May 11, 2023, Defendants implemented a final rule titled "Circumvention of Lawful Pathways." 88 Fed. Reg. 31,314 (May 16, 2023) (codified at 8 C.F.R. §§ 208.33, 1208.33) (the "Rule").

2.      The Rule established a new bar to asylum eligibility and applied that bar in credible fear interviews ("CFIs") conducted in the expedited removal process. 88 Fed. Reg. at 31,318, 31,321.

3.      The Rule imposes a "reasonable possibility" standard to screen eligibility for withholding of removal and protection under the Convention Against Torture ("CAT") for those subject to the new asylum bar. 88 Fed. Reg. at 31,336-38, 31,381.

4.     The Rule finalized a Notice of Proposed Rulemaking ("NPRM"). 88 Fed. Reg. 11,704 (Feb. 23, 2023).

5.     Comments to the NPRM raised concerns about the fairness of applying the proposed new bar to asylum eligibility at the credible fear stage. *See, e.g.,* PC_30837, 33933 (applying bar at credible fear stage "inappropriate" given "limited nature of [CFI], which is not suited for complicated legal and factual issues").

6.     Comments to the NPRM argued that the proposed credible fear regulations violated the "significant possibility" standard. *See, e.g.*, PC_33299 (comment from several states' Attorneys General noting that under the proposed regulations, "rather than determining whether the applicant has a significant possibility of establishing statutory eligibility for asylum, asylum officers 'shall first determine whether the [non-citizen] is covered by the'" asylum bar) (quoting proposed 8 C.F.R. § 208.33(c)(1)) (alteration in original); PC_22027-22030, 22457-22458, 33934-33936.

7.     In the NPRM, the agencies contended that the proposed regulations were "consistent with" the statute by offering the following statement: "If a noncitizen is subject to the lawful pathways condition on eligibility for asylum and not excepted and cannot rebut the presumption of the condition's applicability, there would not be a significant possibility that the noncitizen could establish eligibility for asylum." 88 Fed. Reg. at.11,742.

8.     Comments to the NPRM explained that this reasoning was flawed and contradicts the statutory standard.  *See, e.g.*, PC_22030, 22457-22458.

9.     Comments to the NPRM explained that individuals in expedited removal generally have little to no opportunity to consult counsel or gather evidence. *See, e.g.*, PC_21431 (noting that "[n]oncitizens undergoing credible fear screenings [during expedited removal] often do so

mere days after their initial encounter with DHS" and are "frequently detained and face inadequate access to counsel").

10.    Comments to the NPRM explained that, by contrast, most people "subject to" reinstatement of removal under 8 U.S.C. § 1231(a)(5) and administrative expedited removal under 8 U.S.C. § 1228(b) "by definition ha[d] prior experience with the U.S. immigration system," "and many . . . lived in the United States for extended periods of time." PC_21430.

11.    Defendants have indicated in other litigation that, from May 12 to July 31, 2023, the passage rate for CFIs was 56%. Declaration of Blas Nuñez-Neto, ¶ 14, *State of Indiana v. Mayorkas*, No. 23-cv-106 (D.N.D. Sept. 11, 2023), ECF No. 57-2 ("Nuñez-Neto Decl."). By contrast, the passage rate was 83% from 2014 to 2019. *Id.*

12.    Defendants have indicated in other litigation that "[a]s intended, the rule has significantly reduced [credible fear] screen-in rates." *Id.*

## II.    Expedited Removal and Defendants' Prior Practice

13.    In 2022, the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") issued a Rule titled "Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers." 87 Fed. Reg. 18,078 (Mar. 29, 2022) ("2022 Asylum Rule").

14.    The 2022 Asylum Rule explained that it has been these Departments' "historical practice" to assess asylum, withholding of removal, and CAT claims in CFIs under the "significant possibility" standard. *Id.* at 18,091.

15.    The 2022 Asylum Rule rejected the application of the "reasonable possibility" standard to withholding of removal and CAT claims in CFIs. *Id.* at 18,092.

16.     The 2022 Asylum Rule "return[ed] to the existing and two-decade-long practice of not applying at the credible fear screening the mandatory bars to applying for, or being granted, asylum." *Id*. at 18,084.

## III.    The Third-Country Removal Policy

17.     DHS has implemented a policy of removing nationals of Cuba, Haiti, Nicaragua, and Venezuela to Mexico. CBP_Removals_AR_1-5, 321-25; (in this section, "the policy").

18.     The policy was implemented on or about May 11, 2023. *Id*. at 1.

19.     The policy applies to individuals in expedited removal proceedings. *Id.* at 1-5, 321-25.

20.     The policy, and related guidelines and procedures, are reflected in several documents. *Id*.

21.     One of those documents, dated May 10, 2023, is updated U.S. Border Patrol guidance for processing individuals from Cuba, Haiti, Nicaragua, and Venezuela for voluntary withdrawal or removal to Mexico. *Id.* at 1-5.

22.     Another of those documents is a May 10, 2023, memorandum from Assistant Homeland Security Secretary Blas Nuñez-Neto.  *Id.* at 321-25 ("May 10, 2023 memorandum"); Ex. A to Declaration of Noor Zafar ("Zafar Decl.").

23.     The May 10, 2023 memorandum provides guidance to Customs and Border Protection ("CBP") agents regarding how to determine the country to which a noncitizen will be removed. CBP_Removals_AR_321-25.

24.     CBP agents prepare expedited removal orders and determine the country of removal for such orders under the policy. *Id*.

25.     The May 10, 2023 memorandum repeatedly invokes an exception allowing for removal to a third country—where removal is otherwise "impracticable, inadvisable, or impossible." *Id.* at 321-22.

26.     The May 10, 2023 memorandum directs CBP agents to assess "current removal flight capacity" in determining whether expedited removal of non-Mexican nationals to Mexico is an option based on "impracticability, inadvisability, or impossibility." *Id.* at 322.

27.     The May 10, 2023 memorandum directs CBP agents to screen for fear of removal to selected removal country. *Id.* at 322.

28.     The policy does not direct CBP agents to notify noncitizens in advance of their CFI that they face removal to Mexico. *Id.* at 321-25.

29.     DHS and the DOJ have previously acknowledged that noncitizens "should be informed of the identity of a prospective country of removal" in advance of their screening interviews. 85 Fed. Reg. 84,160, 84,179 (Dec. 23, 2020), *effective date stayed,* 87 Fed. Reg. 79,789 (Dec. 28, 2022); *see also* 88 Fed. Reg. 18,227, 18,240 (Mar. 28, 2023).

30.     The U.N. High Commissioner for Refugees has stated that the prohibition on refoulement under international refugee treaties encompasses a prohibition on removal to a third country where an individual faces a risk of being returned to persecution in their home country. *See* U.N. High Commissioner for Refugees, Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol (Jan. 26, 2007) ("The prohibition of refoulement . . . applies not only in respect of return to the country of origin . . . but also to any other place where a person has reason to fear threats to his or her life . . . or from where he or she risks being sent to such a risk."), Zafar Decl. Ex. B.

31.     The agencies have previously considered concerns about such removal, which is known as "chain refoulement," in other rulemakings. *See, e.g.*, 85 Fed. Reg. at 82,260, 82,273 n.27.

32.     Comments to the NPRM identified chain refoulement from Mexico as a risk faced by noncitizens removed there. *See, e.g.*, PC_12984 (U.N. High Commissioner for Refugees explaining that the Rule may place noncitizens "at risk of chain refoulement to territories where their life or safety is in peril"); *id.* at 20259 (Human Rights Watch explaining that removals to Mexico may lead to "chain refoulement," meaning "onward returns to persecution in an individual's country of origin"); *id.* at 31851-52 (similar).

33.     Comments to the NPRM noted the danger asylum seekers face in Mexico. *See, e.g.*, PC_30901 (documenting nearly 13,500 reports of "murder, torture, kidnaping, rape, and other violent attacks on migrants . . . in Mexico"); PC_23082 (describing how cartels "prey upon people migrating through Mexico"); *id.* at 76248-87.

## IV.     The 24-Hour CFI Policy

34.     U.S. Citizenship and Immigration Services ("USCIS") adopted a new policy that shortens the consultation period that precedes CFIs to "24 hours after a noncitizen's acknowledgement of receipt of the Form M-444, Information about Credible Fear Interview." USCIS_24-Hour_AR_1-3 (in this section, "the policy"); Zafar Decl. Ex. C.

35.     The policy was implemented on or about May 10, 2023. USCIS_24-Hour_AR_1.

36.     USCIS stated that the policy would "more quickly provide relief to those who are eligible [for asylum] while more quickly removing those who are not." *Id.* at 27; *see also id.* at 3 (similar).

37.     Prior USCIS guidance from 2019 explained that the purpose of the consultation period is to allow the noncitizen "an opportunity to rest [and] collect his or her thoughts," in addition to contacting a person of one's choosing. *Id*. at 57.

38.     This consultation period has generally been no shorter than 48 hours. *Id*. at 2, 55.

39.     The policy requires a showing of "extraordinary circumstances" before approving a request to reschedule a noncitizen's CFI. *Id.* at 3.

40.     USCIS is now conducting CFIs in CBP custody. CLP_AR_2188.

41.     Comments to the NPRM noted that CBP custody involves harsh conditions of confinement. *See, e.g.*, PC_55616 (noting "verbal abuse, freezing conditions, inadequate food, lack of adequate medical care, and overcrowding" in CBP custody), *id*. at 56158-59 (report interviewing 12,895 individuals, detailing 30,000 incidents of abuse, and finding that "the abuses individuals report have remained alarmingly consistent for years … many are crammed into cells and subjected to extreme temperatures, deprived of sleep, and threatened with death by Border Patrol agents"), *id*. at 56278 (concluding that CBP facilities are "wholly inadequate for **any** overnight detention" and "conditions are reprehensible … even with respect to truly short-term detention") (bold in original).

42.     Comments to the NPRM noted that people held in CBP custody find it extremely difficult to consult with counsel before or during their CFIs. *See, e.g.*, *id.* at 31507-09 ("dire conditions and lack of access to counsel" in CBP custody would "exacerbate due process nightmare" migrants face), *id.* at 32980-82 (attorneys describing "many obstacles in representing and even just speaking with [ ] detained clients").

**V.     The "Voluntary" Return Policy**

43.     CBP and USCIS adopted a new policy directing officers to ask nationals of Cuba, Haiti, Nicaragua, and Venezuela whether they will withdraw their applications for admission to

the United States and voluntarily return to Mexico. CBP_Withdrawals_AR_333; USCIS_Withdrawals_AR_3-4 (in this section, "the policy").

44.     The policy was implemented on or about May 12, 2023. CBP_Withdrawals_AR_333.

45.     Under the policy, noncitizens are asked up to three or more times whether they would like to accept voluntary return to Mexico. CBP_Withdrawals_AR_333; USCIS_Withdrawals_AR_3-4.

46.     The policy directs CBP and USCIS officers to provide "advisal[s]" to noncitizens about voluntary return. CBP_Withdrawals_AR_6; Zafar Decl. Exs. D, E.

47.     The "advisals" state that the noncitizens will—so long as they have a "supporter in the United States" and satisfy the other requirements that the "advisal" specifies—"remain eligible" for country-specific parole processes if they "voluntarily" "withdraw [their] application for admission to the United States and return to Mexico." *Id*.

48.     Noncitizens who entered Panama or Mexico without authorization in the course of their journey to the United States are ineligible for the country-specific parole programs referred to in the "advisals" if they entered those countries on or after the effective date of the relevant parole program: for Venezuelans, after Oct. 19, 2022; for Cubans, Haitians, and Nicaraguans, after Jan. 9, 2023. *See* 87 Fed. Reg. 63,507, 63,515 (Oct. 19, 2022) (Venezuela); 87 Fed. Reg. 1243, 1252 (Oct. 19, 2022) (Haiti); 88 Fed. Reg. 1255, 1263 (Jan. 9, 2023) (Nicaragua); 88 Fed. Reg. 1266, 1276 (Jan. 9, 2023) (Cuba); *see also Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, USCIS, https://www.uscis.gov/CHNV, (last updated Sept. 20, 2023) (listing criteria for eligibility).

49.     Comments to the NPRM noted that the vast majority of Cuban, Haitian, Nicaraguan, and Venezuelan nationals arriving at the southwest border entered Panama or Mexico without authorization. *See e.g.*, PC_29770 (in a study, 98.3% of asylum seekers indicated having entered Mexico irregularly); *id.* at 29535 (discussing irregular entry into Panama).

50.     Noncitizens are required to sign a form disclaiming fear in order to be eligible for voluntary return. *See* CBP_Withdrawals_AR_333-34.

51.     The version of the form that noncitizens were originally required to sign under the policy, Form I-826, stated "I do not believe I face harm if I return to my country." CBP_Withdrawals_AR_334.   In the Spanish language version of this form, "my country" is translated as "mi país." *See, e.g.*, Zafar Decl. Exs. F, G (Form I-826 for Plaintiffs J.P. and E.B.).

52.     On or around May 18, 2023, agents were directed, for returns under the policy, to use an updated version, Form I-826M, which instead states "I do not believe I face harm if I return to Mexico." CBP_Withdrawals_AR_333-34.

53.     Many people subject to the policy were required to sign the old form, both before and since May 18, 2023. *See, e.g.*, Zafar Decl. Exs. F, G.

54.     CBP previously emphasized that "[w]ithdrawal is strictly voluntary and should not be coerced in any way." Zafar Decl. Ex. H

## VI.   Facts Relating to Individual Plaintiffs

**Plaintiff M.A.**

55.     Plaintiff M.A. is an asylum seeker from Guatemala who fears persecution by her abusive ex-husband, who has ties to the MS-13 gang. Declaration of M.A. ECF No. 4, Ex. 2, ¶¶ 1-8. Her ex-husband stabbed M.A., repeatedly raped her, subjected her to a gang rape by his associates, and threatened to kill her. *Id.* ¶¶ 2-7.

56.     On or about May 14, 2023, M.A. entered the United States without inspection and without a CBP One appointment. *Id*. ¶ 10.

57.     M.A. had a CFI pursuant to the Rule's new credible fear provisions. *Id.* ¶¶ 12-13. A USCIS officer found she did not satisfy the Rule's standards for asylum, withholding of removal, or CAT protection. *Id.* ¶ 12. An immigration judge affirmed the negative determination. *Id.* ¶ 14.

**Plaintiff R.S.**

58.     Plaintiff R.S. is an asylum seeker from El Salvador whose family was targeted by MS-13. Declaration of R.S. ECF No. 4, Ex. 3, ¶¶ 1-13. Her brother was murdered and she was tortured, sexually assaulted, and threatened with death. *Id*. ¶¶ 3, 10-11.

59.     R.S. was robbed in Mexico. *Id.* ¶ 17.

60.     On or about May 19, 2023, R.S. entered the United States without inspection and without a CBP One appointment. *Id.* ¶ 21.

61.     R.S. had a CFI pursuant to the Rule's new credible fear provisions. *Id.* ¶ 25. A USCIS officer found she did not satisfy the Rule's standards for asylum, withholding of removal, or CAT protection. *Id.* ¶ 29. An immigration judge affirmed the negative determination. *Id.* ¶ 32.

**Plaintiff M.P.**

62.     Plaintiff M.P. is an asylum seeker from Guatemala who witnessed a violent attack and helped the victim report it. Declaration of M.P., ECF No. 4, Ex. 4, ¶¶ 1-9. He was threatened with death by the assailants. *Id*. ¶ 5.

63.     On or about June 4, 2023, M.P. entered the United States without inspection and without a CBP One appointment. *Id.* ¶¶ 13-14.

64.     M.P. was detained by CBP and had his CFI in CBP custody. *Id*. ¶¶ 14-16.

65.    M.P. had his CFI one day after he was provided with initial information about the CFI process. *Id.* ¶¶ 15-16; Zafar Decl. Ex. I (Form I-860 for M.P.).

66.    M.P. had no opportunity to consult with an attorney before his interview. Declaration of M.P., ECF No. 4, Ex. 4, ¶ 16.

67.    M.P.'s CFI was conducted pursuant to the Rule's new credible fear provisions. *Id.* ¶ 17. A USCIS officer found he did not satisfy the Rule's standards for asylum, withholding of removal, or CAT protection. *Id.* An immigration judge affirmed the negative determination. *Id.* ¶ 19.

**Plaintiff J.P.**

68.    Plaintiff J.P. is an asylum seeker from Venezuela who fears harm because of his political activism. Declaration of J.P., ECF No. 4, Ex. 5, ¶¶ 1-9. He was threatened with death and beaten. *Id*. ¶¶ 3-4, 9.

69.    After fleeing, J.P. was the twice victimized in Mexico. *Id*. ¶ 12. The first time was by a group that J.P. initially believed to be police. *Id.* This group stopped a bus he was on, forced passengers to strip, and robbed and beat them; after these events, J.P. concluded they were a cartel. *Id*. Later, J.P. was robbed and threatened by police in Mexico. *Id*. ¶ 14.

70.    J.P. presented himself at a port of entry without a CBP One appointment; he was permitted to seek entry into the United States on May 12, 2023. *Id.* ¶¶ 15-17.

71.    J.P. had a CFI pursuant to the Rule's new credible fear provisions. *Id.* ¶¶ 17, 22-24.

72.    J.P. did not understand why the CFI was focused on Mexico, rather than his home country. *Id*. ¶¶ 24-25. J.P. did not understand why the process was so different from what he had seen in a CBP orientation video. *Id*. ¶ 25.

73.     J.P. was told he was ineligible for asylum and encouraged to accept voluntary return to Mexico. *Id.* ¶¶ 24, 26. The officer conducting his interview indicated that parole was an available option for J.P. *Id.* ¶ 26.

74.     On or about June 1, 2023, J.P. was directed to sign Form I-826, which indicated that he agreed to return to Mexico and incorrectly indicated that J.P. disclaimed fear of return to his home country. *Id.* ¶¶ 27-28; Zafar Decl. Ex. F. The Form I-826 contained no references to Mexico. *Id.*

**Plaintiff E.B.**

75.     Plaintiff E.B. is an asylum seeker from Venezuela who was threatened because of his political opinion. Declaration of E.B., ECF No. 4, Ex. 6, ¶¶ 1-4.

76.     On or about May 23, 2023, E.B. entered the United States without inspection and without a CBP One appointment. *Id.* ¶ 10.

77.     E.B. was detained by CBP and had a CFI in CBP custody. *Id.* ¶ 11.

78.     E.B.'s CFI occurred two days after he was taken to a CBP detention facility. *Id.* During those two days, he was able to consult with an attorney by phone. *Id.*

79.     E.B. was not provided with a pen or pencil to write down the attorney's phone number. *Id.* As a result, he was not able to have an attorney present during the interview. *Id.*

80.     E.B. was given a CFI pursuant to the Rule's new credible fear provisions. *Id.* ¶ 12. The interview focused on Mexico, not Venezuela. *Id.*

81.     E.B. did not understand why the officer was so focused on Mexico, as he had understood that the purpose of the interview was to inquire into his fear of returning to Venezuela. *Id.*

82.     On June 1, 2023, E.B. signed Form I-826, which indicated that he agreed to return to Mexico and incorrectly indicated that E.B. disclaimed fear of return to his home country. *Id.* ¶ 15; Zafar Decl. Ex. G. The Form I-826 contained no references to Mexico. Zafar Decl. Ex. G.

**Plaintiff M.N.**

83.     Plaintiff M.N. is an asylum seeker from the Dominican Republic whose stepfather beat and raped her. Declaration of M.N., ECF No. 4, Ex. 7, ¶¶ 1-12.

84.     M.N. was sexually assaulted and robbed while she was in Mexico. *Id.* ¶ 14. She believes she was targeted because she was a migrant. *Id.*

85.     M.N. entered the United States on or about May 15, 2023, without inspection and without a CBP One appointment. *Id.* ¶ 15.

86.     M.N. had a CFI pursuant to the Rule's new credible fear provisions. *Id.* ¶¶ 18-19.

87.     A USCIS officer found she did not satisfy the Rule's standards for asylum, withholding of removal, or CAT protection. *Id.* ¶ 19. An immigration judge affirmed the negative determination. *Id.* ¶ 20.

88.     After the immigration judge decision, M.N. filed a *pro se* request for reconsideration of the decision but was informed that there is no option to seek reconsideration. *Id.*

**Plaintiff K.R.**

89.     Plaintiff K.R. is an asylum seeker from Honduras who fears persecution by the 18th Street Gang. Declaration of K.R., ECF No. 4, Ex. 8, ¶¶ 1-6. The gang tried to recruit her children, and they also sexually assaulted, beat, and threatened K.R. with death. *Id*. ¶¶ 2-4.

90.     On or about May 19, 2023, K.R. entered the United States without inspection and without a CBP One appointment. *Id.* ¶ 9.

13

91.   K.R. had a CFI pursuant to the Rule's new credible fear provisions. *Id.* ¶ 10.

92.   A USCIS officer found she did not satisfy the Rule's standards for asylum, withholding of removal, or CAT protection. *Id.* ¶ 11. An immigration judge affirmed the negative determination. *Id.*

**Plaintiff M.R.**

93.   Plaintiff M.R. is an asylum seeker from Ecuador who was threatened with death because of his refusal to work with a gang and corrupt police officers. Declaration of M.R., ECF No. 4, Ex. 9, ¶¶ 1, 3-10.

94.   In Mexico, near the U.S.-Mexico border, M.R. was kidnapped by cartel members and held for four days, during which time he was fed only once a day. *Id.* ¶¶ 11-12.

95.   M.R. feared he would be kidnapped or attacked again if he waited in Mexico any longer. *Id.* ¶ 13.

96.   On or around May 25, 2023, M.R. entered the United States without inspection and without a CBP One appointment. *Id.*

97.   M.R. had a CFI pursuant to the Rule's new credible fear provisions. *Id.* ¶¶ 13-14. A USCIS officer found he did not satisfy the Rule's standards for asylum, withholding of removal, or CAT protection. *Id.* ¶ 15. An immigration judge affirmed the negative determination. *Id.* ¶ 16.

**Plaintiff B.H.**

98.   Plaintiff B.H. is an asylum seeker from Peru who was beaten and threatened with death because of her political activism. Declaration of B.H., ECF No. 4, Ex. 10, ¶¶ 1-9.

99.   B.H. was robbed in Mexico. *Id.* ¶ 10.

100.   On or about May 25, 2023, B.H. entered the United States without inspection and without a CBP One appointment. *Id.* ¶¶ 12-13.

14

101.    B.H. had a CFI pursuant to the Rule's new credible fear provisions. *Id.* ¶¶ 15-16. A USCIS officer found she did not satisfy the Rule's standards for asylum, withholding of removal, or CAT protection. *Id.* ¶ 16. An immigration judge affirmed the negative determination. *Id.* ¶ 17.

**Plaintiff L.A.**

102.    Plaintiff L.A. is an asylum seeker from Nicaragua who was threatened with death for his connections to a political opposition party. Declaration of L.A., ECF No. 4, Ex. 11, ¶¶ 1-4.

103.    While in Mexico, L.A. and his sons were attacked by men wearing what appeared to be police or military uniforms, but who were in fact cartel members, and his sons were kidnapped. *Id.* ¶ 6. L.A. was also raped in Mexico, robbed and threatened multiple times, and hit with a car. *Id.* ¶¶ 6-7.

104.    In early June 2023, L.A. entered the United States without inspection and without a CBP One appointment. *Id.* ¶¶ 9-10.

105.    L.A. had a CFI pursuant to the Rule's new credible fear provisions. *Id.* ¶ 12, 14.

106.    L.A. did not understand why his CFI was focused on Mexico, or why he was not permitted to explain his fear of return to Nicaragua. *Id.* ¶ 12.

107.    A USCIS officer found he did not satisfy the Rule's standards for asylum, withholding of removal, or CAT protection. *Id.* ¶ 15.

108.    After this suit was filed, an immigration judge vacated the officer's decision. First Amended Complaint, ECF No. 19, ¶ 29.

**Plaintiff R.V.**

109.    Plaintiff R.V. is an asylum seeker from El Salvador who was beaten by police because of his political opinion and activities protesting the Salvadoran government. Declaration of R.V., ECF No. 4, Ex. 12, ¶¶ 1-7.

110.    In Mexico, R.V. and his wife were stopped by a group of armed men who shot at them when they tried to escape. *Id.* ¶¶ 9-10.

111.    At the end of May, R.V. and his wife entered the United States without authorization or a CBP One appointment. *Id.* ¶ 11. R.V. was separated from his wife by CBP. *Id.* ¶ 12.

112.    R.V. had a CFI pursuant to the Rule's new credible fear provisions. *Id.* ¶ 14. A USCIS officer found he did not satisfy the Rule's standards for asylum, withholding of removal, or CAT protection. *Id*. An immigration judge affirmed the negative determination. *Id.* ¶ 15.

**Plaintiff Y.F.**

113.    Plaintiff Y.F. is an asylum seeker from El Salvador who witnessed a gang murder and was attacked and threatened with death and almost raped to intimidate her from reporting it to the police. Declaration of Y.F., ECF No. 4, Ex. 13, ¶¶ 1-7.

114.    In Mexico, Y.F. was robbed multiple times. *Id.* ¶¶ 11, 13. She was targeted because she was a migrant. *Id*. ¶ 11.

115.    On or around May 25, 2023, Y.F. entered the United States without inspection and without a CBP One appointment. *Id.* ¶¶ 14, 16.

116.    While in CBP custody, Y.F. had a rapid CFI. *Id.* ¶ 17. Y.F. was never given the opportunity to consult with a lawyer prior to the CFI. *Id.*

117.    Y.F.'s CFI was pursuant to the Rule's new credible fear provisions. *Id.* ¶ 19. A

USCIS officer found she did not satisfy the Rule's standards for asylum, withholding of removal, or CAT protection. *Id.*

118.    After the CFI denial, on Sunday, June 4, 2023, around 9:00 p.m., an officer took her to an area with a phone and a list of lawyers. *Id.* ¶ 20. Y.F. tried to call every lawyer on the list, but no one answered. *Id.*

119.    The next day, an immigration judge affirmed the negative determination. *Id.* ¶ 21.

**Plaintiff M.S.**

120.    Plaintiff M.S. is an asylum seeker from Brazil who was threatened with death because of his participation in a police investigation of a crime involving a powerful local gang. Declaration of M.S., ECF No. 4, Ex. 14, ¶¶ 1-5.

121.    M.S. entered the United States on or around May 12th or 13th, 2023, without inspection and without a CBP One appointment. *Id.* ¶ 7.

122.    M.S. had a CFI pursuant to the Rule's new credible fear provisions. *Id.* ¶ 10. A USCIS officer found he did not satisfy the Rule's standards for asylum, withholding of removal, or CAT protection. *Id.* ¶ 11. An immigration judge affirmed the negative determination. *Id.* ¶ 12.

**Plaintiff F.C.**

123.    Plaintiff F.C. is an asylum seeker from Ecuador who was threatened with death and whose house was shot by a criminal organization after he cooperated with police. Declaration of F.C., ECF No. 20, Ex. 2, ¶¶ 1-8.

124.    F.C. entered the United States on or about May 28, 2023, without inspection and without a CBP One appointment. *Id.* ¶ 13.

125.    F.C. had a CFI pursuant to the Rule's new credible fear provisions. *Id.* ¶¶ 14-15. A USCIS officer found he did not satisfy the Rule's standards for asylum, withholding of removal,

or CAT protection. *Id*. ¶ 15 An immigration judge affirmed the negative determination. *Id.*

**Plaintiff D.M.**

126.    Plaintiff D.M. is an asylum seeker from Venezuela who fears harm in that country because of his political opinion and who was assaulted and threatened with death by gangs. Declaration of D.M., ECF No. 20, Ex. 3, ¶¶ 1-7.

127.    In Mexico, he was robbed and extorted, and heard various accounts of other migrants being kidnapped. *Id*. ¶ 8.

128.    D.M. entered the United States on or about May 27, 2023, without inspection and without a CBP One appointment. *Id.* ¶¶ 9, 11.

129.    D.M. had a CFI pursuant to the Rule's new credible fear provisions. *Id.* ¶ 12. A USCIS officer found he did not satisfy the Rule's standards for asylum, withholding of removal, or CAT protection. *Id*. ¶ 13. An immigration judge affirmed the negative determination. *Id.*

130.    D.M. was ordered removed to Mexico. *Id*. ¶ 14.

**Plaintiff J.S.**

131.    Plaintiff J.S. is an indigenous asylum seeker from Ecuador. Declaration of J.S., ECF No. 20, Ex. 4, ¶ 3. J.S. fled Ecuador because of physical and sexual abuse by her ex-partners, and racism against her as an indigenous woman. *Id.* ¶¶ 1-13.

132.    On or about May 15, 2023, J.S. entered the United States without inspection and without a CBP One appointment. *Id.* ¶ 14.

133.    J.S. had a CFI pursuant to the Rule's new credible fear provisions. *Id.* ¶¶ 18-22. A USCIS officer found she did not satisfy the Rule's standards for asylum, withholding of removal, or CAT protection. *Id.* ¶ 23. An immigration judge affirmed the negative determination. *Id.* ¶¶ 24-25.

**Plaintiff R.E.**

134.    Plaintiff R.E. is an asylum seeker from Cuba who has faced harm including kidnapping in that country. Declaration of Elizabeth Kalmbach Clark in Support of R.E., ECF No. 20, Ex. 5, ¶¶ 2, 14.

135.    R.E. entered the United States on or about June 10, 2023, without inspection and without a CBP One appointment. *Id.* ¶ 2.

136.    R.E. had a CFI pursuant to the Rule's new credible fear provisions. *Id.* ¶¶ 2, 13, 15.

137.    During his CFI, R.E. told the officer that he had "applied for asylum" in Mexico and "they denied it." *Id.* ¶ 13. The USCIS officer conducting the interview asked if R.E. had any documents related to his asylum application, and he responded "yes." *Id*. The USCIS officer asked if R.E. had copies of the documents, to which R.E. responded "[i]n my phone I think." *Id*. There were no further follow-up questions. *Id*.

138.    The USCIS officer found R.E. did not satisfy the Rule's standards for asylum, withholding of removal, or CAT protection. *Id.* ¶ 15. An immigration judge affirmed the negative determination. *Id.* ¶¶ 5, 15.

139.    R.E. was ordered removed to Mexico. *Id.* ¶ 6.

**Plaintiff S.U.**

140.    Plaintiff S.U. is an asylum seeker from Venezuela who was beaten and threatened by government agents because of his refusal to pay bribes to corrupt officials. Declaration of S.U., ECF No. 20, Ex. 6, ¶¶ 1-4.

141.    S.U. was kidnapped in Mexico two days before he entered the United States; he was also robbed in Mexico. *Id*. ¶ 7.

142.    S.U. entered the United States on or about June 8, 2023, without inspection and

without a CBP One appointment. *Id.* ¶ 9.

143.    S.U. had a CFI pursuant to the Rule's new credible fear provisions. *Id.* ¶ 11. A USCIS officer found he did not satisfy the Rule's standards for asylum, withholding of removal, or CAT protection. *Id*. An immigration judge affirmed the negative determination. *Id*. ¶ 13.

144.    S.U. was ordered removed to Mexico. *Id*. ¶ 14.

## VII.    Facts Relating to Organizational Plaintiffs

**Plaintiff Refugee and Immigrant Center for Education and Legal Services (RAICES)**

145.    Organizational plaintiff the Refugee and Immigrant Center for Education and Legal Services (RAICES) is a 501(c)(3) non-profit organization with headquarters in San Antonio, Texas. Declaration of Javier Hidalgo ¶ 3.

146.    RAICES also has offices in Austin, Corpus Christi, Dallas, Fort Worth, and Houston, Texas. *Id.* ¶ 5.

147.    RAICES's mission is to defend the rights of immigrants and refugees; empower individuals, families, and communities of immigrants and refugees; and advocate for liberty and justice. *Id.* ¶ 3.

148.    RAICES offers a wide array of free and low-cost legal services, including filing affirmative asylum applications and representing noncitizens in defensive removal cases and in bond proceedings before the Executive Office for Immigration Review ("EOIR"), both in immigration court and before the Board of Immigration Appeals ("BIA"). *Id.* ¶ 6.

149.    RAICES's Pre-Removal Services team consists of 14 staff members who represent detained individuals in the expedited removal process. *Id.* ¶ 7.

150.    The Pre-Removal Services team operates a hotline that has traditionally been used for people in the custody of Immigration and Customs Enforcement ("ICE"). *Id.* Earlier this year,

RAICES added the hotline number to a list distributed to people seeking asylum who are held in, and have CFIs in, detention facilities run by CBP. *Id.* ¶ 8.

151.    Since the Rule took effect on May 12, 2023, the Pre-Removal Services team has seen hundreds of clients and potential clients adversely affected by the Rule and the related policy changes. *Id.* ¶ 9.

152.    The Rule requires RAICES staff to engage in much more complex and cumbersome pre-CFI consultations than what was required prior to the Rule's implementation. *Id.* ¶ 13. Among other things, RAICES staff must ask questions to determine whether a noncitizen could not use CBP One or had an "imminent and extreme" threat of harm in Mexico. *Id.* ¶¶ 14-15.

153.    RAICES has historically been able to communicate with individuals in ICE custody before their CFI and before immigration judge review of negative decisions. *Id.* ¶ 11.

154.    RAICES staff members typically only have one phone call with a noncitizen in which to cover all of the information relevant to a CFI. *Id.* ¶ 18.

155.    Almost all of RAICES's clients enter the country via the U.S.-Mexico border and are from countries other than Mexico, and many enter between ports of entry. *Id.* ¶ 47.

156.    CBP custody is much more isolated than ICE custody. *Id.* ¶ 24. In particular, RAICES cannot enter CBP facilities, and there is not a system that allows them to schedule telephone calls with people in CBP custody. *Id.*

157.    RAICES has been able to schedule follow-up calls with people in CBP custody in some, but not all, cases. *Id.* ¶ 25.

158.    Some people in CBP custody do not have access to a pen and paper. *Id.* ¶ 26.

159.    CBP does not have a standardized procedure allowing noncitizens held in CBP custody to send signed forms to, or return telephone calls from, their counsel. *Id.*

160.    For noncitizens held in CBP custody, RAICES has often been able to speak to a noncitizen only after their CFI has already taken place. *Id.* ¶ 29.

161.    There is no online locator for people held in CBP custody, and there is no feasible way for RAICES or anyone else outside the government to track the location of those people. *Id.* ¶ 27. RAICES therefore cannot effectively act on referrals regarding people held in CBP custody. *Id.*

162.    The pre-CFI waiting period of 24 hours means that most people detained in CBP custody have no ability to contact RAICES before their CFI. *Id.* ¶ 28.

163.    Without access to RAICES or the few other organizations that are willing to provide CFI consultations in CBP custody, noncitizens functionally lack a right to consult with counsel before the CFI. *Id.* ¶ 30.

164.    The shortened 24-hour pre-CFI period has forced RAICES to overhaul its processes to handle an increased number of calls coming into its hotline from CBP. *Id.* ¶ 31. RAICES has shifted staff away from ICE hotline calls and moved staff from other RAICES teams to work on incoming calls from CBP detention. *Id.* ¶¶ 31, 33, 45-46. Differences between CBP and ICE custody have also forced RAICES to bifurcate the hotline process, which was previously uniform across all facilities. *Id.* ¶ 45.

165.    If RAICES misses a call from CBP custody, CBP agents sometimes decline to leave a voicemail or provide any information about the person attempting to reach RAICES, which makes it impossible for RAICES to provide pre-CFI consultation on the shortened timeline. *Id.* ¶ 32.

166.    Despite its efforts, RAICES is unable to assist many people before their CFIs on the shortened timeline. *Id.* ¶ 35.

167.    As a result of the compressed timeline, RAICES is routinely unable to support clients during CFIs. *Id.* ¶ 36. Although it consistently tries to represent people at their CFIs, it has been able to do so only with one or two individuals among the hundreds of people subject to the Rule who have contacted RAICES. *Id.*

168.    The 24-hour period has forced RAICES to engage in much more work later in the CFI process, and the stage of immigration judge review, where its ability to provide meaningful assistance is diminished. *Id.* ¶¶ 37-38.

169.    The policies of removing or returning people of certain non-Mexican nationalities to Mexico further complicates RAICES's pre-CFI consultations. *Id.* ¶¶ 39-42. RAICES staff must now prepare those people for questions about both their home country and Mexico. *Id.* ¶¶ 40-41.

170.    The Rule, 24-hour period, and third country removal, and "voluntary" return policies mean that calls to RAICES's hotline now take much longer than calls did before the policies took effect, reducing the number of clients that RAICES can serve. *Id.* ¶ 44.

171.    Many of RAICES's clients are no longer eligible for asylum, meaning that RAICES staff must prepare claims for withholding of removal and CAT relief, which require more evidence and more staff time than asylum claims. *Id.* ¶ 48.

172.    For clients in full removal proceedings, RAICES attorneys must now also spend time preparing arguments that a client qualifies for an exception to the asylum bar—and preparing asylum claims in case an immigration judge agrees. *Id.* ¶ 49.

173.    The Rule and related policy changes have forced RAICES to divert resources to updating internal and external training materials. *Id.* ¶ 50.

174.    The Rule and related policy changes have materially harmed the well-being of RAICES staff. *Id.* ¶¶ 51-52.

**Plaintiff Las Americas Immigrant Advocacy Center (Las Americas)**

175.    Organizational plaintiff the Las Americas Immigrant Advocacy Center (Las Americas) is a non-profit organization based in El Paso, Texas. Declaration of Jennifer Babaie ¶ 3.

176.    Las Americas serves immigrants on both sides of the U.S.-Mexico border,  in West Texas, New Mexico, and Ciudad Juarez, Mexico. *Id.*

177.    Las Americas' mission is to provide high-quality legal services to low-income immigrants, and to advocate for human rights. *Id.*

178.    Las Americas offers a wide array *pro bono* services, including representation in CFIs and reasonable fear interviews, and representing noncitizens in defensive removal cases and in bond proceedings before the immigration courts. *Id.* ¶¶ 3, 8, 12-13, 15.

179.    Las Americas' staff consists of 16 people, including attorneys, accredited representatives, paralegals, and two staff who work for Las Americas in Mexico under the auspices of a legal entity recognized in Mexico. *Id.* ¶ 10.

180.    Las Americas assists individuals and families who have entered the United States, as well as people who are or have been stranded in Mexico due to U.S. policies. *Id.* ¶ 11.

181.    Since the Rule took effect on May 12, 2023, Las Americas has assisted more than 1,000 clients and potential clients adversely affected by the Rule and the related policy changes. *Id.* ¶¶ 16, 24.

182.    The Rule has required that Las Americas Mexico spend a great deal of time providing direct assistance to people unable to navigate the CBP One app on their own. *Id.* ¶¶ 21-25.

183.    Las Americas Mexico has been forced to divert resources to addressing the CBP One app, and helping people to understand the new procedural hurdles that they face. *Id.* ¶ 21.

184.    The Rule has forced Las Americas to focus its resources on helping people navigate the Rule, both in the process of using CBP One and in trying to meet one of the Rule's exceptions during the CFI process. As a result, Las Americas is less able to put those resources toward its mission of assisting asylum seekers with CFIs, reviews of negative determinations, and representation in immigration court. *Id.* ¶¶ 25, 41-42, 63-65.

185.    Las Americas has a history of doing both credible fear and reasonable fear interview preparation with clients. *Id.* ¶ 31. CFI consultation, preparation, and representation form the heart of Las Americas' detained legal services work. *Id.* ¶¶ 12, 46.

186.    By requiring people to show that they satisfy one of its three asylum eligibility conditions or can prove one of the Rule's two limited exceptions, the Rule requires Las Americas staff to change their pre-CFI consultations. *Id.* ¶ 26. Among other things, Las Americas staff must ask questions to determine whether a noncitizen could not use CBP One or had an "imminent and extreme" threat of harm in Mexico. *Id.* ¶¶ 27-29.  Las Americas must also prepare clients to overcome the Rule's bar on the merits, without the benefit of the significant possibility standard. *Id.* ¶ 30. These changes have required Las Americas to engage in consultations that are more complex, cumbersome, and time consuming than they were prior to the Rule's implementation. *Id.* ¶¶ 32-33.

187.    Because Las Americas has a history of doing both credible fear and reasonable fear work, they have firsthand exposure to the fact that the reasonable possibility standard, which applies to the majority of people they serve because they are unable to overcome the Rule, represents a notably higher standard. *Id.* ¶ 31. To address that reality, Las Americas staff must spend additional time with people trying to explain to them how they might go about trying to meet that higher standard. *Id.*

188.    Because of the Rule, Las Americas is forced to provide increased representation to people who have failed their CFIs and request immigration judge review. *Id.* ¶ 36.

189.    Because CFIs now take place in both CBP and ICE custody, Las Americas has created two different workflows and has had to focus on providing pre-CFI consultations to people in ICE custody.  *Id.* ¶ 34. Access to individuals in CBP custody is virtually impossible, and that difficulty is often coupled with the expedited timeline imposed by the 24-hour consultation period. *Id.* ¶¶ 46-48. Las Americas staff is not allowed to enter CBP facilities, and they do not have direct access to people detained there via telephone. *Id.* ¶ 46.

190.    Even if family members attempt to refer a loved one in CBP custody to Las Americas, its staff is unable to make arrangements to communicate with those individuals. *Id.*

191.    Because people detained in CBP facilities will have their CFIs so quickly, it is not possible to provide a CFI consultation to someone before their interview occurs. *Id.* ¶ 47.

192.    Las Americas does not have the capacity to operate a hotline for people detained in CBP custody. *Id.* ¶ 48. Because they are not operating a hotline, Las Americas does not receive phone calls from non-clients detained in CBP custody. *Id.*

193.    The shortened 24-hour pre-CFI period has forced Las Americas to stop providing CFI consultation to people in CBP custody before their interview occurs. *Id* ¶ 47*.* Las Americas has had to overhaul its processes to move some of its CFI consultations to the Mexico side of the border. *Id.* ¶ 49. Las Americas continues to provide CFI preparation to individuals in ICE custody. *Id.*

194.    Las Americas' capacity to provide CFI preparation in Mexico is hampered by the need to provide competing services, including assistance with accessing the CBP One app. *Id.* ¶¶ 20-23.

195.    Even when Las Americas assists people with CFI preparation in Mexico, the 24-hour rule prevents attorneys who have entered an appearance before USCIS from representing those individuals in their CFIs because the interviews are scheduled without notice to the attorney or the client. *Id.* ¶ 49.

196.    The 24-hour period has forced Las Americas to engage in much more work later in the CFI process, and the stage of immigration judge review, where its ability to provide meaningful assistance is diminished. *Id.* ¶ 50.

197.    The policies of removing or returning people of certain non-Mexican nationalities to Mexico further complicates Las Americas' pre-CFI consultations. *Id.* ¶¶ 51-59. Las Americas staff must now prepare those people for questions about both their home country and Mexico and discuss what "voluntary" return to Mexico would mean for a person and their case.  *Id.* ¶¶ 52-55.

198.    Las Americas staff often encounter third-country nationals who have been returned to Mexico under these policies. *Id.* ¶ 56. Some of these individuals receive notice from the Mexican government that they are required to leave Mexico within a short period of time, and as a result are at risk of chain refoulment. *Id.* ¶ 58. Those individuals are often unclear about whether they have been returned voluntarily or under a removal order, and because they need this information to adequately advise clients of the legal consequences of those returns , Las Americas staff must divert resources to investigate which occurred. *Id.* ¶ 59. Or else they must explain the consequences of both types of return, which further complicates the services they are trying to provide. *Id.*

199.    The Rule, the 24-hour period, and the third-country removal and "voluntary" return policies mean that each consultation that Las Americas staff performs now takes much longer than before the policies took effect, reducing the number of clients that Las Americas can serve. *Id.* ¶¶ 41-42.

27

200.     Many of Las Americas' clients are no longer eligible for asylum, meaning that Las Americas staff must prepare claims for withholding of removal and relief under CAT, which require more evidence and more staff time than asylum claims. *Id.* ¶ 43.

201.     For clients in regular removal proceedings, Las Americas attorneys must now also spend time preparing arguments that a client qualifies for an exception to the asylum bar—and preparing asylum claims in case an immigration judge agrees. *Id.*

202.     The Rule and related policy changes have forced Las Americas to divert resources to updating internal and external training materials. *Id.* ¶¶ 26, 40, 62.

203.     The Rule and related policy changes have forced Las Americas to triage, choosing between preparing a larger number of asylum seekers for the new screening processes, and providing full representation to people who are proceeding with their substantive claims. *Id.* ¶ 64.

204.     The Rule and related policy changes have put Las Americas' funding at risk. *Id.* ¶ 9. Some funders expect Las Americas to meet specific quotas for clients served, but the Rule and related changes reduce their capacity to do screenings outside of the CFI context. *Id.* Other funders expect Las Americas to demonstrate a growth trajectory or a reduction in amount of time required for each case, but these are impossible because of the Rule. *Id.* ¶ 61.

205.     The Rule and related policy changes have materially harmed the well-being of Las Americas staff. *Id.* ¶ 65.