**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| M.A., et al., | ) |
|  | ) |
|  | ) |
| *Plaintiffs,* | ) |
|  | ) |
| v. | ) No. 1:23-cv-01843-TSC |
|  | ) |
| ALEJANDRO MAYORKAS, Secretary of the | ) |
| Department of Homeland Security, in his official | ) |
| capacity, et al., | ) |
|  | ) |
| *Defendants.* | ) |
|  | ) |

**<u>DECLARATION OF NOOR ZAFAR</u>**

I, Noor Zafar, declare as follows:

1.      I am an attorney with the American Civil Liberties Union Foundation Immigrants' Rights

Project, and am counsel for Plaintiffs in this case.

2.      An appendix containing relevant excerpts of the administrative records in this case will

be filed with the Court pursuant to LCvR 7(n). Certain excerpts are also attached here for the

Court's convenience.

3.      Attached as Exhibit A is a true and correct copy of the May 10, 2023 memorandum from

Assistant Homeland Security Secretary Blas Nuñez-Neto titled "Process for Determining

Country of Removal for Nationals of Cuba, Haiti, Nicaragua, and Venezuela," available at

CBP_Removals_AR_321-25.

4.      Attached as Exhibit B is a true and correct copy of the United Nations High

Commissioner for Refugees publication "Advisory Opinion on the Extraterritorial Application of

Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and

1

its 1967 Protocol" (Jan. 26, 2007), available at https://www.unhcr.org/sites/default/files/legacy-pdf/4d9486929.pdf.

5.      Attached as Exhibit C is a true and correct copy of the May 10, 2023 memorandum from John L. Lafferty, Chief, Asylum Division titled "Scheduling of Credible Fear Interviews," available at USCIS_24-Hour_AR_1-3.

6.       Attached as Exhibit D is a true and correct copy of the "Withdrawal of Application for Admission Advisal Statement," available at CBP_Withdrawals_AR_6.

7.      Attached as Exhibit E is a true and correct copy of the May 12, 2023 document titled "Circumvention of Lawful Pathways (CLP) & Voluntary Withdrawal of Admission Step-by-Step Guide." Counsel for Defendants provided this document to counsel for Plaintiffs, and confirmed that it is the document referred to as "Appendix A" in "Guidance for Asylum Staff on the Circumvention of Lawful Pathways (CLP) Rule and Procedures for Certain Noncitizens in Border Patrol Custody in the Credible Fear Screening Process," available at USCIS_Withdrawals_AR_1-8.

8.      Attached as Exhibit F is a true and correct copy of the Spanish language version of Form I-826 signed by Plaintiff J.P. It has been redacted to remove J.P.'s identifying information and the identifying information of immigration agents.

9.      Attached as Exhibit G is a true and correct copy of the Spanish language version of Form I-826 signed by Plaintiff E.B. It has been redacted to remove E.B.'s identifying information and the identifying information of immigration agents.

10.     Attached as Exhibit H is a true and correct copy of a March 9, 2015 memorandum from the Customs and Border Patrol Acting Executive Director for Admissibility and Passenger Programs titled "Withdrawal of Application Procedures at Ports of Entry," available at:

https://www.cbp.gov/sites/default/files/assets/documents/2022-

May/Withdrawal%20of%20Application%20Procedures%20at%20Ports%20of%20Entry_Redact

ed.pdf.

11.     Attached as Exhibit I is a true and correct copy of Form I-860, "Notice and Order of

Expedited Removal," issued to Plaintiff M.P. It has been redacted to remove M.P.'s identifying

information and the identifying information of immigration agents.


I, Noor Zafar, declare under penalty of perjury of the laws of the United States of America that

the foregoing is true and correct to the best of my knowledge and belief.


Executed this 28th day of September, 2023 in Dallas, Texas.


_____  .

Noor Zafar

3

# Exhibit A



**U.S. Department of Homeland Security**
Washington, DC 20528

May 10, 2023

ADVISORY MEMORANDUM

FROM:                           Blas Nuñez-Neto
                                Assistant Secretary for Border and Immigration Office of
                                Strategy, Policy, and Plans

TO:                             Troy Miller
                                Acting Commissioner
                                U.S. Customs and Border Protection

                                Tae Johnson
                                Senior Official Performing the Duties of the Director
                                U.S. Immigration and Customs Enforcement

SUBJECT:  Process for Determining Country of Removal for Nationals of Cuba, Haiti, Nicaragua,
and Venezuela

Purpose
This memorandum describes current U.S. capacity to conduct removal flights to Cuba, Haiti,
Nicaragua, and Venezuela. It is meant to inform U.S. Customs and Border Protection (CBP)
determinations in making referrals to U.S. Immigration and Customs Enforcement (ICE) based on (1)
population in ICE Enforcement and Removal Operations (ERO) custody by nationality, and (2)
removal flight capacity both to third countries and countries of origin, and to advise CBP concerning
processes that comport with DHS's authority to remove noncitizens to third countries.

This memorandum, which relates to a foreign affairs function of the United States, does not establish
binding standards and it is not intended to, shall not be construed to, may not be relied upon to, and
does not create any rights, privileges, or benefits, substantive or procedural, enforceable by any party
against the United States, its departments, agencies, or other entities, its officers or employees, or any
other person.

Background
The Immigration and Nationality Act (INA) establishes the authority to remove noncitizens with
final orders of removal to countries other than the country designated by the noncitizen or their
country of citizenship in certain circumstances.  If removal to each of the countries identified in the
statute as potential additional removal countries (including country of birthplace) is **impracticable,**

**inadvisable, or impossible**, the noncitizen may be removed to a third country that will accept the noncitizen.

CBP should work through the framework set forth at INA § 241(b)(2), 8 U.S.C. § 1231(b)(2), to determine the appropriate country of removal for noncitizens who enter the United States between the ports of entry. Under the statute, the analysis begins by the noncitizen designating one country to which they want to be removed (noncitizens may not designate Mexico, Canada, or an adjacent island unless they are a national, citizen, or resident thereof). Next, if that government is not willing to accept the noncitizen, CBP should then determine whether the noncitizen may be removed to their country of citizenship or nationality (if this was not the country designated by the noncitizen). Last, if the noncitizen is not removed to the country designated or the country of citizenship or nationality, CBP should then consider removal to a country where the noncitizen resided before they entered the country from which they entered the United States, the country where they were born, or the country that had sovereignty over the noncitizen's birthplace when they were born.[1] If it is determined that it is impracticable, inadvisable, or impossible to remove the noncitizen to any of the countries described in the previous sentence, DHS may remove the noncitizen to any other country that will accept the noncitizen.



For removal to a third country to be an available option based on impracticability, inadvisability, or impossibility, CBP should refer enough Cuban, Haitian, Nicaraguan, and Venezuelan nationals to ICE-ERO to meet current removal flight capacity under ICE's country removal guidelines. If the number of removable noncitizens of a given nationality in ERO custody exceeds monthly flight capacity to country of origin, CBP should pursue a process to identify third countries as the country of removal for such noncitizens pursuant to INA § 241(b)(2), 8 U.S.C. § 1231(b)(2).

<u>Protection Screening</u>
Screening for fear of removal to the designated third country should be conducted in accordance with the procedures set forth in 8 C.F.R. §§ 208.30, 208.33, and 235.3, as amended by the Circumvention of Lawful Pathways final rule, and accompanying guidance.

---

[1] This memorandum relates only to noncitizens who have entered the United States between ports of entry and not to arrivals at ports of entry. Therefore, the listing of alternate countries of removal in this memorandum does not include the following additional removal countries per the statute: the country from which the noncitizen traveled to be admitted to the United States, and the country in which is located the foreign port from which the noncitizen left for the United States or for a foreign territory contiguous to the United States.

Current Removal Flight Capacity

| Country | Agreement | Max Removal Capacity / Flight | Max Removals / Month |
|---|---|---|---|
| **Cuba** | ▄▄▄▄▄▄▄▄▄▄ ▄▄▄▄▄▄▄▄ ▄▄ | ▄ | ▄ |
| | | | ▄▄▄▄▄▄ |
| | | | ▄▄▄▄▄▄ |
| | | | ▄▄▄▄▄▄ |
| | | | ▄▄▄ |
| | | | ▄▄▄▄▄▄▄ |
| | | | ▄▄▄▄▄▄▄ |
| | | | ▄▄▄▄▄ |
| | | | ▄▄▄▄ |
| **Haiti** | ▄▄▄▄▄▄▄▄▄▄▄ ▄▄▄▄▄▄▄▄▄▄ ▄▄▄ | ▄ | ▄▄▄▄ |
| | ▄▄▄▄▄▄▄▄▄▄▄ | | ▄▄▄▄▄▄ |
| | ▄▄▄▄▄▄▄▄▄ | | ▄ |
| | ▄▄▄▄▄▄▄▄▄ | | |
| | ▄▄▄▄▄▄▄▄ | | |
| | ▄▄▄▄▄▄▄▄▄▄ | | |
| | ▄▄▄▄▄▄ | | |
| | ▄▄▄▄▄▄▄ | | |
| | ▄▄▄▄▄▄▄ | | |
| | ▄▄▄ | | |
| **Nicaragua** | ▄▄▄▄▄▄▄▄▄▄ | ▄ | ▄ |
| **Venezuela** | ▄▄▄▄▄▄▄▄▄▄ | ▄▄▄▄▄▄▄▄ | ▄▄▄▄▄ |
| | ▄▄▄▄▄▄▄▄▄▄ | ▄▄▄▄▄▄▄▄▄ | ▄▄▄ |
| | ▄▄▄▄▄▄▄▄ | ▄▄▄▄▄▄▄ . | ▄▄▄▄▄▄ |
| | ▄▄▄▄▄▄ | | ▄ |
| | ▄▄▄▄▄▄▄ | | ▄▄▄▄▄ |
| | ▄▄▄▄▄▄▄▄ | | ▄▄▄▄▄▄ |
| | ▄▄▄▄▄ | | ▄▄▄ |
| | | | ▄▄ |

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

Appendix 1: Country Conditions

Below, DHS PLCY characterizes U.S. Government bilateral negotiations with Cuba, Haiti, Nicaragua, and Venezuela in relation to removal flights, and where applicable, diplomatic efforts to increase the number or cadence of removal flights to those four countries.

***Cuba.*** Formal diplomatic relations have been reestablished with the Cuban government. In April 2022, the U.S. Government and Government of Cuba agreed to restart bilateral Migration Talks, and in January 2023, the two countries restarted the bilateral Law Enforcement Dialogue.  Both these engagements are important lines of communication, allowing DHS and other U.S. Government departments to continue cooperating with Cuban counterparts on matters related to migration, removals, migrant smuggling, and other areas.

Following the April 2022 Migration Talks, the Cuban government agreed to resume removal charter flights in accordance with the Migration Accords; the first flight took place in April 2023.  Following the April 2023 Migration Talks, the Cuban government agreed to provide approval, within 10 working days, of the list of nationals nominated for removal, and approval for the U.S. to send a flight manifested with those nationals later than three days before the date of departure.  The Cuban government also agreed to allow removals via commercial flights.  ███████████████

██████████████████████████████████████████████████████████████████
███████████████████

In FY 2022, despite best efforts, DHS repatriated or expelled only about 2.5 percent of Cuban encounters.  More than 97% of Cubans encountered at the border in FY2022 were ultimately conditionally released into the interior of the United States.[2]

***Haiti.*** The United States and Haiti have full diplomatic relations.  After six months of operating with limited capacity, as of April 27, 2023, the GoH and the International Organization for Migration (IOM) repatriation support actors reported their operations had normalized.  U.S. Embassy Port Au Prince assessed, based on information from GoH and IOM, that they have capacity to repatriate up to 450 migrants across three separate repatriation events in Port-au-Prince or Cap-Haitien on any given day.  This is due to improved capabilities in identifying, responding to, and mitigating day-to-day challenges with communications, logistics, site infrastructure, fuel access, and insecurity.  The Embassy also analyzed the potential of alternative repatriation locations but found no other locations are currently viable.[3]  ███████████████████████████████████████████████
██████████████████████████████████████████████████████████

In FY 2022, DHS repatriated 28% of Haitian encounters.  72% of Haitian nationals encountered at the SWB in FY2022 were conditionally released into the U.S.[4]

***Nicaragua.*** ████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████

---

[2] DHS Office of Immigration Statistics (OIS) analysis of historic CBP data.
[3] "Haiti: Migrant Repatriation Capacity Improves." U.S. State Department cable, Embassy Port Au Prince, April 27, 2023.
[4] DHS Office of Immigration Statistics (OIS) analysis of historic CBP data.

██████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████

██████████████████████████████████████████████ In FY 2022, DHS repatriated 2,538, and
expelled 4,159 (a total of 6,890) Nicaraguans, or 4.4 percent of Nicaraguan encounters.  More than 95
percent of Nicaraguans encountered at the SWB were conditionally released into the United States in
FY2022.[5]

*Venezuela.* ██████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████

██████████████████████████████████████████████████████
████████████████████████████████████████████████████

[5] DHS Office of Immigration Statistics (OIS) analysis of historic CBP data.

# Exhibit B



**UNHCR**
The UN Refugee Agency

## Advisory Opinion on the Extraterritorial Application of *Non-Refoulement* Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol[*]

### Introduction

1.      In this advisory opinion, the Office of the United Nations High Commissioner for Refugees ("UNHCR") addresses the question of the extraterritorial application of the principle of *non-refoulement* under the 1951 Convention relating to the Status of Refugees[1] and its 1967 Protocol.[2]

2.      Part I of the opinion provides an overview of States' *non-refoulement* obligations with regard to refugees and asylum-seekers under international refugee and human rights law. Part II focuses more specifically on the extraterritorial application of these obligations and sets out UNHCR's position with regard to the territorial scope of States' *non-refoulement* obligations under the 1951 Convention and its 1967 Protocol.

3.      UNHCR has been charged by the United Nations General Assembly with the responsibility of providing international protection to refugees and other persons within its mandate and of seeking permanent solutions to the problem of refugees by assisting governments and private organizations.[3] As set forth in its Statute, UNHCR fulfils its international protection mandate by, *inter alia*, "[p]romoting the conclusion and ratification of international conventions for the protection of refugees, supervising their application and proposing amendments thereto."[4] UNHCR's supervisory responsibility under its Statute is mirrored in Article 35 of the 1951 Convention and Article II of the 1967 Protocol.

4.      The views of UNHCR are informed by over 50 years of experience supervising international refugee instruments. UNHCR is represented in 116 countries. It provides guidance in connection with the establishment and implementation of national procedures for refugee status determinations and also conducts such determinations under its own mandate. UNHCR's interpretation of the provisions of the 1951

---

[*]   This Opinion was prepared in response to a request for UNHCR's position on the extraterritorial application of the *non-refoulement* obligations under the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol. The Office's views as set out in the Advisory Opinion are offered in a broad perspective, given the relevance of the legal questions involved to a variety of situations outside a State's national territory.

[1]   The 1951 Convention relating to the Status of Refugees, 189 U.N.T.S. 137, *entered into force* 22 April 1954 [hereinafter "1951 Convention"].

[2]   The 1967 Protocol relating to the Status of Refugees, 606 U.N.T.S. 267, *entered into force* 4 October 1967 [hereinafter "1967 Protocol"].

[3]   See: *Statute of the Office of the United Nations High Commissioner for Refugees*, G.A. Res. 428(V), Annex, U.N. Doc. A/1775, para. 1 (1950).

[4]   *Id.*, para. 8(a).



Convention and 1967 Protocol is considered an authoritative view which should be taken into account when deciding on questions of refugee law.

<b>I. <span style="font-variant:small-caps">Non-Refoulement Obligations Under International Law</span></b>

**A.      The Principle of _Non-Refoulement_ Under International Refugee Law**

**1.      _Non-Refoulement_ Obligations Under International Refugee Treaties**

_(i)      The 1951 Convention Relating to the Status of Refugees and its 1967 Protocol_

5.      The principle of _non-refoulement_ constitutes the cornerstone of international refugee protection. It is enshrined in Article 33 of the 1951 Convention, which is also binding on States Party to the 1967 Protocol.[5] Article 33(1) of the 1951 Convention provides:

> "No Contracting State shall expel or return ("_refouler_") a refugee in any manner whatsoever to the frontiers of territories where his [or her] life or freedom would be threatened on account of his [or her] race, religion, nationality, membership of a particular social group or political opinion."

6.      The protection against _refoulement_ under Article 33(1) applies to any person who is a refugee under the terms of the 1951 Convention, that is, anyone who meets the requirements of the refugee definition contained in Article 1A(2) of the 1951 Convention (the "inclusion" criteria)[6] and does not come within the scope of one of its exclusion provisions.[7] Given that a person is a refugee within the meaning of the 1951 Convention as soon as he or she fulfills the criteria contained in the refugee definition, refugee status determination is declaratory in nature: a person does not become a refugee because of recognition, but is recognized because he or she is a refugee.[8] It follows that the principle of _non-refoulement_ applies not only to recognized refugees, but also to

---

[5]   Article I(1) of the 1967 Protocol provides that the States Party to the Protocol undertake to apply Articles 2–34 of the 1951 Convention.

[6]   Under this provision, which is also incorporated into Article 1 of the 1967 Protocol, the term "refugee" shall apply to any person who "owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his [or her] nationality and is unable or, owing to such fear, unwilling to avail him [or her]self of the protection of that country; or who, not having a nationality and being outside the country of his [or her] habitual residence is unable or, owing to such fear, unwilling to return to it".

[7]   Exclusion from international refugee protection means denial of refugee status to persons who come within the scope of Article 1A(2) of the 1951 Convention, but who are not eligible for protection under the Convention because

-   they are receiving protection or assistance from a UN agency other than UNHCR (first paragraph of Article 1D of the 1951 Convention); or because
-   they are not in need of international protection because they have been recognized by the authorities of another country in which they have taken residence as having the rights and obligations attached to the possession of its nationality (Article 1E of the 1951 Convention); or because
-   they are deemed undeserving of international protection on the grounds that there are serious reasons for considering that they have committed certain serious crimes or heinous acts (Article 1F of the 1951 Convention).

[8]   See: UNHCR, _Handbook on Procedures and Criteria for Determining Refugee Status_, 1979, Reedited Geneva 1992, para. 28.



those who have not had their status formally declared.[9] The principle of *non-refoulement* is of particular relevance to asylum-seekers. As such persons may be refugees, it is an established principle of international refugee law that they should not be returned or expelled pending a final determination of their status.

7.      The prohibition of *refoulement* to a danger of persecution under international refugee law is applicable to any form of forcible removal, including deportation, expulsion, extradition, informal transfer or "renditions", and non-admission at the border in the circumstances described below. This is evident from the wording of Article 33(1) of the 1951 Convention, which refers to expulsion or return (*refoulement*) "in any manner whatsoever".[10] It applies not only in respect of return to the country of origin or, in the case of a stateless person, the country of former habitual residence, but also to any other place where a person has reason to fear threats to his or her life or freedom related to one or more of the grounds set out in the 1951 Convention, or from where he or she risks being sent to such a risk.[11]

8.      The principle of *non-refoulement* as provided for in Article 33(1) of the 1951 Convention does not, as such, entail a right of the individual to be granted asylum in a particular State.[12] It does mean, however, that where States are not prepared to grant asylum to persons who are seeking international protection on their territory, they must adopt a course that does not result in their removal, directly or indirectly, to a place where their lives or freedom would be in danger on account of their race, religion, nationality, membership of a particular social group or political opinion.[13] As a general rule, in order to give effect to their obligations under the 1951 Convention and/or 1967 Protocol, States will be required to grant individuals seeking international protection access to the territory and to fair and efficient asylum procedures.[14]

---

[9]      This has been reaffirmed by the Executive Committee of UNHCR, for example, in its Conclusion No. 6 (XXVIII) "*Non-refoulement*" (1977), para. (c) (reaffirming "the fundamental importance of the principle of *non-refoulement* … of persons who may be subjected to persecution if returned to their country of origin irrespective of whether or not they have been formally recognized as refugees."). The UNHCR Executive Committee is an intergovernmental group currently consisting of 70 Member States of the United Nations (including the United States) and the Holy See that advises the UNHCR in the exercise of its protection mandate. While its Conclusions are not formally binding on States, they are relevant to the interpretation and application of the international refugee protection regime. Conclusions of the Executive Committee constitute expressions of opinion which are broadly representative of the views of the international community. The specialized knowledge of the Committee and the fact that its conclusions are reached by consensus adds further weight. UNHCR Executive Committee Conclusions are available at   http://www.unhcr.org/cgi-bin/texis/vtx/doclist?page=excom&id=3bb1cd174 (last visited on 26 October 2006).

[10]     The meaning of the terms "expel or return ("*refouler*")" in Article 33(1) is also discussed *infra* at Part II.A.

[11]     See: UNHCR, *Note on Non-Refoulement* (EC/SCP/2), 1977, para. 4. See also P. Weis, *The Refugee Convention, 1951: The Travaux Préparatoires Analysed with a Commentary by Dr. Paul Weis*, Cambridge University Press, Cambridge (1995), at p. 341.

[12]     See: P. Weis, *supra* footnote 11, at p. 342.

[13]     This could include, for example, removal to a safe third country or some other solution such as temporary protection or refuge under certain circumstances. *See* E. Lauterpacht and D. Bethlehem, "The scope and content of the principle of *non-refoulement: Opinion*", in E. Feller, V. Türk and F. Nicholson (eds.), *Refugee Protection in International Law: UNHCR's Global Consultations on International Protection*, Cambridge University Press, Cambridge (2003), para. 76.

[14]     The 1951 Convention and the 1967 Protocol define those to whom international protection is to be conferred and establish key principles such as non-penalisation of entry (Article 31) and *non-refoulement* (Article 33). However, they do not set out procedures for the determination of refugee status as such. Yet it is generally recognised that fair and efficient procedures are an essential element



9.      The *non-refoulement* obligation under Article 33 of the 1951 Convention is binding on all organs of a State party to the 1951 Convention and/or the 1967 Protocol[15] as well as any other person or entity acting on its behalf.[16] As discussed in more detail in Part II below, the obligation under Article 33(1) of the 1951 Convention not to send a refugee or asylum-seeker to a country where he or she may be at risk of persecution is not subject to territorial restrictions; it applies wherever the State in question exercises jurisdiction.

10.     Exceptions to the principle of *non-refoulement* under the 1951 Convention are permitted only in the circumstances expressly provided for in Article 33(2), which stipulates that:

> "The benefit of [Article 33(1)] may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he [or she] is, or who, having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."

The application of this provision requires an individualized determination by the country in which the refugee is that he or she comes within one of the two categories provided for under Article 33(2) of the 1951 Convention.[17]

11.     The provisions of Article 33(2) of the 1951 Convention do not affect the host State's *non-refoulement* obligations under international human rights law, which permit no exceptions. Thus, the host State would be barred from removing a refugee if this

---

in the full and inclusive application of the 1951 Convention outside the context of mass influx situations. *See* UNHCR, Asylum Processes (Fair and Efficient Asylum Procedures), EC/GC/01/12, 31 May 2001, paras. 4–5. See also Executive Committee, Conclusion No. 81 (XLVIII) *"General"* (1997), para. (h); Conclusion No. 82 (XLVIII), *"Safeguarding Asylum"* (1997), para. (d)(iii); Conclusion No. 85 (XLIX), *"International Protection"* (1998), para. (q); Conclusion No. 99 (LV), *"General Conclusion on International Protection"* (2004), para. (l).

[15]   *See supra* footnote 5.

[16]   Under applicable rules of international law, this applies to the acts, or omissions, of all organs, sub-divisions and persons exercising governmental authority in legislative, judicial or executive functions, and acting in that capacity in the particular instance, as well as to the conduct of organs placed at the disposal of a State by another State, even if they exceed their authority or contravene instructions. Pursuant to Articles 4–8 of the Articles of State Responsibility, the conduct of a person or group of persons shall be considered an act of a State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction or control of, that State in carrying out the conduct (*Articles on State Responsibility*, Articles 4–8). The Articles of State Responsibility were adopted by the International Law Commission without a vote and with consensus on virtually all points. The Articles and their commentaries were subsequently referred to the General Assembly with the recommendation that the General Assembly initially take note of and annex the text of the articles in a resolution, reserving to a later session the question whether the articles should be embodied in a convention on State responsibility. *See* J. Crawford, *The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentary.* Cambridge University Press, UK: 2002. The General Assembly annexed the Articles on State Responsibility to its resolution 56/83 of 12 December 2001 on Responsibility of States for Internationally Wrongful Acts.

[17]   For a detailed discussion of the criteria which must be met for Article 33(2) of the 1951 Convention to apply, *see* E. Lauterpacht and D. Bethlehem, *supra* footnote 13, paras. 145–192. On the "danger to the security" exception, *see also* "*Factum of the Intervenor, UNHCR, Suresh v. the Minister of Citizenship and Immigration; the Attorney General of Canada, SCC No. 27790*" (hereinafter: "UNHCR, *Suresh Factum*"), in 14:1 International Journal of Refugee Law (2002).

 UNHCR

would result in exposing him or her, for example, to a substantial risk of torture.[18] Similar considerations apply with regard to the prohibition of *refoulement* to other forms of irreparable harm.[19]

12.     Within the framework of the 1951 Convention/1967 Protocol, the principle of *non-refoulement* constitutes an essential and non-derogable component of international refugee protection. The central importance of the obligation not to return a refugee to a risk of persecution is reflected in Article 42(1) of the 1951 Convention and Article VII(1) of the 1967 Protocol, which list Article 33 as one of the provisions of the 1951 Convention to which no reservations are permitted. The fundamental and non-derogable character of the principle of *non-refoulement* has also been reaffirmed by the Executive Committee of UNHCR in numerous Conclusions since 1977.[20] Similarly, the General Assembly has called upon States "to respect the fundamental principle of *non-refoulement*, which is not subject to derogation."[21]

*(ii)     Other International Instruments*

13.     States' *non-refoulement* obligations with respect to refugees are also found in regional treaties, notably the 1969 OAU Convention Governing Specific Aspects of Refugee Problems in Africa[22] and the 1969 American Convention on Human Rights.[23]

---

[18]   See: UNHCR, *Suresh Factum*, *supra* footnote 17, paras. 18–50; E. Lauterpacht and D. Bethlehem, *supra* footnote 13, para. 159(ii), 166 and 179.

[19]   See the discussion of *non-refoulement* obligations under international human rights law *infra* at Part IB.

[20]   See, for example, Executive Committee, Conclusion No. 6 (XXVIII), *supra* footnote 9, para. (c) (reaffirming "the fundamental humanitarian principle of *non-refoulement* has found expression in various international instruments adopted at the universal and regional levels and is generally accepted by States."); Conclusion No. 17 (XXXI) *"Problems of extradition affecting refugees"* (1980), at. para (b) (reaffirming "the fundamental character of the generally recognized principle of *non-refoulement.");* Conclusion No. 25 (XXXIII) *"General"* (1982), para. (b) (reaffirming "the importance of the basic principles of international protection and in particular the principle of *non-refoulement* which was progressively acquiring the character of a peremptory rule of international law."); Conclusion No. 65 (XLII) *"General"* (1981), para. (c) (emphasizing "the primary importance of *non-refoulement* and asylum as cardinal principles of refugee protection…"); Conclusion No. 68 (XLIII) *"General"* (1982), para. (f) (reaffirming "the primary importance of the principles of *non-refoulement* and asylum as basic to refugee protection); No. 79 (XLVIII) *"General"* (1996), para. (j) (reaffirming "the fundamental importance of the principle of *non-refoulement*); No. 81 (XLVIII), *supra* footnote 14, para. (i) (recognizing "the fundamental importance of the principle of *non-refoulement*"); No. 103 (LVI) *"Provision of International Protection Including Through Complementary Forms of Protection"* (2005), at (m) (calling upon States "to respect the fundamental principle of *non-refoulement*").

[21]   See, for example, A/RES/51/75, 12 February 1997, para. 3; A/RES/52/132, 12 December 1997, at preambular para. 12.

[22]   OAU Convention Governing Specific Aspects of Refugee Problems in Africa, 1969, 1001 U.N.T.S. 45, *entered into force* 20 June 1974 [hereinafter, "1969 OAU Convention"]. Article II(3) reads: "No person shall be subjected by a Member State to measures such as rejection at the frontier, return or expulsion, which would compel him to return to or remain in a territory where his life, physical integrity or liberty would be threatened for the reasons set out in Article I, paras. 1 and 2 *[concerning persecution for reasons of race, religion, nationality, membership of a particular social group or political opinion or who is compelled to leave his country of origin or place of habitual residence in order to seek refuge from external aggression, occupation, foreign domination or events seriously disturbing public order].*"

[23]   1969 American Convention on Human Rights "Pact of San José, Costa Rica", 1144 U.N.T.S. 123, *entered into force* 18 July 1978 [hereinafter, "ACHR"]. Article 22(8) reads: "In no case may an alien be deported or returned to a country, regardless of whether or not it is his country of origin, if in that



*Non-refoulement* provisions modelled on Article 33(1) of the 1951 Convention have also been incorporated into extradition treaties[24] as well as a number of anti-terrorism conventions both at the universal and regional level.[25] Moreover, the principle of *non-refoulement* has been re-affirmed in the 1984 Cartagena Declaration on Refugees[26] and other, important non-binding international texts, including, in particular, the Declaration on Territorial Asylum adopted by the United Nations General Assembly on 14 December 1967.[27]

---

country his right to life or personal freedom is in danger of being violated because of his race, nationality, religion, social status, or political opinions."

[24] In the context of extradition, these provisions are usually referred to as "discrimination clauses". *See*, for example, Article 3(2) of the 1957 European Convention on Extradition, ETS 024, 359 U.N.T.S. 273 *entered into force* 18 April 1960 ("[Extradition shall not be granted] if the requested Party has substantial grounds for believing that a request for extradition for an ordinary criminal offence has been made for the purpose of prosecuting or punishing a person on account of his race, religion, nationality or political opinion, or that that person's position may be prejudiced for any of these reasons."); Article 4(5) of the 1981 Inter-American Convention on Extradition, 20 I.L.M. 723 (1981), *entered into force* 28 March 1992 ("Extradition shall not be granted … when, from the circumstances of the case, it can be inferred that persecution for reasons of race, religion or nationality is involved, or that the position of the person sought may be prejudiced for any of these reasons.")

[25] See, for example, Article 9(1) of the 1979 International Convention against the Taking of Hostages, 1316 U.N.T.S. 205, *entered into force* 3 June 1983 ("A request for the extradition of an alleged offender, pursuant to this Convention, shall not be granted if the requested State Party has substantial grounds for believing: (a) that the request for extradition for an offence set forth in article 1 has been made for the purpose of prosecuting or punishing a person on account of his race, religion, nationality, ethnic origin or political opinion; or (b) that the person's position may be prejudiced: (i) for any of the reasons mentioned in subpara. (a) of this para. …"). *See also* Article 12 of the 1997 International Convention for the Suppression of Terrorist Bombings, 37 I.L.M. 249 (1998), *entered into force* 23 May 2001 ("Nothing in this Convention shall be interpreted as imposing an obligation to extradite or to afford mutual legal assistance, if the requested State Party has substantial grounds for believing that the request for extradition for offences set forth in article 2 or for mutual legal assistance with respect to such offences has been made for the purpose of prosecuting or punishing a person on account of that person's race, religion, nationality, ethnic origin or political opinion or that compliance with the request would cause prejudice to that person's position for any of these reasons."), and the almost identical provisions in Article 15 of the 1999 International Convention for the Suppression of the Financing of Terrorism, 39 I.L.M. 270 (2000), *entered into force* 10 April 2002; Article 5 of the 1977 European Convention on the Suppression of Terrorism, ETS 090, 1137 U.N.T.S. 93, *entered into force* 4 August 1978; Article 14 of the 2002 Inter-American Convention against Terrorism, 42 I.L.M. 19 (2003), *entered into force* 7 October 2003.

[26] Cartagena Declaration on Refugees, 22 November 1984, Annual Report of the Inter-American Commission on Human Rights, OAS Doc. OEA/Ser.L/V/II.66/doc.10, rev. 1, at 190-93 (1984-85) [hereinafter, "Cartagena Declaration"]. The Conclusion set out in section III(5) reads: "To reiterate the importance and meaning of the principle of *non-refoulement* (including the prohibition of rejection at the frontier) as a corner-stone of the international protection of refugees…" While not legally binding, the provisions of the Cartagena Declaration have been incorporated into the legislation of numerous States in Latin America.

[27] A/RES/2312 (XXII), 14 December 1967, at Article 3 ( "No person referred to in Article 1, para. 1, shall be subjected to measures such as rejection at the frontier or, if he has already entered the territory in which he seeks asylum, expulsion or compulsory return to any State where he may be subjected to persecution."). *See also* Resolution (67) 14 on Asylum to Persons in Danger of Persecution, adopted by the Committee of Ministers of the Council of Europe on 29 June 1967, para. 2 (recommending that Governments should "…ensure […] that no one shall be subjected to refusal of admission at the frontier, rejection, expulsion or any other measure which would have the result of compelling him to return to, or remain in, a territory where he would be in danger of persecution.").

 UNHCR

## 2. *Non-Refoulement* of Refugees Under Customary International Law

14.     Article 38(1)(b) of the Statute of the International Court of Justice lists "international custom, as evidence of a general practice accepted as law", as one of the sources of law which it applies when deciding disputes in accordance with international law.[28] For a rule to become part of customary international law, two elements are required: consistent State practice and *opinio juris*, that is, the understanding held by States that the practice at issue is obligatory due to the existence of a rule requiring it.[29]

15.     UNHCR is of the view that the prohibition of *refoulement* of refugees, as enshrined in Article 33 of the 1951 Convention and complemented by *non-refoulement* obligations under international human rights law, satisfies these criteria and constitutes a rule of customary international law.[30] As such, it is binding on all States, including those which have not yet become party to the 1951 Convention and/or its 1967 Protocol.[31] In this regard, UNHCR notes, *inter alia*, the practice of non-signatory States hosting large numbers of refugees, often in mass influx situations.[32] Moreover, exercising its supervisory function,[33] UNHCR has closely followed the practice of Governments in relation to the application of the principle of *non-refoulement*, both by States Party to the 1951 Convention and/or 1967 Protocol and by States which have not adhered to either instrument. In UNHCR's experience, States have overwhelmingly indicated that they accept the principle of *non-refoulement* as binding, as demonstrated, *inter alia*, in numerous instances where States have responded to UNHCR's representations by providing explanations or justifications of cases of actual or intended *refoulement*, thus implicitly confirming their acceptance of the principle.[34]

---

[28]   Article 38(1) of the Statute of the International Court of Justice, 59 Stat. 1031, 1060 (1945).

[29]   See: International Court of Justice, *North Sea Continental Shelf, Judgment,* 1969 ICJ Reports, page 3, para. 74. See also International Court of Justice, *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America)*, Jurisdiction and Admissibility, 1984 ICJ Reports, page 392, para. 77.

[30]   See: UNHCR, *The Principle of Non-Refoulement as a Norm of Customary International Law,* Response to the Questions posed to UNHCR by the Federal Constitutional Court of the Federal Republic of Germany in cases 2 BvR 1938/93, 2 BvR 1953/93, 2 BvR 1954/93 (available at: http://www.unhcr.org/home/RSDLEGAL/437b6db64.html, last accessed on 30 October 2006); UNHCR, *Note on the Principle of Non-Refoulement (EU Seminar on the Implementation of the 1995 EU Resolution on Minimum Guarantees for Asylum Procedures)*, 1 November 1997 (available at: http://www.unhcr.org/home/RSDLEGAL/438c6d972.html, last accessed on 30 October 2006). *See also* New Zealand Court of Appeal, *Zaoui v. Attorney General*, 30 September 2004, (No 2) [2005] 1 NZLR 690, para. 34 ("The prohibition on refoulement, contained in art 33.1 of the Refugee Convention, is generally thought to be part of customary international law, the (unwritten) rules of international law binding on all States, which arise when States follow certain practices generally and consistently out of a sense of legal obligation.") and para. 136 ("The Refugee Convention is designed to protect refugees from persecution and the non-refoulement obligation is central to this function. It is non-derogable in terms of art 42.1 and, as discussed above at para [34] has become part of customary international law."). *See also* E. Lauterpacht and D. Bethlehem, *supra* footnote 13, paras. 193–219; G. Goodwin-Gill, *The Refugee in International Law*, 2nd edition, Oxford University Press (1996), at pp. 167–171.

[31]   The prohibition of *refoulement* of refugees under customary international law also applies, with regard to non-European refugees, in States which are party to the 1951 Convention, but which maintain the geographical limitation provided for Article 1B(1) of the Convention.

[32]   This is the case, for example, in Bangladesh, India, Pakistan and Thailand.

[33]   Under Paragraph 8 of the Statute of UNHCR, Article 35 of the 1951 Convention and Article II of the 1967 Protocol (see also *supra* footnote 3).

[34]   As noted by the International Court of Justice in *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. U.S.)*, Merits, 1986 ICJ Reports, page 14, para. 186, "[i]n order to deduce the existence of customary rules, the Court deems it sufficient that the conduct of States should, in



16.     In a Declaration which was adopted at the Ministerial Meeting of States Parties of 12–13 December 2001 and subsequently endorsed by the General Assembly, the States party to the 1951 Convention and/or 1967 Protocol acknowledged "…the continuing relevance and resilience of this international regime of rights and principles, including at its core the principle of *non-refoulement*, whose applicability is embedded in customary international law."[35] At the regional level, the customary international law character of the principle of *non-refoulement* has also been re-affirmed in a Declaration adopted by Latin American States participating at a gathering to celebrate the twentieth anniversary of the 1984 Cartagena Declaration.[36]

## B.     *Non-Refoulement* Obligations Under International Human Rights Law

### 1.     International Human Rights Treaties

17.     *Non-refoulement* obligations complementing the obligations under the 1951 Convention, which preceded the major human rights treaties, have also been established under international human rights law. More specifically, States are bound not to transfer any individual to another country if this would result in exposing him or her to serious

---

general, be consistent which such rules, and that instances of State conduct inconsistent with a given rule should generally have been treated as breaches of that rule, not as indications of the recognition of a new rule. If a State acts in a way *prima facie* incompatible with a recognized rule, but defends its conduct by appealing to exceptions or justifications contained within the rule itself, then whether or not the State's conduct is in fact justifiable on that basis, the significance of that attitude is to confirm rather than to weaken the rule."

[35]   Declaration of States Parties to the 1951 Convention and/or its 1967 Protocol adopted at the Ministerial Meeting of States Parties of 12–13 December 2001, HCR/MMSP/2001/09, 16 January 2002 (available at:  http://www.unhcr.org/home/RSDLEGAL/3d60f5557.pdf, last accessed on 30 October 2006) at preambular para. 4. Earlier, the Executive Committee of UNHCR observed that "the principle of *non-refoulement* … was progressively acquiring the character of a *peremptory rule* of international law." *See* Executive Committee Conclusion No. 25 (XXXIII), *supra* footnote 20, para. (b). Pursuant to Article 53 of the 1969 Vienna Convention on the Law of Treaties, 1155 U.N.T.S. 331, *entered into force* 27 January 1980 [hereinafter: "1969 Vienna Convention"], peremptory norms of general international law, or *jus cogens*, are norms accepted and recognized by the international community of States as a whole as norms from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character. Article 64 of the 1969 Vienna Convention provides that peremptory norms of international law prevail over treaty provisions.

[36]   Mexico Declaration and Plan of Action to Strengthen the International Protection of Refugees in Latin America of 16 November 2004 (available at:  http://www.unhcr.org/home/RSDLEGAL/424bf6914.pdf, last accessed on 30 October 2006), at preliminary para. 7 ("*Recognizing* the *jus cogens* nature of the principle of *non-refoulement*, including non-rejection at the border, the cornerstone of international refugee law, which is contained in the 1951 Convention relating to the Status of Refugees and its Protocol of 1967, and also set out in Article 22 (8) of the American Convention on Human Rights and Article 3 of the 1984 Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment, …"). *See also* Section III(5) of the 1984 Cartagena Declaration on Refugees, *supra* footnote 26 ("…[The] principle [of *non-refoulement*] is imperative in regard to refugees and in the present state of international law should be acknowledged and observed as a rule of *jus cogens*.").



human rights violations, notably arbitrary deprivation of life[37], or torture or other cruel, inhuman or degrading treatment or punishment.[38]

18.     An explicit *non-refoulement* provision is contained in Article 3 of the 1984 Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,[39] which prohibits the removal of a person to a country where there are substantial grounds for believing that he or she would be in danger of being subjected to torture.

19.     Obligations under the 1966 Covenant on Civil and Political Rights,[40] as interpreted by the Human Rights Committee, also encompass the obligation not to extradite, deport, expel or otherwise remove a person from their territory, where there are substantial grounds for believing that there is a real risk of irreparable harm, such as that contemplated by Articles 6 [right to life] and 7 [right to be free from torture or other cruel, inhuman or degrading treatment or punishment] of the Covenant, either in the country to which removal is to be effected or in any country to which the person may subsequently be removed.[41] The prohibition of *refoulement* to a risk of serious human rights violations, particularly torture and other forms of ill-treatment, is also firmly established under regional human rights treaties.[42]

---

[37]   The right to life is guaranteed under Article 6 of the ICCPR and, for example, Article 2 of the 1950 European Convention for the Protection of Human Rights and Fundamental Freedoms, ETS 005, 213 U.N.T.S. 222, *entered into force* 3 September 1953 [hereinafter: "ECHR"]; Article 4 ACHR; Article 4 of the African (Banjul) Charter on Human and People's Rights, 21 I.L.M. 58 (1982), *entered into force* 21 October 1986 [hereinafter: "Banjul Charter"].

[38]   The right to be free from torture is guaranteed under Article 1 of the 1984 Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and Article 2 of the 1985 Inter-American Convention to Prevent and Punish Torture, 25 I.L.M. 519 (1992), *entered into force* 28 February 1987. Article 16 of the Convention Against Torture prohibits other cruel, inhuman or degrading treatment or punishment. A prohibition of torture and other cruel, inhuman or degrading treatment or punishment is guaranteed under Article 7 of the ICCPR and provisions in regional human rights treaties, such as, for example, Article 3 of the ECHR; Article 5(2) of the ACHR; or Article 5 of the Banjul Charter.

[39]   The 1984 United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 1465 U.N.T.S. 85, *entered into force* 26 June 1987 [hereinafter: "Convention Against Torture"].

[40]   1966 International Covenant on Civil and Political Rights, 999 U.N.T.S. 171, *entered into force* 23 March 1976 [hereinafter: "ICCPR"].

[41]   With regard to the scope of the obligations under Article 7 of the ICCPR, *see* Human Rights Committee in its *General Comment No. 20: Article 7 (Prohibition of torture, or other cruel, inhuman or degrading treatment or punishment),* 10 March 1992, U.N. Doc. HRI/ GEN/1/Rev.7, para. 9 ("States parties must not expose individuals to the danger of torture or cruel, inhuman or degrading treatment or punishment upon return to another country by way of their extradition, expulsion or *refoulement")*; and *General Comment No. 31 on the Nature of the General Legal Obligation on States Parties to the Covenant*, U.N. Doc. CCPR/C/21/Rev.1/Add.13, 26 May 2004, para. 12. Similarly, in its *General Comment No. 6 (2005) on the Treatment of unaccompanied and separated children outside their country of origin*, U.N. Doc. CRC/GC/2005/6, 1 September 2005, the Committee on the Rights of the Child stated that States party to the Convention on the Rights of the Child "[…] shall not return a child to a country where there are substantial grounds for believing that there is a real risk of irreparable harm to the child, such as, but by no means limited to, those contemplated under articles 6 [right to life] and 37 [right to be free from torture or other cruel, inhuman or degrading treatment or punishment and right not to be arbitrarily deprived of liberty] of the Convention." (para. 27).

[42]   See, for example, the jurisprudence of the European Court of Human Rights, which has held that *non-refoulement* is an inherent obligation under Article 3 of the ECHR in cases where there is a real risk of exposure to torture, inhuman or degrading treatment or punishment, including, in particular, the Court's decisions in *Soering v. United Kingdom*, Application No. 14038/88, 7 July 1989 and subsequent cases, including *Cruz Varas v.* Sweden, Application No. 15567/89, 20 March 1991;



20.     The prohibition of *refoulement* to a country where the person concerned would face a real risk of irreparable harm such as violations of the right to life or the right to be free from torture or cruel, inhuman or degrading treatment or punishment extends to all persons who may be within a State's territory or subject to its jurisdiction, including asylum seekers and refugees,[43] and applies with regard to the country to which removal is to be effected or any other country to which the person may subsequently be removed.[44] It is non-derogable and applies in all circumstances,[45] including in the context of measures to combat terrorism[46] and during times of armed conflict.[47]

---

*Vilvarajah et al. v. United Kingdom*, Application No. 13163/87 et al., 30 October 1991; *Chahal v. United Kingdom*, Application No. 22414/93, 15 November 1996; *Ahmed v. Austria*, Application No. 25964/94, 17 December 1996; *TI v. United Kingdom*, Application No. 43844/98 (Admissibility), 7 March 2000. In the Americas, see, for example, Article 22(8) of the 1969 ACHR ("In no case may an alien be deported or returned to a country, regardless of whether or not it is his country of origin, if in that country his right to life or personal freedom is in danger of being violated because of his race, nationality, religion, social status, or political opinions.") or Article 13(4) of the 1985 Inter-American Convention to Prevent and Punish Torture ("Extradition shall not be granted nor shall the person sought be returned when there are grounds to believe that his life is in danger, that he will be subjected to torture or to cruel, inhuman or degrading treatment, or that he will be tried by special or ad hoc courts in the requesting State.").

43  For States Party to the ICCPR, this has been made explicit by the Human Rights Committee in its *General Comment No. 31*, *supra* footnote 41, para. 10 ("… [T]he enjoyment of Covenant rights is not limited to citizens of States Parties but must also be available to all individuals, regardless of nationality or statelessness, such as asylum seekers, refugees, migrant workers and other persons, who may find themselves in the territory or subject to the jurisdiction of the State Party. …"). *See also infra* at Part II.B.

44  See: Human Rights Committee, *General Comment No. 31*, *supra* footnote 41, para. 12. *See also supra* footnote 41.

45  See, for example, Human Rights Committee, *General Comment No. 29 on States of Emergency (Article 4)*, U.N. Doc. CCPR/C/21/Rev.1/Add.11, 31 August 2001, para. 11; Human Rights Committee, *Concluding Observations/Comments* on Canada, U.N. Doc. CCPR/C/CAN/CO/5, 20 April 2006, para. 15; Committee Against Torture, *Gorki Ernesto Tapia Paez v. Sweden*, U.N. Doc. CAT/C/18/D/39/1996, 28 April 1997, para. 14.5. The absolute nature of the prohibition of *refoulement* to a risk of torture and other forms of ill-treatment under Article 3 of the ECHR has been affirmed by the European Court of Human Rights, for example, in *Chahal v. United Kingdom*, *supra* footnote 42.

46  See, for example, Committee Against Torture, *Agiza v. Sweden*, U.N. Doc. CAT/C/34/D/233/2003, 20 May 2005; Human Rights Committee, *Alzery v. Sweden*, U.N. Doc. CCPR/C/88/D/1416/2005, 10 November 2006; Inter-American Commission on Human Rights, *Report on the Situation of Human Rights of Asylum-Seekers within the Canadian Refugee Determination System*, 28 February 2000, para. 154. *See also* United Nations Commission on Human Rights, Resolution 2005/80 of 21 April 2005 on Protection of human rights and fundamental freedoms while countering terrorism; Security Council resolutions 1456 (2003) of 20 January 2003, 1535 (2004) of 26 March 2004, 1624 (2004) of 14 September 2005, the Declaration on Measures to Eliminate International Terrorism (annex to General Assembly resolution 49/60 of 9 December 1994), the Declaration to Supplement the 1994 Declaration on Measures to Eliminate International Terrorism (annex to General Assembly resolution 51/210 of 17 December 1996), the 2005 World Summit Outcome (General Assembly resolution 60/1 of 16 September 2005) and the Plan of Action annexed to the United Nations Global Counter-Terrorism Strategy adopted by the General Assembly on 8 September 2006 (A/RES/60/288).

47  International human rights law does not cease to apply in case of armed conflict, except where a State has derogated from its obligations in accordance with the relevant provisions of the applicable international human rights treaty (for example, Article 4 ICCPR). In determining what constitutes a violation of human rights, regard must be had to international humanitarian law, which operates as *lex specialis* to international human rights in law during a time of armed conflict. This has been confirmed, *inter alia*, by the International Court of Justice in its *Advisory Opinion on the Legality of the Threat or Use of Nuclear Weapons*, 8 July 1996, para. 25; and the judgement of 19 December 2005 in *Case concerning Armed Activities on the Territory of the Congo (Democratic Republic of the Congo v. Uganda)*, paras. 215–219. *See also*, for example, Concluding Observations of the Human Rights Committee, United States of America, U.N. Doc. CCPR/C/USA/CO/3/Rev.1, 18 December 2006, para. 10; Human Rights Committee, *General Comment No. 31*, *supra* footnote 41, para. 11; *see*



## 2.      Human Rights-Based *Non-Refoulement* Obligations Under Customary International Law

21.      The prohibition of torture is also part of customary international law, which has attained the rank of a peremptory norm of international law, or *jus cogens.*[48] It includes, as a fundamental and inherent component, the prohibition of *refoulement* to a risk of torture, and thus imposes an absolute ban on any form of forcible return to a danger of torture which is binding on all States, including those which have not become party to the relevant instruments. The prohibition of arbitrary deprivation of life, which also includes an inherent obligation not to send any person to a country where there is a real risk that he or she may be exposed to such treatment, also forms part of customary international law.[49] The prohibition of *refoulement* to a risk of cruel, inhuman or degrading treatment or punishment, as codified in universal as well as regional human rights treaties is in the process of becoming customary international law, at the very least at regional level.[50]

22.      Under the above-mentioned obligations, States have a duty to establish, prior to implementing any removal measure, that the person whom it intends to remove from their territory or jurisdiction would not be exposed to a danger of serious human rights violations such as those mentioned above. If such a risk exists, the State is precluded from forcibly removing the individual concerned.

## II. EXTRATERRITORIAL APPLICABILITY OF THE PRINCIPLE OF *NON-REFOULEMENT* UNDER THE 1951 CONVENTION AND/OR ITS 1967 PROTOCOL

23.      The Sections of this Advisory Opinion which follow examine the territorial scope of Article 33(1) of the 1951 Convention in light of the criteria provided for under international law for the interpretation of treaties. In accordance with the relevant rules,

---

*also* Conclusions and recommendations of the Committee against Torture concerning the second report of the United States of America, U.N. Doc. CAT/C/USA/CO/2, 25 July 2006 para. 14.

[48]    See, for example, Human Rights Committee, *General Comment No. 29: Article 4: Derogations during a State of Emergency,* U.N. Doc. CCPR/C/21/Rev.1/Add.11, 31 August 2001, para. 11 ("The proclamation of certain provisions of the Covenant as being of a non-derogable nature, in article 4, para. 2, is to be seen partly as recognition of the peremptory nature of some fundamental rights ensured in treaty form in the Covenant (e.g., articles 6 and 7). "); *see also* the decisions of the International Criminal Tribunal for the former Yugoslavia (ICTY) in *Prosecutor v Delalic and Others*, Trial Chamber, Judgement of 16 November 1998, para. 454; *Prosecutor v. Furundzija*, Trial Chamber, Judgement of 10 December 1998, paras. 134–164; *Prosecutor v. Kunarac and Others*, Trial Chamber, Judgement of 22 February 2001, para. 466. *See also* the judgement of the House of Lords in *Pinochet Ugarte, re.* [1999] 2 All ER 97, paras. 108–109. *See also*, for example, *Filartiga v. Pena Irala,* 630 F.2d 876 (2d. Cir. 1980).

[49]    See Human Rights Committee, *General Comment No. 24: Issues relating to reservations made upon ratification or accession to the Covenant or the Optional Protocols thereto, or in relation to declarations under Article 41 of the Covenant*, U.N. Doc. CCPR/C/21/Rev.1/Add.6, 4 November 1994, para. 8 ("… [P]rovisions in the Covenant that represent customary international law (and *a fortiori* when they have the character of peremptory norms) may not be the subject of reservations. Accordingly, a State may not reserve the right to engage in … torture, to subject persons to cruel, inhuman or degrading treatment, to arbitrarily deprive persons of their lives …").

[50]    See, for example, the jurisprudence of the European Court of Human Rights referred to *supra* footnote 42; *see also* Article 19(2) of the European Charter of Fundamental Rights, [2000] OJ C364; and preambular para. 13 of the Council Framework Decision of 13 June 2002 on the European arrest warrant and the surrender procedures between Member States, 2002/584/JHA, adopted by the Council of the European Union.



as stated in the 1969 Vienna Convention on the Law of Treaties,[51] the meaning of a provision in an international treaty must be established by examining the ordinary meaning of the terms employed, in light of their context and the object and purpose of the treaty.[52] Subsequent practice of States in applying the treaty as well as relevant rules of international law must also be taken into consideration in interpreting a treaty.[53]

24.      For the reasons set out below, UNHCR is of the view that the purpose, intent and meaning of Article 33(1) of the 1951 Convention are unambiguous and establish an obligation not to return a refugee or asylum-seeker to a country where he or she would be risk of persecution or other serious harm, which applies wherever a State exercises jurisdiction, including at the frontier, on the high seas or on the territory of another State.[54]

## A.      Scope *Ratione Loci* of Article 33(1) of the 1951 Convention: Ordinary Meaning, Context, Object and Purpose of the 1951 Convention

25.      As noted above, the focus of the present inquiry is the territorial scope of the *non-refoulement* provision under Article 33(1) of the 1951 Convention. In keeping with the primary rule of treaty interpretation stated in Article 31(1) of the 1969 Vienna Convention, it is necessary, first, to examine the ordinary meaning of the terms of Article 33(1) of the 1951 Convention, taking into account their context as well as the object and purpose of the treaty of which it forms part.

26.      The obligation set out in Article 33(1) of the 1951 Convention is subject to a geographic restriction only with regard to the country where a refugee may not be sent to, not the place where he or she is sent from. The extraterritorial applicability of the *non-refoulement* obligation under Article 33(1) is clear from the text of the provision itself, which states a simple prohibition: "No Contracting State shall expel or return *("refouler")* a refugee in any manner whatsoever to the frontiers of territories where his [or her] life or freedom would be threatened…".

---

[51]   *Supra* footnote 35 [hereinafter, "1969 Vienna Convention"]. The 1969 Vienna Convention is generally regarded as expressing rules which constitute customary international law.

[52]   Article 31(1) of the 1969 Vienna Convention provides: "A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

[53]   Article 31(3) of the 1969 Vienna Convention provides that, in interpreting a treaty: "… there shall be taken into account, together with the context, … (b) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation; (c) any relevant rules of international law applicable in the relations between parties."

[54]   In a decision which addressed the applicability *inter alia* of Article 33(1) of the 1951 Convention to the return to Haiti of persons intercepted on the high seas by U.S. coast guard vessels, the United States Supreme Court determined that Article 33(1) of the 1951 Convention is applicable only to persons within the territory of the United States (*Sale, Acting Commissioner, Immigration and Naturalization Service, et al., Petitioners v. Haitian Centers Council, Inc., et. al.,* 509 U.S. 155 (1993)). For the reasons set out in this advisory opinion, UNHCR is of the view that the majority opinion of the Supreme Court in *Sale* does not accurately reflect the scope of Article 33(1) of the 1951 Convention. *See also* Inter-American Commission on Human Rights in *The Haitian Centre for Human Rights et al. v. United States*, *supra* footnote 42, para. 157 ("… The Commission shares the view advanced by the United Nations High Commissioner for Refugees in its Amicus Curiae brief in its argument before the Supreme Court, that Article 33 had no geographical limitations.").



27.     The ordinary meaning of "return" includes "to send back" or "to bring, send, or put back to a former or proper place".[55] The English translations of "*refouler*" "include words like 'repulse', 'repel', 'drive back'."[56] It is difficult to conceive that these words are limited to refugees who have already entered the territory of a Contracting State. The ordinary meaning of the terms "return" and "*refouler*" does not support an interpretation which would restrict its scope to conduct within the territory of the State concerned, nor is there any indication that these terms were understood by the drafters of the 1951 Convention to be limited in this way.[57]

28.     A contextual analysis of Article 33 of the 1951 Convention further supports the view that the scope *ratione loci* of the *non-refoulement* provision in Article 33(1) is not limited to a State's territory. The view has been advanced that Article 33(2) of the 1951 Convention, which permits exceptions to the principle of *non-refoulement* only with regard to a refugee who constitutes a danger to the security or the community of the country in which he is, implies that the scope of Article 33(1) is also limited to persons within the territory of the host country.[58] However, in UNHCR's opinion this view is contradicted by the clear wording of Article 33(1) and 33(2), respectively, which address different concerns,[59] as well as the fact that the territorial scope of a number of other provisions of the 1951 Convention is made explicit.[60] Thus, where the drafters of the 1951 Convention intended a particular clause of the 1951 Convention to apply only to

---

[55]  See: *Merriam-Webster Online Dictionary*, 10th edition, available at: http://www.m-w.com/cgi-bin/dictionary?book=Dictionary&va=return (last accessed on 15 October 2006).

[56]  This was also noted by the majority of the United States Supreme Court in *Sale, supra* footnote 54 (at 181) which, however, went on to state that "'return' means a defensive act of resistance or exclusion at a border rather than an act of transporting someone to a particular destination" (at 182), and that "…because the text of Article 33 cannot reasonably be read to say anything at all about a nation's actions toward aliens outside its own territory, it does not prohibit such actions." (at 183). As noted by Blackmun J in his dissenting opinion in *Sale, supra* footnote 54, "[t]he majority's puzzling progression ('*refouler*' means repel or drive back; therefore 'return' means only exclude at a border; therefore the treaty does not apply) hardly justifies a departure from the path of ordinary meaning. The text of Article 33(1) is clear, and whether the operative term is 'return' or '*refouler*', it prohibits the Government's actions." (at 192–193).

[57]  In support of its finding that Article 33(1) does not apply outside a State's territory, the majority of the United States Supreme Court in *Sale, supra* footnote 54, relied on statements by a number of delegates involved in the drafting of the 1951 Convention. However, these statements were expressions of concern related to a possible obligation to grant asylum to large numbers of arrivals in mass influx situations. In UNHCR's view, these portions of the negotiating history do not warrant the conclusion that the drafters of the 1951 Convention reached consensus about an implicit restriction of the territorial scope of the principle of *non-refoulement* as provided for in Article 33(1). *See also* UNHCR, *The Principle of Non-Refoulement as a Norm of Customary International Law, supra* footnote 30.

[58]  See: *Sale, supra* footnote 54, at 179–180.

[59]  See also the dissenting opinion of Blackmun J in *Sale, supra* footnote 54, at 194 ("Far from constituting 'an absurd anomaly […], the fact that a state is permitted to 'expel or return' a small class of refugees found within its territory but may not seize and return refugees who remain outside its frontiers expresses precisely the objectives and concerns of the Convention. Non return is the rule; the sole exception (neither applicable nor invoked here) is that a nation endangered by a refugee's very presence may 'expel or return' him to an unsafe country if it chooses. The tautological observation that only a refugee already in a country can pose a danger to the country 'in which he is' proves nothing.")

[60]  For example, Articles 2, 4 and 27 require simple presence of a refugee in the host country, while Articles 18, 26 and 32 require that he or she be "lawfully on the territory" of a Contracting State, and Articles 15, 17(1), 19, 21, 23, 24 and 28 apply to refugees who are "lawfully staying" in the country of refuge.



those within the territory of a State Party, they chose language which leaves no doubt as to their intention.

29.     Furthermore, any interpretation which construes the scope of Article 33(1) of the 1951 Convention as not extending to measures whereby a State, acting outside its territory, returns or otherwise transfers refugees to a country where they are at risk of persecution would be fundamentally inconsistent with the humanitarian object and purpose of the 1951 Convention and its 1967 Protocol. In this context, it is worth recalling the first two paragraphs of the Preamble to the 1951 Convention, which read:

"Considering that the Charter of the United Nations and the Universal Declaration of Human Rights approved on 10 December 1948 by the General Assembly have affirmed the principle that human beings shall enjoy fundamental rights and freedoms without discrimination,61

Considering that the United Nations has, on various occasions, manifested its profound concern for refugees and endeavoured to assure refugees the widest possible exercise of these fundamental rights and freedoms."

30.     A comprehensive review of the *travaux préparatoires*[62] confirms the overriding humanitarian object and purpose of the Convention and provides significant evidence that the *non-refoulement* provision in Article 33(1) was intended to prohibit any acts or omissions by a Contracting State which have the effect of returning a refugee to territories where he or she is likely to face persecution or danger to life or freedom. For example, when the 1951 Convention was in the course of preparation, the Secretary-General stated in a Memorandum dated 3 January 1950 to the *Ad Hoc* Committee on Statelessness and Related Problems that "turning a refugee back to the frontier of the country where his life or liberty is threatened… would be tantamount to delivering him into the hands of his persecutors."[63] During the discussions of the Committee, the representative of the United States vigorously argued that:

"[w]hether it was a question of closing the frontier to a refugee who asked admittance, or of turning him back after he had crossed the frontier, or even expelling him after he had been admitted to residence in the territory, the problem was more or less the same. Whatever the case might be, whether or not

---

61   One of the fundamental rights enshrined in the Universal Declaration of Human Rights, General Assembly resolution 217A (III), U.N. Doc. A/810 at 71 (1948), is the right of everyone "to seek and enjoy in other countries asylum from persecution" under Article 14.

62   Pursuant to Article 32 of the 1969 Vienna Convention, *supra* footnote 35, recourse to the preparatory work of the treaty is a supplementary means of treaty interpretation is permitted only where the meaning of the treaty language is ambiguous or obscure; or where interpretation pursuant to the general rules set out in Article 31 of the 1969 Vienna Convention leads to a result which is manifestly absurd or unreasonable. It is a well-established principle that when the meaning of the treaty is clear from its text when viewed in light of its context, object and purpose, supplementary sources are unnecessary and inapplicable, and recourse to such sources is discouraged. *See*, for example, International Court of Justice, *Interpretation of the Treaty of Lausanne*, P.C.I.J., Ser. B, No. 12 (1925), at 22; The *Lotus Case*, P.C.I.J., Ser. A, No. 10 (1927), at 16; *Admission to the United Nations Case*, 1950 ICJ Reports 8. Thus, while UNHCR is of the view that recourse to the drafting history of Article 33(1) of the 1951 Convention is not necessary given the unambiguous wording of this provision, the *travaux préparatoires* are nevertheless of interest in clarifying the background, content and scope of Article 33(1).

63   *Ad Hoc* Committee on Statelessness and Related Problems, Status of Refugees and Stateless Persons – Memorandum by the Secretary General, U.N. Document E/AC.32/2, 3 January 1950, Comments on Article 24 of the preliminary draft, para. 3.

 UNHCR

the refugee was in a regular position, he must not be turned back to a country where his life or freedom could be threatened."[64]

31.     The same representative of the United States proposed that the words "undertakes not to expel or return (*refouler*)" should replace the words "not turn back" in order to settle any doubts that *non-refoulement* applied to refugees whether or not they had been regularly admitted to residence,[65] an amendment that ultimately formed the basis for the "expel or return" final wording of Article 33 of the 1951 Convention. It is also worth noting that at one point the Chairman of the *Ad Hoc* Committee suspended the discussion, observing that it had indicated agreement on the principle that refugees fleeing from persecution on account of their race, religion, nationality or political opinion should not be pushed back into the arms of their persecutors.[66]

**B.     Extraterritorial Applicability of Article 33(1) of the 1951 Convention: Subsequent State Practice and Relevant Rules of International Law**

32.     Limiting the territorial scope of Article 33(1) of the 1951 Convention to conduct of a State within its national territory would also be at variance with subsequent State practice and relevant rules of international law applicable between the States party to the treaty in question. In accordance with Article 31(3) of the 1969 Vienna Convention,[67] these elements also need to be taken into account in interpreting a provision of an international treaty.

33.     Subsequent State practice is expressed, *inter alia*, through numerous Executive Committee Conclusions which attest to the overriding importance of the principle of *non-refoulement* irrespective of whether the refugee is in the national territory of the State concerned.[68] Subsequent State practice which is relevant to the interpretation of the *non-refoulement* obligation under the 1951 Convention and 1967 Protocol is also evidenced by other international refugee and human rights instruments drawn up since 1951, none of which places territorial restrictions on States' *non-refoulement* obligations.[69]

---

[64]   Statement of Mr. Henkin of the United States, U.N. Doc. E/AC.32/SR.20, Feb 1, 1950, paras. 54–55.

[65]   U.N. Doc. E/AC.32/SR.20, para. 56.

[66]   Statement of the Chairman, Mr. Chance of Canada, U.N. Doc. E/AC.32.SR.21, 2 February 1950, at page 7. The Chairman then invited the representatives of Belgium and the United States to confer with him to attempt the preparation of a suitable draft for later consideration.

[67]   *Supra* footnote 53.

[68]   See, for example, Executive Committee, Conclusion No. 6 (XXVIII), *supra* footnote 9, at para (c) (reaffirming "the fundamental importance of the observance of the principle of *non-refoulement* – both at the border and within the territory of a State …"); Conclusion No. 15 (XXX) *"Refugees without an Asylum Country"* (1979) paras. (b) and (c) (stating that "[a]ction whereby a refugee is obliged to return or is sent to a country where he has reason to fear persecution constitutes a grave violation of the principle of *non-refoulement*" and noting that "[i]t is the humanitarian obligation of all coastal States to allow vessels in distress to seek haven in their waters and to grant asylum, or at least temporary refuge, to persons on board wishing to seek asylum."); Conclusion No. 22 (XXXII) *"Protection of Asylum-Seekers in Situations of Large-Scale Influx"* (1981), at II.A.2. ("In all cases the fundamental principle of *non-refoulement* – including non-rejection at the frontier – must be scrupulously observed."); Conclusion No. 53 (XXXIX) *"Stowaway Asylum-Seekers"* (1988), para. (1) (providing *inter alia* that "[l]ike other asylum seekers, stowaway asylum-seekers must be protected against forcible return to their country of origin.").

[69]   These include, in particular, the 1969 OAU Convention (*supra* footnote 22); the 1969 ACHR (*supra* footnote 23); and the Convention Against Torture (*supra* footnote 39). See also the expressions of the principle of *non-refoulement* in non-binding texts such as, for example, the 1984 Cartagena

UNHCR

34.	In keeping with the above-mentioned rules of treaty interpretation, it is also necessary to have regard to developments in related areas of international law when interpreting the territorial scope of Article 33(1) of the 1951 Convention. International refugee law and international human rights law are complementary and mutually reinforcing legal regimes.[70] It follows that Article 33(1), which embodies the humanitarian essence of the 1951 Convention and safeguards fundamental rights of refugees, must be interpreted in a manner which is consistent with developments in international human rights law. An analysis of the scope *ratione loci* of States' *non-refoulement* obligations under international human rights law is particularly pertinent to the question of the extraterritorial applicability of the prohibition on returning a refugee to a danger of persecution under international refugee instruments.

35.	As discussed in more detail below, States are bound by their obligations not to return any person over whom they exercise jurisdiction to a risk of irreparable harm. In determining whether a State's human rights obligations with respect to a particular person are engaged, the decisive criterion is not whether that person is on the State's national territory, or within a territory which is *de jure* under the sovereign control of the State, but rather whether or not he or she is subject to that State's effective authority and control.

36.	In its General Comment No. 31 on the Nature of the General Legal Obligation Imposed on States Parties to the [ICCPR], the Human Rights Committee has stated that "States are required by Article 2(1) [of the ICCPR] to respect and to ensure the Covenant rights to all persons who may be within their territory and to all persons subject to their jurisdiction. This means that a State party must respect and ensure the rights laid down in the Covenant to anyone within the power or effective control of that State Party, even if not situated within the territory of the State Party."[71] The General Comment reaffirms consistent jurisprudence of the Human Rights Committee to the effect that States can "be held accountable for violations of rights under the ICCPR which its agents commit on the territory of another State, whether with the acquiescence of the Government of that State or in opposition to it"[72] and that in certain

---

Declaration (*supra* footnote 26); the 1967 Declaration of Territorial Asylum adopted by the General Assembly (*supra* footnote 27); and Resolution (67) 14 of the Committee of Ministers of the Council of Europe (*supra* footnote 27).

[70]	The complementarity between *non-refoulement* obligations under international refugee and human rights law has been highlighted, for example, in the Mexico Declaration and Plan of Action to Strengthen the International Protection of Refugees in Latin America of 16 November 2004 (available at: http://www.unhcr.org/home/RSDLEGAL/424bf6914.pdf, last accessed on 30 October 2006). This Declaration was adopted by Latin American States participating at a gathering to celebrate the twentieth anniversary of the 1984 Cartagena Declaration. *See also* Executive Committee, Conclusion No. 79 (XLVII), *supra* footnote 20; No. 81(XLVII) "*General*" (1997); Conclusion No. 82 (XLVIII) "*Safeguarding Asylum*" (1997), which specifically refer to the prohibition of return to torture, as set forth in the Convention Against Torture, and Executive Committee Conclusion No. 95 (LIV) "*General Conclusion on International Protection*" (2003), para. (l) (noting the "complementary nature of international refugee and human rights law as well as the possible role of the United Nations human rights mechanisms in this area …").

[71]	General Comment No. 31, *supra* footnote 41, para. 10.

[72]	See the decisions of the Human Rights Committee in *Lopez Burgos v. Uruguay*, U.N. Doc. CCPR/C/13/D/52/1979, 29 July 1981, para. 12.3; and *Celiberti de Casariego v. Uruguay*, U.N. Doc. CCPR/C/13/D/56/1979, 29 July 1981, para. 10.3. In both decisions, the Human Rights Committee has also held that "it would be unconscionable to so interpret the responsibility under article 2 of the Covenant as to permit a State party to perpetrate violations of the Covenant on the territory of another State, which violations it could not perpetrate on its own territory." *See also* the decision of the



circumstances, "persons may fall under the subject-matter of a State Party [to the ICCPR] even when outside that State's territory."[73]

37.     The International Court of Justice has confirmed that the ICCPR is applicable in respect of acts done by a State in the exercise of its jurisdiction outside its own territory.[74] The Court observed that, "while the jurisdiction of States is primarily territorial, it may sometimes be exercised outside the national territory. Considering the object and purpose of the International Covenant on Civil and Political Rights, it would seem natural that, even when such is the case, States parties to the Covenant should be bound to comply with its provisions."[75]

38.     Similarly, the Committee against Torture has affirmed that the *non-refoulement* obligation contained in Article 3 of the Convention Against Torture applies in any territory under a State party's jurisdiction.[76] With regard to those provisions of the Convention Against Torture which "are expressed as applicable to 'territory under [the State party's] jurisdiction'", the Committee Against Torture reiterated "its previously expressed view that this includes all areas under the de facto effective control of the State party, by whichever military or civil authorities such control is exercised" and made it clear that these provisions "apply to, and are fully enjoyed, by all persons under the effective control of its authorities, of whichever type, wherever located in the world."[77]

39.     The extraterritorial applicability of human rights treaties is also firmly established at the regional level. The European Court of Human Rights has examined the concept of "jurisdiction" in a number of decisions and consistently held that the decisive criterion is not whether a person is within the territory of the State concerned, but whether or not, in respect of the conduct alleged, he or she is under the effective control

---

Human Rights Committee in *Pereira Montero v. Uruguay*, U.N. Doc. CCPR/C/18/D/106/1981, 31 March 1983, para. 5.

[73]  See, for example, Concluding Observations of the Human Rights Committee, United States of America, U.N. Doc. CCPR/C/79/Add.50, 3 October 1995, para. 284. In 2006, the Human Rights Committee also reaffirmed the applicability of the provisions of the ICCPR with reference to conduct of the United States at Guantánamo Bay. *See* Concluding Observations of the Human Rights Committee, United States of America, *supra* footnote 47, para. 10. See also Concluding Observations of the Human Rights Committee, Israel, U.N. Doc. CCPR/C/79/Add.93, 18 August 1998, para. 10 and U.N. Doc. CCPR/CO/78/ISR, 21 August 2003, para. 11.

[74]  See the Advisory Opinion of the International Court of Justice in *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory,* (2004) ICJ Gen. List No. 131, 9 July 2004, para. 111. See also the recent judgement of the International Court of Justice in *Case Concerning Armed Activities on the Territory of the Congo (DRC v. Uganda)*, (2005) ICJ Gen. List No. 116, 19 December 2005, para. 216.

[75]  *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, *supra* footnote 74, para. 109.

[76]  See, for example, Committee Against Torture, Conclusions and recommendations of the Committee against Torture concerning the second report of the United States of America, *supra* footnote 47. Having requested the State Party's views on the extraterritorial applicability of Article 3 of the Convention against Torture in the context of Guantánamo Bay, the Committee expressed its concern ("…that the State party considers that the non-refoulement obligation, under article 3 of the Convention, does not extend to a person detained outside its territory. … The State party should apply the *non-refoulement* guarantee to all detainees in its custody, …, in order to comply with its obligations under article 3 of the Convention. …") (para. 20).

[77]  *Id*., para. 15. This applies, *inter alia*, to Article 16 of the Convention Against Torture, which prohibits acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture as defined in Article 1 of the Convention.



of, or is affected by those acting on behalf of, the State in question. Thus, in a decision in which it examined the circumstances in which the obligations under the European Convention apply extraterritorially, the European Court of Human Rights held that while, "from the standpoint of public international law, the jurisdictional competence of a state is primarily territorial",[78] it may extend extraterritorially if a State, "through the effective control of the relevant territory and its inhabitants abroad as a consequence of military occupation or through the consent, invitation or acquiescence of the government of that territory, exercises all or some of the public powers normally to be exercised by that government."[79] A situation in which a person is brought under the "effective control" of the authorities of a State if they are exercising their authority outside the State's territory may also give rise to the extraterritorial application of Convention obligations.[80]

40.     Also relevant in the present context is the judgement of the European Court of Human Rights in *Issa and Ors v. Turkey*, which confirmed that

> "a State may also be held accountable for violations of the Convention rights and freedoms of persons who are in the territory of another State but who are found to be under the former State's authority and control through its agents operating – whether lawfully or unlawfully – in the latter State […]. Accountability in such situations stems from the fact that Article 1 of the Convention cannot be interpreted so as to allow a State party to perpetrate violations of the Convention on the territory of another State, which it could not perpetrate on its own territory […]."[81]

41.     The Inter-American Commission on Human Rights held in its decision in *Coard et al. v. the United States* that "while the extraterritorial application of the American Declaration has not been placed at issue by the parties, the Commission finds it pertinent to note that, under certain circumstances, the exercise of its jurisdiction over acts with an extraterritorial locus will not only be consistent with, but required by the norms which pertain."[82]

---

[78]  *Bankovic et al. v. Belgium and 16 other contracting States (Admissibility)*, Application No. 52207/99, 12 December 2001, para. 59.

[79]  *Id.*, para. 71. See also *Loizidou v. Turkey (Preliminary Objections)*, Application No. 15318/89, Judgement of 23 February 1995, Series A, No. 310, para. 62 ("In this respect the Court recalls that, although Article 1 (art. 1) sets limits on the reach of the Convention, the concept of 'jurisdiction' under this provision is not restricted to the national territory of the High Contracting Parties. […] [t]he responsibility of Contracting Parties can be involved because of acts of their authorities, whether performed within or outside national boundaries, which produce effects outside their own territory.").

[80]  *Öcalan v. Turkey (Preliminary Objections)*, Application No. 46221/99, Judgement of 12 March 2003, para. 93 (the former PKK leader had been arrested by Kenyan authorities and handed over to Turkish officials operating in Kenya). *See also Ilascu and Others v. Russia and Moldova*, Application No. 48787/99, Judgement of 8 July 2004, paras. 382-394 (finding that the complainants came within the "jurisdiction" of the Russian Federation, and that the responsibility of the Russian Federation for acts which occurred on the territory of Moldova was engaged by the conduct of its own soldiers there, as well as that of the Transdniestran authorities, on the basis of the support provided by Russia to the latter) on the basis of the actions of its own soldiers as well as their support to the Transdniestran authorities).

[81]  *Issa and Ors v. Turkey*, Application No. 3821/96, Judgement of 16 November 2004, para. 71, with references, *inter alia*, to decisions of the Human Rights Committee and the Inter-American Commission of Human Rights.

[82]  *Coard et al. v. the United States*, Case No. 10.951, Report No. 109/99, 29 September 1999, para. 37.

UNHCR

42.     In UNHCR's view, the reasoning adopted by courts and human rights treaty bodies in their authoritative interpretation of the relevant human rights provisions is relevant also to the prohibition of *refoulement* under international refugee law, given the similar nature of the obligations and the object and purpose of the treaties which form their legal basis.[83]

43.     Thus, an interpretation which would restrict the scope of application of Article 33(1) of the 1951 Convention to conduct within the territory of a State party to the 1951 Convention and/or its 1967 Protocol would not only be contrary to the terms of the provision as well as the object and purpose of the treaty under interpretation, but it would also be inconsistent with relevant rules of international human rights law. It is UNHCR's position, therefore, that a State is bound by its obligation under Article 33(1) of the 1951 Convention not to return refugees to a risk of persecution wherever it exercises effective jurisdiction. As with *non-refoulement* obligations under international human rights law, the decisive criterion is not whether such persons are on the State's territory, but rather, whether they come within the effective control and authority of that State.

UNHCR, Geneva
26 January 2007

---

[83] As noted by the International Law Commission in its Report of the fifty-eighth session (1 May-9 June and 3 July-11 August 2006), U.N. Doc. A/61/10, at pp. 414–415, "Article 31(3)(c) [of the 1969 Vienna Convention, *supra* footnote 36] also requires the interpreter to consider other treaty-based rules so as to arrive at a consistent meaning. Such other rules are of particular relevance where parties to the treaty under interpretation are also parties to the other treaty, where the treaty rule has passed into or expresses customary international law or where they provide evidence of the common understanding of the parties as to the object and purpose of the treaty under interpretation or as to the meaning of a particular term."

Exhibit C

INFORMATION MEMORANDUM

TO:　　　　　Andrew Davidson
　　　　　　　Acting Deputy Director

THROUGH:　Ted Kim, Associate Director          TED H KIM  Digitally signed by TED
　　　　　　　Refugee, Asylum and International Operations Directorate          H KIM
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Date: 2023.05.10
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　15:17:15 -04'00'

FROM:　　　John L. Lafferty, Chief          JOHN L          Digitally signed by JOHN L
　　　　　　　Asylum Division          LAFFERTY          LAFFERTY
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Date: 2023.05.10 14:50:46
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　-04'00'

SUBJECT:　Scheduling of Credible Fear Interviews

DATE:　　　May 10, 2023

---

**Purpose:** To inform you that, consistent with the applicable statutory and regulatory provisions, the Asylum Division will schedule credible fear interviews to take place no earlier than 24 hours after the noncitizen's acknowledgement of receipt of the Form M-444, Information about Credible Fear Interview.

**Background:** The Immigration and Nationality Act (INA) authorizes the expedited removal of certain noncitizens seeking admission who are determined to be inadmissible under certain grounds of inadmissibility. INA Sec. 235(b)(1). If noncitizens in expedited removal proceedings indicate an intention to apply for asylum or express a fear of persecution or torture or of return to their country, they are referred to a USCIS asylum officer for a credible fear interview, INA Sec. 235(b)(1)(A)(ii), 8 C.F.R. § 235.3(b)(4); and generally will be detained throughout the credible fear screening process, INA Sec. 235(b)(1)(B)(iii)(IV), 8 C.F.R. § 235.3(b)(4)(ii).

The INA requires that the noncitizen be given information about the credible fear interview and provides the right for noncitizens in the credible fear process to consult with a person or persons of their choosing prior to the interview, so long as the consultation is conducted "according to regulations prescribed by [DHS]." INA Sec. 235(b)(1)(B)(iv). Under those regulations, if the noncitizen is represented, the representation shall be at no expense to the government, and consultations "shall be made available in accordance with the policies and procedures of the detention facility where the [noncitizen] is detained, and […] shall not unreasonably delay the process." 8 C.F.R. § 235.3(b)(4)(ii). The applicable regulations further require that noncitizens be provided a Form M-444, *Information About Credible Fear Interview*, that explains the credible fear interview process, and "be given time to contact and consult with any person or persons of the [noncitizen's] choosing" after being referred to USCIS for a credible fear interview. 8 C.F.R. § 235.3(b)(4)(i)-(ii). The regulations do not require that the noncitizen be allowed a particular

amount of time to consult with the person or persons of their choosing. Prior to the interview, the noncitizen can request access to a phone and seek to consult with someone. *See* Form M-444.

Under the current policy, credible fear interviews have generally taken place at least 48 hours after the time of the noncitizen's arrival at the detention facility, unless the noncitizen specifically requests to be interviewed more quickly. That policy originated with the initial implementation of the expedited removal process by the former Immigration and Naturalization Service in 1997 but was not mandated by statute and is not set forth in the regulations.[1]

**Considerations:** Between the time a noncitizen arrives at a DHS holding or detention facility and the credible fear screening takes place, USCIS must receive the documents referring the noncitizen for a credible fear screening from the DHS component holding the noncitizen, schedule a time and date for an available asylum officer to conduct the credible fear interview, and request that the DHS component with custody make the noncitizen available to participate in the scheduled interview. While these steps are being taken to schedule the credible fear interview, the noncitizen can make use of available phone lines to consult with a person or persons of their choosing in advance of the interview.

As noted in the April 27, 2023 Fact Sheet that accompanied the announcement of the multiple actions being taken to manage regional migration with the upcoming end of the CDC's Title 42 public health Order, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration | Homeland Security (dhs.gov), DHS is returning to the use of Title 8 immigration authorities to expeditiously process and remove noncitizens who cross the U.S. border unlawfully and have no basis to legally remain in the United States, generally processing them in a matter of days. To support expeditious processing, DHS is increasing its holding capacity, expanding capabilities and technologies across the expedited removal process continuum, and installing hundreds of additional phone lines and privacy booths to provide increased opportunities for noncitizens to consult with the person or persons of their choice prior to their credible fear interviews and for credible fear interviews to be conducted in an expeditious manner. Completing immigration proceedings at the border in a safe, orderly, and humane manner is necessary in order to maximize the number of noncitizens who can be processed using this increased holding capacity.

To support this effort, USCIS has been closely working with our government partners to establish a streamlined process for receiving credible fear referral documents, scheduling interviews, and issuing decisions on credible fear claims. In addition, USCIS is increasing its capacity by training and preparing additional staff to conduct credible fear interviews and support the processing of

---

[1] USCIS reduced the credible fear consultation period to 24 hours in 2019. Memorandum for the Acting Secretary from Ken Cuccinelli II, *Reduction of Credible Fear Consultation Period* (July 2, 2019). But that policy was set aside in 2020 as *ultra vires* under the Federal Vacancies Reform Act of 1998, 5 U.S.C. § 3348(d)(1), and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), because the court concluded that Mr. Cuccinelli was not lawfully appointed to serve as the acting Director of USCIS. *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 37 (D.D.C. 2020).

these cases, including scheduling credible fear interviews as soon as, but no earlier than, 24 hours after the noncitizen's acknowledgement of receipt of the Form M-444.  Once it has received a complete credible fear referral document package from either U.S. Immigration and Customs Enforcement (ICE) or U.S. Customs and Border Protection (CBP), USCIS will schedule the interview as soon as possible and ensure the noncitizen has no less than 24 hours for consultation before the credible fear interview.

The number of migrants expected to travel without authorization to the United States is expected to significantly increase after the end of the CDC's Title 42 public health Order.[2]  To ensure DHS's continued ability to safely, humanely, and effectively enforce and administer the immigration laws, USCIS must make changes to reduce the amount of time noncitizens who do not have a legal basis to remain in the United States spend in DHS custody before being removed.  This change in the consultation period is being made in alignment with the April 27, 2023 announcement regarding the whole-of-government approach to managing regional migration.  This change will enable the United States to expeditiously process and remove individuals who arrive at the Southwest border and do not have a legal basis to remain in the United States.  In order to effectively implement the change to the consultation period, USCIS is also establishing a new policy of requiring extraordinary circumstances warranting approval of a request to reschedule so that USCIS can ensure, consistent with the statute and regulations, that the consultation period does not unreasonably delay the overall process.

USCIS is also taking all necessary steps to ensure that noncitizens understand the credible fear process, have been given at least 24-hours to seek consultation prior to the interview, and are given a full and fair opportunity to have their claims for protection or fear of return heard by a fully trained USCIS officer, and, to the extent it applies, consistent with the Americans with Disabilities Act.  In practice, this means noncitizens will have longer than 24 hours to consult depending on when they acknowledge receipt of the Form M-444.  USCIS will continually assess the feasibility of scheduling credible fear interviews as soon as 24 hours after the noncitizen's acknowledgement of the Form M-444 and may determine, in its discretion, that a return to a 48-hour period prior to the scheduled credible fear interview is appropriate.

The approach described in this memorandum is an internal general policy that USCIS is pursuing in order to improve procedural efficiency and ensure appropriate disincentives for irregular migration after the end of the CDC's Title 42 public health Order.  It does not set or modify any binding standard.  It is not intended to, shall not be construed to, may not be relied upon to, and does not create any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

---

[2] *See, e.g.*, Secretary Mayorkas Remarks at a Press Conference on New Regional Migration Management Measures (Apr. 28, 2023), https://www.dhs.gov/news/2023/04/28/secretary-mayorkas-remarks-press-conference-april-27-2023.

# Exhibit D



**Title: Updated guidance**
**Date: 05/10/2023**

<u>Annex two</u>

**Withdrawal of Application for Admission Advisal Statement**

You may withdraw your application for admission to the United States and return to Mexico instead of being placed in removal proceedings. It is a voluntary decision. You are not required to withdraw your application for admission and depart, and you may instead decide to remain in the United States to be placed in removal proceedings and seek relief or protection from removal, including asylum, if appropriate.

The United States currently offers parole processes that allows *Cuba, Haiti, Nicaragua, and Venezuela* nationals and their immediate family members to come to the United States. Those parole processes provide a safe and orderly way for Cuba, Haiti, Venezuela, or Nicaragua nationals who lack documents sufficient for admission to the U.S. to be considered, on a case-by-case basis, for advance authorization to travel and a temporary period of parole into the United States for up to 2 years. Participants in such processes must have a supporter in the United States, pass certain security checks, and fly to an interior location in the United States. To seek participation in one of these processes, however, you must be outside the United States. You may choose to depart the United States voluntarily a single time and still be eligible for the parole process. You are being given an opportunity now to withdraw your application for admission and return to Mexico so that you remain eligible for that parole process.

CBP_Withdrawals_AR_000006

# Exhibit E

FOUO

**Circumvention of Lawful Pathways (CLP) & Voluntary Withdrawal of Admission Step-by-Step Guide**



| Step 2:  Voluntary Withdrawal of Admission |
| --- |

Nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV) who entered on or after May 12, 2023 at 12:00 AM ET may have a designated country of removal of Mexico. CHNV nationals with a designated country of removal of Mexico in Border Patrol (BP) custody may be allowed the opportunity to voluntarily withdraw their application for admission.

The designated country of removal will be listed on a continuation page to the I-213. If there is no country of removal designation on the I-213, the designated country of removal is the noncitizen's country of nationality.

**If the noncitizen is not a CHNV national in BP custody with Mexico as the designated country of removal, skip to Step 3.**

If the noncitizen is a CHNV national in BP custody with Mexico as the designated country of removal, where appropriate, provide the following voluntary withdrawal advisal at the beginning of the interview:

> Before we begin your Credible Fear interview today, I want to let you know about a process that is currently in place for individuals in your situation.

> I will give you an opportunity before we start the interview to choose to follow this process if it is something you would like to do.  Here is an explanation of the process:

> The United States currently offers a parole process that allows nationals of certain countries and their immediate family members to come to the United States.  That parole process provides a safe and orderly way for those nationals who lack sufficient U.S. entry documents to be considered, on a case-by-case basis, for advance authorization to travel and a temporary period of parole into the United States for up to 2 years.  Participants in that process must have a supporter in the United States, pass certain security checks, and have a passport or other identification allowing them to fly to an interior location in the United States.  To seek participation in that process, however, you must be outside the United States.  You may choose to depart the United States voluntarily a single time and still be eligible for the parole process. You are being given an opportunity now to withdraw your application for admission to the United States and return to Mexico so that you remain eligible for that parole process.

FOUO

If you decide to withdraw your application for admission, I will not continue with your credible fear interview today and DHS will process your case as a withdrawal of your application for admission.  If you decide not to withdraw your application for admission, I will continue with your credible fear interview.  Following your credible fear interview, you may receive a notice to appear in immigration court, where you can file your application for asylum, or you may receive a negative determination because the asylum officer did not find that you have a credible fear. You may request to have the negative determination reviewed by an immigration judge.  If the immigration judge agrees with the negative determination or if you decline such review, you will be ordered removed from the United States without any further hearing and you will be barred from re-entering the United States for at least 5 years, unless you apply for and receive permission to reapply for admission.

Unfortunately, I cannot answer any questions about this process, predict what will happen to you, or provide you with any advice or more information than the explanation I just gave you.

Would you like to voluntarily withdraw your application for admission at this time so that you can return to Mexico and remain eligible to request access to the parole process I just described?

**An Asylum Officer (AO) cannot answer any questions on the parole process, provide legal advice of any sort, or predict what will happen to the noncitizen if they decide to withdraw. Please do not attempt to answer any questions or tell the noncitizen what might happen to them in the future. Please stick to the exact language of the above script.**

- **If asked any questions on the above explanation, please answer:**  I am not in a position to answer any questions on this process or to provide legal advice. All I can do right now is provide you this explanation of the process and ask if you would like to voluntarily withdraw your application for admission so that you can return to Mexico and participate in the process. Is that something you would like to do?

- **If asked for time to speak with a consultant:** Consult with a supervisor regarding the request to reschedule.

**Voluntary Withdrawal Requested:** If the noncitizen voluntarily withdraws their application for admission, conclude the interview, upload your interview notes and then administratively close the CF case in Global as "CHNV Voluntary Withdrawal."

**Voluntary Withdrawal Not Requested:** If noncitizen does not voluntarily withdraw their application for admission or lacks the capacity to do so, continue to Step 3.



**FOUO**



**FOUO**



FOUO









**Step 9:  Voluntary Withdrawal of Admission**

**If the noncitizen is not a CHNV national in BP custody with Mexico as the designated country of removal, skip to Step 10.**

For noncitizens who are CHNV nationals in BP custody with Mexico as the designated country of removal, provide a second voluntary withdrawal advisal**:**

> Thank you for answering my questions so far. Based on your testimony, it does not appear that you have demonstrated an exception or rebutted the presumption that you are ineligible for asylum.  If I continue with your interview, I will not be screening you for asylum and will only be screening you for eligibility for withholding of removal under section 241(b)(3) of the Immigration and Nationality Act or protection under the Convention Against Torture regulations.

> Before I continue, I would like to offer you another chance to withdraw your application for admission like I offered you at the beginning of the interview.  Do you want me to repeat the explanation of that offer?

> [Only if noncitizen asks for the explanation to be repeated, please read again: The United States currently offers a parole process that allows nationals of certain countries and their immediate family members to come to the United States.  That parole process provides a safe and orderly way for those nationals who lack sufficient U.S. entry documents to be considered, on a case-by-case basis, for advance authorization to travel and a temporary period of parole into the United States for up to 2 years.  Participants in that process must have a supporter in the United States, pass certain security checks, and fly to an interior location in the United States.  To seek participation in that process, however, you must be outside the United States.  You may choose to depart the United States voluntarily a single time and still be eligible for the parole process. You are being given an opportunity now to withdraw your application for admission and return to Mexico so that you remain eligible for that parole process.]

> If you decide to withdraw your application for admission, I will not continue any longer with your credible fear interview today and DHS will process your case as a withdrawal of your application for admission.  If you decide not to withdraw, I will continue with your interview and ask you questions to see if there is a reasonable possibility you would be persecuted or tortured in Mexico [and any other country designated for removal].

> Would you like to voluntarily withdraw your application for admission at this time so that you can return to Mexico and be eligible for the parole process I described to you earlier?

**Voluntary Withdrawal Requested:** If the noncitizen volunteers to withdraw their application for admission, complete and upload the CLP Presumption Worksheet along with the interview notes, and then administratively close the CF case in Global as "CHNV Voluntary Withdrawal."

**Voluntary Withdrawal** **Not** **Requested:** If noncitizen does not volunteer to withdraw, continue to Step 10.

FOUO



Exhibit F

DEPARTMENT OF HOMELAND SECURITY

## NOTIFICACIÓN DE DERECHOS Y SOLICITUD DE RESOLUCIÓN

Subject ID █████████
FINS █████████████

Event No: ████████

Nombre: ████████████████████

Expediente No: ████████

### AVISO DE DERECHOS Y NOTIFICACIONES

Usted ha sido arrestado(a) porque los oficiales de inmigración creen que usted está en los Estados Unidos ilegalmente. Usted tiene el derecho a una audiencia ante la corte de inmigración para que se determine si puede permanecer en los Estados Unidos. Si usted pide una audiencia ante un juez de inmigración, podría permanecer detenido(a) o podría ser elegible para salir de la detención, ya sea con o sin el pago de una fianza.

Usted tiene el derecho de contactar a un abogado de inmigración u otro representante legal para que lo represente en sus audiencias, o para que le conteste cualquier pregunta concerniente a sus derechos legales en los Estados Unidos. El oficial que le ha dado esta notificación le proveerá una lista de servicios legales que podrían representarlo(a) de gratis o a bajo costo. Usted tiene el derecho de comunicarse con los oficiales consulares o diplomáticos de su país. Usted puede utilizar el teléfono para llamar a un abogado, otro representante legal o al oficial consular en cualquier momento antes de su salida de los Estados Unidos.

Como alternativa, usted puede pedir que lo devuelvan a su país lo más pronto posible, sin una audiencia. Si elige regresar a su país, usted podría perder la oportunidad de solicitar ciertos beneficios de inmigración o formas de prevenir la remoción que solamente están disponibles para las personas presentes en los Estados Unidos. Si elige regresar a su país, usted puede cambiar de idea y pedir una audiencia ante un juez en la corte de inmigración en cualquier momento antes de su salida de los Estados Unidos. Usted debe notificar inmediatamente a un oficial de inmigración si cambia de idea.

Si usted ha estado en los Estados Unidos sin estatus legal por un año o más y elige regresar a su país, usted no podrá regresar a los Estados Unidos legalmente por diez años, a no ser que obtenga una dispensa. Si usted ha estado en los Estados Unidos sin estatus legal por más de 180 días pero por menos de un año y elige regresar a su país, usted no podrá regresar a los Estados Unidos legalmente por tres años, a no ser que obtenga una dispensa. Usted puede solicitar una dispensa solamente si tiene un cónyuge o un padre que es ciudadano o residente permanente legal de los Estados Unidos.

### SOLICITUD DE RESOLUCIÓN

_____ Solicito una audiencia ante la corte de inmigración que resuelva si puedo o no permanecer en los Estados
Iniciales Unidos.

_____ Considero que estaría en peligro si regreso a mi país. Mi caso se trasladará a la corte de inmigración para
Iniciales la celebración de una audiencia.

██████ Admito que estoy ilegalmente en los Estados Unidos, y no considero que estaría en peligro si regreso a mi
Iniciales país. Renuncio a mi derecho a una audiencia ante la corte de inmigración. Deseo regresar a mi país en
cuanto se pueda disponer mi salida. Entiendo que pudiera permanecer detenido hasta mi salida.

████████████                              06/01/2023
Firma del Sujeto                          Fecha

### CERTIFICATION OF SERVICE

☐ Notice read by subject.
☒ Notice read to subject by _____████████_____, in the   **SPANISH**   language.

██████████████
Name of Immigration Officer (Print)

Name of Interpreter (Print)

June 01, 2023 06:13 PM

_____
Signature of Officer

Date and Time of Service

DHS Form I-826 (9/14)

Exhibit G

DEPARTMENT OF HOMELAND SECURITY

Subject ██████

FINS #: ██████ **NOTIFICACIÓN DE DERECHOS Y SOLICITUD DE RESOLUCIÓN**

Event ██████

Expediente No. ██████

Nombre ██████

## AVISO DE DERECHOS Y NOTIFICACIONES

Usted ha sido arrestado(a) porque los oficiales de inmigración creen que usted está en los Estados Unidos ilegalmente. Usted tiene el derecho a una audiencia ante la corte de inmigración para que se determine si puede permanecer en los Estados Unidos. Si usted pide una audiencia ante un juez de inmigración, podría permanecer detenido(a) o podría ser elegible para salir de la detención, ya sea con o sin el pago de una fianza.

Usted tiene el derecho de contactar a un abogado de inmigración u otro representante legal para que lo represente en sus audiencias, o para que le conteste cualquier pregunta concerniente a sus derechos legales en los Estados Unidos. El oficial que le ha dado esta notificación le proveerá una lista de servicios legales que podrían representarlo(a) de gratis o a bajo costo. Usted tiene el derecho de comunicarse con los oficiales consulares o diplomáticos de su país. Usted puede utilizar el teléfono para llamar a un abogado, otro representante legal o al oficial consular en cualquier momento antes de su salida de los Estados Unidos.

Como alternativa, usted puede pedir que le devuelvan a su país lo más pronto posible, sin una audiencia. Si elige regresar a su país, usted podría perder la oportunidad de solicitar ciertos beneficios de inmigración o formas de prevenir la remoción que solamente están disponibles para las personas presentes en los Estados Unidos. Si elige regresar a su país, usted puede cambiar de idea y pedir una audiencia ante un juez en la corte de inmigración en cualquier momento antes de su salida de los Estados Unidos. Usted debe notificar inmediatamente a un oficial de inmigración si cambia de idea.

Si usted ha estado en los Estados Unidos sin estatus legal por un año o más y elige regresar a su país, usted no podrá regresar a los Estados Unidos legalmente por diez años, a no ser que obtenga una dispensa. Si usted ha estado en los Estados Unidos sin estatus legal por más de 180 días pero por menos de un año y elige regresar a su país, usted no podrá regresar a los Estados Unidos legalmente por tres años, a no ser que obtenga una dispensa. Usted puede solicitar una dispensa solamente si tiene un conyuge o un padre que es ciudadano o residente permanente legal de los Estados Unidos.

## SOLICITUD DE RESOLUCIÓN

Iniciales — Solicito una audiencia ante la corte de inmigración que resuelva si puedo o no permanecer en los Estados Unidos.

Iniciales — Considero que estaría en peligro si regreso a mi país. Mi caso se trasladará a la corte de inmigración para la celebración de una audiencia.

Iniciales — Admito que estoy ilegalmente en los Estados Unidos, y no considero que estaría en peligro si regreso a mi país. Renuncio a mi derecho a una audiencia ante la corte de inmigración. Deseo regresar a mi país en cuanto se pueda disponer mi salida. Entiendo que pudiera permanecer detenido hasta mi salida.

██████                    06/01/2023

Firma del Sujeto                    Fecha

## CERTIFICATION OF SERVICE

☐ Notice read by subject.

☒ Notice read to subject by ██████ , in the   SPANISH   language.

██████

Name of Immigration Officer (Print)

June 03, 2023 07:17 AM

Signature of Officer                    Date and Time of Service

Name of Interpreter (Print)

DHS Form I-826 (9/14)                    Page 1 of 1

Exhibit H

1300 Pennsylvania Avenue NW
Washington, DC 20229



**U.S. Customs and
Border Protection**

MAR 0 9 2015

MEMORANDUM FOR:     Directors, Field Operations
                    Director, Preclearance Operations
                    Office of Field Operations (b)(6)(b)(7)(C)

FROM:               Acting Executive Director
                    Admissibility and Passenger Programs

SUBJECT:            Withdrawal of Application Procedures at Ports of Entry

The purpose of this memorandum is to clarify the Withdrawal of Application for Admission procedures at Ports of Entry. According to the Immigration and Nationality Act (INA) Section 235(a)(4) and Title 8 Section 235.4 of the Code of Federal Regulations (CFR), an alien who is an applicant for admission may be permitted to withdraw his or her application for admission in lieu of removal proceedings.

Before a CBP officer allows an alien to withdraw his or her application for admission, the officer must ensure the alien has both the intent and the means to depart immediately from the United States. An alien cannot, as a matter of right, withdraw his or her application for admission. An officer must provide the alien with that benefit. Withdrawal is strictly voluntary and should not be coerced in any way. Further, withdrawal may only be considered as an alternative to removal proceedings when the alien is clearly inadmissible.

In light of the consequences associated with the issuance of an expedited removal order, including a five (5) year bar to re-entry, the decision of whether to extend the benefit of a withdrawal should be based on the consideration of relevant favorable and unfavorable factors in order to reach an equitable decision. Such factors might include, but are not limited to:

- The seriousness of the immigration violation;
- Previous findings of inadmissibility against the alien;
- Intent on the part of the alien to violate the law;
- Ability to easily overcome the ground of inadmissibility (i.e., lack of documents);
- Age or poor health of the alien; and,
- Humanitarian or public interest considerations.

In situations where there is (b)(7)(E) an expedited removal order should ordinarily be issued except in Preclearance where Expedited Removals or

Law Enforcement Sensitive
For Official Use Only

Page 2
Withdrawal of Application Procedures at Ports of Entry

Expedited Removal/Credible Fear cases are not authorized and aliens determined to be inadmissible to the U.S. are refused admission.



Please ensure that this memorandum is disseminated to all ports of entry within your jurisdiction. If you have any questions or require additional information, please contact (b)(6)(b)(7)(C), Branch Chief at (b)(6)(b)(7)(C) or (b)(6)(b)(7)(C), Director Enforcement Programs Division at (b)(6)(b)(7)(C).

Exhibit I

**U.S. Department of Homeland Security**

## Notice and Order of Expedited Removal

### DETERMINATION OF INADMISSIBILITY Event No [redacted]

File No: [redacted]

Date: June 06, 2023

In the Matter of: [redacted]

Pursuant to section 235(b)(1) of the Immigration and Nationality Act (Act), (8 U.S.C. 1225(b)(1)), the Department of Homeland Security has determined that you are inadmissible to the United States under section(s) 212(a) ☐ (6)(C)(i); ☐ (6)(C)(ii); ☒ (7)(A)(i)(I); ☐ (7)(A)(i)(II); ☐ (7)(B)(i)(I); and/or ☐ (7)(B)(i)(II) of the Act, as amended, and therefore are subject to removal, in that:

1. You are not a citizen or national of the United States;

2. You are a native of GUATEMALA and a citizen of GUATEMALA ;

3. You are an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Immigration and Nationality Act; on or about June 4, 2023, you illegally entered the United States at or near HIDALGO, TX and were not inspected by an Immigration Officer.

[redacted]

BORDER PATROL AGENT
Name and title of immigration officer (Print)

Signature of immigration officer

### ORDER OF REMOVAL
### UNDER SECTION 235(b)(1) OF THE ACT

Based upon the determination set forth above and evidence presented during inspection or examination pursuant to section 235 of the Act, and by the authority contained in section 235(b)(1) of the Act, you are found to be inadmissible as charged and ordered removed from the United States.

[redacted]

BORDER PATROL AGENT
Name and title of immigration officer (Print)

Signature of immigration officer

[redacted]

ACTING/PATROL AGENT IN CHARGE
Name and title of supervisor (Print)

Signature of supervisor, if available

☐ Check here if supervisory concurrence was obtained by telephone or other means (no supervisor on duty).

### CERTIFICATE OF SERVICE

I personally served the original of this notice upon the above-named person on ___06/06/2023___

(Date)

[redacted]
Signature of immigration officer

Form I-860 (Rev. 08/01/07)

U .S. Department of Homeland Security

**Notice and Order of Expedited Removal**

---

## ACKNOWLEDGEMENT
## Refused to Sign

I acknowledge receipt of this notification _____

Signature of alien

Form I-860 (Reverse)