### DECLARATION OF JAVIER HIDALGO, THE REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES (RAICES)

I, Javier Hidalgo, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. I am a Legal Director at the Refugee and Immigrant Center for Education and Legal Services (RAICES). I joined RAICES in 2018 and have served in my current role since 2022. Before I assumed my current position I worked as a supervisor and previously, as a staff attorney. In my role as Legal Director, I work closely with Pre-Removal Services and oversee that program's work, which among other things serves people facing expedited removal from the United States.

3. RAICES is a 50l(c)(3) nonprofit, non-partisan organization headquartered in San Antonio, Texas. RAICES's mission is to defend the rights of immigrants and refugees; empower individuals, families, and communities of immigrants and refugees; and advocate for liberty and justice. This mission encompasses striving to ensure access to asylum and protection for noncitizens, including those arriving at the border and subject to expedited removal. RAICES provides free and low-cost immigration legal services to underserved immigrant children, families, and individuals. RAICES also conducts social services programming for immigrants, engages in advocacy work, and provides bond assistance to individuals seeking release from custody of the Department of Homeland Security (DHS). To execute our mission, we strive to serve as many noncitizens as possible through our various avenues of work.

1

4. As discussed in detail below, RAICES has and will continue to experience substantive harm under the Circumvention of Lawful Pathways Rule (the Rule) issued by DHS and the Department of Justice (DOJ). RAICES is also harmed by contemporaneous policy changes that have impacted expedited removal proceedings. These related policies include, but are not limited to: (a) the reduction of the consultation time before a credible fear interview (CFI) from 48 to 24 hours, a harm that particularly impacts RAICES' efforts to support people in expedited removal while in the custody of Customs and Border Protection (CBP); (b) the policy that allows DHS to carry out expedited removals of people who are not Mexican to Mexico; and (c) the policy of "voluntarily" returning people to Mexico in the expedited removal process even though those returns are often neither knowing nor voluntary.[1]

### RAICES's Mission & Scope

5. Founded in 1986 as the Refugee Aid Project by community activists in South Texas, RAICES has grown to be the largest immigration legal services provider in Texas. With offices in Austin, Corpus Christi, Dallas, Fort Worth, Houston, and San Antonio, RAICES is a frontline organization that combines expertise developed from the daily practice of immigration law with a deep commitment to advocacy. Its staff includes nearly 300 people, including attorneys, legal assistants, social workers, advocates, and support staff.

6. Since RAICES's founding, its staff, volunteers, and pro bono attorneys have counseled and represented thousands of noncitizens throughout Texas. RAICES offers a wide array of legal services. That includes filing "affirmative" asylum applications, which can be submitted to U.S. Citizenship and Immigration Services (USCIS) by noncitizens who are

---

[1] RAICES and other plaintiffs have challenged other policies in this litigation, but because those claims are being held in abeyance, *see* ECF No. 30, they are not addressed in this declaration.

not in removal proceedings. It also includes representing noncitizens—including adults, children, and families—in regular removal proceedings under 8 U.S.C. § 1229a and in bond proceedings before the Executive Office for Immigration Review (EOIR), both in immigration court and before the Board of Immigration Appeals (BIA). In regular proceedings, which are defensive proceedings, we represent people seeking (among other forms of relief from removal) asylum, withholding of removal, and protection under the Convention Against Torture (CAT). RAICES's defensive legal representation also continues into the federal courts, where we represent clients before the United States Court of Appeals for the Fifth Circuit and the Supreme Court, where appropriate.

7. Importantly for this case, RAICES also provides services to numerous individuals in expedited removal proceedings, including those assessed for protection through the CFI screening process. The team that is most involved in our work serving individuals facing expedited removal is our Pre-Removal Services team, which represents detained individuals in the expedited removal process. That team currently consists of 5 attorneys, 5 legal assistants, 3 data clerks, and an administrative assistant. We currently operate hotlines specifically for individuals detained at South Texas Detention Center, in Pearsall, Texas; Laredo Detention Center in Laredo, Texas; and the Karnes County Immigration Processing Center in Karnes, Texas.

8. In addition to these hotlines, earlier this year we added our hotline number to a list distributed by EOIR to asylum seekers who are required to undergo their CFI while in CBP custody. We also post signup sheets in Immigration and Customs Enforcement (ICE) detention centers and receive referrals from both the family members of detained people and other nongovernmental organizations (NGOs).

9. From January 1, 2022 through September 15, 2023, the Pre-Removal Services team provided legal consultation or representation to 1,417 individuals in expedited removal proceedings. Since the Rule took effect on May 12, 2023, the Pre-Removal Services team has seen hundreds of clients and potential clients adversely affected by the Rule and the related policy changes.

### The Rule Harms RAICES and Our Clients

10. The Rule and the other policies challenged in this suit have compromised RAICES's mission and forced us to divert resources from other services, clients and programs, and will continue to do so. Thus far, it has forced us to divert our limited resources to preparing the relevant teams to properly and ethically represent clients impacted by the Rule. We have had to devote internal resources to training staff to understand the Rule and related policies to advise clients how these changes impact their cases, and advocate for clients. We have also had to redirect staff resources: Pre-Removal staff has trained other RAICES employees, previously working on non-expedited-removal representation, to provide consultations to callers in CBP custody. Even with these reallocations of staff, we are not able to fully support people impacted by the Rule.

#### *The Rule's Changes to the Credible Fear Process*

11. The Rule has caused and will continue to cause significant disruption to our work on behalf of individuals facing expedited removal. Historically, CFIs have been conducted while people are in ICE custody. When CFIs were done exclusively in ICE custody, we were consistently able to schedule consultations—either in person or remote—with noncitizens identified through our hotline or referral systems *before* their CFIs (which must be conducted by Asylum Officers from USCIS). We have also been able to consistently consult with individuals

in ICE custody who receive a negative CFI and prepare them for an immigration judge review of that determination. We sometimes are able to attend these interviews and review hearings with clients, although RAICES attorneys have limited capacity to do so. In addition, we have been able, on a limited basis, to enter appearances to file requests for reconsideration with USCIS for individuals who have received negative credible fear determinations.

12. In our experience, RAICES's work providing consultations (and in some cases representation) is critically important at each step of the expedited removal process. In particular, our consultations advance our mission by helping people understand and prepare for the CFI process. People fleeing persecution have little knowledge of the U.S. immigration system and often find it difficult to speak of past traumatic experiences with agents of a foreign government, particularly when they are detained, when the interview takes place shortly after the frequently horrendous journey to this country, and when noncitizens have had minimal time to rest, recover, and prepare. Asylum seekers are also unaware of what specific information is most relevant to the CFI process and are at risk of omitting critical details because they do not know where to focus their answers in the limited time allotted them during a CFI.

13. The Rule makes this already difficult process much more so. It completely changes the content of a CFI, as well as the immigration judge's review. Now, we have had to spend additional time explaining the changes to people and preparing them to answer questions not only about their fear of persecution or torture in their home countries, but also about the Rule's eligibility conditions and exceptions, which are completely separate from that fear of persecution. The Rule introduces new elements to a CFI by requiring people to show that they satisfy one of its three asylum eligibility conditions or can prove one of the Rule's two limited

exceptions. As a result, RAICES staff must now engage in much more complex and cumbersome consultations and screening interviews.

14. For example, because the Rule requires people to seek an appointment using the CBP One phone application ("CBP One") or otherwise demonstrate that they should be exempt from that requirement, our staff must now figure out if applicants presented at a port of entry but without a CBP One appointment and ask detailed questions about a person's experience with the app. They also must elicit information about language or other barriers to using the app and gather information about the myriad technical failures that a person might have experienced trying to use CBP One. Of course, like most people, most asylum seekers have no technical background and so do not generally understand *why* the app may not have worked for them, making it more challenging to prepare people for their interviews on this topic.

15. Our staff must also elicit information about the Rule's other limited exception—whether the person faced "exceptionally compelling circumstances" such as an "imminent and extreme" threat to their life or safety that may have prevented them from waiting for an appointment. Analyzing whether someone could qualify for an exception requires gathering detailed facts about any harm that the person might have experienced in Mexico and the timing and immediacy of those dangers; gathering facts about medical emergencies or conditions they or a family member may have faced on the way to the border; and screening for potential past incidents where they may have been victim to a form of human trafficking.

16. Many of the asylum seekers we advise have experienced violence and exploitation in Mexico and so these inquiries take a good deal of time, analysis, and trauma-informed services. In fact, helping noncitizens prepare to articulate their "exceptionally compelling circumstances" is in some ways similar to helping them articulate their underlying

claims for protection from harm in their home country. But because the terms of that exception are totally different from eligibility for asylum or other forms of relief, our staff effectively needs to undertake this sensitive and complex process of consultation and preparation for two separate sets of facts.

17. Moreover, the standard that is applied to these questions about the new asylum bar in a CFI is now higher under the Rule, and in many cases, impossible to meet. For people who are seeking to avoid the bar imposed by the Rule, they do not get the benefit of the significant possibility standard as they should. First, instead of determining if a person could rebut the presumption in full removal proceedings, the officer assesses that question on its merits: Did the person meet an exception to the Rule? Then, for people who are subjected to the Rule, to be permitted to present their claims on the merits, they must overcome the "reasonable possibility" standard, which has traditionally been applied in the reinstatement of removal context, and which is higher than the significant possibility standard. For RAICES, the Rule's changes require us to make consultations more detailed, careful, and time-intensive. That is true because we understand people will be forced to prove, for example, "exceptionally compelling circumstances" instead of a *significant possibility* of later demonstrating "exceptionally compelling circumstances" and they will be required to demonstrate their substantive claims to protection under the higher reasonable possibility standard.

18. In addition to these new substantive complexities, as explained below, the timeline for us to do all of this much more complicated work is now very condensed. As discussed below, CFIs and immigration judge reviews are also happening more quickly, RAICES staff typically only have one phone call with an asylum seeker to cover this more complex set of information. This leads to not being able to prepare asylum seekers as thoroughly

for their CFIs and immigration judge reviews and can also lead to having to spend additional time on the phone with each asylum seeker.

19. Finally, it is important to note just how broadly this Rule is impacting RAICES and our clients. In our experience, the Rule leads to *many* more people receiving negative credible fear findings. In turn, that means that RAICES must prepare many more individuals for immigration judge review. These changes have significantly impeded our efforts to serve recently arrived noncitizens as explained more fully below.

<em>Contemporaneous and Related Changes to the Expedited Removal Process</em>

20. In addition to the Rule itself, other related policy changes have altered the expedited removal process in ways that have significantly impaired our ability to access noncitizens and have frustrated our efforts to assist these people in the process.

21. In particular, DHS has shifted to giving individuals in CBP custody only 24 hours for consultation, instead of 48 hours. As described in more detail below, that has upended our ability to connect with clients before their CFIs.

22. DHS has also begun carrying out expedited removals of nationals from certain third countries to Mexico and to first offer those same individuals the option to accept "voluntary return" to Mexico. As elaborated below, these changes have also made our consultations much more complex and time-consuming.

A. <u>24-Hour Consultation Period for CFIs in CBP Custody</u>

23. One of the new changes, as noted above, is a shortening of the period people have to consult with an attorney or other person before their CFI. That consultation is vitally important for all the reasons explained above. Under this new policy, people are guaranteed only 24 hours to consult after they are given the initial information about the CFI process (including a list of

8

legal service providers, which lists RAICES as one of just a few options). There are numerous reasons why holding CFIs in CBP custody after a reduced 24-hour consultation period disrupts our critical work.

24.     First, the limitations on communication with the outside world are much more severe in CBP custody than ICE custody, which makes 24 hours a virtually impossible time frame for consultations. Unlike in ICE facilities, NGOs cannot enter CBP facilities, which means we cannot post signup sheets there or receive referrals from other legal service providers because none operate inside CBP facilities.

25.     Additionally, unlike in ICE facilities, we are also unable to schedule specific times for calls with people who are in CBP custody; instead, noncitizens must call us on our hotline. And noncitizens are not permitted free access to a phone; instead, they are provided limited windows in which they may contact us, often outside of normal business hours, meaning that unfortunately people often cannot reach us or other providers. We have been able to schedule follow-up calls with only a limited number of individuals in CBP custody, and even when we can it is a time-intensive, cumbersome, and impractical process.

26.     Second, CBP facilities are not set up to hold people who have counsel or may be trying to access attorneys. We can email requests for signatures on forms like attorney appearances (form G-28) and follow-up calls to each CBP sector. Often, however, CBP does not respond quickly enough for RAICES attorneys to be able to properly represent an individual. RAICES staff often must send many follow-up emails to eventually get a response. When our lawyers attempt to ensure access to follow-up calls by entering a notice of appearance, this often does not work. There do not seem to be protocols in place to allow or facilitate noncitizens' ability to return phone calls or send us signed forms. In addition, in our experience some people

in CBP custody have not even been given access to a pen and paper, which means that even if they do reach us, they cannot take notes about their interview or how to arrange to call us back for follow up.

27.     Third, referrals from family members also are of little help for those in CBP custody because it is functionally impossible to track a person's whereabouts when in CBP custody, so we do not know where a referred person is located. Unlike with ICE custody, there is no "online detainee locator" for people in CBP custody. Moreover, the transfers and CFI process in CBP custody happen so quickly that people do not have time to even learn that DHS has assigned them a critically important "Alien Registration Number" (A number), memorize it, and communicate it to us or their families in the highly limited opportunities they have to make phone calls. The result is that we often have literally nothing to work with when attempting to locate clients, other than their names. The best we can do is ask families to do their best to pass our hotline number on to their family member seeking legal help from CBP custody and hope they are able to access a legal visitation call prior to their CFI.

28.     The reduction of the pre-CFI consultation time to as little as 24 hours significantly exacerbates these problems. These restrictions mean that people simply do not have enough time to reach us before their CFI.

29.     Because we are seeing many people only after they have already received a negative CFI, we are limited to helping the individual prepare for immigration judge review.

30.     Our routine inability to provide consultations is a significant problem. RAICES is one of just a few organizations that offers CFI consultations to people in CBP custody, and yet the timeline makes that extremely difficult and impracticable. And without access to our services, the right to a consultation prior to the CFI is illusory at best for many asylum seekers.

31. Because of the shortened timeframe for CFI consultations and the general expedited removal process in CBP custody, we had to overhaul our processes in order to handle an increased number of calls coming into our hotline from CBP, as it is our only means of communicating with this group of asylum seekers preparing for a CFI interview. Previously, we would accept hotline calls from individuals in ICE custody based on our capacity and then schedule follow-up calls or visits. This system worked because we knew people could try reaching us several times over the course of a few days, and that if we were unable to answer those calls immediately people could leave a message that we could return by setting up a call with them in ICE detention. Now, however, we have had to shift our hotline staffing and operations to handle a significant number of calls coming from individuals in CBP custody. The super-expedited nature of CFIs in CBP has required us to make this shift: because noncitizens in this space will only have 24 hours of consultation before their CFI (and a similarly short window for immigration judge review), if we do not focus our resources in this way to catch as many calls as possible, we will never be able to communicate with people in this posture at all.

32. And even with these shifts, we continue to face significant hurdles. If we do not answer a call on the spot, at times the CBP agents decline to leave voicemails and do not provide any information about the people trying to reach us. Without any information about the client, we cannot call back or set up a consultation call, and because of the shortened 24-hour time frame, we cannot track people down before their interviews happen. Even when we do receive a voicemail with client information, it is impossible with the current constraints on our capacity to try and get a scheduled follow-up call with individuals for whom we do not have a signed G-28. We often receive voicemails with timestamps well before and after normal business hours,

meaning individuals given access to phone calls at these times have no real chance of securing legal consultation or representation prior to their CFI.

33. Essentially, our staff must strive to immediately answer every call to our hotline because that is our sole means of advising asylum seekers in CBP custody in advance of CFIs. This has required us to devote a dramatically increased amount of staff time—including the time of staff from other parts of RAICES who do not generally conduct in-depth orientations and instead focus on longer-term representation in immigration court—to ensure that we can answer and respond to hotline calls. Staff who are trained to take these CBP calls take, on an ad hoc basis, as many calls as possible between scheduled meetings with clients in ICE custody, court dates, and other work duties.

34. Responding to this stream of calls, each of which is incredibly urgent because of the 24-hour consultation window, diverts resources from potential clients in ICE custody that RAICES staff would have otherwise had time and capacity to assist. That frustrates our ability to advance our mission in providing services to other noncitizens facing removal, such as those in regular proceedings and held in ICE custody.

35. And despite the expenditure of significant extra resources diverted from our work with clients in ICE custody, we still lack capacity to answer many calls and many people are unable to call us before their CFIs in any event. Thus, we are frequently unable to assist clients before their CFIs, which is a critical part of our service mission for individuals subject to expedited removal. The reduced, 24-hour consultation period means that we will miss many potential clients entirely and will never know that they were in CBP custody or that they had a CFI.

36. Further, although we try (in addition to providing consultations) to represent as many people as we can at their CFIs, we have been able to do so for only one or two individuals in CBP custody among the hundreds who have contacted us and are subject to the Rule. That is both because our resources are stretched so thin by the need to answer hotline calls, and also because the speed of interviews makes it practically impossible to arrange to appear at a CFI. Prior to the policies at issue in this case, RAICES staff simply had more time to meet with and prepare clients and to coordinate with the asylum office to be present at interviews. This lack of access means more noncitizens are going to their CFIs both unprepared and unrepresented. These factors, particularly when coupled with the new hurdles imposed by the Rule, make it much harder for individuals to receive a positive credible fear determination.

37. Because of these changes, our work has heavily shifted to helping people prepare for immigration court review *after* they have a CFI denial from an asylum officer. But that hurts noncitizens by depriving them of a fair chance to prepare for *both* stages, if necessary. And many of the same barriers that exist in pre-CFI representation exist for clients at this stage, and in our experience our ability to intervene and achieve a positive outcome is limited once an asylum officer has already found no credible fear.

38. Submitting an appearance for the immigration judge review is difficult because hearing dates are scheduled and completed in an extremely tight timeline. Typically, hearing dates are scheduled and completed within 24 to 48 hours of an individual receiving notice of a negative CFI determination. This makes it difficult to plan, within our limited capacity, for attorney representation with such little notice. Simply put, the compression at the front end of the expedited removal process to just one day for the pre-CFI consultation period has forced us to

engage in much more work at the end of that process where our ability to provide meaningful assistance and consultation to noncitizens is diminished.

      B.      *Removals and "Voluntary" Returns of Third Country Nationals to Mexico*

      39.      Due to other policy changes, our staff must also now focus on preparing some clients—whether in CBP or ICE custody—regarding the possibility of being removed or asked to accept "voluntary" return as to Mexico. That is because individuals from Cuba, Haiti, Nicaragua, and Venezuela may have to present fear claims as to their home countries *as well as* or even *instead of* Mexico.

      40.      For individuals from Cuba, Haiti, Nicaragua, and Venezuela, CBP is designating their country of deportation to Mexico instead of their home country, meaning, that if they overcome the presumption against their claim, they will be asked about their fear of returning to their home country. If they do not, they will only be screened for fear of returning to their country of deportation, namely, Mexico. We must help clients understand this distinction and prepare them for both possible outcomes. These consultations are longer and more complex.

      41.      Eliciting information about persecution is time-consuming and sensitive, as it frequently requires us to walk the client through recent, highly traumatic events—a process that requires time to build rapport with clients to make them feel safe disclosing these difficult events. And for this population, we must now go through this process for two different countries, in addition to preparing them for questions about the Rule itself and its exceptions as discussed above. In addition, for many of these individuals, our staff must explain what the "voluntary return" policy means for them and their case. All of these further considerations only add to the length of these consultations.

42. As discussed below, the combination of these changes, which have now been in place for several months, are frustrating and having a detrimental impact on staff morale, in addition to diverting away time and resources from other services and programs.

*Additional Harms Flowing from Expedited Removal Changes*

43. The Rule and associated changes have impacted RAICES's work in the expedited removal process and have impacted our ability to fulfill our mission, while impacting our resources and other aspects of our work.

44. First, the additional complexities mentioned above mean that our hotline calls now take much longer than they did before, reducing the number hotline callers we can serve and increasing the number of potential clients with whom we can never speak at all. That is true even though we have scaled up the staff resources we commit, including some of our removal defense attorneys' time, to the hotline.

45. Second, because the impact of the reduced consultation period is felt nearly exclusively by people undergoing CFIs in CBP custody, we have had to focus heavily on providing assistance with CFIs to people in CBP custody. That has required us to divert resources away from our existing program that provides assistance for people facing expedited removal in ICE custody. And because the process we need to engage in to undertake CFI preparation varies so much depending on whether a person is in CBP or ICE custody, we have effectively been forced to split our previous, unified contact-and-consultation process into two different processes. The extensive time we must spend on hotline calls with people held by CBP given the urgent, 24-hour timing, directly detracts from our ability to take hotline calls from people detained by ICE.

46. Both the Rule itself and the associated changes have required staff to spend less time on other aspects of their work.

47. In addition to all of these harms, the Rule also has a broader impact on our overarching asylum work. Nearly all of RAICES's clients enter the United States via the U.S.-Mexico land border, 99% of them are from countries other than Mexico, and many of them entered outside of ports of entry. In addition to these factors, none of RAICES's clients—like most asylum seekers—have been able to seek lasting protection in Mexico or another transit country.

48. Given all of these factors, many of the clients who we would have helped to seek asylum are no longer eligible for that relief under the Rule. Rather, they must focus on securing withholding of removal and relief under the CAT, both of which impose higher evidentiary standards than asylum and therefore require more evidence and more staff time.

49. Whether it is for a CFI or an immigration judge review, our staff must spend time preparing arguments that our clients meet an exception to the asylum bar—and must have an asylum case prepared in case the adjudicator agrees.

50. In addition to the substantive additional time that doing all of this extra work entails, we have also been forced to divert resources in order to reshape our training materials, both for our own staff and for *pro bono* attorneys and other volunteers.

51. Everything described above is taking a serious toll on RAICES's staff. The new credible fear procedures mean that our staff are in a constant fire drill. Legal assistants anxiously monitor the hotline to make sure we never miss a call, as it could be our only chance to speak with someone before they are rushed through a CFI and deported, potentially to a place where they face persecution or torture. Our hotline is also where the Asylum Office can reach us to

participate in CFIs. Should we miss an unexpected call, that noncitizen may have to go forward with an interview without preparation or the opportunity to seek representation. The unpredictability of the calls has placed intense stress on our processes and infrastructure.

52. When we do receive calls—and they often come in bursts—our attorneys must immediately drop all their other work and do their best to talk a client through all of the Rule's convoluted exceptions, as well as withholding and CAT claims (sometimes for Mexico as well as their home country), on the spot. Staff must also spend a great deal of time trying to track down clients who previously called and determine if, and when, those clients have further hearings scheduled. It is difficult to plan for capacity under these constraints and unknowns. Our staff are already suffering from burnout due to the chaotic, frenetic pace.

## Conclusion

53. Overall, RAICES has been harmed by the Rule and the related changes because, together and independently, they severely restrict our ability to effectively serve people who are facing expedited removal and denial of protection. These policies are unrealistic and dangerous, and send the message that the United States is not welcoming of asylum seekers. All of these changes are fundamentally contrary to our organization's mission and vision, and they are devastating RAICES's ability to serve asylum seekers, particularly those facing expedited removal.

I hereby declare under penalty of perjury that the foregoing is true and correct.

_____
Javier Hidalgo

Executed on the 27th day of Sept., 2023, in San Antonio, TX.

17