## DECLARATION OF JENNIFER BABAIE
## LAS AMERICAS IMMIGRANT ADVOCACY CENTER

I, Jennifer Babaie, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully.

2. I am an attorney licensed to practice law in California and focused on immigration practice. Since January 2023, I have been the Advocacy and Legal Services Director at Las Americas Immigrant Advocacy Center (Las Americas). Prior to joining Las Americas, I worked in various related positions. Starting in 2018, I worked as a supervising attorney and program director at the International Refugee Assistance Project, where I represented refugees, asylum seekers, and others seeking humanitarian assistance and family reunification, and I ran a cross-border program focused on providing direct legal services to persons in Ciudad Juarez seeking access to safety and family reunification in the United States.

3. Las Americas is a nonprofit legal services organization based in El Paso, Texas. Our mission is to provide high-quality legal services to low-income immigrants, and to advocate for human rights. We provide immigration counseling and representation to immigrants seeking asylum and those detained by the U.S. government in and around West Texas, New Mexico, and Ciudad Juarez, Mexico, including by representing individuals facing expedited removal who are undergoing Credible Fear Interviews (CFIs). We also represent people subject to reinstatement of a prior removal order in Reasonable Fear Interviews (RFIs). Our goal is to ensure that individuals have a fair opportunity to establish their eligibility for protection and are not wrongfully removed to persecution or torture.

4. I am writing to address the substantive harm that Las Americas has experienced and will continue to experience because of a new rule issued by the Department of Justice (DOJ)

1

and the Department of Homeland Security (DHS) entitled Circumvention of Lawful Pathways ("the Rule"). The Rule imposes new bars to asylum eligibility, and it applies both to people facing "regular" removal proceedings and to people facing expedited removal who must undergo a CFI. The Rule has various provisions, but in practice, it requires any asylum seeker at the southern border to present themselves at a port of entry, and only after obtaining an appointment through a smartphone app called "CBP One." People who enter outside of a port of entry or at the port but without an appointment are presumed ineligible for asylum. As discussed below, CBP One is a complex, error-prone, smart phone application. Helping asylum seekers try to comply with the Rule's requirement to use it has caused considerable harm to our work, and it has required us to spend significant amounts of time working to counteract that harm.

5.      I also address harms caused by related and contemporaneous policy changes that impact the implementation of expedited removal following the expiration of Title 42, the public health measures that were used to justify closure of the U.S. border to individuals seeking protection. I address harms relating to (a) the decision to conduct CFIs while people are detained by Customs and Border Protection (CBP) shortly after their arrival in detention, with only 24 hours to consult an attorney; (b) the decision to use expedited removal to systematically deport people who are not Mexican to Mexico, and (c) the use of purportedly "voluntary" returns to Mexico for individuals who are not Mexican and who are not returning voluntarily.[1]

### Las Americas' Mission & Programs

6.      Las Americas has served people in our community from over 80 countries since 1987. We are dedicated to serving the legal needs of low-income noncitizens and asylum seekers

---

[1] Las Americas and other plaintiffs have challenged other policies in this litigation, but because those claims are being held in abeyance, *see* ECF No. 30, they are not addressed in this declaration.

in West Texas, New Mexico, and Ciudad Juarez, Mexico. We assist individuals pursuing entry to the United States by providing targeted legal information, advice, and translation and referral support, in order to help these individuals preserve eligibility for asylum. We also provide legal information presentations centered on clarifying the purpose and consequences of documents received upon crossing the border.

7. Our goal in all of our work with asylum seekers is to ensure that everyone has a fair opportunity to establish their eligibility for protection and that they are not wrongfully removed to persecution or torture. It is absolutely essential to our vision that all asylum seekers have a meaningful chance to fully develop and present their claims. To advance this mission, our goal is to serve as many asylum seekers as possible with our limited resources.

8. We are one of the only organizations providing *pro bono* representation to immigrants, asylum seekers, and other persons migrating or in removal proceedings in the West Texas, New Mexico, and Ciudad Juarez area. We receive a significant number of referrals and play a critical role in the community. Whenever we are suddenly forced to significantly limit or change our services, which has been necessary in order to respond to the Rule and the related changes, it has a palpable impact on these migrant communities and our ability to serve them.

9. Las Americas' total budget in the fiscal year ending 2022 was about $1.7 million. The grants we receive make up approximately 78% of our budget, and some of them have requirements regarding the number of people we serve. For example, one grant requires that we accept about 75 referrals a year. Thus far, we have not been able to meet that quota and are concerned that our future funding could be cut if we cannot meet that requirement. Low bono client fees and other individual contributions make up the remainder of our income sources, but

all of our detention related services, including CFI and RFI services, and our services in Mexico are provided at no cost to the individual.

10. Las Americas' United States staff consists of 14 people, including attorneys, accredited representatives, and paralegals. Two additional staff work in Mexico. We have several programmatic areas; the most relevant to the Rule and related policies are detailed here.

11. Las Americas' asylum work straddles the U.S.-Mexico border. We assist individuals and families who have entered the United States, as well as people who are or have been stranded in Mexico due to U.S. policies, including the so-called Migrant Protection Protocols (MPP or "Remain in Mexico" program), Title 42, and now the Rule.

12. Our Detained Program serves migrants in the El Paso Processing Center, Otero Service Center, and the Torrance and Cibola detention facilities, in New Mexico. The heart of our Detained Program is helping individuals in expedited removal proceedings through the credible fear process and then seeking their release from detention. We provide consultations in advance of the CFI and full representation in CFIs on a limited basis where our capacity permits. However, the Rule and related new policies, including the short, 24-hour notice period before an interview, have significantly impeded this service. Due to the overwhelming need for our CFI-related services, we recently added a legal fellow who is focused on these services, and we have partnered with the CUNY School of Law to provide remote CFI preparations and to expand capacity to support representation in CFIs and immigration judge (IJ) review.

13. For individuals who are able to clear the CFI hurdle, our detained team helps with subsequent stages of the immigration process when capacity allows, including asylum applications, evidence gathering, appeals, bond and parole requests, mental health screenings, competency evaluations, and more. Where resources allow, we provide these services as part of

full representation in immigration court and before the Board of Immigration Appeals. In other cases, we offer these services as *pro se* assistance. For *pro se* individuals, we also provide assistance with document preparation and translation.

14. In early 2019, Las Americas created the Las Americas Mexico Program (LAMX). LAMX was created as a temporary measure to assist noncitizens who were subject to MPP and thus required to wait in Mexico for their asylum cases to be considered. As U.S. immigration policy has changed, we have adapted LAMX's services and formalized LAMX as an incorporated entity in Mexico. While Title 42 was in place and preventing asylum seekers from presenting at the ports to request asylum, we helped people seeking exemptions to that policy as well as parole. Now, LAMX provides *pro se* asylum support and Know Your Rights presentations in shelters and other community spaces. In these presentations, we teach people about the CFI process, advise them about what to expect in the expedited removal process, and field questions from people who are trying to understand how to navigate this process.

15. In 2022, Las Americas served over 4,200 people. We secured Title 42 exemptions for approximately 3,250 people and helped them get paroled into the United States. We also served nearly 400 individuals in Immigration and Customs Enforcement (ICE) custody. This work occurred alongside our casework on behalf of people seeking immigration benefits from USCIS or the immigration courts. Across programs, we opened over 700 new cases last year. More than half of the clients that Las Americas serves are asylum seekers, and at present, we have about 100 open cases in our Detained Program.[2] Additionally, we serve hundreds of people each month with Know Your Rights presentations in shelters, both in El Paso and in Mexico.

---

[2] We collected information for 2022 calendar year data on May 5, 2023. Please note that due to the tight capacity of the organization and the general difficulty of allocating sufficient resources

16. Since before the implementation of the Rule and related changes, Las Americas has been focused on helping people prepare for CFIs on both sides of the U.S.-Mexico border. Because of the Rule and related changes, however, that work is immensely more complex and time consuming. For example, our team in Mexico must now educate people on ways in which the Rule impedes access to asylum, explain the legal significance of getting an appointment using CBP One, and help people undertake that process or prepare for the potential consequences if they decide to enter the United States outside of a port or without an appointment. From May 12, 2023, to September 20, 2023, LAMX has assisted more than 1,000 people in this manner.

17. In addition to this work helping people prepare for the expedited removal process on the front end, we have also worked with many people who were deported or "voluntarily" returned to Mexico even though they are not Mexican nationals. We are continuously working to develop systems to serve these individuals, as discussed in greater detail below.

## The Rule Harms Las Americas' Clients and General Operations

18. The Rule challenged in this suit has caused and will continue to cause harm to Las Americas' mission. In particular, the Rule has forced us to divert limited resources away from individual representation to continue to meet the most urgent needs of the community—which currently means aiding people attempting to navigate the CFI process.

19. In addition, because our mission is premised on ensuring access to asylum for people who are coming to the United States, the Rule fundamentally frustrates our organization's purpose by cutting off the right to seek asylum in the United States for huge numbers of people based on factors unrelated to a person's need for protection.

---

to administrative and technological support, all data reported should be taken as estimates reflecting current case data to the best of my knowledge.

*The Rule's Reliance on CBP One*

20. As noted above, the Rule requires people to make an appointment using CBP One to preserve the right to seek asylum at the border. The harms imposed by this requirement impair the operations of Las Americas before an asylum seeker ever reaches the United States.

21. First, the CBP One requirement has caused a dramatic diversion of resources in our Mexico office. While we have consistently provided Know Your Rights assistance in Mexico, that work has existed alongside direct legal representation. Now, many of those resources are diverted to explaining the Rule, addressing the CBP One requirement, and helping people to understand the new procedural hurdles that they face. In our experience, asylum seekers prefer to come to the United States in a lawful manner. Historically, this has meant that we worked with people who would wait in Mexico for an opportunity to present at the port of entry even though their lives were in danger. Now that the Rule requires using CBP One, we have received hundreds of requests for assistance with the app. Our staff in Mexico now primarily provide assistance with using the app, education as to the purpose of scheduling an appointment with the app, and guidance as to consequences for entering without an appointment. While we have continued to flag highly vulnerable cases directly with CBP in an attempt to seek humanitarian protection for them, our capacity to do so is limited by the amount of time we must spend helping those trying understand the Rule's CBP One requirement.

22. We have also had to divert resources to overhaul the content of the legal presentations we provide to people preparing to enter the United States. Historically, we have focused our presentations on clarifying the purpose and consequences of documents received upon crossing the border, educating people about what to expect from expedited removal, and

preparing for the credible fear process. We have also historically acted as a referral partner whenever clients indicate a need for housing or other psycho-social support in Ciudad Juarez.

23.     With the advent of the Rule, this work has become immensely more complex. On top of having to change our work to educate people about the substantive changes to asylum imposed by the Rule (discussed below), we now spend a great deal of time providing direct assistance to people unable to navigate CBP One on their own.

24.     Because the app is riddled with technical issues and difficult to use in general, our work in this arena is in incredibly high demand. As mentioned above, in the last four months, we have assisted more than 1,000 individuals in Mexico with the process of understanding the Rule and the CBP One requirement.

25.     Simply put, the Rule's requirement that people use the app to preserve asylum eligibility has forced Las Americas to spend resources helping people use the app rather than putting those resources toward its mission of assisting asylum seekers with CFIs, reviews of negative determinations, and representation in immigration court.

*The Rule's Changes to the Credible Fear System*

26.     In addition, the Rule and associate changes have impaired and will continue to impair our work helping individuals who are seeking asylum and subject to the credible fear process. To serve this population, we have had to divert resources to overhauling our educational materials, and the substantive consultations we now must perform are completely different.

27.     Specifically, we must explain what the Rule requires, and for anyone who might be subject to it, what they must do to try to overcome it. Helping people prepare to demonstrate an exception to the Rule requires gathering information that is not relevant to an asylum claim.

28. For instance, for some people, we have to help them show how they were not able to access the app "due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle." To do so, we have to ask detailed questions about the clients' use or attempted use of the CBP One app. We have to try to figure out what kind of phone they have and whether it could run the app. We have also had to ask detailed questions about their attempts to book an appointment and what happened each time they tried.

29. Las Americas staff must also inquire about whether the individual faced an "imminent and extreme" threat to their life or safety that prevented them from waiting in Mexico until they could get a CBP One appointment. To determine whether they qualify for that exception, staff must ask about what happened to people in Mexico. Many of our clients have experienced violence and threats in Mexico that make it unsafe for them. Due to the limited and ambiguous nature of this exception, however, staff must spend additional time learning about how the exception is applied in order to properly advise individuals who seek to invoke it.

30. In addition, the Rule now imposes a higher standard that people must overcome in order to obtain the right to seek asylum. It does so in two ways. First, it requires people to prove that they in fact *have* satisfied one of the Rule's exceptions, whereas before, people would pass a CFI if they proved a *significant possibility* that they could establish their eligibility for asylum.

31. Second, people who are not exempt from the Rule—the majority of people—will have to show that they have a reasonable possibility of persecution or torture and not a significant possibility. Because Las Americas has a history of doing both credible fear and reasonable fear work, we have firsthand exposure to the fact that the reasonable fear standard (which is primarily used in the reinstatement context) represents a notably higher standard. To address that reality, we must spend additional time trying to help people meet a higher burden.

32. These changes make many fewer applicants eligible for asylum and makes our consultations more emotionally complex. Now, we have to prepare people for a realistic chance that they will not be permitted to seek asylum, and that they face removal if they cannot overcome the higher standard.

33. These changes have injured our operations because our procedures for educating people on how to proceed through this system are more complicated and time consuming. We must prepare people for multiple potential scenarios and outcomes. Since the Rule took effect, the duration of our CFI screening consultations has significantly increased, and it has become difficult for us to conduct such screening conversations in less than 90 minutes.

34. Moreover, the fact CFIs now occur both in ICE and CBP custody means that we have had to create two different workflows. For people in ICE custody, we continue to provide consultations prior to the CFI itself. But for individuals in CBP custody, both the fact that they are in CBP custody and the reduced consultation window means that we cannot reach them after their entry but prior to their CFI. Instead, we must try to assist them in Mexico, *before* they even enter the United States. This issue is discussed in detail below.

35. Because of these complexities, it is harder for us to serve as many people, which undermines our mission and complicates our ability to run a sustainable legal department.

36. In addition to making CFI preparation harder and more time-consuming, the Rule has increased demand for Las Americas' representation for people who have failed their CFIs and need IJ review and requests for review by USCIS. But, but our capacity to provide this representation is diminished because we must spend so much of our time and resources providing pre-CFI support. Previously, the need to provide this post CFI-work was a more modest because many clients received a positive result from the CFI.

*The Rule's Cascading Impact Beyond the Credible Fear Interview*

39. In response to the Rule's heightened burdens and convoluted processes that impede access to asylum at our southern border, it is fair to say that *all* of Las Americas' work has been forced to change.

40. Las Americas has already diverted, and will continue to be forced to divert, significant resources to understanding the new Rule and its impact on the communities we serve, training staff and volunteers, and advising our clients, prospective clients, and immigration communities. In addition, we will need to continue to spend resources developing educational materials, including internal training materials, external trainings, and *pro se* materials designed to help the impacted communities. We also need to reroute resources towards helping our non-legal partners on both sides of the border have a better understanding of access to asylum in the United States, so that they are able to appropriately direct individuals for referrals.

41. As a concrete example of this diversion, because of the Rule, we have frequently had to send U.S.-based staff to Mexico to help intending asylum seekers understand the Rule and navigate the CFI process, and to train partners in Ciudad Juarez on the Rule and appropriate usages of CBP One. For our ICE-based CFI work, we have also been able to attend fewer CFI interviews because the interviews themselves have taken significantly longer and occur seven days a week, making it close to impossible to guarantee representation during the interview. The same is true for our consultations. We are able to consult with fewer people because the process of explaining the Rule and its consequences takes additional time.

42. As a result of these changes, we have been forced to significantly reduce the number of individuals we can assist in their efforts to obtain lasting protection or relief. For example, we now have fewer resources to help people who have cleared the CFI hurdle with the

11

next step of completing their asylum applications. And recently, DHS has changed the application process for work authorization, but we are forced to choose between trying to help some people navigate the Rule over helping other people secure this more lasting benefit. We have also had to reduce the number of individuals we can represent who remain in immigration custody and who are in need of full representation. While resource limitations have always existed for Las Americas, the Rule has brought that strain to a new breaking point.

43. For the cases that we are able to take on in regular removal proceedings, if they are subject to the Rule, we will have to expend significantly more resources on representing them in immigration court as well. That is true for various reasons. First, because the Rule applies in removal proceedings, we will have to continue to argue that people should be exempt from it. But in addition, we will have to prepare these cases as applications for withholding of removal and under the Convention Against Torture (CAT), which are subject to more difficult standards. Unlike asylum claims, applications for withholding and CAT do not allow a principal applicant to petition for derivative applicants, and the Rule's presumption of ineligibility for asylum may be lifted only if derivative family members have no claim to relief of their own. This means that, to ensure the safety of our clients and their families, Las Americas will have to file and prepare additional applications for clients who could have previously received protections as derivatives on a parent or spouse's case. Over time, we expect these cases to require markedly more resources than asylum cases not subject to the Rule. Such additional resources will likely include, for example, significant attorney time, separate and additional expert testimony, and separate and additional counseling to prepare for testimony that would not otherwise be required.

**Contemporaneous and Related Changes to the CFI Process**

44. Related changes that impact the implementation of the Rule have also made it significantly more difficult to further our mission and assist our clients.

45. First, DHS has started holding CFIs while individuals are in CBP custody and ensuring only 24 hours of consultation time before the CFI. This change has dramatically affected our ability to provide consultations to people who are preparing for their CFIs.

46. As mentioned above, CFI consultations and representation are central to Las Americas' detained legal services. While we continue to provide this service, there is now an entire population of people—those in CBP custody—that we cannot reliably help. That is true because access to individuals in CBP custody is virtually impossible, particularly on an expedited timeline. We are not allowed to enter CBP facilities nor do we have direct access to people detained there via telephone. Even if a family member contacts us about a loved one in CBP custody, we are unable to make arrangements to communicate with them.

47. The 24-hour timeline for trying to communicate with people in CBP custody exacerbates the communication problem. Because people detained in those facilities will have their CFIs so quickly, it is not possible for us to provide a CFI consultation before the interview actually occurs, forcing us to make the difficult decision to move forward with CFI legal services nearly exclusively for individuals in ICE custody.

48. And while people in CBP custody may be able to make a limited number of outbound calls, the only numbers that they see are for organizations who have been able to set up hotlines specifically for CBP custody. Because we do not have the capacity to operate such a hotline, asylum seekers in CBP custody likely do not have any way to contact us before their CFIs or even after the interview if the result was negative and they wish to challenge it.

49. As mentioned above, our limited ability to help people in CBP custody before they actually have a CFI has forced us to move some of our CFI consultation work to Mexico. There, we try to predict who is most likely to wind up in CBP custody (as opposed to ICE custody, where we are continuing to provide CFI consultations) to give them information about the process before they enter. Even when we try to help people prepare for CFIs while in Mexico and even when we agree to represent them in their CFIs, we are often unable to do so because of the speed with which CFIs occur in CBP custody. Several Las Americas clients have been forced to forego having their attorney present during their CFI because the asylum office scheduled it without providing any advance notice, even in cases where an attorney has made an appearance.

50. In these circumstances, we are limited to assisting people with the IJ review of a negative CFI determination. This assistance is also hindered by lack of information and notice. Staff who plan to attend IJ reviews must spend time and resources keeping track of whether a hearing has been scheduled, as well as preparing substantively for arguing exceptions and eligibility for asylum, withholding of removal, and protection under CAT.

51. In addition to holding CFIs within 24 hours in CBP custody, the government has imposed two other policies that are causing significant harm to Las Americas and the clients we serve: polices to either deport or "voluntarily" return some non-Mexican nationals to Mexico.

52. Specifically, for people from Cuba, Haiti, Nicaragua, and Venezuela, we have to prepare them for the possibility that they will face removal or return to Mexico, or that they will have to establish a fear of persecution or torture *as to Mexico.* This change means that, for people from these countries, staff must prepare people to seek protection from removal to two countries—their country of origin and Mexico—which takes up more time and resources.

53. We have also seen individuals offered the opportunity to "voluntarily" return to Mexico if they withdraw their application to enter the United States. This "offer" is made at multiple points during a CFI and even before the CFI when a person is first screened by CBP.

54. If a person accepts voluntary return before the interview begins, they could be passing up the opportunity to have an exemption applied to them. But if they are offered voluntary return later, it is often because an officer has determined an exemption does not apply. Regardless of when a person receives such an offer, and despite any explanations they receive about what the offer means, our experience is that these offers are confusing to the individuals who end up taking them.

55. We have observed a variety of misinformation about the voluntary return process. We have seen people from Cuba, Haiti, Venezuela, and Nicaragua be informed that they could apply for parole to enter the United States if they accept a voluntary return. However, in reality, most of our clients would not be eligible for these parole programs. First, people are ineligible if they entered Mexico or Panama irregularly after January 2023. Nearly all of the people we assist would be disqualified on that basis alone. Second, the parole programs require that the asylum seeker have a passport, a sponsor, and enough money to book a plane ticket to an interior point of entry. These resources are out of reach for most of the people we assist, who are indigent.

56. There is another aspect of these voluntary return promises that is also problematic. We have assisted many people who have been returned to Mexico who, in the process, have been required to sign a form indicating that they do not fear being returned to their *home countries.* That statement is antithetical to the fact that they are being returned to Mexico and that they are doing so in the context of a CFI, which is triggered when a person expresses a fear of return to their home country.

57. It is my understanding that, at some point, the government has changed this form to require people to state that they do not have a fear of returning *to Mexico*, but the vast majority of people we see in this posture do not have the documents in their possession. Thus, while I have not been able to personally examine this document, it is my understanding from individual accounts of this experience that many people signed a version of this form that speaks to fear of return to their home country. Requiring people to sign this form will have ongoing potential consequences in future asylum cases, where the forms could be used against them, so we have had to be vigilant about advising people as to the realities of this potential problem, usually without access to the relevant documentation.

58. As to the people who are removed (and not returned) to Mexico, we have seen another problem. In many of these cases, the individual is not actually permitted to stay in Mexico; some receive notice from the Mexican government that they are required to leave Mexico within a short period of time. As a result, people are being deported to Mexico only to face rapid deportation to their home countries where they face persecution or torture. But in our experience officers are not asking any questions about this problem sort of "chain refoulment."

59. All told, the return and removal of certain individuals to Mexico has caused another significant diversion of our resources. Staff has to try to understand what occurred in an individual's situation: Often a person does not know if they were returned or deported. Only with that information are we able to adequately advise them of the legal consequences of returns and removals. And for people who have not yet suffered either of these fates, explaining the possibility of being subjected to one of these two policies only further complicates the services we are trying to provide to people in Mexico who are preparing to enter the United States.

**Overarching Harms from the Rule & Related Policies**

60. The combined impact of the Rule and related policy changes has fundamentally altered access to asylum at the U.S-Mexico border. As policy has shifted and immigration legal services work has become more difficult, Las Americas needs to hire more staff to try to meet the demands of our community. While we strive to increase *pro bono* representation and provide high quality legal representation, we are not government-funded and none of our grants are guaranteed beyond two to three years. Moreover, it is difficult to secure funding for legal services, even in areas such as El Paso with clear needs and broad gaps in *pro bono* providers.

61. Additionally, many funders are interested in work that is maximally impactful. Because the Rule will increase the workload for each case and prohibit us from taking as many cases, we risk losing out on grants that expect the reach of our work to maintain a growth trajectory. For example, we have one funding source that has a stated goal of decreasing the amount of time staff take to provide services. This Rule has the opposite effect on our work.

62. Additionally, our programs rely on volunteers. We already spend significant resources to coordinate, manage, and train volunteers. These changes injure our ability to rely on volunteers because the pace and complexity of the issues presented at the border continues to grow. The result is that many people on staff, myself included, have to devote resources to volunteer training and management, to the detriment of other work.

63. In addition, as mentioned above, the need for us to focus on the front end of the expedited removal process detracts from our ability to provide ongoing legal representation in full removal proceedings, before the Board of Immigration Appeals, and with USCIS. This change will result in more denied asylum applications without fully-developed records, more appeals, and less capacity to do that work both for Las Americas and similar organizations.

64. In essence, the Rule and related border polices force us into full-time triage mode. We are now in a position of having to choose between preparing a larger number of asylum seekers for the new screening processes, and providing full representation to people who are actually proceeding with their substantive claims.

65. Moreover, I would be remiss not to highlight the mental and physical toll these changes have had on our team. Living and working on the border, our staff are closely connected to the communities they serve. We witness firsthand the harmful effects of asylum bans and related enforcement-minded policies. Attempting to lead a team that is already inundated with work through more tumult is having a serious, detrimental impact. Since May 2023, I have observed many staff members foregoing their paid leave because of the volume of work. And because so much of our time is spent on the front end of the expedited removal process, staff are feeling less satisfied by the work because we do not have resources to provide longer-term services with the same frequency. The sense that people cannot put their energy to the work that meaningfully advances Las Americas' mission is already leading to a sense of frustration and burnout. These harms will only persist as time goes on.

## Conclusion

66. It is difficult for me to overstate the detrimental impact that this Rule and the related changes has had and will continue to have on Las Americas' clients, staff, and mission. These changes will do nothing to improve the functioning of our immigration courts, and will instead infringe on our clients' rights to seek asylum, cost us numerous resources while forcing us to cut back on our services, and impose insurmountable bureaucratic obstacles on people with legitimate asylum claims seeking refuge from persecution and torture.

                                                                                                                                           */s/ Jennifer Babaie*

                                                                                                                 Jennifer Babaie
                                                       Director of Advocacy and Legal Services
                                                       Las Americas Immigrant Advocacy Center

Executed this 28th day of September 2023 in El Paso, Texas