IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| M.A., et al., | |
| Plaintiffs, | Civil Action No. 1:23-cv-01843 |
| v. | |
| ALEJANDRO MAYORKAS, Secretary of the Department of Homeland Security, in his official capacity, et al., | |
| Defendants. | |

**BRIEF OF AMICUS CURIAE NATIONAL CITIZENSHIP AND IMMIGRATION SERVICES COUNCIL 119 IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Julie Veroff*
Kathleen R. Hartnett
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
Tel: (415) 693-2000
Fax: (415) 693-2222
jveroff@cooley.com
khartnett@cooley.com
zhelstrom@cooley.com

*Counsel for Amicus Curiae*

*\* Admitted Pro Hac Vice*

# <u>TABLE OF CONTENTS</u>

**Page**

INTEREST OF AMICUS CURIAE ...................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .....................................................2

ARGUMENT ......................................................................................................................7

I.     The Rule's Changes to Credible Fear Interviews Are Arbitrary and Undermine the
       Integrity of the Asylum System. ...............................................................................7

       A.     Requiring that the Rule's Asylum Eligibility Bar Be Applied During
              Credible Fear Interviews Unlawfully Transforms a Threshold Screening
              Interview into a Merits Determination..................................................................7

       B.     Requiring Those Subject to the Bar to Satisfy a Reasonable-Possibility
              Standard to Pass a Screening Interview for Withholding and CAT Relief Is
              Unreasonable.................................................................................................13

II.    The Collateral Expedited Removal Policies Are Unreasonable and Harmful. ..................15

III.   The Rule and the Collateral Expedited Removal Policies Undermine Our Nation's
       Longstanding Commitment to Provide Safe Haven to the Persecuted and Are Not
       Necessary to Address the Flow of Migrants at the Southern Border................................19

CONCLUSION.....................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alonso-Juarez v. Garland*,
  80 F. 4th 1039 (9th Cir. 2023) ................................................................14

*East Bay Sanctuary Covenant v. Barr*,
  994 F.3d 962 (9th Cir. 2020) ....................................................................3

*East Bay Sanctuary Covenant v. Biden*,
  No. 18-cv-06810-JST, 2023 WL 4729278 (N.D. Cal July 25, 2023)......................7

*East Bay Sanctuary Covenant v. Trump*,
  993 F.3d 640 (9th Cir. 2021) ....................................................................3

*Grace v. Barr*,
  965 F.3d 883 (D.C. Cir. 2020).................................................................2, 8

*Innovation Law Lab v. McAleenan*,
  924 F.3d 503 (9th Cir. 2019) ..................................................................17

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987)................................................................8, 13, 19, 20

*Kiakombua v. Wolf*,
  498 F. Supp. 3d 1 (D.D.C. 2020)...............................................................8

*Matter of Mogharrabi*,
  19 I. & N. Dec. 439 (BIA 1987) ................................................................8

*Ms. L v. ICE*,
  302 F. Supp. 3d 1149 (S.D. Cal. 2018).......................................................19

*Nasrallah v. Barr*,
  140 S. Ct. 1683 (2020)..........................................................................13

*Nat'l Wildlife Fed'n v. EPA*,
  286 F.3d 554 (D.C. Cir. 2002).................................................................11

*O.A. v. Trump*,
  404 F. Supp. 3d 109 (D.D.C. 2019) ............................................................3

*Pomavilla-Zaruma v. Garland*,
  __ F. 4th __, 2023 WL 5597432 (2d Cir. Aug. 30, 2023) ....................................8

# TABLE OF AUTHORITIES
### (continued)

Page(s)

**Statutes and Regulations**

5 U.S.C. § 3331 .................................................................................................6

8 U.S.C.
§ 1101(a)(42) .............................................................................................8
§ 1158 ........................................................................................................20
§ 1158(b)(2) ...........................................................................................9, 11
§ 1225(b)(1) ......................................................................7, 8, 14, 16, 21
§ 1231(a)(5) ............................................................................................14
§ 1231(b)(3)(A) ......................................................................................20
§ 1252(a)(2)(A) ......................................................................................14
§ 1252(e)(2) ............................................................................................14

8 C.F.R.
§ 208.1 .......................................................................................................6
§ 208.30 ...............................................................................7, 9, 16, 21
§ 208.31 .............................................................................14, 17, 21
§ 208.33 .............................................................................................. *passin*
§ 214.11 .....................................................................................................12
§ 235.3 .................................................................................................16, 21
§ 238.1 ........................................................................................................21
§ 241.8 .................................................................................................14, 21
§ 1208.31 ..................................................................................................14

87 Fed. Reg. 18,078 (Mar. 29, 2022) ........................................5, 10, 12, 13

88 Fed. Reg. 31,314 (May 16, 2023) ........................................... *passim*

Displaced Persons Act of 1948, ch. 647, Pub. L. No. 80-774, 62 Stat. 1009 ..............................20

Refugee Relief Act of 1953, Pub. L. No. 83-203, 67 Stat. 400 ....................................20

**Other Authorities**

142 Cong. Rec. 25,347 (1996) ...........................................................................8

Am. Bar Ass'n Comm'n on Immigration, *Reforming the Immigration System: Proposals to Promote Independence, Fairness, Efficiency, and Professionalism in the Adjudication of Removal Cases* (Mar. 2019) ....................16

CBS News, *Biden Administration Guaranteed Attorney Access for All Migrant Screenings.  Most Don't Have It.* (July 2, 2023) ....................................15

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Charles Tjersland Jr., *I Became An Asylum Officer To Help People.  Now I Put Them Back In Harm's Way*, Wash. Post (July 19, 2019)........................................................18

DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023) .........................................................................15

Gregg A. Beyer, *Reforming Affirmative Asylum Processing in the United States: Challenges and Opportunities*, 9 Am. U. Int'l L. Rev. & Pol'y 43 (1994) ...............19, 20, 21

H.R. Rep. No. 104-469, pt. 1 (1995)..............................................................................2

KRGV, *CBP Implements New Asylum Processing Program in RGV* (Jan. 1, 2020) ...................16

Library of Congress, *1991: American Baptist Churches (ABC) v. Thornburgh* ..........................21

Nat'l Immigrant Justice Ctr., *Obstructed Legal Access: NIJC's Findings From 3 Weeks of Telephonic Legal Consultations in CBP Custody* (May 25, 2023) .........................15

Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status* (1979) ...........................................10

Steven Greenhouse, *U.S. Moves to Halt Abuses in Political Asylum Program*, N.Y. Times (Dec. 3, 1994)..........................................................................................21

U.S. Dep't of State, *U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023) ...............................................................6

U.S. Holocaust Memorial Museum, *Voyage of the St. Louis* .......................................19

USCIS – Refugee Asylum & Int'l Operations Directorate Officer Training, *Lesson Plan Overview: Reasonable Fear of Persecution and Torture Determinations* at 11 (Feb. 13, 2017) .....................................................................14

USCIS – Refugee, Asylum and Int'l Operations Directorate Officer Training, *Lesson Plan Overview: History of the Affirmative Asylum Program* at 4-5 (May 9, 2013)..................................................................................................20, 21

USCIS, *Asylum Merits Interview with USCIS: Processing After a Positive Credible Fear Determination* (last updated May 31, 2022) ..........................................8

USCIS, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols* (Jan. 28, 2019)..................................17

USCIS, Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (May 18, 2023) ..............................................................................................................18

**<u>TABLE OF AUTHORITIES</u>**
**(continued)**

**Page(s)**

USCIS, *Questions and Answers: Credible Fear Screening* ...........................................9

USCIS, *Refugee Timeline* (Feb. 7, 2023)................................................................20, 21

## INTEREST OF *AMICUS CURIAE*[1]

The National Citizenship and Immigration Services Council 119 ("Council 119") is a labor organization that represents over 14,000 bargaining unit employees of U.S. Citizenship and Immigration Services ("USCIS"), a division of the U.S. Department of Homeland Security ("DHS"). Council 119's constituents include approximately 1,400 asylum officers, refugee officers, and adjudications officers who are responsible for, among other things, adjudicating affirmative asylum claims, processing refugees overseas, conducting "credible fear" and "reasonable fear" screenings, researching conditions in refugee-producing countries and regions, and reviewing applications for humanitarian parole. Council 119 also represents several hundred USCIS employees who have been detailed to assist with such operations. Of particular relevance here, Council 119's constituent members and bargaining unit employees employed with or detailed to the Asylum Division are tasked with implementing the final rule entitled "Circumvention of Lawful Pathways" ("the Rule"), 88 Fed. Reg. 31,314 (May 16, 2023) (codified at 8 C.F.R. pt. 208), and certain policy changes to the expedited removal system that were made alongside the Rule's promulgation.

At issue in Plaintiffs' Motion for Summary Judgment (ECF No. 37) are the Rule's changes to how asylum officers must conduct credible fear interviews, as well as three collateral expedited removal policies. The former are the Rule's requirements that asylum officers apply an asylum eligibility bar during the credible fear interview, and that they use a heightened standard to screen noncitizens subject to that bar for withholding of removal and Convention Against Torture relief. The latter policies provide for credible fear interviews to be held as quickly as 24 hours after a noncitizen is screened into immigration custody and given a credible fear interview informational form; for certain non-Mexican nationals to be removed to Mexico rather than their countries of origin; and for certain nationals to be encouraged to accept voluntary return in ways that risk misleading them about the viability of then accessing a parole program. This brief offers Council

---

[1] This brief was not written in whole or in part by counsel for any party, and no person or entity other than amicus curiae and its counsel has made a monetary contribution to the preparation and submission of this brief. The parties have consented to the filing of this amicus brief.

119's views on why the Rule's changes to the credible fear system and the collateral expedited removal policies are unlawful, unwise, and unnecessary.

Council 119 has a special interest in this case as the representative of the collective bargaining unit of federal government employees who are at the forefront of interviewing and adjudicating the legal claims of individuals seeking protection in the United States, many of whom are now subject to the Rule and the collateral expedited removal policies. Council 119's members have first-hand knowledge of how mandatory asylum eligibility bars are applied in the context of affirmative asylum adjudications; how the Rule is impacting pre-screening operations; how the Rule is being implemented in credible fear interviews; how the collateral expedited removal policies are being implemented; whether the Rule and the collateral expedited removal policies are consistent with the United States' obligations under international and domestic laws concerning the right to seek asylum and the protection of refugees; and whether the Rule and the collateral expedited removal policies are necessary to address the flow of migrants through our nation's southern border.

This brief relies solely upon information that is publicly available, and it does not rely on any information that is confidential, law enforcement sensitive, or classified. It represents only the views of Council 119 on behalf of the bargaining unit and does not represent the views of USCIS or USCIS employees in their official capacities.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The commitment to provide a safe haven to people fleeing persecution is fundamental to the best parts of our nation's identity, history, and moral fabric. More than thirty years ago, the United States created a modern asylum system to reflect that commitment, including by establishing a process for fairly, humanely, and efficiently identifying and vetting noncitizens' claims for protection from harm. When Congress created the expedited removal system in 1996 to enable more "efficient removal[s]" of certain noncitizens, it remained conscious of our country's commitment, and designed the credible fear process, described further below, to ensure there would "be no danger that [a person] with a genuine asylum claim will be returned to persecution."

*Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020) (quoting H.R. Rep. No. 104-469, pt. 1, at 158 (1995)). For decades, that system was used to ensure that noncitizens would not be returned to territories where they were at risk of persecution or torture.

Over the last few years, however, the Executive Branch has advanced policies that jeopardize the integrity of our carefully crafted asylum system and America's position as a global leader in refugee protection. Although Council 119 had not previously deemed it necessary to weigh in on proposed and enacted changes to immigration policy, focusing instead on the bread-and-butter work of union member representation, these policies have been such an affront to the steadfast commitments and working conditions of its members that Council 119 felt compelled to express its opposition.[2] Courts were asked to judge the lawfulness of some of the prior Administration's policies to which Council 119 objected, and they correctly recognized those policies' fundamental flaws. *See, e.g.*, *East Bay Sanctuary Covenant v. Trump*, 993 F.3d 640 (9th Cir. 2021) (holding unlawful an asylum eligibility bar for entering between ports of entry); *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) (same); *East Bay Sanctuary Covenant v. Barr*, 994 F.3d 962 (9th Cir. 2020) (holding unlawful an asylum eligibility bar for entering without having first applied for and been denied asylum in a transit country).

The Rule at issue here, promulgated by the current Administration, unfortunately repackages and revives policies that were already deemed unlawful. Like those prior policies, the Rule puts asylum seekers, our asylum system, and our international and moral commitments at

---

[2] *See, e.g.*, Brief of Amicus Curiae Council 119 in Support of Plaintiffs, *East Bay Sanctuary Covenant v. Biden*, No. 4:18-cv-06810-JST (June 7, 2023), ECF No. 174-1; Brief in Support of Respondents for Amicus Curiae of Council 119, *Wolf v. Innovation Law Lab*, No. 19-1212 (U.S. Jan. 22, 2021); Council 119, "Comments on 'Security Bars and Processing'" (Aug. 10, 2020), https://www.regulations.gov/comment/USCIS-2020-0013-1897; Council 119, "Comments on Joint Notice of Proposed Rulemaking: Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review" (July 15, 2020), https://www.regulations.gov/comment/EOIR-2020-0003-6096; Brief for Amicus Curiae Council 119, *East Bay Sanctuary Covenant v. Barr*, No. 19-16487 (9th Cir. Oct. 15, 2019), ECF No. 68.

risk.  Council 119 raised its objections when the Rule was being considered,[3] but as with prior policies, those objections were ignored.

The Rule effectively eliminates asylum for most non-Mexican asylum seekers arriving at the southern border, irrespective of the merits or urgency of their claim for protection.  It does so by requiring asylum officers to deem an applicant ineligible for and thus barred from asylum unless the person: (1) applied for and was denied asylum in a transit country; (2) presented at a port of entry at a pre-scheduled time and place pursuant to an appointment made through a flawed mobile application called CBP One; or (3) obtained advance permission to travel to the United States through a parole program.  8 C.F.R. §§ 208.33(a)-(b).  For those asylum seekers who cannot satisfy one of these conditions—and most cannot—the Rule's bar to asylum is unyielding unless the asylum seeker can demonstrate by a preponderance of the evidence that they or a member of their family with whom they were traveling faced "exceptionally compelling circumstances"—a phrase narrowly defined to include "an acute medical emergency," "an imminent and extreme threat to life or safety," or being a "victim of a severe form of trafficking in persons."  8 C.F.R. § 208.33(a)(3).  Although the Rule leaves room for the possibility that "other exceptionally compelling circumstances" can suffice, 88 Fed. Reg. at 31,334; *see also* 8 C.F.R. § 208.33(a)(3)(i), the Rule provides no guidance on how Council 119's bargaining unit employees are to make that determination.

The Rule applies to all asylum adjudications, both affirmative and defensive.  Even though credible fear interviews are supposed to be only screening interviews designed to ascertain whether a noncitizen has the potential to make out a meritorious asylum claim in a full proceeding, the Rule also requires that its new eligibility bar be applied in such interviews.  8 C.F.R. § 208.33(b).  The Rule thus effectively transforms the credible fear interview from a threshold screening device into a full outcome-determinative adjudication, contrary to Congress's intent and express provision. The Rule then makes it harder for those noncitizens who are deemed ineligible for asylum in their

---

[3]  Council 119, "Comments on 'Circumvention of Lawful Pathways'" (Mar. 27, 2023), https://www.regulations.gov/comment/USCIS-2022-0016-12267.

credible fear interview to access other forms of protection by heightening the screening standard for withholding of removal and protection under the Convention Against Torture ("CAT"). 8 C.F.R. § 208.33(b)(2)(i).[4]

The upshot is that the Rule functions as a sweeping bar to asylum that already has caused many individuals with strong claims for protection to be denied asylum for reasons having nothing to do with the merits of their claims and to be sent back to the very dangers they fled.

The Rule's assault on the asylum system is compounded by several contemporaneous policy changes to expedited removal proceedings, all of which make it more difficult for noncitizens fleeing persecution to obtain protection. These policy changes include: (1) scheduling credible fear interviews for noncitizens within 24 hours after being screened into immigration custody and given a credible fear interview informational form, when they previously were generally given at least 48 hours to recover from their journey and prepare for their interview; (2) removing certain non-Mexicans to Mexico instead of their home countries, forcing them to unexpectedly have to show a need for protection in Mexico rather than the country from which they first fled; and (3) informing certain noncitizens that they can voluntarily return to Mexico without receiving a removal order, and so remain eligible to return to the United States, even though they are unlikely to qualify for parole programs.[5] *See infra* Argument II.

---

[4] In addition, the Rule requires noncitizens to expressly ask for immigration judge review of a negative credible fear determination, whereas previously immigration judge review was provided unless the noncitizen expressly declined review. *Compare* 8 C.F.R. §§ 208.33(b)(2)(iv)-(v) *with* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18,078, 18,094 (Mar. 29, 2022). The Rule also eliminates a noncitizen's ability to ask USCIS for reconsideration of a negative credible fear determination. *Compare* 8 C.F.R. § 208.33(b)(2)(v)(C) *with* 87 Fed. Reg. 18,078, 18,133-34 (Mar. 29, 2022).

[5] Plaintiffs allege that DHS also has been utilizing employees who are not asylum officers, and who may not have received training comparable to that received by asylum officers, to conduct credible fear interviews for asylum seekers potentially subject to the Rule's eligibility bar. (ECF No. 19 (Am. Compl.) ¶¶ 127, 129.) Council 119 does not address this alleged policy change in detail here because Plaintiffs' challenge to the use of non-asylum officers is being held in abeyance (ECF No. 30 (Stip. & Order) ¶ 2), but notes here its serious concerns with such a policy's legality and propriety.

Council 119 opposes the Rule and the collateral expedited removal policy changes for the same reasons it opposed prior asylum policies. Council 119's members are highly trained experts in international and domestic asylum and refugee law. *See* 8 C.F.R. § 208.1(b). They have extensive experience interviewing asylum seekers and vetting their claims. Based on that expertise, Council 119's members firmly believe that this Rule and the collateral policy changes to expedited removal proceedings are at odds with our asylum law, premised on unfounded assumptions, and causing bona fide asylum seekers to be wrongly sent back to harm.

Simply put, the Rule and the collateral expedited removal policies have nothing to do with improving the "effective[ness], human[ity], and efficien[cy]" of our asylum system. 88 Fed. Reg. at 31,314. Nor will they advance the protection of those fleeing persecution and torture. Rather, the Rule and the collateral expedited removal policies are merely an effort to deter noncitizens from seeking protection in the United States and so reduce the number of migrants arriving at the southern border. But extending protection to persons fleeing persecution and effectively managing the border are not mutually exclusive objectives. The United States has an agile, sophisticated asylum system that—if properly resourced—is capable of handling large flows of migrants through our southern border. And there are other lawful and humane policies that can help to regularize and streamline the processing of noncitizens arriving at the southern border, including two policies that the Biden Administration has committed to undertaking: expanding family reunification parole processes and significantly increasing refugee processing in the Western Hemisphere. *See* U.S. Dep't of State, *U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023), https://www.state.gov/u-s-government-announces-sweeping-new-actions-to-manage-regional-migration/.

Council 119's members are deeply committed to advancing our country's proud tradition of serving as a refuge for the persecuted. The Rule and the collateral expedited removal policies force them to help send people with meritorious claims for protection back to harm, and thus to betray that tradition, their moral conscience, and their professional ethics; to violate their oath to faithfully discharge their duty to carry out the immigration laws adopted by Congress, *see* 5 U.S.C.

§ 3331; and to fear that they are being made complicit in violations of domestic and international law.  Council 119 accordingly urges the Court to grant Plaintiffs' Motion for Summary Judgment and requested relief.

## ARGUMENT

I.    **The Rule's Changes to Credible Fear Interviews Are Arbitrary and Undermine the Integrity of the Asylum System.**

The Rule makes two significant changes to credible fear interviews—*first*, it requires that asylum officers determine during the credible fear interview whether a noncitizen is subject to the Rule's asylum eligibility bar and enter a negative credible fear determination with respect to the noncitizen's asylum claim if they find that they are; and *second*, for noncitizens determined to be subject to the Rule's asylum eligibility bar, it requires asylum officers to screen them during the credible fear interview for other forms of protection using a heightened, more difficult-to-satisfy standard.  These changes are arbitrary and at odds with congressional intent, and are undermining the integrity of the asylum system.[6]  By requiring that an eligibility bar to asylum be implemented in credible fear screenings, and by raising the burden of proof for those subject to the bar who are then screened for withholding of removal and CAT protection, the Rule is imposing significant new burdens on the credible fear process for both asylum seekers and asylum officers, and causing individuals with bona fide protection claims to be returned to danger.

A.    **Requiring that the Rule's Asylum Eligibility Bar Be Applied During Credible Fear Interviews Unlawfully Transforms a Threshold Screening Interview into a Merits Determination.**

When a noncitizen placed into the expedited removal process by U.S. Customs and Border Protection ("CBP") indicates a fear of persecution, they are referred to an asylum officer for a credible fear interview.  *See* 8 U.S.C. §§ 1225(b)(1)(A)(ii), (b)(1)(B); 8 C.F.R. § 208.30.   In

---

[6] Council 119 strongly believes that the Rule is unlawful in several other respects, as set forth in its amicus brief filed in *East Bay Sanctuary Covenant v. Biden*, No. 18-cv-06810-JST, 2023 WL 4729278 (N.D. Cal July 25, 2023).  *See id.*, ECF No. 174-1 (June 7, 2023).  The arguments in that amicus brief pertain to claims that are being held in abeyance in this case pending further proceedings in that litigation. (ECF No. 38 (Joint Mot. to Hold Certain Claims in Abeyance); Minute Order of Oct. 4, 2023 (granting Joint Mot.).)

crafting the expedited removal system, Congress provided that a credible fear interview is to serve as a threshold screening interview, during which an adjudicator assesses whether there is "a significant possibility" that the noncitizen "could establish eligibility for asylum" in regular removal proceedings, where—unlike in expedited removal proceedings—they are entitled to receive a full hearing before an immigration judge (or, for those referred for an Asylum Merits Interview, an asylum officer[7]), after having had more time to consult counsel, amass factual evidence, and prepare legal arguments.  8 U.S.C. § 1225(b)(1)(B)(v).[8]

Congress deliberately chose a "'low screening standard for admission into the usual full asylum process'" to "ensur[e] that individuals with valid asylum claims are not returned to countries where they could face persecution."  *Grace*, 965 F.3d at 902 (quoting 142 Cong. Rec. 25,347 (1996) (statement of Sen. Hatch)).  That decision reflects the challenging reality of these screening interviews.  Noncitizens usually undergo their credible fear interviews mere days—and now, sometimes just 24 hours, *see infra* Argument II—after their initial encounter with DHS.  They are often traumatized and exhausted by their journey to the United States, ordinarily have been detained since their arrival, and frequently have had no or inadequate access to counsel.  *See Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 39 (D.D.C. 2020) (Jackson, J.); *Pomavilla-Zaruma v. Garland*, __ F. 4th __, 2023 WL 5597432, at *3 (2d Cir. Aug. 30, 2023) (questioning the presumptive reliability of interviews conducted at the border because they often "take place shortly . . .after significant travel" and noncitizens who fled persecution "may be wary of governmental authorities" and are usually "unrepresented by counsel, unknowledgeable of U.S. asylum law, and

---

[7] *See* USCIS, *Asylum Merits Interview with USCIS: Processing After a Positive Credible Fear Determination* (last updated May 31, 2022), https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/asylum-merits-interview-with-uscis-processing-after-a-positive-credible-fear-determination.

[8] To ultimately be granted asylum, a noncitizen must show a "well-founded fear of persecution on account of" a protected ground.  8 U.S.C. § 1101(a)(42).  That standard is met where "a reasonable person in [the noncitizen's] circumstances would fear persecution."  *Matter of Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987).  A noncitizen "need not prove that it is more likely than not that [they] will be persecuted in [their] home country."  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987).  A noncitizen with only "a 10% chance of being . . . persecuted" can show a well-founded fear.  *Id.* at 440.

unable to understand aspects of the proceedings conducted in English").  Some individuals suffer from memory lapses, the inability to communicate, and other psychological challenges stemming from the harms they experienced.  In the midst of these extremely challenging circumstances, the credible fear interview requires them to disclose deeply personal information to government officials who are strangers to them, including experiences like sexual violence, assault, kidnapping, and torture.  The law thus appropriately provides that a credible fear interview is simply a screening device and is not suited for a full adjudication of an asylum seeker's request for relief, including whether they are ineligible for protection for reasons unrelated to the merits of their claim.

The asylum statute sets forth several eligibility bars to asylum, including having persecuted others and having been convicted of a particularly serious crime.  *See* 8 U.S.C. § 1158(b)(2). Asylum officers do not determine the applicability of any of those statutory bars during the credible fear interview, and so do not use any of those statutory bars as a basis for finding that an asylum seeker lacks a credible fear of persecution.  Instead, if an asylum seeker "is able to establish a credible fear of persecution or torture but appears to be subject to one or more of the mandatory bars to . . . asylum," the asylum officer simply notes in the asylum seeker's file that a mandatory bar to eligibility may apply, and then refers the asylum seeker for a full hearing on their claim, including the applicability of any bar.  8 C.F.R. § 208.30(e)(5)(i); *see also* USCIS, *Questions and Answers: Credible Fear Screening*, https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/questions-and-answers-credible-fear-screening (last updated Sept. 12, 2023) ("An Asylum Officer does not make a final decision whether you are subject to a mandatory bar to asylum or withholding of removal in the credible fear determination process.  An asylum officer will note in their credible fear decision that a mandatory bar to asylum or withholding of removal may apply in a subsequent Asylum Merits Interview before an asylum officer or in immigration proceedings before an IJ.").

During the Trump Administration, DHS briefly departed from the longstanding practice that asylum officers are not authorized (let alone required) to deny asylum based on the

applicability of a mandatory bar during a credible fear interview. But DHS, along with the U.S. Department of Justice, soon recognized the due process problems with that approach and rescinded the requirement that certain mandatory bars to asylum be applied at the credible fear stage. *See* 87 Fed. Reg. at 18,093. The agencies acknowledged "that considerations of procedural fairness counsel against applying mandatory bars that entail extensive fact-finding during the credible fear screening process." *Id.* They explained that, "[u]pon review and reconsideration, due to the intricacies of the fact-finding and legal analysis often required to apply mandatory bars, the Departments now believe that individuals found to have a credible fear of persecution generally should be afforded the additional time, procedural protections, and opportunity to further consult with counsel that the Asylum Merits process or section 240 removal proceedings provide." *Id*. at 18,094. Despite that acknowledgment, the Departments chose to require that the Rule's mandatory asylum bar—but not any of the statutory asylum bars—be imposed during the credible fear screening stage.

By requiring asylum officers to determine the applicability of an asylum eligibility bar in the context of the credible fear interview, the Rule eviscerates the fundamental purpose of the credible fear interview as a screening tool for protection claims. The Rule compels asylum officers to determine if asylum seekers are ineligible for asylum under the Rule before ever assessing whether they have a viable protection claim—in other words, it requires them to consider *exclusion* from protection before ever considering *inclusion*, contrary to the approach set out in the 1951 United Nations Convention Relating to the Status of Refugees, the international treaty from which our country's refugee obligations flow. *See* Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status* ¶ 31 (1979), https://www.unhcr.org/media/handbook-procedures-and-criteria-determining-refugee-status-under-1951-convention-and-1967 ("The inclusion clauses define the criteria that a person must satisfy in order to be a refugee. The . . . exclusion clauses . . . enumerate the circumstances in which a person is excluded from the application of the 1951 Convention although meeting the positive criteria of the inclusion clauses."). As a result, asylum officers are being forced to deny

asylum to noncitizens who could have, but were not given the opportunity to, show a significant possibility of eligibility for asylum. This approach is directly at odds with the screening system that Congress designed when it created the expedited removal process and requires Council 119's members to perpetuate the very unfairness the Departments previously recognized.[9]

To be clear, Council 119's members do not understand the Rule to require or allow credible fear adjudicators to determine whether there is a *significant possibility* that the Rule's eligibility bar applies and no exception can be shown—in other words, the Rule does not enable them to consider applicability of the Rule's eligibility bar through the lens of the credible fear screening standard. Although the Rule's preamble concedes that Congress required the significant possibility standard to be used in credible fear proceedings and so suggests that standard will be used in assessing the applicability of the Rule's eligibility bar, *see* 88 Fed. Reg. at 31,380, the regulatory text itself forecloses the use of significant possibility. The Rule's operative language demands that asylum officers adjudicating credible fear "first *determine* whether the [noncitizen] is covered" by the Rule's new eligibility bar "and, if so, whether the [noncitizen] has rebutted" the bar by establishing that the "exceptionally compelling circumstances" exception applies. 8 C.F.R. § 208.33(b)(1) (emphasis added). If the asylum officer determines that the noncitizen is covered by the Rule and has not established an exception, the asylum officer must enter a negative credible fear determination with respect to the noncitizen's asylum claim. *Id.* § 208.33(b)(1)(i). Council 119's members are bound to follow the regulatory text. *See, e.g.*, *Nat'l Wildlife Fed'n v. EPA*, 286

---

[9] Selectively requiring only the Rule's eligibility bar to be applied during credible fear interviews also leads to irrational and arbitrary results. For example, an individual who passed through Mexico on their way to the United States who articulates a credible fear of persecution to an asylum officer, but who also admits to having committed acts of terrorism in her home country (a statutory asylum bar, *see* 8 U.S.C. § 1158(b)(2)), will receive a positive credible fear finding if she demonstrates that she is not subject to the Rule's eligibility bar—*i.e.*, she presents at a port of entry pursuant to a time and place pre-scheduled via CBP One, or she applied for and was denied asylum in a third country—or if she demonstrates a rebuttal to the bar for "exceptionally compelling circumstances," 8 C.F.R. § 208.33(a). But an individual fleeing political violence in Central America who unambiguously faced persecution on account of a protected ground in her home country but did not apply for asylum in a third country and who arrived in the United States at a port of entry without authorization to request parole or a CBP One appointment will presumptively be deemed ineligible for asylum.

F.3d 554, 570 (D.C. Cir. 2002) ("[I]t is the language of the regulatory text, and not the preamble, that controls.").

To the extent the Departments contend that the bar here is not factually or legally complex, and so can appropriately be adjudicated during credible fear screenings, that argument should be rejected as unreasonable. Assessing whether an asylum seeker faced one of the "exceptionally compelling circumstances" set forth in the Rule is a factually intensive, complex determination. The Rule does not define "acute medical emergency" or "imminent and extreme threat to life or safety," 8 C.F.R. § 208.33(a)(i), and the Departments have issued no public guidance on their meaning, leaving asylum officers and their supervisors to decide for themselves what scenarios these exceptions even reach, potentially creating a serious likelihood that the Rule's exceptions are being inconsistently and arbitrarily applied. And the definition of "[s]evere form of trafficking" is legally complex and challenging for an asylum officer to assess under the conditions of a credible fear interview. *See* 8 C.F.R. § 214.11(a) (requiring that the "commercial sex act" be "induced by force, fraud, or coercion," or that "the recruitment, harboring, transportation, provision, or obtaining of a person for labor services through the use of force, fraud, or coercion" be "for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery").

The Rule's requirement that its asylum eligibility bar be applied during credible fear interviews also significantly adds to the workload and pressures facing asylum officers. Although asylum officers currently ask questions about the statutory mandatory bars during credible fear interviews to identify potential bars, they do not need to elicit testimony and develop a record to the level of detail required to make an outcome-determinative merits determination based on those bars. 87 Fed. Reg. at 18,093. As the Departments recognized when they rescinded prior Trump Administration rules requiring that mandatory bars be assessed in credible fear interviews,

> [i]f a mandatory bar were to become outcome determinative, it would be necessary to develop the record sufficiently to make a decision about the mandatory bar such that, depending on the facts, the interview would go beyond its congressionally intended purpose as a screening for potential eligibility for asylum or related protection—and a fail-safe to minimize the risk of refoulement—and would instead become a decision on the relief or protection itself. The level of detailed testimony

12

necessary in some cases to make such a decision would require asylum officers to spend significantly more time developing the record during the interview and conducting additional research following the interview.

*Id.* Indeed, the Departments recounted that when asylum officers were previously required to apply mandatory bars in credible fear interviews, the result was an "increase [in] credible fear interview and decision times." *Id*.

In sum, the Rule forces asylum officers to make an outcome-determinative decision about a mandatory asylum eligibility bar in the context of a credible fear screening interview, and to deny asylum to noncitizens who could have shown a significant possibility of meeting the asylum standard. The Rule subverts the delicate balance Congress struck between expediency and protection when it designed the expedited removal system and imposed a low threshold screening standard in credible fear interviews, and greatly taxes asylum officers and the whole credible fear system in the process.

**B.      Requiring Those Subject to the Bar to Satisfy a Reasonable Possibility Standard to Pass a Screening Interview for Withholding and CAT Relief Is Unreasonable.**

The Rule further changes the credible fear process by heightening the screening standard asylum officers must use when screening those individuals subject to the Rule's asylum eligibility bar for withholding of removal and CAT protection. That too is arbitrary.

Whereas asylum is a discretionary form of relief, withholding and deferral of removal and CAT protection are mandatory obligations, created to implement our country's international humanitarian treaty commitments to *non-refoulement—i.e.*, the requirement that a country not return people to probable persecution or torture. *See Cardoza-Fonseca*, 480 U.S. at 435, 440, 444; *Nasrallah v. Barr*, 140 S. Ct. 1683, 1687 (2020). Withholding and deferral of removal and CAT relief thus remain available even when an individual is deemed not to merit asylum as a matter of discretion.

Previously, asylum officers conducting credible fear proceedings screened noncitizens for withholding of removal and CAT relief using the significant possibility standard. Now, however, the Rule requires that individuals subject to the Rule's asylum eligibility bar be screened for

withholding and CAT relief using the more stringent reasonable possibility standard.  8 C.F.R. § 208.33(b)(2)(i); *see* 88 Fed. Reg. at 31,336-37, 31,381 (describing reasonable possibility as a "higher" and "more demanding" standard than significant possibility).  Showing a reasonable possibility of persecution or torture is the equivalent of demonstrating *ultimate* eligibility for asylum.  *See* USCIS – Refugee Asylum & Int'l Operations Directorate Officer Training, *Lesson Plan Overview: Reasonable Fear of Persecution and Torture Determinations* at 11 (Feb. 13, 2017), https://www.uscis.gov/sites/default/files/document/lesson-plans/Reasonable_Fear_Asylum_Lesson_Plan.pdf.  The Rule thus not only makes it impossible for noncitizens subject to the Rule's bar to access asylum, but then makes it more difficult for them to access other forms of protection from removal to persecution or torture.

Prior to the Rule, asylum officers only applied the reasonable possibility standard in reasonable fear (not credible fear) screenings, which are used in two specific situations: (1) following the reinstatement of a prior removal order, *see* 8 U.S.C. § 1231(a)(5), 8 C.F.R. § 241.8(e); and (2) following the issuance of a final administrative removal order, which results from certain felony convictions, *see* 8 C.F.R. §§ 208.31, 1208.31.  In other words, the reasonable possibility screening standard was reserved for individuals who had previously violated our nation's laws and by definition had prior experience with the U.S. immigration system.  Many of these individuals have lived in the United States for extended periods of time, and so have a greater ability to identify counsel and prepare in advance for their screenings.  These reasonable fear proceedings are also accompanied by procedural protections unavailable to noncitizens in expedited removal—namely, the ability to seek review of a negative determination by USCIS and by a federal court of appeals.  *Compare Alonso-Juarez v. Garland*, 80 F. 4th 1039 (9th Cir. 2023) *with* 8 U.S.C. §§ 1225(b)(1)(B)(iii), 1252(a)(2)(A), 1252(e)(2); *compare* 8 C.F.R. § 1208.31 *with* 8 C.F.R. § 208.33(b)(2)(v)(C).

The heightened reasonable possibility standard is inappropriate for an initial screening interview immediately following a person's first entry into the United States, when, as noted, they are often exhausted, traumatized, and unable to quickly secure counsel and amass evidence.  *See*

*supra* Argument I.A.  Indeed, the agencies do not require noncitizens possibly subject to any statutory asylum eligibility bar to satisfy this higher standard during credible fear proceedings. The Rule imposes this higher screening standard during credible fear screenings *only* for individuals subject to the Rule's bar.

By forcing asylum officers to use a standard ill-suited to credible fear screenings, the agencies are further taxing an already overburdened credible fear system, and are putting asylum officers at risk of wrongfully sending people with bona fide protection claims back to danger.

## II.    The Collateral Expedited Removal Policies Are Unreasonable and Harmful.

DHS made three changes to the expedited removal system alongside its promulgation of the Rule that likewise threaten the integrity of the credible fear system and risk forcing asylum officers to violate the rights of asylum seekers.

*First*, DHS instituted an accelerated credible fear process, under which credible fear interviews can be scheduled 24 hours after a noncitizen is screened into immigration custody and given a credible fear interview informational form.  *See* DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023), https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration; (ECF No. 37-2 (Declaration of Noor Zafar) ("Zafar Decl.") Ex. C at 1).  Previously, noncitizens had at least 48 hours after arrival to rest, contact counsel, and prepare before their credible fear interview.  (Zafar Decl., Ex. C at 2-3.)

The new 24-hour policy is most likely to affect people in CBP custody, where facilities are in remote locations, visiting hours are short, telephone access is severely restricted, and in-person attorney consultations are prohibited.  *See, e.g.*, CBS News, *Biden Administration Guaranteed Attorney Access for All Migrant Screenings.  Most Don't Have It.* (July 2, 2023), https://www.cbsnews.com/sacramento/news/despite-promises-attorneys-are-scarce-as-the-us-resumes-speedy-asylum-screenings-at-border-2/; Nat'l Immigrant Justice Ctr., *Obstructed Legal Access: NIJC's Findings From 3 Weeks of Telephonic Legal Consultations in CBP Custody* (May 25, 2023), https://immigrantjustice.org/staff/blog/obstructed-legal-access-nijcs-findings-3-weeks-

telephonic-legal-consultations-cbp (describing six cases in which, "[d]espite formal notice of attorney representation" and "explicit requests" for notification, CBP did not notify counsel in advance of their clients' credible fear interviews and did not allow counsel to appear at the interviews); KRGV, *CBP Implements New Asylum Processing Program in RGV* (Jan. 1, 2020), https://www.krgv.com/videos/cbp-implements-new-asylum-processing-program-in-rgv (detailing CBP phone restrictions that permitted asylum seekers just 30 minutes to an hour to contact counsel and form an attorney-client relationship); Am. Bar Ass'n Comm'n on Immigration, *Reforming the Immigration System: Proposals to Promote Independence, Fairness, Efficiency, and Professionalism in the Adjudication of Removal Cases* 12, 40 (Mar. 2019), https://www.americanbar.org/content/dam/aba/publications/commission_on_immigration/2019_r eforming_the_immigration_system_volume_1.pdf.

It is unclear how asylum officers are expected to reconcile the requirement to conduct screening interviews this quickly with regulations guaranteeing noncitizens "time to contact and consult with any person or persons of the [noncitizen's] choosing." 8 C.F.R. § 235.3(b)(4)(ii); *see also* 8 U.S.C. § 1225(b)(1)(B)(iv); 8 C.F.R. § 208.30(d)(4).  Likewise, the policy now restricts rescheduling of credible fear interviews to "extraordinary circumstances" (Zafar Decl., Ex. C at 3), but by regulation asylum officers are permitted to reschedule screening interviews if they "determine[] that the [noncitizen] is unable to participate effectively . . . because of illness, fatigue, or other impediments." 8 C.F.R. § 208.30(d)(1).

Twenty-four hours is not enough time for asylum seekers to collect themselves after an arduous trip to the U.S. border, consult with an attorney, and prepare for a credible fear interview. Forcing asylum officers to conduct credible fear interviews on such a rapid timeline may place Council 119's members in situations where they fear they are depriving asylum applicants of the procedural fairness to which they are entitled, and thus are undermining the fairness and reliability of the credible fear system.

*Second*, DHS implemented a new policy of removing certain nationals of four countries— Cuba, Haiti, Nicaragua, and Venezuela—to Mexico, rather than their countries of origin.  (Zafar

Decl., Ex. A); 88 Fed. Reg. at 31,317 n.21 (announcing agreement under which Mexico will accept removals of noncitizens from Cuba, Haiti, Venezuela, and Nicaragua).  The policy does not require CBP or USCIS officers to notify noncitizens that the government has designated Mexico as their country of removal.  (Zafar Decl., Ex. A.)

The country to which a noncitizen will be removed materially affects the substance of the credible fear interview, because asylum officers must focus on assessing the likelihood of persecution or torture in that country.  *See* 8 C.F.R. § 208.31(c) (stating that "reasonable fear of persecution or torture" "shall be determined" with reference to "the country of removal").  When noncitizens do not know, understand, or expect that they will be removed to Mexico, rather than their country of origin, it is evident that the credible fear interview may become confused, compromising a noncitizen's ability to understand the proceeding and provide information pertinent to the screening determination, and compromising an asylum officer's ability to effectively elicit responsive testimony and make an accurate screening decision.  This reality is clear from the history of the Migrant Protection Protocols ("MPP"), a policy under which certain non-Mexican nationals who came to the U.S. southern border were forced to remain in Mexico pending resolution of their immigration proceedings unless they could establish it was more likely than not that they would be persecuted or tortured in Mexico.  *See* USCIS, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols* (Jan. 28, 2019), https://www.uscis.gov/sites/default/files/document/memos/ 2019-01-28-Guidance-for-Implementing-Section-35-b-2-C-INA.pdf.  Immigration officers did not ask asylum seekers in MPP whether they feared harm in Mexico; instead, asylum seekers in MPP were only referred to an asylum officer for an interview to assess their risk of harm in Mexico if they spontaneously expressed a fear of return to Mexico to a CBP officer.  *See Innovation Law Lab v. McAleenan*, 924 F.3d 503, 5011 (9th Cir. 2019) (Watford, J., concurring).  The result of that policy design was that most migrants forced to remain in Mexico pursuant to MPP never saw an asylum officer.  The few asylum seekers who were referred for screenings were generally very confused about why they were being asked about Mexico rather than their home countries, and

were often unable to sufficiently articulate their fears, including because the struggle to recount traumatic events can be heightened when the trauma occurred in a foreign country and because non-Mexican migrants were not from Mexico and so were understandably not yet familiar with the many ways migrants are at serious risk of harm there.  *See, e.g.*, Charles Tjersland Jr., *I Became An Asylum Officer To Help People.  Now I Put Them Back In Harm's Way*, Wash. Post (July 19, 2019), https://www.washingtonpost.com/outlook/i-became-an-asylum-officer-to-help-people-now-i-put-them-back-in-harms-way/2019/07/19/1c9f98f0-a962-11e9-9214-246e594de5d5_story.html; Brief in Support of Respondents for Amicus Curiae of Council 119, *Wolf v. Innovation Law Lab*, No. 19-1212 (U.S. Jan. 22, 2021).  Asylum officers should not be expected to administer proceedings that do not fully inform applicants of the countries to which they may be removed and the legal implications of that removal.

Third, DHS now directs CBP and USCIS officers to offer nationals of Cuba, Haiti, Nicaragua, and Venezuela who are in expedited removal proceedings the opportunity to withdraw their applications for admission to the United States and voluntarily return home, and to advise them about parole programs.  (Zafar Decl., Ex. D.)  However, these individuals are ineligible for parole if—as is likely—they entered Mexico or Panama without authorization after the effective date of the various parole programs. *See* USCIS, Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (May 18, 2023), https://www.uscis.gov/CHNV.

Any required or encouraged language regarding voluntary return should be extremely clear that withdrawing a request for protection in the United States does not render a noncitizen eligible for parole in any way except that citizens of Cuba, Haiti, Nicaragua, and Venezuela need to be outside the United States to be eligible for these parole programs.  *Id.*  If DHS wishes for CBP and USCIS employees to discuss and encourage voluntary return with certain applicants, it should require employees to first screen those applicants for whether they rendered themselves ineligible for humanitarian parole by crossing into Mexico or Panama without authorization.  Such screening could be easily done and would avoid the coercive effect Plaintiffs raise in their briefing.

III.   **The Rule and the Collateral Expedited Removal Policies Undermine Our Nation's Longstanding Commitment to Provide Safe Haven to the Persecuted and Are Not Necessary to Address the Flow of Migrants at the Southern Border.**

The commitment to provide a safe haven to persecuted people is fundamental to the best traditions of our nation's identity and moral fabric.  Our asylum laws reflect that commitment, and for decades, our nation's resources were dedicated to establishing an agile system to identify, vet, and protect refugees that honored our values and laws.  The agencies contend that the Rule's extreme limitations on asylum are necessary to respond to the increased flow of migrants at the southern border.  88 Fed. Reg. at 31,314-16.  But the appropriate response to that influx is to allocate adequate resources to our existing asylum system—not promulgate an unlawful policy that shuts the door to asylum seekers with bona fide claims.  The Rule and the collateral expedited removal policy changes represent a decision to turn our back on our history and break from our longstanding commitment to offering protection to the vulnerable and persecuted.

Our modern asylum and refugee systems were created after World War II, partially in response to America's failure to do more to help Jewish people fleeing Nazi persecution.  *See, e.g.*, *Ms. L v. ICE*, 302 F. Supp. 3d 1149, 1164 (S.D. Cal. 2018); Gregg A. Beyer, *Reforming Affirmative Asylum Processing in the United States: Challenges and Opportunities*, 9 Am. U. Int'l L. Rev. & Pol'y 43, 55 (1994); U.S. Holocaust Memorial Museum, *Voyage of the St. Louis*, https://encyclopedia.ushmm.org/content/en/article/voyage-of-the-st-louis (last accessed Oct. 6, 2023).  The foundation of our asylum laws is the 1951 Convention Relating to the Status of Refugees, to which the United States committed through its signing and ratification of the 1967 United Nations Protocol Relating to the Status of Refugees, and the 1994 Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment.  These international obligations and the domestic statutes and regulations enacted to implement them require that we do not penalize those seeking protection for how they come to the United States; discriminate against them based on their race, religion, or national origin; or return them to places where they face torture or threats to their lives and freedoms based on their race, religion, nationality, membership in a particular social group, or political opinion.  *See Cardoza-Fonseca*, 480 U.S. at

19

437; USCIS – Refugee, Asylum and Int'l Operations Directorate Officer Training, *Lesson Plan Overview: History of the Affirmative Asylum Program* at 4-5 (May 9, 2013), https://www.uscis.gov/sites/default/files/document/lesson-plans/History_of_the_Affirmative_Asylum_Program.pdf; Beyer at 56-58.

Since World War II, the United States has afforded protection to people fleeing persecution, including in the context of large influxes.  It has done so by embracing adaptable processes that both ensured protection to qualified asylum seekers and refugees and guarded against abuse and security threats.  For example, immediately following World War II, the United States welcomed nearly 40,000 Holocaust survivors and enacted legislation that allowed for the resettlement of roughly half-a-million displaced persons.  *See* USCIS, *Refugee Timeline* (Feb. 7, 2023), https://www.uscis.gov/history-and-genealogy/our-history/refugee-timeline; Displaced Persons Act of 1948, ch. 647, Pub. L. No. 80-774, 62 Stat. 1009; Refugee Relief Act of 1953, Pub. L. No. 83-203, 67 Stat. 400.  In the mid-1960s, the government created an airlift program to safely and efficiently bring more than 250,000 Cuban refugees to the United States. *See* USCIS, *Refugee Timeline*.  And when the end of the Vietnam War resulted in large numbers of refugees, the United States admitted approximately 300,000 refugees from Southeast Asia through a parole program and passed legislation to fund their transportation and resettlement and allow them to become lawful permanent residents.  *See id.*

In the first few decades after World War II, the United States took a piecemeal approach to processing claims for refugee protection, and the asylum system existed as a matter of regulation.  Then, in 1980, Congress created the first statutory basis for asylum, which gave rise to the modern, systemic asylum process.  The Refugee Act of 1980 codifies the 1951 Convention's commitment to non-refoulement and sets forth a number of provisions regarding asylum eligibility and procedure.  *See Cardoza-Fonseca*, 480 U.S. at 427-29, 440; 8 U.S.C. §§ 1158, 1231(b)(3)(A).

A decade later, in 1990, the Immigration and Naturalization Service established an Asylum Corps comprised of professional asylum officers with training in international law and ready access to relevant country conditions and human rights information to enable the more accurate

20

and efficient processing of asylum claims.  *See History of the Affirmative Asylum Program* at 18-20; Beyer at 44.  The need for such a professional corps had been made clear after hundreds of thousands of Salvadorans and Guatemalans fleeing civil strife and government repression in the 1980s were wrongly denied asylum because of the improper influence of foreign policy considerations in asylum decisions.  *See* Library of Congress, *1991: American Baptist Churches (ABC) v. Thornburgh*, https://guides.loc.gov/latinx-civil-rights/abc-v-thornburgh; *History of the Affirmative Asylum Program* at 16-18.  The imperative to make asylum decisions based on an objective application of the law to the facts of a case, free from improper interference or political pressure, is fundamental to the institutional identity and legal obligations of the Asylum Corps.

The Asylum Corps began its work adjudicating affirmative asylum claims.  After just a few years, Congress in the mid-1990s authorized funding to double the number of asylum officers and expanded their responsibilities, allowing them to determine whether noncitizens subject to expedited removal have a credible fear of persecution and so should have the opportunity to seek protection through regular removal proceedings.  *See* Steven Greenhouse, *U.S. Moves to Halt Abuses in Political Asylum Program*, N.Y. Times (Dec. 3, 1994), https://www.nytimes.com/1994/12/03/us/us-moves-to-halt-abuses-in-political-asylum-program.html; 8 U.S.C. § 1225(b)(1)(B)(iii).

In 2003, the USCIS Asylum Division was created.  *See* USCIS, *Refugee Timeline*.  The Division has responsibility for reviewing the claims of asylum seekers who are not in removal proceedings and apply affirmatively for asylum; are subject to expedited removal and indicate an intention to apply for asylum or a fear of returning to their home country and so are interviewed for a "credible fear" of persecution or torture, *see* 8 U.S.C. § 1225(b)(1)(B), 8 C.F.R. §§ 208.30, 235.3; and those who have been ordered removed or convicted of certain crimes but express a fear of returning to their home country and so are interviewed for a "reasonable fear" of persecution or torture, 8 C.F.R. §§ 238.1, 241.8, 208.31.  Through these processes, asylum officers work to offer protection to bona fide asylum seekers, account for national security and public safety concerns, and combat fraud and abuse.

In short, our post-World War II refugee and asylum systems have enabled the United States to welcome asylum seekers and refugees escaping violence, conflict, persecution, or natural disaster, sometimes in waves of hundreds of thousands of people, in sophisticated and agile ways that honor and effectuate our international commitments. Our systems are designed to handle these crises. Instead of responding to long backlogs in asylum processing by devising new ways to shut the door to bona fide asylum seekers, as the Rule and attendant expedited removal policy changes do, the proper response—the one consistent with governing law and our nation's longstanding commitment—is to allocate adequate resources to our existing asylum system to ensure that there are enough asylum officers, immigration judges, and administrative staff to fairly, humanely, and expeditiously hear and adjudicate asylum claims. The government also can and should further leverage the U.S. Refugee Admissions Program to provide increased assistance and processing in the Western Hemisphere so that people can seek protection where they are without having to first travel to the southern border.

By forcing asylum officers to implement an illegal and immoral Rule and set of attendant expedited removal policies that have resulted, and, absent vacatur, will continue to result in sending bona fide asylum seekers back to persecution, the agencies are jeopardizing not only the integrity of our asylum system but its basic ability to function. The Rule and the collateral policies are significantly and negatively impacting the morale of Council 119's members. They feel forced to choose between (1) breaking the law by applying the new Rule in screening interviews; (2) risking disciplinary action (up to removal from federal service) if they refuse; and (3) resigning from their jobs. Given the backlog in asylum processing, it is more essential than ever that we have a cohort of experienced and well-trained asylum officers, but the Rule and the collateral expedited removal policies make continuing their work a source of moral injury.

## CONCLUSION

Council 119's members are duty-bound to protect vulnerable asylum seekers from persecution or torture. The challenged Rule and collateral expedited removal policy changes require them to choose between adhering to the directives of their departmental leaders and

adhering to our nation's legal and moral commitment to not return refugees to territories where they will face persecution.  Asylum officers should not be forced to implement policies that are fundamentally contrary to our international treaty and statutory obligations, and to the best traditions of our nation.

For the foregoing reasons and those set forth by Plaintiffs, this Court should grant Plaintiffs' Motion for Summary Judgment and award Plaintiffs their requested relief.

Dated: October 6, 2023

Respectfully submitted,

*/s/ Julie Veroff*

Julie Veroff*
Kathleen R. Hartnett
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
Tel: (415) 693-2000
Fax: (415) 693-2222
jveroff@cooley.com
khartnett@cooley.com
zhelstrom@cooley.com

*Counsel for Amicus Curiae*

*\* Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record who have consented to electronic notification.

Dated:  October 6, 2023

Respectfully submitted,

*/s/ Julie Veroff*

Julie Veroff*
Kathleen R. Hartnett
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
Tel: (415) 693-2000
Fax: (415) 693-2222
jveroff@cooley.com
khartnett@cooley.com
zhelstrom@cooley.com

*Counsel for Amicus Curiae*

 * *Admitted Pro Hac Vice*