**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| M.A., et al., | ) |
|  | ) |
|  | ) |
| *Plaintiffs*, | ) |
|  | ) |
| v. | ) No. 1:23-cv-01843-TSC |
| ALEJANDRO MAYORKAS, Secretary of the Department of Homeland Security, in his official capacity, et al., | ) |
|  | ) |
|  | ) |
|  | ) |
| *Defendants.* | ) |
|  | ) |

**MOTION OF HUMAN RIGHTS AND LEGAL SERVICES ORGANIZATIONS FOR
LEAVE TO FILE *AMICUS CURIAE* BRIEF**

Al Otro Lado, Haitian Bridge Alliance, Human Rights First and Justice Action Center respectfully request leave to file the accompanying *amicus curiae* brief in support of Plaintiffs' motion for summary judgment. Counsel for both Plaintiffs and Defendants consent to the filing of this brief.

District courts have broad discretion to permit the participation of amicus curiae. *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 519 F. Supp. 2d 89, 93 (D.D.C. 2007). This Court generally permits third parties to participate as *amici curiae* when they have "relevant expertise and a stated concern for the issues at stake in [the] case." *District of Columbia v. Potomac Elec. Power Co.*, 826 F. Supp. 2d 227, 237 (D.D.C. 2011). Specifically, this Court has permitted the filing of *amicus* briefs in cases where a third party has "unique information or perspective" that can contribute to the Court's understanding of the matter in question and assist the Court in the resolution of legal or factual questions. *Jin v. Ministry of State Sec'y*, 557 F.

Supp. 2d 131, 137 (D.D.C. 2008) (quoting *Ryan v. Commodity Futures Trading Comm'n,* 125 F.3d 1062, 1064 (7th Cir. 1997)).

The proposed *amici* are non-governmental, non-profit organizations that provide legal services to non-citizens and advocate for their rights.  All work with asylum seekers affected by the Rule being challenged in this case and have worked to document the impact of this Rule and of prior regulations and policies on persons seeking asylum at the United States' southern border. Given their direct interaction with non-citizens affected by this Rule, both in the United States and in Mexico, and their combined years of experience providing legal assistance and representation to persons seeking asylum in the United States, proposed *amici* have "relevant expertise and a stated concern for the issues at stake," and are in a position to provide "unique information" that will assist the Court in its adjudication of Plaintiffs' motion for summary judgment.  *Nat'l Ass'n of Home Builders*, 826 F. Supp. 2d at 237; *Jin,* 557 F. Supp. 2d at 137.

Based on the foregoing, the organizations listed above respectfully request that the Court grant this motion and accept the accompanying *amicus curiae* brief.

Dated: October 6, 2023

Respectfully submitted,

*/s/ Esther H. Sung*
Esther H. Sung

**Esther H. Sung** (CA00132)
esther.sung@justiceactioncenter.org
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: +1 323 316-0944
Facsimile: +1 323 450-7276

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Motion of Human Rights and Legal Services Organizations for Leave to File *Amicus Curiae* Brief, proposed order, and accompanying *amicus curiae* brief with the U.S. District Court of the District of Columbia using the CM/ECF system on October 6, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: October 6, 2023                                          */s/ Esther H. Sung*
                                                                         Esther H. Sung
                                                                         JUSTICE ACTION CENTER

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| M.A., et al., | ) |
| | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) No. 1:23-cv-01843-TSC |
| | ) |
| ALEJANDRO MAYORKAS, Secretary of the | ) |
| Department of Homeland Security, in his official | ) |
| capacity, et al., | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

**[PROPOSED] ORDER GRANTING MOTION OF HUMAN RIGHTS AND LEGAL
SERVICES ORGANIZATIONS TO FILE *AMICUS CURIAE* BRIEF**

Upon this Court's review and full consideration of the Motion of Human Rights and

Legal Services Organizations for Leave to File *Amicus Curiae* Brief, it is hereby ORDERED that

the Motion is GRANTED, and that the attached *amicus curiae* brief be docketed.

Dated: _____          _____
                                                 HON. TANYA S. CHUTKAN
                                                 UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| M.A., et al., | ) |
| | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | )   No. 1:23-cv-01843-TSC |
| | ) |
| ALEJANDRO MAYORKAS, Secretary of the | ) |
| Department of Homeland Security, in his official | ) |
| capacity, et al., | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

**BRIEF *AMICUS CURIAE* OF HUMAN RIGHTS AND LEGAL SERVICES
ORGANIZATIONS IN SUPPORT OF PLAINTIFFS**

## TABLE OF CONTENTS

STATEMENT OF INTEREST OF AMICI………………………………………………..1

INTRODUCTION AND SUMMARY OF THE ARGUMENT………………………………..3

ARGUMENT…………………………………………………………………………………...4

    I.     THE ASYLUM BAN IS RETURNING ASYLUM SEEKERS TO PERSECUTION
         WITHOUT ADEQUATE ASSESSMENT OF THEIR CLAIMS……………………..4

        A.  The asylum ban is returning to danger asylum seekers who should have had the
            opportunity to apply for asylum under U.S. law…………………………………..4

        B.  The asylum ban is leaving Mexican asylum seekers in danger in their country of
            persecution………………………………………………………………………...9

    II.    THESE ILLEGAL OBSTACLES ARE SUBJECTING ASYLUM SEEKERS IN
         MEXICO TO EXTREME VIOLENCE AND HARM…………………………….10

        A.  Killings, violent assaults, and rape……………………………………………12

        B.  Forced disappearances, trafficking and extortion………………………………..14

        C.  Harms to children……………………………………………………………...18

        D.  Pervasive violence and discrimination against Black, Indigenous, and LGBTQI+
            migrants…………………………………………………………………………..20

CONCLUSION………………………………………………………………………..22

# TABLE OF AUTHORITIES

**Cases**

*Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020)……………………………………………….3

**Statutes**

Illegal Immigration Reform and Immigrant Responsibility Act of 1996…………………………3

8 U.S.C. 1125(b)(1)(B)(v)……………………………………………………………………...3

**Regulations**

88 Fed. Reg. 31,314 (May 16, 2023)………………………………………………………...1

**Congressional Hearing Testimonies**

Hearing on After Apprehension: Tracing DHS Responsibilities after Title 42, Subcommittee on Government Operations and Border Management…………………………..…………………....5

**Reports**

*Refugee Protection Travesty: Biden Asylum Ban Punishes and Endangers At-Risk Asylum Seekers, Human Rights First* (July 2023)…...…………........6, 7, 9, 14, 15, 16, 17, 18, 19, 20, 21

*A Line That Barely Budges*, Human Rights First, Florence Immigrant & Refugee Rights Project, Kino Border Initiative (June 2023)………………………………………………………………11

U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., *2022 Country Reports on Human Rights Practices: Mexico* (2023)…………………………………………………………………………………………10, 12, 14

*Human Rights Stain, Public Health Farce*, Human Rights First (Dec. 2022)……......………….10

*Stuck in Uncertainty and Exposed to Violence: The Impact of US and Mexican Migration Policies on Women Seeking Protection in 2021*, The Women's Refugee Commission (Feb. 2, 2022)………………………………………………………………………………...…12

*"There Is A Target On Us" – The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border*, Black Alliance for Just Immigration…………………………………………20

**Press Releases**

U.S. Dep't of Homeland Security, United States to Resume Removals of Venezuelans Who Do Not Have a Legal Basis to Remain in the United States to Venezuela (Oct. 5, 2023)…...………..7

**News Articles**

*What we know about Matamoros and the kidnapped Americans*, Wash. Post (Mar. 7, 2023)………………………………………………………………………………..20

**Other Authorities**

Mexico Travel Advisory, U.S. Department of State……………..……………………………….11

## STATEMENT OF INTEREST OF AMICI

*Amici* are non-governmental non-profit organizations that serve non-citizens and advocate for their rights, including asylum seekers affected by the new asylum ban promulgated under the title Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023) (the "asylum ban" or the "Rule").[1]  *Amici* are submitting this brief to provide context on the situation in Mexico of persons seeking asylum in the United States who are affected by the asylum ban, and the harms they face in Mexico.

Al Otro Lado is a bi-national advocacy and legal aid organization serving migrants, refugees and deportees in the United States and Mexico.  Al Otro Lado provides legal and humanitarian support to indigent refugees, deportees, and other migrants, including providing free direct legal services on both sides of the U.S.-Mexico border and beyond.  Al Otro Lado's Border Rights Project, established in 2017, provides legal education, representation, accompaniment, and human rights monitoring for 10,000 to 15,000 asylum seekers in Tijuana each year.  The project also documents human rights violations committed by U.S. and Mexican government officials against refugees at the U.S.-Mexico border.  Al Otro Lado uses this data to demonstrate unlawful patterns or practices in our advocacy with U.S. policy makers, international human rights monitoring bodies, and nongovernmental human rights organizations. Its data has been cited by Amnesty International, Human Rights Watch, and numerous academic institutions studying the U.S.-Mexico border.  The Border Rights Project is one of the largest programs of its kind operating in northern Mexico and engages hundreds of volunteers per year

---

[1] *Amici curiae* confirm that: none of the *amici curiae* has a parent corporation; no publicly held corporation owns 10% or more of the stock of any of the *amici curiae;* no party's counsel has authored this brief in whole or in part; no party or party's counsel has contributed money intended to fund the preparation or submission of the brief; and no person other than amici has contributed money intended to fund the preparation or submission of this brief.

to serve refugees in Tijuana and beyond.  Al Otro Lado also provides reintegration services for individuals deported from the United States.  Since 2020, we have provided substantial humanitarian assistance to refugees and deportees in need.

Haitian Bridge Alliance ("HBA") is a grassroots nonprofit community-based organization that advocates for fair and humane immigration policies and provides migrants and immigrants with humanitarian, legal, and social services.  HBA focuses on Black people, the Haitian community, women and girls, LGBTQIA+ individuals, and survivors of torture and other human rights abuses.  HBA staff are either located at or regularly visit border areas in Tijuana, Mexico/San Diego, California; Ciudad Juarez, Mexico/El Paso, Texas; Reynosa, Mexico/McAllen, Texas; and Matamoros, Mexico/Brownsville, Texas.  HBA works with civil society partners in those locations and near other ports of entry along the southern border to serve Haitian and other Black people who are trying to access legal protection, including asylum, in the United States.

Human Rights First is a non-governmental organization established in 1978 that works to ensure the United States' leadership on human rights globally and compliance domestically with its human rights commitments.  Human Rights First provides pro bono legal representation to refugees, working in partnership with volunteer lawyers at leading law firms to represent asylum seekers unable to afford counsel.  Human Rights First has conducted research and advocacy on the impact of the asylum ban at issue in this litigation, publishing multiple reports on the subject, as well as on policies and regulations promulgated under the prior administration (the asylum transit and entry bans, the program known as the Migrant Protection Protocols, and the Title 42 expulsion policy) that sought to subject asylum seekers to extra-statutory bars to asylum and blocked asylum seekers for extended periods of time in Mexico.

2

Justice Action Center ("JAC") is a nonprofit organization dedicated to advancing the civil and human rights of immigrants through a combination of impact litigation and storytelling.  It provides support to select nonprofit organizations that have immigrant members or provide direct services to immigrant communities.  JAC also litigates on behalf of immigrant communities in numerous jurisdictions nationwide, including on behalf of a putative class of Haitian asylum seekers who were expelled from Del Rio, Texas in September 2021. With active litigation challenging the government's decision to deny access to the asylum system to thousands of Haitian asylum seekers, JAC has a strong interest in the ability of asylum seekers to access legal process in safety.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

When Congress created the expedited removal process and gave immigration officers the power to issue deportation orders, it incorporated into that process a requirement that any person placed in expedited removal who expressed an intent to seek asylum or a fear of return to their country of origin be referred for a credible fear interview ("CFI").  Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C § 302, 110 Stat. 3009-546, 3009-579–584 (1996).  The explicit purpose of the credible fear screening requirement was to ensure that in any case where there was a "significant possibility" that a person could establish eligibility for asylum, that person would not face summary removal but would be afforded the opportunity to apply for asylum and a full hearing on that application.  8 U.S.C. 1125(b)(1)(B)(v); *Grace v. Barr,* 965 F.3d 883, 902 (D.C. Cir. 2020).  This was—and by statute is still—the requirement regardless of the applicant's manner of entry into the United States, nationality, or the route by which the applicant reached this country's southern border.

The Rule at issue in this case has attempted to circumvent this standard.  It renders nearly all asylum seekers who traveled through another country on their way to the U.S. southern border ineligible for asylum unless they either applied for and were denied asylum in one of those countries, or were able to secure one of a limited number of pre-scheduled appointments to enter at specified port of entry, using a notoriously glitchy smartphone application administered by U.S. Customs and Border Protection ("CBP") and known as CBP One.

The ways in which application of the asylum ban in the CFI process contravenes the statute are laid out in detail in Plaintiffs' Motion for Summary Judgment.  *Amici* write to describe the impact of the asylum ban on the men, women, and children who seek the protection of the United States at the southern border.  That impact includes the summary deportation of asylum seekers without any adequate consideration of their claims to asylum and based on bars unrelated to the merits of those claims.  It also includes the exposure of these asylum seekers to extreme and frequently life-threatening violence and other harm in Mexico, either as they wait there trying to obtain a CBP One appointment or after being returned to Mexico under the asylum ban.

## ARGUMENT

I.   **THE ASYLUM BAN IS RETURNING ASYLUM SEEKERS TO PERSECUTION WITHOUT ADEQUATE ASSESSMENT OF THEIR CLAIMS.**

The Rule requires asylum seekers to show, in their CFI's, that they are not subject to the ban or that they qualify for one of the narrow exceptions the Rule allows.  Those unable to clear this hurdle—in an interview conducted over the telephone, typically while detained under very difficult conditions and without access to counsel—are deemed ineligible for asylum and required—in the same CFI and under the same bad conditions—to show a "reasonable possibility" that they could establish eligibility for withholding of removal or protection under

the Convention Against Torture, a much higher bar than the "significant possibility" standard enacted by Congress. Other applicants, based on their nationality, are not being screened as to their fears of return to their home countries at all.

**A. The asylum ban is returning to danger asylum seekers who should have had the opportunity to apply for asylum under U.S. law.**

Since it went into effect, the asylum ban has prevented many asylum seekers who should have had the opportunity to apply for asylum under U.S. law from doing so, resulting in *refoulement*. Government data reflects that use of the asylum ban to automatically block people from CFI's and elevate the screening standard makes asylum seekers drastically less likely to pass their screenings, causing deportation orders to soar. *Hearing on After Apprehension: Tracing DHS Responsibilities after Title 42 Before the Subcomm. on Gov't Operations and Border Mgmt., S. Comm. on Homeland Sec. and Gov't Affs.*, 118th Cong. (2023) (statement of Andrew Davidson, Acting Deputy Director, U.S. Citizenship and Immigration Services).

Of the 37,075 people subject to the asylum ban between May 12 and August 11, 2023, the vast majority (85.5 percent) were deemed barred by the ban, while only 2.9 percent satisfied a condition that exempted them from the ban (for example, presenting at a port of entry without an appointment where they faced a significant and ongoing obstacle to using CBP One) and 11.6 percent were deemed to meet an exception (such as medical emergency or threat to life or safety).

People who satisfied a condition or met an exception to the ban and proceeded with the regular CFI process passed their screenings 85 percent of the time, while those who were subjected to the ban and had to meet the higher screening standard fared far worse, with less than 53 percent passing their screenings and the rest ordered deported. This means that people subjected to the asylum ban and forced to meet a higher screening are more than three times as

likely to fail and be ordered deported (with 16 percent of those *not* subject to the ban ordered

deported and nearly 48 percent of those subject to the ban ordered deported).  By imposing an

illegal bar to asylum in the credible fear process, the Rule is causing positive credible fear rates

to plummet because asylum seekers who would have otherwise established a credible fear of

persecution in accordance with U.S. law are automatically blocked by the ban and subjected to a

higher screening standard.

      Like the Trump Administration's asylum transit ban, the current asylum ban is artificially

driving down fear screening pass rates by unlawfully raising the standard created by Congress.  A

Colombian asylum seeker, for example, reported fleeing Colombia after being threatened with

death and tortured, including being stabbed in the chest, by Colombian police and a guerrilla

group.  *Refugee Protection Travesty: Biden Asylum Ban Punishes and Endangers At-Risk Asylum*

*Seekers,* Human Rights First at 55 (July 2023), https://humanrightsfirst.org/wp-

content/uploads/2023/07/Refugee-Protection-Travesty_Asylum-Ban-Report_July-2023-1.pdf

("HRF Rep. July 2023").  While traveling through Mexico, he was kidnapped by a criminal

organization that tortured him and hit him in the chest where he had existing stab wounds from

his experiences in Colombia, leading him to run for his life to the U.S. border.  He was detained

by Immigration and Customs Enforcement and had a credible fear interview while unrepresented

at the Torrance County Detention Facility.  Though he told the asylum officer about the torture he

had suffered in Mexico, the officer determined he was subject to the ban and not eligible for an

exception, despite entering the United States while experiencing a medical emergency and

directly fleeing torture in Mexico.  He was then deported because the officer found he did not

meet the higher "reasonable possibility" standard, according to his attorney at the New Mexico

Immigrant Law Center. *Id.* at 56.

A citizen of Guatemala had fled his country because of death threats he received in retaliation for witnessing and helping report to the police a brutal attack on his relative.  In June 2023, an asylum officer determined that the man, who was unrepresented and had not even had an opportunity to consult with an attorney, was subject to the asylum ban and had not met the higher "reasonable possibility" standard for withholding and CAT protection.  HRF Rep. July 2023 at 59.  Deported to his country of persecution without any opportunity to be considered for U.S. asylum, the man is now terrified for his safety and barely leaves his home, according to an attorney at the National Immigrant Justice Center who represented him at his credible fear review hearing in immigration court.  *Id.*

An Ecuadorian asylum seeker seeking asylum along with her 10-year-old child, who testified about race-based harm in Ecuador and also her fears that her son would be targeted, attacked, and sexually abused because he has autism, was subjected to the ban and ordered deported through expedited removal along with her child, under the higher screening standard, within days of arriving in the United States, according to their attorney at Americans for Immigrant Justice.  Mother and child were deported to Ecuador in September with no opportunity to present their distinct protection claims to an immigration judge.

Citizens of Cuba, Nicaragua, and Venezuela, meanwhile, who are placed in expedited removal proceedings face removal to Mexico under the asylum ban, as detailed in Plaintiffs' Motion for Summary Judgment in this case.  As a result, the government is not screening many of these asylum seekers for fear of return to their countries of origin under *any* screening standard.  Instead, it is deeming them to be barred under the asylum ban and then requiring them to demonstrate a "reasonable possibility" of establishing eligibility for withholding of removal or

protection under the Convention Against Torture with respect to Mexico, where they are deported if they cannot pass this screening.[2]

A young Venezuelan man was detained in CBP custody and subjected to a credible fear interview in June 2023 before he could even consult with a lawyer. Even though the man had been brutally attacked in Mexico, the asylum officer conducting the credible fear interview found that he did not qualify for an exception to the asylum ban based on his fear of harm in Mexico. The officer did not ask any questions about the man's asylum claim or fear of returning to Venezuela. After determining that he was subject to the asylum ban—without providing any written analysis in the decision about why the man did not qualify for an exception—the officer ordered him deported because he found that the man had not met the higher "reasonable possibility" standard with respect to the danger he faced in Mexico. The asylum seeker managed to secure representation before his immigration court review, but his attorney at the National Immigrant Justice Center was not notified in advance of the review despite filing a notice of representation with the court. The immigration judge affirmed the negative credible fear interview decision and the man was deported to Mexico.

The Department of Homeland Security has also pressured asylum seekers from these countries to accept "voluntary return" to Mexico—including by informing them that they are ineligible for asylum due to the ban—thereby denying them an opportunity to seek protection

---

[2] On October 5, 2023, the Department of Homeland Security announced that it was resuming direct removals of Venezuelan nationals to Venezuela. Press Release, Dep't of Homeland Sec., United States to Resume Removals of Venezuelans Who Do Not Have a Legal Basis to Remain in the United States to Venezuela (Oct. 5, 2023), https://www.dhs.gov/news/2023/10/05/us-resume-removals-venezuelans-who-do-not-have-legal-basis-remain. It is unclear what proportion of Venezuelans subject to the asylum ban will be affected by this announcement, or how it will affect their fear screenings.

under U.S law and returning many to danger in Mexico or placing them at risk of refoulement by Mexico to their countries of origin.

A Venezuelan asylum seeker who fears persecution based on his opposition to the Venezuelan government accepted "voluntary" return to Mexico in June 2023 while suffering serious medical neglect in CBP custody.  His asthma was exacerbated by the extreme cold in the CBP facility where he was being held and he had recently been ill with pneumonia, but he was denied access to an inhaler or other medical care by CBP officers who told him they didn't care or to "shut up" when he begged for medical attention.  Though he feared harm in Mexico because he witnessed Mexican police targeting other Venezuelan migrants due to their nationality, he felt compelled to accept voluntary return to Mexico because of the conditions in CBP custody, according to information provided by his attorney at the National Immigrant Justice Center.  HRF Rep. July 2023 at 57.

**B.  The asylum ban is leaving Mexican asylum seekers in danger in their country of persecution.**

Although the asylum ban explicitly does not apply to nationals of Mexico, who are therefore not required to obtain CBP One appointments, *amici* would note that CBP continues to deprioritize persons who present at the port of entry without such appointments, leaving Mexican citizens seeking U.S. asylum blocked in the same country where they fear persecution.

A Mexican family consisting of a woman, her daughter-in-law, and three children aged 11, four and one, had been waiting to seek asylum outside the Nogales port of entry when they spoke to a Human Rights First researcher in June 2023.  They had been sleeping for five nights on the concrete of the public thoroughfare with blankets other asylum seekers had left behind. They recounted fleeing death threats and gender-based violence at the hands of members of a cartel in Mexico who burned the four-year-old, killed the daughter-in-law's sister, and

disappeared her husband; the older woman had herself been kidnapped and beaten and her brother kidnapped and found dead.  They had arrived in Nogales a month earlier, while the Title 42 expulsion policy was still in force, and were blocked from seeking asylum.  The 11-year-old fell ill with diarrhea and vomiting while they were living out on the street.  An elderly man approached them and offered them a room, which turned out to be the same room he slept in and where he placed his bed to block the front door.  He then began to sexually harass them.  The family escaped and fled directly to the port of entry where they were now sleeping on the pavement.  "Why does no one hear us?" the older woman asked.  "We are so scared.  We're afraid when people look at us and ask us where we're from.  We cannot wait here."  *A Line That Barely Budges*, Human Rights First, Florence Immigrant & Refugee Rights Project, Kino Border Initiative at 9 (June 2023), https://humanrightsfirst.org/wp-content/uploads/2023/06/A-Line-That-Barely-Budges_Nogales-Arizona-1.pdf.

## II.     THESE ILLEGAL OBSTACLES ARE SUBJECTING ASYLUM SEEKERS IN MEXICO TO EXTREME VIOLENCE AND HARM.

Many asylum seekers are waiting several months—up to six months in some cases—in Mexico for CBP One appointments in an attempt to request asylum at one of the ports of entry where such appointments are given.  Other asylum seekers are being returned to Mexico after being denied asylum in the United States under the ban, as described in Part I above.  As the U.S. Department of State has repeatedly recognized, human rights conditions in Mexico continue to be marked by forced disappearances and arbitrary killings, including at the hands of government agents.  Criminal elements and groups, including local and transnational gangs and narcotics traffickers, commit "acts of homicide, torture, kidnapping, extortion, human trafficking, bribery, intimidation and other threats, resulting in high levels of violence and exploitation."  U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., *2022 Country Reports on Human Rights*

10

*Practices: Mexico* at 2 (2023), https://www.state.gov/wp-content/uploads/2023/02/415610_MEXICO-2022-HUMAN-RIGHTS-REPORT.pdf.

Asylum seekers and other migrants are frequent victims of these attacks, targeted "by criminal groups and in some cases by police, immigration officers, and customs officials, including at land borders and airports." *Id.* at 19. Migrants are targets for all these state and non-state actors because of their status and vulnerability as migrants, their often very visible foreignness, their lack of protection, and the fact that they may have U.S.-based family who could be targeted for extortion. Human Rights First has documented the stories of thousands of asylum seekers and migrants who suffered horrific attacks in Mexico, including persecution on the basis of nationality, race, sexual orientation, gender identity, and other protected characteristics. These include over 13,000 reports of murders, kidnappings, rapes, and other violent attacks against migrants blocked in or expelled to Mexico under the former Title 42 expulsion policy between January 2021 and the end of that policy in May 2023. *See Human Rights Stain, Public Health Farce,* Human Rights First at 2 (Dec. 2022), https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/.

These attacks, which also target those returned to Mexico under the current asylum ban, are frequent and violent, as the following examples show. And while the Rule provides that an "imminent and extreme threat to life or safety" is among the "exceptionally compelling" circumstances that can provide an exception to the asylum ban, those actually experiencing such extreme threats face extreme difficulties in presenting them to U.S. immigration authorities for consideration.

## A. Killings, violent assaults, and rape

The U.S. government flatly advises against travel to six Mexican states—one of them the border state of Tamaulipas—due to the threat of criminality and violence. In states where it will contemplate travel, the U.S. government prohibits its own employees, for security reasons, from engaging in most of the activities that asylum seekers have little choice but to engage in as they seek to apply for asylum at the U.S.-Mexico border. *See* U.S. Dep't of State, Mexico Travel Advisory (Oct. 5, 2022), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html.  Cartels and gangs have been "implicated in numerous killings, acting with impunity and at times in collusion with corrupt federal, state, local, and security officials."  U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., *2022 Country Reports on Human Rights Practices: Mexico* at 2 (2023), https://www.state.gov/wp-content/uploads/2023/02/415610_MEXICO-2022-HUMAN-RIGHTS-REPORT.pdf.  Mexico's drug-trafficking organizations "have substantial territorial control throughout the country and co-opt institutions through bribery and intimidation;" in addition to drug-trafficking, they engage in "oil theft, human trafficking, kidnapping, and extortion, earning billions of dollars annually. Global Organized Crime Index, Mexico, https://ocindex.net/country/mexico.

Violence against women and girls—including rape, sexual assault, and femicide—is pervasive in Mexico, with high rates of impunity. *2022 Country Reports: Mexico (2023)* at 25-19.  Migrant women face a particularly high risk of sexual assault. *See Stuck in Uncertainty and Exposed to Violence: The Impact of US and Mexican Migration Policies on Women Seeking Protection in 2021*, The Women's Refugee Commission (Feb. 2, 2022), https://www.womensrefugeecommission.org/research-resources/stuck-in-uncertainty-and-

exposed-to-violence-the-impact-of-us-and-mexican-migration-policies-on-women-seeking-protection-in-2021/.

A cartel in Reynosa, for example, kidnapped two young women and two young men from Venezuela in September 2023 while they were waiting to obtain a CBP One appointment.  The kidnappers killed one of the young men, as the survivors later described to a humanitarian aid provider in Matamoros.  Telephone Interview by Human Rights First with humanitarian aid provider (Sept. 18, 2023).

Also in September 2023, persons who identified themselves as members of a cartel in Reynosa kidnapped a Mexican family consisting of a mother, father, 13-year-old daughter, 12-year-old son, and five-year-old daughter, along with the father's two adult brothers.  The cartel members tortured and killed the two adult brothers, sexually assaulted the five-year-old daughter, and forced her family to witness this assault, as they subsequently recounted to a humanitarian aid provider.  The family was released after relatives paid the ransom their captors demanded, but they remain in danger in Mexico and in need of critical trauma-related psychiatric care.  Telephone Interview by Human Rights First with humanitarian aid provider (Sept. 20, 2023).

In September 2023, while waiting to seek asylum in the U.S., a Venezuelan man was shot in the head by members of an organized criminal group after being pulled off a bus that had been taken by the criminal group to kidnap passengers.  The man survived the shooting but lost his eye, as confirmed by a humanitarian aid provider. Telephone Interview by Human Rights First with humanitarian aid provider (Sept. 25, 2023).

A woman who had fled persecution in Honduras was living alone in a makeshift tent in an encampment in Matamoros for three months trying to obtain a CBP One appointment to seek asylum when she was raped in her tent at night in late May 2023 by a man who cursed at her for

being a migrant and threatened to kill her if she told anyone.  She screamed for help, but no one

came.  Her rapist returned another night in early June 2023 and attempted to rape her again.  This

time she was able to defend herself and escape the camp.  Terrified, she filed a police report in

Mexico.  She attempted to access the U.S. port of entry in Matamoros after both attacks, but on

both occasions Mexican immigration officers blocked her from accessing the U.S. port of entry

despite her evidence and testimony that she feared for her life.  Instead, Mexican immigration

officers questioned her as to whether she was in fact raped.  She reports receiving death threats

related to her sexual assault by telephone.  "I am afraid for my life here," she told a Human

Rights First researcher.  "In my country, I'm a professional.  I had a career.  I'm not coming to

work.  I came because my life was in danger.  And something that had never happened to me—a

rape—happened to me here."  HRF Rep. July 2023 at 10-11.

An elderly Colombian woman travelling alone was physically attacked and verbally

assaulted in the Matamoros camp by a member of the cartel who identified himself as the person

in charge and whom others said was the leader.  HRF Rep. July 2023 at 16.  She immediately hid

in another family's tent, pleading to be allowed to sleep there that night before escaping the camp

the next day.  "The terror I felt that night was the worst in my life. They [the cartel] don't respect

if you're an older woman, a child, a pregnant woman. People are taken from the camp and

disappeared, and no one can say anything."  *Id.*

## B.  Forced disappearances, trafficking and extortion

In Mexico, "[d]isappearances remained a persistent problem throughout the country,

especially in areas with high levels of cartel- or gang-related violence." 2022 State Dep't Report

at 3.  Criminal groups often kidnap, threaten, and extort migrants.  *Id.* at 19.

An asylum seeker from a Latin American country waiting to seek U.S. asylum, for example, was kidnapped in Mexico where she was held captive and abused for about a month and a half, according to information received by an attorney with Lawyers for Good Government in Reynosa.  She was able to escape her captors, only to be taken and held captive a second time.  She said: "I was held captive at this house for about two months and I thought the only way I would leave the house was if I were dead."  During her captivity, her captors trafficked her to drug dealers who raped her on several different occasions.  She went into hiding upon escaping and had been requesting a CBP One appointment daily without success.  She was unable to present at the port of entry to seek U.S. asylum protection due to Mexican immigration officers unlawfully blocking access to individuals without CBP One appointments.  HRF Rep. July 2023 at 11-12.

A Venezuelan woman and child were kidnapped, and the mother was raped while waiting for a CBP One appointment.  They were then denied access to the port of entry by Mexican officers.  They risk the punishment of the asylum ban if they attempt to enter between ports of entry or present without a CBP One appointment.  The mother, her minor son, and adult sister attempted to obtain a CBP One appointment to seek asylum in mid-May 2023 when they were kidnapped and held for 12 days in Reynosa in June 2023.  Their abductors threatened to take their organs if their families did not pay a ransom.

Four young Venezuelans, one of them a minor, traveling together arrived in Matamoros after the asylum ban went into effect.  They had been trying to obtain a CBP One appointment to seek U.S. asylum since April.  Access to the U.S. port of entry in Matamoros was blocked by Mexican immigration officers so they traveled to Reynosa in June, where they heard they might be able to access the port of entry.  In Reynosa, they were intercepted by a car while walking.

15

The driver asked where they were from and then kidnapped and held them hostage for three days.  During that time, they were all physically assaulted and the women were tortured for ransom.  The kidnappers threatened "[i]f you don't pay, we'll cut off your fingers." The family's relatives paid the ransom and they were released. After their release they lived in constant fear, as their kidnappers took their photos.  Following the kidnapping, they escaped Reynosa and returned to Matamoros.  They attempted to present at the Matamoros port of entry to request asylum, explaining their fear and what had happened, but were prevented from approaching the U.S. port of entry by Mexican immigration officers who wrongly turned them away because they did not have a CBP One appointment.  HRF Rep. July 2023 at 12-13.

Some asylum seekers from Central America also do not feel safe in Mexico from the persecutors who targeted them in their home countries.  A Honduran couple with two children in Matamoros, for example, whose home in Honduras was attacked by gunfire due to their resistance to a gang that controlled territory, reported that after fleeing their country and while in Tapachula, Mexico, they had seen some of their persecutors in a local park and immediately fled northward.  HRF Rep. July 2023 at 62.

These abuses are by no means limited to the acts of non-state criminal groups.  Migrants and people seeking asylum are targets of violence by Mexican officials throughout the country, with the result that internal relocation is not a reliable option for those facing threats in the northern border areas while waiting to seek U.S. asylum there.  Human Rights First researchers spoke with scores of people seeking asylum who experienced abuse by Mexican authorities during their transit through and wait in Mexico, in southern, central, and northern Mexico.  The officials involved included national immigration officers, municipal, state and federal police, and members of the national guard.  The abuses they inflicted on migrants included discriminatory

and arbitrary detention, intimidation, robbery, extortion, sexual assault, and enforced disappearance through collusion with organized criminal groups by turning migrants and people seeking asylum over to them for kidnapping and ransom.  HRF Rep. July 2023 at 50.

In Ciudad Juárez, a Venezuelan family with a two-year old child had been waiting over 15 days sleeping outside the port of entry without shelter, waiting to be processed to seek asylum when a Human Rights First researcher met with them in June 2023.  They recounted that while they were transiting through Mexico by bus, Mexican immigration police ordered them off the bus and handed them over to a cartel that held them captive them for 15 days and demanded a $1,500 USD ransom per person to release them.  "We wanted to file a police report, but you never know if the police are good or are one of them," a member of the family explained.  HRF Rep. July 2023 at 51.

The threat or actual experience of such harm, and the long waits and difficulty of obtaining CBP One appointments, drives asylum seekers to cross the U.S. border without inspection.  In September 2023, a Human Rights First researcher spoke with a Mexican woman who had spent eight months in Reynosa sleeping in a tent inside a migrant shelter with her adolescent daughter while struggling to obtain a CBP One appointment.  "Many kidnappings occurred outside the shelter in broad daylight because migrants were only allowed out during certain hours," she said.  "Trucks would arrive and take people. Many witnessed it.  The kidnappings got worse in the last three months and people barely left the shelter. . .  Because of this, everyone crossed [into the United States]."  Interview by Human Rights First, in McAllen, Texas (Sept. 12, 2023).

### C.  Harms to children

As the examples described above illustrate, those affected by the asylum ban include many families with children ranging in age from adolescents to newborns.  These children are exposed in Mexico to what would be traumatic conditions and experiences even for an adult, and to living conditions so unhealthy as to be life-threatening to young children.

Parents blocked in Mexico by the asylum ban live in fear that their children will be kidnapped; several have told Human Rights First researchers that they tie their children to themselves with cable wires at night to prevent them from being taken.  HRF Rep. July 2023 at 16, 17.  Parents watch powerlessly as their children's mental health deteriorates under such conditions.  One mother, from Ecuador, living in an unsafe camp in Matamoros for two months unsuccessfully trying to obtain a CBP One appointment, was at her wits' end and contemplating crossing the border without authorization as her teenage daughter's mental health was worsening.  "She cuts herself.  She feels very unsafe here.  There is no privacy.  How can we cross?"  HRF Rep. July 2023 at 17.

An entire family from Venezuela, consisting of a mother, father, and their adolescent and pre-school-aged children, who had been trying to obtain a CBP One appointment were kidnapped by a cartel in Reynosa in early June and held for ten days.  During this time, the mother was sexually abused by cartel members on two occasions.  The family also described witnessing intense beatings of migrant men and hearing their screams of pain, including one man who was severely assaulted and begged his family by telephone to send the money their captors required or he would be killed.  "It was horrible," the mother said.  "You don't know if you'll get out alive.  My kids cried and cried.  They wanted to leave, wanted to cross [to the United States]; they didn't want to be here."  The cartel kept the smartphone the family had used to register for

CBP One, so upon their release they had to register again, while continuing to receive threatening calls from their kidnappers demanding payment of more money on the phone they had managed to retain.  HRF Rep. July 2023 at 13.

A mother from Venezuela, her minor son, and adult sister attempted to obtain a CBP One appointment to seek asylum in mid-May 2023 when they were kidnapped and held for 12 days in Reynosa in June 2023.  Their abductors threatened to take their organs if their families didn't pay a ransom.  The women described being placed in a room with 50 people from China, Cuba, Ecuador, Honduras, Mexico, and Russia, including children as young as two years old, all on top of each other.  Their kidnappers threatened and beat people, including the children. "We witnessed them [the cartel] taser men with electricity who screamed in pain right in front of us and severely beat men if the transfer payment hadn't come through.  My son cried a lot, begging to leave. They'd also give drugs to the teenage children."  That first night, a cartel member raped the Venezuelan mother.  "He threatened to kill my son and sister and threatened me to stay quiet. We were terrified each time the door opened and our abusers entered. We prayed and prayed. We feel completely unsafe here in Mexico. We're terrified to go outside; afraid we'll be taken again."  HRF Rep. July 2023 at 12.

Many children, like their parents, are living in unsafe and unsanitary conditions, both outside the ports of entry and in open-air encampments along the edge of the Rio Grande.  *Amici* have witnessed abysmal conditions in both Matamoros and Reynosa, Tamaulipas, where thousands of women, men, and children are living in makeshift tents made of blankets and garbage bags, lacking minimum humanitarian standards of shelter, water, sanitation and hygiene, nutrition, and health services.  HRF Rep. July 2023 at 47.  There are piles of garbage, burn pits to deal with waste, limited numbers of porta-potties, and a dangerous lack of sanitation and clean

water which can present a risk of cholera.  Respiratory illnesses, gastrointestinal illnesses, and skin infections are prevalent.  *Id.*  Living in these conditions gives parents justifiable fears for the survival of their little children.  A Haitian mother in June 2023 worried about her one-month-old, who was running a fever and having trouble breathing; the two were living in the extreme summer heat in a Haitian encampment in Matamoros.  *Id.* at 49.  A two-month-old Honduran baby who had had diarrhea for a week was sleeping in a tent in an encampment in Reynosa. His mother, who was still breastfeeding, told of how she and their entire family had gastrointestinal symptoms and diarrhea, with limited potable water to drink to stay hydrated.  *Id.*

### D.  Pervasive violence and discrimination against Black, Indigenous, and LGBTQI+ migrants

In Mexico, Black asylum seekers and migrants face pervasive anti-Black violence, harassment, and discrimination, including widespread abuse by Mexican authorities.  *See "There Is A Target On Us" – The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border*, Black Alliance for Just Immigration (2021), https://baji.org/wp-content/uploads/2021/01/The-Impact-of-Anti-Black-Racism-on-African-Migrants-at-Mexico.pdf.  Haitian Bridge Alliance organized at least a dozen funerals since December 2021 for Haitian migrants who died or were killed in Mexico while stranded due to the recently ended Title 42 expulsion policy, including for a 34-year-old Haitian asylum seeker who was murdered last year.  HRF Rep. July 2023 at 61.  The kidnapping in March 2023 of four Black U.S. residents—and murder of two of them—in Matamoros has underscored the violence and targeted attacks that Black people have long faced by cartels in Mexico.  Maham Javaid & Paulina Villegas, *What we know about Matamoros and the kidnapped Americans*, Wash. Post (Mar. 7,

2023), https://www.washingtonpost.com/world/2023/03/06/americans-medicine-kidnapped-mexico/.

A Haitian mother traveling with her husband and young child who was trying to obtain a CBP One appointment described how while she and her family were aboard a bus transiting to the border, a female Mexican immigration officer targeted only them, the only Black passengers aboard the bus, for a search of their belongings, and inappropriately groped her breasts and searched inside her pants.  A Venezuelan woman staying in a shelter in Tijuana with her family in July 2023 described how the week before, her husband had witnessed Mexican police officers beating up Haitians across the street from the shelter.  When he intervened to defend them, she said, Mexican police pulled a gun on him.  HRF Rep. July 2023 at 39.

Indigenous people, LGBTQI+ individuals, women, children, and people with disabilities also face a high risk of violence in Mexico. The 2022 Department of State report on Mexico documented frequent violence and discrimination against Indigenous women, who are among the most vulnerable groups in society according to the National Human Rights Commission. LGBTQI+ persons face widespread violence and mistreatment, including by Mexican police. Transgender women in particular face an enormous risk of harm; in 2021, 55 transgender women were killed in Mexico.  HRF Rep. July 2023 at 62 (citing 2022 State Dep't Report: Mexico).

In Nogales, a Colombian LGBTQI+ asylum seeking woman fleeing sexual violence and persecution by Colombian authorities on account of her sexual orientation and displacement by armed groups was sexually assaulted by a female Mexican state police officer while transiting on a bus enroute to northern Mexico. The Mexican officer solely targeted for search Colombian nationals on the bus and ordered the Colombian LGBTQI+ woman into the bus bathroom where the officer stripped off her clothing and digitally penetrated her vaginally without use of a glove,

alleging the asylum seeker was transporting cocaine, and then robbed her of her money.  HRF Rep. July 2023 at 41.

"I'm gay," a young Venezuelan man living in the Matamoros camp waiting to seek asylum explained to Human Rights First. "And over there [in Venezuela], you're not free to be who you are. Being in the camp here is like being over there. You live the same experiences: lack of respect and verbal violence. There was a group of migrant men in the camp who harassed gay and lesbian people to violate them."

**CONCLUSION**

For these reasons, the Court should grant summary judgment to Plaintiffs.

Dated: October 6, 2023                         Respectfully submitted,

_/s/ Esther H. Sung_
Esther H. Sung

**Esther H. Sung** (CA00132)
esther.sung@justiceactioncenter.org
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: +1 323 316-0944
Facsimile: +1 323 450-7276

Anwen Hughes
Licha M. Nyiendo
Christina Asencio
Rebecca Gendelman
HUMAN RIGHTS FIRST
1120 20th Street, N.W.
Washington, DC 20036