## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| M.A., et al. | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) Civil Action No. 1:23-01843-TSC |
| | ) |
| ALEJANDRO MAYORKAS, Secretary of | ) |
| Homeland Security, in his official capacity, et al., | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

## BRIEF OF THE OFFICE OF THE UNITED NATIONS HIGH COMMISSIONER FOR REFUGEES AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Alice Farmer*
Office of the United Nations High
   Commissioner for Refugees
1800 Massachusetts Avenue NW
Washington, DC 20036
farmera@unhcr.org
(202) 243-7621

*Motion for admission *pro hac vice*
forthcoming

Robert Reeves Anderson (D.C. Bar No. 994989)
Arnold & Porter Kaye Scholer LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202-2848
reeves.anderson@arnoldporter.com
(303) 863-1000
(303) 863-2301 (fax)

Samuel M. Witten (D.C. Bar No. 378008)
Kaitlin Konkel (D.C. Bar No. 1021109)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 942-5000

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................ii

INTEREST OF AMICUS CURIAE .........................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................2

ARGUMENT ...........................................................................................................................3

I.     UNHCR Provides Authoritative Guidance on the 1951 Convention and the 1967
Protocol, As the U.S. Supreme Court Has Recognized ....................................................3

II.    The Rule and Related Expedited Removal Policies Are Fundamentally Inconsistent
with the International Framework Established in the 1951 Convention and the 1967
Protocol ...........................................................................................................................5

       A.    Relevant Provisions of the Rule and Related Policies ...........................................6

       B.    Adding to the Pre-Screening Standard for Asylum-Seekers Violates
International Law ................................................................................................8

       C.    The Rule and Related Policies Are Inconsistent with the United States'
Non-Refoulement Obligations ..........................................................................12

       D.    The Rule Conflicts with Other Fundamental Principles of International Law ..... 15

CONCLUSION ......................................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akinmade v. INS*,
196 F.3d 951 (9th Cir. 1999) ...................................................19

*Attorney-Gen. v. Refugee Council of N.Z., Inc.*
[2003] 2 NZLR 577 (N.Z.) ................................................ 18-19

*Bringas-Rodriguez v. Sessions*,
850 F.3d 1051 (9th Cir. 2017) (en banc) .................................4

*Bundesgericht* [BGer] [Federal Supreme Court]
Mar. 17, 1999, No. 6S.737/1998, 2/1999 Asyl 21 (Switz.) ............... 20-21

*E. Bay Sanctuary Covenant v. Biden*,
--- F. Supp. 3d ---, 2023 WL 4729278 (N.D. Cal. July 25, 2023) ......................6, 15

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ...................................................5

*Grace v. Barr*,
965 F.3d 883 (D.C. Cir. 2020) .................................................9

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987) ..................................................1, 4, 5

*Mason v. Canada*,
2023 S.C.C. 21 (Can.) ..........................................................13

*O.A. v. Trump*,
404 F. Supp. 3d 109 (D.D.C. 2019) .........................................9

*R v. Asfaw*
[2008] UKHL 31 (U.K.) ...................................................19, 20

*R v. Uxbridge Mags. Ct.*
[1999] EWHC (Admin) 765 (Eng.) ........................................19

*Sale v. Haitian Ctrs. Council, Inc.*,
509 U.S. 155 (1993) ..............................................................12

*Suresh v. Canada*,
[2002] 1 S.C.R. 3 (Can.) .......................................................13

Page(s)

**Cases (cont.)**

*Yusupov v. Attorney Gen.*,
   518 F.3d 185 (3d Cir. 2008)..............................................................................4

**Statutes**

8 U.S.C. § 1158 ..................................................................................................6

8 U.S.C. § 1225 ...............................................................................................7, 9

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 ...................................2

**Other Authorities**

142 Cong. Rec. H11071, H11081 (daily ed. Sept. 25, 1996) ...........................9

142 Cong. Rec. H11054, H11066-67 (daily ed. Sept. 25, 1996) ......................9

8 C.F.R. § 208.33 .......................................................5, 7, 21, 22, 23, 24

88 Fed. Reg. 31,314 ..........................................................................................2

Andreas Zimmerman & Claudia Mahler, *Article 1A, Para. 2, in* The 1951 Convention
   Relating to the Status of Refugees & Its 1967 Protocol: A Commentary (Andreas
   Zimmerman et al. eds., 2011) .....................................................................3

Cathryn Costello et al., Article 31 of the 1951 Convention Relating to the Status of
   Refugees (UNHCR Paper No. PPLA/2017/01, 2017)...............................24

Convention on the Privileges & Immunities of the United Nations,
   Feb. 13, 1946, 21 U.S.T. 1418, 1 U.N.T.S. 15............................................1

*Convention Relating to the Status of Refugees,
   July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 ....................... *passim*

Exec. Comm. of the High Commissioner's Programme, Note on International Protection,
   U.N. Doc. A/AC.96/815 (1993)..................................................12, 13, 14

G.A. Res. 49/169 (Dec. 23, 1994)....................................................................3

G.A. Res. 428(V), annex, UNHCR Statute (Dec. 14, 1950) ...........................1

Gregor Noll, *Article 31, in* 1951 Convention Commentary...........................20

**Page(s)**

**Other Authorities (cont.)**

Guy S. Goodwin-Gill, *Article 31 of the 1951 Convention Relating to the Status of Refugees*, *in* Refugee Protection in International Law (Volker Türk et al. eds., 2003) ................................................................................................18, 20

*Handbook on Procedures & Criteria for Determining Refugee Status & Guidelines on International Protection, U.N. Doc. HCR/1P/4/ENG/REV.4 (4th ed. 2019)................4, 16, 21

James C. Hathaway, The Rights of Refugees Under International Law (2005)..........13, 19, 20, 21

Memorandum from the Secretary-General annex art. 24 cmt. ¶ 2 ...............................................18

*Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 .................................................................................................... *passim*

UNHCR, 2022 Highlights: UNHCR Mexico (2022)....................................................................14

UNHCR, Background Note on the Application of Exclusion Clauses: Article 1F of the 1951 Convention Relating to the Status of Refugees (2003)....................................................11

*UNHCR Exec. Comm. 34th session, The Problem of Manifestly Unfounded or Abusive Applications for Refugee Status or Asylum No. 30, U.N.G.A. Doc. No. 12A (A/38/12/Add.1) (1983) ....................................................................................................9

UNHCR Exec. Comm., Conclusion No. 6 (XXVIII) (1977)................................................... 14-15

UNHCR Exec. Comm., Conclusion No. 15 (XXX) (1979)...........................................................20

UNHCR Exec. Comm., Conclusion No. 58 (XL) (1979) ..............................................................19

UNHCR, Fair and Fast: UNHCR Discussion Paper on Accelerated and Simplified Procedures in the European Union (2018) ................................................................................10

UNHCR, Follow-up on Earlier Conclusions of the Sub-Committee on the Determination of Refugee Status with Regard to the Problem of Manifestly Unfounded or Abusive Applications, U.N. Doc. EC/SCP/29 (1983).........................................................................10

UNHCR, Global Consultations on International Protection/Third Track: Asylum Processes (Fair and Efficient Asylum Procedures) (2001) ......................................................8

*UNHCR, Guidance on Responding to Irregular Onward Movement of Refugees & Asylum-Seekers (2019) ...............................................................................16, 17, 22, 23

UNHCR, Guidance Note on Bilateral and/or Multilateral Transfer Arrangements of Asylum-Seekers (2013) ...............................................................................................15, 16, 17

**Page(s)**

**Other Authorities (cont.)**

UNHCR, Guidelines on International Protection No. 5: Application of the Exclusion
    Clauses: Article 1F of the 1951 Convention Relating to the Status of Refugees (2003).........11

UNHCR, Legal Considerations on State Responsibilities for Persons Seeking
    International Protection in Transit Areas of "International" Zones at Airports (2019)...........18

UNHCR, Legal Considerations Regarding Access to Protection & a Connection Between
    the Refugee & the Third Country in the Context of Return or Transfer to Safe Third
    Countries (2018) .................................................................................................................17

UNHCR, Protection Policy Paper: Maritime Interception Operations and the Processing
    of International Protection Claims: Legal Standards and Policy Considerations with
    Respect to Extraterritorial Processing (2010) ................................................................15, 16

UNHCR, UNHCR Statement on the Right to an Effective Remedy in Relation to
    Accelerated Asylum Procedures (1992) ..............................................................................10

UNHCR Statute .....................................................................................................................1, 4

UNHCR, Summary Conclusions on Non-Penalization for Illegal Entry or Presence
    (2017)...................................................................................................................................19

UNHCR, The Principle of Non-Refoulement as a Norm of Customary International Law:
    Response to Questions Posed to UNHCR by the Federal Constitutional Court of the
    Federal Republic of Germany in Cases 2BvR 1938/93, 2 BvR 1953/93, 2 BvR
    1954/93 (Jan. 31, 1994) ......................................................................................................13

## INTEREST OF *AMICUS CURIAE* [1]

The Office of the United Nations High Commissioner for Refugees ("UNHCR") is the organization entrusted by the United Nations General Assembly with responsibility for providing international protection to refugees.  *See* G.A. Res. 428(V), annex, UNHCR Statute ¶ 1 (Dec. 14, 1950).  UNHCR has a direct interest in this matter, which requires the Court to consider the lawfulness of a substantial restriction of asylum access under U.S. law.  Consistent with UNHCR's role and interest, the U.S. Supreme Court has recognized that UNHCR provides "significant guidance" in interpreting international refugee law and its incorporation into the domestic law of the United States.  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 439 n.22 (1987).

UNHCR has a mandate to "[p]romot[e] the conclusion and ratification of international conventions for the protection of refugees" and to "supervis[e] their application and propos[e] amendments thereto."  UNHCR Statute ¶ 8(a).  UNHCR's supervisory role is also expressly provided for in two refugee conventions that apply to the United States: the 1951 Convention Relating to the Status of Refugees ("1951 Convention"), July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150, and the 1967 Protocol Relating to the Status of Refugees ("1967 Protocol"), Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267.

UNHCR exercises its supervisory responsibility, among other ways, by issuing interpretations of the 1951 Convention, the 1967 Protocol, and other international refugee instruments.  It also regularly presents its guidance to national courts, including U.S. federal courts.

---

[1] No person other than UNHCR and its counsel authored this brief in whole or in part or contributed money intended to fund its preparation or submission.  This brief does not constitute a waiver, express or implied, of any privilege or immunity that UNHCR or its staff may enjoy under applicable international legal instruments or recognized principles of international law.  *See* Convention on the Privileges & Immunities of the United Nations, Feb. 13, 1946, 21 U.S.T. 1418, 1 U.N.T.S. 15.

This authoritative guidance is informed by UNHCR's more than seven decades of experience assisting refugees and supervising the treaty-based system of refugee protection.

UNHCR submits this brief out of concern that the rule at issue in this case, Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023) (the "Rule"), together with related expedited removal policies, significantly restricts access to asylum in a way that is at variance with international law protections. UNHCR has a strong interest in ensuring that U.S. asylum policy remains consistent with the international treaty obligations that the United States has assumed (and helped to create), and respectfully offers its guidance on those obligations. Consistent with its approach in other cases, UNHCR takes no position on the merits of the underlying asylum claims of any Individual Plaintiff or individual whom Organizational Plaintiffs serve.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The United States is bound by international treaty obligations related to refugees, including those enshrined in the 1967 Protocol, to which the United States is formally a party, and the 1951 Convention, which is incorporated by reference in the 1967 Protocol. Both treaties set forth core procedural and substantive rights and obligations that parties must uphold, which the U.S. Congress incorporated into domestic statutory law through the Refugee Act of 1980 ("Refugee Act"), Pub. L. No. 96-212, 94 Stat. 102. As the U.S. Supreme Court and others have recognized, UNHCR provides authoritative guidance on the interpretation of these instruments.

UNHCR is concerned that the Rule and related expedited removal policies are inconsistent with the international framework established in the 1951 Convention and the 1967 Protocol. In particular, the Rule adds a further hurdle to an already high standard for credible fear determinations, in conflict with international law. This heightened standard will reduce access to asylum procedures for people in need of international protection. In part as a consequence of the heightened standard, the Rule and related policies are inconsistent with the foundational principle

of non-refoulement—the cornerstone of the 1951 Protocol and the 1967 Protocol—which holds that refugees should not be returned to countries where they face serious threats to life or freedom. Finally, the Rule conflicts with other fundamental principles of international law, including principles permitting the transfer of responsibility for asylum claims and the prohibition against penalties for irregular entry.  The Rule contains a number of exceptions and rebuttal provisions, but they do not cure these violations of international law.

Consistent with UNHCR's responsibility to supervise the implementation of international refugee treaties and advise state parties of their duties thereunder, UNHCR respectfully encourages the Court to consider the United States' international law obligations when evaluating the legality of the Rule and related expedited removal policies.

## ARGUMENT

## I.     UNHCR Provides Authoritative Guidance on the 1951 Convention and the 1967 Protocol, As the U.S. Supreme Court Has Recognized

The United States is bound by the 1951 Convention and the 1967 Protocol, and UNHCR provides authoritative guidance on the meaning of those documents.

In 1950, delegates from the United States and other United Nations Member States convened to draft an international agreement that would ensure that "individuals . . . are not turned back to countries where they would be exposed to the risk of persecution."  Andreas Zimmerman & Claudia Mahler, *Article 1A, Para. 2*, *in* The 1951 Convention Relating to the Status of Refugees & Its 1967 Protocol: A Commentary 281, 337 (Andreas Zimmerman et al. eds., 2011).  The result was the 1951 Convention, which delineates the basic rights of refugees and asylum-seekers that state parties must uphold.  For more than seven decades, the Convention has served as the "cornerstone of the international system" for refugee protection.  G.A. Res. 49/169 (Dec. 23, 1994).

3

The 1951 Convention primarily addressed the plight of those who fled persecution in the wake of World War II.  *See* 1951 Convention art. 1(A).  Sixteen years later, following decisive action by states and the United Nations General Assembly, a second refugee treaty—the 1967 Protocol—came into effect.  The 1967 Protocol universalized the Convention's protections by extending them to any individual unable to return to his or her country of origin on account of threatened persecution on the basis of race, religion, nationality, membership in a particular social group, or political opinion.  1967 Protocol art. I(2)-(3); Handbook on Procedures & Criteria for Determining Refugee Status & Guidelines on International Protection, U.N. Doc. HCR/1P/4/ENG/REV.4 ¶¶ 28, 34-35 (4th ed. 2019) [hereinafter Handbook].

Nearly 150 state parties, including the United States, have acceded to the 1967 Protocol. As Article I(1) of the 1967 Protocol binds parties to Articles 2 through 34 of the 1951 Convention, by ratifying the Protocol, the United States agreed to comply with all of the "substantive provisions" of the 1951 Convention.  *Cardoza-Fonseca*, 480 U.S. at 429.  To implement the United States' commitments, Congress passed the Refugee Act, which amended the Immigration and Nationality Act ("INA") to bring "United States refugee law into conformance" with both treaties. *Id.* at 436.  "The legislative history of the Refugee Act . . . makes clear that Congress intended to protect refugees to the fullest extent of [the United States'] international obligations," rendering the scope and meaning of those obligations relevant to any interpretation of the INA's asylum provisions.  *Yusupov v. Attorney Gen.*, 518 F.3d 185, 203 (3d Cir. 2008) (footnote omitted); *accord, e.g.*, *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1060-61 (9th Cir. 2017) (en banc).

UNHCR has a mandate to supervise the application of international conventions for the protection of refugees, including the 1951 Convention and the 1967 Protocol.  UNHCR Statute ¶ 8(a).  In language proposed by the United States, both treaties specifically acknowledge UNHCR's

4

supervisory role.  *See* 1951 Convention pmbl., art. 35; 1967 Protocol art. II.  UNHCR exercises its supervisory responsibility in part by issuing interpretive guidance concerning the 1951 Convention and its 1967 Protocol.  Chief among these interpretations is UNHCR's Handbook, which UNHCR first issued in 1979.

Consistent with the role and mandate described above, the U.S. Supreme Court and others have recognized that UNHCR provides "significant guidance" in construing the 1951 Convention and the 1967 Protocol, as well as the Refugee Act that implemented them into domestic law.  *See, e.g.*, *Cardoza-Fonseca*, 480 U.S. at 439 n.22; *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 672 n.13 (9th Cir. 2021).

## II.     The Rule and Related Expedited Removal Policies Are Fundamentally Inconsistent with the International Framework Established in the 1951 Convention and the 1967 Protocol

The Rule subjects certain categories of asylum-seekers to a presumption of ineligibility unless they qualify for one of three exceptions defined in the Rule: (1) they present at a port of entry after obtaining an appointment through a DHS scheduling system, 8 C.F.R. § 208.33(a)(2)(ii)(B);[2] (2) they apply for asylum or other protection in a transit country and receive a final denial before coming to the United States, 8 C.F.R. § 208.33(a)(2)(ii)(C); or (3) they apply for parole through a government-approved program and receive advance permission to travel to the United States, 8 C.F.R. § 208.33(a)(2)(ii)(A).  If no exception applies, the only way for an asylum-seeker to avoid the bar is to "demonstrat[e] by a preponderance of the evidence that exceptionally compelling circumstances exist."  8 C.F.R. § 208.33(a)(3); *see* Section II.D.iv.

---

[2] Alternatively, the person may "demonstrate[] by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle."  8 C.F.R. § 208.33(a)(2)(ii)(B).

The Rule went into effect on May 11, 2023, and the substance of its asylum bar was quickly held unlawful in other proceedings, including on the ground that it conflicts with the U.S. asylum statute, 8 U.S.C. § 1158. *See E. Bay Sanctuary Covenant v. Biden*, --- F. Supp. 3d ---, 2023 WL 4729278 (N.D. Cal. July 25, 2023), *appeal pending*, No. 23-16032 (9th Cir.). That judgment is currently stayed. Plaintiffs' challenge in this case focuses on the application of the Rule and related policies in expedited removal proceedings. *See* Section II.A (describing provisions and policies at issue).

The Rule and related policies conflict with the framework of the 1951 Convention and the 1967 Protocol in multiple ways. In particular, the Rule imposes a heightened pre-screening standard for asylum-seekers, contrary to international law, and risks shifting the U.S. standard—which was already out of step with the international standard for pre-screening—even further from the required threshold. By imposing this heightened standard, which also affects other parts of the asylum adjudication process, the Rule restricts the right to seek asylum, putting the United States at variance with the foundational principle of non-refoulement. And the Rule conflicts with other fundamental principles of international refugee law, including principles permitting the transfer of responsibility for asylum claims and the prohibition against penalties for unlawful entry. The Rule contains a patchwork of exceptions and rebuttal grounds, but they are not sufficient—either individually or collectively—to remedy these violations of international law.

### A.      Relevant Provisions of the Rule and Related Policies

As noted, Plaintiffs' challenge focuses on the operation of the Rule in expedited removal proceedings. "Expedited removal" is a process that the U.S. Department of Homeland Security uses to rapidly remove noncitizens who seek to enter the United States without proper documentation. Noncitizens in expedited removal proceedings, in contrast to full removal proceedings before an immigration judge, have more limited rights to counsel, to present evidence,

and to prepare their cases.  Importantly, however, those who "indicate[] either an intention to apply for asylum . . . or a fear of persecution" are entitled to a "credible fear" interview with an asylum officer.  8 U.S.C. § 1225(b)(1)(A)(ii).  The statute defines the term "credible fear of persecution" to mean that "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 1158 of this title."  8 U.S.C. § 1225(b)(1)(B)(v).

The Rule and related policies alter this framework.  First, the Rule imposes additional restrictions on access to asylum procedures at the pre-screening stage.  Under the new regulations, credible fear adjudicators must "determine whether the alien is covered by the presumption [of ineligibility] and, if so, whether the alien has rebutted the presumption."  8 C.F.R. § 208.33(b)(1).  Thus, in contrast to the statutory standard—which asks whether there is "a significant possibility" that the asylum-seeker could, with appropriate access to information and time to prepare, "establish eligibility for asylum" in future proceedings—the regulations require the asylum-seeker to defeat the presumption at the time of the credible fear interview.

Second, Defendants have implemented several expedited removal policies that work in conjunction with the Rule to bar access to protection.  Three such policies are at issue in Plaintiffs' motion for summary judgment: (1) the "24-Hour CFI Policy," which shortened the consultation period that precedes the credible fear interview to 24 hours; (2) the "Third Country Removal Policy," which permits the removal of certain non-Mexican nationals to Mexico; and (3) the "'Voluntary' Return Policy," which actively encourages nationals of Cuba, Haiti, Nicaragua, and Venezuela to choose to return to Mexico, without adequate information about the implications of that choice.  *See* Plaintiffs' Mot. for S.J., ECF No. 37, at 7-8.

The combined effect of the new regulations and policies is further to restrict access to asylum for noncitizens subject to expedited removal proceedings.

**B.      Adding to the Pre-Screening Standard for Asylum-Seekers Violates International Law**

The Rule adds to the standard for credible fear determinations by requiring asylum-seekers to overcome the asylum bar before they are permitted to access a credible fear screening.  Whereas asylum-seekers previously had to show that there was a "significant possibility" that they would be able to demonstrate eligibility for asylum in the future, they must now establish the inapplicability of the presumption of ineligibility first, at the pre-screening stage, without the benefit of the "significant possibility" standard or the due process protections available in full proceedings.  This heightened standard will reduce access to asylum procedures for people in need of international protection, leading to a risk of refoulement.

Although the 1951 Convention does not set out procedures for the determination of refugee status as such, fair and efficient procedures are an essential element in the full and inclusive application of the 1951 Convention.  *See* UNHCR, Global Consultations on International Protection/Third Track: Asylum Processes (Fair and Efficient Asylum Procedures) ¶ 5 (2001).  They enable a state to identify those who should benefit from international protection under the 1951 Convention, and those who should not.  *Id.*  Thus, under the framework of the 1951 Convention and the 1967 Protocol, states must provide a fair and efficient procedure for examining asylum claims.  The details of these systems vary, and states need not pass through every arriving asylum-seeker to full procedure.  When states do elect to use pre-screening mechanisms, however, they must ensure that appropriate standards and safeguards are applied, such that there is no risk that asylum-seekers will be refouled (that is, returned to countries where they face serious threats to life or freedom).

Congress established the credible fear process to comport with the United States' duty of non-refoulement.  In the course of enacting the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Congressman Henry Hyde emphasized that expedited removal would be accompanied by "major safeguards"—most notably the credible fear process—that would protect "against returning persons who meet the refugee definition to conditions of persecution."  142 Cong. Rec. H11071, H11081 (daily ed. Sept. 25, 1996).  Other representatives echoed this sentiment.  *See* 142 Cong. Rec. H11054, H11066-67 (daily ed. Sept. 25, 1996) ("It is important . . . that the process be fair [and] . . . not result in sending genuine refugees back to persecution.").  Case law and statutory text confirm that "credible fear" is an intentionally low threshold, which seeks to filter out only those claims that clearly lack merit.  *See, e.g.*, *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020) (quoting legislative history describing the "low screening standard"); *O.A. v. Trump*, 404 F. Supp. 3d 109, 120 n.3 (D.D.C. 2019) ("The standard necessary to establish a 'credible fear' is lower than the standard for obtaining asylum itself."); 8 U.S.C. § 1225(b)(1)(B)(v) ("'[C]redible fear of persecution' means that there is a significant possibility . . . that the alien could establish eligibility for asylum under section 1158 of this title.").

Under international law, at the pre-screening stage, states may eliminate only those claims that are manifestly unfounded or clearly abusive—that is, clearly fraudulent or unrelated to the criteria for granting refugee status.  *See* UNHCR Exec. Comm. 34th session, The Problem of Manifestly Unfounded or Abusive Applications for Refugee Status or Asylum No. 30 ¶ 97(2), U.N.G.A. Doc. No. 12A (A/38/12/Add.1) (1983).  For example, states may wish to establish procedures for "dealing in an expeditious manner with applications which are considered to be so obviously without foundation as not to merit full examination at every level of the procedure." *Id.* ¶ 97(2)(d).  UNHCR acknowledges that accelerated procedures can benefit both states and

applicants by allowing for the efficient identification of individuals with possible international protection needs. *See, e.g.*, UNHCR, Fair and Fast: UNHCR Discussion Paper on Accelerated and Simplified Procedures in the European Union 5-6 (2018). Due to the risk of a flawed decision at the pre-screening stage, however, international standards require certain due process considerations in accelerated procedures. *Id.* at 13; *see also* UNHCR, UNHCR Statement on the Right to an Effective Remedy in Relation to Accelerated Asylum Procedures ¶¶ 11-12 (1992). In particular, "the criteria for making . . . a determination should be defined in such a way that no application will be treated as manifestly unfounded or abusive unless its fraudulent character or its lack of any connection with the relevant criteria is truly free from doubt." UNHCR, Follow-up on Earlier Conclusions of the Sub-Committee on the Determination of Refugee Status with Regard to the Problem of Manifestly Unfounded or Abusive Applications ¶ 19, U.N. Doc. EC/SCP/29 (1983).

By setting the pre-screening eligibility and admissibility criteria at a level that exceeds the international standard, the Rule risks screening out valid claims. Moreover, the Rule's effects are compounded by the policies that have accompanied its implementation, including policies that shorten the time for asylum-seekers to prepare for the credible fear interview and permit the removal of certain non-Mexican nationals to Mexico. In UNHCR's experience, it is often challenging for asylum-seekers to obtain representation during screening, and those without counsel may receive limited or no legal information prior to the credible fear interview. They might not have a full understanding of their rights or the consequences of failing to exercise them. Even with legal representation, it will often be difficult, if not impossible, to make the required showing given the time pressures and other limitations of the pre-screening interview. Consequently, by requiring asylum-seekers to overcome the presumption of ineligibility at the pre-

10

screening stage, the Rule risks denying refugees access to fair and efficient status determination procedures, refusing them protection, and returning them to places where their lives and safety are in danger, in violation of the 1951 Convention and the 1967 Protocol.

The international legal regime acknowledges that there are individuals who may meet the positive ("inclusion") criteria for refugee status, but who nonetheless are excluded from international protection. The 1951 Convention and the 1967 Protocol set forth a comprehensive framework for determining who is a refugee (and is therefore entitled to the rights enumerated in the 1951 Convention itself)—and who, while otherwise having the characteristics of a refugee, should nonetheless be excluded from refugee status. *See* 1951 Convention, arts. 1D, 1E, 1F. Such exclusionary considerations should generally be considered only after a thorough assessment of the inclusion factors, and should be balanced against the need for protection itself.[3] While these grounds are subject to interpretation, they are exhaustive and they cannot be supplemented by additional criteria in the absence of an international convention to that effect. *See* Background Note on Exclusion Clauses ¶ 7.

Even prior to the Rule, the U.S. threshold for credible fear screenings—which requires applicants to demonstrate a "significant possibility" that they will be able to establish eligibility for protection in a full proceeding—was inconsistent with the international standard providing for the elimination of only manifestly unfounded or clearly abusive claims. The Rule exacerbates that disparity by expanding bars to protection beyond those provided for in the Convention's

---

[3] *See* UNHCR, Guidelines on International Protection No. 5: Application of the Exclusion Clauses: Article 1F of the 1951 Convention Relating to the Status of Refugees, ¶ 31 (2003) ("The exceptional nature of Article 1F suggests that inclusion should generally be considered before exclusion."); UNHCR, Background Note on the Application of Exclusion Clauses: Article 1F of the 1951 Convention Relating to the Status of Refugees ¶ 99 (2003) (explaining that application of the exclusion clauses requires an evaluation of the crime, the applicant's role, and the nature of the persecution feared).

comprehensive exclusion framework.  UNHCR is concerned that the Rule and related policies move the U.S. regime further away from the framework required by the 1951 Convention and the 1967 Protocol, risking the refoulement of those who need protection and placing them at risk of persecution or death.

### C.     The Rule and Related Policies Are Inconsistent with the United States' Non-Refoulement Obligations

UNHCR is deeply concerned that the Rule and related policies will lead to the refoulement of large numbers of asylum-seekers of many different nationalities, ethnic backgrounds, or religions, and of a very wide range of risk profiles.  Non-refoulement, a norm of customary international law, is the cornerstone of the 1951 Convention and its 1967 Protocol.  The Rule and related policies—not least through the heightened standard discussed in Section II.B, above—put forward a regulatory framework at variance with international and U.S. law standards, risking a serious deterioration of the protection historically offered by this country.

Article 33(1) of the 1951 Convention prohibits state parties from "expel[ling] or return[ing] ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."  The article has a broad reach, reflecting that the principle of non-refoulement applies both within a state's territory and at its border, *see Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 180-82 (1993), and to recognized refugees and asylum-seekers whose status has not yet been determined, *see* Exec. Comm. of the High Commissioner's Programme, Note on International Protection ¶ 11, U.N. Doc. A/AC.96/815 (1993) [hereinafter Note on International Protection].  In addition, states must take care to avoid both direct and indirect refoulement.  The prohibition against refoulement applies even if the return to persecution occurs through indirect or "chain refoulement"—that is, removal to a third country where there is

a "readily ascertainable risk of subsequent *refoulement*."  James C. Hathaway, The Rights of Refugees Under International Law 325 (2005); *accord, e.g.*, *Suresh v. Canada*, [2002] 1 S.C.R. 3, 35-36 (Can.).

The importance of non-refoulement cannot be overstated.  It is "the cornerstone of asylum and of international refugee law" and one of the core principles of the 1951 Convention.  Note on International Protection ¶ 10.  As the High Commissioner has explained, "[i]t would be patently impossible to provide international protection to refugees if States failed to respect this paramount principle of refugee law and of human solidarity."  *Id.*  Importantly, non-refoulement is recognized as a principle of customary international law.  *See* UNHCR, The Principle of Non-Refoulement as a Norm of Customary International Law: Response to Questions Posed to UNHCR by the Federal Constitutional Court of the Federal Republic of Germany in Cases 2BvR 1938/93, 2 BvR 1953/93, 2 BvR 1954/93 ¶¶ 4-5 (Jan. 31, 1994); *Mason v. Canada*, 2023 S.C.C. 21, ¶ 108 (Can.).

The Rule and related policies lack the safeguards necessary to prevent either direct or chain refoulement.  With respect to direct refoulement, the Rule bars from asylum anyone who cannot meet the heightened pre-screening standard in expedited removal proceedings—even if the asylum-seeker would have been able to establish eligibility for asylum later on, in full removal proceedings—and permits their return to countries in which they will face persecution and torture. In addition, for those returned to Mexico under the Third Country Removal Policy and "Voluntary" Return Policy, the record is replete with evidence that many third country nationals in Mexico face extraordinary dangers, including kidnapping, rape, torture, and murder.  *See* Plaintiffs' Mot. for S.J., ECF No. 37, at 9.  With respect to chain refoulement, the Rule is not a mechanism for transferring claims—rather, it is a mechanism for denying asylum claims without individualized process—and it fails to ensure the conditions that are required in connection with any transfer

agreement, including access to asylum procedures and treatment in accordance with international standards. *See* Section II.D.i (discussing principles permitting transfer of responsibility for asylum claims).

In addition, UNHCR is concerned that the Rule is increasing strains on asylum systems in countries to the south through sharp increases in case numbers, overall reducing asylum space in the region, not enhancing it. *See* UNHCR, 2022 Highlights: UNHCR Mexico 8 (2022) ("The complexity of mixed movements of refugees and migrants, and consequent response policies . . . increased  not only the risk of refoulement (and chain refoulement) but also posed additional pressure on the already overstretched processing capacity of the Mexican Commission for Refugee Assistance (COMAR) in the face of the fast-increasing asylum demands and absence of alternative legal pathways for those who need them."). Such burden-shifting is contrary to the principles of solidarity, international cooperation, and responsibility sharing articulated in the Preamble of the 1951 Convention and reaffirmed in the Global Compact on Refugees and regional coordination frameworks such as the Comprehensive Regional Protection and Solutions Framework (MIRPS), the Quito Process, and the Los Angeles Declaration.

In short, the combined operation of the Rule and the policies at issue creates a serious risk of excluding asylum-seekers with valid claims, leading to both direct and chain refoulement. Such practices are forbidden by Article 33(1) and are inconsistent with the "international community['s commitment] to ensure to [all] those in need of protection the enjoyment of fundamental human rights, including the rights to life . . . and to liberty and security of [the] person." Note on International Protection ¶ 10; *see* UNHCR Exec. Comm., Conclusion No. 6 (XXVIII) ¶¶ (a)-(c)

(1977).[4]

**D.      The Rule Conflicts with Other Fundamental Principles of International Law**

The Rule conflicts with multiple other principles of international law, affecting asylum

determinations both within and outside of the expedited removal process.[5]   Neither the Rule's

exceptions nor its rebuttal grounds remedy these problems.

**i.      The Rule Is Inconsistent with Principles Permitting Transfer of Responsibility for Asylum Claims**

The Rule amounts to an unofficial and impermissible transfer of asylum claims to countries

south of the United States, as in the implementation of the Rule, certain asylum seekers who would

otherwise have qualified for processing in the United States absent the Rule are instead sent back

to Mexico.[6]   A state does not absolve itself of responsibility to prevent refoulement by transferring

the individual to another state.   UNHCR, Guidance Note on Bilateral and/or Multilateral Transfer

Arrangements of Asylum-Seekers, ¶ 3(viii) (2013) [hereinafter Bilateral Transfer Arrangement

Note].   Asylum-seekers should ordinarily be processed in the state in which they seek asylum.   *See*

UNHCR, Protection Policy Paper: Maritime Interception Operations and the Processing of

International Protection Claims: Legal Standards and Policy Considerations with Respect to

---

[4] UNHCR's Executive Committee Conclusions are adopted by consensus by the states that comprise the Executive Committee.  The Conclusions reflect these states' understanding of legal standards regarding the protection of refugees.  The United States has been a member of the Executive Committee continuously since 1951.

[5] UNHCR respectfully submits the arguments in Section II.D, which relate to the substantive validity of the asylum bar, to assist the Court if and when it reaches those aspects of Plaintiffs' claims.  The parties have jointly moved to hold in abeyance certain of Plaintiffs' claims against the Rule pending further proceedings in *East Bay Sanctuary Covenant*, 2023 WL 4729278, *see* Joint Mot. to Hold Certain Claims in Abeyance, ECF No. 38, and the Court granted that motion and directed the parties to "file a Notice clearly laying out the counts, or, if a count is partially held in abeyance, the remaining portion of that count, to be resolved on Plaintiffs' 37 Motion for Summary Judgment by 10/11/2023," Minute Order (Oct. 4, 2023).

[6] For instance, Mexico has agreed to take returns of certain nationals from countries with which the United States has difficulty executing removals.  *See* ER-34.

15

Extraterritorial Processing (2010) [hereinafter Extraterritorial Processing Paper]; UNHCR, Guidance on Responding to Irregular Onward Movement of Refugees & Asylum-Seekers ¶¶ 16-32 (2019) [hereinafter Onward Movement Guidance].[7]  As a limited exception to this rule, states may enter into formal agreements to facilitate the transfer of asylum-seekers to other states to await processing.  Importantly, however, a state may not use these agreements to "divest itself of responsibility and shift that responsibility to another State" or "as an excuse [by the state] to deny or limit its jurisdiction under international refugee and human rights law."   Extraterritorial Processing Paper ¶ 49.  Rather, any agreement should "contribute to the enhancement of the overall protection space in the transferring State, the receiving State and/or the region as a whole." Bilateral Transfer Arrangement Note ¶ 3(iv).

Accordingly, any arrangement that involves the return or transfer of persons who may be in need of international protection from one country to another must encompass key safeguards in order to avoid placing individuals at risk of refoulement.  For any such arrangement to be appropriate under international law, it must be governed by a legally binding instrument that is challengeable and enforceable in a court of law by affected asylum-seekers.  *Id.* ¶ 3(v).

The transfer arrangement must guarantee that each asylum-seeker:

- will be individually assessed as to the appropriateness of the transfer, subject to procedural safeguards, prior to transfer;

- will be admitted to the proposed receiving state, and permitted to remain while a determination is made;

- will be protected against refoulement;

- will have access to fair and efficient procedures for the determination of refugee status

---

[7] *See also* Handbook ¶ 192(vii) ("The applicant should be permitted to remain in the country pending a decision on his . . . request . . . unless it has been established . . . that his request is clearly abusive.  He should also be permitted to remain in the country while an appeal to a higher administrative authority or to the courts is pending.").

and/or other forms of international protection;

- will be treated in accordance with accepted international standards (for example, appropriate reception arrangements; access to health, education and basic services; safeguards against arbitrary detention; persons with specific needs are identified and assisted); and

- if recognized as being in need of international protection, will be able to receive asylum and/or access a durable solution.

*Id.* ¶ 3(vi). If any of these standards are not or cannot be met, then the transfer violates international law. *Id.*

The obligation to ensure that conditions in the receiving state meet these requirements rests with the transferring state, prior to entering into such arrangements. It is not enough for the transferring state to assume that an asylum-seeker will be treated in conformity with these standards. Rather, to meet international standards, the transferring state must engage in regular monitoring and review of the transfers and conditions in the receiving state. *Id.* ¶ 3(viii). Because such conditions "cannot be [evaluated] without looking at the [third] state's . . . actual practice of implementation" of human rights law, the fact that the transferee state has ratified the 1951 Convention or its 1967 Protocol is not sufficient to validate a transfer. *See* UNHCR, *Legal Considerations Regarding Access to Protection & a Connection Between the Refugee & the Third Country in the Context of Return or Transfer to Safe Third Countries* ¶ 10 (2018). Moreover, because a third country may be safe for one applicant but not another with a different profile, states that seek to transfer responsibility for an asylum claim must ordinarily ensure, after an *individualized* inquiry, that the third state will be safe for the particular claimant and will afford him or her appropriate treatment and a fair and efficient asylum process. Onward Movement Guidance ¶ 22.

ii.     **The Rule Creates a Penalty for Unlawful Entry that Is Prohibited by Article 31(1) of the 1951 Convention**

The Rule is inconsistent with Article 31(1) because it penalizes asylum-seekers for irregular entry.  UNHCR is particularly troubled by the nature and consequences of the penalty imposed—the categorical denial of access to asylum procedures—as its imposition will likely result in the return of some refugees to countries where they will be persecuted.

Under Article 31(1) of the 1951 Convention, states are prohibited from imposing penalties on asylum-seekers "on account of their illegal entry or presence . . . provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence."[8]  The reference to "penalties" in Article 31(1) is not intended to be limited to criminal penalties and encompasses "any administrative sanction or procedural detriment imposed on a person seeking international protection." UNHCR, Legal Considerations on State Responsibilities for Persons Seeking International Protection in Transit Areas of "International" Zones at Airports ¶ 8 (2019).  This Article gives effect to a principle of non-discrimination between asylum-seekers on the basis of the form of their entry.

Refugees are "rarely in a position to comply with the requirements for legal entry." Memorandum from the Secretary-General annex art. 24 cmt. ¶ 2.  Given that they are fleeing persecution and do not have the protection of their home states, refugees may lack "appropriate documentation" for exit and entry or may need to evade the detection of authorities or other persecutors, and must thus resort to "cross[ing] borders clandestinely in order to access protection." *Attorney-Gen. v. Refugee Council of N.Z., Inc.* [2003] 2 NZLR 577 at [6] per Tipping

---

[8] Likewise, under U.S. statutory law, "[a] refugee fulfilling the requirements set out in Article 31(1) of the 1951 Convention should not be charged in relation to document fraud committed at the time of entry." Guy S. Goodwin-Gill, *Article 31 of the 1951 Convention Relating to the Status of Refugees*, *in* Refugee Protection in International Law 185, 198 (Volker Türk et al. eds., 2003).

18

J. (CA) (N.Z.); *R v. Asfaw* [2008] UKHL 31, [51] (Lord Hope of Craighead) (U.K.); UNHCR Exec. Comm., Conclusion No. 58 (XL) ¶ (i) (1979); *accord Akinmade v. INS*, 196 F.3d 951, 955 (9th Cir. 1999) ("[W]e recognize that a genuine refugee escaping persecution may lie about his citizenship to immigration officials in order to flee his place of persecution.").

Because a "quest for asylum" can "reasonably involve[] . . . breaching the law," *R v. Uxbridge Mags. Ct.* [1999] EWHC (Admin) 765, [15]-[16] (Brown LJ) (Eng.), Article 31(1) restricts parties' ability to penalize asylum-seekers for crossing borders irregularly:

> The Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of article 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence.

1951 Convention art. 31(1). The provision's drafting history makes clear that "[t]he fact that a refugee was fleeing from persecution was [in of itself] good cause" for illegal entry. *See* Hathaway at 393 (alterations in original) (quoting Conf. of Plenipotentiaries on the Status of Refugees & Stateless Perss., U.N. Doc. A/CONF.2/SR.14 (1951) (Statement of Mr. Hoare of the United Kingdom)); UNHCR, Summary Conclusions on Non-Penalization for Illegal Entry or Presence ¶ 18 (2017).

It does not change the analysis if some of the refugees affected by the Rule have transited through other countries on their way to seek protection in the United States. Although Article 31(1) protects only refugees who "com[e] directly" from a jurisdiction where they faced persecution on account of a protected ground, this limiting language "does not disfranchise" refugees who have "passed through, or even [have] been provisionally admitted to, another

country."[9]  Hathaway at 396; Goodwin-Gill at 217-18; UNHCR Exec. Comm., Conclusion No. 15 (XXX) ¶ (h)(iii) (1979).  Rather, it simply permits the imposition of penalties on refugees who have already sought and found asylum in a safe third country and later cross into another state irregularly.  Gregor Noll, *Article 31*, *in* 1951 Convention Commentary at 1243, 1257; Goodwin-Gill at 218.

This reading of Article 31(1)'s "coming directly" language is well supported by Article 31(1)'s drafting history.  As the House of Lords described that history, "there was universal acceptance [among the drafters] that the mere fact that refugees stopped while in transit ought not deprive them of the benefit of the article."  *Asfaw* [2008] UKHL 31, [56] (Lord Hope of Craighead).  Moreover, a more expansive reading of the "coming directly" language would overlook the provision's functional role in supporting the architecture of the 1951 Convention. Article 31(1) helps to implement one of the core lessons from the interwar period—the importance of "international co-operation" in ensuring that no one country is forced to bear an "unduly heavy burden[]" that could prompt the closing of borders to refugees.  1951 Convention pmbl.; *see* Noll at 1256.

In short, though Article 31(1) might not preclude penalization of individuals who have spent significant time in a third country of refuge (and who have had access to a full and fair asylum procedure there), its provisions were "intended to apply, and ha[ve] been interpreted to apply, to persons who have briefly transited other countries."  *Asfaw* [2008] UKHL 31, [19], [50] (Lord Hope of Craighead) (quoting *Summary Conclusions: Article 31 of the 1951 Convention*, *in* Refugee Protection in International Law at 253, 255); *accord, e.g.*, Bundesgericht [BGer] [Federal

---

[9] There is no obligation under international law for a person to seek asylum at the first effective country, and "asylum should not be refused solely on the ground that it could be sought from another State."  UNHCR Exec. Comm., Conclusion No. 15 (XXX) ¶ (h)(iv) (1979).

Supreme Court] Mar. 17, 1999, No. 6S.737/1998, 2/1999 Asyl 21, 21-23 (Switz.); Hathaway at 396.  The Rule is inconsistent with these settled principles.

### iii. The Rule's Exceptions to the Presumption of Asylum Ineligibility Do Not Remedy These Problems

The Rule establishes three categories of exceptions to the presumption of asylum ineligibility, but none can remedy the international law violations discussed above.  In fact, two of the exceptions effectively introduce penalties for circumventing preauthorized entry into the United States, thus raising additional concerns that the Rule violates international law.

**Parole exception.**  This exception applies when the person "was provided appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process."  8 C.F.R. § 208.33(a)(2)(ii)(A).

UNHCR welcomes the use of pathways to preauthorized entry into the United States, but insists that reliance on such pathways *at the expense of* other ways to access territory for asylum-seekers violates international law.  The international refugee law framework requires states to grant access to territory and examine the individual's claim to international protection.  Handbook ¶ 192.  When a state does not do so, it risks refouling those in need of protection, regardless of whether the state also makes available pathways to preauthorized entry for some classes of potential asylum claimants.

**Port of entry and appointment exception.**  This exception applies when a person has "[p]resented at a port of entry, pursuant to a pre-scheduled time and place, or presented at a port of entry without a pre-scheduled time and place, if the [person] demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle."  8 C.F.R. § 208.33(a)(2)(ii)(B).

As with the parole exception, UNHCR welcomes the use of safe and orderly mechanisms to facilitate preauthorized entry, but making those mechanisms the near-exclusive means of accessing protection violates international law by denying access to asylum. UNHCR is concerned that the operation of the presumption of ineligibility, in conjunction with the exceptions connected to alternative pathways (parole and appointments at ports of entry), amounts to penalization of irregular entry in violation of Article 31(1) of the 1951 Convention. Disparate treatment of two groups of refugees as regards their eligibility for asylum—those who arrive at ports of entry and those who enter irregularly or who arrive at a port of entry without having secured an appointment—is exactly the kind of conduct that Article 31(1) prohibits.

**Final denial exception.** This exception applies where the person "[s]ought asylum or other protection in a country through which the [person] traveled and received a final decision denying that application." 8 C.F.R. § 208.33(a)(2)(ii)(C).

As an initial matter, UNHCR reiterates that individuals are not required to apply for asylum in any country through which they travel, and by extension, cannot be required to present a denial. Under international law, asylum-seekers need not apply for protection in the first, or any subsequent, country through which they transit. Moreover, the primary responsibility for international protection remains with the state where an asylum claim is lodged. *See* Onward Movement Guidance ¶ 16. In many cases, asylum-seekers move onward to seek international protection that is not in fact available in the place to which they have initially fled. *See id.* at ¶ 4. Refugees' intentions should be taken into account in considering onward movement, as should their connections to the country in which the refugee applies for asylum. The fact that an asylum-seeker has moved onward without having had his or her claim assessed in another country does not affect his or her right to apply for asylum and be treated in conformity with international

refugee and human rights law, including protection from refoulement.  *See id.* ¶ 11.

> iv. **The Rule's Grounds for Rebutting the Presumption of Asylum Ineligibility Do Not Remedy These Problems**

If an asylum-seeker does not qualify for one of the Rule's three exceptions to the presumption of ineligibility, the only way to avoid the asylum bar is to rebut the presumption.  To do so, the asylum-seeker must establish "exceptionally compelling circumstances" by a preponderance of the evidence.  8 C.F.R. § 208.33(a)(3)(i).  The Rule expressly identifies three such circumstances—acute medical emergency, imminent and extreme threat to life or safety, and status as a victim of a severe form of trafficking in persons—and provides that others may be determined at the discretion of the adjudicator.  These rebuttal grounds, both individually and together, are insufficient to remedy the violations of international law that arise from the Rule.

**Acute medical emergency.**  The Rule provides that asylum-seekers may demonstrate that they or an accompanying family member "faced an acute medical emergency."  8 C.F.R. § 208.33(a)(3)(i)(A).  UNHCR is concerned that this rebuttal ground is framed too restrictively to provide effective access to territory.  In particular, it is limited to a very narrow range of circumstances, which may exclude serious but non-acute medical needs, as well as non-medical needs raising compelling humanitarian interests.

**Imminent and extreme threat.**  Second, asylum-seekers may provide evidence of an "imminent and extreme threat to life or safety," citing as examples "an imminent threat of rape, kidnapping, torture, or murder."  8 C.F.R. § 208.33(a)(3)(i)(B).  Distinguishing between asylum-seekers based on whether they have experienced particularly repugnant and time-sensitive threats is inconsistent with the right to seek asylum.  Furthermore, these high temporal and qualitative thresholds risk excluding people with valid claims from protection, placing them at risk of refoulement or chain refoulement.

**Trafficking.**  Third, asylum-seekers may show that they are "victim[s] of a severe form of trafficking in persons" pursuant to the Trafficking Victims Protection Act.  8 C.F.R. § 208.33(a)(3)(i)(C).  This rebuttal ground, like the others, is overly narrow.  UNHCR welcomes the Rule's consideration of the human rights situation of victims of severe forms of human trafficking, but it observes that requiring such victims to prove their status by a "preponderance of the evidence" raises the possible negative effect of "[limiting] trafficking victims' access to justice and protection." Cathryn Costello et al., Article 31 of the 1951 Convention Relating to the Status of Refugees 8 (UNHCR Paper No. PPLA/2017/01, 2017) (citation omitted).

**Other rebuttal grounds.**  Finally, adjudicators may recognize other "exceptionally compelling circumstances" as sufficient to overcome the presumption.  This standard ignores that the right to seek asylum is premised on persecution, not on a different and arbitrary test.  In addition, the Rule's allocation of burden is inconsistent with the framework established in the 1951 Convention and 1967 Protocol.  This framework provides for a right to asylum under defined circumstances, without the need to overcome state-specific presumptions.

## CONCLUSION

UNHCR is concerned that the Rule and related expedited removal policies conflict with the United States' obligations under international law, and it respectfully requests that the Court consider those obligations when evaluating their legality.

Dated:  October 6, 2023

Respectfully submitted,

*/s/ R. Reeves Anderson*

Alice Farmer*
Office of the United Nations High
    Commissioner for Refugees
1800 Massachusetts Avenue NW
Washington, DC 20036
farmera@unhcr.org
(202) 243-7621

*Motion for admission *pro hac vice*
forthcoming

Robert Reeves Anderson (D.C. Bar No. 994989)
Arnold & Porter Kaye Scholer LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202-2848
reeves.anderson@arnoldporter.com
(303) 863-1000
(303) 863-2301 (fax)

Samuel M. Witten (D.C. Bar No. 378008)
Kaitlin Konkel (D.C. Bar No. 1021109)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 942-5000