BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov
PATRICK GLEN
CHRISTINA P. GREER
*Senior Litigation Counsel*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| M.A., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-01843-TSC |
| | ) | |
| Alejandro Mayorkas, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

LEGAL AND PROCEDURAL BACKGROUND ...................................................... 3

Asylum ........................................................................................................................ 3

Expedited Removal ..................................................................................................... 5

Withdrawals and Third-Country Removals ................................................................ 6

Title 42 ........................................................................................................................ 7

The Circumvention of Lawful Pathways Rule ............................................................ 8

Additional expedited removal procedures ................................................................ 11

This Lawsuit .............................................................................................................. 12

ARGUMENT ............................................................................................................... 12

I.      Plaintiffs' Claims Are Foreclosed on Numerous Threshold Grounds ..................... 12

        A.      The organizational plaintiffs lack standing ..................................................... 12

                1.      *United States v. Texas* forecloses Article III standing ............................ 12

                2.      The organizations lack standing under *Havens*. ...................................... 15

        B       Section 1252(e)(3) bars the organizational Plaintiffs' claims ............................ 16

        C.      The organizational Plaintiffs are not within the zone of interests and their claims
                are precluded by the INA .................................................................................... 19

        D.      The withdrawal and third-country removal claims are not justiciable ................. 21

                1.      The withdrawal and third-country removal claims are not redressable .... 21

                2.      The withdrawal procedure is not reviewable .............................................. 22

                3.      The third-country removal claims are not reviewable ............................. 24

        E.      All individual Plaintiffs lacking injury must be dismissed ................................. 25

        F.      The expedited removal procedures are not "final agency action" ...................... 26

1.    Plaintiffs do not challenge final agency action ........................................ 22

2.    The withdrawal procedure is not reviewable ........................................... 23

3.    The third-country removal claims are not reviewable ............................. 25

**II.    Plaintiffs' Claims Fail on the Merits Because the CLP Rule Is Authorized by Statute and Reasonably Explained ........................................................................... 27**

A.    The Rule is Consistent with the INA's Credible Fear Provisions ....................... 28

B.    The Rule Is Not Arbitrary and Capricious ........................................................ 31

1.    The Rule Applies the "Significant Possibility" Standard ............ 33

2.    The Rule Reasonably Applies the Rule During Credible Fear Screenings ...................................................................................... 35

3.    The Rule Reasonably Applies the "Reasonable Possibility" Standard Where Noncitizens Do Not Establish Significant Possibility of Asylum Eligibility .................................................. 39

4.    The Rule Did Not Fail to Consider Interrelated Policies ............. 41

5.    The Rule Did Not Rely on Impermissible Factors ....................... 43

**III.    The remaining guidance is lawful ........................................................................ 44**

A.    The third-country removals guidance is consistent with the statute and not arbitrary and capricious ................................................................................... 45

B.    The voluntary withdrawal guidance is lawful ................................................... 50

C.    The 24-hour consultation guidance is consistent with relevant statutes and regulations and not arbitrary and capricious ................................................... 52

**IV.    Relief Must Be Sharply Limited .......................................................................... 57**

**CONCLUSION .................................................................................................................. 65**

**CERTIFICATE OF SERVICE ........................................................................................ 67**

# TABLE OF AUTHORITIES

*Aberdeen & Rockfish R.R. v. Students Challenging Regulatory Agency Procedures (SCRAP)*,
422 U.S. 289 (1975) .................................................................................................... 58

*\*AILA v. Reno*,
18 F. Supp. 2d 38 (D.D.C. 1998) ........................................................................... 54, 55

*Air Transp. Ass'n of Am., Inc. v. U.S. DOA*,
317 F. Supp. 3d 385 (D.D.C. 2018)............................................................................. 62

*\*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ............................................................................... 60, 61

*\*Am. Tort Reform Ass'n v. OSHA*,
738 F.3d 387 (D.C. Cir. 2013) .................................................................................... 22

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022)........................................................................................ 60

*ASPCA v. Feld Entm't, Inc.*,
659 F.3d 13 (D.C. Cir. 2011) ...................................................................................... 15

*\*Ass'n v. Reno (AILA)*,
199 F.3d 1352 (D.C. Cir. 2000) ........................................................................17, 18, 54

*\*Ayuda, Inc. v. Reno*,
7 F.3d 246 (D.C. Cir. 1993) ........................................................................................ 20

*Bennett v. Spear*,
520 U.S. 154 (1997) .................................................................................................... 22

*\*Biden v. Texas*,
142 S. Ct. 2528 (2022)................................................................................................. 24

*\*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) ............................................................................................... 19, 20

*California v. Texas*,
141 S. Ct. 2104 (2021)................................................................................................. 56

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) .................................................................................................... 30

*Clapper v. Amnesty Int'l USA,
568 U.S. 398 (2013) ............................................................................. 15, 16

Clarke v. Secs. Indus. Ass'n,
479 U.S. 388 (1987) ...................................................................................... 18

DaimlerChrysler Corp. v. Cuno,
547 U.S. 332 (2006) ................................................................................. 21, 56

Dep't of Commerce v. New York,
139 S. Ct. 2551 (2019) .................................................................................. 33

Dep't of Homeland Sec. v. Regents of the Univ. of California,
140 S. Ct. 1907 (2020) ................................................................................... 20

Dhakal v. Sessions,
895 F.3d 532 (7th Cir. 2018) ........................................................................... 4

Direct Mktg. Ass'n v. Brohl,
575 U.S. 1 (2015) .......................................................................................... 57

District of Columbia v. Dep't of Labor,
819 F.3d 444 (D.C. Cir. 2016) ....................................................................... 53

DRG Funding Corp. v. HUD,
76 F.3d 1212 (D.C. Cir. 1996) ....................................................................... 23

East Bay Sanctuary Covenant v. Biden,
2023 WL 4729278 (N.D. Cal. July 25, 2023) ........................................... 26, 64

eBay Inc. v. MercExchange, LLC,
547 U.S. 388 (2006) ...................................................................................... 60

*FCC v. Fox Television Stations, Inc.,
556 U.S. 502 (2009) ...................................................................................... 35

*FCC v. Prometheus Radio Project,
141 S. Ct. 1150 (2021) .............................................................................. 30, 56

*Garland v. Aleman Gonzalez,
142 S. Ct. 2057 (2022) .............................................................................. 57, 58

Giammarco v. Kerlikowske,
665 F. App'x 24 (2d Cir. 2016) ...................................................................... 59

*Gill v. Whitford,*
138 S. Ct. at 1934 (2018). ................................................................. 56, 60

*Grace v. Barr,*
965 F.3d 883 (D.C. Cir. 2020) .......................................................... 30, 38

*Guerrero-Lasprilla v. Barr,*
140 S. Ct. 1062 (2020).......................................................................... 20

*Haitian Refugee Ctr. v. Gracey,*
809 F.2d 794 (D.C. Cir. 1987) .............................................................. 16

*Havens Realty Corp. v. Coleman,*
455 U.S. 363 (1982) ......................................................................... 15, 18

*Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.,*
429 F.3d 1136 (D.C. Cir. 2005) ............................................................ 61

*INS v. Aguirre-Aguirre,*
526 U.S. 415 (1999) ......................................................................... 49, 50

*INS v. Cardoza-Fonseca,*
480 U.S. 421 (1987) .............................................................................. 3

*INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor,*
510 U.S. 1301 (1993)............................................................................ 19

*Jama v. ICE,*
543 U.S. 335 (2005) ............................................................................. 25

*Kiakombua v. Wolf,*
498 F. Supp. 3d 1 (D.D.C. 2020) ................................................ 5, 27, 42

*Kiyemba v. Obama,*
555 F.3d 1022 (D.C. Cir. 2009) ........................................................... 59

*Kowalski v. Tesmer,*
543 U.S. 125 (2004) ............................................................................. 16

*Kucana v. Holder,*
558 U.S. 233 (2010).................................................................. 24, 25, 59

*Las Americas Immigrant Advoc. Ctr. v. Wolf,*
507 F. Supp. 3d 1 (D.D.C. 2020) ......................................................... 41

*Lewis v. Casey,*
518 U.S. 343 (1996) ............................................................................. 56

*Linda R.S. v. Richard D.,*
410 U.S. 614 (1973) ........................................................................ 12, 13

*Lujan v. Defs. of Wildlife,*
504 U.S. 561 (1992) ............................................................................. 21

*\*M.M.V. v. Garland,*
1 F.4th 1100 (D.C. Cir. 2021) ......................................................... 17, 24

*Madsen v. Women's Health Ctr., Inc.,*
512 U.S. 753 (1994) ............................................................................. 60

*\*Make The Rd. New York v. Wolf,*
962 F.3d 612 (D.C. Cir. 2020) ..................................................17, 18, 59

*Moncrieffe v. Holder,*
568 U.S. 184 (2013) ............................................................................... 5

*Moran v. Burbine,*
475 U.S. 412 (1986) ............................................................................. 51

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ............................................................................... 30

*Nat. Res. Def. Council v. EPA,*
571 F.3d 1245 (D.C. Cir. 2009) ........................................................... 53

*Nat. Res. Def. Council v. NRC,*
666 F.2d 595 (D.C. Cir. 1981) ....................................................... 53, 54

*Nat. Res. Def. Council v. Wheeler,*
955 F.3d 81 (D.C. Cir. 2020) ............................................................... 56

*Nat'l Min. Ass'n v. McCarthy,*
758 F.3d 243 (D.C. Cir. 2014) ....................................................... 22, 23

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs,*
145 F.3d 1399 (D.C. Cir. 1998) ........................................................... 59

*Nat'l Treasury Emps. Union (NTEU) v. United States,*
101 F.3d 1423 (D.C. Cir. 1996) ........................................................... 15

*Nat'l Wildlife Fed'n v. EPA*,
286 F.3d 554 (D.C. Cir. 2002) ................................................................. 39

*Pangea Legal Servs. v. DHS*,
512 F. Supp. 3d 966 (N.D. Cal. 2021) ...................................................... 34

*Patel v. Garland*,
142 S. Ct. 1614 (2022) ........................................................................ 25, 26

*Prohibition Juice Co. v. U.S. Food and Drug Admin.*,
45 F.4th 8 (D.C. Cir. 2022) ...................................................................... 40

*Samirah v. O'Connell*,
335 F.3d 545 (7th Cir. 2003) .................................................................... 59

*Save Our Cumberland Mountains, Inc. v. Clark*,
725 F.2d 1422 (D.C. Cir. 1984) ............................................................... 23

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) .............................................................................. 20, 22

*Sure-Tan, Inc. v. NLRB*,
467 U.S. 883 (1984) ................................................................................. 13

*Turlock Irr. Dist. v. FERC*,
786 F.3d 18 (D.C. Cir. 2015) ................................................................... 15

*United States v. Cortez*,
449 U.S. 411 (1981) ................................................................................. 62

*\*United States v. Texas*,
143 S. Ct. 1964 (2023) ..................................................................... *passim*

*Warth v. Seldin*,
422 U.S. 490 (1975) ................................................................................. 14

## FEDERAL STATUTES

5 U.S.C. § 701(a)(1) ........................................................................ 19, 23, 24

5 U.S.C. § 702 .......................................................................................... 18

5 U.S.C. § 702(1) ..................................................................................... 60

5 U.S.C. § 703 ......................................................................................... 60

5 U.S.C. § 704 ................................................................................................................ 22

5 U.S.C. § 706 ................................................................................................................ 40

5 U.S.C. § 706(2) ........................................................................................................... 60

6 U.S.C. § 552(d) ............................................................................................................. 4

8 U.S.C. § 701(a)(1) ...................................................................................................... 24

8 U.S.C. § 1101 ................................................................................................................ 3

8 U.S.C. § 1103(a)(1) ....................................................................................................... 4

8 U.S.C. § 1103(a)(3) ................................................................................................. 4, 52

8 U.S.C. § 1103(a)(5) ..................................................................................................... 52

8 U.S.C. § 1103(g) ........................................................................................................... 4

8 U.S.C. § 1158 ..................................................................................................... 3, 5, 18

8 U.S.C. § 1158(a)(2) .............................................................................................. 3, 4, 36

8 U.S.C. § 1158(a)(2)(A) ............................................................................................... 49

8 U.S.C. § 1158(b)(1)(A) ................................................................................................. 3

8 U.S.C. § 1158(b)(1)(B) .............................................................................................. 3, 4

8 U.S.C. § 1158(b)(2) .............................................................................................. 3, 4, 36

8 U.S.C. § 1158(b)(2)(C) ...................................................................................... 4, 5, 27, 42

8 U.S.C. § 1158(b)(3) ....................................................................................................... 3

8 U.S.C. § 1158(d)(5)(B) ................................................................................................. 4,

8 U.S.C. § 1158(d)(7) .................................................................................... 19, 27, 36, 37

8 U.S.C. § 1158-1159 ....................................................................................................... 3

8 U.S.C. § 1225 .............................................................................................................. 18

8 U.S.C. § 1225(a)(4) ............................................................................................. *passim*

8 U.S.C. § 1225(b) ........................................................................................... 16, 17, 57

8 U.S.C. § 1225(b)(1) ..................................................................................................... 4

8 U.S.C. § 1225(b)(1)(A)(i) ..................................................................................... 5, 48

8 U.S.C. § 1225(b)(1)(A)(ii) ................................................................................... 27, 48

8 U.S.C. § 1225(b)(1)(B)(ii) ..................................................................................... 6, 27

8 U.S.C. § 1225(b)(1)(B)(iii) ........................................................................................ 27

8 U.S.C. § 1225(b)(1)(B)(iii)(I) ..................................................................................... 6

8 U.S.C. § 1225(b)(1)(B)(iii)(III) ............................................................................. 6, 54

8 U.S.C. § 1225(b)(1)(B)(iv) ............................................................................ 52, 53, 54

8 U.S.C. § 1225(b)(1)(B)(v) ...................................................................................... 5, 27

8 U.S.C. § 1225(b)(1)(B)(iv) ....................................................................................... 2, 5

8 U.S.C. § 1225(b)(1)(C) ................................................................................................ 6

8 U.S.C. § 1228(b) ........................................................................................................ 40

8 U.S.C. § 1229a ................................................................................................... 4, 6, 57

8 U.S.C. § 1231 ............................................................................................................. 57

8 U.S.C. § 1231(a)(5) ............................................................................................. 39, 40

8 U.S.C. § 1231(b) ............................................................................................ 2, 22, 26

8 U.S.C. § 1231(b)(1)-(2) ............................................................................................. 48

8 U.S.C. § 1231(b)(2) ................................................................................................... 47

8 U.S.C. § 1231(b)(2)(A) ............................................................................ 7, 25, 45, 46, 47

8 U.S.C. § 1231(b)(2)(C) ........................................................................................ 25, 47

8 U.S.C. § 1231(b)(2)(C)(iii) .................................................................................... 7, 45

8 U.S.C. § 1231(b)(2)(D) .............................................................................. 7, 45, 46, 47

8 U.S.C. § 1231(b)(2)(E) ................................................................................. 46, 47

8 U.S.C. § 1231(b)(2)(E)(i) ........................................................................................ 7

8 U.S.C. § 1231(b)(2)(E)(i)-(vi) .............................................................................. 45

8 U.S.C. § 1231(b)(2)(E)(iii)(iv) ............................................................................... 7

8 U.S.C. § 1231(b)(2)(E)(vii) ........................................................................ 7, 45, 46

8 U.S.C. § 1231(b)(3) ........................................................................................ 4, 26, 49

8 U.S.C. § 1231(b)(3)(A) .................................................................................... 7, 49

8 U.S.C. § 1252 ......................................................................................... 20, 59, 61

8 U.S.C. § 1252(a)(2)(A) .................................................................................. 16, 59

8 U.S.C. § 1252(a)(2)(A)(i) ...................................................................................... 16

8 U.S.C. § 1252(a)(2)(A)(ii) ..................................................................................... 16

8 U.S.C. § 1252(a)(2)(A)(iii) .................................................................................... 59

8 U.S.C. § 1252(a)(2)(A)(iv) ..................................................................................... 16

8 U.S.C. § 1252(a)(2)(B)(i) ....................................................................................... 25

8 U.S.C. § 1252(a)(2)(B)(ii) ......................................................................... 24, 25, 59

8 U.S.C. § 1252(a)(5) ........................................................................................ 19, 20

8 U.S.C. § 1252(b)(4) ............................................................................................... 26

8 U.S.C. § 1252(b)(9) ....................................................................................16, 20, 26

8 U.S.C. § 1252(e) ..........................................................................................16, 59, 61

8 U.S.C. § 1252(e)(1) ................................................................................................ 61

8 U.S.C. § 1252(e)(1)(A) ........................................................................................... 61

8 U.S.C. § 1252(e)(1)(B) ........................................................................................... 61

8 U.S.C. § 1252(e)(2)(B) ........................................................................................... 24

8 U.S.C. § 1252(e)(3) ........................................................................................16, 17, 19, 61

8 U.S.C. § 1252(e)(3)(A) ........................................................................................... 17

8 U.S.C. § 1252(e)(3)(B) ........................................................................................... 17

8 U.S.C. § 1252(f) ...................................................................................................... 58

8 U.S.C. § 1252(f)(1) ............................................................................................ 57, 58

42 U.S.C. § 265 ............................................................................................................. 7

## REGULATIONS

8 C.F.R. § 208.2(a) ....................................................................................................... 4

8 C.F.R. § 208.2(b) ....................................................................................................... 4

8 C.F.R. § 208.13(f) ...................................................................................................... 9

8 C.F.R. § 208.16-.18 .................................................................................................... 5

8 C.F.R. § 208.30 ........................................................................................................ 48

8 C.F.R. § 208.30(d)(4) ................................................................................................. 5

8 C.F.R. § 208.30(e) .................................................................................................... 29

8 C.F.R. § 208.30(e)(2) ............................................................................................. 5, 28

8 C.F.R. § 208.30(e)(5)(i) ........................................................................................... 34

8 C.F.R. § 208.30(f) ...................................................................................................... 6

8 C.F.R. § 208.33(a) ...................................................................................................... 8

8 C.F.R. § 208.33(a)(1) ............................................................................................. 9, 10

8 C.F.R. § 208.33(a)(2) ............................................................................................. 9, 10

8 C.F.R. § 208.33(a)(3)(i) .............................................................................................. 9

8 C.F.R. § 208.33(a)(3)(i)(A)-(C) ............................................................................... 10

8 C.F.R. § 208.33(a)(3)(i)(A)-(C)(ii) .......................................................................... 10

8 C.F.R. § 208.33(b) ....................................................................................... 10, 28

8 C.F.R. § 208.33(b)(1)(i) ..................................................................................... 10

8 C.F.R. § 208.33(b)(1)(ii) .................................................................................... 10

8 C.F.R. § 208.33(b)(2) .......................................................................................... 10

8 C.F.R. § 208.33(b)(2)(ii) ..................................................................................... 11

8 C.F.R. § 214.11(a) .............................................................................................. 10

8 C.F.R. § 235.3(b)(4) ........................................................................................... 48

8 C.F.R. § 235.3(b)(4)(ii) .........................................................................52, 53, 54

8 C.F.R. § 235.4 ........................................................................................ 6, 50, 51

8 C.F.R. § 1208.2(b) ............................................................................................... 4

8 C.F.R. § 1208.13(f) .............................................................................................. 9

8 C.F.R. § 1208.16(a)-(b) ........................................................................................ 7

8 C.F.R. § 1208.16(c) .............................................................................................. 7

8 C.F.R. § 1208.16-.18 ............................................................................................ 5

8 C.F.R. § 1208.33(a) .............................................................................................. 8

8 C.F.R. § 1208.33(a)(1) .......................................................................................... 9

8 C.F.R. § 1208.33(a)(2) .......................................................................................... 9

8 C.F.R. § 1208.33(a)(3)(i) ...................................................................................... 9

8 C.F.R. § 1208.33(a)(3)(i)(A)-(C) ....................................................................... 10

8 C.F.R. § 1208.33(a)(3)(i)(A)-(C)(ii) .................................................................. 10

8 C.F.R. § 1208.33(b) ........................................................................................... 10

8 C.F.R. § 1208.33(c) ........................................................................................... 10

8 C.F.R. § 1240.11(c) .............................................................................................. 4

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 23 .................................................................................. 61

## FEDERAL REGISTER

65 Fed. Reg. 76,121 ............................................................................. 4

65 Fed. Reg. 76,126 ............................................................................. 4

84 Fed. Reg. 33,829 ........................................................................... 28

84 Fed. Reg. 33,837 ........................................................................... 28

87 Fed. Reg. 16,022 ............................................................................. 4

87 Fed. Reg. 18,092 ............................................................................. 4

87 Fed. Reg. 18,093 ........................................................................... 34

87 Fed. Reg. 18,094 ............................................................................. 4

87 Fed. Reg. 63,507 ............................................................................. 4

87 Fed. Reg. 63,509 ............................................................................. 4

88 Fed. Reg. 1,255 ............................................................................. 44

88 Fed. Reg. 1,259 ............................................................................. 44

88 Fed. Reg. 1,243 ............................................................................. 44

88 Fed. Reg. 1,247 ............................................................................. 44

88 Fed. Reg. 1,266 ............................................................................. 37

88 Fed. Reg. 1,270-71 ........................................................................ 44

88 Fed. Reg. 11,704 ............................................................................. 4

88 Fed. Reg. 11,705 ............................................................................. 8

88 Fed. Reg. 11,716 ........................................................................... 32

88 Fed. Reg. 11,742 ......................................................................................................... 33, 35

88 Fed. Reg. 11,742-45 ......................................................................................................... 34

88 Fed. Reg. 11,744 ...................................................................................................... 34, 37

88 Fed. Reg. 11,744-45 ......................................................................................................... 35

88 Fed. Reg. 11,745 ............................................................................................................. 36

88 Fed. Reg. 31,314 ............................................................................................................... 1

88 Fed. Reg. 31,314-19 ......................................................................................................... 31

88 Fed. Reg. 31,317 ............................................................................................................. 40

88 Fed. Reg. 31,317-18 ......................................................................................................... 40

88 Fed. Reg. 31,331 ............................................................................................................... 8

88 Fed. Reg. 31,337 ......................................................................................................... 8, 32

88 Fed. Reg. 31,337-38 ......................................................................................................... 32

88 Fed. Reg. 31,353-63 ......................................................................................................... 37

88 Fed. Reg. 31,363 ............................................................................................................. 63

88 Fed. Reg. 31,380 ...................................................................................................... *passim*

88 Fed. Reg. 31,390 ............................................................................................................. 37

88 Fed. Reg. 31,393 ............................................................................................................. 37

88 Fed. Reg. 31,444 ............................................................................................................. 44

88 Fed. Reg. 31,444-47 ........................................................................................................... 9

88 Fed. Reg. 31,446 ............................................................................................................. 63

88 Fed. Reg. 63,507 ............................................................................................................. 44

88 Fed. Reg. 63,509 ............................................................................................................. 44

## LEGISLATIVE HISTORY

H.R. Rep. No. 104-469 .................................................................................... 43, 58

## MISCELLANEOUS

UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol*, at ¶ 7. available at https://www.unhcr.org/us/media/advisory-opinion-extraterritorial-application-non-refoulement-obligations-under-1951-0 (last visited Oct. 26. 2023)............................................. 49

UNHCR, *States Parties to the 1951 Convention relating to the Status of Refugees and the 1967 Protocol*, available at https://www.unhcr.org/us/media/states-parties-1951-convention-and-its-1967-protocol (last visited Oct. 26, 2023).. .............................................................................. 50

## INTRODUCTION

Plaintiffs ask this Court to hold unlawful a rule, *Circumvention of Lawful Pathways*, 88 Fed. Reg. 31,314 (May 16, 2023) ("the Rule"), and guidance implementing certain procedures applicable in expedited removal that are critical to address unprecedented irregular migration throughout the Western Hemisphere. The Rule was promulgated by the Department of Homeland Security (DHS) and the Department of Justice (DOJ) in anticipation of a significant increase in migrants seeking to enter the United States at the southwest border following the end of the Title 42 public health Order—under which migrants without proper travel documents generally were not processed into the United States but instead expelled to Mexico or their home countries. The Rule generally conditions eligibility for a discretionary grant of asylum on noncitizens using certain orderly migration pathways into the United States or seeking and being denied asylum or other protection in a country through which they traveled, absent exceptionally compelling circumstances. The Departments reasonably concluded that temporarily imposing such a condition on asylum eligibility, including in expedited removal proceedings, as part of cooperative efforts with foreign governments to address increases in migration across the region would incentivize the use of orderly migration pathways and disincentivize irregular migration, which diverts limited government resources and threatens to overwhelm the immigration system.

To accomplish this dual goal, the government implemented a two-pronged approach. First, the United States significantly expanded the lawful, safe, and orderly options available for noncitizens to seek entry to the country and, if desired, to seek asylum after arrival. Second, through the Rule, the Departments determined that certain noncitizens who do not use those expanded lawful pathways (or seek protection in third countries) shall be presumed ineligible for a discretionary grant of asylum. Noncitizens subject to the Rule may overcome that presumptive ineligibility by demonstrating exceptionally compelling circumstances. Moreover, even

1

noncitizens who are unable to obtain discretionary asylum relief under the Rule nonetheless receive appropriate screening for statutory withholding of removal or protection under the Convention Against Torture (CAT), such that DHS will not remove them to a country where there is a reasonable possibility of persecution on protected grounds or torture. Over the last six months, the Rule's approach has helped encourage migrants to use orderly migration pathways, reduced noncitizen encounters between southwest border ports of entry, and alleviated the negative consequences of irregular migration.

Furthering these goals, DHS also implemented additional procedures applicable in expedited removal proceedings, three of which Plaintiffs presently challenge. First, as part of extensive joint, hemispheric efforts to address unprecedented irregular migration, the Government of Mexico agreed to continue to accept the return of nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV) who cannot be removed to their native countries, and who have not availed themselves of orderly pathways. *See id.* § 1231(b). Second, because of this decision by the Government of Mexico, DHS components CBP and U.S. Citizenship and Immigration Service (USCIS) issued separate guidance implementing its discretionary authority under 8 U.S.C. § 1225(a)(4) to permit certain noncitizens to withdraw their applications for admission and voluntarily return to Mexico, rather than going through the expedited removal process. Third, USCIS issued guidance providing that credible fear interviews take place no earlier than 24 hours after the noncitizen receives information explaining the credible fear process. *See* 8 U.S.C. § 1225(b)(1)(B)(iv). Together with the Rule, these guidance memoranda have furthered the two-pronged approach of expanding lawful, safe, and orderly pathways for noncitizens while delivering appropriate consequences to those who do not avail themselves of such pathways.

Plaintiffs challenge the Rule's application in expedited removal proceedings and the three procedures, contending they violate the Administrative Procedure Act (APA). The Court should

reject Plaintiffs' challenges and grant summary judgment to Defendants. At the threshold, the organizational Plaintiffs lack Article III standing, they are not within the statute's zone of interests, and their claims are barred by multiple provisions of the INA. Moreover, the challenges to the withdrawal and third-country-removal procedures are not redressable, are barred by the INA, and do not satisfy the APA's "final agency action" requirement. Additionally, nearly all individual Plaintiffs lack standing as to any expedited removal guidance. On the merits, the Rule and challenged procedures are consistent with statutory authority, reasonable, and reasonably explained. And, in any event, the relief Plaintiffs seek—universal vacatur of the Rule and procedures and an injunction requiring the government to return certain Plaintiffs to the United States—is forbidden by the INA and unjustified by the equitable principles governing APA remedies. Should the Court find any relief warranted, given the significant and immediate harms that would occur if the Rule or procedures were vacated, the Court should remand to the agencies without vacatur. At an absolute minimum the Court should stay any order for fourteen days to allow the government to seek emergency relief in the court of appeals, if warranted.

## LEGAL AND PROCEDURAL BACKGROUND[1]

<u>Asylum.</u> Asylum is a form of discretionary relief under the INA, 8 U.S.C. § 1101 *et seq.* *See id.* § 1158; *INS v. Cardoza-Fonseca*, 480 U.S. 421, 444 (1987). Generally, a grant of asylum protects noncitizens from removal, creates a path to lawful permanent residence and U.S. citizenship, authorizes noncitizens to work, and enables a noncitizen's immediate family members to seek asylum derivatively. *See id.* §§ 1158-1159. To obtain asylum, noncitizens must show that they: (1) qualify as a "refugee"—that is, that they are unable or unwilling to return to their home

---

[1] Defendants submit this background consistent with Local Rule 7(h)(2), (n). Notwithstanding these rules, Plaintiffs submitted a statement of facts citing extensive extra-record evidence. Defendants dispute the accuracy of this "statement" and separately move to strike portions of it. Should the Court not grant that motion, Defendants also respond with their own statement of facts.

country "because of persecution or a well-founded fear of persecution on account of" a protected ground, *id.* §§ 1101(a)(42), 1158(b)(1)(A); (2) are not subject to an exception or mandatory condition or bar that precludes applying for or receiving asylum, *id.* § 1158(a)(2), (b)(2); and (3) merit a favorable exercise of discretion, *id.* § 1158(b)(1)(A).

A request for asylum may arise in three circumstances: (1) a noncitizen present in the United States and not in removal proceedings may affirmatively apply to USCIS, *see Dhakal v. Sessions*, 895 F.3d 532, 536 (7th Cir. 2018); 8 C.F.R. § 208.2(a); (2) a noncitizen in removal proceedings under 8 U.S.C. § 1229a may apply before the immigration judge (IJ) as a defense to removal, 8 C.F.R. §§ 208.2(b), 1208.2(b), 1240.11(c); and (3) a noncitizen in expedited removal proceedings under 8 U.S.C. § 1225(b)(1) may request asylum.[2]

The INA forbids certain noncitizens from applying for asylum and deems others ineligible—for example, those who have participated in persecution or who were firmly resettled in another country before arriving in the United States. *See* 8 U.S.C. § 1158(a)(2), (b)(1)(B), (b)(2). And for decades, the Executive has promulgated mandatory bars that have rendered certain noncitizens ineligible for asylum. *See Circumvention of Lawful Pathways*, 88 Fed. Reg. 11,704, 11,734 (Feb. 23, 2023) (Lawful Pathways NPRM). Attorneys General originally adopted such limits pursuant to their general authority "to establish a procedure" for asylum. *See id.* Then, in 1996, Congress codified several of those limits. *See id.* Simultaneously, Congress reaffirmed that the Departments retain the same broad authority to establish new conditions, specifying that they "may by regulation establish additional limitations and conditions, consistent with [§ 1158], under

---

[2] Section 1225(b)(1)(A)(i), (iii) provides for the expedited removal of certain noncitizens arriving in the United States, but also allows the Secretary to designate a broader group of noncitizens as subject to expedited removal. *See Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal*, 87 Fed. Reg. 16,022 (Mar. 21, 2022) (returning application of expedited removal to noncitizens encountered within 100 air miles of the border and within 14 days of their entry into the United States).

which an alien shall be ineligible for asylum." 8 U.S.C. § 1158(b)(2)(C); *see id.* § 1158 (d)(5)(B); 6 U.S.C. § 552(d); 8 U.S.C. § 1103(a)(1), (a)(3), (g). Secretaries and Attorneys General have invoked that authority for decades to establish conditions beyond those in the statute. *See, e.g.*, *Asylum Procedures*, 65 Fed. Reg. 76,121, 76,126 (Dec. 6, 2000) (internal relocation bar).

While asylum is discretionary, withholding of removal under 8 U.S.C. § 1231(b)(3) and protection under the regulations implementing U.S. obligations under the CAT, 8 C.F.R. §§ 208.16-.18, 1208.16-.18, are mandatory and prohibit removal to a country where the noncitizen will likely be persecuted or tortured. *See Moncrieffe v. Holder*, 568 U.S. 184, 187 n.1 (2013).

Expedited Removal. In expedited removal proceedings certain noncitizens arriving in the United States or who entered illegally who lack valid entry documentation or make material misrepresentations shall be "order[ed] ... removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i); *see id.* § 1182(a)(6)(C), (a)(7). If the noncitizen "indicates either an intention to apply for asylum ... or a fear of persecution," the inspecting officer must "refer the alien for" an interview conducted by an asylum officer (AO).[3] *Id*. § 1225(b)(1)(A)(ii). At the interview, an AO assesses whether the noncitizen has a "credible fear of persecution," meaning "that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under [8 U.S.C. § 1158]." *Id*. § 1225(b)(1)(B)(v). The statute allows for consideration of all issues bearing on eligibility, including those that stem from regulations promulgated by the Departments as described above, but does not generally permit adjudicators to rely on case-by-case discretionary

---

[3] Noncitizens are also screened for eligibility for withholding of removal and CAT protection. *See* 8 C.F.R. §§ 208.30(e)(2), 235.3.

determinations at this stage. *See Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 42 (D.D.C. 2020). "An alien who is eligible for such interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof" and "[s]uch consultation shall be at no expense to the Government and shall not unreasonably delay the process." 8 U.S.C. § 1225(b)(1)(B)(iv); 8 C.F.R. § 208.30(d)(4).

If the AO determines the noncitizen has a credible fear, USCIS may refer the noncitizen to removal proceedings under 8 U.S.C. § 1229a where the noncitizen may apply for asylum and other protection from removal, or USCIS may retain jurisdiction and consider the noncitizen's application for asylum in the first instance. *Id.*, § 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f).

If the AO determines that the noncitizen lacks a credible fear, the noncitizen may seek *de novo* review before an IJ. 8 U.S.C. § 1225(b)(1)(B)(iii)(I), (III). If the IJ concludes that the noncitizen has established a credible fear, the AO's decision is vacated, and the noncitizen's case is returned to USCIS for it to determine whether to initiate removal proceedings under 8 U.S.C. § 1229a (during which the noncitizen may apply for asylum) or retain jurisdiction over the asylum application. 8 C.F.R. §§ 1280.30(g)(2)(iv)(B), 1208.2(a)(1)(ii). If the IJ finds that the noncitizen lacks a credible fear, the noncitizen is "removed from the United States without further hearing or review." 8 U.S.C. § 1225(b)(1)(B)(iii)(I); 8 C.F.R. § 1208.30(g)(2)(iv)(A). The INA precludes further review by the Board of Immigration Appeals or any court of the credible-fear determination. 8 U.S.C. §§ 1225(b)(1)(C), 1252(a)(2)(A)(iii), (e)(2).

Withdrawals and Third-Country Removals. A noncitizen "applying for admission may, in the discretion of the [Secretary] and at any time, be permitted to withdraw the application for admission and depart immediately from the United States." 8 U.S.C. § 1225(a)(4). By regulation, a noncitizen's "decision to withdraw his or her application for admission must be made voluntarily," 8 C.F.R. § 235.4, but no noncitizen has any right to withdraw their application. *See*

*id.* ("nothing in this section shall be construed as to give an alien the right to withdraw his or her application for admission"); *accord* 8 U.S.C. § 1225(a)(4) (decision is discretionary).

In addition, noncitizens subject to removal orders need not be removed to their native country. Generally, noncitizens ordered removed "may designate one country to which the alien wants to be removed," and DHS "shall remove the noncitizen to [that] country[.]" 8 U.S.C. § 1231(b)(2)(A). In certain circumstances, DHS will not remove the noncitizen to their designated country, including where "the government of the country is not willing to accept the alien into the country." *Id.* § 1231(b)(2)(C)(iii). In such a case, the noncitizen "shall" be removed to the noncitizen's country of nationality or citizenship, unless that country "is not willing to accept the noncitizen[.]" *Id.* § 1231(b)(2)(D). If a noncitizen cannot be removed to the country of designation or the country of nationality or citizenship, then the government may consider other options, including "[t]he country from which the alien was admitted to the United States," "[t]he country in which the alien was born," or "[t]he country in which the alien last resided[.]" *Id.* §§ 1231(b)(2)(E)(i), (iii)-(iv). Where removal to any of the countries listed in subparagraph (E) is "impracticable, inadvisable, or impossible," then the noncitizen may be removed to any "country whose government will accept the alien into that country." *Id.* § 1231(b)(2)(E)(vii).

In addition, DHS "may not remove an alien to a country if [it] decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. §§ 208.16(a)-(b), 1208.16(a)-(b), or if the noncitizen faces a likelihood of torture, 8 C.F.R. §§ 208.16(c), 208.17, 1208.16(c), 1208.17.

<u>Title 42.</u> From March 20, 2020, through May 11, 2023, a series of Center for Disease Control (CDC) Title 42 public health Orders were in effect to combat the COVID-19 pandemic. These Orders implemented the CDC's authority under 42 U.S.C. § 265 to prevent the introduction

of individuals into the United States to avoid a serious danger to public health arising from a communicable disease. *See* AR565-78. Under the Title 42 Orders, covered noncitizens were expelled to Mexico or their home countries without processing under Title 8, including processing for asylum. The expiration of the public health emergency on May 11, 2023, caused the then-operative Order to terminate.

The Circumvention of Lawful Pathways Rule. Absent any policy change, the end of the Title 42 Order was expected to cause the number of migrants seeking to illegally enter the United States at the southwest border to increase to all-time highs—an estimated 11,000 migrants daily. 88 Fed. Reg. at 31,331. Those migrants could no longer be promptly expelled under Title 42 and instead would have to be processed at the border through the substantially more resource-intensive procedures required by Title 8. *Id.* at 31,442; 88 Fed. Reg. at 11,705. Under those procedures, many noncitizens who establish a fear of persecution during expedited removal proceedings are found to have credible fear and are statutorily entitled to remain in the United States pending resolution of their asylum claims. 88 Fed. Reg. at 31,337 (citing 83% positive screening rate). Because the number of noncitizens who satisfy this screening standard far exceeds the capacity of the immigration system to process them quickly, many noncitizens remain in the United States for years before their claims are adjudicated. *See id.* at 31,326. This process, along with the insufficient resources to execute removal orders, may incentivize nonmeritorious asylum claims and potentially dangerous irregular migration. *Id.* at 31,326, 31,337-38; *see* 88 Fed. Reg. at 11,716.

The Departments thus faced a looming urgent situation: absent policy change, the end of Title 42 would result in many more migrants crossing the border and asserting asylum claims, which would in turn overwhelm the government's ability to process migrants in a safe, expeditious, and orderly way. To address this exigent circumstance, DHS and DOJ promulgated a final rule, following an NPRM, a 33-day comment period, and review of 51,952 comments. The Rule

generally imposes a condition on asylum eligibility on noncitizens who fail to pursue specified processes for entry into the United States or seek protection in a third-country. 8 C.F.R. §§ 208.33(a), 1208.33(a). That condition on eligibility is, however, subject to various exceptions, and its application may be rebutted in exceptionally compelling circumstances. The Rule was made effective immediately, 88 Fed. Reg. at 31,444-47, and it applies to asylum determinations made in any context, including in removal proceedings, 8 C.F.R. §§ 208.13(f), 1208.13(f), and in credible fear screenings, *id.* §§ 208.33(b), 1208.33(b).

Specifically, the Rule applies "[a] rebuttable presumption of ineligibility for asylum ... to an alien who" "enters the United States from Mexico at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission" (1) "between May 11, 2023 and May 11, 2025," (2) "[s]ubsequent to the end of" the Title 42 Order, and (3) "[a]fter the alien traveled through a country other than the alien's country of citizenship [or] nationality." 8 C.F.R. §§ 208.33(a)(1), 1208.33(a)(1). The presumption does not apply to unaccompanied children or migrants who availed themselves of, or were traveling with a family member who availed themselves of, certain lawful, safe, and orderly pathways—specifically, those who (1) were "provided appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process"; (2) "[p]resented at a port of entry, pursuant to a pre-scheduled time and place"[4] or "presented at a port of entry without a pre-scheduled time and place" but who can "demonstrate[] by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle"; or (3) "[s]ought asylum or other protection in a country through

---

[4] DHS has also increased the number of daily appointments available for orderly processing at ports of entry. 88 Fed. Reg. at 31,396; CBP Newsroom, https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day

which the alien traveled and received a final decision denying that application *Id.*, §§ 1208.33(a)(2). In addition, noncitizens subject to the presumption and who do not establish an exception may overcome that presumption by "demonstrating" by a preponderance of the evidence that "exceptionally compelling circumstances exist." *Id.* §§ 208.33(a)(3)(i), 1208.33(a)(3)(i). And such circumstances necessarily exist where, at the time of entry, the migrant, or a family member with whom the migrant is traveling, "[f]aced an acute medical emergency"; "[f]aced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder"; or was a "victim of a severe form of trafficking in persons" under 8 C.F.R. § 214.11(a). *Id.* §§ 208.33(a)(3)(i)(A)-(C), (ii), 1208.33(a)(3)(i)(A)-(C), (ii). Finally, a noncitizen presumed ineligible for asylum under the Rule will still be assessed as to whether they established a reasonable possibility of persecution or torture; a noncitizen who establishes a reasonable possibility is still eligible to apply for statutory withholding of removal or CAT protection and thus may not be removed to a country where it is likely that they will be persecuted because of a protected ground or tortured.[5]

The Rule's presumption applies not only during asylum merits adjudications but also during credible fear screenings, consistent with those screenings' focus on a noncitizen's ability to ultimately establish eligibility for asylum. *Id.*, §§ 208.33(b), 1208.33(b). Under the Rule, noncitizens subject to expedited removal who indicate an intention to apply for asylum, or express a fear of persecution or torture, or a fear of return to their country, are referred to USCIS for a credible fear interview during which noncitizens are first screened to assess whether the Rule's limitation applies and, if so, whether there is a significant possibility that the noncitizen would be

---

[5] The Rule also provides additional protections for family unity, *see* 8 C.F.R. § 1208.33(c), and exempts noncitizens who were minors when they entered but who apply for asylum as principal applicants after the two-year period expires. *Id.* §§ 208.33(c)(2), 1208.33(d)(2).

able to overcome that limitation during a merits adjudication. *Id.*, § 208.33(b). If the AO determines that the limitation does not apply or the noncitizen could likely overcome the limitation, the general procedures governing the credible fear process then apply. *See id.*, § 208.33(b)(1)(ii). On the other hand, if the AO determines that the limitation does apply and no exception or rebuttal ground applies, the AO will consider whether the noncitizen has established a reasonable possibility of persecution or torture with respect to the designated country or countries of removal. *See id.*, § 208.33(b)(1)(i), (2). If a noncitizen is found to have a reasonable possibility of persecution or torture in any designated country, then DHS will commence § 1229a removal proceedings, during which the noncitizen may seek relief or protection from removal. *Id.*, §§ 208.33(b)(2)(ii), 1208.33(b)(4).

Although a district court vacated the Rule, the Ninth Circuit stayed that order pending appeal. Dkt. 21, *East Bay Sanctuary Covenant v. Biden*, No. 23-16032 (9th Cir. Aug. 3, 2023).

Additional expedited removal procedures. As relevant to this lawsuit, DHS has also implemented three procedures applicable to individuals in expedited removal proceedings.

(1) *Third-Country Removal Procedure:* As part of extensive joint, hemispheric efforts to address unprecedented irregular migration, the government of Mexico agreed to continue to accept returns and removals of CHNV nationals to Mexico following the termination of the Title 42 Order. *See* AR (Customs and Border Protection (CBP) Removals) 321-25 (memorandum from Assistant Secretary Nuñez-Neto). Such removals are governed by the statutory framework regarding designation of the removal country by the noncitizen and the circumstances when DHS may disregard that designation and instead remove the noncitizen to a third country. *See* AR (CBP Removals) 22-24, 321-25. Given the restrictions and limitations on removal of individuals to CHNV countries, DHS directed its components to work through the statutory framework and, in circumstances where the relevant country of citizenship or nationality will not accept the

noncitizen, to designate Mexico as the country of removal. *See* AR (CBP Removals) 24 (designation of country of removal work sheet and form).

(2) *Guidance Regarding Withdrawal of Applications for Admission:* CBP and USCIS separately issued guidance concerning its discretionary authority under § 1225(a)(4) to permit CHNV nationals to withdraw their applications for admission and voluntarily return to Mexico either during inspection before CBP or during credible fear interviews before USCIS. *See* AR (CBP Withdrawals) 3-6, 12-21; AR (USCIS Withdrawals) 3-4. This guidance instructs CBP and USCIS officials, when exercising their discretion to permit withdrawals, to inform CHNV nationals that they may withdraw their application for admission and that, if they do, they may be eligible to request advance authorization to travel to the United States to seek parole under relevant parole processes, and that withdrawal may allow them to apply for parole under such processes. *See* AR (CBP Withdrawals) 6; AR (USCIS Withdrawals) 3. USCIS issued superseding guidance on June 11, 2023. Ex. C, Decl. of Mallory Lynn, ¶¶ 5-6, Exs. 1-2.

(3) *Consultation Period Guidance:* USCIS issued guidance directing AOs to provide noncitizens a minimum consultation period of 24 hours between when they acknowledge receipt of Form M-444, Information About Credible Fear Interview, and their credible fear interview. AR (Waiting Period) 1-3. This replaced prior guidance allowing for a 48 hour period between the noncitizen's arrival in the detention facility and their credible fear interview. *Id.* at 2. This change was made in anticipation of an increase in noncitizens seeking to travel to the United States following the end of the Title 42 Order, and as a way "to expeditiously process and remove individuals who ... do not have a legal basis to remain in the United States." *Id.* at 3.

This Lawsuit. Eighteen individuals and two organizations that provide services to noncitizens and refugees seek vacatur of the Rule. Compl., Prayer for Relief. In their motion, Plaintiffs seek relief on the claims alleging the provisions of the Rule governing expedited removal

and three procedures applicable in expedited removal proceedings violate the APA because they exceed the government's statutory authority and are arbitrary and capricious. *Id.* ¶¶ 133-39, 147-49, 152-68, 174-76 (claims 1, parts of 3, 5-10, and parts of 13). Plaintiffs ask the Court to vacate the Rule nationwide, vacate the individual plaintiffs' negative credible fear determinations, and order the government to return individual plaintiffs already removed. Dkt. 37 at 43.

## ARGUMENT

## I.   Plaintiffs' Claims Are Foreclosed on Numerous Threshold Grounds

### A.   The organizational Plaintiffs lack standing

#### 1.   *United States v. Texas* forecloses Article III standing

The organizational Plaintiffs have failed to identify a "legally and judicially cognizable" injury traceable to the challenged agency actions that would be redressed by a favorable decision in this case. *United States v. Texas*, 143 S. Ct. 1964 (2023). The Rule's direct effect is to limit asylum eligibility for certain noncitizens in the exercise of the Executive's discretion, including in expedited removal proceedings. And the procedures' direct effect is to implement expedited removal procedures. "[A] private citizen"—including an organization—"lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). An individual who does not face prosecution "lacks standing to contest the policies of the prosecuting authority." *Id*. An individual similarly has "no judicially cognizable interest in procuring" or preventing "enforcement of the immigration laws" against someone else. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984). The Supreme Court recently made clear these principles preclude standing in cases like this involving challenges to the Executive's immigration enforcement policies. *See Texas*, 143 S. Ct. at 1970. There, the Court rejected the State plaintiffs' argument that they had standing because, for example, they might spend money on incarceration and social services for "noncitizens who should be (but are not being) arrested by the Federal

Government." *Id*. at 1969. The Supreme Court held that the States' asserted injury, which flowed from the Executive's exercise of immigration enforcement discretion against third parties, was not judicially cognizable under the principles articulated above. *See id.* at 1970-71.

Those principles decide this case. Like the States in *Texas*, the organizations here challenge several discretionary immigration enforcement initiatives and argue they have standing because they will incur additional expenditures to "serve" and "advis[e] clients" and for "pre-credible fear interview preparation." Compl. ¶¶ 129-32. But like the States in *Texas*, the organizations cannot leverage the incidental effects of enforcement actions directed at third parties to create Article III standing for themselves. Changes the organizations may make in their own affairs in light of the Executive's exercise of enforcement discretion with respect to others are not judicially cognizable injuries. *Texas*, 143 S. Ct. at 1871 ("When … a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed.").

The Supreme Court detailed why "federal courts have not traditionally entertained lawsuits of this kind." *Id*. When the Executive makes a discretionary enforcement decision regarding a third party, it "does not exercise coercive power" over "the plaintiff." *Id*. Additionally, lawsuits challenging enforcement policies "run up against the Executive's Article II authority to enforce federal law"—and such suits in the immigration context "implicate[] not only normal domestic law enforcement" discretion "but also foreign-policy objectives." *Id*. at 1971-72. And the Court explained that the contrary-to-law and arbitrary-and-capricious challenges in *Texas* should be dismissed because courts lack "meaningful standards for assessing" discretionary enforcement policies that reflect the Executive's weighing of factors like "resource constraints" and "public-safety and public-welfare needs." *Id*. at 1972.

Each of those rationales highlights the organizations' inability to demonstrate a cognizable

injury here. The organizations do not challenge any exercise of coercive government power directed at them, but instead complain about the incidental effects of the government's choices with respect to third parties. Plaintiffs directly challenge the Executive's exercise of its Article II and statutory enforcement authority to establish conditions on asylum and implement expedited removal procedures, and threaten to upset the substantial foreign-policy objectives undergirding the Rule and procedures. And the Rule and procedures are themselves the product of the complicated balancing of many different factors—including factors related to the government's limited enforcement resources, its assessment of public-safety and public-welfare implications of the situation at the southwest border, and its efforts to address hemisphere-wide migration patterns and intergovernmental initiatives—that courts are not well-situated to assess.

> 2.     The organizations lack standing under *Havens*

Even if *Texas* did not foreclose the organizations' claims of injury, prior case law would. The organizations assert only injury to themselves, specifically a need to expend resources to "serve" and "advis[e] clients" and on "pre-credible fear interview preparation." Compl. ¶¶ 129-32. But these harms are not cognizable.

Where an organization sues on its own behalf, it must establish standing in the same manner as an individual. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975). Organizations may have standing in some situations where they are injured, as recognized in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). The D.C. Circuit has developed a two-part inquiry for determining standing in circumstances where an organization has claimed a diversion-of-resources injury: (1) "whether the defendant's allegedly unlawful activities injured the plaintiff's interest in promoting its mission," and, if so, (2) "whether the plaintiff used its resources to counteract that injury." *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011). As that framework makes clear, nothing about expending resources alone cognizably injures an organization. At most, such expenditures on their

own may constitute "setback[s] to [the organization's] abstract social interests." *Havens*, 455 U.S. at 379. And "[t]he mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." *Nat'l Treasury Emps. Union (NTEU) v. United States*, 101 F.3d 1423, 1434 (D.C. Cir. 1996); *Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) ("impairment of its advocacy" not enough).

Instead, the organizational plaintiff must also demonstrate that the challenged actions have injured the plaintiff in the first instance. And here, the organizations plaintiffs fail to make that showing by alleging they must "serve" and "advis[e] clients" and for "pre-credible fear interview preparation," Compl. ¶¶ 129-32, i.e. things the organizations already do. *See ASPCA*, 659 F.3d at 25. Critically, they are also premised on a fundamental misunderstanding of the Rule. Plaintiffs contend that they need to advise clients on credible fear proceedings because they believe the Rule requires USCIS employees to not apply the "significant possibility" standard provided for by statute. Dkt. 37-3, ¶ 17 (RAICES); Dkt. 38-4, ¶ 30 (Las Americas, similar). But that view is mistaken, as the rule implements the statutory significant possibility standard, *infra* 29-31, and so any injury stemming from this mistake is entirely self-inflicted. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). *Clapper*, 568 U.S. at 416.

Even if not speculative or self-inflicted, in their capacity as lawyers for asylum-seeking clients, the organizational Plaintiffs here have no legally or judicially cognizable interest in avoiding whatever reallocation of resources they may choose to make in light of the Rule or guidance—a merely "indirect effect[]" of the Rule or guidance that makes their assertion of injury "more attenuated," *Texas*, 143 S. Ct. at 1972 n.3, and with which the asylum statute is not concerned. *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 804-07 (D.C. Cir. 1987). "If the law were otherwise, an enterprising plaintiff would be able to secure" the right to challenge a

governmental action without any otherwise cognizable injury "simply by making an expenditure" in response to the action. *Clapper*, 568 U.S. at 416. Plaintiffs' theory would also, as a practical matter, nullify the principle that a lawyer has no independent litigable interest in the legal rules applicable to the lawyer's clients. *See, e.*g., *Kowalski v. Tesmer*, 543 U.S. 125, 130-34 (2004). Nothing in precedent or logic countenances such limitless theories of standing.

### B.     Section 1252(e)(3) bars the organizational Plaintiffs' claims

The Court lacks jurisdiction over the organizational Plaintiffs' claims. Although 28 U.S.C. § 1331 generally supplies jurisdiction, 8 U.S.C. § 1252(a)(2)(A) eliminates such jurisdiction, other than as permitted by § 1252(e). *See Make The Rd. New York v. Wolf*, 962 F.3d 612, 626 (D.C. Cir. 2020). Section 1252(a)(2)(A) and (e)(3) sharply limit jurisdiction over claims involving expedited removal procedures or proceedings, and the organizational Plaintiffs do not qualify for any limited exception to that preclusion. Section 1252(a)(2)(A), titled "Matters not subject to judicial review," provides that "[n]otwithstanding any other provision of law ... no court shall have jurisdiction to review ... except as provided in subsection (e)," "any [] cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1)," "a decision ... to invoke the provisions of such section," or "procedures and policies adopted ... to implement" § 1225(b)(1). 8 U.S.C. § 1252(a)(2)(A)(i), (ii), (iv). Section 1252(a)(2)(A) thus removes from federal courts any jurisdiction to review issues "relating to section 1225(b)(1)," i.e., expedited removal proceedings or credible fear determinations, other than as permitted by § 1252(e).[6] *See Patchak v. Zinke*, 138 S. Ct. 897, 905 (2018) ("notwithstanding any other provision of law" in jurisdictional provision encompasses 28 U.S.C. § 1331).

Section 1252(e)(3) authorizes "[j]udicial review of determinations under section 1225(b)

---

[6] Section 1252(e)(2), permitting review of expedited removal orders, is not at issue here.

of this title and its implementation" in this Court, "limited to determinations of—(i) whether [§ 1225(b)], or any regulation issued to implement such section, is constitutional; or (ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure … implement[ing] such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." 8 U.S.C. § 1252(e)(3)(A). Such suits "must be filed no later than 60 days after the date the challenged action, regulation, directive, guideline, or procedure ... is first implemented." *Id.* § 1252(e)(3)(B); *see generally M.M.V. v. Garland*, 1 F.4th 1100, 1106-11 (D.C. Cir. 2021); *Make the Road*, 962 F.3d at 625-31.

Under these provisions, and binding D.C. Circuit precedent, the organizations' claims are barred. To be sure, § 1252(e)(3) does not bar claims by organizations entirely. Section 1252(e)(3) restores jurisdiction over two limits types of claims. *Make the Road*, 962 F.3d at 627. "While romanettes (i) and (iii) refer to claims pressed by individuals to whom the expedited removal scheme is being "appli[ed]" or an order of removal is being "implement[ed]," the other two romanettes for which review under § 1252(e)(3) is "specifically authorized are not textually confined to claims arising from individual removal actions." *Id.* However, as the D.C. Circuit has twice held, claims brought by organizations are limited to claims advanced on behalf of *individuals* under a theory of associational standing. *See id.* at 627-28. Through § 1252(e)(3), "Congress meant to allow actions *only by aliens* who have been subjected to the summary procedures contained in § 1225(b) and its implementing regulations." *Am. Immigr. Laws. Ass'n v. Reno (AILA)*, 199 F.3d 1352, 1359 (D.C. Cir. 2000) (emphasis added); *accord id.* ("lawsuits challenging [actions]" through § 1252(e)(3) "would be brought, if at all, by *individual aliens* who—during the sixty-day period—were aggrieved by the statute's implementation") (emphasis added).

The D.C. Circuit recently reaffirmed this view. Rejecting an argument that organizations suing on behalf of noncitizens actually subjected to expedited removal procedures, the Court

explained that *AILA* "rejected third party organizational standing ... as a basis to sue under Subsection 1252(e)(3)," but distinguished, as *AILA* did, "a case [brought] on behalf of individuals directly regulated and affected by the challenged rule." *Make the Road*, 962 F.3d at 627. *Make the Road* explicitly restates the holding of *AILA* that § 1252(e)(3) "contemplate[s] that litigation could be brought by affected individual themselves" only. *Id.* at 628. As *Make the Road* further explains, "[w]hether aggrieved individuals sue on their own or band together through a representative association does not change the nature of the lawsuit as seeking to remedy *the individual members' injuries* ... . That is because associational (sometimes called 'representational') standing *is derivative and reflective of individual standing*." *Make the Road*, 962 F.3d at 628 (emphasis added). But whether a party is an individual invoking their injuries directly, or an association invoking its members' injuries, the core requirement under § 1252(e)(3) is the same: the party invoking § 1252(e)(3) must point to a specific *individual's* injuries. *See id.*; *AILA*, 199 F.3d at 1359. Here, the organizational advance a theory of injury premised only on organizational standing under *Havens*, *supra* 15, and so the court lacks jurisdiction under § 1252(e)(3) over their claims.

## C.   The organizational Plaintiffs are not within the zone of interests and their claims are precluded by the INA

In addition, the organizational Plaintiffs' claims fail because the alleged effect of the Rule and procedures on their expenditures does not fall within the zone of interests of §§ 1158 or 1225, the statutes that Plaintiffs seek to enforce. A plaintiff must be "adversely affected or aggrieved by agency action within the meaning of a relevant statute" to sue under the APA. 5 U.S.C. § 702. And "the interest sought to be protected" must "be arguably within the zone of interests to be protected or regulated by the statute ... in question." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 396 (1987). Nothing in the text, structure, or purpose of the INA generally, or §§ 1158 or 1225 specifically, suggests that Congress intended to permit organizations to contest asylum and expedited removal-

related procedures based on attenuated effects on their own spending decisions. Indeed, the judicial review provisions concerning expedited removal explicitly foreclose any cause of action by an organization not invoking the interests of *individuals*. *See supra* 17-19. And § 1158 focuses on the interests of asylum seekers without evincing any desire to protect the interests of organizations that provide legal help to asylum seekers. *See* 8 U.S.C. § 1158(d)(7) ("Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.").

As Justice O'Connor explained in granting the government's stay application in an immigration case involving similar organizational plaintiffs, organizations that "provide legal help to immigrants" do not satisfy the zone-of-interests test. *INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1302 (1993) (O'Connor, J., in chambers). Federal immigration law was "clearly meant to protect the interests of undocumented aliens, not the interests of organizations." *Id*. at 1305. The fact that an immigration regulation "may affect the way an organization allocates its resources" for representing noncitizens accordingly does not bring the organization "within the zone of interests" that the asylum statute protects. *Id.*

The organizations' claims are also precluded by the INA. A plaintiff may not seek review under the APA if "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). The Supreme Court has accordingly recognized that, by providing a detailed scheme for administrative and judicial review, Congress can displace the APA's default cause of action. *See, e.g.*, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). Preclusion of review is determined "not only from [the statute's] express language, but also from the structure of the statutory scheme." *Id*. In particular, Congress may impliedly preclude some parties from seeking judicial review of administrative action by constructing a detailed scheme that provides for review only by other parties. *See id.*

That is the case here. The INA provides for administrative and judicial review at the behest

of *noncitizens*, 8 U.S.C. § 1252(a)(5), (b)(9), (e)(3), but it provides no role for third parties like organizations to play in that process in their own right (rather than as counsel for their clients). As explained, organizations lack any basis to sue on their own behalf with respect to challenges to regulations implementing the expedited removal process. 8 U.S.C. § 1252(a)(2)(A), (e)(3). With respect to individual noncitizens placed in section 1229a removal proceedings, the INA imposes strict limitations on the mechanisms for review. For example, a noncitizen may obtain judicial review of questions arising out of removal proceedings only through a challenge to a final removal order. *Id.*, § 1252(b)(9); *see Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1070 (2020). But that is precisely what the organizations here challenge: the Rule's limitation on asylum eligibility that will determine whether individual noncitizens can secure relief from removal in their removal proceedings and procedures applicable in those proceedings. They thus challenge the "*process* by which removability will be determined," covered by § 1252. *Regents*, 140 S. Ct. at 1907 (emphasis added). Permitting organizations to challenge the Rule through an APA suit would "severely disrupt" the INA's "complex and delicate administrative scheme," including by providing plaintiffs' noncitizen clients "a convenient device for evading the statutory" restrictions on review. *Block*, 467 U.S. at 348; *accord Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (holding similar review scheme precludes "organizational plaintiff" from "suing to challenge [] INS policies or statutory interpretations that bear on an alien's" legal claims).

**D.    The withdrawal and third-country removal claims are not justiciable**

        1.    The withdrawal and third-country removal claims are not redressable

Regardless of whether any Plaintiff, individual or organizational, can demonstrate injury caused by the withdrawal and third-country removal procedures, those injuries would not be redressable by the court. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105-06 (1998). Neither the withdrawal nor third-country removal procedures implement any guidance that is any

different from the governing statutes. 8 U.S.C. §§ 1225(a)(4) and 1231(b). Although Plaintiffs contend the guidance harms them by requiring CBP officers to skip steps in the statutory framework, that allegation is unsupported by the record and incorrect. *See infra* 45-52. The procedures do no more than provide guidance to CBP officers in executing their already statutorily authorized discretion to permit noncitizens to withdraw their applications for admission or in implementing their statutory obligations to designate a country of removal if a noncitizen's native country will not accept their removal. *Id.* Regardless of whether each procedure is in operation, the governing statute continues to authorize withdrawals and removals to third countries. Plaintiffs thus cannot show any possibility of redress because vacating the two procedures could not in any way prevent the government from continuing to permit withdrawals or removals to third countries. *See Lujan*, 504 U.S. at 561.

Thus, as Justice Gorsuch recently explained in a concurrence on behalf of three justices in *Texas*, redressability is lacking where vacatur "does nothing to change the fact that federal officials possess the same underlying ... discretion," or "require federal officials to change how they exercise" their statutory authority. 143 S. Ct. at 1978-79 (Gorsuch, J., concurring). That is precisely the situation here, as a judicial decree vacating the withdrawal or third-country removal procedures would do nothing to prevent DHS officials from using their withdrawal and third-country removal authorities as they see fit in individual cases generally or with any individual Plaintiff in any future processing should their underlying removal orders be nullified.

### 2. The withdrawal procedure is not reviewable

Plaintiffs' claims concerning the USCIS withdrawal guidance is moot. On June 11, 2023, USCIS issued superseding guidance on advisals given to noncitizens subject to the covered parole processes. Ex. C ¶¶ 5-6, Exs. 1-2. The guidance, among other things, addresses the various eligibility criteria for the extant parole processes for CHNV nationals, while also specifically

directing relevant officials to inform noncitizens that they may be ineligible for the relevant parole processes based on unlawful crossing of the Mexican or Panamanian border. *Id.* That new guidance moots Plaintiffs' challenge to the prior guidance. *See*, *e.g.*, *Save Our Cumberland Mountains, Inc. v. Clark*, 725 F.2d 1422, 1432 n.27 (D.C. Cir. 1984). Should Plaintiffs suggest the new guidance does not moot their claims because it is essentially the same process, they would be mistaken. The Supreme Court recently rejected such an argument in *Biden v. Texas*, 142 S. Ct. 2528 (2022), holding that an agency memorandum that supersedes the memorandum at issue in a case is distinct final agency action, such that the lower court was wrong to review the earlier memoranda and refuse to acknowledge the effect of the new memoranda on the case. *Id.* at 2546-48.

Nor is it any answer to suggest Plaintiffs can challenge the superseding June 11 guidance concerning withdrawals as applied during credible fear interviews. Any such challenge is jurisdictionally barred as untimely because Plaintiffs have not sought to challenge it within the statutorily mandated 60-day deadline, *see* 8 U.S.C. § 1252(e)(3)(B), and Plaintiffs may not amend their complaint or tie this new claim to any existing claim through any equitable exception, *see M.M.V.*, 1 F.4th at 1109-11 (holding the time-bar is jurisdictional and rejecting any basis to circumvent that limitation on equitable or other grounds, including through amendment, relation back, or estoppel).

Even if otherwise justiciable, judicial review of all claims challenging the withdrawal guidance—as to both CBP and USCIS—is also barred by 8 U.S.C. § 1252(a)(2)(B)(ii). That provision provides that "[n]otwithstanding any other provision of law,"—which includes § 1252(e)—"no court shall have jurisdiction to review ... any other decision or action of the ... [Secretary] the authority for which is specified under this subchapter to be in the discretion of the ... Secretary." This provision applies when the relevant decision is "specified by statute to be in the discretion of the [Secretary]," *Kucana v. Holder*, 558 U.S. 233, 248 (2010), and decisions

concerning withdrawals are specified in § 1225(a)(4) to be "in the discretion of" the Secretary. 8 U.S.C. § 1225(a)(4) ("An alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States."); *see also* 8 U.S.C. § 701(a)(1). Because the decision to permit a noncitizen to withdraw an application for admission is committed to the Secretary's discretion, guidance implementing that provision is also necessarily discretionary; the guidance is authorized by § 1225(a)(4).

Even if the guidance were considered to be a decision or action that precedes any withdrawal decision or action under § 1225(a)(4), review would still be foreclosed by § 1252(a)(2)(B)(ii). The Supreme Court recently explained that the neighboring provision § 1252(a)(2)(B)(i), which strips courts of jurisdiction to review "any judgment regarding the granting of relief" under certain INA provisions, bars review of "judgments of whatever kind" covered by the statute, "not just discretionary judgments or the last-in-time judgment." *Patel v. Garland*, 142 S. Ct. 1614, 1622 (2022). This bar to review thus "encompasses not just the granting of relief but also any judgment relating to the granting of relief." *Id.* This reasoning also applies to § 1252(a)(2)(B)(ii). As the Supreme Court explained in *Kucana*, 558 U.S. at 247, "[o]ther decisions specified by statute 'to be in the discretion of the [Secretary],' and therefore shielded from court oversight by § 1252(a)(2)(B)(ii), are of a like kind" to those covered by § 1252(a)(2)(B)(i). Accordingly, § 1252(a)(2)(B)(ii)'s jurisdictional bar extends not just to final decisions or actions, but "any [decision or action] relating to the granting of relief." *Patel*, 142 S. Ct. at 1622.

### 3.  The third-country removal claims are not reviewable

For the same reasons, § 1252(a)(2)(B)(ii) bars review of the third-country removal guidance to the extent it involves removals to countries other than those designated by a covered

noncitizen. Although § 1231(b)(2)(A) permits a noncitizen to designate one country of removal, § 1231(b)(2)(C) provides that in specified circumstances the Secretary "*may* disregard a designation." (Emphasis added). The Supreme Court has explained that the use of the term "may" in that provision "connotes discretion," and that "connotation is particularly apt where, as here, 'may' is used in contraposition to the word 'shall': The [Secretary] 'shall remove' an alien to the designated country, except that the [Secretary] 'may' disregard the designation if any one of four potentially countervailing circumstances arises." *Jama v. ICE*, 543 U.S. 335, 346 (2005). Because the Secretary's discretion is provided for explicitly by statute, § 1252(a)(2)(B)(ii) applies to bar judicial review. *Kucana*, 558 U.S. at 248. And following *Patel*, that limitation of judicial review extends not just to a final decision concerning third-country removals, but any antecedent "[decision or action] relating to" designating a country for removal. 142 S. Ct. at 1622.

Congress also eliminated any cause of action with respect to third-country removals. Section 1231(h) of title 8 provides that "[n]othing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." The plain terms of that statute bar any claim, regardless of the "party," invoking § 1231(b). Other provisions of the INA may render § 1231(b) judicially enforceable in discrete contexts. *See, e.g.*, 8 U.S.C. § 1252(b)(4) (referencing § 1231(b)(3) determinations in the context of judicial review of orders of removal); *id.* § 1252(b)(9) (permitting review of "interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States" in petitions for review in the courts of appeal). But Plaintiffs invoke no such provision. Instead, they invoke § 1231 outside of any permitted context to object to the governments third-country removal guidance. Because Plaintiffs rely on § 1231 to provide the relevant "substantive or procedural right," *id.*, § 1231(h) bars their suit.

E.      **All individual Plaintiffs lacking injury must be dismissed**

Most of the individual Plaintiffs must also be dismissed from this suit with respect to the expedited removal procedures because they have not in fact been harmed by the challenged procedures, and thus lack any "legally and judicially cognizable" injury traceable to the challenged policies that would be redressed by a favorable decision in this case. *Texas*, 143 S. Ct. at 1970. With respect to the procedures, of the 18 named Plaintiffs: two (J.P., E.B.) withdrew their applications for admission, but only under the USCIS guidance, three (R.E., D.M., S.U.) were removed to Mexico under the third-country removal statute, and two (M.P., B.H.) received less than 48 hours—the basis for Plaintiffs allegations of injury as to this guidance—from the time they received a Form M-444 to consult. Ex. B, Decl. Kenneth Blanchard, ¶¶ 4-5; Ex. C, Lynn Decl. ¶ 9; Pls. Statement of Facts, ¶¶ 71-74, 80-82. All other Plaintiffs lack any cognizable injury this Court can redress concerning these procedures, and they must be dismissed from this suit. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("plaintiff must demonstrate standing for each claim" and "each form of relief sought"). Furthermore, J.P. and E.B. cannot assert any cognizable injury from their withdrawal. Withdrawal means they have not been subject any adverse consequence, like a finding of inadmissibility or the issuance of a removal order, such that any order setting aside their withdrawal places them in the precise position they are already in. *See Steel Co.*, 523 U.S. at 105-06. And because they were only subject to withdrawal under USCIS guidance, they lack any basis to challenge the CBP guidance.

F.      **The expedited removal procedures are not "final agency action"**

All three procedures are also not reviewable "final" agency action. 5 U.S.C. § 704. Agency action is "final" under the APA only if it both "consummate[es] the agency's decisionmaking process" and also determines "rights or obligations" or produces "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Here, the withdrawal guidance sets out the general manner in

CBP and USCIS will exercise their discretionary authority to permit withdrawal of an application for admission, codified at 8 U.S.C. § 1225(a)(4). The guidance does not bind DHS employees to any particular course with respect to any individual or class of noncitizens—those decisions continue to be made on an individualized basis by individual officials making decisions concerning particular noncitizens. *See, e.g.*, *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) (such non-binding guidance are "statements of policy and "generally do not qualify" as final agency action "because they are not finally determinative of the issues or rights to which [they are] addressed"). It is only in making those individual decisions that the agency completes its decision-making process in a way that determines rights and produces legal consequences. *See Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (Kavanaugh, J.) ("statement of policy" not "final agency action" unless and until it is applied "in a particular situation" to a regulated entity).

Likewise, the third-country removal guidance sets out the general manner in which CBP officials should implement their statutory authority concerning which country to remove a noncitizen to should their home country not accept their removal. That guidance does nothing more than reiterate the government's long-codified authority under § 1231(b). *See infra* 45-50. Agency procedures that do no more than restate the agency's undisputed statutory authority do not create any rights or obligations or produce legal consequences on their own, and so do not constitute final agency action. *See Nat'l Min. Ass'n*, 758 F.3d at 253.

Similarly, the consultation guidance sets out how USCIS will implement its consultation authority. It does not itself affect any Plaintiffs on its own, but only does so contingent on "future administration action." *DRG Funding Corp. v. HUD*, 76 F.3d 1212, 1214 (D.C. Cir. 1996).

That two, three, and two Plaintiffs, respectively, *supra* 26, have been subject to the USCIS (but not CBO) withdrawal, third country removal, or consultation procedures in their expedited removal proceedings does not render the procedures challengeable final agency action. At most it

allows those, and only those, Plaintiffs who have removal orders to challenge their removal order—the relevant final agency action—on that basis. *See id.* But § 1252(a)(2)(A)(iii) unambiguously precludes judicial review concerning "the application of [§ 1225(b)(1)] to individual aliens, including the determination made under section 1225(b)(1)(B)" concerning credible fear, and nothing in § 1252(e) restores jurisdiction over such individual claims. *See* 5 U.S.C. §§ 701(a)(1), 704 (precluding review of final agency action if statute bars judicial review).

## II. Plaintiffs' Claims Fail on the Merits Because the CLP Rule Is Authorized by Statute and Reasonably Explained

The Court should grant summary judgment in favor of Defendants on Counts One, Three, and Thirteen[7] (Compl. ¶¶ 136, 138-39, 148-49, 174-76) because the Rule is consistent with the INA and is reasonably explained.

### A. The Rule is Consistent with the INA's Credible Fear Provisions

Plaintiffs assert that the Rule is contrary to the INA because it "improperly requires asylum officers to apply factors not relevant to whether a person has a 'credible fear of persecution' and to apply standards other than the 'significant possibility' standard." Compl. ¶ 136. These claims are meritless and are based on Plaintiffs' misunderstanding of the Rule and its application.

*First*, the Rule does not require AOs to apply irrelevant factors. The Rule added a rebuttable presumption of ineligibility for asylum under 8 U.S.C. § 1158(b)(2)(C) that is appropriately applied during the credible fear process. As discussed, when a noncitizen in expedited removal expresses a fear of persecution or torture, a fear of return to their country, or an intent to seek asylum, they must be referred for a credible fear interview. 8 U.S.C. § 1225(b)(1)(A)(ii). During

---

[7] Count Three is held in abeyance "insofar as it asserts the arbitrary-and-capricious theories adopted by the district court in *East Bay Sanctuary Covenant v. Biden*, 2023 WL 4729278 at *11-16 (N.D. Cal. July 25, 2023)." Minute Order dated Oct. 4, 2023. Defendants here seek summary judgment on Count Three insofar as it challenges the Rule's credible fear provisions.

the interview, an AO determines whether the noncitizen has a "credible fear of persecution." *Id.* § 1225(b)(1)(B)(ii), (iii). A "'credible fear of persecution' means that there is a significant possibility ... that the alien could establish *eligibility* for asylum." *Id.* § 1225(b)(1)(B)(v) (emphasis added). The statute speaks in terms of "eligibility," and thus allows for consideration of issues bearing on eligibility, including limitations on eligibility adopted by regulation under § 1158(b)(2)(C). *See Kiakombua*, 498 F. Supp. 3d at 42. Because the Departments "by regulation establish[ed] an additional limitation[ or] condition[] . . . under which an alien shall be ineligible for asylum," 8 U.S.C. § 1158(b)(2)(C), the Departments are permitted to apply the Rule during credible fear screenings. Plaintiffs are thus incorrect that the Rule requires AOs to apply factors not relevant to whether a noncitizen has a "credible fear of persecution."

*Second*, contrary to Plaintiffs' allegations, the Rule is consistent with the statutory definition of "credible fear of persecution" because it in fact requires AOs and IJs to apply the "significant possibility" standard when considering the applicability of the rebuttable presumption during credible fear interviews. The Rule explicitly states as much. 88 Fed. Reg. at 31,380 ("the AO will determine whether there is a significant possibility that the noncitizen would be able to show at a full hearing by a preponderance of the evidence that the presumption does not apply or that they meet an exception to or can rebut the presumption"). Even without that explicit statement, the "significant possibility" standard applies by statute, 8 U.S.C. § 1225(b)(1)(B)(v), and the regulation governing the general credible fear process mirrors that statutory language and requires its application in all credible fear interviews, *see* 8 C.F.R. § 208.30(e)(2) ("An alien will be found to have a credible fear of persecution if there is a significant possibility ... that the alien can establish eligibility for asylum ... ."). In other words, the Rule requires that the "significant possibility" standard apply to the rebuttable presumption.

Notably, the provisions added by the Rule mirror the language of prior rules adopting

limitations on asylum eligibility applied during credible fear interviews. *See* 88 Fed. Reg. at 31,380 n.195.[8] The provisions nowhere suggest that the "significant possibility" standard does not apply. Instead, they merely set forth the order of operations and articulate which standard applies to the persecution or torture claims, depending on whether the rebuttable presumption is applicable. Specifically, the provisions first require the adjudicator to consider the applicability of the rebuttable presumption and whether the noncitizen can establish an exception to or can rebut it. The Rule then, depending on the outcome of that threshold inquiry, provides which screening standard shall apply—"significant possibility" if screened for asylum and "reasonable possibility" if not. *See generally* 8 C.F.R. 208.33(b), 1208.33(b). Nothing in those processing provisions displaces the statutory "significant possibility" standard or the general credible fear regulation also requiring its application. The preamble discussion further confirms that:

> When it comes to the rebuttable presumption, the AO will determine whether there is a significant possibility that the noncitizen would be able to show at a full hearing by a preponderance of the evidence that the presumption does not apply or that they meet an exception to or can rebut the presumption.

88 Fed. Reg. at 31,380; *see also id.* at 31,330 ("[T]he Departments note that the overall standard of proof for rebutting or establishing an exception to the presumption of asylum ineligibility during credible fear proceedings remains the 'significant possibility' standard.").

Plaintiffs argue that the Rule's terms explicitly conflict with the statute's requirement that

---

[8] *See, e.g.*, *Security Bars and Processing*, 85 Fed. Reg. 84,160, 84,175 (Dec. 23, 2020) (explaining that "[t]he rule does not, and could not, alter the standard for demonstrating a credible fear of persecution, which is set by statute"); *Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829, 33,837 (July 16, 2019) ("If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates that there is a significant possibility that he or she can establish eligibility for asylum), then the alien will have established a credible fear."); *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55,934, 55,943 (Nov. 9, 2018) ("If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates sufficient facts pertaining to asylum eligibility), then the alien will have established a credible fear.").

a "significant possibility" standard apply. Mot. 11–15. But Plaintiffs fail to acknowledge the context and purpose of the new channeling provisions, as described above.[9] These provisions do not set forth the screening standard for the rebuttable presumption as that is set by statute and in § 208.30(e). Again, the new provisions merely explain the order of operations—screen for the presumption first—and which standard applies to which forms of relief and protection as a result of that threshold determination. No language in the Rule's provisions override the default—that the "significant possibility" standard applies, as the statute requires.

*Third*, and finally, although Plaintiffs rely on extra-record (and therefore irrelevant) evidence to argue that the Departments are not applying the "significant possibility" standard, *see* SUF ¶ 186, their evidence shows no such thing. The Rule's implementing training materials and guidance show that AOs are indeed instructed that the "standard of proof for determining if the noncitizen is subject to the [Rule] or if the noncitizen has established an exception or rebutted the presumption depends upon the type of adjudication" and that for credible fear determinations the inquiry is whether there is a "[s]ignificant possibility that the noncitizen could establish that they are not subject to the CLP or that they could establish an exception or rebut the presumption in a full hearing." Ex. C, ¶¶ 4-5, Exs. 1-2.

### B.     The Rule Is Not Arbitrary and Capricious

   "[T]he scope of review under the 'arbitrary and capricious' standard is narrow and a court

---

[9] Amicus National Citizenship and Immigration Services Council 119 thus incorrectly contend its "members do not understand the Rule to require or allow credible fear adjudicators to determine whether there is a significant possibility that the Rule's eligibility bar applies and no exception can be shown." Amicus Br. at 11. Notably, the amicus does not state its members have been instructed not to apply the "significant possibility" standard or that they are not applying it. Nor could they. USCIS training materials explicitly require AOs to apply the "significant possibility" standard by explaining AOs must ask whether there is a "[s]ignificant possibility that the noncitizen could establish that they are not subject to the [Rule] or that they could establish an exception or rebut the presumption in a full hearing." Ex. C, ¶ 4, Ex. 1.

is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A reviewing court must be satisfied that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 43. The agency's decisions are entitled to a "presumption of regularity," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one," *id.* at 416. At bottom, arbitrary-and-capricious review asks only whether "the agency has acted within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). And "it is well settled that principles of *Chevron* deference are applicable to the [Secretary's and] Attorney General's interpretation of the INA." *Grace v. Barr*, 965 F.3d 883, 896 (D.C. Cir. 2020).

The Rule easily meets that deferential standard. The Rule was promulgated based on several urgent and compelling considerations, including: (1) an expected increase in migration following the end of the Title 42 Order at a time when encounters at the southwest border were already at historic levels; (2) the significant risk that, in the absence of other incentives, increased irregular migration would overwhelm the Departments' ability to safely, effectively, and humanely enforce and administer U.S. immigration and asylum law; (3) the likelihood that, in the absence of other incentives, migrants would undertake a dangerous journey or rely on dangerous human smuggling networks; and (4) the expansion of lawful, safe, and orderly pathways that noncitizens can pursue to seek entry to the United States. *See generally* 88 Fed. Reg. at 31,314-19. The Rule is reasonably related to those objectives. Without this emergency measure, increased irregular migration "risks overwhelming the Departments' ability to effectively process, detain, and remove, as appropriate, the migrants encountered" and will "put an enormous strain on already strained resources, risk overcrowding in already crowded USBP stations and border [ports of entry] in ways

that pose significant health and safety concerns, and create a situation in which large numbers of migrants—only a small population of whom are likely to be granted asylum—are subject to exploitation and risks to their lives by the networks that support their movements north." *Id.* at 31,316. By coupling an expansion of safe and orderly pathways to enter the United States with a presumption of asylum ineligibility for noncitizens who fail to pursue such avenues for entry or seek protection in other countries, the Rule encourages individuals to raise their asylum or protection claims in other countries through which they travel or to avail themselves of lawful, safe, and orderly pathways for entry into the United States. *See, e.g.*, *id.* at 31,329. And by reducing irregular migration and channeling migrants to orderly pathways, the government will be able to devote more of its limited resources to process migrants more efficiently.

At the same time, the Rule's presumption can be overcome in exceptionally compelling circumstances, including circumstances that are linked to the migrant's need to take immediate action notwithstanding that they did not pursue any specified pathways. The Rule thus ensures that individuals who do not pursue an orderly pathway because they, for example, were experiencing an acute medical emergency, faced an imminent threat to life or safety, or were a "victim of a severe form of trafficking in persons" will not be ineligible for asylum based on the Rule. 88 Fed. Reg. at 31,318. And the Rule is reasonably modeled, in part, on past processes that have successfully reduced unauthorized border crossing by coupling orderly pathways with the imposition of new consequences for those who entered without authorization. *Id.* at 31,316-17.

The Departments also reasonably decided to apply the rebuttable presumption during credible fear screenings, reasoning that noncitizens who receive a positive determination are able to remain in the United States for many years, which may be an incentive for noncitizens to make potentially meritless claims. 88 Fed. Reg. at 11,716; 88 Fed. Reg. at 31,337. In order to disincentivize irregular entry, the Departments determined that it was necessary to implement the

rebuttable presumption during credible fear screenings so that those subject to the presumption and who could not avoid its application or make the higher showing for statutory withholding or CAT protection would be removed expeditiously. 88 Fed. Reg. at 31,337-38. This approach follows the model of the successful CHNV parole processes, which paired lawful pathways with speedy returns for those who did not use them, *id.* at 31,316-17. Such application is consistent with the INA and is supported by the facts leading the Departments to take action. Plaintiffs' contrary arguments (Mot. 16-30), are without merit.

        1.     The Rule Applies the "Significant Possibility" Standard

Plaintiffs first repackage their statutory argument, asserting the Rule is arbitrary and capricious because the Departments either departed from the statutory "significant possibility" standard or failed to adequately explain how the regulatory text ensures that it will be applied. Mot. 16–17. As discussed above, *supra* 28-31, it is clear from the text and context of the Rule that the "significant possibility" standard applies.

Plaintiffs argue that language in the NPRM undercuts the Rule's statement that the "significant possibility" standard applies because the NPRM states that "[i]f a noncitizen is subject to the lawful pathways condition on eligibility for asylum and not excepted and cannot rebut the presumption of the condition's applicability, there would not be a significant possibility that the noncitizen could establish eligibility for asylum." Mot. 16 (quoting 88 Fed. Reg. at 11,742). Plaintiffs' belief that this language shows the Departments understood the "significant possibility" standard would not be applied is wrong. Commenters raised this exact concern, *see* 88 Fed. Reg. at 31,379-80, and in response the Departments clarified those statements in the NPRM by plainly stating that "[w]hen it comes to the rebuttable presumption, the AO will determine whether there is a significant possibility that the noncitizen would be able to show at a full hearing by a preponderance of the evidence that the presumption does not apply or that they meet an exception

to or can rebut the presumption." *Id.* at 31,380. In other words, the notice and comment process played out as intended—commenters raised this concern, and the final rule addressed it. *Id.* To the extent Plaintiffs assert the Departments' response was insufficient because the regulatory text was not changed, Plaintiffs are incorrect. *See* Mot. 17. The Departments explained that the "significant possibility" standard applies by statute and cannot be changed by regulation and noted that the language used in the regulatory text had been used in other recent rules applying limitations on eligibility during credible fear screenings. 88 Fed. Reg. at 31,380 & n.195. Plaintiffs' disagreement with the response does not mean that the Departments failed to respond or that the decision the Departments made was arbitrary and capricious. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2571 (2019) ("It is not for us to ask whether [Secretary's] decision was the best one possible or even whether it was better than the alternatives.").

2.     The Rule Reasonably Applies the Rule During Credible Fear Screenings

Plaintiffs next assert the Departments failed to adequately explain why they departed from their decision not to apply statutory bars to asylum during credible fear screenings in the interim final rule (IFR), *Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 87 Fed. Reg. 18,078 (Mar. 29, 2022) (Asylum Processing IFR). Mot. 17-22. Plaintiffs are mistaken.

Historically, AOs and IJs did not apply bars to asylum during credible fear screenings. 88 Fed. Reg. at 11,744. That changed in 2018 when the Departments issued a rule that created a new bar to asylum eligibility and applied that bar during credible fear screenings. *See Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55,934, 55,939, 55,943 (Nov. 9, 2018). The Departments later decided to apply all statutory bars to asylum during credible fear screenings in the rule *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 80,274,

80,391, 80,393 80,399 (Dec. 11, 2020) ("Global Asylum Rule"). The Global Asylum Rule was preliminarily enjoined before becoming effective by *Pangea Legal Servs. v. DHS*, 512 F. Supp. 3d 966, 977 (N.D. Cal. 2021) (finding that former Acting DHS Secretary Chad Wolf likely did not have authority to sign the rule), and remains enjoined. Thereafter, in the Asylum Processing IFR, the Departments superseded the Global Asylum Rule's provisions requiring the consideration of all statutory bars to asylum during credible fear interviews and returned to the pre-Global Asylum Rule practice of issuing a positive credible fear determination even when a noncitizen appears subject to a statutory bar. *See* 87 Fed. Reg. at 18,219; 8 C.F.R. § 208.30(e)(5)(i). Then, in the Lawful Pathways Rule at issue here, the Departments determined that under the circumstances, applying the rebuttable presumption during credible fear interviews was warranted. *See* 88 Fed. Reg. at 11,742-45. In doing so, they acknowledged the change in policy and provided a reasonable explanation for it. *See id.* at 11,744-45. Plaintiffs' claims to the contrary are incorrect.

*First*, the Departments complied with the well-established procedure for changing policy. An agency is not required to justify a change in policy by reasons more substantial than those required to adopt the policy in the first instance. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-15 (2009). Rather, "an agency provide[s] reasoned explanation for its action" when it "display[s] awareness that it is changing position." *Id.* at 515. The Departments made it clear that they were departing from the Asylum Processing IFR's approach in several respects and provided significant explanation why it made sense to do so under the circumstances. 88 Fed. Reg. at 11,742 ("The Departments acknowledge that this approach would differ from that articulated in the Asylum Processing IFR issued in March 2022, but as further discussed below assess that, to respond to the current and impending exigent circumstances, the interests balance differently and warrant a different approach from the one generally applied in credible fear screenings."); 88 Fed. Reg. at 11,744-45 (explaining decision to apply rebuttable presumption during credible fear

screenings specifically).

In choosing to apply the Rule's presumption during credible fear screenings, the Departments addressed the reasons the Asylum Processing IFR gave for declining to do the same for then-existing statutory bars. The Asylum Processing IFR reasoned that, in the circumstances then facing the Departments, applying the bars during credible fear was inefficient, especially given the bars' complexity, and that in order to develop the record sufficiently to make decisions about those bars, the interview would go beyond its screening purpose. 87 Fed. Reg. at 18,093. In the Lawful Pathways NPRM, the Departments explicitly addressed these considerations, reasoning that, although the Departments continued at that time to believe that inquiring into other statutory bars was not a preferable use of the Departments' resources, for various reasons the Departments believed it prudent to apply the Rule's presumption during credible fear interviews. *See* 88 Fed. Reg. at 11,744–45. At bottom, the Departments recognized that applying the presumption during credible fear interviews would require greater resources than not doing so but

> believe[d] that under the circumstances, the interests in ensuring lawful, safe, and order processing and overall system inefficiencies—including screening out and removing those with non-meritorious claims more quickly—outweigh any costs resulting from increasing the length of some credible fear screening interviews, and expanding the operation of the credible fear screening program.

88 Fed. Reg. at 11,745. Such explanation is sufficient under *Fox Television*.

*Second*, Plaintiffs' claim that the Departments failed to address the fairness concerns the Departments previously identified in the Asylum Processing IFR fails for similar reasons. *See* Mot. 21–22. It is correct that, in the circumstances then present, in the Asylum Processing IFR the Departments reasoned that "considerations of procedural fairness counsel against applying mandatory bars that entail extensive fact-finding during the credible fear screening process." 87 Fed. Reg. at 18,094. The Departments further reasoned that

> due to the intricacies of the fact-finding and legal analysis often required to

> apply mandatory bars, the Departments now believe that individuals found to
> have a credible fear of persecution generally should be afforded the additional
> time, procedural protections, and opportunity to further consult with counsel
> that the Asylum Merits process or section 240 removal proceedings provide.

*Id.* at 18,095. The Departments addressed these prior findings when they determined that in comparison with the statutory bars at 8 U.S.C. § 1158(a)(2) and (b)(2), the Rule's presumption would be more straightforward to apply, *see* 88 Fed. Reg. at 31,380, and that in general the relevant facts would be available to the noncitizen at the time of the interview, *id.*

Plaintiffs suggest otherwise by pointing to one of the statutory eligibility bars—the firm resettlement bar. Mot. 21. But whether one statutory bar is more or less complex is irrelevant because, as discussed below, the Departments acknowledged that application of the presumption would not be simple in all cases and could extend the length of credible fear interviews but nevertheless determined that the interest in orderly processing outweighed the increased resource cost. 88 Fed. Reg. at 11,745. Furthermore, the Departments provided significant discussion regarding the due process concerns raised and the fairness of applying the Rule's rebuttable presumption during credible fear screenings. *See* 88 Fed. Reg. at 31,353-63 (responses to comments regarding due process and procedural fairness concerns). Accordingly, Plaintiffs' argument that the Departments did not consider such concerns fails.

*Third*, the majority of Plaintiffs' arguments stem from their apparent assumption that when the Departments referred to the Rule's rebuttable presumption as "simpler" than the statutory bars and described it as "involv[ing] a straightforward analysis," this meant that the Departments believed applying the rebuttable presumption would be easy in all cases. 88 Fed. Reg. at 11,744; Mot. 18 (quoting 88 Fed. Reg. at 31,390, 31,393). But that is not the Departments' position. The Lawful Pathways NPRM explained that many aspects of the presumption will be fairly straightforward to apply. For example, because of how the presumption applies, AOs know at the

38

outset of the interview whether to inquire about the presumption or not depending on how and where a noncitizen entered the United States. 88 Fed. Reg. at 11,744. And inquiring into the exceptions and potential grounds for rebuttal will in many cases require merely asking questions about the conditions surrounding the noncitizen's entry. For example, determining whether the noncitizen presented at a port of entry with a pre-scheduled appointment will be generally straightforward. But contrary to Plaintiffs' assertion, the Departments never suggested that applying the presumption would be easy in all cases. Indeed, the Departments noted that applying the presumption during credible fear may at times require "significant additional time" but nevertheless determined that under the circumstances the orderly processing and expedited rejection of nonmeritorious claims provided by taking this approach in this particular case outweighed the efficiency concerns. *Id.* The Departments thus recognized the costs and benefits and made a policy choice, which agencies are allowed to do. Plaintiffs' disagreement with that choice does not render it arbitrary and capricious.

*Fourth*, Plaintiffs' claim (Mot. 19-20) that applying the presumption in conjunction with the "significant possibility" standard is too complex for a credible fear interview ignores the nature of the interview. AOs and IJs apply the "significant possibility" standard in conjunction with complex factual and legal issues on a daily basis and in credible fear interviews. For example, to determine whether a noncitizen has a significant possibility of establishing eligibility for asylum, an adjudicator must inquire into whether the noncitizen is credible and has a significant possibility of establishing in a full hearing: (1) the applicability of a protected ground, such as the undefined "membership in a particular social group" ground; (2) that they have experienced or have a well-founded fear of harm constituting persecution, which requires that the harm be severe and be at the hands of the government or a private actor that the government is unable or unwilling to control; and (3) that the harm experienced or feared was or will be on account of the protected

ground. *Grace*, 965 F.3d at 888-89. Each one of these inquiries may involve complex issues, the analysis of which differs across the circuits, but adjudicators consider them daily. Plaintiffs do not explain why applying the presumption is any more complex or is any less suitable for credible fear interviews, let alone provide any basis to ignore the government's conclusions on this score.

> 3.    The Rule Reasonably Applies the "Reasonable Possibility" Standard Where Noncitizens Do Not Establish Significant Possibility of Asylum Eligibility

Plaintiffs assert that in adopting the "reasonable possibility" standard for statutory withholding and CAT protection for those who are subject to the presumption and cannot meet an exception or rebut it, the Departments relied on a flawed analogy to reasonable fear screenings. Mot. 22-25. Plaintiffs' argument is based on faulty assumptions and otherwise fails.

*First*, Plaintiffs' suggestion (Mot. 23) that in the Asylum Processing IFR the Departments found the "reasonable fear" standard insufficient to protect against refoulement is incorrect. Nowhere in the Asylum Processing IFR did the Departments suggest that applying the "reasonable possibility" standard is insufficient for complying with the United States' nonrefoulement obligations. Rather, the Departments merely stated that they did not find that the higher standard was more successful overall.

*Second*, Plaintiffs' assertion (Mot. 22-25) that the Departments failed to consider the differences between reasonable fear and credible fear screenings is also incorrect. At the outset, Plaintiffs make unsupported generalizations about the population to whom reasonable fear proceedings apply. Although it is correct that most noncitizens who receive reasonable fear screenings are subject to reinstated orders, it is not the case that all such noncitizens have strong connections to the United States. *See* Mot. 24-25. To be subject to reinstatement, a noncitizen must have a prior removal order and then reenter the United States unlawfully. *See* 8 U.S.C. § 1231(a)(5). The underlying removal order could be any type of removal order, including an

expedited removal order. And that removal order could be reinstated immediately after re-apprehension at the border. In other words, it is not the case that all noncitizens subject to reinstated orders have significant ties to the United States or have significant time to prepare for reasonable fear screenings, as Plaintiffs suggest.

Plaintiffs next assert that the Departments should have, but failed to, consider that those who are subject to the reasonable fear process are able to obtain judicial review of negative reasonable fear determinations, unlike those who receive credible fear screenings. *See* Mot. 24. But Plaintiffs do not identify a single comment that raised this issue, *see generally* Mot., and Defendants have found none. The argument is thus unexhausted and should not be considered. *See, e.g.*, *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002) ("It is well established that issues not raised in comments before the agency are waived and [courts] will not consider them.").

Furthermore, when adopting the reasonable fear process for reinstated orders under 8 U.S.C. § 1231(a)(5) or removal orders under 8 U.S.C. § 1228(b) by regulation, DOJ modeled it after the statutorily created credible fear process and applied the higher "reasonable possibility" screening standard without considering whether or not judicial review would be available. Rather, DOJ concluded that the higher standard made sense given that the standard for withholding and CAT is higher than the standard for asylum. *See Regulations Concerning the Convention Against Torture*, 64 Fed. Reg. 8,474, 8,485 (Feb. 19, 1999). The absence of discussion in the Rule of Plaintiffs' newly asserted argument regarding judicial review does not render the Departments' reasoning arbitrary or capricious. *See* 5 U.S.C. § 706 (in reviewing agency actions "due account shall be taken of the rule of prejudicial error"); *Prohibition Juice Co. v. U.S. Food and Drug Admin.*, 45 F.4th 8, 18-19 (D.C. Cir. 2022) (the "burden of showing that an error is harmful normally falls upon the party attacking the agency's determination" when determining whether an

agency has failed "to consider an important aspect of the problem").

        4.      The Rule Did Not Fail to Consider Interrelated Policies

Plaintiffs next assert that the Departments failed to consider what Plaintiffs refer to as interrelated policies—specifically, the policies allowing for third-country removal to Mexico, withdrawal of applications for admission, and conducting credible fear interviews in CBP custody. Mot. 25-28. As explained below, however, the Rule discusses and addresses relevant policy changes. *See, e.g.*, 88 Fed. Reg. at 31,317-18, 31,317 & n.21 (discussing policies over the prior two years as well as new efforts announced on April 27, 2023). And Plaintiffs do not articulate what they believe the Departments failed to consider about each policy but rather set forth a summary or their disagreements with those policies. *See Prohibition Juice Co.*, 45 F.4th at 18-19.

As the Rule explains, changes to the location and timing of credible fear interviews are beyond the scope of the Rule. 88 Fed. Reg. at 31,363. The Rule adopts a substantive change to asylum eligibility, which is implemented in credible fear proceedings. The procedural aspects of such proceedings are based on separate policies involving different considerations. *See id.* ("Any decision to conduct credible fear interviews while the noncitizen is in CBP custody will take into account a range of factors, including operational limitations associated with the facility, staffing, and throughput."); *see also Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 19, 29–32 (D.D.C. 2020) (under the INA, credible fear interviews may be implemented differently depending on where an individual is detained).

Plaintiffs also claim that the Rule does not consider that the "third-country removal policy further depresses credible fear passage rates." Mot. 27. This is both incorrect and misplaced. The Rule does in fact consider its interaction with the decision to remove noncitizens from some countries to Mexico rather than their country of origin. *See, e.g.*, 88 Fed. Reg. at 11,705-06; AR2489 (including "CHNV Returns to Mexico" in modeling impact of the Rule). Indeed, one of

the key premises of the Rule was data showing that imposing consequences on CHNV nationals—who generally cannot be removed to their home countries—was critical to lowering irregular encounters from nationals of those countries, which were at all-time highs and driving record border encounters. *See, e.g.*, 88 Fed. Reg. at 31,315. And the Rule discusses at length the importance of being able to return or remove such nationals to Mexico, *see id.* at 31,317, 31,325, 31.337; 88 Fed. Reg. at 11,706, 11,712, and how, once the Title 42 Order ends, the government would be unable to expel nationals of those countries, and would instead rely, if Mexico agreed, on returning or removing such nationals to Mexico instead of their home countries, *see* 88 Fed. Reg. at 31,316-17 & n.21; 88 Fed. Reg. at 11,712.

Finally, Plaintiffs note the withdrawal policy and include a cross-reference to where they challenge it more fully but do not explain what they believe the Departments should have but failed to consider about the policy. *See* Mot. 27. The statute clearly allows for the withdrawal of applications for admission. 8 U.S.C. § 1225(a)(4). Plaintiffs do not explain how the Departments' decision to begin advising noncitizens of this should have been considered in the Rule.

### 5.   The Rule Did Not Rely on Impermissible Factors

Finally, Plaintiffs allege that the Rule is arbitrary and capricious because it relies on disagreement with Congress's choice to adopt a "low" credible fear screening standard. Mot. 28-30. But that assertion misunderstands what the Rule does. The Rule does not displace the "significant possibility" standard; it simply exercises the discretion granted under the INA to impose a new regulatory limitation on asylum.

The statute does two things of import here: (1) it defines "credible fear of persecution" as a "significant possibility ... that the alien could establish *eligibility* for asylum," 8 U.S.C. 1225(b)(1)(B)(v) (emphasis added); and (2) it explicitly allows the Secretary and Attorney General to "by regulation establish additional limitations and conditions ... under which an alien shall be

*ineligible* for asylum," 8 U.S.C. 1158(b)(2)(C) (emphasis added). Congress could have permitted the Executive only to establish conditions on the exercise of officials' discretionary judgment whether asylum is warranted in individual cases, which would not be applicable during credible fear. *See Kiakombua*, 498 F. Supp. 3d at 42 ("This Court agrees with Plaintiffs that, insofar as the Lesson Plan requires AOs to consider these kinds of discretionary factors at the credible fear stage of the asylum eligibility process, it plainly subverts the INA's two-stage asylum scheme."). Congress instead chose to allow the Secretary and Attorney General to establish by regulation conditions on eligibility, which can be applicable during credible fear screenings.

A pervasive theme in IIRIRA's legislative history is that Congress was concerned that large numbers of noncitizens who arrived irregularly could remain in the United States for years while their asylum proceedings were pending.[10] Congress's findings on the need for expedited removal are notably stark. As of 1995, "thousands of aliens arrive in the U.S. at airports each year without valid documents and attempt to illegally enter the U.S." H.R. Rep. No. 104-469(1) at 158. Congress was also concerned with the "[t]housands of smuggled aliens [who] arrive in the United States each year with no valid entry documents and declare asylum immediately upon arrival" who "[b]ecause of the lack of detention space and overcrowded immigration court dockets," "have been released into the general population" without "return[ing] for their hearings." *Id.* at 117. Likewise, "[d]ue to the huge backlog in asylum cases, and the inability of the INS to detain failed asylum applicants who are deportable from the United States, these aliens could reasonably expect that the filing of an asylum application would allow them to remain indefinitely in the United States,"

---

[10] *E.g.*, H.R. Rep. No. 104-469, at 158 (according to the House Report, "[t]he credible-fear standard [wa]s designed to weed out nonmeritorious cases so that only applicants with a likelihood of success will proceed to the regular asylum process"); 142 Cong. Rec. 5240, 5295 (1996) (providing key recommendations from the Congressional Task Force on Immigration Reform as "[p]rovid[ing] procedures for expedited exclusion of persons claiming asylum [and] [s]treamlin[ing] present exclusion procedures and decreas[ing] length of asylum process").

providing further incentive for illegal entry. *Id.* at 117-18. Congress also sought to deter noncitizens from making the dangerous journey to the United States. *Id.* Given this background, if legislative history is relevant, the Lawful Pathways Rule and its application in credible fear screenings is fully consistent with it.

## III.   The remaining guidance is lawful

Plaintiffs additionally contend that three procedures the agencies implement during expedited removal proceedings are unlawful. These procedures include: (1) the removal of third-country nationals to Mexico rather than their country of nationality or citizenship (Mot. 31-37); (2) the implementation of a 24-hour minimum waiting period before a noncitizen's credible fear interview (*id.* at 37-40); and (3) the allowance for voluntary withdrawal of an application for admission for nationals of certain countries with extant parole processes (*id.* at 40-42). To the extent that any of these claims are justiciable, *see supra* 13-27, they are premised on fundamental misunderstandings of the procedures at issue. The Court should thus grant summary judgment to Defendants on these claims (Claims 5-10 and part of 13).

### A.   The third-country removals guidance is consistent with the statute and not arbitrary and capricious

In enacting the Rule, the Departments noted that "the United States faces constraints in removing [CHNV nationals] to their home countries. With limited exceptions, such nationals can only be removed to a third country as a result." 88 Fed. Reg. at 31,444.[11]

In recognition of the limitations on removal of certain noncitizens, DHS issued a memorandum on designating third countries as country of removal, *see* AR (CBP Removals) 321-

---

[11] *See Implementation of a Change to the Parole Process for Cubans*, 88 Fed. Reg. 1,266, 1,270-71 (Jan. 9, 2023) (limitations on removals for Cubans); *Implementation of a Parole Process for Nicaraguans*, 88 Fed. Reg. 1,255, 1,259 (Jan. 9, 2023) (Nicaraguans); *Implementation of a Parole Process for Haitians*, 88 Fed. Reg. 1,243, 1,247 (Jan. 9, 2023) (Haitians); *Implementation of a Parole Process for Venezuelans*, 87 Fed. Reg. 63,507, 63,509 (Oct. 19, 2022) (Venezuelans).

25, and CBP prepared a worksheet to implement the memorandum, *id.* at 22-24. Both are consistent with the statute in all respects. The memorandum tracks the statute's creation of a hierarchy of considerations to govern designation of a country of removal. First, the default country of removal is the country that the noncitizen designates. *Compare* 8 U.S.C. § 1231(b)(2)(A) (establishing designated country as the primary option for removal) *with* AR (CBP Removals) 322 (the noncitizen's designated country of removal is the first option). Second, the designated country may be disregarded by DHS in circumstances where, for instance, that country is unwilling to accept the noncitizen. *Compare* 8 U.S.C. § 1231(b)(2)(C)(iii) (statutory basis for disregarding the designation) *with* AR (CBP Removals) 322 (noting this basis for disregarding the noncitizen's designation). Third, if these circumstances apply, DHS should remove the noncitizen to his or her country of citizenship or nationality, *unless* that country, too, is unwilling to accept the noncitizen. *Compare* 8 U.S.C. § 1231(b)(2)(D) (providing these countries as a secondary option for removal and providing exceptions to designating one of these countries for removal purposes) *with* AR (CBP Removals) 322 (tracking the statutory directive, as well as the exception to designating the country of citizenship or nationality for removal). Fourth, DHS should consider alternative third countries of removal, consistent with those options included in the statute. *Compare* 8 U.S.C. § 1231(b)(2)(E)(i)-(vi) (listing additional countries to which a noncitizen may be removed) *with* AR (CBP Removals) 322 (directing consideration of same). Finally, if removal to a statutory alternative country is "impracticable, inadvisable, or impossible," DHS may remove the noncitizen to any country that will accept him or her. *Compare* 8 U.S.C. § 1231(b)(2)(E)(vii) (directing removal in this fashion) *with* AR (CBP Removals) 322 (noting removal to a third country if removal to a statutorily designated country is not possible).[12]

---

[12] As set forth in the guidance, before a CHNV national can be removed to a third country, the

CBP's worksheet also exactly tracks the statute. In undertaking the steps to designate a country of removal, CBP first asks the noncitizen "to which country would you like to be removed," AR (CBP Removals) 22, and gives absolute effect to that designation *unless* that country is "on the current list of countries that do not accept or place limits on the acceptance of its citizens," *id.* (designating the noncitizen's chosen country of removal unless the "unwilling to accept" exception applies); *see* 8 U.S.C. § 1231(b)(2)(A), (C)(iii). If the noncitizen's designated country is on that list, CBP then proceeds to designate the country of nationality or citizenship and will designate that country as the country of removal *unless* that country, too, is on the "list of countries that do not accept its citizens." AR (CBP Removals) 23 (designating country of citizenship or nationality unless the "unwilling to accept" exception applies); *see* 8 U.S.C. § 1231(b)(2)(D). Finally, CBP addresses each of the alternative countries of removal contemplated by the statute, designating Mexico as the country of removal *only* where none of the statutory countries is a possibility for removal. AR (CBP Removals) 23; *see* 8 U.S.C. § 1231(b)(2)(E).

The memorandum and worksheet are consistent with the statute, tracking, as they do, the statutory framework precisely. The process undertaken by DHS gives priority to the country the noncitizen designates for removal, just as the statute does, *see* AR (CBP Removals) 3-5, 22, 322; 8 U.S.C. § 1231(b)(2)(A), and proceeds to the consideration of alternative countries only in circumstances contemplated by the statute itself, *i.e.*, where removal to the designated country, country of nationality or citizenship, and any conceivable third country to which the noncitizen has a connection is not possible, *see* AR (CBP Removals) 3-5, 22-23, 322.

Plaintiffs' arguments all misapprehend and misstate how the guidance operates. Plaintiffs principally argue (Mot. 31-33) that the guidance is inconsistent with the statute because it applies

---

number of CHNV nationals referred to ICE-ERO for removal to their country of origin must exceed monthly flight removal capacity to that country. AR (CBP Removals) 322.

the "impracticable, inadvisable, or impossible" standard, 8 U.S.C. § 1231(b)(2)(E)(vii), at the threshold to eliminate removal to other countries, including the country designated by the noncitizen and the country of nationality or citizenship. Plaintiffs cite nothing to support this contention, and in fact, the memorandum and worksheet belie the argument that DHS is applying this standard in an improper manner. The memorandum and worksheet exactly track the statutory framework, giving primacy to the country designated by the noncitizen, *see* AR (CBP Removals) 22, 322; 8 U.S.C. § 1231(b)(2)(A), secondary consideration to the country of citizenship or nationality, *see* AR (CBP Removals) 22, 322; 8 U.S.C. § 1231(b)(2)(D), and tertiary consideration to possible alternative countries, *see* AR (CBP Removals) 23, 322; 8 U.S.C. § 1231(b)(2)(E), and then directing removal to Mexico only once all other possibilities have been exhausted based on the unwillingness of those countries to accept the return of their citizens or nationals, *see* AR (CBP Removals) 23, 322; 8 U.S.C. § 1231(b)(2)(C), (D), (E)(vii). Far from being applied at the threshold as Plaintiffs erroneously suggest, Mot. 31-33, the "impracticable, inadvisable, or impossible" standard is applied as a last resort by DHS, exactly as contemplated by the statute. *See* AR (CBP Removals) 3-5, 321-22. Plaintiffs thus erect and attack a strawman; the procedure DHS actually implemented has no resemblance to the construction given by Plaintiffs, and in fact is entirely consistent with how Plaintiffs argue the statute should be applied. *Compare* Mot. 31 (recounting statutory framework), *with* AR (CBP Removals) 22-23 (designation worksheet tracking statute), 321-22 (memorandum providing the identical guidance regarding application of the statute).

Plaintiffs also contend the guidance is arbitrary and capricious, but these arguments are either premised on the same misunderstandings that foreclose Plaintiffs' statutory argument or simply lack merit. Plaintiffs argue, for instance, that the guidance is arbitrary and capricious because DHS failed to explain how it is consistent with the statutory framework. *See* Mot. 33. Yet as exhaustively documented *supra*, the memorandum, relevant CBP guidance, and designation-of-

country worksheet all track the statute exactly and contemplate removal to a third country only if all other options have been exhausted in a manner consistent with the statutory directives. *See* AR (CBP Removals) 3-5, 22-23, 321-25; *see generally* 8 U.S.C. § 1231(b)(2).

Plaintiffs also argue (Mot. 33-36) that noncitizens will have inadequate notice and time to present a persecution or torture claim for the actual country of removal. Yet the guidance specifically instructs CBP immigration officers to conduct the appropriate analysis of the country to which the noncitizen may be removed, inform the noncitizen of the country of removal if not the one designated by the noncitizen, and ask whether the noncitizen has a fear of persecution or torture in the country finally designated by CBP. *See* AR (CBP Removals) 4; 8 U.S.C. §§ 1225(b)(1)(A)(i), (ii); 8 C.F.R. § 235.3(b)(4); *see generally* 8 C.F.R. § 208.30. The designation-of-country worksheet additionally directs the immigration officer, as a final step after designation of the country of removal, to "ask whether the individual has a fear of return to the country of designation," and to "[r]efer the noncitizen who says yes to a fear of removal to the country designated to USCIS." AR (CBP Removals) 23-24. Any indication of fear by the noncitizen during this process thus results in referral for a credible fear interview, during which, as provided for by statute and implementing regulations, the noncitizen is questioned about their fear in the country of removal, whether that is the country the noncitizen designated or, in appropriate circumstances, a third country. *See* 8 U.S.C. § 1225(b)(1)(A)(i) (directing expedited removal, unless the noncitizen expresses a fear of persecution), (ii) (directing referral to an AO when a noncitizen expresses a fear of persecution); *see generally* 8 C.F.R. § 208.30 (procedures and standards governing credible fear interviews before the AO). Noncitizens amenable to removal to a third country will have the same opportunity and notice as any other noncitizen to claim a fear of persecution or torture and have that claim fully and fairly adjudicated.

Plaintiffs also argue that DHS failed to consider the possibility of so-called "chain

refoulement," the subsequent removal of a noncitizen to their country of nationality from the country to which they are removed by the United States. *See* Mot. 36-37. The INA expressly contemplates removal of noncitizens to third countries, *see* 8 U.S.C. § 1231(b)(1)-(2), provided that such removal may proceed consistent with the withholding of removal provisions in 8 U.S.C. § 1231(b)(3) (and the CAT regulations). The statute accordingly requires consideration of possible persecution only in the country of removal. *See* 8 U.S.C. § 1231(b)(3)(A) (prohibiting removal "to a country" if the noncitizen's "life or freedom would be threatened *in that country*" because of a protected ground) (emphasis added). Had Congress intended to require consideration of potential indirect refoulement, it could have done so explicitly, as it did in the provision relating to removal to third countries under certain bilateral and multilateral agreements. *See* 8 U.S.C. § 1158(a)(2)(A) (requiring the Secretary to determine whether the third country allows for access to a full and fair procedure for asylum or protection claims).

Plaintiffs rely on improper, non-binding, extra-record evidence in the form of an advisory opinion by the Office of the United Nations High Commissioner for Refugees (UNHCR) to claim that the possibility of "chain refoulement" "is an important consideration." Mot. 36. But this advisory opinion is irrelevant for two reasons. First, the portion of the opinion Plaintiffs cite interprets language in Article 33(1) of the 1951 Convention that prohibits refoulement "in any manner whatsoever."[13] Although the United States is a party to the 1967 Protocol, which adopted Article 33 of the 1951 Convention, and although the INA's withholding provision generally "parallels" Article 33, *INS v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999), Congress nevertheless chose to implement Article 33 with the country-specific language at 8 U.S.C. § 1231(b)(3)(A)—

---

[13] UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol*, at ¶ 7. https://www.unhcr.org/us/media/advisory-opinion-extraterritorial-application-non-refoulement-obligations-under-1951-0 (last visited Oct. 19. 2023).

"in that country"—rather than the language the UNHCR opinion construes—"in any manner whatsoever." Second, although the Supreme Court has found the 1979 UNHCR Handbook as helpful nonbinding "guidance in construing the provisions added to the INA by the Refugee Act" of 1980, *Aguirre-Aguirre*, 526 U.S. at 426-27, a 2007 advisory opinion by UNHCR construing different text cannot provide such guidance.[14]

### B.    The withdrawal guidance is lawful

DHS's subcomponents, CBP and USCIS, issued guidance concerning their discretionary authority under § 1225(a)(4), permitting noncitizens from CHNV countries to withdraw their applications for admission and voluntarily return to Mexico either during inspection before CBP or during credible fear interviews before USCIS. *See* AR (CBP Withdrawals) 3-6, 12-21; AR (USCIS Withdrawals) 3-4. This guidance instructs CBP and USCIS officials, when exercising their discretion to permit withdrawals, to inform CHNV nationals that they may be eligible to request advance authorization to travel to the United States to seek parole consistent with relevant CHNV parole processes if outside of the Unite States, and that withdrawal may allow them to apply for parole under such processes. *See* AR (CBP Withdrawals) 6; AR (USCIS Withdrawals) 3. The statute and regulations specifically permit voluntary withdrawal of an application for admission in the discretion of the government, *see* 8 U.S.C. § 1225(a)(4); 8 C.F.R. § 235.4, and Plaintiffs do not challenge the legal authority of DHS to implement this guidance, *see* Mot. 40. Instead, Plaintiffs contend that the advisal provided pursuant to this guidance is misleading because it encourages noncitizens to accept voluntary withdrawal in exchange for remaining

---

[14] Even assuming that there is an implicit obligation to consider the potential for indirect refoulement, Mexico is a party to both the 1951 Refugee Convention and the 1967 Refugee Protocol and is thus bound by the same nonrefoulement provisions of those instruments as the United States. UNHCR, *States Parties to the 1951 Convention relating to the Status of Refugees and the 1967 Protocol*, https://www.unhcr.org/us/media/states-parties-1951-convention-and-its-1967-protocol (last visited Oct. 19, 2023).

eligible for parole processes that they may actually be barred from pursuing. *Id.* at 40-41. Because the guidance is operating under this guise, according to Plaintiffs, any withdrawal cannot be voluntary, and so the guidance is arbitrary and capricious. *Id.*

As explained, Plaintiffs' argument with respect to USCIS is premised on initial guidance promulgated in May 2023, and is moot,[15] given the superseding guidance issued June 11, 2023, and any challenge to that guidance is now time-barred. *Supra* 23. Even if the revised June 2023 guidance were properly before the Court, Plaintiffs' argument would lack merit. That guidance addresses the various eligibility criteria for the extant parole processes for CHNV nationals, while also specifically directing relevant officials to inform noncitizens that they may be ineligible for the relevant parole processes based on unlawful crossing of the Mexican or Panamanian border, *see* Ex. __, ¶ 5, Ex. 2 (Venezuelans ineligible if unlawfully crossed either border after October 19, 2022); *id.* (Cubans, Haitians, and Nicaraguans ineligible if unlawfully crossed either border after January 9, 2023), or because of interdiction at sea after April 27, 2023, *see id.* (relating to interdiction of Cubans and Haitians). The guidance goes on to note that a CHNV national may accept voluntary withdrawal only once in order to maintain eligibility for the parole processes, and additionally advises that the noncitizen may schedule an appointment through the CBP One app

---

[15] Plaintiffs' argument also lacks merit as to the CBP and superseded USCIS guidance. Although the advisals provided to the noncitizen did not exhaustively address the eligibility criteria and the grounds on which a noncitizen could be barred from pursuing a parole process, *see* AR (CBP Withdrawals) 6, the Notice of Rights and Advisals on the Form 826 that the noncitizen was required to sign did warn that by accepting voluntary withdrawal a noncitizen could be giving up the opportunity to pursue certain immigration benefits or forms of relief. *See id.* at 334. And the advisal provided states that individuals "may," if they depart the United States, "still be eligible for the parole process," without indicating certainty. *Id.* at 4 (CBP). Regardless, only two Plaintiffs, J.P. and E.B., were withdrawal guidance, specifically USCIS's, so even if meritorious, relief must be limited to them and that guidance alone. Moreover, as they concede, both withdrew under the USCIS guidance, so neither can challenge the CBP guidance. ECF 37-1, ¶¶ 71-74, 80-82. And neither J.P. nor E.B. in fact alleges, let alone demonstrates with evidence as required on summary judgment, that they would have been ineligible for CHNV parole programs, let alone misunderstood their eligibility, so even as to them the withdrawals were voluntary.

to present at a U.S. port following withdrawal and voluntarily returning to Mexico instead of seeking to enter via a parole process. *Id.* Any noncitizen who accepts withdrawal based on their ability to pursue a parole process thus does so with full knowledge of any potential ineligibility based on his or her travel to the United States border. Accordingly, that withdrawal *is* voluntary, *see* 8 C.F.R. § 235.4, and the intervening guidance fully redresses all concerns raised by Plaintiffs under USCIS's prior advisals. *See*, *e.g.*, *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (waiver voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it").[16]

## C.     The 24-hour consultation guidance is consistent with relevant statutes and regulations and not arbitrary and capricious

In order to expeditiously conduct expedited removal proceedings for noncitizens arriving at the border without authorization, DHS issued guidance setting a 24-hour minimum wait period from the noncitizen's acknowledgment of receipt of the Form M-444, Information about Credible Fear Interview, which explains the credible fear process, and a credible fear interview. *See* AR (Waiting Period) 1-3. Plaintiffs argue the guidance is inconsistent with the statute and regulation. Mot. 37-40. This guidance is, however, statutorily authorized and reasonably explained.

The minimum 24-hour waiting period from the acknowledgment of receipt of the Form M-444 is fully consistent with DHS's statutory and regulatory authority. The INA delegates to the Secretary or his designees broad authority to promulgate regulations relating to the administration

---

[16] Plaintiffs suggest withdrawal cannot be voluntary because DHS must ask, and noncitizens must affirm, that they do not fear return to Mexico as part of their withdrawal. Mot. 42. Plaintiffs offer no explanation how the government's complying with its nonrefoulement obligations somehow renders withdrawal non-voluntary. Indeed, the "Notice of Rights and Advisals" allows noncitizens to indicate they "believe [they] face harm if [they] return to Mexico," and notifies them what will happen if they do or do not so indicate. AR (CBP Withdrawals) 334. No more is required.

and enforcement of the immigration laws, *see* 8 U.S.C. § 1103(a)(3), as well as "the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of" noncitizens, *see id.*, § 1103(a)(5). As part of that authority, Congress delegated to DHS the authority to promulgate regulations concerning consultation: Under the expedited removal statute, "[a]n alien who is eligible for" a credible-fear interview "may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, *according to regulations prescribed by the [Secretary]*. Such consultation ... shall not unreasonably delay the process." 8 U.S.C. § 1225(b)(1)(B)(iv) (emphasis added). The implementing regulations, in turn, provide that "[s]uch consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained, shall be at no expense to the government, and shall not unreasonably delay the process." 8 C.F.R. § 235.3(b)(4)(ii). Neither the statute nor the regulation, however, prescribes a specific minimum time period in which the consultation must occur, and the term "unreasonable delay" is left undefined by statute. Further, the regulation specifically notes that the consultation right depends on the "policies and procedures of the detention facility where the alien is detained." 8 C.F.R. § 235.3(b)(4)(ii).

The guidance reasonably implements the statute and regulations. The guidance explains that it is setting a 24-hour waiting period to "enable the United States to more expeditiously process and remove individuals who arrive at the Southwest border" with no "basis to remain in the United States." AR (Waiting Period) at 3. The guidance invokes the statutory requirement to not "unreasonably delay" proceedings in implementing this change. *Id.* at 1. The statutes and regulations neither prohibit that nor define "unreasonable delay" with any fixed, static meaning. *Cf. Nat. Res. Def. Council v. EPA*, 571 F.3d 1245, 1253 (D.C. Cir. 2009) (the term "reasonably available" was ambiguous). Instead, given Congress's decision to leave it to the agency to define ambiguous statutory terms, *see* 8 U.S.C. § 1103(a)(1), (3), and delegating to DHS authority to

54

implement the consultation provision, *id.*, § 1225(b)(1)(B)(iv), DHS is entitled to some deference in how it construes the consultation provision. *See AILA v. Reno*, 18 F. Supp. 2d 38, 53-55 (D.D.C. 1998) (deferring to the agency's construction of the consultation provision through implementing guidance and noting "Congress has not 'spoken directly' to this precise question"), *aff'd*, 199 F.3d at 1357; *see also Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 29 (D.D.C. 2020) (in 1252(e)(3) case, concluding agency guidance documents entitled to deference in such circumstances); *Grace v. Whitaker*, 344 F. Supp. 3d. 96, 140 (D.D.C. 2018) (same).

The 24-hour guidance is reasonable under these standards. Neither the statute nor the regulations defines the term "unreasonably delay" or places a floor on the length of time the government must provide between processing a noncitizen for expedited removal and referring for a credible fear interview and conducting the credible fear interview. *See* 8 U.S.C. § 1225(b)(1)(B)(iv); 8 C.F.R. § 235.3(b)(4)(ii). There is thus nothing in the statute or regulation, much less a compelling indication, that the guidance at issue here is "wrong" or impermissible. *See Nat. Res. Def. Council*, 666 F.2d at 603-04. Indeed, although governing a different part of the credible fear process, a companion provision provides that IJ review of the AO's determination should "be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours[.]" 8 U.S.C. § 1225(b)(1)(B)(iii)(III). As Congress directed the agency to act expeditiously in its review of AO determinations, to the extent practicable within 24 hours of that determination, there is no basis in the statute to read a requirement that USCIS provide for more than 24 hours into the statute.

DHS also reasonably balanced the competing interests inherent in the statutory and regulatory language: assuring the noncitizen has an opportunity to consult with an individual of the noncitizen's choosing while preventing "unreasonably delay" of the credible fear proceedings. *See* 8 U.S.C. § 1225(b)(1)(B)(iv); 8 C.F.R. § 235.3(b)(4)(ii). The memorandum notes that DHS

will give all noncitizens "a full and fair opportunity to have their claims for protection or fear of return heard by a fully trained USCIS officer," while minimizing the wait time before the credible fear interview in order to "expeditiously process and remove individuals who arrive at the Southwest border and do not have a legal basis to remain in the United States." AR (Waiting Period) 3. Accordingly, the new guidance is fully consistent with, and a reasonable interpretation of, both the statute and implementing regulations. *See AILA*, 18 F. Supp. 2d at 56 ("the [Secretary]'s determination" concerning the consultation right "was eminently reasonable ... . Plaintiffs cannot impose upon the [Secretary] any obligation to afford more procedures than the governing statute explicitly requires or that she has chosen to afford in her discretion").

Plaintiffs nonetheless argue that the statute and regulations "impose a limit on how short the agency can lawfully cut the consultation period," and assert that "[t]his policy falls on the wrong end of that line." Mot. 38. Plaintiffs offer no support for this claim. Nothing in the statutory or regulatory text supports it, *supra* 53-55, it is contrary to the more rigorously expedited time frame Congress enacted for purposes of IJ review of credible fear determinations, *supra* 55, and it fails to address the practical reality that noncitizens "will have longer than 24 hours to consult" in many cases, while always being provided "a full and fair opportunity to have their claims for protection or fear" heard, AR (Waiting Period) 3.

Plaintiffs also contend that, even if the guidance is statutorily permitted, it is arbitrary and capricious. Mot. 38-40. Plaintiffs argue, for instance, that the Department failed to consider "the fairness considerations that the consultation period is meant to protect." Mot. 38. Yet the memorandum explicitly seeks to balance the fairness considerations of consultation, including consideration of extensions of time in appropriate cases, with the need to expeditiously resolve the cases of noncitizens with no lawful basis to remain in the United States. AR (Waiting Period) 3; *see id.* ("USCIS is also taking all necessary steps to ensure that noncitizens understand the credible

56

fear process ... and are given a full and fair opportunity to have their claims for protection or fear heard by a fully trained USCIS officer."). For similar reasons, Plaintiffs' contention that DHS offered no explanation for *how* the shortened period balances with other interests is incorrect; DHS explained that the shortened period will more expeditiously resolve meritless claims while still serving to support a full and fair opportunity for meritorious claims to be heard and resolved. *Id.* Finally, Plaintiffs argue that, to the extent DHS did present a rationale related to more expeditious resolution of claims, it nonetheless failed to offer evidence or support that a shortened time period would result in quicker negative determinations for meritless claims or quicker positive determinations for meritorious claims. *Id.* at 39-40. Shortening the minimum waiting period will, however, logically and necessarily have the intended effect of shortening the overall credible fear process; if the process before the AO is concluded more quickly, all other steps occur on a faster timeline as well, resulting in both faster negative determinations *and* positive determinations. Nothing in the APA requires the detailed statistical analysis Plaintiffs appear to demand. *Prometheus Radio Project*, 141 S. Ct. at 1158.

## IV.    Relief Must Be Sharply Limited

Under settled constitutional and equitable principles, the Court may not issue relief that is broader than necessary to remedy actual harm shown by specific Plaintiffs. *Gill*, 138 S. Ct. at 1934. "[S]tanding is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.5 (1996), and Plaintiffs bear the burden to "demonstrate standing separately for each form of relief sought," *Cuno*, 547 U.S. at 352. A valid Article III remedy thus "operate[s] with respect to *specific parties*," not with respect to a law "in the abstract." *California v. Texas*, 141 S. Ct. 2104, 2115 (2021). As demonstrated earlier, no relief may issue with respect to the organizational Plaintiffs, or with respect to the superseded withdrawal guidance. And because Plaintiffs expressly disclaim litigating the Rule's application other than in expedited removal proceedings, the Court may not

invalidate the Rule's application outside of expedited removal proceedings. *See* Dkt. 38 (abeyance stipulation); *see also Wheeler*, 955 F.3d at 81-82 (explaining that "a court may invalidate only some applications" of a regulation"). In addition, only those individual Plaintiffs who have had the Rule or specific procedures applied to them would be entitled to any relief concerning their application and those procedures. *Gill*, 138 S. Ct. at 1934.

Even if any relief were warranted, it must be strictly limited. *First*, the court lacks jurisdiction to enjoin or vacate the Rule or challenged procedures under 8 U.S.C. § 1252(f)(1). That provision strips any court other than the Supreme Court of "jurisdiction or authority to enjoin or restrain the operation of" specified provisions of the INA, "other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). As the Supreme Court has explained, § 1252(f)(1)'s reference to "the operation of the relevant statutes"—which include §§ 1225 and 1231, the provisions governing expedited removal, withdrawal of admission, and removal to third countries—"is best understood to refer to the Government's efforts to enforce or implement" those statutes. *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2064 (2022) (quotation omitted). Thus, § 1252(f)(1) generally prohibits courts other than the Supreme Court from "order[ing] federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id*. at 2065. That is exactly what Plaintiffs ask this Court to do in vacating the Rule and procedures. As explained, asylum claims are frequently raised defensively in connection with expedited removal and removal proceedings. As a result, Plaintiffs' proposed relief directs government officials implementing §§ 1225 and 1229a to apply a different substantive rule of decision when asylum claims are raised in the proceedings governed by those provisions. And Plaintiffs' proposed relief likewise directs government officials implementing the withdrawal and third-country removal authorities to refrain for taking actions the government

maintains the statute allows them to take. The vacatur thus contravenes § 1252(f)(1) because it "order[s]" federal officials "to refrain from" applying the Rule's standards or the guidance documents in "implement[ing]" and "otherwise carry[ing] out" the specified statutory provisions. *Aleman Gonzalez*, 142 S. Ct. at 2065.

Nor does it matter that Plaintiffs seek vacatur rather than an injunction. Like an injunction, vacatur "restrict[s] or stop[s] official action," *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015), by prohibiting officials from relying on the agency action under review. A vacatur is practically equivalent to an injunction compelling the Departments to rescind or stop implementing the Rule and challenged procedures and therefore possesses the hallmark of the relief barred by § 1252(f)(1).

Consistent with that functional approach, the Supreme Court has repeatedly given a broad interpretation to terms such as "injunction" in other statutes. For example, the Court interpreted a statute conferring jurisdiction over appeals from "injunction[s]" in certain civil actions to apply to orders with a "coercive" effect. *Aberdeen & Rockfish R.R. v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 422 U.S. 289, 307 (1975). The Court commented that it had "repeatedly exercised jurisdiction under [the provision] over appeals from orders" that were "not cast in injunctive language but which by their terms simply 'set aside' or declined to 'set aside' orders of the [agency]." *Id*. at 308 n.11 (quotation omitted). Here, too, vacating the Rule or procedures qualifies as an injunction barred by § 1252(f)(1).

In any event, § 1252(f)(1) is not limited to injunctions. Instead, it prohibits lower-court orders that "enjoin *or restrain*" the Executive Branch's operation of the covered provisions. 8 U.S.C. § 1252(f)(1) (emphasis added). The common denominator of those terms is that they involve coercion. *See* Black's Law Dictionary 529 (6th ed. 1990) ("[e]njoin" means to "require," "command," or "positively direct" (emphasis omitted)); id. at 1314 ("[r]estrain" means to "limit"

or "put compulsion upon" (emphasis omitted)). Together, they indicate that a court may not impose coercive relief that "interfere[s] with the Government's efforts to operate" the covered provisions in a particular way. *Aleman Gonzalez*, 142 S. Ct. at 2065. That meaning easily encompasses judicial vacatur. Indeed, it is precisely what Congress intended in codifying § 1252(f) and limiting such remedial authority to the Supreme Court. *See* H.R. Rep. No. 104-469, pt. 1, at 161 (Conference Report) ("These limitations do not preclude challenges to the new procedures, but the procedures will remain in force while such lawsuits are pending.").

*Second*, the INA bars requests for relief seeking vacatur of "any negative credible determinations" or to "bring back into the United States any plaintiff who is outside the United States ... and parole them into the United states ...." Dkt. 37-5, ¶¶ 6-7. The first request is foreclosed by § 1252(a)(2)(A)(iii), which provides that "no court shall have jurisdiction to review" "the determination made under section 1225(b)(1)(B) of this title," including credible fear determinations. Unlike the other provisions of § 1252(a)(2)(A), romanette (iii) does not include an exception for review under § 1252(e), and so the Court lacks any authority to set aside individual credible fear determinations through § 1252(e). *Make the Road*, 962 F.3d at 626 (romanette (iii) does not "expressly reserve jurisdiction 'as provided in subsection (e)'").

The request for parole into the country is barred by § 1252(a)(2)(B)(ii), which precludes any orders concerning "decision[s] or action [s] of the Attorney General or the Secretary ... the authority for which is specified under this subchapter to be in the[ir] discretion." Parole is governed by § 1182(d)(5) which provides that the Secretary may parole applicants for admission into the United States "in his *discretion* ... temporarily *under such conditions as he may prescribe*." (Emphasis added). The plain text thus specifies that parole decisions, including whether to grant parole at all, are "to be in the discretion" of the Secretary and are thus subject to § 1252(a)(2)(B)(ii). *Kucana v. Holder*, 558 U.S. 233, 239 (2010); *see Giammarco v. Kerlikowske*, 665 F. App'x 24, 26

(2d Cir. 2016) (given § 1252(a)(2)(B)(ii), court may not order government to parole individual); *Samirah v. O'Connell*, 335 F.3d 545, 549 (7th Cir. 2003) (similar); *see generally Kiyemba v. Obama*, 555 F.3d 1022, 1028 (D.C. Cir. 2009) (courts may not "compel[] the Executive to release [noncitizens] into the United States outside the framework of the immigration laws").[17]

*Third*, even if the provisions of § 1252 do not apply, the universal vacatur of the Rule and expedited removal procedures Plaintiffs request is contrary to constitutional and equitable principles and limitations in the INA that allow at most an award of party-specific relief. Although D.C. Circuit precedent identifies vacatur as an available remedy for a successful APA challenge to a regulation, *see, e.g.*, *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998), the APA itself does not reference vacatur, instead limiting plaintiffs to traditional equitable remedies like injunctions, 5 U.S.C. § 703. There is no indication that Congress intended to create a new and radically different remedy in providing that courts reviewing agency action should "set aside" agency "action, findings, and conclusions." *Id*. § 706(2); *see Texas*, 143 S. Ct. at 1980-85 (Gorsuch, J., concurring in the judgment) (detailing "serious" arguments that "warrant careful consideration" as to whether the APA "empowers courts to vacate agency action").

In any event, the D.C. Circuit has treated universal vacatur of agency action as a discretionary equitable remedy—not a remedy that is automatic or compelled. *See, e.g.*, *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993) (allowing remand without vacatur and noting that an "inadequately supported rule, however, need not necessarily be vacated"). Indeed, the APA is explicit that its provisions do not affect "the power or duty of the

---

[17] R.E., D.M., S.U., who were removed to Mexico under the third-country removal statute, have no basis to demand return to the United States in any event. They do not challenge the validity of their removal orders. Instead they challenge their removal to Mexico, rather than elsewhere. But even assuming that removal was unlawful and otherwise reviewable, it would not entitle them to entry to this Country. At most it would entitle them to redetention pending removal to another country. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV), 1231(a)(1)(A). Plaintiffs do not ask for such relief.

court" to "deny relief on" any "equitable ground," 5 U.S.C. § 702(1), and equitable relief does not "automatically follow[] a determination" that a defendant acted illegally, *see eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392-93 (2006).

The problems caused by universal remedies are well catalogued. Such remedies conflict with Article III's requirement that "[a] plaintiff's remedy must be tailored to redress the *plaintiff's* particular injury,*" Gill*, 138 S. Ct. at 1934 (emphasis added), and the rule in equity that relief "be no more burdensome to the defendant than necessary to provide complete relief to the *plaintiffs*." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (emphasis added). Such remedies also circumvent Rule 23's class-action requirements, "incentivize forum shopping," "short-circuit the decisionmaking benefits of having different courts weigh in on vexing questions of law," and overburden courts' "emergency dockets." *See, e.g., Arizona v. Biden*, 40 F.4th 375, 395-98 (6th Cir. 2022) (Sutton, C.J., concurring). And those concerns apply equally to universal vacatur. *Texas*, 143 S. Ct. at 1985-86 (Gorsuch, J., concurring). Universal vacatur of a rule, if authorized at all, thus should be reserved for "truly extraordinary circumstances," *id.*, which do not exist here.

These problems are substantially magnified in the expedited removal context. "[N]o court may ... enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title *except as specifically authorized in a subsequent paragraph of this subsection*." 8 U.S.C. § 1252(e)(1)(A). Moreover, no court may "certify a class under Rule 23 of the Federal Rules of Civil Procedure in any action for which judicial review is authorized under a subsequent paragraph of this subsection." *Id.* § 1252(e)(1)(B). These limitations apply "[w]ithout regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action." *Id.* § 1252(e)(1). And, as explained, the organizational Plaintiffs' claims are barred by § 1252(e)(3). Universal vacatur is inconsistent with these limitations, which foreclose such relief other than for individuals.

*Fourth*, even if vacatur were an available remedy, with respect to the claims not foreclosed by Article III or § 1252, the circumstances of this case would warrant remand without vacatur. As explained, the decision to order relief under the APA must be exercised in conformity with equitable principles. *See Allied-Signal*, 988 F.2d at 150; *see also Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005) (vacatur a question of the court's remedial "discretion"). In this Circuit, that equitable balance is assessed by looking to "the seriousness of the order's deficiency ... and the disruptive consequences of an interim change that may itself be changed." *Allied–Signal*, 988 F.2d at 150–51. Applying this balance here, if the Court were to find the Rule or procedures invalid, it should remand without vacatur. The asserted defects that Plaintiffs identify could be remedied through additional explanation. *See, e.g.*, *id.* at 151 (remand without vacatur appropriate where agency can "explain" on remand issues found arbitrary and capricious). And even if this Court believes that the Rule or procedures are contrary to law, the agency may well be able to address the serious problems that the Rule and procedures mitigate while comporting with this Court's construction of the statute. *See, e.g.*, *Air Transp. Ass'n of Am., Inc. v. U.S. DOA*, 317 F. Supp. 3d 385, 391 (D.D.C. 2018) (remand without vacatur appropriate where "conceivable that on remand it can develop a reasoned explanation of its statutory authority"). Thus, vacatur is unwarranted.

On the other side of the balance, vacatur would have seriously disruptive consequences, frustrating the "public interest in effective measures to prevent the entry of" noncitizens at the Nation's borders. *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981). Here, the Executive predicted an imminent increase in encounters at the southwest border—noncitizens seeking to enter our country without authorization or documentation, overwhelming the immigration system, incentivizing human trafficking, and risking lives—and the government took targeted measures to prevent that increase. Ex. A, ¶¶ 3-14, 17-32, 33-41. But for those measures, which depend on a

balance of both consequences and incentives, encounters and overcrowding in CBP facilities would have been higher, potentially overwhelming border enforcement resources at great risk to the public, migrants, and DHS officers. *Id.*, ¶¶ 6-32. Indeed, in the run-up to the Title 42 Order's end, encounters rose to record levels, averaging up to 10,000 per day, causing extreme, dangerous overcrowding and overwhelming limited CBP and ICE resources. *Id.*, ¶ 30.

The Rule and procedures have been remarkably effective in preventing this. Since they have gone into effect, and through September 30, encounters between ports of entry at the southwest border decreased by 49 percent from their peak of 9,741 in the week prior to Title 42 expiring, to an average of 4,946 a day. *Id.*. The Rule and procedures also allow DHS to utilize expedited removal more effectively, meaning that DHS is able to repatriate more individuals, process more credible fear cases, and adjudicate claims—both positive and negative—more quickly. *Id.*, ¶¶ 6-7, 14-32 Similarly, noncitizens' use of the CBP One app to schedule an appointment to present at a port of entry, as encouraged under the Rule, has allowed CBP to process more than 160,000 individuals. *Id.*, ¶ 17. Likewise, the CHNV processes have allowed 120,000 individuals to lawfully enter the United States. *Id.* And both, coupled with withdrawal allow more noncitizens to use lawful, safe, and orderly pathways for entering the United States. *Id.*, ¶ 26 The Rule and procedures are therefore encouraging many migrants to use orderly migration pathways, without taxing limited border resources. *Id.*, ¶¶ 3-4, 11-13, 40-43

Vacatur could erase that success and exacerbate the very problems the Rule and procedures address. If the Rule and procedures are unavailable, the government expects that encounters will increase even beyond peak levels and that foreign partners will be less inclined to assist in combatting irregular migration. *Id.*, ¶¶ 8, 13, 30-32, 39-45, *see* 88 Fed. Reg. at 31,446. That is because, in the absence of the Rule and procedures, noncitizens who successfully establish a credible fear of persecution would not be expeditiously removed and thus could remain in the

United States while their asylum claims were adjudicated, even if—as will be the case for many such noncitizens—their asylum claims were ultimately denied. *See* 88 Fed. Reg. at 31,363. Without the Rule and procedures, expedited removal becomes largely impractical for DHS to apply to key nationalities encountered at the border, causing the very problems the Rule and procedures help solve. Ex. A, ¶¶ 15-32, 40-45. And our foreign partners, who have cooperated in migration initiatives and agreed to take actions beneficial to the United States' foreign policy goal, including accepting removals and withdrawals of certain nationals, would be less likely to cooperate with the government's goals in the future, undermining the regional approach that has been carefully developed through intense diplomatic effort. *Id.*, ¶¶ 26, 3-41

Conversely, the individual Plaintiffs themselves will not suffer substantial harm from continued enforcement of the Rule and procedures as to others, and their own injuries, if any, can be cured by relief specific to them if otherwise permitted by the INA. As to the organizations, the Rule and procedures do not directly regulate them, and the only asserted effect of the Rule and procedures relates to their decision to reallocate resources to assist clients. As explained, *supra* 13-21, that alleged harm is not a cognizable injury supporting the organization's standing or an APA action. But even if it were, an organization's marginal reallocation of its resources cannot outweigh the substantial harms to the government and the public described above.

At a minimum, given the impact on circumstances at the border any vacatur would have, the Court should stay any order it issues for fourteen days to allow for orderly review in the court of appeals. *See E. Bay Sanctuary Covenant v. Biden*, No. 18-CV-06810-JST, 2023 WL 4729278, at *19 (N.D. Cal. July 25, 2023) (issuing 14 day stay of order vacating the Rule).

## CONCLUSION

For these reasons, the Court should grant the government summary judgment.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

WILLIAM C. PEACHEY
Director

By: /s/ *Erez Reuveni*
EREZ REUVENI
Assistant Director
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov

PATRICK GLEN
CHRISTINA P. GREER
Senior Litigation Counsel

Dated: October 27, 2023                *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court District Court for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Erez Reuveni*
    EREZ REUVENI
    Assistant Director
    United States Department of Justice
    Civil Division