# Ex. A

(Declaration of Blas Nuñez-Neto)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| M.A., *et al*,<br><br>               Plaintiff,<br><br>v.<br><br>ALEJANDRO MAYORKAS, Secretary<br>Homeland Security, in his official capacity, *et al*.,<br><br>               Defendants. | Case No. 23-cv-01843-TSC |

**DECLARATION OF BLAS NUÑEZ-NETO**

I, Blas Nuñez-Neto, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1.  I am the Assistant Secretary for Border and Immigration Policy for the U.S. Department of Homeland Security (DHS) and have served in this role since March 26, 2023. I am also the Acting Assistant Secretary for International Affairs and have served in this role since June 26, 2023. I previously served as the Acting Assistant Secretary for Border and Immigration Policy since October 1, 2021. Prior to this acting role, I served as the Chief Operating Officer for U.S. Customs and Border Protection (CBP), a DHS component, since March 5, 2021. In a prior administration, I served DHS as Senior Advisor to then-CBP Commissioner Richard Gil Kerlikowske, from January 12, 2015 to January 16, 2017.

**The challenged rule and border management procedures are critical to DHS's plan to effectively manage irregular migration.**

2.      Over the past three years, migration around the world has reached levels not seen since World War II.  The Western Hemisphere is no exception and has been facing historic levels of migration that have severely strained the immigration systems of countries throughout the region.  There is a growing consensus within the region that this shared challenge cannot be solved without collective action—a consensus reflected by the 22 countries that have signed the Los Angeles Declaration on Migration and Protection, which proposes a comprehensive approach to managing migration throughout the region.

3.      As part of these efforts, the United States and its foreign partners, through a variety of actions, are seeking to incentivize noncitizens to use lawful, safe, and orderly pathways and to disincentivize irregular migration.  The Circumvention of Lawful Pathways rule and the complementary border management procedures that have strengthened the consequences in place at the border for those who cross unlawfully are critical components of the United States' regional strategy.  The rule and the complementary procedures do not operate in a vacuum.  They have been accompanied by a concerted effort by the United States and its foreign partners to increase access to lawful pathways and processes for noncitizens to come to the United States in a safe and orderly manner.  These measures, taken together, form a comprehensive framework for managing migratory flows to our border—one that seeks to disincentivize noncitizens from putting their lives in the hands of callous smugglers by crossing the Southwest Border (SWB) unlawfully between ports of entry or presenting without documents

sufficient for admission at ports of entry and to incentivize them to use lawful, safe, and orderly pathways and processes instead.[1]

4.      It is important to note that the rule is a temporary measure intended to respond to a time of heightened irregular migration throughout the Western Hemisphere.  The rule does so by imposing strengthened consequences on noncitizens who: (1) do not avail themselves of a wide range of safe, orderly, and lawful processes and pathways the U.S. Government has made available for entering the United States; (2) do not seek protection from countries they travel through; and (3) do not establish an exception or otherwise rebut the rule's presumption of asylum ineligibility.  The rule is designed to incentivize noncitizens to use new and existing lawful, safe, and orderly pathways and processes that DHS has established and expanded, and to disincentivize dangerous and irregular border crossings by placing a condition on asylum eligibility for those noncitizens who fail to do so, and who do not otherwise qualify for an exception.

5.      DHS also implemented additional but separate procedures that enable it to process noncitizens subject to the rule through expedited removal in greater numbers, and more quickly, than ever before. Those procedures, described in greater detail below, include the following: (1) holding certain noncitizens processed for expedited removal in CBP short-term holding facilities for the pendency of their credible fear interviews; (2) changing the credible fear consultation period such that credible fear interviews take place no earlier than 24 hours after the noncitizen's acknowledgment of receipt of information explaining the credible fear process; (3) following the Government of Mexico's independent decision to continue to accept the return of certain third-

---

[1] U.S. Dep't of Homeland Sec., *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.

country nationals, exercising DHS's authority under the Immigration and Nationality Act to remove certain third-country noncitizens to Mexico and permit certain third-country noncitizens to withdraw their application for admission and voluntarily return to Mexico; and (4) increasing U.S. Citizenship and Immigration Services' (USCIS) capacity to train and prepare additional staff temporarily detailed as asylum officers to conduct credible fear interviews. Along with the rule, these procedures are also being challenged in the above-captioned litigation.

6.      The rule, and the complementary procedures described above, have worked together to increase the number of noncitizens encountered at the border who can be processed under expedited removal and to move them through the process more quickly than ever before, while strengthening consequences at the border for noncitizens who do not avail themselves of expanded lawful pathways.  This has, in turn, allowed DHS to significantly enhance its ability to remove noncitizens who do not establish a basis to legally remain in the United States while reducing the time noncitizens who receive a positive credible fear determinations remain in DHS custody.

7.      These measures are working as intended. As described in more detail below, since May 12, 2023, we have seen continued use of the expanded lawful pathways as well as:

- Record numbers of noncitizens going through the expedited removal process and receiving credible fear interviews;

- A significant decrease in the credible fear screen-in rate[2] for noncitizens processed under the rule;

---

[2] The screen-in rate refers to the percentage of cases with a positive fear determination calculated by dividing the number of cases that receive a positive fear determination by the total number of determinations made (i.e. positive and negative fear determinations).

- Record numbers of removals of noncitizens processed under expedited removal who are found not to have a fear during their credible fear interview, and of non-Mexican nationals undergoing expedited removal; and

- A substantial decline in average daily encounters at the SWB from their pre-May 12, 2023 peak.

8.     By contrast, DHS planning models prepared during the rulemaking process suggested that, in the absence of the rule, encounters at the SWB could have met or exceeded the levels experienced in the days leading up to the end of the Centers for Disease Control and Prevention's Title 42 public health Order on May 12, 2023.  These levels of irregular migration, sustained over an extended period, would have severely stressed DHS and DOJ's continued ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system.  Thus, the rule has proved critical in reducing levels of encounters that would quickly overwhelm shelter capacity in SWB communities and interior cities.

9.     DHS recognizes that, despite the success of these measures, the underlying factors in our hemisphere driving unprecedented movement of people continue to persist—including the lingering economic devastation wrought by the COVID-19 pandemic, failing authoritarian regimes in key countries, and the increasing impact of climate change.  Migratory flows remain dynamic, which has led in recent months to periodic increases in SWB encounters—particularly of Venezuelan nationals.  This is why DHS continues to strengthen the consequences for unlawful or unauthorized entry at the border even as it continues to expand lawful pathways for noncitizens in the region.  For example, in early October 2023 that the United States would begin direct repatriations of Venezuelan nationals to Venezuela, which was quickly followed by the

first two repatriation flights of noncitizens processed under the rule who did not establish a legal basis to remain in the United States.

10.    The rule and complementary border management measures have significantly enhanced DHS's ability to quickly apply consequences at the SWB.  This is critical as the United States seeks to inform intending migrants in the hemisphere about the measures that are in place at the border.  In implementing and modifying border management procedures, DHS must contend with callous human smuggling networks that weaponize misinformation and look for any opportunity to put the lives of intending migrants at risk for profit.  These criminal organizations intentionally twist information about U.S. immigration policy for the express purposes of encouraging would-be migrants to use their services—services that regularly result in tragedy.  Because profit is the motivating factor, criminal organizations have no qualms when it comes to exploiting migrants through false promises—particularly when there are changes in the United States' immigration policy or border operations.  This familiar pattern was seen in the weeks leading up to the end of the Title 42 public health Order.

11.    DHS's approach to border and migration management is composed of more than just consequences for those who irregularly migrate to the United States.  The United States has undertaken a historic expansion of lawful pathways and processes that work in tandem with the rule to incentivize noncitizens to use safe, orderly, and lawful means to come to the United States.  This effort includes the Safe Mobility initiative announced in a number of countries in our region, where noncitizens from certain nationalities can be processed by international organizations for a number of lawful pathways, including expanded refugee processing in the region.  It also includes establishing parole processes for Cuban, Haitian, Nicaraguan, and Venezuelan nationals, expanding labor pathways and dedicating a set number of visas to

nationals of countries in the hemisphere, and announcing and implementing new and modified

family reunification parole (FRP) processes for certain countries in the region.  As a result, over

260,000 noncitizens have elected to come to the United States lawfully through these pathways.

12.     Importantly, the rule's presumption is not applicable to noncitizens who avail

themselves of one of many available lawful pathways, such as being screened for refugee status,

obtaining appropriate authorization to travel to the United States to seek parole, or presenting at a

port of entry pursuant to a pre-scheduled time and place. As such, application of the rule and

additional procedures do not foreclose the ability of noncitizens with a legal basis to enter and

remain in the United States; rather, these procedures incentivize the use of lawful, safe, and

orderly processes.

13.     These efforts have worked.  Despite fluctuations in encounters of noncitizens

between SWB ports of entry over the past five months, the average daily encounter rate since

May 12, 2023 remains well below the high encounter numbers that immediately preceded the

end of the Title 42 public health Order.[3]  This benefits communities throughout the United

States, but particularly those along the SWB that have most acutely felt the strain of these

periodic surges in migration.

14.     Finally, DHS's ability to implement the rule and additional procedures is

important to achieving key foreign policy goals in the region, including those related to

migration management, and to maintaining partnership and credibility with foreign governments

in the hemisphere.  As detailed further below, partner countries in the region have followed our

---

[3] Irregular migration is volatile and caused by a variety of factors, many of which are outside of the U.S. Government's influence and control.  As of August 2023, more than 7.7 million Venezuelans have left their home country, driven by ongoing political and social turmoil.  The majority of these displaced Venezuelans are in Colombia and Peru, but many have made their way to the United States and DHS's encounter numbers reflect an increased number of Venezuelans traveling without authorization to the United States.

lead and announced a number of policy actions, including enforcement mechanisms and
expanded lawful pathways, ultimately reducing the number of people arriving at the U.S. SWB.
Our inability to implement the rule would call into question the United States' commitment to a
shared approach to migration management and could induce other countries to drop or scale back
their own efforts to address irregular migration throughout the hemisphere.

**The rule and border management procedures are having the effect intended by DHS.**

15.    The rule has clearly strengthened the consequences for noncitizens who fail to
avail themselves of available lawful, safe, and orderly pathways.  As intended, the rule has
significantly reduced credible fear screen-in rates for noncitizens encountered along the SWB.
Overall, from May 12 to September 30, 2023, 59 percent of noncitizens processed under the
rule[4] making fear claims have been screened-in,[5] compared to an approximately 85 percent
credible fear screen-in rate in the pre-pandemic period of 2014 to 2019. The decline in screen-in
rates allows DHS to more quickly remove noncitizens who do not establish a legal basis to
remain in the United States (detailed further below), which in turn reduces encounters at the
SWB between ports of entry.

16.    Between May 12 and September 30, 2023, USCIS interviewed approximately
57,700 noncitizens[6] who were subject to the rule, roughly double the previous peak volume of
credible fear cases processed.  Out of these noncitizens, approximately 2,200 (4 percent) were

---

[4] This includes categories of noncitizens processed for expedited removal and referred to USCIS under the rule,
including those who establish an exception or rebut the presumption during the credible fear process.  This does not,
however, include those who are excepted from the presumption because they present at a port of entry with a CBP
One appointment and are not processed for expedited removal. Nor does this number include noncitizens who avail
themselves of DHS parole processes and, accordingly, travel to interior ports of entry to seek parole, except in the
very rare instances that they are placed in expedited removal.
[5] The USCIS screen-in rate refers to the percentage of cases with a positive fear determination calculated by
dividing the number of cases that receive a positive fear determination by the total number of determinations made
(i.e., positive and negative fear determinations).
[6] *See* footnote 8.

able to establish an exception to the rule; approximately 6,700 (12 percent) were able to rebut the

presumption; and approximately 48,700 (84 percent) were subject to the presumption.  Of the

noncitizens who were able to establish an exception to the rule, approximately 1,800 (79 percent)

were able to establish a credible fear of persecution or torture under the "significant possibility"

standard.  Of the noncitizens who were able to rebut the presumption, approximately 5,800 (86

percent) were able to establish a credible fear of persecution or torture under the "significant

possibility" standard.  Of the noncitizens who were subject to the rule's presumption,

approximately 25,900 (53 percent) were able to establish a credible fear of persecution or torture

under the "reasonable possibility" standard.  Accordingly, of the noncitizens subject to the rule

and processed by USCIS during this period, approximately 23,700 were subject to removal

because they did not meet an exception, rebut the presumption, or satisfy the "reasonable

possibility" standard.[7]

17.     Importantly, during this same period hundreds of thousands of noncitizens availed

themselves of lawful pathways and were thus not subject to the rule's presumption, including

more than 160,000 noncitizens processed at SWB ports of entry with CBP One appointments and

more than 120,000 noncitizens granted parole after an individualized, case-by-case determination

under the CHNV processes.

18.     The rebuttable presumption established by the rule has also allowed DHS to

significantly increase its use of expedited removal, including by applying it to more nationalities

than it otherwise would have.  This is because, prior to the rule's implementation, the screen-in

rates for noncitizens from some key countries—including Venezuela, Cuba, and Nicaragua—

were sufficiently high as to make it ineffective to refer nationals of those countries into expedited

---

[7] An additional approximately 500 noncitizens processed under the rule had their credible fear cases administratively closed; most of them were placed in section 240 removal proceedings.

removal, given the significant, multiagency resources required to process them.  In the nearly five-month period (May 12 to September 30, 2023) immediately following implementation of the rule, the screen-in rates for noncitizens from Venezuela, Cuba, and Nicaragua have substantially decreased, and DHS has increased the application of expedited removal to noncitizens from these countries.[8]

19.   As discussed above, the ability to use swift and efficient removal as a consequence is critical to DHS's border management strategy.  Indeed, DHS specifically designed and implemented a number of additional procedures to streamline the expedited removal process—the main immigration consequence available under Title 8 processing.  These measures allow DHS to refer more noncitizens into expedited removal and bring their cases to conclusion faster than ever before.

20.   In April 2023, U.S. Border Patrol (USBP), a subcomponent of CBP, began holding a small number of single adult noncitizens being processed via expedited removal—noncitizens who could be removed to their home countries—in its facilities for the pendency of their credible fear interviews.  After the end of the Title 42 public health Order, this was expanded to include noncitizens who could be quickly removed to Mexico.  The goal of this processing change was to increase referrals of eligible noncitizens to expedited removal by increasing DHS capacity to process noncitizens for expedited removal while also reducing the amount of time noncitizens spend in DHS custody.

---

[8] A comparison of credible fear determinations for January 1 to May 11, 2023 and for May 12 to September 30, 2023 shows that screen-in rates for Venezuelans fell from 81 percent to 62 percent, rates for Cubans fell from 86 percent to 82 percent, and rates for Nicaraguans fell from 78 percent to 61 percent. Screen-in rates for Haitians increased from 54 percent to 63 percent during the same periods. For all nationalities together, screen-in rates fell from 74 percent to 60 percent during these periods.

21.     DHS is committed to providing noncitizens in expedited removal with an opportunity to consult with any person(s) of their choosing prior to their credible fear interview. To allow for this consultation, but not unreasonably delay the expedited removal process in CBP custody, DHS changed the credible fear consultation period such that credible fear interviews take place no earlier than 24 hours after the noncitizen receives information explaining the credible fear process.  CBP also added hundreds of private interview spaces in its facilities—with more than 580 currently deployed—that have significantly increased noncitizens' ability to consult with counsel or another individual of their choosing during their time in CBP custody.

22.     USCIS trained all of its asylum officer corps on the rule and its new requirements to ensure asylum officers were ready to fairly, and efficiently, process these cases.  Additional USCIS staff from across the agency were also trained in asylum processing—to serve temporarily on detail as asylum officers.  As a result of these efforts, USCIS has conducted a record number of credible fear interviews since May 12.  Between May 12 and September 30, 2023, USCIS completed more than 65,000 credible fear interviews resulting from SWB expedited removal cases—this is almost as many interviews in the span of four and half months as the 75,000 interviews USCIS averaged each year from FY 2014 to FY 2019.  On average, since May 12, 2023, USCIS has completed almost 3,600 cases each week, more than double its average weekly completed cases from FY 2014 to FY 2019.

23.     Additionally, DHS is processing more expedited removal cases than ever before and moving noncitizens through this process faster than ever before.  This has significantly reduced the median time to process credible fear cases.  Since May 12, 2023, the median time to refer noncitizens claiming a fear for credible fear interviews decreased by 58 percent from its historical average, from 12 days in the FY 201 to FY 2019 pre-pandemic period to 5 days

currently.  DHS has shortened the time it takes to move noncitizens from encounter to credible

fear referral to a credible fear determination, from 21 days in the pre-pandemic period to 13 days,

a drop of 38 percent.  Meanwhile, the median time to remove noncitizens following a negative

fear determination has decreased 14 percent, from 22 days in the pre-pandemic period to 19 days

currently; and the overall median time from encounter to removal for negative fear cases has

been reduced 45 percent, from 73 days in the pre-pandemic period to 40 days since May 12.[9]

24.     While the rule and additional procedures have enabled DHS to more quickly

remove noncitizens who do not establish a legal basis to remain in the United States, they have

also reduced the time that individuals who are screened in and are released pending 240

proceedings spend in DHS custody.  Since May 12, 2023, DHS has shortened the time it takes to

move noncitizens from encounter to credible fear referral to a credible fear determination from

21 days in the pre-pandemic period to 13 days, a drop of 38 percent.  Minimizing the time that

individuals spend in DHS custody—including those who are found to have a credible fear—is a

benefit not just to the government, but also to the noncitizens we encounter.

25.     These process enhancements, the rule, and the other challenged procedures work

together to more quickly, and effectively, impose consequences on those who do not establish a

legal basis to remain in the United States, while reducing time in custody for noncitizens who

establish a lawful basis to remain.  The rule allows DHS to place more noncitizens into expedited

---

[9] Processing times to remove people with negative fear determinations are based on the date that DOJ's Executive
Office for Immigration Review (EOIR) upholds a negative fear determination for noncitizens who request IJ review
of their initial negative fear determinations.  Overall encounter-to-removal processing times include noncitizens with
negative fear determinations and administrative case closures that are not referred to section 240 proceedings.
Processing times are based on Office of Homeland Security Statistics (OHSS) Enforcement Lifecycle data as of
June 30, 2023.  Post-May 12 processing times cover encounters between May 12 and September 30, 2023, including
unresolved cases but excluding cases that have been reprocessed out of expedited removal.  Post-May 12 estimates
based on OHSS analysis of operational CBP, ICE, USCIS, and DOJ/EOIR data as of October 15, 2023 downloaded
from CBP's Unified Data Portal on October 17, 2023.  Comparisons to the pandemic period are not relevant because
many noncitizens who normally would be referred for expedited removal processing were instead expelled under
Title 42 authority.

removal, and the process enhancements support effective consequence delivery by ensuring that the increased use of expedited removal does not result in unhelpful backlogs or increased holding times.

26.     DHS's implementation of the rule, and the other challenged procedures that have significantly expanded its ability to process noncitizens through expedited removal, has generated widespread understanding that there are strengthened consequences at the U.S. border for those who enter without authorization.  As part of these efforts, DHS expanded its ability to remove certain noncitizens processed under expedited removal whose countries are either unwilling to accept their repatriation or accept repatriations on a very limited basis.  In the weeks leading up to end of the Title 42 public health Order, the Government of Mexico made an independent decision to accept the removal or return of noncitizens processed under Title 8 authorities from certain third countries at the land border—the first time in the United States' bilateral history with the Government of Mexico that the Government of Mexico has accepted the return at scale of third-country nationals under Title 8 authorities.  Mexico's independent decision also enabled DHS to offer certain non-Mexican noncitizens who entered between ports of entry the opportunity to withdraw their application for admission and voluntarily return to Mexico.  This is key because a withdrawal affords noncitizens the opportunity to avail themselves of lawful, safe, and orderly pathways for entering the United States for which they are otherwise eligible following their withdrawal.

27.     These consequences are real and having their intended effect.  As a result of the rule and its complementary procedures, between May 12 and September 30, 2023, DHS has repatriated approximately 294,000 noncitizens, including single adults and family units, to more than 100 countries under Title 8 authorities.  This includes about 21,000 third-country nationals

who were removed or withdrew and returned to Mexico under Title 8 authorities during this time frame, including 8,200 noncitizens from Cuba, Haiti, Nicaragua, and Venezuela.

28.     Since May 12, DHS has removed record numbers of non-Mexicans in expedited removal who are not found to have a credible fear: 6,800/month, compared to 3,600/month pre-pandemic.[10] At the same time, an additional 1,700 other-than-Mexican nationals per month are returning to Mexico after withdrawing their applications for admission.

29.     DHS has also removed record numbers of family unit individuals through expedited removal due to the rule and the additional border management procedures that were implemented.  Since May 12, 2023, DHS has removed an average of 1,800 family unit individuals per month via expedited removal, a nine-fold increase over the pre-pandemic average of 200 such removals per month.[11]

30.     This comprehensive framework, which includes the disincentives to irregular migration put in place through the new rule, has significantly reduced average daily encounters at the SWB since May 12 compared to their peak just before the end of the Title 42 public health Order.  After peaking at 9,741 per day in the seven days just before the end of the Title 42 public health Order, daily SWB encounters between ports decreased by 49 percent to an average of 4,946 per day for the period from May 12 to September 30, 2023.

---

[10] Data in this paragraph are limited to SWB encounters of other-than-Mexican nationals. During the pre-pandemic period, an average of 2,700 non-Mexican nationals per month were removed via expedited removal without claiming fear and 800/month were removed following negative credible fear determinations.  Since May 12, an average of 2,600/month have been removed without claiming fear and with improved credible fear processing times an average of 4,200/month have been removed following negative fear determinations.  Data for the pre-pandemic period is based on OHSS Enforcement Lifecycle data as of June 30, 2023.  Post-May 12 data cover encounters between May 12 and September 30, 2023 based on OHSS analysis of operational CBP, ICE, USCIS, and DOJ/EOIR data as of October 15, 2023 downloaded from CBP Unified Data Portal on October 17, 2023.

[11] Data for the pre-pandemic period is based on OHSS Enforcement Lifecycle data as of June 30, 2023. Post-May 12 data cover encounters between May 12 and September 30, 2023 based on OHSS analysis of operational CBP, ICE, USCIS, and DOJ/EOIR data as of October 15, 2023 downloaded from CBP Unified Data Portal on October 17, 2023.

31.     As noted above, migratory flows in the region continue to fluctuate and the underlying conditions that are spurring the movement of people remain.  As a result, DHS experienced an increase in encounters in August and September, that was primarily driven by Venezuelan nationals, with encounters between ports of entry climbing to a post-May 12 high of 7,292 per day in September.  Since then, however, encounters declined to an average of about 5,400 per day by mid-October.[12]  The timing coincided with the October 5, 2023 announcement that the United States was starting direct repatriation flights to Venezuela, suggesting that this new consequence may be discouraging intending migrants from making the journey to the SWB. It is too soon, however, to draw any definitive conclusions given the underlying factors that continue to drive migration throughout the region.[13]  It is also important to note that the resumption of repatriations to Venezuela is directly tied to the rule's effectiveness: the rule, which, as noted above, allows DHS to process nationalities into expedited removal that it otherwise likely would not be able to given high screen in rates, including of Venezuelans.

32.     Although migration throughout the Western Hemisphere remains dynamic, particularly in the case of nationals of Venezuela, it is clear that the rule's implementation, combined with the complementary procedures, have reduced encounters at the border.  By contrast, DHS anticipates that in the absence of these measures encounters at the border would be substantially higher than they are today.

---

[12] September data is based on OHSS Persist data through September 30, 2023; October data for October 14-20, 2023 is based on preliminary data pulled from operational records.

[13] U.S. Dep't of Homeland Sec., *United States to Resume Removals of Venezuelans Who Do Not Have a Legal Basis to Remain in the United States to Venezuela* (Oct. 5, 2023), https://www.dhs.gov/news/2023/10/05/us-resume-removals-venezuelans-who-do-not-have-legal-basis-remain.

**Impact on relationships with foreign partners.**

33.     The United States' border management strategy is predicated on the belief that migration is a shared responsibility among all countries in the region—a fact that is reflected in the intensive and concerted diplomatic outreach DHS and the Department of State have been making on migration issues with partners throughout the Western Hemisphere.  DHS relies on and works closely with its foreign partners to manage migration throughout the region.[14] Regional partner countries have encouraged and supported DHS's approach to address irregular migration by disincentivizing unlawful entry through increased enforcement and consequences, as well as its efforts to channel intending migrants into expanded lawful pathways and processes, including the refugee program, innovative parole processes, and labor migration. For example, following the development of the parole process for Venezuelans announced in October 2022— an approach that was subsequently expanded to include processes for Cuban, Haitian, and Nicaraguan nationals in January 2023—regional partners urged the United States to continue building on this approach, which couples lawful processes for noncitizens to seek protection in the region or travel directly to the United States with consequences for those who do not avail themselves of these processes.[15]

34.     Prior to the end of the Title 42 public health Order, regional partners expressed great concern that, without specific action from the United States to combat the misperception that the end of the Order would mean an open U.S. border, a surge of irregular migration would

---

[14] *See, e.g.*, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, Exec. Order 14,010, 86 Fed. Reg. 8,267, 8,270 (Feb. 2, 2021); The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.

[15] Following the announcement of the Venezuela parole process in October 2022 and the subsequent announcement of the Cuba, Haiti, and Nicaragua parole processes in January 2023, migration flows through the region, and at the U.S.-Mexico border slowed.

flow through their countries as migrants sought to enter the United States.  One foreign partner, for example, noted that it believed the formation of caravans during the spring of 2022 were spurred by rumors—and the subsequent official announcement—of the anticipated end of the Title 42 public health Order.  This view is consistent with other regional partner countries that have repeatedly expressed concerns about the ways in which changes in migratory flows challenge their local communities and immigration infrastructure and have regularly highlighted how policy announcements have a direct and immediate impact on migratory flows through their countries.

35.    DHS has worked closely with the Department of State to engage foreign partners in the region to help manage this unprecedented movement of people in the hemisphere.  In these diplomatic engagements, DHS and State noted the steps the U.S. government was taking and, based on the principles of co-responsibility and joint migration management, encouraged other countries to take their own actions.

36.    This approach worked. A number of foreign partners, including Mexico, Panama, and Colombia, announced significantly enhanced efforts to enforce their borders in the days leading up to the end of the Title 42 public health Order.[16]  These governments recognized that the United States was taking new measures to strengthen enforcement of its border, in large part through the application of the rule, and committed to taking their own actions to impact irregular migratory flows in the region.  Additionally, as noted above, immediately prior to the transition from DHS processing under the Title 42 public health Order to processing under Title 8

---

[16] Martínez, Kathia, *US, Panama and Colombia Aim to Stop Darien Gap Migration*, AP News (Apr. 11, 2023), https://apnews.com/article/darien-gap-panama-colombia-us-migrants-cf0cd1e9de2119208c9af186e53e09b7; Montoya-Galvez, Camilo, *Mexico Will Increase Efforts to Stop U.S.-Bound Migrants as Title 42 Ends, U.S. Officials Say*, CBS News (May 10, 2023), https://www.cbsnews.com/news/title-42-end-border-mexico-efforts-us-bound-migrants/.

authorities, the Government of Mexico announced that it would continue to accept of the return into Mexico of nationals from CHNV countries under Title 8 processes.  This decision was premised on the success of the CHNV framework under Title 42, which combined the existence of lawful pathways and processes for nationals of these countries combined with a meaningful consequence framework and reduced irregular border crossings.

37.     Continuing to build on this approach is critical to the United States' ongoing engagements on migration management with regional partners. Since May 12, the U.S. Government has continued to work closely with regional partners to build on the successes of the rule and address new and ongoing challenges driving irregular migration throughout the Western Hemisphere. As part of these efforts, the United States has continued to build on the historic expansion of lawful pathways and processes, which include the parole processes for Cuban, Haitian, Nicaraguan, and Venezuelan nationals, efforts to expand labor pathways and dedicate a set number of visas to nationals of countries in the hemisphere, and the implementation of new family reunification parole (FRP) processes for certain nationals of Colombia, El Salvador, Guatemala, and Honduras,[17] the modernization of FRP processes for nationals of Cuba and Haiti,[18] and the announcement of a new FRP for certain nationals of Ecuador.[19]  As part of this

---

[17] U.S. Dep't of Homeland Sec., *DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras* (July 7, 2023), https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala.
[18] U.S. Dep't of Homeland Sec., *DHS Modernizes Cuban and Haitian Family Reunification Parole Processes* (Aug. 10, 2023), https://www.dhs.gov/news/2023/08/10/dhs-modernizes-cuban-and-haitian-family-reunification-parole-processes.
[19] U.S. Dep't of Homeland Sec., *DHS Announces Family Reunification Parole Process for Ecuador* (Oct. 18, 2023), https://www.dhs.gov/news/2023/10/18/dhs-announces-family-reunification-parole-process-ecuador.

comprehensive effort to expand lawful pathways and processes, more than 260,000 noncitizens have come to the United States lawfully.

38.     These ongoing efforts also include the Safe Mobility initiative, in which we have partnered with Colombia, Costa Rica, Guatemala, and Ecuador to establish locations in those countries where international organizations screen individuals and refer them to lawful pathways to the United States and other participating countries, including expedited refugee processing and various other options.  It also includes the recent decision by Venezuelan authorities to accept the return of Venezuelan nationals, which serves to strengthen the consequences in place at the border for individuals processed under the rule.  These measures demonstrate DHS's commitment to continuing to work with our foreign partners to expand access to lawful pathways and processes even as we continue to strengthen consequences at the border for those who enter without authorization.

39.     DHS assesses that, in the absence of the rule and additional challenged procedures, there will be an increase in migratory flows throughout the region that would strain enforcement and migration management resources throughout the hemisphere, contribute to the ongoing humanitarian emergency in the Darién region of Panama, and adversely impact the United States' credibility as it seeks to engage partner countries' governments to reduce irregular migration.  Already, officials from a number of countries, including Mexico, have expressed grave concerns about the impacts that another significant increase in migrants will have on their communities and government agencies.

40.     Ultimately, the rule's implementation is central to achieving the key foreign policy goal of managing migration on a regional or hemispheric basis.  The strengthened consequences under the rule for those who fail to use lawful pathways is responsive to the

concerns raised by regional partner countries, several of whom have previously criticized the United States for maintaining procedures that they believe create a pull factor throughout the region.  Conversely, eliminating the visible consequences for irregular migrants that are a core component of the rule would likely spur increases in encounters at the SWB—especially given how smugglers have previously weaponized similar changes in policy to drive migration.  This would directly undermine the effectiveness of increased enforcement procedures currently underway in partner countries—for example, the current unprecedented campaign by Colombia and Panama to attack smuggling networks operating in the Darién, and Mexico's historic deployments of law enforcement and military personnel to conduct enforcement along its southern border and transit routes.  These enforcement campaigns were implemented at substantial cost for those governments, and a change in U.S. policy that renders them less effective could lead to reduced support in the future for U.S.-led efforts to manage migratory flows throughout the region.

41.     In short, the rule is a substantive demonstration of the U.S. Government's partnership and commitment to the shared goal of stabilizing migratory populations and addressing migration collectively as a region, both of which are critical to maintaining strong bilateral and multilateral relationships.  If the rule is enjoined, it could undermine the regional approach that has been carefully developed through thoughtful and intensive diplomatic effort.

**<u>Conclusion</u>**

42.     The rule and the other border management procedures are foundational components of the comprehensive, all-of-government approach that DHS implemented to prepare for the end of the Title 42 public health Order and respond to the unprecedented movement of people in our hemisphere.  This approach incentivizes intending migrants to use

expanded safe, orderly, and lawful pathways and processes.  It also disincentivizes unlawful and unauthorized entry at the border by allowing DHS to more quickly and effectively deliver consequences to those who do not establish a legal basis to remain in the United States.

43.     The rule, along with the procedures that complement it, are critical components of a measured and thoughtful approach to managing migratory flows.  Taken together, these measures help the U.S. impose strengthened consequences on unlawful entry, disincentivizing migrants from putting their lives in the hands of smugglers, even as we continue to expand the safe, orderly, and lawful options for those who are willing to wait.

44.     This approach is working as intended.  It has allowed us to deliver consequences—in the form of removals—to record numbers of individuals, reducing encounters at the border, even as we have provided record numbers of noncitizens with access to lawful pathways and processes to seek protection in the region or come to the United States.

45.     Should the rule and the other procedures no longer be in effect, DHS anticipates a return to elevated encounter levels that would place significant strain on DHS components, border communities, and interior cities, despite the careful planning and significant investments that have been made.  Border communities, and the NGOs that support them, will once again receive large-scale releases of noncitizens that will overwhelm their ability to coordinate safe temporary shelter and quick onward transportation.  And interior destination cities will, once again, see their resources strained.  This is not speculation—this is something that we just experienced in May, and could experience again.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information, and belief.  Executed on this 27th day of October, 2023.



_____
Blas Nuñez-Neto
Assistant Secretary
Border and Immigration Policy
U.S. Department of Homeland Security

.