**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| M.A., et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>ALEJANDRO MAYORKAS, Secretary of the Department of Homeland Security, in his official capacity, et al.,<br><br>*Defendants.* | )<br>)<br>)<br>)<br>)   No. 1:23-cv-01843-TSC<br>)<br>)<br>)<br>)<br>)<br>) |

**<u>PLAINTIFFS' OPPOSITION TO MOTION TO INTERVENE</u>**

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 1

ARGUMENT ................................................................................................................. 2

   I.    Intervention As of Right Should Be Denied ...................................................... 2

      A.   The States' Motion Is Untimely.................................................................... 3

      B.   The States Lack Standing And A Legally Protectable Interest.................................. 12

      C.   The States Fail To Show Inadequate Representation .................................................. 15

   II.    Permissive Intervention Should Be Denied. ................................................... 17

   III.   In The Alternative, The Court Should Hold The States' Motion In Abeyance Until The Parties Have Concluded Their Negotiations ................................................ 19

CONCLUSION.............................................................................................................. 19

# TABLE OF AUTHORITIES

**Cases**

*Amador Cnty., Cal. v. U.S. Dep't of the Interior,*
  772 F.3d 901 (D.C. Cir. 2014) ........................................................................................... passim

*Arizona v. Biden,*
  40 F.4th 375 (6th Cir. 2022) ...................................................................................................... 14

*Arizona v. Mayorkas,*
  143 S. Ct. 1312 (2023) .................................................................................................................. 7

*Arpaio v. Obama,*
  797 F.3d 11 (D.C. Cir. 2015) ................................................................................ 13, 14, 15, 18

*Bush v. Viterna,*
  740 F.2d 350 (5th Cir. 1984) ..................................................................................................... 16

*Cameron v. EMW Women's Surgical Ctr.,*
  595 U.S. 267 (2022) ..................................................................................................................... 15

*Cooper v. Newsom,*
  13 F.4th 857 (9th Cir. 2021) ...................................................................................................... 18

*Defs. of Wildlife v. Perciasepe,*
  714 F.3d 1317 (D.C. Cir. 2013) .......................................................................................... 13, 18

*Department of Commerce v. New York,*
  139 S. Ct. 2551 (2019) .......................................................................................................... 13, 14

*Deutsche Bank Nat. Trust Co. v. FDIC,*
  717 F.3d 189 (D.C. Cir. 2013) ......................................................................................... 2, 3, 17

*Diamond v. Charles,*
  476 U.S. 54 (1986) ........................................................................................................................ 17

*E.E.O.C. v. Nat'l Children's Ctr., Inc.,*
  146 F.3d 1042 (D.C. Cir. 1998) .......................................................................................... 17, 18

*East Bay Sanctuary Covenant v. Biden,*
  93 F.4th 1130 (9th Cir. 2024) ................................................................................................... 16

*Huisha-Huisha v. Mayorkas,* No. 22-5325,
  2022 WL 19653946 (D.C. Cir. Dec. 16, 2022) (unpublished) ................................................. 7

*Jones v. Prince George's Cnty., Md.,*
 348 F.3d 1014 (D.C. Cir. 2003) ....................................................................... 3, 12, 16

*Keepseagle v. Vilsack,*
 307 F.R.D. 233 (D.D.C. 2014) ................................................................................... 17

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
 140 S. Ct. 2367 (2020) .............................................................................................. 17

*NAACP v. New York,*
 413 U.S. 345 (1973) ...................................................................................... 3, 12, 17

*Pennsylvania v. Kleppe,*
 533 F.2d 668 (D.C. Cir. 1976) .................................................................................. 15

*Trump v. New York,*
 141 S. Ct. 530 (2020) .......................................................................................... 12, 13

*United States v. Texas,*
 599 U.S. 670 (2023) ....................................................................................... 14, 15, 18

*United States v. Washington,*
 86 F.3d 1499 (9th Cir. 1996) ............................................................................ 4, 8, 9

*Yocha Dehe Wintun Nation v. U.S. Dep't of the Interior,*
 3 F.4th 427 (D.C. Cir. 2021) .................................................................................... 18

**Federal Register**

Final Rule, Circumvention of Lawful Pathways,
 88 Fed. Reg. 31,314 (May 16, 2023) ......................................................................... 1

**Other Sources**

Complaint, *Arizona v. Garland*, No. 6:22-cv-1130,
 2022 WL 1267203 (W.D. La. filed Apr. 28, 2022) ................................................... 6

American Governors' Border Strike Force: Overview (Apr. 19, 2022) ......................... 7

Alabama Gov. Kay Ivey, Tweet (Aug. 10, 2022) ......................................................... 7

Georgia Gov. Brian P. Kemp, Tweet (Apr. 13, 2022) ................................................... 7

States' Reply in Support Motion to Intervene, *Huisha-Huisha v. Mayorkas,*
 No. 22-5325, Doc. No. 1977950 (D.C. Cir. Dec. 15, 2022) ....................................... 7

Shayla Klein, *Gov. Jim Justice to Send W.Va. Troops to Texas Over Immigration*
    *'Craziness from Biden,'* WCHS News (May 31, 2023).............................................................. 7

Complaint, *Indiana v. Mayorkas*, No. 23-cv-106,
    2023 WL 3821388 (D.N.D. filed May 31, 2023) ................................................................ 9, 10

States of Indiana et al., *Comment to Notice of Proposed Rulemaking*
    *"Circumvention of Lawful Pathways"* (Mar. 27, 2023) .......................................................... 10

Brief for Respondents, *United States v. Texas*,
    No. 22-58 (S. Ct. Oct. 18, 2022)................................................................................................. 14

## INTRODUCTION

Plaintiffs file this opposition in response to the States' motion to intervene.  First, the motion is untimely.  Second, the States lack standing and a legally protectable interest in this litigation.  Third, the United States is adequately representing their interests.  These same factors also make permissive intervention inappropriate.  The States' motion should therefore be denied.  In the alternative, the motion should be held in abeyance pending the outcome of the parties' settlement negotiations.

## BACKGROUND

Upon the expiration of the COVID-related Title 42 policy previously in effect at the southern border, the Government issued the "Circumvention of Lawful Pathways" rule (the "Rule") effective May 11, 2023.  88 Fed. Reg. 31,314.  The Rule applies in both regular and expedited removal proceedings and bars asylum eligibility for all non-Mexican adults and families unless they satisfy one of a few narrow exceptions.  *Id.* at 31,450-51; Plaintiffs' Motion for Summary Judgment, ECF No. 37, at 5-7.  Around the same time, the Government also implemented several other changes to the expedited removal system, including shortening the consultation period preceding credible fear screening interviews; subjecting some nationals of Cuba, Haiti, Nicaragua, and Venezuela to expedited removal to Mexico rather than their countries of origin; and aggressively encouraging nationals of those same four countries to "voluntarily" return to Mexico based on erroneous advisals that these noncitizens would then remain eligible for certain country-specific parole processes.  *See* Amended Complaint, ECF No. 19, at 35-42; Plaintiffs' Motion for Summary Judgment, ECF No. 37, at 7-9.

Plaintiffs filed their original complaint challenging the Rule and the collateral policies on June 23, 2023, and their amended complaint on July 10, 2023.  ECF Nos. 1, 19.  The parties then

filed cross-motions for summary judgment concerning the Rule and the three collateral policies noted above.  ECF Nos. 37, 53.  Summary judgment briefing was completed on December 20, 2023.  ECF No. 61.[1]

On February 5, 2024, the parties filed a joint stipulation to hold the case in abeyance in light of the fact that "[t]he parties are engaged in discussions regarding implementation of the challenged rule and related policies and whether a settlement could eliminate the need for further litigation."  ECF No. 66.  The next day, the Court stayed this case until further order of the Court.  Minute Order, Feb. 6, 2022.

The States of Alabama, Kansas, Georgia, Louisiana, and West Virginia filed their motion to intervene on March 7, 2023.  ECF No. 67 ("Mot.").[2]

## ARGUMENT

### I.        Intervention As of Right Should Be Denied.

To prevail on their motion to intervene, the States must establish that they have Article III standing.  *Deutsche Bank Nat. Trust Co. v. FDIC*, 717 F.3d 189, 193 (D.C. Cir. 2013).  To intervene as of right under Federal Rule of Civil Procedure 24(a), the States must also show that

---

[1] Plaintiffs' summary judgment opposition-and-reply brief, ECF No. 57, was filed under a motion to seal, pursuant to the protective order, ECF No. 39.  That motion to seal remains pending, and Plaintiffs are prepared to file a redacted version of that brief if so ordered.  The other three summary judgment briefs are on the public docket.  ECF Nos. 37, 53, 61.

[2] That same day, these same five States also moved to intervene in *East Bay Sanctuary Covenant v. Biden*, No. 23-16032 (9th Cir.).  That case also involves a challenge to the Rule—but not to the collateral expedited removal policies challenged here—and the plaintiffs there are represented by some of the same counsel representing Plaintiffs in this case.  In *East Bay*, the district court granted summary judgment to the plaintiffs and vacated the Rule.  The Government appealed and the Ninth Circuit stayed the district court's order pending appeal, leaving the Rule in effect.  The appeal was briefed, and the Ninth Circuit heard argument on November 7, 2023.  On February 5, 2024, the parties in *East Bay* jointly moved to hold the appeal in abeyance pending settlement discussions.  The Ninth Circuit granted that motion and placed the case in abeyance on February 21, 2024.  93 F.4th 1130.

their motion is timely; that they have a "legally protected interest" in the action that may be impaired; and that no existing party can adequately represent their interests. *Id.* at 192. The States must meet all of these requirements, *Jones v. Prince George's Cnty., Md.*, 348 F.3d 1014, 1019 (D.C. Cir. 2003), but they fail to satisfy any of them.

First, the motion is untimely because the States admit that they believed since this litigation began that they could not trust the United States to represent their interests. Second, the interests the States advance are insufficient to confer standing or a legally protectable interest. Third, the States' disagreements with Defendants' litigation strategy and their speculation about what any eventual settlement might entail do not establish inadequate representation. And, again, even if the States' disagreements with the Government could show inadequate representation, the fact that they believe their views and the Government's views have diverged since this litigation began renders their motion untimely. Either way, the States are not entitled to intervention as of right.

### A. The States' Motion Is Untimely.

If intervention is untimely, it "must be denied." *NAACP v. New York*, 413 U.S. 345, 365 (1973). "Timeliness is to be determined from all the circumstances . . . in the exercise of [the Court's] sound discretion." *Id.* at 366. The D.C. Circuit measures timeliness "from when the 'potential inadequacy of representation [comes] into existence.'" *Amador Cnty., Cal. v. U.S. Dep't of the Interior*, 772 F.3d 901, 904 (D.C. Cir. 2014) (citation omitted) (alteration in original); *see also id.* at 905 (holding that proposed intervenor should have sought intervention once it knew "that the United States might not adequately represent [its] interest").

The States admit that they believed they could not rely on the United States to represent their interests in this litigation from the beginning—and yet they did not seek to intervene in the three months before summary judgment briefing commenced, or during the three months that briefing was underway.  *See* ECF No. 30 (Aug. 25, 2023) (setting summary judgment briefing schedule beginning September 19, 2023); ECF No. 61 (Dec. 20, 2023) (Defendants' reply brief).  The States' claim that they had no reason to believe their interests were at risk prior to the abeyance motion.  That is belied by their own statements.  First, the States have repeatedly said, including in this very motion, that even before this litigation commenced, they did not believe they could trust the current administration to protect their interests in immigration litigation.  Second, as to this particular case, the States admit they have disagreed with Defendants' litigation decisions from the outset; and also believed from the outset that even if Defendants prevailed, the States' asserted interests concerning the Rule would not be fully protected.  For these reasons, it was incumbent upon the States to seek intervention early on—rather than waiting until summary judgment was fully briefed and the parties had entered settlement discussions.

1.  The D.C. Circuit has found intervention untimely where the movant admitted "it had 'earlier concerns about a potential conflict of interest in the United States' representation'" but did not seek to intervene at that time.  *Amador Cnty.*, 772 F.3d at 905; *see also United States v. Washington*, 86 F.3d 1499, 1504 (9th Cir. 1996) (finding intervention untimely where the proposed intervenor believed the existing party had engaged in a longstanding "course of conduct" that the movant viewed as "hostile to its interests") (cleaned up).  That is precisely the situation here.  The States' motion, and their previous statements, demonstrate that they have repeatedly disagreed with the Federal Government's immigration and border policies—and with

its litigation decisions concerning such policies—since the start of the current administration more than three years ago.[3]

The proposed intervenors assert that they have "every reason to believe" that the United States will not adequately represent their interests because over the past several years the current administration has, in the States' view, repeatedly "taken a hostile approach toward states that take border security seriously."  Mot. 18-19; *see also id.* at 1 ("In the arena of immigration, Defendants are more than just doubtful friends to the Intervenor States; they have taken deliberate actions that are hostile to the Intervenor States' interests.").  The States complain that "Defendants have abdicated their responsibility toward securing the border" and that when "[s]tates have attempted to fill the void, . . . Defendants have sought to actively harm those states both by frustrating [the states'] own attempts to protect the border" and "by forcing the state[s] to engage in . . . litigation."  *Id.* at 18; *see also id.* at 2 ("When states try and fix the problem by themselves, Defendants sue them to prevent it.").  The States' assert that "Defendants have *repeatedly* failed to perform their most basic duty and secure the border" and characterize the Government's hostility to them on border issues as a "*repeated pattern* of malfeasance."  *Id.* at 2, 18 (emphasis added); *see also* Ex. A to Motion to Intervene ("Arthur Decl."), ECF No. 67-1, at 10-11 (asserting that actions taken by the current administration in its first weeks in January and

---

[3] That the States have long *believed* that the United States will not adequately protect their interests in immigration litigation does not mean that the United States is not actually protecting their interests in this litigation.  *See* Part I.C.  Rather, the fact that the States have long believed their interests would not be protected by the United States is relevant to the test for timeliness— when the proposed intervenor had reason to believe their interests "might not" be adequately represented.  *Amador Cnty.*, 772 F.3d at 905.

February 2021 "reduce[d] control of the border" such that "illegal immigration intensified")
(cleaned up).[4]

The States claim that, in response, they and other "states have had to sue the federal
government to perform the basic duties required" by the immigration laws "[o]ver and over
again." Mot. 3; *accord id.* at 2. In support of this claim, the States cite suits that they and other
states have filed against the Government as far back as April 2021. *Id.* at 4 (citing, inter alia,
*Texas v. Biden*, 589 F. Supp. 3d 595 (N.D. Tex. 2022) (filed April 22, 2021), and the complaint
in *Arizona v. Garland*, No. 6:22-cv-1130, 2022 WL 1267203 (W.D. La. filed Apr. 28, 2022)).

Indeed, three of the five States now seeking intervention—Louisiana, Georgia, and
Kansas—are plaintiffs in one of those cases, *Arizona v. Garland*, filed nearly two years ago.
Their complaint there challenges a different asylum regulation issued by the current
administration in August 2021. Tracking the concerns raised in their present motion, the States'
complaint in that case alleges that rule would cause "more lawlessness at the southern border,
leaving the States to shoulder the enormous costs of Defendants' destructive policies." 2022 WL
1267203, at ¶ 9; *see also* Arthur Decl., ECF No. 67-1, at 12 (asserting that the August 2021
asylum regulation and other "Biden Administration [immigration] policies" were seen as "an
announcement that the U.S. borders are now open").

Notably, all five States seeking intervention here also moved to intervene as defendants
in *Huisha-Huisha v. Mayorkas*, a lawsuit by asylum seekers that sought to vacate Title 42, the

---

[4] Similarly, these same States' concurrently filed intervention motion in the Ninth Circuit case
begins by declaring that they "cannot rely on President Biden et al. . . . to defend and enforce the
Nation's immigration laws" because, "*[f]rom the start*, this presidential administration has . . .
methodically rescinded policies designed to combat illegal immigration." Motion to Intervene at
1, *East Bay Sanctuary Covenant v. Biden*, No. 23-16032, Dkt. No. 86 (9th Cir. Mar. 7, 2024)
(emphasis added).

predecessor border policy to the Rule.  The States' intervention papers in that case argued that

the Government "vigorously defended the Title 42 Orders" until it "*suddenly shifted gears*" by

deciding not to seek a stay pending appeal in the D.C. Circuit.  *See* States' Reply in Support

Motion to Intervene at 3-4, *Huisha-Huisha*, No. 22-5325, Doc. No. 1977950 (D.C. Cir. Dec. 15,

2022) (emphasis added and omitted).  Nonetheless, the States' intervention there was denied as

untimely.  *Huisha-Huisha v. Mayorkas*, No. 22-5325, 2022 WL 19653946 (D.C. Cir. Dec. 16,

2022) (unpublished), *vacated as moot and remanded sub nom. Arizona v. Mayorkas*, 143 S. Ct.

1312 (2023).  And here, by contrast, the States are on even weaker footing because the stipulated

abeyance keeps the Rule in place—the same situation the States also seek to preserve.[5]

By their own admission, then, the conditions the States cite to show divergent interests

have existed since before the start of this case.  These States have consistently clashed with

Defendants on immigration policy—and on the defense of immigration policies in litigation—

throughout the last three years.  Apparently, however, the States had recovered from their shock

at the Government's supposed "sudden" change of litigation strategy in *Huisha-Huisha* more

than a year ago—because they now claim that they were blindsided yet again by the United

States' decision to request an abeyance in this case.

---

[5] The States' leaders have also expressed distrust of the administration on border issues outside
of litigation.  *E.g.*, American Governors' Border Strike Force: Overview, at 1-2 (Apr. 19, 2022)
(states including Alabama, Georgia, and West Virginia announcing "border strike force" in
response "to President Biden's disastrous border policies" and "the absence of federal
leadership" concerning border crossings), *available at* https://perma.cc/275B-TLB4; Georgia
Gov. Brian P. Kemp, Tweet (Apr. 13, 2022) ("the Biden administration" is "encouraging mass
illegal immigration"), *available at* https://perma.cc/BA78-KHDY; Shayla Klein, *Gov. Jim
Justice to Send W.Va. Troops to Texas Over Immigration 'Craziness from Biden,'* WCHS News
(May 31, 2023) (West Virginia governor "calling the state of immigration 'craziness from the
Biden administration'"), *available at* https://perma.cc/56CN-6FMT; Alabama Gov. Kay Ivey,
Tweet (Aug. 10, 2022) (asserting that the administration is "ok with letting folks flood through
the gates at our Southern Border unaccounted for"), *available at* https://perma.cc/5JHR-57QZ.

In light of these admissions, the States' motion is untimely under the D.C. Circuit's decision in *Amador County*. There, the Tribe seeking intervention "all but admit[ted]" its motion was untimely where, like the States here, it acknowledged "it had 'earlier concerns about a potential conflict of interest in the United States' representation'" but failed to intervene at that juncture. 772 F.3d at 905. The States' motion here is untimely for the same reason.

The Ninth Circuit's timeliness holding in *United States v. Washington*, 86 F.3d 1499 (9th Cir. 1996), accords with *Amador County* and closely parallels the situation in this case. There, a commercial fishing group, Harvest Divers, sought to intervene as a defendant in a suit brought by the United States against the State of Washington to enforce several Tribes' treaty fishing rights. After the district court issued a decision upholding the treaty rights and the parties began negotiations to implement the decision, Harvest Divers moved to intervene in those negotiations, much as the States do here. 86 F.3d at 1503-04. Harvest Divers "argue[d] that it should have been allowed to intervene at that late date because Washington State"—the existing defendant— "became 'openly antagonistic' toward Harvest Divers only after the [district court's] opinion was issued." *Id.* The Ninth Circuit held intervention untimely because Harvest Divers' "own documents [filed in support of intervention] indicate[d] that it believed that Washington State was hostile to its interests since long before the [district court's] decision." *Id.* at 1504. Among other things, the intervenor's brief complained "that Washington State has followed a 'pro-Indian' policy 'by a continuous course of conduct,'" and that "'[t]he policies adopted by the State are to seek accommodation with Indians and use all possible means to achieve that goal.'" *Id.* The Ninth Circuit also found significant that Harvest Divers' declaration supporting its intervention motion stated: "We have absolutely no confidence in [the State] to represent our

interests.  In fact, I believe that their interests oppose ours *based on their actions this past two years*."  *Id.* at 1504 (emphasis added).

Here, similarly, the States admit that they have a longstanding policy dispute with the Federal Government concerning its border policies and its litigation decisions concerning border policies that goes back at least two years, predating the filing of this case as well as the Rule and the other policies at issue.  As in *Amador County* and *Washington*, that admission is fatal to the States' motion.

2.  Beyond the States' longstanding general view that the United States could not be counted on to protect their border-related interests, the States also acknowledge several circumstances specific to the Rule and this litigation that they all but concede put them on notice that they could not rely on the United States to represent their purported interests.

Most fundamentally, the States admit that while they hope the core of the Rule is upheld, they strongly object to the Rule's *exceptions*.  And the States have long been aware that these exceptions are being vigorously defended by the United States.  Indeed, the States note that the Government is currently defending the Rule's exceptions "in multiple other lawsuits."  Mot. 19; *see id.* at 8 (citing, inter alia, the complaint in *Indiana v. Mayorkas*, No. 23-cv-106, 2023 WL 3821388 (D.N.D. filed May 31, 2023)).  The States' intervention motion therefore acknowledges that their "interest departs from the interest of Defendants" in the "key respect" that the "States have no interest in preserving the exceptions to the Rule that" (in the States' view) "limit its effectiveness."  Mot. 19.  And the States further concede that they believe "this alone means Defendants are *unable* to represent fully the States' interest in limiting illegal immigration and imposing order on the southern border."  *Id.* (emphasis added).  But this divergence of interest

due to the fact that the United States would defend the Rule's exceptions has been clear since the outset of this case.[6]

The States likewise acknowledge two other disagreements with Defendants about their strategy and "priorities in this litigation" that go back to the very earliest stage of the case, before summary judgment briefing commenced.  Mot. 19.  First, the States note that "Defendants agreed to hold certain claims in abeyance" rather than either party moving for summary judgment on those claims.  *Id.*  The States say that they disagreed with this decision "and would not take such a posture."  *Id.*  Second, the States repeatedly fault Defendants for not engaging in jurisdictional discovery prior to moving forward with summary judgment briefing—and again identify that decision as a basis for believing Defendants will not adequately represent their interests.  *Id.* at 1, 4, 11, 18.  In the States' view, "[a]t a minimum, [this] case should proceed to discovery to probe the factual basis for the Plaintiffs' standing and then the motions for summary judgment can be litigated."  *Id.* at 18; *accord id.* at 11.  Here, again, the States essentially concede their own untimeliness.  Defendants agreed to hold some of Plaintiffs' claims in abeyance and to proceed with summary judgment briefing without conducting discovery in a stipulation filed on August 16, 2023.  ECF No. 29; *see also* ECF No. 30 (Aug. 25, 2023) (adopting stipulation).  That August 2023 stipulation—which the States argue demonstrates that their interests not only might but already did diverge from Defendants' interests—therefore put the States on notice that they

---

[6] These same States (along with others) publicly disagreed with the Government about the Rule's exceptions even before the final version of the Rule was issued.  *See* States of Indiana et al., *Comment to Notice of Proposed Rulemaking "Circumvention of Lawful Pathways,"* at 6 (Mar. 27, 2023) (public comment submitted by all five States that seek intervention (and others), arguing that the Rule "has so many exceptions that it might as well be called an 'always-rebutted presumption'"), *available at* https://perma.cc/PY39-8BUC.

needed to intervene before summary judgment briefing went ahead on only some claims and without jurisdictional discovery.

These further admissions by the States also point to yet another reason for finding their motion untimely. As the D.C. Circuit has observed, "the requirement of timeliness is aimed primarily at preventing potential intervenors from unduly disrupting litigation, to the unfair detriment of the existing parties." *Amador Cnty.*, 772 F.3d at 905 (citation and internal quotation marks omitted). The August 2023 stipulation alerting the States to multiple litigation decisions by Defendants with which they disagreed was followed by four months in which the parties invested substantial resources in "extensive briefing on cross-motions for summary judgment." Mot. 10. Needless to say, the strength of the parties' arguments in that briefing has informed their calculations concerning the comparative risks and benefits of pressing ahead with litigation versus seeking resolution through settlement. Now, more than six months too late, the States seek to intervene to derail the parties' settlement discussions. They would instead have the case "proceed to discovery to probe the basis for the Plaintiffs' standing *and then* the motions for summary judgment can be litigated"—or, rather, re-litigated. *See* Mot. 18 (emphasis added). Permitting the States to do so would be both disruptive to this litigation and prejudicial to the existing parties. *See, e.g.*, *Amador Cnty.*, 772 F.3d at 906 (holding intervention untimely in part because granting intervention would lead to additional briefing and could delay resolution of the case).

In sum, the States have admitted that since the earliest stage of this litigation (and before), they believed the current administration would not protect their interests in immigration cases; and that in this case in particular, the United States would defend the Rule's exceptions, contrary to the States' purported interests. It was therefore "incumbent upon the [States], at that

11

stage of the proceedings, to take immediate affirmative steps to protect their interests." *See NAACP*, 413 U.S. at 367.  Because they failed to do so, their motion is untimely and "must be denied." *Id.* at 365.

### B.  The States Lack Standing And A Legally Protectable Interest.

The States lack both standing and the significantly protectable interest required to intervene to defend the Rule on the merits.  The D.C. Circuit has equated the two requirements. *E.g.*, *Jones*, 348 F.3d at 1018-19.  Standing—and thus a legally protectable under Rule 24— requires "an injury that is concrete, particularized, and imminent rather than conjectural or hypothetical." *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (cleaned up).  Accepting the States' tenuous argument for intervention would render these requirements meaningless.

The States' theory for both standing and legally protectable interest is that (1) Plaintiffs may succeed in vacating the Rule or Defendants may enter into a settlement that rescinds the Rule; (2) one of these outcomes may, in turn, cause border crossings between ports of entry to increase; (3) some of those additional migrants entering between ports of entry will make their way to these five States; (4) the presence of these additional migrants in the States will cause the States to incur various costs; but also (5) proportionally more of these additional migrants may settle in other states, potentially causing these five States to lose congressional representation and federal funding following the 2030 census.  Mot. 12-17, 21-22.  This alleged causal chain is far too attenuated to provide standing or a legally protectable interest that justifies intervention.

To begin with, it makes little sense for the States to rely on the scenario in which "Plaintiffs are successful in vacating [the Rule]" through litigation in this case.  Mot. 16. Plaintiffs and Defendants have stipulated to a stay of these proceedings, which leaves the Rule in effect for the time being.  It is *the States* who wish to end the stay and return to litigation, which

might then result in an order vacating the Rule's expedited removal provisions.  *See, e.g.*, Mot. 11, 18.

And the States can only speculate as to what, if any, settlement might result from the parties' negotiations, and how any possible settlement might impact migration numbers— particularly given "the myriad economic, social, and political realities in the United States and in foreign nations" that may influence "the complex decisions made by non-citizens of the United States before they risk life and limb to come here."  *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015).  Similarly, the States cannot predict how the Government would implement a hypothetical settlement or what other policies or world events may come into play.  *See Trump*, 141 S. Ct. at 535-36 (denying standing where it was not yet possible to "predict[] how the Executive Branch might eventually implement" challenged federal policy); *Defs. of Wildlife v. Percisepe*, 714 F.3d 1317, 1324-25 (D.C. Cir. 2013) ("Article III standing requires more than the possibility of potentially adverse regulation").[7]

The States' speculation that one or more of them might lose congressional representation after the next census—more than five years away—is even more attenuated, given the countless economic and social factors that influence the distribution of the States' respective populations over time.[8]

---

[7] The States repeatedly suggest that the parties' abeyance stipulation refers to settlement discussions concerning "unspecified" and "unknown 'related policies.'"  Mot. at 1, 11, 16, 18. But the other policies challenged in this action are clearly identified in Plaintiffs' complaint and the parties' summary judgment briefs.  *See* ECF Nos. 19, 37, 53, 61; *see also supra* page 1 & page 2 n.1.

[8] *Department of Commerce v. New York*, cited at Mot. 15, does not aid the States.  The states there were able to show standing based on a "concrete and imminent" danger of losing federal funds directly due to "the predictable effect" of including a citizenship question *in the census itself*, where "[t]he evidence at trial established that noncitizen households have historically responded to the census at lower rates than other groups, and the District Court did not clearly err

Just last term, the Supreme Court rejected a similarly expansive theory of standing advanced by two states in *United States v. Texas*, 599 U.S. 670 (2023). The Court held that Texas and Louisiana—the latter of which seeks intervention here—lacked standing to challenge the Government's immigration enforcement priorities based on the same sort of assertions the States raise here. *Id.* at 674; *see* Brief for Respondents at 13, *United States v. Texas*, No. 22-58 (S. Ct. Oct. 18, 2022) (asserting standing based on purported downstream costs). In so holding, the Supreme Court cautioned that "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer," since "in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *Texas*, 599 U.S. at 680 n.3. Thus, when a State asserts that federal policy "has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id.*

The D.C. Circuit and other courts have rejected similarly limitless standing theories advanced by States and local officials seeking to litigate federal immigration policies. *Arpaio*, 797 F.3d at 25 ("If such allegations were routinely accepted as sufficient to confer standing, courts would be thrust into a far larger role of judging governmental policies than is presently the case, or than seems desirable.") (cleaned up); *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) ("Are we really going to say that any federal regulation of individuals . . . that imposes peripheral

---

in crediting the Census Bureau's theory that the discrepancy is likely attributable at least in part to noncitizens' reluctance to answer a citizenship question." 139 S. Ct. 2551, 2565-66 (2019); *see also Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (distinguishing *Department of Commerce* on this basis). By contrast, the States can only speculate about the residence of immigrants affected by the Rule and by this litigation. And innumerable factors unrelated to the Rule and any possible settlement of this action will influence how many residents the various states will have in 2030.

costs on a State creates a cognizable Article III injury for the State to vindicate in federal court? If so, what limits on state standing remain?"); *see also Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976) (downstream state fiscal impacts that are "an incidental result of the challenged action" are insufficient for standing).[9]

Allowing the States to intervene to try to press this case back before the Court would eviscerate "bedrock Article III constraints" as well as the strictures of Rule 24. *See Texas*, 599 U.S. at 680 n.3; *see also Arpaio*, 797 F.3d at 22, 25. Their theory would allow states to intervene to defend virtually any federal policy that might affect immigration—for example, an FBI policy about what resources to use to investigate smuggling; reduced enforcement against employers for hiring undocumented workers; or an agreement with Mexico on aid, trade, or immigration. Each of these decisions (and many others) might conceivably increase downstream costs that states bear vis-à-vis immigrants. And the same theory would apply to nearly every other kind of federal decision-making, such as budgeting or law enforcement. If effectively everything the federal government does provides states with standing and the ability to intervene as of right, the case-or-controversy and significantly protectable interest requirements are meaningless.

### C.  The States Fail To Show Inadequate Representation.

The States admit that the Government has "vigorously defend[ed]" the Rule. Mot. 1, 9, 17. Now that Defendants have agreed to an abeyance to explore the possibility of settlement, the States worry the Government may ultimately agree to a settlement that "repeals the Rule," which the States wish to keep in place. *Id.* at 18.

---

[9] By contrast, a state does have a legally protectable interest "in the continued enforceability of *its own* statutes." *Cameron v. EMW Women's Surgical Ctr.*, 595 U.S. 267, 277 (2022) (emphasis added).

But Defendants' course of action thus far keeps the Rule in place while proceedings are stayed—the very "status quo" that the States want "preserved." Mot. 23. For now, therefore, the Government's approach forestalls the risk of an adverse decision invalidating the portions of the Rule that the States seek to maintain. *See id.* at 14 (asserting that "[t]he States have benefited by the Rule" and that they "will be harmed if the Rule is vacated"); *id.* at 16, 17, 22 (same); *see also East Bay Sanctuary Covenant v. Biden*, 93 F.4th 1130, 1132 (9th Cir. 2024) (VanDyke, J., dissenting from grant of abeyance) (noting the Government's stated concerns about "'any interruption in the rule's implementation[']"); *id.* at 1135 (stating that "[p]lacing these proceedings in abeyance avoids the possibility of a loss before the Ninth Circuit").

The States' disagreement with the Government's decision to seek an abeyance thus "boils down to just another dispute over litigation tactics," which cannot justify intervention. *Jones*, 348 F.3d at 1020; *see Bush v. Viterna*, 740 F.2d 350, 358 (5th Cir. 1984) ("[T]he mere possibility that a party may at some future time enter into a settlement cannot alone show inadequate representation. . . . If this were so, the requirement that the would-be intervenor show inadequacy of representation would be effectively written out of the rule, for it is always a possibility that the present parties will settle a lawsuit.").

Moreover, even if the parties ultimately reach a settlement—which remains to be seen— any such settlement will not necessarily implicate the States' interests, much less undermine those interests. The States suggest that the Government may agree to "a wide-ranging settlement" that "repeals the Rule (in whole or in part) or otherwise impairs the ability of the federal government to enforce other immigration policies." Mot. 17-18. But they provide no basis at all for this speculation. To the contrary, they admit that "[i]t is impossible to know the government's exact motives for its current course of action." *Id.* at 17 (cleaned up).

16

Accordingly, the States have also failed to show that Defendants are not adequately representing their interests.

## II.     Permissive Intervention Should Be Denied.

The Court should deny permissive intervention for essentially the same reasons explained above.  Permissive intervention under Rule 24(b)(2) requires at minimum "a timely motion," "an independent ground for subject matter jurisdiction," and "a claim or defense that has a question of law or fact in common with the main action."  *E.E.O.C. v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998).

First, the States' motion is untimely.  *Supra* Part I.A.  As with intervention of right, a motion for permissive intervention "must be 'timely'" and an untimely motion "must be denied." *NAACP*, 413 U.S. at 365 (quoting Fed. R. Civ. P. 24).

Second, the States lack standing.  *Supra* Part I.B.  Standing is required for permissive intervention as well as intervention as of right.  *Deutsche Bank Nat'l Trust Co.*, 717 F.3d at 193; *Keepseagle v. Vilsack*, 307 F.R.D. 233, 245-46 (D.D.C. 2014).[10]

As Judge Silberman emphasized in his *Deutsche Bank* concurrence, granting permissive intervention "to parties without standing would be . . . intolerable at the district court level, where individual parties have substantial power to direct the flow of litigation and affect settlement negotiation."  717 F.3d at 195 (Silberman, J., concurring).  The States seek precisely

---

[10] At minimum, moreover, any intervenor must show standing "to continue a suit in the absence of the party on whose side intervention was permitted."  *Diamond v. Charles*, 476 U.S. 54, 68 (1986); *see also Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020) ("An intervenor of right must independently demonstrate Article III standing if it pursues relief that is broader than or different from the party invoking a court's jurisdiction.").  And here, the States seek to force the case back before the Court—and into discovery and re-litigation of summary judgment—even if Defendants wish to resolve the case through settlement.  Mot. 11, 18.  They therefore seek different relief and must show standing.

that kind of power to disrupt the flow of this litigation and the parties' negotiations.  Their lack

of standing therefore provides an independent reason to deny permissive intervention.[11]

Finally, even assuming these requirements were satisfied, the Court should also deny

permissive intervention in the exercise of its broad discretion.  "[P]ermissive intervention is an

inherently discretionary enterprise," and "Rule 24(b) vests district courts with considerable

discretion" to deny permissive intervention even if the minimum "requirements of the rule are

met."  *Nat'l Children's Ctr., Inc.*, 146 F.3d at 1046, 1048.  The floodgates concerns raised by the

Supreme Court in *Texas* and by the D.C. Circuit in *Arpaio* militate strongly against granting

permissive intervention.  If the States are granted permissive intervention here, it would open the

door to an untold number of similar intervention motions by state and local officials who wish to

defend other federal policies that only affect them peripherally, if at all.  *See Texas*, 599 U.S. at

680 n.3 (noting that "federal policies frequently generate indirect effects on state revenues or

state spending"); *Arpaio*, 797 F.3d at 25 ("If such allegations were routinely accepted as

sufficient to confer standing, courts would be thrust into a far larger role of judging

governmental policies than is presently the case, or than seems desirable.") (cleaned up); *see also*

*Cooper v. Newsom*, 13 F.4th 857, 868-89 (9th Cir. 2021) (affirming denial of permissive

intervention to county district attorneys seeking to defend state policy in part because "some or

all of the fifty-five other" district attorneys in the state could make the same argument).

---

[11] Additionally, the D.C. Circuit has repeatedly declined to reach the issue of permissive
intervention for applicants without standing.  *E.g.*, *Yocha Dehe Wintun Nation v. U.S. Dep't of
the Interior*, 3 F.4th 427, 431-32 (D.C. Cir. 2021); *Defs. of Wildlife*, 714 F.3d at 1327.  Even
assuming *arguendo* that standing is not required for permissive intervention, this Court need not
and should not favorably exercise its discretion to grant applicants without standing the ability to
dictate the course of this litigation as the States seek to do here.

**III.    In The Alternative, The Court Should Hold The States' Motion In Abeyance Until The Parties Have Concluded Their Negotiations.**

The States claim that a settlement in this case could compromise their interests.  But there is no certainty that the parties will eventually reach a settlement, much less one that undermines the States' alleged interests.  Accordingly, if the Court chooses not to deny the motion at this point, the Court can hold it in abeyance and allow the States to renew it should the parties ultimately reach a settlement.

**CONCLUSION**

The Court should deny the motion, or in the alternative hold it until the conclusion of the parties' settlement negotiations.

Dated: March 21, 2024

Respectfully submitted,

Keren Zwick (D.D.C. Bar. No. IL0055)
Richard Caldarone (D.C. Bar No. 989575)*
Mary Georgevich*
Mark Feldman*
National Immigrant Justice Center
224 S. Michigan Avenue, Suite 600
Chicago, IL 60604
(312) 660-1370
*kzwick@immigrantjustice.org*
*rcaldarone@immigrantjustice.org*
*mgeorgevich@immigrantjustice.org*
*mfeldman@immigrantjustice.org*

Melissa Crow (D.C. Bar. No. 453487)
Center for Gender & Refugee Studies
1121 14th Street, NW, Suite 200
Washington, D.C. 20005
(202) 355-4471
*crowmelissa@uclawsf.edu*

Anne Dutton*
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA 94102
(415) 581-8825
*duttonanne@uclawsf.edu*

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union
Foundation of the District of Columbia
915 15th Street, NW, 2nd floor
Washington, D.C. 20005
(202) 457-0800
*aspitzer@acludc.org*
*smichelman@acludc.org*

*/s/ Lee Gelernt*                                   .
Lee Gelernt (D.D.C. Bar No. NY0408)
Noor Zafar*
Sidra Mahfooz*
Judy Rabinovitz*
Omar C. Jadwat*
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*nzafar@aclu.org*
*smahfooz@aclu.org*
*jrabinovitz@aclu.org*
*ojadwat@aclu.org*

Cody Wofsy (D.D.C. Bar No. CA00103)
Katrina Eiland*
My Khanh Ngo*
Morgan Russell*
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
*cwofsy@aclu.org*
*keiland@aclu.org*
*mngo@aclu.org*
*mrussell@aclu.org*

*Attorneys for Plaintiffs*

*\*Appearing under certificate of pro bono representation*

20