# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **M.A.,** *et al.* | |
| **Plaintiffs,** | |
| **v.** | **Case No. 1:23-cv-01843-TSC** |
| **Alejandro Mayorkas,** *et al.* | |
| **Defendants,** | |
| **v.** | |
| **Kansas,** *et al.* | |
| **Proposed Intervenor-Defendants.** | |

## PROPOSED INTERVENOR-DEFENDANTS'
## REPLY MEMORANDUM
## IN SUPPORT OF MOTION TO INTERVENE

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................ii

REPLY MEMORANDUM ............................................................................................... 1

    I.    The Court Should Grant Intervention As Of Right.......................................... 1

        A.    The motion to intervene is timely. ........................................................ 1

        B.    The States should not need standing, but they have standing nonetheless because the settlement negotiations pose an imminent threat to their interests. ............................................................................................... 6

        C.    The States' interests are not adequately represented by the federal government. ..........................................................................................11

    II.    The Court Should Exercise Its Discretion To Grant Intervention................................ 13

    III.    The Court Should Not Hold The Motion In Abeyance To Facilitate A Settlement That Would Further Harm The States. .......................................................................... 13

CONCLUSION.................................................................................................................. 13

CERTIFICATE OF SERVICE ......................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Amador Cnty v. U.S. Dep't of the Interior*,
   772 F.3d 901 (D.C. Cir. 2014)................................................................................ 4, 5

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019)....................................................................................... 10

*E. Bay Sanctuary Covenant v. Biden*,
   No. 23-16032, 2024 WL 725502 (9th Cir. Feb. 21, 2024) ......................................11

*FDA v. All. for Hippocratic Med.*,
   No. 23-235 (U.S. Mar. 26, 2024) ........................................................................ 12

*Florida v. United States*,
   No. 3:21-cv-1066-TKW-ZCB, 2024 WL 677713 (N.D. Fla. Feb. 20, 2024)........................ 10

*Huisha-Huisha v. Mayorkas*,
   2022 WL 19653946 (D.C. Cir. 2022) ...................................................................... 3

*John Doe No. 1 v. Glickman*,
   256 F.3d 371 (5th Cir. 2001) ................................................................................. 3

*Kalbers v. United States Department of Justice*,
   22 F.4th 816 (9th Cir. 2021) .................................................................................. 3

*Linda R.S. v. Richard D.*,
   410 U.S. 614 (1973)............................................................................................. 9

*NRDC v. Costle*,
   561 F.2d 904 (D.C. Cir. 1977).............................................................................. 1

*Old Dominion Elec. Coop. v. FERC*,
   892 F.3d 1223 (D.C. Cir. 2018).............................................................................. 7

*Pennsylvania v. President United States of Am.*,
   888 F.3d 52 (3d Cir. 2018) .................................................................................... 7

*Texas v. United States*,
   606 F. Supp. 3d 437 (S.D. Tex.)............................................................................. 8

*The Wilderness Soc. v. Babbitt*,
   104 F. Supp. 2d 10 (D.D.C. 2000) .......................................................................... 1

*Town of Chester v. Laroe Ests., Inc.*,
    581 U.S. 433 (2017)........................................................................................... 6, 7

*United States v. Am. Tel. & Tel. Co.*,
    642 F.2d 1285 (D.C. Cir. 1980)........................................................................... 2, 3

*United States v. Texas,*
    599 U.S. 670 (2023)....................................................................................... 8, 9, 10

*United States v. Washington*,
    86 F.3d 1499 (9th Cir. 1996) ................................................................................. 5

**Rules**

Fed. R. Civ. P. 24 .......................................................................................... 1, 7, 8, 13

**REPLY MEMORANDUM**

The States of Alabama, Kansas, Georgia, Louisiana, and West Virginia (the "States") file this consolidated reply memorandum in support of their motion to intervene (DE67).

Both Plaintiffs and Defendants press a rule for intervention that is detached from the law and misapprehends the standards for intervention. If their standard were followed by this Court, it would be virtually impossible for nonparties to stop imminent threats to their interests before the damage is done. "[T]he D.C. Circuit has taken a liberal approach to intervention," *The Wilderness Soc. v. Babbitt*, 104 F. Supp. 2d 10, 18 (D.D.C. 2000) (citing *NRDC v. Costle*, 561 F.2d 904, 910-11 (D.C. Cir. 1977), and the States satisfy the requirements of Rule 24.

The arguments against the States' intervention miss two key points: (1) the States are intervening to uphold an Administrative Procedures Act (APA) rule that has benefitted and will continue to benefit the States, and (2) the States had no reason before February 5, 2024, to suspect Defendants would stop defending their own rule and engage in negotiations for "related policies." When these facts are viewed in the context of the Rule 24 factors, they demonstrate that the States have a right to intervene or, at a minimum, should be permitted to intervene.

## I.    The Court Should Grant Intervention As Of Right.

### A.    The motion to intervene is timely.

The States moved to intervene within thirty days of the Court's order staying proceedings. In light of the federal government's vigorous defense of the Rule for over seven months, followed by its unexplained (and inexplicable) willingness to surrender despite no factual or legal developments that would hurt its case, the States' decision to intervene when they did was timely. Despite misgivings about the federal government's *general* effort to protect the Nation's borders, States had little reason to believe their intervention was needed in *this case* until February 5, 2024. Until then, the federal government had ably defended its Rule.

Defendants largely concede the timeliness of the motion. But Plaintiffs devote the bulk of their opposition to timeliness. Their arguments fail, especially under the lenient and highly discretionary standard for timeliness set forth by the D.C. Circuit. *See United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1295 (D.C. Cir. 1980).

First, Plaintiffs argue that the motion is untimely because the States mistrusted the current administration's ability to protect their interests in immigration litigation well before the February 5 revelation. But the fact that the States "have repeatedly disagreed with the Federal Government's immigration and border policies" does not create an obligation to intervene immediately (or else forfeit the right) in any and every dispute regarding immigration. Ps' Opp. 9-10. The opposition brief posits a false dichotomy in which proposed intervenors either trust or do not trust that their interests will be represented; any degree of distrust, on this view, triggers a duty to immediately intervene. *Id.* And apparently, distrust can be evidenced by any policy disagreements on the general subject matter of the suit. This is a novel and sweeping theory of the timeliness factor that the Court should reject.

It is true that at the start of this litigation, the States could not fully trust the current administration to defend a rule that reduces illegal immigration. How could they? *See, e.g.*, Mot. 7-11. But intervention is not limited to the hasty and the gullible. Plaintiffs' theory is an obvious catch-22 for intervenors: If they move too early, the Court may not credit the suspicion that their interests are threatened (*i.e.*, movants would be timely but lose on the other factors); if they move after the course of litigation makes the threat quite clear, Plaintiffs would have the Court deny intervention based on the movants' earlier suspicions. This view is far too restrictive. The time to intervene cannot be determined by subjective fears alone; otherwise, the States—which have been sensibly suspicious "since the start of the current administration more than three years ago," Ps'

Opp. 10—would have a standing duty to intervene despite the absence of concrete and objective events in the course of litigation that would threaten their interests. The Court should not require such "premature intervention" that would "squander[] scarce judicial resources and increase[] litigation costs." *Kalbers v. United States Department of Justice*, 22 F.4th 816, 823 (9th Cir. 2021) (quoting *John Doe No. 1 v. Glickman*, 256 F.3d 371, 376-77 (5th Cir. 2001)).

Instead, the States may be judicious without losing their rights, and they are entitled to assume (at least at the start of litigation) that the federal government will defend its own laws and regulations. Plaintiffs ask the Court to adopt a rule whereby the federal government may perform so miserably at the border that the States are obligated to intervene at the start of every immigration case. *See* Ps' Opp. 11 (suggesting that because States sued the federal government in 2021, they were required to intervene immediately here). The adoption of such a rule would be a watershed moment and a tremendous embarrassment for the federal government. It would also contravene the nature of the timeliness inquiry as a case-by-case determination. *Contra Am. Tel. & Tel. Co.*, 642 F.2d at 1295. Worse, Plaintiffs' rule would punish the States and their representatives for political speech on this nationally important issue. *See* Ps' Opp. 12 & n.5 (arguing that the States forfeited their rights to intervene due to governors' tweets). If criticism of the federal government triggers a duty to intervene in every future immigration case, the courts will be flooded with such motions.

The unpublished opinion in *Huisha-Huisha v. Mayorkas*, 2022 WL 19653946 (D.C. Cir. 2022), does not suggest untimeliness here. In that case, the D.C. Circuit found an "inordinate and unexplained untimeliness." *Id.* at *1. To start, the case had been "pending for almost two years," and the district court had already granted a motion for summary judgment. *Id.* Importantly, the movants had long known that their specific "interests in the … Title 42 policy had already

diverged" from those of the current administration, which was not the same administration that promulgated the Title 42 policy. *Id.* at *2. The federal government had taken "actions" well before the motion that "called into question whether [they would] continue to defend the Title 42 Process." *Id.* Indeed, "the federal government indicated its intent to drop the Title 42 policy" eight months prior to the intervention motion. *Id.* The proposed intervenors could not "explain why they waited eight to fourteen months to move to intervene." *Id.*

In contrast, the States here reasonably assumed that the same administration that issued the Rule (over objections like those lodged by Plaintiffs) would also defend it against a challenge filed about a month after the Rule's issuance. And the States offer an adequate explanation for the timing of their motion: They did not know until February 5 that the federal government would backtrack and explore a settlement. True, some of "the conditions the States cite to show divergent interests have existed" for years (P's Opp. 12), but that general divergence matured into a problem *here in this case* only when Defendants signaled a willingness to abandon the Rule.

*Amador County* is nothing like this case. In that case, there was a *nine-year* delay from the start of litigation to the intervention motion. And by filing an *amicus* brief, the proposed intervenors had expressly admitted that "the government's representation of the[ir] interests may be inadequate" as early as *six years* prior to their motion. *Amador Cnty v. U.S. Dep't of the Interior*, 772 F.3d 901, 905 (D.C. Cir. 2014) ("[T]he presence of the United States in this case does not fully protect the Tribe's interests."). Unlike the States here, the Tribe had disclaimed any assumption that the United States would protect its interests. That makes sense too because the United States had no general obligation to promote that particular Indian tribe's interests (vis-à-vis the State of California) in profiting from legalized gaming on tribal lands. Here, the United States absolutely has an institutional interest in border security and the defense of this presidential administration's

own rule; the States need not operate on the assumption that the United States will suddenly jettison those shared interests. Finally, even if *Amador County* were analogous, the D.C. Circuit's conclusion that there was no abuse of discretion there does not imply that this Court would abuse its discretion by finding the States' motion to be timely.

Next, Plaintiffs cite a decision of the Ninth Circuit, *United States v. Washington*, which also involved the obviously divergent interests of government, Indian tribes, and private industry. 86 F.3d 1499, 1503-04 (9th Cir. 1996). The courts rejected a trade association's intervention motion on the ground that its hostile relationship with the government over the specific issue in suit had been apparent for years. *Id.* In fact, another association had tried to intervene earlier in the litigation. *Id.* at 1505. The courts also found prejudice because intervention "would upset the delicate balance achieved by the district court after six years of litigation." *Id.* at 1504. Needless to say, the instant motion, filed mere months into the case and before any significant action by the Court, bears no resemblance to the fact pattern in *Washington*.

The Court must conduct a case-specific inquiry, and here, the States had ample reason (until recently) to believe that Defendants would represent their interests. For one, Defendants issued the Rule. Presumably, an administration that spends the time and energy to promulgate a new policy wants to defend it in court. That presumption was corroborated by the administration's vigorous defense in this case (until February). While this administration, to put it lightly, has a spotty record on immigration, it is nonetheless unusual for the same administration to adopt a rule, defend it for months, and then initiate settlement talks without explanation. Plaintiffs offer no historical analogues for the administration's bizarre behavior. And they point to nothing in the record here that would have put the States on notice that the administration would abruptly change tack.

Plaintiffs' point about the Rule's exceptions (Ps' Opp. 14-15 & n.6) is a red herring. The States objected to the Rule's exceptions during notice and comment, and they oppose the exceptions now. The States would have preferred a stronger rule. But that disagreement alone was no reason to intervene as long as the federal government was defending the Rule it issued. That disagreement became part of the reason to intervene once the administration revealed its openness to settlement, which could result in an agreement and an order or decree materially weakening the rule. The motion is not untimely because some of the evidence for the divergence of interests has become more salient now that the administration wants to settle. *Contra id.* at 14-16.

Nor is the motion untimely because Plaintiffs received a windfall by virtue of the federal government's decision to forgo jurisdictional discovery. Ps' Opp. 16. Plaintiffs put the cart before the horse: Whether jurisdictional discovery would be "disruptive" and "prejudicial" (*id.*) should be answered if and when the States seek it; the answer has no bearing on the motion to intervene. Plaintiffs would have the States seek to intervene immediately when the federal government pursues a suboptimal discovery strategy; surely, the States are permitted to wait until a more concrete divergence of interests arises, such as the willingness to settle.

In sum, the States acted quickly when the parties suddenly and surprisingly sought to stay the proceedings to negotiate a settlement. The motion to intervene is timely.

### B.  The States should not need standing, but they have standing nonetheless because the settlement negotiations pose an imminent threat to their interests.

1. The States should not need standing to intervene for two reasons. First, the States do not need standing because the relief they seek is identical to the relief sought by one of the existing parties. *Cf. Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 440 (2017) ("[A]n intervenor of right must have Article III standing in order to pursue relief that is *different* from that which is sought by a party with standing."). Second, the States seek to intervene as defendants (without a

separate counterclaim), and defendants do not need standing. *See Pennsylvania v. President United States of Am.*, 888 F.3d 52, 57 (3d Cir. 2018). The States recognize that D.C. Circuit precedent still requires them to show standing, *see, e.g.*, *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1233 n.2 (D.C. Cir. 2018), but preserve this argument for a possible appeal.

Defendants offer a brief argument that intervention requires standing because otherwise "any organization or individual with only a philosophic identification with a defendant … could attempt to intervene." Ds' Opp. 20. That argument, which finds support only in a concurring opinion, is incorrect. Article III standing is not needed to police intervention based on mere "philosophic identification," for Rule 24 already requires an "interest relating to … the subject of the action," which may be "impair[ed] or impede[d]" absent intervention. Fed. R. Civ. P. 24(a)(2).

Defendants also claim that the principle of *Town of Chester* would require standing here because the States "seek additional relief." Ds' Opp. 20. But the States seek the same relief— dismissal for lack of standing or summary judgment in favor of the Rule—that Defendants at least nominally still seek. Defendants have not withdrawn their cross-motion for summary judgment. Thus, even under Defendants' logic, the States would need to show standing *only* "in the absence" of Defendants. *Id.* at 20-21. Although the States and Defendants have divergent interests, Defendants are not yet absent. Similarly, the States do not "seek additional relief" because they disfavor the Rule's exceptions. The States' position on the Rule's exceptions (Mot. 6, 19) helps to illustrate how the States' interests diverge from those of the Defendants, but it does not mean the States seek distinct relief. Both the States and Defendants (as far as can be determined by their public filings) seek to uphold the challenged rule. Accordingly, the States need not show standing—only that they satisfy the interest-impairment element of Rule 24.

2. Nonetheless, the States have standing and are "so situated" that any disposition without their participation "may as a practical matter impair" their interests. Fed. R. Civ. P. 24(a)(2). The States presently benefit from the Rule and would be harmed by its absence or modification. Plaintiffs argue that "it makes little sense for the States to rely on the scenario in which 'Plaintiffs are successful in vacating [the Rule]'" because the stipulated stay "leaves the Rule in effect for the time being." Ps' Opp. 17. But the phrase *for the time being* is quite crucial. Plaintiffs still demand vacatur, and the federal government is exploring unknown settlement options; any day now, the parties could announce a settlement. Because the States seek to preserve the Rule, *any settlement* would be adverse to their interests. It is thus not "too attenuated" (*id.*) or "only speculat[ion]" (*id.* at 18) for the States to fear that Defendants, who have stated their willingness to settle, would do just that. Only intervention can meaningfully protect the States.

The costs that the States would incur absent the Rule (or with a materially weakened Rule) are largely unrebutted. In their Motion, the States cite many of the same arguments and evidence offered *by Defendants* that the Rule has "reduced noncitizen encounters" and "alleviated the negative consequences of irregular migration." DE53 at 18. Many of those negative consequences would fall on the States. First, the States incur costs associated with providing services to illegal aliens who would reside here but are turned away under the Rule. *See, e.g.*, Ex. A to Mot. ¶ 105, 127; Ex D. to Mot. ¶ 5. Such costs include emergency medical care, public education, and criminal justice. *See generally Texas v. United States*, 606 F. Supp. 3d 437, 463-65 (S.D. Tex.), *rev'd*, 599 U.S. 670. Second, the States save the heightened legal and compliance costs they would face in determining when to deny services to illegal aliens who are not eligible for certain benefits. *United States v. Texas,* 599 U.S. 670, 676 (2023).

To these first two types of harms, Plaintiffs simply deny that the Rule prevents illegal immigration to the States. But the States' citation to the memorandum from Assistant Secretary Nuñez-Neto (DE53-1) goes unrebutted, and that declaration documents thousands of individuals subject to removal every month under the Rule. Indeed, Plaintiffs themselves claim that they are or were subject to the Rule, so they cannot now deny that the Rule prevents some concrete amount of illegal immigration. If their argument in opposition to intervention is accepted, then the organizational Plaintiffs also lack standing because their interests are premised (in their view) on speculation and an "interest in the … nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *see also* DE53 at 29-31. Instead, the Court should credit the view, espoused by all parties at different points in this litigation, that the Rule does prevent some degree of illegal immigration. And it is undeniable that those costs will be borne by States.

For their part, Defendants assert that "an increase in [a] state's population" is not an injury, DE80 at 12. But the States assert harms that go beyond the size of their populations and require specific resources to address. Moreover, Defendants' position cannot be squared with *United States v. Texas*, in which Texas and Louisiana asserted similar harms, yet the Supreme Court did not reject them as non-injuries. "Monetary costs are of course an injury," the Court reiterated. 599 U.S. at 676 (2023). If these types of harms to States were merely "incidental, downstream effects" (Ds' Opp. 14), then *Texas* would have been an easy case. Likewise, the case would have been easily dispatched if Defendants were right that "the States do not have a legally protectable interest … [in] the special judicial review scheme" for expedited removal of illegal aliens. Ds' Opp. 16. The Court implicitly rejected those simplistic and sweeping rationales by resting its holding on principles of redressability instead. *Id.* at 677-78 (discussing *Linda R. S.*, 410 U.S. 614).

While the *Texas* Court concluded that certain States lacked standing to sue over a *general* underenforcement of the immigration laws, the Court explicitly left open State standing to challenge a policy that "implicate[s] more than simply the Executive's traditional enforcement discretion," such as a policy concerning the "provision of legal benefits or legal status." *Id.* at 683. Non-enforcement of the Rule would remove the presumption of ineligibility for certain illegal aliens—a change in status that goes beyond mere non-prosecution. And if there is a credible threat that Defendants would abandon all or part of the Rule, as they have done previously (*see* Ps' Opp. 11-12), it would "amount to an abdication" and "exceed the bounds of enforcement discretion and support Article III standing." *Texas*, 599 U.S. at 683. Consequently, the States do not seek to intervene merely based on "enforcement decisions" (Ds' Opp. 14), but based on their interests implicated by an agency rule's changes to the asylum system and presumptive eligibility of certain illegal aliens. This is the kind of interest the judiciary "routinely and appropriately" vindicates in challenges like this one. *Texas*, 599 U.S. at 684. *See also Florida v. United States*, No. 3:21-cv-1066-TKW-ZCB, 2024 WL 677713, at *1-3 (N.D. Fla. Feb. 20, 2024).

Finally, the Rule helps the States reduce additional dilution of their political representation that accompanies relative increased population of other States by illegal aliens. *See Dep't of Commerce v. New York,* 139 S. Ct. 2551, 2565 (2019). Defendants call this harm "attenuated and speculative," DE80 at 14, but it is telling that none of the federal agencies sued will deny that illegal immigration disproportionately improves the political standing of States other than the movant States. Defendants' assertion that the present and ongoing "settlement patterns" will not "be sufficiently large and sustained" to make a difference (Ds' Opp. 14-15), but there have been over nine million border encounters under this administration alone. *See* DE67. The Rule is one of the tools preventing many thousands more would-be illegal immigrants from residing in States

like California. By comparison, movant West Virginia has a population under two million. The disparate impact of illegal immigration will reduce relative representation (through apportionment and the electoral college) and federal funding for movant States.

C.    **The States' interests are not adequately represented by the federal government.**

There was no reason for the defendants to enter settlement negotiations. In this case, all that's happened was the filing of cross motions for summary judgment. Meanwhile in the companion case, the first federal court of appeals to look at the merits entered a stay pending appeal—implying a likelihood that the federal government will succeed on the merits. The parties cite no legal or factual developments since then that would cause the federal government to entertain settlement. Settlement would almost certainly mean sacrificing some aspects of the Rule; otherwise, Plaintiffs here and Appellees in the Ninth Circuit would receive no benefit. By looking to settle a very winnable case without reason, "the administration is snatching defeat from the jaws of victory*." E. Bay Sanctuary Covenant v. Biden*, No. 23-16032, 2024 WL 725502, at *3 (9th Cir. Feb. 21, 2024) (VanDyke, J., dissenting from the grant of a stay). The States have more than met their minimal burden of showing inadequate representation.

As Plaintiffs recount, the States "demonstrate that they have repeatedly disagreed with the Federal Government's immigration and border policies—and with its litigation decisions concerning such policies—since the start of the current administration." Ps' Opp. 9-10. While Plaintiffs intimate that Defendants might "actually protect[] their interests," *id.* at 10 n.3, Plaintiffs are in no position to promise that—and they do not disclaim their desire to extract rescission or partial rescission of the Rule in settlement negotiations. True, Defendants "thus far" have kept the Rule in place. *Id.* at 21. "For now," the Rule remains in effect. *Id.* But these arguments ignore the elephant in the room—Defendants acted one way until February 5, 2024, and then executed an

abrupt about-face. On the parties' view, Defendants could threaten to abandon the Rule completely, yet it would still adequately represent the States up until the moment it did so. That makes no sense. The only way to prevent that possibility is for the States to represent themselves in settlement negotiations; the mere announcement of the possibility of settlement is evidence of divergent interests. The States do not need to wait until the damage is done.

Defendants are so willing to capitulate to these Plaintiffs that they would contradict the federal government's own position on organizational standing. Just last week, the Solicitor General of the United States cautioned the Supreme Court not to adopt an expansive view of standing and explicitly cited the danger of opening the floodgates to pro-illegal-immigration groups that are not the direct targets of immigration policy. *See* Transcript of Oral Argument at 19-21, *FDA v. All. for Hippocratic Med.*, No. 23-235 (U.S. Mar. 26, 2024). Presumably, this posture would engender vigorous litigation in a case like this one, where Defendants have contested the standing of such organizational plaintiffs. Instead, Defendants are negotiating with the same Plaintiffs who lack standing, suggesting that a "sue and settle" is brewing—a tactic that would betray the State interests in defending the Rule.

Finally, Defendants assert that they alone represent "the interests of the United States" in the courts. D's Opp. at 21. True, but those are not the only interests at stake. The States are not instrumentalities of the United States.  They are their own sovereigns, whose interests do not always align with those of the whole. Some States have sanctuary cities—perhaps they want more residents who are asylum seekers, even those with ultimately unsuccessful claims.  Some States might want more illegal aliens to reside in their territory to increase their political representation and federal funding. Others, like the movant States, view increased illegal immigration as an affront to the rule of law and to their sovereignty, a massive potential cost on society, and a threat

to their political representation—interests Defendants have not even asserted that they will protect in settlement negotiations.

The Court should not require the States to hope and pray that Defendants will adequately represent their interests while contemplating which parts of the Rule to abandon in settlement negotiations. The States have a right to intervene where their interests are imminently threatened, and Defendants cannot provide adequate representation.

## II.      The Court Should Exercise Its Discretion To Grant Intervention.

Even if the proposed intervenors do not have a *right* to enter this case, under Rule 24(b), the Court can allow the intervention if it is timely and the intervenor's claim or defense "shares with the main action a common question."  The States have easily met these requirements. As detailed above, they have interests beyond mere "philosophic identification" and do not seek "additional relief" beyond the defense of the Rule against this challenge. *Contra* Ds' Opp. 20.

## III.      The Court Should Not Hold The Motion In Abeyance To Facilitate A Settlement That Would Further Harm The States.

Plaintiffs propose that the Court could hold the intervention motion to see whether "the parties will eventually reach a settlement … that undermines the States' [] interests." Ps' Opp. 24. This approach would waste party and judicial resources. As the States prefer the Rule to any relief requested by Plaintiffs, any settlement would undermine the States' interests. The Court need not wait and see; it should ensure that States can represent themselves now before Defendants tread further down this damaging path.

## CONCLUSION

The Court should grant the motion to intervene.

Respectfully submitted,

Steve Marshall
Attorney General of Alabama

/s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Solicitor General*
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

DATED: April 4, 2024                              *Counsel for Proposed Intervenor-Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 4, 2024, I electronically filed the foregoing document with the U.S. District Court for the District of Columbia using the CM/ECF system, which will serve counsel for all parties.

/s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
Solicitor General
State of Alabama