## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

M.A. *et al*,

    *Plaintiffs*,

    v.

ALEJANDRO MAYORKAS, Secretary of the Department of Homeland Security, in his official capacity, *et al*,

    *Defendants*.

Case No. 1:23-cv-1843-TSC

**BRIEF AMICUS CURIAE OF MONTANA, FLORIDA, ALASKA, ARKANSAS, IDAHO, INDIANA, IOWA, KENTUCKY, MISSISSIPPI, MISSOURI, NEBRASKA, NEW HAMPSHIRE, NORTH DAKOTA, OHIO, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, TEXAS, UTAH, AND VIRGINIA IN SUPPORT OF PROPOSED INTERVENOR-DEFENDANTS' MOTION TO INTERVENE**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................ii

INTEREST OF AMICI CURIAE ....................................................... 1

BACKGROUND............................................................................ 1

ARGUMENT................................................................................ 5

I.  States have standing to defend immigration rules, especially rules implementing Expedited Removal. ....................................... 5

    A.  The INA amendments creating Expedited Removal were specifically intended to protect states from the fiscal harms of asylum abuse. ............................................. 5

    B.  Intervenor States have standing under well-established principles........................................................... 9

    C.  *United States v. Texas* clarifies that states have a legally cognizable interest in protecting against fiscal harms from immigration. ............................................. 11

II. States have an interest in preventing dead-hand control and circumvention of the Administrative Procedure Act's procedural protections.......................................................... 13

CONCLUSION ......................................................................... 17

ADDITIONAL COUNSEL .......................................................... 19

CERTIFICATE OF COMPLIANCE ............................................... 20

TABLE OF AUTHORITIES

## Cases

*Arizona v. City & Cnty. of S.F.,*
  142 S. Ct. 1926 (2022) ........................................................................ 15

*Arizona v. United States,*
  567 U.S. 387 (2012) ........................................................................ 10

*Carpenters Indus. Council v. Zinke,*
  854 F.3d 1 (D.C. Cir. 2017) ........................................................... 9

*City & Cnty. of S.F. v. U.S.C.I.S.,*
  992 F.3d 742 (9th Cir. 2021) ........................................................ 15

*Competitive Enter. Inst. v. FCC,*
  970 F.3d 372 (D.C. Cir. 2020) ................................................... 9, 10

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  140 S. Ct. 1891 (2020) ................................................................... 12

*Dep't of Homeland Sec. v. Thuraissigiam,*
  140 S. Ct. 1959 (2020) ..................................................................... 9

*E. Bay Sanctuary Covenant v. Biden,*
  2023 WL 4729278 (N.D. Cal. July 25, 2023) ................................. 3

*E. Bay Sanctuary Covenant v. Biden,*
  2024 WL 725502 (9th Cir. Feb. 21, 2024) ..................................... 3

*Flores v. Lynch*
  828 F.3d 898 (9th Cir. 2016) ........................................................ 13

*Flores v. Rosen,*
  984 F.3d 720 (9th Cir. 2020) ........................................................ 14

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
  561 U.S. 477 (2010) ........................................................................ 16

*Horne v. Flores,*
  557 U.S. 433 (2009) ........................................................................ 13

*Linda R.S. v. Richard D.*,
410 U.S. 614 (1973) ................................................................ 11, 12

*Louisiana ex rel. Nixon v. Graham*,
25 La. Ann. 433 (1873) ............................................................ 16-17

*Make the Rd. N.Y. v. Wolf*,
962 F.3d 612 (D.C. Cir. 2020) ........................................................ 7

*N.E. Mental Health – Mental Retard. Comm'n v. Cleveland*,
187 So. 3d 601 (Miss. 2016) .......................................................... 16

*New York v. U.S. Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020) ............................................................. 7

*Ojeda-Terrazas v. Ashcroft*,
290 F.3d 292 (5th Cir. 2002) .......................................................... 6

*Plyler v. Doe*,
457 U.S. 202 (1982) ..................................................................... 8

*Texas v. United States*,
50 F.4th 498 (5th Cir. 2022) ........................................................... 8

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) ......................................................... 12

*United States v. Texas*,
579 U.S. 547 (2016) .................................................................... 12

*United States v. Texas*,
599 U.S. 670 (2023) ..................................................... 11, 12, 15-16

*Utahns for Better Transp. v. U.S. Dep't of Transp.*,
295 F.3d 1111 (10th Cir. 2002) ...................................................... 10

*Uzuegbunam v. Preczewski*,
141 S. Ct. 792 (2021) ................................................................. 9-10

*Valdiviez-Hernandez v. Holder*,
739 F.3d 184 (5th Cir. 2013) ........................................................... 6

## OTHER AUTHORITIES

### UNITED STATES CODE

8 U.S.C. § 1601 ............................................................... 8

8 U.S.C. §§ 1611-13 ........................................................ 7

18 U.S.C. § 1182(a)(4) ...................................................... 7

18 U.S.C. § 1183a ............................................................. 7

### CODE OF FEDERAL REGULATIONS

42 C.F.R. § 440.255 ......................................................... 8

### FEDERAL REGISTER

88 Fed. Reg. 11,704 (Feb. 23, 2023) .............................. 2, 9

88 Fed. Reg. 31,314 (May 16, 2023) .............................. 2, 3

### OTHER RESOURCES

1 W. Blackstone, Commentaries on the Laws of England 90
(1765) ............................................................................. 16

H.R. Rep. No. 104-469, pt. 1 (1995) .................................. 5, 6

Illegal Immigration Reform and Immigrant Responsibility Act
of 1996, Division C of Pub. L. 104-208, 110 Stat. 3009-546 .................... 6

Immigration and Nationality Act, Pub. L. 82-414, 66 Stat. 163
(1952) ............................................................................. 5

Indiana Att'y Gen, Comment to Notice of Proposed Rulemaking
"*Circumvention of Lawful Pathways*," Dkt. No. USCIS 2022-0016
(Mar. 27, 2023) ............................................................... 2

Summary of Welfare Reforms Made by Public Law 104-193, House
Ways & Means Committee, WMCP 104-15 (1996)................................. 7

Title IV of the Personal Responsibility and Work Opportunity
Reconciliation Act of 1996, Pub. L. 104-193, 110 Stat. 2105.................... 6

## INTEREST OF AMICI CURIAE

Montana, Florida, Alaska, Arkansas, Idaho, Indiana, Iowa, Kentucky, Mississippi, Missouri, Nebraska, New Hampshire, North Dakota, Ohio, South Carolina, South Dakota, Tennessee, Texas, Utah, and Virginia ("Amici States") are sovereign states.  Amici States seek to protect standing of states to defend immigration rules when the Executive abdicates its obligation to do so.  Amici States are especially focused on the standing of states to defend rules that implement statutes intended to protect states from the adverse effects of unlawful immigration.  More broadly, Amici States seek to protect their procedural rights and the welfare of their citizens by ensuring regulations are adopted or repealed only after notice and comment, not via sue-and-settle tactics.

## BACKGROUND

In early 2023, the U.S. Department of Justice and U.S. Citizenship and Immigration Services proposed a rule "establish[ing] a rebuttable presumption that certain noncitizens who enter the United States without documents sufficient for lawful admission are ineligible for asylum, if they traveled through a country other than their country of citizenship, nationality, or, if stateless, last habitual residence, unless they were

provided appropriate authorization to travel to the United States to seek parole pursuant to a DHS-approved parole process; presented at a port of entry at a pre-scheduled time or demonstrate that the mechanism for scheduling was not possible to access or use; or sought asylum or other protection in a country through which they traveled and received a final decision denying that application." *Circumvention of Lawful Pathways*, 88 Fed. Reg. 11,704, 11,707 (Feb. 23, 2023).  Amici Montana, Florida, Arkansas, Idaho, Indiana, Iowa, Kentucky, Mississippi, Missouri, Nebraska, New Hampshire, Ohio, South Carolina, Texas, Utah ("State Commenters"), along with Alabama, Georgia, Kansas, Louisiana, West Virginia, and other states, provided extensive comments supporting "first safe country principles" but opposing the exceptions to the rule that would have permitted the release of inadmissible aliens into the interior. Indeed, the State Commenters expressed concern with, among other things, the rule's fiscal impact to states.[1]  DOJ and USCIS nevertheless finalized their proposed rule.  *Circumvention of Lawful Pathways*, 88 Fed. Reg. 31,314, 31,438 (May 16, 2023) ("CLP Rule").  The preamble

---

[1] Indiana Att'y Gen, Comment to Notice of Proposed Rulemaking "*Circumvention of Lawful Pathways*," Dkt. No. USCIS 2022-0016 (Mar. 27, 2023), https://www.regulations.gov/comment/USCIS-2022-0016-12295.

responded to State Commenters' letter by "respectfully disagree[ing]" and stating "[t]his rule is expected to reduce irregular migration, not increase it." *Id.* at 31,438.

Multiple parties sued.

- In the Northern District of California, activist organizations filed a supplemental complaint asserting the "government cannot force asylum seekers to enter at ports" and "cannot force asylum seekers to apply for asylum in transit countries." Supp. Compl. (ECF 164), *E. Bay Sanctuary Covenant v. Biden*, No. 4:18-cv-6810 (N.D. Cal.). The court rejected the Government's arguments that plaintiffs lacked standing and granted summary judgment in plaintiffs' favor. 2023 WL 4729278 (N.D. Cal. July 25, 2023). The Government appealed, and the Ninth Circuit held oral argument. 2024 WL 725502 (9th Cir. Feb. 21, 2024).

- In this Court, activist organizations and individual asylum seekers filed a complaint attacking the first safe country provisions and purported changes to the standards applied to determine credible fear, as well as asserting procedural violations. Compl. (ECF 1), *M.A. v. Mayorkas*, No. 1:23-cv-1843 (D.D.C.). The parties filed cross-motions for summary judgment, with the Government arguing—as it did in *East Bay*—that plaintiffs lack standing and that their claims are foreclosed by a statutory jurisdictional bar.

- In the District of North Dakota, North Dakota, Indiana, and sixteen other states attacked the "lawful pathways" and parole process created by the CLP Rule. Compl. (ECF 1), *North Dakota v. Mayorkas*, No. 1:23-cv-106 (D.N.D.). The Government moved to dismiss for lack of standing and failure to state a claim; that motion is now fully briefed and pending.

- In the Northern District of Texas, Texas attacked the CBP One appointments system as contrary to law and incentivizing illegal immigration, and further attacked the rule as arbitrary and capricious because it is so "rife with concessions that [it] will operate to increase the number of illegal aliens processed at the border." Compl. (ECF 1), *Texas v. Mayorkas*, No. 2:23-cv-00024 (N.D. Tex.). The Government moved to dismiss, and Texas responded by filing an amended complaint.

On February 5, 2024, the Government and plaintiffs jointly moved to hold this case in abeyance, stating that "[t]he parties are engaged in discussions regarding implementation of the challenged rule and related policies and whether a settlement could eliminate the need for further litigation." ECF 66. The Government filed a similar joint motion in the Ninth Circuit *East Bay* case. To Amici States's knowledge, no such discussions regarding resolution were being held in the *North Dakota* or *Texas* cases. Kansas, Alabama, Georgia, Louisiana, and West Virginia ("Intervenor States") moved to intervene in this case and in *East Bay*, arguing that in view of the abeyance and settlement discussions, the Government no longer appeared to adequately represent their interests. ECF 67. The Government opposes.

4

ARGUMENT

## I. States have standing to defend immigration rules, especially rules implementing Expedited Removal.

### A. The INA amendments creating Expedited Removal were specifically intended to protect states from the fiscal harms of asylum abuse.

The Immigration and Nationality Act, Pub. L. 82-414, 66 Stat. 163 (1952), *as amended*, generally requires that aliens without valid entry documents be removed from the United States unless they qualify for asylum or other humanitarian protections.  In 1995, Congress concluded "the asylum system … ha[d] been subject to abuse by tens of thousands … who filed non-legitimate claims simply in order to extend their stay in the U.S. and to receive work authorization."  H.R. Rep. No. 104-469, pt. 1, at 139.  Making that problem worse, the Executive had been abusing its limited parole authority "to admit entire categories of aliens who do not qualify for admission," despite the INA being "clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs."  *Id*. at 140.  The resulting influx of aliens was a significant burden on the states.  A House Committee Report explained:

> The current cohort of Immigrants is far more likely to have less than a high-school education than native-born Americans.  This can have the effect of flooding the labor market for unskilled work, as well as creating pockets of impoverished

5

> immigrants…. The rise of immigrant-based organized crime
> groups suggests that screening of potential immigrants is not
> as rigorous as it ought to be. These negative impacts are most
> keenly felt in the handful of States in which a vast majority of
> immigrants choose to live….
>
> * * * * *
>
> Again, these problems are heightened in high-immigration
> States. Our education system, for example, is burdened by
> the needs of immigrants who either are not proficient in Eng-
> lish or illiterate in their own language or both. In Los Angeles
> county, education is provided in over 70 languages at a larger
> "per student" cost to the taxpayer.

*Id.* at 133. The Committee Report went on to explain that "aliens [were] applying for and receiving public benefits from Federal, State and local governments at increasing rates." *Id.* at 144. Congress accordingly enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. 104-208, 110 Stat. 3009-546 ("IIRIRA"), and Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104-193, 110 Stat. 2105 ("PRWORA") to help address these problems.[2]

IIRIRA and PRWORA included several provisions relevant here:

---

[2] H.R. Rep. 104-169 is considered part of the legislative history and justification for IIRIRA. *See, e.g.*, *Valdiviez-Hernandez v. Holder,* 739 F.3d 184, 191 (5th Cir. 2013); *Ojeda-Terrazas v. Ashcroft*, 290 F.3d 292, 296 n.11 (5th Cir. 2002).

*First*, Congress created the expedited removal process coupled with mandatory detention during that process.  *See Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618-20 (D.C. Cir. 2020) (reviewing history and summarizing expedited removal process).

*Second*, Congress amended the long-standing bar on admitting "[a]ny alien who … is likely at any time to become a public charge" to, *inter alia*, mandate consideration of "age," "health," "family status," "assets, resources, and financial status;" and "education and skills," 18 U.S.C. § 1182(a)(4), and to require certain aliens to obtain affidavits of support that are "legally enforceable against the sponsor by … any State," 18 U.S.C. § 1183a; *see also New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 53 (2d Cir. 2020) (summarizing provisions).

*Third*, Congress limited alien eligibility for any "federal public benefit" to "qualified aliens," with even those qualified aliens generally subject to a five-year bar on receiving benefits.  8 U.S.C. §§ 1611-13; *see also* Summary of Welfare Reforms Made by Public Law 104-193, House Ways & Means Committee, WMCP 104-15, at 34-40 (1996). Aliens nevertheless remained eligible for certain benefits that are partially funded by states,

including Emergency Medical Services, *see* 42 C.F.R. § 440.255, and public education, *see Plyler v. Doe*, 457 U.S. 202 (1982).

*Fourth*, Congress found that, *inter alia*, "aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates," "[c]urrent eligibility rules for public assistance … have proved wholly incapable of assuring that individual aliens not burden the public benefits system," "[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits," and "[w]ith respect to the State authority to make determinations concerning the eligibility of qualified aliens for public benefits … a State that chooses to follow the Federal classification in determining the eligibility of such aliens for public assistance shall be considered to have" satisfied strict scrutiny.  8 U.S.C. § 1601.

In short, the INA—as amended by IIRIRA and PRWORA— "encompasses [Intervenor States'] concerns about the financial burdens of illegal immigration." *Texas v. United States*, 50 F.4th 498, 521 (5th Cir. 2022) ("Texas DACA").  "It's clear that the INA aimed, at least in part, to protect States from just those kinds of [fiscal] harms." *Id.*  In this case, Plaintiffs attack parts of the CLP Rule as "violat[ing] the expedited

removal statute," ECF 37, at 10, and base their standing on purportedly being subject to "unlawfully issued expedited removal orders," ECF 1 ¶ 19.  It would be extraordinary to find that states lack standing to defend regulations implementing statutory provisions that were enacted expressly to protect states from fiscal harms.[3]

### B. Intervenor States have standing under well-established principles.

Congress's rationale for IIRIRA and PRWORA was well-founded, and the Court need inquire no further.  Regardless, Intervenor States' standing also follows from well-established principles.  "For standing purposes, even a small financial injury is enough[.]"  *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 384 (D.C. Cir. 2020) (citing *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017)); *see also Uzuegbunam v.*

---

[3] Statistically, most of the aliens subject to Circumvention of Lawful Pathway ("CLP") Rule are unlawful immigrants, not legitimate asylum claimants.  "Most asylum claims … ultimately fail, and some are fraudulent."  *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1963 (2020); *see also id.* at 1967 & n.10 (referencing "study in which 58% of randomly selected asylum applications exhibited indicators of possible fraud and 12% were determined to be fraudulent").  Many claimants don't even file for asylum, and instead simply abscond into the interior.  *Id*; *see also* 88 Fed. Reg. at 11,716 ("A full 83 percent of the people who were subject to ER and claimed fear from 2014 to 2019 were referred to an IJ for section 240 proceedings, but only 15 percent of those cases that were completed were granted asylum or some other form of protection.").

*Preczewski*, 141 S. Ct. 792, 801 (2021) (finding standing based on claim for nominal damages: "[A] single dollar often cannot provide full redress, but the ability to effectuate a partial remedy satisfies the redressability requirement."). Certainty of the injury is not required; a "substantial likelihood" suffices, and injury may be based on the predictable responses of others. *Competitive Enter. Inst.*, 970 F.3d at 384. Applied here, it's unquestionable that states "bear[] many of the consequences" of unlawful immigration, but they have limited ability to alleviate that burden. *Arizona v. United States*, 567 U.S. 387, 397, 416 (2012). Intervenor States have introduced evidence of the burden they bear from asylum applicants. The safe third country portion of the Circumvention of Lawful Pathways Rule was designed, in part, to alleviate that burden. And keeping that part of the Rule in place will do just that. Conversely, Intervenor States will be injured if that part of the Rule is compromised. That's a protectable interest warranting intervention. *See, e.g.*, *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 295 F.3d 1111, 1115 (10th Cir. 2002) ("The threat of economic injury from the outcome of litigation undoubtedly gives a petitioner the requisite interest."). And Intervenor States' injury would be fairly traceable to any compromise of the safe-third-

10

countries-portion of the Rule and redressable by its reinstatement.   Intervenor States have standing.

**C. *United States v. Texas* clarifies that states have a legally cognizable interest in protecting against fiscal harms from immigration.**

Nothing in *United States v. Texas*, 599 U.S. 670 (2023) ("*Texas Priorities*"), precludes Intervenor States's standing.  Indeed, in *Texas Priorities*, the Supreme Court acknowledged "[m]onetary costs are of course an injury." *Id.* at 676.  It clarified, however, "that the alleged injury must [also] be legally and judicially cognizable." *Id.*  The plaintiff states in *Texas Priorities* had "not cited any precedent, history, or tradition of courts ordering the Executive Branch to change its arrest or prosecution policies," and the Court "has previously ruled that a plaintiff lacks standing to bring such a suit." *Id.* at 677 (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).  So the Court simply applied its precedent in *Linda R.S.* anew.  The Supreme Court emphasized the limited nature of its holding: even in the context of arrests and prosecutions, "the standing calculus might change [1] if the Executive Branch wholly abandoned its statutory responsibilities," [2] if the challenged policy "involves both the Executive Branch's arrest or prosecution priorities and the Executive

Branch's provision of legal benefits or legal status," or [3] the challenged policy was "governing the continued detention of noncitizens who have already been arrested." *Id.* at 683 (emphasis in original). That's because in those circumstances, "the challenged policy might implicate more than simply the Executive's traditional enforcement discretion." *Id.* The Court then cited *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020), for the proposition that "benefits such as work authorization and Medicare eligibility accompanied by non-enforcement mean that the policy was 'more than simply a non-enforcement policy.'" *Id.* It similarly cited *Texas v. United States*, 809 F.3d 134, 154 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547 (2016) ("*Texas DAPA*"), for the proposition that *Linda R.S.* "'concerned only nonprosecution,' which is distinct from 'both nonprosecution and conferral of benefits.'" *Id.* Here, of course, no arrests or prosecutions are at issue, and Intervenor States are asserting injury from public benefits costs if the CLP Rule is compromised. That is the situation *Texas Priorities* expressly distinguished in light of the history and precedent of *Regents* and *Texas DAPA*.

## II. States have an interest in preventing dead-hand control and circumvention of the Administrative Procedure Act's procedural protections.

The prospect of Defendants' circumventing the Administrative Procedure Act via "sue-and-settle" tactics raises grave federalism, separation of powers, due process, APA, and political-accountability concerns.

The risk of an overbroad settlement is one aspect of the problem. "[P]ublic officials sometimes consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law." *Horne v. Flores*, 557 U.S. 433, 448 (2009). "Injunctions of this sort bind … officials to the policy preferences of their predecessors and may thereby improperly deprive future officials of their designated legislative and executive powers." *Id.* at 449. The decades-old *Flores* settlement[4] amply illustrates the problem, with new regulations enjoined not because they

---

[4] The *Flores* Agreement, entered as a consent decree in 1997, sets forth a "nationwide policy for the detention, release, and treatment of minors" in immigration custody—applying to unaccompanied alien children and accompanied minors alike. *Flores v. Lynch* (*Flores I*), 828 F.3d 898, 901 (9th Cir. 2016). It also announces a general policy favoring release of apprehended minors and requiring the government to place them in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interests in protecting the minor's well-being and ensuring his or her presence at removal proceedings. Minors are to be detained in safe and sanitary facilities and cannot be housed with an unrelated adult for more than 24 hours.

13

are unlawful, but because they violate a settlement entered decades ago by long-out-of-office bureaucrats. *See, e.g.*, *Flores v. Rosen*, 984 F.3d 720 (9th Cir. 2020) (affirming order denying termination of decades old settlement agreement and affirming-in-part injunction against regulations "inconsistent with" that agreement).

That the Government appears willing to settle an APA case is even more concerning. A regulation is either lawful or it's not; there is no middle ground. Any resolution other than dismissal, a judgment on the merits, or remand to the agency to correct defects risks allowing the Executive to circumvent the procedural protections set forth in the APA. Just three terms ago, the Supreme Court sought to address that very problem. It granted certiorari on "[w]hether States with interests should be permitted to intervene to defend a rule when the United States cease[d] to defend" in circumstances strikingly similar to those here. *Arizona v. City & Cnty. of San Francisco*, No. 20-1775 (U.S.). In that case, Judge Van-Dyke summarized the Government's collusive gamesmanship vis-à-vis an immigration rule:

> In concert with the various plaintiffs …, the federal defendants simultaneously dismissed all the cases challenging the [Public Charge] rule (including cases pending before the Supreme Court), acquiesced in a single judge's nationwide

14

vacatur of the rule, leveraged that now unopposed vacatur to immediately remove the rule from the Federal Register, and quickly engaged in a cursory rulemaking stating that the federal government was reverting back to the Clinton-era guidance—all without the normal notice and comment typically needed to change rules.

*  *  *  *  *

***By deliberately evading the administrative process in this way, the government harmed the state intervenors by preventing them from seeking any meaningful relief through agency channels***.

*City & Cnty. of S.F. v. U.S.C.I.S.*, 992 F.3d 742, 743, 751 (9th Cir. 2021)

(VanDyke, J., dissenting) (emphasis added).

The Supreme Court ultimately dismissed the writ of certiorari in *Arizona* as improvidently granted. *Arizona v. City & Cnty. of S.F.*, 142 S. Ct. 1926 (2022). A concurrence by Chief Justice Roberts, joined by Justices Thomas, Alito, and Gorsuch, explained that the Government's "maneuvers raise a host of important questions," including "whether the Government's actions, all told, comport with the principles of administrative law." *Id.* at 1928. Dismissal was warranted, however, because of the "mare's nest" of "issues beyond the question of appellate intervention on which [the Court] granted certiorari" which "could stand in the way of … reaching the question presented." *Id.* Subsequent opinions make clear that "rulemaking-by-collective-acquiescence" still should be

scorned.  *Texas Priorities*, at 599 U.S. at 694-95 (Gorsuch, J., joined by Thomas and Barrett, J.J., concurring).

The same "important questions" raised in *Arizona* are once again raised in this case.  The recurring theme is the Executive seeking to side-step not only the APA, but also centuries of limits on the power of elected officials.  *See* 1 W. Blackstone, Commentaries on the Laws of England 90 (1765).  Amici submit that Executive officials lack authority to sidestep the APA or contractually bind their successors.  *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 497 (2010) ("The Pres-ident can always choose to restrain himself in his dealings with subordi-nates.  He cannot, however, choose to bind his successors by diminishing their powers….").  Indeed, the long-standing rule among states is that executive officials cannot contractually bind successors in the exercise of their discretion.  *See, e.g.*, *N.E. Mental Health – Mental Retard. Comm'n v. Cleveland*, 187 So. 3d 601, 605 (Miss. 2016) ("This Court repeatedly has applied the rule against binding successors to void all types of agree-ments, even when that board or municipality had statutory authority to lease or contract, but not statutory authority to bind successors."); *Loui-siana ex rel. Nixon v. Graham*, 25 La. Ann. 433, 434 (1873) ("An Attorney

General who palpably neglects his duty and who abandons the interest of the State, which he was charged to protect and to defend, has no authority to make contracts binding on his successor for a like dereliction of duty to the State.  The Attorney General is not the State; but only the counsel for the State.  His agreement to acquiesce in a judgment is not the acquiescence of the State; nor does it bind a succeeding Attorney General….").  Consistent with those principles, Intervenor States have a strong interest in protecting their own procedural rights under the APA, as well as an interest in preventing gamesmanship by the current Executive that may delay or impede policy changes by successor officials.

## CONCLUSION

The Court should grant the Intervenor States' motion to intervene.

DATED this 5th day of April, 2024.

AUSTIN KNUDSEN
  *Montana Attorney General*

CHRISTIAN B. CORRIGAN
  *Solicitor General*

*/s/ Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.
  *Deputy Solicitor General*

Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Tel:  (406) 444-2026
peter.torstensen@mt.gov
christian.corrigan@mt.gov

*Counsel for Amicus State of Montana*

ASHLEY MOODY
  *Florida Attorney General*

*/s/ Henry C. Whitaker*
HENRY C. WHITAKER
  *Solicitor General*
JAMES H. PERCIVAL
  *Chief of Staff*
BRIDGET K. O'HICKEY
  *Assistant Solicitor General*
Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399
Tel: (850) 414-3300
henry.whitaker@myfloridalegal.com

*Counsel for Amicus State of Florida*

18

ADDITIONAL COUNSEL

TREG TAYLOR
*Attorney General of
Alaska*

TIM GRIFFIN
*Attorney General of
Arkansas*

RAÚL R. LABRADOR
*Attorney General of
Idaho*

THEODORE E. ROKITA
*Attorney General of
Indiana*

BRENNA BIRD
*Attorney General of
Iowa*

RUSSELL COLEMAN
*Attorney General of
Kentucky*

LYNN FITCH
*Attorney General of
Mississippi*

ANDREW BAILEY
*Attorney General of
Missouri*

MICHAEL T. HILGERS
*Attorney General of
Nebraska*

JOHN M. FORMELLA
*Attorney General of
New Hampshire*

DREW H. WRIGLEY
*Attorney General of
North Dakota*

DAVE YOST
*Attorney General of
Ohio*

ALAN WILSON
*Attorney General of
South Carolina*

MARTY J. JACKLEY
*Attorney General of
South Dakota*

JONATHAN SKRMETTI
*Attorney General and
Reporter of Tennessee*

KEN PAXTON
*Attorney General of
Texas*

SEAN D. REYES
*Attorney General of
Utah*

JASON MIYARES
*Attorney General of
Virginia*

19

CERTIFICATE OF COMPLIANCE

1.  This brief complies with Local Civil Rule 7(o)(4) because it does not exceed 25 pages.

2.  This brief complies with Local Civil Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4) because it complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font and is double-spaced except for footnotes and for quoted and indented material.

/s/    *Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.