**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| M.A., *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) No. 1:23-cv-01843-TSC |
| | ) |
| KRISTI NOEM, Secretary of Homeland Security, in her official capacity, *et al.*, | ) |
| | ) |
| *Defendants*. | ) |

## <u>PLAINTIFFS' RENEWED MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT</u>

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

   A.  Asylum and Related Relief ....................................................................................... 2

   B.  Full and Expedited Removal Proceedings .............................................................. 4

   C.  Prior Asylum Bans ................................................................................................... 5

   D.  The Rule and Subsequent Asylum Bans ................................................................. 7

   E.  Elimination of the So-Called "Lawful Pathways" and Sunset of the Rule's
      Application to New Entrants ................................................................................... 10

   F.  The Collateral Expedited Removal Policies ........................................................ 11

LEGAL STANDARD ....................................................................................................... 13

ARGUMENT .................................................................................................................... 13

   I.  The Rule's Asylum Eligibility Bar Is Unlawful .................................................... 14

      A.  The Eligibility Bar Is Contrary to Law .......................................................... 14

         1.  The Bar's Three Asylum Eligibility Conditions Are Contrary to the Statute ........... 14

         2.  In Practice, the Eligibility Bar Collapses Into an Entry-Based Bar ......................... 16

      B.  The Eligibility Bar Is Arbitrary and Capricious .............................................. 18

         1.  The Rule's Justification Depends on Factors Congress Has Rejected. ..................... 19

         2.  The Record Belies the Rule's Main Justification for the Bar ................................... 20

         3.  The Record Does Not Support the Rule's Assumption that People Who Do Not
            Use Its "Pathways" Have Weaker Asylum Claims ................................................. 27

         4.  Defendants Arbitrarily Refused to Consider the Interacting Effects of
            Contemporaneous Policies ..................................................................................... 27

   II.  The Rule's Application in Expedited Removal Is Unlawful ............................... 30

      A.  The Rule Violates § 1225(b) ........................................................................... 30

      B.  The Bar's Application in the Expedited Removal Process is Arbitrary and
         Capricious ........................................................................................................ 32

   C.  The Rule's Heightened Screening Standard Is Arbitrary and Capricious ....................... 34

   III.  The Collateral Policies Are Unlawful ................................................................. 36

      A.  The 24-Hour Guidance Is Unlawful ............................................................... 37

      B.  The Third Country Removal Policy Is Unlawful............................................. 39

         1.  The Policy Violates the INA and Failed to Consider this Conflict ......................... 40

         2.  The Policy Impermissibly Fails to Provide Advance Notice ................................... 41

         3.  The Policy Impermissibly Fails to Consider the Danger of Chain *Refoulement* ....... 43

   IV.  The Court Should Grant Vacatur and Other Relief ............................................. 43

CONCLUSION.................................................................................................................. 45

i

## INTRODUCTION

The so-called "Circumvention of Lawful Pathways" Rule, 88 Fed. Reg. 31,420 (May 16, 2023) (Rule), bars asylum to people who entered the United States without presenting at official ports of entry via appointments made using the CBP One smartphone app. It applies to noncitizens who crossed the southern border between May 11, 2023, and May 11, 2025. Although no longer applying to new entrants, every day the Rule continues to bar protection to otherwise-eligible asylum applicants in regular removal proceedings in immigration court and in affirmative asylum proceedings. It also continues to harm people facing expedited removal because in recent months Defendants expanded the applicability of expedited removal and began dismissing cases in regular removal proceedings for placement in expedited removal. While the Rule purported to encourage asylum seekers to use the CBP One system or other "pathways" to the United States, those pathways were always largely illusory. And most—including CBP One—have now been eliminated entirely. As Judge Contreras recently held in vacating a similar 2024 asylum bar, conditioning asylum on presenting at ports of entry with appointments violates the asylum statute, which permits noncitizens present in the United States to seek asylum "'whether or not' a noncitizen arrives 'at a designated port of arrival.'" *Las Americas Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec.*, No. 24-1702, 2025 WL 1403811 at *30-31, ___ F. Supp. 3d ___ (D.D.C. May 9, 2025) (hereinafter *Las Americas*) (quoting 8 U.S.C. § 1158(a)(1)).

The collateral expedited removal policies that Defendants issued concurrently with the Rule are also unlawful. As relevant here, Defendants reduced the consultation period before asylum screening interviews to as little as 24 hours and adopted a policy providing for expedited removals to third countries. These changes have recently taken on renewed urgency. Judge Contreras vacated an even further reduction in the consultation period in *Las Americas*, *id*. at *19-

20, leaving the 24-hour policy at issue here as the operative timeline. And while Defendants previously conducted third country removals to Mexico, the current administration has pursued removal to a host of third countries, including El Salvador, Panama, and South Sudan.

Consistent with Judge Contreras' recent decision and with every court that has considered Defendants' attempts to override their statutory obligations to consider asylum applications, this Court should hold unlawful and vacate the Rule and the other challenged policies.[1]

## BACKGROUND

### A.    Asylum and Related Relief

People fleeing persecution and torture may seek three primary forms of protection in the United States: asylum under 8 U.S.C. § 1158; withholding of removal under 8 U.S.C. § 1231(b)(3); and protection under the Convention Against Torture (CAT), *see* 8 C.F.R. §§ 1208.16-18. Asylum gives protection from removal to people who have a "well-founded fear of persecution"—which can be satisfied by showing a ten percent chance of persecution—on account of a protected ground. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428, 430, 440 (1987). Withholding of removal and CAT require applicants to meet a higher standard by proving that they are more likely than not to be persecuted or tortured. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 419 (1999); *Nasrallah v. Barr*, 590 U.S. 573, 575 (2020). They also do not confer all of the benefits of asylum; unlike asylum, a person granted withholding of removal or CAT relief may not petition for immediate family members and has neither permanent protection from deportation nor a pathway to U.S. citizenship. *See O.A. v. Trump*, 404 F. Supp. 3d 109, 118 (D.D.C. 2019). The Supreme Court has held that

---

[1] Plaintiffs' earlier motion for summary judgment also challenged Defendants' policy of "voluntarily" returning non-Mexicans to Mexico. Defendants have represented that this policy is no longer in effect, and Plaintiffs do not object to the dismissal without prejudice of their challenge to that policy as moot. This motion also does not challenge the policy, discussed in the Amended Complaint, of using non-asylum officers to conduct credible fear interviews.

these more limited forms of protection implement our nation's international treaty obligations. *See, e.g.*, *Cardoza-Fonseca*, 480 U.S. at 435.

Congress "recognized that refugees fleeing imminent persecution do not have the luxury of choosing their escape route into the United States." *E. Bay Sanctuary Covenant (EBSC) v. Biden*, 993 F.3d 640, 658 (9th Cir. 2021). Indeed, it was "well recognized when the Refugee Act of 1980 was drafted" that "[m]any migrants enter between ports of entry out of necessity" and "have no choice but to cross into a safe country irregularly prior to making an asylum claim." *Id.* at 673. Congress therefore expressly mandated that any noncitizen "who is physically present in … or who arrives in the United States" may apply for asylum "whether or not" they arrive "at a designated port of entry" and "irrespective" of their status at the time. 8 U.S.C. § 1158(a)(1).

Congress also delineated several narrow categories of people who are ineligible to apply for or receive asylum. *See* 8 U.S.C. § 1158(a)(2) & (b)(2). These include both people who have been "firmly resettled in another country," *id.* § 1158(b)(2)(A)(vi), and people who can, pursuant to a formal bilateral agreement, be removed to a "safe third country" where they can access "a full and fair procedure" for seeking asylum, *id.* § 1158(a)(2)(A). And although the Attorney General and DHS Secretary "may by regulation establish additional limitations and conditions" on asylum eligibility, any such limitations and conditions must be "consistent with [§ 1158]." *Id.* § 1158(b)(2)(C).

Noncitizens who are in full removal proceedings in immigration court may file "defensive" applications for asylum, withholding, and CAT protection in those proceedings. Noncitizens who are not in removal proceedings may file "affirmative" applications for asylum with U.S. Citizenship and Immigration Services (USCIS). *See* 8 C.F.R. §§ 208.2(a), 208.9.

B.    **Full and Expedited Removal Proceedings**

Congress created the "expedited removal scheme to substantially shorten and speed up the removal process" for certain noncitizens arriving without valid immigration documents. *Make The Rd. N.Y. v. Wolf,* 962 F.3d 612, 618 (D.C. Cir. 2020). The process "lives up to its name." *Id.* Absent an indication of fear of persecution or torture, a noncitizen placed in expedited removal may be removed almost immediately. *Id.* But Congress balanced the interest in "efficient removal" against "a second, equally important goal: ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution." *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020).

To that end, noncitizens in expedited removal who express a fear of removal or an intention to apply for asylum must be given a credible fear interview (CFI) with an asylum officer. 8 U.S.C. § 1225(b)(1)(B). If noncitizens demonstrate a "significant possibility" that they "could establish eligibility for asylum," they must be taken out of the expedited removal process and placed in full removal proceedings under 8 U.S.C. § 1229a, in which they can pursue asylum and other forms of protection. *See id.* § 1225(b)(1)(B)(v). If a noncitizen does not establish a significant possibility of asylum eligibility, the asylum officer will also screen for withholding and CAT protection, with a positive finding likewise leading to full removal proceedings. 8 C.F.R. § 208.30(e)(2)-(3). A negative finding by the asylum officer on any of these issues is reviewable only by an immigration judge in a summary proceeding held within a week after the CFI; further review is not available. 8 U.S.C. §§ 1225(b)(1)(B)(iii), 1252(a)(2)(A) & (e)(2); 8 C.F.R. § 1208.30.

Noncitizens who are placed in full removal proceedings receive significantly more robust procedural protections. They have rights to counsel, to present evidence, to examine the government's evidence and witnesses, and to appeal to both the Board of Immigration Appeals

and a federal court of appeals. 8 U.S.C. §§ 1229, 1229a, 1252(a)-(b); 8 C.F.R. §§ 1003.12-1003.47. They also have substantially more time to gather evidence, consult with counsel and experts, develop arguments, and otherwise prepare. The "significant possibility" standard asks whether noncitizens could prevail on the merits under these more forgiving circumstances.

Historically, asylum officers did not apply any bars to asylum at the CFI stage. *See* 87 Fed. Reg. 18,078, 18,084 (Mar. 29, 2022). Likewise, under longstanding regulations, all three forms of protection were assessed under the significant-possibility standard at the CFI stage. *Id.* at 18,091. Both of these historical practices were briefly suspended in the first Trump administration, but Defendants reaffirmed them just a year before promulgating the Rule. *See id.* at 18,084.[2]

## C.    Prior Asylum Bans

For almost forty years after Congress enacted the asylum statute, every new regulatory bar to asylum was narrow. *See, e.g.*, 55 Fed. Reg. 30,674, 30,678, 30,683 (July 27, 1990) (certain criminal convictions); 45 Fed. Reg. 37,392 (June 2, 1980) (firm resettlement bar, later adopted by Congress). Since 2018, however, the executive branch has issued a series of regulations and other executive actions that all sought to significantly narrow access to the asylum process. The federal courts have held each of those attempts to be invalid.

In 2018, Defendants issued regulations that, together with a presidential proclamation, barred asylum to anyone who entered the United States between ports of entry. *See* 83 Fed. Reg. 55,934 (Nov. 9, 2018) (entry ban). A district court enjoined the entry ban—and the Ninth Circuit affirmed the injunction—on multiple grounds, including that the Immigration and Nationality Act (INA) prohibits DHS from requiring asylum seekers to enter at ports. *EBSC v. Trump*, 354 F. Supp.

---

[2] In a separate rulemaking, the Biden Administration changed course again on the application of bars to asylum in CFIs. 89 Fed, Reg. 103370 (Dec. 17, 2024). That rule is being challenged in another case. *See E.Q. v. DHS*, No. 1:25-cv-00791-CRC (D.D.C. filed Mar. 17, 2025).

3d 1094, 1112, 1121 (N.D. Cal. 2018), *aff'd*, 993 F.3d at 681 (9th Cir. 2021); *see also O.A*, 404 F.Supp.3d. at 109 (vacating the entry ban at summary judgment).

In 2019, Defendants issued a regulation barring asylum to people who passed through a third country en route to the United States, with narrow exceptions for those who applied for and were denied protection in a transit country and for victims of a "severe form of trafficking." 84 Fed. Reg. 33,829, 33,843-44 (July 16, 2019) (transit ban). A district court enjoined the transit ban nationwide, both because Congress had already addressed the narrow situations where asylum could be denied based on availability of protection in other countries and because the record contradicted the rule's conclusions that transit countries provided a safe and viable alternative for people seeking asylum. *EBSC v. Barr*, 385 F. Supp. 3d 922, 952-57 (N.D. Cal. 2019); *EBSC v. Barr*, 391 F. Supp. 3d 974, 985 (N.D. Cal. 2019). The Supreme Court stayed that injunction pending appeal without providing reasoning. *Barr v. EBSC*, 140 S. Ct. 3 (2019). The Ninth Circuit then affirmed the district court's merits ruling in full. *EBSC v. Garland*, 994 F.3d 962 (9th Cir. 2020).

After the Supreme Court stayed the injunction, the transit ban applied for almost a year until Judge Kelly vacated the rule for failure to follow notice-and-comment procedures. *Cap. Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020), *appeal dismissed sub nom. I.A. v. Garland*, No. 20-5271, 2022 WL 696459 (D.C. Cir. Feb. 24, 2022). During that time, less than 2% of people overcame the transit ban—and an unknown number of the people who did overcome the ban did so on the basis of an exception for trafficking victims, not because they satisfied the transit condition. *See* PC_39850 & n.29.[3] Although Defendants then re-issued the

---

[3] In the administrative record for the Rule, Defendants stamped documents they compiled with page numbers beginning "CLP_AR"; and stamped public comments (and their attachments) with

transit ban as a final rule, 85 Fed. Reg. 82,260 (Dec. 17, 2020), a district court again enjoined the transit ban on the merits, *EBSC v. Barr*, 519 F. Supp. 3d 663, 666-68 (N.D. Cal. 2021).

In 2020, after the start of the COVID-19 pandemic, the government instituted a new policy under which asylum seekers were expelled without being screened for protection. 85 Fed. Reg. 17,060 (Mar. 26, 2020) (Title 42). Title 42, like the entry ban and transit ban, was held unlawful. *See Huisha-Huisha v. Mayorkas*, 21 F.4th 718 (D.C. Cir. 2022); *Huisha-Huisha v. Mayorkas*, 642 F. Supp. 3d 1 (D.D.C. 2022), *vac'd as moot*, 2023 WL 5921335 (D.C. Cir. Sept. 7, 2023). Nevertheless, the policy remained in effect pursuant to a separate court order, *Louisiana v. CDC*, 603 F. Supp. 3d 406, 441(W.D. La. 2022), until the COVID-19 public health emergency expired on May 11, 2023, 88 Fed. Reg. 31,319.

### D.     The Rule and Subsequent Asylum Bans

Defendants issued the proposed version of the Rule on February 23, 2023. 88 Fed. Reg. 11,704. After a truncated 30-day comment period during which they received more than 50,000 comments, Defendants issued the final Rule on May 10, 2023, without any significant changes. 88 Fed. Reg. 31,314.

The Rule took effect on May 11, 2023—the same day that Title 42 expired—and applies to noncitizens who crossed the southern border between that date and May 11, 2025. Specifically, the Rule covers all non-Mexican adults and families who entered without authorization at the southern land border or adjacent coastlines during that time. *See* 8 C.F.R. § 208.33(a)(1) & (a)(2)(i). It bars such noncitizens from asylum unless they (1) arrived at a port of entry after obtaining one of a limited number of border port appointments through a smartphone application

---

page numbers beginning "CLP_PC." For clarity, Plaintiffs cite these documents simply as "AR_1," "PC_1," and so on.

called CBP One, *id.* § 208.33(a)(2)(ii)(B); (2) applied for asylum or similar relief in a transit country and received a final denial before coming to the United States, *id.* § 208.33(a)(2)(ii)(C); or (3) received advance permission to travel to the United States through a government-approved parole program, *id.* § 208.33(a)(2)(ii)(A). The first and third of these so-called "pathways" have since been eliminated by the current administration. *See* Executive Order No. 14165 § 7(a)-(b), 90 Fed. Reg. 8467, 8468 (Jan. 20, 2025).

The Rule contains two extremely narrow exceptions for those who fail to satisfy one of the three "pathways." First, the bar does not apply if a person shows by a preponderance of the evidence that, "at the time of entry," they faced "exceptionally compelling circumstances," such as an "acute medical emergency," a "severe form of trafficking," or "an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder." 8 C.F.R. § 208.33(a)(3). This exception does not cover people requiring ongoing medical treatment for serious diseases or people who experienced violent assaults or other threats to their life or safety in Mexico unless they show that the threat remained "imminent" at the moment they crossed the border. 88 Fed. Reg. at 31,391-93.

Under the second exception, which applies only to people who presented at ports of entry, an individual can be excused from the CBP One requirement if they demonstrate, by a preponderance of the evidence, "that it was not possible to access or use" the app. 8 C.F.R. § 208.33(a)(2)(ii)(B). That exception is intended to "capture[] a narrow set of circumstances" and does not apply to someone who could not afford a smartphone, could not read in one of CBP One's few available languages, or because no CBP One appointments were available. 88 Fed. Reg. at 31,401, 31,406.

The Rule confusingly describes its bar as a "presumption" against asylum eligibility that can be "rebutted." But a rebuttable presumption is a conclusion inferred from relevant facts that is deemed true unless evidence is proffered to show that it is not true. *See, e.g.*, *Nat'l Ass'n of Telecomms. Officers & Advisers v. FCC*, 862 F.3d 18, 21-22 (D.C. Cir. 2017). The Rule does not work that way. Rather, it functions as a blanket ban with exceptions, barring asylum to all non-Mexicans who do not satisfy a "pathway" or exception, all of which are unrelated to the merits of their persecution claims. *See* 88 Fed. Reg. at 31,415; PC_21347-48. The Rule's asylum bar was invalidated by another district court, *EBSC v. Biden*, 683 F. Supp. 3d 1025 (N.D. Cal. 2023), although that decision has been vacated for the district court to consider the effect, if any, of intervening developments, *EBSC v. Trump*, 134 F.4th 545 (9th Cir. 2025).

The Rule also eliminates the "significant possibility" standard that Congress mandated in CFIs. The Rule instructs adjudicators to "determine whether the [noncitizen] *is* covered by the presumption [of ineligibility] and, if so, whether the [noncitizen] *has rebutted* the presumption." 8 C.F.R. § 208.33(b)(1) (emphasis added); *id*. at § 1208.33(b)(2) (same). In other words, the Rule does not ask whether there is a significant possibility that an asylum seeker could later defeat the bar but rather requires noncitizens to defeat the bar on the merits in the CFI.

Moreover, the Rule imposes a heightened "reasonable possibility" standard for withholding and CAT claims in CFIs. *See* 8 C.F.R. § 208.33(b)(2)(i)-(iii). This change broke from Defendants' conclusion, made only the year before, that imposing such a standard would be inefficient and unfair. 88 Fed. Reg. at 31,336-37, 31,381.[4]

---

[4] Defendants later imposed an even higher screening standard. *See* 8 C.F.R. § 208.35(b)(2). But the "reasonable possibility" standard continues to govern CFIs conducted under the Rule.

Defendants' efforts to severely restrict asylum did not end with the Rule. In 2024, roughly a year after issuing the Rule, Defendants promulgated a rule that barred from asylum anyone who entered the United States via the southern border or coastline without presenting at a port of entry via an appointment made through CBP One. *See* 89 Fed. Reg. 48710, 48718 (June 7, 2024) (interim final rule of 2024 ban); 89 Fed. Reg. 81156 (Oct. 7, 2024) (final rule of 2024 ban). That rule contained the same "exceptionally compelling circumstances" exception as the Rule at issue here. *See* 8 C.F.R. § 208.35(a)(2) (2024). The 2024 asylum bar was thus identical to the bar in the Rule except that it (1) applied to people from Mexico, and (2) did not contain exceptions for parole, third-country asylum denials, or (for those who entered at ports of entry) the complete inability to use CBP One. Judge Contreras vacated the 2024 asylum bar on the ground that it violates Congress's "clear" instruction "that asylum is available to noncitizens who enter the United States outside ports of entry." *Las Americas*, 2025 WL 1403811, at *14.

Finally, on January 20, 2025, the White House issued a Presidential Proclamation barring noncitizens from any relief under the INA. *See* Proclamation No. 10888, 90 Fed. Reg. 8333. Judge Moss held that action illegal, and the D.C. Circuit generally agreed but stayed Judge Moss's decision insofar as it mandated consideration for asylum as opposed nondiscretionary relief in the form of withholding of removal and protection under the Convention Against Torture. *See Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, ___ F. Supp. 3d ___, 2025 WL 1825431 (D.D.C. July 2, 2025), *stay pending appeal granted in part and denied in part*, D.C. Cir. No. 25-5243, Doc. 2128457 (D.C. Cir. Aug. 1, 2025).

## E.  Elimination of the So-Called "Lawful Pathways" and Sunset of the Rule's Application to New Entrants

The Rule's primary purpose was to force noncitizens to use one of the "pathways" that provided an exception to its asylum bar: a CBP One appointment, an approved parole program, or

a third-country asylum application. *See* 88 Fed. Reg. at 31,336; *see also, e.g.*, *id.* at 31,314, 31,316-17, 31,324, 31,330-31, 31,344, 31,365, 31,409 (relying on the purported availability of these pathways). The Rule also sought to justify its limitations on asylum by pointing to other pathways to coming to the United States, including the refugee program. *See, e.g.*, *id.* at 31,332-33.

However, on January 20, 2025, while the Rule remained in effect, the government terminated two of the Rule's "pathways." By an executive order, President Trump terminated both the CBP One appointment system and all previously available parole processes. *See* Executive Order No. 14,165 § 7(a)-(b), 90 Fed. Reg. 8467, 8468 (Jan. 20, 2025). Defendants are nevertheless applying the Rule to people who entered the United States across the southern border between January 20, 2025, and May 11, 2025.

The Rule ceased applying to new entrants on May 11, 2025. *See* 8 C.F.R. § 208.33(a)(1)(i). Nevertheless, because the Rule applies at all stages of the asylum process—including not just CFIs but also both affirmative and defensive asylum applications, 8 C.F.R. § 208.33(b)-(c)—it continues to harm thousands of noncitizens who entered between May 11, 2023, and May 11, 2025, and who have filed, or intend to file, applications for asylum.

## F.    The Collateral Expedited Removal Policies

Defendants made a raft of other changes to the expedited removal system contemporaneously with the Rule. Two such policies are at issue in this motion.

*The 24-Hour Guidance*. First, Defendants shortened the consultation period that precedes CFIs. As Defendants' own guidance from 2019 explained, the purpose of this period is to allow the noncitizen "an opportunity to rest, collect his or her thoughts, and contact a relative, representative, attorney, or friend whom the [noncitizen] may want to act as a consultant during the credible fear interview." 24-Hour_AR_57. This consultation period has generally been no

shorter than 48 hours. *Id.* at 2, 55. On May 10, 2023, however, USCIS issued guidance shortening the minimum period to "24 hours after the noncitizen's acknowledgment of receipt of" a CFI informational form (Guidance). *Id.* 1-3. In *Las Americas*, Judge Contreras invalidated a later, further reduction of the period to as little as four hours. 2025 WL 1403811, at *19-*20. As a result, the 24-Hour Guidance again governs the timing of CFIs.

The Third Country Removal Policy. Second, Defendants implemented a policy of removing nationals of Cuba, Haiti, Nicaragua, and Venezuela subjected to expedited removal to third countries rather than their countries of nationality. CBP_Removals_AR_321-22. Although Congress created a mandatory, multi-step process governing the determination of the country of removal, *see* 8 U.S.C. § 1231(b)(2), the Third Country Removal policy allows the removal of people to third countries on the sole basis of limitations on Defendants' charter deportation flight capacity, *see* CBP_Removals_AR_321-22. Nothing in the policy directs officers to notify noncitizens that Defendants intend to remove them to a third country, a fact that has left many noncitizens unable to prepare for protection interviews that will focus on dangers in the third country rather than their home countries.

Defendants have not represented that this policy has been rescinded or superseded or is no longer being used. To the contrary, Defendants used this policy, or variations on it, in conjunction with the January 2025 proclamation to remove or repatriate people otherwise subject to expedited removal to third countries without utilizing the credible fear process at all. Defendants have also removed to third countries people who had been through the full removal process and were either granted limited protection (like withholding of removal) or ordered removed to a country that would not accept them. This latter practice was invalidated by the district court in *D.V.D. v. DHS*, 778 F. Supp. 3d 355, 387 (D. Mass. 2025), *stayed without reasoning*, 145 S. Ct. 2153 (2025).

Although Defendants issued the Rule, the Guidance, the Third Country Removal Policy, and other related changes contemporaneously, they did not consider the cumulative impact of these changes. To the contrary, in response to commenters who raised concerns about that cumulative impact, Defendants asserted that such concerns were "beyond the scope of this [R]ule." 88 Fed. Reg. at 31,355; *see also id.* at 31,362.

## LEGAL STANDARD

"When a plaintiff challenges an agency's final action under the [APA], summary judgment 'is the mechanism for deciding whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review.'" *Council of Parent Att'ys & Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 47 (D.D.C. 2019) (quoting *Louisiana v. Salazar*, 170 F. Supp. 3d 75, 83 (D.D.C. 2016)). "The APA requires courts to 'hold unlawful and set aside' an agency's action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.*

## ARGUMENT

The Rule, the Guidance, and the Third Country Removal Policy are all unlawful. Each of the Rule's so-called "pathways" violates the asylum statute, 8 U.S.C. § 1158. Moreover, the Rule operates as a straight entry-based bar to asylum identical to the one that Judge Contreras held impermissible. By requiring adjudicators to determine the applicability of the bar on the merits, rather than under the "significant possibility" standard, the bar also violates 8 U.S.C. § 1225. And the bar, the imposition of the "reasonable possibility" standard, and the Guidance are all rendered arbitrary and capricious by fundamental flaws, including Defendants' complete failure to consider either procedural fairness concerns or the effect of contemporaneous policy changes. The Third

Country Removal Policy, meanwhile, violates the INA, the constitutional guarantee of due process, Defendants' own regulations, and their obligation to provide a reasoned decision.

## I.    The Rule's Asylum Eligibility Bar Is Unlawful

### A.    The Eligibility Bar Is Contrary to Law

Any restrictions Defendants place on asylum must be consistent with the asylum statute. 8 U.S.C. § 1158(b)(2)(C). The Rule is not. It imposes three "pathways." Courts have held that two of those "pathways" are inconsistent with § 1158. *See, e.g.*, *Las Americas*, 2025 WL 1403811 (requirement to enter at ports illegal); *EBSC v. Biden*, 993 F.3d 640 (9th Cir. 2021) (same); *EBSC v. Garland*, 994 F.3d 962 (9th Cir. 2020) (requirement to apply for protection in transit countries illegal). The third likewise exceeds Defendants' authority. And a forced choice between three unlawful options is itself unlawful. Moreover, in practice, the Rule collapses into an entry ban that stands in plain contradiction of the statute.

#### 1.    The Bar's Three Asylum Eligibility Conditions Are Contrary to the Statute

The Rule offers a supposed choice among three "pathways" to avoid the eligibility bar: a CBP One appointment at a port of entry, a transit-country denial of protection, or use of a parole program. But none of the three conditions, if imposed as a standalone requirement for asylum eligibility, would be "consistent with" the asylum statute. 8 U.S.C. § 1158(b)(2)(C).

*First*, Defendants may not require asylum seekers to enter at ports of entry, because § 1158(a)(1) allows any noncitizen who arrives in the United States, "whether or not at a designated port of arrival," to seek asylum. *EBSC v. Biden*, 993 F.3d at 669-70. And the Rule's requirement that noncitizens arrive at a port of entry *in a certain way*—with a CBP One appointment—cannot cure its conflict with the statute. *See Las Americas*, 2025 WL 1403811, at *15. Given that Defendants may not "require[] migrants to enter the United States at ports of entry

14

to preserve their eligibility for asylum," *EBSC v. Biden*, 993 F.3d at 669, they certainly may not limit asylum to a subset of people who enter at ports. Judge Contreras struck down the same requirement to use CBP One in the context of the 2024 ban for precisely this reason, holding that the requirement "facially conflicts with the INA." *Las Americas*, 2025 WL 1403811, at *14.

*Second*, the requirement to seek and be denied protection in a transit country is inconsistent with § 1158. Congress "specifically addressed" the categories of people who are barred from asylum because they can seek protection in other countries in two separate statutory bars to asylum. *EBSC v. Garland*, 994 F.3d at 978 (discussing 8 U.S.C. § 1158(a)(2)(A) & (b)(2)(A)(vi)); *see also EBSC v. Barr*, 385 F. Supp. 3d at 943-47. And in both cases, Congress required "assurances of safety," *EBSC v. Garland,* 994 F.3d at 977, before a bar applies: One bar covers those with permanent status in another country, 8 U.S.C. 1158(b)(2)(A)(vi), while the other—found in a statutory subsection titled "Safe third country"—applies only to countries that provide a "full and fair procedure" for assessing protection claims, are places where the noncitizen's life or freedom will not be threatened on the basis of a protected ground, and have a treaty with the United States for receiving people seeking asylum, *id.* § 1158(a)(2)(A).[5] The Rule, in contrast, offers no such guarantee of safety. Its transit-denial requirement is therefore invalid because it "would make entirely superfluous the protection provided by the two safe-place bars in § 1158." *EBSC v. Garland*, 994 F.3d at 978.

*Third*, the requirement that a noncitizen apply for parole from abroad pursuant to an existing program and receive advance permission to travel to the United States likewise would be unlawful standing alone. 88 Fed. Reg. at 31,450-51. Congress made asylum available "irrespective of [a] status" like parole, and far from requiring advance permission to travel, Congress expressly

---

[5] When Defendants issued the Rule, only Canada had such a treaty with the United States.

permitted anyone who is "physically present" in the United States or "arrives" at the border to apply for asylum. 8 U.S.C. § 1158(a)(1). Indeed, the entire purpose of the Refugee Act was to "create a predictable and permanent admissions system" so that people seeking asylum would not have to rely on "ad hoc," country-specific uses of "parole." *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1060 (9th Cir. 2017) (en banc). A requirement that noncitizens seeking asylum first obtain parole is therefore also inconsistent with § 1158.

Thus, each of the Rule's three required "pathways," standing alone, would be an unlawful restriction on asylum. The requirements do not become consistent just because they are imposed in the alternative. To the contrary, it is unlawful for the government to require a choice between unlawful alternatives. *See New York v. United States*, 505 U.S. 144, 176 (1992) (holding that Congress could not force States to choose among independently unlawful requirements); *see also, e.g.*, *Simmons v. United States*, 390 U.S. 377, 394 (1968) (criminal defendant could not be forced to choose between giving up constitutional claim and waiving privilege against self-incrimination). The Rule's asylum bar should thus be vacated as violating the INA.[6]

## 2. In Practice, the Eligibility Bar Collapses Into an Entry-Based Bar

In addition to being facially unlawful, the Rule is also unlawful if one looks at its practical application. Courts regularly look to the practical effects of rules to assess their legality. *See, e.g.*, *Gill v. Dep't of Justice*, 913 F.3d 1179, 1185 (9th Cir. 2019) (holding agency action final "because of its practical effects"); *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382-85 (D.C. Cir. 2002) (holding

---

[6] The existence of narrow exceptions in the Rule also makes no difference. *See, e.g.*, *Zheng v. Gonzales*, 422 F.3d 98, 119 (3d Cir. 2005) ("very narrow exception" did not impact rule's legality); *see also EBSC v. Barr*, 385 F. Supp. 3d at 935 (enjoining transit ban despite its narrow exceptions). In particular, the "exceptionally compelling circumstances" exception cannot save the CBP One requirement because "when the government cannot make an action mandatory, it also cannot require a showing of 'extraordinary circumstances' to justify departing from that action." *Las Americas*, 2025 WL 1403811, at *15 (quoting *Gall v. United States*, 552 U.S. 38, 45-47 (2007)).

agency guidance to be a rule because it was "binding as a practical matter"); *Zheng*, 422 F.3d at 120 (statutory violation based on "the regulation's effect"); *Texas v. United States*, 809 F.3d 134, 173-74 (5th Cir. 2015) (examining prior similar rule to determine how a new rule would operate in practice). Here, as a practical matter, the Rule does not offer any real choice at all to people seeking asylum at the southern border and coastline. Rather, the Rule provides such people with only one real option: presenting at a port of entry with a CBP One appointment. The record shows that the Rule's other "pathways" for maintaining eligibility are illusory.

Virtually no one subject to the Rule could satisfy the parole condition. The Rule applied only at the southern land border and adjacent coastal areas. 88 Fed. Reg. at 31,450. But participants in the parole programs discussed in the Rule could not enter at the border; they had to "agree to fly at their own expense to an interior U.S. port of entry (POE)"—*i.e.*, an airport—"rather than entering at a land POE." 88 Fed. Reg. 1,279, 1,279 (Jan. 9, 2023); *see also, e.g.*, 88 Fed. Reg. 1,255, 1,256, 1,263 (Jan. 9, 2023) (requiring "air travel"). And people seeking asylum could not be granted parole once they arrive in the U.S.-Mexico border region because the programs disqualified anyone who entered Panama or Mexico irregularly, *e.g.*, 88 Fed. Reg. at 1,255, as nearly all people seeking asylum must, *see, e.g.*, AR_4871-72; PC_22859. Therefore, the parole programs were not a viable option for asylum seekers at the border when they existed. *EBSC v. Biden*, 683 F. Supp. 3d at 1046-47. And like the CBP One option, these programs were cancelled months before the Rule ceased applying to new entrants in May 2025.

The transit-denial "pathway" likewise applies to almost no one. During the year it was in force, the 2019 transit ban barred access to asylum in over 98% percent of cases where it applied— and the small fraction of people who were not barred include those who could show that they satisfied a separate exception for trafficking survivors. PC_39850 & n.29 (only 421 of 25,158

17

people subjected to transit ban met its transit-denial or trafficking exceptions). In other words, the transit ban imposed a requirement that almost no one could meet. The Rule's transit-denial "pathway" imposes the exact same requirement, and there is no reason to believe it was more widely available in 2023 than in 2019. To the contrary, as detailed below, *infra* Part I.B.2, transit countries are unsafe for most people seeking asylum and also either lack asylum systems or have systems that are overwhelmed.

With the other two "pathways" unavailable, the Rule functionally required noncitizens to enter at ports of entry with CBP One appointments to be eligible for asylum. It is an elaborate, disguised entry ban. And as two courts considering other entry bans have held, "'[i]t would be hard to imagine a more direct conflict'" with § 1158(a)(1). *Las Americas*, 2025 WL 1403811, at *14 (quoting *EBSC v. Trump*, 354 F. Supp. 3d 1094, 1112 (N.D. Cal. 2018)). After all, "Congress could not have been more clear that asylum is available to noncitizens who enter the United States outside ports of entry." *Id.* Worse still, the CBP One "pathway" was—along with the supposed parole "pathway"—entirely eliminated on January 20, 2025, meaning that the Rule became a *flat* bar to asylum with even fewer narrow exceptions after that date.

For these reasons, the Rule would violate § 1158(a)(1) even if Defendants could lawfully impose the transit and parole "pathways."

### B. The Eligibility Bar Is Arbitrary and Capricious

In promulgating the Rule's eligibility bar, Defendants relied on factors Congress did not intend to be considered and justified the Rule on the basis of two key assumptions that are belied by the record. Moreover, Defendants issued the bar (and all of the other policies in issue) without undertaking their obligation to consider the cumulative effects of a contemporaneous bundle of related policies.

18

### 1.    The Rule's Justification Depends on Factors Congress Has Rejected.

The Rule justifies its dramatic restriction of asylum as a means of "incentiviz[ing] migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel." 88 Fed. Reg. at 31,336; *see also, e.g.*, *id.* at 31,318, 31,347. As "pathways," the Rule points to parole programs, refugee admissions, and work visas. *E.g., id.* at 31,336. But the existence of these other forms of immigration status is a factor that "Congress [did] not intend[] [the agencies] to consider." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see EBSC v. Biden*, 683 F. Supp. 3d at 1045.

Congress made asylum broadly available to anyone physically present in the United States, regardless of how they entered the country. *See* 8 U.S.C. § 1158(a)(1). It did so in 1980 and repeatedly declined to narrow the scope of § 1158(a)(1) in subsequent legislation amending the asylum statute—including earlier this year. *See* Pub. L. No. 119-21, § 100018, 139 Stat. 72, 385 (July 4, 2025); *see generally* 8 U.S.C. § 1158 (also amended in 1990, 1994, 1996, 2001, 2002, 2005, and 2008). And the broad availability of asylum has always coexisted with the other "pathways" the Rule identifies.

For example, the executive has had parole authority since 1952, *see* 8 U.S.C. § 1182(d)(5) (1952), and has long offered significant parole programs on a country-specific basis, *see Bringas Rodriguez*, 850 F.3d at 1059-60. In enacting the asylum statute, Congress thus instructed the executive branch to create a means of entry that *supplemented* the parole power. *EBSC v. Biden*, 683 F. Supp. 3d at 1044. The refugee admissions program, meanwhile, was created alongside asylum in 1980 to allow people to apply for protection from abroad. *See* 8 U.S.C. § 1157; Pub. L. 96-212, § 201, 94 Stat. 102, 102 (1980). "That Congress provided for refugees and asylees

separately—and has maintained that distinction in the intervening decades—indicates that the availability of refugee protection," like the availability of parole, "should not impact asylum eligibility." *EBSC v. Biden*, 683 F. Supp. 3d at 1045. And work visas, like parole, predate the asylum statute by decades. *See Mendoza v. Perez*, 754 F.3d 1002, 1007 (D.C. Cir. 2014).

In creating an asylum system separate from these mechanisms, Congress's necessary premise was that these other options were insufficient to satisfy our international obligations and protect people fleeing persecution. That is unsurprising, given that none of these other pathways fully satisfies the United States' humanitarian commitments and treaty obligations relating to protecting people fleeing persecution. *See, e.g., Cardoza-Fonseca*, 480 U.S. at 436-37. In using other methods of entry to justify restrictions on asylum, then, Defendants based their action on "[]arbitrary, [ir]relevant" factors. *Judulang v. Holder*, 565 U.S. 42, 55 (2011) (quoting *State Farm*, 463 U.S. at 43); *see also Kiakombua v. Wolf*, 498 F. Supp. 3d 1,  46 (D.D.C. 2020) (policy that conflicts with statutory goals is arbitrary and capricious). The Rule's asylum bar is thus arbitrary and capricious.

### 2.    The Record Belies the Rule's Main Justification for the Bar

The Rule's main justification for the bar is that its "pathways"—CBP One appointments, parole approval, and seeking asylum in transit countries—provide sufficient methods to obtain protection. *See, e.g.*, 88 Fed. Reg. at 31,364-70, 31,375-82. That justification is contrary to the record. CBP One was not a new path to protection but rather a drastic restriction on asylum access at ports of entry, while the parole programs discussed in the Rule were available for only five countries—and both were terminated in January 2025. Transit countries, meanwhile, do not present a safe or available option. By disregarding the record evidence on these points, Defendants

both failed to consider an important aspect of the problem and made a decision that runs counter to the evidence.

*CBP One Appointments.* The Rule touts CBP One as a new "pathway" to seek protection, *see, e.g.*, 88 Fed. Reg. at 31,397-99, 31,450-51, but that app sharply *reduced* asylum access at ports of entry even while it was available. Previously, asylum was available to anyone who presented at a port of entry or entered between ports. But CBP One was restricted to ports, and because Defendants offered far too few appointments distributed via lottery, access was restricted to only a fraction of those who would otherwise have sought asylum. *See* PC_ 24902, 24903-08. Even those who eventually received CBP One appointments waited weeks, and often months, before securing them—as illustrated by the record evidence of wait times when CBP One was used to secure exemptions from Title 42. *E.g.*, PC_20360-61, 21167, 34910-12.

Worse, the cities in northern Mexico where CBP One forced people seeking asylum to wait were "among the most dangerous areas in the world," PC_25090, such that migrants were at "serious risk of violence," *EBSC v. Biden*, 683 F. Supp. 3d at 1050. In a 2022 study, large majorities of service providers working with asylum seekers in the area reported that more than half their clients had been kidnapped, extorted, sexually assaulted, or raped near the border. PC_21752. Defendants knew of these dangers and had themselves conceded that people forced to await immigration court hearings in Mexico "were subject to extreme violence and insecurity at the hands of transnational criminal organizations." PC_23693.

The CBP One app also imposed other significant obstacles to protection. The app's "geo-fencing" technology only allowed people to make appointments while in northern and central Mexico, 88 Fed. Reg. at 31,399, leaving those who were unable to schedule appointments stranded in dangerous circumstances indefinitely, *see, e.g.*, PC_20361-62, 31532-33 (documenting attacks

on people waiting for appointments). Many people lacked stable internet service or could not afford the sophisticated smartphone models required to run the CBP One app. PC_20662, 21093-94, 21170-71, 25460-61, 31896, 32317, 32973-74, 33006. The app was available only in English, Spanish, and Haitian Creole, and required strong literacy skills. PC_31531, 31898-900, 32315. It frequently malfunctioned, and its error messages were delivered only in English. PC_21169-70, 25499-500, 31900, 32315-17, 32975-76. And its facial recognition technology functioned to discriminate against Black and Indigenous people and others with darker skin tones. PC_21168-69, 25499-500, 34910-11.

Although the Rule has a limited exception to the CBP One requirement for people who present at ports, its preamble makes clear that this exception is very narrow. The preamble states that a person does not satisfy the exception even if they cannot afford a smartphone, read, or understand any of the app's three languages. 88 Fed. Reg. 31,401, 31,406. Thus, far from facilitating protection, the CBP One app throttled access to asylum.

*Parole Programs.* The parole programs cited in the Rule, while helpful to those who qualified, did little to preserve the asylum access that the Rule curtails. Programs existed for only five countries—Ukraine, Cuba, Haiti, Nicaragua, and Venezuela—which means that people from most of the world did not have access. *See* 88 Fed. Reg. at 31,325, 31,349. And access to parole was severely limited even for people from those five countries, because the programs required people to obtain passports, find U.S. sponsors, and pay for plane tickets. *See, e.g.*, 88 Fed. Reg. at 1,256, 1,263, 1,279.

Furthermore, the four largest parole programs were not an option for people at the southern border—where the Rule applies—both because the programs required air travel to the United States and because most people who approach the border enter Panama or Mexico irregularly and

therefore were not eligible for the programs. *See, e.g.*, 88 Fed. Reg. at 1,255; AR_4871-72; PC_22859. Moreover, the parole programs were completely discretionary. *See* 88 Fed. Reg. at 31,370. Finally, for those who entered between January 20 and May 11, 2025, parole was not even a theoretical option, because Defendants had terminated the programs. In short, "the record shows that the [Rule's] exception for parole-related travel authorization [was] necessarily … unavailable to many asylum seekers." *EBSC v. Biden*, 683 F. Supp. 3d at 1046-47.

*Transit Countries.* Defendants disregarded overwhelming evidence that obtaining asylum in transit countries remains unrealistic for most people. Transit countries are not remotely safe for most asylum seekers to transit through, let alone wait months or years for asylum decisions, and are also not equipped to adjudicate additional asylum applications.

The record documents widespread violence and exploitation against asylum seekers in Mexico. *See EBSC v. Biden*, 683 F. Supp. 3d at 1048. Violent crime in the country is extremely high, PC_23079, and cartels "prey upon people migrating through Mexico," PC_23082. Such attacks have been alarmingly common: nearly 13,500 instances of kidnapping, rape, torture, murder, and other violent attacks on asylum seekers in Mexico were documented in 2021 and 2022. PC_30901; *see also* PC_76248-87 (cataloging crimes). Women, LGBTQ+ migrants, and Black migrants are particularly vulnerable. *See* PC_22672, 29701-02, 29704-06, 29741, 32769. And crimes against asylum seekers in Mexico are rarely investigated or punished. PC_23082. In fact, Mexican authorities themselves often victimize migrants. PC_23082, 32446; *see also, e.g.*, PC_22857, 29743-44, 32447, 33178.

The record shows that people seeking asylum also face severe violence in other transit countries. *EBSC v. Biden*, 683 F. Supp. 3d at 1048-49. For example, Guatemala "remains among the most dangerous countries in the world," PC_24105, with "widespread and serious" sexual and

gender-based violence, PC_25150. People transiting the country are abused, assaulted, and extorted by police and immigration authorities. PC_29447. Guatemala thus cannot provide asylum seekers "even minimal levels of safety and well-being." PC_26150. Similarly, Belize has "one of the highest per capita murder rates in the world," and rape and other violent crimes are common. PC_23728. The State Department likewise warns of extensive violence in Colombia, and reports that migrants there are subjected to forced labor with impunity. PC_23780-82, 34263. Refugee women in Colombia face especially frequent attacks. PC_29608. Ecuador presents similar dangers, PC_23232, 23829, with women and LGBTQ+ asylum seekers at particular risk, PC_22586, 34282. Other common transit countries are no safer. *E.g.*, PC_25181 (Honduras); PC_23875-76, 34188-89 (El Salvador); PC_21610 (gender-based violence ubiquitous from Panama through Mexico).

Transit countries also have woefully inadequate asylum systems unequipped to process the applications they already receive. *EBSC v. Biden*, 683 F. Supp. 3d at 1048-49. The record shows that many transit countries have asylum systems that are so underdeveloped as to be effectively nonexistent. *See, e.g.*, PC_25143, 26235, 26309, 29465 (Guatemala); PC_23478-80, 23483-86 (Belize, Colombia, Guatemala, and Honduras). And the asylum systems in the only two transit countries that process a meaningful number of claims—Mexico and Costa Rica—have been at a breaking point. The record shows that Costa Rica, a country of just five million people, has ten times more asylum applicants per capita than the United States. PC_29161-62; *see also* PC_23473-74, 30102. As a result, Costa Rica's system is "under severe stress," PC_23348, and asylum seekers face a "years-long wait for an appointment" to even begin the process; one applicant's appointment was scheduled for 2030, PC_30102, 30107.

The record similarly shows that Mexico's asylum agency has been "in a situation of near-breakdown." PC_22811. The "overwhelmed" and underfunded agency has a quickly growing

backlog of cases following a 174-fold increase in applications from 2011 to 2021, PC_22864, 22855; *see also* PC_23388-89. And even though Mexico can only decide a fraction of the applications it receives each year, the Rule contemplated that tens of thousands more people would apply for asylum in Mexico (or other already-overstrained countries). *See* 88 Fed. Reg. at 31,410-11; *see also* PC_23388.

Transit countries' restrictive policies and practices made the Rule's transit-denial "pathway" even less realistic. Mexico imposes a harsh 30-day filing deadline that many asylum seekers cannot meet. PC_21976, 22852, 33406. Those who miss the deadline do not have their claims adjudicated but also do not receive a denial, which is necessary to invoke this supposed exception to the Rule. *See* PC_20781, 23429-30. In addition, Mexico has asylum offices in only ten places, many situated in the country's poorest and most dangerous states, and it treats an application as abandoned if someone either leaves the state or misses weekly check-ins where they applied. *See* PC_21965-66, 21980-83, 22858, 23388, 33410. These policies mean that many people who try to apply in Mexico receive neither asylum nor final decisions denying their claims. People who persevere with their applications are regularly returned to persecution. PC_21587, 21962, 22504, 22856, 23433-34; *see also, e.g.*, PC_22605, 33450 (similar refoulement by Ecuador and Guatemala). And those who receive final denials from Mexico are often deported from that country before they can reach the United States. *See* PC_21961-62 (describing Mexico's "mass detention and deportation of migrants"); *see also* PC_23318-19, 22665.

Rather than confronting these glaring facts about transit countries, the Rule inaccurately dismisses them as "generalizations" and persists in assuming, contrary to all the evidence, that transit countries provide viable options for asylum seekers. 88 Fed. Reg. at 31,410-11. For example, instead of grappling with the specific deficiencies in Mexico's ability to provide safe

refuge, the Rule cites the increase in asylum applicants there, asserting that those applicants "felt safe enough to apply for asylum in Mexico." *Id.* at 31,414-15. But more applications do not signal that conditions in Mexico meaningfully improved. Rather, the increase in applications in 2021 and 2022 occurred only after the Title 42 policy effectively ended access to asylum in the United States, leaving many asylum seekers trapped in Mexico with no choice but to apply there. *See* AR_4874. The record also makes clear that many people file asylum applications in Mexico just to obtain documents they hope will reduce their risk of refoulement while they travel onward. PC_22811, 23442. And as explained, Mexico has been utterly unable to keep pace with even the pre-Rule increase in applications.

Similarly, the Rule cites temporary programs in Colombia, Belize, and Costa Rica. 88 Fed. Reg. at 31,411, 31,416. But the eligibility cut-offs for all three programs expired before the Rule took effect. *See* PC_22823, 22825, 23398, 23400. Those past programs do not suggest that the same countries can and will provide refuge to significantly increased numbers of people going forward. *See EBSC v. Biden*, 683 F. Supp. 3d at 1047-48.

In response to these defects, the Rule's circular refrain is that the failures of one pathway are curable by the other pathways. *See, e.g.*, 88 Fed. Reg. at 31,412, 31,415 (people who are not safe in transit countries can seek parole or use CBP One); *id.* at 31,408(people who cannot seek parole can use CBP One); *id.* at 31,370 (if parole programs end, those nationals can use CBP One); *id.* at 31,340 (pointing to "multiple ways" to rebut the presumption). Those pivots underscore Defendants' refusal to grapple with evidence that each of the "pathways" is severely restrictive at best. Because the facts show that each "pathway" is narrow, unsafe, inaccessible, and sometimes unavailable for many people, it is entirely insufficient for Defendants to respond that other narrow, unsafe, inaccessible, and sometimes unavailable pathways also exist.

### 3.  The Record Does Not Support the Rule's Assumption that People Who Do Not Use Its "Pathways" Have Weaker Asylum Claims

The Rule repeatedly relies on the assumption that people who use its "pathways" are the "most likely to warrant protection." 88 Fed. Reg. at 31,381 (citing 88 Fed. Reg. at 11,742); *see id.* at 31,329, 31,335-36, 31,343, 31,387. As in the past, there "is no evidence in the record to support [that] assumption." *EBSC v. Garland*, 994 F.3d at 982 (holding the same assumption in the transit ban rule arbitrary and capricious). And that absence is telling, given that Defendants keep extensive data about people's migration histories, means of entry, and case outcomes. Defendants' assumption also "ignores extensive evidence in the record documenting the dangerous conditions" and dysfunctional asylum systems in transit countries, which "would lead [noncitizens] with valid asylum claims to pursue those claims in the United States rather than [elsewhere]." *Id.* at 983. Indeed, "the failure to apply for asylum in a [third] country through which [a noncitizen] has traveled has no bearing on the validity of [a noncitizen's] claim for asylum in the United States." *Id.* at 982. Nor, for that matter, does the choice to enter between ports of entry, *EBSC v. Biden,* 993 F.3d at 671-72, or ineligibility for restrictive parole programs available only in a few countries. The untenability of Defendants' key assumption to the contrary renders the Rule arbitrary and capricious.

### 4.  Defendants Arbitrarily Refused to Consider the Interacting Effects of Contemporaneous Policies

The entire Rule is arbitrary and capricious for the additional reason that Defendants "entirely failed to consider an important aspect of the problem"—namely, how the Rule, and the agency's justifications for the Rule, interact with contemporaneous and interrelated policy changes. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017). An agency has an "obligation to acknowledge and account for a changed regulatory posture the agency

creates," especially when the change is "contemporaneous and related." *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011). Here, Defendants made a number of interrelated policy changes to asylum processing close in time to the Rule's effective date. Among other things, they began conducting CFIs while noncitizens are in CBP custody, reduced the pre-CFI consultation period, and authorized expedited removals of people to third countries for the first time.

Each of these changes makes it more difficult for a person to pass a CFI for reasons that are unrelated to the merits of their protection claims. Take the resumption of the practice of conducting credible fear interviews in CBP custody. *See* AR_2188. That custody involves horrific conditions of confinement including intentional sleep deprivation and the use of frigid, bare concrete holding cells known as *hieleras* ("iceboxes"). *See, e.g.*, PC_55616, 56158-59, 56278. People in CBP custody also find it extremely difficult, and often impossible, to consult with counsel before or during their credible fear interviews. *E.g.*, PC_31507-09, 32980-82. And at the same time they began conducting CFIs in CBP custody, Defendants reduced the pre-CFI waiting period to just 24 hours, effectively eliminating the statutory right to consultation for those subject to expedited removal. *See infra* Part IV.A.

Defendants' own data—collected during an earlier use of CBP custody for credible fear interviews—demonstrates that these policies impair noncitizens' ability to present their claims and pass the credible fear interview. *See* 88 Fed. Reg. at 31,362. So, too, do the experiences of Plaintiffs. For example, Plaintiff Y.F. explains that she did not understand how to consult with anyone prior to her interview, which occurred while she was in CBP custody. *See* Declaration of Y.F., ECF No. 4, Ex. 13, ¶ 17. Indeed, she did not even know she was going to an interview when she was called for her CFI. *Id.* When she finally was afforded a supposed opportunity to consult, it was *after* her interview and after she had already received a negative determination. *Id.* ¶ 20.

28

Moreover, the consultation slot CBP offered her was on a Sunday night at around 9:00 p.m. *Id.* Unsurprisingly, no one answered when she tried to make a legal call, and the immigration judge sustained the negative fear finding the next day. *Id.* ¶¶ 20-21.

The Third Country Removal Policy further depresses credible fear passage rates because, when it applies, that policy switches the focus of the interview to the third country. *See infra* Part IV.B. For example, Plaintiff L.A. is from Nicaragua, but his entire CFI was focused on Mexico. *See* Declaration of L.A., ECF No. 4, Ex. 11, ¶ 12. And the new policy does not even require notice of the government's intent to remove to the third country, so noncitizens are not made aware that they need to prepare for an interview about another country. Even under the best circumstances, a person will have difficulty substantiating a fear of persecution on a protected ground or torture in a country in which they have spent little time—despite the extremely dangerous conditions in, for example, Mexico. Without preparation or counsel, success becomes even more unlikely.

The policy changes enacted alongside the Rule therefore individually and collectively make it more difficult for people with colorable or even strong claims to protection to pass initial screening interviews. Yet in the Rule, which also makes it harder to pass CFIs in multiple ways, Defendants ignored the effect of these "contemporaneous and closely related" policy changes. *Portland Cement Ass'n*, 665 F.3d at 187. When confronted with questions about the effect of the Rule in conjunction with possible other limitations on the credible fear process, such as conducting interviews in CBP custody, limited consultation periods, and barriers to accessing counsel, Defendants' only response was to assert that these concerns were "beyond the scope of this [R]ule." 88 Fed. Reg. at 31,355; *see id.* at 31,363. But agencies must consider comments arguing that, "*given*" other policies, a rule should not be adopted. *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1173 (D.C. Cir. 1994). And they have duties to "account for [the] changed regulatory

posture the [agencies] create[d]," *Portland Cement Ass'n*, 665 F.3d at 187, and to "examine all relevant factors," *Am. Wild Horse*, 873 F.3d at 923. Defendants' abandonment of those duties renders the Rule arbitrary and capricious.

## II.    The Rule's Application in Expedited Removal Is Unlawful

Even if the Rule's asylum bar were lawful as a general matter—and it is not—the bar would be unlawful as applied to the expedited removal process. The bar is inconsistent with the expedited removal statute, 8 U.S.C. § 1225(b). It is also arbitrary and capricious as applied to expedited removal because Defendants failed to consider procedural fairness concerns, had an improper purpose, and failed to reasonably explain their decision to jettison the "significant possibility" standard.

### A.    The Rule Violates § 1225(b)

The Rule also violates 8 U.S.C. § 1225(b). In that statute, Congress established an intentionally low screening standard for people facing expedited removal. Whenever there is "a significant possibility" that a noncitizen "could establish eligibility for asylum" in full removal proceedings, the noncitizen must be taken out of the expedited removal system. 8 U.S.C. § 1225(b)(1)(B)(v). The "significant possibility" standard is the cornerstone of the expedited removal system's "design" to "ensur[e] that individuals with valid asylum claims are not returned to countries where they could face persecution." *Grace*, 965 F.3d at 902. Thus, the statute requires that noncitizens with "a significant possibility" of success in future removal proceedings—where they would be able to fully prepare and marshal legal arguments as well as factual evidence, including potential expert testimony, to support their claims for protection—must be given the opportunity for that full hearing.

30

Congress's choice reflects the reality of credible fear assessments, which are "'often rushed'" and "can occur under 'tense conditions.'" *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 39 (D.D.C. 2020) (quoting *Lin Ming Feng v. Sessions*, 721 F. App'x 53, 55 (2d Cir. 2018)). As then-Judge Jackson explained:

> As a practical matter, a noncitizen "appearing at a credible fear interview has ordinarily been detained since his or her arrival in the United States and is therefore likely to be more unprepared, more vulnerable, and more wary of government officials than an asylum applicant who appears for an interview before immigration authorities well after arrival." *Zhang v. Holder*, 585 F.3d 715, 724 (2d Cir. 2009). Moreover, the interviewee "is not represented by counsel, and may be completely unfamiliar with United States immigration laws and the elements necessary to demonstrate eligibility for asylum." *Ramsameachire v. Ashcroft*, 357 F.3d 169, 179 (2d Cir. 2004) (Sotomayor, J.).

*Id*. Congress's low screening standard is thus a key safeguard against erroneous return to persecution and torture under these difficult conditions.

The Rule removes that safeguard. It directs credible fear adjudicators to ask whether the noncitizen before them "is covered" by the Rule's bar, and "has rebutted" it—*i.e.*, whether the noncitizen "has" established one of its conditions or exceptions on the merits. 8 C.F.R. § 208.33(b)(1). Thus, although the INA requires a noncitizen to be placed in full removal proceedings if they "*might* be able to establish the elements of [their] claim" in full removal proceedings, the Rule permits expedited removal unless the noncitizen "establishe[s]" a defense or exception to the bar on the merits. *Kiakombua*, 498 F. Supp. 3d at 45. That outcome is directly contrary to § 1225(b).

This conflict between the Rule and the statute has serious practical consequences. For example, the Rule has an exception to the bar for "exceptionally compelling circumstances." 8 C.F.R. §§ 208.33(a)(3)(i), 1208.33(a)(3)(i). But under the statutory standard, a credible fear adjudicator must consider whether there is a significant possibility that a future immigration judge,

the Board of Immigration Appeals, or a federal court of appeals could deem the circumstances—as illuminated by the applicant's full testimony and any additional evidence—sufficiently compelling to warrant an exception. *See Grace v. Whitaker*, 344 F. Supp. 3d 96, 139-40 (D.D.C. 2018), *aff'd in relevant part on other grounds*, 965 F.3d at 900-03. Thus, under the statutory standard, noncitizens must be afforded "the benefit of" any room for "disagreement." *Grace*, 344 F. Supp. at 140. The Rule, by contrast, instructs CFI adjudicators making rapid judgments based on minimal evidence to decide for themselves whether the circumstances are compelling enough.[7]

### B.    The Bar's Application in the Expedited Removal Process is Arbitrary and Capricious

Defendants' decision to apply the Rule's asylum bar in credible fear proceedings is arbitrary and capricious for two reasons. First, in making that decision, Defendants failed to "consider an important aspect of the problem": fairness concerns. *State Farm*, 463 U.S. at 43 (1983). The year before issuing the Rule, Defendants expressly "recognize[d] that considerations of procedural fairness counsel against applying mandatory bars that entail extensive fact-finding during the credible fear screening process." 87 Fed. Reg. at 18,093; *see also id*. at 18,134-35; PC_30837, 33933. Defendants, however, failed to acknowledge these concerns in the Rule. And where an agency has previously identified a factor as important to its consideration of an issue, it cannot simply ignore that factor in later changing its position. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("a reasoned explanation is needed for disregarding facts and circumstances that underlay … the prior policy"); *Council of Parent Att'ys*, 365 F. Supp. 3d at 50

---

[7] The preamble to the Rule claims that adjudicators will apply the correct standard. 88 Fed. Reg. at 31,380. But "it is the language of the regulatory text, and not the preamble, that controls." *Nat'l Wildlife Federation v. EPA*, 286 F.3d 554, 570 (D.C. Cir. 2002).

(agency reversal "either did not address" important aspects of earlier rulemaking "or responded to them in an inadequate or cursory manner").

Second, the Rule repeatedly treats the "significant disparity" between the number of people found to have a credible fear and the number ultimately granted asylum or other protection as a crucial problem to be solved. *See, e.g.*, 88 Fed. Reg. at 11,716, 11,737, 31,329-30. But such a disparity is the point of the "significant possibility" standard. Congress expressly chose to adopt a "low screening standard" to ensure that "individuals with valid asylum claims are not returned to countries where they could face persecution." *Grace*, 965 F.3d at 902 (quotation omitted). That choice necessarily means that a significant proportion of people who pass a screening interview will not prevail under the higher ultimate standards for relief. And Defendants may not "alter Congress's choice" by seeking to eliminate that deliberate disparity. *Nat'l Ass'n of Broadcasters v. FCC*, 39 F.4th 817, 820 (D.C. Cir. 2022); *see Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 971 (9th Cir. 2002) (invalidating rule where its "justification" was "directly contrary to" a "fundamental purpose[] of Congress"); *Kiakombua*, 498 F. Supp. 3d at 46 (rejecting policy that conflicted with "the goals of the [credible fear] statute") (cleaned up).

The Rule's choice to jettison the "significant possibility" standard is independently arbitrary and capricious. Although the Rule's preamble asserts that credible fear adjudicators will apply that standard to the Rule's bar, 88 Fed. Reg. at 31,380, that assertion is contrary to the text of the regulations. Such an "inconsistency between the language of the regulations and the preamble's explanation of what [the agency] did" reflects a "failure [to] adequately … explain [the agency's] action," rendering "the action arbitrary and capricious." *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1220 (D.C. Cir. 1996). Defendants' failure is amplified here because they shifted ground between the proposed and final versions of the Rule. Unlike the

preamble, the NPRM conceded that the regulatory text did *not* envision use of the significant-possibility standard but contended that it nevertheless was consistent with the statute. 88 Fed. Reg. at 11,742. The final Rule discards that argument without acknowledgment and asserts that the *very same regulatory text* involves application of the significant-possibility standard.

### C.    The Rule's Heightened Screening Standard Is Arbitrary and Capricious

Defendants' failure to consider the cumulative effect of their bundle of contemporaneous policies provides a sufficient ground, standing alone, to vacate the Rule's heightened, "reasonable possibility" CFI screening standard, along with the rest of the Rule. *See supra* Part I.B.4.

That standard is also arbitrary and capricious for another reason. The risk of error—that is, of removing people even if they *will* likely be persecuted or tortured—is unquestionably "an important aspect of the problem" when Defendants impose a screening standard for CFIs. *State Farm*, 463 U.S. at 43. Unlike asylum, which is discretionary, both CAT protection and statutory withholding of removal are mandatory, obligating the United States, consistent with our treaty commitments, not to commit *refoulement*—the removal of people to probable persecution or torture. *See Aguirre-Aguirre,* 526 U.S. at 419; *Nasrallah*, 590 U.S. at 575. Thus, in elevating the screening standard, Defendants were required to meaningfully assess whether more people would be wrongfully removed to persecution and torture. Indeed, in rejecting the "reasonable possibility" standard in 2022, Defendants specifically examined whether imposing a higher standard would adequately "ensur[e] the United States complie[s] with its non-refoulement obligations." 87 Fed. Reg. at 18,092. They found, "based on the Departments' experience implementing divergent screening standards," that there was "no evidence" that applying the reasonable fear standard in CFIs "resulted in more successful screening out of non-meritorious claims while" safeguarding against *refoulement*. *Id.*

In the Rule, by contrast, Defendants categorically rejected the concern, raised in comments, that applying the reasonable-possibility standard "will result in errors" and thus wrongfully return people to persecution and torture. 88 Fed. Reg. at 31,420. Defendants' core assertion was an analogy: Because the reasonable-possibility standard has been used in screenings applicable to *other* immigration contexts—principally reinstatement of prior removal orders under 8 U.S.C. § 1231(a)(5)—the standard can also be applied to expedited removal proceedings without erroneous denials of protection. 88 Fed. Reg. at 31,420.

That analogy is untenable. Reinstatement proceedings involve important safeguards against *refoulement* that are absent in CFIs. For example, where an asylum officer finds no reasonable possibility of persecution or torture in the reinstatement context, the noncitizen may seek review not only by an immigration judge, but also by a federal court of appeals. By contrast, with very limited exceptions there is no judicial review of expedited removal proceedings. *See* 8 U.S.C. §§ 1225(b)(1)(B)(iii), 1252(a)(2)(A), 1252(e)(2). Thus, quite unlike the reinstatement context, erroneous denials of withholding and CAT protection in expedited removal can never be reviewed and corrected by Article III courts. And the Rule further amplifies the risk of uncorrected erroneous denials by simultaneously eliminating the option to seek reconsideration by USCIS of credible fear denials. 8 C.F.R. § 208.33(b)(2)(v)(C).

Reinstatement also applies to a very different population: Most people previously "subject to" reinstatement of removal "by definition ha[d] prior experience with the U.S. immigration system" because they were previously in removal proceedings, "and many … lived in the United States for extended periods of time." PC_21430. Noncitizens in reinstatement proceedings thus often have more of an opportunity to find legal representation and are better able to prepare for the interview. By contrast, people in expedited removal generally have little to no opportunity to

consult counsel or gather evidence, *see* PC_21431, a reality reflected in Congress's design of the expedited removal system. As Defendants previously acknowledged, the significant-possibility standard better "align[s] with Congress's intent that a low screening threshold standard apply" in expedited removal proceedings. 88 Fed. Reg. at 11,745-46 (citing 87 Fed. Reg. at 18,091-93 and 86 Fed. Reg. 46,906, 46,914 (Aug. 20, 2021)).

In nevertheless applying the reasonable-possibility standard in CFIs, Defendants never acknowledged the critical differences between the expedited removal and reinstatement contexts. *See Petroleum Commc'ns*, 22 F.3d at 1172 (agency must consider "circumstances that appear to warrant different treatment"); *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 824 (D.C. Cir. 1983) (failure to consider "obvious and substantial differences" was arbitrary and capricious). And besides that flawed analogy, Defendants offered no real basis for reversing their earlier conclusion that the reasonable-possibility standard is not adequate to protect against erroneously removing people to places where they will face persecution or torture. 88 Fed. Reg. at 31,419-20. Because it is inadequately examined and explained, their conclusion that "reasonable possibility" can safely be applied in CFIs is arbitrary and capricious.

## III.    The Collateral Policies Are Unlawful

The collateral policies are likewise unlawful. The 24-hour Guidance should be invalidated for the same reasons that Judge Contreras held later guidance on the pre-CFI consultation period to be arbitrary and capricious. And the Third Country Removal Policy amounts to a shadow regime set up in violation of the INA's removal procedures that unlawfully fails to provide notice and that Defendants enacted without considering whether noncitizens would be deported from third countries to persecution or torture in their countries of origin.

36

### A.      The 24-Hour Guidance Is Unlawful

Contemporaneous with the Rule, Defendants issued the Guidance, which reduces the pre-CFI consultation period from 48 hours to 24 hours. 24-Hour_AR_1-3. Defendants later cut the period even further, to as little as four hours, but that reduction was vacated by Judge Contreras in *Las Americas* as arbitrary and capricious. 2025 WL 1403811, at *19-20. Specifically, Judge Contreras held that Defendants had not offered "a reasoned justification for the four-hour consultation window," because they "did not expressly consider whether noncitizens would actually be able to consult" in that window and also "did not provide any evidence" that a longer period "caused unreasonable delays." *Id.* at *20. He further noted that Defendants had "failed to take into account the purpose and people the consultation period serves" and stated "no limiting principle" that would stop them from imposing a period of only an hour or even 30 minutes. *Id.* at *20.

The Guidance suffers from precisely the same problems. First, Defendants did not adequately consider the important fairness considerations that the consultation period is meant to protect. USCIS had previously explained that the 48-hour pre-interview period was intended to allow a noncitizen "to rest, collect his or her thoughts, and contact a relative, representative, attorney, or friend." 24-Hour_AR_57. But the Guidance neither addresses this factor nor grapples with the emphasis the agency previously placed on the need for time to rest and prepare. *See id.* at 59. And it is arbitrary and capricious for an agency to treat considerations underpinning prior policies "in an inadequate or cursory manner." *Council of Parent Att'ys*, 365 F. Supp. 3d at 50.

Defendants also never attempted to explain how 24 hours would be sufficient to permit meaningful preparation or comply with Defendants' statutory and regulatory obligations. That question must be understood in context: "[A]n agency cannot possibly conduct reasoned, non-

arbitrary decision making concerning policies that might impact *real* people and not take such *real life circumstances* into account." *Make The Rd. N.Y. v. McAleenan*, 405 F. Supp. 3d, 55 (D.D.C. 2019) (emphasis in original). Here, the relevant inquiry is what the 24-hour limit means for people in CBP custody, where it was most likely to be applied at the time it was issued. *See, e.g.*, *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1113-14 (D.C. Cir. 2019) (examining policy change in context of "key aspects of the program," including its likely consequences in practice). In that context, the consequences of the Guidance are severe. As noted above, access to phones and legal services for noncitizens in CBP custody is heavily restricted, with the result that contacting anyone in a 24-hour window is often impossible. *E.g.*, PC_31507-09, 32980-82. Yet nothing in the Guidance reflects *any* acknowledgement of these limitations, much less attempts to explain how 24 hours could be considered an adequate consultation period under the relevant circumstances.

Indeed, the record is bereft of evidence suggesting that 24 hours is sufficient for meaningful consultation. There is simply nothing from which a policymaker could conclude that people in CBP custody (or, for that matter, people *outside* CBP custody) will have an opportunity to contact a person of their choosing within 24 hours. The Guidance is therefore arbitrary and capricious.[8]

The justification for the 24-hour Guidance that Defendants did advance is likewise unsupported by the record. Defendants stated that the policy would "more quickly provide relief to those who are eligible [for asylum] while more quickly removing those who are not." 24-Hour_AR_26, 27; *see also id.* at 3 (similar). But that justification, like those at issue in *Las Americas*, has no limit: it could be used to shrink the consultation period to less than one hour. Furthermore, the assumption underlying the justification is that reducing the waiting period will

---

[8] As in *Las Americas*, there is also no record evidence suggesting that the prior, longer consultation period caused unreasonable delays. *See* 2025 WL 1403811, at *20.

speed up proceedings *without impairing their accuracy*—that is, without wrongfully removing people to danger. But Defendants never stated or examined that premise; nor did they cite any evidence to support it. That failure to "examin[e] a key assumption" renders the Guidance arbitrary and capricious. *Hispanic Affairs Proj. v. Acosta*, 901 F.3d 378, 389 (D.C. Cir. 2018); *see Nat'l Lifeline Ass'n*, 921 F.3d at 1113 (arbitrary reasoning where agency "pointed to no record evidence" on key issues); *Nat'l Women's L. Ctr. v. Off. of Mgmt. & Budget*, 358 F. Supp. 3d, 89 (D.D.C. 2019) ("conclusory statements will not do").

In any event, Defendants' premise is highly doubtful. The Guidance shoves everyone through the credible-fear process at breakneck speed, effectively eliminating the opportunity to consult with an attorney *regardless* of the strength of one's claims to protection. The predictable result is that people who should pass their CFI will be denied and removed because they lack a fair opportunity to consult and prepare before their interview. For all of these reasons, and because Defendants failed to consider the cumulative effects of their contemporaneous policy changes, *see supra* Part I.B.4, the 24-hour policy is arbitrary and capricious.

### B.    The Third Country Removal Policy Is Unlawful

Contemporaneous with the Rule, Defendants also established an unprecedented policy of expedited removals to third countries. *See* CBP_Removals_AR_321-22; *see also id.* at 2. This Third Country Removal Policy violates the statute governing permissible countries of removal, unlawfully fails to provide notice to affected noncitizens, and both runs afoul of and inadequately takes into account Defendants' *non-refoulement* obligations. Like the Rule and the Guidance, the Third Country Removal Policy is also arbitrary and capricious because Defendants failed to consider the cumulative impact of their bundle of contemporaneous policy changes.

### 1.    The Policy Violates the INA and Failed to Consider this Conflict

The Third Country Removal Policy asserts that limits on Defendants' internal capacity to conduct removals to Cuba, Haiti, Nicaragua, and Venezuela justifies the routine removal of people from those countries to third countries. CBP_Removals_AR_321-22. In particular, Defendants seek to justify the policy by claiming that removal to Cuba, Haiti, Nicaragua, and Venezuela is "impracticable, inadvisable, or impossible" because their "current removal flight capacity" is limited. *Id.* (emphasis omitted). The resulting policy violates 8 U.S.C. § 1231(b)(2).

That statute obligates DHS to follow a specific four-step procedure to designate a noncitizen's country of removal. *See Jama v. ICE*, 543 U.S. 335, 341 (2005). In the overwhelming majority of cases, removal must be made to a country designated by the noncitizen (from a set of countries delineated by statute) or, failing that, to a country of which the noncitizen is a "subject, national, or citizen." 8 U.S.C. § 1231(b)(2)(A), (D). Officials may generally move beyond those two categories of countries only if the governments of countries in those two categories refuse to accept the particular noncitizen or do not respond to a request to accept the noncitizen within 30 days. *See id.* § 1231(b)(2)(B)-(D); *Jama*, 543 U.S. at 341-42.[9] If that happens, the statute requires Defendants to look to six other categories of countries. *See* 8 U.S.C. § 1231(b)(2)(E)(i)-(vi). It is only if removal to *those* countries is "impracticable, inadvisable, or impossible" that Defendants may choose any other country that will accept the noncitizen. *Id.* § 1231(b)(2)(E)(vii).

The Third Country Removal Policy short-circuits this progression. Rather than obeying Congress's command that DHS may move beyond the noncitizen's country of origin and their designated country only in very narrow circumstances, the policy treats the "impracticable,

---

[9] The exception to this rule is for individual cases in which the government determines that "removing the [noncitizen] to the country is prejudicial to the United States." 8 U.S.C. § 1231(b)(2)(C)(iv).

inadvisable or impossible" language as a means of circumventing the statute entirely. CBP_Removals_AR_321-22. Defendants simply constructed a parallel policy that ignores, and contravenes, Congress's commands. And even if the Third Country Removal Policy *did* track Congress's mandated progression, it would remain unlawful, because the availability of commercial flights—which Defendants concede are available, *see* CBP_Removals_AR_323-24— means that removals to the countries at issue are not "impracticable, inadvisable, or impossible."

The Third Country Removal Policy is arbitrary and capricious for a closely related reason. Where an agency's directives are in stark tension with the governing statute, the agency must demonstrate that it understood and considered the correct statutory requirements and must "explain" how, in its view, "these actions are consistent with [its] authority under the statute." *Indep. U.S. Tanker Owners Comm. v. Dole,* 809 F.2d at 847. Defendants failed to do so here.

### 2.    The Policy Impermissibly Fails to Provide Advance Notice

The Third Country Removal Policy is also both contrary to law and arbitrary and capricious because it fails to provide adequate notice that people subject to the policy face removal to third countries. "Due process requires notice that is 'reasonably calculated, under all the circumstances, to apprise interested parties' and that 'afford[s] a reasonable time ... to make [an] appearance.'" *A.A.R.P. v. Trump,* 145 S. Ct. 1364, 1367-68 (2025) (quoting *Mullane v. Cent. Hanover Bank & Tr.,* 339 U.S. 306, 314 (1950)). The Supreme Court has made clear that this right to notice applies in the context of third-country removals. *See id.*; *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025). Defendants' own regulations likewise recognize that a noncitizen seeking protection from persecution and torture must be afforded information about the fear determination process and an opportunity to prepare for their interview. *See* 8 C.F.R. § 235.3(b)(4)(i); 8 C.F.R. § 208.30(d)(2); *see also* 8 U.S.C. § 1225(b)(1)(B)(iv). These "basic procedural rights … are particularly

important" here, because an applicant erroneously denied withholding or CAT relief could be subject to grave harm if forced to return to an unsafe third country, *see Marincas v. Lewis*, 92 F.3d 195, 203 (3d Cir. 1996) (addressing asylum), and because the United States has a mandatory duty under treaties it has adopted *not* to remove noncitizens to places where they are more likely than not to be persecuted or tortured, *see, e.g.*, *Nasrallah,* 590 U.S. at 575.

The Third Country Removal Policy, however, does not provide for *any* advance notice to noncitizens. Nowhere does it require immigration officers to inform applicants, in advance of their screening interview, that they face removal to a third country. *See* CBP_Removals_AR_321-22. And Plaintiffs' experience confirms that notice of intended removal to a third country is not, in fact, provided. *See* Declaration of E.B., ECF No. 4, Ex. 6, ¶ 12; Declaration of L.A., ECF No. 4, Ex. 11, ¶ 12. Noncitizens first learn about this possibility *during* the CFI itself, when the questions unexpectedly focus on a third country.

Nothing more is necessary to determine that the policy is contrary to law. The Constitution requires reasonable notice, but Defendants provide none. *See Kossov v. INS*, 132 F.3d 405, 408-09 (7th Cir. 1998) (notice of intended removal country at outset of hearing was insufficient). The absence of notice also violates the plain text of 8 C.F.R. § 235.3(b)(4)(i) and 8 C.F.R. § 208.30(d)(2), which require noncitizens to receive a "description" of the credible fear process "in writing," so that they have an "understanding of the fear determination process," *before* the CFI.

In addition, the Third Country Removal policy is arbitrary and capricious because it fails to acknowledge or consider an important aspect of the problem: that the failure to require clear notice substantially heightens the risk that noncitizens will be removed to harm in a third country.

*See Make The Rd. N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 55 (D.D.C. 2019) (Jackson, J.), *rev'd on other grounds*, 962 F.3d 612 (D.C. Cir. 2020).

### 3.    The Policy Impermissibly Fails to Consider the Danger of Chain *Refoulement*

Defendants also "entirely failed to consider" a second "important aspect of the problem"—namely, the risk that noncitizens will be sent from third countries back to their countries of origin, where they face a likelihood of persecution or torture. *See State Farm*, 463 U.S. at 43. "The prohibition of refoulement … applies not only in respect of return to the country of origin … but also to any other place where a person has reason to fear threats to his or her life … or from where he or she risks being sent to such a risk." U.N. High Commissioner for Refugees, Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol (Jan. 26, 2007). But Defendants failed to consider this risk inherent in the third country removal policy. And they failed to do so despite being on notice of the all-too-real danger of chain refoulement from Mexico, the only third-country destination at the time Defendants issued the policy. *See, e.g.*, PC_20259, 031851-52. The failure to consider this important aspect of the problem renders the Third Country Removal Policy arbitrary and capricious. *See Am. Wild Horse*, 873 F.3d at 923.

## IV.    The Court Should Grant Vacatur and Other Relief

Where, as here, agency action is unlawful, "the ordinary result is that the rules are vacated." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see Kiakombua*, 498 F. Supp. 3d at 54 (vacatur appropriate for credible fear policies); 5 U.S.C. § 706(2). Further, as discussed above, the policies are both contrary to the governing statutes and riddled with serious failures of reasoned decision-making. The Court should therefore follow "the

normal course and vacate" the Rule, the Guidance, and the Third Country Removal Policy. *See United Steel v. Mine Safety & Health Admin*., 925 F.3d 1279, 1287 (D.C. Cir. 2019).

That remedy is particularly appropriate here. Every day, noncitizens fleeing persecution face merits hearings in immigration court where they are subject to the Rule. As a result, Organizational Plaintiffs RAICES and Las Americas have been and continue to be impeded in their core work of serving individuals seeking asylum. *See* Supplemental Declaration of Javier Hildalgo for RAICES (Hidalgo Decl.) ¶¶ 7-23; Supplemental Declaration of Jennifer Babaie for Las Americas (Babaie Decl.) ¶¶ 4-23.  Both RAICES and Las Americas have explained how the Rule has harmed their core work of representing and advising asylum seekers at all stages of the process, whether they are facing expedited removal, full removal proceedings in immigration court, or applying affirmatively. Hidalgo Decl. ¶¶ 15-22; Babaie Decl. ¶¶ 10-23. The same is true for the collateral policies. The core work of both organizations includes serving people facing expedited removal, and the 24-hour consultation period has and will continue to make it difficult or outright impossible to access clients and individuals seeking pro se advice in a timely manner. Hidalgo Decl. ¶¶ 24-25; Babaie Decl. ¶ 24. And advising people who face removal to third countries likewise impedes this work because it severely complicates the scope of information that Plaintiffs now need to provide, and it makes the process of trying to secure asylum or related protection more onerous. Hidalgo Decl. ¶¶ 24, 26-67; Babaie Decl. ¶¶ 25-26. The Rule has also negatively impacted Las Americas' finances and jeopardizes additional injury to its funding. Babaie Decl. ¶¶ 27-28.

And every day, Defendants arrest noncitizens who entered the United States while the Rule was effective and place them into expedited removal proceedings where they are subject to the Rule and the collateral policies. Indeed, because expedited removal now applies nationwide and

to any person who cannot prove by a preponderance of the evidence that they have been present in the United States for more than two years, 90 Fed. Reg. 8139, the number of people—including clients of both RAICES and Las Americas—who will be harmed by the Rule is likely to continue to grow.

Additionally, the Individual Plaintiffs will likely have the Rule applied to their proceedings. Most of the Individual Plaintiffs still have removal orders from the application of the Rule and the collateral policies to their expedited removal proceedings. And even for those who are in ongoing removal proceedings like J.P. and D.M., they will be barred from asylum under the Rule in those proceedings unless the Rule is vacated.

In addition to vacatur of the Rule, the Guidance, and the Third Country Removal Policy, the Individual Plaintiffs also request that the Court vacate their negative credible fear and reasonable fear determinations and removal orders. *See, e.g.*, Order at 3, *Grace v. Whitaker*, No. 18-cv-1853 (D.D.C. Dec. 19, 2018), ECF No. 105. Plaintiffs also request that the Court enter appropriate declaratory relief. *See* Proposed Order.[10]

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment; vacate the Rule, the Guidance, and the Third Country Removal Policy and declare those policies unlawful; and vacate the individual Plaintiffs' negative credible and reasonable fear determinations.

Dated: August 14, 2025                           Respectfully submitted,

                                                 /s/ Lee Gelernt
Richard Caldarone*                               Lee Gelernt (D.D.C. Bar No. NY0408)
Kristy Blumeyer-Martinez**                       Omar C. Jadwat*

---

[10] Plaintiffs previously submitted a Statement of Undisputed Facts (SUF) in an abundance of caution in case it was required by this Court's local rules. Dkt. 37. Defendants filed a motion to strike the SUF. Dkt. 54. The Court denied the motion to strike without prejudice in its Minute Order dated July 24, 2025. Plaintiffs do not rely on the SUF in this renewed motion.

Refugee and Immigrant Center for Education
and Legal Services (RAICES)
P.O. Box 786100
San Antonio, TX 78278
T: 210-960-3206
richard.caldarone@raicestexas.org
kristy.blumeyermartinez@raicestexas.org

Keren Zwick (D.D.C. Bar. No. IL0055)
Mary Georgevich*
Mark Feldman*
National Immigrant Justice Center
111 W. Jackson Blvd.,
  Suite 800
Chicago, IL 60604
T: 312-660-1370
kzwick@immigrantjustice.org
mgeorgevich@immigrantjustice.org
mfeldman@immigrantjustice.org

Melissa Crow (D.C. Bar. No. 453487)
Center for Gender & Refugee Studies
1121 14th Street, NW, Suite 200
Washington, D.C. 20005
T: 202-355-4471
crowmelissa@uclawsf.edu

Anne Dutton*
Anne Peterson**
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA 94102
T: 415-581-8825
duttonanne@uclawsf.edu
petersonanne@uclawsf.edu

Robert Pauw**
Center for Gender & Refugee Studies
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: 206-682-1080
rpauw@ghp-law.net

Noor Zafar*
Sidra Mahfooz*
Judy Rabinovitz*
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2660
lgelernt@aclu.org
ojadwat@aclu.org
nzafar@aclu.org
smahfooz@aclu.org
jrabinovitz@aclu.org

Cody Wofsy (D.D.C. Bar No. CA00103)
Morgan Russell*
My Khanh Ngo*
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, Suite 700
San Francisco, CA 94104
T: 415-343-0770
cwofsy@aclu.org
mrussell@aclu.org
mngo@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: 202-457-0800
aspitzer@acludc.org
smichelman@acludc.org

*Attorneys for Plaintiffs*

*\*Appearing pro hac vice or under certificate
of pro bono representation
\*\*Certificate of pro bono representation
forthcoming*

46