## SUPPLEMENTAL DECLARATION OF JENNIFER BABAIE
## LAS AMERICAS IMMIGRANT ADVOCACY CENTER

I, Jennifer Babaie, make the following declaration on behalf of Las Americas Immigrant Advocacy Center. I certify under penalty of perjury that the following declaration is true and correct pursuant to 28 U.S.C. § 1746.

1. I make this declaration to update my prior declaration submitted in this case signed on September 28, 2023.  This declaration is based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to the matters described herein.

2. I am an attorney licensed to practice law in California and focused on immigration practice. Since January 2023, I have been the Advocacy and Legal Services Director at Las Americas Immigrant Advocacy Center (Las Americas). Prior to joining Las Americas, I worked in various related positions. Starting in 2018, I worked as a supervising attorney and program director at the International Refugee Assistance Project, where I represented refugees, asylum seekers, and others seeking humanitarian assistance and family reunification, and I ran a cross-border program focused on providing direct legal services to persons in Ciudad Juarez seeking access to safety and family reunification in the United States.

3. Las Americas is a nonprofit legal services organization based in El Paso, Texas. Our mission is to provide high-quality legal services to low-income immigrants, and to advocate for human rights. We provide immigration counseling and representation to immigrants seeking asylum and other forms of humanitarian relief, including by representing individuals facing expedited removal who are referred for credible fear interviews ("CFIs"). We principally represent people detained by the U.S. government in and around West Texas and New Mexico. Our goal is to ensure that individuals have a fair opportunity to establish their eligibility for protection and are not wrongfully removed to persecution or torture.

**Las Americas' Work**

4. Las Americas has served people in our community from over 80 countries since 1987. We are dedicated to serving the legal and informational needs of low-income asylum seekers and other noncitizens in West Texas, New Mexico, and Ciudad Juárez, Mexico. We assist individuals who express a desire to seek protection in the United States by providing legal information, legal screenings, and translation and referral support, which helps these individuals understand eligibility for asylum and other lawful humanitarian pathways, as well as the rules applicable to them. We also provide legal information presentations centered on clarifying the purpose and consequences of documents received upon or after crossing the border.

5. Our goal is to ensure that all asylum seekers have a fair opportunity to establish their eligibility for protection and that they are not wrongfully removed to persecution or torture in violation of U.S. immigration law. It is essential to this work that all asylum seekers have a meaningful chance to fully develop and present their claims, as well as a meaningful

opportunity to consult with an immigration attorney during the pendency of their proceedings. To advance this mission, we serve asylum seekers with our limited resources using various forms of legal assistance.

6. Las Americas' asylum work straddles the U.S.-Mexico border as well as west Texas and southern New Mexico. Our legal programs cover individuals and families who have entered the United States seeking humanitarian relief or other lawful immigrant pathways, migrant families residing in the U.S. for several years, as well as people who are or have been stranded in Mexico due to U.S. policies.  Our Detained Program predominantly serves migrants in the El Paso Processing Center in El Paso, and Otero Service Center in New Mexico, with limited services to persons in Torrance and Cibola detention facilities in New Mexico when resources allow. One central purpose of our Detained Program is helping individuals in expedited removal proceedings through the credible fear interview (CFI) process and then seeking their release from detention.

7. For individuals who can clear the CFI hurdle, our detained team helps with subsequent stages of the immigration process when capacity allows, including asylum applications, evidence gathering, appeals, bond and parole requests, mental health screenings, competency evaluations, and more. Where resources allow, we provide these services as part of full representation in immigration court and before the Board of Immigration Appeals. In other cases, we offer these services as *pro se* or limited representation assistance through mechanisms allowed under current EOIR policies. For *pro se* individuals, we also aid with document preparation and translation.

8. We are one of the only organizations providing *pro bono* representation to immigrants, asylum seekers, and other persons migrating to or already in removal proceedings in West Texas and New Mexico. Over 90% of our services are provided free-of-charge.  Las Americas does not have the financial resources to hire attorneys to perform all of the work necessary to represent the population we serve.  Instead, we rely in part on non-attorney accredited representatives through the Recognition and Accreditation Program of the Executive Office for Immigration Reform (EOIR).  *See* https://www.justice.gov/eoir/recognition-and-accreditation-program.  Accredited representatives are authorized under EOIR regulations to provide representation to clients who are seeking asylum in immigration proceedings.  Fully accredited representatives can provide representation both in proceedings before DHS and in proceedings before EOIR (both in immigration courts and at the Board of Immigration Appeals).

9. EOIR has approved Las Americas as a "Recognized Organization," authorizing us to employ accredited representatives to represent our clients for decades.  The Recognition and Accreditation Program was designed to increase the availability of competent immigration legal representation for low-income and indigent persons.  This aligns with Las Americas' mission to ensure that all asylum seekers have a meaningful chance to fully develop and present their claims, as well as a meaningful opportunity to consult with a qualified legal representative during the pendency of their proceedings.

**The CLP Rule Harms Las Americas' Core Organizational Activities**

10. The Circumvention of Lawful Pathways Rule (CLP Rule or Rule) and associated policies challenged in this lawsuit have interfered and will continue to interfere with Las Americas' core organizational activities.  The CLP Rule fundamentally frustrates our work of ensuring meaningful access to asylum to the populations we serve by cutting off the right to seek asylum in the United States for large numbers of people based on factors totally unrelated to their actual need for protection.  As a result of the CLP Rule, we are not able to take on nearly as many cases in expedited removal as we were before the Rule was in place, and we cannot fully support asylum seekers who are impacted by the Rule, for reasons that I explain further below.

11. Although the CLP Rule does not apply to new entrants after May 11, 2025, the Rule applies to individuals who crossed the border between May 11, 2023, and May 11, 2025, and are currently present in the United States.  The Rule continues to impact these individuals. Because of the CLP Rule, Las Americas must now screen potential clients to determine if they are impacted by the Rule and if so determine what their options are.  This additional work exacerbates the current drain on our limited resources and adversely impacts our ability to provide representation to asylum seekers facing removal. For cases where CLP applies, our staff is required to take on additional screening irrelevant to the reasons they are afraid to return to their home country. The purpose of this screening is to a) identify if the individual is precluded from asylum eligibility because of the rule, and b) if so, determine if one of the enumerated exceptions apply. If the latter situation arises, our staff are then required to determine if we can stretch resources to bring forth this issue to the IJ and submit arguments via a separate briefing process. Without this legal assistance, most asylum seekers falling under CLP would be forced to continue in their removal proceedings completely forfeiting their right to seek asylum because it is not common practice for IJs to *sua sponte* look for exceptions on their own, even for *pro se* applicants appearing in their courtroom. If the CLP Rule is allowed to stand, it will limit the number of clients we are able to represent, and it will continue to interfere with our core organizational activities to ensure that migrants coming to the United States have meaningful access to asylum and humanitarian protection.

12. To provide representation to as many individuals as possible within the financial resources we have, Las Americas relies on employing accredited representatives.  However, the CLP Rule significantly interferes with this core aspect of our organizational structure and day-to-day operations.  Because the CLP Rule makes the process of applying for asylum so complicated, it is not possible for non-attorney accredited representatives to provide representation without close supervision from an attorney from the point of intake to completion of the case. Although all accredited representatives in our office are supervised by qualified attorneys, the additional legal complications and the disparate treatment between IJs and immigration courts of CLP's application means attorneys are more involved in day-to-day preparation of the case, thus frustrating the purpose of the accreditation program, which is increased capacity to meet the high demand for legal representation in immigration proceedings.

13.  The goal of our asylum work is to ensure that clients who are in fact eligible for asylum are given a meaningful opportunity to apply for and be granted asylum.  Prior to the CLP Rule, it was possible for accredited representatives to conduct the initial intake, decide whether a person is eligible for asylum, and represent the person before the immigration court, with support from an attorney.  Under the CLP Rule, however, accredited representatives are not able to do that.  Each case requires additional supervision and review by the Legal Director and/or experienced staff attorneys to ensure that the accredited representatives are providing competent representation.  One important concern we have in employing accredited representatives is to ensure that our clients do not receive ineffective assistance of counsel and do not fall prey to unqualified 'notarios' that are known to charge exorbitant rates while offering subpar or unlicensed legal assistant to the vulnerable person.  The CLP Rule requires additional training and supervision of accredited representatives to ensure effective representation, which interferes with our ability to ensure that as many migrants as possible have meaningful access to asylum and humanitarian protection.  Because of the CLP Rule, Las Americas has expended additional time and resources to ensure that our clients are not deprived of their right to effective assistance of counsel.  Thus, the CLP Rule interferes with our operations of providing representation through EOIR's accredited representation program to individuals seeking asylum.  In addition, the CLP Rule undermines the purposes that EOIR's Representation and Accreditation Program was designed to achieve.

14. The CLP Rule interferes with our ability to represent noncitizens who entered the United States between May 11, 2023, and May 11, 2025.  This population includes many people who would otherwise seek and receive asylum and whom Las Americas could represent, even if in a limited fashion.  Now, because the CLP Rule creates such a complicated asylum process, in many cases Las Americas is not able to represent these individuals and must turn them away because even limited representation would not adequately allow for them to engage in a meaningful opportunity to seek asylum before the immigration court.

15. Under the CLP Rule, with certain exceptions that are rarely applicable, the Rule required everyone—including people from Mexico—to make an appointment using CBP One to preserve the right to seek asylum. The harms imposed by this requirement impaired the operations of Las Americas before asylum seekers reached the United States. While it was in place, the CBP One requirement caused a dramatic diversion of resources in office. Our staff typically engage in providing legal information presentations alongside direct legal representation for qualified persons. While the CLP Rule was applied at the border, many of those resources were diverted to explaining the Rule in multiple languages, not just Spanish, which the majority of our office speaks, addressing the CBP One requirement, and helping people to understand the new procedural hurdles that they face, whether that be in managing to find a way to utilize the CBP One app successfully, or by explaining in detail the negative consequences of seeking asylum outside of a formal port of entry.

16. This was further complicated by realities on the ground, including the high rates of attacks and kidnappings of migrant women and children and technological bugs and other issues with the application. Our staff found that the majority of questions coming forth during legal information presentations arose from these technological issues, including bugs causing the application to crash before a person's place in line for an appointment was secured, language

inaccessibility (for many, many, months, the application was only available in English, before then having questions released in Spanish but still requiring responses to be written in English). Other issues arose because of facial recognition technology not recognizing the faces of black and brown migrants, nor young infants, forcing many to pause their use of the application since facial recognition was required before securing a place in line for an appointment. Our staff attempted to raise these issues in stakeholder meetings and other advocacy channels with local and headquarter DHS officials, but the rate of change was simply not enough to counter the devastating impact on the asylum seekers we spoke with.

17. Generally, in my experience as an immigration attorney and in interviewing hundreds of asylum seekers, asylum seekers prefer to come to the United States through a port of entry, as it is the safest and persons are more comfortable knowing they are complying with the law. However, the hard realities of the conditions in Mexico – such as lack of timely access to an CBP One appointment, violence, kidnapping attempts, lack of safe housing or potable water, threats of deportation by Mexican officials, refusals by CBP to speak to anyone who appeared at the port of entry without an appointment, and rapid misinformation online and by word of mouth– lead individuals and families to decide to seek entry between ports of entry. Because of the CLP Rule, Las Americas has had to expend additional time and resources in attempting to help these individuals apply for asylum and other asylum-related relief, and in attempting to find DHS officials willing to listen to the issues harming the very persons eligible for the protection the law enshrines.

18. While the CLP Rule was applied at the border, we received thousands of requests for assistance with the CBP One app. Because of the Rule's CBP One requirement, our staff in Mexico, primarily aided with using the app, education as to the purpose of scheduling an appointment with the app, warnings about 'notario' fraud and other bad actors charging money to register appointments on the app, and guidance as to consequences for entering without an appointment. While we continued to flag highly vulnerable cases directly with CBP in an attempt to seek humanitarian protection for them without the need to wait for an appointment, our capacity to do so was limited by the amount of time we had to spend helping others trying to understand the Rule's CBP One requirements and by the fact that port officials ignored our requests or otherwise stated that exceptions did not exist to the CBP One interview requirement, which is blatantly incorrect according to the very terms of the CLP rule.

19. While the CLP Rule was applied at the border, we diverted resources to overhaul the content of the legal presentations we provided to people preparing to enter the United States in multiple languages and in educating civil society partners as a means of attempting to slow down the spread of misinformation and confusion. Because of the CLP Rule, this work became immensely more complex and time consuming. In addition to changing our work to educate people about the substantive changes to asylum requirements imposed by the Rule, we spent a great deal of time providing direct assistance to people unable to navigate CBP One on their own, mostly because there were no other groups engaging in this work. Because the app was riddled with technical issues and was difficult to use in general, our work in this arena was in incredibly high demand.

20. During a four-month period, we assisted more than 1,000 individuals in Mexico in understanding the Rule and the CBP One requirement. This took away time and resources that would otherwise have been used assisting individuals who were eligible to apply for asylum, but for the CLP Rule. The CLP Rule requiring asylum seekers to use the CBP One app to preserve asylum eligibility forced Las Americas to spend resources helping people use the app rather than putting those resources toward its mission of assisting asylum seekers with CFIs, reviews of negative fear determinations, and representation in immigration court.

21. The CLP Rule fundamentally altered access to asylum at the U.S-Mexico border. As policy has shifted and immigration legal services work has become more difficult, Las Americas has struggled to increase *pro bono* representation and provide high quality legal representation. We are not government-funded and none of our grants are guaranteed beyond two to three years. Moreover, it is difficult to secure funding for direct legal services, even in areas such as El Paso with clear needs and broad gaps in *pro bono* providers.

22. Additionally, our programs rely on volunteers, interns, and student fellows. We spend significant resources to coordinate, manage, and train volunteers. The changes brought about by the CLP Rule have injured our ability to rely on volunteers because the Rule creates new additional levels of complexity that are too difficult to train students on given the short time frame of student externship periods. The result is that many people on staff, me included, have to devote resources to volunteer training and management, and keeping those trainings up to date and accurate, to the detriment of other work directly with asylum seekers.

23. Further, the need for Las Americas to focus on the front end of the expedited removal process detracts from our ability to provide ongoing legal representation in full removal proceedings in immigration court, appeals before the Board of Immigration Appeals, and on related benefits applications with USCIS. I have seen the CLP Rule result in more denied asylum applications without fully developed records, more appeals, and less capacity to do that work both for Las Americas and similar organizations.

**Impact of the 24-Hour Consultation Guidance and Third Country Removal Policy**

24. The limitation of the CFI consultation period to as little as 24 hours makes it significantly more difficult to further our mission and assist our clients. CFI consultations and representation are central to Las Americas' detained legal services. The 24-hour timeline for communicating with people prior to their CFI makes it organizationally impossible for Las Americas to assist and represent these individuals, especially when they were kept in CBP custody for the duration of the CFI process. Under the 24-hour timeline, it is not possible for us to provide a CFI consultation prior to the interview, nor is it realistic to expect staff with multiple case responsibilities and who work only from 8:30am to 5 pm to have the means of discovering the actual date and time of an interview, thus frustrating our goal of providing representation and assistance to individuals at their CFI. Several Las Americas clients were unable to have their attorney present during their CFI because the asylum office scheduled it without providing us any advance notice, even in cases where an attorney had previously entered an appearance. This is harmful to our mission because the CFI process is the key procedural hurdle to having any opportunity for an asylum seeker to have their case heard.

Review standards are complicated, and the vast majority of those within the process do not speak English and are unfamiliar with legal proceedings, making them completely unprepared for a legal screening interview conducted by a trained officer of the U.S. government.

25. The third country expedited removal policy has also interfered with and continues to interfere with the ability of Las Americas to provide representation to people in expedited removal proceedings. For individuals seeking asylum in ordinary removal proceedings who have been in the United States for less than two years, DHS has been making oral motions at master calendar hearings to terminate ordinary removal proceedings under INA section 240. I and my staff and volunteers have observed that the majority of immigration judges in El Paso grant these DHS motions without giving the asylum seeker a meaningful opportunity to review the motion and present evidence and arguments as to why they should be allowed to proceed with their asylum case. Immediately after the IJ terminates the case, DHS is then arresting these individuals (often at the immigration court immediately after the immigration court hearing), detaining them without bond, and placing them into expedited removal proceedings even in cases where that individual has been present in the United States for more than two years.

26. Many of these people entered the United States between May 11, 2023, and May 11, 2025, and are therefore subject to the CLP Rule.  The third country expedited removal policy applies to this population.  Where a person is subject to expedited removal to a third country, in many instances effective representation to ensure that the person has meaningful access to protection is frustrated by procedural hurdles, complexity of the rules, and lack of transparency on the part of DHS agents responsible for implementing third country removals. This is despite efforts by staff to advocate for their clients directly to DHS, resend representation documents, including G28, to multiple DHS officers at the facility where the client is held, advocacy to local congressional offices, and information passed on to the client themselves to give them the means of trying to advocate for themselves when we cannot reach them.  Often Las Americas does not receive timely notice of the intention to remove a person to a third country, even in cases where our representation documents are on file with the court and with DHS, and in those cases where notice is received there is insufficient time to inform the individual they have a right to claim fear and request a CFI, let alone prepare for a CFI.  These cases are complex and occur on an expedited timeline.  Las Americas staff cannot be in detention eight hours a day nor is any legal service provider allowed to conduct mass information seminars in these centers. As a result, I have observed and in a few lucky instances, represented individuals who discovered they were being processed for a third country removal within hours of a scheduled deportation. Las Americas' accredited representatives cannot represent these individuals on their own adequately because the primary tool available to prevent a wrongful deportation in this context is a writ of habeas corpus filed in federal court, where only licensed attorneys in good standing can practice. Writs of habeas corpus are not a standard component of direct immigration representation as it requires completely different training and admission to federal court and/or resources to seek admission. The third country removal policy thus substantially interferes with our core operations and activities intended to ensure that asylum seekers have meaningful access to protection.

7

**The CLP Rule Has Negatively Impacted Las Americas' Funding**

27. In part because of the CLP Rule and the heightened complexity and risks involved with representing migrants and asylum seekers, Las Americas' total budget has fallen from $1.4 million to approximately $1.2 million.  The grants we receive make up approximately 85% of our revenues, and some of those grants have requirements regarding the number of people we serve as well as caveats on the geography and types of services provided. For example, one grant requires us to serve 600 persons per year while another requires us to provide direct representation to 35 persons and pro se support to an additional 100 persons in ICE custody in New Mexico. "Low bono" client fees and other individual contributions make up the remainder of our income sources, but all our detention-related services, including CFI services, are provided at no cost to the individual.

28. Additionally, many funders are interested in funding work that reaches the greatest number of people possible. Because the CLP Rule has increased the workload for each case and interferes with our ability to take as many cases as before, we risk losing out on grants that expect the reach of our work to maintain a growth trajectory in terms of the number of different people served.

**Conclusion**

29. Las Americas' staff has experienced a mental and physical toll because of the CLP Rule and the harm to Las Americas' mission. Living and working on the border, our staff are closely connected to the communities they serve. Throughout the two-year period the CLP Rule was applied at the border, we witnessed firsthand the harmful effects of the CLP policies. Attempting to lead a team through the tumult caused by the CLP Rule has had and continues to have a serious, detrimental impact on the organization. Since the CLP Rule went into effect, I have observed many staff members foregoing their paid leave because of the volume of work and feel discouraged at taking on new cases out of concern that the rule will make it impossible for the individual to get their day in court. And because so much of our time is spent on the front end of the expedited removal process and screening individuals for the application of a myriad of complex rules aimed at limiting access to asylum, staff feel less satisfied by the work because we do not have resources to provide longer-term services with the same frequency. The sense that people cannot devote their energy to the work that meaningfully advances Las Americas' mission is already contributing to a sense of frustration and burnout. These harms will only persist as time goes on.

30. It is difficult for me to overstate the detrimental impact that the CLP Rule has had, and continues to have, on Las Americas' work and operations. The changes brought about by the CLP Rule have done nothing to improve the functioning of our immigration system and has instead infringed on our clients' rights to seek asylum, strained our resources and forced us to cut back on our services, and imposed insurmountable bureaucratic obstacles on people with legitimate asylum claims seeking refuge from persecution and torture.

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of August, 2025, in El Paso, Texas.

Jennifer Babaie
Director of Advocacy and Legal Services
Las Americas Immigrant Advocacy Center

08|14|2025