BRETT A. SHUMATE
*Assistant Attorney General*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
BRIAN C. WARD
*Acting Assistant Director*
KATHERINE J. SHINNERS
*Senior Litigation Counsel*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Email: katherine.j.shinners@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| M.A., *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>Kristi Noem[1], *et al.*, )<br><br>Defendants. ) | Civil Action No. 1:23-cv-01843-TSC |

**DEFENDANTS' RENEWED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR SUMMARY JUDGMENT**

---

[1] Secretary of Homeland Security Noem is automatically substituted for her predecessor under Fed. R. Civ. P. 25(d).

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 3

   I.    Legal Background ......................................................................................... 3

   II.   Background Concerning the Rule and Policies at Issue. ........................................ 7

   III.  This Lawsuit ................................................................................................ 14

ARGUMENT ........................................................................................................ 17

   I.    Plaintiffs' Claims Are Foreclosed on Numerous Threshold Grounds ................. 17

       A.   The Organizational Plaintiffs Cannot Challenge the Rule and its Procedures. .17

       B.   The Third-Country Removal Claims Are Not Justiciable or Reviewable. ........ 30

       C.   Individual Plaintiffs Lack Standing to Challenge Procedures that Were Not, and Are Not Likely to Be, Applied to Them. ........................................................... 33

       D.   The Expedited Removal Procedures Are Not "Final Agency Action." ............. 34

       E.   The APA Does Not Permit Plaintiffs' Challenge to a "Combination" of Policies. ............................................................................................................ 35

       F.   Plaintiffs Cannot Challenge the Conditions on Asylum Eligibility in District Court, Except as Applied in Expedited Removal. .................................................... 36

   II.   Plaintiffs' Claims Against the Rule Fail on the Merits Because the CLP Rule Is Authorized by Statute and Reasonably Explained. ................................................ 38

       A.   The Rule's Conditions on Asylum Eligibility Are Not Contrary to Law. ......... 38

       B.   The Rule's Conditions on Asylum Eligibility Are Not Arbitrary and Capricious. ...................................................................................................... 51

       C.   The Rule is Consistent with the INA's Credible Fear Provisions .................... 61

       D.   Arbitrary-and-Capricious Review of the Rule's Application in Expedited Removal Is Unavailable, but This Aspect of the Rule Is Likewise Reasonable and Reasonably Explained. ............................................................................... 63

III.   The Remaining Procedures Are Lawful. ................................................................74

    A.   The 24-hour Consultation Guidance Is Consistent with Relevant Statutes and Regulations and Not Arbitrary and Capricious.........................................................75

    B.   The Third-Country Removal Procedures Are Consistent with the Statute and Not Arbitrary and Capricious.......................................................................................79

IV.   The Court Should Grant Summary Judgment to Defendants on Counts Nine and Ten. ............................................................................................................................85

IV.   Any Relief Must Be Sharply Limited ................................................................85

CONCLUSION...............................................................................................................90

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Aberdeen & Rockfish R.R. v. Students Challenging Regulatory Agency Procedures (SCRAP)*,
  422 U.S. 289 (1975) ........................................................................................................ 87

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
  429 F.3d 1136 (D.C. Cir. 2005) ...................................................................................... 89

*Air Transp. Ass'n of Am., Inc. v. U.S.,
  DOA*, 317 F. Supp. 3d 385 (D.D.C. 2018) ..................................................................... 90

*Alanniz v. Barr*,
  924 F.3d 1061 (9th Cir. 2019) ........................................................................................ 47

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) .............................................................................. 88, 89, 90

*Already, LLC, v. Nike, Inc.*,
  568 U.S. 85 (2013) .......................................................................................................... 25

*Arizona v. United States*,
  567 U.S. 387 (2012) .................................................................................................. 40, 54

*Am. Immigr. Laws. Ass'n v. Reno (AILA)*,
  199 F.3d 1352 (D.C. Cir. 2000) ................................................................................ 27, 28

*ASPCA v. Feld Entm't, Inc.*,
  659 F.3d 13 (D.C. Cir. 2011) .......................................................................................... 20

*Ayuda, Inc. v. Reno*,
  7 F.3d 246 (D.C. Cir. 1993) ........................................................................................... 30

*Barr v. East Bay Sanctuary Covenant*,
  140 S. Ct. 3 (2019) ......................................................................................................... 46

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................................................ 34

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984) .................................................................................................. 29, 30

*Bob Jones Univ. v. United States*,
  461 U.S. 574 (1983) .................................................................................................. 40, 41

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ........................................................................................... 89

*California v. Texas*,
593 U.S. 659 (2021) ........................................................................................... 85

*Citizens for Resp. & Ethics in Washington v. Wheeler*,
352 F. Supp. 3d 1 (D.D.C. 2019) ....................................................................... 25

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971) ..................................................................................... 50, 51

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................................... 24

*Clarke v. Secs. Indus. Ass'n*,
479 U.S. 388 (1987) ........................................................................................... 28

*Coal. for Humane Immigrant Rts. v. Noem*,
No. 25-CV-872 (JMC), 2025 WL 2192986 (D.D.C. Aug. 1, 2025) ...................... 47

*Ctr. for Responsible Science v. Gottlieb*,
346 F Supp. 3d 29 (D.D.C. 2018) ...................................................................... 23

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ..................................................................................... 34, 85

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019) ............................................................................. 59, 78, 79

*Dhakal v. Sessions*,
895 F.3d 532 (7th Cir. 2018) ............................................................................... 3

*DHS v. Thuraissigiam*,
591 U.S. 103 (2020) ............................................................................................. 6

*Direct Mktg. Ass'n v. Brohl*,
575 U.S. 1 (2015) ............................................................................................... 87

*DRG Funding Corp. v. HUD*,
76 F.3d 1212 (D.C. Cir. 1996) ........................................................................... 35

*E. Bay Sanctuary Covenant v. Biden*,
683 F. Supp. 3d 1025 (N.D. Cal. 2023) ............................................................. 11

*E. Bay Sanctuary Covenant v. Biden*,
  No. 23-16032, 2023 WL 11662094 (9th Cir. Aug. 3, 2023) .................................................. 11

*E. Bay Sanctuary Covenant v. Trump*,
  134 F.4th 545 (9th Cir. 2025) ..................................................................................... 11

*East Bay (I) Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) ............................................................................... 44, 49

*East Bay (II) Sanctuary Covenant v. Garland*,
  994 F.3d 962 (9th Cir. 2021) ............................................................................... 46, 47

*Environmental Def. Fund, Inc. v. EPA*,
  82 F.3d 451 (D.C. Cir. 1996) ...................................................................................... 39

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) .................................................................................................... 66

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ............................................................................... 52, 54, 64, 78

*FDA v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) ............................................................. 17, 20, 22, 23, 24

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ............................................................................... 20, 21

*Garland v. Aleman Gonzalez*,
  596 U.S. 543 (2022) ............................................................................................... 86, 87

*Gill v. Whitford*,
  585 U.S. 48 (2018) ........................................................................................... 18, 85, 89

*Grace v. Barr*,
  965 F.3d 883 (D.C. Cir. 2020) .................................................................................... 36

*Guerrero-Lasprilla v. Barr*,
  589 U.S. 221 (2020) .................................................................................................... 29

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ............................................................................................... 17, 20

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ........................................................................................................ 40

*Huisha-Huisha v. Mayorkas,*
    27 F.4th 718 (D.C. Cir. 2022) ................................................................ 7, 39, 43

*INS v. Aguirre-Aguirre,*
    526 U.S. 415 (1999) ............................................................................. 84

*INS v. Cardoza-Fonseca,*
    480 U.S. 421 (1987) ............................................................................. 3, 38

*INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labo*r,
    510 U.S. 1301 (1993) ........................................................................... 29

*\*J.E.F.M. v. Lynch,*
    837 F.3d 1026 (9th Cir. 2016) ............................................................. 37

*Jama v. ICE,*
    543 U.S. 335 (2005) ............................................................................. 32

*Judulang v. Holder,*
    565 U.S. 42 (2011) ............................................................................... 53, 54

*Khan v. Holder,*
    584 F.3d 773 (9th Cir. 2009) ............................................................. 84

*Kiakombua v. Wolf,*
    498 F. Supp. 3d 1 (D.D.C. 2020) ...................................................... 69

*Komarenko v. I.N.S.,*
    35 F.3d 432 (9th Cir. 1994) ............................................................... 45

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004) ............................................................................. 22

*Kucana v. Holder,*
    558 U.S. 233 (2010) ............................................................................. 32

*Las Americas Immigrant Advoc. Ctr. v. Wolf,*
    507 F. Supp. 3d 1 (D.D.C. 2020) ...................................................... 60, 77, 78

*Las Americas Imm. Advoc. Center v. U.S. DHS,*
    2025 WL 1403811 (D.D.C. May 9, 2025) ......................................... 13, 46, 79

*Lewis v. Casey,*
    518 U.S. 343 (1996) ............................................................................. 85

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973) ........................................................................................ 18

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369, 295 (2024) ............................................................................... 51

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................... 17, 23, 24, 31

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ....................................................................................... 36

*\*M.M.V. v. Garland*,
  1 F.4th 1100 (D.C. Cir. 2021) ....................................................................... 26

*\*Make the Road New York v. Wolf*,
  962 F.3d 612 (D.C. Cir. 2020) .......................................................... 26, 27, 88

*MercExchange, LLC*,
  547 U.S. 388 (2006) ....................................................................................... 89

*Meza v. Renaud*,
  9 F.4th 930 (D.C. Cir. 2021) ......................................................................... 36

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................... 51, 64

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*,
  145 F.3d 1399 (D.C. Cir. 1998) ..................................................................... 88

*Nat'l Min. Ass'n*,
  758 F.3d ......................................................................................................... 35

*Nat. Res. Def. Council v. Wheeler*,
  955 F.3d 68 (D.C. Cir. 2020) ......................................................................... 85

*Nat'l Treasury Emps. Union v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996) ..................................................................... 21

*\*Nat'l Treasury Emps. Union v.Vought*,
  No. 25-5091, ---F. 4th ---, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) ............... 36

*Nat'l Wildlife Fed'n v. EPA*,
  286 F.3d 554 (D.C. Cir. 2002) ....................................................................... 73

*New York v. United States*,
    505 U.S. 144 (1992) ................................................................................ 49

*Norton v. So. Utah Wilderness All.*,
    542 U.S. 55 (2004) ................................................................................. 36

*Pangea Legal Servs. v. DHS*,
    512 F. Supp. 3d 966 (N.D. Cal. 2021) ................................................... 66

*Prohibition Juice Co. v. U.S. Food and Drug Admin.*,
    45 F.4th 8 (D.C. Cir. 2022) ............................................................. 60, 73

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
    No. 25-cv-306 (RDM), 2025 WL 1825431 (D.D.C. July 2, 2025) .......... 14

*DHS v. Regents of Univ. of Cal.*,
    591 U.S. 1 (2020) .................................................................................. 30

*Reno v. Flores*,
    507 U.S. 292 (1993) ............................................................................... 42

*R-S-C- v. Sessions*,
    869 F.3d 1176 (10th Cir. 2017) ............................................................ 45

*Samma v. Dep't of Def.*,
    136 F.4th 1108 (D.C. Cir. 2025) .......................................................... 85

*Spencer v. Kemna*,
    523 U.S. 1 (1998) .................................................................................. 25

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ...................................................................... 25, 30, 33

*Sure-Tan, Inc. v. NLRB*,
    467 U.S. 883 (1984) ............................................................................... 18

*Swanson Grp. Mfg. LLC v. Jewell*,
    790 F.3d 235 (D.C. Cir. 2015) ........................................................ 23, 24

*\*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025) ....................................................................... 3, 89

*\*United States v. Texas*,
    599 U.S. 670 (2023) ........................................................ 18, 19, 31, 33, 88, 89

*Vetcher v. Sessions,*
  316 F. Supp. 3d 70 (D.D.C. 2018) ................................................. 37

*Washington v. U.S. Off. of Special Couns.,*
  480 F. Supp. 3d 118 (D.D.C. 2020) ............................................... 21

*Wild Fish Conservancy v. Jewell,*
  730 F.3d 791 (9th Cir. 2013) ........................................................ 36

*Yang v. INS,*
  79 F.3d 932 (9th Cir. 1996) .......................................................... 42

## <u>ADMINISTRATIVE DECISIONS</u>

*Matter of D-A-C-,*
  27 I. & N. Dec. 575 (B.I.A. 2019) ................................................. 42

*Matter of Pula,*
  19 I. & N. Dec. 467 (B.I.A. 1987) ............................................. 42, 46

## <u>STATUTES</u>

5 U.S.C. § 701(a)(1) ................................................................. 29, 35

5 U.S.C. § 702 ............................................................................. 28

5 U.S.C. § 702(1) ......................................................................... 89

5 U.S.C. § 703 ............................................................................. 88

5 U.S.C. § 704 ............................................................................. 34

5 U.S.C. § 706 ............................................................................. 73

5 U.S.C. § 706(2) ......................................................................... 88

6 U.S.C. § 552(d) ........................................................................... 4

8 U.S.C. § 1101 ............................................................................. 3

8 U.S.C. § 1101(a)(42) ................................................................. 3, 48

8 U.S.C. § 1103(a)(1) ..................................................................... 4

8 U.S.C. § 1103(a)(3) ................................................................. 4, 75

8 U.S.C. § 1103(a)(5) ........................................................................................... 75

8 U.S.C. § 1103(g) ................................................................................................. 4

8 U.S.C. § 1158 ............................................................................................. 3, 4, 5

8 U.S.C. § 1158(2) ................................................................................................. 3

8 U.S.C. § 1158(a)(2) ............................................................................................ 4

8 U.S.C. § 1158(a)(2)(A) ........................................................................... 46, 68, 83

8 U.S.C. § 1158(a)(2)(B) ...................................................................................... 41

8 U.S.C. § 1158(b)(1)(A) ....................................................................... 3, 38, 41, 54

8 U.S.C. § 1158(b)(1)(B) ........................................................................................ 4

8 U.S.C. § 1158(b)(2) ............................................................................................. 4

8 U.S.C. § 1158(b)(2)(C) ............................................................................. 4, 38, 69

8 U.S.C. § 1158(d)(7) ........................................................................................... 28

8 U.S.C. § 1182(a)(1)-(3) ..................................................................................... 14

8 U.S.C. § 1182(d)(5) ........................................................................................... 47

8 U.S.C. § 1182(f) ................................................................................................ 14

8 U.S.C. § 1185(a) ................................................................................................ 14

8 U.S.C. § 1225(a)(4) ................................................................................. 6, 14, 30

8 U.S.C. § 1225(b)(1) ...................................................................................... 3, 10

8 U.S.C. § 1225(b)(1)(A)(i) ............................................................................. 4, 83

8 U.S.C. § 1225(b)(1)(B)((iii)(I) ........................................................................... 5

8 U.S.C. § 1225(b)(1)(B)((iii)(III) ................................................................... 5, 76

8 U.S.C. § 1225(b)(1)(B)(iv) .................................................................. 2, 75, 76, 78

8 U.S.C. §§ 1225(b)(1)(C) ..................................................................................... 6

8 U.S.C. § 1228(b) .................................................................................................. 73

8 U.S.C. § 1229 ...................................................................................................... 15

8 U.S.C. § 1229a .................................................................................................. 3, 5

8 U.S.C. § 1231(a)(5) ........................................................................................ 72, 73

8 U.S.C. § 1231(b) ............................................................................................. 2, 35

8 U.S.C. § 1231(b)(1) .............................................................................................. 83

8 U.S.C. § 1231(b)(2) ....................................................................................... 11, 82

8 U.S.C. § 1231(b)(2)(A) ................................................................................ 6, 79, 81

8 U.S.C. § 1231(b)(2)(C) ............................................................................... 6, 32, 82

8 U.S.C. § 1231(b)(2)(D) ................................................................................... 80, 81

8 U.S.C. § 1231(b)(2)(E) ......................................................................................... 81

8 U.S.C. § 1231(b)(2)(E)(i)-(vi) .............................................................................. 80

8 U.S.C. § 1231(b)(2)(E)(vii) .................................................................................. 81

8 U.S.C. § 1231(b)(3) .............................................................................................. 83

8 U.S.C. § 1231(b)(3)(A) ............................................................................... 7, 83, 84

8 U.S.C. § 1252(a)(2)(A) ................................................................................... 25, 29

8 U.S.C. § 1252(a)(2)(A)(i) ..................................................................................... 26

8 U.S.C. § 1252(a)(2)(A)(ii) ....................................................................................26

8 U.S.C. § 1252(a)(2)(A)(iii) .....................................................................................6

8 U.S.C. § 1252(a)(2)(A)(iv) .................................................................................... 26

8 U.S.C. § 1252(a)(5) .....................................................................................29, 36, 37

8 U.S.C. § 1252(b)(4) .............................................................................................32

8 U.S.C. § 1252(b)(9) .....................................................................................29, 36, 37

8 U.S.C. § 1252(e)(1)(A) ................................................................................ 89

8 U.S.C. § 1252(e)(2) ...................................................................................... 6

8 U.S.C. § 1252(e)(3) ...................................................................................... 29

8 U.S.C. § 1252(e)(3)(A) ................................................................................. 26

8 U.S.C. § 1252(e)(3)(A)(ii) ............................................................................ 74

8 U.S.C. § 1252(e)(3)(ii) ................................................................................. 63

8 U.S.C. § 1252(f)(1) ................................................................................. 86, 87

42 U.S.C. § 265 ............................................................................................... 7

Foreign Affairs Reform and Restructuring Act of 1998 (FARRA),
    Pub. L. No. 105-277 .................................................................................. 73

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
    Pub. L. No. 104-208 ............................................................................. 4, 40

Refugee Act of 1980, Pub. L. No. 96-212 ..................................................... 40

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 56(c) ...................................................................................... 23

## REGULATIONS

8 C.F.R. § 208.2(a) .......................................................................................... 3

8 C.F.R. § 208.2(b) .......................................................................................... 3

8 C.F.R. § 208.13 ............................................................................................ 40

8 C.F.R. § 208.13(f) ..................................................................................... 8, 36

8 C.F.R. § 208.14(c)(1) .................................................................................. 37

8 C.F.R. § 208.30 ...................................................................................... 82, 83

8 C.F.R. § 208.30(d)(4) ................................................................................... 5

8 C.F.R. § 208.30(e)(2) .................................................................................. 5, 62

8 C.F.R. § 208.30(e)(5)(i) .................................................................................... 66

8 C.F.R. § 208.30(f) .............................................................................................. 5

8 C.F.R. § 208.33(a) .............................................................................................. 8

8 C.F.R. § 208.33(a)(1) ..................................................................................... 9, 11

8 C.F.R. § 208.33(a)(1)(ii) .................................................................................. 10

8 C.F.R. § 208.33(a)(2) .......................................................................................... 9

8 C.F.R. § 208.33(a)(2)(ii)(A) ....................................................................... 47, 58

8 C.F.R. § 208.33(a)(2)(ii)(B) .............................................................................. 56

8 C.F.R. § 208.33(a)(2)(ii)(C) .............................................................................. 44

8 C.F.R. § 208.33(a)(3) ........................................................................................ 53

8 C.F.R. § 208.33(b) .................................................................................. 10, 15, 63

8 C.F.R. § 208.33(b)(1)(i) ..................................................................................... 10

8 C.F.R. § 208.33(b)(1)(ii) .................................................................................... 10

8 C.F.R. § 214.11(a) ............................................................................................. 10

8 C.F.R. § 235.3 ...................................................................................................... 5

8 C.F.R. § 235.3(b)(4) ...........................................................................................82

8 C.F.R. § 235.3(b)(4)(ii) ................................................................................75, 76

8 C.F.R. § 235.4 ......................................................................................................6

8 C.F.R. § 253.3 ......................................................................................................5

8 C.F.R. § 1208.2(a)(1)(ii) .....................................................................................5

8 C.F.R. § 1208.2(b) ...............................................................................................3

8 C.F.R. § 1208.13(f) ..........................................................................................8, 9

8 C.F.R. § 1208.16(a)-(b) ................................................................................7

8 C.F.R. § 1208.16(c) ......................................................................................7

8 C.F.R. § 1208.17 ...........................................................................................7

8 C.F.R. § 1280.30(g)(2)(iv)(A) ......................................................................6

8 C.F.R. § 1280.30(g)(2)(iv)(B) ......................................................................5

8 C.F.R. § 1208.33(a) .......................................................................................8

8 C.F.R. § 1208.33(a)(1) ..................................................................................9

8 C.F.R. § 1208.33(c) .....................................................................................10

8 C.F.R. § 1240.11 ...........................................................................................3

## **FEDERAL REGISTER**

*Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55,934 (Nov. 9, 2018) .................................................. 62, 65

*Asylum Eligibility and Procedural Modifications*,
84 Fed. Reg. 33,829, 33,837 (July 16, 2019) .......................................................... 62

*Asylum Procedures*,
65 Fed. Reg. 76,121 (Dec. 6, 2000) ......................................................... 4

*Circumvention of Lawful Pathways*,
88 Fed. Reg. 11,704 (Feb. 23, 2023) ...................... 1, 4, 7, 8, 50, 60, 61, 64, 65, 66, 67, 68, 71

*Circumvention of Lawful Pathways*,
88 Fed. Reg. 13,316 (May 16, 2023) ............................................................... *passim*

*Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 80,274 (Dec. 11, 2020) ......................................................... 66

*Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*,
87 Fed. Reg. 18,078 (Mar. 29, 2022) ............................................. 65, 66, 67, 68, 72

*Regulations Concerning the Convention Against Torture*,
64 Fed. Reg. 8,474 (Feb. 19, 1999) .......................................................... 73

*Securing the Border*,
  89 Fed. Reg. 48,710 (June 7, 2024) .......................................................................... 13

*Securing the Border*,
  89 Fed. Reg. 81,156 (Oct. 7, 2024) ............................................................................ 13

*Security Bars and Processing*,
  85 Fed. Reg. 84,160 (Dec. 23, 2020) ......................................................................... 62

*Termination of the Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*,
  90 Fed. Reg. 13,611 (Mar. 25, 2025) .................................................................. 13, 49

## EXECUTIVE ORDERS AND PROCLAMATIONS

Amending Proclamation 10773, 89 Fed. Reg. 80,351 ..................................................... 13

Exec. Order No. 14165, 90 Fed. Reg. 8467 (Jan 29, 2025) .................................... 13, 49

Securing the Border, 89 Fed. Reg. 48,487 ................................................................... 13

Proclamation No. 10888, 90 Fed. Reg. 8333 (Jan. 29, 2025) ................................. 14, 50

**INTRODUCTION**

Plaintiffs ask this Court to hold unlawful measures that, when adopted, were deemed crucial to managing the ongoing crisis at the southern border. In fact, those measures—all of which were well within the Executive Branch's statutory authorities—did not do nearly enough to address the sheer volume of illegal entries that overwhelmed and rendered ineffective the expedited removal processes. The measures are all well within the Executive Branch's statutory authority and consistent with the governing statutes. The Court should reject Plaintiffs' invitation to second-guess the Executive Branch's reasoned policy judgments.

First, Plaintiffs ask the Court to vacate and hold unlawful a Rule that is well within the Executive Branch's statutory authority to impose limitations and conditions on asylum eligibility. The Circumvention of Lawful Pathways Rule was promulgated by the Department of Homeland Security (DHS) and the Department of Justice (DOJ) (the "Departments") in anticipation of a significant increase in migrants seeking to enter the United States at the southwest border following the end of the Title 42 public health orders—under which migrants without proper travel documents generally were not processed into the United States but instead expelled due to COVID-19 related concerns. *See Circumvention of Lawful Pathways*, 88 Fed. Reg. 31,314 (May 16, 2023) ("the Rule"); *see also Circumvention of Lawful Pathways*, 88 Fed. Reg. 11,704 (Feb. 23, 2023) (Notice of Proposed Rulemaking). The Rule applies only to certain aliens who entered across the southwest land border or adjacent coastal borders between May 11, 2023, and May 11, 2025, and it generally conditions eligibility for a discretionary grant of asylum on aliens' using certain orderly "pathways" or seeking protection in countries through which they travelled, absent exceptionally compelling circumstances. Regardless of the merits of certain of those other "pathways," the Departments reasonably concluded at the time of promulgating the Rule that temporarily imposing such a condition, including in expedited removal proceedings, would help

encourage aliens to use orderly and lawful pathways or seek protection in transit countries and would discourage illegal entries and other irregular migration, which diverts limited government resources and threatens to overwhelm the immigration system.

Next, Plaintiffs challenge certain agency guidance governing expedited removal procedures that furthered these same goals and were in line with statutory requirements. First, following extensive negotiations, Mexico agreed to allow DHS to remove to Mexico nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV) who could not be removed to their native countries. *See* 8 U.S.C. § 1231(b). Second, U.S. Citizenship and Immigration Services (USCIS) issued guidance shortening the minimum consultation period for individuals awaiting credible fear interviews from 48 to 24 hours. *See* 8 U.S.C. § 1225(b)(1)(B)(iv). Together with the Rule, this guidance furthered the goal of delivering efficient, expeditious processing of aliens who entered without authorization and were subject to expedited removal.

The Court should grant summary judgment to Defendants on these claims. Plaintiffs—two organizations and eighteen individuals—challenge these measures under the Administrative Procedure Act (APA) and the provisions of the Immigration and Nationality Act (INA) that grant limited review of expedited removal procedures and regulations. But the Organizational Plaintiffs lack Article III standing, they are not within the statute's zone of interests as required to bring an APA claim, and their claims are barred by multiple jurisdiction-stripping provisions of the INA. Additionally, most Individual Plaintiffs lack standing to challenge the expedited removal guidance at issue, and the INA bars their challenge to the application of the Rule's asylum eligibility condition outside the expedited removal context. All Plaintiffs' claims challenging the third-country-removal procedures are not redressable, are barred by the INA, and do not satisfy the APA's "final agency action" requirement. On the merits, the Rule and challenged procedures are consistent with statutory authority, reasonable, and reasonably explained. And, in any event, the

relief Plaintiffs seek—universal vacatur of the Rule and procedures—is forbidden by the INA and by the Supreme Court's decision in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025), and unjustified by the equitable principles governing APA remedies. Should the Court find any relief warranted, the Court should remand to the agencies without vacatur.

## BACKGROUND[2]

### I.    Legal Background

Asylum. Asylum is a form of discretionary relief under the INA, 8 U.S.C. § 1101 *et seq.*, which, if granted, affords relief from removal and a path to lawful permanent residence for certain aliens and their family members. *See* 8 U.S.C. § 1158; *INS v. Cardoza-Fonseca*, 480 U.S. 421, 444 (1987). To obtain asylum, aliens must show that they: (1) qualify as a "refugee"—that is, that they are unable or unwilling to return to their home country "because of persecution or a well-founded fear of persecution on account of" a protected ground, 8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(A); (2) are not subject to one of the many exceptions or mandatory conditions or bars that precludes either applying for or receiving asylum, *id.* § 1158(a)(2), (b)(2); and (3) merit a favorable exercise of discretion, *id.* § 1158(b)(1)(A).

An alien may request asylum in three contexts: (1) an alien who is present in the United States and not in removal proceedings may affirmatively apply with USCIS, *see Dhakal v. Sessions*, 895 F.3d 532, 536 (7th Cir. 2018); 8 C.F.R. § 208.2(a); (2) an alien who is in removal proceedings under 8 U.S.C. § 1229a may apply before the immigration judge as a defense to removal, 8 C.F.R. §§ 208.2(b), 1208.2(b), 1240.11(c); and (3) an alien who is subject to expedited removal under 8 U.S.C. § 1225(b)(1) may indicate an intention to seek asylum or a fear of

---

[2] Defendants submit this background consistent with Local Rule 7(h)(2), (n). The index of administrative records was initially filed on October 27, 2023, with Defendants' first summary judgment motion; a corrected index was filed on December 22, 2023 (*see* ECF 63).

persecution and be screened for entitlement to pursue a claim to asylum (as well as other forms of protection) before removal.

The INA forbids certain aliens from applying for asylum and deems others ineligible—such as those who have participated in persecution or who were firmly resettled in another country before arriving in the United States. *See* 8 U.S.C. § 1158(a)(2), (b)(1)(B), (b)(2). And for decades, the Executive Branch has promulgated mandatory bars that have rendered certain aliens ineligible for asylum. *See Circumvention of Lawful Pathways*, 88 Fed. Reg. 11,704, 11,734 (Feb. 23, 2023) (NPRM). Attorneys General originally adopted such limits pursuant to their general authority "to establish a procedure" for asylum. *See id.* Then, in 1996, Congress codified several of those limits. *See id.* Simultaneously, Congress reaffirmed that the Attorney General (and now, the Departments) retained the same broad authority to establish new conditions, specifying that they "may by regulation establish additional limitations and conditions, consistent with [§ 1158], under which an alien shall be ineligible for asylum." 8 U.S.C. § 1158(b)(2)(C) (codifying § 604 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009); *see id.* § 1158(d)(5)(B); 6 U.S.C. § 552(d); 8 U.S.C. § 1103(a)(1), (a)(3), (g). DHS Secretaries and Attorneys General have since that time continued to invoke that authority to establish conditions beyond those in the statute. *See, e.g.*, *Asylum Procedures*, 65 Fed. Reg. 76,121, 76,126 (Dec. 6, 2000) (internal relocation bar).

<u>Expedited Removal.</u> In expedited removal proceedings certain aliens who arrive in the United States at a port of entry or who entered illegally, but who lack valid entry documentation, shall be "order[ed] ... removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i); *see id.* § 1182(a)(6)(C), (a)(7). If the alien "indicates either an intention to apply for asylum ... or a fear of persecution," the inspecting officer—typically

an agent or officer of U.S. Customs and Border Protection (CBP)—must "refer the alien for" an interview conducted by an asylum officer. *Id*. § 1225(b)(1)(A)(ii). At the interview, an asylum officer from USCIS assesses whether the alien has a "credible fear of persecution," meaning "that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under [8 U.S.C. § 1158]." *Id*. § 1225(b)(1)(B)(v). At the interview, aliens are also screened for eligibility for withholding of removal and protection under the regulations implementing U.S. obligations under Article 3 of the Convention Against Torture (CAT). 8 C.F.R. §§ 208.30(e)(2), 235.3. "An alien who is eligible for [a credible fear] interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof" but "[s]uch consultation shall be at no expense to the Government and shall not unreasonably delay the process." *Id.* § 1225(b)(1)(B)(iv); 8 C.F.R. § 208.30(d)(4).

If the asylum officer determines that the alien has a credible fear of persecution or torture, the asylum officer may refer the alien to full removal proceedings under 8 U.S.C. § 1229a ("section 240 removal proceedings"), where the alien may apply for asylum and other protection from removal before an immigration judge. *Id*. § 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f). Alternatively, the regulations permit USCIS to retain jurisdiction and consider the alien's application for asylum in the first instance. *See* 8 C.F.R. § 208.30(f).

If the asylum officer determines that the alien lacks a credible fear, the alien may seek *de novo* review before an immigration judge. 8 U.S.C. § 1225(b)(1)(B)(iii)(I), (III). If the immigration judge concludes that the alien has established a credible fear, the asylum officer's decision is vacated and the alien's case is returned to USCIS to determine whether to initiate removal proceedings under 8 U.S.C. § 1229a (during which the alien may apply for asylum) or retain jurisdiction over the asylum application. 8 C.F.R. §§ 1280.30(g)(2)(iv)(B), 1208.2(a)(1)(ii). If the

immigration judge finds that the alien lacks a credible fear, the alien is "removed from the United States without further hearing or review." 8 U.S.C. § 1225(b)(1)(B)(iii)(I); 8 C.F.R. § 1208.30(g)(2)(iv)(A). The INA precludes further review of the credible-fear determination, by the immigration courts or any court. 8 U.S.C. §§ 1225(b)(1)(C), 1252(a)(2)(A)(iii), (e)(2); *see also, e.g.*, *DHS v. Thuraissigiam*, 591 U.S. 103 (2020).

Withdrawals. An alien "applying for admission"—such as those aliens who enter at a port of entry or who cross illegally—"may, in the discretion of the [Secretary] and at any time, be permitted to withdraw the application for admission and depart immediately from the United States" in lieu of removal proceedings, including expedited removal proceedings. 8 U.S.C. § 1225(a)(4). By regulation, an alien's "decision to withdraw his or her application for admission must be made voluntarily," 8 C.F.R. § 235.4, but no alien has any right to withdraw their application for admission, *id.*; *accord* 8 U.S.C. § 1225(a)(4) (decision is discretionary).

Third-Country Removals. Aliens subject to removal orders may not always be removed to their native country. Generally, aliens ordered removed "may designate one country to which the alien wants to be removed," and DHS "shall remove the alien to [that] country[.]" 8 U.S.C. § 1231(b)(2)(A). DHS may, however, disregard the alien's designation in certain circumstances, including where "the government of the country is not willing to accept the alien into the country." *Id.* § 1231(b)(2)(C)(iii). If the designated country of removal is not an option, then the alien "shall" be removed to the alien's country of nationality or citizenship, unless that country "is not willing to accept the alien[.]" *Id.* § 1231(b)(2)(D). If an alien cannot be removed to the country of designation or the country of nationality or citizenship, then the government may consider other options, including removal to "[t]he country from which the alien was admitted to the United States," "[t]he country in which the alien was born," or "[t]he country in which the alien last resided[.]" *Id.* §§ 1231(b)(2)(E)(i), (iii)-(iv). Where removal to any of the countries listed in

subparagraph (E) is "impracticable, inadvisable, or impossible," then the alien may be removed to any "country whose government will accept the alien into that country." *Id.* § 1231(b)(2)(E)(vii).

DHS "may not," however, "remove an alien to a country if [it] decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1231(b)(3)(A) (withholding of removal); 8 C.F.R. § 1208.16(a)-(b), or if the alien more likely than not would be tortured there, 8 C.F.R. §§ 1208.16(c), 1208.17 (CAT).

## II. Background Concerning the Rule and Policies at Issue.

Title 42. From March 20, 2020, through May 11, 2023, a series of CDC Title 42 public health Orders were in effect to combat the COVID-19 pandemic. These Orders implemented the CDC's authority under 42 U.S.C. § 265 to prevent the introduction of individuals into the United States to avoid a serious danger to public health arising from a communicable disease. *See* AR565-78. Under the Title 42 Orders, covered aliens were expelled to Mexico or their home countries without processing under Title 8, including processing for asylum. *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 731 (D.C. Cir. 2022) (upholding denial of access to asylum to aliens covered by the public health orders). The expiration of the public health emergency on May 11, 2023, caused the then-operative Title 42 Order to terminate.

Circumvention of Lawful Pathways Rule. Absent policy change, the end of the Title 42 Order was expected to cause the number of aliens seeking to illegally enter the United States at the southwest border to increase or remain at all-time highs—an estimated 11,000 migrants daily. 88 Fed. Reg. at 31,331. Even while the Title 42 orders were in effect, border encounters had been "at historically high levels." *Id.* And the end of the Title 42 orders would mean those aliens could no longer be promptly expelled under Title 42 and instead would have to be processed through the substantially more resource-intensive procedures in Title 8 (that is, the INA). *Id.* at 31,442; 88 Fed.

Reg. at 11,705. Under the expedited removal procedures in place before this Rule, many aliens who asserted a fear of persecution during expedited removal were found to have credible fear and thus remained in the United States pending resolution of their asylum claims. 88 Fed. Reg. at 31,337 (citing 83 percent positive credible-fear screening rate). Because the number of aliens who were able to satisfy this screening standard far exceeded the capacity of the immigration system to process them quickly, many aliens remained in the United States for years before their claims were adjudicated. *See id.* at 31,326. This process, along with the insufficient resources to execute removal orders, would incentivize nonmeritorious asylum claims and illegal migration. *Id.* at 31,326, 31,337-38; *see also* 88 Fed. Reg. at 11,716.

Thus, facing the end of Title 42 and its expulsion authority, the Departments faced an urgent situation. Absent policy change, many more aliens would cross the border to assert asylum claims, which would in turn overwhelm the government's ability to process migrants in a safe, expeditious, and orderly way. To address this exigent circumstance, DHS and DOJ promulgated the Circumvention of Lawful Pathways Rule (the Rule), following a Notice of Proposed Rulemaking (NPRM), a 33-day comment period, and review of 51,952 comments. 88 Fed. Reg. at 31,319, 31,324, 31,433. Among other goals, the Rule sought to "protect against an unmanageable flow of migrants arriving" at the Southwest Border and "to further ongoing efforts to share the responsibility of providing asylum and other forms of protection with the United States' regional partners." 88 Fed. Reg. at 31,318. To accomplish these goals, the Rule limits asylum eligibility for certain aliens who cross the southwest land border or adjacent coastal borders ("Southwest Border")[3] into the United States, subject to various exceptions and rebuttal grounds. 8 C.F.R.

---

[3] Defendants use the term "Southwest Border" herein to mean "southwest land border or adjacent coastal borders."

§§ 208.33(a), 1208.33(a), 208.13(f), 1208.13(f).

Specifically, the Rule applies "[a] rebuttable presumption of ineligibility for asylum ... to an alien who" "enters the United States from Mexico at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission" (1) "between May 11, 2023 and May 11, 2025," (2) "[s]ubsequent to the end of" the Title 42 Order, and (3) "[a]fter the alien traveled through a country other than the alien's country of citizenship [or] nationality." 8 C.F.R. §§ 208.33(a)(1), 1208.33(a)(1). This presumption of asylum ineligibility is, however, subject to various exceptions—including for aliens who use specified processes for entry into the United States or pursue an application for asylum in a transit country—and may be rebutted in exceptionally compelling circumstances. 8 C.F.R. §§ 208.33(a)(2), (3), 1208.33(a)(2), (3). The Rule took effect immediately, 88 Fed. Reg. at 31,444–47, and it applies to asylum determinations for covered aliens made in any context, including in removal proceedings, 8 C.F.R. § 1208.13(f), and in credible fear screenings, *id.* §§ 208.33(b), 1208.33(b).

The presumption does not apply to aliens who availed themselves of, or were traveling with a family member who availed themselves of, certain safe and orderly pathways—specifically, those who (1) were "provided appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process" (the "parole-process exception"); (2) "[p]resented at a port of entry, pursuant to a pre-scheduled time and place" or "presented at a port of entry without a pre-scheduled time and place" but who can "demonstrate[] by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle" (the "appointment exception"); or (3) "[s]ought asylum or other protection in a country through which the alien traveled and received a final decision denying that application (the "transit-country exception"). *Id.* §§ 208.33(a)(2), 1208.33(a)(2). The presumption also does not apply to

unaccompanied alien children. *See id.*

Under the Rule, aliens who do not meet one of these exceptions may still overcome the presumption of asylum ineligibility by "demonstrating" by a preponderance of the evidence that "exceptionally compelling circumstances exist." *Id.* §§ 208.33(a)(3)(i), 1208.33(a)(3)(i). And such circumstances necessarily exist where, at the time of entry, the alien, or a family member with whom the alien is traveling, "[f]aced an acute medical emergency"; "[f]aced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder"; or was a "victim of a severe form of trafficking in persons" under 8 C.F.R. § 214.11(a). *Id.* §§ 208.33(a)(3)(i)(A)-(C), (ii), 1208.33(a)(3)(i)(A)-(C), (ii). Finally, an alien presumed ineligible for asylum under the Rule is still eligible for statutory withholding of removal or CAT protection and thus may not be removed to a country where it is likely that they will be persecuted on account of a protected ground or tortured.[4]

As noted, the Rule's presumption applies during credible fear screenings, because the credible fear assessment focuses on an alien's ability to ultimately establish eligibility for asylum. 8 C.F.R. §§ 208.33(b), 1208.33(b); *see also* 8 U.S.C. § 1225(b)(1). Under the Rule, aliens subject to expedited removal who assert a fear of persecution or an intention to apply for asylum are first screened to assess whether the Rule's limitation applies and, if so, whether there is a significant possibility that the alien would be able to overcome that limitation during a merits adjudication. 8 C.F.R. § 208.33(b); 88 Fed. Reg. at 31,379–80. If the asylum officer determines that the limitation does not apply or the alien could likely overcome the limitation, the general procedures governing the credible fear process at 8 C.F.R. § 208.30 then apply. *See* 8 C.F.R. § 208.33(b)(1)(ii). On the

---

[4] The Rule also provides additional protections for family unity, *see* 8 C.F.R. § 1208.33(c), and exempts aliens who were minors when they entered but who apply for asylum as principal applicants after the two-year period expires. *Id.* §§ 208.33(c)(2), 1208.33(d)(2).

other hand, if the asylum officer determines that the limitation does apply and no exception or rebuttal ground applies, the asylum officer will consider whether the alien has established a reasonable possibility of persecution or torture with respect to the identified country or countries of removal. *See* 8 C.F.R. § 208.33(b)(1)(i), (2). If an alien is found to have a reasonable possibility of persecution or torture, then DHS will commence section 1229a removal proceedings, during which the alien may seek protection from removal. 8 C.F.R. § 208.33(b)(2)(ii).

The Rule remains in effect, although it no longer applies to new entrants to the United States as of May 12, 2025. *See* 8 C.F.R. §§ 208.33(a)(1), 1208.33(a)(1). It continues to apply to those aliens who last entered across the Southwest Border between May 11, 2023 and May 11, 2025, without documents sufficient for admission and after traveling through a third country en route to the United States. *See id.* § 208.33(c)(1). A district court in the Northern District of California had issued an order vacating the Rule in July 2023, *see E. Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025, 1038 (N.D. Cal. 2023), but the Ninth Circuit stayed that order, *see E. Bay Sanctuary Covenant v. Biden*, No. 23-16032, 2023 WL 11662094, at *1 (9th Cir. Aug. 3, 2023). The Ninth Circuit ultimately vacated the district court's order and remanded for further proceedings, which are ongoing. *E. Bay Sanctuary Covenant v. Trump*, 134 F.4th 545 (9th Cir. 2025); *E. Bay Sanctuary Covenant v. Trump*, No. 18-cv-06810-JST (N.D. Cal.).

<u>Additional expedited removal procedures</u>. Also in May 2023, DHS implemented certain additional procedures applicable to individuals in expedited removal proceedings.

*Third-Country Removal Procedure*. First, as part of the prior Administration's efforts to address irregular migration, the government of Mexico agreed to continue to accept returns and removals of nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). *See* CBP_Removals_AR_321-25 (memorandum from Assistant Secretary Nuñez-Neto). Such removals to Mexico are and were governed by the statutory framework of 8 U.S.C. § 1231(b)(2),

which sets forth the circumstances when DHS may disregard the alien's designation of a removal country and instead remove the alien to a third country. *See* CBP_Removals_AR_22-24, CBP_Removals_AR_321-25. Given the restrictions and limitations on removal to CHNV countries, DHS directed its components to work through the § 1231(b)(2) statutory framework and, in accordance with that framework, to designate Mexico as the country of removal in circumstances where the relevant country of citizenship or nationality will not accept the alien. *See* CBP_Removals_AR_4 (guidance dated May 10, 2023, setting forth process for designation of country of removal and stating that CHNV nationals may "under specific circumstances, be removed to Mexico directly from [U.S. Border Patrol] custody consistent with this guidance"); CBP_Removals_AR_22-24 (designation of country of removal worksheet).

*Consultation Period Guidance*. USCIS issued guidance directing asylum officers to provide aliens a minimum consultation period of 24 hours between when they acknowledge receipt of the Form M-444, Information About Credible Fear Interview, and their credible fear interview. USCIS_24-Hour_AR_1-3; *see also* USCIS_24-Hour_AR_65–68. This replaced prior guidance allowing for a 48-hour period between the alien's arrival at the detention facility and his credible fear interview. USCIS_24-Hour_AR_2. This change was made in anticipation of an increase in aliens seeking to enter the United States following the end of the Title 42 Order, and as a way "to expeditiously process and remove individuals who ... do not have a legal basis to remain in the United States." USCIS_24-Hour_AR_3.

Subsequent Asylum Limitations. After the Rule failed to adequately address the crisis of illegal immigration at the U.S.-Mexico border, two subsequent asylum limitations were put into place. In June 2024, the Departments promulgated a new rule—*Securing the Border*—that established a limitation on asylum eligibility for those who enter the United States during times when encounters between ports of entry are above thresholds specified by two Presidential

Proclamations: "Securing the Border," 89 Fed. Reg. 48,487 (June 7, 2024), and "Amending Proclamation 10773," 89 Fed. Reg. 80,351 (Oct. 2, 2024). The *Securing the Border* interim final rule took effect on June 5, 2024, *see* 89 Fed. Reg. 48,710 (June 7, 2024), and was replaced by a final rule effective October 1, 2024, *see* 89 Fed. Reg. 81,156 (Oct. 7, 2024). The rule's limitation on asylum eligibility applied to illegal border crossers from June 5, 2024, until March 27, 2025; it remained in effect until May 9, 2025, when it was vacated by the U.S. District Court for the District of Columbia. *See Las Americas Immigr. Advoc. Ctr. v. DHS*, No. 24-cv-1702, --- F. Supp. 3d ---, 2025 WL 1403811 (D.D.C. May 9, 2025), *appeal pending*, No. 25-5313 (D.C. Cir.).

On January 20, 2025, to address the nation's broken immigration system and the ongoing crisis at the southern border that had not been resolved by the Rule or by other actions of the prior Administration, the President took two additional actions. The first, the Executive Order titled "Securing Our Borders," called for DHS to "ceas[e] using the 'CBP One' application as a method of paroling or facilitating the entry of otherwise inadmissible aliens into the United States" and to terminate "all categorical parole programs that are contrary to the policies of the United States established in" the President's Executive orders, including the CHNV parole programs. Executive Order 14165 § 7(a)-(b), 90 Fed. Reg. 8467, 8468 (Jan. 29, 2025). In accordance with that Order, DHS "announced removal of the scheduling functionality within the CBP One™ mobile application, effective Jan. 20, 2025, at noon EST." CBP, *CBP Removes Scheduling Functionality in CBP One™ App* (Jan. 21, 2025), https://www.cbp.gov/newsroom/national-media-release/cbp-removes-scheduling-functionality-cbp-one-app (last visited July 30, 2025). On March 25, 2025, the Secretary of Homeland Security terminated the CHNV parole programs. *Termination of the Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13,611 (Mar. 25, 2025).

The second Presidential action, Presidential Proclamation 10888, titled "Guaranteeing the

States Protection Against Invasion," invokes the President's authorities under the INA, 8 U.S.C. §§ 1182(f) and 1185(a), and the Constitution, to preclude the entry of aliens who engage in an invasion across the southern border, or who fail to submit "sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of" the inadmissibility provisions of 8 U.S.C. § 1182(a)(1)–(3). Proclamation §§ 1, 3, 90 Fed. Reg. 8333, 8335 (Jan. 29, 2025). This includes precluding aliens from invoking provisions of the INA, including the asylum statute, that would permit their continued presence in the United States. Proclamation §§ 1, 3, 90 Fed. Reg. at 8335.

Although a court in this District enjoined the application of the 2025 Proclamation to aliens in the United States, *Refugee & Immigrant Ctr. for Educ. & Legal Servs. (RAICES) v. Noem*, No. 25-cv-306 (RDM), 2025 WL 1825431 (D.D.C. July 2, 2025), the government has appealed. *See RAICES v. Noem*, No. 25-5243 (D.C. Cir.). The D.C. Circuit has stayed the district court's order insofar as it enjoins, vacates, and declares unlawful the Proclamation's restrictions on asylum. *See* Exhibit A, *RAICES v. Noem*, No. 25-5243, Stay Order and Ops., at p. 2 (D.C. Cir. Aug. 1, 2025).

## III.    This Lawsuit

Eighteen individual aliens and two organizations that provide services to aliens filed a Complaint challenging, among other things, the Rule, the consultation period guidance, and the procedures for third-country removals of non-Mexicans to Mexico. *See* Am. Compl. (ECF 19) ¶¶ 1–16, 82–118, 138–154, 157–168, 179.

Each individual Plaintiff alleges that he or she illegally crossed the border into the United States or, in the case of Plaintiff J.P., presented himself at a port of entry without an appointment. Am. Compl. ¶¶ 20–37. Plaintiffs J.P. and E.B. withdrew their applications for admission under 8 U.S.C. § 1225(a)(4) and returned to Mexico. *See* Blanchard Decl. (ECF 53-2) at ¶ 4; Am. Compl. ¶¶ 23, 24. The remainder of the Plaintiffs were subject to expedited removal and received credible

fear interviews that were subject to the Rule, 8 C.F.R. §§ 208.33(b), 1208.33(b). *See, e.g.*, Compl. ¶¶ 20–22, 25–37. Most Plaintiffs who were processed for expedited removal under the Rule were interviewed well over 24 hours after they were served with the Form M-444, Information About Credible Fear Interview. *See* Lynn Decl. (ECF 53-3) ¶ 9. Only Plaintiff B.H. arguably received less than the time allowed by the prior consultation policy (48 hours between the time of arrival at the detention facility and the credible fear interview), and only Plaintiffs M.P. and R.E. may have received less than 48 hours after receiving the Form M-444 before starting their interviews. *See* Blanchard Decl. (ECF 53-2) ¶ 7; Lynn Decl. (ECF 53-3) ¶ 9; USCIS_24-Hour_AR_2.

Plaintiffs M.A., M.P., D.M., R.E. and S.U. were removed after receiving negative credible fear determinations. Am. Compl. (ECF 19) ¶¶ 20, 22, 34, 36. Plaintiffs D.M., R.E., and S.U., who are from Venezuela and Cuba, were removed to Mexico. *See* Blanchard Decl. (ECF 53-2) ¶ 5; Am. Compl. ¶¶ 34, 36, 37. Plaintiffs S.U. and D.M. both later re-entered the United States. Blanchard Decl. (ECF 53-2) ¶ 6. Plaintiffs J.P. and E.B., who are from Venezuela, voluntarily withdrew their applications for admission and were returned to Mexico, although Plaintiff J.P. subsequently re-entered the United States and was placed in removal proceedings under 8 U.S.C. § 1229a. Lynn Decl. (ECF 53-3) ¶ 9(d), (e); Blanchard Decl. (ECF 53-2) ¶¶ 4, 6; Am. Compl. ¶¶ 23–24. Plaintiff L.A. asserts that during his credible fear interview (CFI), he was only asked about his fear of return to Mexico, not his home country of Nicaragua, but an immigration judge later vacated the initial negative credible fear determination. *Id.* ¶ 29.

The Organizational Plaintiffs—Refugee and Immigrant Center for Education and Legal Services (RAICES) and Las Americas Immigrant Advocacy Center—are non-profit organizations that provide immigration legal services to aliens, including aliens in expedited removal proceedings, in Texas and New Mexico. *See* Am. Compl. ¶¶ 38–39, 134–37; Hidalgo Decl. (ECF 37-3) at ¶ 7; Babaie Decl. (ECF 37-4 at ¶¶ 3, 6, 9); Suppl. Babaie Decl. (ECF 109-2) at ¶ 6.

RAICES also engages in "social services programming" and "advocacy work," Suppl. Hidalgo Decl. (ECF 109-1) at ¶ 4, and Las Americas provides educational services about the U.S. asylum process to people in Mexico. Babaie Decl. (ECF 37-4) at ¶ 14.

After Plaintiffs filed their Amended Complaint, the parties stipulated to hold in abeyance several claims asserted in that Complaint: Count Two; part of Count Three "insofar as that Count asserts the arbitrary-and-capricious theories adopted by the district court in" *East Bay Sanctuary Covenant v. Biden*, 2023 WL 4729278 at *11-16 (N.D. Cal. July 25, 2023); Count Four; the parts of Counts Five and Six that challenge the use of CBP facilities to conduct credible fear interviews; and Counts Eleven and Twelve. *See* Order (ECF 30) ¶ 2; Joint Motion (ECF 38) ¶¶ 6–7; Minute Order dated Oct. 4, 2023. The parties initially filed and briefed cross-motions for summary judgment in the fall of 2023 based on the remaining, non-stayed claims. *See, e.g.*, ECF 37, 53.

After summary judgment briefing was completed, the Court stayed the entire case pending settlement discussions. *See* Minute Order dated Feb. 6, 2024; Joint Stipulation (ECF 66). The Court has since lifted that stay, lifted the stay concerning Counts One and Two, denied the parties' prior summary-judgment motions without prejudice, and set an agreed-upon schedule for renewed cross-motions for summary judgment. *See* Minute Order dated July 18, 2025; Minute Order dated July 24, 2025; Joint Status Report and Joint Motion (ECF 106). Thus, the following claims currently remain stayed: Count Four, the parts of Counts Five and Six that challenge the use of CBP facilities to conduct credible fear interviews; and Counts Eleven and Twelve.

In their renewed motion for summary judgment, Plaintiffs appear to move for summary judgment on all non-stayed claims except Counts Nine and Ten (Am. Compl. ¶¶ 169–173); that is, they do not renew their motion for summary judgment as to their claims challenging voluntary withdrawal procedures. Plaintiffs ask the Court to order universal vacatur of the Rule, the consultation period guidance, and the third-country removal procedures; declare the Rule and those

procedures unlawful; and vacate the individual Plaintiffs' negative credible fear or reasonable fear determinations and/or expedited removal orders. ECF 109-3.  Defendants oppose Plaintiffs' motion and move for summary judgment on all non-stayed claims.

## ARGUMENT

### I.    Plaintiffs' Claims Are Foreclosed on Numerous Threshold Grounds

#### A.    The Organizational Plaintiffs Cannot Challenge the Rule and its Procedures.

##### 1.    The Organizations Lack Article III Standing.

Organizations "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 393–94 (2024) ("*Alliance*") (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). "Like an individual, an organization may not establish standing simply based on the intensity of the litigant's interest, no matter how longstanding the interest and no matter how qualified the organization." *Alliance*, 602 U.S. at 394 (cleaned up). The Organizational Plaintiffs cannot satisfy these standards, because they are not directly regulated by the Rule or the challenged procedures, and any claimed downstream impacts on the amount of resources the Organizations devote to particular immigration cases and eventually on funding streams are not judicially cognizable injuries.

Where a regulation or guidance—like the Rule and guidance at issue here—does not directly regulate the plaintiff, standing "is ordinarily substantially more difficult to establish." *Alliance*, 602 U.S. at 382 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). Here, the Organizational Plaintiffs seek to vacate the Rule and the challenged expedited removal procedures as to all covered aliens based on their assertions of downstream, indirect impacts of these procedures on the legal work they do. The Organizational Plaintiffs claim that the Rule and procedures have caused them to make changes to their approach to assisting with and handling the

immigration cases of aliens who seek asylum or other forms of protection in the United States—including by spending more time and resources on certain cases—and to take time to learn about the Rule, educate their staff, and adapt their materials. These downstream, incidental impacts are not the type of "invasion of a legally protected interest" sufficient to support Article III standing. *Gill v. Whitford*, 585 U.S. 48, 65 (2018). The Rule's direct effect is to limit asylum eligibility for certain aliens in the exercise of the Executive's discretion, including in expedited removal proceedings. And the challenged procedures' direct effect is to implement credible fear procedures and third-country removals. Legal services organizations lack any "judicially cognizable interest" in how the Executive enforces these immigration laws against third parties. *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984) (similarly holding that an individual has "no judicially cognizable interest in procuring" or preventing "enforcement of the immigration laws" against someone else).

The Supreme Court reiterated these principles in *United States v. Texas*, 599 U.S. 670 (2023), holding that these principles precluded plaintiff States from establishing standing to challenge the Executive's immigration enforcement priorities, even though the States contended that those priorities caused the States to spend additional money. The Supreme Court held that the States' asserted injury, which flowed from the Executive's exercise of immigration enforcement discretion against third parties, was not judicially cognizable under the principles articulated above. *See id.* at 677.

Those principles decide the Organizational Plaintiffs' claims of standing here. Like the States in *Texas*, the Organizational Plaintiffs challenge several discretionary immigration enforcement initiatives and argue they have standing because they will incur additional resource expenditures to "serve" clients and "advis[e] people about the Rule" and for "pre-credible fear

interview preparation." Compl. ¶¶ 135–137. Thus, each of the reasons underlying the Supreme Court's rejection of standing in *Texas* are applicable here: in the Rule and challenged expedited removal procedures, the Departments "do[] not exercise coercive power" over "the [organizational] plaintiff," *Texas*, 599 U.S. at 678; challenges to immigration enforcement policies like the Rule's exercise of statutory enforcement authority to limit asylum eligibility, manage the credible fear process, or engage in third country removals, "run up against the Executive's Article II authority to enforce federal law," *id.* (which, here, implicates "foreign-policy objectives" including cooperation with regional partners concerning migration, *see id.* at 679); and the courts lack "meaningful standards for assessing" the Rule's discretionary exercise of authority to set conditions on asylum or managing the credible fear and expedited removal processes under the relevant statutes, which reflects a complicated balancing of various factors like resource constraints, public safety, and the unprecedented numbers of aliens seeking to cross the Southwest Border in 2023, *id.* at 679–80. Here, the Organizational Plaintiffs argue that the Executive Branch is impermissibly exercising its discretionary authority to deny asylum, and thus to subject aliens to removal; their interest therefore hinges on the circumstances in which aliens are subject to immigration enforcement. Their challenges to the expedited removal procedures are no different. Indeed, those challenges directly seek to change the manner in which DHS conducts its enforcement of expedited removal and third-country removals and to restrict DHS's immigration enforcement.

Like the States in *Texas*, the Organizational Plaintiffs cannot leverage the incidental effects of enforcement policies directed at third parties to create Article III standing for themselves. Any changes the Organizations may make in their own affairs in light of the Executive's exercise of enforcement discretion with respect to others are not judicially cognizable injuries.

The Supreme Court's recent decision in *Alliance* confirms that the Organizational Plaintiffs

lack standing here. Organizations may have standing in some situations where they themselves are directly injured by the defendant's conduct, as recognized in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). But, as the *Alliance* decision made clear, an organization cannot establish standing under *Havens Realty* merely by spending money to counteract an injury to an organization's interest caused by the defendant's policy or practice. Instead, the proper question under *Havens Realty* is whether an organization can show that the challenged policy directly impairs its pre-existing activities.

In *Alliance*, the Supreme Court explained that its prior decision in *Havens Realty* did not stand for the broad proposition that an organization that diverts resources in response to a policy that touches on or frustrates its mission has standing to challenge that policy. *See Alliance*, 602 U.S. at 395. It is not enough that "an organization diverts its resources in response to defendants' actions," even if it will "expend considerable time, energy, and resources" in response to a policy change. *Id.* at 394–95. Thus, contrary to certain formulations of the *Havens Realty* test, a diversion of resources to "counteract" an injury to "the plaintiff's interest in promoting its mission" is not sufficient to establish standing. *See, e.g.*, *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011). Instead, an unregulated organization must show that the challenged action "perceptibly impair[s]" or "interferes with" its activities by imposing an affirmative "impediment" to performing those activities. *Alliance*, 602 U.S. at 394–95. This requirement safeguards against an organization being permitted to "spend its way into standing." *Id.* As the Supreme Court made clear in *Alliance*, *Havens Realty* was an "unusual case" where the defendant, as part of its challenged practice, provided the organizational plaintiff's employees with "false information about apartment availability," thereby "perceptibly impair[ing] [the organization's] ability to provide counseling and referral services to" its home-seeking clients. *Alliance*, 602 U.S. at 395–96. Thus, the organizational plaintiff's theory of standing in *Havens Realty* was akin to that of "a

retailer who sues a manufacturer for selling [it] defective goods." *Id.* at 395.

Plaintiffs' evidence does not demonstrate the type of interference with or impairment of their core activities that could amount to a cognizable injury under *Havens Realty*. Even if the Rule frustrates the Organizations' missions of helping people seek asylum by "cutting off" asylum for some aliens, *see, e.g.*, Suppl. Babaie Decl. (ECF 109-2) at ¶ 10, such "frustration of an organization's objective" alone cannot constitute a cognizable Article III injury, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) ("[T]he presence of a direct conflict between the defendant's conduct and the organization's mission is ... not alone sufficient ... to establish standing."); *Citizens for Resp. & Ethics in Washington v. U.S. Off. of Special Couns.*, 480 F. Supp. 3d 118, 128 (D.D.C. 2020) ("[A]n organization seeking to bring a case in its own right must first allege that the challenged conduct perceptibly impairs its activities, as opposed to merely frustrating its mission.").

And nothing about the Rule or the challenged procedures places any direct limits or requirements on the Organizational Plaintiffs' provision of legal services. And the Organizational Plaintiffs do not demonstrate an impairment of the type at issue in *Havens Realty* in their ability to provide services. At most, Plaintiffs' proffered evidence demonstrates the common-sense principle that changes to the legal landscape of asylum eligibility may mean that some aliens will not be eligible for that relief and that, in particular cases, lawyers will have to meet additional evidentiary or procedural burdens to try to establish their clients' eligibility for asylum or other protection from removal. *See* Suppl. Babaie Decl. (ECF 109-2) at ¶¶ 11–14, 25–26; Babaie Decl. (ECF 37-4) at ¶¶ 41, 43; Suppl. Hidalgo Decl. (ECF 109-1) at ¶¶ 16–22, 26–27. Accepting such common-place impacts of legal developments on legal services providers as judicially cognizable injuries would allow lawyers to sue whenever changes in the law require them to change their

approach to handling particular cases or to devote more time to particular cases. Such a theory of standing is startling, as it would provide lawyers with standing to sue over every new statute or regulation that touches their core business areas and nullify the principle that lawyers generally lack an independent interest in the rules applicable to their clients. *See Kowalski v. Tesmer*, 543 U.S. 125, 130-34 (2004) (addressing third-party standing). Plaintiffs' theory would, for example, allow "medical malpractice attorney[s]" to claim cognizable injury from "tort reform statutes," *id.* at 134 n.5, on the ground that the statutes require them to gather relevant evidence or otherwise limit their ability to take on clients, thereby affecting their caseload and income. It would also allow "attorney[s] specializing in Social Security cases [to] challenge implementation of a new regulation," *id.*, on the ground that they will respond by expending resources developing arguments. Such injuries thus cannot constitute the type of impairment of services contemplated in *Alliance.*

Similarly, Plaintiffs assert that the Rule has caused them to spend resources on learning and obtaining information about the Rule, training staff, updating internal procedures, and developing new strategies for counseling aliens who may be ineligible for asylum under the Rule. *See, e.g.*, Babaie Decl. (ECF 37-4) at ¶¶ 26, 40; Suppl. Hidalgo Decl. (ECF 109-1) at ¶ 23. But such education and outreach expenditures are the type of activities taken in *response* to a government policy that cannot satisfy standing. *See, e.g.*, *Alliance*, 602 U.S. at 394. They do not represent any independent impairment of the Organizations' pre-existing activities, but are instead a continuation of those activities. As the Supreme Court explained in *Alliance,* an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Alliance*, 602 U.S. at 394. Although the Supreme Court references advocacy activities, the principle announced in *Alliance* is broader—it places the focus of the injury analysis on the *impairment* of the organization's *services*, rather than on the

organization's expenditures or allocation of resources. This principle applies equally to direct services organizations who spend money or resources *in response* to the challenged policy without any corresponding impairment to their ability to provide services. As the Supreme Court's reasoning in *Alliance* made clear, courts should not allow an organization to demonstrate standing any time it shifts resources from one set of direct-service activities to another set of similar activities in support of its mission. "[S]omething about the challenged action itself—rather than the organization's response to it—[must] make[] the organization's task more difficult." *Ctr. for Responsible Science v. Gottlieb*, 346 F. Supp. 3d 29, 41 (D.D.C. 2018). The organization must show that the new policy directly harms its already-existing core activities. To hold otherwise would impermissibly allow organizations to manufacture standing to challenge any policy that touches on their mission by voluntarily spending money in response to the policy and in support of their mission. *See Alliance*, 602 U.S. at 394.

The fact that Las Americas claims a potential negative impact from the Rule on funding due to an alleged diminishment of the number of aliens it will be able to represent does not alter this analysis. *See* Suppl. Babaie Decl. (ECF 109-2) at ¶¶ 27-28. Las Americas has not substantiated any loss of funding traceable to the Rule, as required at the summary-judgment stage. *See Lujan*, 504 U.S. at 561; Fed. R. Civ. P. 56(c). Because the Organizational Plaintiffs seek the equivalent of injunctive relief (universal vacatur), they must show "a substantial probability of injury." *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015). They have not done so. Las Americas does not identify any specific funding streams it has lost as a result of the Rule, nor has it provided any client numbers to substantiate its claims that the Rule has limited the number of aliens it can represent in removal proceedings. *See* Suppl. Babaie Decl. (ECF 109-2) at ¶ 11. It alludes only vaguely to a "risk" of future loss of grants. *See* Suppl. Babaie Decl. (ECF 109-2) at ¶ 28. But injury must be "actual or imminent" at the time Plaintiffs filed suit. *See Lujan*, 504 U.S.

at 560, 571 n.4. Injury that remains speculative and remote two years into the lawsuit is insufficient to satisfy Article III's standing requirements, particularly at the summary-judgment stage and where the Plaintiffs seek injunctive relief. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013); *Swanson Grp. Mfg. LLC*, 790 F.3d at 240. And Plaintiffs' inability to specifically tie any loss of funding or budgetary impact to the Rule only underscores that the Rule has at most a "distant . . . ripple effect" on Las Americas' finances, which are certainly also influenced by numerous other factors that are completely independent of the Rule. *See Alliance*, 602 U.S. at 383 ("distant (even if predictable) ripple effects" of government action "cannot establish Article III standing"); *see also supra* at 18–19 (explaining that such downstream impacts are not cognizable injuries, particularly in the context of immigration enforcement).

Critically, the Organizational Plaintiffs' injuries are also premised on a fundamental misunderstanding of the Rule. Plaintiffs contend that they need to advise clients on credible fear proceedings because they believe the Rule requires USCIS employees to not apply the "significant possibility" standard provided for by statute. Hidalgo Dec. (ECF 37-3), ¶ 17; Babaie Decl. (ECF 37-4), ¶ 30. But that view is mistaken, as the Rule implements the statutory significant possibility standard, *infra* § II.C, and so any injury stemming from this mistake is entirely self-inflicted. *Clapper*, 568 U.S. at 416. The Organizational Plaintiffs also point to other claimed injuries that do not arise from the Rule or the expedited removal procedures at issue but relate instead to practices and events that are not the subject of their current legal challenges. *See, e.g.*, Suppl. Babaie Decl. (ECF 109-2) at ¶ 24 (asserting difficulties arising from practices or events not challenged here— such as holding aliens in CBP custody and lack of advance notice of credible fear interviews); *see supra* at 16 (explaining that claims challenging use of CBP facilities to conduct credible fear interviews are still held in abeyance). These alleged injuries cannot form the basis for a finding of standing here.

Finally, even assuming the Organizational Plaintiffs had a cognizable injury to begin with, they have not demonstrated that they continue to suffer any such injury from the Rule's application in expedited removal now that the Rule no longer applies to new entrants. "For a controversy to remain live, Plaintiffs must . . . be able to point to an ongoing injury" that meets a "certain level of definiteness." *Citizens for Resp. & Ethics in Washington v. Wheeler*, 352 F. Supp. 3d 1, 9 (D.D.C. 2019) (citing *Already, LLC, v. Nike, Inc*., 568 U.S. 85, 91 (2013)). Neither RAICES nor Las Americas asserts that they are currently providing consultation or representation services to aliens who are in expedited removal and also subject to the Rule. *See generally* Suppl. Babaie Decl. (ECF 109-2); Suppl. Hidalgo Decl. (ECF 109-1) at ¶ 24 (failing to assert that any of the aliens currently subject to the Rule in expedited removal are clients, potential clients, or consultees of RAICES). Indeed, many of their assertions of injury are based on circumstances that no longer exist. *See, e.g.*, Babaie Decl. (ECF 37-4) ¶¶ 21–25 (discussing resources expended explaining the CBP One app); Suppl. Babaie Decl. (ECF 109-2) at ¶¶ 15–20 (describing claimed *past* diversion of resources, without asserting that these alleged expenditures continue). Accordingly, their claims for prospective relief relating to the application of the Rule in expedited removal are moot. *See Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (Article III injury must persist "throughout the litigation").

2.    Section 1252(e)(3) bars the Organizational Plaintiffs' Claims Challenging the Application of the Rule and Procedures in Expedited Removal.

Even assuming the Organizational Plaintiffs could demonstrate Article III standing, the Court lacks jurisdiction for the independent reason that the INA does not permit the Organizational Plaintiffs' challenge to the expedited removal process. That is because 8 U.S.C. § 1252(a)(2)(A) eliminates any possible jurisdiction over challenges to expedited removal, other than as permitted by § 1252(e). *See Make the Road New York v. Wolf*, 962 F.3d 612, 626 (D.C. Cir. 2020). And the

Organizational Plaintiffs do not qualify for any of the limited exceptions to that preclusion.

Section 1252(a)(2)(A), titled "Matters not subject to judicial review," provides that "[n]otwithstanding any other provision of law ... no court shall have jurisdiction to review ... except as provided in subsection (e)," "any [] cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1)," "a decision ... to invoke the provisions of such section," or  "procedures and policies adopted ... to implement" section 1225(b)(1). 8 U.S.C. § 1252(a)(2)(A)(i), (ii), (iv). Section 1252(a)(2)(A) thus removes from federal courts any jurisdiction to review issues "relating to section 1225(b)(1)," *i.e.*, expedited removal proceedings or credible fear determinations, other than as explicitly permitted by § 1252(e).[5]

Section 1252(e)(3) authorizes "[j]udicial review of determinations under section 1225(b) of this title and its implementation" in this Court, "limited to determinations of—(i) whether [§ 1225(b)], or any regulation issued to implement such section, is constitutional; or (ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure … implement[ing] such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." 8 U.S.C. § 1252(e)(3)(A). Such suits "must be filed no later than 60 days after the date the challenged action, regulation, directive, guideline, or procedure ... is first implemented." *Id*. § 1252(e)(3)(B); *see also M.M.V. v. Garland*, 1 F.4th 1100, 1106-11 (D.C. Cir. 2021); *Make the Road*, 962 F.3d at 625-31.

Under these provisions, and binding D.C. Circuit precedent, the Organizations' claims are barred. To be sure, § 1252(e)(3) does not bar claims by organizations entirely. Section 1252(e)(3) restores jurisdiction over two limited types of claims. *Make the Road*, 962 F.3d at 627. "While

---

[5] Section 1252(e)(2), which permits limited review of individual expedited removal orders, is not at issue here.

romanettes (i) and (iii) refer to claims pressed by individuals to whom the expedited removal scheme is being "appli[ed]" or an order of removal is being "implement[ed]," the other two romanettes for which review under § 1252(e)(3) is "specifically authorized are not textually confined to claims arising from individual removal actions." *Id.* However, as the D.C. Circuit has twice held, claims brought by organizations are limited to claims advanced on behalf of *individuals* under a theory of associational standing. *See id.* at 627–28. Through § 1252(e)(3), "Congress meant to allow actions *only by aliens* who have been subjected to the summary procedures contained in § 1225(b) and its implementing regulations." *Am. Immigr. Laws. Ass'n v. Reno*, 199 F.3d 1352, 1359 (D.C. Cir. 2000) ("*AILA*") (emphasis added); *accord id.* ("lawsuits challenging [actions] through § 1252(e)(3) "would be brought, if at all, by *individual aliens* who—during the sixty-day period—were aggrieved by the statute's implementation") (emphasis added).

The D.C. Circuit more recently reaffirmed this view. Rejecting an argument by organizations suing on behalf of third-party aliens subjected to expedited removal procedures, the Court explained that *AILA* "rejected third party organizational standing ... as a basis to sue under Subsection 1252(e)(3)," but distinguished, as *AILA* did, "a case [brought] on behalf of individuals directly regulated and affected by the challenged rule." *Make the Road*, 962 F.3d at 627. *Make the Road* explicitly restates the holding of *AILA* that § 1252(e)(3) "contemplate[s] that litigation could be brought by affected individuals themselves" only. *Id.* at 628. As *Make the Road* further explains, "[w]hether aggrieved individuals sue on their own or band together through a representative association does not change the nature of the lawsuit as seeking to remedy *the individual members' injuries* ... . That is because associational (sometimes called 'representational') standing *is derivative and reflective of individual standing.*" *Make the Road*, 962 F.3d at 628 (emphasis added). But whether a party is an individual invoking their injuries directly, or an association invoking its members' injuries, the core requirement under § 1252(e)(3) is the same: the party

27

invoking § 1252(e)(3) must point to a specific *individual's* injuries. *See id.*; *AILA*, 199 F.3d at 1359. Here, the Organizational Plaintiffs advance a theory of injury premised only on a theory of injury to the Organization, *see* Am. Compl. ¶¶ 134–137, and so the Court lacks jurisdiction under § 1252(e)(3) over their claims.

3.    <u>The Organizational Plaintiffs Are Not Within the Zone of Interests and Their Claims Are Precluded by the INA</u>

Additionally, the claimed impact of the Rule and the challenged expedited removal procedures on the Organizational Plaintiffs' expenditure of resources does not fall within the zone of interests of §§ 1158 or 1225, the statutes that Plaintiffs seek to enforce. A plaintiff must be "adversely affected or aggrieved by agency action within the meaning of a relevant statute" to sue under the APA. 5 U.S.C. § 702. And "the interest sought to be protected" must "be arguably within the zone of interests to be protected or regulated by the statute ... in question." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 396 (1987). Nothing in the text, structure, or purpose of the INA generally, or §§ 1158 or 1225 specifically, suggests that Congress intended to permit organizations to contest asylum and expedited removal-related procedures based on attenuated effects on their allocations of resources. Indeed, as just discussed, the judicial review provisions concerning expedited removal explicitly foreclose any cause of action by an organization not invoking the interests of *individuals*. *See supra* § I.A.2. And § 1158 focuses on the interests of asylum seekers without evincing any desire to protect the interests of organizations that provide legal help to those asylum seekers. *See* 8 U.S.C. § 1158(d)(7) ("Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.").

As Justice O'Connor explained in granting the government's stay application in an immigration case involving similar organizational plaintiffs, organizations that "provide legal help

to immigrants" do not satisfy the zone-of-interests test. *INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labo*r, 510 U.S. 1301, 1302 (1993) (O'Connor, J., in chambers). Federal immigration law was "clearly meant to protect the interests of undocumented aliens, not the interests of organizations." *Id*. at 1305. The fact that an immigration regulation "may affect the way an organization allocates its resources" for representing aliens accordingly does not bring the organization "within the zone of interests" that the asylum statute protects. *Id*.

The Organizations' claims are also precluded by the INA. A plaintiff may not seek review under the APA if "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). The Supreme Court has accordingly recognized that, by providing a detailed scheme for administrative and judicial review, Congress can displace the APA's default cause of action. *See, e.g*., *Block v. Cmty. Nutrition Inst*., 467 U.S. 340, 345 (1984). Preclusion of review is determined "not only from [the statute's] express language, but also from the structure of the statutory scheme." *Id*. In particular, Congress may impliedly preclude some parties from seeking judicial review of administrative action by constructing a detailed scheme that provides for review only by other parties. *See id.*

That is the case here. The INA provides for administrative and judicial review at the behest of *aliens*, 8 U.S.C. § 1252(a)(5), (b)(9), (e)(3), but it provides no role for third parties like organizations to play in that process in their own right (rather than as counsel for their clients). As explained, organizations lack any basis to sue on their own behalf with respect to challenges to regulations implementing the expedited removal process. 8 U.S.C. § 1252(a)(2)(A), (e)(3). With respect to individual aliens placed in section 240 removal proceedings, the INA imposes strict limitations on the mechanisms for review. For example, an alien may obtain judicial review of questions arising out of removal proceedings only through a challenge to a final removal order. *Id.* § 1252(b)(9); *see Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 230–31 (2020). But that is precisely what the Organizations here challenge: the Rule's limitation on asylum eligibility that will

determine whether individual aliens can secure relief from removal in their removal proceedings and procedures applicable in those proceedings. They thus challenge the "*process* by which removability will be determined," which is covered by § 1252. *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 19 (2020) (emphasis added). Permitting organizations to challenge the Rule through an APA suit would "severely disrupt" the INA's "complex and delicate administrative scheme," including by providing the Organizational Plaintiffs' alien clients "a convenient device for evading the statutory" restrictions on review. *Block*, 467 U.S. at 348; *accord Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (holding similar review scheme precludes "organizational plaintiff" from "suing to challenge [] INS policies or statutory interpretations that bear on an alien's" legal claims).

### B. The Third-Country Removal Claims Are Not Justiciable or Reviewable.

#### 1. No Plaintiff's Injury from Third-Country Removal Practices is Redressable.

Regardless of whether any Plaintiff, individual or organizational, can demonstrate injury caused by the challenged third-country removal procedures, those injuries would not be redressable by the Court. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105-06 (1998). The challenged third-country removal procedures do not implement any policy that is any different from the governing statutes. 8 U.S.C. § 1231(b); *see infra* § III.B.

As an initial matter, it warrants clarification that Plaintiffs here challenge a specific application of third-country removal authorized by statute: third-country removals of non-Mexicans—and primarily nationals of Cuba, Haiti, Nicaragua, and Venezuela—to Mexico in the expedited removal context. *See* Compl. ¶¶ 114–117 (defining what Plaintiffs call the "Third Country Removal Policy"). Although Plaintiffs allude to other third-country removals, Pls.' Mot. (ECF 109) at 12, 39, those practices are not relevant to this case. Plaintiffs' Complaint did not challenge all procedures governing third-country removal, let alone all procedures in the context of expedited removal. Their claim is limited to the particular procedures and agency actions they

identified in their Complaint. Those specific written procedures and guidance—which are part of the produced Administrative Record—concern the guidance for the circumstances when nationals of Cuba, Haiti, Nicaragua, and Venezuela may be removed to Mexico. Pls.' Mot. (ECF 109) at 39, 40 (citing CBP_Removals_AR_321–22 (filed under seal)); CBP_Removals_AR_000003; CBP_Removals_AR_22–24; *see also infra* § III.B; Am. Compl. ¶¶ 114–117 (defining "Third Country Removal Policy"); Pls.' First Mot. for Summ. J. (ECF 37) at 31–36 (specifically challenging removals of non-Mexicans to Mexico).

Plaintiffs' challenge to these third-country removal procedures is not justiciable. The specified procedures do no more than provide guidance to CBP officers and agents in executing their preexisting statutorily-authorized discretion to designate a country to which to remove aliens if their native country will not accept their removal. Regardless of whether the challenged procedures are in operation, the governing statute continues to authorize removals to third countries. Plaintiffs thus cannot show any possibility of redress because vacating the procedures could not in any way prevent the government from continuing to permit removals to third countries. *See Lujan*, 504 U.S. at 561.

Thus, as Justice Gorsuch explained in a concurrence on behalf of three justices in *Texas*, redressability is lacking where vacatur "does nothing to change the fact that federal officials possess the same underlying ... discretion," or "require federal officials to change how they exercise" their statutory authority. *Texas*, 599 U.S. at 691 (Gorsuch, J., concurring). That is precisely the situation here, as a judicial decree vacating the third-country removal procedures would do nothing to prevent DHS officials from using their third-country removal authorities in individual cases generally, or as to any individual Plaintiff in any future inspection should their underlying removal orders be nullified.

2.    The Third-Country Removal Claims Are Not Reviewable.

For the same reasons, § 1252(a)(2)(B)(ii), which strips jurisdiction to review discretionary actions or decisions, bars review of the third-country removal guidance to the extent it involves removals to countries other than those designated by a covered alien. Although § 1231(b)(2)(A) permits aliens to designate preferred countries of removal, § 1231(b)(2)(C) provides that in specified circumstances the Secretary "*may* disregard a designation." 8 U.S.C. § 1231(b)(2)(C) (emphasis added). The Supreme Court has explained that the use of the term "may" in that provision "connotes discretion," and that "connotation is particularly apt where, as here, 'may' is used in contraposition to the word 'shall': The [Secretary] 'shall remove' an alien to the designated country, except that the [Secretary] 'may' disregard the designation if any one of four potentially countervailing circumstances arises." *Jama v. ICE*, 543 U.S. 335, 346 (2005). Because the Secretary's discretion is provided for explicitly by statute, § 1252(a)(2)(B)(ii) bars judicial review. *Kucana v. Holder*, 558 U.S. 233, 248 (2010).

Congress also eliminated any cause of action with respect to third-country removals. Section 1231(h) of title 8 provides that "[n]othing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." The plain terms of that statute bar any claim, regardless of the "party," invoking § 1231(b). Other provisions of the INA may render § 1231(b) judicially enforceable in discrete contexts. *See, e.g.*, 8 U.S.C. § 1252(b)(4) (referencing § 1231(b)(3) determinations in the context of judicial review of orders of removal); *id.* § 1252(b)(9) (permitting review of "interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States" in petitions for review in the courts of appeals). But Plaintiffs invoke no such provision. Instead, they invoke § 1231 outside of any permitted context to object to the government's third-

country removal guidance. Because Plaintiffs rely on § 1231 to provide the relevant "substantive or procedural right," *id.* § 1231(h), § 1231(h) bars their challenge to the third-country removal procedures.

### C.    Individual Plaintiffs Lack Standing to Challenge Procedures that Were Not, and Are Not Likely to Be, Applied to Them.

Certain individual Plaintiffs must also be dismissed from this suit because they have not in fact been subject to any of the challenged procedures, and thus lack any "legally and judicially cognizable" injury traceable to the challenged policies that would be redressed by a favorable decision in this case. *Texas*, 599 U.S. at 676. Specifically, Plaintiffs J.P and E.B. withdrew their applications for admission, *see supra* at 14, and thus did not suffer a redressable injury from the Rule, the consultation period guidance, or the third-country removal procedures. They also have no expedited removal orders or fear determinations to set aside. A withdrawal of an application for admission means these Plaintiffs did not receive removal orders and are not subject to any adverse current or future consequences from their unauthorized entry into the United States—such as a finding of inadmissibility or the potential for reinstatement of a removal order. Any order setting aside their withdrawal would only place them in the precise position they are already in. *See Steel Co.*, 523 U.S. at 105-06. Indeed, Plaintiffs recognize as much, as they only seek to vacate any negative fear determinations or expedited removal orders—not any withdrawals of applications for admission. *See* Proposed Order (ECF 109-3). And, even if they averred an intent to re-enter the United States across the Southwest Border, prospective relief against the Rule would not benefit them, because if they entered again now, they would no longer be subject to the Rule. As such, they lack any injury redressable by this Court.

The remaining Plaintiffs only have standing to challenge the particular procedures that were applied, or will imminently be applied, to them. *See DaimlerChrysler Corp. v. Cuno*, 547

U.S. 332, 352 (2006) ("plaintiff must demonstrate standing for each claim" and "each form of relief sought"). Although the remaining Plaintiffs were subject to the Rule's asylum eligibility limitation as applied in the credible-fear process, most lack standing to challenge the consultation period guidance. At most, three Plaintiffs—B.H., M.P, and R.E.—received less than the 48-hour waiting period set forth in the prior consultation policy (*i.e.*, 48 hours between the time they arrived at the detention facility and their credible fear interview). *See supra* at 15. All other Plaintiffs lack any cognizable injury this Court can redress concerning the consultation period guidance, because the guidance shortening the minimum waiting period from 48 hours to 24 hours had no ascertainable impact on the time period for consultation in their individual cases. And no Plaintiff can challenge any third-country removal practice other than that applied to them: the guidance concerning third-country removals of non-Mexicans to Mexico. Only Plaintiffs D.M., R.E., and S.U. were subject to such removals to Mexico while the challenged procedures were in effect, and, to the extent their injuries are redressable by vacatur of the procedures at all, *see supra* § I.B, they only have standing to challenge those particular procedures. *See supra* at 15 (explaining that Plaintiffs D.M., R.E., and S.U., who are from Venezuela and Cuba, were removed to Mexico). Any other practices involving third-country expedited removals are outside the scope of this lawsuit—and, in any event, as explained, are merely implementing the statutory procedures.

**D.    The Expedited Removal Procedures Are Not "Final Agency Action."**

The two challenged expedited removal procedures are also not reviewable "final" agency action. 5 U.S.C. § 704. Agency action is "final" under the APA only if it both "consummate[es] the agency's decisionmaking process" and also determines "rights or obligations" or produces "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

The challenged third-country removal guidance sets out the general manner in which CBP officials should implement their statutory authority concerning which country to designate as the

country of removal should the alien's home country not accept his repatriation. The guidance does nothing more than reiterate the government's long-codified authority to conduct third-country removals under 8 U.S.C. § 1231(b). *See supra* § I.B.1. Agency procedures that do no more than restate the agency's undisputed statutory authority do not create any rights or obligations or produce legal consequences on their own, and so do not constitute final agency action. *See Nat'l Min. Ass'n*, 758 F.3d at 253.

Similarly, the consultation guidance sets out how USCIS will implement its authority under the statute to provide the opportunity for consultation to aliens in expedited removal. It does not itself adversely affect any Plaintiffs, but "only affects [their] rights adversely on the contingency of future administrative action." *DRG Funding Corp. v. HUD*, 76 F.3d 1212, 1214 (D.C. Cir. 1996).

That particular Individual Plaintiffs have been subject to the third-country removal or consultation procedures in their removal proceedings does not render the procedures challengeable final agency action. At most it allows those, and only those, Plaintiffs who were subject to those procedures to challenge their removal order—the relevant final agency action. *See id.* But § 1252(a)(2)(A)(iii) unambiguously precludes judicial review concerning "the application of [section 1225(b)(1)] to individual aliens, including the determination made under section 1225(b)(1)(B)" concerning credible fear, and nothing in § 1252(e) restores jurisdiction over such individual claims. *See* 5 U.S.C. §§ 701(a)(1), 704 (precluding review even of final agency action where statue bars judicial review).

### E.    The APA Does Not Permit Plaintiffs' Challenge to a "Combination" of Policies.

The APA only permits challenges to discrete agency actions, and thus the Court can and should grant summary judgment to Defendants on Count Thirteen on this basis alone. *See* Am. Compl. ¶¶ 179-81. This claim alleges that "the Rule and the various policies challenged in this suit

. . . in combination are contrary to law." *Id.* But an APA plaintiff must identify and challenge a "circumscribed, discrete agency action[]." *Norton v. So. Utah Wilderness All.*, 542 U.S. 55, 62 (2004); *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 801 (9th Cir. 2013). An "entire 'program'—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 892–93 (1990). "[A]n APA challenge may not bundle together discrete actions in order to challenge them all together." *Nat'l Treasury Emps. Union v. Vought*, No. 25-5091, --- F. 4th ---, 2025 WL 2371608, at *16 (D.C. Cir. Aug. 15, 2025) (citing *Nat'l Wildlife Fed'n*, 497 U.S. at 890–94). To the extent otherwise reviewable, each challenged agency action must be evaluated independently.

### F.    Plaintiffs Cannot Challenge the Conditions on Asylum Eligibility in District Court, Except as Applied in Expedited Removal.

Plaintiffs' renewed motion challenges the Rule's conditions on asylum eligibility not just as applied in expedited removal, which would fall under a § 1252(e)(3) challenge, but also in the context of affirmative asylum applications and removal proceedings under 8 C.F.R. §§ 208.13(f) and 1208.13(f). The INA provides no provision for systemic review of asylum regulations as applied in section 240 removal proceedings. *See Meza v. Renaud*, 9 F.4th 930, 933 (D.C. Cir. 2021) (holding that there is only one exception to § 1252(a)(5)'s limitations on review of removal orders, "for certain system-wide challenges to written rules governing expedited removal" under 8 U.S.C. § 1252(e)(3)). That makes sense because, unlike in the expedited removal context, such claims are meant to be challenged in the context of petitions for review of removal orders presented to the Circuit Courts. *See* 8 U.S.C. §§ 1252(a)(5), (b)(9); *see also Grace v. Barr*, 965 F.3d 883, 895-96 (D.C. Cir. 2020) (noting that § 1252(e)(3) permitted challenge of Attorney General decision as applied in credible fear proceedings, but that petitions for review proceeded as a means of

reviewing the Attorney General decision as applied in the immigration courts). Thus, to the extent the Individual Plaintiffs have standing to challenge the application of the Rule in these contexts, such challenges are barred by 8 U.S.C. § 1252(a)(5) and (b)(9)'s provisions channeling judicial review of issues arising from removal proceedings to the petition-for-review process.

Section 1252(a)(5) mandates that "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal." 8 U.S.C. § 1252(a)(5). And § 1252(b)(9) ensures that all issues that relate to the removal proceedings are channeled into that judicial review process, by consolidating "[j]udicial review of all questions of law and fact ... arising from any action taken or proceeding brought to remove an alien from the United States" into "judicial review of a final order" of removal. 8 U.S.C. § 1252(b)(9). Plaintiffs who will have the Rule applied to them in section 240 removal proceedings thus may not preemptively raise claims in district court that can be raised in those removal proceedings, including challenges to the Rule's changes to asylum eligibility. *See J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032-35 (9th Cir. 2016) (explaining that section 1252 prohibits "policies-and-practices challenges," if they challenge policies or practices that are "bound up in and an inextricable part of the administrative process"); *Vetcher v. Sessions*, 316 F. Supp. 3d 70, 76 (D.D.C. 2018) ("[C]onsolidating all claims in the courts of appeals after a final order of removal is precisely what Congress intended."). In other words, any individual Plaintiff's challenge to the Rule's condition on asylum eligibility as applied outside the expedited removal context hinges on that Plaintiff being denied asylum in removal proceedings as a result of the Rule's application,[6] and thus is

---

[6] If an alien who is not lawfully in the United States affirmatively applies for asylum before USCIS and USCIS has jurisdiction over the application but is unable to approve the application, the alien is referred to removal proceedings for adjudication of the asylum application in the immigration courts. 8 C.F.R. §§ 208.14(c)(1), 1208.2(b).

subject to §§ 1252(a)(5) and (b)(9)'s judicial review bars.

## II. Plaintiffs' Claims Against the Rule Fail on the Merits Because the CLP Rule Is Authorized by Statute and Reasonably Explained.

To the extent any of the Plaintiffs' claims against the Rule are justiciable and reviewable, however, they lack merit. To start, the Rule's rebuttable presumption of asylum ineligibility is well within the Executive Branch's statutorily-bestowed discretion to set limitations and conditions on asylum eligibility, including at the credible fear stage. All aspects of the Rule are likewise reasonable and reasonably explained, and the Departments' stated rationales are amply supported by the record before them at the time the Rule was adopted.

### A.    The Rule's Conditions on Asylum Eligibility Are Not Contrary to Law.

Asylum is a discretionary benefit to which no alien is entitled, and Congress has expressly provided the Executive with authority to establish limitations on asylum eligibility so long as those limitations are "consistent with" the asylum statute. 8 U.S.C. § 1158(b)(2)(C). The Rule is thus a valid exercise of that authority because it does not conflict with any provision of the statute.

#### 1.    The Departments Are Statutorily Authorized to Impose the Rule's Conditions on Asylum Eligibility.

The INA's text, structure, and history all confirm the lawfulness of the Rule's conditions on asylum eligibility. Asylum is always a matter of "discretion"—never of "entitlement." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987). Thus, Congress has specified that the Executive "*may* grant asylum" to an alien who satisfies governing requirements but is never obligated to do so. 8 U.S.C. § 1158(b)(1)(A) (emphasis added). The D.C. Circuit has twice recognized the breadth of that discretion, upholding the Executive Branch's decision to completely *eliminate* up front certain aliens' opportunity to request asylum. First, in *Huisha Huisha v. Mayorkas*, the D.C. Circuit preliminarily upheld the expulsion of aliens under the Title 42 public health orders without allowing them to request asylum under the INA's expedited removal provisions, because the

Executive was exercising its statutory discretion to foreclose asylum for aliens covered by those orders. *See Huisha-Huisha*, 27 F.4th at 730–31. As the decision to deny asylum had already been made, the court reasoned, the expedited removal procedures "would be futile." *Id.* at 731. Then, more recently, in *RAICES*, a D.C. Circuit motions panel again recognized the Executive Branch's likelihood of success on defending its authority to deny asylum to categories of aliens who had recently crossed the border in violation of a Presidential suspension on entry. *See* Ex. A, *RAICES*, No. 25-5243, Stay Order and Ops. at 37 (Millett, J., concurring) ("[T]his court held in *Huisha-Huisha* that . . . categorical and upfront rejections of asylum are permissible in emergency situations for limited periods of time."); *see also id.* at 55 (Katsas, J., concurring) (similar).

In accordance with its conferral of this broad discretion over asylum to the Executive Branch, the INA expressly provides that the responsible agency heads may by rule establish "limitations and conditions" on asylum eligibility, beyond those already set out in the statute, that are "consistent with" the asylum statute. *Id.* § 1158(b)(2)(C). The Rule fits comfortably within that express statutory authorization, which enables the Executive to promulgate additional limitations so long as those limitations are "consistent"—that is, may "coexist[]" and do not reflect any "noteworthy opposing, conflicting, inharmonious, or contradictory qualities," Webster's Third New International Dictionary of the English Language 484 (1993)—with the statute. *See, e.g.*, *Envl. Def. Fund, Inc. v. EPA*, 82 F.3d 451, 457 (D.C. Cir. 1996) (per curiam) (holding that "consistent with" does not require "exact correspondence but only congruity or compatibility"). The Rule temporarily established a presumptive condition on asylum eligibility that was aimed at safeguarding the effective functioning of the immigration system and the equitable allocation of the government's limited resources, as well as encouraging other countries in the region to address pressing migration issues, in the face of an anticipated dramatic increase in border encounters. *See, e.g.*, 88 Fed. Reg. at 31,316, 31,318. No provision of § 1158 prohibits consideration of these

factors or otherwise clashes with the Rule. Because the Rule and the statute comfortably coexist with no conflict or contradiction, the Rule is "consistent with" § 1158.

The statutory context and history reinforce that the Rule comports with the INA. The Executive's broad authority in this area stems not only from the statutory text, but also from the Executive's enforcement discretion in this specific context. Asylum decisions, like other "discretionary decisions" about whether aliens will be returned to other countries, necessarily "bear on this Nation's international relations," *Arizona v. United States*, 567 U.S. 387, 396 (2012)—indeed, the Rule was part of an overarching cooperative effort with foreign governments to manage regional migration. Decisions related to asylum eligibility implicate the "sensitive and weighty interests" of foreign affairs, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010), that are within the Executive's particular responsibility.

The statutory history further highlights the extensive discretion Congress has conferred on the Executive. When § 1158 was first enacted in 1980, the statute simply allowed for the Attorney General to grant asylum as a matter of discretion and did not include language allowing the Executive to create "additional limitations and conditions." Refugee Act of 1980, Pub. L. No. 96-212, § 201(b), 94 Stat. 102, 103–05. The Attorney General, implementing his categorical discretion concerning when or if to grant asylum, issued regulations establishing various restrictions on asylum, such as generally mandating discretionary denials for claims based on past persecution alone. *See* 8 C.F.R. § 208.13. In 1996, Congress codified six of the Attorney General's mandatory bars and amended the INA to expressly confirm the Attorney General's authority to add further "conditions or limitations." Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, § 604, 110 Stat. 3009 (codified at 8 U.S.C. § 1158(b)(2)). Congress's decision not only to leave undisturbed the Attorney General's construction of his authority, but also to affirmatively endorse the authority to promulgate additional limitations,

confirms the Executive Branch's broad discretionary authority. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 599 (1983) (concluding that failure to modify Executive Branch decisions and congressional awareness of an Executive Branch interpretation when enacting related legislation "make out an unusually strong case of legislative acquiescence in and ratification by implication" of those decisions).

Moreover, although not necessary to establish consistency with the statute, multiple provisions in § 1158 affirmatively underscore the permissibility of the Rule's focus on protecting the systemic efficiency of the asylum system. Congress conditioned the grant of asylum on an alien's applying "in accordance with the requirements and procedures established by" the Departments. 8 U.S.C. § 1158(b)(1)(A). Consistent with Congress's recognition that a properly functioning immigration system depends on orderly procedures that aliens must follow, the Departments determined, in light of the circumstances facing them at the time the Rule was adopted, that aliens should generally be required—absent exceptionally compelling circumstances—to pursue what the Departments deemed orderly and lawful migration pathways to be eligible for asylum.

And Congress itself has already established mandatory bars to asylum that are aimed at promoting systemic efficiency. For example, Congress has generally prohibited applications for asylum more than one year after an alien entered the United States. 8 U.S.C. § 1158(a)(2)(B). And Congress has generally prohibited aliens from pursuing successive asylum applications. *See id.* § 1158(a)(2)(C). These provisions make clear that the INA does not prioritize the identification of otherwise-meritorious asylum claims above all else, and that administrative practicality and systemic efficiency are legitimate considerations. Nothing in the statute suggests that Congress intended to foreclose the Departments from similarly taking systemic considerations into account.

Indeed, the Executive Branch has long considered factors similar to those underlying the

Rule in determining whether any particular asylum applicant warrants a favorable exercise of discretion. As the Board of Immigration Appeals has explained, "[t]he ultimate consideration" for whether an alien is deserving of discretionary relief, including asylum, is whether granting relief "appears to be in the best interest of the United States," as determined by the Executive Branch officials charged with making asylum determinations. *Matter of D-A-C-*, 27 I. & N. Dec. 575, 578 (B.I.A. 2019). In accordance with that best-interest standard, the Board has long held that an alien's "circumvention of orderly refugee procedures" is a relevant consideration. *Matter of Pula*, 19 I. & N. Dec. 467, 473 (B.I.A. 1987). And the Board has also considered the alien's "manner of entry or attempted entry," "whether [they] passed through any other countries or arrived in the United States directly from [their] country, whether orderly refugee procedures were in fact available to help [them] in any country [they] passed through, and whether [they] made any attempts to seek asylum before coming to the United States." *Id.* at 473-74. Although Congress has amended the asylum statute since *Pula*, Congress has never foreclosed or limited consideration of these systemic factors in exercising discretion.

Consistent with the longstanding reliance on these systemic factors in determining whether to favorably exercise discretion in individual cases, the Rule established a presumptive limitation on eligibility for discretionary relief—subject to being overcome in compelling circumstances— for aliens who circumvent orderly procedures and thereby undermine the interest of the United States in maintaining a safe and effective immigration system. *Cf. Reno v. Flores*, 507 U.S. 292, 313 (1993) (emphasizing the Executive's ability to promulgate "generic rules" even where the INA requires the exercise of discretion through "some level of individualized determination" (quotation omitted)); *Yang v. INS*, 79 F.3d 932, 936-37 (9th Cir. 1996) (similar). Nothing about the asylum statute dictates how much weight the Executive may, through regulation, place on those systemic factors. Nor does the statute require that every alien who may be able to *apply* for asylum

must also be eligible to *receive* asylum. And the D.C. Circuit has already recognized that the Executive Branch likely has the authority to exercise its significant discretion in this area by denying asylum "up front." Ex. A, *RAICES*, No. 25-5243, Stay Order and Ops. at 37 (Millett, J., concurring) ("[T]his court held in *Huisha-Huisha* that . . . categorical and upfront rejections of asylum are permissible in emergency situations for limited periods of time."); *id.* at 55 (Katsas, J., concurring) (("Once the 'asylum decision ha[d] already been made,' the government also likely could bar those aliens from filing 'futile' asylum applications.") (quoting *Huisha-Huisha*, 27 F.4th at 731)).

### 2.    Plaintiffs' Arguments to the Contrary Lack Merit.

Plaintiffs claim that the Rule is inconsistent with the asylum statute, but they do not identify any specific provision of the INA with which the Rule conflicts. *See* Pls.' Mot. (ECF 109) at 14–18. Instead, they principally contend that each of the pathways identified in the Rule as an exception to the presumption of asylum ineligibility would be unlawful as a stand-alone bar to asylum for any alien who did not follow that particular pathway. Pls.' Mot. (ECF 19) at 14–16. That contention is incorrect and is in conflict with the D.C. Circuit's rulings that the Executive Branch has authority to employ its discretion over asylum up front to categorically preclude asylum. *See* Ex. A, *RAICES,* Stay Order and Ops., at 2, 37–39, 55. In any event, the Rule does not contain stand-alone bars to asylum but instead takes a holistic approach, providing multiple alternative means for aliens to avoid the presumption of asylum ineligibility, with the goal of protecting the integrity of the asylum and related expedited removal systems in face of overwhelming numbers of aliens that threatened to render those systems unworkable. It does not categorically or definitively preclude aliens from receiving asylum even if they did not pursue *any* alternative pathway. Moreover, even assuming each individual exception would be inconsistent if it established a stand-alone categorical bar to asylum, combining those exceptions alleviates any

potential illegality.

*First*, the Rule does not "require" aliens to use CBP One to be eligible for asylum, nor does it treat manner of entry as dispositive in determining asylum eligibility—unlike the prior "Entry" rule addressed in the case Plaintiffs rely on, *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 669-75 (9th Cir. 2021) (*East Bay I*). *See* Pls.' Mot. (ECF 109) at 14–15. In *East Bay I*, the Ninth Circuit acknowledged that both the Executive and that court had "long recognized that a refugee's method of entering the country is a discretionary factor in determining whether the migrant should be granted humanitarian relief," but concluded that the categorial "Entry" rule impermissibly placed dispositive weight in nearly all cases on the method of entry. *East Bay I*, 993 F.3d at 671. But the Rule does not place such dispositive weight on manner of entry. Aliens who entered illegally—that is, who do not enter the United States at a port of entry—but who were denied protection in another country are not subject to the Rule's presumption. *See* 8 C.F.R. § 208.33(a)(2)(ii)(C). And although aliens were able to avoid the presumption by entering at a port of entry with a prescheduled appointment, even those who entered without an appointment or between ports of entry are potentially eligible for asylum if they can qualify for an exception, or if they overcome the Rule's presumption by showing that they or a member of their family faced an acute medical emergency, faced an imminent and extreme threat to life or safety or were the victim of a severe form of trafficking at the time of entry, or that other exceptionally compelling circumstances exist. *See id.* § 208.33(a)(2)(ii), (a)(3). Thus, even assuming *East Bay I* was correctly decided (it was not), the Rule is consistent with that decision, as it treats manner of entry as relevant to—but not dispositive of—asylum eligibility. There is thus no possible conflict between the Rule and § 1158(a)(1)'s provision that aliens who arrive in the United States may apply for asylum "whether or not" they arrived "at a designated port of arrival."

As Plaintiffs recognize, lawful entry at a port of entry is neither necessary nor sufficient to

overcome or avoid the Rule's presumption—further showing that the condition on asylum eligibility does not differentiate between aliens based on whether they entered at or between ports of entry. The Rule is thus like other statutory and regulatory asylum conditions that similarly operate to limit asylum for defined categories of aliens for reasons separate from the merits of their claims. The INA does not mandate that anyone who presents at a port of entry or who enters illegally must be eligible for asylum. It would be improper to infer from the INA that Congress intended there be "no categories of aliens for whom asylum would be completely unavailable," let alone presumptively unavailable. *Komarenko v. I.N.S.*, 35 F.3d 432, 436 (9th Cir. 1994); *see also R-S-C- v. Sessions*, 869 F.3d 1176, 1187 & n.9 (10th Cir. 2017). That is, although Congress made asylum "available to those who enter the United States outside ports of entry," *Las Americas Imm. Advocacy Center v. U.S. DHS*, 2025 WL 1403811, at *14 (D.D.C. May 9, 2025), that does not mean that everyone who enters outside a port of entry must be eligible for asylum. The decisions on which Plaintiffs rely (Pls.' Mot. (ECF 109) at 14–15, 18)—which are not binding on this Court—took an overly circumscribed view of the Departments' authority to enact additional "conditions or limitations" on an alien's eligibility for asylum. Further, as noted, a D.C. Circuit panel recently implicitly rejected Plaintiffs' very contention, determining that the government was likely to succeed on its argument that the Executive Branch could "decide in advance to 'foreclos[e] asylum' for covered aliens" who had entered illegally between ports of entry. *See* Ex. A, *RAICES* Stay Order and Ops. at 55 (Katsas, J., concurring); *see also id.* at 36–39 (Millett, J., concurring).

*Second*, contrary to Plaintiffs' arguments, the Rule did not "require[]" aliens "to seek and be denied protection in a transit country" to be eligible to seek asylum in the United States. *See* Pls.' Mot. (ECF 109) at 15. Although such a requirement would be lawful, the Rule does not actually impose such a rigid requirement. Instead, the Rule includes multiple provisions addressing

circumstances in which aliens may receive asylum despite failing to apply for protection in a transit country. In any event, such a requirement would be perfectly in harmony with the other provisions of the asylum statute, which expressly recognize the relevance of an alien's interaction with third countries to their asylum eligibility, *see* 8 U.S.C. § 1158(a)(2)(A) (safe-third-country provision); *id.* § 1158(b)(2)(A)(vi) (firm-resettlement bar); *Pula*, 19 I&N Dec. at 474. Encouraging *some aliens* to try to obtain protection in third countries by providing them the *option* to avoid asylum ineligibility if they do so is fully consistent with the asylum statute, as well as with Board of Immigration Appeals decisions recognizing that the passage through other countries where orderly refugee procedures were available is relevant to a discretionary grant of asylum.

Plaintiffs rely on *East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 978 (9th Cir. 2021) (*East Bay II*), but the reasoning in that case is unpersuasive, and in any event that case does not support Plaintiffs' claim. *East Bay II* addressed a rule that generally deemed ineligible for asylum aliens who failed to seek protection in transit countries on their way to the United States. *Id.* at 968. The Supreme Court had stayed an order enjoining this transit rule, allowing the rule to go into effect nationwide. *See Barr v. East Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019). Despite this, the Ninth Circuit nonetheless subsequently concluded that the plaintiffs' challenge to the transit rule was likely to succeed. The Ninth Circuit did not identify any actual conflict between the asylum statute and the transit rule, however, and there is none. Instead, that court relied on its own assessment of the aims of certain asylum provisions and opined that the transit condition did not sufficiently serve those aims. Specifically, the Ninth Circuit observed that two statutory bars in § 1158 are aimed at denying asylum to aliens who do not need this country's protection and that both include what the Court described as "critical" requirements to ensure the third-country option is "genuinely safe." *East Bay II*, 994 F.3d at 976-77 (discussing the safe-third-country agreement

provision and the firm resettlement eligibility bar).[7] It held that the transit rule was inconsistent with these two statutory bars because the transit rule had the same aim—screening out aliens who do not need this country's protection—but failed to include a similar safeguard. *See id.* at 977-78. But, as the Supreme Court implicitly recognized in staying an injunction of the transit rule, the transit condition is in fact in harmony with those statutory bars. Here, Plaintiffs similarly identify no actual conflict between the asylum statute and the Rule's condition on asylum eligibility relating to whether an alien sought protection in a third country en route to the United States.

*Third*, the Rule's exception to the presumption for those who used a parole pathway does not conflict with § 1158. *See* Pls.' Mot. (ECF 109) at 15–16. Plaintiffs argue that the exception is inconsistent with § 1158(a)(1)'s provision that aliens are permitted to apply for asylum in the United States "'irrespective of [a] status' like parole." Pls.' Mot. (ECF 109) at 15–16. This contention is wrong for several reasons. Initially, the exception to the presumption of asylum ineligibility for those who used a parole process are not contingent on a *grant* of parole—instead, the alien need only have been "provided appropriate authorization to travel to the United States to *seek* parole." 8 C.F.R. § 208.33(a)(2)(ii)(A). Nor is parole a "status"—it is a mechanism for the release of aliens from custody into the United States, without admitting them. *See* 8 U.S.C. § 1182(d)(5); *Coal. for Humane Immigrant Rts. v. Noem*, No. 25-CV-872 (JMC), 2025 WL 2192986, at *7 (D.D.C. Aug. 1, 2025); *Alanniz v. Barr*, 924 F.3d 1061, 1066 (9th Cir. 2019) (parolee has not been "admitted in any status"). And again, nothing in the Rule requires an alien to obtain parole or qualify for a parole program to be eligible for asylum; it instead encourages use

---

[7] As to the firm resettlement bar, the Ninth Circuit relied solely on agency regulations to locate this supposedly "critical" requirement. *See East Bay II*, 994 F.3d at 977; *see also id.* at 972. The statute itself merely provides that an alien is ineligible for asylum if he or she "was firmly resettled in another country prior to arriving in the United States." 8 U.S.C. § 1158(b)(2)(A)(vi).

of parole programs as one option to avoid asylum ineligibility.

*Fourth*, Plaintiffs' caricature of the Rule as simply combining three allegedly "unlawful" choices reflects a logical fallacy. *See* Pls.' Mot. (ECF 109) at 14, 16. Even assuming each condition would be inconsistent with the asylum statute if imposed as a stand-alone limit on asylum—which is wrong for the reasons stated above, and especially in light of the D.C. Circuit's recognition that the Executive Branch may use its discretion to foreclose asylum, *see* Ex. A, *RAICES* Stay Order and Ops. at 55 (Katsas, J., concurring); *see also id.* at 36–39 (Millett, J., concurring)—that does not necessarily mean that the government could not require applicants to satisfy one or the other of the conditions (even apart from the fact, discussed above, that this is an inaccurate description of the Rule). Even assuming the government may not condition eligibility for asylum solely on entry at a port of entry, that does not mean that it is unlawful for the government to say that asylum will be denied unless the applicant *either* entered through a port of entry *or* satisfies an alternative prerequisite. And that logic does not change if each of the other means by which an applicant can make the required showing could not alone be an independent prerequisite for asylum eligibility.

The cases on which Plaintiffs rely are inapposite because they involved pairing two unlawful options in circumstances where the pairing did not resolve the impermissibility of either option taken alone. *See* Pls.' Mot. (ECF 109) at 16. For example, the government cannot force states to choose between taking title to waste or issuing regulations that it might prefer not to promulgate. *New York v. United States*, 505 U.S. 144 (1992). But that is because the option to take title to waste does nothing to ameliorate the Tenth Amendment problem with commandeering the States to enact regulations, and vice versa. Here, by contrast, the addition of multiple options does ameliorate the concerns that Plaintiffs claim exist with each individual exception. *See East Bay I*, 993 F.3d at 669-71 (acknowledging that it is permissible to consider manner of entry in a less dispositive manner than the prior "Entry Rule"). Stripped of this logical fallacy, Plaintiffs' entire

argument fails. *See* Pls.' Mot. at 14–16.

*Finally*, Plaintiffs contend that, notwithstanding the Rule's various alternatives to asylum ineligibility, the only viable option under the Rule was to present at a port of entry with a CBP One appointment. Pls.' Mot. (ECF 109) at 16–18. This is plainly incorrect, as evidenced by both the administrative record and subsequent events. And Plaintiffs cannot dispute that the parole-process exception encouraged hundreds of thousands of aliens to seek travel authorization and parole under the CHNV and Uniting for Ukraine parole programs rather than travel to the U.S.-Mexico border to seek to cross that border illegally or to present at a land port of entry, and that those aliens who so entered the country are able to seek asylum, whether affirmatively or in expedited or full removal proceedings. *See* CLP_AR_4553 (the CHNV parole programs covered up to 30,000 CHNV nationals per month); CLP_AR_857–860 (Ukraine); CLP_AR_907–917, 1023–1026 (Venezuela); CLP_AR_0995–1006 (Nicaragua); CLP_AR_1009–1022, 1065–1067 (Cuba); 90 Fed. Reg. 13,611, 13,612 (Mar. 25, 2025) (CHNV termination noting 530,000 aliens paroled under CHNV parole programs). Although the current administration disagrees with the prior administration's use of mass parole programs and has terminated the CHNV parole programs, the Rule must be evaluated based on its promulgators' reasoning and the facts in place at the time of the Rule's adoption. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971) (APA review is based on the administrative record "before the [agency] *at the time [it] made [its] decision*").[8]

---

[8] Plaintiffs also focus on the fact that the parole programs and the ability to schedule an appointment using CBP One were cancelled in early 2025. *See* Pls.' Mot. (ECF 109) at 17. But at the same time, the President also signed Proclamation 10888, which suspended the entry of most aliens without documents sufficient for admission and imposed a separate asylum bar for those whose entry is suspended—and which asylum bar has been allowed to remain in effect by the D.C. Circuit. *See supra* at 13–14. Accordingly, since January 20, 2025, the CLP Rule has had little to no impact on aliens who enter without authorization, regardless of the existence of parole processes

Aliens who traveled to the U.S.-Mexico border instead of using parole programs were also able to seek asylum in Mexico or another transit country to either obtain lasting protection in one of those countries, or, if denied protection, avoid the Rule's presumption of asylum eligibility. Plaintiffs' assertions that the transit-country exception is illusory are belied by the record. The Departments acknowledged in the Rule that while not all countries an alien might pass through will be safe for all aliens, the Rule does not require anyone to apply for protection in any *particular* country. 88 Fed. Reg. at 31,413. And seeking and perhaps obtaining protection in such countries is far from illusory: Mexico's asylum system, in particular, has the ability to handle a large volume of asylum claims—the fact that it has a significant backlog, as does the United States, does not diminish it as a viable option. 88 Fed. Reg. at 31,413; *see also* 88 Fed. Reg. at 11,720–23 (discussing functionality of and improvements to asylum systems of Mexico, Guatemala, Belize, Costa Rica, Columbia, and Ecuador); CLP_AR_4942–4947, 4999–5008, 5421–5424, 5757–5761, 6126–6173. Indeed, applicants can apply to work lawfully in Mexico while they await adjudication of their asylum applications. CLP_AR_4866. Focusing on the number of aliens who showed that they had applied for asylum in a third country during a 10-month period in which the prohibition at issue in *East Bay II* was in effect sidesteps the point. *See* Pls.' Mot. (ECF 109) at 17–18. One purpose of the Rule was to encourage aliens to pursue opportunities in other countries, such as by obtaining asylum there or by finding a place to stay pending consideration of an asylum application. *See* 88 Fed. Reg. at 13,316. That aliens may not be able to seek asylum in the United States right away does not render the exception unlawful or illusory. Finally, any aliens who did face a serious threat of violence in Mexico and entered illegally could still establish that they faced an "imminent and extreme threat to life or safety" or some other exceptionally compelling

---

or the CBP One scheduling function.

circumstance. *See, e.g.*, Nunez-Neto Decl. (ECF 53-1) at ¶ 16 (explaining that, of aliens interviewed by USCIS between May 12 and September 30, 2023, who were subject to the Rule, twelve percent were able to show that they could rebut the presumption).

* * *

For these reasons, the Court should grant summary judgment to Defendants on Count Two. *See* Am. Compl. ¶¶ 145–51.

### B.    The Rule's Conditions on Asylum Eligibility Are Not Arbitrary and Capricious.

"[T]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A reviewing court need only be satisfied that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* The agency's decisions are entitled to a "presumption of regularity," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one," *id.* at 416. At bottom, arbitrary-and-capricious review asks only whether "the agency has acted within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *accord Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 295 (2024) (where a statute delegates discretionary authority to an agency, "the role of the reviewing court under the APA" is to ensure the "agency has engaged in reasoned decisionmaking within" the bounds of the delegated authority) (internal quotation marks and citations omitted). All aspects of the Rule—including its conditions on asylum eligibility—meet that deferential standard.

The Departments explained that the Rule encouraged aliens to use orderly pathways to

enter the United States, to alleviate an expected increase in border encounters and illegal entries that threatened to overwhelm the immigration system. Although the Departments understood that the Rule would result in the denial of some asylum claims that otherwise may have been granted, they determined that the cost was justified by the countervailing benefits of the Rule. The Court may not use arbitrary-and-capricious review to second-guess the Departments' weighing of the relevant costs and benefits.

1.    <u>The Rule is Reasonable and Reasonably Explained</u>.

The Rule was promulgated to address "the reality of unprecedented migratory flows, the systemic costs those flows impose on the immigration system, and the ways in which increasingly sophisticated smuggling networks cruelly exploit the system for financial gain." 88 Fed. Reg. at 31,316. Without the Rule, the expected increase in border encounters threatened to overwhelm the Departments' "ability to effectively process, detain, and remove, as appropriate, the migrants encountered," *id.*, with attendant increases in the number of aliens unlawfully present in the country, strains on government operations and resources, health and safety concerns for aliens at overcrowded processing facilities, and impacts on local communities along the southwest border, *id.* at 31,325-26, 31,387. The Rule's provisions are reasonably related to these objectives, providing aliens with access to protection while imposing reasonable limitations on asylum eligibility to safeguard the overall system from overwhelm and its attendant costs. Indeed, as evidenced by subsequent measures taken by both this and the prior Administration to stem the continued high numbers of illegal crossings, the Rule did not go far *enough* to protect the asylum and expedited removal systems and the country from the heavy burden of the unprecedented volume of illegal immigration.

To encourage aliens to use orderly pathways to enter the United States, the Rule temporarily imposed a rebuttable presumption of asylum ineligibility for aliens who failed to

pursue such pathways. *See* 88 Fed. Reg. at 31,329. By reducing irregular migration and channeling migrants to specified alternatives during a two-year period, the Departments anticipated that the Rule would allow the government to devote more of its limited resources to processing inadmissible aliens effectively. *See id.* at 31,326. The Rule excepts aliens who demonstrate exceptionally compelling circumstances, including circumstances linked to the need to forgo using one of the specified pathways. *See id.* at 31,338; 8 C.F.R. § 208.33(a)(3) (identifying "acute medical emergencies, imminent and extreme threats to life or safety, and victims of severe forms of human trafficking" as sufficient but not exclusive grounds to rebut the presumption).

At the same time, the Departments recognized that not all aliens could use the alternative pathways or establish an exception or rebuttal ground. The Rule describes in detail the functioning of and the limitations on those pathways and on the exceptionally-compelling-circumstances test, *see* 88 Fed. Reg. at 31,315-18, 31,325, 31,337, 31,398-405, 31,410-14, and acknowledges that it "will result in the denial of some asylum claims that otherwise may have been granted," *id.* at 31,332. But the Departments weighed those costs and concluded that they are justified by "the benefits to the overall functioning of the system" that the Rule occasions. *Id.*

It is appropriate for the Executive Branch to consider the "operation of the immigration system," *Judulang v. Holder*, 565 U.S. 42, 55 (2011), particularly in the context of a Rule that limits a discretionary benefit in a manner that affects "this Nation's international relations," *Arizona*, 567 U.S. at 396. Indeed, the overall policies at issue were part of cooperative efforts with foreign governments to manage an increase in regional migration, *see* 88 Fed. Reg. at 31,341-42, thus implicating matters within the Executive's particular responsibility. The Rule readily survives arbitrary-and-capricious review, which asks only whether "the agency has acted within a zone of reasonableness." *Prometheus Radio Project*, 592 U.S. at 423.

2. <u>The Rule Does Not Rely on Impermissible Factors.</u>

Plaintiffs argue that the Departments were barred from considering the availability of alternative pathways to enter the United States or to seek protection in other countries in exercising their discretion to determine asylum eligibility because those alternatives already existed in the INA and operate independently of asylum. Pls.' Mot. (ECF 109) at 19–20. But Congress did not make its own judgments about which individuals should receive asylum; it gave the Executive Branch discretion to determine whether asylum was warranted in each individual case, 8 U.S.C. § 1158(b)(1)(A), and to promulgate regulations limiting eligibility for asylum, *id.* § 1158(b)(2)(C). Nothing in the broad grant of authority in § 1158(b)(2)(C) precludes the Executive from considering the availability of other pathways to enter the United States beyond entering illegally or without authorization at or between ports of entry, nor from considering the potential effects of an asylum limitation on the immigration system as a whole. Indeed, as the Executive is responsible for managing the entire immigration system, *see Judulang*, 565 U.S. at 55, it is entirely expected that the Executive would take into account other means of reducing burdens at the border in calibrating the country's approach to immigration.

The interdependence of policies is particularly salient here, where the Departments' experience demonstrated that various alternatives affect one another and were all relevant to achieving the prior Administration's policy goals. The Departments sought to "promote lawful, safe, and orderly pathways to the United States" by "removing the incentive to make a dangerous irregular migration journey and reducing the role of exploitative transnational criminal organizations and smugglers." 88 Fed. Reg. at 31,345. The Departments drew on prior success in discouraging aliens from irregular entry by imposing consequences on those who fail to use available pathways. *Id.* at 31,370.

3.    The Departments' Reliance on Alternative Pathways Is Supported by the Record.

Plaintiffs next argue that the "[t]he Rule's main justification" for its conditions on asylum eligibility are that other pathways "provide sufficient methods to obtain protection," but that the record does not support that justification. Pls.' Mot. (ECF 109) at 20–26. This misstates the premise of the Rule as well as the administrative record.

As an initial matter, Plaintiffs wrongly assert that a core premise of the Rule is that a viable alternative pathway will be available to every alien affected by the Rule. *Id.* at 20. The Rule does not articulate such a goal. Rather, as discussed just above, the Rule acknowledged that "despite the protections preserved by the [R]ule and the availability of lawful pathways, the rebuttable presumption . . . will result in the denial of some asylum claims that otherwise may have been granted." 88 Fed. Reg. at 31,332. But the Departments reasoned that this risk was outweighed by "the benefits to the overall functioning of the system, including deterrence of dangerous irregular migration and smuggling." *Id.* Plaintiffs also critique the rationales offered by the Departments by finding fault with each piece in isolation. But this critique ignores that the various "pathways" are not isolated mechanisms but part of a larger Rule designed to balance systemic efficiency against countervailing concerns like those voiced by Plaintiffs.

Even on their own terms, Plaintiffs' arguments fail, as the record supports a conclusion that each pathway presented a meaningful option. *First*, the anticipated number of port-of-entry appointments—1,250 daily—amounted to 456,250 appointments a year. This number is significant, and was more than the number of aliens encountered at the southwest border in *total* (between or at ports of entry) each year between 2010 and 2020 other than 2014 (479,370) and 2019 (851,508). CLP_AR_2377; 88 Fed. Reg. at 31,398. Moreover, CBP later increased the number of appointments to 1,450 appointments a day—or more than 500,000 appointments a year.

*See CBP One™ Appointments Increased to 1,450 Per Day*, https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day (June 30, 2023). It is not unreasonable for the government to afford a preference to aliens who waited for an appointment to become available so that they can be processed in an orderly fashion, instead of rewarding irregular and illegal entries. And the use of CBP One did not "force" aliens to await their appointments in northern Mexico as Plaintiffs claim. Pls.' Mot. (ECF 109) at 21. The record demonstrated that CBP One was able to be accessed by aliens in central Mexico as well. CLP_AR_1652. Regardless, the Rule did not require anybody to wait in Mexico—it was expected to result in fewer aliens waiting in Northern Mexico by encouraging the use of alternate pathways. *See* 88 Fed. Reg. at 31,431 ("As has been shown with the CHNV parole processes, pairing such policies together can lead to meaningful decreases in the flow of irregular migration to the [Southwest Border]."). Additionally, the Rule contains an exception for those who presented themselves at a port of entry without an appointment and can show that it was not possible for them to use the CBP One scheduling system. *See* 8 C.F.R. § 208.33(a)(2)(ii)(B).

*Second,* Plaintiffs' categorical argument that "transit countries are not remotely safe" and "have woefully inadequate asylum systems," Pls.' Mot. (ECF 109) at 24–26, rehashes public comments on the Rule "that these countries are universally unsafe and cannot provide protection to asylum seekers," which the Departments already considered and rejected, even while recognizing "that not every country will be safe for every migrant," 88 Fed. Reg. at 31,411. Plaintiffs disregard the Rule's extensive discussion of Mexico's asylum system and ability to handle a large volume of asylum claims and which, despite its backlog, "remains a viable option for many seeking protection." *Id.* at 31,414; *see also supra* at 50. The Rule also recognized that many transit countries "have taken substantial and meaningful steps in recent years that demonstrate their willingness to provide protection to those who need it." 88 Fed. Reg. at 31,410;

CLP AR_004942-47, 4999-5008, 5421-24, 5757-61, 6126-73. Mexico and every Central American country are parties to the 1951 Refugee Convention and its 1967 Protocol, which require them to afford migrants nonrefoulement protections, and all have adopted the non-binding Cartagena Declaration on Refugees, which contains a more expansive definition of "refugee" than that contained in U.S. law, *i.e.*, some may qualify for protection under that definition who would not qualify for asylum in the United States. *Id.* at 31,410-11. Colombia is also a party to both instruments and, in 2021, "adopted legislation that allows Venezuelans to apply for temporary protected status, which grants Venezuelans 10-year residency and allows them to access public education, health care, and employment." *Id.* at 31,411. By February 2022, Colombia had received 2.2 million applications under this program, and by July of that same year it had already approved 1.4 million of these applications. *Id.* Belize likewise "offers an amnesty program for registered asylum seekers and certain irregular migrants that provides permanent residence and a path to citizenship." *Id.* Such programs demonstrated those governments' willingness to provide protection. Importantly, Mexico has continued to develop the capacities of its refugee system and has demonstrated the ability to handle and resolve a large volume of claims in an efficient manner. *See id.* ("Mexico has made exceptional strides to improve conditions for asylum seekers, migrants, and refugees within its borders."). Asylum processing times in Mexico averaged 8 to 12 months, and almost three quarters of applicants were granted some form of relief or protection in 2021. *Id.* at 31,414 (noting asylum was granted in 72 percent of cases, with an additional 2 percent of applicants granted some form of complementary protection). Moreover, Mexico has "substantially increased its Local Integration Program, which relocates and integrates individuals granted asylum in safe areas of Mexico's industrial corridor." *Id.* Although the Departments acknowledged concerns about potential harm to migrants in Mexico, they reasonably concluded, given the high number of claims it can adjudicate every year, the significant grant rate for protection, ongoing

efforts to assimilate asylum seekers, and other general efficiency and security gains, that Mexico "remains a viable option for many seeking protection," and that the Rule preserves multiple alternative pathways for those for whom Mexico is not a viable option. *Id.* And while the Departments acknowledged that asylum in transit countries will not be available for all aliens, they nonetheless determined it was not "unreasonable to expect" aliens to "pursue other safe options" to the extent they exist, or to "rebut the presumption by showing that exceptionally compelling circumstances exist." *Id.* at 31,411.

It would be a remarkable intrusion on the Executive's foreign affairs authority for a court to premise the rejection of the Rule on a disagreement with the Executive's assessment of the conditions in other countries, on Plaintiffs' predictions about the capacity of other countries in the Western Hemisphere to accept and process migrants, or on a court's disagreement with the Executive's weighing of the costs and benefits of the Rule in exercising its discretion to adopt limitations on asylum eligibility. And again, the Rule does not require any particular alien to seek protection in a transit country.

*Third*, Plaintiffs' characterization of the availability of the parole-process exception omits key information. *See* Pls.' Mot. (ECF 109) at 22–23. Not only do the approximately 360,000 aliens per year who were authorized to travel to the United States "pursuant to a DHS-approved parole process" fall outside the Rule's presumption, 8 C.F.R. § 208.33(a)(2)(ii)(A), but the Rule's existence encouraged aliens to opt for this alternative over irregular migration and entry across the Southwest Border, furthering the Rule's aims of reducing burdens on the border.

*Fourth*, Plaintiffs' argument largely disregards the ability to rebut the Rule's presumption based on "exceptionally compelling circumstances." This aspect of the Rule allows aliens who did not pursue an alternative pathway but at the time of entry experienced an acute medical emergency, faced an imminent threat to life or safety, or were victims of a severe form of trafficking in persons

will not be subject to the Rule's presumption. 88 Fed. Reg. at 31,338. At base, Plaintiffs' disagreement with the specific calibration of the Rule does not render the Rule arbitrary and capricious.

        4.    <u>The Rule Does Not Rely on Assumptions Concerning Meritorious Claims.</u>

Plaintiffs also argue that the record does not support the "assumption that people who use its 'pathways' are the 'most likely to warrant protection." Pls.' Mot. (ECF 109) at 29. This is a strawman. The Rule is not based on the premise that those subject to it are less likely than other aliens to otherwise qualify for asylum. Instead, it was based on the Department's determination that it was imperative, given the exigent circumstances, "to strike a balance" between systemic efficiencies and deterrence of irregular migration. *See id.* at 31,314–19, 31,329. Ultimately, Plaintiffs disagree with the reasoned judgment of the Departments, but the Court may not "second-guess[]" agencies' "weighing of risks and benefits" in adopting a policy choice. *Dep't of Commerce v. New York*, 588 U.S. 752, 777 (2019).

        5.    <u>The Rule Does Not Fail to Consider the Interrelation of Expedited Removal Procedures.</u>

Plaintiffs next argue that the Departments acted arbitrarily because they allegedly did not take into account certain changes to expedited removal procedures—including the consultation period guidance, conducting credible fear interviews while aliens are in CBP custody, and the third-country removal procedures. Pls.' Mot. (ECF 109) at 27–30. Yet the Rule discusses and appropriately addresses relevant policy changes. *See* 88 Fed. Reg. at 31,317–18, 31,317 & n.21 (discussing policies over the prior two years as well as new efforts announced on April 27, 2023). And Plaintiffs do not articulate what they believe the Departments failed to consider about each policy. Instead, they set forth a summary of their disagreements with those policies, which is insufficient to meet their burden to demonstrate error. *See Prohibition Juice Co. v. U.S. Food and*

*Drug Admin.*, 45 F.4th 8, 18–19 (D.C. Cir. 2022) (the "burden of showing that an error is harmful normally falls upon the party attacking the agency's determination" when determining whether an agency has failed "to consider an important aspect of the problem").

As the Rule explains, changes to the location and timing of credible fear interviews are beyond the scope of the Rule. 88 Fed. Reg. at 31,363. The Rule adopts a *substantive* change to asylum eligibility that is implemented in credible fear proceedings. The procedural aspects of such proceedings are based on separate policies involving different considerations. *See id.* ("Any decision to conduct credible fear interviews while the noncitizen is in CBP custody will take into account a range of factors, including operational limitations associated with the facility, staffing, and throughput."); *see also Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 19, 29–32 (D.D.C. 2020) (under the INA, credible fear interviews may be implemented differently depending on what border sector an individual is detained in). Moreover, conducting credible fear interviews in CBP custody does not disturb any of the well-supported rationales for adopting the Rule's presumption of asylum ineligibility.

Plaintiffs also claim that the Rule does not consider that the "third-country removal policy further depresses credible fear passage rates." Pls.' Mot. (ECF 109) at 31. This is both incorrect and misplaced. The Rule does in fact consider its interaction with the decision to remove or return aliens from some countries to Mexico rather than to their country of origin. *See, e.g.*, 88 Fed. Reg. at 11,705-06; CLP_AR_2489 (including "CHNV Returns to Mexico" in modeling impact of the Rule). Indeed, one of the key premises of the Rule was data showing that imposing consequences on CHNV nationals—who generally could not be removed to their home countries at the time— was critical to lowering irregular encounters from nationals of those countries, which were at all-time highs and driving record border encounters. *See, e.g.*, 88 Fed. Reg. at 31,315. And the Rule discusses at length the importance of being able to return or remove such nationals to Mexico, *see*

*id.* at 31,317, 31,325, 31.337; 88 Fed. Reg. at 11,706, 11,712, and how, once the Title 42 Order ended, the government would be unable to expel nationals of those countries, and would instead rely, if Mexico agreed, on returning or removing such nationals to Mexico instead of their home countries, *see* 88 Fed. Reg. at 31,316-17 & n.21; 88 Fed. Reg. at 11,712. The Departments thus considered, and indeed relied upon, the ability to remove aliens from certain countries to Mexico.

* * *

Because the Rule's presumption of asylum ineligibility is reasonable, reasonably explained, and does not fail to consider important aspects of the issues or rely on impermissible rationales, the Court should grant summary judgment in favor of Defendants on Count Three insofar as it challenges the Rule's conditions on asylum eligibility. *See* Am. Compl. ¶¶ 152–54.

### C.    The Rule is Consistent with the INA's Credible Fear Provisions

Plaintiffs' claim that the Rule is contrary to the INA's "significant possibility" standard may be rejected outright. *See* Am. Compl. ¶¶ 138–44. The Rule does not, as Plaintiffs claim, "improperly require[] asylum officers to apply standards other than the 'significant possibility' standard." Am. Compl. ¶ 136; Pls.' Mot. (ECF 109) at 30–32.

The Rule is consistent with the statutory definition of "credible fear of persecution" because it requires asylum officers and immigration judges to apply the "significant possibility" standard when considering the applicability of the presumption of asylum ineligibility in credible fear interviews. As the preamble explains, under the Rule's credible-fear provisions, "the [asylum officer] will determine whether there is a significant possibility that the noncitizen would be able to show at a full hearing by a preponderance of the evidence that the presumption does not apply or that they meet an exception to or can rebut the presumption." 88 Fed. Reg. at 31,380.

It is true that the "significant possibility" standard is required by statute where applicable. *See* 8 U.S.C. § 1225(b)(1)(B)(v). The expedited removal statute provides that certain aliens will

be referred for a credible fear interview, at which an asylum officer must determine whether the alien has a "credible fear of persecution," which means "there is a significant possibility . . . that the alien could establish eligibility for asylum." *Id.* The Rule's provisions governing the application of the asylum-ineligibility presumption in the credible fear process mirrors that statutory language and requires its application in all credible fear interviews. *See* 8 C.F.R. § 208.30(e)(2) ("An alien will be found to have a credible fear of persecution if there is a significant possibility ... that the alien can establish eligibility for asylum ... ."). In other words, the Rule requires that the "significant possibility" standard apply to the rebuttable presumption.

The new regulatory provisions added by the Rule mirror the language of prior rules adopting limitations on asylum eligibility applied during credible fear interviews. *See* 88 Fed. Reg. at 31,380 n.195.[9] The provisions do not indicate that the "significant possibility" standard does not apply; they merely set forth the order of operations and which standard applies to the persecution or torture claims depending on the applicability of the rebuttable presumption. Specifically, the provisions first require the adjudicator to consider the applicability of the rebuttable presumption and whether the alien is exempt from or can rebut it and then, depending on the outcome of that threshold inquiry, provides which screening standard shall apply—"significant possibility" if screened for asylum and "reasonable possibility" if not. *See generally* 8 C.F.R. 208.33(b),

---

[9] *See, e.g.*, *Security Bars and Processing*, 85 Fed. Reg. 84,160, 84,175 (Dec. 23, 2020) (explaining that "[t]he rule does not, and could not, alter the standard for demonstrating a credible fear of persecution, which is set by statute"); *Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829, 33,837 (July 16, 2019) ("If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates that there is a significant possibility that he or she can establish eligibility for asylum), then the alien will have established a credible fear."); *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55,934, 55,943 (Nov. 9, 2018) ("If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates sufficient facts pertaining to asylum eligibility), then the alien will have established a credible fear.").

1208.33(b). Nothing in those processing provisions displaces the statutory "significant possibility" standard or the generally applicable credible fear regulation also requiring its application. The preamble discussion further confirms that:

> When it comes to the rebuttable presumption, the [asylum officer] will determine whether there is a significant possibility that the noncitizen would be able to show at a full hearing by a preponderance of the evidence that the presumption does not apply or that they meet an exception to or can rebut the presumption.

88 Fed. Reg. at 31,380; *see also id.* at 31,330 ("[T]he Departments note that the overall standard of proof for rebutting or establishing an exception to the presumption of asylum ineligibility during credible fear proceedings remains the 'significant possibility' standard.").

For these reasons, the Court should grant summary judgment in favor of Defendants on Count One and the portion of Count Thirteen that challenges the Rule's application to expedited removal. *See* Am. Compl. ¶¶ 138–144, 179, 181.

**D.    Arbitrary-and-Capricious Review of the Rule's Application in Expedited Removal Is Unavailable, but This Aspect of the Rule Is Likewise Reasonable and Reasonably Explained.**

As an initial matter, § 1252(e)(3) does not permit arbitrary-and-capricious review of the Rule's implementation in expedited removal. Section 1252(e)(3) authorizes only contrary-to-law challenges. *See* 8 U.S.C. § 1252(e)(3)(ii) (limiting review to "whether . . . any regulation issued to implement [section 1225(b)] is constitutional" and "whether such a regulation … is not consistent with applicable provisions of this subchapter or is otherwise in violation of law"). Thus, the Court must grant summary judgment to Defendants on the portions of Count Three that challenge this aspect of the Rule. *See* Am. Compl. ¶¶ 152–154.

But even assuming this aspect of Plaintiffs' claims are reviewable, the Rule's application in expedited removal is reasonable and reasonably explained and thus meets the "narrow" "scope of review under the 'arbitrary and capricious' standard." *State Farm*, 463 U.S. at 43; *see also*

*Prometheus Radio Project*, 592 U.S. at 423. The Rule is reasonably related to the urgent and compelling objectives set forth by the Department, most notably the aim of stemming the tide of illegal immigration that weakened the Departments' ability to effectively enforce and administer U.S. immigration and asylum law. *See generally* 88 Fed. Reg. at 31,314-19. The Departments reasoned that without this measure, increased irregular migration "risk[ed] overwhelming the Departments' ability to effectively process, detain, and remove, as appropriate, the migrants encountered" and would "put an enormous strain on already strained resources, risk overcrowding in already crowded [U.S. Border Patrol] stations and border [ports of entry] in ways that pose significant health and safety concerns, and create a situation in which large numbers of migrants— only a small population of whom are likely to be granted asylum—are subject to exploitation and risks to their lives by the networks that support their movements north." *Id.* at 31,316. The Rule's presumption thus encouraged aliens to use orderly pathways and to seek protection in other countries through which they travel. *See, e.g.*, *id.* at 31,329.

In line with that goal, the Departments also reasonably decided to apply that presumption during credible fear screenings, reasoning that aliens who receive a positive determination are able to remain in the United States for many years, which incentivizes aliens to make meritless asylum claims to be able to remain in the United States. *See* 88 Fed. Reg. at 11,716; 88 Fed. Reg. at 31,337. Thus, the Departments determined that it was necessary to implement the rebuttable presumption during credible fear screenings to disincentivize use of the asylum system in this manner, and so that those aliens subject to the presumption and who could not avoid or overcome its application or make the higher showing for withholding or CAT protection would be able to be removed expeditiously. 88 Fed. Reg. at 31,337-38; *see also id.* at 31,316-17 (following the model of the CHNV parole processes, which paired lawful pathways with the consequence of speedy return to Mexico for those who did not use them, reducing overall entries). Such application is consistent

with the INA and is supported by the facts that compelled the Departments to take action. Indeed, the Rule clearly did not go far enough to disincentivize illegal entry, as the Executive Branch has had to since further reduce asylum availability in order to curb the tide of illegal immigration at the Southwest Border. *See supra* at 12–14.

Plaintiffs' arguments that application of the Rule in expedited removal is arbitrary lack merit, as they take issue with the Departments' permissible policy choices but do not identify any actual defects in the Departments' decisionmaking. *See* Pls.' Mot. (ECF 109) at 32–35.

1. <u>The Rule Reasonably Applies Asylum Eligibility Conditions During Credible Fear Screenings.</u>

Plaintiffs first incorrectly assert the Departments failed to adequately explain why they departed from their decision in a different rule not to apply other statutory bars to asylum during credible fear screenings, citing *Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 87 Fed. Reg. 18,078 (Mar. 29, 2022) (the "Asylum Processing IFR"). Pls.' Mot. (ECF 109) at 32–33. To the contrary, the Departments acknowledged the change in policy and provided a reasonable explanation for it.

Historically, asylum officers and immigration judges did not consider bars to asylum during credible fear screenings. 88 Fed. Reg. at 11,744. That changed in 2018 when the Departments issued a rule that created a new bar to asylum eligibility and applied that bar during credible fear screenings. *See Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55,934, 55,939, 55,943 (Nov. 9, 2018). The Departments later decided to apply all statutory bars to asylum during credible fear screening in the rule called *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 80,274, 80,391, 80,393, 80,399 (Dec. 11, 2020)

("Global Asylum Rule"). The Global Asylum Rule was preliminarily enjoined before becoming effective by *Pangea Legal Servs. v. DHS*, 512 F. Supp. 3d 966, 977 (N.D. Cal. 2021) (finding that former DHS Secretary Chad Wolf likely did not have authority to sign the rule), and remains enjoined. Thereafter, in the 2022 Asylum Processing IFR, the Departments rescinded the Global Asylum Rule's provisions requiring the consideration of all statutory bars to asylum during credible fear interviews and returned to the pre-Global Asylum Rule practice. *See* 87 Fed. Reg. at 18,219; 8 C.F.R. § 208.30(e)(5)(i). Then, in the Circumvention of Lawful Pathways Rule at issue here, the Departments determined that to address the concerns giving rise to the Rule, applying the rebuttable presumption during credible fear interviews was warranted. *See* 88 Fed. Reg. at 11,742-45. In doing so, they acknowledged the change in policy and provided a reasonable explanation for it. *See id.* at 11,744-45. Plaintiffs' claims to the contrary are incorrect.

*First*, the Departments complied with the well-established procedure for changing policy. An agency is not required to justify a change in policy by reasons more substantial than those required to adopt the policy in the first instance. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-15 (2009). Rather, "an agency provide[s] reasoned explanation for its action" when it "display[s] awareness that it is changing position." *Id.* at 515. The Departments made it clear that they were departing from the Asylum Processing IFR's approach in several respects and provided significant explanation why it made sense to do so under the circumstances. *See* 88 Fed. Reg. at 11,742 ("The Departments acknowledge that this approach would differ from that articulated in the Asylum Processing IFR issued in March 2022, but as further discussed below assess that, to respond to the current and impending exigent circumstances, the interests balance differently and warrant a different approach from the one generally applied in credible fear screenings."); 88 Fed. Reg. at 11,744-45 (explaining decision to apply rebuttable presumption during credible fear screenings specifically).

In choosing to apply the Rule's presumption during credible fear screenings, the Departments addressed the reasons the Asylum Processing IFR gave for declining to do the same for then-existing statutory bars. The Asylum Processing IFR reasoned that, in the circumstances then facing the Departments, applying the bars during credible fear was inefficient, especially given the bars' complexity, and that in order to develop the record sufficiently to make decisions about those bars, the interview would go beyond its screening purpose. 87 Fed. Reg. at 18,093. In the Lawful Pathways NPRM, the Departments explicitly addressed these considerations, reasoning that, although the Departments at that time continued to believe that inquiring into other statutory bars was not a preferable use of the Departments' resources, the rationales behind the adoption of the presumption of asylum ineligibility warranted the presumption's application during credible fear interviews. *See* 88 Fed. Reg. at 11,744–45. The Departments recognized that applying the presumption during credible fear interviews would require greater resources than not doing so but

> believe[d] that under the circumstances, the interests in ensuring lawful, safe, and orderly processing and overall system inefficiencies—including screening out and removing those with non-meritorious claims more quickly—outweigh any costs resulting from increasing the length of some credible fear screening interviews, and expanding the operation of the credible fear screening program.

88 Fed. Reg. at 11,745. Such explanation is sufficient under *Fox Television*.

*Second*, the Departments addressed the fairness concerns the Departments previously identified in the Asylum Processing IFR. It is correct that, in the circumstances then present, in the Asylum Processing IFR the Departments reasoned that "considerations of procedural fairness counsel against applying mandatory bars that entail extensive fact-finding during the credible fear screening process." 87 Fed. Reg. at 18,094–95. But, in the Rule, the Departments addressed these prior findings when they determined that in comparison with the statutory bars at 8 U.S.C. § 1158(a)(2) and (b)(2), the Rule's presumption would be more straightforward to apply, *see* 88 Fed. Reg. at 31,380, and that in general the relevant facts would be available to the alien at the

time of the interview, *id.* The Departments acknowledged that the application of the presumption would not be simple in all cases and could extend the length of credible fear interviews but nevertheless determined that the interest in orderly processing outweighed the increased resource cost. 88 Fed. Reg. at 11,745. Furthermore, the Departments provided significant discussion regarding the due process concerns raised and the fairness of applying the Rule's rebuttable presumption during credible fear screenings. *See* 88 Fed. Reg. at 31,353-63 (responses to comments regarding due process and procedural fairness concerns). Accordingly, Plaintiffs' argument that the Departments did not adequately consider such concerns fails. That Plaintiffs disagree with the Departments' weighing of the costs and benefits does not render the Departments' reasoned change in policy with respect to this asylum eligibility condition "arbitrary and capricious."

2.    The Rule Did Not Rely on Impermissible Factors and Is Not Contrary to a Fundamental Purpose of the Expedited Removal Statute.

Second, Plaintiffs allege that the Rule relies on disagreement with Congress's choice to adopt a "low" credible fear screening standard. Pls.' Mot. (ECF 109) at 33. But that assertion misunderstands what the Rule does. The Rule does not displace the "significant possibility" standard or "alter Congress's choice" to use that standard, *see id.*; it simply exercises the discretion granted under the INA to impose a new regulatory limitation on asylum that is applied at the credible fear stage.

The statute does two things of import here: (1) it defines "credible fear of persecution" as a "significant possibility ... that the alien could establish *eligibility* for asylum," 8 U.S.C. § 1225(b)(1)(B)(v) (emphasis added); and (2) it explicitly allows the Secretary and Attorney General to "by regulation establish additional limitations and conditions ... under which an alien shall be *ineligible* for asylum," 8 U.S.C. § 1158(b)(2)(C) (emphasis added). Congress chose to

expressly authorize the Executive to promulgate conditions on eligibility, which the statute explicitly incorporates into the credible fear determination. In other words, Congress explicitly provided the Executive with the means to adopt conditions on eligibility by regulation, which can be applicable during credible fear screenings.[10]

    The statutory text thus makes clear the permissibility of considering the Rule's limitation during credible-fear screenings. That conclusion is reinforced by the expedited removal statute's legislative history, which reflects that Congress was concerned with the problem of many aliens arriving illegally and being permitted to remain in the United States for years while their asylum proceedings played out.[11] Congress's findings on the need for expedited removal are notably stark. As of 1995, "thousands of aliens arrive in the U.S. at airports each year without valid documents and attempt to illegally enter the U.S." H.R. Rep. No. 104-469(1) at 158. Expedited removal was thus viewed as one of several critical tools to deal with the "crisis at the land border, allowing hundreds of thousands of illegal aliens to cross each year, and contributing more than half of the 300,000 to 400,000 annual growth in the illegal alien population." *Id.* at 107. Congress was also

---

[10] The Rule is thus unlike the aspect of the credible fear trainings addressed in *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 46 (D.D.C. 2020). *See* Pls.' Mot. at 33. In the Rule, the Departments reasonably chose to expressly apply an eligibility requirement at the credible fear stage, and there is thus far more than a "reasonable fit" between the Rule and the goals of the credible fear provisions. *Kiakombua*, 498 F. Supp. 3d at 46.

[11] *E.g.*, H.R. Rep. No. 104-469, at 158 (according to the House Report, "[t]he credible-fear standard [wa]s designed to weed out nonmeritorious cases so that only applicants with a likelihood of success will proceed to the regular asylum process"); 142 Cong. Rec. 5240, 5282 (1996) ("stopping the 300,000 illegal immigrants that stream across our border each year in pickup trucks and under barbed wire fences is the most important Federal law and order issue in generations"); *id.* at 5288 ("there is no secret that the asylum process was totally abused and that hundreds of thousands of people, literally, in the last decade, have used the asylum process, some on their own, some at the urging of smugglers, some at the urging of lawyers, to abuse it. They did not deserve asylum. But because the system worked in such a rinky-dinky, jerry-built way, they asked for it."); *id.* at 5295 (providing key recommendations from the Congressional Task Force on Immigration Reform as "[p]rovid[ing] procedures for expedited exclusion of persons claiming asylum [and] [s]treamlin[ing] present exclusion procedures and decreas[ing] length of asylum process").

concerned with the "[t]housands of smuggled aliens [who] arrive in the United States each year with no valid entry documents and declare asylum immediately upon arrival" that, "[b]ecause of the lack of detention space and overcrowded immigration court dockets," "have been released into the general population" without "return[ing] for their hearings." *Id.* at 117. Likewise, "[d]ue to the huge backlog in asylum cases, and the inability of the INS to detain failed asylum applicants who are deportable from the United States, these aliens could reasonably expect that the filing of an asylum application would allow them to remain indefinitely in the United States," providing further incentive for illegal entry. *Id.* at 117-18. Congress also sought to deter aliens from making the dangerous journey to the United States. *Id.* The Rule and its application in the credible fear process is fully consistent with the purpose of the expedited removal provisions.

3.    The Rule Applies the "Significant Possibility" Standard.

Plaintiffs next repackage their statutory argument, asserting the Rule is arbitrary and capricious because the Departments either departed from the statutory "significant possibility" standard or failed to adequately explain how the regulatory text ensures that it will be applied. Pls.' Mot. (ECF 109) at 33–34. As discussed above, *supra* § II.C, it is clear from the text and context of the Rule that the "significant possibility" standard continues to apply, and there is no disparity between the regulatory text and the preamble's assurances in this regard.

Plaintiffs argue that language in the NPRM undercuts the Rule's statement that the "significant possibility" standard applies because it says: "[i]f a noncitizen is subject to the lawful pathways condition on eligibility for asylum and not excepted and cannot rebut the presumption of the condition's applicability, there would not be a significant possibility that the noncitizen could establish eligibility for asylum." Pls.' Mot (ECF 109) at 33–34 (quoting 88 Fed. Reg. at 11,742). This language does not evidence any intent or understanding that the "significant possibility" standard would not be applied to the presumption. Commenters raised this exact

concern, *see* 88 Fed. Reg. at 31,379-80, and in response the Departments clarified those statements in the NPRM by plainly stating that "[w]hen it comes to the rebuttable presumption, the [asylum officer] will determine whether there is a significant possibility that the noncitizen would be able to show at a full hearing by a preponderance of the evidence that the presumption does not apply or that they meet an exception to or can rebut the presumption." *Id.* at 31,380. To the extent Plaintiffs assert the Departments' response was insufficient because the regulatory text was not changed, Plaintiffs are incorrect. *See* Pls.' Mot. (ECF 109) at 34. The Departments explained in response to these comments that the "significant possibility" standard applies by statute and cannot be changed by regulation and noted that the language used in the regulatory text had been used in other recent rules applying limitations on eligibility during credible fear screenings. 88 Fed. Reg. at 31,380 & n.195. Plaintiffs' disagreement with the response does not mean that the Departments failed to respond nor that the decision the Departments made was arbitrary and capricious.

> 4.   The Rule Reasonably Applies the "Reasonable Possibility" Standard Where Aliens Do Not Establish Significant Possibility of Asylum Eligibility.

The Departments' choice to use the "reasonable possibility" standard to screen claims for protection from persecution or torture for those aliens as to whom the presumption of asylum ineligibility applies is also reasonable and adequately explained. *See, e.g.*, 88 Fed. Reg. at 31,336, 31,420. Plaintiffs' assertion that the Rule's adoption of the "reasonable possibility" standard for withholding and CAT protection is arbitrary and capricious is based on faulty assumptions and otherwise lacks merit. Pls.' Mot. (ECF 109) at 34–36.

*First*, Plaintiffs claim this aspect of the Rule must be vacated along with the asylum eligibility conditions because the Departments allegedly "failed to consider the cumulative effect" of various policies. *See id.* at 34. Yet Plaintiffs do not explain what precisely they claim Defendants failed to consider in regard to this provision of the Rule. In any event, as stated above, the

Departments did not fail to consider these other policies, which complement the aims of the Rule. *See supra* § II.B.5.

*Second*, Plaintiffs incorrectly suggest that in the Asylum Processing IFR the Departments found the "reasonable fear" standard insufficient to protect against refoulement. Pls.' Mot. (ECF 109) at 34. In the Asylum Processing IFR, the Departments did not state or suggest that the "reasonable possibility" standard is insufficient for complying with the United States' nonrefoulement obligations. Rather, the Departments merely stated that they did not find that the higher standard was more successful overall in screening out non-meritorious claims to protection. *See* 87 Fed. Reg. at 18,092.

*Third*, Plaintiffs' assertion that the Departments failed to acknowledge and consider the differences between reasonable fear screenings in the reinstatement context and credible fear screenings is also incorrect. *See* Pls.' Mot. (ECF 109) at 35–36. At the outset, Plaintiffs make unsupported generalizations about the population to whom reasonable fear proceedings apply. *See id.* at 35–36 (citing to an unsupported description in a public comment, at CLP_AR_PC_21430). Although it is correct that most aliens who receive reasonable fear screenings are subject to reinstated orders of removal, it is not the case that all such aliens have strong connections to the United States or extensive experience with the immigration system. *See id.* To be subject to reinstatement, an alien need only have a prior removal order and then reenter the United States unlawfully. *See* 8 U.S.C. § 1231(a)(5). The underlying removal order could be any type of removal order, including an expedited removal order. And that removal order could be reinstated immediately after re-apprehension. In other words, aliens subject to reinstated removal orders do not, as a rule, have an advantage in preparing for reasonable fear screenings, as Plaintiffs suggest.

Plaintiffs' assertion that the Departments failed to consider the availability of judicial

review in reinstatement cases also does not call into question the Departments' decision-making. *See* Pls.' Mot. (ECF 109) at 35. Notably, Plaintiffs do not identify a single comment that raised this issue, *see generally id.*, and Defendants have found none. The argument is thus unexhausted and should not be considered. *See, e.g.*, *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002) ("It is well established that issues not raised in comments before the agency are waived and [courts] will not consider them.").

Furthermore, when adopting the reasonable fear process, which applies to those with reinstated removal orders under 8 U.S.C. § 1231(a)(5) or removal orders under 8 U.S.C. § 1228(b), DOJ modeled it after the statutorily-created credible fear process and applied the higher "reasonable possibility" screening standard without considering whether or not judicial review would be available. Rather, DOJ concluded that the higher standard made sense given that the standard for withholding and CAT is higher than the standard for asylum. *See Regulations Concerning the Convention Against Torture*, 64 Fed. Reg. 8,474, 8,485 (Feb. 19, 1999). The absence of discussion in the Rule of Plaintiffs' newly asserted argument regarding judicial review does not render the Departments' reasoning arbitrary or capricious. *See* 5 U.S.C. § 706 (in reviewing agency actions "due account shall be taken of the rule of prejudicial error"); *Prohibition Juice Co. v. U.S. Food and Drug Admin.*, 45 F.4th 8, 18-19 (D.C. Cir. 2022) (the "burden of showing that an error is harmful normally falls upon the party attacking the agency's determination" when determining whether an agency has failed "to consider an important aspect of the problem").

*Finally*, there is no jurisdiction to review regulations adopted to implement CAT. *See* Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, § 2242(d), 112 Stat. at 2681-822 (providing that "no court shall have jurisdiction to review the regulations adopted to implement [CAT]").

\* \* \*

The Court should thus grant summary judgment in favor of Defendants on the portions of Count Three that are not already addressed in § II.B, above. *See* Am. Compl. ¶¶ 152–54.

## III.    The Remaining Procedures Are Lawful.

The two procedures implemented during expedited removal proceedings that Plaintiffs challenge here—the 24-hour consultation period guidance and the procedures for third-country expedited removals of non-Mexicans to Mexico, *see* Am. Compl. ¶¶ 109–118, 157–168[12]—are likewise well within the agencies' statutory authority. To the extent that Plaintiffs' challenges to these procedures are justiciable, *see supra* §§ I.B–I.D, they do not succeed on the merits. Further, any review by this Court of the procedures implementing expedited removal is limited to determining whether the challenged "written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General [or Secretary of Homeland Security] to implement [§ 1225(b)], is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." 8 U.S.C. § 1252(e)(3)(A)(ii). Section 1252(e)(3) does not contemplate arbitrary-and-capricious review of policy choices related to expedited removal such as those challenged here. Even assuming the Court could review the agency's policy choices under the arbitrary-and-capricious rubric, however, the agency's choices are reasonable and easily withstand the deferential standard of review.

---

[12] As noted, Plaintiffs have not renewed their challenge to Defendant's policies regarding voluntary withdrawal of applications for admission and return to Mexico. *See* Am. Compl. ¶¶ 119–26, 169–73; Pls.' Mot. (ECF 109) at 2 n.1. Further, although the Complaint initially challenged a practice of conducting credible fear interviews in CBP custody in conjunction with Plaintiffs' challenge to the 24-hour consultation period guidance, those portions of Count Five and Six have been held in abeyance. *See supra* at 16.

### A.    The 24-hour Consultation Guidance Is Consistent with Relevant Statutes and Regulations and Not Arbitrary and Capricious

In order to expeditiously process aliens who crossed the border without authorization, DHS issued guidance setting a 24-hour minimum wait period between an alien's acknowledgment of receipt of the Form M-444, which explains the credible fear process, and a credible fear interview. *See* USCIS_24-Hour_AR_1-3. This guidance is statutorily authorized and reasonably explained.

The minimum 24-hour waiting period from the alien's acknowledgment of the Form M-444, Information about Credible Fear Interview, is fully consistent with DHS's statutory and regulatory authority. The INA delegates to the Secretary or her designees broad authority to promulgate regulations relating to the administration and enforcement of the immigration laws, *see* 8 U.S.C. § 1103(a)(3), as well as "the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens," *see* 8 U.S.C. § 1103(a)(5). As part of that authority, Congress delegated to DHS the authority to promulgate regulations concerning consultation: Under the expedited removal statute, "[a]n alien who is eligible for" a credible-fear interview "may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, *according to regulations prescribed by the [Secretary]*. Such consultation ... shall not unreasonably delay the process." 8 U.S.C. § 1225(b)(1)(B)(iv) (emphasis added). The implementing regulations, in turn, provide that "[s]uch consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained, shall be at no expense to the government, and shall not unreasonably delay the process." 8 C.F.R. § 235.3(b)(4)(ii). Neither the statute nor the regulation, however, prescribes a specific minimum time period in which the consultation must occur, and the term "unreasonabl[e] delay" is left undefined. Further, the regulation specifically notes that any right to consultation depends on the "policies and procedures of the detention facility where the alien is detained." 8 C.F.R.

§ 235.3(b)(4)(ii).

USCIS's consultation period guidance reasonably implements the statute and regulations. The guidance explains that it is setting a 24-hour waiting period "to enable the United States to more expeditiously process and remove individuals who arrive at the Southwest border" with no "basis to remain in the United States." USCIS_24-Hour_AR_3. In implementing the change from the prior policy—which allowed 48 hours from the time of *arrival at the detention facility* (not from receipt of information about the credible fear interview) [13]—the guidance invokes the statutory requirement that the consultation must not "unreasonably delay" the expedited removal process. *See* USCIS_24-Hour_AR_1; 8 U.S.C. § 1225(b)(1)(B)(iv); 8 C.F.R. § 235.3(b)(4)(ii). The agency's conclusion is supported by a neighboring statutory provision, which requires immigration-judge review of the asylum officer's negative credible fear determination to "be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours[.]" 8 U.S.C. § 1225(b)(1)(B)(iii)(III).

Indeed, Plaintiffs do not take issue with any of this. Although Plaintiffs' argument heading asserts that the "24-Hour Guidance" is "Unlawful," *see* Pls.' Mot. (ECF 109) at 37, they do not point to any conflict between the guidance and the governing statute or regulation. They do not offer a contrary interpretation of "unreasonably delay" or argue that the statute or regulation imposes an outer limit on the consultation period that the 24-hour guidance does not meet. Instead, they focus solely on whether the agency's guidance is adequately explained. *See id.* at 37–39. Yet § 1252(e) does not contemplate this type of review of expedited removal procedures. *See* 8 U.S.C. § 1252(a)(2)(A)(iv) (barring review of procedures and policies adopted to implement

---

[13] It is thus not technically accurate to say that the guidance "reduce[s] the pre-CFI consultation period from 48 hours to 24 hours." Pls.' Mot. (ECF 109) at 37.

§ 1225(b)(1), except as permitted by subsection (e)); *id.* § 1252(e) (permitting limited review of written procedures for legal violations).

In any event, USCIS reasonably explained and supported its decision to adopt the 24-hour waiting period. Plaintiffs argue that USCIS "did not adequately consider the important fairness considerations that the consultation period is meant to protect." Pls.' Mot. (ECF 109) at 37. Yet the guidance explicitly seeks to balance the fairness considerations of consultation with the need to expeditiously resolve the cases of aliens with no lawful basis to enter or remain in the United States. USCIS_24-Hour_AR_3. The agency explained that DHS will give all aliens "a full and fair opportunity to have their claims for protection or fear of return heard by a fully trained USCIS officer," while minimizing the wait time before the credible fear interview in order to "expeditiously process and remove individuals who arrive at the Southwest border and do not have a legal basis to remain in the United States" and reduce the time such aliens spend in DHS custody. USCIS_24-Hour_AR_3. USCIS further took into account the fact that DHS was "installing hundreds of phone lines and privacy booths [in CBP facilities and other facilities] to conduct credible fear interviews . . . and increase access to counsel." USCIS_24-Hour_AR_72. Thus, contrary to Plaintiffs' assertions (at 38), and unlike the Court's finding in *Las Americas*—which vacated guidance imposing a much shorter consultation period—the administrative record shows that DHS did consider "the practical availability of consultations" within the 24-hour window, *see Las Americas*, 2025 WL 1403811, at *20. Moreover, the statute itself provides significant leeway for DHS to prescribe regulations and "to utilize its expertise to determine the scope of the right to consult that the statute prescribes." *Las Americas Immigr. Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 27 (2020).

Further, the 24-hour window is on its face a reasonable amount of time for consultation— no less so than the prior 48-hour window post-arrival at a detention facility. The APA's arbitrary-

and-capricious standard does not require holding Defendants to the high burden that Plaintiffs demand to justify a brief reduction of the minimum consultation period in what Congress expressly intended to be an expedited process. *Id.* at 39–40 (stating that the "manifest purpose of the expedited removal scheme" is to efficiently distinguish between aliens with meritorious claims and those without); *see* Pls.' Mot. (ECF 109) at 38–39. This is particularly so where the statute expressly qualifies its provision of a right to consultation with the caveat that the consultation may not "unreasonably delay the process." 8 U.S.C. § 1225(b)(1)(B)(iv). In other words, Congress's emphasis was on expeditious conduct and resolution of the credible fear interview—not on providing a substantial amount of time to prepare for that interview, particularly where the alien is provided with detailed information about the purpose of the interview. *See* USCIS_24-Hour_AR_65–68. USCIS's reasoning in adopting the consultation period guidance is in line with the balance Congress struck.

Similarly, Plaintiffs' insistence that the administrative record must include data showing that the prior 48-hour window in fact caused unreasonable delays is incorrect. DHS explained that the shortened period will more expeditiously resolve meritless claims while still serving to support a full and fair opportunity for meritorious claims to be heard and resolved. *Id.* Nothing in the APA or the expedited removal statute's consultation provision requires or warrants the detailed statistical analysis Plaintiffs appear to demand to justify any shortening of the consultation period. *See Prometheus Radio Project*, 592 U.S. at 423.

Plaintiffs' arbitrary and capricious arguments ultimately boil down to their disagreement with the rationale advanced by the Departments to support the guidance, and in particular the Departments' focus on avoiding delay and promoting expeditious processing of credible fear interviews. But this Court may not "second-guess[] the [Departments'] weighing of risks and benefits" and "substitute [its own] judgment for that of the agenc[ies]." *Dep't of Commerce*, 588

U.S. at 777 ("It is not for us to ask whether [Secretary's] decision was the best one possible or even whether it was better than the alternatives."). The Departments considered relevant evidence and provided a rationale for the changes that is rationally connected to the facts and is in line with the statute. Arbitrary-and-capricious review requires nothing more.

For these reasons, the Court should grant summary judgment in favor of Defendants on the portions of Counts Five, Six, and Thirteen that address the consultation period guidance. *See* Am. Compl. ¶¶ 157–162, 179.

### B.    The Third-Country Removal Procedures Are Consistent with the Statute and Not Arbitrary and Capricious

The third-country removal procedures at issue in this case mirror the statutory directives and are reasonable on their face.

In recognition of the limitations on removal of certain aliens, including CHNV nationals, *see* 88 Fed. Reg. at 31,444,[14] DHS issued a memorandum on designating third countries as the alien's country of removal in certain situations, *see* CBP_Removals_AR_321-25, and CBP prepared a worksheet to implement the memorandum, *see* CBP_Removals_AR_22-24. The guidance is consistent with the statute in all respects and thus well within DHS's statutory authority. The guidance tracks the statute's creation of a hierarchy of considerations that govern designation of a country of removal. First, the default country of removal is the country that the alien designates. *Compare* 8 U.S.C. § 1231(b)(2)(A) (establishing designated country as the primary option for removal), *with* CBP_Removals_AR_322 (the alien's designated country of removal is the first option). Second, the designated country may be disregarded by DHS in

---

[14] The Departments recognized in the Rule that "the United States faces constraints in removing [CHNV nationals] to their home countries. With limited exceptions, such nationals can only be removed to a third country as a result." 88 Fed. Reg. at 31,444.

circumstances where, for instance, that country is unwilling to accept the alien. *Compare* 8 U.S.C. § 1231(b)(2)(C)(iii) (statutory basis for disregarding the designation), *with* CBP_Removals_AR_322 (noting this basis for disregarding the alien's designation). Third, DHS should remove the alien to his or her country of citizenship or nationality, *unless* that country, too, is unwilling to accept the alien. *Compare* 8 U.S.C. § 1231(b)(2)(D) (providing these countries as a secondary option for removal and providing exceptions to designating one of these countries for removal purposes), *with* CBP_Removals_AR_322 (tracking the statutory directive, as well as the exception to designating the country of citizenship or nationality for removal). Fourth, DHS should consider alternative third countries of removal, consistent with those options included in the statute. *Compare* 8 U.S.C. § 1231(b)(2)(E)(i)-(vi) (listing additional countries to which an alien may be removed), *with* CBP_Removals_AR_322 (directing consideration of same). Finally, if removal to a statutory alternative country is "impracticable, inadvisable, or impossible," DHS may remove the alien to any country that will accept him or her. *Compare* 8 U.S.C. § 1231(b)(2)(E)(vii) (directing removal in this fashion), *with* CBP_Removals_AR_322 (noting removal to a third country if removal to a statutorily designated country is not possible).

CBP's worksheet also exactly tracks the statute. In undertaking the steps to designate a country of removal, CBP first asks the alien "to which country would you like to be removed," CBP_Removals_AR_22, and gives absolute effect to that designation *unless* that country is "on the current list of countries that do not accept or place limits on the acceptance of its citizens," *id.* (designating the alien's chosen country of removal unless the "unwilling to accept" exception applies); *see* 8 U.S.C. § 1231(b)(2)(A), (C)(iii). CBP then proceeds to the country of nationality or citizenship, and will designate that country as the country of removal *unless* that country, too, is on the "list of countries that do not accept its citizens." CBP_Removals_AR_23 (designating country of citizenship or nationality unless the "unwilling to accept" exception applies); *see* 8

U.S.C. § 1231(b)(2)(D). Finally, CBP addresses each of the alternative countries of removal contemplated by the statute, designating Mexico as the country of removal *only* where none of the statutory countries is a possibility for removal. CBP_Removals_AR_23; *see* 8 U.S.C. § 1231(b)(2)(E).

The memorandum and its implementation are consistent with the statute, tracking, as they do, the statutory framework precisely. The process undertaken by DHS gives priority to the country the alien designates for removal, just as the statute does, *see* CBP_Removals_AR_3-5, 22, 322; 8 U.S.C. § 1231(b)(2)(A), and proceeds to the consideration of alternative countries only in circumstances contemplated by the statute itself, *i.e.*, where removal to the designated country, country of nationality or citizenship, and any conceivable third country to which the alien has a connection is not possible, *see* CBP_Removals_AR_3-5, 22-23, 322.

Plaintiffs' arguments all misapprehend and misstate how the guidance operates. Plaintiffs principally argue that the guidance impermissibly applies the "impracticable, inadvisable, or impossible" standard, 8 U.S.C. § 1231(b)(2)(E)(vii), at the threshold to eliminate other possibilities for country of removal, including the country designated by the alien and the country of nationality or citizenship. *See* Pls.' Mot. (ECF 109) at 40–41. Plaintiffs cite nothing to support this contention, and in fact, the memorandum and its implementation belie the argument that the policy applies this standard in an unauthorized manner. The memorandum and designation-of-country worksheet utilized by CBP both exactly track the statutory framework, giving primacy to the country designated by the alien, *see* CBP_Removals_AR_22, CBP_Removals_AR_322; 8 U.S.C. § 1231(b)(2)(A), secondary consideration to the country of citizenship or nationality, *see* CBP_Removals_AR_22; CBP_Removals_AR_322; 8 U.S.C. § 1231(b)(2)(D), and tertiary consideration to possible alternative countries, *see* CBP_Removals_AR_23; CBP_Removals_AR_322; 8 U.S.C. § 1231(b)(2)(E), and then directing removal to Mexico only

once all other possibilities have been exhausted based on the unwillingness of those countries to accept the return of their citizens or nationals, *see* CBP_Removals_AR_23; CBP_Removals_AR_322; 8 U.S.C. § 1231(b)(2)(C), (D), (E)(vii). Far from being applied at the threshold as Plaintiffs erroneously suggest, Mot. 40–41, the "impracticable, inadvisable, or impossible" standard is applied as a last resort by DHS, exactly as contemplated by the statute. *See* CBP_Removals_AR_3-5; CBP_Removals_AR_321-22. Plaintiffs thus erect and attack a strawman; the policy DHS actually adopted and implemented has no resemblance to the construction given by Plaintiffs.

Plaintiffs also contend the guidance is arbitrary and capricious, but these arguments are either premised on the same misunderstandings that foreclose Plaintiffs' statutory argument or simply lack merit. Plaintiffs first argue that the guidance is arbitrary and capricious because DHS failed to explain how it is consistent with the statutory framework. *See* Pls.' Mot. (ECF 109) at 41. Yet as just shown, the memorandum, relevant CBP guidance, and designation-of-country worksheet are all consistent with the statutory framework, contemplating removal to a third country only if all other options have been exhausted in a manner consistent with the statutory directives. *See* CBP_Removals_AR_3-5, 22-23, 321-25; *see generally* 8 U.S.C. § 1231(b)(2).

Plaintiffs also argue that the procedures are arbitrary and capricious because they claim aliens have inadequate notice and time to present a persecution or torture claim for the actual country of removal. *See* Pls.' Mot. (ECF 109) at 41–43. Yet the guidance challenged here specifically instructs CBP to conduct the appropriate analysis for the country to which the alien may be removed, inform the alien of any deviation by CBP from the country designated by the alien, and ask whether the alien has a fear of persecution or torture in the country finally designated by CBP. *See* CBP_Removals_AR_4; 8 U.S.C. §§ 1225(b)(1)(A)(i), (ii); 8 C.F.R. § 235.3(b)(4); *see generally* 8 C.F.R. § 208.30. The designation-of-country worksheet additionally directs the

immigration officer, as a final step after designation of the country of removal, to "ask whether the individual has a fear of return to the country of designation," and to "[r]efer the [alien] who says yes to a fear of removal to the country designated to USCIS." CBP_Removals_AR_23-24. Any indication of fear by the alien during this process thus results in referral for a credible fear interview, during which, as provided for by statute and implementing regulations, the alien is questioned about his or her fear in the country of removal, whether that is the country the alien designated or, in appropriate circumstances, a third country. *See* 8 U.S.C. § 1225(b)(1)(A)(i) (directing expedited removal, unless the alien expresses a fear of persecution), (ii) (directing referral to an asylum officer when an alien expresses a fear of persecution); *see generally* 8 C.F.R. § 208.30 (procedures and standards governing credible fear interviews before the asylum officer). To the extent any Individual Plaintiffs allege that those procedures for providing notice were not faithfully applied to them, *see* Pls.' Mot. (ECF 109) at 42, such claims are outside the scope of their facial, programmatic challenge under § 1252(e)(3).

Plaintiffs finally argue that DHS failed to consider the possibility of so-called "chain refoulement," the subsequent return of an alien to their country of nationality from the country to which they are removed by the United States. *See* Pls.' Mot. (ECF 109) at 43. The INA expressly contemplates removal of aliens to third countries, *see* 8 U.S.C. § 1231(b)(1)-(2), provided that such removal may proceed consistent with the withholding of removal provisions in 8 U.S.C. § 1231(b)(3) (and the CAT regulations). The statute accordingly requires consideration of possible persecution only in the country of removal. *See* 8 U.S.C. § 1231(b)(3)(A) (prohibiting removal "to a country" if the alien's "life or freedom would be threatened *in that country*" because of a protected ground) (emphasis added). Had Congress intended to require consideration of potential indirect refoulement, it could have done so explicitly, as it did in the provision relating to removal to third countries under certain bilateral and multilateral agreements. *See* 8 U.S.C. § 1158(a)(2)(A)

(requiring the Secretary to determine whether the third country allows for access to a full and fair procedure for asylum or protection claims).

Plaintiffs rely on improper, non-binding, extra-record evidence in the form of an advisory opinion by the Office of the United Nations High Commissioner for Refugees (UNHCR) to claim that the possibility of "chain refoulement" "is an important consideration." Pls.' Mot. at 43. But this advisory opinion is irrelevant for two reasons. *First*, the portion of the opinion Plaintiffs cite interprets language in Article 33(1) of the 1951 Convention that prohibits refoulement "in any manner whatsoever."[15] Although the United States is a party to the 1967 Protocol, which adopted Article 33 of the 1951 Convention, the Protocol is not self-executing and aliens have no domestically enforceable rights thereunder. *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009). And although the INA's withholding provision generally "parallels" Article 33, *INS v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999), Congress nevertheless chose to implement Article 33 with the country-specific language at 8 U.S.C. § 1231(b)(3)(A)—"in that country"—rather than the language the UNHCR opinion construes—"in any manner whatsoever." *Second*, although the Supreme Court has found the 1979 UNHCR Handbook as helpful nonbinding "guidance in construing the provisions added to the INA by the Refugee Act" of 1980, *Aguirre-Aguirre*, 526 U.S. at 426-27, a 2007 advisory opinion by UNHCR construing different text cannot not provide such guidance.[16]

---

[15] UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol*, at ¶ 7. https://www.unhcr.org/us/media/advisory-opinion-extraterritorial-application-non-refoulement-obligations-under-1951-0 (last visited Oct. 19. 2023).

[16] Even assuming there were an implicit obligation to consider the potential for indirect refoulement, Mexico is a party to both the 1951 Refugee Convention and the 1967 Refugee Protocol and is thus bound by the same nonrefoulement provisions of those instruments as the United States. UNHCR, *States Parties to the 1951 Convention relating to the Status of Refugees*

For these reasons, the Court should grant summary judgment in favor of Defendants on Counts Seven and Eight, and on the portion of Count Thirteen that addresses the third-country removal procedures. *See* Am. Compl. ¶¶ 157–162, 180.

## IV.    The Court Should Grant Summary Judgment to Defendants on Counts Nine and Ten.

Plaintiffs have not moved for summary judgment on their APA claims in Counts Nine and Ten, which are not held in abeyance. Moreover, the guidance challenged in those claims is no longer in effect. *See* Exhibit B (Decl. of Graham Dudley); Exhibit C (Decl. of Michael Julien); Exhibit D (Decl. of Nicole Romano-Ferreira). Accordingly, the Court should dismiss these Counts. *See Samma v. Dep't of Def.*, 136 F.4th 1108, 1114 (D.C. Cir. 2025) (finding case moot where agency rescinded challenged policy). Alternatively, Plaintiffs have stated that they are willing to voluntarily dismiss this claim without prejudice. *See* Pls.' Mot. (ECF 109) at 2 n.1.

## IV.    Any Relief Must Be Sharply Limited

At the outset, the Court cannot issue relief that is broader than necessary to remedy actual harm shown by specific Plaintiffs. *Gill*, 585 U.S. at 73. "[S]tanding is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.5 (1996), and Plaintiffs bear the burden to "demonstrate standing separately for each form of relief sought," *Cuno*, 547 U.S. at 352. A valid Article III remedy thus "operate[s] with respect to *specific parties*," not with respect to a law "in the abstract." *California v. Texas*, 593 U.S. 659, 672 (2021). As demonstrated earlier, no relief may issue with respect to the organizational Plaintiffs, or with respect to the third-country removal procedures. *Supra* §§ I.A–C. And the Court cannot invalidate the Rule's application outside of expedited removal proceedings due to various jurisdictional impediments and bars. *See supra* §§ I.A, I.F; *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 81–82 (D.C. Cir. 2020) (explaining

*and the 1967 Protocol*, https://www.unhcr.org/us/media/states-parties-1951-convention-and-its-1967-protocol (last visited Sept. 11, 2025).

that "a court may invalidate only some applications" of a regulation"). In addition, only those Individual Plaintiffs who have had or will have the Rule or specific procedures applied to them are possibly entitled to any relief concerning their application. *Supra* § I.C.

Even if any relief were warranted, it must be strictly limited. *First*, the Court lacks jurisdiction to enjoin or vacate the Rule or challenged procedures under 8 U.S.C. § 1252(f)(1). That provision strips any court other than the Supreme Court of "jurisdiction or authority to enjoin or restrain the operation of" specified provisions of the INA, "other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). As the Supreme Court has explained, § 1252(f)(1)'s reference to "the operation of the relevant statutes"—which include §§ 1225(b) and 1231, the provisions governing expedited removal and removal to third countries—"is best understood to refer to the Government's efforts to enforce or implement" those statutes. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) (quotation omitted). Thus, § 1252(f)(1) generally prohibits courts other than the Supreme Court from "order[ing] federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id*. That is exactly what Plaintiffs ask this Court to do in vacating the Rule and procedures. Plaintiffs' proposed relief against the Rule directs government officials implementing §§ 1225(b) and 1229a to apply a different substantive rule of decision when asylum claims are raised in the proceedings governed by those provisions. This would contravene § 1252(f)(1) because it "order[s]" federal officials "to refrain from" applying the Rule's standards in "implement[ing]" and "otherwise carry[ing] out" the specified statutory provisions. *Id.* And vacatur of the expedited removal procedures would likewise compel the government "to refrain from" implementing § 1225(b)(1) and § 1231(b)(2) in the manner the government deemed appropriate in those procedures.

It does not matter that Plaintiffs seek vacatur rather than an injunction. Like an injunction,

vacatur "restrict[s] or stop[s] official action," *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015), by prohibiting officials from relying on the agency action under review. A vacatur is practically equivalent to an injunction compelling the Departments to rescind or stop implementing the Rule and challenged policies and therefore possesses the hallmark of the relief barred by § 1252(f)(1). Consistent with that functional approach, the Supreme Court has repeatedly given a broad interpretation to terms such as "injunction" in other statutes. For example, the Court interpreted a statute conferring jurisdiction over appeals from "injunction[s]" in certain civil actions to apply to orders with a "coercive" effect. *Aberdeen & Rockfish R.R. v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 422 U.S. 289, 307 (1975). The Court commented that it had "repeatedly exercised jurisdiction under [the provision] over appeals from orders" that were "not cast in injunctive language but which by their terms simply 'set aside' or declined to 'set aside' orders of the [agency]." *Id.* at 308 n.11 (quotation omitted). Here, too, vacating the Rule or procedures qualifies as an injunction barred by § 1252(f)(1).

In any event, § 1252(f)(1) is not limited to injunctions. Instead, it prohibits lower-court orders that "enjoin *or restrain*" the Executive Branch's operation of the covered provisions. 8 U.S.C. § 1252(f)(1) (emphasis added). The common denominator of those terms is that they involve coercion. *See* Black's Law Dictionary 529 (6th ed. 1990) ("[e]njoin" means to "require," "command," or "positively direct" (emphasis omitted)); id. at 1314 ("[r]estrain" means to "limit" or "put compulsion upon" (emphasis omitted)). Together, they indicate that a court may not impose coercive relief that "interfere[s] with the Government's efforts to operate" the covered provisions in a particular way. *Aleman Gonzalez*, 596 U.S. at 551. That meaning easily encompasses judicial vacatur. Indeed, it is precisely what Congress intended in codifying § 1252(f) and limiting such remedial authority to the Supreme Court. *See* H.R. Rep. No. 104-469, pt 1, at 161 (Conference Report) ("These limitations do not preclude challenges to the new procedures, but the procedures

will remain in force while such lawsuits are pending.").

*Second*, the INA bars requests for relief seeking vacatur of "any negative credible determinations." ECF 109. Section 1252(a)(2)(A)(iii) provides that "no court shall have jurisdiction to review" "the determination made under section 1225(b)(1)(B) of this title," including credible fear determinations. Unlike the other provisions of § 1252(a)(2)(A), romanette (iii) does not include an exception for review under § 1252(e), and so the Court lacks any authority to set aside individual credible fear determinations through § 1252(e). *Make The Rd.*, 962 F.3d at 626 (romanette (iii) does not "expressly reserve jurisdiction 'as provided in subsection (e)'").

*Third*, universal vacatur of the Rule and expedited removal procedures is contrary to constitutional and equitable principles and limitations in the INA that allow at most an award of party-specific relief. Although D.C. Circuit precedent identifies vacatur as an available remedy for a successful APA challenge to a regulation, *see, e.g.*, *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998), the APA itself does not reference vacatur, instead limiting plaintiffs to traditional equitable remedies like injunctions, 5 U.S.C. § 703. There is no indication that Congress intended to create a new and radically different remedy in providing that courts reviewing agency action should "set aside" agency "action, findings, and conclusions." *Id.* § 706(2); *see also Texas*, 599 U.S. at 693–702 (Gorsuch, J., concurring in the judgment) (detailing "serious" arguments that "warrant careful consideration" as to whether the APA "empowers courts to vacate agency action").

In any event, the D.C. Circuit has treated universal vacatur of agency action as a discretionary equitable remedy—not a remedy that is automatic or compelled. *See, e.g.*, *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993) (allowing remand without vacatur and noting that an "inadequately supported rule, however, need not necessarily be vacated"). The APA itself is explicit that its provisions do not affect "the power or duty of the

court" to "deny relief on" any "equitable ground," 5 U.S.C. § 702(1), and equitable relief does not "automatically follow[] a determination" that a defendant acted illegally, *see eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392-93 (2006).

The problems caused by universal remedies are well catalogued. Such remedies conflict with Article III's requirement that "[a] plaintiff's remedy must be tailored to redress the *plaintiff's* particular injury," *Gill*, 585 U.S. at 43 (emphasis added), and the rule in equity that relief be no more burdensome to the defendant than necessary to provide "complete relief to the *plaintiffs before the court*," *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2557 (2025) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). The concerns apply equally to universal vacatur as to universal injunctions. *Texas*, 599 U.S. at 702–03 (Gorsuch, J., concurring). Universal vacatur of a rule, if authorized at all, thus should be reserved for "truly extraordinary circumstances," *id.* at 702, which do not exist here. And these concerns are magnified in the expedited removal context, where Congress clearly circumscribed broad judicial remedies under § 1252(e). 8 U.S.C. § 1252(e)(1)(A) (providing that "no court may ... enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title *except as specifically authorized in a subsequent paragraph of this subsection*"); *id.* § 1252(e)(1)(B) (precluding class certification). Thus, as an equitable remedy, vacatur (if available) should at minimum be governed by the complete-relief principles set forth in *CASA*—and be limited to address the specific harms of the specific Plaintiffs before the Court.

*Fourth*, even if universal vacatur were an available remedy, the circumstances of this case would warrant remand without vacatur. As explained, the decision to order relief under the APA must be exercised in conformity with equitable principles. *See Allied-Signal*, 988 F.2d at 150; *see also Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005) (vacatur a question of the court's remedial "discretion"). That equitable

balance is assessed by looking to "the seriousness of the order's deficiency ... and the disruptive consequences of an interim change that may itself be changed." *Allied–Signal*, 988 F.2d at 150–51. Applying this balance here, if the Court were to find the Rule or procedures invalid, it should remand without vacatur. The asserted defects that Plaintiffs identify with respect to the Rule and the procedures could be remedied through additional explanation. *See, e.g.*, *id.* at 151 (remand without vacatur appropriate where agency can "explain" on remand issues found arbitrary and capricious). And even if this Court believes that the Rule or procedures are contrary to law, remand is appropriate. *See, e.g.*, *Air Transp. Ass'n of Am., Inc. v. U.S. DOA*, 317 F. Supp. 3d 385, 391 (D.D.C. 2018) (remand without vacatur appropriate where "conceivable that on remand it can develop a reasoned explanation of its statutory authority").

Additionally, vacatur of the Rule would have disruptive consequences in ongoing removal proceedings by changing the framework for deciding asylum claims and, potentially, requiring remand of cases that had already been decided by the immigration court. Vacatur of the expedited removal procedures—and in particular the consultation guidance—would likewise deprive the government of a tool for ensuring efficiency in the conduct of credible fear interviews. By contrast, the Individual Plaintiffs themselves will not suffer substantial harm from continued enforcement of the Rule and procedures as to others, and their own injuries, if any, can be cured by relief specific to them if otherwise permitted by the INA. Thus, vacatur is unwarranted.

## CONCLUSION

For these reasons, the Court should grant the government summary judgment.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

BRIAN C. WARD
Acting Assistant Director

By: */s/ Katherine J. Shinners*
KATHERINE J. SHINNERS
Senior Litigation Counsel
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Email: katherine.j.shinners@usdoj.gov

Dated: September 11, 2025                    *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 11, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court District Court for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: <u>*/s/ Katherine J. Shinners*</u>
KATHERINE J. SHINNERS
Senior Litigation Counsel
United States Department of Justice
Civil Division