**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| M.A., *et al.*, | ) |
| *Plaintiffs*, | ) ) |
| v. | ) No. 1:23-cv-1843-TSC ) |
| KRISTI NOEM, Secretary of Homeland Security, in her official capacity, *et al.*, | ) ) ) |
| *Defendants*. | ) ) ) ) |

**PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' RENEWED CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 1

I.    Defendants' Threshold Arguments Lack Merit. ........................................................ 1

    A.    At Least One Individual Plaintiff Has Standing to Raise Each Claim. ................. 1

    B.    The Organizational Plaintiffs Have Standing. ....................................................... 2

    C.    The Organizational Plaintiffs Satisfy the Zone-of-Interests Test. ........................ 6

    D.    Section 1252(e)(3) Permits the Organizational Plaintiffs' Claims. ...................... 7

    E.    Sections 1252(a)(5) and (b)(9) Do Not Prevent Review. ...................................... 8

    F.    The APA Does Not Bar Review of the Collateral Policies. ................................ 10

    G.    Plaintiffs' Challenge to the Third Country Removal Policy Is Reviewable. ....... 11

II.    The Rule's Asylum Eligibility Bar Is Unlawful. .................................................... 14

    A.    The Eligibility Bar Is Contrary to Law. ............................................................. 14

        1.    The Bar's Three Asylum Eligibility Conditions Are Contrary to Statute. .......................................................................................... 14

        2.    In Practice, the Eligibility Bar Collapses into an Entry-Based Bar. ......... 20

    B.    The Eligibility Bar Is Arbitrary and Capricious. ................................................ 21

        1.    The Rule's Justification Depends on Factors Congress Has Rejected. ........................................................................................... 22

        2.    The Record Belies the Rule's Main Justification for the Bar. .................. 23

        3.    The Record Does Not Support the Rule's Assumption That People Who Do Not Use Its "Pathways" Have Weaker Asylum Claims. ............. 28

        4.    Defendants Arbitrarily Refused to Consider the Interacting Effects of Contemporaneous Policies. .................................................... 29

III.    The Rule's Application in Expedited Removal Is Unlawful. ............................................. 30

    A.    The Rule Violates Section 1225(b). .................................................................. 30

    B.    The Bar's Application in Expedited Removal Is Arbitrary and Capricious. ........ 31

    C.    The Rule's Heightened Screening Standard Is Arbitrary and Capricious. ........... 33

IV.    The Collateral Policies Are Illegal. ....................................................................... 35

    A.    The 24-Hour Guidance Is Unlawful. ................................................................. 35

    B.    The Third Country Removal Policy Is Unlawful. ............................................... 37

        1.    The Policy Violates the INA. ................................................................. 37

        2.    The Policy Does Not Provide Adequate Notice. ..................................... 38

        3.    Defendants Failed to Consider The Risk of Chain Refoulement. ............. 39

V.    Plaintiffs Are Entitled to Vacatur and Other Relief. ............................................... 41

    A.    Vacatur of the Policies is Available. .................................................................. 41

    B.    Remand Without Vacatur is Unwarranted. ........................................................ 43

    C.    The Court Can Vacate Plaintiffs' Negative Credible Fear Determinations. .......... 45

CONCLUSION .................................................................................................................. 45

## INTRODUCTION

Defendants advance a litany of threshold and remedy arguments, many of which are foreclosed by precedent, and all of which fail. On the merits, Defendants offer little response beyond attempting to rewrite their own policies or back-fill explanations the agencies never gave. That is not good enough. The Rule's asylum bar reimposes restrictions repeatedly held unlawful by courts in this District and elsewhere. And in practice, because most of the Rule's supposed "pathways" are so narrow that they are virtually non-existent; the only real option to maintain asylum eligibility was to enter at a port. That limit is in clear violation of 8 U.S.C. § 1158(a)(1). The 24-hour Guidance and Third Country Removal Policy suffer from equally incurable defects. All three policies should be vacated.

## ARGUMENT

## I.    Defendants' Threshold Arguments Lack Merit.

Defendants spill a great deal of ink challenging Plaintiffs' right to bring their claims. *See* Defs.' Renewed Cross-MSJ & Opp., ECF 110 ("Opp") at 17-38. Those arguments lack merit.

### A.    At Least One Individual Plaintiff Has Standing to Raise Each Claim.

There is no dispute that at least one Individual Plaintiff has standing to raise each claim and to seek relief against each policy at issue—the Rule, the 24-Hour Guidance, and the Third Country Removal Policy. Defendants do not dispute that the Individual Plaintiffs, aside from J.P. and E.B., have standing to challenge the Rule. *See* Opp. 33-34.[1] Defendants also do not dispute

---

[1] Defendants claim that J.P. and E.B. lack standing to challenge the Rule, Opp. 33, but that is incorrect as to E.B. E.B. has a pending application for asylum, and because of the date and manner of his entry, his application for asylum will be subject to the Rule absent a favorable decision from this Court. *See* Suppl. Decl. of E.B. ¶ 4 (filed concurrently). As to J.P., Plaintiffs concede that he is pursuing asylum after reentering the United States with a CBP One appointment and is therefore unlikely to have the Rule applied in his asylum case. Thus, while he had standing to challenge the Rule and related policies, he no longer seeks redress of an ongoing injury through this case.

that Plaintiffs B.H., M.P., and R.E. have standing to challenge the 24-hour Guidance or that Plaintiffs D.M., R.E., and S.U. have standing to challenge the Third Country Removal Policy. Opp. 34. Moreover, the Rule and other policies caused Individual Plaintiffs concrete harm. *See* Pls.' Renewed MSJ, ECF 109 ("Mot.") at 28-29, 42, 45; ECF 4-2 to 4-12 (Individual Plaintiff declarations). "To establish jurisdiction, the court need only find one plaintiff who has standing." *Mendoza v. Perez,* 754 F.3d 1002, 1010 (D.C. Cir. 2014); *see L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 15-16 (D.D.C. 2020). Accordingly, the Court has "no need to consider" Defendants' other standing arguments. *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012).

**B.    The Organizational Plaintiffs Have Standing.**

Organizational Plaintiffs also have standing. The Rule and policies have "directly affected and interfered with" Organizational Plaintiffs' "core business activities" by "perceptibly impair[ing] [their] ability to provide counseling" and other services to noncitizens at risk of removal. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) ("*Alliance*") (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *accord PETA v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015). Indeed, courts in this District recently held that both RAICES and Las Americas have standing to challenge agency actions limiting access to asylum. *See Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, -- F. Supp. 3d --, 2025 WL 1825431, at *23-24 (D.D.C. July 2, 2025) ("*RAICES*"), *stayed in part pending appeal on other grounds*, D.C. Cir. No. 25-5243 (Aug. 1, 2025); *Las Americas Immigrant Advoc. Ctr. v. DHS*, 783 F. Supp. 3d 200, 216-17 (D.D.C. 2025) ("*Las Americas*"), *appeal pending,* D.C. Cir. No. 25-5313. The same is true here.

Defendants rely on *Alliance*, Opp. 19-24, but that decision held only that "issue-advocacy" organizations "cannot manufacture" standing "by expending money to gather information and advocate against the defendant's action." 602 U.S. at 394-95. *Alliance* also reaffirmed that service-

based organizations have standing to challenge actions that "directly affect[] and interfere[] with [their] core business activities." *Id.* at 395 (citing *Havens*, 455 U.S. at 368, 379). Thus, as the two recent decisions from this District recognized, the very Organizational Plaintiffs in this case continue to have standing post-*Alliance* to challenge asylum policies.

Organizational Plaintiffs are not merely—or even primarily—issue-advocacy organizations, and they have not manufactured their injuries. Instead, they are legal service providers whose ability to provide services is directly impaired by the Rule and collateral policies. Their core business activities include providing counseling, representation, and other legal services to noncitizens seeking asylum and related relief. *See* ECF 37-3 ¶¶ 3, 6-9 and ECF 109-1 ¶¶ 4, 7-14 (RAICES); ECF 37-4 ¶¶ 3, 6-8 and ECF 109-2 ¶¶ 3, 5-6, 8-9 (Las Americas). It is also undisputed that the Rule and related policies seriously impede this work and that the total number of clients RAICES and Las Americas can represent has been reduced as a result. *See* ECF 109-1 ¶¶ 15-16, 18-20, 26; ECF 109-2 ¶¶ 10-14, 17-18, 20, 22. For example, because the Rule makes large numbers of people ineligible for asylum based on factors unrelated to their need for protection, Organizational Plaintiffs must focus on seeking withholding of removal and protection under the Convention Against Torture ("CAT")—claims that are subject to a higher evidentiary standard, more time-intensive, and harder to win. *See* ECF 109-1 ¶¶ 21-22; ECF 37-4 ¶¶ 27-32. And because these claims do not allow for derivative family members to be included in the principal applicant's case, Organizational Plaintiffs must prepare separate applications for each family member, further reducing their capacity. *See* ECF 109-1 ¶¶ 21-22; ECF 37-4 ¶ 43.

Because of the 24-Hour Guidance, meanwhile, RAICES and Las Americas are unable to reach most people in expedited removal, who lack time to try to contact them before credible fear interviews. *See* ECF 109-1 ¶ 25; ECF 109-2 ¶ 24. And when they can make contact, the Third

Country Removal Policy adds substantial complexity to conversations that were already time-pressed: Introducing the prospect of removal to a third country effectively doubles the amount of screening and preparation required. *See* ECF 109-1 ¶ 27; ECF 37-4 ¶ 25. Defendants' failure to ensure timely notice that interviews will concern third countries further impedes Organizational Plaintiffs' ability to provide meaningful counsel. *See* ECF 109-2 ¶ 26.

Defendants' other challenges to Organizational Plaintiffs' standing also fail. *First*, Defendants mistakenly rely on *Linda R.S. v. Richard D.*, 410 U.S. 614 (1973), *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883 (1984), and *United States v. Texas*, 599 U.S. 670 (2023). *See* Opp. 18-19. Unlike this case, those cases concerned suits seeking to compel the government to carry out "more arrests" or "more prosecutions" of third parties. *See Texas*, 599 U.S. at 677 (citing *Linda R.S.* and *Sure-Tan*); *see also RAICES*, 2025 WL 1825431, at *29. The Supreme Court called these situations "highly unusual" and emphasized that these opinions do not affect courts' ability to decide "cases involving statutory requirements or prohibitions on the Executive." *Texas*, 599 U.S. at 684.

*Second*, Defendants argue that Organizational Plaintiffs fail to show interference with their core activities. Opp. 20-21 (citing *Alliance*, 602 U.S. at 394-95). As demonstrated above, however, Organizational Plaintiffs have shown exactly that. And *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015) (cited at Opp. 21), likewise made clear that harm to an organization's "daily operations" suffices for standing. *Id.* at 919. For the same reason, Defendants' suggestion that Organizational Plaintiffs are attempting to "spend [their] way into standing" falls flat. *See* Opp. 22. As Defendants admit, "*impairment* of [an] organization's *services*," is sufficient under *Alliance*. *Id.* And that is precisely what Organizational Plaintiffs have shown: They are "engaged in direct services to individuals that [are] made more difficult by the challenged action[s]." *Ctr. for Responsible Science v. Gottlieb*, 346 F. Supp. 3d 29, 42 (D.D.C. 2018) (cited at Opp. 23).

*Third*, Defendants are wrong that Organizational Plaintiffs seek to vindicate their clients' rights. Opp. 21-22. Organizational Plaintiffs are not asserting third-party standing; they instead seek to redress their *own* harms. *Kowalski v. Tesmer*, 543 U.S. 125 (2004) (cited at Opp. 22), which *did* concern third-party standing, is thus irrelevant and does not preclude standing for organizations based on their own injuries.

*Fourth*, Defendants claim that the Rule's impact on Las Americas' funding is insufficiently imminent. *See* Opp. 23-24. Because both Organizational Plaintiffs have standing under *Havens* and *Alliance*, Las Americas need not separately show standing based on this financial injury. In any event, Defendants are also incorrect: Las Americas' budget has *already* fallen approximately 14% due in part to the Rule, ECF 109-2 ¶ 27, and the Rule and other policies will perpetuate that trend, *id.* ¶¶ 10-14, 17-18, 20, 22, 28-29. No more is needed. *See, e.g., RAICES*, 2025 WL 1825431, at *23; *Nw. Immigrant Rts. Project v. USCIS*, 496 F. Supp. 3d 31, 47-48 (D.D.C. 2020).

*Finally*, Defendants argue that Organizational Plaintiffs' claims regarding the Rule's application in expedited removal are moot because the Rule no longer applies in that context. Opp. 25. But the Rule continues to apply to anyone placed in expedited removal proceedings who arrived between May 11, 2023, and May 11, 2025. And as Defendants well know, they are aggressively seeking to apply expedited removal to noncitizens who entered during that period. *See Make the Road N.Y. ("MRNY") v. Noem*, No. 25-cv-190-JMC, 2025 WL 2494908, at *1, *5-6 (D.D.C. Aug. 29, 2025) (describing nationwide expansion of expedited removal), *appeal pending*, D.C. Cir. No. 25-5320; Complaint ¶¶ 1-8, 16-27, 39-67, 86-101, *Immigrant Advocs. Response Collaborative v. DOJ*, No. 1:25-cv-2279-TNM (D.D.C. July 16, 2025), Dkt. No. 1 (describing other government policies to place people who entered during the relevant period in expedited removal proceedings). Organizational Plaintiffs serve noncitizens currently in the

affirmative asylum process and in full immigration court proceedings who entered between the relevant dates and thus continue to be subject to the Rule. Because of these recent changes to expedited removal, those clients are at risk of being placed in expedited removal and having the Rule applied to them. *See* ECF 109-1 ¶¶ 16, 18-19, 24; ECF 109-2 ¶¶ 7, 11-12. Organizational Plaintiffs' challenges to the Rule's expedited removal provisions are thus not moot so long as the Rule is applied to those seeking asylum.[2]

### C.    The Organizational Plaintiffs Satisfy the Zone-of-Interests Test.

Likewise meritless is Defendants' contention that Organizational Plaintiffs are outside the INA's zone of interests. Opp. 28-30. The "lenient" zone-of-interests test is met unless a plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be reasonably assumed that Congress authorized that plaintiff to sue." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (cleaned up). Justice O'Connor's non-precedential, in-chambers opinion in *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1302 (1993) (cited at Opp. 28-29), expressed the view "of only a single Justice" about "a statute other than the INA," and the Supreme Court has since "consistently adopted a broader view" of the zone of interests. *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 43-44 (D.D.C. 2020) ("*CAIR Coal.*").

Organizational Plaintiffs, who provide free and low-cost legal services to noncitizens, easily satisfy this lenient test. Courts in this Circuit and elsewhere have thus routinely held that immigration legal services organizations meet the zone-of-interests test. The INA's zone of interests encompasses the goal of "ensuring that individuals with valid asylum claims are not

---

[2] Defendants also dispute Plaintiffs' assertion that the Rule violates the statutory significant possibility standard in credible fear interviews such that any resultant injuries to Organizational Plaintiffs are "self-inflicted." Opp. 24. Defendants are incorrect. *See* Mot. 30-32; *infra* at 29-31.

returned to countries where they could face persecution." *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020); *see also O.A. v. Trump*, 404 F. Supp. 3d 109, 144 (D.D.C. 2019) (noting Congress's intent to establish a "statutory procedure for granting asylum to refugees" (internal quotation marks omitted)). Organizational Plaintiffs' work advances these goals, and their "interest in providing legal assistance to as many asylum seekers as they can is consistent with the INA's purpose." *O.A.*, 404 F. Supp. 3d at 144; *see* ECF 109-1 ¶¶ 4, 8-14; ECF 109-2 ¶¶ 3-9; *E. Bay Sanctuary Covenant ("EBSC") v. Trump*, 932 F.3d 742, 768 (9th Cir. 2018); *CAIR Coal.*, 471 F. Supp. 3d at 43. The many INA provisions concerning the right to counsel—*e.g.*, 8 U.S.C. §§ 1158(d)(4), 1229(a)(1)(E), (b)(2), 1362—underscore that Organizational Plaintiffs' interests "further[] the purposes of the INA." *O.A.*, 404 F. Supp. 3d at 144; *see EBSC v. Trump*, 932 F.3d at 769; *RAICES*, 2025 WL 1825431, at *28-29; *CAIR Coal.*, 471 F. Supp. 3d at 43.

**D.    Section 1252(e)(3) Permits the Organizational Plaintiffs' Claims.**

Contrary to Defendants' assertions, Opp. 25-28, 8 U.S.C. § 1252(e)(3) does not bar Organizational Plaintiffs' claims. Section 1252(e)(3) provides jurisdiction over "[c]hallenges on [the] validity of the [expedited removal] system." 8 U.S.C. § 1252(e)(3). The D.C. Circuit has emphasized that the "broad[]" "sweep[]" of the provision is particularly notable coming, as it does, "[i]n the midst of a statutory section that largely limits and channels judicial relief." *MRNY v. Wolf*, 962 F. 3d 612, 625, 628 n.10 (D.C. Cir. 2020).

Nothing in § 1252(e)(3) purports to narrow that jurisdictional grant by barring organizational standing. While Congress barred class claims in this context, *see* 8 U.S.C. § 1252(e)(1)(B), it did not foreclose claims by organizations. "If Congress wanted the jurisdictional bar to encompass" not just class actions but also organizational claims, it "could easily have said so." *See Kucana v. Holder*, 558 U.S. 233, 248 (2010) (addressing another section

of § 1252). The absence of any reference to individuals in § 1252(e)(3), contrasted with repeated references to "individual [noncitizens]" elsewhere in § 1252, further indicates that Congress did not bar organizational claims. *See id*. at 249. It is therefore no surprise that two courts in this District recently rejected Defendants' argument. *Las Americas*, 783 F. Supp. 3d at 218; *RAICES*, 2025 WL 1825431, at *26 n.8.

Defendants also rely on *American Immigration Lawyers Association v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000) ("*AILA*"). Opp. 27. But *AILA* "rejected *third-party* organizational standing." *MRNY v. Wolf*, 962 F.3d at 627 (emphasis added). It did not hold that § 1252(e)(3) bars organizations from bringing suits on their own behalf, since it had no occasion to consider that claim. *See RAICES*, 2025 WL 1825431, at *26 n.8 (rejecting argument that *AILA* barred organizational standing). And, again, "nothing in the text of § 1252(e)(3) limits review to individuals." *Id.*

### E.     Sections 1252(a)(5) and (b)(9) Do Not Prevent Review.

Defendants argue that 8 U.S.C. §§ 1252(a)(5) and (b)(9) bar review of the Rule's asylum bar except as applied in expedited removal. Opp. 29-30, 36-38. Those statutes, however, simply act as "claim-channeling provisions" that limit noncitizens placed in full removal proceedings in immigration court "to one bite of the apple with regard to challenging an order of removal." *EBSC v. Biden*, 993 F.3d 640, 666 (9th Cir. 2021) (cleaned up). They "apply to challenges that either seek review of a removal order" entered after full removal proceedings "or involve questions arising from a [full] removal action or proceeding." *CAIR Coal.*, 471 F. Supp. 3d at 40. They do not bar review "where, as here, the parties are not challenging" full "removal proceedings." *Id.* (quoting *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 19 (2020)); *accord O.A.*, 404 F. Supp. 3d at 129, 132. Indeed, Organizational Plaintiffs could not press their claims at all under

Defendants' view because they are not parties in removal proceedings. *See, e.g.*, *CAIR Coal.*, 471 F. Supp. 3d at 39-40 (rejecting contention that §§ 1252(a)(5) and (b)(9) "precluded an organization from challenging an immigration-related rule under the APA as a matter of law").

Furthermore, "allowing collateral APA challenges to an asylum-eligibility rule does not," as Defendants contend, "undermine" the claim-channeling function of § 1252(a)(5) and (b)(9). *EBSC v. Biden*, 993 F.3d at 667; *see* Opp. 30. And Defendants' argument is especially misplaced here, because the Rule's asylum bar also applies to affirmative asylum cases, which are conducted outside the context of *any* kind of removal proceedings. *See EBSC v. Biden*, 993 F.3d at 667; *O.A.*, 404 F. Supp. 3d at 132 (allowing APA challenge "to a regulation that applies equally to affirmative and defensive applications for asylum, seeking to set aside the regulation itself").

For much the same reason, *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), is inapposite. *See* Opp. 29-30. "[W]hen a statute is not addressed to the type of grievance which the plaintiff seeks to assert, then the statute cannot prevent an APA suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216 (2012) (cleaned up). The Supreme Court has thus refused to read *Block* to mean that a statute governing review of "one kind of suit seeking one form of relief" implicitly "bar[s] another person from bringing another kind of suit seeking another form of relief." *Id.* at 222-23. And unlike here, the channeling provision in *Ayuda, Inc. v. Reno*, 7 F.3d 246 (D.C. Cir. 1993) (cited at Opp. 30), applied because that suit concerned an immigration legalization process under a statutory scheme that specifically permitted review of legalization decisions *only* via deportation proceedings. *Id.* at 247 n.3, 250. By contrast, § 1252(a)(5) and § 1252(b)(9) do not address APA challenges to policies that apply both within and outside any form of removal proceedings.

### F.    The APA Does Not Bar Review of the Collateral Policies.

Contrary to Defendants' assertions, Opp. 34-35, the 24-Hour Guidance and Third Country Removal Policy are reviewable under the APA. The APA permits review of both "[a]gency action made reviewable by statute *and* final agency action." 5 U.S.C. § 704 (emphasis added). Thus, where a statute "provides for judicial review over a defined class of" agency actions, "the APA imposes no additional finality requirement." *Fontem US, LLC v. United States Food & Drug Admin.*, 82 F.4th 1207, 1214 (D.C. Cir. 2023). That is the case here: The collateral policies are "made reviewable" by § 1252(e)(3), which provides that "[j]udicial review . . . is available" to determine whether "a written policy directive, written policy guideline, or written procedure issued . . . to implement" expedited removal is "in violation of law." 8 U.S.C. § 1252(e)(3)(A), (A)(ii). The finality requirement thus does not apply. *See Fontem*, 82 F.4th at 1214; *Grace v. Whitaker*, 344 F. Supp. 3d 96, 118 (D.D.C. 2018), *aff'd in part, rev'd in part on other grounds, and remanded sub nom. Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020).

In any event, the collateral policies constitute final agency action. Defendants argue that the policies simply set out how CBP and USCIS will implement statutory authority. Opp. 34-35. But finality does not turn on whether a policy interprets existing authority; it turns on whether the policy determines "rights or obligations" and has "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up); *see Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 29 (D.C. Cir. 2006) (looking to the "impact" the policy "has on an agency, a petitioner, or both"). The policies challenged here "alter the legal regime" applied to Individual Plaintiffs and other people seeking asylum. *See Bennett*, 520 U.S. at 178; *see also Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022-23 (D.C. Cir. 2000) (holding guidance to be final agency action because it set out a position the agency planned to follow and that agency officials were bound to apply).

The Third Country Removal Policy sets out a new basis for agents to determine the country of removal based on "current removal flight capacity" and makes its directions binding. It also directs agents to screen for fear of removal in accordance with the statute "as amended by the [Rule] and accompanying guidance." CBP_Removals_AR_322. And Defendants themselves admit that the 24-hour Guidance changed the legal regime for expedited removal by reducing the time to consult with an attorney or family members. Opp. 12; USCIS_24-Hour_AR_3. Both policies thus determine rights and obligations and are therefore final agency actions. *See MRNY v. McAleenan*, 405 F. Supp. 3d 1, 48 (D.D.C. 2019) (change to expedited removal policy "sufficiently definitive to qualify as a final agency action"*), rev'd on other grounds* 962 F.3d 612 (D.C. Cir. 2020); *see also Las Americas*, 783 F. Supp. 3d at 229-31 (concluding that an even more extreme contraction of the consultation period was arbitrary and capricious).[3]

Moreover, Defendants' suggestion that individual expedited removal orders are the only "relevant final agency action[s]," Opp. 35, cannot be squared with Congress's decision in 8 U.S.C. § 1252(e)(3) to expressly permit *systemic* challenges to expedited removal policies.

### G.    Plaintiffs' Challenge to the Third Country Removal Policy Is Reviewable.

Defendants' threshold arguments specific to the Third Country Removal Policy all fail. Opp. 30-33. They first assert that the Policy permits removals only to Mexico. Opp. 30-31. But the documents that Defendants concede constitute the "specific written procedures and guidance" at issue, Opp. 30, are not specific to Mexico. *See* CBP_Removals_AR_3-5, 22-24, 321-25. Indeed,

---

[3] While the policies here go far beyond restating statutory authority, Defendants' cases also do not support their assertion that policies that restate such authority cannot constitute final agency action. *See Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (holding that a policy is not final agency action if violating it has no consequences); *DRG Funding Corp. v. HUD*, 76 F.3d 1212, 1215 (D.C. Cir. 1996) (holding that an interlocutory ruling in an administrative hearing process was not final agency action).

the only mention of Mexico in them is to note that "noncitizens may not designate Mexico, Canada, or an adjacent island" as a country of removal "unless they are a national, citizen, or resident thereof." CBP_Removals_AR_322. And although the Amended Complaint refers to Mexico as the likely third country, ECF 19 ¶¶ 114-18, the complaint challenges the Third Country Removal Policy generally, not just as to Mexico, *id.* ¶¶ 163-68.

Defendants next argue that the harm caused by the Third Country Removal Policy is not redressable because vacating the Policy would not preclude removals to third countries. Opp. 31. But vacating and declaring the Policy unlawful would prevent Defendants from using procedures that deviate from the statutory requirements—which prescribe a detailed process that Defendants must follow to remove an applicant to a third country, *see* 8 U.S.C. § 1231(b)—and thus would redress the harm the Policy causes. *See Las Americas*, 783 F. Supp. 3d at 215-17 (holding similar harm was redressable by vacatur of the challenged actions). Vacating the Policy would also prevent it from being re-applied to Plaintiffs D.M., R.E., and S.U. And vacating the expedited removal orders that resulted from applying the Policy to these Plaintiffs will provide them redress by preventing those orders from having continuing legal effect. *See* 8 U.S.C. § 1182(a)(9)(A) (barring admission for five years to noncitizens with expedited removal orders).

Defendants also assert that 8 U.S.C. § 1252(a)(2)(B)(ii), which addresses certain discretionary "decision[s] or action[s]," bars judicial review of the Third Country Removal Policy. Opp. 32. But § 1252(a)(2)(B)(ii) is focused on review of orders denying "individualized forms of discretionary relief from removal or exclusion" and does not bar review of "generally applicable" policies "governing removal *procedures.*" *MRNY v. Wolf*, 962 F.3d at 629-30. This is doubly true here because § 1252(e)(3) "expressly grants jurisdiction." *Id.* at 630; *accord Grace*, 965 F.3d at 894. In any event, § 1252(a)(2)(B)(ii) only bars review of certain decisions "made discretionary

by statute," *Kucana v. Holder*, 558 U.S. 233, 248 (2010), and Plaintiffs challenge no such decisions. Defendants note that § 1231(b)(2)(A) states that DHS "may" disregard a noncitizen's country designation if certain statutory prerequisites are met. Opp. 32. But Plaintiffs do not challenge any such *choice*; rather, they argue that the Policy violates the statute. *See* Mot. 40-41. And compliance with statutory requirements is "non-discretionary." *Hussam F. v. Sessions*, 897 F.3d 707, 723 (6th Cir. 2018) (cleaned up); *accord, e.g.*, *Loumiet v. United States*, 828 F.3d 935, 944 (D.C. Cir. 2016).

Finally, Defendants contend that 8 U.S.C. § 1231(h) bars review of the Policy. Opp. 32-33. But § 1231(h) "simply forbids courts to construe [§ 1231] 'to create any . . . procedural right or benefit that is legally enforceable'; it does not deprive [litigants] of the right to rely on" *other* statutes that allow them to assert violations of § 1231. *Zadvydas v. Davis*, 533 U.S. 678, 687-88 (2001) (quoting 8 U.S.C. § 1231(h)). Plaintiffs may challenge the Third Country Removal Policy under the APA and § 1252(e)(3). Section 1231(h) therefore presents no barrier. *See Zadvydas*, 533 U.S. at 687-88 (permitting habeas corpus challenge); *Texas v. United States*, 515 F. Supp. 3d 627, 634 (S.D. Tex. 2021) (permitting APA challenge).

Defendants try to evade these cases by claiming that § 1231 arguments are permitted only "in discrete contexts" when authorized by other statutes, such as one referring to "interpretation and application of . . . statutory provisions." Opp. 32 (quoting 8 U.S.C. § 1252(b)(9)). But they fail to  explain why this purported requirement is not met by either the authority under the APA to vacate agency actions that are "not in accordance with law," 5 U.S.C. § 706(2)(A), or the more specific authority under the INA to review whether expedited removal policies are "consistent with applicable provisions of this subchapter"—which includes § 1231—or "otherwise in violation of law," 8 U.S.C. § 1252(e)(3). Nor can Defendants' argument be squared with the many cases

enforcing § 1231(b)'s withholding of removal provision. *E.g.*, *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018-20 (2025); *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 732 (2022).[4]

## II.    The Rule's Asylum Eligibility Bar Is Unlawful.

### A.    The Eligibility Bar Is Contrary to Law.

The Rule requires asylum seekers to satisfy one of three conditions: entry via a CBP One appointment, use of a parole program, or entry after an application for protection has been denied in a transit country. The first two of those conditions violate 8 U.S.C. § 1158(a)(1), while the transit condition conflicts with 8 U.S.C. § 1158(a)(2)(A) and (b)(2)(A)(vi). *See* Mot. 14-16.  And because none of the Rule's conditions is "consistent with" the asylum statute, 8 U.S.C. § 1158(b)(2)(C), Defendants may not force people seeking asylum to choose between them. Mot. 16. Defendants fail to refute these inconsistencies with the asylum statute or the fact that the Rule effectively collapses into an impermissible entry requirement. *See* Mot. 16-18.

#### 1.    The Bar's Three Asylum Eligibility Conditions Are Contrary to Statute.

Defendants' attempts to defend the legality of the Rule's eligibility conditions lack merit. First, Defendants argue that the CBP One requirement is permissible because of the existence of the other two "pathways." *See* Opp. 44-45. But those "pathways" cannot save the CBP One condition from being an impermissible entry-based restriction on asylum that directly contravenes 8 U.S.C. § 1158(a)(1). Indeed, they would not save the CBP One requirement even if they were both legal and widely available, which they are and were not. *See* Mot. 20-26; *infra* at 23-27.

---

[4] Defendants also argue that the APA does not permit review of Claim Thirteen insofar as that claim asserts that the challenged policies, "in combination," are contrary to law. Opp. 35-36. But Plaintiffs' motion does not press any argument based on Claim Thirteen. *See* Mot. 13-43. (Plaintiffs' argument that the Rule impermissibly failed to consider the interacting effects of the other policies, Mot. 27-30; *infra* 29-30, is an arbitrary-and-capricious argument as to the Rule under Claim Three, ECF 19 ¶ 152-54, not a contrary-to-law argument under Claim Thirteen.)

Defendants also argue that the Rule's narrow exceptions make it permissible. Opp. 44. But narrow exceptions cannot save an unlawful rule. Mot. 16 n.6; *see, e.g.*, *NFIB v. Dep't of Labor*, 595 U.S. 109, 114-18 (2022); *Zheng v. Gonzales*, 422 F.3d 98, 119 (3d Cir. 2005); *City of San Francisco v. DHS*, 408 F. Supp. 3d 1057, 1110 (N.D. Cal. 2019), *aff'd*, 981 F.3d 742 (9th Cir. 2020). The prior transit ban was invalidated despite its narrow exceptions. *EBSC v. Barr*, 385 F. Supp. 3d 922, 935 (N.D. Cal. 2019). And as Judge Contreras recently concluded in addressing a functionally identical requirement to use CBP One—with similarly narrow "exceptionally compelling circumstances" exceptions—such exceptions "'do[] not address the reason why restricting asylum eligibility based on place of entry conflicts with the law,'" because "the 'failure to present at a port of entry'" is still what matters in most cases. *Las Americas*, 783 F. Supp. 3d at 224 (quoting *EBSC v. Biden*, 683 F. Supp. 3d 1025, 1042 (N.D. Cal. 2023)).

Finally, Defendants resort to a word game, arguing that the statutory guarantee of the right to apply for asylum regardless of manner of entry "does not mean that everyone who enters outside a port of entry must be eligible for asylum." Opp. 45. Defendants, in other words, seek to defend their asylum bar on the basis that it is a bar on asylum *eligibility* rather than a bar on *the right to apply* for asylum. As every court to consider that argument has held, there is "no distinction" between a bar to applying for asylum and a categorical bar to receiving asylum following an application process. *O.A.*, 404 F. Supp. 3d at 147-50; *accord, e.g.*, *EBSC v. Trump*, 932 F.3d at 771 ("It is the hollowest of rights that [a noncitizen] must be allowed to apply for asylum regardless of whether she arrived through a port of entry if another rule makes her categorically ineligible for asylum based on precisely that fact. . . . [T]he bottom line—no possibility of asylum—is the same").

Second, Defendants argue that the transit-country condition is "perfectly in harmony" with the asylum statute's safe-third country provision, 8 U.S.C. § 1158(a)(2)(A), and firm-resettlement bar, *id.* § 1158(b)(2)(A)(vi), because those provisions "recognize the relevance of [a noncitizen's] interaction with third countries." Opp. 46. But as the Ninth Circuit correctly held when it addressed and rejected a free-standing ban on asylum based on transit through a third country, conditioning asylum eligibility on seeking protection elsewhere is inconsistent with those provisions because it is "[a] critical component of both" statutory provisions that the proposed alternative country "be genuinely safe." *EBSC v. Garland*, 994 F.3d 962, 977 (9th Cir. 2020); Mot. 15.[5]

Further, contrary to Defendants' implication, the Supreme Court's order granting a stay at an early stage of that initial transit-ban litigation did not provide any reasoning at all, let alone "implicitly recognize[]" that a transit-denial requirement is consistent with the asylum statute. Opp. 47. Indeed, the government's lead merits argument to the Supreme Court in its stay application there concerned a notice-and-comment issue not at issue here. *See* Application for Stay Pending Appeal 4, 21-24, *EBSC v. Barr*, No. 19A230 (U.S. Aug. 26, 2019).

Defendants attempt to distinguish this Rule's transit-denial requirement from the earlier transit-based ban by arguing that the other pathways make the requirement here merely "option[al]." Opp. 46 (emphasis omitted). Not so: The Rule unambiguously required people seeking asylum to use one of the three pathways to preserve asylum eligibility, and it is unlawful for the government to require a choice between unlawful alternatives. *See* Mot. 7-8, 16.

---

[5] *Matter of Pula*, 19 I&N Dec. 467 (BIA 1987) (cited at Opp. 42, 46), similarly addressed consideration of whether a noncitizen had found a truly "safe haven" in another country—and only as *one* factor among many at the ultimate discretionary stage of an asylum adjudication. *See EBSC v. Barr*, 385 F. Supp. 3d at 947 (quoting *Matter of Pula*, 19 I&N Dec. at 474).

Third, as to the parole "pathway," Defendants' arguments return to meritless wordplay. They contend that parole is not a "status" within the meaning of 8 U.S.C. § 1158(a)(1) because parolees are not technically "admitt[ed]." Opp. 47. But the plain meaning of the word "status"—which the INA does not define—is "the condition of a person or thing in the eyes of the law." *See* Merriam-Webster Dictionary, www.merriam-webster.com/dictionary/status; *accord* Black's Law Dictionary (12th ed. 2024) ("[a] person's legal condition"). That definition squarely covers lawful presence on parole. Indeed, Defendants themselves refer to "parole status" in regulations and other official documents. *E.g.*, *Coal. for Humane Immigrant Rights. v. Noem*, No. 25-cv-872 (JMC), 2025 WL 2192986, at *9 (D.D.C. Aug. 1, 2025) (cleaned up) (quoting DHS memorandum issued January 23, 2025), *stay pending appeal denied*, D.C. Cir. No. 25-5289 (Sept. 12, 2025); 8 C.F.R. § 212.5(e)(2)(ii)-(iii); 67 Fed. Reg. 45,402, 45,403 (July 9, 2002).

Defendants also argue that the Rule's parole requirement is "not contingent on a *grant* of parole" but on the grant of "authorization to travel to the United States." Opp. 47. But the condition of having received such travel authorization likewise fits comfortably within the plain meaning of "status." Section 1158(a)(1)'s command that asylum be available "irrespective" of status does not permit the denial of asylum based on the "status" of lacking either parole or travel authorization.

In any event, Defendants ignore the parole condition's other conflict with § 1158(a)(1). The parole conditions require advance permission to fly into the country and present at an interior port of entry (an airport), possession of a passport, and the ability to identify a sponsor in the United States. The asylum statute, by contrast, allows anyone who is physically present, or arrives in, the United States to seek asylum "whether or not" they enter at a port of entry. Mot. 15-16 (citing *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1060 (9th Cir. 2017) (en banc)).

17

Unable to square the Rule with § 1158, Defendants argue that consistency with that statute does not matter because they have unconstrained discretion to impose categorical bars to asylum. *See* Opp. 38-43. That is wrong. Congress has explicitly circumscribed Defendants' authority by requiring that any restrictions must be "consistent with" the asylum statute. 8 U.S.C. § 1158(b)(2)(C). It makes no difference that Defendants purport to "safeguard[] the effective functioning of the immigration system" and pursue other policy goals. *See* Opp. 39. Defendants' goals do not permit them to impose bars that conflict with the statute.

Similarly, neither the text of the 1980 Refugee Act nor Congress's adoption of unrelated statutory bars to asylum, Opp. 40-41, can bring the Rule into compliance with the current statutory text. Nor does it matter that Defendants have the discretion to deny asylum in individual cases and to consider manner of entry in making those determinations. Opp. 41-43. The "[d]iscretion to deny asylum to eligible [noncitizens]" in particular cases "is different"—and is treated differently in § 1158—than "discretion to prescribe criteria for asylum eligibility." *EBSC v. Garland*, 994 F.3d at 979. Defendants may prescribe such criteria only in ways "consistent with" § 1158, rather than in ways that conflict with the statute. If Defendants believe that limitation prevents them from attaining their policy goals, they must appeal to Congress, not to this Court.

Defendants also lean heavily on the D.C. Circuit's decision concerning preliminary relief in *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022), and the unpublished concurring statements at the stay stage in *RAICES v. Noem*, D.C. Cir. No. 25-5243 (Aug. 1, 2025) (filed at ECF 110-1). Opp. 38-39, 43. But those decisions do not alter the analysis. Both *Huisha-Huisha* and *RAICES* concerned whether a separate statutory authority, found outside § 1158, provided authority for the government to override the normal functioning of the asylum statute. *See Huisha-Huisha*, 27 F.4th at 723-24, 730-31 (discussing 42 U.S.C. § 265); ECF 110-1 at 37-40 (*RAICES*

Order) (Statement of Millett, J.) (discussing 8 U.S.C. §§ 1182(f) and 1185(a)). Indeed, *Huisha-Huisha* recognized the existence of a distinct source of authority as dispositive, making clear that the actions at issue would have otherwise been unlawful. 27 F.4th at 730. And the concurring statements in the *RAICES* order rest squarely on that analysis. ECF 110-1 at 37-40 (Statement of Millett, J.); *id.* at 56 (Statement of Katsas, J.). By contrast, the Rule here is not premised on any such separate statutory authority. *See, e.g.*, 88 Fed. Reg. 31,314, 31,374-75 (stating that the Rule is an exercise of the agencies' authority under 8 U.S.C. § 1158(b)(2)(C) and (d)(5)(B)).

Moreover, neither *Huisha-Huisha* nor *RAICES* involved regulations issued by DHS and DOJ pursuant to § 1158. Such regulations—unlike the COVID-related "Title 42" policy in *Huisha-Huisha* and the presidential proclamation in *RAICES*—are undisputably subject to the requirement in § 1158(b)(2)(C) that regulatory asylum bars must be "consistent with" the asylum statute.[6]

Finally, Defendants argue that the Rule is lawful because combining three unlawful restrictions on asylum "alleviates any potential illegality." Opp. 43-44; *see also id.* at 48-49 (similar). Defendants cite no authority supporting that counter-intuitive proposition. In keeping with common sense, courts have instead held that the government may not force a choice between alternatives that would be invalid standing alone. *See* Mot. 16 (citing cases); *Doe v. Indian River Sch. Dist.*, 653 F.3d 256, 279 (3d Cir. 2011); *Spence v. Bailey*, 465 F.2d 797, 800 (6th Cir. 1972); *Johnson v. Branch*, 364 F.2d 177, 180 (4th Cir. 1966). That remains true no matter how "holistic"

---

[6] Even in the distinct contexts presented by *Huisha-Huisha* and *RAICES*, the D.C. Circuit expressly stated that the question of the executive branch's ability to override asylum was a "close" one subject to reconsideration after a full hearing on the merits. *See Huisha-Huisha*, 27 F.4th at 730; ECF 110-1 at 37, 39-40 (statement of Millett, J.). And even if it were pertinent, the *RAICES* order would carry little weight, because a "stay order is not a ruling on the merits." *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J. concurring).

the government's purported approach, *see* Opp. 43: Defendants may not impose a "choice" between two, three, or even a dozen unlawful options.

### 2.    In Practice, the Eligibility Bar Collapses into an Entry-Based Bar.

The Rule is also unlawful because in practice it operates as a harsher version of the prior entry ban, since people's only real option to preserve asylum eligibility was to present at ports of entry with CBP One appointments. Mot. 16-18.

Defendants contend that the Rule did not force people to ports, because the other two "pathways" were available. Opp. 43-44, 49-51. But it is undisputed that the Rule's parole provision was categorically unavailable to people fleeing any of the 189 countries without recognized parole programs and to those who entered the United States via the southern border or adjacent coasts— the places where the Rule applied but where participants in the parole programs *could not* enter. Mot. 17. And to the extent Defendants suggest that this problem was not evident "at the time of the Rule's adoption," Opp. 49, it is amply apparent from the plain text of the Rule and the notices creating the parole programs, which are in the administrative record and required that participants "fly" to "interior U.S." airports. *E.g.*, CLP_AR_907-08, 912, 982-83, 988, 995-96, 1001.

The Rule's transit-denial pathway was just as illusory—and that too was clear when Defendants finalized the Rule. Defendants do not dispute that over 98% of asylum seekers were unable to meet the transit condition during the year the prior transit ban was in effect between 2019 and 2020. *See* Mot. 17-18. And they provide no basis for the agencies to believe that things would be different under this Rule, which imposes precisely the same condition. *See* Opp. 50.[7]

---

[7] The transit condition was illusory because asylum was unavailable in transit countries and those countries were too unsafe to offer protection, and not, as Defendants suggest, because applicants could not "seek asylum in the United States right away." Opp. 50.

Defendants also contend that Mexico can "handle a large volume of asylum claims." Opp. 50. But they ignore the record evidence that the increase in asylum filings in Mexico occurred only because the Title 42 policy blocked access to asylum in the United States, forcing people to submit applications to avoid refoulement by Mexican immigration officials. Mot. 25. And Mexico's true capacity, measured by the number of cases *decided*, remained extremely small. Mot. 24-25; *see also infra* at 25-27 (addressing asylum systems in Mexico and other transit countries).

The Rule is thus unlawful because it functioned as an entry ban with exceptionally narrow exceptions, in contravention of § 1158(a)(1).

### B. The Eligibility Bar Is Arbitrary and Capricious.

Plaintiffs showed that the Rule's asylum bar is arbitrary and capricious for four reasons: (1) the Rule impermissibly relies on the existence of other, separate forms of immigration status, Mot. 19-20; (2) the Rule's premise that its "pathways" are sufficient to protect people fleeing persecution is contrary to the record, *id.* at 20-26; (3) the Rule relies on the false assumption that people who do not use its "pathways" have weaker asylum claims, *id.* at 27; and (4) the agencies failed to consider the cumulative effects of contemporaneous policies that, together with the Rule's bar, make it harder to pass credible fear interviews, *id.* at 27-30.

Defendants fail to show otherwise. Their recitations of the Rule's stated rationale, Opp. 51-53, 63-65, do not address the fatal defects Plaintiffs have identified. Nor do Defendants explain how the "presumption of regularity," Opp. 51 (cleaned up), can save action that is otherwise arbitrary and capricious. It cannot.[8]

---

[8] The presumption of regularity depends on the executive branch's "tradition" of "act[ing] 'in obedience to [its] duty.'" *Fed. Educ. Ass'n v. Trump*, ___ F. Supp. 3d ___, 2025 WL 2355747, at *10 (D.D.C. Aug. 14, 2025). The presumption can have no play here, because the Rule represented Defendants' fourth attempt to ban asylum since 2018, after courts had repeatedly declared the

### 1. The Rule's Justification Depends on Factors Congress Has Rejected.

Defendants have no plausible response to the fact that their justification for the Rule depends on impermissible factors. *See* Mot. 19-20. Defendants do not dispute that the Rule was intended to persuade noncitizens to seek types of immigration status other than asylum and related protection. They do not dispute that those other types of relief are insufficient to satisfy the United States' treaty obligations to people fleeing persecution. And they also do not dispute that Congress understood as much and therefore created asylum as an independent form of relief.

The responses that Defendants do make are non-sequiturs. They note that they have the discretion to deny asylum in "individual case[s]," Opp. 54 (citing 8 U.S.C. § 1158(b)(1)(A)); that Congress provided for the creation of regulatory bars, *id.* (citing 8 U.S.C. § 1158(b)(2)(C)); and that the executive branch "manag[es] the entire immigration system," *id.* But even when agencies have the authority to act, they must do so in lawful ways. Thus, even accepting that Defendants had authority to restrict asylum, they could not rest their justification for that action or their approach to doing so on "factors which Congress has not intended [the agencies] to consider." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The question, then, is whether Congress intended Defendants to rely on the availability of other types of status in implementing the asylum statute. Defendants suggest without citation that Congress *must* have done so. *See* Opp. 54. But as Plaintiffs have shown, all relevant evidence is to the contrary. *See* Mot. 19-20. The Rule is therefore arbitrary and capricious.

---

earlier bans illegal. *See, e.g.*, *EBSC v. Garland*, 994 F.3d at 968-69; *EBSC v. Biden*, 993 F.3d at 658; *O.A.*, 404 F. Supp. 3d at 118. Indeed, Defendants repeatedly imply that what truly matters is not whether they have complied with the INA but whether they have sufficiently reduced the number of people seeking protection in the United States. *See* Opp. 52, 64-65.

### 2.  The Record Belies the Rule's Main Justification for the Bar.

The Rule is also arbitrary and capricious because it rests on the foundational premise that its "pathways" provide sufficient methods to obtain protection—and that premise is belied by the administrative record. Mot. 20-26. Defendants' attempt to show otherwise badly mischaracterizes Plaintiffs' arguments. Plaintiffs do not "assert that a core premise of the Rule is that a viable alternative pathway will be available to *every* [noncitizen] affected by the Rule." Opp. 55 (emphasis added). Plaintiffs instead challenge the Rule's express premise: that "[a]vailable pathways" provide adequate "mechanisms for migrants to enter the United States and make their protection claims," such that those who "fail to avail themselves" of these options should face "consequences." 88 Fed. Reg. at 31,318; *see id.* at 31,352 (stating the Rule bars asylum seekers who "choose to forgo such options"); *id.* at 31,366 (describing the "purpose of this rule" as "preserving the opportunity for individuals fleeing persecution to pursue protection-based claims"); *see also* 88 Fed. Reg. 11,704, 11,737 (NPRM) (stating that the Rule would bar "those who would circumvent orderly procedures and forgo *readily available* options") (emphasis added).

This premise underpins the Rule: The agencies never claimed that they would adopt the Rule if its "pathways" were *not* available to most people seeking asylum, much less explain why they would have done so. And as to each of the "pathways," Defendants fail to meaningfully address the overwhelming record evidence contradicting the Rule's premise.

***CBP One.*** As Plaintiffs showed, CBP One was inaccessible to many people seeking asylum because appointments were insufficient to meet demand; those waiting for appointments were forced to do so for weeks or months in extremely dangerous conditions; and the app was available only in a few languages, and only to people with smartphones and reliable internet access in limited

regions of Mexico. Mot. 21-22. Defendants do not directly dispute the evidence underlying those conclusions, and their attempts to evade that evidence lack merit.

Defendants invoke the raw number of appointments made available before Defendants eliminated CBP One usage entirely in January 2025 to argue that the supply of appointments would have been sufficient to meet demand. Opp. 55-56. But the question is whether the Rule made asylum "available" to those fleeing persecution while the Rule was in effect, *e.g.*, 88 Fed. Reg. at 31,329, and Defendants do not, and cannot, dispute that the number of appointments was insufficient for that purpose. Moreover, by pointing to the total number of people who might be able to get a CBP One appointment in a year, Defendants ignore the record evidence that whole categories of particularly vulnerable people entirely lacked access to CBP One on the basis of poverty, language capacity, illiteracy, lack of access to a smartphone and reliable internet, dangerous conditions in the geographic region where CBP one was available, and other barriers. *See* Mot. 21-22. Nor do they address the period from January 20, 2025, through May 11, 2025, in which the Rule remained in effect, but CBP One appointments were unavailable altogether.

Defendants next note that before it was terminated, CBP One could be accessed in central Mexico as well as northern Mexico. Opp. 56. The reality, however, was that most people seeking appointments to enter the United States "wait[ed] in northern Mexico." 88 Fed. Reg. at 31,400; *accord* PC_24899-910, 33003-04. Moreover, the record shows that the dangers facing those waiting for CBP One appointments extended throughout Mexico. *See, e.g.*, CLP_PC_23079, 23082, 29742, 30901, 33467-75, 76248-87. Defendants' argument that people could instead use parole programs, meanwhile, both repeats the circular logic of the Rule and ignores the glaring fact that parole programs were available only to subsets of people from five countries. *See* Mot. 17, 22-23; *infra* at 25.

24

Finally, Defendants invoke the "exception" for those who presented at ports of entry and could show that it was impossible for them to use CBP One. Opp. 56. But that exception was exceedingly narrow, given that Defendants interpreted it not to cover common and compelling reasons for being unable to use CBP One. *See* 88 Fed. Reg. at 31,401 (suggesting that people who cannot afford smartphones should try to borrow them from "trusted partners"); *id.* at 31,406 (rejecting "illiteracy" exception and instead suggesting that people who could not read the three languages in which the app was available "seek assistance, including translation assistance, in using the app"); *see also id.* (exception "captures a narrow set of circumstances in which it was truly not possible for the noncitizen to access or use the CBP One app"). CBP One therefore did not provide an adequate mechanism for seeking protection.

*Parole.* Defendants say almost nothing about parole programs—and for good reason. There can be no dispute that those programs *did not apply to anyone at the U.S.-Mexico border*—the population to which the Rule applied—because they required eligible noncitizens to fly into the interior of the United States. Nor can there be any dispute that parole was restricted to five countries; included conditions that many vulnerable people could not meet; and ended entirely in January 2025, four months before the Rule ceased applying to new entrants. Mot. 22-23. And while Defendants claim that the Rule "encouraged" people to use parole programs, they make no attempt to explain how it could have had that effect on people ineligible for the programs. Opp. 58. The inescapable conclusion is that "[p]arole programs [were] not meaningfully available to many noncitizens subject to the Rule." *EBSC v. Biden*, 683 F. Supp. 3d at 1046.

*Transit Countries.* The transit-country "pathway" was "similarly infeasible for many asylum seekers subject to the Rule." *EBSC v. Biden* 683 F. Supp. 3d at 1047. Plaintiffs showed

that transit countries are dangerous and also could not, and would not, process the additional asylum claims the Rule sought to encourage. Mot. 23-26.

Defendants do not dispute that transit countries were highly dangerous. Instead, they contend that Plaintiffs "rehash[] public comments" that Defendants "considered and rejected." Opp. 56. Not so. Plaintiffs' argument summarized *the voluminous record evidence* showing that transit countries are unsafe. Mot. 23-24. And because agencies may not rely on conclusions that "run[] counter to the evidence before the agency," *State Farm*, 463 U.S. at 43, Defendants' attempt to sweep that evidence under the rug cannot succeed.

Defendants also do not dispute that transit countries aside from Mexico cannot meaningfully process significant numbers of asylum applications. They do attempt to argue that transit countries have welcoming, well-functioning asylum systems, Opp. 56-57, but that attempt gets nowhere. The fact that a country signed the Refugee Convention and the non-binding Cartagena Declaration, Opp. 57, does not indicate a capacity and willingness to hear any significant number of asylum claims. After all, Belize, Honduras, Guatemala, and Colombia (on which the Rule relies) granted protection to only 2,500 people *combined* over two decades, PC_23478-80, 23483-86, while Nicaragua's asylum commission "has not met since 2015," PC_34206, and Panama adjudicates "fewer than 50 cases annually," PC_24122. And although Defendants invoke prior amnesty programs in Costa Rica, Colombia, and Belize, they do not dispute that those programs ended before the Rule took effect. *See* Mot. 26.

That leaves Mexico. Defendants fail to address the ample evidence showing that Mexico's asylum system was entirely overwhelmed even before the Rule. *See* Mot. 24-25. Instead, they treat an assertion in the Rule as dispositive of the capacity of Mexico's system. Opp. 56. Defendants, however, may not create their own facts; they must work with the reality of the record, which flatly

contradicts the Rule. *See, e.g.*, *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019) (stating that courts "are not required to exhibit a naiveté from which ordinary citizens are free" (citation omitted)). Moreover, although Defendants trumpet Mexico's asylum grant rate, that rate excludes the countless applications that Mexico deemed "abandoned" because people failed to strictly comply with its restrictive policies and practices—including, for example, requirements to apply for asylum within 30 days of entry into Mexico and remain in specific, often dangerous geographic regions while applications are pending. *See* PC_21965-66, 21980-83, 22858, 23388, 33410. The record thus "refutes the suggestion that seeking protection in Mexico [was] a viable option for many asylum seekers." *EBSC v. Biden*, 683 F. Supp. 3d at 1048.

Finally, Defendants contend that applying the familiar rule that agency decisions must not contravene the administrative record would somehow constitute "a remarkable intrusion on the Executive's foreign affairs authority." Opp. 58. But U.S. regulations that restrict asylum within the United States do not implicate the executive's foreign affairs function. *See, e.g.*, *EBSC v. Biden*, 993 F.3d at 676-77; *CAIR Coal.*, 471 F. Supp. 3d at 55. And Defendants' assertions that the Rule was somehow related to vague, unspecified "cooperative efforts" to reduce migration, *see* Opp. 40, 53, cannot change that conclusion. *See, e.g.*, *CAIR Coal.*, 471 F. Supp. 3d at 56-57.

***"Exceptionally compelling circumstances."*** Unable to defend the Rule's core premise about the adequacy of its "pathways," Defendants seek shelter in the "exceptionally compelling circumstances" exception to the Rule's asylum bar. Opp. 58-59. But it is undisputed that this exception was very narrowly applied and did not, for instance, cover people who had previously been assaulted, raped, or kidnapped in Mexico—or who faced threats of those actions that were days away rather than literally imminent at the time they crossed the U.S.-Mexico border. *See* Mot. 8 (citing 88 Fed. Reg. at 31,391-93). The exception therefore cannot alter the fact that, contrary to

the Rule's core premise, it provided no usable pathway for many people seeking protection from persecution.

### 3. The Record Does Not Support the Rule's Assumption That People Who Do Not Use Its "Pathways" Have Weaker Asylum Claims.

Defendants do not defend the Rule's assumption "that those subject to it are less likely than other [noncitizens] to otherwise qualify for asylum." Opp. 59. Instead, they deny that the Rule rests on that false assumption. *Id.* Defendants are attempting to rewrite history. The Rule's preamble stated that the Rule permits the agencies to identify and "remov[e] those with non-meritorious claims." 88 Fed. Reg. at 31,336. The Rule further asserted that its asylum bar was "reasonable and necessary for the reasons discussed in the NPRM." *Id.* (citing NPRM, 88 Fed. Reg. at 11,744-47). In turn, the cited pages of the NPRM state that the Rule would facilitate the "rejection of unmeritorious claims," "removing those with non-meritorious claims," and "screening out more non-meritorious claims" so that "those without meritorious claims [can] be removed quickly." 88 Fed. Reg. at 11,744-47. And the Rule states that its pathways are sufficient "for migrants with valid claims," 88 Fed. Reg. at 31,329; that it enables the agencies to "identify[] non-meritorious claims" in order to "focus on those claims most likely to warrant protection," *id.* at 31,381; and that people who cross the border irregularly "unfairly delay the adjudication of meritorious claims for asylum," *id.* at 31,387; *accord* NPRM, 88 Fed. Reg. at 11,737, 11,746-47.

These were not idle observations. Defendants employed these statements both to explain their change from prior policies, *see* 88 Fed. Reg. at 31,336, 31,381, and as a primary response to commentors' concerns, *see id.* at 31,329, 31,387. To use this assumption about non-meritorious claims in these ways, Defendants were required to "examin[e]" the assumption, *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 389 (D.C. Cir. 2018) (citation omitted), and to ensure it was supported by "record evidence," *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102,

28

1113 (D.C. Cir. 2019). Defendants did not do so—and it is undisputed that the assumption is *not*

consistent with the record. The Rule is thus arbitrary and capricious.

### 4.  Defendants Arbitrarily Refused to Consider the Interacting Effects of Contemporaneous Policies.

In prmulgating the Rule, Defendants had an "obligation to acknowledge and account for"

other policy changes that were "contemporaneous and closely related." *Portland Cement Ass'n v.*

*EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011). It is undisputed that Defendants issued the other policies

challenged here (as well as the then-live voluntary return policy discussed in the Amended

Complaint, ECF 19 ¶¶ 119-26) and also returned to conducting credible fear interviews in CBP

custody contemporaneously with the Rule. It is also undisputed that these policy changes both

individually and cumulatively made it more difficult for people to pass credible fear interviews for

reasons unrelated to the merits of their protection claims. Mot. 28-29. These effects—far from

triggering mere policy "disagreements," Opp. 59—instead triggered Defendants' obligation to

consider whether the Rule should be adopted "given" these other policies. *Petroleum Commc'ns,*

*Inc. v. FCC*, 22 F.3d 1164, 1173 (D.C. Cir. 1994) (emphasis removed).

Defendants did not do so. They claim the Rule "addresses relevant policy changes." Opp.

59. But the pages of the Rule they cite do not address any of the planned policy changes to make

credible fear interviews more difficult. *See* 88 Fed. Reg. at 31,317-18 & n.21.[9] And as to the

contemporaneous policies impacting credible fear interviews, the Rule stated only, and without

---

[9] The only arguably relevant language in the cited pages of the Rule are vague references to "Mexico's independent decision" to "accept back" some nationals of Cuba, Haiti, Nicaragua, and Venezuela "on humanitarian grounds." *Id.* at 31,317. But those broad references to a decision *by Mexico* do not address the Third Country Removal Policy instituted by Defendants. And the cited portion of the Rule nowhere discusses subjecting noncitizens to credible fear interviews concerning third countries, much less doing so without advance notice. *See id.* at 31,317-18.

explanation, that they are "beyond the scope of this rule." 88 Fed. Reg. at 31,355. That is incorrect and does not amount to reasoned decisionmaking.

## III.    The Rule's Application in Expedited Removal Is Unlawful.

### A.    The Rule Violates Section 1225(b).

The Rule contravenes 8 U.S.C. § 1225(b)(1)(B)(v), which requires DHS to apply a low, "significant possibility" standard at the credible-fear stage. The Rule instead directs asylum officers to "determine whether the [noncitizen] *is covered* by the [Rule's asylum bar] and, if so, whether the [noncitizen] *has rebutted*" the bar. 8 C.F.R. § 208.33(b)(1) (emphasis added); *see* Mot. 31. Defendants' response, Opp. 61-63, fails to address this language. That failure is unsurprising, given that the Rule's text never includes the phrase "significant possibility." *See* 8 C.F.R. § 208.33. It is also dispositive, because Defendants' silence effectively concedes that the plain text of the Rule requires asylum officers to apply the ultimate, merits-based standard rather than the low screening standard Congress prescribed.

Defendants' scattershot appeals to sources outside the four corners of the regulatory text cannot change matters. Defendants repeatedly invoke the Rule's preamble, *see* Opp. 61, 63, but they do not, and cannot, dispute that "it is the language of the regulatory text, and not the preamble, that controls." *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 570 (D.C. Cir. 2002). Defendants also cite the regulation that governed all credible fear interviews before they promulgated the Rule, which correctly requires application of the significant-possibility standard. Opp. 62 (citing 8 C.F.R. § 208.30(e)(2)). But the Rule applies "[n]otwithstanding any contrary section" of the asylum regulations. 8 C.F.R. § 208.33. Indeed, the prior regulation generally prohibits the application of asylum bars at the credible fear stage, *id.* § 208.30(e)(5)—so it would make no sense to look to that regulation for the standard applied when assessing the Rule's bar. And although

other portions of the Rule *do* direct asylum officers to prior regulations, *see id.* § 208.33(b)(1)(ii) (citing § 208.30), the provisions concerning the standard for applying the bar do not, *see id.* § 208.33(b)(1).

Finally, Defendants invoke language in the preambles to other rules, Opp. 62, but that attempt fails for the same reasons. Because the Rule's own preamble cannot alter its plain meaning, it goes without saying that the preambles to *other* rules cannot do so. And the rules Defendants cite are not analogous, because those rules—none of which is in force—all purported to build upon the prior regulations enshrining the significant possibility standard, whereas this Rule expressly displaces that standard. The Rule thus contravenes § 1225(b).

### B.    The Bar's Application in Expedited Removal Is Arbitrary and Capricious.

The Rule's bar is arbitrary and capricious as applied in expedited removal for three reasons: (1) Defendants failed to address significant fairness concerns; (2) the Rule impermissibly treats the gap between the number of noncitizens who clear Congress's intentionally low screening standard and the number who ultimately receive relief as a problem to be solved; and (3) the Rule's preamble is inconsistent with both its text and the notice of proposed rulemaking concerning the application of the "significant possibility" standard. Mot. 32-34.

In response, Defendants first raise the novel contention that § 1252(e)(3) does not permit arbitrary-and-capricious review. Opp. 63. But the D.C. Circuit and courts in this District have repeatedly engaged in precisely such review under § 1252(e)(3). *See, e.g.*, *Grace*, 965 F.3d at 894, 900; *Coal. for Humane Immigrant Rights*, 2025 WL 2192986, at *30-34. And no wonder. After all, § 1252(e)(3) permits arguments that policies within its scope are "in violation of law," 8 U.S.C. § 1252(e)(3)—and the plain text of the APA makes "unlawful" any agency action that is "arbitrary [or] capricious," 5 U.S.C. § 706(2)(A). Defendants' contention is thus a non-starter.

31

As to Defendants' substantive responses, it is undisputed that the Rule does not expressly acknowledge, much less address, the fairness concerns with applying asylum bars in credible fear interviews that Defendants themselves recognized in 2022. Defendants throw smoke around that issue, spending pages pointing to their acknowledgement of *other* things they said in the 2022 rule, Opp. 65-67; their discussion of due process concerns *other* than the one they raised in 2022, *id.* at 68 (citing 88 Fed. Reg. at 31,353-63); answers to comments in which they made no mention of the 2022 rule, *id.* at 67-68 (citing 88 Fed. Reg. at 31,380); and a discussion from the NPRM about DHS resource constraints, *id.* (citing 88 Fed. Reg. at 11,744-45). These off-center citations merely underscore the fact that the agencies never acknowledged their prior fairness concerns or explained why they were changing position. That failure alone warrants invalidating the Rule's expedited removal provisions. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016).

Defendants likewise fail to even mention the Rule's impermissible treatment of a "'significant disparity'" between the percentages of noncitizens who pass credible fear interviews and who ultimately receive relief as a "problem to be solved." Mot. 33 (quoting Rule); *cf.* Opp. 68-70. Defendants instead suggest that the legislative history of the expedited removal statute gives them license to bar anyone they wish at the screening stage. Opp. 68-69. But Defendants tell at most half the story. The expedited removal statute was not intended *solely*, as Defendants would have it, to disincentivize irregular entries. Rather, as the D.C. Circuit has recognized, Congress also had "a second, equally important goal": minimizing the "danger that [a noncitizen] with a genuine asylum claim will be returned to persecution," and they advanced this goal by adopting a "low screening standard." *Grace*, 965 F.3d at 902 (quoting H.R. Rep. No. 104-469, pt. 1, at 158 (1995), and 142 Cong. Rec. 25,347 (1996)).

Inherent in Congress's choice to adopt a low screening standard is the fact that not everyone who passes the screening will ultimately receive relief. By aiming to alter that fact, Defendants have subverted Congress's choice. That is the end of the matter, because Defendants cannot use the tools Congress gives them to undermine Congress' work. *See, e.g.*, *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) ("Agencies have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency [may] add pages and change the plot line.'"); *Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 854 (D.C. Cir. 1987) (agencies are "not free to substitute new goals in place of the statutory objectives without explaining how these actions are consistent with . . . the statute").

Finally, Defendants have no answer to the fact that the Rule's text and its preamble are inconsistent with respect to the application of the significant possibility standard. *See* Mot. 33-34. There is no way to read the regulatory text as requiring, or even permitting, the application of that statutorily mandated standard. *See supra* at 29-31. And under binding precedent that Defendants ignore, this kind of inconsistency "between the language of the regulations and the preamble[]" is sufficient, without more, to show that an agency's "action [is] arbitrary and capricious." *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1220 (D.C. Cir. 1996).[10]

## C.    The Rule's Heightened Screening Standard Is Arbitrary and Capricious.

When Defendants raised the screening standard for withholding of removal and CAT relief in credible fear interviews, they failed to reasonably consider the risk that doing so would result in erroneous denials of relief—and the return of noncitizens to persecution and torture. Mot. 34-36.

---

[10] Furthermore, contrary to Defendants' suggestion, a statement in the Rule's preamble that "the 'significant possibility' standard applies by statute," Opp. 71, cannot alchemically render the regulatory text consistent with that statutory mandate.

Defendants contend that regulations involving CAT are unreviewable. Opp. 73. But the statute they cite expressly *permits* review of regulations as "part of the review of a final order of removal pursuant to" 8 U.S.C. § 1252. *See* Pub. L. No. 105-277, § 2242(d) (1998) (codified at note to 8 U.S.C. § 1231). That is precisely the review that this Court is conducting of the Individual Plaintiffs' expedited removal orders pursuant to 8 U.S.C. § 1252(e)(3).

Defendants also argue that no commenter raised the fact that noncitizens subjected to reinstatement proceedings, unlike those covered by the Rule, may seek judicial review. Opp. 73. That is false. At least one commenter expressly stated that "reasonable fear interviews for individuals in reinstatement proceedings" provide "stronger procedural protections" than the credible-fear process, "such as the right to counsel and circuit court review." CLP_PC_32948. There is thus no basis for Defendants to avoid review of this issue.

On the merits, Defendants assert that the Rule did "acknowledge and consider the differences between reasonable fear screenings in the reinstatement context and credible fear screenings." Opp. 72. But they do not point to any such discussion in the Rule. Nor do Defendants directly dispute that these differences concern an important aspect of the problem, *i.e.*, fairness considerations, or that the analogy drawn in the Rule between reinstatement proceedings and credible fear interviews is fatally flawed. Instead, they argue that they also did not address judicial review when instituting the reinstatement process. Opp. 72-73. But their statements about that process in 1999 have no bearing on whether fairness concerns encompassing judicial review form an important aspect of the problem that the agencies were required to address 24 years later.[11]

---

[11] Moreover, contrary to Defendants' assertion, Opp. 72, the 2022 rule's discussion of this topic says precisely what Plaintiffs indicated, *see* Mot. 34: that "no evidence has been identified that" using a higher screening standard "resulted in more successful screening out of non-meritorious claims while ensuring the United States complied with its non-refoulement obligations." 87 Fed. Reg. 18,078, 18,092 (Mar. 29, 2022).

Defendants' remaining merits argument attacks a straw man: Plaintiffs do not argue that "*all* [noncitizens]" subject to reinstatement "have strong connections to the United States or *extensive* experience with the immigration system." *See* Opp. 72 (emphasis added). Rather, Plaintiffs observe that "*[m]ost* people previously 'subject to' reinstatement of removal 'by definition ha[d] prior experience with the U.S. immigration system' because they were previously in removal proceedings, 'and many . . . lived in the United States for extended periods of time.'" Mot. 35 (ellipsis in original) (quoting PC_21430). Those facts remain undisputed.

The Rule's heightened screening standard is therefore arbitrary and capricious.

## IV.    The Collateral Policies Are Illegal.

### A.    The 24-Hour Guidance Is Unlawful.

In adopting the 24-Hour Guidance, Defendants did not adequately consider fairness considerations; failed to explain how 24 hours would be sufficient to protect the statutory guarantee that a noncitizen may consult with a person of their choosing before a credible fear interview; failed to examine their untenable key assumption that they could reduce the consultation period without reducing the accuracy of credible fear outcomes; and failed to consider the cumulative impact of contemporary policy changes. Mot. 37-39. Defendants do not contest the last two of these points, Opp. 74-79, and that alone provides a sufficient basis to vacate the Guidance. Mot. 39 (citing *Hispanic Affairs Project*, 901 F.3d at 389).

Defendants' arguments on the other points are unpersuasive. They contend that the Guidance "explicitly seeks to balance . . . fairness" with speed. Opp. 77. But merely incanting the word "fairness" is insufficient to satisfy the APA. *See Am. Fed'n of Gov't Emps. v. Fed. Lab. Rels. Auth.*, 25 F.4th 1, 10 (D.C. Cir. 2022) (a court is "not bound by the [agency]'s conclusory and counterintuitive assertions . . . especially when the record contains no factual basis"); *Council of*

*Parent Att'ys & Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 50 (D.D.C. 2019) (an agency may not treat important considerations "in an inadequate or cursory manner"). Plaintiffs do not demand a "detailed statistical analysis." Opp. 78. But the record is "bereft of evidence" that a 24-hour period is adequate. Mot. 38. Defendants do not dispute that fact.[12]

Defendants also argue that the 24-hour period was a "minimum" that began after a noncitizen received information regarding credible fear interviews. Opp. 75-76. But Defendants provide no reason to believe that matters. They do not dispute that noncitizens were still unable to secure consultations before their interviews.

Moreover, the rationale of this policy depends on the unsupported assumption "that reducing the waiting period will speed up proceedings *without impairing their accuracy*." Mot. 38-39. But there is no evidence to show—and it is illogical to assume—that people who are forced to go through a complicated system more quickly and without access to outside communication will fail interviews at a higher rate *because* they have "meritless claims." *Id.* As such, Defendants have acted arbitrarily by failing to justify this key assumption. *See Hispanic Affairs Project*, 901 F.3d at 389 ("an agency must justify a key assumption underlying its regulation") (cleaned up). And, as Judge Contreras noted in a recent decision that found an even-more substantial limitation on the consultation period arbitrary and capricious: "If the only value DHS considers is efficiency, what stops the agency from adopting a one-hour consultation window? Thirty minutes?" *Las Americas*, 783 F. Supp. 3d at 231. For these reasons, the Guidance is arbitrary and capricious.

---

[12] *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021), underscores Defendants' failure. There, unlike here, the record contained relevant evidence, and the agency both elicited additional evidence and specifically addressed it in promulgating the policy at issue. *See id.* at 425-26.

**B.     The Third Country Removal Policy Is Unlawful.**

The Third Country Removal Policy upends Congress's process for selecting a country of removal by treating the *last* step as one Defendants take in the first instance if they do not have flight capacity to a noncitizen's country of origin. Mot. 40-41. Defendants have no persuasive answer to the ways this renders the Third Country Removal Policy unlawful.

**1.   The Policy Violates the INA.**

Defendants assert that the Third Country Removal Policy "exactly tracks the statute," Opp. 80, but it does not. The statute allows Defendants to go beyond the noncitizen's designated country and country of origin only if those countries either fail to respond to an individualized inquiry within 30 days or are unwilling to accept the noncitizen. 8 U.S.C. § 1231(b)(2)(C)(ii)-(iii), (D).[13] The Policy, by contrast, allows Defendants to disregard the designated country and country of origin if the "number of removable noncitizens of a given nationality in [ICE] custody exceeds monthly ████████ flight capacity to" those countries. CBP_Removals_AR_322. In other words, instead of following the statutory requirement to make inquiries as to the relevant countries and be bound by the answer, Defendants rely on their own flight capacity. In this way, the Policy replaces the statutorily mandated consideration of whether a country is "unwilling" to accept an individual with consideration of whether removal to the appropriate country is "impracticable, inadvisable, or impossible." CBP_Removals_AR_321-22.

The Policy is explicitly inconsistent with the statute. It states that DHS may disregard the designated country or country of citizenship "if the noncitizen *is not removed* to the country designated or the country of citizenship or nationality." CBP_Removals_AR_322. That is not the

---

[13] In the case of the designated country, the statute has very narrow exceptions to this rule not at issue here. *See* 8 U.S.C. § 1231(b)(2)(C)(i), (iv).

statutory test. A country of designation or citizenship may be disregarded only if the country indicates, either affirmatively or by omission, that it "is not willing to accept" the particular noncitizen—not if the noncitizen's removal would move too slowly for Defendants' liking. 8 U.S.C. § 1231(b)(2)(C)(ii)-(iii), (D)(i)-(ii).



Defendants' argument that the Policy is not arbitrary and capricious, Opp. 82, fails for the same reasons. Their refusal to acknowledge and explain the Policy's deviation from the statute is a further basis for rejecting it. *See Indep. U.S. Tanker Owners Comm.*, 809 F.2d at 854; Mot. 41.

### 2. The Policy Does Not Provide Adequate Notice.

Next, the Third Country Removal Policy does not provide notice of intended removal to a third country, which is required for noncitizens to understand and prepare for their fear screenings *as to that country*. Mot. 41-43. Defendants do not dispute that clear advance notice is a prerequisite for a citizen to meaningfully complete a credible fear interview. Instead, Defendants claim that the Policy *does* provide such notice. Opp. 82. Defendants are wrong.

The Policy provides that, if DHS disregards a noncitizen's designated country of removal, the noncitizen will be asked about a fear of return to their country of origin *and* to the country

designated for removal and that, if the noncitizen claims fear as to either country, they will be referred to USCIS. CBP_Removals_AR_4. While the Policy says that "*USCIS* must be made aware of the designated country of removal" there is no equivalent requirement as to the noncitizen. *Id.* (emphasis added). In other words, the agency will know its intended country of removal but the noncitizen very likely will not. Nor does the Policy require that the noncitizen be informed that their credible fear interview will address a third country rather than their country of origin. *See id.*

Instead, the only purported "notice" the noncitizen receives is when a CBP agent asks if they fear removal to the third country that DHS has decided to designate for removal. *See* Opp. 82 (citing CBP_Removals_AR_4). Based on that single question, a noncitizen is apparently supposed to discern that, if they answer yes, the credible fear interview they will have in as little as 24 hours will focus on a country other than the one they fled. That is plainly insufficient. *See A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1367-68 (2025).

Defendants' assertion that noncitizens then receive screening interviews as to the third countries is not responsive. *See* Opp. 83. The problem is that noncitizens do not receive *notice* that those interviews will concern third countries, so they cannot prepare for the interviews. Mot. 42.

Finally, Defendants do not meaningfully respond to Plaintiffs' argument that the Policy is arbitrary and capricious because it failed to acknowledge or consider that these notice defects heighten the risk that people will be erroneously removed to harm in third countries. Mot. 42-43.

### 3. Defendants Failed to Consider The Risk of Chain Refoulement.

The Third Country Removal policy is also arbitrary and capricious because it entirely failed to consider an important aspect of the problem: the risk of chain refoulement, i.e., the risk that third countries will in turn send noncitizens back to persecution or torture in their countries of origin. Mot. 43. Defendants respond with a lengthy and alarming tangent arguing that chain

refoulement is permitted by the withholding statute. Opp. 83-84. In addition to being incorrect, that assertion makes no difference to the claim at issue. Plaintiffs do not argue that the policy violates the withholding statute but rather that the risk of chain refoulement is an important aspect of the problem that the agencies were required—and failed—to consider. Mot. 43.

For the same reason, Defendants miss the mark by arguing that the views of the U.N. High Commissioner for Refugees ("UNHCR") are not binding. Opp. 84. The point is not that Defendants had to agree with UNHCR's conclusions. Rather, the fact that UNHCR—the authoritative interpreter of the 1951 Refugee Convention and 1967 Refugee Protocol—has long called attention to the risk of chain refoulement indicates that it is at the very least an important aspect of the problem that Defendants had to consider. Mot. 43.[14]

Defendants' only response to Plaintiffs' actual argument is that Mexico is a party to the 1951 Refugee Convention and the 1967 Refugee Protocol. Opp. 84 n.16. But acceding to international commitments is not the same as compliance, and Defendants knew that there is a serious risk of chain refoulement from Mexico—the only third country to which Defendants were sending noncitizens when the Policy was adopted. *See, e.g.*, CLP_PC_22043, 30641 (discussing Title 42 policy); *see also EBSC v. Garland*, 994 F.3d at 981 (danger of refoulement from Mexico was an important aspect of the problem); *id.* at 990 (Miller, J., concurring in part) ("[T]he non-refoulement principle is systematically violated in Mexico."); *see also* UNHCR Amicus Brief,

---

[14] Defendants incorrectly suggest that the UNHCR advisory opinion is impermissible extra-record evidence. Opp. 84. The opinion sets out UNHCR's interpretation on the extraterritorial scope of nonrefoulement. *See* UNHCR, Advisory Opinion on the Extraterritorial Application of the Non-Refoulement Obligations Under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol ¶ 4 (Jan. 26, 2007). Even if the opinion were "evidence" rather than a statement of international legal principles, it would be permissible evidence. The D.C. Circuit has long recognized that extra-record evidence may be considered in determining whether "the agency failed to consider factors which are relevant to its final decision." *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (citation omitted).

ECF No. 48-1 at 13-14. The failure to consider this risk, regardless of whether the agencies were legally obligated to avoid chain refoulement, renders the Policy arbitrary and capricious.

## V.    Plaintiffs Are Entitled to Vacatur and Other Relief.

### A.    Vacatur of the Policies is Available.

Defendants' arguments that the Court cannot vacate the challenged policies all lack merit. They first contend that vacatur of the Rule and the other policies is barred by 8 U.S.C. § 1252(f)(1). Opp. 86-88. That position has been uniformly rejected.  "By its plain terms," § 1252(f)(1) "is nothing more or less than a limit on injunctive relief." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999). As every court to consider the issue has agreed—both before and after *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022)—the provision does not apply to vacatur. *See, e.g.*, *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022); *Las Americas*, 783 F. Supp. 3d at 232-33 (collecting cases); *RAICES*, 2025 WL 1825431, at *18-21. Section 1252(f)(1) simply "prohibits lower courts from *entering injunctions*" against certain INA provisions. *Aleman Gonzalez*, 596 U.S. at 550 (emphasis added).

The uniformity on this issue is unsurprising. Nothing in the statute refers to vacatur, and § 1252(f)(1) is titled "Limit on injunctive relief." *See Biden v. Texas*, 142 S. Ct. 2528, 2539 (2022) (Section 1252(f)'s "title . . . makes clear the narrowness of its scope"); *Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 481 (relying on the provision's title). Moreover, vacatur is not an injunction: It is "less drastic" than the "extraordinary remedy" of an injunction, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010), in that it "neither compels nor restrains" agency action. *Texas*, 40 F.4th at 220; *see also Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 52 (D.D.C. 2020) (noting that "the Supreme Court has made it abundantly clear that injunctions and vacaturs are distinct remedies, and that the latter is considered substantially less intrusive"). And with

respect to the Rule's application in expedited removal and the collateral policies, § 1252(e)(3) confirms that this Court can "order systemwide relief" including vacatur in hearing "'[c]hallenges on [the] validity of the [expedited removal] system.'" *Las Americas*, 783 F. Supp. 3d at 232 (quoting 8 U.S.C. § 1252(e)(3) and citing *Grace*, 965 F.3d at 907-08).[15]

Defendants' contrary arguments are meritless. *Aberdeen & Rockfish Railroad Company v. Students Challenging Regulatory Agency Procedures*, on which they rely, Opp. 87, addressed not vacatur but an injunctive order "direct[ing] the [agency] to perform certain acts." 422 U.S. 289, 307 (1975). And the term "restrain" in § 1252(f)(1) does not do the work Defendants claim. Opp. 87-88. Rather, "enjoin or restrain" is a "common doublet" that refers to the canonical forms of injunctive relief: injunctions and restraining orders. BRYAN A. GARNER, GARNER'S DICTIONARY OF LEGAL USAGE 295-96 (3d ed. 2011); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 179 (2012); *California v. Arizona*, 452 U.S. 431, 432 (1981) (using "enjoined and restrained" to describe an injunction). This reading is confirmed not only by the title of § 1252(f)(1) but also by the legislative history of that section, which refers only to injunctions. H.R. Rep. No. 104-469, pt. 1, at 161 (1996).[16]

Defendants also assert that vacatur is not authorized by the APA. Opp. 88-89. But, as they acknowledge, that argument is foreclosed by circuit precedent. *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). And the Supreme Court's ruling in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025), that the Judiciary Act of 1789 does not authorize universal

---

[15] Defendants correctly do not dispute that the Court may grant Plaintiffs' requested declaratory judgment that the Rule and expedited removal policies are unlawful. Section 1252(f)(1) "does not bar declaratory relief." *MRNY v. Wolf*, 962 F.3d at 635.

[16] Even if § 1252(f)(1) applied to vacatur as well as injunctive relief, it would not bar vacatur of the Rule's asylum bar, which implements the asylum statute, 8 U.S.C. § 1158, rather than any of the statutory provisions covered by § 1252(f)(1). *See O.A.*, 404 F. Supp. 3d at 158.

*injunctions*, explicitly did not address "the distinct question whether the [APA] authorizes federal courts to vacate federal agency action." 145 S. Ct. at 2554 n.10; *see also id.* at 869 (Kavanaugh, J., concurring) (noting the continued availability of APA vacatur); *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2663 (2025) (Roberts, C.J., concurring in part and dissenting in part) ("[T]he District Court's vacatur of the challenged directives . . . . falls well within the scope of the District Court's jurisdiction under the [APA]." (citation omitted)); *id.* at 2661 (Barrett, J., concurring) (indicating continued availability of vacatur).

### B. Remand Without Vacatur is Unwarranted.

The Court should also reject Defendants' argument, Opp. 89-90, for the "exceptional remedy" of remand without vacatur. *See Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020); *see also United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (remand without vacatur available only "[i]n rare cases"). When an agency's action is unlawful, "vacatur is the normal remedy." *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024); *see O.A.*, 404 F. Supp. 3d at 152. Whether to depart from that norm "depends on the 'seriousness of the [action]'s deficiencies' and the likely 'disruptive consequences' of vacatur." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)). Defendants fall well short of carrying their burden of showing that "equity demands" remand without vacatur. *Nat'l Women's L. Ctr. v. Off. of Mgmt. & Budget*, 358 F. Supp. 3d 66, 93 (D.D.C. 2019).

Defendants' "errors could not be more serious insofar as [they] acted unlawfully, which is more than sufficient reason to vacate" their actions. *NRDC v. EPA*, 489 F.3d 1364, 1374 (D.C. Cir. 2007); *accord Las Americas*, 783 F. Supp. 3d at 231. The other failings of the Rule and collateral policies are also so fundamental as to require vacatur. *See Kiakombua*, 498 F. Supp. 3d at 51-52

(cleaned up). Unlike *Air Transport Ass'n of America, Inc. v. USDA*, in which the agency essentially made a "citation error," Defendants have offered no explanation of the steps they would take to remedy the legal errors here, let alone demonstrated "a 'serious possibility'" of justifying the policies. 317 F. Supp. 3d 385, 391 (D.D.C. 2018). Contrary to Defendants' conclusory assertion, Opp. 90, the agencies cannot "easily cure the defects [of the Rule or other policies] by further explanation of [their] reasoning," because of inherent flaws in their reasoning and the complete lack of support in the record. *Nat'l Women's L. Ctr.*, 358 F. Supp. 3d at 93; *see also Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1052-53 (D.C. Cir. 2002) (concluding that remand without vacatur was "a hopeless cause" where the agency "failed to respond to the objections put before it" and "gave [no] plausible reason" justifying the rule); *Grayscale Invs., LLC v. Secs. & Exch. Comm'n*, 82 F.4th 1239, 1252 (D.C. Cir. 2023) (vacating where agency "failed to adequately explain" why it treated two similar situations differently); *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1222 (D.C. Cir. 2004) (vacating rule where agency failed to consider important aspect of problem).

Accordingly, remand without vacatur is unwarranted regardless of any supposed disruptive consequences. *See Comcast Corp. v. FCC*, 579 F.3d 1, 9 (D.C. Cir. 2009) ("[T]he second *Allied-Signal* factor is weighty only insofar as the agency may be able to rehabilitate its rationale for the regulation." (citation omitted)). In any event, Defendants' conclusory assertions of disruptive consequences fail to carry their burden to show that remand without vacatur is warranted. *See* Opp. 90. There is nothing disruptive about resuming the normal processes for reviewing and adjudicating asylum claims without the complicating overlay of the Rule. And Defendants provide no evidence that vacating the unlawful expedited removal policies would cause undue disruption— particularly while Defendants tout the low recent number of border crossings. *See, e.g.*, Press

Release, U.S. Customs & Border Protection (Sept. 19, 2025), https://perma.cc/3MLW-2MYL; Press Release, U.S. Customs & Border Protection (Aug. 12, 2025), https://perma.cc/X7Z8-ZT8G. Meanwhile, contrary to Defendants' suggestion, Opp. 90, Plaintiffs bear no burden to demonstrate that the normal remedy of vacatur is warranted.

### C.   The Court Can Vacate Plaintiffs' Negative Credible Fear Determinations.

Circuit precedent forecloses Defendants' argument that 8 U.S.C. § 1252(a)(2)(A)(iii) bars vacatur of Individual Plaintiffs' negative credible fear determinations. *See* Opp. 88. That provision applies only to "direct review of individual [noncitizens'] negative credible-fear determinations, not to facial challenges to the written policies that govern those determinations." *Grace*, 965 F.3d at 893; *see id*. at 892 (same). That Plaintiffs seek vacatur of their credible fear determinations as a *remedy* does not require the Court to "to examine how USCIS officers 'appl[ied]' the challenged policies 'to individual [noncitizens].'" *Id*. at 892-93 (quoting 8 U.S.C. § 1252(a)(2)(A)(iii)). Indeed, the same relief was ordered in *Grace. See id.* at 914 (Henderson, J., dissenting); Order ¶ 3, *Grace v. Whitaker*, No. 1:18-cv-1853-EGS, Dkt. No. 105 (D.D.C. Dec. 19, 2018).

### CONCLUSION

The Court should grant Plaintiffs' summary judgment motion and order all requested relief.

Dated: October 9, 2025

Respectfully submitted,

Richard Caldarone (D.C. Bar No. 989575)*
Kristy Blumeyer-Martinez*
Refugee and Immigrant Center for Education
and Legal Services (RAICES)
P.O. Box 786100
San Antonio, TX 78278
T: 210-960-3206
richard.caldarone@raicestexas.org
kristy.blumeyermartinez@raicestexas.org

/s/ Lee Gelernt
Lee Gelernt (D.D.C. Bar No. NY0408)
Omar C. Jadwat*
Noor Zafar*
Sidra Mahfooz*
Judy Rabinovitz*
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2660
lgelernt@aclu.org

Keren Zwick (D.D.C. Bar. No. IL0055)
Mary Georgevich*
Mark Feldman*
National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
T: 312-660-1370
kzwick@immigrantjustice.org
mgeorgevich@immigrantjustice.org
mfeldman@immigrantjustice.org

Melissa Crow (D.C. Bar. No. 453487)
Center for Gender & Refugee Studies
1121 14th Street, NW, Suite 200
Washington, D.C. 20005
T: 202-355-4471
crowmelissa@uclawsf.edu

Anne Dutton*
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA 94102
T: 415-581-8825
duttonanne@uclawsf.edu

Robert Pauw*
Center for Gender & Refugee Studies
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: 206-682-1080
rpauw@ghp-law.net

ojadwat@aclu.org
nzafar@aclu.org
smahfooz@aclu.org
jrabinovitz@aclu.org

Cody Wofsy (D.D.C. Bar No. CA00103)
Morgan Russell*
My Khanh Ngo*
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, Suite 700
San Francisco, CA 94104
T: 415-343-0770
cwofsy@aclu.org
mrussell@aclu.org
mngo@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: 202-457-0800
aspitzer@acludc.org
smichelman@acludc.org

*Attorneys for Plaintiffs*

*\*Appearing pro hac vice or under certificate
of pro bono representation*