BRETT A. SHUMATE
*Assistant Attorney General*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
KATHERINE J. SHINNERS
*Senior Litigation Counsel*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Email: katherine.j.shinners@usdoj.gov

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ) | |
| M.A., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:23-cv-01843-TSC |
| ) | |
| Kristi Noem[1], *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## DEFENDANTS' REPLY IN SUPPORT OF RENEWED CROSS MOTION FOR SUMMARY JUDGMENT [ECF NO. 110]

---

[1] Secretary of Homeland Security Noem is automatically substituted for her predecessor under Fed. R. Civ. P. 25(d).

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

ARGUMENT .......................................................................................................................2

   I.    Plaintiffs' Claims Are Foreclosed on Numerous Threshold Grounds ............................... 2

      A.    Organizational Plaintiffs Cannot Challenge the Rule and its Procedures........................ 3

      B.    The Third-Country Removal Claims Are Not Justiciable or Reviewable. .................... 8

      C.    Individual Plaintiffs Lack Standing to Challenge Procedures that Were Not, and Are Not Likely to Be, Applied to Them. ........................................................................... 9

      D.    The Expedited Removal Procedures Are Not "Final Agency Action." ........................ 10

      E.    The APA Does Not Permit Plaintiffs' Challenge to a "Combination" of Policies. ....... 11

      F.    Plaintiffs Cannot Challenge the Conditions on Asylum Eligibility in District Court, Except as Applied in Expedited Removal. .................................................................11

   II.    Plaintiffs' Claims Against the Rule Fail on the Merits Because the CLP Rule Is Authorized by Statute and Reasonably Explained....................................................... 13

      A.    The Rule's Conditions on Asylum Eligibility are Consistent with the Asylum Statute. ........................................................................................................... 13

      B.    The Rule's Conditions on Asylum Eligibility Are Not Arbitrary and Capricious. .... 177

      C.    The Rule Is Consistent with the INA's Credible Fear Provisions ............................. 21

      D.    Arbitrary-and-Capricious Review of the Rule's Application in Expedited Removal Is Unavailable, but This Aspect of the Rule Is Likewise Reasonable and Reasonably Explained. ...................................................................................................... 22

   III.   The Remaining Procedures Are Lawful. ...................................................................... 28

      A.    The 24-hour Consultation Guidance Is Consistent with Relevant Statutes and Regulations and Not Arbitrary and Capricious ..................................................... 29

      B.    The Third-Country Removal Procedures Are Consistent with the Statute and Not Arbitrary and Capricious ....................................................................................... 30

   IV.   The Court Should Grant Summary Judgment to Defendants on Counts Nine and Ten. .. 33

   V.    The Relief Plaintiffs Seek is Improper........................................................................ 33

      A.    Universal Vacatur is Unavailable and Inappropriate................................................. 344

      B.    The INA Bars the Individual Relief of Vacatur of Credible Fear Determinations and Parole. ............................................................................................................. 377

CONCLUSION.............................................................................................................. 37

## INTRODUCTION

The challenged regulation and procedures are consistent with the Executive's authority under the Immigration and Nationality Act (INA) and are well supported by reasoned decision-making. Plaintiffs' lawsuit invites the Court to re-weigh the considerations governing the prior Administration's policy choices and to dictate the Executive's discretion to regulate asylum eligibility and manage expedited removal practices in the face of crisis-levels of irregular migration. For the reasons stated in Defendants' cross-motion for summary judgment and below, the Court should not do so.

As explained in Defendants' motion, Plaintiffs' challenge to the Circumvention of Lawful Pathways Rule (the "Rule")—promulgated by the Department of Homeland Security (DHS) and the Department of Justice (DOJ) (the "Departments") in May 2023 in anticipation of a significant increase in migrants seeking to enter the United States at the southwest border in efforts to protect the functioning of the asylum and expedited removal systems—fails at the threshold and on the merits. The Organizational Plaintiffs lack standing to challenge the Rule, and no Plaintiff can obtain review of the Rule's application in affirmative asylum or removal proceedings, as those issues are only reviewable on an individual basis on a petition for review of a final removal order. In any event, the Rule's condition on asylum eligibility and its application in expedited removal are lawful. Nor is any aspect of the Rule arbitrary and capricious. In their efforts to demonstrate otherwise, Plaintiffs continue to re-cast the immigration statutes and the Departments' reasoning. Fundamentally, Plaintiffs disagree with the Departments weighing of the relevant considerations—but such policy disagreement does not violate the Administrative Procedure Act (APA). Plaintiffs may have a sincere interest in ensuring that as many people as possible are eligible for asylum or pass credible fear screenings—but that is not what the law requires, nor is that an underlying premise of the Rule.

1

Plaintiffs' challenges to the 24-hour consultation period and the third-country removal guidance similarly fail. Not only do most Plaintiffs lack standing to challenge the procedures, those procedures are not reviewable under the INA or the APA. Moreover, the challenged procedures comport with the governing statutes. While Plaintiffs disagree with Defendants' choice to promote the efficiency of expedited removal, including through the use of available third-country removal options as permitted by the INA, these disagreements do not state a claim. This is particularly so because 8 U.S.C. § 1252(e)(3), the only applicable carve-out from jurisdictional bars to judicial review of expedited removal guidance, does not permit arbitrary-and-capricious review of agency decisionmaking.

The Court should thus grant summary judgment to Defendants on these claims. But if the Court were to grant summary judgment to Plaintiffs on any of their claims, it should decline to enter the universal relief sought. Universal vacatur of the Rule and procedures and vacatur of the credible fear determinations are forbidden by the INA and unjustified by the equitable principles governing APA remedies. Should the Court find any relief warranted, the Court should remand to the agencies without vacatur.

## ARGUMENT

### I.    Plaintiffs' Claims Are Foreclosed on Numerous Threshold Grounds

Plaintiffs' claims fail at the threshold on a variety of justiciability and reviewability grounds—including lack of standing. Plaintiffs appear to argue that the Court need not look into standing for each Plaintiff so long as it determines there is one Plaintiff with standing to assert each claim. *See* ECF 116 at 2. This is incorrect. It is not enough to determine that at least one Plaintiff has standing to challenge each practice because Plaintiffs must do more at this stage than merely "establish jurisdiction." *Id.* (citing *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014)). To determine the proper scope of relief, the Court must determine which, if any, Plaintiffs

may properly challenge which practices. *See* ECF 110 at 85–86.

**A.    Organizational Plaintiffs Cannot Challenge the Rule and its Procedures.**

The Organizations lack the ability to challenge the regulation and practices because they lack Article III standing, lack statutory standing under § 1252(e)(3), and are not within the zone of interests of the relevant immigration statutes. Further, the Court must examine whether each Organization has asserted a cognizable injury to determine the appropriate scope of relief.

1.    The Organizations Lack Article III Standing.

Nothing about the Rule or the challenged procedures directly limits or regulates the Organizational Plaintiffs' provision of legal or other services. Any claimed downstream impacts of these practices on the resources the Organizations devote to particular immigration cases and on funding streams are not judicially cognizable injuries. *See* ECF 110 at 18 (citing, *inter alia*, *United States v. Texas*, 599 U.S. 670 (2023)). Contrary to Plaintiffs' arguments (ECF 116 at 4), the Supreme Court's decision in *Texas* is not only about whether a third party may sue to compel arrest or prosecutions. It recognizes the broader principles that third parties—whether individuals or organizations—lack a "judicially cognizable interest" in whether or how the Executive exercises its immigration enforcement discretion against someone else. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984), *cited in Texas*, 599 U.S. at 677. Plaintiffs do not dispute that each of the reasons the Supreme Court articulated in *Texas* to support its conclusion that the plaintiff States lacked standing—including that discretionary enforcement decisions relating to third parties involve no exercise of coercive power over the organizational plaintiff; that those decisions implicate Article II and foreign-policy concerns; and that courts lack "meaningful standards" to assess such decisions, *see id.* at 678–81—apply with equal force here. *See* ECF 110 at 18–19. This case, unlike other cases "involving statutory requirements or prohibitions on the Executive," *see* ECF 116 at 4 (citing *Texas*, 599 U.S. at 684), involves the Executive Branch's exercise of discretion over

immigration enforcement, *see Texas*, 599 U.S. at 684–85.

The Supreme Court's recent decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) ("*Alliance*"), confirms that the Organizational Plaintiffs lack standing. That decision made clear that an organization's expenditure of resources in response to a government practice is not itself a cognizable injury—there must first be an actual impairment of the organization's services. *See* ECF 110 at 19–20, 22–23. Contrary to Plaintiffs' assertion (ECF 116 at 2), the requirement to show a perceptible impairment of services rather than merely an expenditure of resources does not depend on the nature of the organization's services and is not limited to issue-advocacy services. *See id.* at 22–23. Thus, it is not material that the Organizations allege they are spending more resources to litigate each removal case or conduct credible fear consultations as a result of the implementation of the Rule or the third-country removal procedures. *See* ECF 116 at 3, 4. The only impediment or impairment the Organizations have shown in this regard is the same any lawyer faces when there is a change of law in their practice area: a need to shift their legal practice to adapt to changes in the law regarding available forms of protection. As explained, recognizing such an injury as sufficient to support Article III standing would nullify the principle that lawyers generally lack an independent interest in the rules applicable to their clients. *See* ECF 110 at 21–22 (citing *Kowalski v. Tesmer*, 543 U.S. 125, 130–34 (2004)).[2] Further, the commonplace impacts of legal developments on legal service providers is far from the type of organizational injury recognized in *Havens Realty*, where, the challenged practice itself involved the defendant providing the plaintiff organization with false information about housing availability, which made it more difficult for the organization to provide housing counseling

---

[2] Although *Kowalski* addresses third-party standing, its reasoning supports the conclusion that a legal services organization lacks any cognizable Article III injury based on the downstream impacts on its practice arising from changes to the substantive law in its practice area.

4

services. *See Alliance*, 602 U.S. at 295–96 (discussing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)); *see also* ECF 110 at 20.[3]

The Organizations' claimed difficulties communicating with clients in credible fear proceedings or claimed loss of funding also cannot establish Article III standing to challenge the respective procedures. As to the Organizations' claim that they are "unable to reach most people in expedited removal" as a result of the 24-hour consultation period (ECF 116 at 3), the cited declarations do not support this statement. According to those declarations, those claimed difficulties are speculative or appear to primarily arise from other practices or events not challenged here, such as holding aliens in custody—and in particular CBP custody—and a claimed lack of advance notice of credible fear interviews. ECF 109-2 at ¶ 24; *see also* ECF 109-1 at ¶ 25 (failing to assert specific facts demonstrating interference). As to claims of lost funding, Las Americas does not meet the requirements at this stage to demonstrate a loss of funding traceable to the Rule. While it claims that its budget has fallen approximately 14% "due in part to the Rule," ECF 116 at 5, it does not explain how exactly the decreased budget relates specifically to the Rule nor specify the funding lost. Again, Las Americas' inability to provide details that could tie this budgetary impact to the Rule and challenged practices specifically—as opposed to immigration policies generally—dooms its claim to Article III standing on this ground. *See* ECF 110 at 24; *see also Arizona v. Garland*, 730 F. Supp. 3d 258, 278 (W.D. La. 2024) ("[T]he issue before the Court is not whether the Plaintiff States have been harmed by the cumulative effect of this administration's immigration policies and administrative actions. It is whether the [challenged rule], specifically, has caused an economic injury in fact to the [Plaintiff States].").

---

[3] Plaintiffs do not dispute that the Organizations' expenditures on learning and obtaining information about the Rule, training staff, updating internal procedures, and developing new strategies for counseling aliens are not cognizable injuries. *See* ECF 110 at 22–23.

Finally, the Organizations cannot demonstrate continuing injury from the Rule's application in expedited removal. Article III injury must persist 'throughout the litigation,'" *Spencer v. Kemna*, 523 U.S. 1, 7 (1998), and Plaintiffs do not dispute that the Organizations do not currently represent clients in expedited removal who are subject to the Rule, *see* ECF 116 at 5–6. It is not enough that RAICES and Las Americas represent aliens who have pending affirmative asylum applications or are in immigration court proceedings and who could *theoretically* be placed in expedited removal: to satisfy Article III, the injury must be "certainly impending." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992). Further, Plaintiffs do not explain how the Rule's application in expedited removal would injure the Organizations in such circumstances, where they presumably have already worked with the clients on their applications for relief or protection from removal.

2.    Section 1252(e)(3) Does Not Permit Suit to Remedy an Organization's Alleged Injury from Expedited Removal Procedures.

Circuit precedent clearly holds that suit under 8 U.S.C. § 1252(e)(3), on which the Organizational Plaintiffs rely for jurisdiction, *see* ECF 19 (Am. Compl.) ¶ 17, must be brought to vindicate the interest of *individuals* subject to expedited removal. "Congress must have contemplated that lawsuits challenging [§ 1225(b) and implementing regulations and policies] would be brought, if at all, by individual aliens who—during the sixty-day period—were aggrieved by the statute's implementation." *AILA v. Reno*, 199 F.3d 1352, 1359 (D.C. Cir. 2000); *see* ECF 110 at 25–28. As explained, and contrary to Plaintiffs' arguments (ECF 116 at 7–8), the D.C. Circuit recently reaffirmed this view in *Make the Road*. The court in *Make the Road* allowed suit by associational organizations made up of individual aliens directly regulated by an expedited removal regulation, who were asserting a "derivative" claim "on behalf of their individual members." *Make the Road New York v. Wolf*, 962 F.3d 612, 626–28 (D.C. Cir. 2020). But it adhered

to *AILA*'s holding that § 1252(e)(3) contemplates only suits on behalf of individuals—whether individually or through an organization *made up of individual members* directly covered by the regulation at issue. *See id.* at 627–28. Here, by contrast, the Organizations are asserting indirect injury to themselves, and do not qualify as permissible claimants under § 1252(e)(3).

        3.      <u>The Organizational Plaintiffs Are Not Within the Zone of Interests and Their Claims Are Precluded by the INA</u>

The Organizations' interests in providing legal services to aliens who wish to seek asylum in the United States are also not within the zone of interests protected by the INA. ECF 110 at 28–29. Although the INA provides that aliens subject to removal be permitted consultation and representation at their own expense, the INA does not evince any concern with the interests of those lawyers or legal services organizations themselves. And even assuming the expedited removal statute is concerned with "ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution," as Plaintiffs claim (*see* ECF 116 at 6–7), the fact that the organizations' missions are consistent with that purported concern cannot bring them within the zone of interests. Were this so, any advocacy or services organization could bring themselves within the zone of interests of their chosen statute based on their mission, which would run counter to the Supreme Court's recent holdings in *Alliance* and *Texas* in the Article III context, limiting the scope of third parties' judicially cognizable interests. *See supra* § I.A.1.

Indeed, the INA's statutory review scheme *forecloses* review of the Organizational Plaintiffs' claims, by strictly limiting administrative and judicial review to review at the behest of individual aliens. *See* 8 U.S.C. § 1252(a)(2), (5), (b)(9), (e)(3); ECF 110 at 29–30. Plaintiffs' response that § 1252(e)(3) permits other judicial review, ECF 116 at 7–8, is contrary to circuit precedent, as discussed just above. *See supra* § I.A.2. And the INA does not provide for systemic review of the application of asylum restrictions—instead, those claims must be channeled into

individualized review of removal orders. *See infra* § I.F. Permitting organizations to challenge the Rule through an APA suit would "severely disrupt" the INA's "complex and delicate administrative scheme," including by providing plaintiffs' alien clients "a convenient device for evading the statutory" restrictions on review. *Block v. Community Nutrition Inst.*, 467 U.S. 340, 348 (1984); *accord Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (holding similar review scheme precludes "organizational plaintiff" from "suing to challenge [] INS policies or statutory interpretations that bear on an alien's" legal claims). The clear import of the INA's channeling provisions is to re-direct challenges to the rules applicable in removal proceedings into individualized judicial review of removal orders. *See infra* § I.F. The INA does not permit the Organizations to evade those limitations by asserting claims on their own behalf.

B.    **The Third-Country Removal Claims Are Not Justiciable or Reviewable.**

Plaintiffs fail to adequately explain how their alleged injuries may be redressed by an order of this Court vacating the third-country removal procedures at issue. An order vacating the procedures would do nothing to prevent DHS officials from using their third-country removal authorities as appropriate in individual cases. Plaintiffs do not dispute the underlying premise, but respond that the procedures do not align with the statutory authority. *See* ECF 116 at 12. This is incorrect. *See infra* § III.B. And to the extent certain Plaintiffs' individual past injuries may be redressable by an order setting aside their removal orders, that relief is unavailable, *see infra* § V.B.

Leaving aside the redressability problems with Plaintiffs' systemic challenge to the third-country removal procedures, those procedures are not reviewable. Section 1252(a)(2)(B)(ii) bars review of the third-country removal guidance to the extent that guidance allows removals to countries other than those designated by a covered alien in accordance with § 1231(b)(2)(C)'s conferral of discretion on DHS to disregard a designation under specified circumstances. *See* ECF

110 at 32. And contrary to Plaintiffs' arguments, ECF 116 at 12–13, § 1231(h) also bars this aspect of their suit. In arguing that § 1252(e)(3) and the APA render § 1231(b) judicially enforceable notwithstanding § 1231(h), Plaintiffs primarily rely on *Zadvydas v. Davis*, 533 U.S. 678, 687–88 (2001). But that case is inapposite. The aliens in *Zadvydas* filed habeas corpus petitions, contending the government lacked authority to detain them under any provision of law, including § 1231. *See* 533 U.S. at 689. Here, by contrast, because Plaintiffs rely directly on § 1231 as the source of their asserted additional "substantive or procedural right[s]"—and which do not implicate habeas corpus under 28 U.S.C. § 2241 or the Suspension Clause's protections against unlawful detention—Section 1231 bars their suit. And their claim that § 1252(e)(3) provides authority is incorrect. Section 1252(e)(3) merely restores narrow jurisdiction over policies and procedures implementing expedited removal that would otherwise be barred by § 1252; it does not independently provide a cause of action or render reviewable that which is not independently reviewable, nor does it expand APA jurisdiction to cover agency actions that are not otherwise reviewable under the APA.[4]

### C.    Individual Plaintiffs Lack Standing to Challenge Procedures that Were Not, and Are Not Likely to Be, Applied to Them.

Plaintiffs do not dispute that not all Individual Plaintiffs were or are likely to be injured by each challenged procedure. *See* ECF 116 at 1–2. Although they are correct that at this time, at least one Individual Plaintiff claims injury from at least one of the challenged procedures, those who do not establish injury as to a given procedure should have their individual claim dismissed as to that procedure. *See* ECF 110 at 33–34. And Plaintiff J.P.'s claims should be dismissed in their entirety,

---

[4] Plaintiffs also cite an out-of-circuit district-court decision allowing an APA challenge despite § 1231(h), ECF 116 at 13 (citing *Texas v. United States*, 515 F. Supp. 3d 627, 634 (S.D. Tex. 2021)), but notably that case did not involve the special expedited-removal review scheme.

because he withdrew his application for admission, does not claim to have been subjected to expedited removal or the challenged expedited removal procedures upon re-entry, and is not subject to the Rule's condition on asylum eligibility. *See* ECF 116 at 1 n.1; ECF 110 at 33.[5]

### D. The Expedited Removal Procedures Are Not "Final Agency Action."

The two challenged expedited removal procedures are also not reviewable "final" agency action under 5 U.S.C. § 704. *See* ECF 110 at 34–35 (citing, inter alia, *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). The third-country removal guidance is not final action because: (1) it does not bind DHS employees to any particular action with respect to any individual or class of aliens, *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013); *Nat'l Min. Ass'n v. McCarthy*, 758 243, 253 (D.C. Cir. 2014) ("statement of policy" not "final agency action" unless and until it is applied to a regulated entity); and (2) by merely restating the agency's undisputed statutory authority, the third-country removal guidance does not create any rights or obligations or produce legal consequences on its own, *see id.* As to the consultation guidance, it sets out how U.S. Citizenship and Immigration Services (USCIS) will implement its consultation authority, but does not itself affect any Plaintiffs—it does so only contingent on "future administrative action." *DRG Funding Corp. v. HUD*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)).

That particular Individual Plaintiffs have been subject to the third-country removal or consultation procedures in their removal proceedings does not render the procedures challengeable final agency action. At most it allows those, and only those, Plaintiffs who were subject to those

---

[5] Defendants withdraw their arguments that Plaintiff E.B. lacks standing to challenge the Rule, but do not withdraw their arguments that he lacks standing to challenge the 24-hour consultation period and third-country removal procedures, as he has not been subjected to expedited removal and has not alleged facts that could demonstrate imminent injury.

procedures to challenge their removal order—the relevant final agency action. *See id.* But § 1252(a)(2)(A)(iii) unambiguously precludes judicial review concerning "the application of [section 1225(b)(1)] to individual aliens, including the determination made under section 1225(b)(1)(B)" concerning credible fear, and nothing in § 1252(e) restores jurisdiction over such individual claims. *See* 5 U.S.C. §§ 701(a)(1), 704 (precluding review even of final agency action where statue bars judicial review).[6]

### E.    The APA Does Not Permit Plaintiffs' Challenge to a "Combination" of Policies.

Plaintiffs disclaim any reliance on Count Thirteen (Am. Compl. ¶¶ 179-81), which has not been held in abeyance. *See* ECF 116 at 14 n.4; ECF 110 at 16 (summarizing agreements and orders as to claims held in abeyance). Thus, the Court may grant summary judgment to Defendants on this Count for the reasons stated in Defendants' motion. *See* ECF 110 at 35–36.

### F.    Plaintiffs Cannot Challenge the Conditions on Asylum Eligibility in District Court, Except as Applied in Expedited Removal.

Neither the Organizations nor the Individual Plaintiffs can assert a systemic challenge to the Rule's conditions on asylum eligibility as applied in regular removal proceedings, as the INA does not provide for such review. *See* ECF 110 at 36–37 (citing, *inter alia*, *Meza v. Renaud*, 9 F.4th 930, 933 (D.C. Cir. 2021) (stating there is only one exception to § 1252(a)(5)'s limitations on review of removal orders, "for certain system-wide challenges to written rules governing expedited removal" under § 1252(e)(3)); *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032–35 (9th Cir. 2016). Instead, the INA channels challenges that relate to removal proceedings into review of an individual removal order. 8 U.S.C. §§ 1252(a)(5), (b)(9).

---

[6] But even assuming, as Plaintiffs contend (ECF 116 at 10), that the APA nonetheless permits review under § 1252(e)(3), that section limits review to the procedures' constitutionality or legality, and does not permit review of agency action as an allegedly arbitrary and capricious policy choice. *See infra* at 22–23, 29.

Plaintiffs argues that the INA's judicial-review scheme "do[es] not address APA challenges to policies that apply both within and outside any form of removal proceedings." *See* ECF 116 at 9. This reasoning does not apply here and is also incorrect. *First*, as discussed (ECF 110 at 37 n.6), and contrary to Plaintiffs' assertions, there is no relevant denial of asylum pursuant to the Rule that exists "outside the context of *any* kind of removal proceedings." *See* ECF 116 at 9. If an alien subject to the Rule files an affirmative application for asylum before USCIS, and USCIS determines that it cannot grant asylum, that decision is not final and thus not subject to challenge under the APA because the unlawfully-present alien will be referred to removal proceedings in the immigration courts, where he or she may assert his or her asylum claim as a defense to removal. *See* 8 C.F.R. §§ 208.14(c)(1), 1208.2(b)[7]; *Nwaeke v. Garland*, 2025 WL 1622104, at *3 (D.N.J. June 9, 2025) ("While a referral to immigration court concludes USCIS's role in the asylum process, referral is not a final agency action."). Thus, ultimately, from the perspective of judicial review, there is no separation between affirmative asylum and removal proceedings: the application of the Rule's condition on asylum eligibility in affirmative asylum proceedings will result in removal proceedings, and any legal issues arising from any denial of asylum in removal proceedings would be channeled into the petition-for-review process.

*Second*, even assuming some applications of the Rule in affirmative asylum proceedings were not inextricably tied to the removal process, that would be no justification for allowing a universal challenge to a rule that has its primary application in removal proceedings. It would

---

[7] Only if the alien is in some other lawful immigration status or deferral of removal at the time USCIS determines that an applicant will not be granted asylum, shall USCIS deny the application. 8 C.F.R. § 208.14(c)(2). Even then, however, the denial is not final because if the alien subsequently loses that lawful immigration status and is placed in removal proceedings, he or she would renew their application for asylum before the IJ. *See, e.g.*, *Dhakal v. Sessions*, 895 F.3d 532, 541 (7th Cir. 2018).

defeat the purpose of § 1252(a)(5) and (b)(9)'s channeling provisions to allow universal review and vacatur of a rule where *some applications* arise outside the removal context. This would evade the review restrictions for all those who are or will be in removal proceedings.

In sum, contrary to Plaintiffs' arguments, the INA's channeling provisions are indeed addressed to the "type of grievance" that Plaintiffs raise here—denial of asylum as a defense to removal, review of which is "only permitted in removal proceedings." ECF 116 at 9; *see Dhakal v. Sessions*, 895 F.3d 532, 541 (7th Cir. 2018). That Plaintiffs are preemptively and systemically attacking an asylum-eligibility rule is immaterial—the INA clearly envisions that such a challenge must be raised in the context of review of an individual asylum denial in removal proceedings. Plaintiffs cannot evade the INA's clear jurisdictional limits through their programmatic challenge.

## II.    Plaintiffs' Claims Against the Rule Fail on the Merits Because the CLP Rule Is Authorized by Statute and Reasonably Explained.

To the extent any of the Plaintiffs' claims against the Rule are justiciable and reviewable, however, they lack merit. To start, the Rule's rebuttable presumption of asylum ineligibility is well within the Executive Branch's statutorily-bestowed discretion to set limitations and conditions on asylum eligibility, including at the credible fear stage. All aspects of the Rule are likewise reasonable and reasonably explained, and the Departments' stated rationales are amply supported by the record before them at the time the Rule was adopted.

### A.    The Rule's Conditions on Asylum Eligibility are Consistent with the Asylum Statute.

Asylum is a discretionary benefit to which no alien is entitled, and Congress has expressly provided the Executive with authority to establish limitations on asylum eligibility so long as those limitations are "consistent with" the asylum statute. 8 U.S.C. § 1158(b)(2)(C). The Rule is thus a valid exercise of that authority because it does not conflict with any provision of the statute. *See* ECF 110 at 38–61. Plaintiffs' arguments to the contrary lack merit.

As an initial matter, Plaintiffs continue to incorrectly describe the Rule as imposing three different conditions on asylum eligibility, each of which (they say) is inconsistent with the asylum statute. *See* ECF 116 at 14–20. None of the three conditions is inconsistent with the asylum statute, which affords broad discretion on the Executive to impose conditions on asylum eligibility and renders permissible upf-front denials of asylum by the Executive Branch. *See* ECF 110 at 38–43. But in any event, Plaintiffs' description continues to ignore the Rule's goals and how the Rule works. None of the conditions in the Rule operates as a stand-alone bar to asylum; instead, the Rule sought to protect the systemic efficiency of the asylum system by taking a holistic approach, providing multiple alternative means for aliens to avoid the presumption of asylum ineligibility. *See id.* at 44–51.

Thus, even assuming that the asylum statute prohibits the Executive from imposing an "entry-based restriction" in order to protect the integrity of the asylum system—which Defendants dispute—the Rule simply does not impose such a rigid restriction. Regardless of how Plaintiffs characterize the various means of avoiding or rebutting the presumption of asylum ineligibility, it is a logical fallacy to insist that a bar to imposing one or the other condition, standing alone, necessarily means that the government could not require applicants to satisfy one or the other of the conditions (even though this too is an inaccurate description of the Rule). Put another way, even assuming it were unlawful for the government to say that asylum will be denied unless you enter through a port of entry, that does not mean it is unlawful for the government to say that asylum will be denied unless the applicant *either* entered through a port of entry *or* satisfies an alternative prerequisite. In such a case, the manner of entry is not dispositive. Again, this is not a case where the government is offering a choice between "unlawful" options. *See* ECF 116 at 16, 19. Here, the joining of multiple options resolve any possible impermissibility of either option taken alone. *See* ECF 110 at 48–49. That is, even under Plaintiffs' view—that entry-based or

transit-country restrictions are inconsistent with the asylum statute—it is the continuing availability of other options and rebuttal grounds that renders each condition an option, rather than a restriction, and renders the Rule consistent with the asylum statute. Because all of Plaintiffs' arguments rely on the same logical fallacy, they all fail.[8]

Moreover, the various means of avoiding the presumption are not themselves inconsistent with the statute even if treated as stand-alone bars to asylum eligibility. Even assuming the CBP One exception could be viewed as a stand-alone entry-based restriction (it cannot), the D.C. Circuit has twice countenanced up-front denials of asylum to address emergency circumstances like those presented here, including for aliens who enter between ports of entry, as an exercise of the Executive Branch's ultimate discretion over asylum set forth in 8 U.S.C. § 1158(b)(1)(A). *See* ECF 110 at 42–43. But again, the Rule does not place dispositive weight on manner of entry, as lawful entry at a port of entry is neither necessary nor sufficient to overcome or avoid the Rule's presumption. *See East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 669–75 (9th Cir. 2021) (*East Bay I*) (acknowledging that it is permissible to consider manner of entry in a less dispositive fashion).

As to the "transit-country" exception for those aliens who seek asylum in a country through which they traveled en route to the United States, neither Plaintiffs nor the Ninth Circuit in *East Bay II* have shown how this condition—even if it were a stand-alone bar—would *conflict with* or *contradict* the asylum statute. ECF 110 at 39, 45–47. Indeed, this option would be entirely compatible with § 1158's provisions even if it were a prerequisite to asylum eligibility for those who transited through other countries before arriving in the United States. *See id.* But in any event, the Rule does not impose a rigid requirement to seek asylum in a third country—it provides

---

[8] Nor are the options so "narrow" as to render them not viable options. *See* ECF 110 at 49, 55–59; ECF 116 at 15.

multiple circumstances in which aliens may be eligible for asylum despite failing to apply for protection in a transit country.

The "parole-process" exception for those aliens who received travel authorization pursuant to a parole pathway also would not be inconsistent with § 1158(a)(1) even if it operated as a stand-alone bar. *See* ECF 110 at 47. Here, it is Plaintiffs who engage in "wordplay," insisting that the option to avoid asylum eligibility by applying for a parole program is a "status"-based restriction despite the fact that travel authorization does not confer any type of status. *See* ECF 116 at 17. Indeed, this exception would apply regardless of whether or not the alien was granted parole at the port of entry, so long as they sought authorization to travel to the port of entry through a parole process. 8 C.F.R. § 208.33(a)(2)(ii)(A). Nor does this exception render the alien's manner of entry dispositive of asylum eligibility. Again, nothing in the Rule requires an alien to have qualified for one of the prior parole programs and travel to a port of entry to be eligible for asylum—that was merely one option to avoid asylum ineligibility.

Finally, it is not correct that the Rule operates in practice as an "entry-based" restriction. ECF 116 at 20 (asserting this argument). Each of the options to avoid the presumption of ineligibility was meaningful, even if not all options were available to all aliens, as shown by the data demonstrating use of those options and the data demonstrating those aliens who were able to rebut the presumption. ECF 110 at 49–51, 55–59. Despite their complaints about the third-country exception, Plaintiffs cannot deny that this is a viable option, including for aliens who may obtain protection in third countries and never need to come to the United States. And Plaintiffs' assertions that the parole provision did not apply to people who entered via the southwest border (ECF 116 at 20) misses the point. The prior parole processes provided an option for certain aliens to travel to interior air ports of entry to seek parole *instead of* entering across the southwest border, where the presumption of asylum ineligibility could have applied. *See* 88 Fed. Reg. at 31,317.

**B.** **The Rule's Conditions on Asylum Eligibility Are Not Arbitrary and Capricious.**

The Rule's conditions on asylum eligibility readily survive arbitrary-and-capricious review, which asks only whether "the agency has acted within a zone of reasonableness." *Federal Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 424, 423 (2021). The Departments enacted the Rule for compelling reasons: an expected increase in border encounters that threatened to overwhelm the Departments' "ability to effectively process, detain, and remove, as appropriate, the migrants encountered," 88 Fed. Reg. at 31,316, with attendant increases in the number of aliens unlawfully present in the country, strains on government operations and resources, health and safety concerns for aliens at overcrowded processing facilities, and impacts on local communities along the southwest border, *id.* at 31,325-26, 31,387.  In the Rule, the Departments appropriately weighed the availability of alternative pathways, the Rule's benefits, and the Rule's interaction with other relevant policies. ECF 110 at 51–61. The Rule's rebuttable presumption of asylum ineligibility for aliens who failed to pursue one of several alternatives in other countries or in seeking to enter the United States, coupled with an expansion of alternatives, encouraged aliens to choose these alternatives for seeking entry over irregular migration, or discouraged them from undertaking the dangerous migration in the first place. Indeed, as evidenced by subsequent measures taken by both this and the prior Administration to stem the continued high numbers of illegal crossings, the Rule did not go far *enough* to protect the asylum and expedited removal system and the country from the heavy burden of the unprecedented volume of illegal immigration.

Plaintiffs do not directly contest that the stated justifications support the Rule. Instead, they primarily attack premises on which the Departments did not in fact rely or disagree with the Departments' weighing of the relevant factors. Plaintiffs' arguments lack merit.

1.  <u>The Rule Does Not Rely on Impermissible Factors.</u>

In arguing that Defendants considered impermissible factors, Plaintiffs both misstate and oversimplify the INA, as well as the Departments' reasoning and goals in enacting the Rule.[9] The Rule was intended to discourage irregular migration and encourage orderly entry. Plaintiffs still point to nothing that precludes the Departments from considering the factors they did, including the availability of other pathways to enter the United States in lieu of illegal or unauthorized entry and the potential effects of an asylum limitation on the immigration system as a whole. *See* ECF 110 at 54; ECF 116 at 22. Congress specifically gave the Executive Branch discretion over asylum, including to promulgate regulations limiting eligibility for asylum and to determine whether asylum was warranted in a particular case. *See* ECF 110 at 54. Further, it is appropriate for the Executive Branch to consider the "operation of the immigration system," *Judulang v. Holder*, 565 U.S. 42, 55 (2011), particularly in the context of a Rule that limits a discretionary benefit in a manner that affects "this Nation's international relations," *Arizona v. United States*, 567 U.S. 387, 396 (2012). It is entirely expected that the Executive Branch would take into account other means of reducing burdens at the border in calibrating the country's approach to immigration. Congress, in providing an avenue for certain aliens to seek protection in the United States once present in the country—but subject to the Executive Branch's considerable discretion—in no way precluded the Executive Branch from considering these factors.

---

[9] For example, parole is not a "status" but instead a means for aliens to be temporarily released into the country. *See* 1182(d)(5)(A). Aliens who are paroled can thus apply for asylum, if they believe they qualify for the protection. Indeed, the prior parole processes contemplated that parolees would seek asylum or other forms of relief once in the United States. *See, e.g.*, *Implementation of a Parole Process for Haitians*, 88 Fed. Reg. 1243, 1244 (Jan. 29, 2023) ("[T]hose who are not granted asylum or any other immigration benefits during this two year parole period generally will need to depart the United States prior to the expiration of their authorized parole period or will be placed in removal proceedings after the period of parole expires.").

2.  The Departments' Reliance on Alternative Pathways Is Supported by the Record.

Plaintiffs disclaim that they have argued that a key premise of the Rule is that a viable alternative pathway will be available to *every* alien affected by the Rule; instead, they say, their argument is that the Rule's premise is that the pathways provide "sufficient" or "adequate" methods to obtain protection. ECF 116 at 23. But the Rule's preamble likewise does not use these terms in this context. In any event, this is semantics: the import of Plaintiffs' arguments is that the pathways and rebuttal grounds cannot possibly be "sufficient" or "adequate" unless they are available to nearly all aliens who seek to enter the United States to access its asylum process. *See id.* And this was not the Departments' stated goal: the Departments acknowledged that not all pathways would be available, *see, e.g.*, 88 Fed. Reg. at 31,371 ("[F]or some individuals, particular third countries—or even all third countries—may not be a viable option"), and that some asylum claims would be denied as a result of the Rule, 88 Fed. Reg. at 31,332, but nonetheless reasoned that this risk was "outweighed by the benefits to the overall function of the system, including deterrence of dangerous irregular migration and smuggling," *id*. The preamble cannot plausibly be read to suggest that nearly every alien would have a means to avoid or rebut the presumption. Moreover, the Rule also aimed to disincentivize aliens with non-meritorious claims from crossing the border illegally. *See* 88 Fed. Reg. at 11,736.

In any event, as already shown, the record evidence demonstrates that each pathway and rebuttal ground presents a meaningful option to avoid the presumption of ineligibility. *See* ECF 110 at 55–59. The record supports the Departments' calculus in weighing the availability of alternative pathways and the Rule's benefits to the functioning of the immigration system. While Plaintiffs attempt to pick apart the record evidence, their arguments boil down to a disagreement with the Departments' weighing of the factors. But "a court may not substitute its own policy

judgment for that of the agency" so long as the agency's reasoning is sound. *Prometheus Radio Project*, 592 U.S. at 423. And that is precisely what Plaintiffs are asking the Court to do. At base, Plaintiffs' disagreement with the specific calibration of the Rule does not render the Rule arbitrary and capricious.

### 3.   The Rule Does Not Rely on Assumptions Concerning Meritorious Claims.

Contrary to Plaintiffs' insistence (ECF 116 at 28–29), the Rule is not based on the premise that those aliens subject to it are less likely than others to otherwise qualify for asylum. Instead, it was based on the Department's determination that it was imperative, given the exigent circumstances, "to strike a balance" between systemic efficiencies and deterrence of irregular migration. *See* 88 Fed. Reg. at 31,314–19, 31,329. The Departments did reason that the Rule would enhance control over the border and thus enable the Departments to more expeditiously remove "those with non-meritorious claims" to all forms of protection, 88 Fed. Reg. at 31,336, and that the Rule would enable it to screen out "more" non-meritorious claims, 88 Fed. Reg. at 11,746.  But this in no way means that the Rule rests on the premise that everyone who is subject to the Rule is less likely to qualify for asylum. Indeed, the Departments expressly acknowledged the Rule would result "in the denial of some asylum claims that otherwise may have been granted." 88 Fed. Reg. at 31,332. Ultimately, Plaintiffs simply disagree with the reasoned judgment of the Departments in accepting that risk in order to safeguard the border and the overall functioning of the immigration system. But the Court may not "second-guess[]" agencies' "weighing of risks and benefits" in adopting a policy choice. *Dep't of Commerce v. New York*, 588 U.S. 752, 777 (2019).

### 4.   The Rule Does Not Fail to Consider the Interrelation of Expedited Removal Procedures.

The Rule likewise adequately considers the separate expedited removal procedures. *See* ECF 110 at 59–61. The procedures identified by Plaintiffs were either outside the scope of the

Rule or expressly addressed. *See id.* Nor have Plaintiffs explained precisely what they believe Departments failed to consider about each policy and why it was relevant to the overall reasoning. In particular, Plaintiffs do not explain how procedures governing removal to *third countries* could have any reasonable bearing on the Rule's conditions on eligibility for asylum from the alien's *home country*. *See* 8 U.S.C. § 1101(a)(42)(A) (defining "refugee"). Moreover, the expedited removal procedures challenged here are in line with the Rule's efficiency goals, including expeditious removal to reduce the strain on DHS resources at the border and elsewhere. *See* 88 Fed. Reg. at 31,334–35.

### C.    The Rule Is Consistent with the INA's Credible Fear Provisions

The Rule's approach to applying the asylum-eligibility condition in credible fear screenings is also entirely consistent with the INA's definition of "credible fear of persecution." 8 U.S.C. § 1225(b)(1)(B)(v) (defining "credible fear of persecution as a "significant possibility . . . that the alien could establish eligibility for asylum"). The Rule applies its condition on asylum eligibility during credible fear screenings and applies the "significant possibility" standard to the consideration of the presumption. ECF 110 at 10–11, 61–63. And where the presumption of asylum ineligibility applies and the alien is not exempt or able to rebut it, the Rule reasonably applies the "reasonable possibility" standard to screen for withholding and CAT. These choices are consistent with the INA.

Plaintiffs incorrectly assert that because the adopted regulatory text does not explicitly set forth the "significant possibility" standard or specifically refer to the prior credible fear regulations, the Rule does not require adjudicators to apply that statutory standard. ECF 109 at 30–32; ECF 116 at 30–31. But, as Defendants explained, the text of the regulation merely provides the order of operations and must be read in context. ECF 110 at 61–63. That is, it must be read in the context of the  statutory "significant possibility" standard, the Departments' previous use of

the same language in other regulations to require the application of that standard,[10] the generally applicable credible fear regulation at 8 C.F.R. § 208.30(e)(2) that uses that standard, and the contemporaneous explanation in the Rule's preamble that explains how the "significant possibility" standard applies, *see* 88 Fed. Reg. at 31,380.[11] Plaintiffs simply insist that the Rule cannot be interpreted that way, despite these contemporaneous explanations of the Rule's meaning. Yet Plaintiffs' claim erects a strawman; the Court cannot find the Rule unlawful based on an interpretation of the regulation that is inconsistent with the promulgating Departments' own reading of the regulation, as memorialized not only in the preamble to the Rule, but also in the relevant agency training procedures. *See* ECF 53-3 at 15 (attaching June 2023 agency procedures).

### D.    Arbitrary-and-Capricious Review of the Rule's Application in Expedited Removal Is Unavailable, but This Aspect of the Rule Is Likewise Reasonable and Reasonably Explained.

As explained, § 1252(e)(3) does not authorize an APA challenge under the arbitrary-and-capricious standard. Reviewing agency action not just for illegality, but for allegedly deficient decision-making, is inconsistent with the statute's limited carve-out to allow judicial review only of whether an expedited removal practice is unconstitutional, inconsistent with the provisions of the INA, or "otherwise in violation of law." *See* 8 U.S.C. § 1252(e)(3)(ii). This limited carve-out mirrors some of the APA's judicial-review provisions, which allow a court to set aside agency

---

[10] *See* 88 Fed. Reg. at 31,380 n. 195 (noting that prior rules that used "is" in the same way as this Rule were contemporaneously interpreted to maintain and apply the "significant possibility" standard"); *cf. WA All. Of Tech. Workers v. DHS*, 50 F.4th 164, 180–81 (D.C. Cir. 2022), *cert. denied* No. 22-1071, 2023 WL 6377843 (U.S. Oct. 2, 2023) ("If a statute uses words or phrases that have already received authoritative construction by . . . a responsible administrative agency, they are to be understood according to that construction.").

[11] As explained, the preamble states that "[w]hen it comes to the rebuttable presumption, the [asylum officers] will determine whether there is a significant possibility that the noncitizen would be able to show at a full hearing by a preponderance of the evidence that the presumption does not apply or that they meet an exception to or can rebut the presumption." 88 Fed. Reg. at 31,380.

action or findings that are "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "not in accordance with law." *See* 5 U.S.C. § 706(2)(A)–(C). Notably absent from § 1252(e)(3) is language mirroring the APA's provision allowing courts to set aside agency action as "arbitrary and capricious" or for "abuse of discretion." *See* 5 U.S.C. § 706(2)(A). Congress's failure to specifically provide for review of written procedures as "arbitrary and capricious"—despite the existence of this ground for review of agency action under the APA—is meaningful.

But even assuming this aspect of Plaintiffs' claims are reviewable, the Rule's application in expedited removal is reasonable and reasonably explained and easily withstands the deferential arbitrary-and-capricious review standard. *See* ECF 110 at 63–65. The Rule is reasonably related to the urgent and compelling objectives set forth by the Department, most notably the aim of stemming the tide of illegal immigration that weakened the Departments' ability to effectively enforce and administer U.S. immigration and asylum law. *See generally* 88 Fed. Reg. at 31,314-19. The Rule's presumption encouraged aliens to use orderly pathways and to seek protection in other countries through which they travel. *See, e.g.*, *id.* at 31,329. In line with that goal, the Departments also reasonably decided to apply that presumption during the credible fear determination, reasoning that aliens who receive a positive determination are able to remain in the United States for many years, which incentivizes aliens to make meritless asylum claims to be able to remain in the United States. *See* 88 Fed. Reg. at 11,716; 88 Fed. Reg. at 31,337. Thus, the Departments chose to implement the rebuttable presumption during credible fear screenings as necessary to disincentivize use of the asylum system in this manner, and so that those subject to the presumption and who could not avoid or overcome its application or make the higher showing for withholding or CAT protection would be able to be removed expeditiously. 88 Fed. Reg. at 31,337-38. Such application is consistent with the INA and is supported by the facts that compelled

the Departments to take action. Indeed, the Rule clearly did not go far enough to disincentivize illegal entry, as the Executive Branch has had to since further reduce asylum availability in order to curb the tide of illegal immigration at the southwest border. *See* ECF 110 at 12–14.

Plaintiffs' arguments to the contrary lack merit. Plaintiffs may disagree with the Departments' permissible policy choices, but they do not identify any actual defects in the Departments' decisionmaking. *See* ECF 109 at 32–35; ECF 116 at 32–35.

1.  The Rule Reasonably Applies Asylum Eligibility Conditions During Credible Fear Screenings.

The Departments adequately explained their departure from their 2022 decision not to apply eligibility bars at the credible fear stage in the Asylum Processing IFR (*Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 87 Fed. Reg. 18,078 (Mar. 29, 2022)). ECF 110 at 65–67. An agency need only "display awareness that it is changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–515 (2009); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). Here, the Departments acknowledged the prior position and provided good reasons for their departure from that position: primarily, the need to "respond to the current and impending exigent circumstances" at the Southwest border. 88 Fed. Reg. at 11,742. The Departments recognized that between the Asylum Processing IFR's issuance in March 2022 and the Rule's issuance in May 2023, circumstances had drastically changed, warranting a departure "from the approach generally applied in credible fear screenings." 88 Fed. Reg. at 31,336; *see also* 88 Fed. Reg. at 11,742. The APA does not require more.

Notably, Plaintiffs do not dispute (or even mention) this most important justification for the policy change. Instead, Plaintiffs appear to take issue with the precise language and framing

the Departments used when re-weighing the considerations in favor of applying an asylum-eligibility condition at the credible fear stage, arguing that the Departments did not "expressly acknowledge the fairness concerns" recognized in the Asylum Processing IFR. ECF 116 at 32. But Plaintiffs ignore the substance of the Departments' reasoning. The Departments did address their prior finding that considerations of "procedural fairness" counseled against "broad-based application of mandatory bars at the credible fear stage," Asylum Processing IFR, 87 Fed. Reg. at 18,094–95, which were that aliens should have "reasonable and fair opportunity" to contest application of the bars, "particularly in cases with complicated facts," and that mandatory consideration of every bar at the credible fear stage would not "preserve the efficiencies Congress intended in making credible fear screening as part of the expedited removal process," *id*. In promulgating the Rule, the Departments evaluated at length whether consideration of *this* condition on eligibility during credible fear screenings would raise due process concerns, 88 Fed. Reg. at 31,380, 31,353–63, and determined that under the circumstances, considering the presumption of asylum ineligibility during credible fear was warranted. The Departments' reweighing of the interests at stake is well within their authority and satisfies the requirements for reasoned decision-making. *See Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) ("[R]easoned decision-making requires that when departing from precedents or practices, an agency must offer a reason to distinguish them or explain its apparent rejection of their approach." (internal quotations omitted)). By claiming that still more is needed, Plaintiffs seek to impose a more onerous burden on agency decisionmaking than the APA requires.

      2.      <u>The Rule Did Not Rely on Impermissible Factors and Is Not Contrary to a Fundamental Purpose of the Expedited Removal Statute.</u>

Plaintiffs next continue to incorrectly assert that the Rule is arbitrary and capricious because it conflicts with Congress's choice to adopt a "low" credible fear screening standard. ECF

116 at 32. Plaintiffs ignore Defendants' point that Congress also allowed the Executive Branch to create conditions on asylum eligibility. The Rule exercises that discretion to impose a new regulatory limitation on asylum that is applied at the credible fear stage and in accordance with the "significant possibility" standard. ECF 110 at 68–69. Moreover, the Rule's concern with limiting the number of non-meritorious asylum claims that proceed past the credible fear stage is entirely consistent with the goals of the expedited removal statute, which was primarily focused on reducing abuse of the asylum system. *See* ECF 110 at 69–70. And the Rule's exceptions to and grounds for rebuttal of the presumption of asylum ineligibility address any claimed Congressional concern with "minimizing" the risk that those aliens with "genuine asylum claim[s] will be returned to persecution." *See* ECF 116 at 32 (citing *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020)).

### 3.    The Rule Applies the "Significant Possibility" Standard.

As discussed above, *supra* § II.C, it is clear from the text and context of the Rule that the "significant possibility" standard continues to apply. There is no inconsistency between the regulatory text and the language of the preamble, and the Rule is not arbitrary and capricious in this regard. *See* ECF 116 at 33. Plaintiffs' reliance on *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1220 (D.C. Cir. 1996), is misplaced. Unlike the rule at issue there, the Departments have consistently used the present tense "is" in connection with regulatory conditions on asylum eligibility at the credible fear stage and contemporaneously explained that the "significant possibility" standard applied when using such language. In both *Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829 (July 16, 2019), and *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55,934 (Nov. 9, 2018), the Departments amended the DHS credible fear regulations to instruct asylum officers to "enter a negative credible fear determination with respect to the alien's

intention to apply for asylum" if "the alien *is found* to be" subject to the relevant bar. 84 Fed. Reg. at 33,843 (emphasis added); 83 Fed. Reg. at 55,952 (same). Those rules also amended the EOIR regulations using the phrase "is determined." 84 Fed. Reg. at 33,844; 83 Fed. Reg. at 55,952. The preambles of both rules confirmed that the "significant possibility" standard applied by stating that under each rule "[i]f there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates that there is a significant possibility that he or she can establish eligibility for asylum), then the alien will have established a credible fear." 84 Fed. Reg. at 33,837; 83 Fed. Reg. at 55,943.

        4.    <u>The Rule Reasonably Applies the "Reasonable Possibility" Standard Where Aliens Do Not Establish Significant Possibility of Asylum Eligibility.</u>

The Departments also reasonably adopted the "reasonable possibility" standard to screen claims for protection from persecution or torture for those aliens as to whom the presumption of asylum ineligibility applies, and adequately considered any risks involved. ECF 110 at 71–73. Here, Plaintiffs' arguments to the contrary continue to rely on their assertion that the Departments failed to consider the differences between reinstatement proceedings (in which the reasonable fear standard is also applied) and the credible-fear process. ECF 116 at 34–35. But the Departments' analogy to reasonable fear screenings in the reinstatement context was sound. It is logical to screen applications with a higher burden of proof ("more likely than not" for withholding and CAT as opposed to "well-founded fear" for asylum) using a higher standard ("reasonable possibility" for withholding and CAT as opposed to "significant possibility" for asylum). 88 Fed. Reg. at 11,745-47; *see also* 88 Fed. Reg. at 31,336, 31,420. Plaintiffs ignore this rationale, which is the thrust of the Departments' reasoning.

That said, Plaintiffs' attacks on the Departments' reasoning remain faulty for the reasons

already identified. *See* ECF 110 at 72–73.[12] Just as the *Las Americas* court found with respect to the Securing the Border Rule (STB Rule), "[t]hat Defendants rejected a reasonable possibility standard in 2022 [in the Asylum Processing IFR] is not enough, on its own, to render [the] Rule's standard arbitrary and capricious." *Las Americas Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec.*, 783 F. Supp. 3d 200, 228 (D.D.C. 2025); *see also* ECF 110 at 72. Here, the Departments reasonably explained why a departure from those prior standards made sense in the context of the Rule, particularly given the "exigent circumstances" facing the Departments. *See* 88 Fed. Reg. at 31,336 ("The Asylum Processing IFR was designed for non-exigent circumstances."), 31,420; *see also Las Americas*, 783 F. Supp. 3d at 228 (upholding STB rule applying stricter "reasonable probability" standard for CAT and withholding screening under similar reasoning).

Finally, Plaintiffs' argument that the CAT regulations are reviewable on review of the Individual Plaintiffs' removal orders under § 1252(e)(3) proves too much. *See* ECF 116 at 34 (citing Pub. L. No. 105-277 § 2242(d)). At most, such review (if available despite other restrictions in § 1252) would allow relief for the Individual Plaintiffs to whom the reasonable possibility standard was applied, not vacatur of this aspect of the Rule.

## III.    The Remaining Procedures Are Lawful.

The 24-hour consultation period guidance and the procedures for conducting third-country expedited removals of non-Mexicans to Mexico are likewise well within the agencies' statutory authority. To the extent that Plaintiffs' challenges to these procedures are justiciable, *see supra* § I, they do not succeed on the merits. Even assuming the Court could review the agency's policy

---

[12] Plaintiffs still identify no commenter that raised the complaints they now assert regarding the Departments' analogy to reasonable fear proceedings. The comment they do point to, at CLP_PC_032948, does not raise the issue. At most, the comment notes that reasonable fear determinations are reviewable but does not make the arguments Plaintiffs now raise—that is, that the availability of judicial review over such determinations makes reasonable fear an improper analogy.

choices under the arbitrary-and-capricious rubric, *see* ECF 110 at 74, the agencies' choices are reasonable and easily withstand that deferential standard of review. Plaintiffs' arguments to the contrary rest on the same misunderstandings as their original motion. *See* ECF 116 at 35–41.

A.    **The 24-hour Consultation Guidance Is Consistent with Relevant Statutes and Regulations and Not Arbitrary and Capricious**

In order to "more expeditiously process" aliens who crossed the border without authorization, DHS issued guidance setting a 24-hour minimum wait period between an alien's acknowledgment of receipt of the Form M-444, which explains the credible fear process, and a credible fear interview. *See* USCIS_24-Hour_AR_1–3. Plaintiffs do not dispute that this is a permissible implementation of the statute. ECF 116 at 35–36; ECF 110 at 76. Instead, they incorrectly argue that the relevant agency—USCIS—failed to adequately explain or support its reason for implementing the policy, which was to speed up processing in line with the statutory goal that consultation not "unreasonably delay" the credible fear and expedited removal process. Assuming that such a challenge is permissible under § 1252(e)(3), *see* ECF 110 at 74, 76, Plaintiffs' arguments constitute a disagreement with the agency's placement of greater weight on avoidance of delay and on maximizing DHS's ability to process aliens for expedited removal. This disagreement does not state any APA violation. Nor are Defendants required to justify their balancing of these factors with the type of evidence that Plaintiffs demand. *See generally* ECF 110 at 76–79.

Plaintiffs contend that Defendants failed to address the argument that USCIS did not examine its so-called "key assumption" that it "could reduce the [minimum] consultation period without reducing the accuracy of credible fear outcomes." ECF 116 at 35. Defendants did, however, address this: they explained the actual rationales for the decision, which demonstrates USCIS's judgment that this step will improve procedural efficiency while enabling the alien to

29

consult with an individual of their choosing. It is common sense that quicker processing will result in quicker removal of those aliens who are unable to pass the credible fear screening. The actual "key assumption" in USCIS's decisionmaking is that a minimum 24-hour consultation period better balanced the need for expeditious processing with a fair credible fear process. USCIS_24-Hour_AR_3; *see* ECF 110 at 77. Given that the only statutory directive is that consultation be permitted only so long as it does not "unreasonably delay" the process, this assumption and USCIS's explanation are hardly "counterintuitive" (ECF 116 at 35), and are more than adequate to justify USCIS's 24-hour consultation period guidance.

Finally, there was no need for Defendants to respond to Plaintiffs' undeveloped, one-sentence argument that USCIS failed to consider "the cumulative impact of policy changes." ECF 116 at 34 (citing ECF 109 at 39). Plaintiffs provided no details as to precisely what USCIS should have considered and why, and how that purportedly undermines its rationales for the policy change. "[P]erfunctory and undeveloped arguments . . . are deemed waived." *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013). The Court thus need not consider this argument.

**B.    The Third-Country Removal Procedures Are Consistent with the Statute and Not Arbitrary and Capricious**

The third-country removal procedures at issue in this case mirror the statutory directives and are reasonable on their face. Because of limitations on the ability to remove nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV), DHS implemented guidance to effectuate removal, in appropriate cases, to a third country, *i.e.*, Mexico. *See* 88 Fed. Reg. at 31,444 (noting limitations on removal); *see also* CBP_Removals_AR_321-25 (memorandum); CBP_Removals_AR_22-24 (CBP designation worksheet, specifying Mexico as the likely country of removal if the country of

the alien's designation, nationality/citizenship, prior residence, or birth, will not accept the alien).[13] As documented, both the memorandum and worksheet track exactly the statutory framework for designating a country of removal. *See* ECF 110 at 79–81. These documents, like the statute, give priority to the country designated by the alien, followed by the country of nationality or citizenship, as well as any other possible alternative country to which the alien has a qualifying connection. *Compare* CBP_Removals_AR_22-23, 322 (setting forth this hierarchy of consideration), *with* 8 U.S.C. § 1231(b)(2) (mandating this order of consideration and providing relevant exceptions at each step). Only if none of the countries the statute directs will accept the alien may DHS proceed to designating a third country under the challenged procedures, *see* CBP_Removals_AR_23, as permitted by the statute, *see* 8 U.S.C. § 1231(b)(2)(E).

Plaintiffs argue that CBP is in fact applying the "impracticable, inadvisable, or impossible" standard of the final step at the threshold. *See* ECF 116 at 37. However, the guidance contemplates that consideration of flight capacity and other concerns come into play only once other statutory countries have been considered and rejected under the governing framework, and at that point, it is appropriate to consider those issues in designating a third country for removal. *See* ECF 110 at 79–81. Plaintiffs cite nothing in either the memorandum or worksheet to establish that the guidance permits designation of a third country *except* in the circumstances contemplated by the statute. Plaintiffs cite to one sentence of the memorandum that states: "If the noncitizen is not removed to the country designated or the country of citizenship or nationality, CBP should then consider removal to a country where the noncitizen resided before they entered the country from which they

---

[13] Because the worksheet designates Mexico as the country of likely removal at the last step, *see* CBP_Removals_AR_23, Plaintiffs are incorrect to state that the procedures' only mention of Mexico is to note that "noncitizens may not designate Mexico" as a country of removal "unless they are a national, citizen, or resident thereof," *see* ECF 116 at 11–12 (citing CBP_Removals_AR_322).

entered the United States, the country where they were born, or the country that had sovereignty over the noncitizen's birthplace when they were born." ECF 116 at 37 (citing CBP_Removals_AR_322). Plaintiffs ignore that the immediately preceding sentence mirrors the statutory steps, stating that "if [the] government [of the country designated by the noncitizen] is not willing to accept the noncitizen, CBP should then determine whether the noncitizen may be removed to their country of citizenship or nationality (if this was not the country designated by the noncitizen)." CBP_Removals_AR_322. Further, the CBP worksheet makes clear that CBP would designate (first) the country of the alien's designation or (second) the country of nationality or citizenship, *unless* those countries are on the "list of countries that do not accept its citizens." CBP_Removals_AR_22, 23.

Plaintiffs' arbitrary-and-capricious arguments fare no better. They again contend that aliens for whom Mexico or other third countries are the country of designation will have insufficient notice to raise a fear of persecution or torture during their credible fear interview. *See* ECF 116 at 38–39. Yet the procedures provide that aliens be informed of the country of designation during their initial processing with CBP and questioned regarding their fear of harm in *that* country. *See* CBP_Removals_AR_23-24 (officers "ask whether the individual has a fear of return to the *country of designation*") (emphasis added). Aliens were thus made aware that they will be removed to a third country. Having been questioned specifically about their fear of harm in the third country, aliens were on notice that the credible fear interview, following the referral based on any professed fear of harm in the third country, would similarly focus on harm in that third country. Plaintiffs acknowledge that the policy provides that aliens be asked about a fear of return "to the country designated for removal," but argues that there should more explicit notice. ECF 116 at 38–39. Their preference for a different formulation does not alter the fact that the existing procedures are sufficient to place noncitizens on notice of their removal to a third country and that any fear

screening may relate to harm in that third country. Further, that fear screening served to ascertain whether the alien will face persecution in that third country.

Finally, Plaintiffs contend that the government gave insufficient consideration to the problem of chain refoulement in permitting removal to Mexico. ECF 116 at 39–40. As explained, however, nothing in the statute *requires* DHS to consider the subsequent removal of a noncitizen to a third country following removal from the United States. ECF 116 at 83–84. The government's statutory obligations are fulfilled by determining whether the noncitizen could be harmed in the country of removal, *see* 8 U.S.C. § 1231(b)(3)(A), and nothing in the statute requires a further inquiry into whether the noncitizen may be removed from *that* country to yet another third country where they may face different risks, *see id.*; *cf id.* § 1158(a)(2)(A) (requiring, prior to entry into a safe-third-country agreement, an assessment of whether the third country allows access to full and fair procedures for asylum and protection). Plaintiffs attempt to sidestep the issue by arguing that the agencies were nonetheless required to *consider* the risk of chain refoulement. *See* ECF 116 at 40. But as the underlying statute does not contemplate consideration of that risk, there is no legal source for Plaintiffs' insisted requirement that the agencies explicitly address that risk before implementing procedures that are faithful to the statute's terms.

## IV.    The Court Should Grant Summary Judgment to Defendants on Counts Nine and Ten.

Plaintiffs do not dispute that the Court may grant summary judgment for Defendants on Counts Nine and Ten. *See* ECF 110 at 85.

## V.    The Relief Plaintiffs Seek is Improper.

At the outset, Plaintiffs do not dispute that the Court may not issue relief that is broader than necessary to remedy the actual harm shown by specific Plaintiffs. *See* ECF 110 at 85–86. As a result, the Court must tailor the remedy to address the harms shown by the Plaintiffs who can demonstrate standing. Further, even if any relief were warranted with respect to any Plaintiffs,

other principles require limiting the relief here.

### A.    Universal Vacatur is Unavailable and Inappropriate.

Universal vacatur of the Rule and of the Procedures is the equivalent of class-wide injunctive relief and is not permissible under the INA or warranted in this case. *First*, Plaintiffs cannot obtain universal relief because 8 U.S.C. § 1252(f)(1) precludes district courts from issuing orders that "enjoin or restrain the operation of" the covered provisions except as to individual noncitizens. ECF 110 at 86–88. Plaintiffs generally do not dispute that the Rule and Procedures fall within the covered provisions,[14] nor do they dispute that § 1252(f)(1) precludes the Court from enjoining application of the Rule or Procedures on a class-wide basis—instead, they argue the relief they seek is different because they seek *vacatur*. ECF 116 at 41–43.

Yet an order vacating the Rule or Procedures as to all aliens would function to "enjoin or restrain" the implementation of the covered provisions underlying the Rule/Procedure, and thus would impermissibly "interfere with the government's efforts to operate" those provisions. *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022); ECF 110 at 87–88. Plaintiffs' proposed reading of "enjoin or restrain" as referring only to orders labeled as "injunctions" and restraining orders (ECF 116 at 42) runs contrary to—or is at least in significant tension with—the Supreme Court's broader interpretation of these terms as encompassing orders (like vacatur) that have coercive effect. ECF 110 at 86–87. The heading of § 1252(f) "cannot be used to limit the

---

[14] In a footnote, Plaintiffs argue that § 1252(f)(1) does not cover the Rule's presumption of asylum ineligibility. ECF 116 at 42 n.16. That is incorrect. The Rule expressly applies the presumption in expedited removal under the covered provision of § 1225(b)(1). *See* 8 C.F.R. § 208.33(b). Thus, § 1252(f)(1) still bars any injunction of the application of the Rule's conditions on asylum eligibility in expedited removal. Further, for similar reasons, § 1252(f)(1) also bars the application of the presumption in removal proceedings under 8 U.S.C. § 1229a, *see* 8 U.S.C. § 1229a(c)(4), which is also a provision covered by § 1252(f)(1). In either case, vacatur of those aspects of the Rule would interfere with the government's operation of expedited removal and removal.

plain meaning of the text." *Abuzeid v. Mayorkas*, 62 F.4th 578, 584 (D.C. Cir. 2023).

Plaintiffs do not explain how universal vacatur is meaningfully differs from an injunction. Nor do they explain why Congress would have distinguished among forms of relief that have exactly the same practical effect: prohibiting agency officials from applying a rule or procedure. It does not matter that Plaintiffs disagree with the government's interpretation of the underlying statutes; § 1252(f)(1) precludes orders that seek to conform the government's conduct to the court's or plaintiff's interpretation of the statute. *Aleman Gonzalez*, 596 U.S. at 552-53.[15]

To the extent Plaintiffs suggest that § 1252(f)(1) does not apply to challenges brought under § 1252(e)(3) (ECF 116 at 41–42), that is also incorrect. The INA contains no such carve-out, and § 1252(f)(1) limits the available relief in *all* cases, "*regardless of the nature of the action or claim.*" 8 U.S.C. § 1252(f)(1) (emphasis added).[16] Under § 1252(f)(1) Plaintiffs may seek only non-coercive relief, such as declaratory relief, which is consistent with the language of § 1252(e)(3) allowing for a "determination[]" whether any new written policy "is not consistent with applicable provisions of this subchapter or is otherwise in violation of law," *id.* § 1252(e)(3)(A)(ii), and an "order" to that effect, *id.* § 1252(e)(3)(C).[17] Further, § 1252(e)(1)(B)'s

---

[15] Plaintiffs are correct that Defendants did not argue that § 1252(f)(1) did not bar the Court's ability to enter a declaratory judgment; however, such relief is properly to the named Plaintiffs who can demonstrate standing. ECF 110 at 85–86. Further, although Defendants recognize that the D.C. Circuit has held otherwise in an opinion pre-dating *Aleman Gonzalez*, *Make The Rd. New York v. Wolf*, 962 F.3d 612, 635 (D.C. Cir. 2020), it remains the government's view that § 1252(f)(1) also bars declaratory relief. *See Aleman Gonzalez*, 596 U.S. at 551 n.2; *cf. California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982) (Tax Injunction act barred declaratory relief as well as injunctive relief); *Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010).

[16] *Grace*, cited by Plaintiffs as well as in the *Las Americas* decision (*see* ECF 116 at 42), does not control. In that case, the D.C. Circuit rejected the application of § 1252(f)(1) based on a restrictive interpretation of the provision that has been rejected in *Aleman Gonzalez. Grace*, 965 F.3d at 907.

[17] In *Grace* the D.C. Circuit rejected the government's argument that the above-quoted language in § 1252(e)(3) limited the court to only declaratory relief. 965 F.3d at 908–09. Again, that decision pre-dated *Aleman Gonzalez*.

prohibition on class certification as to *any* challenges to expedited removal, including those brought under § 1252(e)(3), reinforces that Congress did not intend to allow for universal relief, like the vacatur Plaintiffs seek, as such relief would apply to an entire class of noncitizens subject to expedited removal. *See id.* § 1252(e)(3).

*Second*, contrary to Plaintiffs' assumptions (ECF 116 at 43), if universal vacatur is permitted at all (*see* ECF 110 at 88; *Texas,* 599 U.S. at 693–702 (Gorsuch, J., concurring in the judgment)), it is at most a discretionary remedy rather than the *default* remedy in actions under the APA. *See* ECF 110 at 88–89. *But see Nat'l Parks Conservation Ass'n v. Semonite,* 925 F.3d 500, 501 (D.C. Cir. 2019) (per curiam) (characterizing *Allied Signal* as identifying vacatur as the default remedy to correct agency action). Vacatur as the default remedy does not accord with equitable principles requiring the remedy to correspond to the specific harms and equities in a particular case and is inconsistent with Article III and traditional equitable principles. ECF 110 at 88–89. Plaintiffs argue that it is Defendants who must demonstrate that universal vacatur is *not* appropriate. Opp. 38. Yet this runs contrary to general principles underlying the grants of equitable relief. *See* ECF 110 at 85–86. And the D.C. Circuit has treated universal vacatur of agency action as a discretionary equitable remedy—not a remedy that is automatic or compelled. *See* ECF 110 at 88; *see also* 5 U.S.C. § 702(1).

*Third*, even if vacatur were an available remedy, and even if Plaintiffs could demonstrate standing and succeed on the merits, the circumstances of this case would warrant remand without vacatur. ECF 110 at 89–90. As shown, any claimed deficiencies in the challenged practices can be remedied by additional explanation, and do not require vacatur of any aspect of the Rule. *See id.* And Plaintiffs' argument that vacating the Rule and Procedures would not have disruptive consequences ignores that vacatur will deprive the government of tools for ensuring the ongoing efficiency in the conduct of credible fear interviews. On the other side of the balance, the Plaintiffs

identify no comparable harms from the Rule and Procedures. *See* ECF 110 at 90.

      **B.**      **The INA Bars the Individual Relief of Vacatur of Credible Fear Determinations and Parole.**

As to the relief sought by the Individual Plaintiffs, the Court has no authority to vacate negative credible fear determinations because of 8 U.S.C. § 1252(a)(2)(A)(iii), which contains no exception to its jurisdiction-stripping provision. ECF 110 at 88. And the D.C. Circuit decisions Plaintiffs cite do not specifically address whether vacatur of the determinations or compelling a grant of parole was proper *relief* for the plaintiffs in those § 1252(e)(3) cases. *See* ECF 116 at 45 (citing *Grace*, 965 F.3d at 892-94).

## CONCLUSION

For these reasons, the Court should grant the government summary judgment.

                         Respectfully submitted,

                         BRETT A. SHUMATE
                         Assistant Attorney General

                         DREW C. ENSIGN
                         Deputy Assistant Attorney General

                    By: */s/ Katherine J. Shinners*
                         KATHERINE J. SHINNERS
                         Senior Litigation Counsel
                         Office of Immigration Litigation
                         U.S. Department of Justice, Civil Division
                         P.O. Box 878, Ben Franklin Station
                         Washington, DC 20044
                         Tel: (202) 598-8259
                         Email: katherine.j.shinners@usdoj.gov

Dated: December 5, 2025               *Attorneys for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 5, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court District Court for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.


By: <u>*/s/ Katherine J. Shinners*</u>
    KATHERINE J. SHINNERS
    Senior Litigation Counsel
    United States Department of Justice
    Civil Division