**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| M.A., et al., | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| *Plaintiffs,* | |
| v. | No. 1:23-cv-1843-TSC |
| Kristi Noem, et al., | |
| *Defendants.* | |

**REVISED JOINT APPENDIX VOLUME I[1]**

---

[1] The parties prepared this revised version of Volume I of the Joint Appendix pursuant to the Court's Minute Order dated March 12, 2026. This revised filing is intended to replace the unsealed Volume I of the Joint Appendix previously filed at ECF No. 64. However, the parties determined that no revisions were needed for Volume II of the Joint Appendix, which was filed under a motion to seal at ECF No. 65. Therefore, Plaintiffs are not currently filing a revised version of Volume II. But they will do so (under a new motion to seal) if the Court prefers.

*Circumvention of Lawful Pathways* **Administrative Record Excerpts (CLP_AR & CLP_PC)**[2]

| | Document Title | Excerpted Pages |
|---|---|---|
| | **CLP_AR Documents** | |
| 1. | Implementation of the Uniting for Ukraine Parole Process, 87 Fed. Reg. 25,040 (Apr. 27, 2022) | CLP_AR_000857-60 |
| 2. | Implementation of a Parole Process for Venezuelans, 87 Fed Reg. 63,507 (Oct. 19, 2022) | CLP_AR_000907-17 |
| 3. | Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1,243 (Jan. 9, 2023) | CLP_AR_000982-94 |
| 4. | Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1,255 (Jan. 9, 2023) | CLP_AR_000995-1006 |
| 5. | Implementation of Parole Process for Cubans, 88 Fed. Reg. 1,266 (Jan. 9, 2023) | CLP_AR_001009-22 |
| 6. | Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1,279 (Jan. 9, 2023) | CLP_AR_001023-26 |
| 7. | Implementation of a Change to the Parole Process for Cubans, 88 Fed. Reg. 26,329 (Apr. 28, 2023) | CLP_AR_001065-67 |
| 8. | Memorandum from Tricia Kennedy, Program Manager, Off. of Field Operations, U.S. Customs & Border Prot., CBP One$^{TM}$ Application (May 8, 2023) | CLP_AR_001650-60 |
| 9. | U.S. Dep't of Homeland Sec., Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023) | CLP_AR_002187-89 |
| 10. | U.S. Dep't of Homeland Sec., Off. of Immigration Statistics, Data for May 2023 Final Rule. | CLP_AR_002374-84 |
| 11. | U.S. Dep't of Homeland Sec., Off. of Immigration Statistics, Encounter Projections (May 3, 2023) | CLP_AR_002485-95 |
| 12. | White House, Fact Sheet: Biden-Harris Administration Announces New Border Enforcement Actions (Jan. 5, 2023) | CLP_AR_004552-56 |
| 13. | Brewer, Stephanie et al, Struggling to Survive: the Situation of Asylum Seekers in Tapachula, Mexico, WASH OFF. ON LATIN AM. (June 2022) | CLP_AR_004858-62, 4865-77 |

---

[2] This appendix includes the entirety of short documents and other documents cited in their entirety by the parties. Excerpts for other documents are limited to the documents' first page(s), the pages cited by the parties, and adjacent pages included for context. *See* Local Rule 7(n) (appendix shall contain "those portions of the administrative record that are cited or otherwise relied upon" by the parties and not include "excess material from the administrative record").

| | Document Title | Excerpted Pages |
|---|---|---|
| 14. | Colloquium on Int'l Prot. of Refugees in Cent. Am., Mex., & Pan., Cartagena Declaration on Refugees, Colloquium on the International Protection of Refugees in Central America, Mexico and Panama (Nov. 19-22, 1984) | CLP_AR_004942-47 |
| 15. | Comprehensive Regional Protection and Solutions Framework, MIRPS in Mexico | CLP_AR_004999-5008 |
| 16. | Gov't of Belize, Amnesty Background Information, 2022 | CLP_AR_005421-24 |
| 17. | Gov't of Mexico, Press Release, Mexico to Expand Labor Mobility Programs and Integrate Refugees Into Its Labor Market (June 10, 2022) | CLP_AR_005757-61 |
| 18. | Int'l Crisis Group, Hard Times in a Safe Haven: Protecting Venezuelan Migrants in Colombia (Aug. 9, 2022) | CLP_AR_006126-73 |
| | **CLP_PC Documents** | |
| 19. | Human Rights Watch Public Comment (Mar. 23, 2023) | CLP_PC_020252-53, 20258-60 |
| 20. | Kino Border Initiative Public Comment (Mar. 24, 2023) | CLP_PC_20355-56, 20359-62 |
| 21. | Catholic Legal Immigration Network Public Comment (Mar. 24, 2023) | CLP_PC_020658, 20662-64 |
| 22. | Asylum Access & Asylum Access Mexico, Mexican Asylum System for U.S. Immigration Lawyers FAQ (Nov. 2019) | CLP_PC_020773-82 |
| 23. | George Washington Law School Immigration Clinic Public Comment (Mar. 27, 2023) | CLP_PC_021091-94 |
| 24. | Yale Law School Immigrant Justice Project Public Comment (Mar. 27, 2023) | CLP_PC_021162, 21167-71 |
| 25. | Round Table of Former Immigration Judges Public Comment (Mar. 27, 2023) | CLP_PC_021345-49 |
| 26. | National Citizenship and Immigration Services Council 119 Public Comment (Mar. 27, 2023) | CLP_PC_021417, 21421, 21429-32 |
| 27. | Women's Refugee Commission & IMUMI, Stuck in Uncertainty and Exposed to Violence: The Impact of US and Mexican Migration Policies on Women Seeking Protection in 2021 (Feb. 2022) | CLP_PC_021586-88 |
| 28. | Women's Refugee Commission, et al., The Consequences of US and Mexican Immigration Policies on the Protection of Venezuelan Women and LGBTIQ+ Individuals in Southwest Mexico (Dec. 2022) | CLP_PC_021595-96, 21610-11 |

| | Document Title | Excerpted Pages |
|---|---|---|
| 29. | Tahirih Justice Center & Oxfam America, Surviving Deterrence (2022) | CLP_PC_021741-42, 21752 |
| 30. | Helen Kerwin, The Mexican Asylum System in Regional Context (May 2018) | CLP_PC_ 021945-48, 21955-67 |
| 31. | Eduardo Torre Cantalapiedra, et al., The Mexican Asylum System: Between Protecting and Control, Frontera Norte (Apr. 15, 2021) | CLP_PC_021968, 21976, 21980-84 |
| 32. | Amnesty International Public Comment (Mar. 27, 2023). | CLP_PC_022038-44 |
| 33. | Amnesty International, Overlooked, Under-Protected: Mexico's Deadly Refoulement of Central Americans Seeking Asylum (2018) | CLP_PC_022500-04 |
| 34. | Amnesty International, Unprotected in Ecuador: Venezuelan Refugee Women Survivors of Gender-Based Violence (2022) | CLP_PC_022583-87, 22605-07 |
| 35. | IMUMI & Black Alliance for Just Immigration, "There is a Target On Us": The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border | CLP_PC_022632, 22635, 22665, 22671-72 |
| 36. | Reuters, Mexico Seeks to Curb 'Abuse' of Asylum Systems by Migrants Who Do Not Plan to Stay (Feb. 13, 2023) | CLP_PC_022810-12 |
| 37. | Fragomen LLP, Costa Rica: Special Permit for Cuban, Nicaraguan and Venezuelan Refugees Will Reopen (Dec. 19, 2022) | CLP_PC_022823 |
| 38. | Belize Ministry of Foreign Affairs, Foreign Trade & Immigration, Amnesty – Who Qualify (2023) | CLP_PC_022825-26 |
| 39. | Human Rights First, Is Mexico Safe for Refugees and Asylum Seekers? (Nov. 2018) | CLP_PC_022851-52 |
| 40. | Human Rights Watch, Mexico: Asylum Seekers Face Abuses at Southern Border (June 6, 2022) | CLP_PC_022853-65 |
| 41. | Human Rights Watch, World Report 2023: Events of 2022 (2023). | CLP_PC_022869-70, 23079-83 |
| 42. | International Crisis Group, Ecuador's High Tide of Drug Violence (Nov. 4, 2022) | CLP_PC_023232-33 |
| 43. | Migration Policy Institute, Laying the Foundation for Legal Cooperation (Apr. 2021) | CLP_PC_023303, 23316-21, 23347-48 |
| 44. | Arturo Castellanos-Canales, Mexico's Asylum System: Good in Theory, Insufficient in Practice (Mar. 15, 2023) | CLP_PC_023385-90 |
| 45. | New York University Center on International Cooperation, Colombia's Support for Venezuelan Migrants & Refugees (Sept. 2022) | CLP_PC_023395-401 |

|  | Document Title | Excerpted Pages |
|---|---|---|
| 46. | Refugees International, A New Way Forward: Strengthening the Protection Landscape in Mexico (Nov. 12, 2020) | CLP_PC_023428-35 |
| 47. | CNN, Mexico Rethinks Asylum Initiative After Controversial US Announcement (Feb. 24, 2023) | CLP_PC_023442-45 |
| 48. | UNHCR, Number of Displaced Nicaraguans in Costa Rica Doubles in Less than a Year (Mar. 25, 2022) | CLP_PC_023473-75 |
| 49. | UNHCR Refugee Statistics | CLP_PC_023478-80, 23483-86 |
| 50. | Memorandum from Alejandro N. Mayorkas, Secretary of U.S. Department of Homeland Security, Termination of the Migrant Protection Protocols (Oct. 29, 2021). | CLP_PC_023691-94 |
| 51. | U.S. Department of State, Belize International Travel Information (Feb. 28, 2023) | CLP_PC_023726-30 |
| 52. | U.S. Department of State, Colombia Travel Advisory (Jan. 4, 2023) | CLP_PC_023780-82 |
| 53. | U.S. Department of State, Ecuador Travel Advisory (Nov. 4, 2022) | CLP_PC_023828-31 |
| 54. | U.S. Department of State, El Salvador International Travel Information (Oct. 6, 2022) | CLP_PC_023874-79 |
| 55. | U.S. Department of State Overseas Security Advisory Council, Guatemala Country Security Report (Aug. 15, 2022) | CLP_PC_024105 |
| 56. | U.S. Department of State, Panama 2021 Human Rights Report | CLP_PC_024113, 24122-23 |
| 57. | University of Texas Strauss Center for International Security & Law, Asylum Processing at the U.S.-Mexico Border: February 2023 | CLP_PC_024899-910 |
| 58. | Washington Office on Latin America, Key Issues on Access to Asylum in Mexico, Protections for Migrant Children, and U.S. Cooperation (Mar. 23, 2021) | CLP_PC_025089-91 |
| 59. | U.S. Department of State, Guatemala 2022 Human Rights Report | CLP_PC_025128, 25143, 25150-51 |
| 60. | U.S. Department of State, Honduras 2022 Human Rights Report | CLP_PC_025171, 25181 |
| 61. | San Diego Tribune, Asylum Seekers in Tijuana Are Scrambling Through Mobile App Error Messages for Few Appointments into the U.S. (Jan. 22, 2023) | CLP_PC_025454-65 |

| | Document Title | Excerpted Pages |
|---|---|---|
| 62. | Arizona Luminaria, Glitchy CBP One App Turning Volunteers into Geek Squad Support for Asylum-Seekers in Nogales (Mar. 20, 2023) | CLP_PC_025499-500 |
| 63. | Declaration of Dr. Eric Hershberg, Case No. 1:20-cv-116-EGS (Jan. 20, 2020) | CLP_PC_026149-51 |
| 64. | Declaration of Claudia Paz y Paz Bailey, Case No. 1:20-cv-116-EGS (Feb. 26, 2020) | CLP_PC_026234-39 |
| 65. | Human Rights Watch, Deportation with a Layover (May 19, 2020) | CLP_PC_026308-11 |
| 66. | Karen Musalo, Biden's Embrace of Trump's Transit Ban Violates US Legal and Moral Refugee Obligations, Just Security (Feb. 8, 2023) | CLP_PC_029159-63 |
| 67. | U.S. Citizenship & Immigration Services, Guatemala: Treatment of Non-Guatemalan Migrants (Nov. 15, 2019) | CLP_PC_029447-48 |
| 68. | Department of Homeland Security Email Thread re: Asylum Staffing in NCA Countries (2019) | CLP_PC_029465-66 |
| 69. | Amnesty International, Unprotected: Gender-Based Violence Against Venezuelan Refugee Women in Colombia & Peru (2020) | CLP_PC_029603-04, 29608-09 |
| 70. | Human Rights Watch, US: LGBT Asylum Seekers in Danger at the Border (May 31, 2022) | CLP_PC_029700-08 |
| 71. | Women's Refugee Commission & IMUMI, Stuck in Uncertainty and Exposed to Violence: The Impact of US and Mexican Migration Policies on Women Seeking Protection in 2021 (Feb. 2022) | CLP_PC_029738-44 |
| 72. | AP News, Fleeing Nicaraguans Strain Costa Rica's Asylum Systems (Sept. 2, 2022) | CLP_PC_030102-07 |
| 73. | Refugees International Public Comment (Mar. 27, 2023) | CLP_PC_030637-43 |
| 74. | Human Rights First Public Comment (Mar. 27, 2023) | CLP_PC_030801, 30835-38 |
| 75. | Human Rights First, Human Rights Stain, Public Health Farce: Evasion of Asylum Law and Title 42 Abuse Must End—and Never Be Revived (Dec. 2022) | CLP_PC_030900-04 |
| 76. | American Gateways Public Comment (Mar. 27, 2023) | CLP_PC_031497, 31504-10 |
| 77. | Florence Immigrant & Refugee Rights Project Public Comment | CLP_PC_031520-21, 31530-33 |
| 78. | Oxfam America Public Comment (Mar. 27, 2023) | CLP_PC_031825, 31849-53 |
| 79. | Taylor Levy Law Public Comment (Mar. 27, 2023) | CLP_PC_031895-901 |

| | Document Title | Excerpted Pages |
|---|---|---|
| 80. | Hastings to Haiti Partnership, et al., Making a Mockery of Asylum (Mar. 27, 2023) | CLP_PC_032310-11, 32315-17 |
| 81. | U.S. Department of State, Mexico 2022 Human Rights Report | CLP_PC_032428, 32446-47 |
| 82. | Young Center for Immigrant Children's Rights Public Comment (Mar. 27, 2023) | CLP_PC_032747, 32769-71 |
| 83. | Asylum Defense Project Public Comment (Mar. 27, 2023) | CLP_PC_032943, 32947-49 |
| 84. | Texas Civil Rights Project Public Comment (Mar. 27, 2023) | CLP_PC_032968, 32972-82 |
| 85. | Frente Accion Latinx de Minnesota Public Comment (Mar. 27, 2023) | CLP_PC_032996, 33002-07 |
| 86. | Las Americas Immigrant Advocacy Center Public Comment (Mar. 27, 2023) | CLP_PC_033168, 33174-79 |
| 87. | Center for Justice & International Law, et al., Asylum in Mesoamerica | CLP_PC_033392-94, 33406-10, 33450 |
| 88. | U.S. Department of State, Mexico Travel Advisory (Oct. 5, 2022) | CLP_PC_033467-79 |
| 89. | Center for Gender & Refugee Studies Public Comment (Mar. 27, 2023) | CLP_PC_033860, 33932-34 |
| 90. | U.S. Department of State, El Salvador 2022 Human Rights Report | CLP_PC_034188-89, 34205-06 |
| 91. | U.S. Department of State, Colombia 2022 Human Rights Report | CLP_PC_034224, 34262-64 |
| 92. | U.S. Department of State, Ecuador 2022 Human Rights Report | CLP_PC_034267-68, 34282-83 |
| 93. | AP News, Online System to Seek Asylum in US Is Quickly Overwhelmed (Jan. 28, 2023) | CLP_PC_034909-12 |
| 94. | U.S. Department of Homeland Security, Fiscal Year 2020 Refugees and Asylees Annual Flow Report (Mar. 8, 2022) | CLP_PC_039827-28, 39850 |
| 95. | American Civil Liberties Union, American Exile: Rapid Deportations That Bypass the Courtroom (Dec. 2014). | CLP_PC_055579-82, 55614-17 |
| 96. | No More Deaths, A Culture of Cruelty (2011) | CLP_PC_056155-60 |
| 97. | American Immigration Council, Detained Beyond the Limit (Aug. 2016) | CLP_PC_056275-79 |
| 98. | Human Rights First, Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021 (Dec. 15, 2022) | CLP_PC_076248-87 |

**Third-Country Removals Administrative Record Excerpts (CBP_Removals_AR)**

| | Document Title | Excerpted Pages |
|---|---|---|
| 99. | Email from U.S. Border Patrol Headquarters, Post T42 Priority Processing and Current Updates (May 11, 2023) | CBP_Removals_AR_ 000001-02 |
| 100. | Email attachment, U.S. Border Patrol Headquarters, Updated Guidance (May 10, 2023) | CBP_Removals_AR_000003-06 |
| 101. | U.S. Dep't of Homeland Sec., U.S. Customs & Border Prot., U.S. Border Patrol Headquarters, Prioritization of Processing Pathways/Coordinating Instructions for VZ/NC Plan (Dec. 19, 2022) | CBP_Removals_AR_000013-24 |
| 102. | Memorandum from Blas Nunez-Neto, Assistant Sec'y for Border and Immigration Office of Strategy, Policy, and Plans, Process for Determining Country of Removal for Nationals of Cuba, Haiti, Nicaragua, and Venezuela (May 10, 2023) | CBP_Removals_AR_000321-25 |

**24-Hour Waiting Period Administrative Record Excerpts (USCIS_24-Hour_AR)**

| | Document Title | Excerpted Pages |
|---|---|---|
| 103. | Memorandum from John L. Lafferty, Asylum Div. Chief, U.S. Citizenship & Immigration Servs., Scheduling of Credible Fear Interviews (May 10, 2023). | USCIS_24-Hour_AR_ 000001-03 |
| 104. | Email from John L. Lafferty, Asylum Div. Chief, U.S. Citizenship & Immigration Servs., Updated Guidance on Consultation Period and Reschedules - CFPM III.D.1.a. and III.E.4.b. (May 10, 2023) | USCIS_24-Hour_AR_000026 |
| 105. | Email from John L. Lafferty, Asylum Div. Chief, U.S. Citizenship & Immigration Servs., Preparation Strategies for Return to Title 8 Processing (May 10, 2023). | USCIS_24-Hour_AR_000027-28 |
| 106. | U.S. Citizenship & Immigration Servs, Credible Fear Procedures Manual, § III.D, 7-8 (last updated Apr. 6, 2023). | USCIS_24-Hour_AR_000057-58 |
| 107. | U.S. Citizenship & Immigration Servs, Updated Credible Fear Procedures Manual, § III.D.1, III.E.4 (last updated May 10, 2023) | USCIS_24-Hour_AR_000059-60 |

| | Document Title | Excerpted Pages |
|---|---|---|
| 108. | U.S. Citizenship & Immigration Servs, Form M-444, Information About Credible Fear Interview (last updated May 10, 2023). | USCIS_24-Hour_AR_000065-68 |
| 109. | U.S. Dep't of Homeland Sec., Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023) | USCIS_24-Hour_AR_000070-73 |

for approval. All comments will become a matter of public record.

## Overview of This Information Collection

*Title:* Record of Vessel Foreign Repair or Equipment Purchase.

*OMB Number:* 1651–0027.

*Form Number:* CBP Form 226.

*Current Actions:* Revision of an existing information collection.

*Type of Review:* Revision.

*Affected Public:* Businesses.

*Abstract:* 19 U.S.C. 1466(a) provides for a 50 percent *ad valorem* duty assessed on a vessel master or owner for any repairs, purchases, or expenses incurred in a foreign country by a commercial vessel registered in the United States. CBP Form 226, Record of Vessel Foreign Repair or Equipment Purchase, is used by the master or owner of a vessel to declare and file entry on equipment, repairs, parts, or materials purchased for the vessel in a foreign country. This information enables CBP to assess duties on these foreign repairs, parts, or materials. CBP Form 226 is provided for by 19 CFR 4.7 and 4.14 and is accessible at: *https://www.cbp.gov/document/forms/form-226-record-vessel-foreign-repair-or-equipment-purchase.*

### Proposed Change

This form is anticipated to be submitted electronically as part of the maritime forms automation project through the Vessel Entrance and Clearance System (VECS), which will eliminate the need for any paper submission of any vessel entrance or clearance requirements under the above referenced statutes and regulations. VECS will still collect and maintain the same data, but will automate the capture of data to reduce or eliminate redundancy with other data collected by CBP.

*Type of Information Collection:* Record of Vessel Foreign Repair or Equipment Purchase.

*Estimated Number of Respondents:* 421.

*Estimated Number of Annual Responses per Respondent:* 28.

*Estimated Number of Total Annual Responses:* 11,788.

*Estimated Time per Response:* 2 hours.

*Estimated Total Annual Burden Hours:* 23,576.

Dated: April 22, 2022.

**Seth D. Renkema,**

*Branch Chief, Economic Impact Analysis Branch, U.S. Customs and Border Protection.*

[FR Doc. 2022–08983 Filed 4–26–22; 8:45 am]

**BILLING CODE 9111–14–P**

## DEPARTMENT OF HOMELAND SECURITY

## Implementation of the Uniting for Ukraine Parole Process

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** This notice announces the implementation of a U.S. Department of Homeland Security (DHS) parole process called *Uniting for Ukraine.* Pursuant to this process, DHS will offer certain Ukrainian citizens and their immediate family members who were recently displaced by Russia's war of aggression in Ukraine, pass biometric and biographic vetting, have sufficient financial support in the United States, and meet other eligibility requirements, an opportunity to apply for and receive advance authorization to travel to the United States for the purpose of seeking a discretionary grant of parole for urgent humanitarian reasons or significant public benefit for up to two years. The process is intended to be a safe, legal, and orderly pathway to support vulnerable Ukrainian citizens and their immediate family members in Europe who have been displaced from their country as a result of Russia's unprovoked invasion.

**DATES:** DHS will make the *Uniting for Ukraine* parole process available on April 25, 2022.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King, Jr. Avenue SE, Washington, DC 20528–0445

**SUPPLEMENTARY INFORMATION:**

### I. Background

On February 24, 2022, Russia's military launched an unprovoked full-scale invasion of the sovereign nation of Ukraine, marking the largest conventional military action in Europe since World War II [1] and causing the fastest growing refugee crisis in modern history. As of April 10, 2022, nearly 12 million people have fled Russia's invasion, including seven million displaced inside Ukraine.[2] Russia's

forces have continued to engage in significant, sustained bombardment of major cities, indiscriminately targeting civilian populations and causing widespread terror.[3] While most of those fleeing the violence remain in Europe,[4] the United States has committed to welcoming up to 100,000 displaced Ukrainians and others fleeing Russian aggression.[5] Among other legal pathways, the United States will consider, on a case-by-case basis, granting Ukrainians advance authorization to travel to the United States for the purpose of seeking a discretionary grant of parole for urgent humanitarian reasons or significant public benefit.[6]

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security with discretionary authority to parole noncitizens into the United States temporarily, under such reasonable conditions that the Secretary may prescribe, on a case-by-case basis, for ''urgent humanitarian reasons or significant public benefit.'' INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole''). Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during the period of parole in the United States. INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS may set the duration of the parole based on the purpose for granting the parole request, and may impose reasonable conditions on parole. INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS may terminate parole in its discretion at any time. *See* 8 CFR 212.5(e). Individuals who are paroled into the United States generally may apply for employment authorization. *See* 8 CFR 274a.12(c)(11).

---

[1] ''Russia invades Ukraine on multiple fronts in 'brutal act of war','' *PBS,* Feb. 24, 2022, available at: *https://www.pbs.org/newshour/world/russia-invades-ukraine-on-multiple-fronts-in-brutal-act-of-war* (last visited Apr. 20, 2022); Natalia Zinets and Aleksandar Vasovic, ''Missiles rain down around Ukraine,'' *Reuters,* Feb. 24, 2022, available at: *https://www.reuters.com/world/europe/putin-orders-military-operations-ukraine-demands-kyiv-forces-surrender-2022-02-24/* (last visited Apr. 20, 2022).

[2] ''Russia's invasion of Ukraine in maps—latest updates,'' *Financial Times,* Apr. 20, 2022, available

at: *https://www.ft.com/content/4351d5b0-0888-4b47-9368-6bc4dfbccbf5* (last visited Apr. 20, 2022).

[3] Ukraine: Humanitarian Impact Situation Report No. 1, United Nations Office for the Coordination of Humanitarian Affairs, Feb. 26, 2022, available at: *https://reliefweb.int/report/ukraine/ukraine-humanitarian-impact-situation-report-no-1-500-pm-26-february-2022* (last visited Apr. 20, 2022).

[4] Map: Where Ukraine refugees are heading, *ABC News,* Mar. 30, 2022, available at *https://abcnews.go.com/International/map-ukrainian-refugees-heading/story?id=83178031.*

[5] *FACT SHEET: The Biden Administration Announces New Humanitarian, Development, and Democracy Assistance to Ukraine and the Surrounding Region,* White House Briefing Room, Mar. 24, 2022, available at *https://www.whitehouse.gov/briefing-room/statements-releases/2022/03/24/fact-sheet-the-biden-administration-announces-new-humanitarian-development-and-democracy-assistance-to-ukraine-and-the-surrounding-region/* (last visited Apr. 20, 2022).

[6] *See* INA section 212(d)(5), 8 U.S.C. 1182(d)(5); 8 CFR 212.5(f).

CLP_AR_000857

*Uniting for Ukraine* establishes a process by which eligible Ukrainian citizens and their immediate family members, if supported by an individual or entity in the United States, can apply for advance authorization to travel to the United States for the purpose of seeking a discretionary grant of parole. If advance authorization is granted, the recipient will be permitted to board a flight to the United States for the purpose of requesting parole. This notice outlines the process by which U.S.-based persons can apply to financially support eligible Ukrainian citizens and their immediate family members, the process by which those Ukrainians may request advance authorization to travel to the United States, and the relevant screening and vetting that is required prior to issuance of such travel authorization and any grant of parole.

The decision to parole a noncitizen into the United States is made at the port of entry, on a case-by-case basis, pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A); as a result, approval of travel authorization to apply for parole at a U.S. port of entry, *see* 8 CFR 212.5(f), does not guarantee that the individual will be paroled. If parole is granted pursuant to this process, it will generally be for a term of up to two years.

## II. Ongoing Armed Conflict, Human Rights Abuses, and Humanitarian Situation in Ukraine

Russia's full-scale military invasion of Ukraine, beginning on February 24, 2022, has indiscriminately targeted civilian populations, placing civilians throughout the country at significant risk of physical harm.[7] As of mid-April 2022, Russian forces continue sustained shelling campaigns of cities and towns across Ukraine that have harmed, killed, and injured civilians and struck hospitals, schools, and apartment buildings.[8] Artillery attacks and air strikes by Russia's military forces have become regular occurrences in cities across Ukraine since the start of the February 2022 invasion.[9] Aerial bombardments in and around major

cities have been reported as Russia's forces continue to target critical infrastructure.[10] In an April 13, 2022 update, the United Nations (UN) Office of the High Commissioner for Human Rights (OHCHR) reported 4,521 civilian casualties during the ongoing Russian invasion of Ukraine, with more casualties expected as the fighting continues.[11] OHCHR also notes that these estimates likely significantly undercount civilian fatalities.[12]

Russia's unprovoked war against Ukraine continues to "generate further population displacement, damage civilian infrastructure, and exacerbate humanitarian needs across the country."[13] Since February 24, 2022, significant infrastructural damage in Ukraine from Russia's air strikes has "left hundreds of thousands of people without electricity or water, while bridges and roads damaged by shelling have left communities cut off from markets for food and other basic supplies."[14] In February 2022, the U.N. Office for the Coordination of Humanitarian Affairs (UNOCHA) estimated that millions of Ukrainian nationals were in need of water, sanitation and hygiene assistance.[15] Those without access to alternative water sources have been most heavily impacted.[16]

Food security remains an ongoing is concern in Ukraine, with more than one million Ukrainian nationals in need of food assistance—including a significant number that are severely or moderately

food insecure.[17] The impact on women has been particularly pronounced: "available data show that female-headed households are an estimated 1.3 times more often experiencing food insecurity, compared to the overall population."[18] According to the United Nations, women and girls also face "higher risks of human rights violations and sexual exploitation and abuse, including transactional sex, survival sex and conflict-related sexual violence."[19]

Critical medicines, health supplies and equipment, and shelter and protection for those displaced from their home are also in short supply.[20] According to the United Nations, more than a million Ukrainian nationals were in need of health care assistance, even prior to the initiation of conflict; the conflict has significantly exacerbated these challenges.[21] Hospitals have struggled with the volume of COVID cases and Ukraine has one of the lowest vaccination rates in Europe.

These factors, coupled with the ongoing violence, have led to large scale displacements of Ukrainians. Since Russia invaded Ukraine, over five million people have, as of April 19, 2022, fled Ukraine for Poland, Hungary, Slovakia, Romania, and Moldova.[22] Another seven million have been internally displaced inside Ukraine.[23]

---

[7] *Press briefing notes on Ukraine,* UN OHCHR, Mar. 8, 2022, available at: *https://www.ohchr.org/en/press-briefing-notes/2022/03/press-briefing-notes-ukraine* (last visited Apr. 20, 2022).

[8] *War Crimes by Russia's Forces in Ukraine, Press Statement,* U.S. Secretary of State Antony J. Blinken, Mar. 23, 2022, available at: *https://www.state.gov/war-crimes-by-russias-forces-in-ukraine/* (last visited Apr. 20, 2022).

[9] "Fear, darkness and newborn babies: inside Ukraine's underground shelters," *The Guardian,* Feb. 26, 2022, available at: *https://www.theguardian.com/world/2022/feb/26/fear-darkness-and-newborn-babies-inside-ukraine-underground-shelters* (last visited Apr. 20, 2022).

[10] "Russia's invasion of Ukraine in maps—latest updates," *Financial Times,* Apr. 20, 2022, available at: *https://www.ft.com/content/4351d5b0-0888-4b47-9368-6bc4dfbccbf5* (last visited Apr. 20, 2022).

[11] UN OHCHR, "Ukraine: civilian casualty update 13 April 2022," Apr. 13, 2022, available at: *https://www.ohchr.org/en/news/2022/04/ukraine-civilian-casualty-update-13-april-2022* (last visited Apr. 20, 2022).

[12] *See supra* note 7.

[13] *Ukraine—Complex Emergency,* U.S. Agency for International Development, Mar. 25, 2022, available at: *https://www.usaid.gov/sites/default/files/documents/2022-03-25_USG_Ukraine_Complex_Emergency_Fact_Sheet_8.pdf* (last visited Apr. 20, 2022).

[14] *Ukraine: Humanitarian Impact, Situation Report No. 01,* UNOCHA Ukraine, Feb. 26, 2022, available at: *https://reliefweb.int/report/ukraine/ukraine-humanitarian-impact-situation-report-no-1-500-pm-26-february-2022* (last visited Apr. 20, 2022).

[15] *2022 Humanitarian Needs Overview—Ukraine,* UNOCHA, p. 73, Feb. 11, 2022, available at: *https://www.humanitarianresponse.info/sites/www.humanitarianresponse.info/files/documents/files/ukraine_2022_hno_eng_2022-02-11.pdf* (last visited Apr. 20, 2022).

[16] *2022 Humanitarian Needs Overview—Ukraine,* UNOCHA, p. 39, Feb. 11, 2022, available at: *https://www.humanitarianresponse.info/sites/www.humanitarianresponse.info/files/documents/files/ukraine_2022_hno_eng_2022-02-11.pdf* (last visited Apr. 20, 2022).

[17] *2022 Humanitarian Needs Overview—Ukraine,* UNOCHA, p. 79, Feb. 11, 2022, available at: *https://www.humanitarianresponse.info/sites/www.humanitarianresponse.info/files/documents/files/ukraine_2022_hno_eng_2022-02-11.pdf* (last visited Apr. 20, 2022).

[18] *2022 Humanitarian Needs Overview—Ukraine,* UNOCHA, p. 51, Feb. 11, 2022, available at: *https://www.humanitarianresponse.info/sites/www.humanitarianresponse.info/files/documents/files/ukraine_2022_hno_eng_2022-02-11.pdf* (last visited Apr. 20, 2022).

[19] *Rapid Gender Analysis of Ukraine: Secondary data review,* UNHCR, Mar. 29, 2022, *https://data2.unhcr.org/en/documents/details/91723* (last visited Apr. 20, 2022).

[20] *Ukraine: Humanitarian Impact, Situation Report No. 01,* UNOCHA Ukraine, Feb. 26, 2022, available at: *https://reliefweb.int/report/ukraine/ukraine-humanitarian-impact-situation-report-no-1-500-pm-26-february-2022* (last visited Apr. 20, 2022).

[21] *2022 Humanitarian Needs Overview—Ukraine,* UNOCHA, p. 87, Feb. 11, 2022, available at: *https://www.humanitarianresponse.info/sites/www.humanitarianresponse.info/files/documents/files/ukraine_2022_hno_eng_2022-02-11.pdf* (last visited Apr. 20, 2022); *Impact of Health Reform on the Primary Healthcare Level in Conflict-Affected Areas of Donetsk and Luhansk Oblasts,* Médicos del Mundo, June 2021, available at: *https://reliefweb.int/report/ukraine/impact-healthcare-reform-primary-healthcare-level-conflict-affected-areas-donetsk-and* (last visited Apr. 20, 2022).

[22] Operational Data Portal, UNHCR, Apr. 19, 2022, available at: *https://data2.unhcr.org/en/situations/ukraine* (last visited Apr. 20, 2022).

[23] *One in Six People Internally Displaced in Ukraine,* International Organization on Migration, Apr. 21, 2022, available at: *https://reliefweb.int/*

Continued

CLP_AR_000858

## III. Uniting for Ukraine

Pursuant to the process established by *Uniting for Ukraine,* U.S.-based individuals who agree to provide financial support to Ukrainian citizens and their immediate family members (supporters) will be able to initiate a process that will ultimately allow those Ukrainian citizens and their immediate family members (Ukrainian beneficiaries) to seek advance authorization to travel to the United States for the purpose of seeking parole into the United States at a U.S. port of entry. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (permitting parole of a noncitizen into the United States for urgent humanitarian reasons or significant public benefit); 8 CFR 212.5(f). The determination as to whether to parole a particular noncitizen who presents such authorization remains a case-by-case, discretionary determination made upon arrival at the port of entry.

## IV. Participation in Uniting for Ukraine and Filing Process

*1. Eligibility*

Certain Ukrainian citizens, and certain non-Ukrainian immediate family members,[24] who were physically present in Ukraine as of February 11, 2022 and have a U.S.-based supporter are eligible for this process. The process is triggered when a prospective supporter files a Form I–134, *Declaration of Financial Support,* with U.S. Citizenship and Immigration Services (USCIS) through an online portal. USCIS will review that form in order to verify and vet the information submitted. Once USCIS determines that the Form I–134 includes sufficient evidence of financial support, the relevant Ukrainian beneficiary will be notified and will be prompted to submit any additional required information. To be eligible, the Ukrainian beneficiary must possess a valid Ukrainian passport, or if a child without their own passport, be included in a parent's passport. At this time, only children

traveling with a parent or a legal guardian will be eligible for *Uniting for Ukraine.* Individuals who are not eligible for *Uniting for Ukraine* may make an appointment at the nearest U.S. Embassy or consulate for additional information about available options.

The Ukrainian beneficiary also must clear biographic and biometric background checks, and will need to meet public health requirements, including, as appropriate, proof of required vaccinations, as determined by DHS's Chief Medical Officer, in consultation with the Centers for Disease Control and Prevention (CDC). Pursuant to these requirements, Ukrainian beneficiaries must demonstrate proof of first doses of measles, polio, and COVID–19 vaccines and must complete a screening for tuberculosis for all individuals two years of age or older. These requirements may be adjusted in accordance with evolving public health needs; the most up-to-date requirements will be available at *www.dhs.gov/ukraine.*

*2. Processing Steps*

*Filing and confirmation of financial support:* The process is initiated when a supporter—either an individual or an individual acting on behalf of an organizations—files a Form I–134, *Declaration of Financial Support,* online using the myUSCIS platform. This declaration must include biographic and financial information on the supporter, and biographic identifying information on the Ukrainian beneficiary.

The individual who submits and signs the Form I–134 must be a U.S.-based person in lawful status, a parolee, or a beneficiary of deferred action or Deferred Enforced Departure. The individual can, however, represent an organization. If the individual is acting on behalf of an organization, and if that organization is providing the financial or other services to support the Ukrainian beneficiary, this information should be provided as part of the evidence submitted with the Form I–134.

USCIS will conduct background checks on the supporter to protect against exploitation and abuse and to determine the supporters' financial suitability to support beneficiaries. If the supporter is approved, USCIS will notify the Ukrainian beneficiary electronically with an invitation to create a myUSCIS account.

*Ukrainian beneficiary account registration:* Following USCIS's approval of the named supporter, the Ukrainian beneficiary will receive an electronic communication from USCIS

with instructions on how to set up an account with myUSCIS and other next steps. The Ukrainian beneficiary will be required to confirm their biographic information on myUSCIS and attest to completion of all other requirements, including the required vaccinations and screening listed above.

*Vetting and Clearance:* Biographic information provided by the prospective Ukrainian beneficiary will be vetted against national security and law enforcement databases. The my USCIS system will transmit biographic information for Ukrainian beneficiaries directly to U.S. Customs and Border Protection (CBP) and into CBP's Automated Targeting System (ATS) for vetting. Only Ukrainian beneficiaries who complete all the requirements, including vaccinations, and clear the vetting of their biographic information will receive the necessary advanced authorization to travel to the United States to seek parole

Once vetting is complete and advance authorization to travel has been approved, Ukrainian beneficiaries will receive a notification in myUSCIS in an automated manner. Cleared individuals will be authorized to travel via commercial routes to the United States for a period of 90 days. Carriers utilizing CBP's Document Validation program will be able to access this authorization to facilitate generation of a boarding pass. Carriers who are not participants in the Document Validation program will utilize manual verification mechanisms to generate a boarding pass.

*Travel and public health related requirements:* Ukrainian beneficiaries who receive advance authorization to travel to the United States will be responsible for arranging and funding their travel to the United States. In addition, Ukrainian beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with CDC, with respect to health and travel,[25] including

---

*report/ukraine/ukraine-humanitarian-impact-situation-report-no-1-500-pm-26-february-2022* (last visited Apr. 24, 2022).

[24] Ukrainians' immediate family members who are not Ukrainian citizens may also be considered for parole under *Uniting for Ukraine.* Immediate family members, for the purposes of *Uniting for Ukraine,* include: The spouse or common-law partner of a Ukrainian citizen; and their unmarried children under the age of 21. Non-Ukrainian immediate family members authorized to travel under this process must accompany the principal Ukrainian when completing travel to the United States. Unaccompanied minors and family groups that include minors traveling with adults that are not the child's parent or legal guardian are not currently eligible for this process.

[25] Changes to requirements for travel by air were implemented by, *inter alia,* Presidential Proclamation 10294 of October 25, 2021, 86 FR 59603 (Oct. 28, 2021) (''Presidential Proclamation''), and a related CDC orders, 86 FR 61224 (Nov. 5, 2021) and 87 FR 20405 (Apr. 7, 2022). *See also* CDC, *Requirement for Proof of Negative COVID–19 Test or Recovery from COVID–19 for All Air Passengers Arriving in the United States, https://www.cdc.gov/quarantine/pdf/Global-Testing-Order-10-25-21-p.pdf* (Oct. 25, 2021); *Requirement for Airlines and Operators to Collect Contact Information for All Passengers Arriving into the United States, https://www.cdc.gov/quarantine/pdf/CDC-Global-Contact-Tracing-Order-10-25-2021-p.pdf* (Oct. 25, 2021). CDC later amended its testing order following developments related to the Omicron variant. *See* CDC, *Requirement for Proof of Negative COVID–19 Test Result or Recovery from COVID–19 for All Airline Passengers Arriving into the United States, https://www.cdc.gov/quarantine/*

CLP_AR_000859

vaccination and/or testing requirements for diseases like COVID–19, polio, measles, and tuberculosis.

*Parole determination at a U.S. port of entry:* Upon arrival at a port of entry, Ukrainian beneficiaries will be inspected by a CBP officer who will make a case-by-case processing determination, to include consideration of parole. Individuals granted parole pursuant to this process will generally be paroled for a period of up two years. Individuals granted parole under this process will be eligible to apply for employment authorization with USCIS.

## V. Paperwork Reduction Act

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB) for review and approval, any new reporting requirements they impose. OMB has approved USCIS Form I–134, *Declaration of Financial Support,* and assigned the revision to OMB control number 1615–0014.

USCIS is making some changes to this form in connection with the implementation of the *Uniting for Ukraine* process and has submitted a request to OMB for emergency approval of the required changes under 5 CFR 1320.13. Following OMB approval of the emergency request, USCIS will publish a notice under the PRA and will make some revisions to the currently approved burden for OMB control number 1615–0014.

## VI. Implementation

This process will be implemented beginning on April 25, 2022.

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2022–09087 Filed 4–25–22; 4:15 pm]
**BILLING CODE 9110–9M–P**

---

## DEPARTMENT OF THE INTERIOR

### Geological Survey

**[GX22EE000101100]**

### Public Meeting of the National Geospatial Advisory Committee

**AGENCY:** Department of Interior.
**ACTION:** Notice of public meeting.

**SUMMARY:** In accordance with the Federal Advisory Committee Act of 1972, the U.S. Geological Survey (USGS) is publishing this notice to announce that a Federal Advisory

*pdf/Amended-Global-Testing-Order_12-02-2021-p.pdf* (Dec. 2, 2021).

Committee meeting of the National Geospatial Advisory Committee (NGAC) will take place.

**DATES:** The meeting will be held as a webinar on Wednesday, May 18, 2022, from 1:00 p.m. to 5:00 p.m., and on Thursday, May 19, 2022, from 1:00 p.m. to 5:00 p.m. (Eastern Daylight Time).

**ADDRESSES:** The meeting will be held on-line and via teleconference. Instructions for accessing the meeting will be posted at *www.fgdc.gov/ngac.* Comments can be sent to Ms. Dionne Duncan-Hughes, Group Federal Officer by email to *gs-faca@usgs.gov.*

**FOR FURTHER INFORMATION CONTACT:** Mr. John Mahoney, Federal Geographic Data Committee (FGDC), USGS, by mail at 909 First Avenue, Room 703, Seattle, WA 98104; by email at *jmahoney@usgs.gov;* or by telephone at (206) 375–2565.

**SUPPLEMENTARY INFORMATION:** This meeting is being held under the provisions of the Federal Advisory Committee Act of 1972 (5 U.S.C., Appendix 2), the Government in the Sunshine Act of 1976 (5 U.S.C. 552B, as amended), and 41 CFR 102–3.140 and 102–3.150.

*Purpose of the Meeting:* The NGAC provides advice and recommendations related to management of Federal and national geospatial programs, the development of the National Spatial Data Infrastructure (NSDI), and the implementation of the Geospatial Data Act of 2018 (GDA) and the Office of Management and Budget Circular A–16. The NGAC reviews and comments on geospatial policy and management issues and provides a forum to convey views representative of non-federal stakeholders in the geospatial community. The NGAC meeting is one of the primary ways that the FGDC collaborates with its broad network of partners. Additional information about the NGAC meeting is available at: *www.fgdc.gov/ngac.*

*Agenda Topics:*
—FGDC Update
—GDA Reporting
—Landsat Advisory Group
—Partnerships/Stakeholder Engagement
—3D Elevation Program
—Executive Order 14008/Climate Mapping Initiative
—Public Comment

*Meeting Accessibility/Special Accommodations:* The webinar meeting is open to the public and will take place from 1:00 p.m. to 5:00 p.m. on May 18, 2022, and from 1:00 p.m. to 5:00 p.m. on May 19, 2022. Members of the public wishing to attend the meeting should visit *www.fgdc.gov/ngac* or contact Mr.

John Mahoney (see **FOR FURTHER INFORMATION CONTACT**). Webinar/conference line instructions will be provided to registered attendees prior to the meeting. Individuals requiring special accommodations to access the public meeting should contact Mr. John Mahoney (see **FOR FURTHER INFORMATION CONTACT**) at least five (5) business days prior to the meeting so that appropriate arrangements can be made.

*Public Disclosure of Comments:* There will be an opportunity for public comment during both days of the meeting. Depending on the number of people who wish to speak and the time available, the time for individual comments may be limited. Written comments may also be sent to the Committee for consideration. To allow for full consideration of information by the Committee members, written comments must be provided to John Mahoney (see **FOR FURTHER INFORMATION CONTACT**) at least three (3) business days prior to the meeting. Any written comments received will be provided to the committee members before the meeting.

Before including your address, phone number, email address, or other personally identifiable information (PII) in your comment, you should be aware that your entire comment—including your PII—may be made publicly available at any time. While you may ask us in your comment to withhold your PII from public review, we cannot guarantee that we will be able to do so.

*Authority:* 5 U.S.C. Appendix 2.

**Kenneth Shaffer,**
*Deputy Executive Director, Federal Geographic Data Committee.*
[FR Doc. 2022–08924 Filed 4–26–22; 8:45 am]
**BILLING CODE 4338–11–P**

---

## INTERNATIONAL TRADE COMMISSION

### Notice of Receipt of Complaint; Solicitation of Comments Relating to the Public Interest

**AGENCY:** International Trade Commission.
**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that the U.S. International Trade Commission has received a complaint entitled *Certain CPAP Pillows, DN 3615;* the Commission is soliciting comments on any public interest issues raised by the complaint or complainant's filing pursuant to the Commission's Rules of Practice and Procedure.

**FOR FURTHER INFORMATION CONTACT:** Lisa R. Barton, Secretary to the Commission,

**SUPPLEMENTARY INFORMATION:** The United States is signatory to the International Maritime Organization's International Regulations for Preventing Collisions at Sea, 1972 (72 COLREGS), as amended. The special construction or purpose of some vessels makes them unable to comply with the light, shape, or sound signal provisions of the 72 COLREGS. Under statutory law, however, specified 72 COLREGS provisions are not applicable to a vessel of special construction or purpose if the Coast Guard determines that the vessel cannot comply fully with those requirements without interfering with the special function of the vessel.[1]

The owner, builder, operator, or agent of a special construction or purpose vessel may apply to the Coast Guard District Office in which the vessel is being built or operated for a determination that compliance with alternative requirements is justified,[2] and the Chief of the Prevention Division would then issue the applicant a certificate of alternative compliance (COAC) if he or she determines that the vessel cannot comply fully with 72 COLREGS light, shape, and sound signal provisions without interference with the vessel's special function.[3] If the Coast Guard issues a COAC, it must publish notice of this action in the **Federal Register**.[4]

The Chief of Prevention Division, Eighth District, U.S. Coast Guard, certifies that the HAYDEN GRACE, O.N. 1326783 is a vessel of special construction or purpose, and that, with respect to the position of the mast lights, stern light, and sidelights, it is not possible to comply fully with the requirements of the provisions enumerated in the 72 COLREGS, without interfering with the normal operation, construction, or design of the vessel. The Chief of Prevention Division, Eighth District, U.S. Coast Guard, further finds and certifies that the mast lights, stern light, and sidelights are in the closest possible compliance with the applicable provisions of the 72 COLREGS.[5]

This notice is issued under authority of 33 U.S.C. 1605(c) and 33 CFR 81.18.

Dated: October 13, 2022.

**A.H. Moore, Jr.,**

*Captain, U.S. Coast Guard, Chief, Prevention Division, Eighth Coast Guard District.*

[FR Doc. 2022–22712 Filed 10–18–22; 8:45 am]

**BILLING CODE 9110–04–P**

---

[1] 33 U.S.C. 1605.
[2] 33 CFR 81.5.
[3] 33 CFR 81.9.
[4] 33 U.S.C. 1605(c) and 33 CFR 81.18.
[5] 33 U.S.C. 1605(a); 33 CFR 81.9.

# DEPARTMENT OF HOMELAND SECURITY

## Implementation of a Parole Process for Venezuelans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice.

---

**SUMMARY:** This notice describes a new effort designed to immediately address the increasing number of encounters of Venezuelan nationals along the southwest border (SWB), as the Administration continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by irregular migration. Venezuelans who do not avail themselves of this process, and instead enter the United States without authorization between POEs, will be subject to expulsion or removal. As part of this effort, the Department of Homeland Security (DHS) will implement a process—modeled on the successful *Uniting for Ukraine* (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner. To be eligible, individuals must have a supporter in the United States who agrees to provide housing and other supports as needed; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of entry (POE), rather than entering at a land POE. Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication.

**DATES:** DHS will begin accepting online applications for this process on October 18, 2022.

**FOR FURTHER INFORMATION CONTACT:** Ihsan Gunduz, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445, (202) 282–9708.

**SUPPLEMENTARY INFORMATION:**

## I. Background—Venezuela Parole Process

This notice describes the implementation of a new parole process for certain Venezuelan nationals announced by the Secretary of Homeland Security on October 12, 2022,[1] including the eligibility criteria

---

[1] DHS Announces New Migration Enforcement Process for Venezuelans, October 12, 2022, available at: *https://www.dhs.gov/news/2022/10/12/dhs-announces-new-migration-enforcement-process-venezuelans.*

and filing process. The parole process is intended to enhance border security by reducing the record levels of Venezuelan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The Secretary's announcement followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated October 12, 2022.[2] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

### A. Overview

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration. The strategy—a shared endeavor with partner countries—focuses on addressing the root causes of migration, which currently are fueling unprecedented levels of irregular migration, and creating safe and orderly processes for migration throughout the region. This strategy will reduce regional irregular migration in the mid- to long-term, but we anticipate continued substantial pressures along the southwest border over the coming months.

In light of this reality, DHS is implementing an immediate effort to address the increasing number of encounters of Venezuelan nationals at the SWB as we continue to implement the broader and long-term strategy. We anticipate that this new effort would reduce the record levels of Venezuelan nationals seeking to irregularly enter the United States between POEs along the SWB, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

With the cooperation of the Government of Mexico (GOM), and potentially other governments, this effort is intended to serve as a deterrent to irregular migration by providing a meaningful alternative to irregular migration and by imposing immediate consequences on Venezuelan nationals who choose to not avail themselves of the new process and instead seek to irregularly enter the United States

---

[2] *See* Memorandum for the Secretary from U.S. Customs and Border Protection Commissioner and U.S. Citizenship and Immigration Services Director, Parole Process for Certain Venezuelan Nationals (Oct. 12, 2022).

CLP_AR_000907

**63508**    **Federal Register** / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices

between POEs. It will also provide an incentive for Venezuelans to avoid the often dangerous journey to the border altogether, by putting in place a safe and orderly process for Venezuelan nationals to travel to the United States to seek a discretionary, case-by-case grant of parole into the United States, based on significant public benefit and urgent humanitarian reasons.[3] Venezuelan nationals who irregularly enter the United States between POEs after October 19, 2022 are subject to expulsion or removal from the United States; those who enter irregularly into the United States, Mexico, or Panama will also be found ineligible for a discretionary grant of parole under this process. Only those who meet specified criteria and pass national security and public safety vetting would be eligible for consideration for parole under this process.

Implementation of the parole process is conditioned on Mexico continuing to accept the expulsion or removal of Venezuelan nationals seeking to irregularly enter the United States between POEs. As such, this new process will couple a meaningful incentive to seek a lawful, safe and orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly.

The new policy is modeled on *Uniting for Ukraine* (U4U), the successful parole process that was put in place in the wake of Russia's unprovoked invasion of Ukraine, when thousands of Ukrainian migrants spontaneously arrived at SWB POEs. Once U4U was implemented, such spontaneous arrivals fell sharply, and travel shifted to a safe and orderly process. This new process is procedurally similar to U4U, in which certain Ukrainians with U.S.-based supporters who meet specified eligibility criteria have been able to travel to the United States to seek a discretionary, case-by-case grant of parole for up to two years. As in U4U, applications using this parole process will be initiated by a supporter in the United States who would apply on behalf of a Venezuelan individual and commit to providing the beneficiary housing and other financial support, as needed, for the duration of their parole.

In addition to the supporter requirement, Venezuelan nationals are required to meet several eligibility criteria, as outlined in more detail later in this notice, to receive advance authorization to travel to the United States and be considered for parole, on

a case-by-case basis. Importantly, individuals are ineligible if they have been ordered removed from the United States within the prior five years; they are also ineligible if they have crossed into the United States between POEs, or entered Mexico or Panama without authorization, after October 19, 2022. Only those who pass national security and public safety vetting and agree to fly to an interior POE, as opposed to entering between POEs, and who meet all specified criteria below will be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process.

Any discretionary grants of parole will be for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged and long-term strategy and engage with our foreign partners throughout the region. These efforts are intended to support conditions that would decrease irregular migration, work to improve refugee processing and other lawful immigration pathways in the region, and allow for increased removals of those who continue to migrate irregularly and lack a valid claim of asylum or other lawful basis to remain in the United States. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the U.S. economy as they do so. Those who are not granted asylum or other immigration benefits will need to leave the United States at the expiration of their authorized period of parole or will generally be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Venezuelan nationals pursuant to this process will provide a significant public benefit for the United States, while also addressing the urgent humanitarian reasons that Venezuelan nationals are fleeing, to include repression and unsafe conditions in their home country. Most significantly, we anticipate that parole will: (i) enhance the security of our SWB by reducing irregular migration of Venezuelan nationals; (ii) enhance border security and national security by vetting individuals prior to their arrival at a United States POE; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of Venezuelan irregular migration; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important

foreign policy goals to manage migration collaboratively in the hemisphere. The process is capped at 24,000 beneficiaries. After this cap is reached, DHS will not approve additional beneficiaries, absent a Secretary-level decision, at the Secretary's sole discretion, to continue the process.

*B. Conditions at the Border*

1. Trends and Flows: Increase of Venezuelan Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year. By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[4] These gains were subsequently reversed, however, as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID–19 pandemic— continued to increase at a similar pace in 2021 and 2022.

Shifts in demographics have also had a significant effect on irregular migration. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons. Beginning in the 2010s, a growing share of migrants have been from Northern Central America [5] (NCA) and, since the late 2010s, from countries throughout the Americas. Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence and political oppression and for other non-economic reasons.[6]

The most recent rise in the numbers of encounters at the border has been driven in significant part by a surge in

---

[3] *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[4] Office of Immigration Statistics (OIS) analysis of historic CBP data.

[5] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[6] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of Title 42 expulsions in 2020. As the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

CLP_AR_000908

**Federal Register** / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices **63509**

migration of Venezuelan nationals. Unique encounters of Venezuelan nationals increased throughout fiscal year (FY) 2021, totaling 47,328. More than 25% of Venezuela's population has left the country. The United States is seeing a rising rate of Venezuelans encountered at our border over the past two years, which has surged in the last few months. Average monthly unique encounters of Venezuelan nationals at the land border totaled 15,494 in FY 2022,[7] rising further to over 25,000 in August and 33,000 in September, compared to a monthly average of 127 unique encounters from FY 2014–2019.[8] Of note, unique encounters of Venezuelan nationals rose 293 percent between FY 2021 and FY 2022, while unique encounters of all other nationalities combined increased by 45 percent. Panama is currently seeing more than 3,000 people, mostly Venezuelan nationals, crossing into its territory from Colombia via the Darién jungle each day.

In recent months, this surge in irregular migration of Venezuelan nationals has been accelerating. Nationals from Venezuela accounted for 25,130 unique encounters in August 2022, and the Office of Immigration Statistics (OIS) estimates that there were 33,500 unique encounters in September, more than Mexico and more than all three NCA countries combined.[9]

2. Push and Pull Factors

DHS assesses that the high—and rising—number of Venezuelan encounters has three key causes: First, the deteriorating conditions in Venezuela, including repression, instability, and violence, are pushing large numbers to leave their home country. Second, the lack of safe and orderly migration alternatives throughout the entire region, including to the United States, means that those seeking refuge outside of Venezuela have few lawful options. Third, the United States faces significant limits on the ability to return Venezuelan nationals to Venezuela or elsewhere, as

described below; absent such a return ability, more individuals are willing to take a chance that they can come—and stay.

a. Factors Pushing Migration From Venezuela

A complex political, humanitarian, and economic crisis; the widespread presence of non-state armed groups; crumbling infrastructure; and the repressive tactics of Nicolás Maduro have caused nearly 7 million Venezuelans to flee their country.[10] Maduro has arbitrarily banned key opposition figures from participating in the political process, detained hundreds of political prisoners, employed judicial processes to circumscribe political parties, and denied opposition political representatives equal access to media coverage and freedom of movement in the country.[11] In a February 2022 report, Amnesty International reported that ''[c]rimes under international law and human rights violations, including politically motivated arbitrary detentions, torture, extrajudicial executions and excessive use of force have been systematic and widespread, and could constitute crimes against humanity.'' [12] Amnesty International further reported that ''trends of repression in Venezuela have been directed against a specific group of people: those perceived as dissidents or opponents'' of Nicolás Maduro.[13]

According to the United Nations High Commissioner for Refugees, Venezuela has become the second-largest external displacement crisis in the world, following Syria.[14] At least in the short term, the crisis is expected to continue, thus continuing to push Venezuelans to seek alternatives elsewhere. As described above, Panama is currently seeing more than 3,000 people, mostly Venezuelan nationals, crossing into its

territory from Colombia via the Darién jungle each day.

b. Return Limitations

At this time, there are significant limits in DHS's ability to expel or return Venezuelans who enter the United States without authorization in between POEs. DHS is currently under a court-ordered obligation to implement the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, under which covered noncitizens may be prevented entry or expelled to prevent the spread of communicable disease.[15] But Venezuela does not presently allow repatriations via charter flights, which significantly limits DHS's ability to return those subject to the Title 42 Order or who are ordered removed. To date, other countries, including Mexico, have generally been reluctant to accept Venezuelans as well. As a result, DHS was only able to repatriate a small number of Venezuelan nationals to Venezuela in FY 2022.

c. Overall Effect

DHS assesses that the combination of the country conditions in Venezuela, the lack of safe and orderly lawful pathways, and the present inability to expel or remove Venezuelan nationals engaged in irregular migration, has significantly led to the significant increase in irregular migration among Venezuelan nationals. Conversely, DHS assesses that the return of a significant portion of Venezuelans who enter irregularly at the border, coupled with an alternative process pursuant to which Venezuelans could enter the United States lawfully, would meaningfully change the incentives for those intending to migrate—leading to a decline in the numbers of Venezuelans seeking to irregularly cross the SWB.

This prediction is based on prior experience: CBP saw rapidly increasing numbers of encounters of Guatemalan and Honduran nationals from January 2021 until August 2021, when these countries began accepting the direct return of their nationals. In January 2021, CBP encountered an average of 424 Guatemalan nationals and 362 Honduran nationals a day. By August 4, 2021, the 30-day average daily encounter rates had climbed to 1,249 Guatemalan nationals and 1,502 Honduran nationals—an increase of 195 percent and 315 percent, respectively. In the 60 days immediately following the resumption of routine flights, average daily encounters fell by 37

---

[7] FY 2022 CBP data cited in this notice is based on internal reporting to date. CBP releases official data in regular intervals; final FY 2022 figures may differ to some degree from the figures cited here.

[8] OIS analysis of OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of U.S. Customs and Border Protection (CBP) data from Unified Immigration Portal (UIP) as of October 6, 2022. Unique encounters include encounters of persons at the Southwest Border who were not previously encountered in the prior 12 months. Throughout this notice unique encounter data are defined to also include OFO parolees and other OFO administrative encounters.

[9] OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of CBP UIP data as of October 6, 2022.

[10] UNHCR, Venezuela Situation, available at: *https://www.unhcr.org/en-us/venezuela-emergency.html* (last visited Sept. 24, 2022).

[11] 2021 Country Reports of Human Rights Practices: Venezuela, U.S. Department of State, Apr. 12, 2022, available at: *https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/venezuela/* (last visited Sept. 24, 2022).

[12] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p. 11, Feb. 10, 2022, available at: *https://www.amnesty.org/en/documents/amr53/5133/2022/en/* (last visited Sept. 25, 2022).

[13] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p.52, Feb. 10, 2022, available at: *https://www.amnesty.org/en/documents/amr53/5133/2022/en/* (last visited Sept. 25, 2022).

[14] UNHCR, Venezuela Situation, available at: *https://www.unhcr.org/en-us/venezuela-emergency.html* (last visited Sept. 24, 2022).

[15] *Louisiana* v. *CDC,*—F. Supp. 3d—, 2022 WL 1604901 (W.D. La. May 20, 2022).

CLP_AR_000909

percent for Guatemala and 42 percent for Honduras, as shown in Figure 1 below.[16]

Figure 1: Daily Encounters of Guatemalan and Honduran Nationals, May 1–November 1, 2021.



**NOTE:** Figure depicts 30-day average of daily encounters.

Source: OIS analysis of OIS Persist Dataset.

Returns alone, however, are not sufficient. While the numbers of encounters of Guatemalan and Honduran nationals have fallen, CBP is currently encountering a total of around 1,000 nationals from these two countries each day. The process thus seeks to *combine* a consequence for Venezuelan nationals who seek to enter the United States irregularly at the land border with an incentive to use the lawful process to request authorization to travel by air to and enter the United States, without making the dangerous journey to the border.

This effort is informed by the way that similar incentives and disincentives worked in the U4U process. In the two weeks prior to U4U's implementation, DHS encountered a daily average of 940 nationals of Ukraine at the U.S.-Mexico land border seeking to enter the United States. After the new parole process launched and approved Ukrainians could fly directly into the United States—whereas those who sought to enter irregularly were subject to expulsion pursuant to the Title 42 public health Order—daily encounters dropped to fewer than twelve per day.[17]

Mexican officials also reported seeing a similar decline in the number of inbound Ukrainian air passengers.

3. Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in significant part by the number of Venezuelan nationals encountered—DHS has taken a series of extraordinary steps. Largely since FY 2021, DHS has built and now operates 10 soft-sided processing facilities, which cost $688 million in FY 2022. It has detailed 3,770 officers and agents from CBP and ICE to the SWB. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from elsewhere in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 on grants to non-governmental organizations (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP—H) to assist with the reception and onward travel of irregular migrants arriving at the SWB.

This spending is in addition to $1.4 billion in FY 2022 one-year surge funding for SWB enforcement and processing capacities.[18]

The impact has been particularly acute in certain border sectors. The increased flows of Venezuelan nationals are disproportionately occurring within the remote Del Rio, El Paso, and Yuma sectors, all of which are at risk of operating, or are currently operating, over capacity. In FY 2022, 93 percent of unique encounters of Venezuelan nationals occurred in these three sectors, with the trend rising to 98 percent in September 2022.[19] In FY 2022, the Del Rio, El Paso, and Yuma sectors encountered almost double the number of migrants as compared to FY 2021 (an 87 percent increase), and a ten-fold increase over the average for FY 2014–FY 2019, primarily as a result of increases in Venezuelans and other non-traditional sending countries.[20]

The focused increase in encounters in those three sectors is particularly challenging. Yuma and Del Rio sectors are geographically remote, and because—until the past two years—they have never been a focal point for large numbers of individuals entering irregularly, they have limited infrastructure and personnel in place to safely process the elevated encounters

---

[16] OIS analysis of OIS Persist Dataset based on data through August 31, 2022.

[17] OIS Persist Dataset based on data through August 31, 2022.

[18] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security, Apr. 26, 2022.

[19] OIS analysis of OIS Persist Dataset through August 31, 2022 and CBP UIP data for September 1–30, 2022.

[20] OIS analysis of OIS Persist Dataset through August 31, 2022.

CLP_AR_000910

**Federal Register**/Vol. 87, No. 201/Wednesday, October 19, 2022/Notices    **63511**

that they are seeing. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border, but is far away from other CBP sectors, which makes it challenging to move individuals elsewhere for processing during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors with capacity to process. In just one week (between September 22–September 28), El Paso and Yuma sectors operated a combined 79 decompression buses staffed by Border Patrol agents to neighboring sectors.[21] In that same week, El Paso and Yuma sectors also operated 29 combined lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[22]

Because these assets are finite, using DHS air resources to operate lateral flights impacts DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. This is concerning given the correlation between DHS's ability to operate return flights to non-contiguous home countries and encounters at the border, as described above. DHS assesses that a reduction in the flow of Venezuelans arriving at the SWB would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

## II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with discretionary authority to parole noncitizens into the United States temporarily, under such reasonable conditions that the Secretary may prescribe, on a case-by-case basis for "urgent humanitarian reasons or significant public benefit."[23] Parole is not an admission of the individual to the United States, and a parolee remains an "applicant for admission" during the period of parole in the United States.[24] DHS may set the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[25] Individuals may be granted advance authorization to travel to the United

States to seek parole.[26] DHS may terminate parole in its discretion at any time.[27] Individuals who are paroled into the United States generally may apply for employment authorization.[28]

This effort will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Venezuelan nationals to remain where they are and use a lawful process to request authorization to travel by air to and ultimately enter the United States for the purpose of seeking a discretionary grant of parole for up to two years.

## III. Justification for the Process

### A. Significant Public Benefit

The case-by-case parole of Venezuelan nationals pursuant to this process—which combines consequences for those who seek to enter the United States irregularly between POEs with an opportunity for eligible Venezuelan nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—will serve a significant public benefit for multiple, intersecting reasons. Specifically, as noted above, we assess that the parole of eligible individuals pursuant to this process will result in the following: (i) enhancing the security of our border by reducing irregular migration of Venezuelan nationals; (ii) enhancing border security and national security by vetting individuals before they arrive at our border; (iii) reducing the strain on DHS personnel and resources; (iv) minimizing the domestic impact of Venezuelan irregular migration; (v) disincentivizing a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfilling important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

### 1. Enhancing the Security of Our Border by Reducing Irregular Migration of Venezuelan Nationals

Implementation of the parole process is contingent on the GOM agreeing to accept the return of Venezuelan nationals encountered irregularly entering the United States without authorization between POEs. While DHS remains under the court order to implement the CDC's Title 42 public

health Order, these returns will take the form of expulsions. Once Title 42 is no longer in place, DHS will engage the GOM to effectuate Title 8 removals of individuals subject to expedited removal who cannot be returned to Venezuela or elsewhere. The ability to effectuate returns to Mexico will impose a consequence on irregular entry that currently does not exist.

As described above, Venezuelan nationals make up a significant and growing number of those encountered seeking to cross between POEs irregularly. We assess that without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly parole process, the numbers will continue to grow. By pairing a consequence on those seeking to irregularly cross between the POEs with the incentive provided by the opportunity to apply for advance authorization to travel to the United States to seek a discretionary grant of parole, this process will create a combination of incentives and disincentives that will lead to a substantial decline in irregular migration by Venezuelans to the SWB.

As also described above, this expectation is informed, in part, by past experience with respect to the ways that flows of irregular migration decreased from NCA countries once nationals from those countries were returned to their home countries and shifts that took place once the U4U process was initiated. These experiences provide compelling evidence of the importance of coupling effective disincentives for irregular entry with incentives for lawful entry as a way of addressing migratory surges.

### 2. Enhance Border Security and National Security by Vetting Individuals Before They Arrive at Our Border

The Venezuelan parole process described above will allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States. It is important to note that all noncitizens DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing, and that individuals who are determined to pose a national security or public safety threat are detained pending removal. Venezuelan nationals seeking parole via this process will still be subject to this vetting upon their arrival at the POE. That said, there are distinct advantages to being able to conduct some vetting actions *before* an individual arrives at the border to prevent individuals who

---

[21] Data from SBCC, as of September 29, 2022.

[22] Data from SBCC, as of September 29, 2022.

[23] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole").

[24] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[25] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[26] *See* 8 CFR 212.5(f).

[27] *See* 8 CFR 212.5(e).

[28] *See* 8 CFR 274a.12(c)(11).

CLP_AR_000911

could pose threats to national security or public safety from even traveling to the United States.

As described above, the vetting will require prospective beneficiaries to upload a live photograph via a mobile application. This will substantially enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them an advance authorization to travel before they arrive at our border.

3. Reduce the Burden on DHS Personnel and Resources

As discussed above, the impact of the increased migratory flows has strained the DHS workforce in ways that have been particularly concentrated in certain sectors along the SWB. By reducing encounters of Venezuelan nationals at the SWB, and channeling decreased flows of Venezuelan nationals to interior POEs through this streamlined process, we anticipate the process will relieve some of this burden. This will free up resources, including those focused on decompression of border sectors, which in turn could enable an increase in removal flights—enabling the removal of more noncitizens with final orders of removal faster and reducing the number of days in DHS custody. While the process will also draw on DHS resources within USCIS and CBP to process requests for discretionary parole on a case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require minimal resources as compared to the status quo.

4. Minimize the Domestic Impact

The increase in irregular migration, including the change in demographics, has put a strain on domestic resources, which is felt most acutely by border communities. As the number of arrivals increases, thus necessitating more conditional releases, the strains are shared by others as well. Given the current inability to return or repatriate Venezuelans in substantial numbers, Venezuelan nationals account for a significant percentage of the individuals being conditionally released pending their removal proceedings or the initiation of such proceedings after being encountered and processed along the SWB.

State and local governments, along with NGOs, are providing services and assistance to the Venezuelans and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[29] DHS also has worked with Congress to make approximately $290 million available since FY 2019 through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. This funding has allowed DHS to support building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Despite these efforts, local communities have reported strain on their ability to provide needed social services.[30] Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[31] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[32] The parole process will address these concerns by diverting flows of Venezuelan nationals to interior POEs through a safe and orderly process and ensuring that those who do arrive in the United States have support during their period of parole. The effort is intended to yield a decrease in the numbers arriving at the SWB.

Moreover, and critically, beneficiaries will be required to fly to the interior, rather than arriving at the SWB, absent extraordinary circumstances. They will only be authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also will be eligible to apply for work authorization, thus enabling them to support themselves. We anticipate that this process will help reduce the burden on communities, state and local governments, and NGOs that currently support the reception and onward travel of migrants arriving at the SWB.

5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[33] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[34] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[35] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[36] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[37] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[38] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils of the journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. Migrants are increasingly traveling to the SWB from South America through the Darién Gap, an incredibly dangerous and grueling 100-kilometer stretch of dense jungle between Colombia and Panama. Women and children are particularly vulnerable. Children are particularly at risk for diarrhea, respiratory diseases, dehydration, and other ailments that

[29] Aya Elamroussi and Adrienne Winston, Washington, DC, approves creation of new agency to provide services for migrants arriving from other states, CNN, Sept. 21, 2022, available at: *https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office* (last visited Sept. 29, 2022).

[30] Lauren Villagran. El Paso struggles to keep up with Venezuelan migrants: 5 key things to know. Sep. 14, 2022, available at: *https://www.elpasotimes.com/story/news/2022/09/14/venezuelan-migrants-el-paso-what-to-know-about-their-arrival/69493289007/* (last visited Sept. 29, 2022); Uriel J. Garcia. El Paso scrambles to move migrants off the streets and gives them free bus rides as shelters reach capacity. Sept. 20, 2022, available at: *https://www.texastribune.org/2022/09/20/migrants-el-paso-texas-shelter/* (last visited Sept. 29, 2022).

[31] Email from City of San Diego Office of Immigration Affairs to DHS, Sept. 23, 2022.

[32] Denelle Confair, Local migrant shelter reaching max capacity as it receives hundreds per day, KGUN9 Tucson, Sept. 23, 2022, available at: *https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day* (last visited Sept. 29, 2022).

[33] Priscilla Alvarez, First on CNN: A record number of migrants have died crossing the US-Mexico border, Sept. 7, 2022, available at: *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html* (last visited Sept. 30, 2022).

[34] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

[35] Priscilla Alvarez, First on CNN: A record number of migrants have died crossing the US-Mexico border, Sept. 7, 2022, available at: *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html* (last visited Sept. 30, 2022).

[36] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

[37] Valerie Gonzalez, The Guardian, Migrants risk death crossing treacherous Rio Grande river for 'American dream,' Sept. 5, 2022, available at: *https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream* (last visited Oct. 11, 2022).

[38] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

CLP_AR_000912

require immediate medical attention.[39] According to Panama migration authorities, of the over 31,000 migrants passing through the Darién Gap in August 2022, 23,600 were Venezuelan.[40]

These migration movements are in many cases facilitated by numerous human smuggling organizations that treat the migrants as pawns.[41] These organizations exploit migrants for profit, often bringing them through across inhospitable jungles, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey. Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico last December, and the tragic incident in San Antonio, Texas on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[42]

[39] UNICEF, 2021 Records Highest Ever Number of Migrant Children Crossing the Darien Towards the U.S., Oct. 11, 2021, available at: *https://www.unicef.org/lac/en/press-releases/2021-records-highest-ever-number-migrant-children-crossing-darien-towards-us* (last visited Sept. 29, 2022).

[40] Panamá Migración, Irregulares en Tránsito Frontera Panamá—Colombia 2022, available at: *https://www.migracion.gob.pa/inicio/estadisticas*

[41] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security, Apr. 26, 2022.

[42] Jacob Garcia, Reuters, Migrant truck crashes in Mexico killing 54, available at: *https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R* (last visited Sept. 29, 2022); Mica Rosenberg, Kristina Cooke, Daniel Trotta, The border's toll: Migrants increasingly die crossing into U.S. from Mexico, July 25, 2022, available at: *https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X* (last visited Oct. 2, 2022).

This new process, which will incentivize intending migrants to use a safe and orderly means to access the United States via commercial air flights, cuts out the smuggling networks. DHS anticipates it will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit.

6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy); the Collaborative Migration Management Strategy (CMMS); and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries. The CMMS and the L.A. Declaration call for a collaborative and regional approach to migration. Countries that have endorsed the L.A. Declaration are committed to implementing programs and processes to stabilize communities that host migrants, or that have high outward migration. They commit to humanely enforcing existing laws regarding movements across international boundaries, especially when minors are involved, taking actions to stop migrant smuggling by targeting the criminals involved in these activities, and providing increased regular pathways and protections for migrants residing in or transiting through the 21 countries. The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees." [43]

[43] L.A. Declaration.

This new process helps achieve these goals by providing an immediate and temporary safe and orderly process for Venezuelan nationals to lawfully enter the United States while we work to improve conditions in sending countries and expand more permanent lawful immigration pathways in the region, including refugee processing, and other lawful pathways into the United States and other Western Hemisphere countries. It thus enables the United States to lead by example.

The process also responds to an acute foreign policy need. The current surge of Venezuelan nationals transiting the Darién Gap is impacting every country between Colombia and the SWB. Colombia, Peru, and Ecuador are now hosting almost 4 million displaced Venezuelans among them. The Government of Panama has repeatedly signaled that it is overwhelmed with the number of migrants, a significant portion of whom are Venezuelan, emerging from harrowing journeys through the Darién Gap.

Reporting indicates that in the first six months of 2022, 85 percent more migrants, primarily Venezuelans, crossed from Colombia into Panama through the Darién Gap than during the same period in 2021—including approximately 40,000 Venezuelans in September alone.[44] Again, Darién Gap migrant encounters now average more than 3,000 each day, predominantly comprised of Venezuelan nationals.

Figure 2 shows that the number of Venezuelan nationals processed by Panama after entering irregularly from Colombia increased by almost 30-fold from the week of April 1, 2022 to the week of October 1, 2022.

Figure 2: Panamanian Encounters of Venezuelan Nationals in the Darién Gap, February–September 2022

[44] The Department of State Cable, 22 Panama 624.

CLP_AR_000913

**63514**    **Federal Register** / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices



**Note:** September figure is a preliminary estimate.

Source: Panama Migration Report, September 24, 2022.

Key allies throughout the region—including the Governments of Mexico, Costa Rica, and Panama, all of which are also affected by the increased movement of Venezuelan nationals—have been seeking greater action to address these challenging flows for some time. Meanwhile, the GOM has consistently expressed concerns with policies, programs, and trends that contribute to large populations of migrants, many of whom are Venezuelan, entering Mexico. These entries strain local governmental and civil society resources in Mexican border communities in both the south and north, and have at times led to violence, crime, and unsafe and unhealthy encampments.

The United States is already taking key steps to address some of these concerns. On June 10, 2022, the Department of State's Bureau of Population, Refugees, and Migration (PRM) and the U.S. Agency for International Development (USAID) announced $314 million in new funding for humanitarian and development assistance for refugees and vulnerable migrants across the hemisphere, including support for socio-economic integration and humanitarian aid for Venezuelans in 17 countries of the region.[45] And on September 22, 2022,

PRM and USAID announced nearly $376 million in additional humanitarian assistance, which will provide essential support for vulnerable Venezuelans inside Venezuela, as well as urgently needed assistance for migrants, refugees, and host communities across the region. This funding will further address humanitarian needs in the region.[46]

This new process adds to these efforts and enables the United States to lead by example. It is a key mechanism to advance the larger domestic and foreign policy goals of this Administration to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. It also lays the foundation for the United States to press regional partners to undertake additional actions with regards to these populations, many of which are already taking important steps. Colombia, for example, is hosting more than 2.4 million displaced Venezuelans and has provided temporary protected status for more than 1.5 million of them. Costa Rica is developing plans to renew temporary protection for Venezuelans. And on June 1, 2022, the Government of Ecuador—which is hosting more than 500,000 Venezuelans—authorized a second regularization process that would provide certain Venezuelans a

two-year temporary residency visa.[47] Any effort to meaningfully address the crisis in Venezuela will require continued efforts by these and other regional partners.

Importantly, the United States will not implement the new parole process without the ability to return Venezuelan nationals to Mexico who enter irregularly. The United States' ability to execute this process thus requires the GOM to accept the return of Venezuelan nationals who bypass this new process and enter the United States irregularly between POEs.

For its part, the GOM has made clear that in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe and orderly processes for migrants who seek to enter the United States. As the GOM makes a unilateral decision whether to accept returns of third country nationals at the border and how best to manage migration within Mexico, it is closely watching the United States' approach to migration management and whether the United States is delivering on its plans in this space. Initiating and managing this process—which is dependent on the GOM's actions—will require careful, deliberate, and regular assessment of the GOM's responses to unilateral U.S. actions and ongoing, sensitive diplomatic engagements.

This process is responsive to the GOM's desire to see more lawful pathways to the United States and is aligned with broader Administration

---

[45] The United States Announces More Than $314 Million in New Stabilization Efforts and Humanitarian Assistance for Venezuelans and Other Migrants at the Summit of the Americas, June 10, 2022, available at: *https://www.usaid.gov/news-information/press-releases/jun-10-2022-united-states-announces-more-314-million-new-*

*stabilization-efforts-venezuela* (last visited Oct. 11, 2022).

[46] The United States Announces Nearly $376 Million in Additional Humanitarian Assistance for People Affected by the Ongoing Crisis in Venezuela and the Region, Sept. 22, 2022, available at: *https://www.usaid.gov/news-information/press-releases/sep-22-2022-the-us-announces-nearly-376-million-additional-humanitarian-assistance-for-people-affected-by-ongoing-crisis-in-venezuela* (last visited Sept. 30, 2022).

[47] Venezuela Regional Crisis—Complex Emergency, June 14, 2022, available at: *https://www.usaid.gov/sites/default/files/documents/2022-06-14_USG_Venezuela_Regional_Crisis_Response_Fact_Sheet_3.pdf* (last visited Sept. 29, 2022).

CLP_AR_000914

domestic and foreign policy priorities in the region. It will couple a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly. The goal of this process is to reduce the irregular migration of Venezuelan nationals throughout the hemisphere while we, together with partners in the region, work to improve conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

### B. Urgent Humanitarian Reasons

The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian reasons faced by so many Venezuelans subject to the repressive regime of Nicolás Maduro. This process provides a safe and orderly mechanism for Venezuelan nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States.

### IV. Eligibility To Participate in the Process and Processing Steps

#### A. Supporters

U.S.-based supporters will initiate an application on behalf of a Venezuelan national [48] by submitting a Form I–134, Declaration of Financial Support, to USCIS for each beneficiary. Supporters can be sole individuals, individuals filing on behalf of a group, or individuals representing an entity. To serve as a supporter under the process, an individual must:
- be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;
- pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and
- demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

#### B. Beneficiaries

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United

States to seek a discretionary grant of parole at the POE, such individuals must:
- be outside the United States;
- be a national of Venezuela or be a non-Venezuelan immediate family member [49] of and traveling with a Venezuelan principal beneficiary;
- have a U.S.-based supporter who filed a Form I–134 on their behalf that USCIS has vetted and confirmed;
- possess a passport valid for international travel;
- provide for their own commercial travel to an air POE and final U.S. destination;
- undergo and pass required national security and public safety vetting;
- comply with all additional requirements, including vaccination requirements and other public health guidelines; and
- demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Venezuelan national is ineligible to be considered for parole under this process if that person is a permanent resident or dual national of any country other than Venezuela, or currently holds refugee status in any country.[50]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:
- failed to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;
- has been ordered removed from the United States within the prior five years or is subject to a bar based on a prior removal order; [51]
- has crossed irregularly into the United States, between the POEs, after October 19, 2022;
- has irregularly crossed the Mexican or Panamanian borders after October 19, 2022; or
- is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[52]

*Travel requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with CDC, with respect to health and travel, including vaccination and/or testing requirements for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *https://www.uscis.gov/venezuela.*

#### C. Processing Steps

Step 1: Financial Support

A U.S.-based supporter will submit a Form I–134, Declaration of Financial Support with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134 identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134 for each beneficiary they are seeking to support, including Venezuelans' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the individual and any immediate family members whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS on how to create an account with myUSCIS and instructions on next steps for completing the application. The beneficiary will be required to confirm their biographic information in myUSCIS and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive

---

[48] Certain non-Venezuelans may use this process if they are an immediate family member of a Venezuelan beneficiary and traveling with that Venezuelan beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

[49] See the preceding footnote.

[50] This limitation does not apply to immediate family members traveling with a Venezuelan national.

[51] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[52] As defined in 6 U.S.C. 279(g)(2). Children under the age of 18 must be traveling to the United States in the care and custody of their parent or legal guardian to be considered for parole at the POE under the process.

CLP_AR_000915

instructions through myUSCIS on how to access the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

Step 4: Approval To Travel to the United States

After completing Step 3, the beneficiary will receive a notice to their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel via commercial air to the United States.[53] Approval of advance authorization to travel does not guarantee parole into the United States at a U.S. POE. That parole is a discretionary determination made by CBP at the POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Upon their arrival at a POE, each individual arriving under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with the CBP inspectional process. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to

apply for employment authorization under existing regulations. Individuals may request authorization to work from USCIS. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for work authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

*D. Sunset, Renewal, and Termination*

The process is capped at 24,000 beneficiaries. After this cap is reached, the program will sunset absent a decision by the Secretary to continue the process, based on the Secretary's sole discretion. The Secretary also retains the sole, unreviewable discretion to terminate the process at any point.

*E. Administrative Procedure Act (APA)*

This process is exempt from notice-and-comment rulemaking requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[54] *i.e.,* a "statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[55] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process is exempt from such requirements because it involves a foreign affairs function of the United States.[56] In addition, although under the APA, invocation of this exemption from notice-and-comment rulemaking does not require the agency to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing,[57] and DHS can make one here.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM— to provide a lawful process for Venezuelan nationals to enter the United States. The United States will

not implement the new parole process without the ability to return Venezuelan nationals who enter irregularly to Mexico, and the United States' ability to execute this process thus requires the GOM's willingness to accept into Mexico those who bypass this new process and enter the United States irregularly between POEs. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to this unilateral U.S. action and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now and result in definitely undesirable international consequences. It also would complicate broader discussions and negotiations about migration management. For now, Mexico has indicated it is prepared to make a unilateral decision to accept a substantial number of Venezuela returns. That willingness to accept the returns could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return nationals of Venezuela to Mexico at a future date would likely result in a surge in migration, as migrants rush to the border to enter before the rule becomes final—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the request of Mexico and key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process will advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining a strong bilateral relationship.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, in 2017 DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in

---

[53] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[54] 5 U.S.C. 553(b)(A).

[55] *Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[56] 5 U.S.C. 553(a)(1).

[57] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

CLP_AR_000916

policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[58]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM described above, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[59] It would be impracticable to delay issuance in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Venezuelan nationals currently being encountered attempting to enter irregularly at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, unduly impedes DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths. Undertaking such procedures would also be contrary to the public interest because an advance announcement of this process would seriously undermine a key goal of the policy by incentivizing even more irregular migration of Venezuelan nationals seeking to enter the United States before the process would take effect.

*F. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

First, OMB has approved a revision to USCIS Form I–134, *Declaration of Financial Support* (OMB control number 1615–0014) under the PRA's emergency processing procedures at 5 CFR 1320.13. USCIS is making some changes to the online form in connection with the implementation of the process described above. These changes include: requiring two new data elements for U.S.-based supporters (''Sex'' and ''Social Security Number'');

adding a third marker (''X'') in addition to ''M'' and ''F'' in accordance with this Administration's stated gender equity goals; and adding Venezuela as an acceptable option for the beneficiary's country of origin. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

Second, OMB has approved an emergency request under 5 CFR 1320.13 for a new information collection from CBP entitled *Advance Travel Authorization.* OMB has approved the emergency request for a period of 6 months and will assign a control number to the collection. This new information collection will allow certain noncitizens from Venezuela, and their qualifying immediate family members, who lack United States entry documents to submit information through the newly developed CBP ATA capability within the CBP One™ application as part of the process to request an advance authorization to travel to the United States to seek parole. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA. More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2022–22739 Filed 10–18–22; 8:45 am]
**BILLING CODE 9110–9M–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–7050–N–52]**

### 30-Day Notice of Proposed Information Collection: Debt Resolution Program, OMB Control No.: 2502–0483

**AGENCY:** Office of Policy Development and Research, Chief Data Officer, HUD.
**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for an additional 30 days of public comment.
**DATES:** *Comments Due Date:* November 18, 2022.
**ADDRESSES:** Interested persons are invited to submit comments regarding

this proposal. Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to *OIRA_submission@ omb.eop.gov* or *www.reginfo.gov/public/ do/PRAMain.* Find this particular information collection by selecting ''Currently under 30-day Review—Open for Public Comments'' or by using the search function.

**FOR FURTHER INFORMATION CONTACT:** Colette Pollard, Reports Management Officer, QDAM, Department of Housing and Urban Development, 451 7th Street SW, Room 4176, Washington, DC 20410–5000; email Colette Pollard at *Colette.Pollard@hud.gov* or telephone 202–402–3400. This is not a toll-free number. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech and communication disabilities. To learn more about how to make an accessible telephone call, please visit: *https:// www.fcc.gov/consumers/guides/ telecommunications-relay-service-trs.*

Copies of available documents submitted to OMB may be obtained from Ms. Pollard.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

The **Federal Register** notice that solicited public comment on the information collection for a period of 60 days was published on March 23, 2022 at 87 FR 1479.

### A. Overview of Information Collection

*Title of Information Collection:* Debt Resolution Program.
*OMB Approval Number:* 2502–0483.
*OMB Expiration Date:* November 30, 2022.
*Type of Request:* Revision of a currently approved collection.
*Form Number:* HUD–56141, HUD–56142, HUD–56146.
*Description of the need for the information and proposed use:* HUD is required to collect debt owed to the agency. As part of the collection process, demand for repayment is made on the debtor(s).
*Respondents:* Individuals or Households, Business or other For-Profit.
*Estimated Number of Respondents:* 648.
*Estimated Number of Responses:* 2,159.
*Frequency of Response:* 1.
*Average Hours per Response:* 1.
*Total Estimated Burden:* 590 hours.

---

[58] *See* 82 FR 4902 (Jan. 17, 2017).
[59] 5 U.S.C. 553(b)(B).

CLP_AR_000917

include: (1) remarks from the administration and CISA leadership on salient NS/EP and cybersecurity efforts; (2) a status update on the NSTAC Addressing the Misuse of Domestic Infrastructure by Foreign Malicious Actors Subcommittee; and (3) a deliberation and vote on the *NSTAC Report to the President on a Strategy for Increasing Trust in the Information and Communications Technology and Services Ecosystem.*

Dated: January 3, 2023.

**Christina Berger,**

*Designated Federal Officer, NSTAC, Cybersecurity and Infrastructure Security Agency, Department of Homeland Security.*

[FR Doc. 2023–00181 Filed 1–6–23; 8:45 am]

**BILLING CODE 9110–9P–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Implementation of a Parole Process for Haitians**

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to respond to and protect against a significant increase in the number of Haitian nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by irregular migration. Haitians who do not avail themselves of this process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Haitian nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for

admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

**I. Background—Haitian Parole Process**

This notice describes the implementation of a new parole process for certain Haitian nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by responding to and protecting against a significant increase of irregular migration by Haitians to the United States via dangerous routes that pose serious risks to migrants' lives and safety, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

*A. Overview*

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for

migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations as well as their facilitators and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to and arriving, without authorization, at the SWB.

In October 2022, DHS undertook a new effort to address the high number of Venezuelans encountered at the SWB.[3] Specifically, DHS provided a new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by flying to interior ports of entry—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the Government of Mexico (GOM) made an independent decision for the first time to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, thus imposing a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced Parole Process. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 a day to under 200 a day, and as of the week ending December 4, to an average of 86 a day.[4] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in irregular migration of Venezuelans throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién Gap—an inhospitable jungle that spans between Panama and Colombia—was down from 40,593 in October 2022 to just 668 in November.[5]

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Haitian Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.

[3] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[4] DHS Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[5] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_*

Continued

CLP_AR_000982

DHS anticipates that implementing a similar process for Haitians will reduce the number of Haitians seeking to irregularly enter the United States between POEs along the SWB or by sea by coupling a meaningful incentive to seek a safe, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization pursuant to this process. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process.

Instituting a similar process for Haitians is critical to responding to and protecting against a significant increase of irregular migration by Haitians to the United States via dangerous routes that pose serious risks to migrants' lives and safety. At the end of FY 2021, DHS experienced a focused surge in Haitian migration in the Del Rio sector of the border that strained its capacity to process individuals in a timely manner, necessitating an all-of-government response. In FY 2022, DHS encounters of Haitians at the SWB increased to unprecedented levels, with 48,697 unique encounters, as compared to the annual average of 3,242 unique encounters for FY 2014 to FY 2019.[6] In addition, the number of Haitian nationals entering Panama through the Darién Gap has been steadily increasing in recent months—something that has been a key predictor of migrant movement towards the SWB in the past, including with nationals of Venezuela a few months ago. Haitians represented the third highest nationality encountered in the Darién Gap between January and November 2022, at 16,933 encounters, and the number of Haitian encounters in Panama doubled between September and November 2022.[7]

Haitian migrants are also increasingly taking to the sea in makeshift boats. Maritime migration from Haiti also increased sharply in FY 2022, with a total of 4,025 Haitian nationals interdicted at sea compared to 1,205 in FY 2021 and 398 in FY 2020.[8] While attempted irregular entry of Haitians between POEs has waned since June 2022, DHS assesses that this trend could

quickly shift again, given the prevalence of displaced Haitian communities gathered in Mexico and the increasing volume of Haitians traversing the Darién Gap on their way north.

DHS anticipates that instituting a Venezuela-like process for nationals of Haiti will reduce the irregular migration of Haitians in the hemisphere, disincentivize Haitians in northern Mexico from seeking to enter along the SWB of the United States without authorization, and reduce dangerous attempts to travel to the United States by sea. This will be accomplished by coupling a meaningful incentive to seek a safe, orderly means of traveling by air to interior ports of entry in the United States with the imposition of consequences for those who seek to enter without authorization between POEs along the SWB. Individuals can access this lawful process from safe locations in Haiti or in third countries. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process. Implementation of the new parole process for Haitians is contingent on the GOM making an independent decision to accept the return or removal of Haitian nationals who bypass this new process and enter the United States without authorization.

As in the process for Venezuelans, a supporter in the United States must initiate the process on behalf of a Haitian national (and certain non-Haitian nationals who are an immediate family member of a primary beneficiary), and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Haitian nationals and their immediate family members must meet several eligibility criteria in order to be considered, on a case-by-case basis, for advance travel authorization and parole. Only those who meet all specified criteria are eligible to receive advance authorization to travel to the United States and be considered for a discretionary grant of parole, on a case-by-case basis, under this process. Beneficiaries must pass national security, public safety, and public health vetting prior to receiving a travel authorization, and those who are approved must arrange air travel at their own expense to seek entry at an interior POE.

A grant of parole under this process is for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the

region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region. These strategies will support efforts to stabilize conditions in Haiti, thus diminishing the push factors and enabling more regular removals of those Haitians who nonetheless enter the United States or partner nations unauthorized and who lack a valid claim of asylum or other forms of protection. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the United States. Those who are not granted asylum or any other immigration benefits during this two-year parole period generally will need to depart the United States prior to the expiration of their authorized parole period or will be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Haitian nationals pursuant to this process will provide a significant public benefit for the United States by reducing unauthorized entries along our SWB while also addressing the urgent humanitarian reasons that have displaced hundreds of thousands of Haitians throughout the Western Hemisphere, to include concurrent health, economic, and political crises. Most significantly, DHS anticipates this process will: (i) enhance the security of the U.S. SWB by reducing irregular migration of Haitian nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Haiti; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

The Secretary retains the sole discretion to terminate the process at any point.

*B. Conditions at the Border*

1. Impact of Venezuela Process

This process is modeled on the Venezuela process—as informed by the way that similar incentive and disincentive structures successfully decreased the number of Venezuelan nationals making the dangerous journey to and being encountered along the

---

%20DARI%C3%89N_NOVIEMBRE_2022.pdf (last viewed Dec. 11, 2022).

[6] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[7] Servicio Nacional de Migración de Panamá, *Irregulares en Tránsito Frontera Panamá-Colombia 2022, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf,* (last viewed Dec. 11, 2022).

[8] OIS analysis of United States Coast Guard (USCG) data provided October, 2022; Maritime Interdiction Data from USCG, October 5, 2022.

CLP_AR_000983

SWB. The Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use a safe, orderly process to come to the United States can change migratory flows. Prior to the October 12, 2022 announcement of the Venezuela process, DHS encountered approximately 1,100 Venezuelan nationals per day between POEs—with peak days exceeding 1,500.[9] Within a week of the announcement, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, an average of 86 per day.[10]

Panama's daily encounters of Venezuelans also declined significantly, falling some 88 percent, from 4,399 on October 16 to 532 by the end of the month—a decline driven entirely by Venezuelan migrants' choosing not to make the dangerous journey through the Darién Gap. The number of Venezuelans attempting to enter Panama through the Darién Gap continued to decline precipitously in November—from 40,593 encounters in October, a daily average of 1,309, to just 668 in November, a daily average of just 22.[11]

The Venezuela process fundamentally changed the calculus for Venezuelan migrants. Venezuelan migrants who had already crossed the Darién Gap have returned to Venezuela by the thousands on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[12] Other migrants who were about to enter the Darién Gap have turned around and headed back south.[13] Still others who were intending to migrate north are staying where they are to apply for this parole process.[14] Put simply, the

Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use this parole process to come to the United States can yield a meaningful change in migratory flows.

2. Trends and Flows: Increase of Haitian Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year.[15] By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[16] However, these gains were subsequently reversed as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID–19 pandemic—continued to increase at a similar pace in 2021 and 2022.[17]

Shifts in demographics have also had a significant effect on migration flows. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[18] Beginning in the 2010s, a growing share of migrants have come from Northern Central America[19] (NCA) and, since the late 2010s, from countries throughout the Americas.[20] Migrant

populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence, political oppression, and for other non-economic reasons.[21]

*C. Trends in Haitian Migration*

1. Migration by Land

Since 2019, increasing numbers of Haitians have sought to enter the United States at the land border. In FY 2019, DHS encountered just 3,039 Haitian nationals at the SWB.[22] This number grew to 4,431 unique encounters in FY 2020, and then sharply increased by 881 percent to 43,484 unique encounters in FY 2021.[23]

In September 2021, the U.S. experienced a mass migration event involving approximately 15,000 Haitians crossing into Del Rio, Texas, within a matter of days. The group included many thousands who had left Haiti years before, spent time living and working in countries like Chile and Brazil, and then traveled up to our border through Panama.[24] This led to thousands of Haitian nationals living in a makeshift camp under a bridge in Del Rio and placed immense strain on U.S. government resources that were employed to respond to the event.

Unique encounters of Haitian nationals at the SWB continued to increase in FY 2022 to 48,697, with a peak of 9,753 unique encounters in a single month in May 2022.[25] While encounters of Haitian migrants at our border have declined since June 2022, the Government of Panama, which tracks irregular migration through the Darién Gap, has observed a surge in

---

[9] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[10] Office of Immigration Statistics (OIS) analysis of data pulled from CBP UIP December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[11] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

[12] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama, https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/,* Nov. 9 2022 (last viewed Dec. 8, 2022).

[13] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route, https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html,* Oct. 14, 2022 (last viewed Dec. 8, 2022).

[14] Axios, *Biden's new border policy throws Venezuelan migrants into limbo, https://*

*www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap,* Nov. 7 2022 (last viewed Dec. 8, 2022).

[15] OIS analysis of historic CBP data.

[16] *Id.*

[17] *Id.*

[18] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 96 to over 99 percent of apprehensions of persons entering without inspection between 1980 and 2000. OIS Yearbook of Immigration Statistics, various years. On Mexican migrants from this era's demographics and economic motivations see Jorge Durand, Douglas S. Massey, and Emilio A. Parrado, ''The New Era of Mexican Migration to the United States,'' *The Journal of American History* Vol. 86, No. 2 (Sept. 1999): 518–536.

[19] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[20] According to OIS analysis of CBP data, Mexican nationals continued to account for 89 percent of total SWB encounters in FY 2010, with Northern Central Americans accounting for 8 percent and all other nationalities for 3 percent. Northern Central Americans' share of total encounters increased to 21 percent by FY 2012 and averaged 46 percent in FY 2014–FY 2019, the last full year before the start of the COVID–19 pandemic. All other countries accounted for an

average of 5 percent of total SWB encounters in FY 2010–FY 2013, and for 10 percent of total encounters in FY 2014–FY 2019.

[21] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. At the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[22] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[23] *Id.*

[24] The Texan, *Many Haitian Nationals Came From Chile and Brazil Before Heading to Del Rio,* Oct. 7, 2021, *https://thetexan.news/many-haitian-nationals-came-from-chile-and-brazil-before-heading-to-del-rio/.*

[25] CBP, Nationwide Encounters, *https://www.cbp.gov/newsroom/stats/nationwide-encounters,* (last visited, Dec. 17, 2022; OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

CLP_AR_000984

land-based encounters of Haitian nationals migrating north in recent months. Encounters of Haitian nationals in Panama jumped from 1,021 in July 2022, to 2,170 in September, to 4,607 in November.[26]

Those numbers are rising at a time when Haitians are already concentrated in Mexico. UNHCR estimates that there were 62,680 Haitians in Mexico in 2022 and projects that this population will grow to 104,541 in 2023.[27] From October 2021 to October 2022, approximately 55,429 Haitian nationals were granted 12-month temporary humanitarian visitor status in Mexico, the highest of any nationality and almost twice as many as the second-highest nationality.[28] Some Haitians migrating north have sought asylum in Mexico—a number that peaked in 2021—and may be planning to settle there permanently.[29] However, DHS assesses that many thousands of Haitians are waiting in Mexico with the ultimate goal of entering the United States, with many reporting they are waiting until the Centers for Disease Control and Prevention (CDC) Title 42 Order is lifted.

2. Migration by Sea

Increasing numbers of Haitian migrants also continue to attempt migration to the United States via maritime routes, often endangering their own lives in precarious and unseaworthy vessels. Maritime migration from Haiti more than tripled in FY 2022, with a total of 4,025 Haitian nationals interdicted at sea compared to 1,205 in FY 2021 and 398 in FY 2020.[30]

The southeast coastal border sectors also have seen increases in unique encounters of Haitian nationals who arrived in the United States by sea.[31] In FY 2021, those sectors encountered 593 unique Haitian nationals, a 411 percent increase compared to 116 in FY 2020.[32]

In FY 2022, unique encounters of Haitian nationals in coastal sectors tripled from FY 2021 to 1,788—composing 31 percent of total unique encounters by USBP in the southeast coastal sectors.[33]

3. Push and Pull Factors

DHS assesses that the high number of Haitian nationals encountered at the land border and interdicted at sea is driven primarily by two key factors: First, the displacement of Haitians throughout the Western Hemisphere caused by years of political, health, and economic crises, as well as the explosion of gang violence in Haiti—exacerbated by events that took place in the summer of 2021—are causing thousands to leave the country. Second, the precarious security situation in Haiti is having an impact on DHS's ability to remove Haitian nationals who do not establish a legal basis to remain in the United States; absent such an ability, more individuals may be willing to take a chance that they can come—and stay.

i. Factors Pushing Migration From Haiti

In recent years, Haiti has experienced a series of events, including natural disasters, economic stagnation, pervasive hunger, gang violence, and political assassinations that have devastated the country. This has led tens of thousands of Haitians to lose hope and attempt to migrate.[34]

On August 14, 2021, a 7.2 magnitude earthquake hit Haiti, killing more than 2,200 people, injuring over 12,000 more, destroying tens of thousands of homes, and crippling Haiti's already fragile infrastructure.[35] Just days later, Tropical Storm Grace hit Haiti, with heavy downpours hampering the continuing rescue efforts for those impacted by the earthquake.[36] Within a month, over 650,000 Haitians required humanitarian assistance, including 260,000 children.[37] The World Bank estimates

that the August 2021 earthquake caused damages and losses in excess of more than $1.6 billion, roughly 11 percent of GDP.[38]

Amidst the political, security, and environmental crises, Haiti's economy has collapsed. Even before the events of 2021, Haiti already stood as the poorest country in the Americas and one of the poorest in the world.[39] In 2021, Haiti had a GDP per capita of $1,815, the lowest in the Latin America and the Caribbean region, ranking 170 out of 189 on the UN's Human Development Index.[40] The situation has deteriorated to such a point that the Haitian Government itself, on October 7, 2022, asked for international military assistance to help address the converging crises.[41]

In addition to the economic turmoil the island has confronted, the security situation in Haiti has been problematic for some time. Violence in Haiti reached an inflection point on July 7, 2021, with the assassination of Haitian President Jovenel Moïse.[42] The President's death exacerbated political instability on the island, undermining state institutions and generating a power vacuum that has been occupied by gangs. Between January and June 2022, gangs have carried out approximately 930 killings, 680 injuries, and 680 kidnappings in Port-au-Prince alone, with more than 1,200 kidnappings occurring in 2021, almost twice the number reported in 2020 and five times more than in 2019.[43] This recent surge in gang

---

[26] Servicio Nacional de Migración de Panamá, Irregulares Por Darien, November 2022.

[27] UNHCR Global Focus, *Mexico,* See countries of origin data for 2022 and 2023, *https://reporting.unhcr.org/mexico?year=2022.*

[28] OIS analysis of *Instituto Nacional de Migracion* data.

[29] Estadísticas Comisión Mexicana de Ayuda a Refugiados, *Mexico Commission for Assistance of Refugee data show that about 6,000 Haitians applied for asylum in Mexico in 2020, 50,000 in 2021, and nearly 16,000 in 2022 (through November), https://www.gob.mx/cms/uploads/attachment/file/783226/Cierre_Noviembre-2022_1-Dic._.pdf,* (last viewed Dec. 17, 2022).

[30] OIS analysis of United States Coast Guard (USCG) data provided October 2022; Maritime Interdiction Data from USCG, October 5, 2022.

[31] Includes Miami, FL; New Orleans, LA; and Ramey, PR sectors where all apprehensions are land apprehensions not maritime.

[32] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

---

[33] *Id.*

[34] Diana Roy, Council on Foreign Relations, *Ten Graphics That Explain the U.S. Struggle With Migrant Flows in 2022* (Dec. 1, 2022). *https://www.cfr.org/article/ten-graphics-explain-us-struggle-migrant-flows-2022.*

[35] UNICEF, *Massive earthquake leaves devastation in Haiti: UNICEF and partners are on the ground providing emergency assistance for children and their families, https://www.unicef.org/emergencies/massive-earthquake-devastation-haiti* (last viewed Dec. 12, 2022).

[36] The Washington Post, *Tropical Depression Grace Drenching Haiti Days After Major Earthquake,* Aug. 16, 2021, *https://www.washingtonpost.com/weather/2021/08/16/tropical-depression-grace-haiti-flooding/,* (last viewed Dec. 19, 2022).

[37] UNICEF, *One Month After Haiti Earthquake: 260,000 Children Still Need Humanitarian Assistance,* Sept. 15, 20221, *https://www.unicef.org.uk/press-releases/one-month-after-*

---

*haiti-earthquake-260000-children-still-need-humanitarian-assistance-unicef,* (last visited Dec. 19, 2022).

[38] The World Bank, *Haiti Overview,* Updated Nov. 8, 2022, *https://www.worldbank.org/en/country/haiti/overview#:~:text=The%20results%20of%20the%20assessment%20of%20the%20effects,in%20damage%20and%20losses%2C%20or%2011%25%20of%20GDP,* (last visited Dec. 19, 2022).

[39] *Id.*

[40] The Human Development Index (HDI) is a summary measure of average achievement in key dimensions of human development: a long and healthy life, being knowledgeable and have a decent standard of living.

[41] CNN, *Haiti government asks for international military assistance,* Oct. 7, 2022, *https://www.cnn.com/2022/10/07/americas/haiti-international-military-assistance-humanitarian-crisis-intl/index.html* (last viewed Dec. 17, 2022).

[42] Catherine Porter, Michael Crowley, and Constant Méheut, The New York Times, *Haiti's President Assassinated in Nighttime Raid, Shaking a Fragile Nation* (July 7, 2021). *https://www.nytimes.com/2021/07/07/world/americas/haiti-president-assassinated-killed.html.*

[43] *See* International Crisis Group, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists* (July 27, 2022), *https://www.crisisgroup.org/latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists;* Office of the High Commissioner for Human Rights, *Sexual violence in Port-au-Prince: A weapon used by gangs to instill*

CLP_AR_000985

violence has destroyed infrastructure and caused businesses to close, leaving Haitians struggling to find basic products including food, water, and medicines.[44] Armed clashes with gangs have destroyed water networks, severely restricting access to potable drinking water and further hampering the attempts to control a cholera outbreak that, as of November 15, 2022, had caused 8,146 hospitalizations and 188 deaths.[45]

The situation has deteriorated to such a point that the Haitian Government, on October 7, 2022, asked for international military assistance to help address the converging crises.[46]

Over the past two years, many of the Haitian nationals encountered at our SWB actually left Haiti for opportunities in South America many years before.[47] This Haitian diaspora in South America developed after the January 2010 earthquake in Haiti that killed more than 217,000 and displaced more than 1.5 million people. Many migrated to Brazil, which offered employment opportunities, humanitarian protection, and support from large and growing Haitian diaspora communities.[48] Others migrated to Chile, where Haitian nationals could, until 2020, enter visa-free. As of 2020, there were an estimated 143,000 Haitians living in Brazil and 180,000 in Chile.[49] However, over the

past two years, declining economic conditions in Chile and Brazil, which were exacerbated by the COVID–19 pandemic, have led many Haitian migrants to leave those countries to head north.[50]

As noted above, UNHCR estimates 62,680 Haitians were in Mexico in 2022, and projects that this population will grow to 104,541 in 2023.[51] Many thousands more are between Mexico and South America.

### ii. Return Limitations

While the Government of Haiti generally accepts repatriations, gang activity and conditions in the country have created significant instability, at times curtailing DHS's ability to repatriate Haitians, either by air or maritime repatriations by sea. For example, in early September 2022, destabilizing events, including gangs seizing control of a key fuel terminal, led to a pause in repatriation flights. The ability of our on-the-ground partners to help receive migrants that provide services for individuals returned to Haiti is evaluated on a day-to-day basis.[52] The ability to conduct returns is tenuous, and not something that can be counted on at scale should large numbers of Haitian nationals once again start crossing our SWB.

The maritime environment is similarly affected by the limitation on returns. Even a temporary inability of DHS to repatriate Haitians interdicted at sea could have a cascading effect on U.S. Government resources. U.S. Coast Guard (USCG) uses its vessels to conduct direct repatriations, yet these have limited capacity to hold migrants; they cannot continue to hold migrants for extended periods of time if repatriations are not possible.

### 4. Impact on DHS Resources and Operations

#### i. Impact on DHS Resources

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in part by the number of Haitian nationals encountered—DHS has taken a series of extraordinary steps. Since FY 2021, DHS has built and now operates 10 soft-sided processing facilities at a cost of $688 million. CBP and ICE detailed a

combined 3,770 officers and agents to the SWB to effectively manage this processing surge. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from other divisions in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 combined on grants to non-governmental (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP–H) to assist with the reception and onward travel of migrants arriving at the SWB. This spending is in addition to $1.4 billion in additional FY 2022 appropriations that were designated for SWB enforcement and processing capacities.[53]

#### ii. Impact on Border Operations

The impact has been particularly acute in certain border sectors. In FY 2021, 81 percent of unique Haitians encountered occurred in the Del Rio sector.[54] In FY 2022, flows shifted disproportionately to the El Paso and Yuma sectors, which accounted for 82 percent of unique encounters in that year, while Del Rio fell to 13 percent.[55] All three sectors remain at risk of operating, or are currently operating, over capacity.[56] In FY 2022, El Paso and Yuma sector encounters increased by 161 percent, a seven-fold increase over the average for FY 2014–FY 2019, in part as a result of the increases in Haitian nationals being encountered there.[57]

The focused increase in encounters within those three sectors is particularly challenging. Yuma and Del Rio sectors are geographically remote, and because—up until the past two years—they have not been a focal point for large numbers of individuals entering irregularly, have limited infrastructure and personnel in place to safely process the elevated encounters that they are seeing. The Yuma Sector is along the Colorado River corridor, which presents additional challenges to migrants, such

---

*fear* (Oct. 14, 2022), *https://www.ohchr.org/en/documents/country-reports/sexual-violence-port-au-prince-weapon-used-gangs-instill-fear.* Doctors Without Borders, *Returning to Haiti means death* (Aug. 12, 2022), *https://www.doctorswithoutborders.org/latest/returning-haiti-means-death.*

[44] Office of the High Commissioner for Human Rights, *Press Release: Haiti: Bachelet deeply disturbed by human rights impact of deteriorating security situation in Port-au-Prince* (May 17, 2022), *https://www.ohchr.org/en/press-releases/2022/05/haiti-bachelet-deeply-disturbed-human-rights-impact-deteriorating-security.*

[45] Pan American Health Organization, *Cholera Outbreak in Hispaniola Situation Report #6* (Nov. 17, 2022), *https://www.paho.org/en/documents/cholera-outbreak-hispaniola-2022-situation-report-6.*

[46] CNN, *Haiti government asks for international military assistance,* Oct. 7, 2022, *https://www.cnn.com/2022/10/07/americas/haiti-international-military-assistance-humanitarian-crisis-intl/index.html,* (last viewed Dec. 17, 2022).

[47] Migration Policy Institute, *Haitian Migration through the Americas: A Decade in the Making,* (Sept. 30, 2021), *https://www.migrationpolicy.org/article/haitian-migration-through-americas;* Council on Foreign Relations, *Why Are Haitian Migrants Gathering at the U.S. Border?* October 1, 2021, *https://www.cfr.org/in-brief/why-are-haitian-migrants-gathering-us-border,* (last visited Dec. 19, 2022).

[48] *Id.*

[49] Migration Policy Institute, *Chile's Retooled Migration Law Offers More Restrictions, Less Welcome,* (May 2021), *https://www.migrationportal.org/insight/chiles-retooled-migration-law-offers-more-restrictions-less-welcome/,* (last visited Dec. 19, 2022).

[50] *Id.* Migration Policy Institute.

[51] UNHCR Global Focus, *Mexico,* See countries of origin data for 2022 and 2023, *https://reporting.unhcr.org/mexico?year=2022.*

[52] International Organization for Migration, *IOM condemns violence and looting of humanitarian supplies in Haiti* (Sept. 24, 2022). *https://haiti.iom.int/news/iom-condemns-violence-and-looting-humanitarian-supplies-haiti.*

[53] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness,* Apr. 26, 2022, *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.*

[54] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[55] *Id.*

[56] OIS analysis of data pulled from CBP UIP December 7, 2022.

[57] *Id.*

CLP_AR_000986

as armed robbery, assault by bandits, and drowning, as well as to the U.S. Border Patrol (USBP) agents encountering them. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border but is far away from other CBP sectors, which makes it challenging to move individuals for processing elsewhere during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors that have additional capacity to process. In November 2022, USBP sectors along the SWB operated a combined 602 decompression bus routes to neighboring sectors and operated 124 lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[58]

Because DHS assets are finite, using air resources to operate lateral flights reduces DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources.

iii. Impact on Maritime Operations

In FY 2022, interdictions of Haitians surged to 4,025, compared to just 824 interdictions at sea in FY 2019.[59] While these numbers are significantly smaller than those encountered at the land border, they are high for the maritime environment where the safety risk is particularly acute.

Responding to this increase requires significant resources. In response to the persistently elevated levels of irregular maritime migration across all southeast vectors, the Director of Homeland Security Task Force-Southeast (HSTF–SE) elevated the operational phase of DHS's maritime mass migration plan (Operation Vigilant Sentry) from Phase 1A (Preparation) to Phase 1B (Prevention).[60] Operation Vigilant Sentry is HSTF–SE's comprehensive, integrated, national operational plan for a rapid, effective, and unified response of federal, state, and local capabilities in response to indicators and/or warnings of a mass migration in the Caribbean.

The shift to Phase 1B triggered the surge of additional DHS resources to support HSTF–SE's Unified Command staff and operational rhythm. Between July 2021 and December 2022, Coast

Guard deployed three times the number of large cutters to the South Florida Straits and the Windward Passage, four times the number of patrol boats and twice the number of fixed/rotary-wing aircraft to support maritime domain awareness and interdiction operations in the southeastern maritime approaches to the United States.[61] USCG also added two MH–60 helicopters to respond to increased maritime migration flows in FY 2022.[62] USCG almost doubled its flight hour coverage per month to support migrant interdictions in FY 2022. Increased resource demands translate into increased maintenance on those high demand air and sea assets.

DHS assesses that a reduction in the flow of Haitian nationals arriving at the SWB or taking to sea would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

## II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''[63] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during the period of parole in the United States.[64] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[65] DHS may terminate parole in its discretion at any time.[66] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[67]

This process will combine a consequence for those who seek to enter

the United States irregularly between POEs with a significant incentive for Haitian nationals to remain where they are and use a lawful process to request authorization to travel by air to, and ultimately apply for discretionary grant of parole into, the United States for a period of up to two years.

## III. Justification for the Process

As noted above, section 212(d)(5)(A) of the INA confers upon the Secretary of Homeland Security the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''[68]

### A. Significant Public Benefit

The parole of Haitian nationals and their immediate family members under this process—which imposes new consequences for Haitians who seek to enter the United States irregularly between POEs, while providing an alternative opportunity for eligible Haitian nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—serves a significant public benefit for several, interrelated reasons. Specifically, we anticipate that the parole of eligible individuals pursuant to this process will: (i) enhance border security through a reduction in irregular migration of Haitian nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Haiti; (v) provide a disincentive to undergo the dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

1. Enhance Border Security by Reducing Irregular Migration of Haitian Nationals

As described above, in FY 2022, Haitian nationals made up a significant and growing number of those encountered seeking to cross, unauthorized, into the United States by land or who are intercepted after taking to the sea. While the number of Haitian encounters at our land border have

[58] Data from SBCC, as of December 11, 2022.

[59] OIS analysis of USCG data provided October 2022; Maritime Interdiction Data from USCG, October 5, 2022.

[60] Operation Vigilant Sentry (OVS) Phase 1B, Information Memorandum for the Secretary from RADM Brendon C. McPherson, Director, Homeland Security Task Force—Southeast, August 21, 2022.

[61] *Id.*

[62] Joint DHS and DOD Brief on Mass Maritime Migration, August 2022.

[63] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole''). Haitians paroled into the United States through this process are not being paroled as refugees, and instead will be considered for parole on a case-by-case basis for a significant public benefit or urgent humanitarian reasons. This parole process does not, and is not intended to, replace refugee processing.

[64] INA 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A).

[65] *See* 8 CFR 212.5(c).

[66] *See* 8 CFR 212.5(e).

[67] *See* 8 CFR 274a.12(c)(11).

[68] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

CLP_AR_000987

decreased in recent months, they could quickly rise again due to the conditions in Haiti, the significant number of Haitians present in Mexico, and the increasing number of Haitians crossing into Panama from South America.

By incentivizing individuals to seek a lawful, orderly means of traveling to the United States, while imposing consequences to irregular migration, DHS assesses that the new parole process will mitigate anticipated future surges of Haitians seeking to cross into the United States without authorization, whether by land or by sea. This expectation is informed by the recently implemented process for Venezuelans and the significant shifts in migratory patterns that took place once the process was initiated. The success to date of the Venezuela process provides compelling evidence that coupling effective disincentives for irregular entry with incentives to travel in a lawful and orderly manner can meaningfully shift migration patterns in the region and to the SWB.

Implementation of the parole process is contingent on the GOM's independent decision to accept the return of Haitian nationals who voluntarily depart the United States, those who voluntarily withdraw their application for admission, and those subject to expedited removal who cannot be removed to Haiti or elsewhere. The ability to effectuate voluntary departures, withdrawals, and removals of Haitian nationals to Mexico will impose a consequence on irregular entry that may not exist should the security situation in Haiti continue to deteriorate to the extent that DHS cannot effectuate sufficient returns in a safe manner.

## 2. Improve Vetting for National Security and Public Safety

All noncitizens whom DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing. Individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to vet more individuals before they arrive at the border so that we can stop individuals who could pose threats to national security or public safety even earlier in the process. The Haitian parole process will allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States.

As described below, the vetting will require prospective beneficiaries to upload a live photograph via an app. This will enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them travel before they arrive at our border, representing an improvement over the status quo.

## 3. Reduce the Burden on DHS Personnel and Resources

By mitigating an anticipated increase in encounters of Haitian nationals along the SWB as well as maritime interdictions, and channeling decreased flows of Haitian nationals to interior POEs, we anticipate the process will relieve some of the forecasted impact increased migratory flows could have on the DHS workforce, resources, and other missions.

In the Caribbean, DHS also has surged significant resources—mostly from USCG—to address the heightened rate of maritime encounters. Providing a safe and orderly alternative path is expected to also reduce the number of Haitians who seek to enter the United States by sea and will allow USCG, in particular, to better balance its other important missions, including its counter-drug smuggling operations, protection of living marine resources, support for shipping navigation, and a range of other critical international engagements.

In addition, permitting Haitian nationals to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

## 4. Minimize the Domestic Impact

Though the Venezuelan process has significantly reduced the encounters of Venezuelan nationals, other migratory flows continue to strain domestic resources, which is felt most acutely by border communities. Recent experience, including the Del Rio incident in August 2021, show that migratory surges can happen suddenly and quickly overwhelm U.S. government and partner resources. Given the number of Haitian migrants currently residing in Mexico, the prospect of another surge cannot be discounted. The Haiti process directly mitigates against such a surge—and the impact it would have on State and local governments and civil society stakeholders—by providing a substantial incentive for Haitians to use a lawful process to fly directly to the United States, and a significant consequence for those who do not.

Generally, since FY 2019, DHS has worked with Congress to make approximately $290 million available through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. These entities have provided services and assistance to Haitian nationals and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[69] FEMA funding has supported building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Nevertheless, local communities have reported strain on their ability to provide needed social services. Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[70] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[71] As Haitian nationals are amongst those being conditionally released into communities after being processed along the SWB, this parole process will address these concerns by diverting flows of Haitian nationals into an orderly and lawful process in ways that DHS anticipates will yield a decrease in the numbers arriving at the SWB.

DHS anticipates that this process will help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of arriving migrants at the SWB. Beneficiaries are required to fly at their own expense to an interior POE, rather than arriving at the SWB. They also are only authorized to come to the United States if they have a supporter who has agreed to receive them and provide

---

[69] CNN, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States* (Sept. 21, 2022), *https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office.*

[70] San Antonio Report, *Migrant aid groups stretched thin as city officials seek federal help for expected wave* (Apr. 27, 2022), *https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/.*

[71] KGUN9 Tucson, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day* (Sept. 23, 2022), *https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day.*

CLP_AR_000988

**1250** **Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices

basic needs, including housing support. Beneficiaries also are eligible to apply for work authorization, thus enabling them to support themselves.

5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

The process, which will incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks. This is critical, because transnational criminal organizations—including the Mexican drug cartels—are increasingly playing a key role in human smuggling, reaping billions of dollars in profit and callously endangering migrants' lives along the way.[72]

In FY 2022, more than 750 migrants died attempting to enter the United States,[73] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[74] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[75] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[76] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[77] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[78] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils in the migrant journey.

Meanwhile, these numbers do not account for the countless incidents of

death, illness, and exploitation migrants experience during the perilous journey north. These migratory movements are in many cases facilitated by numerous human smuggling organizations, for which the migrants are pawns;[79] the organizations exploit migrants for profit, often bringing them across inhospitable deserts, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross into the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey. Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico, in December 2021 and the tragic incident in San Antonio, Texas, on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[80]

Migrants who travel via sea also face perilous conditions, including at the hands of smugglers. Human smugglers continue to use unseaworthy, overcrowded vessels that are piloted by inexperienced mariners. These vessels often lack any safety equipment, including but not limited to: personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons. USCG and interagency consent-based interviews suggest that human-smuggling networks and migrants consider the attempts worth the risk.

The increase in migrants taking to sea, under dangerous conditions, has also led to devastating consequences. In FY 2022, the USCG recorded 107 noncitizen deaths, including presumed dead, as a result of irregular maritime migration. In January 2022, the USCG located a capsized vessel with a survivor clinging to the hull. USCG crews interviewed the survivor who indicated there were 34 others on the vessel who were not in the vicinity of

the capsized vessel and survivor.[81] The USCG conducted a multi-day air and surface search for the missing migrants, eventually recovering five deceased migrants, while the others were presumed lost at sea.[82] In November 2022, USCG and CBP rescued over 180 people from an overloaded boat that became disabled off of the Florida Keys.[83] They pulled 18 Haitian migrants out of the sea after they became trapped in ocean currents while trying to swim to shore.[84]

DHS anticipates this process will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit because it incentivizes intending migrants to use a safe and orderly means to access the United States via commercial air flights, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey.

6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy);[85] the Collaborative Migration Management Strategy (CMMS);[86] and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries.[87] The

---

[72] CBP, Fact Sheet: Counter Human Smuggler Campaign Updated (Oct. 6, 2022), *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[73] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.*

[74] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[75] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.*

[76] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[77] The Guardian, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream'* (Sept. 5, 2022), *https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream.*

[78] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[79] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.*

[80] Reuters, *Migrant Truck Crashes in Mexico Killing 54* (Dec. 9, 2021), *https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R;* Reuters, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico* (July 25, 2022), *https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X.*

[81] Adriana Gomez Licon, Associated Press, Situation 'dire' as Coast Guard seeks 38 missing off Florida, Jan. 26, 2022, *https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe064304740c3a3019.*

[82] Adriana Gomez Licon, Associated Press, Coast Guard suspends search for migrants off Florida, Jan. 27, 2022, *https://apnews.com/article/florida-lost-at-sea-79253e1c65cf5708f19a97b6875ae239.*

[83] Ashley Cox, CBS News CW44 Tampa, More than 180 people rescued from overloaded vessel in Florida Keys, Nov. 22, 2022, *https://www.cbsnews.com/tampa/news/more-than-180-people-rescued-from-overloaded-vessel-in-florida-keys/.*

[84] *Id.*

[85] National Security Council, *Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[86] National Security Council, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery.*

[87] *Id.;* The White House, *Los Angeles Declaration on Migration and Protection* (LA Declaration) (June 10, 2022) *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

CLP_AR_000989

CMMS and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries.[88] The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees." [89]

In June 2022, the U.S. Government announced the planned resumption of operations under the Haitian Family Reunification Parole (HFRP) program.[90] Approved HFRP beneficiaries enter the United States as parolees but are eligible to apply for lawful permanent residence (LPR) status once their immigrant visas become available. However, the security situation in Haiti makes it virtually impossible to resume the program in a timely manner and with enough resources to process meaningful numbers of beneficiaries. Furthermore, the Department of State temporarily reduced presence in Haiti due to the security situation, hampering its ability to process parents, spouses, and children of U.S. citizens and lawful permanent residents for more than 20,000 beneficiaries with immigrant visas currently available.

While HFRP and other efforts represent important progress for certain Haitians who are the beneficiaries of family-based immigrant petitions, HFRP's narrow eligibility criteria, coupled with the operational challenges posed by the security situation in Haiti and Department of State's limited family-based visa processing, result in modest processing throughput and mean that additional pathways are required to meet the current and acute border security and irregular migration mitigation objective. This new process will help achieve these goals by providing an immediate, temporary, and orderly process for Haitian nationals to lawfully enter the United States while

we work to improve conditions in Haiti and expand more permanent lawful immigration pathways in the region, including refugee processing and other lawful pathways into the United States and other Western Hemisphere countries.

The process also will respond to an acute foreign policy need complementary to regional efforts. Many countries in the region are affected by the surge in migration of Haitian nationals, and some are eagerly seeking greater United States action to address these challenging flows. The Dominican Republic, which shares a border with Haiti, hosts thousands of Haitian migrants. Brazil and Chile, which had provided Haitians a legal pathway allowing them to reside there, saw Haitians leaving in very high numbers as a result of declining economic conditions, which were only exacerbated by the COVID–19 pandemic.[91] Peru, Ecuador, and Colombia have observed Haitian migrants who had been residing in South America for some time transiting their countries in order to reach the SWB. Panama has been particularly hard-hit by these migratory flows given its geographic location; additionally, the Darién Gap serves as a bottleneck and also creates a humanitarian challenge for the country as it seeks to provide shelter, medical care, food, and other services to migrants exiting the jungle.[92]

Along with the Venezuelan process, this new process will add to these efforts and enable the United States to lead by example. Such processes are a key mechanism to advance the larger domestic and foreign policy goals of the U.S. Government to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. The new process also strengthens the foundation for the United States to press regional partners—many of which are already taking important steps—to undertake additional actions with regards to this population, as part of a regional response. Any effort to meaningfully address the crisis in Haiti will require continued efforts by these and other regional partners.

Importantly, the United States will only implement the new parole process while able to return or remove to

Mexico Haitian nationals who enter the United States without authorization across the SWB. The United States' ability to execute this process thus is contingent on the GOM making an independent decision to accept the return or removal of Haitian nationals who bypass this new process and enter the United States without authorization.

For its part, the GOM has made clear its position that, in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. The GOM, as it makes its independent decisions as to its ability to accept returns of third country nationals at the border and its efforts to manage migration within Mexico, is thus closely watching the United States' approach to migration management and whether it is delivering on its plans in this space. Initiating and managing this process— which is dependent on GOM's actions— will require careful, deliberate, and regular assessment of GOM's responses to independent U.S. actions and ongoing, sensitive diplomatic engagements.

As noted above, this process is responsive to the GOM's request that the United States increase lawful pathways for migrants and is also aligned with broader Administration domestic and foreign policy priorities in the region. The process couples a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly along the SWB. The goal of this process is to reduce the irregular migration of Haitian nationals while the United States, together with partners in the region, works to improve conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

*B. Urgent Humanitarian Reasons*

The case-by-case temporary parole of individuals pursuant to this process also will address the urgent humanitarian needs of many Haitian nationals. As described above, escalating gang violence, the aftermaths of an earthquake, and a cholera outbreak have worsened already concerning political, economic, and social conditions in Haiti.[93] This process provides a safe mechanism for Haitian nationals who

[88] *Id.*

[89] *Id.*

[90] White House, Fact Sheet: The Los Angeles Declaration on Migration and Protection U.S. Government and Foreign Partner Deliverables (June 2022) *https://www.whitehouse.gov/briefing-room/ statements-releases/2022/06/10/fact-sheet-the-los- angeles-declaration-on-migration-and-protection-u- s-government-and-foreign-partner-deliverables/.*

[91] Council on Foreign Relations, *Why Are Haitian Migrants Gathering at the U.S. Border?* October 1, 2021, *https://www.cfr.org/in-brief/why-are-haitian- migrants-gathering-us-border,* (last visited Dec. 19, 2022).

[92] Reuters, *Thousands of mostly Haitian Migrants Traverse Panama on Way to United States,* Sept. 26, 2021, *https://www.reuters.com/world/americas/ thousands-mostly-haitian-migrants-traverse- panama-way-united-states-2021-09-26/,* (last viewed Dec. 19, 2021).

[93] Congressional Research Service, *Haiti: Political Conflict and U.S. Policy Overview* (Aug. 2, 2022), *https://crsreports.congress.gov/product/pdf/IF/ IF12182.*

seek to enter the United States for urgent humanitarian reasons without having to make a dangerous journey by land or sea.

## IV. Eligibility

### A. Supporters

U.S.-based supporters must initiate the process by filing Form I–134A on behalf of a Haitian national and, if applicable, the national's immediate family members.[80] Supporters may be individuals filing on their own, with other individuals, or on behalf of non-governmental entities or community-based organizations. Supporters are required to provide evidence of income and assets and declare their willingness to provide financial support to the named beneficiary for the length of parole. Supporters are required to undergo vetting to identify potential human trafficking or other concerns. To serve as a supporter under the process, an individual must:

- be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;
- pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and
- demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

### B. Beneficiaries

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, such individuals must:

- be outside the United States;
- be a national of Haiti or be a non-Haitian immediate family member[81] and traveling with a Haitian principal beneficiary;
- have a U.S.-based supporter who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;
- possess an unexpired passport valid for international travel;
- provide for their own commercial travel to an air U.S. POE and final U.S. destination;
- undergo and pass required national security and public safety vetting;
- comply with all additional requirements, including vaccination requirements and other public health guidelines; and
- demonstrate that a grant of parole is warranted based on significant public

benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Haitian national is ineligible to be considered for advance authorization to travel to the United States as well as parole under this process if that person is a permanent resident or dual national of any country other than Haiti, or currently holds refugee status in any country, unless DHS operates a similar parole process for the country's nationals.[94]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

- fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;
- has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order;[83]
- has crossed irregularly into the United States, between the POEs, after January 9, 2023 except individuals permitted a single instance of voluntary departure pursuant to INA section 240B, 8 U.S.C. 1229c or withdrawal of their application for admission pursuant to INA section 235(a)(4), 8 U.S.C. 1225(a)(4) will remain eligible;
- has irregularly crossed the Mexican or Panamanian border after January 9, 2023; or
- is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[84]

*Travel Requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to an interior POE of the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with CDC, with respect to health and travel, including vaccination and/or testing requirements for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *www.uscis.gov/CHNV.*

---

[94] This limitation does not apply to immediate family members traveling with a Haitian national.

### C. Processing Steps

Step 1: Declaration of Financial Support

A U.S.-based supporter will submit a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134A identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134A for each beneficiary they are seeking to support, including Haitians' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the beneficiary whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the application. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

Step 4: Approval To Travel to the United States

After completing Step 3, the beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel

CLP_AR_000991

via commercial air to an interior POE of the United States.[85] Approval of advance authorization to travel does not guarantee parole into the United States. Whether to parole the individual is a discretionary determination made by CBP at the POE at the time the individual arrives at the interior POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Each individual arriving under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with CBP inspection processes. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to ICE for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to apply for employment authorization from USCIS under existing regulations. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for employment authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

*D. Scope, Termination, and No Private Rights*

The Secretary retains the sole discretion to terminate the Parole Process for Haitians at any point. The number of travel authorizations granted under this process shall be spread across this process and the separate and independent Parole Process for Cubans, the Parole Process for Nicaraguans, and Parole Process for Venezuelans (as described in separate notices published concurrently in today's edition of the

**Federal Register**) and shall not exceed 30,000 each month in the aggregate. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

**V. Regulatory Requirements**

*A. Administrative Procedure Act*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[95] *i.e.,* a "statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [96] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[97] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [98] In addition, although the text of the Administrative Procedure Act does not expressly require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[99] This rule satisfies both standards.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM— to provide a lawful process for Haitian nationals to enter the United States. The United States will only implement the

new parole process while able to return or remove Haitian nationals who enter the United States without authorization across the SWB. The United States' ability to execute this process is contingent on the GOM making an independent decision to accept the return or removal of Haitian nationals who bypass this new process and enter the United States without authorization. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to U.S. action in this regard, and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now. It also would complicate broader discussions and negotiations about migration management. For now, the GOM has indicated it is prepared to make an independent decision to accept the return or removal of Haitian nationals. That willingness could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return or remove nationals of Haiti to Mexico at a future date would likely result in a surge in migration, as migrants rush to the border to enter before the process begins—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process would advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs

---

[95] 5 U.S.C. 553(b)(A); *id.* 553(d)(2).

[96] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[97] 5 U.S.C. 553(a)(1).

[98] *Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[99] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

exemption because the change was central to ongoing negotiations between the two countries.[100] DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[101]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable.[102] The numbers of Haitians encountered at the SWB are already high, and a delay would greatly exacerbate an urgent border and national security challenge and would miss a critical opportunity to reduce and divert the flow of irregular migration.[103]

Undertaking notice-and-comment rule making procedures would be contrary to the public interest because an advance announcement of the process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Haitian nationals seeking to enter the United States before the process would take effect. There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[104] It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment process.[105] If, for example, advance notice of a coming price increase would immediately produce market

dislocations and lead to serious shortages, advance notice need not be given.[106] A number of cases follow this logic in the context of economic regulation.[107]

The same logic applies here, where the Department is responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. It is well established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy.[108] For example, as detailed above, implementation of the parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans. Had the parole process been announced prior to a notice-and-comment period, it likely would have had the opposite effect, resulting in many hundreds of thousands of Venezuelan nationals attempting to cross the border before the program went into effect. Overall, the Department's experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States. Smugglers routinely prey on migrants in

response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance of this process in order to undertake such procedures because—as noted above—maintaining the status quo is likely to contribute to more Haitians attempting to enter irregularly either at the SWB or by sea, at a time when DHS has extremely limited options for processing, detaining, or quickly removing such migrants safely and in sufficient numbers. Inaction would unduly impede DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area. For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because ''pre-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region.'' [109] DHS cited the prospect that ''publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule.'' [110] DHS found that ''[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations.'' [111] DHS concluded that ''a surge could result in significant loss of human life.'' [112]

---

[100] *See* 82 FR 4902 (Jan. 17, 2017).

[101] *See* 87 FR 63507 (Oct. 19, 2022).

[102] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

[103] *See Chamber of Commerce of U.S.* v. *SEC.,* 443 F.3d 890, 908 (D.C. Cir. 2006) (''The [''good cause''] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare.'' (citations omitted)).

[104] *See* 5 U.S.C. 553(b)(B).

[105] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 94–95 (D.C. Cir. 2012) (noting that the ''good cause'' exception ''is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded'' (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) (''[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline.'' (cleaned up)).

[106] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) (''[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.'').

[107] *See, e.g., Chamber of Commerce of U.S.* v. *S.E.C.,* 443 F.3d 890, 908 (D.C. Cir. 2006) (''The [''good cause''] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare.'' (citations omitted)); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) (''On a number of occasions . . . this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.'').

[108] *See, e.g.,* Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on Social Media, *https://www.techtransparencyproject. org/articles/inside-world-misinformation-targeting-migrants-social-media,* July 26, 2022, (last viewed Dec. 6, 2022).

[109] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[110] *Id.*

[111] *Id.*

[112] *Id.; accord, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

CLP_AR_000993

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Haiti parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Haitian nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**

*Secretary of Homeland Security.*

[FR Doc. 2023–00255 Filed 1–5–23; 4:15 pm]

**BILLING CODE 9110–09–P**

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of a Parole Process for Nicaraguans

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security of our Southwest Border (SWB) by reducing the number of encounters of Nicaraguan nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by a surge in migration. Nicaraguans who do not avail themselves of this new process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal—including to third countries, such as Mexico. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Nicaraguan nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication, with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background—Nicaraguan Parole Process

This notice describes the implementation of a new parole process for certain Nicaraguan nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by reducing the record levels of Nicaraguan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

*A. Overview*

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations, as well as their facilitators, and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to, and arriving without authorization at, the SWB.

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Nicaraguan Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.

CLP_AR_000994

## B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Haiti parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Haitian nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00255 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of a Parole Process for Nicaraguans

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security of our Southwest Border (SWB) by reducing the number of encounters of Nicaraguan nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by a surge in migration. Nicaraguans who do not avail themselves of this new process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal—including to third countries, such as Mexico. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Nicaraguan nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication, with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background—Nicaraguan Parole Process

This notice describes the implementation of a new parole process for certain Nicaraguan nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by reducing the record levels of Nicaraguan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

### A. Overview

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations, as well as their facilitators, and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to, and arriving without authorization at, the SWB.

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Nicaraguan Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.

CLP_AR_000995

Building on the success of the successful Uniting for Ukraine (U4U) process and the Process for Venezuelans, DHS is implementing a similar process to address the increasing number of encounters of Nicaraguan nationals at the SWB, which have reached record levels over the past six months. Similar to Venezuela, Nicaragua has restricted DHS's ability to remove individuals to Nicaragua, which has constrained DHS's ability to respond to this surge.

In October 2022, DHS undertook a new effort to address the high number of Venezuelans encountered at the SWB.[3] Specifically, DHS provided a new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by flying to interior ports of entry—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the Government of Mexico (GOM) for the first time made an independent decision to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, thus imposing a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced Parole Process. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and, as of the week ending December 4, to an average of 86 per day.[4] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in irregular migration of Venezuelans throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién Gap—an inhospitable jungle that spans between Panama and Colombia—was down from 40,593 in October 2022 to just 668 in November.[5]

DHS anticipates that implementing a similar process for Nicaraguans will reduce the number of Nicaraguans seeking to irregularly enter the United States between POEs along the SWB by coupling a meaningful incentive to seek

a safe, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization pursuant to this process. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process. Implementation of the new parole process for Nicaraguans is contingent on the GOM accepting the return, departure, or removal to Mexico of Nicaraguan nationals seeking to enter the United States without authorization between POEs on the SWB.

As in the process for Venezuelans, a supporter in the United States must initiate the process on behalf of a Nicaraguan national (and certain non-Nicaraguan nationals who are an immediate family member of a primary beneficiary), and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Nicaraguan nationals and their immediate family members must meet several eligibility criteria in order to be considered, on a case-by-case basis, for advance travel authorization and parole. Only those who meet all specified criteria are eligible to receive advance authorization to travel to the United States and be considered for a discretionary grant of parole, on a case-by-case basis, under this process. Beneficiaries must pass national security, public safety, and public health vetting prior to receiving a travel authorization, and those who are approved must arrange air travel at their own expense to seek entry at an interior POE.

A grant of parole under this process is for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region, and allow for increased removals of Nicaraguans from both the United States and partner nations who continue to migrate irregularly but who lack a valid claim of asylum or other forms of protection. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the United States. Those who are not granted asylum or any other immigration benefit during this two-year parole period generally will need to depart the United States prior to the expiration of their authorized parole

period or will be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Nicaraguan nationals pursuant to this process will provide a significant public benefit for the United States by reducing unauthorized entries along our SWB while also addressing the urgent humanitarian reasons that are driving hundreds of thousands of Nicaraguans to flee their home country, to include widespread and violent repression and human rights violations and abuses by the Ortega regime. Most significantly, DHS anticipates this process will: (i) enhance the security of the U.S. SWB by reducing irregular migration of Nicaraguan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) enhance border security and national security by vetting individuals prior to their arrival at a U.S. POE; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Nicaragua; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

The Secretary retains the sole discretion to terminate the Nicaragua process at any point.

*B. Conditions at the Border*

1. Impact of Venezuela Process

This process is modeled on the Venezuela process—as informed by the way that similar incentive and disincentive structures successfully decreased the number of Venezuelan nationals making the dangerous journey to and being encountered along the SWB. The Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use a safe, orderly process to come to the United States can change migratory flows. Prior to the October 12, 2022 announcement of the Venezuela process, DHS encountered approximately 1,100 Venezuelan nationals per day between POEs—with peak days exceeding 1,500.[6] Within a week of the announcement, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under

---

[3] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[4] DHS Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[5] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

[6] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

CLP_AR_000996

200 per day, and as of the week ending December 4, an average of 86 per day.[7]

Panama's daily encounters of Venezuelans also declined significantly over the same time period, falling some 88 percent, from 4,399 on October 16 to 532 by the end of the month—a decline driven entirely by Venezuelan migrants' choosing not to make the dangerous journey through the Darién Gap. The number of Venezuelans attempting to enter Panama through the Darién Gap continued to decline precipitously in November—from 40,593 encounters in October, a daily average of 1,309, to just 668 in November, a daily average of just 22.[8]

The Venezuela process fundamentally changed the calculus for Venezuelan migrants. Venezuelan migrants who had already crossed the Darién Gap returned to Venezuela by the thousands on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[9] Other migrants who were about to enter the Darién Gap turned around and headed back south.[10] Still others who were intending to migrate north are staying where they are to apply for this parole process.[11] Put simply, the Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use this parole process to come to the United States can yield a meaningful change in migratory flows.

2. Trends and Flows: Increase of Nicaraguan Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year.[12] By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[13] However, these gains were subsequently reversed as border encounters more than doubled between 2017 and 2019, and— following a steep drop in the first months of the COVID–19 pandemic— continued to increase at a similar pace in 2021 and 2022.[14]

Shifts in demographics have also had a significant effect on migration flows. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[15] Beginning in the 2010s, a growing share of migrants have come from Northern Central America [16] (NCA) and, since the late 2010s, from countries throughout the Americas.[17] Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence, political oppression, and for other non-economic reasons.[18]

Historically, Nicaraguans migrated south to Costa Rica, resulting in relatively few Nicaraguan encounters at the SWB. Consistent with this trend, the number of Nicaraguans seeking asylum in Costa Rica has grown rapidly in recent years, putting immense pressure on the country's asylum system, and causing many asylum seekers to wait years for an initial interview.[19] According to United Nations High Commissioner for Refugees (UNHCR), as of February 2022, ''more Nicaraguans are currently seeking protection in Costa Rica than all the refugees and asylum seekers combined, during Central America's civil wars in the 1980s, when Costa Rica was a sanctuary for those fleeing violence.'' [20] The Government of Costa Rica recently announced its intention to regularize the status of more than 200,000 Nicaraguan migrants and asylum seekers providing them with access to jobs and healthcare as part of the process.[21]

Despite Costa Rica's efforts, increasing numbers of Nicaraguans are traveling north to the SWB due to renewed unrest in Nicaragua and the strained asylum system in Costa Rica. As a result, the United States and Mexico saw surges in migration from Nicaragua, with Nicaraguans claiming asylum in Mexico at three times the rate through October 31 of this year than the previous year and with a surge in migration having significantly contributed to the rising number of encounters at the SWB.[22] Unique encounters of Nicaraguan nationals increased throughout fiscal year (FY) 2021, totaling 47,300,[23] and increased further—and sharply—in FY 2022. DHS encountered an estimated 157,400 unique Nicaraguan nationals in FY 2022, which composed nine percent

---

[7] OIS analysis of data pulled from CBP UIP December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[8] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/ img2022/PDF/IRREGULARES_%20POR_ %20DARI%C3%89N_NOVIEMBRE_2022.pdf,* (last viewed Dec. 11, 2022).

[9] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama, https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/,* Nov. 9 2022 (last viewed Dec. 8, 2022).

[10] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route, https:// www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/ 6790996.html,* Oct. 14, 2022 (last viewed Dec. 8, 2022).

[11] Axios, *Biden's new border policy throws Venezuelan migrants into limbo, https:// www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap,* Nov. 7, 2022 (last viewed Dec. 8, 2022).

[12] OIS analysis of historic CBP data.

[13] *Id.*

[14] *Id.*

[15] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 96 to over 99 percent of apprehensions of persons entering without inspection between 1980 and 2000. On Mexican migrants from this era's demographics and economic motivations see Jorge Durand, Douglas S. Massey, and Emilio A. Parrado, ''The New Era of Mexican Migration to the United States,'' *The Journal of American History* Vol. 86, No. 2 (Sept. 1999): 518–536.

[16] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[17] According to OIS analysis of CBP data, Mexican nationals continued to account for 89 percent of total SWB encounters in FY 2010, with Northern Central Americans accounting for 8 percent and all other nationalities for 3 percent. Northern Central Americans' share of total encounters increased to 21 percent by FY 2012 and averaged 46 percent in FY 2014–FY 2019, the last full year before the start of the COVID–19 pandemic. All other countries accounted for an average of 5 percent of total SWB encounters in FY 2010–FY 2013, and for 10 percent of total encounters in FY 2014–FY 2019.

[18] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. At the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[19] AP News, Fleeing Nicaraguans Strain Costa Rica's Asylum System (Sept. 2, 2022), *https:// apnews.com/article/covid-health-elections-presidential-caribbean-52044748d15dbbb6 ca706c66cc7459a5.*

[20] UNHCR, 'Sharp rise' in Nicaraguans fleeing to Costa Rica, strains asylum system, *https:// news.un.org/en/story/2022/03/1114792,* Mar. 25, 2022 (last viewed Dec. 9, 2022).

[21] Reuters, Costa Rica prepares plan to regularize status of 200,000 mostly Nicaraguan migrants, *https://www.reuters.com/world/americas/costa-rica-prepares-plan-regularize-status-200000-mostly-nicaraguan-migrants-2022-08-10/,* Aug. 10, 2022 (last viewed Dec. 4, 2022).

[22] Boris Cheshirkov, Number of displaced Nicaraguans in Costa Rica doubles in less than a year, *https://www.unhcr.org/news/briefing/2022/3/ 623d894c4/number-displaced-nicaraguans-costa-rica-doubles-year.html,* Mar. 25, 2022 (last viewed Dec. 7, 2022).

[23] OIS analysis of OIS Persist Dataset based on data through October 31, 2022. Unique encounters include encounters of persons at the Southwest Border who were not previously encountered in the prior 12 months. Throughout this memo unique encounter data are defined to also include OFO parolees and other OFO administrative encounters.

CLP_AR_000997

of all unique encounters and was the fourth largest origin group.[24] Between FY 2021 and FY 2022, unique encounters of Nicaraguan nationals rose 232 percent while unique encounters of all other nationalities combined increased just 47 percent.[25] FY 2022 average unique monthly encounters of Nicaraguan nationals at the land border totaled 13,113 as opposed to an average monthly rate of 316 encounters in FYs 2014–2019, a 41-fold increase.[26]

These trends thus far are only accelerating in FY 2023. In October and November of 2022, DHS encountered 51,000 Nicaraguan nationals at the border—nearly one third of the record total of Nicaraguan encounters in FY 2022.[27]

3. Push and Pull Factors

DHS assesses that the high—and rising—number of Nicaraguan nationals encountered at the SWB is driven by two key factors: First, a confluence of political, economic, and humanitarian crises in Nicaragua—exacerbated by the widespread and violent crackdown on democratic freedoms by the Ortega regime and the government's numerous human rights violations against its own population—are causing thousands to leave the country. This situation is compounded by the fact that increasingly sophisticated human smugglers often target migrants in such circumstances to offer them a facilitated opportunity to travel to the United States—at a cost. Second, the United States faces significant limits on the ability to remove Nicaraguan nationals who do not establish a legal basis to remain in the United States to Nicaragua or elsewhere; absent such an ability, more individuals are willing to take a chance that they can come—and stay.

i. Factors Pushing Migration From Nicaragua

Current political, economic, and humanitarian crises in Nicaragua are driving migration of Nicaraguans throughout the hemisphere as well as to our border.[28] As conditions have deteriorated in Nicaragua due to this confluence of factors, the Government of Nicaragua has shown little tolerance for those who openly criticize their regime

and moves swiftly to brazenly silence dissent.[29]

Since 2007, Daniel Ortega and his party, the Sandinista National Liberation Front (FSLN), have gradually consolidated control over the country's institutions and society, including by eliminating presidential term limits.[30] Human Rights Watch (HRW) reported in July 2022 that "[s]ince taking office in 2007, the Ortega administration has dismantled all institutional checks on presidential power, including the judiciary.'' [31] According to the Inter-American Commission on Human Rights (IACHR), this consolidation of power in the executive "has facilitated Nicaragua's transformation into a police state in which the executive branch has instituted a regime of terror and of suppression of all freedoms. . . supported by the other branches of government.'' [32] The IACHR reported in June 2022 that "the state's violent response to the social protests that started on April 18, 2018, triggered a serious political, social, and human rights crisis in Nicaragua,'' [33] and that as of late September, "more than 2,000 organizations of civil society—linked to political parties, academic, and religious spaces—have been cancelled'' since April 2018.[34] Further, HRW reported that the shutting down of non-governmental organizations in Nicaragua "is part of a much broader effort to silence civil society groups and independent media through a combination of repressive tactics that include abusive legislation,

intimidation, harassment, arbitrary detention, and prosecution of human rights defenders and journalists.'' [35]

Since early 2021, the IACHR has observed the escalation of repression by the Nicaraguan government, characterized by a series of state actions leading to the elimination of the opposition's participation in the elections even before they were held.[36] In December 2021, the IACHR expressed its concern "about the increasing number of people who have been forced to flee Nicaragua and to request international protection in the context of the ongoing serious human rights crisis in the country.'' [37] In August 2022, Ortega had a bishop, five priests, and two seminarians arrested, claiming that the bishop "persisted in destabilizing and provocative activities.'' [38] Prior to the November 2022 municipalities election, the government closed 200 nongovernmental groups and over 50 media outlets.[39]

Exacerbated by political repression, Nicaragua is one of the poorest countries in Latin America. According to the World Bank, Nicaragua's gross domestic product (GDP) per capita in 2021 was only $2,090.80, the second lowest in the region, above Haiti.[40] According to the World Food Program, almost 30 percent of Nicaraguan families live in poverty in the country, "over 8 percent struggle in extreme poverty, surviving on less than $1.25 daily,'' and "17 percent of children aged under five suffer from chronic malnutrition.'' [41] Migrants often seek economic opportunities to be able to support their families that remain in Nicaragua. Remittances from the United

[24] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[25] *Id.*

[26] *Id.*

[27] *Id.;* OIS analysis of UIP CBP data pulled on November 28, 2022.

[28] Voice of America, *With Turmoil at Home, More Nicaraguans Flee to the U.S.* (July 29, 2021), *https:// www.voanews.com/a/americas_turmoil-home-more-nicaraguans-flee-us/6208907.html.*

[29] Los Angeles Times, *Sandinistas Complete Their Political Domination of Nicaragua Following Local Elections* (Nov. 8, 2022), *https:// www.latimes.com/world-nation/story/2022-11-08/ sandinistas-complete-political-domination-nicaragua-local-elections.*

[30] Reuters, *Ortega's Path to Run for Fourth Straight Re-election as Nicaraguan President* (Nov. 3, 2021), *https://www.reuters.com/world/americas/ ortegas-path-run-fourth-straight-re-election-nicaraguan-president-2021-11-03/.*

[31] Office of the United Nations High Commissioner for Human Rights (OHCHR), *Human Rights Situation in Nicaragua* 2 (Sept. 2, 2022), *https://reliefweb.int/report/nicaragua/human-rights-situation-nicaragua-report-united-nations-high-commissioner-human-rights-ahrc5142-unofficial-english-translation.*

[32] Inter-American Commission On Human Rights, *Nicaragua: Concentration of Power and the Undermining of the Rule of Law,* OEA/Ser.L/V/II, Doc. 288, 65 (Oct. 25, 2021), *https://www.oas.org/ en/iachr/reports/pdfs/2021_nicaragua-en.pdf.*

[33] Inter-American Commission On Human Rights, *Annual Report 2021,* Chapter IV.B—Nicaragua, 775, (June 2, 2022), *https://www.oas.org/en/iachr/ reports/ia.asp?Year=2021.*

[34] In light of serious allegations regarding the closure of civic spaces in Nicaragua, UN and IACHR Special Rapporteurs urge authorities to comply with their international obligations to respect and guarantee fundamental freedoms, IACHR, Sept. 28, 2022, *https://www.oas.org/en/iachr/expression/ showarticle.asp?lID=1&artID=1257.*

[35] Nicaragua: Government Dismantles Civil Society, Human Rights Watch, July 19, 2022, *https://www.hrw.org/news/2022/07/19/nicaragua-government-dismantles-civil-society.*

[36] IACHR, *Annual Report 2021,* Chapter IV.B—Nicaragua, 775 (June 2, 2022), *https://www.oas.org/ en/iachr/reports/ia.asp?Year=2021.*

[37] Inter-American Commission On Human Rights, *IACHR Calls for International Solidarity, Urges States to Protect the People Who Have Been Forced to Flee from Nicaragua* (Dec. 20, 2021), *http:// www.oas.org/en/IACHR/jsForm/?File=/en/iachr/ media_center/PReleases/2021/346.asp.*

[38] The Washington Post, *Nicaragua Detains Catholic Bishop in Escalating Crackdown on Dissent* (Aug. 19, 2022), *https:// www.washingtonpost.com/world/2022/08/19/ nicaragua-bishop-rolando-alvarez-arrest-ortega/.*

[39] Politico, *Sandinistas Complete Their Political Domination of Nicaragua* (Nov. 8, 2022), *https:// www.politico.com/news/2022/11/08/nicaragua-sandinistas-ortega-repression-00065603.*

[40] The World Bank, *GDP per Capita (Current U.S. $)—Latin America & Caribbean, Nicaragua, https:// data.worldbank.org/indicator/NY.GDP.PCAP.CD? locations=ZJ-NI&most_recent_value_desc=false* (last visited Dec. 6, 2022).

[41] World Food Programme, *Nicaragua, https:// www.wfp.org/countries/nicaragua* (last visited: Sept. 26, 2022).

CLP_AR_000998

States to Nicaragua from January–September 2022 have surpassed the total remittances sent in all of 2021.[42]

According to the UNHCR, approximately 200,000 Nicaraguans have sought international protection worldwide.[43] More than 100,000 filed asylum applications in 2021; this is a five-fold increase from 2020.[44] Daniel Ortega's repressive policies, coupled with widespread poverty, have pushed thousands of Nicaraguans to seek humanitarian relief in the Western Hemisphere, including increasingly in the United States.[45]

ii. Return Limitations

The Government of Nicaragua is not accepting returns or removals of their nationals at a volume that allows the United States to effectively manage the number of encounters of Nicaraguans by the United States. Additionally, the GOM has generally not allowed returns of Nicaraguan nationals pursuant to Title 42 authorities, or their removal from the United States pursuant to Title 8 authorities.[46] Other countries have similarly refused to accept Title 8 removals of Nicaraguan nationals. As a result, DHS was only able to repatriate a small number of Nicaraguan nationals to Nicaragua in FY 2022.

Moreover, returns alone are not sufficient to reduce and divert irregular flows of Nicaraguans. The United States will combine a consequence for Nicaraguan nationals who seek to enter the United States without authorization at the land border with an incentive to use the safe, orderly process to request authorization to travel by air to, and seek parole to enter, the United States, without making the dangerous journey to the border.

4. Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in part by the number of Nicaraguan nationals encountered—DHS has taken a series of extraordinary steps. Since FY 2021,

DHS has built and now operates 10 soft-sided processing facilities at a cost of $688 million. U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) detailed a combined 3,770 officers and agents to the SWB to effectively manage this processing surge. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from other divisions in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 combined on grants to non-governmental organizations (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP–H) to assist with the reception and onward travel of irregular migrants arriving at the SWB. This spending is in addition to $1.4 billion in additional FY 2022 appropriations that were designated for SWB enforcement and processing capacities.[47]

The impact has been particularly acute in certain border sectors. The increased flows of Nicaraguan nationals are disproportionately occurring within the remote Del Rio and Rio Grande Valley sectors, all of which are at risk of operating, or are currently operating, over capacity. In FY 2022, 80 percent of unique encounters of Nicaraguan nationals occurred in these two sectors.[48] There have also been a growing number of encounters in El Paso sector since September 2022. In FY 2023, Del Rio, El Paso, and Rio Grande Valley sectors have accounted for 88 percent of encounters of Nicaraguan nationals.[49] In FY 2022, Del Rio sector encountered almost double (85 percent increase) the number of migrants as compared to FY 2021. Driven in part by the sharp increase in Nicaraguan nationals being encountered in this sector, this was an eighteen-fold increase over the average for FY 2014–FY 2019.[50]

The focused increase in encounters within those three sectors is particularly challenging. Del Rio sector is

geographically remote, and because—up until the past two years—it has not been a focal point for large numbers of individuals entering without authorization, has limited infrastructure and personnel in place to safely process the elevated encounters that CBP is now seeing there. The Yuma Sector is along the Colorado River corridor, which presents additional challenges to migrants, such as armed robbery, assault by bandits, and drowning, as well as to the U.S. Border Patrol (USBP) agents encountering them. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border but is far away from other CBP sectors, which makes it challenging to move individuals for processing elsewhere during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors that have additional capacity to process. In November 2022, U.S. Border Patrol (USBP) sectors along the SWB operated a combined 602 decompression bus routes to neighboring sectors and operated 124 lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[51]

Because DHS assets are finite, using air resources to operate lateral flights reduces DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. Fewer international repatriation flights in turn exacerbates DHS's inability to return or remove Nicaraguans and other noncitizens in its custody by sending the message that there is no consequence for illegal entry. DHS assesses that a reduction in the flow of Nicaraguan nationals arriving at the SWB would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

**II. DHS Parole Authority**

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or

---

[42] Banco Central De Nicaragua, Remesas Por País de Origen, *https://www.bcn.gob.ni/sites/default/files/estadisticas/siec/datos/remesas_origen.htm* (last visited Dec. 6, 2022).

[43] UNHCR USA, Displacement in Central America, *https://www.unhcr.org/en-us/displacement-in-central-america.html.*

[44] UNHCR, 2021 Global Trends Report, June 16, 2022, *https://www.unhcr.org/62a9d1494/global-trends-report-2021.*

[45] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[46] There are some limited exceptions to this prohibition, including Nicaraguan nationals that have Mexican family members.

[47] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.*

[48] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[49] *Id.,* and CBP UIP data for November 1–27 pulled on November 28, 2022.

[50] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[51] Data from SBCC, as of December 11, 2022.

CLP_AR_000999

significant public benefit.'' [52] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during the period of parole in the United States.[53] DHS may set the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[54] Individuals may be granted advance authorization to travel to the United States to seek parole.[55] DHS may terminate parole in its discretion at any time.[56] Individuals who are paroled into the United States generally may apply for and be granted employment authorization.[57]

This process will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Nicaraguan nationals to remain where they are and use a lawful process to request authorization to travel by air to, and ultimately apply for a discretionary grant of parole into, the United States for a period of up to two years.

### III. Justification for the Process

As noted above, section 212(d)(5)(A) of the INA confers upon the Secretary of Homeland Security the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [58]

#### A. Significant Public Benefit

The parole of Nicaraguan nationals and their immediate family members under this process—which imposes new consequences for Nicaraguans who seek to enter the United States without authorization between POEs, while providing an alternative opportunity for eligible Nicaraguan nationals and their immediate family members to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—serves a significant public benefit for several, interrelated

reasons. Specifically, we anticipate that the parole of eligible individuals pursuant to this process will: (i) enhance border security through a reduction in irregular migration of Nicaraguan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Nicaragua; (v) provide a disincentive to undergo the dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

#### 1. Enhanced Border Security by Reducing Irregular Migration of Nicaraguan Nationals

As described above, Nicaraguan nationals make up a significant and growing number of those encountered seeking to cross between POEs without authorization. Without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly process for Nicaraguans to enter the United States, without making the journey to the SWB, the numbers will continue to grow.

By incentivizing individuals to seek a safe, orderly means of traveling to the United States through the creation of an alternative pathway to the United States, while imposing additional consequences to irregular migration, DHS assesses this process could lead to a meaningful drop in encounters of Nicaraguan individuals along the SWB. This expectation is informed by the recently implemented process for Venezuelans and the significant shifts in migratory patterns that took place once the process was initiated. The success to date of the Venezuela process provides compelling evidence that coupling effective disincentives for irregular entry with incentives for a safe, orderly parole process can meaningfully shift migration patterns in the region and to the SWB.

Implementation of this parole process is contingent on the GOM's acceptance of Nicaraguan nationals who voluntarily depart the United States, those who voluntarily withdraw their application for admission, and those subject to expedited removal who cannot be removed to Nicaragua or another designated country. The ability to effectuate voluntary departures,

withdrawals, and removals of Nicaraguan nationals to Mexico will impose a consequence on irregular entry that currently does not exist.

#### 2. Improve Vetting for National Security and Public Safety

All noncitizens whom DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing. Individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to vet more individuals before they arrive at the border so that we can stop individuals who could pose threats to national security or public safety even earlier in the process. The Nicaraguan parole process will allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States.

As described below, the vetting will require prospective beneficiaries to upload a live photograph via an app. This will enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny authorization to travel under this process before they arrive at our border, representing an improvement over the status quo.

#### 3. Reduce the Burden on DHS Personnel and Resources

By reducing encounters of Nicaraguan nationals at the SWB, and channeling decreased flows of Nicaraguan nationals to interior POEs, we anticipate that the process will relieve some of the impact increased migratory flows have had on the DHS workforce along the SWB. This process is expected to free up resources, including those focused on decompression of border sectors, which in turn may enable an increase in removal flights—allowing for the removal of more noncitizens with final orders of removal faster and reducing the number of days migrants are in DHS custody. While the process will also draw on DHS resources within U.S. Citizenship and Immigration Services (USCIS) and CBP to process requests for discretionary parole on a case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require fewer resources as compared to the status quo.

In addition, permitting Nicaraguans to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process also will reduce the burden

---

[52] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole''). Nicaraguans paroled into the United States through this process are not being paroled as refugees, and instead will be considered for parole on a case-by-case basis for a significant public benefit or urgent humanitarian reasons. This parole process does not, and is not intended to, replace refugee processing.

[53] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[54] *Id.*

[55] *See* 8 CFR 212.5(f).

[56] *See* 8 CFR 212.5(e).

[57] *See* 8 CFR 274a.12(c)(11).

[58] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

CLP_AR_001000

on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

### 4. Minimize the Domestic Impact

Though the Venezuelan process has significantly reduced the encounters of Venezuelan nationals, other migratory flows continue to strain domestic resources, which is felt most acutely by border communities. Given the inability to remove, return, or repatriate Nicaraguan nationals in substantial numbers, DHS is currently conditionally releasing 96 percent of the Nicaraguan nationals it encounters at the border, pending their removal proceedings or the initiation of such proceedings, and Nicaraguan nationals accounted for 18 percent of all encounters released at the border in October 2022.[59] The increased volume of provisional releases of Nicaraguan nationals puts strains on U.S. border communities.

Generally, since FY 2019, DHS has worked with Congress to make approximately $290 million available through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. These entities have engaged to provide services and assistance to Nicaraguan nationals and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[60] FEMA funding has supported building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Nevertheless, local communities have reported strain on their ability to provide needed social services. Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[61] and stakeholders in the border region have expressed concern that shelters will

eventually reach full bed space capacity and not be able to host any new arrivals.[62] Since Nicaraguan nationals account for a significant percentage of the individuals being conditionally released into communities after being processed along the SWB, this parole process will address these concerns by diverting flows of Nicaraguan nationals into a safe and orderly process in ways that DHS anticipates will yield a decrease in the numbers arriving at the SWB.

DHS anticipates that this process will help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of arriving migrants at the SWB. Beneficiaries are required to fly at their own expense to an interior POE, rather than arriving at the SWB. They also are only authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also are eligible to apply for work authorization, thus enabling them to support themselves.

### 5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

The process, which will incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks. This is critical, because transnational criminal organizations—including the Mexican drug cartels—are increasingly playing a key role in human smuggling, reaping billions of dollars in profit and callously endangering migrants' lives along the way.[63]

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[64] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[65] The approximate number of migrants

rescued by CBP in FY 2022 (almost 19,000 rescues)[66] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[67] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[68] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[69] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils in the migrant journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. These migratory movements are in many cases facilitated by numerous human smuggling organizations, for which the migrants are pawns;[70] the organizations exploit migrants for profit, often bringing them across inhospitable deserts, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross into the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey.[71] Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico, in December 2021 and the tragic incident in San Antonio, Texas, on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs

---

[59] OIS analysis of and CBP subject-level data and OIS Persist Dataset based on data through October 31, 2022.

[60] CNN, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States* (Sept. 21, 2022), *https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office.*

[61] San Antonio Report, *Migrant aid groups stretched thin as city officials seek federal help for expected wave* (Apr. 27, 2022), *https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/.*

[62] KGUN9 Tucson, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day* (Sept. 23, 2022), *https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day.*

[63] CBP, Fact Sheet: Counter Human Smuggler Campaign Updated (Oct. 6, 2022), *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[64] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the U.S.-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.*

[65] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[66] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the U.S.-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.*

[67] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[68] The Guardian, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream'* (Sept. 5, 2022), *https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream.*

[69] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[70] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.*

[71] New York Times, *Smuggling Migrants at the Border Now a Billion-Dollar Business,* (July 25, 2022), *https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html.*

engaged in human smuggling prioritize profit over safety.[72]

DHS anticipates this process will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit because it incentivizes intending migrants to use a safe and orderly means to access the United States via commercial air flights, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey to the SWB. By reducing the demand for these services, DHS is effectively targeting the resources of TCOs and human smuggling networks that so often facilitate these unprecedented movements with utter disregard for the health and safety of migrants. DHS and federal partners have taken extraordinary measures— including the largest-ever surge of resources against human smuggling networks—to combat and disrupt the TCOs and smugglers and will continue to do so.[73]

6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy);[74] the Collaborative Migration Management Strategy (CMMS);[75] and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries.[76] The

CMMS and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries.[77] The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees."[78]

This new process helps achieve these goals by providing an immediate and temporary orderly process for Nicaraguan nationals to lawfully enter the United States while we work to improve conditions in sending countries and expand more permanent lawful immigration pathways in the region, including refugee processing and other lawful pathways into the United States and other Western Hemisphere countries. It thus provides the United States another avenue to lead by example.

The process also responds to an acute foreign policy need. Key allies in the region—including specifically the Governments of Mexico and Costa Rica—are affected by the increased movement of Nicaraguan nationals and have been seeking greater U.S. action to address these challenging flows for some time. These Nicaraguan flows contribute to strain on governmental and civil society resources in Mexican border communities in both the south and the north—something that key foreign government partners have been urging the United States to address.

Along with the Venezuelan process, this new process adds to these efforts and enables the United States to lead by example. Such processes are a key mechanism to advance the larger domestic and foreign policy goals of the U.S. Government to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. The new process also strengthens the foundation for the United States to press regional partners—many of which are already taking important steps—to undertake additional actions with regard to this population, as part of a regional response. Any effort to meaningfully address the crisis in

Nicaragua will require continued efforts by these and other regional partners.

Importantly, the United States will only implement the new parole process while able to remove or return to Mexico Nicaraguan nationals who enter the United States without authorization across the SWB. The United States' ability to execute this process thus is contingent on the GOM making an independent decision to accept the return or removal of Nicaraguan nationals who bypass this new process and enter the United States without authorization.

For its part, the GOM has made clear its position that, in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. The GOM, as it makes its independent decisions as to its ability to accept returns of third country nationals at the border and its efforts to manage migration within Mexico, is thus closely watching the United States' approach to migration management and whether it is delivering on its plans in this space. Initiating and managing this process— which is dependent on GOM's actions— will require careful, deliberate, and regular assessment of GOM's responses to independent U.S. actions and ongoing, sensitive diplomatic engagements.

As noted above, this process is responsive to the GOM's request that the United States increase lawful pathways for migrants and is also aligned with broader Administration domestic and foreign policy priorities in the region. The process couples a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization along the SWB. The goal of this process is to reduce the irregular migration of Nicaraguan nationals while the United States, together with partners in the region, works to improve conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

*B. Urgent Humanitarian Reasons*

The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian needs of Nicaraguan nationals who have fled the Ortega regime and Nicaragua. The Government of Nicaragua continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against

---

[72] Reuters, *Migrant Truck Crashes in Mexico Killing 54* (Dec. 9, 2021), *https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R;* Reuters, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico* (July 25, 2022), *https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X.*

[73] *See* DHS Update on Southwest Border Security and Preparedness Ahead of Court-Ordered Lifting of Title 42 (Dec. 13, 2022), *https://www.dhs.gov/publication/update-southwest-border-security-and-preparedness-ahead-court-ordered-lifting-title-42.*

[74] National Security Council, *Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[75] National Security Council, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery.*

[76] *Id.;* The White House, *Los Angeles Declaration on Migration and Protection* (LA Declaration) (June 10, 2022) *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[77] *Id.*
[78] *Id.*

CLP_AR_001002

those who oppose its positions.[79] This process provides a safe mechanism for Nicaraguan nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States.

## IV. Eligibility To Participate in the Process and Processing Steps

### A. Supporters

U.S.-based supporters must initiate the process by filing Form I–134A on behalf of a Nicaraguan national and, if applicable, the national's immediate family members.[80] Supporters may be individuals filing on their own, with other individuals, or on behalf of non-governmental entities or community-based organizations. Supporters are required to provide evidence of income and assets and declare their willingness to provide financial support to the named beneficiary for the length of parole. Supporters are required to undergo vetting to identify potential human trafficking or other concerns. To serve as a supporter under the process, an individual must:

• be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;

• pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and

• demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

### B. Beneficiaries

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, such individuals must:

• be outside the United States;

• be a national of Nicaragua or be a non-Nicaraguan immediate family member[81] and traveling with a Nicaraguan principal beneficiary;

• have a U.S.-based supporter who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• possess an unexpired passport valid for international travel;

• provide for their own commercial travel to an air U.S. POE and final U.S. destination;

• undergo and pass required national security and public safety vetting;

• comply with all additional requirements, including vaccination requirements and other public health guidelines; and

• demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Nicaraguan national is ineligible to be considered for advance authorization to travel to the United States as well as parole under this process if that person is a permanent resident or dual national of any country other than Nicaragua, or currently holds refugee status in any country, unless DHS operates a similar parole process for the country's nationals.[82]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

• fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order;[83]

• has crossed irregularly into the United States, between the POEs, after January 9, 2023 except individuals permitted a single instance of voluntary departure pursuant to INA section 240B, 8 U.S.C. 1229c or withdrawal of their application for admission pursuant to INA section 235(a)(4), 8 U.S.C. 1225(a)(4) will remain eligible;

• has irregularly crossed the Mexican or Panamanian border after January 9, 2023; or

• is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[84]

*Travel Requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to an interior POE of the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with the Centers for Disease Control and Prevention, with respect to health and travel, including vaccination and/or testing requirements for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *www.uscis.gov/CHNV.*

### C. Processing Steps

Step 1: Declaration of Financial Support

A U.S.-based supporter will submit a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134A identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134A for each beneficiary they are seeking to support, including Nicaraguans' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the beneficiary whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the application. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and

---

[79] OHCHR, Presentation of Report on the Human Rights Situation in Nicaragua, Human Rights Council Resolution 49/3 (Sept. 13, 2022), *https://www.ohchr.org/en/speeches/2022/09/presentation-report-human-rights-situation-nicaragua.*

[80] Certain non-Nicaraguans may use this process if they are an immediate family member of a Nicaraguan beneficiary and traveling with that Nicaraguan beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

[81] See preceding footnote.

[82] This limitation does not apply to immediate family members traveling with a Nicaraguan national.

[83] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[84] As defined in 6 U.S.C. 279(g)(2). Children under the age of 18 must be traveling to the United States in the care and custody of their parent or legal guardian to be considered for parole at the POE under the process.

CLP_AR_001003

completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

Step 4: Approval to Travel to the United States

After completing Step 3, the beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel via commercial air to the United States.[85] Approval of advance authorization to travel does not guarantee parole into the United States. Whether to parole the individual is a discretionary determination made by CBP at the POE at the time the individual arrives at the interior POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Each individual arriving at a POE under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with CBP inspection processes. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to ICE for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to

applicable health and vetting requirements, and will be eligible to apply for employment authorization from USCIS under existing regulations. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for employment authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

*D. Scope, Termination, and No Private Rights*

The Secretary retains the sole discretion to terminate the process at any point. The number of travel authorizations granted under the Parole Process for Nicaraguans shall be spread across this process and the separate and independent Parole Process for Cubans, the Parole Process for Haitians, and Parole Process for Venezuelans (as described in separate notices published concurrently in today's edition of the **Federal Register**) and shall not exceed 30,000 each month in the aggregate. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

**V. Regulatory Requirements**

*A. Administrative Procedure Act*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[86] *i.e.,* a "statement[ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [87] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment

rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[88] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [89] In addition, although the text of the Administrative Procedure Act does not expressly require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[90] This process satisfies both standards.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM— to provide a lawful process for Nicaraguan nationals to enter the United States. The United States will only implement the new parole process while able to return or remove to Mexico Nicaraguan nationals who enter without authorization across the SWB. The United States' ability to execute this process is contingent on the GOM making an independent decision to accept the return or removal of Nicaraguan nationals who bypass this new process and enter the United States without authorization. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to U.S. action in this regard, and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now. It also would complicate broader discussions and negotiations about migration management. For now, the GOM has indicated it is prepared to make an independent decision to accept the return or removal of Nicaraguan nationals. The GOM's willingness to accept the returns or removals could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return or remove nationals of Nicaragua to Mexico at a future date would likely result in an even greater surge in migration, as migrants rush to the border to enter before the process begins—which would adversely impact each country's border security and

---

[85] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[86] 5 U.S.C. 553(b)(A); *id.* 553(d)(2).

[87] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[88] 5 U.S.C. 553(a)(1).

[89] *Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[90] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

CLP_AR_001004

further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process will advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[91] DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[92]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable.[93] The numbers of Nicaraguans encountered at the SWB are already high, and a delay would greatly exacerbate an urgent border and national security challenge and would miss a critical opportunity to reduce and divert the flow of irregular migration.[94]

Undertaking notice-and-comment rule making procedures would be contrary to the public interest because an advance announcement of the process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Nicaraguan nationals seeking to enter the United

States before the process would take effect. There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[95] It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment process.[96] If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[97] A number of cases follow this logic in the context of economic regulation.[98]

The same logic applies here, where the Department is responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. It is well established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy.[99] For example, as

detailed above, implementation of the parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans. Had the parole process been announced prior to a notice-and-comment period, it likely would have had the opposite effect, resulting in many hundreds of thousands of Venezuelan nationals attempting to cross the border before the program went into effect. Overall, the Department's experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States. Smugglers routinely prey on migrants in response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance of this process in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Nicaraguan nationals currently being encountered attempting to enter without authorization at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, would unduly impede DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area. For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region." [100] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting

---

[91] *See* 82 FR 4902 (Jan. 17, 2017).

[92] *See* 87 FR 63507 (Oct. 19, 2022).

[93] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

[94] *See Chamber of Commerce of U.S.* v. *SEC,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)).

[95] *See* 5 U.S.C. 553(b)(B).

[96] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 94–95 (D.C. Cir. 2012) (noting that the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of section 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline." (cleaned up)).

[97] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.").

[98] *See, e.g., Chamber of Commerce of U.S.* v. *SEC.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.").

[99] *See, e.g.,* Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on

Social Media, *https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media,* July 26, 2022 (last viewed Dec. 6, 2022).

[100] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule.'' [101] DHS found that ''[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations.'' [102] DHS concluded that ''a surge could result in significant loss of human life.'' [103]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Nicaragua parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control

number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Nicaraguan nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00254 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–9M–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Federal Emergency Management Agency**

**[Internal Agency Docket No. FEMA–4679–DR; Docket ID FEMA–2022–0001]**

**West Virginia; Major Disaster and Related Determinations**

**AGENCY:** Federal Emergency Management Agency, DHS.
**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of West Virginia (FEMA–4679–DR), dated November 28, 2022, and related determinations.

**DATES:** The declaration was issued November 28, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 28, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the ''Stafford Act''), as follows:

I have determined that the damage in certain areas of the State of West Virginia resulting from severe storms, flooding, landslides, and mudslides during the period of August 14 to August 15, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the

''Stafford Act''). Therefore, I declare that such a major disaster exists in the State of West Virginia.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance and Hazard Mitigation will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Jeffrey L. Jones, of FEMA is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of West Virginia have been designated as adversely affected by this major disaster:

Fayette County for Public Assistance.
All areas within the State of West Virginia are eligible for assistance under the Hazard Mitigation Grant Program.

The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund; 97.032, Crisis Counseling; 97.033, Disaster Legal Services; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance Grant; 97.048, Disaster Housing Assistance to Individuals and Households In Presidentially Declared Disaster Areas; 97.049, Presidentially Declared Disaster Assistance— Disaster Housing Operations for Individuals and Households; 97.050, Presidentially Declared Disaster Assistance to Individuals and Households—Other Needs; 97.036, Disaster Grants—Public Assistance (Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.

**Deanne Criswell,**
*Administrator, Federal Emergency Management Agency.*
[FR Doc. 2023–00178 Filed 1–6–23; 8:45 am]
**BILLING CODE 9111–23–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Implementation of a Parole Process for Cubans**

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security

---

[101] *Id.*
[102] *Id.*
[103] *Id.; accord, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

CLP_AR_001006

continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule.'' [101] DHS found that ''[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations.'' [102] DHS concluded that ''a surge could result in significant loss of human life.'' [103]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Nicaragua parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control

number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Nicaraguan nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00254 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–9M–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Federal Emergency Management Agency**

**[Internal Agency Docket No. FEMA–4679–DR; Docket ID FEMA–2022–0001]**

**West Virginia; Major Disaster and Related Determinations**

**AGENCY:** Federal Emergency Management Agency, DHS.
**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of West Virginia (FEMA–4679–DR), dated November 28, 2022, and related determinations.

**DATES:** The declaration was issued November 28, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 28, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the ''Stafford Act''), as follows:

I have determined that the damage in certain areas of the State of West Virginia resulting from severe storms, flooding, landslides, and mudslides during the period of August 14 to August 15, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the

''Stafford Act''). Therefore, I declare that such a major disaster exists in the State of West Virginia.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance and Hazard Mitigation will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Jeffrey L. Jones, of FEMA is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of West Virginia have been designated as adversely affected by this major disaster:

Fayette County for Public Assistance.
All areas within the State of West Virginia are eligible for assistance under the Hazard Mitigation Grant Program.

The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund; 97.032, Crisis Counseling; 97.033, Disaster Legal Services; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance Grant; 97.048, Disaster Housing Assistance to Individuals and Households In Presidentially Declared Disaster Areas; 97.049, Presidentially Declared Disaster Assistance— Disaster Housing Operations for Individuals and Households; 97.050, Presidentially Declared Disaster Assistance to Individuals and Households—Other Needs; 97.036, Disaster Grants—Public Assistance (Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.

**Deanne Criswell,**
*Administrator, Federal Emergency Management Agency.*
[FR Doc. 2023–00178 Filed 1–6–23; 8:45 am]
**BILLING CODE 9111–23–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Implementation of a Parole Process for Cubans**

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security

---

[101] *Id.*
[102] *Id.*
[103] *Id.; accord, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

CLP_AR_001009

of our Southwest Border (SWB) by reducing the number of encounters of Cuban nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by a surge in migration. Cubans who do not avail themselves of this new process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal—including to third countries, such as Mexico. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Cuban nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication, with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background—Cuban Parole Process

This notice describes the implementation of a new parole process for certain Cuban nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by reducing the record levels of Cuban nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

### A. Overview

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations as well as their facilitators and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to and arriving, without authorization, at the SWB.

Building on the success of the Uniting for Ukraine (U4U) process and the Process for Venezuelans, DHS is implementing a similar process to address the increasing number of encounters of Cuban nationals at the SWB and at sea, which have reached record levels over the past six months. Similar to Venezuela, Cuba has restricted DHS's ability to remove

individuals to Cuba, which has constrained the Department's ability to respond to this surge.

In October 2022, DHS undertook a new effort to address the high number of Venezuelans encountered at the SWB.[3] Specifically, DHS provided a new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by flying to interior ports of entry—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the Government of Mexico (GOM) made an independent decision for the first time to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, thus imposing a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced Parole Process. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[4] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in irregular migration of Venezuelans throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién Gap—an inhospitable jungle that spans between Panama and Colombia—was down from 40,593 in October 2022 to just 668 in November.[5]

DHS anticipates that implementing a similar process for Cubans will reduce the number of Cubans seeking to irregularly enter the United States between POEs along the SWB or by sea by coupling a meaningful incentive to seek a safe, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization pursuant to this process. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process. Implementation of the new parole process for Cubans is

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Cuban Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.

[3] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[4] DHS Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[5] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

CLP_AR_001010

contingent on the GOM accepting the return, departure, or removal to Mexico of Cuban nationals seeking to enter the United States without authorization between POEs on the SWB.

As in the process for Venezuelans, a supporter in the United States must initiate the process on behalf of a Cuban national (and certain non-Cuban nationals who are an immediate family member of a primary beneficiary), and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Cuban nationals and their immediate family members must meet several eligibility criteria in order to be considered, on a case-by-case basis, for advance travel authorization and parole. Only those who meet all specified criteria are eligible to receive advance authorization to travel to the United States and be considered for a discretionary grant of parole, on a case-by-case basis, under this process. Beneficiaries must pass national security, public safety, and public health vetting prior to receiving a travel authorization, and those who are approved must arrange air travel at their own expense to seek entry at an interior POE.

A grant of parole under this process is for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region, and allow for increased removals of Cubans from the United States and partner nations who continue to migrate irregularly but who lack a valid claim of asylum or other forms of protection. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits, including adjustment of status pursuant to the Cuban Adjustment Act, Public Law 89–732, 80 Stat. 1161 (1966) (8 U.S.C. 1255 note), for which they may be eligible, and to work and contribute to the United States. Those who are not granted asylum or any other immigration benefits during this two-year parole period generally will need to depart the United States prior to the expiration of their authorized parole period or will be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Cuban nationals pursuant to this process will provide a significant public benefit for the United States, by reducing unauthorized entries along our SWB, while also addressing the urgent humanitarian reasons that are driving hundreds of thousands of Cubans to flee their home country, to include crippling economic conditions and dire food shortages, widespread social unrest, and the Government of Cuba's (GOC) violent repression of dissent.[6] Most significantly, DHS anticipates this process will: (i) enhance the security of the U.S. SWB by reducing irregular migration of Cuban nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Cuba; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

The Secretary retains the sole discretion to terminate the process at any point.

*B. Conditions at the Border*

1. Impact of Venezuela Process

This process is modeled on the Venezuela process—as informed by the way that similar incentive and disincentive structures successfully decreased the number of Venezuelan nationals making the dangerous journey to and being encountered along the SWB. The Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use a safe, orderly process to come to the United States can change migratory flows. Prior to the October 12, 2022 announcement of the Venezuela process, DHS encountered approximately 1,100 Venezuelan nationals per day between POEs—with peak days exceeding 1,500. Within a week of the announcement, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, an average of 86 per day.[7]

Panama's daily encounters of Venezuelans also declined significantly over the same time period, falling some 88 percent, from 4,399 on October 16 to 532 by the end of the month—a decline driven entirely by Venezuelan migrants' choosing not to make the dangerous journey through the Darién Gap. The number of Venezuelans attempting to enter Panama through the Darién Gap continued to decline precipitously in November—from 40,593 encounters in October, a daily average of 1,309, to just 668 in November, a daily average of just 22.[8]

The Venezuela process fundamentally changed the calculus for Venezuelan migrants. Venezuelan migrants who had already crossed the Darién Gap have returned to Venezuela by the thousands on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society. Other migrants who were about to enter the Darién Gap have turned around and headed back south. Still others who were intending to migrate north are staying where they are to apply for this parole process. Put simply, the Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use this parole process to come to the United States can yield a meaningful change in migratory flows.

2. Trends and Flows: Increase of Cuban Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year.[9] By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[10] However, these gains were subsequently reversed as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID–19 pandemic—continued to increase at a similar pace in 2021 and 2022.[11]

Shifts in demographics have also had a significant effect on migration flows. Border encounters in the 1980s and

---

[6] Washington Office on Latin America, *U.S.-Cuba Relations: The Old, the New and What Should Come Next,* Dec. 16, 2022, *https://www.wola.org/ analysis/us-cuba-relations-old-new-should-come-next/* (last visited Dec. 17, 2022).

[7] Office of Immigration Statistics (OIS) analysis of data pulled from CBP UIP December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[8] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/ img2022/PDF/IRREGULARES_%20POR_ %20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

[9] OIS analysis of historic CBP data.

[10] *Id.*

[11] *Id.*

CLP_AR_001011

1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[12] Beginning in the 2010s, a growing share of migrants have come from Northern Central America [13] (NCA) and, since the late 2010s, from countries throughout the Americas.[14] Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence, political oppression, and for other non-economic reasons.[15]

Cubans are fleeing the island in record numbers, eclipsing the mass exodus of Cuban migrants seen during the Mariel exodus of 1980.[16] In FY 2022, DHS encountered about 213,709 unique Cuban nationals at the SWB, a seven-fold increase over FY 2021 rates, and a marked 29-fold increase over FY 2020.[17] FY 2022 average monthly unique encounters of Cuban nationals at the land border totaled 17,809, a stark increase over the average monthly rate of 589 unique encounters in FYs 2014–

2019.[18] These trends are only accelerating in FY 2023. In October and November 2022, DHS encountered 62,788 unique Cuban nationals at the border—almost one third FY 2022's record total.[19] The monthly average of 31,394 unique Cuban nationals is a 76 percent increase over the FY 2022 monthly average.[20] The first 10 days of December 2022 saw 15,657 encounters of Cubans at the SWB.[21] In FY 2023, Cuban nationals have represented 16.5 percent of all unique encounters at the SWB, the second largest origin group.[22]

Maritime migration from Cuba also increased sharply in FY 2022 compared to FY 2021. According to DHS data, in FY 2022, a total of 5,740 Cuban nationals were interdicted at sea, the top nationality, compared to 827 in FY 2021, an almost 600 percent increase in a single fiscal year.[23]

In addition to the increase of Cuban nationals in U.S. Coast Guard (USCG) interdictions at sea and U.S. Customs and Border Protection (CBP) encounters at the SWB, USBP encounters of Cubans in southeast coastal sectors are also on the rise.[24] In FY 2022, DHS encountered 2,657 unique Cuban nationals (46 percent of total unique encounters), an increase of 1,040 percent compared to FY 2021.[25] This trend also has accelerated sharply in FY 2023, as CBP has made 1,917 unique encounters of Cuban nationals in the first two months of the FY—almost three-quarters of FY 2022's total.[26] Cuban nationals are 72 percent of all unique encounters in these sectors in October and November.[27]

### 3. Push and Pull Factors

DHS assesses that the high—and rising—number of Cuban nationals encountered at the SWB and interdicted at sea is driven by three key factors: First, Cuba is facing its worst economic crisis in decades due to the lingering impacts of the COVID–19 pandemic, high food prices, and economic sanctions.[28] Second, the government's

response has been marked by further political repression, including widespread arrests and arbitrary detentions in response to protests.[29] Third, the United States faces significant limits on the ability to return Cuban nationals who do not establish a legal basis to remain in the United States to Cuba or elsewhere; absent the ability to return Cubans who do not have a lawful basis to stay in the United States, more individuals are willing to take a chance that they can come—and stay.

Further, in November 2021, the Government of Nicaragua announced visa-free travel for Cubans.[30] This policy provided Cubans a more convenient and accessible path into the continent, facilitating their ability to begin an irregular migration journey to the SWB via land routes.[31] Many such Cuban migrants fall victim to human smugglers and traffickers, who look to exploit the most vulnerable individuals for profit with utter disregard for their safety and wellbeing, as they attempt the dangerous journey northward through Central America and Mexico.[32]

### i. Factors Pushing Migration From Cuba

There are a number of economic and other factors that are driving migration of Cuban nationals. Cuba is undergoing its worst economic crisis since the 1990s [33] due to the lingering impact of the COVID–19 pandemic, reduced foreign aid from Venezuela because of that country's own economic crisis, high food prices, and U.S. economic sanctions.[34] In July 2022, the

---

[12] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 96 to over 99 percent of apprehensions of persons entering without inspection between 1980 and 2000. OIS Yearbook of Immigration Statistics, various years. On Mexican migrants from this era's demographics and economic motivations see Jorge Durand, Douglas S. Massey, and Emilio A. Parrado, ''The New Era of Mexican Migration to the United States,'' *The Journal of American History* Vol. 86, No. 2, 518–536 (Sept. 1999).

[13] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[14] According to OIS analysis of CBP data, Mexican nationals continued to account for 89 percent of total SWB encounters in FY 2010, with Northern Central Americans accounting for 8 percent and all other nationalities for 3 percent. Northern Central Americans' share of total encounters increased to 21 percent by FY 2012 and averaged 46 percent in FY 2014–FY 2019, the last full year before the start of the COVID–19 pandemic. All other countries accounted for an average of 5 percent of total SWB encounters in FY 2010–FY 2013, and for 10 percent of total encounters in FY 2014–FY 2019.

[15] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. At the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[16] El País, *The Cuban Migration Crisis, Biggest Exodus in History Holds Key to Havana-Washington Relations,* Dec. 15, 2022, *https://english.elpais.com/ international/2022-12-15/the-cuban-migration-crisis-biggest-exodus-in-history-holds-key-to-havana-washington-relations.html* (last visited Dec. 17, 2022).

[17] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] OIS analysis of CBP Unified Immigration Portal (UIP) data pulled on December 12, 2022.

[22] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[23] OIS analysis of United States Coast Guard (USCG) data provided October 2022; Maritime Interdiction Data from USCG, October 5, 2022.

[24] Includes Miami, FL; New Orleans, LA; and Ramey, PR sectors where all apprehensions are land apprehensions not maritime.

[25] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[26] *Id.*

[27] *Id.*

[28] The Economist, *Cuba is Facing Its Worst Shortage of Food Since 1990s,* July 1, 2021, *https://*

*www.economist.com/the-americas/2021/07/01/ cuba-is-facing-its-worst-shortage-of-food-since-the-1990s* (last visited Dec. 17, 2022).

[29] Miami Herald, *As Cubans Demand Freedom, President Díaz-Canel Says He Will Not Tolerate 'Illegitimate' Protests,* October 2, 2022, *https:// www.miamiherald.com/news/nation-world/world/ americas/cuba/article266767916.html* (last visited Dec. 17, 2022).

[30] Reuters, Nicaragua Eliminates Visa Requirement for Cubans, November 23, 2021, *https://www.reuters.com/world/americas/ nicaragua-eliminates-visa-requirement-cubans-2021-11-23/* (last visited Dec. 17, 2022).

[31] The New York Times, *Cuban Migrants Arrive to U.S. in Record Numbers, on Foot, Not by Boat,* May 4, 2022, *https://www.nytimes.com/2022/05/03/ world/americas/cuban-migration-united-states.html* (last visited Dec. 17, 2022).

[32] CNN, *Cubans are Arriving to the U.S. in Record Numbers. Smugglers are Profiting from Their Exodus, https://www.cnn.com/2022/05/12/ americas/cuba-mass-migration-intl-latam/ index.html,* May 12, 2022 (last visited Dec. 17, 2022).

[33] The Economist, *Cuba is Facing Its Worst Shortage of Food Since 1990s,* July 1, 2021, *https:// www.economist.com/the-americas/2021/07/01/ cuba-is-facing-its-worst-shortage-of-food-since-the-1990s* (last visited Dec. 17, 2022).

[34] Congressional Research Service, *Cuba: U.S. Policy in the 117th Congress,* Sept. 22, 2022, *https://*
Continued

Government of Cuba (GOC) reported the economy contracted by 10.9% in 2020, grew by 1.3% in 2021, and is projected to expand by 4% in 2022.[35] However, this projected expansion is unlikely to respond to the needs of the Cuban people. Mass shortages of dairy and other basic goods continue to persist, and Cubans wait in lines for hours to receive subsidized cooking oil or other basic goods.[36] Deepening poverty, exacerbated by the COVID–19 pandemic, has led to food shortages and rolling blackouts, and continues to batter the economy.[37] This combination of factors has created untenable economic conditions on the island that are likely to continue to drive Cubans to travel irregularly to the United States in the immediate future.[38]

The GOC has not been able to effectively address these issues to date, and has instead taken to repressive tactics to manage public discontent. Cuba remains a one-party authoritarian regime under the Communist Party of Cuba (PCC) government, which continues to restrict freedoms of expression, association, peaceful assembly, and other human rights.[39] The GOC employs arbitrary detention to harass and intimidate critics, independent activists, political opponents, and others.[40] While the Cuban constitution grants limited freedoms of peaceful assembly and association, the GOC restricts these freedoms in practice.[41] The government routinely blocks any attempts to peacefully assemble that might result in opposition to, or criticism of, the government.[42] This was evident when the human rights situation in Cuba began to decline significantly in 2020.[43]

In November 2020, the government cracked down on the San Isidro Movement (MSI), a civil society group opposed to restrictions on artistic expression.[44] This crackdown, coupled with deteriorating economic conditions (food and medicine shortages and blackouts), led to demonstrations in Havana and throughout the country.[45]

According to a Human Rights Watch report, the GOC also committed extensive human rights violations in response to massive anti-government protests in July 2021 with the apparent goal of punishing protesters and deterring future demonstrations.[46] The report documents a wide range of human rights violations against well-known government critics and ordinary citizens, including, arbitrary detention, prosecutions without fair trial guarantees, and cases of physical ill treatment, including beatings that in some cases constitute torture.[47] Several organizations reported countrywide internet outages, followed by erratic connectivity, including restrictions on social media and messaging platforms.[48]

Protests over the challenges of obtaining basic necessities have continued as have heavy-handed government responses. In September 2022, a prolonged blackout caused by Hurricane Ian led to protests in Havana and other cities.[49] Cuban President Miguel Díaz-Canel denounced the peaceful gatherings as "counterrevolutionary" and "indecent," remarking that "[d]emonstrations of this type have no legitimacy." [50] Amnesty International received reports of the GOC deploying the military and police to repress these protests as well as reports of arbitrary detention.[51]

The government's repression and inability to address the underlying shortages that inspired those lawful demonstrations have generated a human rights and humanitarian crisis that is driving Cubans from the country. On June 2, 2022, the Inter-American Commission on Human Rights (IACHR) in its 2021 Annual Report stated that no guarantees currently exist for exercising freedom of expression in Cuba.[52] Although the forms of harassment of independent journalists, artists, activists, and any who question government officials are not new, the 2021 Annual Report notes that they are worsening quickly.[53] The government controls formal media and closely monitors and targets perceived dissidents within the artistic community, mainstream artists, and media figures who express independent or critical views.[54] GOC frequently blocks access to many news websites and blogs and has repeatedly imposed targeted restrictions on critics' access to cellphone data.[55]

Cuba's deteriorating economic conditions and political repression continue to increasingly drive Cubans out of their country. As a result, many have taken dangerous journeys, including through maritime means, often costing their lives at sea and on land while trying to reach the United States.

ii. Return Limitations

Due to the global COVID–19 pandemic, the GOC stopped accepting regular returns of their nationals via U.S. Immigration and Customs Enforcement (ICE) aircraft after February 28, 2020. The U.S. Government has been engaged in discussions with the GOC to reactivate the Migration Accords, which specify that the United States will process 20,000 Cuban nationals—not including immediate relatives of U.S. citizens—to come to the United States through immigrant visas and other lawful pathways, such as the Cuban Family Reunification Parole (CFRP) program, and that the Cuban government will accept the repatriation of its nationals who are encountered entering the United States without authorization. A limited number of removal flights will not, absent other efforts, impose a deterrent to Cuban nationals seeking to cross, unauthorized, into the United States.

---

*crsreports.congress.gov/product/pdf/R/R47246* (last visited Dec. 17, 2022).

[35] Caribbean Council, *Gil Says Economic Recovery Gradual, Inflation Must Be Better Addressed,* Cuba Briefing, July 25, 2022, *https:// www.caribbean-council.org/gil-says-economic-recovery-gradual-inflation-must-be-better-addressed/* (last visited Sept. 25, 2022).

[36] Washington Post, *In Cuba, a Frantic Search for Milk,* May 21, 2022, *https://www.washingtonpost. com/world/interactive/2022/cuba-economy-milk-shortage/* (last visited Sept. 25, 2022).

[37] New York Times, *'Cuba Is Depopulating': Largest Exodus Yet Threatens Country's Future,* Dec. 10, 2022. *https://www.nytimes.com/2022/12/ 10/world/americas/cuba-us-migration.html* (last visited Dec. 16, 2022).

[38] *Id.*

[39] U.S. Department of State, *2021 Country Reports on Human Rights Practices: Cuba, https:// www.state.gov/reports/2021-country-reports-on-human-rights-practices/cuba/* (last visited Dec. 17, 2022).

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] Congressional Research Service, Cuba: U.S. Policy Overview, Aug. 5, 2022, *https://*

---

*crsreports.congress.gov/product/pdf/IF/IF10045* (last visited Dec. 17, 2022).

[44] *Id.*

[45] *Id.*

[46] Human Rights Watch, Prison or Exile: Cuba's Systematic Repression of July 2021 Demonstrators, July 11, 2022. *https://www.hrw.org/report/2022/07/ 11/prison-or-exile/cubas-systematic-repression-july-2021-demonstrators.*

[47] *Id.*

[48] Human Rights Watch, World Report 2022— Cuba. See *https://www.hrw.org/world-report/2022/ country-chapters/cuba.*

[49] Dave Sherwood, Reuters, Oct. 1, 2022, Banging pots, Cubans stage rare protests over Hurricane Ian blackouts, *https://www.reuters.com/world/ americas/cubans-havana-bang-pots-protest-days-long-blackout-after-ian-2022-09-30/.*

[50] Miami Herald, *As Cubans Demand Freedom, President Díaz-Canel Says He Will Not Tolerate 'Illegitimate' Protests,* October 2, 2022, *https:// www.miamiherald.com/news/nation-world/world/ americas/cuba/article266767916.html* (last visited Dec. 17, 2022).

[51] Amnesty International, *Cuba: Tactics of Repression Must Not be Repeated,* Oct. 5, 2022, *https://www.amnesty.org/en/latest/news/2022/10/ cuba-repression-must-not-be-repeated/* (last viewed Dec. 19, 2022).

---

[52] IACHR, Annual Report 2021—Chapter IV.B— Cuba, p.678, June 2, 2022, *https://www.oas.org/en/ iachr/reports/ia.asp?Year=2021* (last visited Dec. 19, 2022).

[53] *Id.*

[54] *Id.*

[55] *Id.*

CLP_AR_001013

As a result, the U.S. did not return any Cuban nationals directly to Cuba in FY 2022. In addition, other countries, including Mexico, have generally refused to accept the returns of Cuban nationals, with limited exceptions including Cubans who have immediate family members who are Mexican citizens or who otherwise have legal status in Mexico. In FY 2022, DHS expelled 4,710 Cuban nationals to Mexico, equivalent to 2 percent of Cuban encounters for the year.[56]

Like the Venezuela process, the Cuba process will require a significant expansion of opportunities for return or removal, to include the GOM's acceptance of Cuban nationals encountered attempting to irregularly enter the United States without authorization between POEs.

Returns alone, however, are not sufficient to reduce and divert the flows of Cubans. The United States will combine a consequence for Cuban nationals who seek to enter the United States irregularly at the land border with an incentive to use the safe, orderly process to request authorization to travel by air to, and seek parole to enter, the United States, without making the dangerous journey to the border.

4. Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in part by the number of Cuban nationals encountered—DHS has taken a series of extraordinary steps. Since FY 2021, DHS has built and now operates 10 soft-sided processing facilities at a cost of $688 million. CBP and ICE detailed a combined 3,770 officers and agents to the SWB to effectively manage this processing surge. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from other divisions in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 combined on grants to non-governmental (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP–H) to assist with the reception and onward travel of migrants arriving at the SWB. This spending is in addition to $1.4 billion in additional FY 2022 appropriations

that were designated for SWB enforcement and processing capacities.[57]

The impact has been particularly acute in certain border sectors. The increased flows of Cuban nationals are disproportionately occurring within the remote Del Rio and Yuma sectors, both of which are at risk of operating, or are currently operating, over capacity. In FY 2022, 73 percent of unique encounters of Cuban nationals occurred in these two sectors.[58] Thus far in FY 2023, Del Rio and Yuma sectors have accounted for 72 percent of unique encounters of Cuban nationals.[59] In FY 2022, Del Rio and Yuma sectors encountered over double (137 percent increase) the number of migrants as compared to FY 2021, a fifteen-fold increase over the average for FY 2014–FY 2019, in part as a result of the sharp increase in Cuban nationals being encountered there.[60]

The focused increase in encounters within those two sectors is particularly challenging. Del Rio sector is geographically remote, and because—up until the past two years—it has not been a focal point for large numbers of individuals entering irregularly, it has limited infrastructure and personnel in place to safely process the elevated encounters that they are seeing. The Yuma Sector is along the Colorado River corridor, which presents additional challenges to migrants, such as armed robbery, assault by bandits, and drowning, as well as to the U.S. Border Patrol (USBP) agents encountering them. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border but is far away from other CBP sectors, which makes it challenging to move individuals for processing elsewhere during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors that have additional capacity to process. In November 2022, USBP sectors along the SWB operated a combined 602 decompression bus routes to neighboring sectors and operated 124 lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[61]

Because DHS assets are finite, using air resources to operate lateral flights reduces DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. Fewer international repatriation flights in turn exacerbates DHS's inability to return or remove noncitizens in its custody by sending the message that there is no consequence for illegal entry.

The sharp increase in maritime migration has also had a substantial impact on DHS resources. USCG has surged resources and shifted assets from other missions due to this increased irregular maritime migration. In response to the persistently elevated levels of irregular maritime migration across all southeast vectors, the Director of Homeland Security Task Force-Southeast (HSTF–SE) elevated the operational phase of DHS's maritime mass migration plan (Operation Vigilant Sentry) from Phase 1A (Preparation) to Phase 1B (Prevention).[62] Operation Vigilant Sentry is HSTF–SE's comprehensive, integrated, national operational plan for a rapid, effective, and unified response of federal, state, and local capabilities in response to indicators and/or warnings of a mass migration in the Caribbean.

The shift to Phase 1B triggered the surge of additional DHS resources to support HSTF–SE's Unified Command staff and operational rhythm. For example, between July 2021 and August 2022, Coast Guard operational planners surged three times the number of large cutters to the South Florida Straits and the Windward Passage, four times the number of patrol boats and twice the number of fixed/rotary-wing aircraft to support maritime domain awareness and interdiction operations in the southeastern maritime approaches to the United States. USCG also added two MH–60 helicopters to respond to increased maritime migration flows in FY 2022.[63] Moreover, USCG had to almost double its flight hour coverage per month to support migrant interdictions in FY 2022. Increased resource demands translate into increased maintenance on those high demand air and sea assets.

DHS assesses that a reduction in the flow of Cuban nationals arriving at the SWB or taking to sea would reduce pressure on overstretched resources and enable the Department to more quickly

---

[56] OIS analysis of OIS Persist Dataset and CBP subject-level data through November 30, 2022.

[57] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.*

[58] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[59] *Id.*

[60] *Id.*

[61] Data from SBCC, as of December 11, 2022.

[62] Operation Vigilant Sentry (OVS) Phase 1B, Information Memorandum for the Secretary from RADM Brendon C. McPherson, Director, Homeland Security Task Force—Southeast, August 21, 2022.

[63] Joint DHS and DOD Brief on Mass Maritime Migration, August 2022.

CLP_AR_001014

process and, as appropriate, return or remove those who do not have a lawful basis to stay, or repatriate those encountered at sea while also delivering on other maritime missions.

## II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [64] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during the period of parole in the United States.[65] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[66] DHS may terminate parole in its discretion at any time.[67] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[68]

This process will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Cuban nationals to remain where they are and use a lawful process to request authorization to travel by air to, and ultimately apply for discretionary grant of parole into, the United States for a period of up to two years.

## III. Justification for the Process

As noted above, section 212(d)(5)(A) of the INA confers upon the Secretary of Homeland Security the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [69]

### A. Significant Public Benefit

The parole of Cuban nationals and their immediate family members under

---

[64] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole''). Cubans paroled into the United States through this process are not being paroled as refugees, and instead will be considered for parole on a case-by-case basis for a significant public benefit or urgent humanitarian reasons. This parole process does not, and is not intended to, replace refugee processing.

[65] INA sec. 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A).

[66] *See* 8 CFR 212.5(c).

[67] *See* 8 CFR 212.5(e).

[68] *See* 8 CFR 274a.12(c)(11).

[69] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

---

this process—which imposes new consequences for Cubans who seek to enter the United States irregularly between POEs, while providing an alternative opportunity for eligible Cuban nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—serves a significant public benefit for several, interrelated reasons. Specifically, we anticipate that the parole of eligible individuals pursuant to this process will: (i) enhance border security through a reduction in irregular migration of Cuban nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Cuba; (v) provide a disincentive to undergo the dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

### 1. Enhance Border Security by Reducing Irregular Migration of Cuban Nationals

As described above, Cuban nationals make up a significant and growing number of those encountered seeking to cross between POEs irregularly. DHS assesses that without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly process for Cubans to enter the United States, without making the journey to the SWB, the numbers will continue to grow.

By incentivizing individuals to seek a safe, orderly means of traveling to the United States through the creation of an alternative pathway to the United States, while imposing additional consequences to irregular migration, DHS assesses this process could lead to a meaningful drop in encounters of Cuban individuals along the SWB and at sea. This expectation is informed by the recently implemented process for Venezuelans and the significant shifts in migratory patterns that took place once the process was initiated. The success to date of the Venezuela process provides compelling evidence that coupling effective disincentives for irregular entry with incentives for a safe, orderly parole process can meaningfully shift migration patterns in the region and to the SWB.

Implementation of the parole process is contingent on the GOM's independent decision to accept the return of Cuban nationals who voluntarily depart the United States, those who voluntarily withdraw their applications for admission, and those subject to expedited removal who cannot be removed to Cuba or elsewhere. The ability to effectuate voluntary departures, withdrawals, and removals of Cuban nationals to Mexico will impose a consequence on irregular entry that currently does not exist.

### 2. Improve Vetting for National Security and Public Safety

All noncitizens whom DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing. Individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to vet more individuals before they arrive at the border so that we can stop individuals who could pose threats to national security or public safety even earlier in the process. The Cuban parole process will allow DHS to vet potential beneficiaries for national security and public safety purposes before they travel to the United States.

As described below, the vetting will require prospective beneficiaries to upload a live photograph via an app. This will enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them travel before they arrive at our border, representing an improvement over the status quo.

### 3. Reduce the Burden on DHS Personnel and Resources

By reducing encounters of Cuban nationals encountered at sea or at the SWB, and channeling decreased flows of Cuban nationals to interior POEs, we anticipate that the process could relieve some of the impact increased migratory flows have had on the DHS workforce along the SWB. This process is expected to free up resources, including those focused on decompression of border sectors, which in turn may enable an increase in removal flights—allowing for the removal of more noncitizens with final orders of removal faster and reducing the number of days migrants are in DHS custody. While the process will also draw on DHS resources within U.S. Citizenship and Immigration Services (USCIS) and CBP to process requests for discretionary parole on a

CLP_AR_001015

case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require fewer resources as compared to the status quo.

In the Caribbean, DHS also has surged significant resources—mostly from USCG—to address the heightened rate of maritime encounters. Providing a safe and orderly alternative path is expected to also reduce the number of Cubans who seek to enter the United States by sea, and will allow USCG to better balance its other important missions, including its counter-drug smuggling operations, protection of living marine resources, support for shipping navigation, and a range of other critical international engagements.

In addition, permitting Cuban nationals to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

4. Minimize the Domestic Impact

Though the Venezuelan process has significantly reduced the encounters of Venezuelan nationals, other migratory flows continue to strain domestic resources, which is felt most acutely by border communities. Given the inability to remove, return, or repatriate Cuban nationals in substantial numbers, DHS is currently conditionally releasing 87 percent of the Cuban nationals it encounters at the border, pending their removal proceedings or the initiation of such proceedings, and Cuban nationals accounted for 23 percent of all encounters released at the border in November 2022.[70] The increased volume of provisional releases of Cuban nationals puts strains on U.S. border communities.

Generally, since FY 2019, DHS has worked with Congress to make approximately $290 million available through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. These entities have engaged to provide services and assistance to Cuban nationals and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and

constructing tent shelters to address the increased need.[71] FEMA funding has supported building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Nevertheless, local communities have reported strain on their ability to provide needed social services. Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[72] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[73] Since Cuban nationals account for a significant percentage of the individuals being conditionally released into communities after being processed along the SWB, this parole process will address these concerns by diverting flows of Cuban nationals into a safe and orderly process in ways that DHS anticipates will yield a decrease in the numbers arriving at the SWB.

DHS anticipates that this process will help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of migrants arriving at the SWB. Beneficiaries are required to fly at their own expense to an interior POE, rather than arriving at the SWB. They also are only authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also are eligible to apply for work authorization, thus enabling them to support themselves.

5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

The process, which will incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks. This is critical, because transnational criminal organizations—including the Mexican drug cartels—are increasingly playing a

key role in human smuggling, reaping billions of dollars in profit and callously endangering migrants' lives along the way.[74]

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[75] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[76] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[77] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[78] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[79] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[80] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils in the migrant journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. These migratory movements are in many cases facilitated by numerous human smuggling organizations, for which the migrants are pawns;[81] the organizations exploit migrants for profit, often bringing them across inhospitable deserts, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area,

---

[70] OIS analysis of CBP subject-level data and OIS Persist Dataset based on data through November 30, 2022.

[71] CNN, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States,* Sept. 21, 2022, *https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office.*

[72] San Antonio Report, *Migrant aid groups stretched thin as city officials seek federal help for expected wave,* Apr. 27, 2022, *https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/.*

[73] KGUN9 Tucson, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day,* Sept. 23, 2022, *https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day.*

[74] CBP, Fact Sheet: Counter Human Smuggler Campaign Updated (Oct. 6, 2022), *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[75] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.*

[76] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[77] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.*

[78] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[79] The Guardian, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream'* (Sept. 5, 2022), *https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream.*

[80] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[81] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.*

noncitizens seeking to cross into the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey. Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico, in December 2021 and the tragic incident in San Antonio, Texas, on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[82]

Migrants who travel via sea also face perilous conditions, including at the hands of smugglers. Human smugglers continue to use unseaworthy, overcrowded vessels that are piloted by inexperienced mariners. These vessels often lack any safety equipment, including but not limited to: personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons. USCG and interagency consent-based interviews suggest that human-smuggling networks and migrants consider the attempts worth the risk.[83]

The increase in migrants taking to sea, under dangerous conditions, has led to devastating consequences. In FY 2022, the USCG recorded 107 noncitizen deaths, including presumed dead, as a result of irregular maritime migration. In January 2022, the Coast Guard located a capsized vessel with a survivor clinging to the hull. USCG crews interviewed the survivor who indicated there were 34 others on the vessel, who were not in the vicinity of the capsized vessel and survivor.[84] The USCG conducted a multi-day air and surface search for the missing migrants, eventually recovering five deceased migrants; the others were presumed lost at sea.[85]

DHS anticipates this process will save lives and undermine the profits and operations of the dangerous TCOs that

put migrants' lives at risk for profit because it incentivizes intending migrants to use a safe and orderly means to access the United States via commercial air flights, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey to the SWB. By reducing the demand for these services, DHS is effectively targeting the resources of TCOs and human-smuggling networks that so often facilitate these unprecedented movements with utter disregard for the health and safety of migrants. DHS and federal partners have taken extraordinary measures— including the largest-ever surge of resources against human-smuggling networks—to combat and disrupt the TCOs and smugglers and will continue to do so.[86]

6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy);[87] the Collaborative Migration Management Strategy (CMMS);[88] and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries.[89] The CMMS and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals

involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries.[90] The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees." [91]

The U.S. Government has been working with the GOC to restart the Cuba Migration Accords. On November 15, 2022, U.S. and Cuban officials met in Havana to discuss the implementation of the Accords and to underscore our commitment to pursuing safe, regular, and humane migration between Cuba and the United States.[92] These Migration Talks provide an opportunity for important discussions on mutual compliance with the Migration Accords—composed of a series of binding bilateral agreements between the United States and Cuba signed in 1984, 1994, 1995, and 2017— which establish certain commitments of the United States and Cuba relating to safe, legal, and orderly migration.

In September 2022, the U.S. Government announced the resumption of operations under the CFRP program, which allows certain beneficiaries of family-based immigrant petitions to seek parole into the United States while waiting for a visa number to become available. Beginning in early 2023, U.S. Embassy Havana will resume full immigrant visa processing for the first time since 2017, which will, over time, increase the pool of noncitizens eligible for CFRP.[93] Approved beneficiaries through this process will enter the United States as parolees but will be eligible to apply for adjustment to lawful permanent resident (LPR) status once their immigrant visas become available. Also during this period, Cubans may be eligible to apply for lawful permanent residence under the Cuban Adjustment Act.[94]

While these efforts represent important progress for certain Cubans who are the beneficiaries of a family-based immigrant petition, CFRP's narrow eligibility, challenges faced

[82] Reuters, *Migrant Truck Crashes in Mexico Killing 54* (Dec. 9, 2021), *https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R;* Reuters, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico* (July 25, 2022), *https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X.*

[83] Email from U.S. Coast Guard to DHS Policy, Re: heads up on assistance needed, Dec. 13, 2022.

[84] Adriana Gomez Licon, Associated Press, Situation 'dire' as Coast Guard seeks 38 missing off Florida, Jan. 26, 2022, *https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe064304740c3a3019.*

[85] Adriana Gomez Licon, Associated Press, Coast Guard suspends search for migrants off Florida, Jan. 27, 2022, *https://apnews.com/article/florida-lost-at-sea-79253e1c65cf5708f19a97b6875ae239.*

[86] *See* DHS Update on Southwest Border Security and Preparedness Ahead of Court-Ordered Lifting of Title 42, Dec. 13, 2022, *https://www.dhs.gov/publication/update-southwest-border-security-and-preparedness-ahead-court-ordered-lifting-title-42* (last visited Dec. 18, 2022).

[87] National Security Council, *Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[88] National Security Council, *Collaborative Migration Management Strategy,* July 2021, *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery.*

[89] *Id.;* The White House, *Los Angeles Declaration on Migration and Protection* (LA Declaration), June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[90] *Id.*

[91] *Id.*

[92] Department of State, *Migration Talks with the Government of Cuba,* Nov. 15, 2022; *https://www.state.gov/migration-talks-with-the-government-of-cuba-2/.*

[93] USCIS, *USCIS Resumes Cuban Family Reunification Parole Program Operations, https://www.uscis.gov/newsroom/alerts/uscis-resumes-cuban-family-reunification-parole-program-operations,* Sept. 9, 2022 (last visited Dec. 10, 2022).

[94] Public Law 89–732, Cuban Adjustment Act of 1966 (CAA), Nov. 2, 1966, *https://www.gpo.gov/fdsys/pkg/STATUTE-80/pdf/STATUTE-80-Pg1161.pdf* (last viewed Dec. 16, 2022).

CLP_AR_001017

operating in Cuba, and more modest processing throughput mean that additional pathways are required to meet the current and acute border security and irregular migration mitigation objective. This new process helps achieve these goals by providing an immediate and temporary orderly process for Cuban nationals to lawfully enter the United States while we work to improve conditions in Cuba and expand more permanent lawful immigration pathways in the region, including refugee processing and other lawful pathways into the United States and other Western Hemisphere countries. It thus provides the United States another avenue to lead by example.

The process also responds to an acute foreign policy need. Key allies in the region—including specifically the Governments of Mexico, Honduras, Guatemala, and Costa Rica—are affected by the increased movement of Cuban nationals and have been seeking greater U.S. action to address these challenging flows for some time. Cuban flows contribute to strain on governmental and civil society resources in Mexican border communities in both the south and the north—something that key foreign government partners have been urging the United States to address.

Along with the Venezuelan process, this new process adds to these efforts and enables the United States to lead by example. Such processes are a key mechanism to advance the larger domestic and foreign policy goals of the U.S. Government to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. The new process also strengthens the foundation for the United States to press regional partners—many of which are already taking important steps—to undertake additional actions with regards to this population, as part of a regional response. Any effort to meaningfully address the crisis in Cuba will require continued efforts by these and other regional partners.

Importantly, the United States will only implement the new parole process while able to remove or return to Mexico Cuban nationals who enter the United States without authorization across the SWB. The United States' ability to execute this process thus is contingent on the GOM making an independent decision to accept the return or removal of Cuban nationals who bypass this new process and enter the United States without authorization.

For its part, the GOM has made clear its position that, in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. The GOM, as it makes its independent decisions as to its ability to accept returns of third country nationals at the border and its efforts to manage migration within Mexico, is thus closely watching the United States' approach to migration management and whether it is delivering on its plans in this space. Initiating and managing this process— which is dependent on GOM's actions— will require careful, deliberate, and regular assessment of GOM's responses to U.S. actions in this regard, and ongoing, sensitive diplomatic engagements.

As noted above, this process is responsive to the GOM's request that the United States increase lawful pathways for migrants and is also aligned with broader Administration domestic and foreign policy priorities in the region. The process couples a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly along the SWB. The goal of this process is to reduce the irregular migration of Cuban nationals while the United States, together with partners in the region, works to improve conditions in sending countries and create more immigration and refugee pathways in the region, including to the United States.

*B. Urgent Humanitarian Reasons*

The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian needs of Cuban nationals who have fled crippling economic conditions and social unrest in Cuba. The GOC continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against those who oppose its positions.[95] This process provides a safe mechanism for Cuban nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States.

## IV. Eligibility To Participate in the Process and Processing Steps

*A. Supporters*

U.S.-based supporters must initiate the process by filing Form I–134A on behalf of a Cuban national and, if applicable, the national's immediate

family members.[96] Supporters may be individuals filing on their own, with other individuals, or on behalf of non-governmental entities or community-based organizations. Supporters are required to provide evidence of income and assets and declare their willingness to provide financial support to the named beneficiary for the length of parole. Supporters are required to undergo vetting to identify potential human trafficking or other concerns. To serve as a supporter under the process, an individual must:

• be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;

• pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and

• demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

*B. Beneficiaries*

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, such individuals must:

• be outside the United States;

• be a national of Cuba or be a non-Cuban immediate family member[97] and traveling with a Cuban principal beneficiary;

• have a U.S.-based supporter who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• possess an unexpired passport valid for international travel;

• provide for their own commercial travel to an air POE and final U.S. destination;

• undergo and pass required national security and public safety vetting;

• comply with all additional requirements, including vaccination requirements and other public health guidelines; and

---

[95] *Id.;* Congressional Research Service, Cuba: U.S. Policy in the 117th Congress, Sept. 22, 2022, *https://crsreports.congress.gov/product/pdf/R/R47246.*

[96] Certain non-Cubans may use this process if they are an immediate family member of a Cuban beneficiary and traveling with that Cuban beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

[97] Certain non-Cubans may use this process if they are an immediate family member of a Cuban beneficiary and traveling with that Cuban beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

CLP_AR_001018

- demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Cuban national is ineligible to be considered for advance authorization to travel to the United States as well as parole under this process if that person is a permanent resident or dual national of any country other than Cuba, or currently holds refugee status in any country, unless DHS operates a similar parole process for the country's nationals.[98]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

- fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;
- has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order; [99]
- has crossed irregularly into the United States, between the POEs, after January 9, 2023, except individuals permitted a single instance of voluntary departure pursuant to INA section 240B, 8 U.S.C. 1229c or withdrawal of their application for admission pursuant to INA section 235(a)(4), 8 U.S.C. 1225(a)(4) will remain eligible;
- has irregularly crossed the Mexican or Panamanian border after January 9, 2023; or
- is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[100]

*Travel Requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to an interior POE of the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with the Centers for Disease Control and Prevention, with respect to health and travel, including vaccination and/or testing requirements

for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *www.uscis.gov/CHNV.*

*C. Processing Steps*

Step 1: Declaration of Financial Support

A U.S.-based supporter will submit a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134A identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134A for each beneficiary they are seeking to support, including Cubans' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the beneficiary whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the application. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

Step 4: Approval To Travel to the United States

After completing Step 3, the beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United

States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel via commercial air to an interior POE of the United States.[101] Approval of advance authorization to travel does not guarantee parole into the United States. Whether to parole the individual is a discretionary determination made by CBP at the POE at the time the individual arrives at the interior POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Each individual arriving at a POE under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with CBP inspection processes. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to ICE for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to apply for employment authorization under existing regulations. Individuals may request employment authorization from USCIS. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for employment authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

---

[98] This limitation does not apply to immediate family members traveling with a Cuban national.

[99] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[100] As defined in 6 U.S.C. 279(g)(2). Children under the age of 18 must be traveling to the United States in the care and custody of their parent or legal guardian to be considered for parole at the POE under the process.

[101] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

CLP_AR_001019

*D. Scope, Termination, and No Private Rights*

The Secretary retains the sole discretion to terminate the Parole Process for Cubans at any point. The number of travel authorizations granted under this process shall be spread across this process and the separate and independent Parole Process for Nicaraguans, the Parole Process for Haitians, and Parole Process for Venezuelans (as described in separate notices published concurrently in today's edition of the **Federal Register**) and shall not exceed 30,000 each month in the aggregate. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

**V. Regulatory Requirements**

*A. Administrative Procedure Act*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[102] *i.e.,* a "statement[ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [103] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[104] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [105] In addition, although the text of the Administrative Procedure Act

does not expressly require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[106] This process satisfies both standards.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM— to provide a lawful process for Cuban nationals to enter the United States. The United States will only implement the new parole process while able to return or remove to Mexico Cuban nationals who enter without authorization across the SWB. The United States' ability to execute this process is contingent on the GOM making an independent decision to accept the return or removal of Cuban nationals who bypass this new process and enter the United States without authorization. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to this independent U.S. action and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now. It also would complicate broader discussions and negotiations about migration management. For now, the GOM has indicated it is prepared to make an independent decision to accept the return or removal of Cuban nationals. That willingness could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return or remove nationals of Cuba to Mexico at a future date would likely result in an even greater surge in migration, as migrants rush to the border to enter before the process begins—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the

implementation of this process will advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[107] DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[108]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable.[109] The numbers of Cubans encountered at the SWB are already high, and a delay would greatly exacerbate an urgent border and national security challenge, and would miss a critical opportunity to reduce and divert the flow of irregular migration.[110]

Undertaking notice-and-comment rulemaking procedures would be contrary to the public interest because an advance announcement of the process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Cuban nationals seeking to enter the United States before the process would take effect. There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[111] It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment

---

[102] 5 U.S.C. 553(b)(A); *id.* 553(d)(2).

[103] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[104] 5 U.S.C. 553(a)(1).

[105] *Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[106] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[107] *See* 82 FR 4902 (Jan. 17, 2017).

[108] *See* 87 FR 63507 (Oct. 19, 2022).

[109] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

[110] *See Chamber of Commerce of U.S.* v. *SEC.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)).

[111] *See* 5 U.S.C. 553(b)(B).

CLP_AR_001020

process.[112] If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[113] A number of cases follow this logic in the context of economic regulation.[114]

The same logic applies here, where the Department is responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. It is well established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy [115] For example, as detailed above, implementation of the parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans. Had the parole process been announced prior to a notice-and-comment period, it

likely would have had the opposite effect, resulting in many hundreds of thousands of Venezuelan nationals attempting to cross the border before the program went into effect. Overall, the Department's experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States. Smugglers routinely prey on migrants in response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance of this process in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Cuban nationals currently being encountered attempting to enter without authorization at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, would unduly impede DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area. For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region." [116] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule." [117] DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable

Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations." [118] DHS concluded that "a surge could result in significant loss of human life." [119]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Cuban parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Cuban nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP

---

[112] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 94–95 (D.C. Cir. 2012) (noting that the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of section 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'— or avoid them—before the freeze deadline." (cleaned up)).

[113] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.").

[114] *See, e.g., Chamber of Commerce of U.S.* v. *SEC.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.").

[115] *See, e.g.,* Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on Social Media, *https:// www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media,* July 26, 2022 (last viewed Dec. 6, 2022).

[116] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[117] *Id.*

[118] *Id.*

[119] *Id.; accord, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

CLP_AR_001021

**Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices    **1279**

One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00252 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of Changes to the Parole Process for Venezuelans

**ACTION:** Notice

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to the Parole Process for Venezuelans that was initiated in October 2022. The Venezuela process provides a safe and orderly pathway for certain individuals to seek authorization to travel to the United States to be considered for parole at an interior port of entry, contingent on the Government of Mexico (GOM) making an independent decision to accept the return or removal of Venezuelan nationals who bypass this new process and enter the United States without authorization. Pursuant to this notice, the Secretary has removed the limit of 24,000 total travel authorizations and replaced it with a monthly limit of 30,000 travel authorizations spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**). The Secretary also has updated the eligibility criteria for the Venezuela process by including an exception that will enable Venezuelans who cross without authorization into the United States at the Southwest Border (SWB) and are subsequently permitted a one-time option to voluntarily depart or voluntarily withdraw their application for admission to maintain eligibility to participate in this parole process. DHS believes that these changes are needed to ensure that the Venezuela process continues to deliver the already-realized benefits of reducing the number of Venezuelan nationals crossing our border without authorization and the surge in migration throughout the hemisphere and channels migrants into

a safe and orderly process that enables them to enter the United States without making the dangerous journey to the SWB.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023. DHS will apply the changes to the process beginning on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### I. Background—Venezuelan Parole Process

On October 19, 2022, DHS published a **Federal Register** Notice describing a new effort to address the high number of Venezuelans encountered at the SWB.[1] Since the announcement of that process, Venezuelans who have not availed themselves of the process, and instead entered the United States without authorization, have been expelled to Mexico pursuant to the Centers for Disease Control and Prevention (CDC) Title 42 public health Order or, if not expelled, processed for removal or the initiation of removal proceedings.

Once the Title 42 public health Order is lifted, DHS will no longer expel noncitizens to Mexico, but rather all noncitizens will be processed pursuant to DHS's Title 8 immigration authorities. The United States' continued operation of this process will continue to be contingent on the GOM's independent decision to accept the return of removal of individuals, including under Title 8 authorities.

*Eligibility To Participate in the Process*

As described in the October 19 **Federal Register** Notice, the Department of Homeland Security (DHS) implemented a process—modeled on the successful Uniting for Ukraine (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support, such as housing and other needs; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of

entry (POE), rather than entering at a land POE.

Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States, Mexico, or Panama after October 19, 2022. Venezuelan nationals also are generally ineligible if they are a permanent resident or dual national of any country or hold refugee status in any country other than Venezuela, though per the conforming change described below, they will now remain eligible to be considered for parole under this process if DHS operates a similar parole process for nationals of that other country. Only those who meet all specified criteria will be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process. The process originally limited the number of Venezuelans who could receive travel authorization to 24,000.

### II. Assessment of Venezuela Parole Process to Date

The success of the Venezuela process demonstrates that combining a clear and meaningful consequence for unauthorized entry along the SWB with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States can change migratory flows. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[2] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in Venezuelan irregular migration[3] throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién was down from 40,593 in October 2022 to just 668 in November.[4] DHS provided the new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by

---

[1] 87 FR 63507 (Oct. 19, 2022).

[2] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[3] In this notice, irregular migration refers to the movement of people into another country without authorization.

[4] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

CLP_AR_001022

 

One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00252 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of Changes to the Parole Process for Venezuelans

**ACTION:** Notice

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to the Parole Process for Venezuelans that was initiated in October 2022. The Venezuela process provides a safe and orderly pathway for certain individuals to seek authorization to travel to the United States to be considered for parole at an interior port of entry, contingent on the Government of Mexico (GOM) making an independent decision to accept the return or removal of Venezuelan nationals who bypass this new process and enter the United States without authorization. Pursuant to this notice, the Secretary has removed the limit of 24,000 total travel authorizations and replaced it with a monthly limit of 30,000 travel authorizations spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**). The Secretary also has updated the eligibility criteria for the Venezuela process by including an exception that will enable Venezuelans who cross without authorization into the United States at the Southwest Border (SWB) and are subsequently permitted a one-time option to voluntarily depart or voluntarily withdraw their application for admission to maintain eligibility to participate in this parole process. DHS believes that these changes are needed to ensure that the Venezuela process continues to deliver the already-realized benefits of reducing the number of Venezuelan nationals crossing our border without authorization and the surge in migration throughout the hemisphere and channels migrants into

a safe and orderly process that enables them to enter the United States without making the dangerous journey to the SWB.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023. DHS will apply the changes to the process beginning on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### I. Background—Venezuelan Parole Process

On October 19, 2022, DHS published a **Federal Register** Notice describing a new effort to address the high number of Venezuelans encountered at the SWB.[1] Since the announcement of that process, Venezuelans who have not availed themselves of the process, and instead entered the United States without authorization, have been expelled to Mexico pursuant to the Centers for Disease Control and Prevention (CDC) Title 42 public health Order or, if not expelled, processed for removal or the initiation of removal proceedings.

Once the Title 42 public health Order is lifted, DHS will no longer expel noncitizens to Mexico, but rather all noncitizens will be processed pursuant to DHS's Title 8 immigration authorities. The United States' continued operation of this process will continue to be contingent on the GOM's independent decision to accept the return of removal of individuals, including under Title 8 authorities.

*Eligibility To Participate in the Process*

As described in the October 19 **Federal Register** Notice, the Department of Homeland Security (DHS) implemented a process—modeled on the successful Uniting for Ukraine (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support, such as housing and other needs; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of

[1] 87 FR 63507 (Oct. 19, 2022).

entry (POE), rather than entering at a land POE.

Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States, Mexico, or Panama after October 19, 2022. Venezuelan nationals also are generally ineligible if they are a permanent resident or dual national of any country or hold refugee status in any country other than Venezuela, though per the conforming change described below, they will now remain eligible to be considered for parole under this process if DHS operates a similar parole process for nationals of that other country. Only those who meet all specified criteria will be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process. The process originally limited the number of Venezuelans who could receive travel authorization to 24,000.

### II. Assessment of Venezuela Parole Process to Date

The success of the Venezuela process demonstrates that combining a clear and meaningful consequence for unauthorized entry along the SWB with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States can change migratory flows. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[2] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in Venezuelan irregular migration[3] throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién was down from 40,593 in October 2022 to just 668 in November.[4] DHS provided the new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by

[2] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[3] In this notice, irregular migration refers to the movement of people into another country without authorization.

[4] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/ img2022/PDF/IRREGULARES_%20POR_ %20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

CLP_AR_001023

flying to interior POEs—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the GOM for the first time made an independent decision to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, which imposed a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced parole process. With the vast majority of those encountered returned to Mexico, fewer releases have freed up DHS resources that would otherwise be used to process these individuals; this has also reduced the number of individuals state and local governments, as supported by civil society, have had to receive and assist.

The effects have been felt throughout the Western Hemisphere, not just in the United States. Thousands of Venezuelans who had already crossed the Darién have flown back to Venezuela on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[5] Other migrants who were about to enter the Darién have turned around and headed back south.[6] Still others who were intending to migrate north are staying where they are to apply for this lawful process, rather than make the dangerous journey to the SWB.[7]

DHS has seen strong interest in this parole process. As of December 27, 2022, DHS had authorized travel for more than 15,700 Venezuelan beneficiaries, already more than half of the available number of travel authorizations.[8] Of those authorized to travel to the United States, more than 10,600 have arrived and been paroled into the country.[9] More than 3,600 of those Venezuelans who have flown into the United States and were paroled through this process arrived from Colombia; another 2,300 came from Venezuela, 1,500 from Mexico, and

3,100 from other countries. Those figures show that the process is reaching both people in Venezuela and Colombia *before* they seek to irregularly migrate, and those who are displaced in transit countries, like Mexico.[10]

### III. Changes

Given the early success of the process, the Secretary has authorized two changes to the process to ensure its continued viability, particularly as DHS prepares for an eventual transition from Title 42 processing to full Title 8 processing at the border.[11]

*A. Removal of the 24,000 Limit on Travel Authorizations and Replacement With a 30,000 Monthly Limit Spread Across Separate and Independent Parole Processes*

The process announced in the October 19 **Federal Register** Notice was subject to a numerical limit. Demand for the Venezuela process has far exceeded the 24,000 limit set in the first **Federal Register** Notice. In just two months of operation, DHS received thousands of applications from supporters and has already approved well more than half of the available travel authorizations. Were DHS to reach the numerical limit, prospective migrants would no longer be eligible for this process, which serves as a meaningful alternative to irregular migration. DHS anticipates that we would then see increased irregular migration of Venezuelans.

Accordingly, the Secretary has removed the 24,000 numerical limit on travel authorizations and replaced it with a monthly limit of 30,000 travel authorizations in the aggregate spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**). This change gives DHS the flexibility to continue the process for Venezuelans, thereby providing more certainty to the public and supporting partners. It also preserves the flexibility to extend or terminate the process, as the circumstances warrant. DHS will continue to evaluate this monthly limit and make adjustments if needed over time.

*B. Updated Eligibility Criteria*

Following the GOM's independent decision to accept returns of Venezuelans, DHS began expelling Venezuelans who are encountered after entering the United States without authorization, pursuant to the Title 42 public health Order. Currently, a Venezuelan (or qualifying immediate family member) is ineligible to participate in the parole process if, among other things, they crossed irregularly into the United States after October 19, 2022—regardless of whether they were expelled, ordered removed, or departed voluntarily.[12]

After the Title 42 Order ceases to be in effect, DHS will resume Title 8 immigration processing of all individuals, including Venezuelans. Pursuant to Title 8, noncitizens who have entered the United States without authorization may be permitted to voluntarily depart pursuant to Immigration and Nationality Act (INA) 240B, 8 U.S.C. 1229c, may be permitted to voluntarily withdraw their application for admission pursuant to INA 235(a)(4), 8 U.S.C. 1225(a)(4), or may be ordered removed, regardless of whether Title 42 remains in effect.

Individuals continue to be generally ineligible for consideration for parole pursuant to this process if they have crossed into the United States without authorization between POEs along the SWB since October 20, 2022. There will now be the following exception: individuals who have crossed without authorization into the United States after December 20, 2022, and have been permitted a single instance of voluntary departure pursuant to INA 240B, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to INA 235(a)(4), 8 U.S.C. 1225(a)(4), will remain eligible to participate in the parole process. If such an individual crossed without authorization between POEs along the SWB from October 20, 2022 through December 20, 2022, they would remain ineligible to participate and the exception would not apply. Permitting Venezuelan nationals to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

---

[5] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama, https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/,* Nov. 9 2022 (last viewed Dec. 8, 2022).

[6] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route, https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html,* Oct. 14, 2022 (last viewed Dec. 8, 2022).

[7] Axios, *Biden's new border policy throws Venezuelan migrants into limbo, https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap,* Nov. 7 2022 (last viewed Dec. 8, 2022).

[8] Department of Homeland Security, Daily Venezuela Report, Dec. 27, 2022.

[9] *Id.*

[10] *Id.*

[11] The Secretary authorized the changes following considerations reflected in the Secretary's decision memorandum dated December 22, 2022. *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Updates to the Parole Process for Certain Venezuelan Nationals (Dec. 22, 2022).

[12] 87 FR 63507 (Oct. 19, 2022).

CLP_AR_001024

The Secretary has also approved a conforming change to provide that a Venezuelan national who is a permanent resident or dual national of any country or holds refugee status in any country other than Venezuela remains eligible to be considered for parole under this process if DHS operates a similar parole process for nationals of that other country. All other eligibility requirements described in the October 19, 2022 Notice remain the same.

These changes are responsive to our multilateral commitments to address irregular migration throughout the Hemisphere. In this case, the United States is making two changes to this process that will support our commitment to creating additional lawful pathways. For its part, the GOM has made an independent decision to accept the return or removal, including under Title 8, of Venezuelan nationals who bypass this new process and enter the United States without authorization. The United States' continued operation of this process is contingent on the GOM's independent decision in this regard.

*C. Scope, Termination, and No Private Rights*

The Secretary retains the sole discretion to terminate the Parole Process for Venezuelans at any point.The number of travel authorizations granted under this process shall be spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**), and shall not exceed 30,000 each month. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

## IV. Regulatory Requirements

*A. Administrative Procedure Act*

The October 19 **Federal Register** Notice describing this process explained that this process is exempt from notice-and-comment rulemaking requirements because (1) the process is a general statement of policy,[13] (2) the process

pertains to a foreign affairs function of the United States,[14] and (3) even if notice-and-comment were required, DHS would for good cause find that the delay associated with implementing these changes through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[15] The changes described in this Notice are amenable to immediate issuance and implementation for the same reasons.

First, these changes relate to a general statement of policy,[16] *i.e.,* a ''statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.''[17] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security ''in his discretion.''

Second, even if these changes were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, these changes—like the implementation of the process itself—pertain to a foreign affairs function of the United States, as described in the October 19 notice, and are directly responsive to ongoing conversations with, and requests from, foreign partners.[18] Specifically, the GOM has urged the United States to consider lifting the 24,000 limit,[19] which would allow more Venezuelans to participate in and engage the process and further disincentivize irregular migration, enhancing the security of both of our borders. Delaying implementation of these changes to conduct notice-and-comment rulemaking would directly implicate the GOM's independent decision to accept returns, including under Title 8 processes, and produce undesirable international consequences. Absent these changes, DHS would soon reach the 24,000 cap and GOM would no longer accept the returns of Venezuelan nationals. Thus, without these changes,

DHS would no longer have the ability to return Venezuelan nationals to Mexico, and the Venezuela process would no longer be viable. That would then, in all likelihood, lead to another surge in migration of Venezuelan nationals throughout the hemisphere and to our border.

Finally, even if notice-and-comment and a delayed effective date were required, DHS would for good cause find that the delay associated with implementing these changes through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[20] As noted above, absent immediate action, there is a risk that DHS meets the 24,000 cap, which would in turn cause the GOM to no longer accept the returns of Venezuelan nationals and end the success of the parole process to date at reducing the number of Venezuelan nationals encountered at the border.

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice involves three collections of information, as follows.

In connection with the process for Venezuelans, OMB has previously approved a revision to USCIS Form I–134, *Declaration of Financial Support* (OMB control number 1615–0014) under the PRA's emergency processing procedures at 5 CFR 1320.13. OMB has recently approved a new collection, Form I–134A, Online Request for Consideration to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will now be used for the Venezuela parole process and is being revised in connection with this notice, including by increasing the burden estimate. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has also previously approved an emergency request under 5 CFR 1320.13 for a revision to an information

---

[13] 5 U.S.C. 553(b)(A); *see also id.* 553(d)(2).

[14] 5 U.S.C. 553(a)(1).

[15] 5 U.S.C. 553(b)(B).

[16] 5 U.S.C. 553(b)(A); *id.* 553(d)(2).

[17] *Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[18] 5 U.S.C. 553(a)(1).

[19] *See* Dallas Morning News, *Ahead of Title 42's end, U.S.-Mexico negotiations called 'intense,' 'round-the-clock' https://www.dallasnews.com/news/2022/12/13/ahead-of-title-42s-end-us-mexico-negotiations-called-intense-round-the-clock/,* Dec. 13, 2022 (last viewed Dec. 14, 2022).

[20] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

CLP_AR_001025

collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the changes described above, CBP is making further changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about these collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00253 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Federal Emergency Management Agency

**[Internal Agency Docket No. FEMA–4678–DR; Docket ID FEMA–2022–0001]**

### West Virginia; Major Disaster and Related Determinations

**AGENCY:** Federal Emergency Management Agency, DHS.
**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of West Virginia (FEMA–4678–DR), dated November 28, 2022, and related determinations.

**DATES:** The declaration was issued November 28, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 28, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the ''Stafford Act''), as follows:

I have determined that the damage in certain areas of the State of West Virginia resulting from severe storms, flooding, landslides, and mudslides during the period of July 12 to July 13, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the ''Stafford Act''). Therefore, I declare that such a major disaster exists in the State of West Virginia.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance and Hazard Mitigation will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Jeffrey L. Jones, of FEMA is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of West Virginia have been designated as adversely affected by this major disaster:

McDowell County for Public Assistance.
All areas within the State of West Virginia are eligible for assistance under the Hazard Mitigation Grant Program.

The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund; 97.032, Crisis Counseling; 97.033, Disaster Legal Services; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance Grant; 97.048, Disaster Housing Assistance to Individuals and Households In Presidentially Declared Disaster Areas; 97.049, Presidentially Declared Disaster Assistance—Disaster Housing Operations for Individuals and Households; 97.050, Presidentially Declared Disaster Assistance to Individuals and Households—Other Needs; 97.036, Disaster Grants—Public Assistance (Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.

**Deanne Criswell,**
*Administrator, Federal Emergency Management Agency.*
[FR Doc. 2023–00177 Filed 1–6–23; 8:45 am]
**BILLING CODE 9111–23–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Federal Emergency Management Agency

**[Internal Agency Docket No. FEMA–4677–DR; Docket ID FEMA–2022–0001]**

### South Carolina; Major Disaster and Related Determinations

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of South Carolina (FEMA–4677–DR), dated November 21, 2022, and related determinations.

**DATES:** The declaration was issued November 21, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 21, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the ''Stafford Act''), as follows:

I have determined that the damage in certain areas of the State of South Carolina resulting from Hurricane Ian during the period of September 25 to October 4, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the ''Stafford Act''). Therefore, I declare that such a major disaster exists in the State of South Carolina.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Individual Assistance and Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance, Hazard Mitigation, and Other Needs Assistance under section 408 will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The time period prescribed for the implementation of section 310(a), Priority to Certain Applications for Public Facility and Public Housing Assistance, 42 U.S.C. 5153, shall be for a period not to exceed six months after the date of this declaration.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Kevin A. Wallace, Sr., of FEMA is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of South Carolina have been designated as adversely affected by this major disaster:

CLP_AR_001026

 

**Federal Register** / Vol. 88, No. 82 / Friday, April 28, 2023 / Notices **26329**

system, prevent loss of life at sea and to deter and dissuade maritime migration through mobilizing DHS resources, reinforced by other federal, state, and local assets and capabilities.

The USCG supports HSTF–SE and views its migrant interdiction mission as a humanitarian effort to rescue those taking to the sea and encourage noncitizens to pursue lawful pathways to enter the United States. By allocating additional assets to migrant interdiction operations and to prevent conditions that could lead to maritime mass migration, the USCG assumes certain operational risk to other statutory missions. Some USCG assets were diverted from other key mission areas, including counter-drug operations, protection of living marine resources, and support for shipping navigation. Through a reduction of maritime migration, USCG would in turn reduce the operational risk to its other statutory missions.

### C. Ineligibility Criteria for Maritime Interdictions

In response to the increase in maritime migration and interdictions, and to disincentivize migrants from attempting the dangerous journey to the United States by sea, DHS will make individuals who have been interdicted at sea after April 27, 2023 ineligible for the parole process for Haitians. Further, DHS expects this change in eligibility criteria to materially reduce the number of maritime interdictions, by incentivizing migrants to use safe and orderly means to access the United States.

Migrants who take to the sea are putting their lives at incredible risk. The goal of this change, like the parole process for Haitians more broadly, is to save lives and undermine the profits and operations of the dangerous smuggling networks and transnational criminal organizations that callously prioritize their profits over the lives and safety of the people they transport and traffic. The parole process for Haitians will continue to incentivize intending migrants to use a safe and orderly means to access the United States via commercial air flights, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey by sea.

### III. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process discussed in this notice involves two collections of information, both of which have previously been approved under emergency processing. The collections are as follows:

• USCIS, Form I–134A, *Online Request to be a Supporter and Declaration of Financial Support,* OMB control number 1615–0157.

• CBP, *Advance Travel Authorization,* OMB control number 1651–0143.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–09014 Filed 4–27–23; 8:45 am]
**BILLING CODE 9110–9M–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of a Change to the Parole Process for Cubans

**ACTION:** Notice.

**SUMMARY:** This notice announces that the Secretary of Homeland Security has authorized a change to the Parole Process for Cubans that the U.S. Department of Homeland Security (DHS) described in a **Federal Register** notice on January 9, 2023. The change provides that those who have been interdicted at sea after April 27, 2023 will be ineligible for the announced parole process.

**DATES:** DHS will begin applying this amendment on April 28, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### I. Background

On January 9, 2023, DHS published a notice titled *Implementation of a Parole Process for Cubans. See* 88 FR 1266. That notice describes a new effort to address the increasing number of encounters of Cuban nationals at the Southwest Border (SWB) and at sea, which had reached record levels over the six months preceding the announcement. Cubans who do not avail themselves of this parole process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to return or removal. DHS implemented the parole process to allow certain Cuban nationals and their immediate family members to be considered on a case-by-case basis for parole and, if granted, lawfully enter the United States in a safe and orderly manner. As described in the January 2023 notice, to be eligible, individuals must: (1) have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period; (2) pass national security and public safety vetting; (3) fly at their own expense to an interior POE, rather than entering at a land POE; and (4) possess a valid, unexpired passport. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into Mexico or Panama after January 9, 2023 (the date of the notice's publication); have entered the United States without authorization between POEs after January 9, 2023 (except for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process); or are otherwise deemed not to merit a favorable exercise of discretion.

The parole process for Cubans is intended to enhance border security by addressing the number of encounters of Cuban nationals at the SWB and at sea, which reached record levels in recent months, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

### II. Amendment

In response to the increasing number of Cubans traveling to the United States by sea without authorization through January 2023, and the likelihood of another record number of interdictions this fiscal year (FY), DHS is announcing an amendment to the eligibility criteria announced in the January 9, 2023 notice [1] to make individuals who have been interdicted at sea [2] after April 27, 2023 ineligible for the parole process. The policy announced in this notice is consistent with the policy and justification described in the January 9, 2023 notice, including the justification for the parole process and description of the multiple exceptions to notice-and-comment rulemaking requirements applicable to this process. DHS incorporates those justifications here by

---

[1] Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023).

[2] For purposes of this notice, ''interdicted at sea'' refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

CLP_AR_001065

reference as appropriate. This notice makes one update to the eligibility criteria for the parole process.

### A. Impact of Cuba, Haiti, Nicaragua, and Venezuela Enforcement Processes

Parole processes established for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV) and their immediate family members have significantly reduced SWB encounters. Following the announcement of the CHNV parole processes, DHS has seen a drastic decrease in the number of Cubans, Haitians, Nicaraguans, and Venezuelans encountered at the SWB. In fact, DHS encountered 128,410 noncitizens who entered between POEs along the SWB in January 2023, which is the lowest monthly SWB encounters total since February 2021.[3] Encounters of CHNV nationals between POEs at the SWB declined from a 7-day average of 1,231 on the day of the announcement on January 5th, to 35 on January 31—a drop of 97 percent in just over three weeks.[4] Those trends have continued with a daily average of 46 encounters of CHNV nationals between POEs at the SWB during the last seven days of February 2023.[5] This reduction occurred even as encounters of other noncitizens began to rebound from the typical seasonal decline.[6] The data continues to underscore and support the notion that when there is a safe and orderly way to come to the United States, coupled with consequences for those who do not avail themselves of such established processes, people are less inclined to attempt the dangerous, and at times, deadly, journey to our borders, and less likely to put their lives in the hands of smugglers.

### B. Maritime Migration Continues To Increase, With Devastating Consequences for Migrants

While DHS continues to see a meaningful reduction in encounters of CHNV nationals across the SWB following the announcement of the CHNV parole processes, maritime interdictions of Cuban and Haitian nationals in the Caribbean have

increased in recent fiscal FYs and persist at high levels. Total interdictions at sea increased by 502 percent between FY 2020 (2,079) and FY 2022 (12,521). Interdictions continue to rise in FY 2023 with 7,402 through January, almost 60 percent of the total in FY 2022 within four months. Maritime migration from Cuba increased by nearly 600 percent in FY 2022, with 5,740 Cuban nationals interdicted at sea, compared to 827 in FY 2021. In the first four months of FY 2023, Cuban interdictions are over 80 percent of the Cuban FY 2022 total, comprising 65 percent of all FY 2023 interdictions at sea.[7]

Apprehensions of Cuban nationals in southeast coastal sectors by U.S. Border Patrol have been increasing rapidly.[8] There were 2,675 Cuban apprehensions in FY 2022, an 11-fold increase over the FY 2021 total of 239 apprehensions. The first four months of FY 2023 have already surpassed FY 2022 with 4,273 apprehensions of Cuban nationals in southeast coastal sectors.[9]

The U.S. Coast Guard (USCG) has interdicted and repatriated Cubans in recent months. On January 12, 2023, USCG repatriated 177 Cubans from 7 separate interdictions.[10] USCG repatriated an additional 67 Cubans between February 23–24 following prior interdictions.[11]

While maritime interdictions of Cuban nationals declined somewhat in February, DHS assesses that in the Caribbean, the weather and migrant knowledge of increased law enforcement presence played a significant role in this reduced maritime movement. Through much of February, weather conditions were unfavorable for maritime ventures, particularly on smaller vessels. However, DHS assesses this was only temporary. In the final days of February and early days of March 2023, DHS saw a return to multiple interdictions per day. The growing numbers of migrants taking to sea under dangerous conditions put

lives at risk and places stress on DHS's resources.

Human smugglers and irregular migrant populations continue to use unseaworthy, overly crowded vessels, piloted by inexperienced mariners, without any safety equipment—including but not limited to, personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons. In FY 2022, the USCG recorded 107 noncitizen deaths, including those presumed dead, as a result of irregular maritime migration. In January 2022, the USCG located a capsized vessel with a survivor clinging to the hull. USCG crews interviewed the survivor, who indicated there were 34 other individuals on the vessel who were not in the vicinity of the capsized vessel and the survivor.[12] The USCG conducted a multi-day air and surface search for the missing migrants, eventually recovering five deceased migrants, while the others were presumed lost at sea.[13] In November 2022, USCG and U.S. Customs and Border Protection (CBP) rescued over 180 people from an overloaded boat that became disabled off the Florida Keys.[14]

The International Organization for Migration's (IOM) Missing Migrants Project reported at least 321 documented deaths and disappearances of migrants throughout the Caribbean in 2022, signaling the highest recorded number since IOM began tracking such events in 2014 and a 78% overall increase over the 180 documented cases in 2021.[15] Most of those who perished or went missing in the Caribbean were from Haiti and Cuba.[16]

The U.S. Government's response to maritime migration in the Caribbean region is governed by Executive Orders, Presidential Directives, and resulting framework and plans that outline interagency roles and responsibilities. Homeland Security Task Force-Southeast (HSTF–SE) is primarily responsible for DHS's response to

---

[3] U.S. Customs and Border Protection, *CBP Releases January 2023 Monthly Operational Update,* Feb. 10, 2023, *https://www.cbp.gov/newsroom/national-media-release/cbp-releases-january-2023-monthly-operational-update.*

[4] DHS Office of Immigration Statistics (OIS) analysis of OIS Persist Dataset based on data through January 31, 2023.

[5] OIS analysis of CBP Unified Immigration Portal (UIP) data pulled on March 2, 2023.

[6] DHS, *Unlawful Southwest Border Crossings Plummet Under New Border Enforcement Measures,* Jan. 25, 2023, *https://www.dhs.gov/news/2023/01/25/unlawful-southwest-border-crossings-plummet-under-new-border-enforcement-measures.*

[7] OIS analysis of USCG data.

[8] Includes Miami, Florida; New Orleans, Louisiana; and Ramey, Puerto Rico sectors where all apprehensions are land apprehensions not maritime.

[9] OIS analysis of OIS Persist Dataset based on data through January 31, 2023.

[10] USCG, *Coast Guard Repatriates 177 People to Cuba,* Jan. 12, 2023, *https://www.news.uscg.mil/Press-Releases/Article/3265898/coast-guard-repatriates-177-people-to-cuba/.*

[11] USCG, *Coast Guard Repatriates 29 People to Cuba,* Feb. 23, 2023, *https://www.news.uscg.mil/Press-Releases/Article/3306722/coast-guard-repatriates-29-people-to-cuba/;* USCG, *Coast Guard Repatriates 38 People to Cuba,* Feb. 24, 2023, *https://www.news.uscg.mil/Press-Releases/Article/3306850/coast-guard-repatriates-38-people-to-cuba/.*

[12] Adriana Gomez Licon, Associated Press, Situation 'dire' as Coast Guard seeks 38 missing off Florida, Jan. 26, 2022, *https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe064304740c3a3019.*

[13] Adriana Gomez Licon, Associated Press, Coast Guard suspends search for migrants off Florida, Jan. 27, 2022, *https://apnews.com/article/florida-lost-at-sea-79253e1c65cf5708f19a97b6875ae239.*

[14] Ashley Cox, CBS News CW44 Tampa, More than 180 people rescued from overloaded vessel in Florida Keys, Nov. 22, 2022, *https://www.cbsnews.com/tampa/news/more-than-180-people-rescued-from-overloaded-vessel-in-florida-keys/.*

[15] IOM, *Missing Migrants in the Caribbean Reached a Record High in 2022,* Jan. 24, 2023, *https://www.iom.int/news/missing-migrants-caribbean-reached-record-high-2022.*

[16] *Id.*

CLP_AR_001066

maritime migration in the Caribbean Sea and the Straits of Florida. Operation Vigilant Sentry is the DHS interagency operational plan for integrated operations to address and mitigate the threat of a maritime mass migration in the Caribbean Sea and the Straits of Florida.[17] The primary objectives of HSTF–SE are to protect the safety and security of the United States, uphold U.S. humanitarian principles, maintain the integrity of the U.S. immigration system, prevent loss of life at sea and to deter and dissuade maritime migration through mobilizing DHS resources, reinforced by other federal, state, and local assets and capabilities.

The USCG supports HSTF–SE and views its migrant interdiction mission as a humanitarian effort to rescue those who risk their lives by taking to the sea and encourage noncitizens to pursue legal pathways to enter the United States. By allocating additional assets to migrant interdiction operations and to prevent conditions that could lead to a maritime mass migration, the USCG assumes certain operational risk to other statutory missions. Some USCG assets were reallocated from other key mission areas, including counter-drug operations, protection of living marine resources, and support for shipping navigation. Through a reduction of maritime migration, USCG would in turn reduce the operational risk to its other statutory missions.

*C. Ineligibility Criteria for Maritime Interdictions*

In response to the increase in maritime migration and interdictions, and to disincentivize migrants from attempting the dangerous journey to the United States by sea, DHS will make individuals who have been interdicted at sea after April 27, 2023 ineligible for the parole process for Cubans. Further, DHS expects this change in eligibility criteria to materially reduce the number of maritime interdictions, by incentivizing migrants to use safe and orderly means to access the United States.

Migrants who take to the sea are putting their lives at incredible risk. The goal of this change, like the parole process for Cubans more broadly, is to save lives at sea and undermine the profits and operations of the dangerous smuggling networks and transnational

criminal organizations that callously prioritize their profits over the lives and safety of the people they transport and traffic. The parole process for Cubans will continue to incentivize intending migrants to use a safe and orderly means to access the United States via commercial air flights, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey by sea.

**III. Paperwork Reduction Act (PRA)**

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process discussed in this notice involves two collections of information, both of which have previously been approved under emergency processing. The collections are as follows:

• USCIS, Form I–134A, *Online Request to be a Supporter and Declaration of Financial Support,* OMB control number 1615–0157.

• CBP, *Advance Travel Authorization,* OMB control number 1651–0143.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–09013 Filed 4–27–23; 8:45 am]
**BILLING CODE 9110–9M–P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**[Docket No. FR–7070–N–22]**

**30-Day Notice of Proposed Information Collection: Enterprise Income Verification (EIV) Systems—Access Authorization Form and Rules of Behavior and User Agreement; OMB Control No.: 2577–0267**

**AGENCY:** Office of Policy Development and Research, Chief Data Officer, HUD.

**ACTION:** Notice of proposed information collection.

---

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for an additional 30 days of public comment.

**DATES:** *Comments Due Date:* May 30, 2023.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to *OIRA_submission@ omb.eop.gov* or *www.reginfo.gov/public/ do/PRAMain.* Find this particular information collection by selecting ''Currently under 30-day Review—Open for Public Comments'' or by using the search function.

**FOR FURTHER INFORMATION CONTACT:** Colette Pollard, Reports Management Officer, REE, Department of Housing and Urban Development, 7th Street SW, Room 8210, Washington, DC 20410; email Colette Pollard at *PaperworkReductionActOffice@hud.gov* or telephone 202–402–3400. This is not a toll-free number. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit *https://www.fcc.gov/consumers/guides/ telecommunications-relay-service-trs.*

Copies of available documents submitted to OMB may be obtained from Ms. Pollard.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in section A.

The **Federal Register** notice that solicited public comment on the information collection for a period of 60 days was published on February 23, 2023 at 88 FR 11467.

**A. Overview of Information Collection**

*Title of Information Collection:* EIV System User Access Authorization Form and Rules of Behavior and User Agreement.

*OMB Approval Number:* 2577–0267.

*Type of Request:* Revision of currently approved collection.

*Form Number:* 52676 and 52676I.

*Description of the need for the information and proposed use:* In accordance with statutory requirements at 5 U.S.C. 552a, as amended (most commonly known as the Federal Privacy Act of 1974), the Department is required to account for all disclosures of information contained in a system of records. Specifically, the Department is required to keep an accurate accounting of the name and address of the person or agency to which the disclosure is made. The Enterprise Income

---

[17] Homeland Security Task Force—Southeast, published through the U.S. Embassy in Cuba, *Homeland Security Task Force Southeast partners increase illegal migration enforcement patrols in Florida Straits, Caribbean,* Sept. 6, 2022, *https:// cu.usembassy.gov/homeland-security-task-force- southeast-partners-increase-illegal-migration- enforcement-patrols-in-florida-straits-caribbean/.*

CLP_AR_001067

May 8, 2023

MEMORANDUM FOR THE FILE

FROM:      Tricia Kennedy
         Program Manager TRICIA B KENNEDY Digitally signed by TRICIA B KENNEDY
                            Date: 2023.05.08 12:05:13 -04'00'
         Office of Field Operations (OFO)
         U.S. Customs and Border Protection (CBP)

SUBJECT:      CBP One$^{TM}$ Application

I am the CBP One$^{TM}$ (CBP One) application Product Owner for OFO. I have been in this role since development started for this application in 2019. I am responsible for providing and prioritizing requirements for the Emerging Technology Team within the Office of Information Technology (OIT). I am also the lead for testing and deploying most of the capabilities within the application, including the deployment of the ability of noncitizens to use the app to schedule an appointment to present themselves at a land POE. This memo provides certain data and information about the CBP One application and that capability. This information was confirmed and relied upon in rulemaking.

## I.  CBP One Application Background

In October 2020, CBP launched the free CBP One mobile and desktop application to modernize and streamline access to CBP services. CBP One is intended to provide one common portal for travelers and stakeholders to interact with CBP across a wide range of mission sets, with an intuitive interface. The application includes defined user roles for different functionality for travelers, importers, brokers, carriers, International Organizations, and additional stakeholders to improve access to and experience with CBP services. From a traveler and trade perspective, CBP One facilitates the advance submission and payment for Form I-94s, advance information for biological or other permitted agriculture products for travelers, as well as the ability to quickly create and submit manifests for bus passengers or schedule perishable inspections. Key capabilities for stakeholders and travelers include scheduling exams with live status updates and chat capability, instant access to proof of admission status and remaining days for their authorized length of stay and advance submission of import documents to streamline their inspection upon arrival.

Since the app's launch, CBP has instituted several functionalities specific to noncitizens who lack documents sufficient for admission (referred to throughout this memo as "migrants" or "undocumented noncitizens"). Specifically, in February 2021, CBP One offered International Organizations (IOs) the capability to check case status for individuals during the winddown of the Migrant Protection Protocols (MPP). In April 2021, CBP developed a capability to permit IOs to assist individuals in submitting advance information and scheduling a time to present at a

CLP_AR_001650

Port of Entry (POE) to be considered for an exception to the Title 42 public health Order (Title 42 Order).  This capability was fully available in both the mobile and desktop version of the application.  These processes did not have the same geofencing and live photo requirement discussed below in the Submit Advance Information capability, given the role of trusted Non-Government Organizations (NGOs) in the process, as it was anticipated that their ability to interact with noncitizens before submitting information on would help limit potential fraud in using the app.

In April 2022, CBP added a capability to the app to allow certain Ukrainian nationals seeking parole into the United States under the Uniting for Ukraine program to directly submit advance information and schedule their arrival at a land Port of Entry.  This capability was also made available in the mobile application and via the desktop version of the application.

As of October 2022 and augmented in January 2023, Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV) requesting to travel to the United States to seek parole under the CHNV parole processes utilize CBP One as part of the Advance Travel Authorization (ATA) process to provide passport information and a live photo to enable CBP to verify their identity and conduct law enforcement vetting prior to their travel to the United States.  This ATA process was the first time that the live photo requirement was added to a CBP One functionality.  The CHNV ATA process is only available via the mobile application due to the live photo requirement.  A live photo utilizes software that verifies "genuine presence," or that the user is a live person.  This software is not currently compatible with the desktop version and requires a mobile phone to complete.

## II.     CBP One Direct "Submit Advance Information" Capability

Up until January 12, 2023, only those noncitizens eligible for the U4U were able to directly submit their information and schedule an appointment at a POE.  As referenced above, NGOs had access to the app to schedule appointments for noncitizens seeking exceptions to the Title 42 Order.  On January 12, 2023, CBP transitioned away from NGO access, and moved to expand the ability to directly submit advance information and schedule an appointment to seek a Title 42 Order exception to all undocumented noncitizens.  These appointments are available at 8 ports of entry on the Southwest Border.

Currently, this capability within the CBP One application, referred to as the "Submit Advance Information" capability, requires two distinct steps for users to obtain an appointment to present at one of the participating Ports of Entry.

1.  The first step is for a user to create a registration either for themselves or for all members of a family group or otherwise traveling together as co-travelers.  This step can be accessed and completed from anywhere, with no geofencing restrictions.  Users must have a Login.gov authenticated identity to register, and there is no limit to the number of family members or co-travelers who can be included in that registration.  CBP continues

CLP_AR_001651

3

to encourage families and groups to create one registration on behalf of the entire family or group. Users may generally create multiple accounts and multiple registrations. However, if a user creates a registration consisting of more than five individuals, the user may not create another registration under the same account. This limitation is designed to prevent fraudulent use of the app. Users must submit biographic and biometric information for each individual to be included in the registration, all of which is information which would otherwise be collected during primary and/or secondary processing at the POEs. This includes descriptive information such as: Name, Date of Birth, Country of Birth, City of Birth, Country of Residence, Contact Information, Addresses, Nationality, Employment history (optional), Travel History, Emergency Contact (optional), U.S. and Foreign Addresses, Familial Information (optional), Marital Status (optional), Identity Document (not a Western Hemisphere Travel Initiative (WHTI) compliant document) (optional), Gender, Preferred Language, Height (optional), Weight (optional), Eye Color and Photograph. The photo collected is a still photo, and is used for 1-to-1 facial matching during the scheduling step. A 1-to-1 facial matching means the photo submitted by users during the registration process described here is compared to subsequent photos submitted by the same user during the scheduling process described below. This photo matching helps prevent fraudulent use of CBP One by ensuring the same individual who registered is the same individual requesting an appointment. Once the registration is complete, the user will see a summary screen listing everyone in the registration, with each individual given unique confirmation numbers and provided instructions to request an appointment. The user will also receive a confirmation email with the same information as that displayed on the summary screen.

2. The second step is to request an appointment at a Port of Entry. The ability to schedule appointments opens at 11 a.m. ET each day. The user must be within the geofenced area to do this. The user will access the application, select "Submit Advance Information," and then select their previously completed registration. This will pull up all the co-travelers registered in the previous step and allow the user who created the registration to request an appointment for everyone in the registration. After review to ensure the user selects the correct registration (because, as described in Step 1, users may create multiple registrations), the user will select their desired Port of Entry. The CBP app will immediately respond if no appointments are available for the next thirteen days. If an appointment is available, the user will be asked to submit a live photo, which is subject to software that verifies "genuine presence" or that the user is a live person. The photo is also compared to the still photo submitted in the registration process using the 1-to-1 facial matching process described above. The live photograph is required only from the main account holder; other members of the family or group are not required to submit a live photograph. Next, the application will collect the latitude and longitude to ensure the user is within Central or Northern Mexico. Finally, if appointments are available, the user will be presented with a calendar to select a day and times. The app will only display dates and times available for the number of individuals in a particular submission. For example, if a user is scheduling appointments for a family of five, the app will only

4

provide date/time options when there are five appointments available.  Once selected, the user will be provided a confirmation screen with their appointment information and all individuals in their submission who have an appointment on the same day and time.  The user will also receive another confirmation email with the appointment information.  Users can cancel or reschedule their appointments through the application at any time.

The application is currently geofenced to only allow appointment scheduling for those located in Central and Northern Mexico.  This requirement allows individuals to remain in areas with increased support networks instead of congregating in already strained communities near the U.S./Mexico border.  Since the implementation of geofencing, various checks have been implemented through the workflow to detect whether a user is employing techniques to spoof their location. Additionally, in April 2023, CBP began conducting analysis on the potential use of automation techniques and has taken definitive steps toward addressing these issues. Detecting fraud and misuse and deploying countermeasures is an ongoing effort for CBP that will continue to be a priority.

Two major modifications have also been made to the desktop version of the application.

- On January 12, 2023, CBP eliminated the ability for undocumented noncitizens to access the desktop version of the application to submit information and schedule an appointment. This was eliminated since the requirement of a live photo cannot be completed via the desktop version. Additionally, in an attempt to limit noncitizens from congregating at the border in unsafe conditions, the application was geofenced to only allow appointment scheduling for those located in Central and Northern Mexico. The new requirement for geofencing to Central and Northern Mexico cannot be accomplished via a web browser. Finally, removing the desktop version ensured there is a singular method for migrants to submit their information and schedule appointments.
- On January 26, 2023, after a short transition period following the implementation of direct access to CBP One by noncitizens, CBP discontinued the capability for NGOs to access the desktop version of the app to schedule appointments.  The NGO access was removed based on information that such capability had been used to exploit undocumented noncitizens, including financial exploitation.

## CBP One Application Timeline For Capabilities Related to Undocumented Noncitizens



5

### III.    CBP One App Feedback on, and Evolution of Workflow and Technical Issues

CBP primarily receives reports of errors or other concerns through three mechanisms.  First, the CBP One email inbox, is the primary mechanism by which users send an inquiry or concern about any capability within the CBP One application.  Since CBP One has many capabilities and functionalities, and is available to a diverse audience, the inbox initially responds to the author by asking them to select the appropriate topic pertaining to their specific issue.  Emails related to the scheduling capability s are addressed by one of three teams: CBP Customer Service, Office of Information Technology, or the CBP One team within OFO.  My team is responsible for the overall management of this inbox.   CBP also receives reports of errors or issues through recurrent briefings and sessions with NGOs.  Third, CBP personnel both at local POEs and within CBP Headquarters receive direct email communications from the NGOs.

CBP has made several changes to the app in response to user feedback.  In particular, there have been several technical changes since February 2023.  When the advance scheduling functionality was implemented on January 12, 2023, it was originally implemented as a single workflow.  Therefore, in contrast to the process described above, from January 12, 2023 through February 23, 2023, the "Submit Advance Information" capability to register and schedule an appointment was completed in the same workflow.  In other words, all steps were completed at the same time: as part of the registration process, the user had to take a live photo and the app captured the phone's geolocation.  At that time, the user was immediately presented the option to schedule an appointment. If there were no available appointments during the initial registration, the user was required to return to CBP One at a later time to separately access the previously-submitted registration to schedule an appointment.  The user had to provide a new live photo, and the app re-verified the geolocation before the user could access the calendar again to seek an appointment.

During this initial period, users were experiencing a high number of error codes, or the app was "timing out," or "crashing," primarily around the process of submitting a photograph to verify liveness.  Through NGO assistance and user feedback, CBP was made aware that the registration process was having particular "timing out" issues for families with babies or young children.  While CBP had conducted internal load testing of the app prior to its launch, as well as testing in partnership with an NGO partner, such internal testing did not include testing the bandwidth of other technological platforms that supported the app.  Following the reports of error messages, CBP was able to identify that they were primarily caused by bandwidth/connectivity issues in our support services.  CBP utilizes a third-party software to verify liveness from a company called iProov through a Silicon Valley Innovation Program Pilot with the Department of Homeland Security.  Based on the significant demand and predefined service requirements with the vendor, iProov was forced to reduce the rate at which they were processing liveness verification, which created an excess number of errors for users as maximum bandwidth was exceeded.

CLP_AR_001654

6

For these reasons, CBP made the decision to reduce the requirement to validate liveness for each user during registration and scheduling and increase bandwidth for users.  On February 18, 2023, CBP modified the process in an attempt to collect liveness and geolocation at the same time However, this change was not successful at reducing the errors users were experiencing.  Therefore, CBP implemented a new workflow change on February 23, 2023, to separate the workflow into two distinct steps:  registration and scheduling.  This process is described above.  This new workflow allowed for the removal of the liveness verification process from the registration completely, as the users could no longer schedule during that workflow.  Liveness was now restricted to the scheduling workflow only, and only if the application found available appointments for the Port of Entry requested.  This change has resulted in a smaller technical burden for the liveness software, and CBP has received feedback from NGOs that there are fewer reported errors as a result of the liveness detection, however users still experience errors in low bandwidth and connectivity scenarios and navigating the daily scheduling process.  Users continue to utilize unauthorized old versions of the app to circumvent the changes. CBP has received feedback from NGOs and noncitizens that individuals attempt to access older version of the app that allows them to schedule via previous workflows with different photo requirements.  They have reported using older versions has a perceived advantage to scheduling an appointment compared to those on newer versions.

During this same time frame, CBP also consolidated appointment slots to provide the same number of appointments per day, but with more available at a particular time, to make it easier for families to schedule an appointment.  For example, Brownsville started with 5 different time slots.  On February 16, 2023, based on a request from the OFO Operations Directorate, I combined those time slots into two larger time slots while maintaining the same number of appointments.  CBP also continues to advise that all members of a family seeking to travel together make an appointment in a single submission, as families or groups who do not register together on one CBP One account may not be accommodated at the same POE or on the same date.

In addition, CBP has made and is continuing to make several changes or enhancements to the application to address technical concerns or enhance the user experience.  Below is a list of some of those issues as well as their associated resolution and implementation date.

| Issue | Comments | Resolution | Date Resolved |
|---|---|---|---|
| Log-on issues when Sharing Devices | When sharing devices, users were not logging out of their account, resulting in new users canceling or rescheduling the previous users existing appointments. | Enhancement implemented to mitigate this issue including requiring the user to sign out of their account when they close the application. | 1/24/2023 |

CLP_AR_001655

7

| | | | |
|---|---|---|---|
| Location Services - Users too close to the Border | The geofence needed a half mile buffer to address those users who were very close to U.S./Mexico border | Geolocation was adjusted to address this issue. | 1/24/2023 |
| Haitian Creole translation requested | NGOs requested Haitian Creole as a priority translation. | CBP One update with Haitian/Creole translation as of February 1, 2023. | 2/1/2023 |
| Certain biographical information, such as height and weight are unknown to many users | Users are not aware of their height and weight | Made these fields optional. | 3/6/2023 |
| Change the posting from 0900 to 1100 | NGOs requested we change the daily post of appointments to 1100 so the users do not have to get up so early | The posting and messaging was updated to 1100 eastern. | 3/8/2023 |
| More clearly explain reason for errors and reduce the instances of the spinning seal | | Modified error messages to more clearly explain the problem. | 4/4/2023 |
| Users can not delete duplicate registrations themselves. | Users with multiple registrations would like to delete the extra appointments. | Implemented ability to delete registrations to manage multiple registrations more easily under their account. | 4/4/2023 |
| Terms and Conditions are only in English | | Implemented translated terms and conditions. | 4/6/2023 |
| Upcoming Enhancements: | | | |
| Translate drop down menus to include Spanish and Haitian Creole | | | 5/11/23 |
| Program the app to replace special characters with English characters, consistent with backend data systems, to address the issue where users are using special characters in their names which results in an error is USEC. | | | 5/11/23 |

CLP_AR_001656

8

| | | | |
|---|---|---|---|
| Facilitate the auto-capture of data from passports, if applicable to facilitate user input and increase data integrity. | | | End May 2023 |
| Implement new software to better track errors and system performance | | | End of June 2023 |
| Enable capability to create registrations (only) via desktop app | | | Summer 2023 |

### IV.    CBP One Application Dashboard

In order to provide a common operating picture and for senior managers, the Office of Information Technology implemented a dashboard to consolidate data from multiple databases within the Automated Targeting System.  The data contains the following information about undocumented noncitizens as it relates to the CBP One capability on the Southwest Border:

- Number of appointments (by age, gender, nationality)
- Number of registrations (by Day and Group vs. Single)
- Number processed at a POE (by day, POE, age, gender, nationality)

Based on a review of the dashboard on April 18, 2023, CBP data on group and single scheduled appointments shows that, for appointments scheduled from March 8, 2023 through May 1, 2023, groups make up an average of 83% of the CBP One scheduled appointments.

| CBP One Dashboard Data Pull *Data Pulled as of April 18, 2023* | | |
|---|---|---|
| **Scheduled Entry Date** | **Percentage of Group Appointments** | **Percentage of Single Appointments** |
| 05/01/2023 | 85% | 15% |
| 04/30/2023 | 88% | 12% |
| 04/29/2023 | 87% | 13% |
| 04/28/2023 | 89% | 11% |
| 04/27/2023 | 88% | 12% |
| 04/26/2023 | 88% | 12% |
| 04/25/2023 | 88% | 12% |
| 04/24/2023 | 90% | 10% |
| 04/23/2023 | 88% | 12% |
| 04/22/2023 | 92% | 8% |
| 04/21/2023 | 91% | 9% |

CLP_AR_001657

9

| | | |
|---|---|---|
| 04/20/2023 | 91% | 9% |
| 04/19/2023 | 86% | 14% |
| 04/18/2023 | 90% | 10% |
| 04/17/2023 | 84% | 16% |
| 04/16/2023 | 93% | 7% |
| 04/15/2023 | 94% | 6% |
| 04/14/2023 | 94% | 6% |
| 04/13/2023 | 92% | 8% |
| 04/12/2023 | 92% | 8% |
| 04/11/2023 | 94% | 6% |
| 04/10/2023 | 94% | 6% |
| 04/09/2023 | 91% | 9% |
| 04/08/2023 | 91% | 9% |
| 04/07/2023 | 92% | 8% |
| 04/06/2023 | 91% | 9% |
| 04/05/2023 | 88% | 12% |
| 04/04/2023 | 91% | 9% |
| 04/03/2023 | 91% | 9% |
| 04/02/2023 | 91% | 9% |
| 04/01/2023 | 91% | 9% |
| 03/31/2023 | 85% | 15% |
| 03/30/2023 | 84% | 16% |
| 03/29/2023 | 77% | 23% |
| 03/28/2023 | 73% | 27% |
| 03/27/2023 | 80% | 20% |
| 03/26/2023 | 77% | 23% |
| 03/25/2023 | 78% | 22% |
| 03/24/2023 | 79% | 21% |
| 03/23/2023 | 78% | 22% |
| 03/22/2023 | 79% | 21% |
| 03/21/2023 | 76% | 24% |
| 03/20/2023 | 77% | 23% |
| 03/19/2023 | 59% | 41% |
| 03/18/2023 | 70% | 30% |
| 03/17/2023 | 69% | 31% |
| 03/16/2023 | 79% | 21% |
| 03/15/2023 | 69% | 31% |
| 03/14/2023 | 75% | 25% |
| 03/13/2023 | 75% | 25% |
| 03/12/2023 | 68% | 33% |
| 03/11/2023 | 73% | 27% |
| 03/10/2023 | 73% | 27% |
| 03/09/2023 | 69% | 31% |

CLP_AR_001658

| | | |
|---|---|---|
| 03/08/2023 | 60% | 40% |
| **Average** | **83%** | **17%** |

## V.      CBP Engagement with Stakeholders

CBP has remained in constant contact with the stakeholder community.  In particular, CBP has ensured that relevant NGOs have been briefed on the transition from the submission of information and scheduling of appointments away from the NGOs to direct submission by the undocumented noncitizens.  CBP conducted two formal briefings to the NGOs on January 11 and 13, 2023.  These introductory briefs were followed by 4 additional update briefings as well as 3 live training sessions, as of April 11, 2023.  In additional to these formalized briefings, numerous emails and phone calls were held with individual NGOs regarding issues and concerns.  A list of the dates and participants in each briefing is listed below.  Additionally, the most beneficial exchange of information occurs during every day conversations between the NGOs and the officials in OFO field offices, who communicate with the CBP One Program Manager at OFO HQ almost every day to address questions and issues as close to real-time as possible.  This communication occurs in person as well as both email and phone calls.

Throughout these engagements, access to smartphones has been raised, although not as a significant concern for most individuals.  Additionally, NGOs have discussed helping individuals complete their submissions and working with individuals during the scheduling process as best as possible.  NGOs have even requested information about the phone requirements to ensure they invest in adequate equipment for migrants to use.

- January 11, 2023 – CBP One Brief for IO Partners
- January 13, 2023 – CBP One Brief for IO Partners #2
- February 6, 2023 – Discussion: CBP One with NGOs
- February 22, 2023 – California Welcoming Task Force/DHS Biweekly Engagement
- March 14, 2023 – Live Training Session – CBP One (Laredo area NGOs)
- March 23, 2023 – Live Training Session – CBP One (Mexicali shelter NGOs)
- March 31, 2023 – CBP One Scheduling Discussion (RGV NGOs)
- April 10, 2023 – Live Training session – CBP One (Tijuana Shelter NGOs)

## VI.      Feedback and Studies on Racial Bias

CBP received feedback that CBP One was having particular issues recognizing individuals of color.  The vast majority of the feedback received from users and NGOs during in-person, phone, email, and formal briefings were challenges related to the registration process.  Neither CBP nor CBP One collects data on race or skin complexion, and CBP does not provide the third-party software provider any personally identifiable information.  However, as noted above, CBP and iProov determined that there were issues related to the bandwidth for liveness detection, and

made requisite app updates. Following the app updates and increased bandwidth, iProov data provided to CBP shows the app is successfully verifying liveness around 80 – 90 percent of the time. Additionally, CBP requested the results of previous analytics conducted on racial bias in iProov's genuine presence software. IProov advised they conducted their own equality analysis and provided a summary statement of their findings, stating that "Across our global platform, differences in performance between ethnicities are of the order of tenths of a percent. These long-term averages are smaller than the variations we see month-to month for each ethnicity, and so it's unlikely they would be noticeable to users." Based on communications with IProov, CBP's understanding of the term "performance" is the "successful identification of genuine presence."

## VII.    Language and Disability Access

The CBP One advance information workflow is currently available in Spanish, English, and Haitian Creole. Haitian Creole was added on February 1, 2023 based on stakeholder feedback that language access was a significant concern for the large Haitian population attempting to use this functionality. The terms and conditions were translated in all 3 languages on April 6, 2023. However, not all drop-down menus are translated. CBP is working to translate the drop-down menus and terms of service, and anticipates that this will be completed by May 11, 2023. Additionally, CBP makes efforts to translate error messages, although I am not able to confirm that 100% of errors are translated. The CBP One team is able to translate the vast majority of errors, unless it is a bug or stems from an independent system that CBP One does not control. For example, 500 and 403 errors are now translated.

CBP will continue to assess whether additional languages are warranted, based on user feedback and demographics encountered at the border. CBP continues to monitor and evaluate language access in CBP One and will continue to respond to stakeholder feedback for additional languages as needed. Initial analysis conducted in March 2023 indicated the current three languages account for 82% of the applications users with the next highest demand being Russian at 9%. CBP has not received any requests for the app to be translated into Russian, and does not intend on adding Russian currently. Additionally, CBP is aware that Login.gov is currently not available in Haitian Creole. I have asked members of CBP's Office of Information Technology to reach out to their contacts at Login.gov and submit a request for translation into Haitian Creole.

The CBP One app is also undergoing a section 508 compliance review, which will be complete by the end of May 2023. CBP expects a final certification by the end of August 2023. In the meantime, CBP is aware of multiple free iOS and Android assistive technologies that can be used to access the app, if needed. For example, users can utilize free translate applications or other applications targeted to convert text to sound, provide magnification or translate into various languages. There are also videos online in various languages that provide step-by-step instruction. CBP is in the process of developing step-by step instructions in Spanish and Haitian Creole.

CLP_AR_001660



**U.S. Department of Homeland Security**

# Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration

**Release Date:** April 27, 2023

Today, the Department of State (State) and Department of Homeland Security (DHS) are announcing sweeping new measures to further reduce unlawful migration across the Western Hemisphere, significantly expand lawful pathways for protection, and facilitate the safe, orderly, and humane processing of migrants.

Like many other COVID-era public health measures, the CDC's temporary Title 42 public health order will also come to an end. But the lifting of the Title 42 order does not mean the border is open. When the Title 42 order lifts at 11:59 PM on May 11, the United States will return to using Title 8 immigration authorities to expeditiously process and remove individuals who arrive at the U.S. border unlawfully. These decades-old authorities carry steep consequences for unlawful entry, including at least a five-year ban on reentry and potential criminal prosecution for repeated attempts to enter unlawfully. The return to processing under Title 8 is expected to reduce the number of repeat border crossings over time, which increased significantly under Title 42. Individuals who cross into the United States at the southwest border without authorization or having used a lawful pathway, and without having scheduled a time to arrive at a port of entry, would be presumed ineligible for asylum under a new proposed regulation, absent an applicable exception.

The measures announced today will be implemented in close coordination with regional partners, including the governments of Mexico, Canada, Spain, Colombia, and Guatemala. They draw on the success of recent processes that have significantly reduced unlawful border crossings through a combination of expanded lawful pathways and swift removal of those who fail to use those lawful pathways.

Importantly, these measures do not supplant the need for congressional action. Only Congress can provide the reforms and resources necessary to fully manage the regional migration challenge. Since taking office, President Biden has continually called on Congress to pass legislation to update and reform our outdated immigration system. State and DHS are taking action with the tools and resources available under current law, but Congress's failure to pass and fund the President's plan will increase the challenge at the southwest border.

The measures announced today include:

## Imposing Stiffer Consequences for Failing to Use Lawful Pathways

The transition back to Title 8 processing for all individuals encountered at the border will be effective immediately when the Title 42 order lifts. Individuals who unlawfully cross the U.S. Southwest border:

- will generally be processed under Title 8 expedited removal authorities in a matter of days
- will be barred from reentry to the United States for at least five years if ordered removed; and
- would be presumed ineligible for asylum under the proposed Circumvention of Lawful Pathways regulation, absent an applicable exception

To avoid these consequences, individuals are encouraged to use the many lawful pathways the United States has expanded over the past two years. Today, the United States is announcing additional lawful pathways, including:

- **Expanded Access to the CBPOne App to Appear at a U.S. Port of Entry.** When the Title 42 order lifts, migrants located in Central and Northern Mexico will have access to the CBPOne mobile application to schedule an appointment to present themselves at a port of entry rather than trying to enter between ports. CBPOne will make additional appointments available, and the use of this tool will enable safe, orderly, and humane processing.
- **New Family Reunification Parole Processes.** DHS is creating new family reunification parole processes for El Salvador, Guatemala, Honduras and Colombia. The agency is also modernizing existing family reunification parole processes for Cuba and Haiti. These processes, once finalized, will allow vetted individuals with already approved family-based petitions to be paroled into the United States, on a case-by-case basis. The U.S. Government will deliver timely and efficient authorization for those approved and vetted to travel. Individuals paroled into the U.S. under these processes would be eligible to apply for work authorization.
- **Double Number of Refugees from Western Hemisphere.** The United States will commit to welcoming thousands of additional refugees per month from the Western Hemisphere – with the goal of doubling the number of refugees the United States committed to welcome as part of the

CLP_AR_002187

Case 1:23-cv-01843-TSC   Document 123   Filed 03/03/26   Page 83 of 721

Los Angeles Declaration on Migration and Protection. To achieve this goal, the United States is building on processing efficiencies achieved over the last two years and further increasing resources and staffing to the U.S. Refugee Admissions Program in this region.

In addition, the United States will continue to accept up to 30,000 individuals per month from Venezuela, Nicaragua, Cuba, and Haiti as part of the expanded parole processes announced earlier this year. Encounters at the border for these nationalities plummeted when DHS expanded the parole programs. The United States will also continue to utilize available authorities to continue to strengthen and expand additional lawful pathways.

## Humanely Managing Migration Flows with Regional Partners

A border-only approach to managing migration is insufficient. From day one, the Biden-Harris Administration has approached migration as a regional challenge – rebuilding relationships with key partners across the Western Hemisphere, bringing 20 world leaders together through the Los Angeles Declaration on Migration and Protection to jointly manage migration flows, and securing commitments from across the Western Hemisphere to expand lawful pathways, address root causes, and step up enforcement.

Building on these efforts, the United States is joining forces with partners across the Western Hemisphere to:

- **Open Regional Processing Centers Across the Western Hemisphere to Facilitate Access to Lawful Pathways.** In a historic move, the United States alongside other countries of the Los Angeles Declaration today announced they will establish Regional Processing Centers (RPCs) in key locations throughout the Western Hemisphere to reduce irregular migration and facilitate safe, orderly, humane, and lawful pathways from the Americas. The first centers will be established in several countries, including Colombia and Guatemala, in the region. Individuals from the region will be able to make an appointment on their phone to visit the nearest RPC before traveling, receive an interview with immigration specialists, and if eligible, be processed rapidly for lawful pathways to the United States, Canada, and Spain.
- **Launch an Aggressive Anti-Smuggling Campaign Targeting Criminal Networks in the Darien.** Panama, Colombia and the United States reached an historic agreement to launch a 60-day surge campaign to address the unprecedented migration through the dangerous Darien corridor. The campaign officially launched on April 20 and is focused on disrupting criminal networks that facilitate the illicit movement of people and increasing state presence in the jungle. As the authorities reclaim control of this region and root out criminal actors, migrants are urged to wait and avail themselves of safe, orderly lawful pathways, including new pathways announced today.
- **Increase Removals of Those Without a Lawful Basis to Stay.** The United States, in coordination with our regional partners, has dramatically scaled up the number of removal flights per week. That includes flights to Cuba, which resumed this week following a pause due to COVID-19. The number of weekly flights will double or triple for some countries. With this increase in removal flights, migrants who cross the U.S. border without authorization and who fail to qualify for protection should expect to be swiftly returned with at least a five-year bar to returning. The United States is also collaborating with foreign partners to crack down on criminal networks that charge enormous fees to migrants to facilitate migration by air. Individuals who arrive at international airports in the region with the intent to cross the U.S. border unlawfully should expect to be turned around and subject to consequences. DHS has also made those who attempt to migrate irregularly to the U.S. via dangerous maritime means ineligible for the parole processes announced in January.
- **Combat Smuggler Misinformation.** Smugglers are already ramping up misinformation campaigns to profit off of vulnerable migrants ahead of the return to Title 8 processing. To combat this misinformation, State's diplomatic missions across the hemisphere are broadcasting accurate information about U.S. migration laws and engaging with a wide spectrum of regional audiences to counter smuggler narratives. It will be incumbent upon all elected leaders and stakeholders – regardless of political affiliation – to work to counter smuggler misinformation and propaganda, not contribute to it.

## Facilitating Safe, Orderly, and Humane Processing of Migrants

The measures announced today aim to change the incentive structure that drives individuals to flee their countries and seek unlawful immigration pathways. They facilitate safe and orderly access to lawful pathways throughout the Western Hemisphere so that fewer migrants are putting their lives at risk to arrive directly at the Southwest border.

To facilitate the safe, orderly, and humane processing of migrants who arrive at the Southwest border, the United States will:

- **Expeditiously Process and Remove Individuals Who Arrive at the Southwest Border and Don't Have a Legal Basis to Remain.** Individuals in expedited removal proceedings and who express a fear of persecution in their country of nationality or designated country of removal will be referred to a U.S. Citizenship and Immigration Services officer with specialized asylum training for a credible fear interview. Interviews of single adults, as well as any immigration judge review of a negative determination, will take place while the noncitizen is in DHS custody, either in a U.S. Border Patrol or U.S. Immigration and Customs Enforcement facility. By expediting review of these asylum claims, DHS will be able to provide relief more quickly to those who are eligible and to more quickly remove those who are not. To support faster processing, DHS is increasing its holding capacity, expanding capabilities and technologies, installing hundreds of phone lines and privacy booths to conduct credible fear interviews (CFIs) and increase access to counsel, and schedule CFI interviews within 24 hours. DHS and the Department of Justice

CLP_AR_002188

Case 1:23-cv-01843-TSC    Document 123    Filed 03/03/26    Page 84 of 721

(DOJ) are also surging asylum officers and immigration judges, respectively, to complete immigration proceedings at the border more quickly. Like single adults, families will be placed in removal proceedings, which will include expedited removal.  DHS is currently focused on utilizing its Alternatives to Detention program for families, including GPS monitors and enhanced supervision, such as curfews, and expanding case management services.  More stringent measures may be used for those who do not comply. Like single adults, families with final orders of removal will be removed.

- **Surge Additional Resources.** DHS is significantly scaling up its air and ground transportation capabilities to quickly remove migrants when warranted or transport migrants to less-congested border sectors for further immigration enforcement proceedings. DHS is also making an additional $15 million available for its Case Management Pilot Program to provide voluntary case management and other services to noncitizens to increase compliance with court dates and accelerate processing times. Services will be made available to certain noncitizens enrolled in DHS's Alternatives to Detention program, which is an important tool used by DHS for individuals and families as they await the outcome of immigration proceedings.

- **Manage Resource Needs.** The initial actions announced today are necessary to prepare the return to Title 8 processing and increased encounters along the Southwest Border but are not in and of themselves sufficient to address the resources requirements DHS will incur after Title 42 is lifted. DHS notified Congress of its intent to reprogram funds within its budget to support other emerging requirements across DHS. The reprograming of existing funds to address the immediate shortfalls in border operations should not be interpreted as adequate for the longer term needs of securing our border and enforcing our laws. The Administration requested $4.9 billion for these functions but received only $2.7 billion in the Omnibus passed in December, which is not an adequate level to address both the anticipated short-term surge following the end of Title 42 on May 11 and the longer-term constraints of operating within a broken immigration system that Congress has not updated for decades. While the Department is prudently utilizing the limited funding Congress has provided to prepare for the post-Title 42 environment, this notification of repurposing existing funds is only a fraction of what DHS will ultimately need.

- **Reduce Impacts on Border Communities**. DHS has awarded more than $135 million to communities to date this fiscal year and will award an additional $290 million in the coming weeks.  The Administration is also ramping up coordination between state and local officials and other federal agencies to provide resources, technical assistance and support, including through regular information sessions with stakeholders to ensure that the program is broadly understood and the funds are accessible. The Administration will continue to mobilize faith-based and non-profit organizations supporting migrants, including those providing temporary shelter, food, transportation, and humanitarian assistance as individuals await the outcome of their immigration proceedings.

The Biden-Harris Administration has been preparing for the eventual lifting of the Title 42 public health order for well over a year. In addition to working to combat misinformation and coordinating with local communities and NGOs, DHS began contingency planning efforts to prepare for the eventual lifting of Title 42. In February 2022, DHS formally stood up the Southwest Border Coordination Center, which leads the planning and coordinating of a whole of government response to the anticipated increase in border encounters. In April 2022, Secretary Mayorkas issued the DHS Plan for Southwest Border Security and Preparedness, laying out a six-pillar plan to manage an increase in encounters once Title 42 is no longer in effect, and updated the plan in December 2022.

Notwithstanding these efforts, we expect the days following the end of Title 42 public health order will be challenging and that encounters will increase for a time, as smugglers will seek to spread disinformation to capitalize on this change. Through the approach described below and the work of our outstanding personnel, the Biden-Harris Administration will do everything within its authority to manage this challenge, but until and unless Congress delivers on the immigration reform measures President Biden requested on his first day in office, the United States' immigration system will remain broken.

## Topics

BORDER SECURITY (/TOPICS/BORDER-SECURITY)    CITIZENSHIP AND IMMIGRATION SERVICES (/TOPICS/CITIZENSHIP-AND-IMMIGRATION-SERVICES)

IMMIGRATION AND CUSTOMS ENFORCEMENT (/TOPICS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT)

## Keywords

BORDER SECURITY (/KEYWORDS/BORDER-SECURITY)    CUSTOMS AND BORDER PROTECTION (CBP) (/KEYWORDS/CUSTOMS-AND-BORDER-PROTECTION-CBP)

ENFORCEMENT AND REMOVAL OPERATIONS (ERO) (/KEYWORDS/ENFORCEMENT-AND-REMOVAL-OPERATIONS-ERO)

FAMILY REUNIFICATION (/KEYWORDS/FAMILY-REUNIFICATION)    HUMAN SMUGGLING (/KEYWORDS/HUMAN-SMUGGLING)    IMMIGRATION (/KEYWORDS/IMMIGRATION)

IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)

INTERNATIONAL PARTNERSHIP (/KEYWORDS/INTERNATIONAL-PARTNERSHIP)    MIGRATION (/KEYWORDS/MIGRATION)

PORT OF ENTRY (POE) (/KEYWORDS/PORT-ENTRY-POE)    REFUGEE (/KEYWORDS/REFUGEE)    REMOVAL (/KEYWORDS/REMOVAL)

SOUTHWEST BORDER (/KEYWORDS/SOUTHWEST-BORDER)    TRANSNATIONAL CRIMINAL ORGANIZATION (TCO) (/KEYWORDS/TRANSNATIONAL-CRIMINAL-ORGANIZATION-TCO)

Last Updated: 04/27/2023

CLP_AR_002189

Quote: Analysis by the DHS Office of Immigration Statistics ("OIS") found that even while CDC's Title 42 public health Order has been in place, encounters at our SWB —referring to the number of times U.S. officials encounter noncitizens attempting to
Source: OIS analysis of OIS Persist Dataset based on data through March 31, 2023; OIS Analysis of historic U.S. Border Patrol data.
Filters: SWB (ALWAYS Southwest Land Border); excludes CBPOne

Monthly encounters are highlighted red if larger than 14-19 average

| | Brazil | Colombia | Cuba | Ecuador | El Salvador | Haiti | Nicaragua | Peru | Venezuela | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Oct-19 | 1,504 | 41 | 1,843 | 1,343 | 2,582 | 230 | 348 | 72 | 728 | 45,139 |
| Nov-19 | 1,698 | 67 | 1,182 | 1,181 | 2,175 | 459 | 313 | 63 | 588 | 42,642 |
| Dec-19 | 1,331 | 58 | 949 | 1,638 | 1,939 | 657 | 304 | 72 | 693 | 40,563 |
| Jan-20 | 1,141 | 60 | 655 | 1,565 | 1,330 | 490 | 218 | 72 | 243 | 36,583 |
| Feb-20 | 726 | 61 | 596 | 1,437 | 1,488 | 839 | 209 | 58 | 206 | 36,686 |
| Mar-20 | 327 | 40 | 432 | 1,381 | 1,441 | 586 | 215 | 77 | 166 | 34,457 |
| Apr-20 | 81 | 4 | 164 | 682 | 553 | 20 | 89 | 18 | 9 | 17,106 |
| May-20 | 39 | 17 | 535 | 368 | 471 | 8 | 70 | 4 | 10 | 23,237 |
| Jun-20 | 61 | 12 | 947 | 146 | 542 | 151 | 97 | 16 | 13 | 33,029 |
| Jul-20 | 50 | 18 | 1,567 | 151 | 947 | 158 | 110 | 13 | 36 | 40,949 |
| Aug-20 | 34 | 16 | 2,181 | 685 | 1,478 | 55 | 126 | 5 | 49 | 50,007 |
| Sep-20 | 169 | 10 | 2,359 | 1,518 | 2,219 | 882 | 192 | 14 | 46 | 57,668 |
| Oct-20 | 163 | 26 | 1,679 | 2,220 | 3,014 | 593 | 256 | 12 | 143 | 71,927 |
| Nov-20 | 229 | 69 | 1,590 | 2,765 | 3,650 | 97 | 387 | 22 | 184 | 72,113 |
| Dec-20 | 291 | 73 | 2,067 | 3,676 | 3,921 | 237 | 640 | 63 | 206 | 73,994 |
| Jan-21 | 308 | 69 | 1,899 | 3,598 | 3,580 | 1,718 | 534 | 52 | 295 | 78,414 |
| Feb-21 | 991 | 76 | 3,848 | 3,440 | 5,599 | 827 | 706 | 81 | 913 | 101,098 |
| Mar-21 | 3,995 | 179 | 5,700 | 5,579 | 9,475 | 3,084 | 1,930 | 126 | 2,566 | 173,277 |
| Apr-21 | 8,750 | 260 | 3,288 | 8,079 | 11,043 | 1,250 | 3,074 | 250 | 6,048 | 178,795 |
| May-21 | 7,374 | 408 | 2,664 | 11,691 | 10,462 | 2,817 | 4,414 | 296 | 7,499 | 180,597 |
| Jun-21 | 6,566 | 481 | 3,072 | 12,803 | 11,582 | 5,904 | 7,435 | 450 | 7,583 | 189,034 |
| Jul-21 | 8,643 | 751 | 3,559 | 17,335 | 12,719 | 5,521 | 13,456 | 438 | 6,126 | 213,593 |
| Aug-21 | 9,100 | 1,562 | 4,496 | 17,611 | 12,692 | 7,569 | 9,979 | 511 | 6,301 | 209,840 |
| Sep-21 | 10,471 | 2,248 | 4,812 | 7,353 | 10,953 | 17,638 | 7,298 | 896 | 10,814 | 192,001 |
| Oct-21 | 7,904 | 3,015 | 5,896 | 748 | 9,801 | 908 | 9,255 | 1,024 | 13,416 | 164,837 |
| Nov-21 | 6,955 | 3,368 | 6,605 | 556 | 9,664 | 1,022 | 13,627 | 1,193 | 20,388 | 174,845 |
| Dec-21 | 7,926 | 4,094 | 7,986 | 673 | 8,874 | 7,144 | 15,297 | 1,268 | 24,801 | 179,253 |
| Jan-22 | 2,766 | 3,911 | 9,721 | 602 | 5,810 | 3,372 | 11,564 | 860 | 22,779 | 154,874 |
| Feb-22 | 1,402 | 9,608 | 16,557 | 683 | 7,146 | 1,877 | 13,296 | 1,458 | 3,073 | 166,010 |
| Mar-22 | 1,346 | 15,373 | 32,153 | 877 | 8,403 | 2,171 | 16,017 | 2,460 | 4,053 | 222,574 |
| Apr-22 | 3,024 | 13,128 | 34,839 | 1,636 | 8,355 | 5,739 | 12,565 | 3,573 | 4,107 | 235,785 |
| May-22 | 5,125 | 19,320 | 25,643 | 3,046 | 8,980 | 10,514 | 19,034 | 9,744 | 5,088 | 241,137 |
| Jun-22 | 4,026 | 12,597 | 16,172 | 3,231 | 9,123 | 4,069 | 11,200 | 5,853 | 13,199 | 207,834 |
| Jul-22 | 5,504 | 13,454 | 20,098 | 2,948 | 7,952 | 5,380 | 12,073 | 7,216 | 17,647 | 200,162 |
| Aug-22 | 5,747 | 13,497 | 19,060 | 3,681 | 6,675 | 6,551 | 11,749 | 7,782 | 25,361 | 204,087 |
| Sep-22 | 1,732 | 13,807 | 26,178 | 5,379 | 6,247 | 5,163 | 18,199 | 8,231 | 33,804 | 227,547 |
| Oct-22 | 747 | 17,191 | 28,841 | 7,030 | 5,995 | 6,577 | 20,919 | 9,079 | 22,039 | 228,603 |
| Nov-22 | 709 | 15,609 | 34,709 | 11,995 | 5,457 | 5,385 | 34,236 | 8,529 | 7,963 | 231,021 |
| Dec-22 | 1,215 | 17,428 | 42,653 | 16,203 | 4,804 | 5,073 | 35,387 | 11,357 | 8,131 | 248,604 |
| Jan-23 | 1,084 | 9,215 | 6,229 | 9,013 | 3,680 | 2,640 | 3,352 | 3,890 | 3,740 | 146,485 |
| Feb-23 | 1,286 | 12,576 | 189 | 7,003 | 4,515 | 185 | 412 | 5,029 | 1,614 | 135,691 |

14-19 yearly totals, and 14-19 average. If higher than this average, unprecedented

| Row Label | Brazil | Colombia | Cuba | Ecuador | El Salvador | Haiti | Nicaragua | Peru | Venezuela |
|---|---|---|---|---|---|---|---|---|---|
| 2014 | 583 | 330 | 17,564 | 4,858 | 68,385 | 493 | 1,874 | 974 | 78 |
| 2015 | 1,410 | 413 | 31,065 | 2,659 | 45,110 | 343 | 1,069 | 541 | 163 |
| 2016 | 4,648 | 490 | 41,617 | 2,980 | 80,566 | 6,427 | 1,377 | 687 | 326 |
| 2017 | 4,703 | 293 | 15,557 | 1,586 | 57,188 | 9,263 | 1,150 | 567 | 395 |
| 2018 | 5,917 | 320 | 7,124 | 1,554 | 36,999 | 308 | 3,553 | 682 | 686 |
| 2019 | 19,513 | 631 | 33,014 | 13,374 | 92,345 | 3,067 | 14,380 | 934 | 7,677 |
| | | | | | | | | | |
| 14-19 | 6,129 | 413 | 24,324 | 4,502 | 63,432 | 3,317 | 3,901 | 731 | 1,554 |

CLP_AR_002374

CLP_AR_002375

Mar-23    2,247    16,596    193    6,729    5,427    328    232    8,248    3,860    169,035

cross the SWB of the United States without authorization to do so— reached an all-time high in 2022, driven in large part by an unprecedented exodus of migrants at different times from countries such as Brazil, Colombia, Cuba, Ecuador, Haiti, M

**USBP SWB Encounters (Yearbook)**

| Year | Encounters | | |
|---|---|---|---|
| 1960 | 21,022 | | |
| 1961 | 21,745 | average FY1983-2006 | 1,190,461 |
| 1962 | 21,103 | average FY2011-2018 | 377,364 |
| 1963 | 29,644 | Factor increase from 2017-2019 | 2.80 |
| 1964 | 32,519 | Factor increase from 2019-2021 | 1.95 |
| 1965 | 40,020 | Factor increase from 2021-22 | 1.33 |
| 1966 | 62,640 | 2022 all time high | 2,206,437 |
| 1967 | 73,973 | | |
| 1968 | 96,641 | | |
| 1969 | 137,968 | | |
| 1970 | 201,780 | | |
| 1971 | 263,991 | | |
| 1972 | 321,326 | | |
| 1973 | 441,066 | | |
| 1974 | 571,606 | | |
| 1975 | 512,264 | | |
| 1976 | 607,499 | | |
| 1977 | 733,193 | | |
| 1978 | 789,441 | | |
| 1979 | 795,798 | | |
| 1980 | 690,554 | | |
| 1981 | 749,808 | | |
| 1982 | 745,820 | | |
| 1983 | 1,033,974 | | |
| 1984 | 1,058,276 | | |
| 1985 | 1,183,351 | | |
| 1986 | 1,615,844 | | |
| 1987 | 1,122,067 | | |
| 1988 | 942,561 | | |
| 1989 | 852,506 | | |
| 1990 | 1,049,321 | | |
| 1991 | 1,077,876 | | |
| 1992 | 1,145,574 | | |
| 1993 | 1,212,886 | | |
| 1994 | 979,101 | | |
| 1995 | 1,271,390 | | |
| 1996 | 1,507,020 | | |
| 1997 | 1,368,707 | | |
| 1998 | 1,516,680 | | |
| 1999 | 1,537,000 | | |
| 2000 | 1,643,679 | | |

CLP_AR_002376

CLP_AR_002377

| Year | Value |
|------|-------|
| 2001 | 1,235,718 |
| 2002 | 929,809 |
| 2003 | 905,065 |
| 2004 | 1,139,282 |
| 2005 | 1,171,396 |
| 2006 | 1,071,972 |
| 2007 | 858,638 |
| 2008 | 705,005 |
| 2009 | 540,865 |
| 2010 | 447,731 |
| 2011 | 327,577 |
| 2012 | 356,873 |
| 2013 | 414,397 |
| 2014 | 479,370 |
| 2015 | 331,333 |
| 2016 | 408,870 |
| 2017 | 303,916 |
| 2018 | 396,579 |
| 2019 | 851,508 |
| 2020 | 400,635 |
| 2021 | 1,659,206 |
| 2022 | 2,206,437 |

CLP_AR_002378

Nicaragua, Peru, and Venezuela.

Quote: The U.S. Border Patrol ("USBP") completed 221,710 encounters between ports of entry in December 2022, second only to May 2022 (224,371 encounters) for the most monthly encounters since at least Fiscal Year ("FY") 2000 (the period f
Footnote: OIS analysis of OIS Production data based on data through March 31, 2023.
Filters: SWB; USBP

Average daily encounters 2000-2019: 1,977
Average daily encounters 2014-2019: 1,265

**USBP Encounters**

| | |
|---|---|
| Oct-21 | 159,113 |
| Nov-21 | 167,015 |
| Dec-21 | 170,602 |
| Jan-22 | 147,877 |
| Feb-22 | 159,170 |
| Mar-22 | 211,181 |
| Apr-22 | 203,504 |
| May-22 | 224,371 |
| Jun-22 | 192,399 |
| Jul-22 | 181,834 |
| Aug-22 | 181,774 |
| Sep-22 | 207,597 |
| Oct-22 | 204,885 |
| Nov-22 | 207,448 |
| Dec-22 | 221,710 |
| Jan-23 | 128,936 |
| Feb-23 | 130,024 |
| Mar-23 | 162,317 |

**USBP Encounters**

| | |
|---|---|
| 12/01/202 | 7532 |
| 12/02/202 | 8736 |
| 12/03/202 | 7119 |
| 12/04/202 | 7100 |
| 12/05/202 | 7369 |
| 12/06/202 | 7415 |
| 12/07/202 | 8390 |
| 12/08/202 | 8371 |
| 12/09/202 | 8497 |
| 12/10/202 | 8181 |
| 12/11/202 | 7902 |
| 12/12/202 | 7811 |
| 12/13/202 | 8073 |
| 12/14/202 | 8281 |
| 12/15/202 | 8132 |
| 12/16/202 | 6849 |
| 12/17/202 | 6940 |
| 12/18/202 | 6904 |
| 12/19/202 | 7309 |
| 12/20/202 | 8568 |
| 12/21/202 | 8431 |
| 12/22/202 | 8086 |
| 12/23/202 | 7301 |
| 12/24/202 | 6247 |
| 12/25/202 | 3532 |
| 12/26/202 | 5013 |
| 12/27/202 | 6084 |
| 12/28/202 | 5914 |
| 12/29/202 | 5512 |
| 12/30/202 | 4736 |
| 12/31/202 | 5375 |

| | |
|---|---|
| Low | 3,532 |
| High | 8,736 |
| Average | 7,152 |
| Over 8000 | 11 |

**USBP SW Land Border Apprehensions: FY2000-FY2023YTD (March)**

| FY | CY | Month | Mon-FY | Mon-CY'n of count | Daily Avg | FY Totals | Days/year |
|---|---|---|---|---|---|---|---|
| 2000 | 1999 | Oct | Oct-00 | Oct-99 | 87,819 | 2,833 | 1,566,421 | 366 |
| 2000 | 1999 | Nov | Nov-00 | Nov-99 | 74,362 | 2,479 | | |
| 2000 | 1999 | Dec | Dec-00 | Dec-99 | 66,256 | 2,137 | | |
| 2000 | 2000 | Jan | Jan-00 | Jan-00 | 175,383 | 5,658 | | |
| 2000 | 2000 | Feb | Feb-00 | Feb-00 | 200,619 | 7,165 | | |
| 2000 | 2000 | Mar | Mar-00 | Mar-00 | 209,311 | 6,752 | | |
| 2000 | 2000 | Apr | Apr-00 | Apr-00 | 170,621 | 5,687 | | |
| 2000 | 2000 | May | May-00 | May-00 | 155,961 | 5,031 | | |
| 2000 | 2000 | Jun | Jun-00 | Jun-00 | 103,856 | 3,462 | | |
| 2000 | 2000 | Jul | Jul-00 | Jul-00 | 111,963 | 3,612 | | |
| 2000 | 2000 | Aug | Aug-00 | Aug-00 | 113,448 | 3,660 | | |
| 2000 | 2000 | Sep | Sep-00 | Sep-00 | 96,822 | 3,227 | | |
| 2001 | 2000 | Oct | Oct-01 | Oct-00 | 81,995 | 2,645 | 1,231,412 | 365 |
| 2001 | 2000 | Nov | Nov-01 | Nov-00 | 67,217 | 2,241 | | |
| 2001 | 2000 | Dec | Dec-01 | Dec-00 | 54,828 | 1,769 | | |
| 2001 | 2001 | Jan | Jan-01 | Jan-01 | 124,586 | 4,019 | | |
| 2001 | 2001 | Feb | Feb-01 | Feb-01 | 150,616 | 5,379 | | |
| 2001 | 2001 | Mar | Mar-01 | Mar-01 | 169,904 | 5,481 | | |
| 2001 | 2001 | Apr | Apr-01 | Apr-01 | 142,040 | 4,735 | | |
| 2001 | 2001 | May | May-01 | May-01 | 123,054 | 3,969 | | |
| 2001 | 2001 | Jun | Jun-01 | Jun-01 | 89,034 | 2,968 | | |
| 2001 | 2001 | Jul | Jul-01 | Jul-01 | 83,853 | 2,705 | | |
| 2001 | 2001 | Aug | Aug-01 | Aug-01 | 84,837 | 2,737 | | |
| 2001 | 2001 | Sep | Sep-01 | Sep-01 | 59,448 | 1,982 | | |
| 2002 | 2001 | Oct | Oct-02 | Oct-01 | 37,746 | 1,218 | 930,341 | 365 |
| 2002 | 2001 | Nov | Nov-02 | Nov-01 | 32,694 | 1,090 | | |
| 2002 | 2001 | Dec | Dec-02 | Dec-01 | 31,531 | 1,017 | | |
| 2002 | 2002 | Jan | Jan-02 | Jan-02 | 79,647 | 2,569 | | |
| 2002 | 2002 | Feb | Feb-02 | Feb-02 | 95,645 | 3,416 | | |
| 2002 | 2002 | Mar | Mar-02 | Mar-02 | 126,906 | 4,094 | | |
| 2002 | 2002 | Apr | Apr-02 | Apr-02 | 121,908 | 4,064 | | |
| 2002 | 2002 | May | May-02 | May-02 | 97,571 | 3,147 | | |
| 2002 | 2002 | Jun | Jun-02 | Jun-02 | 78,730 | 2,624 | | |
| 2002 | 2002 | Jul | Jul-02 | Jul-02 | 76,719 | 2,475 | | |
| 2002 | 2002 | Aug | Aug-02 | Aug-02 | 82,860 | 2,673 | | |
| 2002 | 2002 | Sep | Sep-02 | Sep-02 | 68,384 | 2,279 | | |
| 2003 | 2002 | Oct | Oct-03 | Oct-02 | 61,913 | 1,997 | 906,734 | 365 |
| 2003 | 2002 | Nov | Nov-03 | Nov-02 | 47,919 | 1,597 | | |
| 2003 | 2002 | Dec | Dec-03 | Dec-02 | 37,930 | 1,224 | | |
| 2003 | 2003 | Jan | Jan-03 | Jan-03 | 87,002 | 2,807 | | |
| 2003 | 2003 | Feb | Feb-03 | Feb-03 | 97,016 | 3,465 | | |

Oct 1,977
Nov
Dec
Jan
Feb
Mar
Apr
May
Jun
Jul
Aug
Sep

CLP_AR_002379

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2003 | 2003 | Mar | Mar-03 | Mar-03 | 98,625 | 3,181 | | |
| 2003 | 2003 | Apr | Apr-03 | Apr-03 | 75,564 | 2,519 | | |
| 2003 | 2003 | May | May-03 | May-03 | 88,845 | 2,866 | | |
| 2003 | 2003 | Jun | Jun-03 | Jun-03 | 75,634 | 2,521 | | |
| 2003 | 2003 | Jul | Jul-03 | Jul-03 | 79,396 | 2,561 | | |
| 2003 | 2003 | Aug | Aug-03 | Aug-03 | 84,651 | 2,731 | | |
| 2003 | 2003 | Sep | Sep-03 | Sep-03 | 72,239 | 2,408 | | |
| 2004 | 2003 | Oct | Oct-04 | Oct-03 | 65,388 | 2,109 | 1,140,247 | 366 |
| 2004 | 2003 | Nov | Nov-04 | Nov-03 | 57,942 | 1,931 | | |
| 2004 | 2003 | Dec | Dec-04 | Dec-03 | 43,663 | 1,408 | | |
| 2004 | 2004 | Jan | Jan-04 | Jan-04 | 92,751 | 2,992 | | |
| 2004 | 2004 | Feb | Feb-04 | Feb-04 | 110,824 | 3,958 | | |
| 2004 | 2004 | Mar | Mar-04 | Mar-04 | 155,089 | 5,003 | | |
| 2004 | 2004 | Apr | Apr-04 | Apr-04 | 135,632 | 4,521 | | |
| 2004 | 2004 | May | May-04 | May-04 | 118,811 | 3,833 | | |
| 2004 | 2004 | Jun | Jun-04 | Jun-04 | 94,607 | 3,154 | | |
| 2004 | 2004 | Jul | Jul-04 | Jul-04 | 92,152 | 2,973 | | |
| 2004 | 2004 | Aug | Aug-04 | Aug-04 | 93,299 | 3,010 | | |
| 2004 | 2004 | Sep | Sep-04 | Sep-04 | 80,089 | 2,670 | | |
| 2005 | 2004 | Oct | Oct-05 | Oct-04 | 75,908 | 2,449 | 1,171,391 | 365 |
| 2005 | 2004 | Nov | Nov-05 | Nov-04 | 65,110 | 2,170 | | |
| 2005 | 2004 | Dec | Dec-05 | Dec-04 | 48,410 | 1,562 | | |
| 2005 | 2005 | Jan | Jan-05 | Jan-05 | 93,029 | 3,001 | | |
| 2005 | 2005 | Feb | Feb-05 | Feb-05 | 113,776 | 4,063 | | |
| 2005 | 2005 | Mar | Mar-05 | Mar-05 | 143,044 | 4,614 | | |
| 2005 | 2005 | Apr | Apr-05 | Apr-05 | 140,074 | 4,669 | | |
| 2005 | 2005 | May | May-05 | May-05 | 115,817 | 3,736 | | |
| 2005 | 2005 | Jun | Jun-05 | Jun-05 | 90,796 | 3,027 | | |
| 2005 | 2005 | Jul | Jul-05 | Jul-05 | 94,964 | 3,063 | | |
| 2005 | 2005 | Aug | Aug-05 | Aug-05 | 96,745 | 3,121 | | |
| 2005 | 2005 | Sep | Sep-05 | Sep-05 | 93,718 | 3,124 | | |
| 2006 | 2005 | Oct | Oct-06 | Oct-05 | 83,561 | 2,696 | 1,071,976 | 365 |
| 2006 | 2005 | Nov | Nov-06 | Nov-05 | 70,954 | 2,365 | | |
| 2006 | 2005 | Dec | Dec-06 | Dec-05 | 52,663 | 1,699 | | |
| 2006 | 2006 | Jan | Jan-06 | Jan-06 | 101,262 | 3,267 | | |
| 2006 | 2006 | Feb | Feb-06 | Feb-06 | 125,030 | 4,465 | | |
| 2006 | 2006 | Mar | Mar-06 | Mar-06 | 160,696 | 5,184 | | |
| 2006 | 2006 | Apr | Apr-06 | Apr-06 | 126,554 | 4,218 | | |
| 2006 | 2006 | May | May-06 | May-06 | 105,443 | 3,401 | | |
| 2006 | 2006 | Jun | Jun-06 | Jun-06 | 68,365 | 2,279 | | |
| 2006 | 2006 | Jul | Jul-06 | Jul-06 | 59,633 | 1,924 | | |
| 2006 | 2006 | Aug | Aug-06 | Aug-06 | 59,733 | 1,927 | | |
| 2006 | 2006 | Sep | Sep-06 | Sep-06 | 58,082 | 1,936 | | |
| 2007 | 2006 | Oct | Oct-07 | Oct-06 | 60,726 | 1,959 | 858,736 | 365 |
| 2007 | 2006 | Nov | Nov-07 | Nov-06 | 51,592 | 1,720 | | |
| 2007 | 2006 | Dec | Dec-07 | Dec-06 | 40,527 | 1,307 | | |
| 2007 | 2007 | Jan | Jan-07 | Jan-07 | 72,000 | 2,323 | | |

CLP_AR_002380

CLP_AR_002381

| | | | | | | | Total A | Total B |
|---|---|---|---|---|---|---|---|---|
| 2007 | 2007 | Feb | Feb-07 | Feb-07 | 79,273 | 2,831 | | |
| 2007 | 2007 | Mar | Mar-07 | Mar-07 | 114,136 | 3,682 | | |
| 2007 | 2007 | Apr | Apr-07 | Apr-07 | 104,465 | 3,482 | | |
| 2007 | 2007 | May | May-07 | May-07 | 88,510 | 2,855 | | |
| 2007 | 2007 | Jun | Jun-07 | Jun-07 | 71,336 | 2,378 | | |
| 2007 | 2007 | Jul | Jul-07 | Jul-07 | 66,793 | 2,155 | | |
| 2007 | 2007 | Aug | Aug-07 | Aug-07 | 59,801 | 1,929 | | |
| 2007 | 2007 | Sep | Sep-07 | Sep-07 | 49,577 | 1,653 | | |
| 2008 | 2007 | Oct | Oct-08 | Oct-07 | 51,355 | 1,657 | 705,049 | 366 |
| 2008 | 2007 | Nov | Nov-08 | Nov-07 | 42,208 | 1,407 | | |
| 2008 | 2007 | Dec | Dec-08 | Dec-07 | 31,824 | 1,027 | | |
| 2008 | 2008 | Jan | Jan-08 | Jan-08 | 59,034 | 1,904 | | |
| 2008 | 2008 | Feb | Feb-08 | Feb-08 | 73,483 | 2,624 | | |
| 2008 | 2008 | Mar | Mar-08 | Mar-08 | 89,769 | 2,896 | | |
| 2008 | 2008 | Apr | Apr-08 | Apr-08 | 91,552 | 3,052 | | |
| 2008 | 2008 | May | May-08 | May-08 | 69,240 | 2,234 | | |
| 2008 | 2008 | Jun | Jun-08 | Jun-08 | 53,850 | 1,795 | | |
| 2008 | 2008 | Jul | Jul-08 | Jul-08 | 49,468 | 1,596 | | |
| 2008 | 2008 | Aug | Aug-08 | Aug-08 | 48,544 | 1,566 | | |
| 2008 | 2008 | Sep | Sep-08 | Sep-08 | 44,722 | 1,491 | | |
| 2009 | 2008 | Oct | Oct-09 | Oct-08 | 42,937 | 1,385 | 540,851 | 365 |
| 2009 | 2008 | Nov | Nov-09 | Nov-08 | 32,782 | 1,093 | | |
| 2009 | 2008 | Dec | Dec-09 | Dec-08 | 25,946 | 837 | | |
| 2009 | 2009 | Jan | Jan-09 | Jan-09 | 44,503 | 1,436 | | |
| 2009 | 2009 | Feb | Feb-09 | Feb-09 | 49,211 | 1,758 | | |
| 2009 | 2009 | Mar | Mar-09 | Mar-09 | 67,342 | 2,172 | | |
| 2009 | 2009 | Apr | Apr-09 | Apr-09 | 58,493 | 1,950 | | |
| 2009 | 2009 | May | May-09 | May-09 | 50,883 | 1,641 | | |
| 2009 | 2009 | Jun | Jun-09 | Jun-09 | 46,044 | 1,535 | | |
| 2009 | 2009 | Jul | Jul-09 | Jul-09 | 43,841 | 1,414 | | |
| 2009 | 2009 | Aug | Aug-09 | Aug-09 | 43,519 | 1,404 | | |
| 2009 | 2009 | Sep | Sep-09 | Sep-09 | 35,350 | 1,178 | | |
| 2010 | 2009 | Oct | Oct-10 | Oct-09 | 40,890 | 1,319 | 447,731 | 365 |
| 2010 | 2009 | Nov | Nov-10 | Nov-09 | 32,815 | 1,094 | | |
| 2010 | 2009 | Dec | Dec-10 | Dec-09 | 25,034 | 808 | | |
| 2010 | 2010 | Jan | Jan-10 | Jan-10 | 34,784 | 1,122 | | |
| 2010 | 2010 | Feb | Feb-10 | Feb-10 | 42,790 | 1,528 | | |
| 2010 | 2010 | Mar | Mar-10 | Mar-10 | 61,361 | 1,979 | | |
| 2010 | 2010 | Apr | Apr-10 | Apr-10 | 55,237 | 1,841 | | |
| 2010 | 2010 | May | May-10 | May-10 | 47,045 | 1,518 | | |
| 2010 | 2010 | Jun | Jun-10 | Jun-10 | 32,955 | 1,099 | | |
| 2010 | 2010 | Jul | Jul-10 | Jul-10 | 25,609 | 826 | | |
| 2010 | 2010 | Aug | Aug-10 | Aug-10 | 26,415 | 852 | | |
| 2010 | 2010 | Sep | Sep-10 | Sep-10 | 22,796 | 760 | | |
| 2011 | 2010 | Oct | Oct-11 | Oct-10 | 26,165 | 844 | 327,577 | 365 |
| 2011 | 2010 | Nov | Nov-11 | Nov-10 | 22,405 | 747 | | |
| 2011 | 2010 | Dec | Dec-11 | Dec-10 | 19,429 | 627 | | |

CLP_AR_002382



| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2011 | 2011 | Jan | Jan-11 | Jan-11 | 23,926 | 772 | | |
| 2011 | 2011 | Feb | Feb-11 | Feb-11 | 28,786 | 1,028 | | |
| 2011 | 2011 | Mar | Mar-11 | Mar-11 | 42,014 | 1,355 | | |
| 2011 | 2011 | Apr | Apr-11 | Apr-11 | 36,251 | 1,208 | | |
| 2011 | 2011 | May | May-11 | May-11 | 31,236 | 1,008 | | |
| 2011 | 2011 | Jun | Jun-11 | Jun-11 | 27,166 | 906 | | |
| 2011 | 2011 | Jul | Jul-11 | Jul-11 | 23,170 | 747 | | |
| 2011 | 2011 | Aug | Aug-11 | Aug-11 | 24,166 | 780 | | |
| 2011 | 2011 | Sep | Sep-11 | Sep-11 | 22,863 | 762 | | |
| 2012 | 2011 | Oct | Oct-11 | Oct-12 | 25,612 | 826 | 356,873 | 366 |
| 2012 | 2011 | Nov | Nov-11 | Nov-12 | 23,368 | 779 | | |
| 2012 | 2011 | Dec | Dec-11 | Dec-12 | 18,983 | 612 | | |
| 2012 | 2012 | Jan | Jan-12 | Jan-12 | 25,714 | 829 | | |
| 2012 | 2012 | Feb | Feb-12 | Feb-12 | 31,579 | 1,128 | | |
| 2012 | 2012 | Mar | Mar-12 | Mar-12 | 42,218 | 1,362 | | |
| 2012 | 2012 | Apr | Apr-12 | Apr-12 | 40,628 | 1,354 | | |
| 2012 | 2012 | May | May-12 | May-12 | 36,966 | 1,192 | | |
| 2012 | 2012 | Jun | Jun-12 | Jun-12 | 30,669 | 1,022 | | |
| 2012 | 2012 | Jul | Jul-12 | Jul-12 | 26,978 | 870 | | |
| 2012 | 2012 | Aug | Aug-12 | Aug-12 | 27,567 | 889 | | |
| 2012 | 2012 | Sep | Sep-12 | Sep-12 | 26,591 | 886 | | |
| 2013 | 2012 | Oct | Oct-12 | Oct-13 | 28,929 | 933 | 414,397 | 365 |
| 2013 | 2012 | Nov | Nov-12 | Nov-13 | 27,636 | 921 | | |
| 2013 | 2012 | Dec | Dec-12 | Dec-13 | 23,243 | 750 | | |
| 2013 | 2013 | Jan | Jan-13 | Jan-13 | 26,921 | 868 | | |
| 2013 | 2013 | Feb | Feb-13 | Feb-13 | 35,042 | 1,252 | | |
| 2013 | 2013 | Mar | Mar-13 | Mar-13 | 47,293 | 1,526 | | |
| 2013 | 2013 | Apr | Apr-13 | Apr-13 | 48,212 | 1,607 | | |
| 2013 | 2013 | May | May-13 | May-13 | 43,856 | 1,415 | | |
| 2013 | 2013 | Jun | Jun-13 | Jun-13 | 34,436 | 1,148 | | |
| 2013 | 2013 | Jul | Jul-13 | Jul-13 | 33,230 | 1,072 | | |
| 2013 | 2013 | Aug | Aug-13 | Aug-13 | 33,797 | 1,090 | | |
| 2013 | 2013 | Sep | Sep-13 | Sep-13 | 31,802 | 1,060 | | |
| 2014 | 2013 | Oct | Oct-13 | Oct-14 | 35,312 | 1,139 | 479,370 | 365 · ==1264.982== |
| 2014 | 2013 | Nov | Nov-13 | Nov-14 | 31,896 | 1,063 | | |
| 2014 | 2013 | Dec | Dec-13 | Dec-14 | 29,528 | 953 | | |
| 2014 | 2013 | Jan | Jan-14 | Jan-14 | 28,668 | 925 | | |
| 2014 | 2014 | Feb | Feb-14 | Feb-14 | 36,403 | 1,300 | | |
| 2014 | 2014 | Mar | Mar-14 | Mar-14 | 49,596 | 1,600 | | |
| 2014 | 2014 | Apr | Apr-14 | Apr-14 | 51,502 | 1,717 | | |
| 2014 | 2014 | May | May-14 | May-14 | 60,683 | 1,958 | | |
| 2014 | 2014 | Jun | Jun-14 | Jun-14 | 57,861 | 1,929 | | |
| 2014 | 2014 | Jul | Jul-14 | Jul-14 | 40,708 | 1,313 | | |
| 2014 | 2014 | Aug | Aug-14 | Aug-14 | 31,388 | 1,013 | | |
| 2014 | 2014 | Sep | Sep-14 | Sep-14 | 25,825 | 861 | | |
| 2015 | 2014 | Oct | Oct-15 | Oct-14 | 26,450 | 853 | 331,333 | 365 |
| 2015 | 2014 | Nov | Nov-15 | Nov-14 | 24,641 | 821 | | |

CLP_AR_002383

| Year | Year | Month | Date | Date | Value | Value | Total | Days |
|---|---|---|---|---|---|---|---|---|
| 2015 | 2014 | Dec | Dec-15 | Dec-14 | 25,019 | 807 | | |
| 2015 | 2015 | Jan | Jan-15 | Jan-15 | 21,514 | 694 | | |
| 2015 | 2015 | Feb | Feb-15 | Feb-15 | 24,376 | 871 | | |
| 2015 | 2015 | Mar | Mar-15 | Mar-15 | 29,791 | 961 | | |
| 2015 | 2015 | Apr | Apr-15 | Apr-15 | 29,750 | 992 | | |
| 2015 | 2015 | May | May-15 | May-15 | 31,576 | 1,019 | | |
| 2015 | 2015 | Jun | Jun-15 | Jun-15 | 29,303 | 977 | | |
| 2015 | 2015 | Jul | Jul-15 | Jul-15 | 28,388 | 916 | | |
| 2015 | 2015 | Aug | Aug-15 | Aug-15 | 30,239 | 975 | | |
| 2015 | 2015 | Sep | Sep-15 | Sep-15 | 30,286 | 1,010 | | |
| 2016 | 2015 | Oct | Oct-16 | Oct-15 | 32,724 | 1,056 | 408,870 | 366 |
| 2016 | 2015 | Nov | Nov-16 | Nov-15 | 32,838 | 1,095 | | |
| 2016 | 2015 | Dec | Dec-16 | Dec-15 | 37,014 | 1,194 | | |
| 2016 | 2016 | Jan | Jan-16 | Jan-16 | 23,758 | 766 | | |
| 2016 | 2016 | Feb | Feb-16 | Feb-16 | 26,072 | 931 | | |
| 2016 | 2016 | Mar | Mar-16 | Mar-16 | 33,316 | 1,075 | | |
| 2016 | 2016 | Apr | Apr-16 | Apr-16 | 38,089 | 1,270 | | |
| 2016 | 2016 | May | May-16 | May-16 | 40,337 | 1,301 | | |
| 2016 | 2016 | Jun | Jun-16 | Jun-16 | 34,450 | 1,148 | | |
| 2016 | 2016 | Jul | Jul-16 | Jul-16 | 33,723 | 1,088 | | |
| 2016 | 2016 | Aug | Aug-16 | Aug-16 | 37,048 | 1,195 | | |
| 2016 | 2016 | Sep | Sep-16 | Sep-16 | 39,501 | 1,317 | | |
| 2017 | 2016 | Oct | Oct-17 | Oct-16 | 46,184 | 1,490 | 303,916 | 365 |
| 2017 | 2016 | Nov | Nov-17 | Nov-16 | 47,211 | 1,574 | | |
| 2017 | 2016 | Dec | Dec-17 | Dec-16 | 43,251 | 1,395 | | |
| 2017 | 2017 | Jan | Jan-17 | Jan-17 | 31,576 | 1,019 | | |
| 2017 | 2017 | Feb | Feb-17 | Feb-17 | 18,754 | 670 | | |
| 2017 | 2017 | Mar | Mar-17 | Mar-17 | 12,195 | 393 | | |
| 2017 | 2017 | Apr | Apr-17 | Apr-17 | 11,127 | 371 | | |
| 2017 | 2017 | May | May-17 | May-17 | 14,519 | 468 | | |
| 2017 | 2017 | Jun | Jun-17 | Jun-17 | 16,087 | 536 | | |
| 2017 | 2017 | Jul | Jul-17 | Jul-17 | 18,187 | 587 | | |
| 2017 | 2017 | Aug | Aug-17 | Aug-17 | 22,288 | 719 | | |
| 2017 | 2017 | Sep | Sep-17 | Sep-17 | 22,537 | 751 | | |
| 2018 | 2017 | Oct | Oct-18 | Oct-17 | 25,488 | 822 | 396,579 | 365 |
| 2018 | 2017 | Nov | Nov-18 | Nov-17 | 29,085 | 970 | | |
| 2018 | 2017 | Dec | Dec-18 | Dec-17 | 28,995 | 935 | | |
| 2018 | 2018 | Jan | Jan-18 | Jan-18 | 25,975 | 838 | | |
| 2018 | 2018 | Feb | Feb-18 | Feb-18 | 26,666 | 952 | | |
| 2018 | 2018 | Mar | Mar-18 | Mar-18 | 37,390 | 1,206 | | |
| 2018 | 2018 | Apr | Apr-18 | Apr-18 | 38,243 | 1,275 | | |
| 2018 | 2018 | May | May-18 | May-18 | 40,339 | 1,301 | | |
| 2018 | 2018 | Jun | Jun-18 | Jun-18 | 34,089 | 1,136 | | |
| 2018 | 2018 | Jul | Jul-18 | Jul-18 | 31,299 | 1,010 | | |
| 2018 | 2018 | Aug | Aug-18 | Aug-18 | 37,524 | 1,210 | | |
| 2018 | 2018 | Sep | Sep-18 | Sep-18 | 41,486 | 1,383 | | |
| 2019 | 2018 | Oct | Oct-19 | Oct-18 | 51,005 | 1,645 | 851,508 | 365 |

| | | | | | | | | |
|------|------|-----|--------|--------|---------|-------|-----------|-----|
| 2019 | 2018 | Nov | Nov-19 | Nov-18 | 51,857 | 1,729 | | |
| 2019 | 2018 | Dec | Dec-19 | Dec-18 | 50,751 | 1,637 | | |
| 2019 | 2019 | Jan | Jan-19 | Jan-19 | 47,979 | 1,548 | | |
| 2019 | 2019 | Feb | Feb-19 | Feb-19 | 66,883 | 2,389 | | |
| 2019 | 2019 | Mar | Mar-19 | Mar-19 | 92,833 | 2,995 | | |
| 2019 | 2019 | Apr | Apr-19 | Apr-19 | 99,273 | 3,309 | | |
| 2019 | 2019 | May | May-19 | May-19 | 132,856 | 4,286 | | |
| 2019 | 2019 | Jun | Jun-19 | Jun-19 | 94,902 | 3,163 | | |
| 2019 | 2019 | Jul | Jul-19 | Jul-19 | 71,978 | 2,322 | | |
| 2019 | 2019 | Aug | Aug-19 | Aug-19 | 50,684 | 1,635 | | |
| 2019 | 2019 | Sep | Sep-19 | Sep-19 | 40,507 | 1,350 | | |
| 2020 | 2019 | Oct | Oct-20 | Oct-19 | 35,402 | 1,142 | 400,635 | 366 |
| 2020 | 2019 | Nov | Nov-20 | Nov-19 | 33,524 | 1,117 | | |
| 2020 | 2019 | Dec | Dec-20 | Dec-19 | 32,853 | 1,060 | | |
| 2020 | 2020 | Jan | Jan-20 | Jan-20 | 29,205 | 942 | | |
| 2020 | 2020 | Feb | Feb-20 | Feb-20 | 30,077 | 1,074 | | |
| 2020 | 2020 | Mar | Mar-20 | Mar-20 | 30,389 | 980 | | |
| 2020 | 2020 | Apr | Apr-20 | Apr-20 | 16,182 | 539 | | |
| 2020 | 2020 | May | May-20 | May-20 | 21,593 | 697 | | |
| 2020 | 2020 | Jun | Jun-20 | Jun-20 | 30,816 | 1,027 | | |
| 2020 | 2020 | Jul | Jul-20 | Jul-20 | 38,556 | 1,244 | | |
| 2020 | 2020 | Aug | Aug-20 | Aug-20 | 47,276 | 1,525 | | |
| 2020 | 2020 | Sep | Sep-20 | Sep-20 | 54,762 | 1,825 | | |
| 2021 | 2020 | Oct | Oct-21 | Oct-20 | 69,032 | 2,227 | 1,659,206 | 365 |
| 2021 | 2020 | Nov | Nov-21 | Nov-20 | 69,169 | 2,306 | | |
| 2021 | 2020 | Dec | Dec-21 | Dec-20 | 71,141 | 2,295 | | |
| 2021 | 2021 | Jan | Jan-21 | Jan-21 | 75,316 | 2,430 | | |
| 2021 | 2021 | Feb | Feb-21 | Feb-21 | 97,643 | 3,487 | | |
| 2021 | 2021 | Mar | Mar-21 | Mar-21 | 169,216 | 5,459 | | |
| 2021 | 2021 | Apr | Apr-21 | Apr-21 | 173,699 | 5,790 | | |
| 2021 | 2021 | May | May-21 | May-21 | 172,654 | 5,569 | | |
| 2021 | 2021 | Jun | Jun-21 | Jun-21 | 178,649 | 5,955 | | |
| 2021 | 2021 | Jul | Jul-21 | Jul-21 | 200,658 | 6,473 | | |
| 2021 | 2021 | Aug | Aug-21 | Aug-21 | 196,514 | 6,339 | | |
| 2021 | 2021 | Sep | Sep-21 | Sep-21 | 185,515 | 6,184 | | |
| 2022 | 2021 | Oct | Oct-22 | Oct-21 | 159,113 | 5,133 | 2,206,437 | 365 |
| 2022 | 2021 | Nov | Nov-22 | Nov-21 | 167,015 | 5,567 | | |
| 2022 | 2021 | Dec | Dec-22 | Dec-21 | 170,602 | 5,503 | | |
| 2022 | 2022 | Jan | Jan-22 | Jan-22 | 147,877 | 4,770 | | |
| 2022 | 2022 | Feb | Feb-22 | Feb-22 | 159,170 | 5,685 | | |
| 2022 | 2022 | Mar | Mar-22 | Mar-22 | 211,181 | 6,812 | | |
| 2022 | 2022 | Apr | Apr-22 | Apr-22 | 203,504 | 6,783 | | |
| 2022 | 2022 | May | May-22 | May-22 | 224,371 | 7,238 | | |
| 2022 | 2022 | Jun | Jun-22 | Jun-22 | 192,399 | 6,413 | | |
| 2022 | 2022 | Jul | Jul-22 | Jul-22 | 181,834 | 5,866 | | |
| 2022 | 2022 | Aug | Aug-22 | Aug-22 | 181,774 | 5,864 | | |
| 2022 | 2022 | Sep | Sep-22 | Sep-22 | 207,597 | 6,920 | | |

CLP_AR_002384

**FOUO**

Encounter Projections: Blended                                                Release Date: **2023-05-03**

Key updates from previous version: Machine learning (LightGBM) is used to model FM and UC encounters. BSTS continues to be used for SA encounters. May and June SME survey results are used for Model 1. Model 2 is assumed to have the same uncertainty as Model 1, so the width of Model 2's confidence intervals are set equal to that of Model 1.

**Policy Assumptions**:

- Title 42 public health Order ends on May 11, 2023 (all models)

Model 1:

- CHNV returns to Mexico end June 30, 2023.

- NPRM not in effect.

Model 2:

- CHNV returns to Mexico continue.

- Presumed implementation of NPRM after the lifting of the Title 42 public health Order. Enforcement measures and lawful pathways (e.g.- expanded CBP One, CHNV parole processes, in-country refugee processing) are also implemented.


**Workbook Details:** This workbook presents the most recent Blended Encounter Projections.  The workbook contains the following worksheets:

- **Overview**: Current worksheet, providing details about the workbook and the projections.
- **Model 1**: Daily average of the encounter projections by Total, Family Type, and HHS Referrals.
  - Note: HHS Referrals are estimated by summing all non-Mexican UC encounter projections.  This estimate is likely to be a slight underestimate because there are usually a small number of Mexican UCs who do get referred to HHS.
- **Model 2**: Daily average of the encounter projections by Total, Family Type, and HHS Referrals.
  - Note: HHS Referrals are estimated by summing all non-Mexican UC encounter projections.  This estimate is likely to be a slight underestimate because there are usually a small number of Mexican UCs who do get referred to HHS.
- **Graphs-High**: Graphs of the High lines from each scenario for total and by family type, as well as actuals for the prior 13 months.
- **Graphs-Moderately High**: Graphs of the Moderately High lines from each scenario for total and by family type, as well as actuals for the prior 13 months.

CLP_AR_002485

**The Blended Encounter Projections:** A mixed-methods approach that combines the knowledge and intel of subject matter expertise with mathematical, regression-based predictive models. More specifically, the current Blended Projections average, or 'blend', the:

- Hybrid Model.
- Bayesian Structural Time Series (BSTS) Model projections.
- LightGBM Model projections.

**Model Specifications and Notes:**

- Uses actuals of encounters through:
  - Hybrid Model: **NA.**
  - BSTS Model: **2023-03-31.**
  - LightGBM Model: **2023-03-31.**
- Model Descriptions:
  - The Hybrid Model combines field level intelligence, SME analysis of relevant policies and factors, historic monthly change, and current and past trends. It also has a specific focus on accounting for expectations of the consequences of ending the Title 42 public health Order.
    - Broken down into results by country with country-family type proportions based on encounter actuals for last 3 months.
  - The BSTS Model was built using a machine learning approach and includes: a 12-seasonal component, a semi-local linear trend (except for CHNV), an autoregressive component (AR(1)), and a regression component.
    - The BSTS regression component includes the following predictors: Mexico Apprehensions (through Jan 2023), USA Unemployment (through Jan 2023), and ratio of Removals by T8 Encounters (through Jan 2023).
  - The LightGBM Model was built using a machine learning approach and includes predictors from the BSTS.

CLP_AR_002486

CLP_AR_002487

**FOUO**
**Blended Projections, Totals**
Assumptions:        Title 42 ends May 11. CHNV returns to Mexico and CHNV paroles end June 30. NPRM not implemented.

Projection Type:    Planning. All projections are for planning purposes, showing what OIS estimates may happen under these assumptions. Effects of these policy assumptions are also based on best available information.
                    Operational confidence intervals (not assuming growing uncertainty over time) are used to quantify model uncertainty.

                    Users should not treat these results as a precise statement of what will happen.

| | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Total |
|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | |
| **Projection** | **5,392** | **6,768** | **7,527** | **6,878** | **7,119** | **7,712** | **6,900** |
| Moderately High | 6,817 | 8,147 | 8,953 | 8,257 | 8,499 | 9,137 | 8,301 |
| Moderately Low | 4,098 | 5,407 | 6,130 | 5,511 | 5,750 | 6,423 | 5,553 |
| High | 8,186 | 9,471 | 10,321 | 9,581 | 9,823 | 10,505 | 9,647 |
| Low | 3,208 | 4,174 | 4,824 | 4,252 | 4,494 | 5,203 | 4,358 |
| **FM** | | | | | | | |
| **Projection** | **1,145** | **2,089** | **2,787** | **2,244** | **2,326** | **2,466** | **2,177** |
| Moderately High | 1,826 | 2,748 | 3,468 | 2,903 | 2,985 | 3,147 | 2,847 |
| Moderately Low | 584 | 1,449 | 2,127 | 1,598 | 1,670 | 1,921 | 1,558 |
| High | 2,480 | 3,381 | 4,122 | 3,536 | 3,618 | 3,801 | 3,490 |
| Low | 266 | 893 | 1,522 | 1,019 | 1,099 | 1,408 | 1,034 |
| **SA** | | | | | | | |
| **Projection** | **3,814** | **4,243** | **4,233** | **4,182** | **4,335** | **4,769** | **4,263** |
| Moderately High | 4,521 | 4,927 | 4,940 | 4,866 | 5,020 | 5,476 | 4,958 |
| Moderately Low | 3,118 | 3,559 | 3,532 | 3,498 | 3,658 | 4,062 | 3,571 |
| High | 5,200 | 5,584 | 5,619 | 5,523 | 5,677 | 6,155 | 5,626 |
| Low | 2,578 | 2,916 | 2,867 | 2,852 | 3,007 | 3,391 | 2,935 |
| **UC** | | | | | | | |
| **Projection** | **433** | **436** | **507** | **452** | **458** | **476** | **460** |
| Moderately High | 470 | 472 | 545 | 488 | 493 | 513 | 497 |
| Moderately Low | 397 | 400 | 470 | 416 | 422 | 439 | 424 |
| High | 506 | 506 | 580 | 522 | 528 | 549 | 532 |
| Low | 363 | 366 | 435 | 382 | 387 | 404 | 389 |
| **HHS Referrals** | | | | | | | |
| **Projection** | **326** | **338** | **397** | **352** | **347** | **356** | **353** |
| Moderately High | 356 | 367 | 427 | 381 | 376 | 387 | 382 |
| Moderately Low | 297 | 309 | 367 | 323 | 318 | 327 | 324 |
| High | 459 | 435 | 488 | 424 | 444 | 450 | 450 |
| Low | 270 | 282 | 339 | 295 | 291 | 299 | 296 |

CLP_AR_002488

**FOUO**
**Blended Projections, Totals**
Assumptions: CHNV Returns to Mexico continue. CHNV parole (30,000 monthly) continues. NPRM begins May 12. Title 42 ends May 11. CBP One increases from 740 per day to 1,000 per day on May 12, then to 1,250 per day on June 1. In-country refugee processing in Latin America expands.

Projection Type: Planning. All projections are for planning purposes, showing what OIS estimates may happen under these assumptions. Effects of these policy assumptions are also based on best available information. Model 2 is assumed to have equal uncertainty as the operational confidence interval (not assuming growing uncertainty over time) from Model 1.

Users should not treat these results as a precise statement of what will happen.

| | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Total |
|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | |
| **Projection** | **5,392** | **5,480** | **5,580** | **5,079** | **5,258** | **5,730** | **5,420** |
| Moderately High | 6,807 | 6,860 | 7,005 | 6,458 | 6,638 | 7,156 | 6,820 |
| Moderately Low | 4,108 | 4,119 | 4,182 | 3,713 | 3,889 | 4,441 | 4,075 |
| High | 8,165 | 8,184 | 8,373 | 7,782 | 7,962 | 8,524 | 8,165 |
| Low | 3,227 | 2,887 | 2,877 | 2,453 | 2,633 | 3,221 | 2,883 |
| **FM** | | | | | | | |
| **Projection** | **1,145** | **1,239** | **1,499** | **1,233** | **1,337** | **1,511** | **1,326** |
| Moderately High | 1,826 | 1,898 | 2,180 | 1,892 | 1,996 | 2,192 | 1,998 |
| Moderately Low | 584 | 598 | 839 | 587 | 681 | 966 | 709 |
| High | 2,480 | 2,531 | 2,834 | 2,525 | 2,629 | 2,846 | 2,641 |
| Low | 266 | 43 | 234 | 8 | 110 | 453 | 186 |
| **SA** | | | | | | | |
| **Projection** | **3,814** | **3,805** | **3,610** | **3,426** | **3,496** | **3,776** | **3,655** |
| Moderately High | 4,521 | 4,489 | 4,317 | 4,110 | 4,180 | 4,483 | 4,350 |
| Moderately Low | 3,118 | 3,121 | 2,910 | 2,741 | 2,818 | 3,069 | 2,963 |
| High | 5,200 | 5,146 | 4,996 | 4,767 | 4,837 | 5,162 | 5,018 |
| Low | 2,578 | 2,478 | 2,245 | 2,095 | 2,168 | 2,398 | 2,327 |
| **UC** | | | | | | | |
| **Projection** | **433** | **436** | **470** | **420** | **425** | **443** | **438** |
| Moderately High | 470 | 472 | 507 | 456 | 461 | 480 | 474 |
| Moderately Low | 397 | 400 | 433 | 384 | 390 | 406 | 402 |
| High | 506 | 507 | 543 | 490 | 496 | 515 | 509 |
| Low | 363 | 366 | 398 | 350 | 355 | 370 | 367 |
| **HHS Referrals** | | | | | | | |
| **Projection** | **326** | **339** | **368** | **327** | **323** | **332** | **336** |
| Moderately High | 356 | 367 | 398 | 356 | 352 | 362 | 365 |
| Moderately Low | 297 | 310 | 338 | 299 | 294 | 302 | 307 |
| High | 459 | 436 | 459 | 400 | 420 | 425 | 433 |
| Low | 270 | 282 | 310 | 271 | 267 | 274 | 279 |

CLP_AR_002489

FOUO

| | | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | Actual | 5,885 | 7,048 | 7,146 | 7,733 | 6,885 | 6,414 | 6,540 | 7,535 | 7,334 | 7,657 | 7,975 | 4,679 | 4,759 | 5,393 | | | | | |
| Title 42 & CHNV end | Model 1 | | | | | | | | | | | | | | 5,393 | 8,165 | 9,452 | 10,264 | 9,530 | 9,771 |
| Policy Bundle | Model 2 | | | | | | | | | | | | | | 5,393 | 8,165 | 8,184 | 8,373 | 7,782 | 7,962 |
| FM | Actual | 955 | 1,172 | 1,418 | 1,920 | 1,725 | 1,681 | 1,672 | 1,798 | 1,875 | 2,031 | 2,420 | 1,080 | 933 | 1,090 | | | | | |
| Title 42 & CHNV end | Model 1 | | | | | | | | | | | | | | 1,090 | 2,480 | 3,381 | 4,122 | 3,536 | 3,618 |
| Policy Bundle | Model 2 | | | | | | | | | | | | | | 1,090 | 2,480 | 2,531 | 2,834 | 2,525 | 2,629 |
| SA | Actual | 4,503 | 5,420 | 5,326 | 5,340 | 4,653 | 4,306 | 4,503 | 5,340 | 5,072 | 5,189 | 5,160 | 3,298 | 3,443 | 3,910 | | | | | |
| Title 42 & CHNV end | Model 1 | | | | | | | | | | | | | | 3,910 | 5,200 | 5,584 | 5,619 | 5,523 | 5,677 |
| Policy Bundle | Model 2 | | | | | | | | | | | | | | 3,910 | 5,200 | 5,146 | 4,996 | 4,767 | 4,837 |
| UC | Actual | 427 | 455 | 402 | 473 | 508 | 427 | 365 | 396 | 387 | 436 | 395 | 301 | 384 | 394 | | | | | |
| Title 42 & CHNV end | Model 1 | | | | | | | | | | | | | | 394 | 506 | 506 | 580 | 522 | 528 |
| Policy Bundle | Model 2 | | | | | | | | | | | | | | 394 | 507 | 507 | 543 | 490 | 496 |
| HHS Referrals | Actual | 334 | 358 | 314 | 394 | 437 | 367 | 295 | 320 | 309 | 367 | 335 | 224 | 292 | 297 | | | | | |
| Title 42 & CHNV end | Model 1 | | | | | | | | | | | | | | 297 | 459 | 435 | 488 | 424 | 444 |
| Policy Bundle | Model 2 | | | | | | | | | | | | | | 297 | 460 | 435 | 459 | 400 | 421 |



CLP_AR_002490

CLP_AR_002491



Blended Projections, HHS Referrals

CLP_AR_002492

Sep-23

10,451
8,524

3,801
2,846

6,155
5,162

549
516

450
426

FOUO

| | | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | Actual | 5,885 | 7,048 | 7,146 | 7,733 | 6,885 | 6,414 | 6,540 | 7,535 | 7,334 | 7,657 | 7,975 | 4,679 | 4,759 | 5,393 | | | | |
| | Title 42 & CHNV end Model 1 | | | | | | | | | | | | | | 5,393 | 6,807 | 8,138 | 8,905 | 8,215 |
| | Policy Bundle Model 2 | | | | | | | | | | | | | | 5,393 | 6,807 | 6,860 | 7,005 | 6,458 |
| FM | Actual | 955 | 1,172 | 1,418 | 1,920 | 1,725 | 1,681 | 1,672 | 1,798 | 1,875 | 2,031 | 2,420 | 1,080 | 933 | 1,090 | | | | |
| | Title 42 & CHNV end Model 1 | | | | | | | | | | | | | | 1,090 | 1,826 | 2,748 | 3,468 | 2,903 |
| | Policy Bundle Model 2 | | | | | | | | | | | | | | 1,090 | 1,826 | 1,898 | 2,180 | 1,892 |
| SA | Actual | 4,503 | 5,420 | 5,326 | 5,340 | 4,653 | 4,306 | 4,503 | 5,340 | 5,072 | 5,189 | 5,160 | 3,298 | 3,443 | 3,910 | | | | |
| | Title 42 & CHNV end Model 1 | | | | | | | | | | | | | | 3,910 | 4,521 | 4,927 | 4,940 | 4,866 |
| | Policy Bundle Model 2 | | | | | | | | | | | | | | 3,910 | 4,521 | 4,489 | 4,317 | 4,110 |
| UC | Actual | 427 | 455 | 402 | 473 | 508 | 427 | 365 | 396 | 387 | 436 | 395 | 301 | 384 | 394 | | | | |
| | Title 42 & CHNV end Model 1 | | | | | | | | | | | | | | 394 | 470 | 472 | 545 | 488 |
| | Policy Bundle Model 2 | | | | | | | | | | | | | | 394 | 470 | 472 | 507 | 456 |
| HHS Referrals | Actual | 334 | 358 | 314 | 394 | 437 | 367 | 295 | 320 | 309 | 367 | 335 | 224 | 292 | 297 | | | | |
| | Title 42 & CHNV end Model 1 | | | | | | | | | | | | | | 297 | 356 | 367 | 427 | 381 |
| | Policy Bundle Model 2 | | | | | | | | | | | | | | 297 | 356 | 367 | 398 | 356 |



Blended Projections, Total Encounters

Blended Projections, FM Encounters

Blended Projections, SA Encounters

Blended Projections, UC Encounters

Actual — Model 1 — Model 2

CLP_AR_002493



Blended Projections, HHS Referrals

CLP_AR_002494

| Aug-23 | Sep-23 |
|---|---|
| 8,456 | 9,093 |
| 6,638 | 7,156 |
| 2,985 | 3,147 |
| 1,996 | 2,192 |
| 5,020 | 5,476 |
| 4,180 | 4,483 |
| 493 | 513 |
| 461 | 480 |
| 376 | 387 |
| 352 | 362 |

CLP_AR_002495

Case 1:23-cv-01843-TSC   Document 123   Filed 08/23/26   Page 107 of 721

JANUARY 05, 2023

# FACT SHEET: Biden-Harris Administration Announces New Border Enforcement Actions

*New Measures Leverage Success of Venezuela Enforcement Initiative to Limit Disorderly and Unsafe Migration*

While the courts have prevented the Title 42 public health order from lifting for now, the Biden-Harris Administration today is announcing new enforcement measures to increase security at the border and reduce the number of individuals crossing unlawfully between ports of entry. These measures will expand and expedite legal pathways for orderly migration and result in new consequences for those who fail to use those legal pathways. They also draw on the success of the Venezuela initiative, which launched in October 2022 and has resulted in a dramatic drop in the number of Venezuelan nationals attempting to enter the United States unlawfully.

The Administration is also announcing that it is surging additional resources to the border and the region, scaling up its anti-smuggling operations, and expanding coordination and support for border cities and non-governmental organizations. Importantly, the actions announced today are being implemented in close partnership with Mexico and governments across the Western Hemisphere.

While these steps will help address some of the most acute challenges at the Southwest border, they will not solve all of the problems in an immigration system that has been broken for far too long. That can only happen if Republicans in Congress who have spent the past two years talking about border security quit blocking the comprehensive immigration reform and border security measures President Biden proposed on his first day in office, and opposing the billions of dollars in additional funds the President has requested for border security and management.

Unlike some Republican officials playing political games and obstructing real solutions to fix our broken immigration system, President Biden has a plan and is taking action.

CLP_AR_004552

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 108 of 721

Under the new enforcement measures announced today, the Biden-Harris Administration will:

**Impose New Consequences for Individuals who Attempt to Enter Unlawfully**

To facilitate a return to the processing of all noncitizens under Title 8 authorities when Title 42 eventually lifts, the Department of Homeland Security (DHS) is:

- **Increasing the Use of Expedited Removal.** Effective immediately, individuals who attempt to enter the United States without permission, do not have a legal basis to remain, and cannot be expelled pursuant to Title 42 will be increasingly subject to expedited removal to their country of origin and subject to a five-year ban on reentry.

- **Announcing New Measures to Encourage Individuals to Seek Orderly and Lawful Pathways to Migration.** DHS and the Department of Justice today are announcing their intent to propose a new regulation that would encourage individuals to seek orderly and lawful pathways to migration and reduce overcrowding along the southwest border and the strain on the immigration system.

**Expand Legal Pathways for Safe, Orderly, and Humane Migration**

The Biden-Harris Administration and its international partners in the region are also announcing new and expanded legal pathways to the United States and other countries that individuals can and should use to avoid consequences for crossing the border unlawfully. These include:

- **Expanding the Parole Process for Venezuelans to Nicaraguans, Haitians, and Cubans.** Today, the Biden Administration is announcing it will extend the successful Venezuela parole process and expand it to nationals of Nicaragua, Haiti, and Cuba. Up to 30,000 individuals per month from these four countries, who have an eligible sponsor and pass vetting and background checks, can come to the United States for a period of two years and receive work authorization. Individuals who irregularly cross the Panama, Mexico, or U.S. border after the date of this announcement will be ineligible for the parole process and will be subject to expulsion to Mexico, which will accept returns of 30,000 individuals per

CLP_AR_004553

Case 1:23-cv-01843-TSC   Document 23   Filed 08/23/26   Page 109 of 721

month from these four countries who fail to use these new pathways.

- **Tripling Refugee Resettlement from the Western Hemisphere.** The Biden-Harris Administration intends to welcome up to 20,000 refugees from Latin American and Caribbean countries during Fiscal Years 2023 and 2024, putting the United States on pace to *more than triple* refugee admissions from the Western Hemisphere this Fiscal Year alone. This delivers on the President's commitment under the *Los Angeles Declaration for Migration and Protection* to scale up refugee admissions from the Western Hemisphere.

- **Launching Online Appointment Portal to Reduce Overcrowding and Wait Times at U.S. Ports of Entry.** When Title 42 eventually lifts, noncitizens located in Central and Northern Mexico seeking to enter the United States lawfully through a U.S. port of entry have access to the CBP One mobile application for scheduling an appointment to present themselves for inspection and to initiate a protection claim instead of coming directly to a port of entry to wait. This new feature will significantly reduce wait times and crowds at U.S. ports of entry and allow for safe, orderly, and humane processing.

- **New Legal Pathways to Other Countries Across the Region.** Countries across the Western Hemisphere are delivering on their commitments under the *Los Angeles Declaration* to expand legal immigration pathways. Colombia, Ecuador, Costa Rica, and Belize are each implementing new regularization or temporary protection policies to provide legal status to hundreds of thousands of migrants. Canada, Mexico, and Spain have expanded refugee resettlement and temporary work opportunities. Mexico and Guatemala have also significantly grown their asylum system. Individuals are encouraged to avail themselves of this wide range of legal pathways in the region and avoid the dangerous consequences of irregular migration.

- **Increasing Humanitarian Assistance in Mexico and Central America.** The United States is announcing today nearly $23 million in additional humanitarian assistance in Mexico and Central America. This new assistance will help governments in the region respond to the increased humanitarian and protection needs of migrants, refugees and other vulnerable populations in their care. Recognizing that no one country can respond to these needs alone, this assistance will help support shelter, health, legal assistance, mental health and

CLP_AR_004554

Case 1:23-cv-01843-TSC    Document 123    Filed 08/23/26    Page 110 of 721

psychosocial support, water, sanitation, hygiene products, gender-based violence response, livelihoods, other protection related activities, and capacity building for partners.

**Surge Resources to Secure the Border, Disrupt Criminal Smuggling Networks, and Support Border Communities**

The Biden-Harris Administration is surging resources and expanding efforts to securely manage the border, disrupt the criminal smuggling networks preying on vulnerable migrants, and support communities receiving migrants as they await their immigration enforcement proceedings. New and expanded efforts include:

- **Mobilizing Record Resources for Safe, Orderly, and Humane Processing of Migrants.** The Biden Administration is marshalling available authorities and resources from across the Federal Government to help ensure the border is secure and well-managed when the Title 42 public health order eventually lifts. DHS and DOJ are surging asylum officers and immigration judges to review asylum cases at the border more quickly – with the aim of reducing initial processing times from months to days. The two agencies are also expanding capabilities and technologies to support faster processing, including by installing hundreds of phone lines and privacy booths to conduct these interviews and proceedings. DHS is also hiring and deploying additional agents and officers to join the over 23,000 already working to secure the border. In addition, DHS is significantly scaling up its air and ground transportation capabilities to quickly remove migrants when warranted or transport migrants to less-congested border sectors for further immigration enforcement proceedings.

- **Taking Thousands of Smugglers off the Streets and Countering Smuggler Misinformation.** In Los Angeles earlier this year, President Biden announced a first-of-its kind operation against the multi-billion-dollar human smuggling industry. Since April, this operation has led to over 7,300 arrests, forcing many criminal smuggling organizations out of business. The Administration is also taking on the smuggler misinformation. The Department of State is expanding its paid and earned media outreach to ensure timely and accurate information is reaching migrants. Messaging and outreach will target high out-migration communities and migrant routes through relevant communications channels (e.g., radio, digital,

CLP_AR_004555

trusted partners, and more.) with an estimated reach of over 85 million potential migrants

- **Expanding Coordination with and Support for Border Cities, Receiving Communities, and Non-Governmental Organizations.** The Biden-Harris Administration is increasing funding available to border cities and those cities receiving an influx of migrants, in addition to strengthening ongoing coordination and collaboration across all levels of government. DHS is also expanding outreach efforts with local jurisdictions to provide coordination of resources and technical assistance support and the Administration has been facilitating coordination between state and local officials and other federal agencies. Additionally, the Administration will continue to mobilize faith-based and non-profit organizations supporting migrants, including those providing temporary shelter, food, and humanitarian assistance before often reuniting with family as they await the outcome of their immigration proceedings.

The Biden-Harris Administration will do everything within its authority and available resources to manage this challenge, but until and unless Congress delivers the funding as well as comprehensive immigration reform measures President Biden requested, the United States' broken immigration system will indeed remain broken.

###

CLP_AR_004556

# Struggling to Survive: the Situation of Asylum Seekers in Tapachula, Mexico

By: Stephanie Brewer, Lesly Tejada, and Maureen Meyer

## JUNE 2022

RESEARCH
**REPORT**



Advocacy for Human Rights in the Americas

CLP_AR_004858

# TABLE OF CONTENTS

Key Findings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Introduction and Acknowledgements . . . . . . . . . . . . . . . . 3

Background on Mexico's Asylum System. . . . . . . . . . . . . 5

Legal and institutional framework . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Trends in asylum claims and approvals. . . . . . . . . . . . . . . . . . . . . . . 6

Migration enforcement role of the armed forces, including the National Guard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

The role of Tapachula in the asylum process. . . . . . . . . . . . . . . . . . 8

Findings from WOLA's 2022 Visit to Tapachula. . . . . . 10

Lack of immediate access to asylum at Mexico's southern border puts families and individuals at risk. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Diverse factors have caused drastic increases in asylum claims, overwhelming COMAR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Asylum seekers' and institutions' responses, 2021-2022. . . . . . . . . . 15

The importance of resettlement and integration support to stabilize forced migration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CLP_AR_004859

**Asylum intake patterns in 2022**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

**The "prison city": migrants and asylum seekers caught between a rock and a hard place** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

# U.S. government engagement with Mexico on access to protection for refugees. . . . . . . . . . . . . . . . . . . . . . . **27**

**U.S. government support to Mexico's asylum system and efforts to address root causes** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

**U.S. migration policies and Mexico: a failed attempt to deter largely forced migration**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

# Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

# Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

# Endnotes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

CLP_AR_004860

# KEY FINDINGS

- **Migrants and asylum seekers arriving in Tapachula—the city in southern Mexico where the vast majority of asylum claims are made—face what service providers repeatedly described to us as a "system to wear people down" (*política de desgaste*).** This refers not to a written policy, but rather to the combined effects of a series of government actions and omissions that leave people struggling to survive and vulnerable to abuse and arbitrary treatment as they navigate multiple backlogged legal processes. These conditions do not contribute to addressing forced migration to or through Mexico; rather, they increase the suffering and risks faced by people on the move.

- **Skyrocketing asylum claims in Mexico reflect growing forced displacement and protection needs in the region and worldwide. They also reflect a failure to respond adequately to the different needs of the migrant population, including people who migrate in search of economic opportunities or for other reasons that fall outside the recognized grounds for seeking asylum.** Asylum claims in Mexico have grown a hundredfold since 2013 to reach over 130,000 in 2021. Mexico's asylum system is overwhelmed and under-resourced, with prolonged delays in case processing times. In addition to large numbers of people in need of international protection, Mexican migration authorities' reticence to facilitate access to other legal pathways has the effect of channeling people into Mexico's asylum system as though it were the only option to seek a documented status in the country, creating an even more acute situation.

- **Those needing protection are almost never able to request it at ports of entry. This puts people at further risk and constitutes an undue barrier to seeking asylum.** People displaced from their homes by violence, repression, or other threats to their survival arrive at Mexico's border with protection needs, generally after additional violence and trauma on the journey north. Yet even if they are prepared to claim asylum, protection-seeking families and individuals have found themselves blocked from doing so at ports of entry, where agents of the National Migration Institute (*Instituto Nacional de Migración*, INM) may instead tell them that this is not the right place to seek asylum or instruct them to cross between ports of entry without documentation. Migrants who are able to request asylum at ports of entry will generally be detained by the INM and held for at least a few days for processing. As a result, asylum seekers are often forced to cross between ports and try to reach the offices of Mexico's refugee agency (*Comisión Mexicana de Ayuda a Refugiados*, COMAR) to claim asylum without being

CLP_AR_004861

detained by enforcement authorities or victimized by criminals.

- **While trapped in Tapachula, asylum seekers struggle to survive. Mexican authorities' efforts to contain them there are both arbitrary and untenable.** Mexican asylum law requires asylum seekers to wait out their cases in the state where they made their claim. In reality, security forces generally block them from leaving Tapachula itself. Asylum seekers in Tapachula face scarce employment opportunities, obstacles to healthcare, and a dearth of affordable housing, with government, United Nations, and civil society support programs insufficient to meet overwhelming levels of demand. Tapachula's close proximity to Central America puts some people at risk of encounters with their persecutors. Asylum seekers also face abuses by authorities ranging from arbitrary detention to extortion to other forms of violence. Women and Afro-descendant migrants face particular situations of risk and discrimination. All of these factors point to the need to end Mexico's containment policy for asylum seekers.

- **Deterrence-based tactics that only serve to put more suffering and danger in migrants' paths will not decrease forced migration to and through Mexico.** Closing off legal paths to migration forces the displaced population into hiding along dangerous migratory routes, while the growing list of visa restrictions for South American countries that prevent people from flying into Mexico force more people to cross north by land. These inescapable realities highlight the need to prioritize access to protection in regional migration management, alleviating the human suffering in places like Tapachula, and developing sustainable solutions for the migrant population.

- **Initiatives to support migrants' and asylum seekers' integration into other parts of Mexico, such as those currently led by the UN Refugee Agency (UNHCR), are crucial to preventing humanitarian crises in Tapachula and providing solutions and stability to the migrant population.** As desperation, overcrowding, and marches by migrants increased over 2021, the INM sporadically transported migrants and asylum seekers to other states, but it did so without clear criteria or coordination with other institutions. A regularized relocation system, more resources for Mexico's refugee agency, and additional efforts to provide legal status to migrants seeking better opportunities would be important measures to address the growing number of migrants arriving at Mexico's southern border.

CLP_AR_004862

# BACKGROUND ON MEXICO'S ASYLUM SYSTEM

### *Legal and institutional framework*

In 2000, Mexico became a party to the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees, the cornerstone United Nations (UN) agreements that provide for the right to seek asylum from persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. Mexico's Law on Refugees, Complementary Protection and Political Asylum (*Ley Sobre Refugiados, Protección Complementaria y Asilo Político*, "Law on Refugees") incorporates this protection framework as well as gender-based persecution. It further incorporates additional grounds for protection outlined in the Cartagena Declaration.[1] Thus, Mexican law recognizes refugee status for people who have fled their country of origin "because their lives, security, or freedom have been threatened by generalized violence, foreign aggression, internal conflicts, massive human rights violations, or other circumstances that have seriously disturbed public order[.]"[2]



*Mural near the Mexico-Guatemala border*

Mexico's refugee law also provides for "complementary protection" to people who are not recognized as refugees but whose life would be in danger or who would be at risk of torture or ill treatment if returned to another country.[3] Complementary protection applies to the person who requested protection, but it is not extended to their family members. These different forms of protection do not cover all people forcibly displaced from their countries of origin: in particular, disasters provoked by climate change and other environmental factors are increasingly relevant drivers of forced migration, but families and individuals displaced by climate disasters were not understood to be refugees at the time the aforementioned international and national legal instruments were drafted. However, Mexico's legal framework protects a decidedly broader class of refugees than U.S. law does.

CLP_AR_004865

The Mexican Commission for Refugee Assistance (COMAR), housed within the Ministry of the Interior (*Secretaría de Gobernación*, SEGOB) is the government agency charged with processing asylum claims. COMAR has central offices in Mexico City, as well as offices in the south and north of the country (two in Chiapas and one each in the states of Tabasco, Veracruz, Coahuila, Nuevo León, Baja California, and the central state of Jalisco).

The National Migration Institute (INM), also within SEGOB, is in charge of overseeing migrant arrivals at ports of entry, granting visas and legal residency, and migration enforcement. One of the INM's functions as outlined by the Law on Refugees' implementing regulations is to detect individuals in need of international protection and assist and coordinate with COMAR in facilitating their access to the asylum system.[4]

Families and individuals seeking asylum must submit their application no later than 30 business days after entering the country.[5] After the application has been received, COMAR issues a document (*constancia*) that serves as proof of an open asylum case. Once someone has requested refugee protection, legally they cannot be returned back to their country of origin during the processing of their case.[6]

With their *constancia* from COMAR, asylum seekers can apply with the INM to receive a humanitarian visa, known as a Visitor Card for Humanitarian Reasons (*Tarjeta de Visitante por Razones Humanitarias*, TVRH), which confers legal permission for people to live and work in Mexico for a year.

To determine refugee status, COMAR will interview applicants about the reason for leaving their country (with the participation of interpreters when an asylum seeker does not speak Spanish).[7] By law, COMAR has 45 business days to process applications, which may be extended up to 90 days.[8] These limits are not currently observed, as will be discussed below. Crucially, while a claim is being processed, asylum seekers are required by the Law on Refugees' current regulations to remain in the state where they filed their asylum request,[9] unless they receive special permission to relocate and continue their case from a different state.[10]

### Trends in asylum claims and approvals

In 2021 Mexico received a record-breaking 130,627 asylum requests, more than 100 times the number received just eight years ago in 2013.[11] The top three nationalities that applied for asylum in Mexico in 2021 were Haitians, Hondurans, and Cubans. The number of Haitian asylum seekers saw the most dramatic increase from 2020 to 2021, from 5,917 to 51,337. Children born to Haitian parents also accounted for a large percentage of 2021 asylum seekers from Chile and Brazil, who increased from a combined total of 1,170 in 2020 to 10,749 in 2021.

CLP_AR_004866



In 2021, COMAR resolved 38,054 asylum cases, with an overall asylum grant rate of 72 percent (74 percent counting complementary protection), considerably higher than the average U.S. asylum approval rate of roughly 37 percent in FY2021. There were significant disparities in approval rates for applicants of different nationalities. The major nationalities that saw the highest percentage of approval rates last year were Venezuelans (97 percent), Hondurans (85 percent), and Salvadorans (85 percent). COMAR regularly evaluates applications from nationals of these countries under the broader criteria of the Cartagena Declaration. Of the top asylum-seeking nationalities, Haitians had the lowest approval rate at 23 percent.



CLP_AR_004867

**7  Struggling to Survive** *June 2022*

Asylum claims in Mexico continue to rise and may be on track to break new records, with 40,026 requests filed in the first four months of 2022—the highest number in the January-April period in the past three years.

### Migration enforcement role of the armed forces, including the National Guard

While not officially responsible for the asylum process, Mexico's armed forces currently play a leading role in migration enforcement, bringing them into direct contact with arriving families and individuals, with consequences that can impact people's access to asylum. As of late April 2022, 28,542 military troops were deployed in a migration enforcement role at Mexico's borders. Available data suggest that military forces, in particular the army and the National Guard,[12] carry out or collaborate in the majority of migratory detentions in Mexico, depriving hundreds of thousands of migrants of their liberty in recent years.

Military troops are primarily trained to combat enemy forces, a background that raises obvious concerns when assigning troops to be potential first contact points for migrant and asylum-seeking families, children, and adults. The deployment of the armed forces to intercept migrants is a clear example of an official response that treats migration—including forced migration and those seeking protection—as though it were a national security threat rather than a movement of people who have disproportionately high levels of vulnerability, trauma, and humanitarian needs. Concerns regarding militarization of border and migration tasks in Mexico are not just theoretical: in 2021, army and National Guard troops shot and killed two migrants in separate incidents in Chiapas, while the National Human Rights Commission (*Comisión Nacional de los Derechos Humanos*, CNDH) has issued recommendations finding National Guard troops responsible for other violations against migrants at Mexico's southern border. In 2021, the CNDH received complaints against the National Guard in Chiapas for cruel and inhumane treatment, arbitrary detention, and torture.

While a detailed analysis of border militarization is beyond the scope of this report, this remains one of the most concerning aspects of the armed forces' multiplying roles in Mexico. It is also an area in which the U.S. government has negatively influenced migrant rights and access to protection in Mexico in recent years by pressuring Mexican authorities to crack down on northward migration, including through the threat of tariffs on Mexican exports during the Trump administration and by praising Mexico's efforts to stop migrant caravans, which translates into the deployment of military troops.

### The role of Tapachula in the asylum process

Due to its location just inland of the Mexico-Guatemala border, size, and connectivity to main highways from Central America, Tapachula is the main point of arrival for a significant portion of migrants and asylum seekers coming by land to Mexico. A large majority of asylum claims—89,613 in 2021—were filed in COMAR's Tapachula office, creating an enormous strain on this office and prolonged delays in case processing, stretching into wait times of many months for asylum applicants.

CLP_AR_004868

*Map showing Tapachula/southern border*



Since asylum seekers are generally required to wait out their cases in the state where they file their claims, tens of thousands of asylum seekers are currently expected to live in Chiapas, the southern border state where Tapachula is located (and Mexico's poorest state, with a poverty rate of 75.5 percent in 2020). In practice, Mexican authorities seek to confine these families and individuals not just to Chiapas state, but to the city of Tapachula itself. For this reason, Tapachula is known as the "prison city" (*ciudad cárcel*) for asylum seekers. As we will discuss below, this containment policy has led to a series of negative consequences including lack of access to basic services and the means to survive, pushing asylum seekers to try to find ways to leave the city.



*Bicentennial Park in Tapachula, where migrants and asylum seekers without a place to stay often spend the night*

CLP_AR_004869

**9  Struggling to Survive** *June 2022*

# FINDINGS FROM WOLA'S 2022 VISIT TO TAPACHULA

*Lack of immediate access to asylum at Mexico's southern border puts families and individuals at risk*

While Mexico continues to experience mixed migration flows, a large number of people arriving in Tapachula have international protection needs after fleeing life-threatening circumstances in their home countries.

Migrants and asylum seekers generally arrive in Mexico after living through different forms of violence, trauma, and exploitation during their journey north. As numerous people told us, every step along the migratory route to Mexico costs money, whether due to criminal extortion, bribes demanded by authorities, fees to secure guides, or other payments necessary to move from one place to another with as little violence as possible. Even those able to muster resources through their family and social networks are still vulnerable to violence and repeated criminal attacks, including kidnapping and rape, while people forced to flee their homes with little prior notice are likely to travel with even fewer resources and thus have even less of an opportunity to fend off detention and violent attacks. Regardless of their circumstances, arriving migrants and asylum seekers in Tapachula, especially those in a heightened situation of vulnerability such as children, are likely to arrive in need of physical, psychological, and other humanitarian attention after their journey, as well as with the right to request international protection or to pursue other pathways for temporary or permanent legal status.

**"It's impossible to live in Honduras. It's so dangerous now. The gangs see 12-year-olds, 13-year-olds, and they already want to recruit them… I have a 10-year-old daughter and a 14-year-old daughter, that's why I had to leave my country, leave my family and everything behind, because the gangs came… they said they were going to recruit my daughters… and that if I didn't let them, they were going to kill us all, my children and me…"**

**-"Maria," Honduran asylum seeker**

Families and individuals face severe obstacles in requesting asylum when they arrive at Mexico's border because COMAR does not have a regular presence at ports of entry, which are instead manned by INM agents. Despite the INM's legal mandate to assist and collaborate with COMAR, according to multiple service providers in Tapachula, INM agents at ports of entry are known to tell asylum seekers that they cannot seek asylum at the border and cannot enter Mexico without documents.

Paradoxically, rather than seeking truly to block the path of asylum seekers into Mexico, the

CLP_AR_004870

INM agents themselves may also instruct people to cross between ports of entry in order to make their way to COMAR's Tapachula office to claim asylum. Only in certain cases, such as when a service-providing organization has contacted authorities to request entry for an asylum-seeking person or group, are there greater guarantees of asylum seekers' being able to cross at a port of entry and to avoid detention in the INM's migration stations (detention centers) while their paperwork is being processed.



*The Suchiate River, which divides Tecún Umán, Guatemala from Ciudad Hidalgo, Mexico*

The result of this approach by the INM is that many asylum-seeking families and individuals must cross Mexico's border in hiding and try to make it from the border to the COMAR office or an NGO or other service provider without documentation that authorizes their presence in Mexico. These journeys put asylum seekers at risk of attacks and extortion by criminal groups who prey on migrants and of detention or extortion by INM agents, state and local police, and military forces.

**"When you're an immigrant and you're on the move… the authorities, instead of helping you because they're authorities, no, what they do is take what little you have… even if you have children, they don't care, they take their papers, and it's, 'either give me what you have or I'll send you back or I'll imprison you…' As a migrant, you're afraid, so you agree to whatever they ask of you… you just say, 'yes.'"**

**–"Maria," Honduran asylum seeker**

WOLA staff heard accounts of detentions and abuses by the INM, police agents, and the military even against migrants with official permission to be in Mexican territory; for arriving asylum seekers with no documentation who are forced to cross irregularly into the country,

CLP_AR_004871

the risks are even higher. According to data collected from 2,742 asylum seekers in Tapachula between October 2020 and October 2021 by the Danish Refugee Council (DRC) and the Jesuit Refugee Service Mexico (JRS), 98.3 percent of respondents affirmed having entered Mexico irregularly, and 34.3 percent of these respondents "describe incidents of extortion, violence, threats, and other abuses, compared with only 9.1% of respondents who indicate having entered the country regularly."

Detention by authorities may lead to extortion and/or temporary imprisonment in the INM's detention centers. According to international standards and guidelines, detention of asylum seekers should be exceptional and based on an evaluation of the specific need for detention in each case. In Mexico, such detention tends to respond to few criteria other than migratory status and may be prolonged for months. While an alternatives-to-detention program exists in Mexico, which releases asylum seekers from detention and refers them to shelters in coordination with COMAR and support from the UN Refugee Agency, the INM has curtailed its use in recent years. Interviews conducted during our visit and reporting from organizations working with asylum seekers suggest that the INM has become less responsive to requests for migrants to be released from detention.

Once detained, many asylum seekers are told that if they make a protection claim, they will remain locked up while their case moves forward. This factor alone makes it much more difficult for people to prepare their asylum case, as they face obstacles such as inadequate access to information, legal assistance, and healthcare, overcrowding, or safety issues. This leads some people with protection needs to desist from their claims in order to be released from detention.

A 2020 reform to Mexico's migration and refugee framework established that children (unaccompanied and those with their families) should not be held in detention by the INM.[13] Children and their families should instead be referred to the National System for Integral Family Development (*Sistema Nacional para el Desarrollo Integral de la Familia*, DIF). However, service providers told WOLA that this sometimes amounts to little more than a change of detention setting for individuals and families sent to DIF shelters. Civil society counterparts also told WOLA of the INM's practice of separating families, for instance by detaining a father in a migration station and sending a mother and children to a DIF facility.

**"At the first checkpoint… [the authorities] took me; they brought me to the *Siglo XXI* migrant detention center… I was scared when I got there, I've never been detained… after three and a half months, I couldn't stand it there anymore… I decided not to continue [with that asylum request], because I wasn't sleeping, I wasn't eating well by then… it got to the point where I would talk to myself…"**

**-Nelson, Nicaraguan asylum seeker**

*Diverse factors have caused drastic increases in asylum claims, overwhelming COMAR*

Mirroring global trends, there has been a dramatic increase in people displaced from their homes throughout the Western Hemisphere. Mexico, which in 2021 became the third country

CLP_AR_004872

worldwide in the number of asylum requests received, has become a significant destination country for a growing number of people.

Latin America has witnessed an increase in human mobility in recent years as both long-standing and emerging causes of displacement force more people to flee their homes. Latin American and Caribbean countries consistently lead the world in homicide rates, with gang violence in Central America and organized crime in Mexico continuing to be significant causes of displacement. Repression and political and humanitarian crises, exemplified in different forms in countries such as Venezuela, Nicaragua, and Cuba, add to forced displacement. The devastation caused by Hurricanes Eta and Iota in Central America in 2020 highlighted the increasing percentage of people on the move who can be considered climate refugees. Violence, poverty, and other already life-threatening crises have now been aggravated by the Covid-19 pandemic.

In addition to people fleeing directly from their countries of origin, a large percentage of 2021 asylum requests in Mexico came from people of Haitian origin who had previously fled Haiti following its devastating 2010 earthquake, resettled for a time in South American countries (notably Brazil and Chile), but once again found themselves on the move due to shrinking visa availability, scant labor opportunities, and racism and discrimination in South America, with fewer possibilities than ever of returning to Haiti as gang violence, political crises, and natural disasters engulfed the country in 2021.

In this context, the modern face of northward migration through Latin America includes a significant percentage of women and children, with many families migrating and seeking asylum together.



**Asylum seekers in Mexico, 2021**

Girls 11.8%
Boys 12.4%
Adult men 46.5%
Adult women 29.3%

Source: COMAR · Created with Datawrapper

In addition to these trends, both authorities and civil society counterparts agree that people on the move are currently funneled into Mexico's asylum system even though Mexican law has some other paths available to those seeking a legalized status in the country. In particular, while

CLP_AR_004873

Mexican law makes TVRH humanitarian visas available to migrants who have been victims of or witnessed a crime in Mexico, children, or for other humanitarian purposes or public interest reasons,[14] in practice these visas have not been made widely available to migrants. Even asylum seekers face steep obstacles in obtaining a TVRH. In 2021, the INM issued 87,174 TVRHs. However, only 35,397 were provided to asylum seekers, contributing to the obstacles WOLA staff witnessed in Tapachula with asylum seekers unable to access employment because they lacked this visa. At the same time, the fact that more than half (48,611) of these visas were issued for humanitarian reasons, including 30,057 to Haitians (and another 6,547 to Brazilians and Chileans, many of whom are likely children of Haitians born in these countries), illustrates that in the context of high levels of forced migration and significant pressure as a result of the tens of thousands of migrants and asylum seekers trapped in Tapachula in the fall of 2021, the Mexican government more broadly used TVRHs as a tool to provide temporary status in Mexico. In contrast, the INM issued only 25,414 TVRHs in 2020, with less than a thousand, 862, provided for humanitarian reasons.

Given the INM's reticence to offer alternatives to migrants arriving at Mexico's southern border, seeking asylum is seen as the necessary route to obtain a TVRH for most arriving migrants, contributing to COMAR's increased caseload. This also means that an unknown number of people who intend to reach the United States to reunite with family or for other reasons find themselves channeled into applying for asylum in Mexico to regularize their presence in the country, even though Mexico is not their final destination.

Finally, with the U.S. border closed to many arriving asylum seekers under Title 42 since March 2020, some asylum seekers may have requested protection from COMAR even if they do not feel safe in Mexico, following expulsion or being blocked at U.S. ports of entry. If the Title 42 policy is lifted, part of this population will likely move to the U.S. border in the hope of being able to request asylum in the United States. These asylum seekers would join a growing number of other foreign nationals who have been bottled up along the U.S.-Mexico border awaiting their chance to approach a port of entry and request asylum in the United States, with U.S. authorities estimating this number could be around 25,000.

The record-breaking rise in asylum requests in Mexico has meant that those arriving find themselves navigating an asylum system that is overwhelmed, under-resourced, and severely backlogged. Nowhere is this reality more evident than in Tapachula.

**"I came here, not because I had some American dream, but because I was fleeing so that [the authorities] wouldn't hurt my family, first of all, and secondly to protect my own life…**

**[This has been] an emotional and economic change that hit me hard, believe me… I don't wish this on anyone. That's what I can tell you: I don't wish this on anyone."**

**-Nelson, Nicaraguan asylum seeker**

CLP_AR_004874

**14** **Struggling to Survive** *June 2022*

As has been evident in the images of hundreds of asylum seekers waiting outside of COMAR's offices in Tapachula, the agency has yet to secure enough resources to process current caseloads. In response to rising numbers of claims, COMAR has expanded in recent years with support from the UN Refugee Agency; today, COMAR has nine offices throughout the country and plans to open more, including a coordinating office in Chiapas state to oversee the work of the multiple Chiapas COMAR offices. With UNHCR support, COMAR increased its processing capacity by 116 percent between 2020 and 2021, and has gone from 20,466 case determinations in 2019 to 38,054 in 2021. In December 2021, COMAR signed a new agreement with UNHCR that will allow COMAR to directly hire 230 staff members (under Mexican law, government officers must be the ones to make asylum determinations; that is, staff directly paid by UNHCR cannot substitute COMAR in this role).



However, even with this additional support, the resources afforded to COMAR are still far from sufficient to enable prompt processing of incoming asylum requests, with the agency's overall domestic budget remaining essentially stable from 2021 to 2022 despite skyrocketing levels of asylum claims.[15]

*Asylum seekers' and institutions' responses, 2021-2022*

As mentioned, delays of many months in refugee determinations, coupled with Mexico's containment policy, have effectively trapped tens of thousands of foreign nationals in

CLP_AR_004875

untenable conditions in Tapachula. As this situation reached crisis levels in 2021, lack of access to job opportunities, housing, healthcare, and other necessities in Tapachula; safety concerns; discrimination; and desperation at seemingly never-ending legal processes led large groups of asylum seekers to try to leave the city.

In perhaps the best-known example, hundreds of foreign nationals sought to leave Tapachula by marching north together in "caravans" in the second half of 2021, particularly beginning at the end of August. However, the caravans met with blockades, detention, and sometimes violent repression from INM agents and the National Guard. Since then, multiple caravans have left Tapachula, with some reaching other states, though none remaining intact beyond the center of the country.



*Mexican immigration agents detain a Haitian migrant in Escuintla, Chiapas state, Mexico in September 2021 (AP Photo/Marco Ugarte)*

For its part, COMAR's Tapachula office tried several strategies throughout 2021 to increase its capacity to process asylum claims. At the beginning of the year, unable to keep up with case intake, the office began issuing appointment notices (*citatorios*), which stipulate a later date for the formalization of a family's or individual's asylum application. In mid-2021, COMAR set up an online platform for use in Tapachula to request asylum appointments. However, WOLA staff was told, the system received tens of thousands of online requests in a single week, grew to include people who had not yet arrived in Mexico, and led to large numbers of case inquiries. Service providers pointed out that the online system also created challenges for asylum seekers unfamiliar with navigating the internet or unable to access the online platform.

Changing tactics, from late September to late November COMAR convened asylum seekers to come in person to Tapachula's stadium to confirm their appointment requests, in an unprecedented strategy in which UN agencies and other Mexican institutions collaborated. Approximately 55,000 asylum seekers participated, allowing COMAR to reorganize and open up appointment times.

CLP_AR_004876

These efforts were disrupted, however, by the INM's own parallel response strategies. As growing numbers of desperate asylum seekers sought to leave Tapachula on foot, producing high-level news coverage including images of caravans and repression, the INM began offering caravan participants or would-be participants humanitarian visas and relocation by bus to a series of other Mexican states. In this context, the INM announced that it too would use Tapachula's stadium at the end of November 2021 to program transportation to other states. INM's announcement prompted families and individuals to abandon jobs, housing, and other activities in Tapachula to camp out around the stadium, awaiting what they believed would be their turn to leave. Given Tapachula's extremely hot conditions, the situation for families and children in particular was often unbearable according to service providers who sought to assist asylum seekers at the time.

Not everyone waiting at the stadium received transportation, however. In December, the INM began issuing QR codes to migrants and asylum seekers, instructing them to pay their own way to one of a list of different states (determined in each case by the QR code) and then report to an INM office within 30 days to regularize their status. It is estimated that some 35,000 people were relocated to 17 central and northern Mexican cities through the INM programs. The long list of states in which the INM issued over 1,000 humanitarian visas in December 2021 (44,425 TVRHs in total) is one indicator of the application of this program.

While the initiative to move people out of Tapachula points to recognition of the failure of the containment policy, the INM has implemented this plan in a piecemeal and reactive manner, and it is not permanently or universally available. The main criterion for busing seems to be a desire to break up caravans, deactivate protests, and diminish the crisis of overcrowding in Tapachula.

The INM also failed to adequately coordinate its busing project with COMAR, and asylum seekers were sometimes unwittingly considered to have abandoned their claims by virtue of no longer being able to show up at Tapachula's COMAR office. Some, having struggled to leave Tapachula, even found themselves returning there once they realized they could not follow up on their cases from other states. WOLA was told that the INM eventually began providing more complete data to COMAR on which asylum seekers were transported to what destinations, which would allow COMAR to re-open their cases. However, it is unclear what will happen to many of the transported migrants who wish to pursue their asylum claims.

**"Abuses by authorities, corruption, and impunity are very severe problems… and they're aggravated when the victim is a person who isn't perceived as a person… they're perceived as the other."**

**-Brenda Ochoa, Director of the Fray Matías de Córdova Human Rights Center**

CLP_AR_004877

## Cartagena Declaration on Refugees, Colloquium on the International Protection of Refugees in Central America, Mexico and Panama

Adopted by the Colloquium on the International Protection of Refugees in Central America, Mexico and Panama, held at Cartagena, Colombia from 19 - 22 November 1984

**I**

*Recalling* the conclusions and recommendations adopted by the Colloquium held in Mexico in 1981 on Asylum and International Protection of Refugees in Latin America, which established important landmarks for the analysis and consideration of this matter;

*Recognizing* that the refugee situation in Central America has evolved in recent years to the point at which it deserves special attention;

*Appreciating* the generous efforts which have been made by countries receiving Central American refugees, notwithstanding the great difficulties they have had to face, particulary in the current economic crisis;

*Emphasizing* the admirable humanitarian and non-political task which UNHCR has been called upon to carry out in the Central American countries, Mexico and Panama in accordance with the provisions of the 1951 United Nations Convention and the 1967 Protocol, as well as those of resolution 428 (V) of the United Nations General Assembly, by which the mandate of the United Nations High Commissioner for Refugees is applicable to all States whether or not parties to the said Convention and/or Protocol;

*Bearing in mind* also the function performed by the Inter-American Commission on Human Rights with regard to the protection of the rights of refugees in the continent;

*Strongly supporting* the efforts of the Contadora Group to find an effective and lasting solution to the problem of Central American refugees, which constitute a significant step in the negotiation of effective agreements in favour of peace in the region;

*Expressing* its conviction that many of the legal and humanitarian problems relating to refugees which have arisen in the Central American region, Mexico and Panama can only be tackled in the light of the necessary co-ordination and harmonization of universal and regional systems and national efforts;

**II**

*Having acknowledged* with appreciation the commitments with regard to refugees included in the Contadora Act on Peace and Co-operation in Central America, the bases of which the Colloquium fully shares and which are reproduced below:

CLP_AR_004942

(a)  "To carry out, if they have not yet done so, the constitutional procedures for accession to the 1951 Convention and the 1967 Protocol relating to the Status of Refugees."

(b)  "To adopt the terminology established in the Convention and Protocol referred to in the foregoing paragraph with a view to distinguishing refugees from other categories of migrants."

(c)  "To establish the internal machinery necessary for the implementation, upon accession, of the provisions of the Convention and Protocol referred to above."

(d)  "To ensure the establishment of machinery for consultation between the Central American countries and representatives of the Government offices responsible for dealing with the problem of refugees in each State."

(e)  "To support the work performed by the United Nations High Commissioner for Refugees (UNHCR) in Central America and to establish direct co-ordination machinery to facilitate the fulfillment of his mandate."

(f)   "To ensure that any repatriation of refugees is voluntary, and is declared to be so on an individual basis, and is carried out with the co-operation of UNHCR."

(g)   "To ensure the establishment of tripartite commissions, composed of representatives of the State of origin, of the receiving State and of UNHCR with a view to facilitating the repatriation of refugees."

(h)  "To reinforce programmes for protection of and assistance to refugees, particularly in the areas of health, education, labour and safety."

(i)   "To ensure that programmes and projects are set up with a view to ensuring the self-sufficiency of refugees."

(j)   "To train the officials responsible in each State for protection of and assistance to refugees, with the co-operation of UNHCR and other international agencies."

(k)  "To request immediate assistance from the international community for Central American refugees, to be provided either directly, through bilateral or multilateral agreements, or through UNHCR and other organizations and agencies."

(l)   "To identify, with the co-operation of UNHCR, other countries which might receive Central American refugees. In no case shall a refugee be transferred to a third country against his will."

(m) "To ensure that the Governments of the area make the necessary efforts to eradicate the causes of the refugee problem."

(n)  "To ensure that, once agreement has been reached on the bases for voluntary and individual repatriation, with full guarantees for the refugees, the receiving countries permit official delegations of the country of origin, accompanied by representatives of UNHCR and the receiving country, to visit the refugee camps."

(o)  "To ensure that the receiving countries facilitate, in co-ordination with UNHCR, the departure procedure for refugees in instances of voluntary and individual repatriation."

(p)  "To institute appropriate measures in the receiving countries to prevent the participation of refugees in activities directed against the country of origin, while at all times respecting the human rights of the refugees."

**III**

The Colloquium adopted the following conclusions:

1.   To promote within the countries of the region the adoption of national laws and regulations facilitating the application of the Convention and the Protocol and, if necessary, establishing internal procedures and mechanisms for the protection of refugees. In addition, to ensure that the national laws and regulations adopted reflect the principles and criteria of the Convention and the Protocol, thus fostering the necessary process of systematic harmonization of national legislation on refugees.

2.   To ensure that ratification of or accession to the 1951 Convention and the 1967 Protocol by States which have not yet taken these steps is unaccompanied by reservations limiting the scope of those instruments, and to invite countries having formulated such reservations to consider withdrawing them as soon as possible.

3.   To reiterate that, in view of the experience gained from the massive flows of refugees in the Central American area, it is necessary to consider enlarging the concept of a refugee, bearing in mind, as far as appropriate and in the light of the situation prevailing in the region, the precedent of the OAU Convention (article 1, paragraph 2) and the doctrine employed in the reports of the Inter-American Commission on Human Rights. Hence the definition or concept of a refugee to be recommended for use in the region is one which, in addition to containing the elements of the 1951 Convention and the 1967 Protocol, includes among refugees persons who have fled their country because their lives, safety or freedom have been threatened by generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances which have seriously disturbed public order.

4.   To confirm the peaceful, non-political and exclusively humanitarian nature of grant of asylum or recognition of the status of refugee and to underline the importance of the internationally accepted principle that nothing in either shall be interpreted as an unfriendly act towards the country of origin of refugees.

5.   To reiterate the importance and meaning of the principle of non-refoulement (including the prohibition of rejection at the frontier) as a corner-stone of the international protection of refugees. This principle is imperative in regard to refugees and in the present state of international law should be acknowledged and observed as a rule of jus cogens.

6.   To reiterate to countries of asylum that refugee camps and settlements located in frontier areas should be set up inland at a reasonable distance from the frontier

with a view to improving the protection afforded to refugees, safeguarding their human rights and implementing projects aimed at their self-sufficiency and integration into the host society.

7.   To express its concern at the problem raised by military attacks on refugee camps and settlements which have occurred in different parts of the world and to propose to the Governments of the Central American countries, Mexico and Panama that they lend their support to the measures on this matter which have been proposed by the High Commissioner to the UNHCR Executive Committee.

8.   To ensure that the countries of the region establish a minimum standard of treatment for refugees, on the basis of the provisions of the 1951 Convention and 1967 Protocol and of the American Convention on Human Rights, taking into consideration the conclusions of the UNHCR Executive Committee, particularly No. 22 on the Protection of Asylum Seekers in Situations of Large-Scale Influx.

9.   To express its concern at the situation of displaced persons within their own countries. In this connection, the Colloquium calls on national authorities and the competent international organizations to offer protection and assistance to those persons and to help relieve the hardship which many of them face.

10.  To call on States parties to the 1969 American Convention on Human Rights to apply this instrument in dealing with asilados and refugees who are in their territories.

11.  To make a study, in countries in the area which have a large number of refugees, of the possibilities of integrating them into the productive life of the country by allocating to the creation or generation of employment the resources made available by the international community through UNHCR, thus making it possible for refugees to enjoy their economic, social and cultural rights.

12.  To reiterate the voluntary and individual character of repatriation of refugees and the need for it to be carried out under conditions of absolute safety, preferably to the place of residence of the refugee in his country of origin.

13.  To acknowledge that reunification of families constitutes a fundamental principle in regard to refugees and one which should be the basis for the regime of humanitarian treatment in the country of asylum, as well as for facilities granted in cases of voluntary repatriation.

14.  To urge non-governmental, international and national organizations to continue their worthy task, co-ordinating their activities with UNHCR and the national authorities of the country of asylum, in accordance with the guidelines laid down by the authorities in question.

15.  To promote greater use of the competent organizations of the inter-American system, in particular the Inter-American Commission on Human Rights, with a view to enhancing the international protection of asilados and refugees. Accordingly, for the performance of this task, the Colloquium considers that the close co-ordination and co-operation existing between the Commission and UNHCR should be strengthened.

CLP_AR_004945

16.  To acknowledge the importance of the OAS/UNHCR Programme of Co-operation and the activities so far carried out and to propose that the next stage should focus on the problem raised by massive refugee flows in Central America, Mexico and Panama.

17.  To ensure that in the countries of Central America and the Contadora Group the international norms and national legislation relating to the protection of refugees, and of human rights in general, are disseminated at all possible levels. In particular, the Colloquium believes it especially important that such dissemination should be undertaken with the valuable co-operation of the appropriate universities and centres of higher education.

**IV**

The Cartagena Colloquium therefore

Recommends:

-That the commitments with regard to refugees included in the Contadora Act should constitute norms for the 10 States participating in the Colloquium and be unfailingly and scrupulously observed in determining the conduct to be adopted in regard to refugees in the Central American area.

-That the conclusions reached by the Colloquium (III) should receive adequate attention in the search for solutions to the grave problems raised by the present massive flows of refugees in Central America, Mexico and Panama.

-That a volume should be published containing the working document and the proposals and reports, as well as the conclusions and recommendations of the Colloquium and other pertinent documents, and that the Colombian Government, UNHCR and the competent bodies of OAS should be requested to take the necessary steps to secure the widest possible circulation of the volume in question.

-That the present document should be proclaimed the "Cartagena Declaration on Refugees".

-That the United Nations High Commissioner for Refugees should be requested to transmit the contents of the present declaration officially to the heads of State of the Central American countries, of Belize and of the countries forming the Contadora Group.

Finally, the Colloquium expressed its deep appreciation to the Colombian authorities, and in particular to the President of the Republic, Mr. Belisario Betancur, the Minister for Foreign Affairs, Mr. Augusto Ramírez Ocampo, and the United Nations High Commissioner for Refugees, Mr. Poul Hartling, who honoured the Colloquium with their presence, as well as to the University of Cartagena de Indias and the Regional Centre for Third World Studies for their initiative and for the realization of this important event. The Colloquium expressed its special recognition of the support and hospitality offered by the authorities of the Department of Bolivar and the City of Cartagena. It also thanked the people of Cartagena, rightly known as the "Heroic City", for their warm welcome.

CLP_AR_004946

In conclusion, the Colloquium recorded its acknowledgement of the generous tradition of asylum and refuge practised by the Colombian people and authorities.

Cartagena de Indias, 22 November 1984

CLP_AR_004947



# Mexico

CLP_AR_004999

# MIRPS in Mexico

Mexico has received increasingly complex mixed flows of migrants and refugees from the region in recent years. The social, political and economic situation of various countries in the region, the restrictive asylum and migratory policies of neighboring countries and the geographic location of Mexico, among other factors, have contributed to an exponential increase in applications for refugee status. Claimants include many children and adolescents fleeing with their families but also a rising number who are unaccompanied.

Mexico has participated in MIRPS since 2017 and has sought to implement a range of commitments to provide protection and solutions for the forcibly displaced. However, additional support from the international community is needed in relation to specific commitments. In particular to strengthen public services in the host communities in the southern states of Mexico (Chiapas and Tabasco) where most asylum-seekers arrive, especially in the areas of public health and education. The commitments made in the MIRPS process are complemented by a number of pledges made during the Global Refugee Forum.

# National Action Plan Focus Areas

CLP_AR_005000



## Protection

19 commitments



## Jobs and Livelihoods

5 commitments



## Education

1 commitment



## Health

4 commitments



## Social Protection

9 commitments

CLP_AR_005001



To read the National Action Plan of the MIRPS in Mexico, click the button below

Learn more

CLP_AR_005002

# Latest Achievements

CLP_AR_005003

 **Improved efficiency of case registration and processing**

The Mexican Refugee Aid Commission (COMAR) has advanced in this area through procedural changes. This includes simplified forms, developed with the support of the Quality Asylum Initiative, which facilitates case "triage" and differentiated processing. Additionally, changes in the SIRE registration system are being undertaken to improve case processing onsite and online. The programme under which asylum-seekers are released from migration stations has been implemented in more than 23 cities, with approximately 20,000 persons having benefited since 2016. The number of beneficiaries is now lower due to recent reforms in the Migration Law which have meant that families with children are no longer taken to migration stations.

 **Increased protection of children and adolescents in the context of human mobility**

In January 2021, reforms to various articles of the Migration Law and the Law on Refugees, Complementary Protection and Political Asylum in matters of migrant children came into force. The implementation of the reforms will help to strengthen the child protection system, namely by preventing girls, boys and adolescents from being kept in migration stations, and ensuring their best interest is prioritized. Moreover, the Comprehensive Care Route for Migrant Children (a coordination mechanism approved in 2019), was implemented at the local level in various states during 2020, with additional efforts made in 2021.

CLP_AR_005004

### Legal assistance

Legal counseling and support by the Federal Public Defender's Office (IFDP) are now available to people with asylum claims before COMAR. IFPD has increased the number of specialized staff and the frequency of visits migration stations to offer its services.

### Progress on the protection of internally displaced persons

In September 29th, 2021 the Chamber of Deputies unanimously approved the bill for the General Law on Forced Internal Displacement and passed it for the review of the Senate. Pilot programs have begun to support internally displaced families.

CLP_AR_005005

 **Labor integration and relocation program**

Since 2016, more than 10,000 people identified in the south of the country have been relocated to the centre and north, namely to cities such as Saltillo, Guadalajara and Monterrey, and have been connected to job opportunities, public education and psychosocial support. COMAR and local government support to the programme has enabled thousands of families to enjoy livelihood opportunities, leading to self-reliance.

 **Increased support for livelihoods and self-reliance**

The inter-institutional roundtable on asylum and complementary protection (the national mechanisms for the implementation of the MIRPS Action Plan) has held specialized sessions on health, education, identity documentation and labour market inclusion of asylum-seekers and refugees. The coordination between technical ministries and the Ministry of Interior, the participation of UN agencies and civil society increased the engagement of many actors and collaboration to achieve inclusive policies. Continued engagement and dialogue with banks is underway to ensure that, documents issued by COMAR and INM are considered sufficient for identification purposes and for refugees to be able to access financial services in Mexico.

# Looking ahead

CLP_AR_005006

### Strengthen the capacity of COMAR

to deliver protection; accelerate the issuance of documents for persons of concern and provide adequate assistance in the integration process.

### Facilitate the identification children with international protection needs

Increase the operational capacity of the Child Protection Authorities, and strengthen alternative care centers and shelters for refugee and asylum-seeking children and families with children.

### Promote the inclusion of refugee and asylum-seeking children in preschool, primary and secondary school

(ie. investment in materials and infrastructure, especially in host communities in southern Mexico).

### Ensure access to public health services

through the new legislative framework and strengthen the capacity of public health services in the host communities in southern Mexico (ie. investment in infrastructure, equipment).

CLP_AR_005007

Case 1:23-cv-01843-TSC    Document 128    Filed 09/23/26    Page 145 of 721

 **Strengthen the capacity of the National Employment Service to match refugees and asylum-seekers to job vacancies across Mexico**

Include greater numbers in vocational training and certification programs and ensure access to financial services through the Association of Banks of Mexico.

© 2022 MIRPS

CLP_AR_005008



Passport ⌄    Citizenship ⌄    Residence ⌄    Permits ⌄    Visa ⌄    Refugees

Other Services ⌄    🔍

AMENSTY MENU

ESPAÑOL



ackground Information

/ho Qualify?

/hat Documents You eed?

ow To Apply?

/hat is the Cost?

AQs

orms

# Amnesty Background Information

**The focus of the Amnesty 2022 are as follows:**

1. Managing Migration
2. National Security
3. Economic Development
4. Humanitarian Assistance

**A. PURPOSE**

The purpose of action if to address the issue of migrants who are residing in Belize illegally, or recommended asylum seekers. Those who qualify for the amnesty would be offered Permanent Residence status with a path to citizenship.

**B. BACKGROUND**

- Over the past decade or so, there has been a significant increase in migration, both legal and illegal , throughout the world, the Central American region included. The figures are staggering. According to World Migration Report 2020.

> *The current global estimate is that there were around 281 million international migrants in the world in 2020, which equates to 3.6 per cent of the global population.*
>
> *...*
>
> *Overall, the estimated number of international migrants has increased over the past five decades. The total estimated 281 million people living in a country other than their countries of birth in 2020 was 128 million more than in 1990, and over three times the estimated number in 1970.*
>
> *...*
>
> *Migration to Northern America is a key feature in the Latin America and the Caribbean region. In 2019, over 26 million migrants had made the journey north and were residing in*

CLP_AR_005421

*Northern America.*

*…*

*Several countries in Latin America and the Caribbean have undergone considerable population change over the last decade. Figure 20 shows the 20 countries in the region which have experienced the largest proportional population change from 2009 to 2019. All the top 20 countries experienced an increase in the size of their populations during this period, with the largest proportional population changes occurring in Central America. Belize had the greatest percentage change, with its population increasing by 24 per cent from 2009 to 2019. It was followed by Guatemala and Honduras, whose populations grew by nearly 23 and 20 per cent respectively.*

- The government of Ecuador estimated that the number of Venezuelans residing in Ecuador likely exceeded 380,000 as of September 10, 2019. At September, 2019 the government had issued visas to approximately 120,000 Venezuelans. The government began a nationwide registration and regularization process on September 26, 2019, which ended March 31, 2020. At October 27, 2019 the Migration Secretariat of the Ministry of Government had registered more than 125,000 Venezuelans–the first step required to regularize status. On October 26, 2019 the Foreign Ministry began issuing two-year humanitarian visas to those registered as the next step in the regularization process. (Source – US Department of State 2019 Country Reports on Human Rights Practices: Ecuador)

- In 2021 Colombia implemented the Temporary Protection Statute for Venezuela Migrants (TPS), which sought to regularize more than 1.8 million Venezuela migrants with a path to citizenship in 10 years. The Statute allowed Colombia to provide the migrant population with decent living conditions, transparent access to state institutions, as well as access to COVID 19-vaccines and assist with their integration into the Colombian economy and labor market. The TPS was coherent with the Global Compact on Migration (GCM) and offered protections that are consistent with the Global Compact on Refugees (GCR). It complemented the international refugee protection regime, contributing towards a safe, orderly and regular migration, and represents a contribution from Colombia to the improvement of the global migration governance. (Source – U.S. Colombia Ministerial Migration Meeting on 20 October 2021 Concept Note)

- Prime Minister of Antigua and Barbuda, Gaston Browne informed that his administration was considering granting an amnesty to illegal migrants as he urged all people on the island to work together to help Antigua and Barbuda rebound economically and socially from the coronavirus (COVID-19) pandemic. "We don't want anybody to be in a situation where they cannot contribute…so that's a discussion I will be having with my colleagues next week…and they will tell me whether or not we give an amnesty to the immigrants who are here". Browne said that Antigua and Barbuda has always had to deal with migrants who have been in the country for more than 15 years and are "now well integrated in our society, they have homes, they work and they have children. "We have to be flexible enough to allow for some form of integration of these individuals in society as we seek to get the contribution of all. (Source – Jamaican Gleaner December 13, 2021)

- Most of the migrants who have settled in Belize are from the neighbouring republics with increasing numbers from Haiti, China and Africa. Migrants from the Central American Republics are, in the main, fleeing gang-related violence and seeking employment opportunities. Migrants

CLP_AR_005422

from Haiti are fleeing political related violence, ungovernability and economic opportunities, whilst those from China are primarily seeking economic opportunities.

- The 2010 Census by the Statistical Institute of Belize found that 14.2% of Belize's population was born abroad. However, this percentage doesn't begin to reflect the number of undocumented migrants who moved to Belize during the past two decades. The SIB does not have any statistics of the number of undocumented migrants in Belize. Therefore, accurate projections of social assistance, losses in tax revenue, increasing social impacts, and unbalanced access to social services are impossible.

- The Belize Refugee Department with support of United Nations High Commission on Refugees (UNHCR) has been responsible for the registration and processing of asylum cases in Belize. The Registration system shows that there are 4,104 persons registered to claim refugee status. However, only 74 have been confirmed as refugees resulting in over 4,030 with an asylum seeker status.

- Belize has had two amnesties. The first was in late April 1984, where eight thousand six hundred and eighty (8,680) undocumented migrants were registered. Fifteen years later in 1999, another integration exercise resulted in granting approximately eleven thousand one hundred and sixty-eight (11,168) newly registered migrants, permanent residence. Yet another exercise was planned for 2010 when an estimate of over 20,000 undocumented migrants were expected to be registered. Unfortunately, the amnesty never occurred.

- Whilst some of the migrants have since 2010 regularized their status, it is believed that many more have entered the country and have an irregular immigration status. Using the figures from the two amnesties and the estimate in 2010, the Ministry of Immigration estimates that the number of irregular migrants in Belize in 2021 would be approximately 40,000-60,000 migrants.

- Irregular migration breeds illegality and abuse. Many migrants find themselves victims of human trafficking – modern day slavery. Irregular migrants, because of their vulnerability, are often employed at very low wages, and work in dreadful conditions, additionally, many are paid 'off the books' and therefore generate little tax revenue. Some of the migrants are gang members or former gang members and engage in serious criminal activities in Belize. Many have children in Belize and enter relationships which leads to complications. There are families where both or one parent is irregular, but their children are regular. Registering the children in school exposes the parents, and there is a tendency not to enroll them. Of course, any irregular migrants access social and other services and therefore add to the cost-of-service delivery.

- It is emphasized that migrants contribute positively to Belize and the economy. They work in many sectors of the economy, and many operate small and micro businesses contributing to economic activity and employment.

SERVICES MENU

Passport

Citizenship

Residence

TOP MENU

Home

The Ministry    >

Forms

Search…

DESIGNED AND MAINTAINED BY

CLP_AR_005423

Visa

Permits

Refugees

CSME Skilled Certificate

Border Crossing Card

Contact Us

Copyright © 2023. Government of Belize | Ministry of Foreign Affairs, Foreign Trade & Immigration | All Rights Reserved.

f

CLP_AR_005424



⌂ (http://www.gob.mx) › Secretaría de Relaciones Exteriores (/sre) › **Press**

Publicaciones Recientes  es diplomáticas con firma de Declaración de Amistad (/sre/en.

# Mexico to expand labor mobility programs and integrate refugees into its labor market

## Press Release 212

Secretaría de Relaciones Exteriores | June 10, 2022 | Press Release

CLP_AR_005757

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 151 of 721



Mexico to expand labor mobility programs and integrate refugees into its labor market

- The Government of Mexico will expand its temporary labor programs for foreigners and integrate refugees into its labor market
- Mexico and the U.S. are launching two new working groups: to strengthen the labor rights of Mexicans and expand the visa programs, and to protect minors in a situation of mobility in both countries.

At the 9th Summit of the Americas, as a gesture of its willingness to cooperate and of its regional leadership on this issue, the Government of Mexico committed to specific, ambitious measures that strengthen the Los Angeles Declaration on Migration and Protection. The measures are consistent with Mexico's vision of migration. They expand labor and refugee programs with the countries of northern Central America and request the support of the United States for the Mexican communities in that country.

The Los Angeles Declaration advances the common goal of orderly, safe, and regular migration in the Americas. It focuses on measures to strengthen communities that receive substantial numbers of migrants; expands labor mobility programs; and commits to more humane migration management measures and a coordinated

CLP_AR_005758

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 152 of 721

response to emergency situations. Therefore, Mexico supports the Declaration and is complementing it with a series of new specific measures for labor mobility, refugees and vulnerable groups.

Regarding labor mobility, the Government of Mexico will work with the Government of Guatemala to launch a new labor cooperation program for 15,000-20,000 Guatemalans, with a view to  expanding the program to include Hondurans and Salvadorans in the medium term.

In addition, the Government of Mexico will expand the existing Border Worker Card Program, doubling it to include 10,000-20,000 additional beneficiaries per year.  Both programs will be carried out with the support of the United States Agency for International Development (USAID) to recruit workers in an ethical manner, accompany the visa application processes in northern Central America and strengthen the monitoring of labor rights.

In conjunction with UN agencies such as the Office of the United Nations High Commissioner for Human Rights (UNHCR), Mexico will seek to provide job opportunities to 20,000 relocated and integrated refugees over the next three years, starting in 2022. Mexico has a solid labor market for both its citizens and foreigners, and a tradition of solidarity and a commitment to refugees at the American and global levels. This effort by the federal government, led by the Mexican Commission for Refugee Assistance (Comar), as well as state, municipal and private sector authorities, with a key role played by UNHCR, benefits refugees, companies and society as a whole.

In addition, the governments of Mexico and the United States have agreed to create two new bilateral working groups. The first will seek to sign a Memorandum of Understanding that strengthens visa programs and the labor rights of Mexicans who work in the United States. Both governments will work together to carry out ethical recruitment processes that respect the workers' human and labor rights.

CLP_AR_005759

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 153 of 721

The new process would strengthen cooperation between our two governments on the H-2A and H-2B temporary worker programs, including a focus on the southern states of Mexico, in order to promote development in the region. Mexico's National Employment Service (Labor Ministry) will promote and advertise its vacancies and find the best way to bring the human capital needed to fill them.

The agenda of the new binational group includes the design of a pilot program to find and hire Mexican workers in specific sectors. The program's goal is to link U.S. industries with essential sectors and for the participating workers to come mainly from Mexico's southern states. This will strengthen the role of both governments in recruiting potential workers, which will protect them from intermediaries and reduce the possibility of abuse, such as charging fees for a temporary work visa.

The second binational working group will design and implement new measures to protect the rights of minors in situations of mobility in both countries.  In the spirit of the Los Angeles Declaration on Migration and Protection, Mexico and the United States will strengthen their cooperation, together with UN agencies, so that their authorities provide adequate attention to this key vulnerable group.

Lastly, the Government of Mexico reiterates the importance of addressing the structural causes of migration in order to provide economic alternatives to migrants so that they can remain in their communities of origin. In order to strengthen the various economic development programs, the Government of Mexico continues to work with its regional partners on a conference on this issue, to be held soon in northern Central America.

Twittear

Compartir (https://www.facebook.com/sharer/sharer.php?
u=https://www.gob.mx/sre/prensa/231462&src=sdkpreparse)

🖶 Imprime la página completa

La legalidad, veracidad y la calidad de la información es estricta responsabilidad de la dependencia, entidad o empresa productiva del Estado que la proporcionó en virtud de sus atribuciones y/o facultades normativas.

CLP_AR_005760



CLP_AR_005761



# Hard Times in a Safe Haven:
# Protecting Venezuelan Migrants in Colombia

**Latin America Report N°94**  |  9 August 2022

Headquarters
**International Crisis Group**
Avenue Louise 235  •  1050 Brussels, Belgium
Tel: +32 2 502 90 38  •  brussels@crisisgroup.org

*Preventing War. Shaping Peace.*

CLP_AR_006126

## Table of Contents

Executive Summary..............................................................................................................  i

I.    Introduction ................................................................................................  1

II.   A Mass Exodus and a Hard Landing ...................................................................  4
      A.  Mass Migration's Drivers...........................................................................  4
      B.  Permits to Stay..........................................................................................  6
      C.  For Many, a Precarious Home in the City ................................................  7
      D.  Labour Market Difficulties .......................................................................  8
      E.  Access to Health Care ...............................................................................  9

III.  The Lure of Crime...............................................................................................  11
      A.  Venezuelans and Colombian Armed Groups.............................................  11
      B.  Criminal Groups and Urban Gangs ..........................................................  14
      C.  Coca Cultivation........................................................................................  17
      D.  Gold Mining and Trafficking ....................................................................  18

IV.   Human Trafficking and Sexual Exploitation ....................................................  19

V.    The Backlash against Venezuelans....................................................................  22
      A.  Public Perceptions ....................................................................................  22
      B.  Stigma and Vulnerability ..........................................................................  23
      C.  Deportation................................................................................................  24

VI.   Recommendations...............................................................................................  26
      A.  Protection...................................................................................................  26
      B.  Integration .................................................................................................  28
      C.  Bilateral Diplomacy ..................................................................................  30
      D.  Resolving the Venezuelan Crisis...............................................................  31

VII.  Conclusion .........................................................................................................  34

APPENDICES
A.    Map of Colombia ...................................................................................................  35
B.    Venezuelan Migrants and Refugees in Colombia ................................................  36
C.    About the International Crisis Group ...................................................................  38
D.    Crisis Group Reports and Briefings on Latin America and the Caribbean since 2019....  39
E.    Crisis Group Board of Trustees ............................................................................  41

CLP_AR_006127

# Principal Findings

**What's new?**  Close to 2.5 million Venezuelans are living in Colombia, having fled their home country's economic collapse and political crisis. While Bogotá has generously offered residency rights, many migrants and refugees nevertheless face extreme hardship and have few resources to sustain themselves.

**Why does it matter?**  Thriving armed and criminal groups in Colombia's cities and countryside have absorbed Venezuelans as cheap recruits, often deploying them for high-visibility crimes while exposing them to great physical danger. Xenophobia toward Venezuelans has risen sharply, surging during periods of unrest.

**What should be done?**  The new Colombian government and donors should cooperate to improve protection of arriving migrants, including by diverting them from violent areas, and help them get access to the formal labour market. Rebuilding ties between Colombia and Venezuela will be vital to giving migrants an option to return safely home.

CLP_AR_006128

International Crisis Group

**Latin America Report N°94**                                    **9 August 2022**

## Executive Summary

Colombia has welcomed millions of Venezuelans fleeing their homeland, but many remain at risk in the country. Venezuelans have fanned out across the Americas, but by far the largest number, close to 2.5 million, have settled in Colombia, where governments sympathetic to the distress across the border and cool to leaders in Caracas have offered them residency and services. These policies stand out for their compassion but are not matched by sufficient economic or other support. Penniless migrants and refugees are vulnerable to sexual exploitation. Many have little choice but to rely on informal work and are vulnerable to recruitment into armed groups or street gangs. As the Venezuelans' role in criminal outfits has grown more prominent, xenophobia directed at them has also increased. To break this cycle, Colombian authorities should work with partners to offer better protections for Venezuelans and to strengthen legal economic opportunities. Colombian President Gustavo Petro's plan to restore dialogue with Caracas will be essential to ensuring that migrants can pass safely between the two countries.

Escaping a huge economic contraction, rising insecurity, collapsing public services and a political crackdown, over six million migrants and refugees from Venezuela have sought a new, safer life abroad over the past decade – with most leaving home since 2017. From these Venezuelans' perspective, Colombia boasts several attractions as a destination: it shares a porous 2,200km frontier with its neighbour, making it possible albeit dangerous to cross, even when official borders are closed; its governments have been highly critical of Caracas; and it has offered residency and access to public services to the newcomers. Moreover, until the onset of COVID-19, its economy was enjoying steady growth, with thriving labour markets in its big cities.

But in other ways Colombia is one of the least suitable Latin American countries to receive a mass migrant exodus. Over decades, various fronts of a vicious, multi-pronged internal war caused the country to suffer some of the world's highest rates of forced displacement – and drove out millions of migrants and refugees. Colombia has had no previous experience of offering shelter and respite to so many migrants, and its lack of know-how and capacity is conspicuous. The country's cash-based informal economy accounts for close to half of all jobs and is characterised by paltry, erratic pay – particularly for Venezuelans, who, for lack of formal alternatives, often accept wages considerably lower than what locals receive.

In poor rural areas, both close to the border with Venezuela and in remote corners elsewhere, the most easily available employment is often to be found in illicit business and among armed and criminal groups. Despite the 2016 agreement with the guerrilla Revolutionary Armed Forces of Colombia (FARC), which brought an end to the country's largest insurgency and mapped out a route to lasting peace, splinter groups (known as "dissident" factions) and other armed bands continue to coerce communities and perpetrate acts of violence throughout large parts of the country. Migrants have been immersed in conflict zones with no understanding of the unwritten rules for survival. Coca production and illegal mining have become major sources of work for Venezuelans; human trafficking and sexual exploitation plague border towns (and big cities as well), with women and minors in special danger. Gender-based violence

CLP_AR_006129

is particularly common at informal border crossings under criminal control, where the means of protecting victims are generally absent.

Struggling with high unemployment, bouts of social unrest and, since 2020, the effects of COVID-19, Colombia's big cities have likewise proven inhospitable. Tens of thousands of Venezuelans ended up walking back to the border in the first months of the pandemic after the state prohibited their work as streets vendors, causing many to be evicted from cramped lodgings. Just as armed groups in the countryside lure Venezuelan recruits with one-off payments, food and shelter, urban gangs have targeted desperate migrants, many of them sleeping rough (an estimated 16 per cent of homeless people in Colombia are now Venezuelan). Employed by gangs as part of their growing work force, migrants offer cheap labour as street fighters, drug dealers and hit men. Although working under the orders of illicit Colombian groups, the high-visibility crimes perpetrated by migrants have fuelled xenophobia toward Venezuelans. Migrants who have been exploited for their vulnerability and poverty are regularly vilified by members of the public and politicians as the cause of low wages, insecurity and public disorder.

Preventing recruitment of migrants and refugees by armed and criminal groups is essential both to the safety of Venezuelans and the broader cause of peace and security in Colombia. Crucial steps toward this end should include strengthening migrant reception services close to the border or in big cities; improving support for all newcomers seeking safe passage to their destination; and making migrants aware of the perils of involvement with organised crime. More safe houses for sexually exploited and trafficked women and children along the border are also an acute need. But Colombia cannot do all these things by itself. Foreign partners and international bodies working on migration, conflict, gender and humanitarian emergencies should help the cash-strapped Colombian state foot the bill.

In certain areas, however, the incoming government in Bogotá will have to assume primary responsibility. Where Venezuelans have found themselves embroiled in violence, they should be given the right to be registered as victims of Colombia's conflict, which by law entitles them to reparation payments and special judicial attention. The Colombian state should also strive to iron out the difficulties Venezuelan migrants encounter in trying to join the formal economy by taking additional steps to recognise their educational qualifications and providing vocational training where necessary. Stricter law enforcement to ensure Venezuelan employees are not exploited or underpaid in their work, thereby undercutting protections for Colombians, could help relieve the labour market frictions that the migration wave has created.

President Petro's goal of patching up severed ties between the Colombian and Venezuelan governments is also long overdue. Communication channels between border provinces enabled pedestrian traffic to resume through the main formal crossings in late 2021. But the incoming Colombian government has made clear it wishes to restore full diplomatic and consular relations, while Petro himself has stressed the need for the two states to work together in improving security and boosting formal trade along the border. A fragile stabilisation of Venezuela's economy, driven in large part by use of the U.S. dollar as legal tender in the country, has raised the prospect that more migrants can go back to their home country voluntarily. Making sure there

CLP_AR_006130

is safe passage in both directions will require far more cooperation between the two states, as well as support from international agencies.

Colombia's offer of a safe haven for Venezuelans is both a grand gesture of solidarity and a promise the country has been hard pressed to meet. Stronger protection upon migrants' arrival, clear routes to the formal labour market, restored bilateral ties and a safe way to return home if desired are vital to protecting migrants from the lures and dangers of crime and exploitation, with all the ill effects that those may bring.

**Bogotá/Washington/Brussels, 9 August 2022**

CLP_AR_006131

| International Crisis Group | |
| --- | --- |
| **Latin America Report N°94** | **9 August 2022** |

# Hard Times in a Safe Haven:
# Protecting Venezuelan Migrants in Colombia

## I.   **Introduction**

Over the past quarter-century, migration out of Venezuela has come in three successive stages, prompted by political tumult, economic and social unrest, and a deep humanitarian crisis.[1] The first wave included affluent Venezuelans in possession of passports and sufficient funds to book a flight, many of them leaving during President Hugo Chávez's rule (1999-2013). During the second wave, between 2016 and 2017, many middle-income families departed, primarily to other South American countries. Finally, since 2018, people lacking resources to travel and often without passports have headed out on foot, becoming known as *los caminantes* (the walkers). As time passed, worsening conditions – including hunger, extreme poverty, a failing health system and widespread violence – have accelerated the exodus. Around one fifth of Venezuela's population of 30 million has moved abroad over the past decade, with most of this migration occurring since 2017.

Of the six million Venezuelans who have left their country since 2013, nearly 2.5 million live in Colombia, which shares a 2,200km border with Venezuela, and which has in many respects presented itself as a welcoming neighbour.[2] Successive governments have sought to assure incoming migrants and refugees of their rights to stay, work and enjoy access to social services.[3] Leaders in Bogotá have won plaudits from foreign officials and international humanitarian bodies for their efforts to provide newly arrived Venezuelans with a degree of protection, including through special residency permits and close working arrangements with UN agencies and donors to handle the migrant inflow.

---

[1] Bram Ebus, "Under a Merciless Sun: Venezuelans Stranded across the Colombian Border", Crisis Group Commentary, 25 February 2020. In Latin America and the Caribbean, according to surveys done by the International Organization for Migration (IOM), about 34 per cent of the female migrants travelled by themselves. In Colombia, about half of the Venezuelan migrant population are women. Frequently, men depart first, with their wives and children following later. "Displacement Tracking Matrix", IOM, July 2020.

[2] About 295,000 undocumented Venezuelans are in Colombia. "Distribución de Venezolanos en Colombia – Corte 28 de Febrero de 2022", Migración Colombia, 19 July 2022; Plataforma de Coordinación para Refugiados y Migrantes de Venezuela (R4V), January 2022. Crisis Group telephone interview, Bogotá city official, 29 March 2022.

[3] For brevity's sake, this report will refer to migrants, refugees and returnees as "migrants". While the term has no definition under international law, the IOM defines a migrant as a person who "moves away from his or her place of usual residence, whether within a country or across an international border, temporarily or permanently, and for a variety of reasons". "Who is a Migrant", IOM, undated. For purposes of this report, the term includes both refugees (whom the UN Refugee Convention of 1951 defines as "someone who is unable or unwilling to return to their country of origin owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion") and returnees (here, Colombians who settled in Venezuela, mainly escaping the internal conflict in Colombia, but who have decided to return to their homeland).

CLP_AR_006132

But laudable as these efforts have been, Colombia has struggled to provide Venezuelan migrants with the support they need, a problem with both humanitarian and security implications. Many migrants suffer extreme economic hardship and violent intimidation in a country still troubled by armed and criminal outfits, and with its own long history of forced displacement.[4] For many Colombians, the visible face of Venezuela's humanitarian emergency consists of the migrants scraping by in the country's cities, where organised crime often has more absorptive capacity than formal businesses or state employment schemes. But many migrants also end up in rural and conflict-affected regions. Although the largest insurgency in the country, the Revolutionary Armed Forces of Colombia (FARC), handed over its weapons following the 2016 peace accord, an array of armed groups continues to plague rural areas. Migrants can now be found in the most remote corners of Colombia, working in rackets that help fund these groups and their activities, including illegal gold mining, fuel smuggling and coca growing.

A rupture in diplomatic relations between Colombia and Venezuela in February 2019 only deepened the difficulties faced by migrants. Whether seeking to cross a frequently closed formal border, return safely to family in their homeland, obtain official documents or receive basic consular services, migrants have found their efforts thwarted by the refusal of President Iván Duque's government in Bogotá to entertain any sort of relationship with President Nicolás Maduro.

But major changes are afoot in Colombia and the question is what happens now. President Gustavo Petro's victory at the polls in June and his formal inauguration on 7 August made him Colombia's first left-wing president in recent history, auguring a dramatic switch in policy direction for Bogotá on many key issues, including relations with Caracas. Despite his historical differences with the Maduro government, Petro spoke with the Venezuelan president days after his election and declared that borders between the two countries would be fully reopened; he also made clear throughout his campaign that he would restore ties with Venezuela.[5] Petro is also expected to renew efforts to negotiate with Colombia's current largest guerrilla group, the National Liberation Army (ELN), which has a presence on both sides of the border, and has flourished deeper inside Venezuela in recent years.[6]

As the political transition proceeds in Bogotá, this report examines the challenges faced by Venezuelan migrants who have sought safe harbour in Colombia, including the risk of being recruited into criminal and armed groups, and how their vulnerability in this regard has affected public perceptions of them. Focusing on the second and

---

[4] Over eight million people are registered as victims of forced displacement in Colombia. Colombia's Victims Unit, April 2022. The number of Colombians who fled to Venezuela due to decades of conflict is unknown. About five million Colombians lived in Venezuela in 2015, making up some 15 per cent of the population. This total included refugees, but also Colombians who had migrated to Venezuela in search of employment opportunities. See Yhoger Contreras, "Colombians flee homes in Venezuela amid border crackdown", Associated Press, 25 August 2015.

[5] "Gustavo Petro concede a Noticias Caracol su primera entrevista tras ser elegido presidente", Noticias Caracol, 22 June 2022. Regarding Petro's differences with Maduro, see "Dura arremetida de Petro al gobierno de Nicolás Maduro", *El Tiempo*, 31 January 2020.

[6] "Negociar la paz con el ELN, un desafío para el gobierno de Gustavo Petro", *El País*, 25 June 2022. On failed attempts to negotiate with the ELN, see Crisis Group Latin America Report N°68, *The Missing Peace: Colombia's New Government and Last Guerrillas*, 12 July 2018.

CLP_AR_006133

third migratory waves described above, the report explores the ways in which the Colombian state has sought to support migrants; the difficulties it has encountered in doing so, particularly during the pandemic; and the gaps in support and protection that the new government will need to fill. This report is based on interviews with about 90 state and local officials, migrants, civil society leaders, diplomats and aid workers between November 2019 and July 2022. Research was conducted through visits to Colombian regions including Bajo Cauca, the Pacific, north-eastern Antioquia, Arauca and Catatumbo, as well as the cities of Villavicencio, Medellín, Cúcuta and Bogotá.

CLP_AR_006134

## II.    **A Mass Exodus and a Hard Landing**

Prior to the Venezuelan migrant exodus of the past decade, Colombia had not experienced a major inflow of migrants or refugees. The Venezuelan crisis thus forced a largely unprepared country to adapt at speed. Colombia welcomed Venezuelan migrants, but their arrival aggravated existing social tensions and placed a new set of demands on the country's already taxed institutions.

### A.    *Mass Migration's Drivers*

Venezuela's economic collapse has been a primary engine driving recent waves of migration into Colombia. A massive contraction prompted by ill-considered state interventions, falling oil prices and corruption, and worsened by the imposition of U.S. financial and economic sanctions from 2017 onward, shaved 74 per cent off Venezuela's gross domestic product between 2014 and 2020.[7] Recent studies have indicated that 95 per cent of Venezuelans remaining in their country live in poverty and 77 per cent in extreme poverty following this nosedive, which caused the monthly minimum wage to decline to a few dollars by early 2022, although it has risen since.[8] Dollarisation of Venezuela's economy has afforded a modicum of stability by tempering hyperinflation, but salaries for public-sector employees remain very low and economic conditions are still forbiddingly tough for most people.[9]

The country's economic straits are linked to its political crisis, which has also escalated under the government of President Maduro. Following his election in 2013, economic collapse, rising insecurity, and shortages of food and medicines created the backdrop for an opposition victory in the 2015 legislative contests. Two years later, the government stripped the opposition-held National Assembly of its powers. Amid intensifying political conflict and an authoritarian clampdown by the government, the opposition boycotted the 2018 presidential polls, which Maduro won. Arguing that the vote was fraudulent and unfair, the speaker of the National Assembly, Juan Guaidó, asserted his claim to be "interim president" in early 2019 and won recognition from over 50 countries, including the U.S. Subsequent attempts by elements of the opposition to unseat Maduro, including a civil-military uprising and a mercenary invasion, failed to achieve their goal, enabling the president to consolidate his hold on power.[10]

---

[7] "Encuesta Nacional de Condiciones de Vida 2021", Universidad Católica Andrés Bello, 2021.

[8] In March, President Maduro announced an eighteen-fold increase in the minimum wage, which now stands at $28 a month. "Salario mínimo Venezuela sólo cubre 5 % de alimentos, según ente independiente", Swissinfo, 20 June 2022.

[9] "Encuesta Nacional de Condiciones de Vida 2021", op. cit.; "Extreme poverty in Venezuela rises to 76.6% – study", Reuters, 29 September 2021. Many Venezuelans have quit their jobs, and those who have stayed in the country, including highly educated professionals, have resorted to informal means of earning a living, including illegal gold mining in southern states or smuggling goods across the borders with Brazil and Colombia. Crisis Group Latin America Report N°73, *Gold and Grief in Venezuela's Violent South*, 28 February 2019.

[10] See Crisis Group Latin America Reports N°s 75, *A Glimmer of Light in Venezuela's Gloom*, 15 July 2019; and 85, *Venezuela: What Lies Ahead after Election Clinches Maduro's Clean Sweep*, 21 December 2020.

CLP_AR_006135

Increasing repression has also been a hallmark of the Maduro administration. While repression and widespread abuse are not the main causes of migration, they are among the reasons migrants cite for leaving the country.[11] The UN Independent International Fact-Finding Mission on Venezuela has condemned state authorities for a wide variety of human rights violations, including arbitrary arrests and disappearances by security forces, and stated that instead of protecting rights and freedoms, judicial authorities have facilitated impunity.[12] In November 2021, the International Criminal Court announced a formal investigation into possible crimes against humanity in Venezuela allegedly committed by security forces.[13]

One further cause pushing Venezuelans to leave their country has only surfaced in the last year or so. Since early 2021, flare-ups of fighting between FARC "dissident" factions (ie, splinters of the disbanded organisation) and the Venezuelan army in the border state of Apure has forced Venezuelans to flee across the border.[14] Of the at least 6,000 uprooted people who crossed into Colombia in early 2021, several hundred were displaced from Apure state to the departments of Arauca and Vichada in Colombia, including over a dozen families of the Jivi ethnic tribe.[15]

Even though Colombia is right next door, crossing the border is a perilous endeavour. Due to border closures or their lack of travel documents, many Venezuelans have no alternative but to walk over informal tracks (*trochas*) controlled by armed groups and gangs that charge fees for passage and are frequently violent.[16] An estimated 63 per cent of families entering Colombia did so over irregular border crossings.[17] Corrupt police officers may also benefit by collecting extortion fees of roughly 5,000 Colombian pesos ($1.25) from motorcyclists transporting food products, such as eggs, across the border from Colombia to Venezuela. Venezuelans have also reported abuses by Colombian migration officials, including throwing water at sleeping mi-

---

[11] "La Crisis de Migrantes y Refugiados Venezolanos", OAS, June 2021; "¿Qué se sabe sobre la migración venezolana reciente?", Observatorio Venezolano de Migración, 2021.

[12] "Report of the independent international fact-finding mission on the Bolivarian Republic of Venezuela", UN Human Rights Council, September 2020; "Report of the independent international fact-finding mission on the Bolivarian Republic of Venezuela", UN Human Rights Council, 16 September 2021.

[13] Mariano de Alba, "Venezuela: International Criminal Court Probe Puts Maduro in a Quandary", Crisis Group Commentary, 12 November 2021.

[14] Following the 2016 peace deal with the government, several splinter groups of the guerrilla still using the name FARC are active in Colombia. See Crisis Group Latin America Report N°92, *A Fight by Other Means: Keeping the Peace with Colombia's FARC*, 30 November 2021.

[15] Crisis Group telephone interview, humanitarian aid official, April 2022. See also "Ya son más de 6.000 los refugiados venezolanos en Arauquita", *El Tiempo*, 2 April 2021. In the years prior to the uptick in fighting in Apure, Venezuelans had already been displaced across the border due to conflict in the southern mining districts of Amazonas and Bolívar states. See Crisis Group Report, *Gold and Grief in Venezuela's Violent South*, op. cit.

[16] Crisis Group interview, Venezuelan migrant, Villa del Rosario, 27 November 2021.

[17] "Colombia: Evaluación de Seguridad Alimentaria en Emergencias (ESAE) para Población Migrante de Venezuela y Hogares de Acogida en Departamentos Fronterizos", World Food Programme, February 2020.

CLP_AR_006136

grants, sometimes beating people who need to spend the night outside near their offices, and destroying valid identity documents.[18]

B.    *Permits to Stay*

In 2017, as migration from Venezuela surged, President Juan Manuel Santos' government created the Permiso Especial de Permanencia, or special residency permit, to enable incoming Venezuelans to stay legally in Colombia. Colombian solidarity with Venezuelan migrants reflected an expression of sympathy with their flight from an increasingly authoritarian government, as well as a pragmatic understanding that migrants could not be stopped from coming across a long, porous border. The permit granted registered migrants two years of residency, access to social services and a work permit.[19] Appointment of a border czar working in the presidential offices helped streamline coordination among ministries and state agencies handling the migrant flow and cut red tape, enabling around 660,000 Venezuelans to obtain residency permits within three years.[20] Even so, ranging from 2017 to 2021, between 41 per cent and 57 per cent of Venezuelans in Colombia still had no formal legal authority to stay because of administrative hurdles and the lack of capacity to process permit requests.[21]

In response to increasing migrant numbers, President Duque's government developed new legislation, enacted in May 2021, that granted Venezuelans temporary protection status (known as the Estatuto Temporal de Protección para Migrantes Venezolanos).[22] Widely praised abroad for its generous provisions, the statute affords Venezuelan migrants who obtain a permit ten-year residency and allows them access to public education, health care and the job market. By February 2022, about 2.4 million Venezuelans, or 96 per cent of the migrant population, had applied for a protection permit, with Colombian migration authorities having approved nearly 1.4 million by July 2022.[23] Still, not all Venezuelan migrants are eligible to apply. Those who cannot prove their date of entry or provide valid identification documents are subject to deportation, spawning a black market in "service providers" who offer to fix paper-

[18] Crisis Group interview, Venezuelan migrant, Villa del Rosario, 27 November 2021. Abuses by border officials have been previously documented and described by Colombian media and Crisis Group. See "El drama de las violaciones en la frontera con Venezuela", *Semana*, 12 March 2020; and Crisis Group Latin America Report N°84, *Disorder on the Border: Keeping the Peace between Colombia and Venezuela*, 14 December 2020.

[19] Stephanie López Villamil and Helen Dempster, "Why Colombia Granted Full Rights to Its 1.7 Million Venezuelans, and What Comes Next", Center for Global Development, 26 January 2021.

[20] Crisis Group interview, migration expert, Bogotá, 1 March 2022.

[21] "Migration from Venezuela: Opportunities for Latin America and the Caribbean", International Labour Organization, 2021; "Socioeconomic Integration of Venezuelan Migrants and Refugees", IOM, July 2021.

[22] Ronal Rodríguez, "Lo que sigue para el Estatuto temporal de protección para migrantes venezolanos", *El Espectador*, 22 February 2021.

[23] "Distribución de Venezolanos en Colombia – Corte 28 de Febrero de 2022", op. cit.; "Migración Colombia entrega balance de la implementación del estatuto temporal de protección", press release, Migración Colombia, 19 July 2022.

CLP_AR_006137

work.[24] Venezuelans living in rural areas and lacking funds for travel often find it difficult to reach towns where the permits are handed out.[25]

C.    *For Many, a Precarious Home in the City*

Conditions remain challenging for many migrants and refugees upon arrival in Colombia. Whereas food, fuel and medicine are generally not scarce, finding work in Colombia's formal economy and the means to purchase goods can be an ordeal. By the end of 2021, 48 per cent of workers were employed in the informal economy, a rate that rose to 70 per cent in the town of Cúcuta, the largest Colombian city close to the border with Venezuela, and home to nearly 170,000 Venezuelan migrants.[26] An estimated 90 per cent of Venezuelans working in Colombia are employed in the informal economy, where pay tends to be lower and more erratic.[27]

Venezuelan migrants have mainly settled in Colombia's big cities. Some 495,000 Venezuelans are registered in the capital Bogotá, while another 191,000 are located in Medellín, Colombia's second biggest city. After that come the border city Cúcuta, Cali, Colombia's third largest conurbation, located in the south west, and the Caribbean port of Barranquilla.[28]

Cities present specific challenges for many migrants. Those who have been unable to get their hands on a legal stay permit or lack a stable income face difficulties in obtaining apartment leases. For this reason, many poorer Venezuelans end up in informal accommodation or pay-per-day rooms, called *pagadiarios,* a predominantly urban phenomenon. Conditions in these facilities are commonly described by their inhabitants as miserable and inhumane.[29] Entire families cluster together in tiny rooms and share mattresses. "The state does not provide economic guarantees and migrants look for their own solutions", a state official said of these housing conditions.[30]

To pay for these *pagadiarios*, many Venezuelans join the informal street economy, selling products such as cigarettes, rubbish bags and sweets. What is earned during the day is spent after work on food and nightly accommodation. Experts who work closely with migrants warn that the owners of temporary accommodation sometimes entice tenants into taking part in criminal activities, or ask for sexual favours, as a means of paying the rent.[31]

---

[24] Crisis Group interview, social worker, Cúcuta, December 2022. Migrants who entered before 31 January 2021 can apply for protection status under the 2021 statute. Migration experts highlight the importance of scheduling a new round of applications for the status that includes a more recent date of entry. Crisis Group interview, senior official international agency, Bogotá, 19 July 2022.

[25] Crisis Group interview, humanitarian agency representatives, Bogotá, 10 February 2022.

[26] "Distribución de Venezolanos en Colombia – Corte 28 de Febrero de 2022", op. cit.; "Informalidad cedió en las 13 principales ciudades del país", *Portafolio*, 10 November 2021; "Migration from Venezuela: Opportunities for Latin America and the Caribbean", op. cit.

[27] "¿En qué trabajan los migrantes venezolanos en Colombia, por lo general?", El Tiempo, 9 November 2021.

[28] Crisis Group telephone interview, Bogotá city official, 29 March 2022. See also "Distribución de Venezolanos en Colombia – Corte 28 de Febrero de 2022", op. cit.; and R4V, op. cit.

[29] Crisis Group interviews, migrants, refugees and civil society representatives, 2020-2022.

[30] Crisis Group interview, state official, Villa del Rosario, 1 December 2021.

[31] Crisis Group interviews, migration and human rights experts, January and February 2022.

CLP_AR_006138

Venezuelans are also vulnerable to being kicked out when unable to pay. Mass eviction became an acute problem in Colombia during the first COVID-19 lockdown from March 2020, when social distancing rules prohibited street vendors from working outside, in effect denying many migrants their only source of income. Lockdowns forced tens of thousands of Venezuelans to walk back to their native land, where they could at least find a place to stay with family or friends after losing their livelihoods and being turned out into the street by landlords, despite a ban on dislodging tenants during the pandemic's early stages.[32] Due to their precarious employment conditions and poverty, some 31 per cent of Venezuelan families indicated in a recent survey that they risked eviction because they could not pay rent and utilities, while about a quarter of refugee and migrant households in Colombia face food insecurity and consume poor-quality water.[33]

### D.   *Labour Market Difficulties*

Most of the Venezuelans in Colombia yearn for stable, paid employment.[34] But their chances of gaining work are limited, and the opportunities on offer are often far from desirable. At least 24 per cent of Venezuelan refugees and migrants in Colombia are unemployed, according to the state statistical institute.[35] For those who have work, conditions are often harsh. About 41 per cent of the Venezuelans in Colombia work more than 48 hours a week – above the legal limit on working hours – and often make considerably less money than their Colombian peers. In the construction industry, for example, a Colombian employee can earn up to 70,000 Colombian pesos ($17.5) a day, while a Venezuelan is paid about 30,000 pesos ($7.5), even if he is similarly skilled.[36]

Low pay affects Venezuelan women even more acutely than men, with earnings 26.5 per cent less than those of a Venezuelan man, according to a 2019 survey.[37] Venezuelan women are frequently the primary breadwinners for their households; as

---

[32] Crisis Group Latin America Briefing N°24, *Broken Ties, Frozen Borders: Colombia and Venezuela Face COVID-19*, 15 April 2020.

[33] "Refugee and Migrant Response Plan for Venezuela 2022", Inter-Agency Coordination Platform for Refugees and Migrants from Venezuela, 2021. By July 2021, according to the World Food Programme, 1.1 million Venezuelans in Colombia – representing 64 per cent of migrants in the country – were food-insecure, and 14 per cent were malnourished. "Food Security Update Venezuelan Migrants in Colombia, Ecuador and Peru", World Food Programme, August 2021. Another survey found that some 77 per cent of refugee and migrant households in June 2021 reported that they lacked access to health care; 85 per cent of the households said their priority was obtaining food, while about 59 per cent of households skip at least one meal a day. "Evaluación Conjunta de Necesidades", Inter-Agency Coordination Platform for Refugees and Migrants from Venezuela, June 2021.

[34] "Migration from Venezuela: Opportunities for Latin America and the Caribbean", op. cit.

[35] "Mercado Laboral", DANE, December 2021; "Bogotá es la ciudad con más migrantes venezolanos desempleados: Dane", Proyecto Migración Venezuela, 30 June 2021; Jairo Chacón, "¿Dónde viven y en qué trabajan los venezolanos en Colombia?", Voice of America, 9 February 2022.

[36] Crisis Group interview, mining sector representative, north-eastern Antioquia, 11 November 2020.

[37] "¿Cuál era la brecha de género de migrantes en el mercado laboral antes de la pandemia?", Proyecto Migración Venezuela, 2021. A higher percentage of migrant women, compared to migrant men, work in the informal economy. "Dinámicas laborales de las mujeres migrantes venezolanas en Colombia", UN High Commissioner for Refugees, 2020.

CLP_AR_006139

a result, they are especially vulnerable to being exploited in order to support their children. In the border city of Cúcuta, some restaurants pay Venezuelan women half what they would pay Colombian citizens.[38]

Legal stay permits, including residency visas and temporary protection status, are no guarantee that Venezuelans can gain access to legal employment or avoid discrimination. In Bogotá, some stores state in their vacancy notices that Venezuelans should not apply.

When Venezuelans do get work, but at lower pay rates, they can find themselves at odds with the Colombian work force. Colombian workers who lose their jobs or face difficulties looking for new employment because of competition with Venezuelan migrants experience acute frustration.[39] Even among migrants, excessively low pay can generate grudges. Women who clean houses but refuse to accept less than a Colombian domestic worker (who, although by law they should receive around 70,000 Colombian pesos per day, often get paid 25,000 to 30,000, or $6.25 to $7.5) can be sacked in favour of other migrants earning 10,000 to 15,000 pesos ($2.5 to $3.75).[40]

Competition and resentment between Venezuelan and Colombian workers extend beyond the legal labour market to the illicit economy. ELN guerrillas reportedly intervened in 2018 after locals in the hamlet of El Tarra sought to drive away Venezuelan coca leaf pickers and sex workers because of their alleged deleterious effect on wages. According to these reports, the ELN ordered farm and brothel owners to pay Venezuelans and Colombians equally to quell local tensions. Most coca leaf pickers in the area are now Venezuelan.[41]

### E.    *Access to Health Care*

The quest for health care is one of the main causes of migration from Venezuela, where the national public health system has broken down and many hospitals lack clean water and essential medication. Expensive medicines can be obtained privately, but the prices (generally set in U.S. dollars) are unaffordable for most people. Many health care workers have also migrated, causing shortages of essential medical staff.[42] Because migrants have the right to emergency treatment in Colombia irrespective of immigration status, women cross the border in search of prenatal checkups. Babies of

---

[38] Crisis Group interview, social worker, Cúcuta, 27 November 2021.

[39] Economists say there is no conclusive evidence of unemployment increasing as a result of Venezuelan migration, although migrants may well have boosted the relative size of the informal economy. "Venezolanos no les están quitando el trabajo a colombianos como dice Claudia López", *Semana*, 11 March 2021.

[40] Crisis Group focus groups, migrants and returnees, Cúcuta, 4 December 2021.

[41] Crisis Group interview, security expert, Cúcuta, 26 November 2021.

[42] "World Report 2021: Venezuela", Human Rights Watch, 2022; William Rhodes and Cristina Valencia, "Venezuela's healthcare crisis needs emergency attention", *Financial Times*, 8 February 2019; Crisis Group Report, *Disorder on the Border*, op. cit.; and Ebus, "Under a Merciless Sun", op. cit. Venezuelans were granted access to COVID-19 vaccines in 2021. Prior to this decision, in December 2020 President Duque responded when asked whether undocumented Venezuelan migrants would receive a jab: "Of course not. We could have calls to stampede the border". See "Venezolanos que no tengan doble nacionalidad ni estén regularizados no tendrán vacuna COVID: Duque", Blu Radio, 21 December 2020; and "Independiente de su estatus migratorio, todos pueden vacunarse", press release, Ministry of Health and Social Protection, 29 October 2021.

CLP_AR_006140

Venezuelan parents born in Colombia since 19 August 2015 are now granted Colombian citizenship, a measure in force until 2023. About 66,000 babies and children have benefited.[43]

But the struggling Colombian health care system is limited in what it can deliver. Colombians themselves find it hard to gain access to decent health care, while for Venezuelans matters are even worse.[44] The state is responsible for paying hospitals for any costs related to emergency care for migrants. Since the payouts can be very slow, hospitals feel little inclination to attend to undocumented Venezuelans, and when they do, prefer to charge them directly. During the early days of the COVID-19 pandemic, irrespective of whether they had residency permits or not, Venezuelans with the virus could not get medical care or were retained in hospitals by private security until reaching agreement on payment.[45] One human rights defender in Bogotá referred to a case in which women prostituted themselves near a hospital until they could pay their medical bills.[46] Venezuelans without legal residency can also be denied the right to medical attention if the hospital deems their cases not to be emergencies; undocumented citizens with chronic diseases, cancer or in need of antiretroviral drugs are often excluded from free treatment.[47]

For those Venezuelans with formal residency, the problems faced in gaining access to health care are typical of the travails of many Colombians. The Colombian government hopes to affiliate 945,000 Venezuelans to the public health system, but by December 2021 only 427,000 had health insurance.[48] Migrants with residency papers can acquire a public health insurance policy for low-income households, but members of a focus group complained that the doctors they were allocated make prescriptions without a proper consultation (they noted painkillers in particular), while some have stopped visiting Colombian hospitals after receiving inadequate attention.[49]

[43] "Ellos ya son colombianos", UNHCR, 23 December 2021. Some Venezuelan hospitals do not have the tools to deliver clean caesarean-style deliveries and charge patients in dollars for medical supplies that should be free. See Ebus, "Under a Merciless Sun", op. cit.

[44] More than eight million people in Colombia live more than an hour away from the nearest health centre and about 2.2 million face barriers to getting any health-care services. See "Resumen Panorama de Necesidades Humanitarias 2022 Colombia", UN Office for the Coordination of Humanitarian Affairs, February 2022.

[45] Jhoandry Suárez, "Migrantes venezolanas entre las trabas de un sistema y la solidaridad para parir en Colombia (I)", *Efecto Cocuyo*, 5 February 2022; "Desigualdades en salud de la población migrante y refugiada venezolana en Colombia", Profamilia, 2020.

[46] Crisis Group interviews, human rights lawyers, Bogotá, 12 February 2021.

[47] Crisis Group telephone interviews, migration experts, 17 November 2020. Emergency services should also be given to survivors of gender-based violence. For more information, see "Unprotected: Gender-based Violence against Venezuelan Refugee Women in Colombia and Peru", Amnesty International, July 2022.

[48] "Minsalud logra afiliar 21.476 migrantes en una semana", press release, Ministry of Health and Social Protection, 9 February 2022.

[49] Crisis Group focus groups, migrants and returnees, Cúcuta, 4 December 2021.

CLP_AR_006141

## III.  **The Lure of Crime**

Venezuelans are vulnerable to armed group recruitment and face extraordinary risks on Colombian territory. They are often unprotected thanks to their undocumented status, unfamiliar with Colombian legislation and the rights it affords, and ignorant of unwritten rules in conflict zones such as curfews and codes of conduct imposed by armed groups.[50] In Bogotá's rougher areas and other urban centres, penniless migrants become caught up in gang violence, contract killing and drug trafficking, among other things.[51] Outside the cities they are drawn into coca cultivation, illegal mining and other illicit activity.

### A.  *Venezuelans and Colombian Armed Groups*

Despite the 2016 peace accord with the FARC, armed conflict continues to impinge on the lives of millions of Colombians and in some areas has worsened in recent years.[52] According to Colombia's transitional justice system, 2021 turned out to be the most violent year since the peace agreement was signed, with competition intensifying among rival armed bands over illicit economies and trafficking routes that require control over land and communities.[53]

Unlike the Colombians who have experienced recurrent waves of fighting, sometimes over decades, the Venezuelans who find themselves in rural areas do not know the de facto rules of the road in zones disputed by armed groups.[54] They consequently face risks that range from detonating landmines on rural tracks and braving crossfire in border areas to breaking nightly curfews imposed by armed groups.[55] Women, children, undocumented migrants and refugees can face grave peril in these settings. Two Venezuelan boys were killed by FARC dissidents in the border town of Tibú in October 2021 after being suspected of shoplifting. Their bodies, found on a village road, bore signs with "thief" written on them.[56] In the Colombian province of Cauca, hundreds of Venezuelans were coerced into leaving a coca-growing region late in 2020 after a pamphlet signed by the ELN ordered them out. "A share of the migrant popu-

---

[50] Crisis Group interviews, aid agency representatives, Bogotá, 10 February 2022.

[51] "Graves violaciones de derechos humanos a población proveniente de Venezuela en Colombia", CODHES, October 2020.

[52] Crisis Group Commentary, "Tackling Colombia's Next Generation in Arms", 27 January 2022. About 5.8 million people live in areas controlled by armed groups. See "Resumen Panorama de Necesidades Humanitarias 2022 Colombia", OCHA, February 2022.

[53] "En 2021 el conflicto armado se reactivó en 12 zonas del país", press release, Special Peace Jurisdiction, 2022. The International Committee of the Red Cross identifies five "non-international armed conflicts" in Colombia. "Armed Conflict in Colombia: A Pain That Doesn't Go Away", International Committee of the Red Cross, 17 March 2021.

[54] Non-state armed groups set strict rules in areas where they operate with the aim of exercising strict social and territorial control. Examples of such rules are curfews, mobility restrictions, closing times for shops and no-go zones. The groups mete out violent punishments for breaking these rules.

[55] Crisis Group interviews, representatives international aid agency, 10 February 2022.

[56] Joe Parkin Daniels, "Killing of two boys for alleged shoplifting shocks Colombia", *The Guardian*, 13 October 2021.

CLP_AR_006142

lation is a victim of the armed conflict in Colombia", said one young Venezuelan migrant working on a coca plantation.[57]

Lacking resources and often without a residency permit or temporary protection status in Colombia, Venezuelan migrants have also become prime targets for armed group recruitment – often more so than poor young Colombians. Forced recruitment of both Colombian nationals and Venezuelan migrants has been on the increase since 2017 and rose notably after the COVID-19 pandemic started.[58] Armed groups' thirst for territorial expansion and increased revenues has driven the quest to absorb more personnel. "Men and numbers give military power", one state official observed.[59]

With no place to stay, and little money to pay for food and accommodation, Venezuelans en route are easy prey as they walk from town to town.[60] The ELN, for example, is reported to have a makeshift lodge in the border department of Arauca where migrants can get clean clothing, rest and something to eat for a few days while being enticed to join the group.[61] Armed groups "show they are different to the government, which does not lend a hand", an expert in child recruitment said. Even though guerrilla outfits such as the ELN do not pay their soldiers a salary, fake offers are made to recruit Venezuelans, or gifts are distributed such as cell phones or even motorbikes. In Arauca, one of its traditional bastions, the guerrilla group allegedly pays one-off signup fees of between 200,000 and 500,000 Colombian pesos ($50 to $125).

Recruitment of migrants, sometimes by force, occurs both along the border and in areas throughout the country. Venezuelans who work for armed groups are found in regions far from the customary migration routes, for example in the Chocó department on Colombia's Pacific coast.[62] Migrants are lured with gifts or recruited under threat, particularly in conflict-ridden provinces such as Nariño, Norte de Santander, Arauca, Cauca and Putumayo.[63] Cases of online recruitment have also come to light. Youngsters in Venezuela have been tricked by job offers on social media and invited to the cities of Arauca and Cúcuta, whence they were subsequently taken to rural areas by an unidentified armed group.[64]

Once in these groups, Venezuelans find escaping a perilous enterprise. Venezuelans who manage to desert lack information about their rights, where they can go and the risks they face. One 24-year-old Venezuelan, interviewed by Crisis Group in a police cell, was recruited at gunpoint in Bajo Cauca by the Caparros, a criminal outfit

---

[57] Crisis Group telephone interview, Venezuelan migrant, 9 November 2021.

[58] Crisis Group interviews, international cooperation representatives, Cúcuta, 26 November 2021; experts on child recruitment, Bogotá, 12 January 2022.

[59] Crisis Group interview, senior local state official, north-eastern Antioquia, 12 November 2020.

[60] A senior military representative connected the presence of armed groups in certain areas partly to migration. "Here we have a presence of groups and a lack of presence of the state. These [non-state armed] groups have taken roots due to migration, poverty, extortion and the low level of state investment". Crisis Group interview, senior military official, Arauca, March 2022.

[61] Crisis Group interviews, experts on child recruitment, Bogotá, 12 January 2022.

[62] A Venezuelan belonging to the Gulf Clan post-paramilitary group was caught and wounded in a law enforcement operation near Bojayá, Chocó. Crisis Group interview, international agency representative, Chocó, October 2021.

[63] Crisis Group interviews, experts on child recruitment, Bogotá, 12 January 2022; senior UN official, Bogotá, 15 February 2021.

[64] Crisis Group interviews, experts on child recruitment, Bogotá, 12 January 2022.

CLP_AR_006143

that sprung from former paramilitary forces. The group promised him monthly pay of 800,000 Colombian pesos ($200) and a permit to visit his family after eight months. He received a haircut, shave, uniform and M79 grenade launcher and was immediately sent into a conflict area without any training. Induction into the Caparros proved hellish. Over seven months, he endured humiliation and regular beatings. He did not receive the promised payment and lived through skirmishes in which he lost a Venezuelan friend. "It was either continuing or dying", he said. "I decided to continue, to find a way out". After deserting, he helped the army to find hidden weapons but was subsequently arrested himself for firearm possession and has since spent 21 months in jail.[65]

The indifference of state and security officials toward the particular needs of Venezuelans embroiled in Colombia's armed conflicts is a recurrent concern. Migration experts told Crisis Group that it is common for law enforcement agencies to prosecute both Venezuelans and Colombians on the basis of ordinary criminal law for belonging to armed groups, even if they desert after being forcibly recruited. Desertion thus spells double jeopardy for migrants, who also face violent repercussions if armed groups believe they are sharing information with the authorities.[66]

The costs of reporting crimes frequently outweigh the benefits. In 2019, a 14-year-old Venezuelan girl who escaped in Norte de Santander after being recruited by the Popular Liberation Army, an armed group dedicated largely to drug trafficking, was handed by judicial authorities to a foster home in the same department run by the Colombian Institute of Family Welfare. Armed men subsequently found her and killed her.[67]

Some armed group members complain about rapid growth through the absorption of Venezuelans, though such grumbling is not the norm. One ELN militant griped that migrants had been used to collect extortion fees or intimidate locals without first being provided with proper education and ideological training. In his view, the migrants' presence explained why locals in certain regions under ELN control were displaying much more aversion to the group than before. "They are not making a good entry into communities and are using very top-down approaches", he said.[68] But in general the armed groups see value in recruiting Venezuelans. "It's better to work with any immigrant. It's cheaper, they do what's required and they don't get as much jail time as [a Colombian]", said a Colombian gang leader in Bogotá.[69]

---

[65] Crisis Group interview, detained Venezuelan refugee, Bajo Cauca, 14 June 2021.

[66] Crisis Group interviews, international cooperation representatives, Cúcuta, 26 November 2021.

[67] "Adolescente asesinada en Ábrego sería buscada por un grupo armado", *La Opinión*, 12 May 2019.

[68] Crisis Group interview, ELN militant, February 2021. The position of migrants and refugees within armed groups differs. Venezuelans have been able to reach the rank of local commander in a FARC dissident faction in Nariño, but have been used as disposable fighters by another dissident faction in Arauca. Crisis Group interview, international monitoring official, Cauca, September 2021; telephone interview, security expert, May 2022.

[69] Crisis Group interview, gang leader, Bogotá, May 2022.

CLP_AR_006144

B.    *Criminal Groups and Urban Gangs*

Venezuelans are easily assimilated into Colombian gangs due to their vulnerable position and immediate need to survive in competitive urban environments. The nature and extent of criminal involvement by recruited Venezuelans varies. Certain organised crime groups such as those in Norte de Santander generally block them from acquiring status or ascending the ranks. Some migrants are drawn into specific tasks, such as carrying drugs during their journeys. Venezuelans are reportedly given discounts on the price of informal transport over the border into Arauca department if they bring packages with unknown contents.[70] In Norte de Santander, some migrants are forced to carry packages containing drugs as gang members accompany them to check up on their cargo.[71]

In large cities, criminal groups target Venezuelans who are homeless and living on the street, many of them young men.[72] "A gang gives work to a Venezuelan, gives him shelter and food", a Venezuelan drug trafficker explained.[73] The temporary accommodation used by Venezuelans in Bogotá, or *pagadiarios* (discussed above), are one gateway to recruitment. Indebted migrants are induced to consume drugs, creating a dependency relationship with criminal groups. Fake charities offer shelter but reportedly insert migrants in networks of sexual exploitation and micro-trafficking.[74]

The chief of an enterprise of contract killers (known as *sicarios*) in Colombia explained that he now mainly works with Venezuelans due to the lower costs. "A Colombian asks for 10 million pesos ($2,500) to kill someone; a Venezuelan does it for two or three million ($500-750)".[75] According to a Venezuelan member of one criminal group, recruits start by carrying out a murder, for which they are paid between 1,000,000 to 5,000,000 Colombian pesos ($250 to $1,250). Depending on the victim's profile, the killer may or may not briefly go back to Venezuela to avoid a police investigation. After between five and ten such hits, a *sicario* can be killed to prevent him or her from acquiring power or status within the group.[76] Trust issues with recruited migrants are usually resolved with violence. "They are killed at once", the leader of the enterprise of contract killers explained. "You get them out of the way. … They are disposable. [Venezuelans] can be removed and they can be replaced".[77]

---

[70] Crisis Group interviews, human rights lawyers, Bogotá, 12 February 2021.

[71] Crisis Group interview, state official, Cúcuta, 25 November 2021.

[72] Around 16 per cent of people sleeping rough in Colombia are reported to be Venezuelan, while more than 1,200 Venezuelans live on the streets of border town Cúcuta. Luis Miguel Rodríguez, "DANE: El 16% de los indigentes en Colombia son venezolanos", *El Impulso*, 13 January 2022.

[73] Crisis Group interview, February 2021.

[74] Crisis Group interviews, social worker, Bogotá, 7 February 2022; Venezuelan migrants, Villa del Rosario, November 2021; and Bogotá, March 2022.

[75] Crisis Group interview, chief of enterprise of contract killers, May 2022.

[76] Crisis Group interview, Venezuelan organised crime member, February 2021. Venezuelans are often given a bat or knife with which to extort, threaten and steal, but a low-ranking migrant is rarely trusted with a gun when it comes to street operations. Crisis Group interview, security expert, Cúcuta, 26 November 2021. Venezuelans with weapons experience, often acquired from militia training at home, are now also recruited. Crisis Group interview, security expert, Cúcuta, 26 November 2021.

[77] Crisis Group interview, chief of enterprise of contract killers, May 2022.

CLP_AR_006145

Colombian gangs also hire Venezuelans as dealers and street fighters.[78] Smaller Colombian gangs use Venezuelans as lookouts or to sell drugs in Cúcuta.[79] In Bogotá, Venezuelans have not replaced Colombian street dealers, often called *jíbaros*, so much as enabled the latter to gain turf and boost revenues by deploying a larger work force.[80] Local gangs in Bogotá, especially around Corabastos, Colombia's biggest marketplace for fresh produce – and a hotbed for drug trafficking, sexual exploitation and gun running – recruit Venezuelans as foot soldiers in their urban gang wars.[81] Venezuelans hawking drugs on street corners often get killed by competing gangs, end up in shootouts for neighbourhood control or are killed in internal struggles.[82] Most of the murders of Venezuelans in Bogotá have taken place in this part of the capital.[83]

A social worker explained that Bogotá's gangs use migrants and refugees as "cannon fodder" – a trend that is reflected in the rising number of Venezuelans killed in the capital.[84] The number murdered each year has jumped from one in 2016, to 72 in 2019 and 109 in 2021 – meaning the proportion of murder victims that is Venezuelan is higher than the percentage of Venezuelans in the city's population (see graph 1 in Appendix B).[85] "They are pawns that gangs use to have more power and displace the competition", a state official said.[86]

Reports and rumours regarding the expansion of large Venezuelan criminal groups into Colombia and beyond have proliferated in recent years. But evidence from insiders and eyewitnesses suggests that the presence in Colombia of Venezuelan criminal groups is less prominent than often claimed.[87] "No Venezuelan gang comes to Colombia to build an empire here", a Venezuelan organised crime member said. According to a state official, if Venezuelan gangs tried to move into the territory occupied by Colombian organised crime, a turf war would most likely erupt. Most of the major crime groups competing for control in Bogotá, especially in the districts of

[78] Crisis Group interviews, international cooperation representatives, Cúcuta, 26 November 2021.
[79] In Cúcuta, small crime groups pay quotas to receive permission to operate from larger structures, such as the Gulf Clan, ELN or the Popular Liberation Army. Crisis Group interviews, international cooperation representatives, Cúcuta, 26 November 2021.
[80] Crisis Group interview, state official, 10 February 2022.
[81] A local, who worked in the marketplace and now runs an aid group, said women are sexually exploited in the back of trucks in and around the marketplace. "They raffle a bottle of whiskey and add a girl". Crisis Group interview, local resident and social worker, March 2022.
[82] Crisis Group interview, state official, Bogotá, 10 February 2022.
[83] "Plan de acción para la verificación y seguimiento al cumplimiento de la sentencia T-386 de 2021", Bogotá Mayor's Office, 2022. In May, two bodies of tortured Venezuelans were found in garbage bags in Kennedy. Diana Giraldo, "Hallan dos cuerpos en bolsas en Kennedy, ya van 13 en Bogotá", Noticias Canal1, 11 May 2022.
[84] Crisis Group interview, social worker, Bogotá, 7 February 2022.
[85] "Plan de acción para la verificación y seguimiento al cumplimiento de la sentencia T-386 de 2021", op. cit. While representing an estimated 5 per cent of the population of Bogotá in 2021, Venezuelan migrants made up 9.7 per cent of the city's murder victims. Other major cities, such as Medellín, saw significant upticks in lethal violence against Venezuelans. See "Graves violaciones de los derechos humanos a población proveniente de Venezuela, en Colombia", Consultoría para los Derechos Humanos y el Desplazamiento, May 2021.
[86] Crisis Group interview, state official, 10 February 2022.
[87] "La guerra de las bandas delincuenciales venezolanas en Colombia", *Semana*, 6 August 2020; "La banda delincuencial venezolana cuyas redes azotan Colombia", *El Espectador*, 16 September 2021; "Así operan tres bandas venezolanas que se disputan crimen en Colombia", *El Tiempo*, 5 July 2020.

CLP_AR_006146

Kennedy and Bosa, are not Venezuelan in origin, although these groups do recruit migrants.[88]

Even so, smaller criminal startups founded by Venezuelan migrants are active in certain urban areas.[89] A group of Venezuelans called Los Maracuchos operates in María Paz, in the Bogotá's Kennedy district, where it is known for its extremely violent behaviour and involvement in street robberies.[90] A gang leader in Bogotá complained about Venezuelans trying to make a move. "They are a plague and they are bad", he said.[91]

Large Venezuela-based crime syndicates, called *megabandas*, have expanded in recent years and forged supply chain relations across the border. The Tren de Aragua is one of the most notorious *megabandas* and its influence is said to extend across Latin America, but some reports of its presence in Colombia might be based on the work of impostors.[92] "There are many who say they are the Tren de Aragua, but they are not, they use the name to intimidate people", a Venezuelan criminal operative said.[93]

Still, the group does have some operations in Colombia. For example, Crisis Group was able to confirm the presence of the Tren de Aragua in the Villa de Rosario municipality, on the border with Venezuela, where the group started working in 2018.[94] During the pandemic, the Tren de Aragua continued to operate in the department of Norte de Santander with the approval of larger Colombian armed groups, above all the Gulf Clan, with whom it collaborates, but it has faced armed resistance from the ELN. The Tren de Aragua traffics drugs and humans, and extorts migrants wishing to cross the border illegally. National media and law enforcement officials argue that the Tren de Aragua has taken over drug sales in large parts of Bogotá and allege they are responsible for a series of brutal killings.[95] Even so, various sources in the state and in organised crime concur that the Tren de Aragua's presence in the capital and other major cities goes no further than small cells working alongside local illegal outfits.[96]

[88] Crisis Group interviews, state official, Bogotá, February-March 2022.

[89] Similar allegations circulate in Cali, where Venezuelan crime groups have tried to make a name for themselves. Crisis Group interviews, humanitarian officials, Cali, September 2021.

[90] Crisis Group interview, resident and social worker in Kennedy, Bogotá, March 2022. The name Los Maracuchos may mean that the gang's members used to live in Maracaibo, capital of Venezuela's Zulia state. Crisis Group interviews, community activists, state officials, Bogotá, June and July 2022.

[91] Crisis Group interview, gang leader, Bogotá, May 2022.

[92] Colombian media report that Venezuelan crime syndicates operate in seven large cities in Colombia and several countries in the hemisphere. See "La guerra de las bandas delincuenciales venezolanas en Colombia", Semana, 6 August 2020; and "Así operan tres bandas venezolanas que se disputan crimen en Colombia", *El Tiempo*, 5 July 2020.

[93] Crisis Group interview, Venezuelan organised crime member, February 2021.

[94] Crisis Group interviews, Venezuelan organised crime member, February 2021; state official, Villa del Rosario, 1 December 2021. The Tren de Aragua never managed to get a firm foothold in Cúcuta and was pushed out in mid-2020.

[95] Jonathan Alexander Toro Romero, "La disputa del Tren de Aragua por el control de la droga en Bogotá", *El Tiempo*, 17 July 2022.

[96] Crisis Group interviews, Venezuelan organised crime member, February 2021; international cooperation representatives, Cúcuta, 26 November 2021; state official, Bogotá, March 2022; gang leader, Bogotá, May 2022. The Tren de Aragua is led by Venezuelans in Venezuela, but has Colom-

CLP_AR_006147

C.    *Coca Cultivation*

A large number of Venezuelans find their way – whether of their own free will or under coercion – to rural areas remote from the standard migration routes. Hoping to avoid tough competition for informal employment in urban settings, particularly during the pandemic-related lockdowns, they are often following invitations from family members or acquaintances.[97] The opportunities they find are frequently illicit, and include work on coca plantations and logging in environmentally protected areas.[98] "Venturing to a city to look for work is impossible in Colombia because there are two million Venezuelans", said a young migrant by way of explanation for his job at a coca plantation. He eventually used his earnings to move on to Chile.[99]

Illicit activities in Colombia's remote rural areas offer dirt-poor migrants a chance to make ends meet. Work on the coca plantations provides quick pay and often includes food and board, which to some doubtless seems preferable to the back-breaking chores for little money in nearby African oil palm plantations, where work can include clearing overgrowth or carrying heavy palm fruit onto carts.[100] Still, conditions are also harsh on the coca plantations, even when these offer a place to sleep and daily meals. "In Venezuela I never thought of a farm in such a deplorable state. There's no electricity, a very thin mattress that feels like a table. Conditions are worse than in Venezuela. The only difference is that in Venezuela we have nothing to eat, but in Colombia we do", the migrant coca leaf picker said.[101]

Typically, a coca leaf picker can earn between 30,000 to 50,000 Colombian pesos ($7.5 to $12.5) for a day's work. A fast worker paid per quantity of coca leaves can earn over 100,000 pesos ($25).[102] Many migrants reach the coca plantations on their own initiative, but some leaf pickers are also recruited in Venezuela, in cities in Colombia and at informal border crossings. Some schools close to the border in Zulia state, Venezuela, have been abandoned during harvest periods as both students and teachers left for coca plantations on the other side of the border.[103]

Armed groups display contrasting attitudes to Venezuelans in coca plantations. ELN guerrillas forced crop owners and farmers to pay migrants properly in the southern part of Bolívar state. "If any person here is owed money on a farm, do not hesitate to contact us", the guerrillas would tell migrant workers.[104] But in another coca growing

bian leaders in Cúcuta. The Tren de Aragua needs permission from the Gulf Clan to conduct activities in the interior of the Norte de Santander department and pays commissions to this group to operate on the Colombian side of the border. Crisis Group interview, Venezuelan migrant, Villa del Rosario, 27 November 2021.
[97] Crisis Group interview, health worker, north-eastern Antioquia, 12 November 2020.
[98] Crisis Group interviews, law enforcement officials, Meta, May 2021.
[99] Crisis Group telephone interview, Venezuelan migrant, 9 November 2021.
[100] Crisis Group interview, humanitarian aid worker, Norte de Santander, 2 December 2021.
[101] Crisis Group telephone interview, Venezuelan migrant, 9 November 2021.
[102] Crisis Group focus groups, migrants and returnees, Cúcuta, 4 December 2021. Crisis Group interview, international cooperation representatives, Cúcuta, 26 November 2021. One source said a day's work is remunerated at 30,000 to 40,000 pesos as well as three meals and accommodation.
[103] Crisis Group telephone interviews, Venezuelan academic and NGO representative in Zulia state, 21 March 2022.
[104] Crisis Group focus groups, migrants and returnees, Cúcuta, 4 December 2021; Crisis Group telephone interview, Venezuelan migrant, 9 November 2021.

area, Venezuelan pickers who did not like their work and opted to leave the plantations without asking permission were killed, allegedly by local armed actors who mistrusted the migrants and thought they would share information with the authorities.[105]

### D.    *Gold Mining and Trafficking*

Venezuelans with or without prior experience have also landed jobs in gold mining in Colombia, where illegal mines are often financed by drug money.[106] Migrants tend to reach remote mining areas on the basis of hearsay or invitations from fellow Venezuelans who previously worked in the mines. To gain work in a particular mine, a migrant mostly requires a personal introduction.[107] Women are also frequently employed recycling mine waste that still contains concentrations of gold.[108]

The pay for migrants who work in the gold mines tends to vary. Some Venezuelans working in a region controlled by paramilitary groups said they are paid about 40 per cent less than Colombians if they lack formal residency, but at equal rates to Colombians if they have valid papers.[109] In another area, controlled by the ELN, a woman who had trouble finding a job in Bogotá and proceeded to work in the sex industry in Antioquia told Crisis Group that she now earns a few hundred U.S. dollars a month in an illegal gold mine. She brought her sons over from Venezuela so they could also work in the mines.[110]

Further down the supply chain, migrants are also involved in trafficking gold from illegal Venezuelan mines into Colombia. They are used as cross-border smugglers and are called *pulmones*, or lungs.[111] Many smugglers carrying small amounts can end up accumulating significant quantities of gold for wholesale buyers on the Colombian side of the border, which is called "smurfing".[112] "All this is squared with migration and police authorities", said a Venezuelan crime syndicate member.[113]

Cúcuta is a hub for gold smuggling and other contraband. A gram of gold without paperwork fetches close to $50, enabling large amounts of the metal to be gathered and sold quickly. Most pawn shops that work in this market buy *oro de mina*, meaning unprocessed gold extracted straight from the Venezuelan mines.[114] Buyers tend to bring gold from Cúcuta to cities such as Bogotá, Cali or Medellín, where the gold is smelted and exported with the help of false documents.[115]

---

[105] Crisis Group interview, Venezuelan organised crime member, February 2021.
[106] "Organized Crime and Illegally Mined Gold in Latin America", The Global Initiative Against Transnational Organized Crime, April 2016.
[107] Crisis Group interview, community leader, north-eastern Antioquia, 12 November 2020.
[108] Crisis Group interview, gold mine operator, north-eastern Antioquia, 11 November 2020.
[109] Crisis Group interviews, Venezuelan migrants, north-eastern Antioquia, 12 November 2020. Mines often look for day labourers for myriad tasks and truck in up to fifteen Venezuelans.
[110] Crisis Group interview, Venezuelan migrant and miner, north-eastern Antioquia, 7 February 2021.
[111] Crisis Group interviews, law enforcement officials, Norte de Santander, December 2021.
[112] "Venezuela, the smugglers' paradise", InfoAmazonia, 23 July 2019.
[113] Crisis Group interview, Venezuelan organised crime member, February 2021.
[114] Crisis Group interviews, gold merchants, Cúcuta, November 2021.
[115] Crisis Group interview, Venezuelan organised crime member, February 2021; "Venezuela: The Smugglers' Paradise", op. cit.

CLP_AR_006149

## IV.  **Human Trafficking and Sexual Exploitation**

Migrants and refugees have become a major focus for organised crime networks, and young women in particular, including minors, are victims of human trafficking and sexual exploitation.[116] Criminal groups may recruit women and minors by offering them jobs in restaurants or hotels before forcing them into sexual exploitation and retaining their passports, often saying they will divulge compromising pictures to family members to secure compliance. They may also threaten to kidnap women's children. Under pressure, victims may eventually become recruiters themselves, trying to lure in other women.

Recruitment occurs in Venezuela, on the border, and in Colombia's interior.[117] Alongside the Simón Bolívar bridge (which is traditionally the busiest border crossing), in an area called La Parada, some Venezuelan women are forced into sex work after arriving in Colombia, often winding up in clandestine brothels where they are exploited and abused. One of the criminal groups active in La Parada, the Venezuelan Tren de Aragua, allegedly recruits and sells women to other illegal outfits.[118] One migrant mentioned a house inhabited by about 25 women, including five minors, who had been marked behind their ears to prove "ownership".[119] To prevent the women from escaping, the criminals threaten them with violence.

Sexually exploited women in border areas are often tricked or forced into going to rural areas where they are put at the service of members of armed groups. A driver who frequently takes Venezuelan women and girls to Catatumbo, a coca-growing epicentre, explained that the women hope to work a weekend and earn good money, but brothel owners sometimes coerce them into staying for as long as a month. Local armed groups approved these arrangements after negotiating with brothel owners.[120] Young women and girls – sometimes underage – are also escorted to rural areas to be wed in servile marriages to coca growers, with some men ostensibly "buying" them from armed groups or human traffickers. Women and girls are abused and beaten if they are caught attempting to escape. Local authorities allegedly do not act even when they harbour suspicions about landowners engaging in child marriage.[121]

There are also reports of armed group members harassing, sexually abusing and murdering migrant women.[122] In Antioquia, female sex workers explained how one

---

[116] Women have been forced to take more risks and have shouldered greater burdens as a result of the crisis in Venezuela, which increased pressure on them to care and provide for their families. The pandemic also increased responsibilities for women as caregivers while their incomes fell. For more information, see "Una emergencia desigual: Análisis Rápido de Género sobre la Crisis de Refugiados y Migrantes en Colombia, Ecuador, Perú y Venezuela", CARE, June 2020.

[117] Crisis Group interview, security expert, Cúcuta, 26 November 2021. Colombian networks do not necessarily work with counterparts in Venezuela. A source argues there is no need because so many vulnerable migrant women are coming across the border of their own accord. Crisis Group interview, criminal lawyer, Medellín, 10 November 2020.

[118] Crisis Group interview, Venezuelan migrant, Villa del Rosario, 27 November 2021; Crisis Group telephone interview, Venezuelan crime expert, June 2022.

[119] Crisis Group interview, Venezuelan migrant, Villa del Rosario, 27 November 2021.

[120] Crisis Group interview, chauffeur, Norte de Santander, November 2021.

[121] Crisis Group interview, security expert, Cúcuta, 26 November 2021.

[122] Crisis Group interviews, sex workers, 12 November 2020.

CLP_AR_006150

of their friends was killed and buried in a hamlet after armed groups discovered she was carrying HIV.[123] Armed groups are also known to expel sex workers from the area they control if they test positive for sexually transmitted diseases.[124]

Some migrant women are also recruited for webcam work; although considered safer due to the absence of physical contact, advocates note that it also is exploitative and can incur serious risks for those involved. Through force or deception, young women, including minors, end up being compelled to meet and sleep with clients, with Medellín's tourist areas notorious as hubs of sexual exploitation. Again, one method of strongarming girls and women into complying is the threat of sending compromising videos and pictures to family members, who have been located on social media. Some of the girls and women have their identity documents retained and need to work 24-hour shifts.[125]

To the extent that the foregoing activities involve human trafficking, Colombia has certain legal mechanisms to protect survivors. It has ratified the UN Convention against Transnational Organized Crime, which includes an anti-trafficking protocol. In a landmark October 2021 ruling, Colombia's Constitutional Court ordered the state to create new regulations for the identification and protection of trafficking victims, and highlighted the vulnerable position of migrant women and the need for special protection.[126]

Impunity for these crimes, however, remains the norm. Out of 908 reported cases of human trafficking between 2011 and 2016, only 52 ended in convictions, while state authorities have so far shown little inclination or capacity to protect vulnerable women and girls from being trafficked and exploited.[127] Despite the fact that sex work is legal in Colombia, officials reportedly often discriminate against Venezuelans engaged in prostitution and violate their rights rather than treating them as potential victims of exploitation.[128]

In some cases, state and law enforcement officials have been found complicit in sexual exploitation of trafficking victims.[129] A lawyer explained that police officers have collaborated with human traffickers, pointing to cases where they sent Venezuelan women and children back to their captors, often family members of the victims.[130] Four police officials working in Cúcuta were arrested in 2019 for participating in a

---

[123] Ibid.

[124] Crisis Group interviews, sex workers, 12 November 2020; aid workers, 2021. Local doctors are sometimes forced to share test results with armed groups.

[125] Crisis Group interview, criminal lawyer, Medellín, 10 November 2020.

[126] Julia Zulver and Ana Margarita González, "La justicia protege a Yolanda, migrante venezolana víctima de la trata en Colombia", Open Democracy, 28 January 2022.

[127] "La trata de personas en Colombia – Principales fallas en el sistema de protección", Women's Link, March 2021.

[128] Crisis Group telephone interview, women's rights experts, 17 November 2020. Women are being criminalised instead of the clients and exploiters. Crime groups sometimes directly extort sex workers, for example in Parque de Berrío, in the centre of Medellín. Crisis Group telephone interview, NGO investigator, 17 November 2020

[129] "Golpe al 'negocio' de explotación sexual de niñas en Cúcuta", *La Opinión*, 21 June 2022.

[130] Crisis Group interviews, criminal lawyer, 10 November 2020, Medellín; Venezuelan migrant, Villa del Rosario, 27 November 2021; telephone interview, social worker, 9 November 2021.

CLP_AR_006151

human trafficking network.[131] A social worker in Bogotá cited another case involving police officers who allegedly returned a Venezuelan woman to her pimp after she had escaped his clutches. "They put her in a patrol car and brought her back to the brothel. This was done by the same police officials who patrol the area".[132]

[131] Audrey Carrillo, "Capturados cuatro policías en Cúcuta por trata de personas", W Radio, 22 August 2019.
[132] Crisis Group telephone interview, social worker, 9 November 2021.

CLP_AR_006152

## V.    **The Backlash against Venezuelans**

Against the backdrop of waves of protest and surging political tensions, Venezuelans living in Colombia have been widely stigmatised for the involvement of some migrants in crime, and scapegoated for rising levels of poverty and unemployment.

### A.    *Public Perceptions*

Public perceptions of Venezuelan migrants in Colombia have grown notably more hostile in the past three years. Before May 2019, most Colombians believed that it was right to receive Venezuelan migrants, but a minority now holds this viewpoint, with only 40 per cent of Colombians saying they support residency rights for Venezuelan migrants.[133] Surveys showed that over 80 per cent held unfavourable opinions of the migrants by the start of the pandemic, although the percentage of detractors has fallen slightly since then.[134]

Social media is frequently a platform for the vitriol directed toward Venezuelans, with migrants blamed for stirring up protests, making streets unsafe and competing for benefits from underfunded social programs.[135] When Colombian media outlets or government officials suggest that a Venezuelan has been involved in a prominent crime, the number of xenophobic posts on social media reportedly increases.[136] For example, such postings spiked when Bogotá's centre-left mayor, Claudia López, blamed migrants for episodes of criminal violence in the city, saying: "Whoever comes to work is welcome, but whoever comes to commit a crime should be deported immediately".[137] The day after López's remarks, anti-migrant messages increased by 83 per cent according to one tracker.[138] Hate messages toward migrants also proliferated when the protection statute for Venezuelans was announced in February 2021, with false information spread via social media about migrants becoming eligible to vote in Colombia.[139]

Daily face-to-face contact with migrants tends to reduce xenophobia, but opportunities for those interactions diminished during the pandemic and its associated lockdowns, which in Colombia tended to be strict and long.[140] Some local academics suggested that the lockdowns increased the extent to which Colombians formed

---

[133] Invamer, July 2022.
[134] "Percepción de la integración de los migrantes en Colombia en tiempos de coronavirus – Boletín 10", Proyecto Migración Venezuela, 2020. Crisis Group telephone interview, migration expert and academic, 16 December 2021.
[135] "Xenofobia hacia personas venezolanas manifestaciones en cinco ciudades colombianas", Friedrich Ebert Stiftung, January 2021.
[136] Crisis Group telephone interview, migration expert and academic, 16 December 2021.
[137] "Xenofobia hacia personas venezolanas manifestaciones en cinco ciudades colombianas", op. cit.
[138] Milagros Palomares, "Xenofobia aumentó 83% tras declaraciones de Claudia López", Proyecto Migración Venezuela, 30 October 2020.
[139] "Boletín Mensual Barómetro de Xenofobia en Colombia #15", Barómetro de Xenofobia, 2021.
[140] Colombia shut down all border crossings on 14 March 2020, declared a state of emergency on 17 March and started a series of strict lockdowns on 20 March that ended on 1 September that year. Crisis Group telephone interview, migration expert and academic, 16 December 2021.

CLP_AR_006153

opinions about the activities of migrants primarily through negative messaging on social media.[141]

B.    *Stigma and Vulnerability*

As discussed above, Venezuelan migrants are often drawn into the ranks of organised crime, which has exploited migrants' acute economic need to boost their profits. The precise extent of Venezuelans' contribution to crime rates is difficult to measure. Quantitative studies differ as to whether they now commit more crimes per head than Colombian nationals. Several studies indicate that Venezuelans are involved in fewer offences.[142] Data shows that Venezuelans have lower arrest rates than Colombians when it comes to violent crime, but slightly higher rates relative to the population when minor infractions are considered.[143] That said, the proportion of convictions received by Venezuelans now slightly exceeds their share of the population in Colombia (see graph 2 in Appendix B). Meanwhile, 2,439 Venezuelans are in jail on criminal charges, representing about 2.5 per cent of a national headcount of prisoners that stands at 96,962. While this percentage is significantly lower than their share of the country's population, the number of Venezuelan inmates has risen much faster than the number of Colombian prisoners.[144]

By contrast, data from Bogotá indicates that Venezuelans are arrested in the capital for high-visibility crimes such as burglary, theft and drug sales at far higher rates than their share of the population, and at a slightly higher rate for murder.[145] Migrants say the conspicuous role played by Venezuelans in carrying out street crime for Colombian groups leads the entire community to be stigmatised and treated with suspicion. Migrants, above all in the capital, report being subjected to regular abuse by police officers, who beat them and destroy their identity documents. These incidents are said to occur above all in the early morning hours and on Sundays, when Bogotá is quieter.[146]

Bogotá mayor Claudia López has contributed to this stigmatisation, stating that "we have very violent Venezuelan immigrants here. … They murder first and then they

[141] Crisis Group telephone interview, migration expert and academic, 16 December 2021. "Migración, pandemia y xenofobia en Colombia, Perú y Chile: tres palabras que nunca debieron unirse", Dejusticia, September 2021. For more on the importance of face-to-face interaction in reducing xenophobia toward Venezuelans (in this case, in Peru), see "Una oportunidad para todos: Los migrantes y refugiados venezolanos y el Desarrollo de Perú", World Bank, 2019.
[142] "Inmigrantes venezolanos, crimen y percepciones falsas: Un análisis de los datos en Colombia, Perú y Chile", Brookings Institution, 14 September 2020; "Seguridad ciudadana y migración venezolana", Fundación Ideas para la Paz, August 2019.
[143] In 2019, Venezuelans in Colombia represented 2.3 per cent of the arrests for violent crime, while making up 3.2 per cent of the total population. "Venezuelan Migration, Crime and Misperceptions", Brookings Institution, September 2020.
[144] "Estadísticas", Instituto Nacional Penitenciario y Carcelario, 2022.
[145] "Plan de acción para la verificación y seguimiento al cumplimiento de la sentencia T-386 de 2021", op. cit., p. 8.
[146] Crisis Group telephone interview, NGO representative, 17 November 2020.

CLP_AR_006154

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 184 of 721

Hard Times in a Safe Haven: Protecting Venezuelan Migrants in Colombia
Crisis Group Latin America Report N°94, 9 August 2022                    Page 24

steal".[147] She also made remarks in which she claimed that "Venezuelans mak[e] life difficult" for citizens in the capital city, which a chamber of the Constitutional Court ordered her to retract.[148]

Whether Venezuelans are responsible for an increasing share of crime in Colombia or not, they are without doubt becoming exposed to higher levels of lethal violence as they are being used as disposable fighters by rural armed groups and recruited for high-exposure jobs in the urban underworld. A total of 1,933 Venezuelans were killed across the country between 2015 and 2020. The murder rate of Venezuelans has risen sharply and is now far in excess of that for Colombians – reaching close to twice the national average in 2021 (see graph 3 in Appendix B).[149]

### C.    *Deportation*

Colombian authorities have turned increasingly to deportation in response to the difficulties in imprisoning undocumented migrants, as well as the problems in verifying the identity of detained suspects – the effect of severed diplomatic and consular relations between Colombia and Venezuela.[150] Colombian criminal outfits have even taken advantage of these deportation practices by recruiting Venezuelans, knowing that they are less likely to be put in jail. "The worst thing that can happen is that they send him back to his country again", a gang leader who employs Venezuelans explained.[151] From 2015 to 2021, Colombia deported over 4,000 Venezuelans (see graph 4 in Appendix B).[152]

Senior officials have sought to justify waves of deportations by arguing that Venezuelans represented a threat to national security during nationwide protests in 2019 and 2021, as well as during the eruption of unrest in Bogotá in September 2020.[153] During the protests in 2019, authorities put 59 Venezuelans on an airplane heading to Puerto Inírida, on the Colombian side of the border in the Amazon, where locals blocked the airstrip to prevent the Venezuelans from being released in their vicinity.

---

[147] "'They offer everything to Venezuelans. What guarantees are left for Colombians?' Claudia López, mayor of Bogotá", *Caracas Chronicles*, 12 March 2021; "'Primero asesinan y luego roban': Claudia López sobre bandas de venezolanos", *Forbes Colombia*, 11 March 2021.

[148] "Claudia López se retracta de sus declaraciones contra los migrantes venezolanos", Deutsche Welle, 19 December 2021.

[149] "Situación de derechos humanos de la población refugiada y migrantes venezolana en Colombia", CODHES, June 2021.

[150] Catalina Lobo-Guerrero, "Expulsiones: El lado oscuro de la política migratoria colombiana", Armando Info, 7 November 2021.

[151] Crisis Group interview, gang leader, Bogotá, May 2022.

[152] Lobo-Guerrero, "El lado oscuro de la política migratoria colombiana", op. cit. Crisis Group interview, academic, 16 December 2021. Before the deportations began, opportunistic Colombian criminals reportedly hid their identity cards when arrested and pretended to be Venezuelan in the hope of being released. Crisis Group interview, migration expert, Bogotá, 2 March 2022.

[153] Crisis Group interview, senior military officer, Bogotá, July 2021. See "Atención: primeras expulsiones de venezolanos por participar en desmanes en Cali", *Semana*, 30 April 2021. In 2021, Venezuelans actually started to leave Colombia as a result of the protests and related hardships. See Valeria Guerrero Osorio, "Venezolanos estarían abandonando Colombia por paro y protestas", LaFM, 24 June 2021. For more information about the protests, see Crisis Group Latin America Report N°90, *The Pandemic Strikes: Responding to Colombia's Mass Protests*, 2 July 2021.

CLP_AR_006155

After the plane finally landed in nearby Puerto Carreño, in Colombia, the deportees were taken to the Venezuelan bank of the Orinoco river and dropped in a remote area frequented by armed groups, without ever being officially handed over to Venezuelan authorities.[154]

Bogotá's messages about Venezuelan involvement in the 2021 protest wave were especially pointed. "The information that intelligence has indicates that there is a strong presence of Venezuelans at some roadblocks", said Defence Minister Diego Molano in May 2021, at the height of the national strike.[155] Government officials went so far as to spread claims that the Maduro government and drug traffickers had a role in organising protests.[156] (The Maduro government has denied involvement.[157]) Subsequently, hundreds of Venezuelans were rounded up and deported, without substantial evidence being amassed against them.[158]

---

[154] Lobo-Guerrero, "El lado oscuro de la política migratoria colombiana", op. cit.

[155] Laura Cristancho and Indira Córdoba, "Preocupa que declaraciones del ministro Molano originen expulsiones masivas", Proyecto Migración Venezuela, 7 May 2021.

[156] Then presidential adviser for national security, Rafael Guarín, tweeted that: "It is becoming increasingly clear that the escalation of vandalism, violence and crime with which the Colombian population is being attacked has not only the ELN and FARC dissidents behind it, but also the Maduro dictatorship and the Cartel de los Soles". See María Kamila Correa Escobar, "Detrás de la violencia está el régimen de Maduro y Cartel de los Soles: Gobierno", WRadio, 6 May 2021.

[157] "Venezuela rechaza acusaciones a Maduro sobre protestas en Colombia", *El Tiempo*, 7 May 2021.

[158] Lobo-Guerrero, "El lado oscuro de la política migratoria colombiana", op. cit. The UN Special Rapporteur on the human rights of migrants has expressed concern about the use of national security-related arguments to deport migrants and refugees. "Derechos humanos de los migrantes", UN General Assembly, 25 September 2018.

CLP_AR_006156

## VI.   Recommendations

Migrants and refugees who left Venezuela during the first years of the country's political conflict had high hopes for change in their home country and for a return in the near future. Despite signs of fragile economic stabilisation in Venezuela, a true recovery is likely to depend on political agreements between the Maduro government and the opposition, followed by the relaxation and lifting of U.S. sanctions – none of which appears to be in the offing. In all likelihood, a large number of Venezuelans in Colombia are there to stay. A recent survey by the Bogotá city government found that 88 per cent of migrants wished to remain in the country.[159] It will be incumbent on the new administration and its international partners to act accordingly.

### A.   *Protection*

Providing Venezuelan migrants with information and support they need to protect themselves as soon as possible after they arrive in Colombia can help prevent them from wandering into problems.

Right now, both are in short supply. For example, migrants and refugees who cross the Simón Bolívar bridge – east of Cúcuta – encounter criminal networks in the small town on the Colombian side. These groups try to extort, recruit or profit from the Venezuelans. By contrast, to gain access to Colombia's state services, migrants first need to reach Cúcuta and navigate a complicated bureaucratic system. Until they obtain legal stay permits, they are not allowed into buses that can take them to their destinations or next transit points, condemning them to walk across Colombia with all the attendant risks. The ones who reach Bogotá, sometimes after walking more than 500km, have little idea where to look for jobs, shelter or any sort of support, and are easy pickings for the grey market and organised crime. Illegal and informal businesses that involve sexual exploitation and micro-trafficking offer immediate economic relief, and these easily accessible but poorly paid jobs are attractive when there are no other options for making ends meet.[160]

Authorities at every level of government should be equipped to receive Venezuelan migrants and steer them toward safe, productive activities. Resource constraints will pose challenges to this effort. After decades of conflict, Colombia has more than five million internally displaced people, and the addition of nearly 2.5 million Venezuelan migrants is taxing it yet further.[161] Still, improved collaboration among the relevant state agencies should be possible and could improve matters significantly. In particular, migration and law enforcement authorities should cooperate better with municipal authorities, child protection services and the office of the human rights ombudsman. They should work with large cities to provide resources and personnel

---

[159] Crisis Group telephone interview, Bogotá official, 29 March 2022.

[160] Crisis Group telephone interview, NGO representative, 15 March 2022. People who apply for political asylum in Colombia need to wait for up to three or four years for a response. Meanwhile, they are not allowed to work in the country. Crisis Group telephone interview, migration lawyer, 15 March 2022.

[161] For more information about internal displacement numbers, see "Global Report on Internal Displacement 2022", IDCM, 2022. "Distribución de Venezolanos en Colombia – Corte 28 de Febrero de 2022", op. cit.

CLP_AR_006157

for receiving migrants and refugees at known entry points. A prime objective of greater cooperation should be to ensure that arriving Venezuelans receive timely, clear, useful information about hotspots for trafficking, forced recruitment and sexual exploitation, as well as where to turn for help – including how to get government and UN programs and benefits.[162]

Colombian authorities should also take greater steps to protect trafficking victims and survivors of sexual exploitation – as well as potential victims – along migratory routes. Protected environments are vital to prevent women from being exploited and trafficked, especially on the border; they should also afford women and children who have already become victims of trafficking and sexual exploitation an opportunity to escape from their abusers as well as medical and psychological support.[163] There are about two dozen safe houses in Bogotá, but in the main border city of Cúcuta, the lack of safe spaces for women and minors is pronounced.[164] Colombia's police should also designate a unit to investigate and prosecute human trafficking, which could work in close collaboration with judicial systems in other Latin American states, while pursuing internal investigations to tackle the alleged complicity of police officers in trafficking networks.

Another protective step that Colombian authorities can take would be to recognise those Venezuelan nationals who have become victims of Colombia's internal conflict as such for purposes of Colombia's 2011 Victims Law. That law stipulates that all people who suffer from violations of international humanitarian or human rights law amid Colombia's armed conflict are legally entitled to special rights, including reparations as well as certain social and economic benefits. But Venezuelans are excluded from the National Victims Unit's register and are not eligible for reparations payments even if they otherwise satisfy the law's requirements.[165] Although the Victims Law does not discriminate based on nationality or migratory status, as a practical matter the Unit for Comprehensive Care and Reparation for Victims does not carry out assessments of undocumented citizens. There are many other hurdles to overcome before Venezuelans can be recognised as conflict victims as well.[166]

Colombia is not alone in facing the challenge of protecting and integrating Venezuelan migrants; all the Andean countries are struggling with it in the face of growing domestic intolerance and xenophobia. Left-leaning Chilean President Gabriel Boric declared at the Summit of the Americas in June that "no country can absorb [Vene-

---

[162] "A Bus Ticket for Venezuelan Walkers in Colombia", Human Rights Watch, 17 January 2022.
[163] Intimate partner violence is the most prevalent form of violence that Venezuelan refugee women face. See "Unprotected: Gender-based Violence against Venezuelan Refugee Women in Colombia and Peru", op. cit.
[164] Crisis Group telephone interview, NGO representative, 15 March 2022.
[165] Crisis Group interview, experts on child recruitment, Bogotá, 12 January 2022. Lina Arroyave, "Las personas migrantes también son víctimas del conflicto armado", Dejusticia, 4 October 2020.
[166] Local authorities often do not attend to undocumented migrants, are unfamiliar with protocols or discriminate against Venezuelans. State officials often do not take statements from undocumented migrants when they enter into contact to make a declaration. In addition, there is a lack of reliable statistics concerning Venezuelan victims of Colombia's conflict. Colombia's prosecution service should kickstart efforts to provide more reliable numbers of migrants affected by conflict, while the Victims Unit should add a category for Venezuelan nationals to their database. Crisis Group interviews, migration experts, February and April 2022.

CLP_AR_006158

zuelan migration] by itself", insisting on the need for a regional response anchored in human rights.[167] The core components of such a response should include greater information sharing regarding migration flows, the presence of organised criminal groups and other security risks faced by migrants; cross-border initiatives to ensure safe passage with common rules as to valid documentation; and a broad agreement to recognise Venezuelans' qualifications. This program should draw on backing from international donors and agencies, and should focus on helping protect Venezuelan migrants from the risks of violence and exploitation they encounter.

Attracting support could be difficult, however. Foreign assistance for Venezuelan migrants has previously paled in comparison to support for other humanitarian emergencies, and is likely to decline further in 2022 as donors shift budgets to the humanitarian crisis caused by the war in Ukraine. Meanwhile, aid packages reserved for Colombia are turning their focus to victims of the country's worsening internal conflicts.[168]

B.    *Integration*

While migration can be beneficial for host countries, these benefits may be over-shadowed by the challenges of absorbing a wave of new entrants into a labour market characterised by high levels of unemployment and informality and low levels of pay.[169] Since it is likely that many Venezuelans will not return to their homeland, developing routes to formal employment will be essential to ensure that migrants are not marooned in informal jobs or vulnerable to recruitment by criminal groups.

In spite of the state's steps toward legalising the stay of migrants, providing them with access to health care, and beginning to validate diplomas earned in Venezuela, employers are still hesitant to formally hire or enter into contracts with Venezuelans. Additionally, many of the more predatory employers instead exploit their vulnerable status through informal arrangements. Meanwhile, the gut fear of many Colombians, especially those earning lower incomes, is that Venezuelans will steal their jobs. Government leaders sometime reinforce these anxieties.[170] The outgoing vice president, Marta Lucía Ramírez, stated in February that Colombia has taken in the "less wealthy and qualified sectors" of the Venezuelan diaspora and has not benefited from the skills and resources typical of the migrants reaching North America and Europe.[171]

In fact, Venezuelan migrants are not necessarily less qualified than Colombians, but they have struggled to get their qualifications recognised. About 69 per cent of

---

[167] "Boric pide ayuda regional por crisis migratoria de venezolanos en Chile", *Vanguardia*, 6 June 2022.
[168] Crisis Group interviews, humanitarian NGO representatives, Bogotá, June 2022. In 2021, only 37 per cent of the $708.1 million in funding requirements for the UN Office for the Coordination of Humanitarian Affairs' humanitarian response plan were covered, which nevertheless was higher than in the previous two years. See "Global Humanitarian Overview 2022 – Venezuela", OCHA, 2022.
[169] "How Immigrants Contribute to Developing Countries' Economies", OECD, 24 January 2018; "Desde el Desplazamiento hacia el Desarrollo", Center for Global Development, October 2020.
[170] "Colombia convalidará títulos universitarios de migrantes venezolanos", *El Nacional*, 19 November 2021.
[171] Santiago Torrado, "La vicepresidenta dice que Colombia no puede 'seguir asimilando' migrantes venezolanos", *El País*, 17 February 2022.

CLP_AR_006159

Venezuelans in Colombia possess at least a high school diploma, roughly 9 per cent higher than the rate for Colombia's population.[172] Due to a lack of funds and government programs stalled by the COVID-19 pandemic, however, Colombia has been slow in moving ahead with efforts to integrate Venezuelans after granting legal stay permits. Like other regional states, it has lagged with respect to the recognition of educational credentials.[173] Only about 10 per cent of the Venezuelans in Chile, Colombia and Peru had their diplomas and credentials recognised by October 2020. By March 2022, about 22,000 Venezuelans in Colombia had completed the first steps to validate their university degrees.[174]

With the support of multilateral bodies such as the UN Development Programme and World Bank, Colombia as well as other Latin American states should make the recognition of credentials quicker and cheaper, while also helping migrants and refugees gain access to courses and re-schooling, which are essential to bridge the gap between supply and demand in the labour market.

In addition, the state should put more effort into communicating the legal rights of migrants to the private sector. Even though stay permits allow Venezuelans to open bank accounts and access credit, bank employees often deny these because of distrust or a lack of knowledge.[175]

As for the large population of migrants and refugees who do not possess valid migratory status, above all those living in remote rural areas, the risks of exploitation in the labour market are high. Barriers to obtaining status can be significant. Migration offices are located in larger cities that for Venezuelans, for example in the remote border region of Catatumbo, are too costly or far away to reach.[176] Mobile units carrying migration officials and training for municipal officials to work on migratory issues, such as handling applications for stay permits, could help improve access to formal work and social services for migrants in areas prone to conflict and crime.

At the same time, authorities should do what they can to overcome at least some of the concerns that Colombians have about competing with Venezuelans in the labour market. A stricter law enforcement approach to businesses that illegally exploit Venezuelans could help assure Colombians that migrants are not undermining employee protection laws, including those requiring payment of at least the official minimum wage. Steps to increase trade between the two countries could also enhance the perceived value of Venezuelans to the Colombian economy, enabling them to take commercial advantage of their connections across the border in ways that could create jobs for Colombians rather than take them away.

---

[172] Nahomi Ruiz Moreno, "El 40,7% de los migrantes venezolanos trabaja más de 48 horas a la semana", Proyecto Migración Colombia, 9 November 2021.

[173] With help from the UN Development Programme, Colombia's government designed a plan to integrate migrants and refugees, but the pandemic prevented the state from carrying it out in full. Crisis Group interview, migration expert, Bogotá, 1 March 2022.

[174] "Socioeconomic Integration of Venezuelan Migrants and Refugees", op. cit.; tweet by Lucas Gómez, @Lgomez4, border czar, 10:01am, 1 March 2022.

[175] Crisis Group focus group, migrants and refugees, Ciudad Bolívar, February 2022. Crisis Group interview, migration expert, Bogotá, 1 March 2022.

[176] Crisis Group telephone interview, senior local state official, north-eastern Antioquia, 3 November 2020.

CLP_AR_006160

C.    *Bilateral Diplomacy*

Diplomatic relations between Colombia and Venezuela have been frozen since 23 February 2019, when President Maduro cut ties with Bogotá after opposition leader Juan Guaidó spearheaded a Colombia-U.S.-backed plan to transport humanitarian aid across the border.[177] As a result, each country closed the other's embassies and consulates. The border closure forced tens of thousands of migrants, refugees and residents to take enormous risks at dangerous informal crossings under the control of armed and criminal groups.[178] Since the closing of embassies and consulates, the only consular services that Venezuelans have access to in Colombia have been provided by Guaidó's "interim government". Fewer than ten countries now recognise his claim to the presidency following the failure of the various schemes in 2019 and 2020 to unseat Maduro.[179]

A marked deterioration in bilateral relations has been felt most acutely at the border, above all in worsening insecurity. At the same time, acrimonious or even severed relations between the countries need not impede functioning border ties. Maduro's predecessor as president, the late Hugo Chavéz, and his Colombian counterpart Álvaro Uribe, president between 2002 and 2010, had a plainly adversarial relationship, but the two maintained open borders and commercial relations for several years before diplomatic frictions between 2007 and 2009 led to border closures.[180] Maduro and former Colombian President Juan Manuel Santos met in Ecuador in 2015 to discuss their border dispute at length. Yet there is as yet no official record of even as much as a telephone call between Maduro and Duque.[181]

Even so, conditions at the border for migrants and refugees, as well as daily traffic between the two countries, have started to improve. Since October 2021, the Venezuelan-Colombian border has been partially reopened again for pedestrians.[182] Fluid

---

[177] "Crisis en Venezuela: Maduro rompe relaciones diplomáticas con Colombia y da 24 horas a sus diplomáticos para que abandonen el país", BBC, 23 February 2019.

[178] Crisis Group Report, Disorder on the Border, op. cit.

[179] The interim government's embassy in Colombia is led by Chargé d'Affaires Eduardo Battistini. It provides limited consular services, such as birth certificates and certification of university documents, but has no diplomatic headquarters, offering only online attention.

[180] In November 2007, Chávez announced a freeze in relations with Colombia after Uribe suspended his mediating role with the FARC. See "El Gobierno venezolano llama a consultas a su embajador en Colombia", 20minutos, 27 November 2007; "Colombia termina negociaciones FARC-Chávez", VOA, 21 November 2007. In March 2008, Chávez withdrew all Venezuelan diplomats from Bogotá and ordered tanks deployed at the Colombian border after Colombia attacked a FARC guerrilla camp in Ecuador. See "Chavez sends tanks to Colombia border in dispute", Reuters, 2 March 2008. In 2009, Chávez froze diplomatic relations with Colombia after Bogotá declared that anti-tank weapons purchased by Venezuela had ended up in the hands of the FARC, ordered an end to binational trade with Colombia, threatened to close the border and increased the Venezuelan military presence there. See Arthur Brice, "Venezuela freezes relations with Colombia", CNN, 29 July 2009; "Promesa del Presidente Chávez de reducir a cero el comercio con Colombia amenaza la recuperación de Venezuela", *Portafolio*, 24 November 2009; "Chávez ordena al Ejército que se prepare para la guerra con Colombia", *El País*, 9 November 2009.

[181] Crisis Group telephone interview, government official, May 2022.

[182] The border was not only closed due to political tensions but also because of preventive measures related to the COVID-19 pandemic. "Venezuela to reopen border with Colombia after more than two years", France 24, 5 October 2021.

CLP_AR_006161

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 191 of 721

**Hard Times in a Safe Haven: Protecting Venezuelan Migrants in Colombia**
Crisis Group Latin America Report N°94, 9 August 2022                    Page 31

dialogue between senior officials in the neighbouring regions of Norte de Santander, in Colombia, and Táchira, in Venezuela, has ensured an increasing level of local cooperation regarding shared security threats and humanitarian relief for migrants.[183] In 2021, authorities in Táchira warned their Colombian counterparts that members of the Tren de Aragua had escaped from prison and were hiding in Colombia. The exchange of intelligence led to their arrest.[184]

The incoming government in Bogotá, which took power on 7 August, appears determined to build on this fragile progress and restore ties between the two nations completely. President Petro, a left-leaning former urban guerrilla who has pledged to fight inequality and reduce Colombia's reliance on fossil fuels, has said he would re-establish diplomatic relations with Venezuela, "whatever the government".[185] Following his first telephone call with Maduro, days after his election victory, Petro declared that he would open the border fully and work toward improving human rights along the frontier, potentially signifying an end to the mistrust and mutual accusations of support for armed factions that have marred bilateral relations since 2019.[186] The government is also likely to be keen to expand trade following the collapse in formal commercial relations over the past decade, and to find ways to handle more humanely the arrival and return of migrants.

On the specific issue of migration, Petro has made explicit his goal of improving the well-being of Venezuelans. Building on the efforts of previous governments to offer Venezuelans temporary residency, his manifesto states that his government would support migrants' economic integration and educational programs, as well as "dignified conditions for return to their countries of origin".[187] He has also said he would promote dialogue with other Latin American states to support the integration of migrants and recognise their contribution to host societies.[188] Despite the new government's concern for migrants' needs, political refugees from Venezuela in Colombia have voiced concern about whether renewed bilateral relations will compromise their safety by enabling extradition back to Venezuela.[189]

### D.   *Resolving the Venezuelan Crisis*

Venezuela's economic, political, humanitarian and security woes have driven the migrant exodus. But while fixing some of these underlying causes could create the conditions for more migrants to return, a solution to Venezuela's political crisis that could spark a steady economic recovery nevertheless appears far from imminent. Tentative

---

[183] Crisis Group interview, Norte de Santander state officials, 13 May 2022.

[184] Ibid.

[185] "Restablecer relaciones con Venezuela y un ferrocarril entre los dos países: las promesas de Petro en Cúcuta", *Semana*, 11 November 2022.

[186] Tweet by Gustavo Petro, @petrogustavo, president of Colombia, 7:45am, 22 June 2022. Crisis Group Report, Disorder on the Border, op. cit.

[187] Gustavo Petro, "Colombia, potencia mundial de la vida. Programa de gobierno 2022-2026", manifesto, 2022, p. 35.

[188] "Petro y su política exterior: las propuestas del próximo presidente de Colombia", *El Espectador*, 20 June 2022.

[189] Patricia Laya, "Maduro's enemies are fleeing Colombia as persecution fears mount", Bloomberg, 5 July 2022.

CLP_AR_006162

negotiations between the Maduro government and an opposition alliance in Mexico started in August 2021, but Maduro suspended them two months later. In March 2022, however, the push for a negotiated settlement in Venezuela received a fresh boost when Maduro announced he would resume talks with the opposition after a high-level U.S. delegation visited Caracas.[190] Unfortunately, progress toward a new round of dialogue has stumbled since then, though it is not off the table, with frequent contacts between representatives of the two sides in recent months.[191]

The resumption of talks between Caracas and Washington was profoundly influenced by the war in Ukraine, but could in theory generate a climate that is favourable not just to resuming oil exports to the U.S. market, but also restarting the Mexico dialogue, preparing the ground for improved electoral conditions and providing sanctions relief. There is no quick fix for a political conflict that has dragged on for over two decades, but in the event of breakthrough toward a political settlement or a hypothetical lifting of U.S. sanctions, living standards in Venezuela could finally embark on a sustained recovery from their current nadir, while migrants might consider returning home.

Down the road, returnees could play a major role in the reconstruction of Venezuela. Yet it is uncertain how many of the Venezuelans who fled their homeland would consider going back when the situation allows for it. Estimates vary greatly, but civil society groups argue that most Venezuelan migrants and refugees plan on staying in neighbouring host countries.[192]

In the meantime, Maduro has argued that Venezuelans who are facing discrimination and xenophobia abroad need a helping hand to return home. "The doors of our country are open and they can return and be in peace, without discrimination, next to their families and on their land", he has declared.[193] A campaign to support returnees, branded Plan Vuelta a la Patria, claims to have brought back over 28,000 Venezuelans from 21 countries in 165 flights and sea journeys since 2018. This figure represents not even 0.5 per cent of the total Venezuelan diaspora, but the *chavista* government has given its campaign a high profile. While the campaign was supposedly designed for stricken migrants who could not finance a return trip, Venezuelans complained about having been charged large sums for their repatriation flights. Critics have treated the strategy as a political stunt.[194]

---

[190] The visit came as Washington is looking for options to reduce its reliance on Russian fuel. Phil Gunson, "A Twist in Caracas: Is a Venezuela-U.S. Reboot on the Cards?", Crisis Group Commentary, 16 March 2022.

[191] "Venezuela government and opposition to renew talks amid humanitarian crisis", BBC, 18 May 2022.

[192] For example, the NGO Observatory of the Venezuelan Diaspora surveyed migrants and refugees in neighbouring countries. About 80 per cent indicated they had no plans to return to Venezuela. See "Observatorio de la Diáspora afirma que el número de migrantes venezolanos asciende a 7,2 millones", *El Nacional*, 22 April 2022.

[193] "Venezuela inicia Plan Vuelta a la Patria 2022 desde Ecuador", TeleSur, 23 March 2022.

[194] "Regresar a Venezuela en vuelos de repatriación cuesta entre 120 y 1.390 dólares", *El Pitazo*, 8 May 2020.

CLP_AR_006163

Some entrepreneurial Venezuelans have also returned home, many with the aim of profiting from the elimination of price controls and free circulation of the U.S. dollar in the country.[195]

To promote future safe returns, the Venezuelan government should not be in sole charge of these operations. International partners should press Colombia and Venezuela to open effective humanitarian corridors across the border as part of any improvement in relations between the two, with support from international agencies such as the International Organization for Migration and UN High Commissioner for Refugees.[196] Guarantees aimed at safeguarding human rights of returnees during their journey will be vital. UN agencies and donor countries should also increase financial and technical support for returning migrants and strengthen the responsiveness of the Venezuelan state so as to ensure returnees have food and safe transportation to their destination. Special attention for women and children who have already faced extreme risks and hardships during their flight from Venezuela is of particular importance.

Close monitoring of the entire return process is critical. Venezuelans who opted to return home during the early months of the pandemic were received in overcrowded quarantine centres on the Venezuelan side of the border, where conditions were dire. *Colectivos*, violent para-police groups loyal to *chavista* politicians, were looking for signs of political dissent inside these centres and behaved violently toward former military officers who were perceived as traitors.[197]

---

[195] Some Venezuelans now make more money in Venezuela than they made abroad as migrants or refugees. Ezra Fieser, Nicolle Yapur and Fabiola Zerpa, "Venezuelan migrants are coming home as Maduro embraces capitalism", Bloomberg, 8 March 2022.

[196] The IOM has designed guidelines for the full spectrum of return, readmission and reintegration, which could be the departure point for future return policies. See "IOM's Policy on the Full Spectrum of Return, Readmission and Reintegration", IOM, April 2021.

[197] Crisis Group Report, *Disorder on the Border*, op. cit.

CLP_AR_006164

## VII. **Conclusion**

Colombian authorities have provided a generous welcome to Venezuelans fleeing extreme hardship in their homeland, setting a high bar for granting migrants formal residency and access to public services. But the migrants' urgent quest for money, food and shelter has tended to overshadow the scope of Bogotá's legal protections. Many migrants have found themselves exposed to poverty, discrimination and physical peril. Colombia's large informal economy has failed to ease many migrants' financial straits, above all during the pandemic lockdowns. Meanwhile, the country's far-reaching armed and criminal networks have emerged as major employment providers, but at the cost of sexually exploiting women, entrapping migrants in conflict zones or dispatching them to commit crimes in cities.

The xenophobic reaction of many Colombians to Venezuelans has spiked at moments of unrest, but it owes much to the perception that migrants and refugees lower wages for locals and account for a rising share of crime, above all high-visibility offences in big cities such as drug dealing and burglary. While debate continues as to the extent of their involvement in crime, there is little doubt that vulnerable Venezuelans have been exploited as cheap, docile labour by legal employers and crime groups alike. These employment terms, and their effects on Colombians' perceptions of migrants (informed by anxiety about competing with them), have in turn been aggravated by the country's rising joblessness, worsening insecurity, buoyant illicit businesses and the pandemic's economic effects.

Ensuring that Venezuelans receive enhanced information and support to help protect them on arrival and doing more to enable them to join the formal economy would help rescue them from illicit recruitment and exploitation. But a safer life for Venezuelans in Colombia will also depend on improving ties between the two countries. Mending ruptured diplomatic and consular relations looks far more likely now that Gustavo Petro is the president of Colombia. Rebuilding relationships should be a priority for Caracas as well, and the broader region should do more to pool efforts to address the exodus and the criminal threats migrants face. Recognising that Venezuelans will continue to cross into Colombia should not impede strategies to facilitate safe returns to Venezuela for those who wish, especially if and when the country makes progress toward resolution of its longstanding political conflict. In the process, both governments must collaborate to increase border security and make passage safer in both directions.

Crime may well remain an alluring option for vulnerable migrants so long as Venezuela's economy stays in the doldrums and employment in Colombia is hard to find. A route for migrants to a legal home and livelihood will require greater physical protection, more economic opportunity and serious steps toward cooperation between the two states. Overall, however, the Petro administration's advent and other developments hold out the hope that the worst of Venezuelan migrants' travails in Colombia may be in the past.

**Bogotá/Washington/Brussels, 9 August 2022**

CLP_AR_006165

**Hard Times in a Safe Haven: Protecting Venezuelan Migrants in Colombia**
Crisis Group Latin America Report N°94, 9 August 2022                    Page 35

Appendix A: Map of Colombia



## Appendix B: Venezuelan Migrants and Refugees in Colombia

**Graph 1.** Homicide rate in Bogota (2017-2021)



**Source:** Venezuelan and Colombian homicide rates from the Colombian National Institute of Legal Medicine and Forensic Sciences. The number of Venezuelan immigrants comes from Colombian state migration agency (Migracion Colombia) for the years 2018 to 2021. Colombian population projections from Colombian National Statistical Administrative Department (DANE) from 2018 to 2021. For 2017, we did a reverse population projection using the average rate increase observed in the available years.

**Graph 2.** Conviction and arrests rates



**For left panel:** Crisis Group elaboration using conviction data from the Colombian Attorney General Office. Total convictions of those accused of crime according to criminal news entries to the Accusatory Oral Criminal System in Law 906 of 2004 and Law 1098 of 2006. Data collected on June 24, 2022. The number of Venezuelan immigrants comes from Migración Colombia for 2018 to 2021. Colombian population projections from DANE from 2018 to 2021. For 2017, we did a reverse population projection using the average rate increase observed in the available years.

**For right panel:** Crisis Group elaboration using arrest data from the National Penitentiary and Prison Institute of Colombia (INPEC), and population from the Colombian Ministry of Foreign Relations, and DANE.

CLP_AR_006167

**Graph 3.** Homicide rate in Colombia (2017-2021)



**Source:** Venezuelan and Colombian homicides from the Colombian National Institute of Legal Medicine and Forensic Sciences. The number of Venezuelan immigrants comes from Migración Colombia for 2018 to 2021. Colombian population projections from DANE from 2018 to 2021. For 2017, we did a reverse population projection using the average rate increase observed in the available years.

**Graph 4.** Deportations of Venezuelans from Colombia



**Source:** Crisis Group elaboration using data from Armandoinfo, Dejusticia and Migracion Colombia. 2021 data from an interview with an immigration specialist in Colombia.

CLP_AR_006168

## Appendix C: About the International Crisis Group

The International Crisis Group (Crisis Group) is an independent, non-profit, non-governmental organisation, with some 120 staff members on five continents, working through field-based analysis and high-level advocacy to prevent and resolve deadly conflict.

Crisis Group's approach is grounded in field research. Teams of political analysts are located within or close by countries or regions at risk of outbreak, escalation or recurrence of violent conflict. Based on information and assessments from the field, it produces analytical reports containing practical recommendations targeted at key international, regional and national decision-takers. Crisis Group also publishes *CrisisWatch*, a monthly early-warning bulletin, providing a succinct regular update on the state of play in up to 80 situations of conflict or potential conflict around the world.

Crisis Group's reports are distributed widely by email and made available simultaneously on its website, www.crisisgroup.org. Crisis Group works closely with governments and those who influence them, including the media, to highlight its crisis analyses and to generate support for its policy prescriptions.

The Crisis Group Board of Trustees – which includes prominent figures from the fields of politics, diplomacy, business and the media – is directly involved in helping to bring the reports and recommendations to the attention of senior policymakers around the world. Crisis Group is co-chaired by President & CEO of the Fiore Group and Founder of the Radcliffe Foundation, Frank Giustra, as well as by former Foreign Minister of Argentina and Chef de Cabinet to the United Nations Secretary-General, Susana Malcorra.

Comfort Ero was appointed Crisis Group's President & CEO in December 2021. She first joined Crisis Group as West Africa Project Director in 2001 and later rose to become Africa Program Director in 2011 and then Interim Vice President. In between her two tenures at Crisis Group, she worked for the International Centre for Transitional Justice and the Special Representative of the UN Secretary-General in Liberia.

Crisis Group's international headquarters is in Brussels, and the organisation has offices in seven other locations: Bogotá, Dakar, Istanbul, Nairobi, London, New York, and Washington, DC. It has presences in the following locations: Abuja, Addis Ababa, Bahrain, Baku, Bangkok, Beirut, Caracas, Gaza City, Guatemala City, Jerusalem, Johannesburg, Juba, Kabul, Kiev, Manila, Mexico City, Moscow, Seoul, Tbilisi, Toronto, Tripoli, Tunis, and Yangon.

Crisis Group receives financial support from a wide range of governments, foundations, and private sources. The ideas, opinions and comments expressed by Crisis Group are entirely its own and do not represent or reflect the views of any donor. Currently Crisis Group holds relationships with the following governmental departments and agencies: Australian Department of Foreign Affairs and Trade, Austrian Development Agency, Canadian Department of National Defence, Danish Ministry of Foreign Affairs, Dutch Ministry of Foreign Affairs, European Union Emergency Trust Fund for Africa, European Union Instrument contributing to Stability and Peace, Finnish Ministry of Foreign Affairs, French Development Agency, French Ministry of Europe and Foreign Affairs, Global Affairs Canada,, Irish Department of Foreign Affairs, Japan International Cooperation Agency, Ministry of Foreign Affairs of the Principality of Liechtenstein, Luxembourg Ministry of Foreign and European Affairs, Norwegian Ministry of Foreign Affairs, Qatar Ministry of Foreign Affairs, Swedish Ministry of Foreign Affairs, Swiss Federal Department of Foreign Affairs, United Arab Emirates (Ministry of Foreign Affairs and International Cooperation and Anwar Gargash Diplomatic Academy), United Nations Development Programme, United Nations World Food Programme, UK Foreign, Commonwealth and Development Office, and the World Bank.

Crisis Group also holds relationships with the following foundations and organizations: Carnegie Corporation of New York, Ford Foundation, Global Challenges Foundation, Henry Luce Foundation, John D. and Catherine T. MacArthur Foundation, Open Society Foundations, Ploughshares Fund, Robert Bosch Stiftung, Rockefeller Brothers Fund, Stiftung Mercator, and Wellspring Philanthropic Fund.

**August 2022**

CLP_AR_006169

## Appendix D: Reports and Briefings on Latin America and the Caribbean since 2019

**Special Reports and Briefings**

*Council of Despair? The Fragmentation of UN Diplomacy,* Special Briefing N°1, 30 April 2019.

*Seven Opportunities for the UN in 2019-2020,* Special Briefing N°2, 12 September 2019.

*Seven Priorities for the New EU High Representative,* Special Briefing N°3, 12 December 2019.

*COVID-19 and Conflict: Seven Trends to Watch*, Special Briefing N°4, 24 March 2020 (also available in French and Spanish).

*A Course Correction for the Women, Peace and Security Agenda*, Special Briefing N°5, 9 December 2020.

*Ten Challenges for the UN in 2021-2022*, Special Briefing N°6, 13 September 2021.

*Gold and Grief in Venezuela's Violent South* Latin America Report N°73, 28 February 2019 (also available in Spanish).

*A Way Out of Latin America's Impasse over Venezuela,* Latin America Briefing N°38, 14 May 2019 (also available in Spanish).

*The Keys to Restarting Nicaragua's Stalled Talks,* Latin America Report N°74, 13 June 2019 (also available in Spanish).

*A Glimmer of Light in Venezuela's Gloom*, Latin America Report N°75, 15 July 2019 (also available in Spanish).

*Calming the Restless Pacific: Violence and Crime on Colombia's Coast,* Latin America Report N°76, 8 August 2019 (also available in Spanish).

*Venezuela's Military Enigma,* Latin America Briefing N°39, 16 September 2019 (also available in Spanish).

*Containing the Border Fallout of Colombia's New Guerrilla Schism*, Latin America Briefing N°40, 20 September 2019 (also available in Spanish).

*Fight and Flight: Tackling the Roots of Honduras' Emergency*, Latin America Report N°77, 25 October 2019 (also available in Spanish).

*Peace in Venezuela: Is There Life after the Barbados Talks?*, Latin America Briefing N°41, 11 December 2019 (also available in Spanish).

*A Glut of Arms: Curbing the Threat to Venezuela from Violent Groups,* Latin America Report N°78, 20 February 2020 (also available in Spanish).

*Imagining a Resolution of Venezuela's Crisis*, Latin America Report N°79, 11 March 2020 (also available in Spanish)

*Broken Ties, Frozen Borders: Colombia and Venezuela Face COVID-19*, Latin America Briefing N°42, 16 April 2020 (also available in Spanish).

*Mexico's Everyday War: Guerrero and the Trials of Peace*, Latin America Report N°80, 4 May 2020 (also available in Spanish).

*Miracle or Mirage? Gangs and Plunging Violence in El Salvador*, Latin America Report N°81, 8 July 2020 (also available in Spanish).

*Bolivia Faces New Polls in Shadow of Fraud Row*, Latin America Briefing N°43, 31 July 2020 (also available in Spanish).

*Leaders under Fire: Defending Colombia's Front Line of Peace*, Latin America Report N°82, 6 October 2020 (also available in Spanish).

*Virus-proof Violence: Crime and COVID-19 in Mexico and the Northern Triangle*, Latin America Report N°83, 13 November 2020 (also available in Spanish).

*Disorder on the Border: Keeping the Peace between Colombia and Venezuela*, Latin America Report N°84, 14 December 2020 (also available in Spanish).

*Venezuela: What Lies Ahead after Election Clinches Maduro's Clean Sweep*, Latin America Report N°85, 21 December 2020 (also available in Spanish).

*The Exile Effect: Venezuela's Overseas Opposition and Social Media*, Latin America Report N°86, 24 February 2021 (also available in Spanish).

*Deeply Rooted: Coca Eradication and Violence in Colombia*, Latin America Report N°87, 26 February 2021 (also available in Spanish).

*The Risks of a Rigged Election in Nicaragua*, Latin America Report N°88, 20 May 2021 (also available in Spanish).

*Electoral Violence and Illicit Influence in Mexico's Hot Land*, Latin America Report N°89, 2 June 2021 (also available in Spanish).

*The Pandemic Strikes: Responding to Colombia's Mass Protests*, Latin America Report N°90, 2 July 2021 (also available in Spanish).

*Haiti: A Path to Stability for a Nation in Shock*, Latin America and Caribbean Briefing N°44, 30 September 2021 (also available in French and Spanish).

*A Broken Canopy: Preventing Deforestation and Conflict in Colombia*, Latin America Report N°91, 4 November 2021 (also available in Spanish).

*Handling the Risks of Honduras' High-stakes Poll*, Latin America Briefing N°45, 23 November 2021 (also available in Spanish).

CLP_AR_006170

*A Fight by Other Means: Keeping the Peace with Colombia's FARC*, Latin America Report N°92, 30 November 2021 (also available in Spanish).

*Overcoming the Global Rift on Venezuela*, Latin America Report N°93, 17 February 2022 (also available in Spanish).

*Keeping Oil from the Fire: Tackling Mexico's Fuel Theft Racket*, Latin America Briefing N°46, 25 March 2022 (also available in Spanish).

*Brazil's True Believers: Bolsonaro and the Risks of an Election Year*, Latin America Briefing N°47, 16 June 2022 (also available in Portuguese and Spanish).

CLP_AR_006171

## Appendix E: International Crisis Group Board of Trustees

PRESIDENT

**Comfort Ero**
Former Crisis Group Vice Interim
President and Africa Program Director

CO-CHAIRS

**Frank Giustra**
President & CEO, Fiore Group;
Founder, Radcliffe Foundation

**Susana Malcorra**
Former Foreign Minister of Argentina

OTHER TRUSTEES

**Fola Adeola**
Founder and Chairman, FATE
Foundation

**Hushang Ansary**
Chairman, Parman Capital Group LLC;
Former Iranian Ambassador to the
U.S. and Minister of Finance and
Economic Affairs

**Gérard Araud**
Former Ambassador of France
to the U.S.

**Carl Bildt**
Former Prime Minister and Foreign
Minister of Sweden

**Sandra Breka**
Member, Executive Committee
and Board, European Endowment for
Democracy

**Maria Livanos Cattaui**
Former Secretary General of the
International Chamber of Commerce

**Ahmed Charai**
Chairman and CEO of Global Media
Holding and publisher of the Moroccan
weekly *L'Observateur*

**Nathalie Delapalme**
Executive Director and Board Member
at the Mo Ibrahim Foundation

**Alexander Downer**
Former Australian Foreign Minister
and High Commissioner to the United
Kingdom

**Sigmar Gabriel**
Former Minister of Foreign Affairs and
Vice Chancellor of Germany

**Mo Ibrahim**
Founder and Chair, Mo Ibrahim
Foundation; Founder, Celtel
International

**Wadah Khanfar**
Co-Founder, Al Sharq Forum; former
Director General, Al Jazeera Network

**Nasser al-Kidwa**
Chairman of the Yasser Arafat
Foundation; Former UN Deputy
Mediator on Syria

**Bert Koenders**
Former Dutch Minister of Foreign
Affairs and Under-Secretary-General
of the United Nations

**Andrey Kortunov**
Director General of the Russian
International Affairs Council

**Ivan Krastev**
Chairman of the Centre for Liberal
Strategies (Sofia); Founding Board
Member of European Council on
Foreign Relations

**Tzipi Livni**
Former Foreign Minister and Vice
Prime Minister of Israel

**Helge Lund**
Former Chief Executive BG Group
(UK) and Statoil (Norway)

**Lord (Mark) Malloch-Brown**
Former UN Deputy Secretary-General
and Administrator of the United
Nations Development Programme

**William H. McRaven**
Retired U.S. Navy Admiral who served
as 9th Commander of the U.S. Special
Operations Command

**Shivshankar Menon**
Former Foreign Secretary of India;
former National Security Adviser

**Naz Modirzadeh**
Director of the Harvard Law School
Program on International Law and
Armed Conflict

**Federica Mogherini**
Former High Representative of the
European Union for Foreign Affairs
and Security Policy

**Saad Mohseni**
Chairman and CEO of MOBY Group

**Ayo Obe**
Chair of the Board of the Gorée
Institute (Senegal); Legal Practitioner
(Nigeria)

**Lubna Olayan**
Chair of Executive Committee and
Deputy Chairperson of Olayan
Financing Company (OFC)

**Meghan O'Sullivan**
Former U.S. Deputy National Security
Adviser on Iraq and Afghanistan

**Kerry Propper**
Managing Partner of ATW Partners;
Founder and Chairman of Chardan
Capital

**Ahmed Rashid**
Author and Foreign Policy Journalist,
Pakistan

**Ghassan Salamé**
Former UN Secretary-General's
Special Representative and Head of
the UN Support Mission in Libya;
Former Minister of Culture of Lebanon;
Founding Dean of the Paris School of
International Affairs, Sciences Po
University

**Juan Manuel Santos Calderón**
Former President of Colombia; Nobel
Peace Prize Laureate 2016

**Ellen Johnson Sirleaf**
Former President of Liberia

**Alexander Soros**
Deputy Chair of the Global Board,
Open Society Foundations

**George Soros**
Founder, Open Society Foundations
and Chair, Soros Fund Management

Aleander Stubb
Director of the School of Transnational
Governance; Former Prime Minister of
Finland

**Darian Swig**
Founder and President, Article 3
Advisors; Co-Founder and Board
Chair, Article3.org

**Helle Thorning-Schmidt**
CEO of Save the Children International;
former Prime Minister of Denmark

CLP_AR_006172

## CORPORATE COUNCILS

A distinguished group of companies who share Crisis Group's vision and values, providing support and sharing expertise to strengthen our efforts in preventing deadly conflict.

**President's Council**

| CORPORATE | INDIVIDUAL | |
|---|---|---|
| BP | (2) Anonymous | Stephen Robert |
| Shearman & Sterling LLP | David Brown & Erika Franke | Alexander Soros |
| White & Case LLP | The Edelman Family Foundation | Ian R. Taylor |

**International Advisory Council**

| CORPORATE | INDIVIDUAL | |
|---|---|---|
| (1) Anonymous | (3) Anonymous | David Jannetti |
| APCO Worldwide Inc. | Mark Bergman | Faisel Khan |
| Chevron | Stanley Bergman & Edward | Cleopatra Kitti |
| Edelman UK & Ireland | Bergman | Samantha Lasry |
| Eni | Peder Bratt | Jean Manas & Rebecca Haile |
| Equinor | Lara Dauphinee | Dror Moreh |
| Ninety One | Herman De Bode | Lise Strickler & Mark Gallogly |
| Tullow Oil plc | Ryan Dunfield | Charitable Fund |
| Warburg Pincus | Tanaz Eshaghian | The Nommontu Foundation |
| | Seth & Jane Ginns | Brian Paes-Braga |
| | Ronald Glickman | Kerry Propper |
| | Geoffrey R. Hoguet & | Duco Sickinghe |
| | Ana Luisa Ponti | Nina K. Solarz |
| | Geoffrey Hsu | Raffi Vartanian |

**Ambassador Council**

Rising leaders from diverse fields who contribute their perspectives and talents to support Crisis Group's mission.

| | | |
|---|---|---|
| Christina Bache | Reid Jacoby | Betsy (Colleen) Popken |
| Alieu Bah | Tina Kaiser | Sofie Roehrig |
| Amy Benziger | Jennifer Kanyamibwa | Perfecto Sanchez |
| James Blake | Gillian Lawie | Rahul Sen Sharma |
| Thomas Cunningham | David Litwak | Chloe Squires |
| Matthew Devlin | Madison Malloch-Brown | Leeanne Su |
| Sabrina Edelman | Megan McGill | AJ Twombly |
| Sabina Frizell | Hamesh Mehta | Theodore Waddelow |
| Sarah Covill | Clara Morain Nabity | Zachary Watling |
| Lynda Hammes | Gillian Morris | Grant Webster |
| Joe Hill | Duncan Pickard | Sherman Williams |
| Lauren Hurst | Lorenzo Piras | Yasin Yaqubie |

## SENIOR ADVISERS

Former Board Members who maintain an association with Crisis Group, and whose advice and support are called on (to the extent consistent with any other office they may be holding at the time).

| | | |
|---|---|---|
| **Martti Ahtisaari**<br>Chairman Emeritus | Kim Beazley | Swanee Hunt |
| | Shlomo Ben-Ami | Wolfgang Ischinger |
| **George Mitchell**<br>Chairman Emeritus | Christoph Bertram | Aleksander Kwasniewski |
| | Lakhdar Brahimi | Ricardo Lagos |
| **Thomas R. Pickering**<br>Chairman Emeritus | Kim Campbell | Joanne Leedom-Ackerman |
| | Jorge Castañeda | Todung Mulya Lubis |
| **Gareth Evans**<br>President Emeritus | Joaquim Alberto Chissano | Graça Machel |
| | Victor Chu | Jessica T. Mathews |
| | Mong Joon Chung | Miklós Németh |
| Kenneth Adelman | Sheila Coronel | Christine Ockrent |
| Adnan Abu-Odeh | Pat Cox | Timothy Ong |
| HRH Prince Turki al-Faisal | Gianfranco Dell'Alba | Roza Otunbayeva |
| Celso Amorim | Jacques Delors | Olara Otunnu |
| Óscar Arias | Alain Destexhe | Lord (Christopher) Patten |
| Richard Armitage | Mou-Shih Ding | Fidel V. Ramos |
| Diego Arria | Uffe Ellemann-Jensen | Olympia Snowe |
| Zainab Bangura | Stanley Fischer | Javier Solana |
| Nahum Barnea | Carla Hills | Pär Stenbäck |

CLP_AR_006173



March 23, 2023

*Submitted via: https://www.regulations.gov.*

Daniel Delgado
Acting Director
Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security
telephone (202) 447-3459

Lauren Alder Reid
Assistant Director,
Office of Policy, EOIR
U.S. Department of Justice
telephone (703) 305-0289

**Re: Comment on the Proposed Rule by the Department of Homeland Security (DHS)[1] and the Executive Office for Immigration Review (EOIR)[2] on Circumvention of Lawful Pathways, CIS No. 2736-22; Docket No: USCIS 2022-0016; A.G. Order No. 5605-2023**

Dear Mr. Daniel Delgado and Ms. Lauren Alder Reid:

Human Rights Watch submits this comment in response to the proposed rule of the Department of Homeland Security (DHS) and the Department of Justice (DOJ) published in the Federal Register on February 23, 2023, that would ban many refugees from asylum protection in the United States, subjecting them to refoulement in violation of international human rights, refugee, and US law, and deprive refugees of the ability to reunite with their families and pursue a path to citizenship.[3] The proposed rule is a new version of similar asylum bans promulgated by the Trump administration that were repeatedly struck down by federal courts as unlawful.

This proposed asylum ban attempts to end access to asylum for many refugees at the US southern border, discriminates against Black, Brown, and Indigenous asylum seekers, and seeks to circumvent US

---

[1] "Homeland Security Department," Federal Register, https://www.federalregister.gov/agencies/homeland-security-department (accessed March 21, 2023).
[2] "Executive Office for Immigration Review," Federal Register, https://www.federalregister.gov/agencies/executive-office-for-immigration-review (accessed March 21, 2023).
[3] Department of Homeland Security, "Circumvention of Lawful Pathways," February 21, 2023, https://public-inspection.federalregister.gov/2023-03718.pdf (accessed March 21, 2023).

CLP_PC_020252

law and US obligations under international human rights and refugee law. Human Rights Watch strongly urges DHS and DOJ to withdraw the proposed rule in its entirety. The Biden administration should instead uphold US and international human rights and refugee law, restore full access to asylum at and between ports of entry, ensure adequate funding for temporary shelters, including by re-allocating funds, ensure fair and humane asylum adjudications, and rescind the Trump administration entry and transit bans in their entirety.

Furthermore, Human Rights Watch strongly urges the Biden administration to abandon the use of CBP One due to due process, privacy, and discrimination concerns. CBP One is an extremely flawed government application to request an appointment at a port of entry with very limited appointment slots such that requiring asylum seekers to use it institutes another version of "metering," which a US federal judge ruled illegal[4] because it violates due process rights, and which also violates international standards protecting asylum seekers.[5] The application is inaccessible to many asylum seekers due to financial, language, technological, and other barriers, all of which have disproportionately adverse impacts on Black and Indigenous asylum seekers. The app also collects personal and biometric data from individuals, raising human rights concerns with regard to the right to privacy, due process, non-discrimination, and fair and equal treatment before the law.

**Human Rights Watch and Its Interest in the Issue**

Human Rights Watch is a nonprofit, non-partisan organization established in 1978 that investigates and reports on violations of fundamental human rights in over 100 countries worldwide with the goal of securing the respect of these rights for all persons. It is the largest international human rights organization based in the United States. By exposing and calling attention to human rights abuses committed by state and non-state actors, Human Rights Watch seeks to bring international public opinion to bear upon offending governments and others and thus bring pressure on them to end abusive practices. Human Rights Watch provides commentary and has filed amicus briefs based on its investigations and reports to various bodies, including many agencies of the Executive Branch of the United States, the US Supreme Court, US Courts of Appeal, and the Inter-American Commission on Human Rights.

As a member of border-wide coalitions and collaborations, we have documented abuses experienced by asylum seekers forced to wait in Mexico under prior policies and practices (abuses which we have raised formally with DHS[6]), just as asylum seekers will be forced to wait under the proposed rule. We have also documented abuses experienced by individuals from Honduras[7] and El Salvador[8] who have been returned by the United States to face danger due to previous administration's restrictive policies; and we have examined human rights conditions and asylum system failures in countries, such as Guatemala,

---

[4] *Plaintiffs v. Alejandro Mayorkas, Troy A. Miller, and William A. Ferrera*, No. 17-cv-02366-BAS-KSC, (S.D. Cal. September 2, 2021), https://fingfx.thomsonreuters.com/gfx/legaldocs/zjvqkkzdwvx/IMMIGRATION_METERING_LAWSUIT_decision.pdf (accessed March 21, 2023).

[5] "U.S. Asylum and Border Policies Resulting in Human Rights Violations," Human Rights First, March 1, 2022, https://humanrightsfirst.org/library/u-s-asylum-and-border-policies-resulting-in-human-rights-violations/ (accessed March 21, 2023).

[6] "DHS OIG Formal Complaint Regarding 'Remain in Mexico,'" Human Rights Watch statement, June 2, 2020, https://www.hrw.org/news/2020/06/02/dhs-oig-formal-complaint-regarding-remain-mexico#_ftn83.

[7] Human Rights Watch, *"You Don't Have Rights Here": US Border Screening and Returns of Central Americans to Risk of Serious Harm*, (New York: Human Rights Watch, 2014), https://www.hrw.org/report/2014/10/16/you-dont-have-rights-here/us-border-screening-and-returns-central-americans-risk.

[8] Human Rights Watch, *Deported to Danger: United States Deportation Policies Expose Salvadorans to Death and Abuse*, (New York: Human Rights Watch, 2020), https://www.hrw.org/report/2020/02/05/deported-danger/united-states-deportation-policies-expose-salvadorans-death-and.

CLP_PC_020253

initiatives for some nationalities, there are no similar parole initiatives for people from Guatemala, Honduras, and El Salvador.[31]

**Requiring Refugees at the Southern Border to Use CBP One Constitutes Illegal "Metering" Denies Asylum Access to the Most Vulnerable Refugees**

The rule requires asylum seekers at the southern border to schedule appointments through the CBP One app and would generally deny asylum to refugees who arrive at a border port of entry without a previously scheduled appointment and who were not denied protection in a transit country. Requiring refugees to use CBP One at the southern border appears to constitute illegal metering (based not on wait time but on luck, technology skills, or resources to secure an appointment — turning asylum access in effect into a lottery).[32] Use of CBP One may result in other violations of human rights to privacy, due process, and fair and equal treatment before the law. CBP One is an impossible tool for many asylum seekers to access or use, including those who do not have the resources to obtain a smartphone or ability to navigate the app.[33] The app is not accessible to illiterate or non-literate people, it is not available in most languages–including Indigenous languages–and all error messages are in English, effectively meaning that many asylum seekers will not be able to use the app.  It also disparately harms Black asylum seekers due to racial bias in its facial recognition technology,[34] which has prevented many from obtaining an appointment. Asylum seekers who can access and navigate the app are still often unable to schedule appointments due to extremely limited slots and are forced to remain in danger indefinitely.[35]

The use of CBP One to implement an illegal metering system has already resulted in horrific violence and death, including the murder of a 17-year-old Cuban boy in Mexico who was required to wait weeks for an appointment.[36] A Venezuelan family unable to secure an appointment at a port of entry near them in Piedras Negras and forced to travel over 1200 miles to another port of entry for an appointment was kidnapped, tortured, and extorted by a criminal group while traveling to their appointment.[37] After 20 days, their abductors blindfolded them and brought them to the US-Mexico border, threatening to murder them if they did not cross. After crossing, the family tried to explain to Border Patrol that they had been kidnapped and forced to cross, but agents told them they were criminals for crossing illegally and expelled them back to Mexico.

By requiring people at the southern border to use CBP One, the proposed rule would leave many vulnerable asylum seekers in grave danger. Survivors of gender-based violence, for example, often face pursuit by their abusers, including up to the border. LGBT+ asylum seekers frequently confront sexual and other violence, extortion, and other serious abuse on their journey through Mexico, particularly at the border. Women regularly face sexual violence and are at risk of trafficking and other exploitation,

[31] Julia Ainsley, "Rights Groups Threaten to Sue Biden Administration over Plan to Block Migrants with What Groups Call a Trump-Era Tactic," *NBC News*, February 20, 2023, https://www.nbcnews.com/politics/immigration/biden-block-migrants-trump-era-stephen-miller-tactic-rcna71282 (accessed March 21, 2023).

[32] *Plaintiffs v. Alejandro Mayorkas, Troy A. Miller, and William A. Ferrera*, United States District Court Southern District of California.

[33] The University of Texas at Austin Strauss Center, "Asylum Processing at the U.S.-Mexico Border: February 2023," February 2023, https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf (accessed March 21, 2023).

[34] Melissa del Bosque, "Facial Recognition Bias Frustrates Black Asylum Applicants to US, Advocates Say," *The Guardian*, February 8, 2023, https://www.theguardian.com/us-news/2023/feb/08/us-immigration-cbp-one-app-facial-recognition-bias (accessed March 21, 2023).

[35] Lindsay Toczylowski, Tweet, March 1, 2023, https://twitter.com/L_Toczylowski/status/1631063774210785280 (accessed March 21, 2023).

[36] Jack Herrera, "Fleeing For Your Life? There's An App For That." *Texas Monthly*, March 2, 2023, https://www.texasmonthly.com/news-politics/cbp-app-asylum-biden-administration/ (accessed March 21, 2023).

[37] Aaron Reichlin-Melnick, Tweet, March 2, 2023, https://twitter.com/ReichlinMelnick/status/1631400369266872322 (accessed March 21, 2023).

CLP_PC_020258

among other serious harms, and these risks increase in border towns. Asylum seekers who are Indigenous, disabled, not Spanish speakers, or unaccompanied children are also among those who are particularly vulnerable to these and other serious harms, the risks of which increase substantially the longer they must remain in border areas.  Asylum seekers unable to secure appointments through the CBP One app will be forced to remain indefinitely at the border in dangerous conditions, often with no access to safe housing or stable income as they continue to try to make an appointment. These conditions increase the likelihood that they will be targeted for violence by cartels, traffickers, and the abusers from which they initially fled.[38]  Many LGBT+ asylum seekers and families and other vulnerable populations have already been unable to secure appointments through CBP One, leaving them in extreme danger.

The limited availability of appointments via the CBP One app has the foreseeable consequence of causing families to separate. In fact, the administration's use of the CBP One app and denial of access to asylum for people who cannot schedule appointments through the app has already forced families to separate.[39] Families unable to secure CBP One app appointments together as a family unit have made the impossible choice to send their children across the border alone to protect them from harm in Mexican border regions. Like the Title 42 policy and other policies that block, ban, and deny asylum to refugees, this proposed rule would fuel family separations at the border.

**Deportation of Refugees to Danger**

If implemented, the asylum ban would lead to the deportation of refugees to countries where they are at risk of persecution and torture. The rule largely bans asylum for refugees based on their manner of entry into the US and travel through other countries–factors that are irrelevant to their fears of return and will lead to denials of asylum for refugees. Refugees who are otherwise eligible for asylum but banned by the rule would likely be deported to danger. Such deportations, even if to countries that an individual passed through while attempting to reach the United States, will risk violating US obligations under international human rights and refugee law because individuals experience human rights abuses in countries like Guatemala,[40] Honduras,[41] Nicaragua,[42] El Salvador,[43] and Mexico[44] and because the asylum systems in these countries are unable to consistently provide effective protection against onward returns to persecution in an individual's country of origin – a process known as "chain refoulement." The UN Refugee Agency has observed that "chain refoulement" violates the obligations of any state party (in this case the United States) to the 1951 Refugee Convention and its 1967 Related Protocol.[45]

---

[38] Tahirih Justice Center and Oxfam America, "Surviving Deterrence: How Us Asylum Deterrence Policies Normalize Gender-Based Violence," 2022, https://www.tahirih.org/wp-content/uploads/2022/10/Oxfam_Tahirh_Surviving-Deterrence_English_2022.pdf (accessed March 21, 2023).

[39] The University of Texas at Austin Strauss Center, "Asylum Processing at the U.S.-Mexico Border: February 2023."

[40] Human Rights Watch, *World Report* 2023, (New York: Human Rights Watch, 2023), Guatemala chapter, https://www.hrw.org/world-report/2023/country-chapters/guatemala.

[41] Human Rights Watch, *World Report* 2023, (New York: Human Rights Watch, 2023), Honduras chapter, https://www.hrw.org/world-report/2023/country-chapters/honduras.

[42] Human Rights Watch, *World Report* 2023, (New York: Human Rights Watch, 2023), Nicaragua chapter, https://www.hrw.org/world-report/2023/country-chapters/nicaragua.

[43] Human Rights Watch, *World Report* 2023, (New York: Human Rights Watch, 2023), El Salvador chapter, https://www.hrw.org/world-report/2023/country-chapters/el-salvador.

[44] Human Rights Watch, *World Report* 2023, (New York: Human Rights Watch, 2023), Mexico chapter, https://www.hrw.org/world-report/2023/country-chapters/mexico.

[45] United Nations High Commissioner for Refugees, "Written Submission by the Office of the United Nations High Commissioner for Refugees in the Case of *Sharifi and others v Italy and Greece* (Application No. 16643/09)," October 2009, https://www.refworld.org/pdfid/4afd25c32.pdf (accessed October 2009).

While the Trump administration's transit ban was in effect, asylum seekers were denied all relief and ordered deported due to the ban, including a Venezuelan opposition journalist and her one-year-old child; a Cuban asylum seeker who was beaten and subjected to forced labor due to his political activity; a Nicaraguan student activist who had been shot at during a protest against the government, had his home vandalized, and was pursued by the police; a gay Honduran asylum seeker who was threatened and assaulted for his sexual orientation; and a gay Nicaraguan asylum seeker living with HIV who experienced severe abuse and death threats on account of his sexual orientation, HIV status, and political opinion.[46]

Many asylum seekers were summarily ordered deported through expedited removal without an asylum hearing due to the transit ban, including Indigenous asylum seekers fleeing gender-based and other persecution in Guatemala and a Congolese woman who had been beaten by police in her country when she sought information about her husband, who had been jailed and tortured due to his political activity.[47]

**Asylum Seekers are Unsafe in Transit Countries, Without Access to Meaningful Protection**

The proposed rule attempts to require many refugees to seek asylum in transit countries that have no formal agreement with the United States and where refugees would not be safe or have access to meaningful asylum procedures, thereby circumventing US law requirements for safe third countries. In Mexico, which would be a transit country for non-Mexican asylum seekers at the southern border, refugees face life-threatening harms. There have been over 13,000 attacks[48] reported against asylum seekers and migrants stranded in Mexico under the Title 42 policy over the past two years in addition to the many attacks suffered under the Trump administration's Remain in Mexico policy.[49] Refugees do not have access to fair asylum procedures in Mexico, where many are at risk of deportation to persecution in their home countries.[50] Black asylum seekers and migrants face pervasive anti-Black violence, harassment, and discrimination, including widespread abuse by Mexican authorities and non-state actors.[51]

El Salvador,[52] Honduras,[53] and Guatemala[54] do not have functional asylum systems that can protect large numbers of refugees, and many transiting through these countries face extreme dangers including gender-based violence, anti-LGBT+ attacks, race-based violence, and other persecution.[55] In fact, Human

---

[46] "Biden Administration Plan to Resurrect Asylum Ban Advances Trump Agenda," Human Rights First, January 2023, https://humanrightsfirst.org/wp-content/uploads/2023/01/AsylumBanFactsheet_final2.pdf (accessed March 21, 2023).

[47] "Biden Administration Plan to Resurrect Asylum Ban Advances Trump Agenda," Human Rights First.

[48] "Title 42: "Human Rights Stain, Public Health Farce"," Human Rights First, December 16, 2022, https://humanrightsfirst.org/library/title-42-human-rights-stain-public-health-farce/ (accessed March 21, 2023).

[49] "US: Asylum Seekers Returned to Uncertainty, Danger in Mexico," Human Rights Watch news release, July 2, 2019, https://www.hrw.org/news/2019/07/02/us-asylum-seekers-returned-uncertainty-danger-mexico (accessed March 21, 2023).

[50] Human Rights First, "Human Rights Stain, Public Health Farce," December 2022, https://humanrightsfirst.org/wp-content/uploads/2022/12/HumanRightsStainPublicHealthFarce-1.pdf (accessed March 21, 2023).

[51] S. Priya Morley et al., "There is a Target on Us" – The Impact of Mexico's Anti-Black Racism on African Migrants at Mexico's Southern Border," Black Alliance for Just Immigration and Instituto para las Mujeres en la Migración, 2021, https://baji.org/wp-content/uploads/2021/01/The-Impact-of-Anti-Black-Racism-on-African-Migrants-at-Mexico.pdf (accessed March 21, 2023).

[52] US State Department, Bureau of Democracy, Human Rights, and Labor, "Country Reports on Human Rights Practices – 2021: El Salvador," https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/el-salvador/ (accessed March 21, 2023).

[53] US State Department, Bureau of Democracy, Human Rights, and Labor, "Country Reports on Human Rights Practices – 2021: Honduras," https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/honduras/ (accessed March 21, 2023).

[54] US State Department, Bureau of Democracy, Human Rights, and Labor, "Country Reports on Human Rights Practices – 2021: Guatemala," https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/guatemala/ (accessed March 21, 2023).

[55] Human Rights Watch, *Deportation with a Layover: Failure of Protection under the US-Guatemala Asylum Cooperative Agreement*.



P.O. Box 159
Nogales, AZ 85628-0159
(520) 287-2370

Kino Border Initiative
Iniciativa Kino para la Frontera

www.kinoborderinitiative.org

Edificio 3, Dept. 401
Colonia Fovissste II,
C.P. 84020 Nogales, Sonora
(631) 316-2086

March 24, 2023

Daniel Delgado
Acting Director
Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security
telephone (202) 447-3459

Lauren Alder Reid
Assistant Director,
Office of Policy, EOIR
U.S. Department of Justice
telephone (703) 305-0289

**Re: Comment on the Proposed Rule by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) on Circumvention of Lawful Pathways, CIS No. 2736-22; Docket No: USCIS 2022-0016; A.G. Order No. 5605-2023**

Dear Acting Director Daniel Delgado and Assistant Director Lauren Alder Reid:

The Kino Border Initiative (KBI) submits this comment to urge the Department of Justice (DOJ) and the Department of Homeland Security (DHS) to withdraw the proposed rule: "Circumvention of Lawful Pathways" in its entirety. These regulations would ban individuals and families fleeing violence and persecution from accessing the protection they desperately need, deserve, and are entitled to under both international (UN 1951 Refugee Convention and 1967 Protocol) and domestic law (Refugee Act of 1980), regardless of how they enter.

To exclusively condition access to asylum at ports of entry on having the means and knowledge to download and operate the CBP One application on a cell phone or tablet device is cruel, inhumane, and completely disconnected from the difficulties endured by people seeking asylum at the southern border. Furthermore, it is unfair to punish individuals and families for the decisions

CLP_PC_020355

they are forced to make to seek safety when US officials deny them regular access to asylum processing at ports of entry.

The KBI is a binational Catholic organization that provides direct humanitarian assistance, such as food, shelter, clothing, and medical attention, to migrants in Nogales, Mexico. Our faith teaches us to welcome the stranger and protect people from violence, especially those most at risk in our society, like women and children. Our faith also informs our involvement in advocacy, since we believe we have a moral obligation to promote laws and policies that protect life and oppose those that treat some lives as disposable. This proposed regulation violates Catholic teaching in that it blocks certain families from seeking protection, which we know in the past has led to death for some of our most at-risk brother and sister migrants.

In 2022, we provided direct assistance and accompaniment to 4485 migrants who expressed violence as their primary reason for migration. These individuals come from a range of geographic locations: 3,730 from Mexico, 268 from Guatemala, 136 from Honduras, 86 from Venezuela, 69 from El Salvador, 58 from Nicaragua, 49 from the U.S., 39 from Haiti, 23 from Ecuador, 12 from Peru, 8 from Cuba, 6 from Russia, and 1 from Guinea.

This direct assistance provides us with a unique understanding of the on-the-ground realities of the southern border. We also collaborate closely with the Florence Immigrant and Refugee Rights Project to provide legal orientation and basic legal assistance to individuals and families who are currently stranded in Nogales, Mexico and attempting to access safety in the US. Current border policies, such as Title 42, force people fleeing violence and persecution to navigate extremely limited options to access safety, placing them in ongoing danger.

**The Proposed Rule Violates US/International Law and Treaty Obligations**
In 1980, Congress passed the Refugee Act, codifying the US' obligations under the 1951 Refugee Convention and Protocol. The Refugee Act of 1980 incorporated into US law non-discriminatory access to asylum, the prohibition against returning refugees to places they would face persecution and the prohibition against improper penalties on asylum seekers based on manner of entry. The proposed rule conditions access to the asylum system on manners of transit and entry, in violation of US and international refugee law. People seeking asylum are fleeing for their lives, which in most cases means their options for when and how they leave their place of origin are extremely limited, as has been recognized since the 1951 Refugee Convention. As we have seen time and again, placing the burden of further restrictions on families in these dire circumstances simply means some will not be able to access safety.

**Asylum Seekers Cannot Access to Meaningful Asylum Processes in Transit Countries**
The proposed rule would require all asylum seekers to make appointments through the CBP One app or be subject to a presumption of ineligibility, unless they can prove they applied for and were

CLP_PC_020356

organized crime members to check if she had tattoos and told by organized crime members at gunpoint that it was too late to be outside at 7 pm.

Jovani* fled Ecuador due to discrimination based on his sexual orientation. He was detained by Mexican Immigration in Southern Mexico, and when the agents found out he was HIV positive, they said so in front of everyone in the detention center. They detained him in a separate cell, where sick people were, and each time they detained an additional person there, they told them that Jovani had HIV.

Juan* a young man from Venezuela  fled due to political persecution and violence. He trekked through the Darien Gap, one of the most treacherous migration routes in the world. Juan recounted seeing people dead along the way and he feared that he would not make it. But he did. And he continued his journey through Panama, Costa Rica, Nicaragua, Honduras, Guatemala, and lastly, Mexico. In Mexico, Juan was extorted numerous times by Mexican authorities, and he was kidnapped three times. He explained that during one of these kidnappings,Mexican Immigration authorities with their faces covered kidnapped him in collusion with organized crime. By the grace of God, he survived and managed to make it to the southern border where he now battles to secure an appointment to seek asylum through the CBP One application. When asked if he tried to seek asylum in another country before seeking asylum in the United States, he said, "My journey through Mexico was worse than anything that I experienced in the Darien Gap. Why would I ever seek asylum in a country that has nearly killed me several times? I cannot stay here. I am not safe here."

**The Proposed Rule Would Force More Asylum Seekers to Cross in Dangerous Ways**
Obstacles to the asylum process, such as Title 42 and the proposed rule, ignore the lived experience of asylum seekers and force families and individuals to seek protection in whatever way they can. Since mid-May of 2018, there has been some type of policy blocking regular, timely access to the asylum system at ports of entry, beginning with the  border-wide policy of so-called metering, which forced families to wait weeks or months in Mexico before accessing a process at a port of entry. Families forced to wait in Mexico have faced discrimination as they attempt to piece together the resources to survive, from hospitals that deny them services in life-threatening situations to schools and daycare centers that refuse to admit students for fear that the violence they are fleeing will follow them. Due to this widespread discrimination, and despite the efforts of the KBI and others, civil society organizations in northern Mexico cannot fill the gap created when families are forced to wait in uncertainty in a region plagued by organized crime and ill-equipped to support families for months while they attempt to access a process that is increasingly designed to exist beyond their reach. For families and individuals in a desperate humanitarian situation, or who fear for their lives in northern Mexico, restrictions on access to the port of entry may make crossing between ports the only viable option. In fact, the DHS Office of the Inspector General concluded

CLP_PC_020359

that limiting the numbers processed at ports does lead asylum seekers who would have otherwise presented legally to cross the border between ports of entry.

The asylum ban does not advance the national security objectives of the federal government. Most asylum seekers do not wish to evade detection but instead to present themselves to CBP to start the asylum process. In the event that people seeking safety who are not able to get an appointment through CBPOne are blocked from access to asylum, smuggling operations and organized crime in Mexico will only gain more power, take individuals on more treacherous routes to evade detection, and Border Patrol will have to invest more resources to detain individuals. In Nogales, we already see the strong control that organized crime exercises over vulnerable individuals. Migrants report that they are forced to pay from $1,000 USD to $15,000 USD to cross into the US to access safety when they would prefer to cross through legal channels. Researchers have documented the way obstacles to asylum strengthen organized crime groups at the border, and this ban will only contribute to the problem, rather than promoting safety and security.

**The Proposed Rule Would Disproportionately Harm Vulnerable Asylum Seekers**
The proposed rule also disproportionately harms the most vulnerable asylum seekers. The rule would discriminate against people seeking safety based on their manner of transit and entry, disproportionately impacting people who do not have the resources to enter the US by plane and who must present themselves at the Southern border. What distinguishes a person who presents at the port of entry and a person who crosses between ports is not their desire to follow the law, but rather the resources they have access to: whether or not they can get a visa to travel to the US based on their country of origin, whether they can financially afford to travel by plane, what kind of access to legal information they have, and whether they can afford passport processing fees, among other factors. The ban on access to asylum for individuals who cross between ports is an unjust approach and punishes people based on lack of access to resources.

For example, Brenda* and her 2 children are fleeing violence in Southern Mexico. They spent 4 months in Matamoros, Tamaulipas, Mexico waiting for a chance to seek asylum and tried for 6 weeks to schedule an appointment through CBPOne. They felt very unsafe in Matamoros and almost never went outside. Finally, they decided to try to cross through the desert, out of their desperation to access safety in the US.

**CBPOne Denies Access to Asylum and Inflicts Harm**
Further, this rule requires asylum seekers at the southern border to use the CBPOne application to access the asylum system, despite the well-documented reality that CBPOne is impossible for many asylum seekers to use or access. The application requires that asylum seekers own a smartphone, can pay for internet and phone data to use the application, are literate in one of the 3 languages in which the application is offered, have the technological literacy to navigate an

CLP_PC_020360

application, and the resources to spend months trying to schedule an appointment on an application full of technological glitches and offering an extremely limited number of slots.

This requirement bans the most vulnerable asylum seekers from seeking asylum, such as Black and Brown asylum seekers who encounter racialized facial recognition bias in the application, people who speak indigenous languages or other languages not offered in the application, people with literacy challenges or learning disabilities, and those with scarce financial resources. This month, 35 Members of Congress expressed their opposition to the proposed rule and its requirement that asylum seekers use the CBPOne application due to the grave harm it has already caused. For instance, after a family from Cuba had been trying for weeks to get an appointment and finally scheduled one for February 3, 2023 , their 17-year old son was murdered in Monterrey, Mexico before that day ever came. At KBI, we have also received reports about the dangers that families and individuals face while waiting for their appointments.

Jaime,* his wife and his son fled Venezuela and arrived in Piedras Negras, Coahuila. There, they were able to schedule an appointment through CBP One, but the only available appointment was in San Ysidro, Baja California, over 1200 miles away. While traveling to San Ysidro by bus, the entire family was kidnapped, tortured, and extorted by a criminal group. The people who boarded the bus identified themselves as Mexican immigration agents, and after asking Jaime and his family where they were from, told them they needed to get off the bus so they could check their documents. These supposed immigration agents brought them to a house, where they were held for 20 days, extorted, and tortured. One night at 3:00 a.m., they were blindfolded, put in a truck and taken to the border wall. They said they had to walk and cross and if they tried to come back, their captors would kill them. Once they crossed, they called 911 and explained what happened. Border Patrol arrived and they explained that they had been kidnapped, had missed their CBP One appointment while being held hostage, and were forced to cross. The agent responded that they were the criminals, as they had crossed illegally. A few hours later, Border Patrol expelled them to Nogales, Mexico.

The CBPOne application also separates families. The extremely limited number of appointments available means every morning that new appointments are released, they are gone in a matter of seconds. Average-sized families of 3 or 4 people have found it nearly impossible to get an appointment for all members of their family. This means that families are forced to separate when they can only secure appointments for 1 or 2 family members at a time.

KBI has been advocating for 17 families who faced family separation/rejection at the POE in February 2023. Out of these families, 5 are from Haiti. These families reported that they had been attempting to schedule an appointment for all their family members for weeks, but were not able to. Some of them missed the larger batch of appointments that were originally made available on January 12, 2023 because at that time, CBPOne was not available in Haitian Kreyol. All of the

Haitian families have a child/children 5 years or younger, were only able to schedule CBPOne appointments for one parent, and therefore, faced family separation and/or rejection at the Nogales POE.

These families reported that even though none of them were allowed to enter as a complete family unit, they saw other families who were able to do so, despite not having all family members on their appointment. Some of these families were made to form a line at the POE with other families whose children lacked appointments and saw 8-9 families before them be allowed to enter, only to be denied the same opportunity because CBP officers told them they had already let in enough families. When the families began to speak out against this injustice, CBP officers began to threaten to call the Mexican police if they didn't leave and started yelling loudly: "GO! GO AWAY!"

In the case of 3 families, CBP refused to allow their young child[ren] to enter with the parent who had the appointment because the children's names were not on the appointment. This resulted in family separations that have greatly affected these children. These families report that their young children who have been separated from their mothers or fathers cry nonstop, have difficulty sleeping, refuse to eat, or fear being out of sight of the parent they remain with for even a moment.

To illustrate this pattern, here are the details of one of these instances:

In mid-February 2023, Jesús*, Rosa* and their 2 kids approached the port of entry with a CBPOne appointment. The application would only allow the family to list Jesús and Rosa and would not permit them to add their 2 children, ages 4 and 6, to the same appointment. The CBP agent at the Nogales POE said the children could not be admitted because they were not registered, and if Jesús and Rosa wanted to keep their appointment, they would have to cross and leave their children behind. Jesús asked if he and his son could cross together instead, so that Rosa would only have to try to secure an appointment for 2 people, rather than 4 if they all stayed. The official aggressively responded that he could not. As they tried to figure out what to do, CBP officials said if they didn't vacate the premises they were going to call the Mexican police to remove them. Jesús finally decided he would cross alone, so that he could find a way to support his family, figuring it would be slightly easier for Rosa to secure 3 appointments. After informing the officer of his decision, the officer asked Jesús, "Are you really going to leave your family all alone?" As a result of these obstacles to seeking asylum as a family unit, Jesús and his family decided he would cross alone.

**Inadequate Safeguards for Rogue Officer Behavior: Case of CBPOne Rejections**
In Nogales, the Port of Entry processes 40 CBPOne appointments daily: 20 at 7 am and 20 at 12 pm. On March 18, 2023, KBI received 13 reports of people who presented at the POE with

CATHOLIC LEGAL
IMMIGRATION
NETWORK, INC.

8757 Georgia Avenue ● Suite 850 ● Silver Spring, MD 20910● Tel: 301.565.4800● Fax: 301.565.4824 ● Website: www.cliniclegal.org

Submitted via www.regulations.gov

March 24, 2023

Daniel Delgado, Acting Director
Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security

Lauren Alder Reid, Assistant Director, Office of Policy,
Executive Office for Immigration Review
U.S. Department of Justice
5107 Leesburg Pike, Falls Church, VA 22041

**RE: DHS RIN 1615-AC83/EOIR RIN 1125-AB26 or Docket No. USCIS 2022-0016/A.G. Order No. 5605-2023 Public Comment Opposing Proposed Rule: Circumvention of Lawful Pathways**

The Catholic Legal Immigration Network, Inc. or CLINIC[1], submits these comments regarding the Notice of Proposed Rulemaking, or proposed rule, titled Circumvention of Lawful Pathways, which would deny most people the right to seek asylum at the southern border and disqualify asylum seekers who don't seek asylum at an official U.S. port of entry. Our organization strongly urges the Department of Justice (DOJ) and Department of Homeland Security (DHS) to withdraw this proposed rule in its entirety.

Embracing the Gospel value of welcoming the stranger, CLINIC has promoted the dignity and protected the rights of immigrants in partnership with a dedicated network of Catholic and community legal immigration programs since its founding in 1988. CLINIC's network, originally comprised of 17 programs, has now increased to more than 450 diocesan and community-based programs in 49 states and the District of Columbia. CLINIC is the largest nationwide network of nonprofit immigration programs. In partnership with its affiliates, CLINIC advocates for the just and humane treatment of noncitizens. Many of CLINIC's affiliates offer legal services to help qualified noncitizens apply for asylum, an immigration benefit that will be affected by this proposed rule.

As a Catholic organization, we base our work with immigrants on our belief in the fundamental and equal dignity of all people as created in the image of God, as well as our call as Christians to welcome the stranger and care for the vulnerable. Catholic social teaching on immigration strongly supports the right of migrants to seek asylum. The U.S. Conference of Catholic Bishops has consistently condemned policies that would weaken asylum access, including this and previous iterations of an asylum or transit ban.

---

[1] Reena Arya, Supervising Senior Attorney; Elnora Bassey, Policy Advocate; Elizabeth Carlson, Senior Attorney; Joanna Mexicano Furmanska, Senior Attorney; and Tania Guerrero, Project Attorney authored these comments. The authors would like to thank Michelle Sardone for her contributions to this comment.

CLP_PC_020658

high.[14] Similarly, the three Northern Triangle countries remain in the top ten countries for numbers of affirmative asylum grants by USCIS.[15] And although the numbers of asylum seekers from the Northern Triangle at the border have dropped in recent years,[16] this drop is likely due to the use of Title 42 policies curtailing asylum access at the border, not to a decrease in viable claims for asylum. A program that only benefits those who can wait patiently in their home countries, demonstrate proven connections with those in the United States that have resources, have access to passports and only benefit a small subset of the countries of origin for all migrants arriving at the border, is not a sufficient substitute for an asylum system in the United States.

**B. Requiring the use of the CBP One application as a precondition for asylum eligibility violates U.S. asylum law.**

The proposed rule requires that asylum seekers download the CBP One application on their phones and search for an appointment to present themselves to Customs and Border Protection, or CBP, in order to seek asylum. Given the technical difficulties many have with using CBP One, its existence has been equated to another 'metering' system, which the courts have found to be illegal.[17] Under the metering system, asylum seekers had to schedule a time to come to the U.S. Port of Entry to seek asylum.

The administration's requirement that asylum seekers must access this application in order to be eligible to apply for asylum is also concerning for a variety of other reasons.[18] For one, advocates and asylum seekers have both complained that the application requires reliable internet for a sustained period of time in order to successfully and consistently search within it for an appointment with CBP. Many asylum seekers on the border do not have access to reliable and consistent internet, which means scheduling an appointment via their mobile phones is not a viable option for them. These asylum seekers should not be deemed ineligible for asylum simply because they lack the technological capacity to make an appointment on a mobile application or because the government has placed an unlawful condition on the right to seek asylum.

The proposed rule indicates that the majority of asylum seekers at the border have cellphones. However, the CBP One app is not compatible with all cellphones. Many times, the glitches are due to the incompatibility between app and cellphone. It is plainly inequitable to condition the right to seek asylum on an individual's ability to obtain a smart phone, particularly a recent model, just to be able to schedule an appointment and present themselves at a port of entry.

Another significant glitch in the CBP One app is in the facial recognition feature. As a requirement to complete registration, asylum seekers must have their faces scanned for facial recognition. Many times, this feature freezes or marks error.

---

[14] *A Sober Assessment of the Growing U.S. Asylum Backlog*, TRAC IMMIGR. (Dec. 22, 2022), trac.syr.edu/reports/705/.

[15] *Yearbook of Immigration Statistics 2021*, U.S. DEP'T OF HOMELAND SEC., tbl 17, "Individuals Granted Asylum Affirmatively by Region and Country of Nationality: Fiscal Years 2012 to 2021," https://www.dhs.gov/immigration-statistics/yearbook/2021 (last updated 3/3/2023).

[16] Diana Roy, *Ten Graphics that Explain the U.S. Struggle with Migrant Flows in 2022*, COUNCIL ON FOREIGN RELATIONS, Dec. 1, 2022, https://www.cfr.org/article/ten-graphics-explain-us-struggle-migrant-flows-2022

[17] *Al Otro Lado Inc., Et al. V. Mayorkas, et al.*, S. POVERTY L. CENTER, https://www.splcenter.org/seeking-justice/case-docket/al-otro-lado-inc-et-al-v-mayorkas-et-al (last visited Mar. 24, 2023).

[18] Jack Herrera, *Fleeing for Your Life? There's an App for That*, TEX. MONTHLY, March 2, 2023, https://www.texasmonthly.com/news-politics/cbp-app-asylum-biden-administration/.

CLP_PC_020662

In Juarez, an advocate who was trying to assist asylum seekers complete their registration, struggled for one hour to take the picture of a young man. This young asylum seeker was one of several dozen awaiting assistance. The facial recognition feature in the app is a serious limitation for asylum seekers to complete registration and be able to utilize the app to schedule an appointment. Another asylum seeker shared she had finalized her registration, and when she tried to enter the app later in the day, it failed to recognize her. After many attempts, she was able to access the platform; however, she continues to have this recurring issue.

The CBP One app has a feature that does consider the loss or destruction of the cellphone which allows for people to access their accounts through borrowed cellphones with a series of codes as a security measure. This in practice, translates into people locking themselves out of the app and having to re-register. Also, despite an asylum seeker having the option to borrow a phone to register, the app continues to place asylum seekers who do not own a compatible smart phone at a disadvantage because it reduces their probability to obtain an appointment. It is taking months for someone who does own a compatible smart phone to schedule an appointment; for someone who does not own a phone, it is essentially impossible. The CBP One app is inequitable and marginalizes those who are already in dangerous circumstances.

The proposed rule does allow for an exception to asylum ineligibility if a person is unable to utilize the CBP One app, but the individual bears the burden of proving that they were unable to use the app. A person arriving at the southern border can rebut the presumption of asylum ineligibility if they can show by "a preponderance of the evidence that it was not possible to use the scheduling system [due to illiteracy, a language barrier or significant technical challenge] and other compelling reasons." However, those who face language barriers and illiteracy are the most vulnerable and unlikely to be able to explain how their challenges make it harder for them to navigate these intricate asylum procedures. Many people who are unable to use the app will find it difficult or impossible to demonstrate that the app was inaccessible to them.

There is an extremely vulnerable group of people who are disenfranchised by the CBP One app, such as those without cellphones, those who are illiterate, those who lack access to a working internet, and those with disabilities. The proposed rule does carve out exceptions for this group but only in theory. In practice, this population is not able and/or is unaware of how to make these circumstances known to an officer without being intimidated by them or threatened and physically assaulted by Mexican authorities.

For instance, Magdalena*[19], a woman fleeing her home in Guerrero, Mexico with her three minor children has been stranded in a border town for three months. She and her children are perceived as foreigners in their own country. They are Mixteco and speak very little Spanish. They have experienced prolonged homelessness, racial discrimination, and physical abuse while attempting to not be found by the cartel that murdered her husband and her children's father. Magdalena and her children have unsuccessfully attempted to present themselves at a U.S. port of entry. Mexican authorities serve as the first barrier to safety. U.S. officers have expelled the family, returning them directly to danger. Magdalena never had an opportunity to explain her situation to anyone.

The CBP One app is the ultimate barrier for this family to seek protection. Magdalena does not have a cellphone. She does not know how to read or write in any language and is constantly worried about the safety and well-being of her children, while mourning the loss of her husband and her entire life as she knew it.

---

[19] Names with asterisks have been changed for privacy purposes.

CLP_PC_020663

Conditioning the access to asylum on the use of the CBP One app has left Magdalena and her family in immense danger without an opportunity to explain her circumstance to any U.S. immigration authority. Under the proposed rule, Magdalena bears the burden of proving that she and her children were unable to use the app to be able to rebut the presumption of asylum ineligibility if they can show by a preponderance of the evidence that it was not possible to use the scheduling system due to Magdalena's illiteracy and technical challenge. Despite exceptions in the proposed rule, it is certain that in practice, having an opportunity to prove any of these exceptions would be impossible.

### C. Applying for asylum and awaiting a subsequent denial in a third country is nearly impossible for most fleeing asylum seekers.

The proposed rule outlines that one can be exempted from the presumption of asylum ineligibility if they apply for and are denied asylum in a third country. This is essentially a transit ban similar to the one the prior administration issued in 2019, which was finally struck down by the courts in 2021. In East Bay Sanctuary Covenant v. Barr, the Ninth Circuit held the prior "transit ban" was "not in accordance with the law" or "in excess of statutory limitations" because it was inconsistent with the safe third country bar to eligibility to apply for asylum or the firm resettlement mandatory bar to asylum.[20]

The Ninth Circuit made clear that the prior administration's Transit Ban ran afoul of the safeguards established by Congress. One such safeguard, is the safe third country bar which explicitly requires that there be a formal agreement between a 'safe third country', such as we have with Canada, and that there should be a 'full and fair' asylum system.[21] The second safeguard, found within the exceptions to the firm resettlement mandatory bar to asylum, applies to asylum seekers who face persecution in the country of asylum or those who never intended the country of asylum to be their final destination. The Ninth Circuit stated that "[t]he sole protection provided by the [Final] Rule is its requirement that the country through which the barred [asylum seeker] has traveled be a 'signatory' to the 1951 Convention and the 1967 Protocol" without requiring these countries have any meaningful or established asylum procedures.[22] The Ninth Circuit twice held that "[t]his requirement does not remotely resemble the assurances of safety built into the two safe-place bars of § 1158 [firm resettlement bar exceptions and safe third country bar]," and in fact is inconsistent with those provisions.[23] The Transit Ban was finally struck down in 2020.[24]

The countries asylum seekers most often travel through, namely Mexico and other Central American countries, do not have asylum procedures similarly structured to that of the United States, have backlogged asylum systems, and are generally unsafe.[25]

For example, in Mexico, asylum seekers must reside in the state where they applied for asylum and cannot go to other parts of the country where they have connections or are able to find work. They also must apply for asylum within 30 days after entering Mexico,[26] rendering many migrants ineligible by the time they start to understand

---

[20] *East Bay v. Barr*, 964 F.3d 832, 841, 845-49 (9th Cir. 2021).

[21] Id. at 841.

[22] Id. at 847.

[23] Id. at 845-49.

[24] *CAIR Coalition v. Trump*, 19-2117, 2020 WL 3542481 (D.D.C. Jun. 30, 2020).

[25] *Is Guatemala Safe for Refugees and Asylum Seekers?*, HUMAN RIGHTS FIRST (June 2019), available at https://humanrightsfirst.org/wp-content/uploads/2022/10/IsGuatemalaSafeforRefugeesandAsylumSeekers.pdf.

[26] *Key Points on Access to Asylum in Mexico, Protections for Migrant Children and U.S. Cooperation*, WOLA (Mar. 23, 2021), https://www.wola.org/analysis/key-points-migration-march-2021/.

CLP_PC_020664

 

# Mexican Asylum System for U.S. Immigration Lawyers FAQ
November 2019

<u>Summary</u>

Mexico has adopted a broader refugee definition than the U.S. and grants a higher percentage of asylum applications. Recognized refugees in Mexico can access rights to work, healthcare, education, and family reunification. Recent U.S. policy changes, however, have overwhelmed the Mexican asylum system and pushed Mexico to militarize its southern border, leading to long wait times, poor-quality decisions, and high levels of detention and deportation without access to the asylum system. Legal barriers, including a bar to applications submitted more than 30 days after entering the country, further limit access to the asylum process. The legal and practical challenges within Mexico's asylum system make clear that it cannot replace the U.S. role in refugee protection. Nonetheless, Mexico may offer better options for certain refugees who cannot find international protection in the U.S. A better understanding of the Mexican asylum system may help U.S. lawyers advise clients who are subject to the U.S. third-country-asylum rule or who are deciding where to seek asylum.

**Who is protected by Mexico's asylum law?**  2

**What is the Mexican asylum process?**  3

**What rights do asylum seekers have during the process?**  4

**What rights are granted with asylum status?**  4

**What is the grant rate?**  5

**What are the barriers to asylum?**  5

**How has recent U.S. policy affected asylum in Mexico?**  6

**Accessing and interpreting Mexican asylum records as a U.S. immigration lawyer**  8

*What does a denial of asylum look like? What are other possible statuses from the Mexican asylum system?*  8

*How do I get my client's records from the Mexican asylum system?*  9

**How can I get more involved with Asylum Access Mexico?**  10

**What other resources are available on the Mexican asylum system?**  10

CLP_PC_020773

 

**Who is protected by Mexico's asylum law?**

Legal Framework:

1. 1951 Convention Relating to the Status of Refugees
2. Mexican Constitution, Article 11, guarantees the right to seek & receive asylum
3. Cartagena Declaration: voluntary regional protection framework
4. Law of Refugees, Political Asylum, and Complementary Protection (2011) and its implementing Regulation (2012)

Mexico has acceded to the 1951 Refugee Convention and its 1967 Optional Protocol, and signed the Cartagena Declaration, a nonbinding regional protection framework. The Mexican Constitution guarantees the right to seek and receive asylum. The Mexican Refugee Law, passed in 2011, establishes the asylum process. This law has a broad definition of refugees eligible for asylum.

A refugee in Mexico is someone who is outside their country of origin and:

- cannot return to that country due to a well-founded fear of persecution on account of race, religion, nationality, political opinion, membership in a particular social group (1951 Convention categories), or gender (added by Mexican asylum law); or
- has fled their country because their life, safety, or freedom was threatened by generalized violence, foreign aggression, internal conflict, massive human rights violations, or other circumstances that have gravely disturbed public order (Cartagena Decl.).

An asylum seeker may be recognized under either prong of the refugee definition. All asylum petitions are decided under the same process and all recognized refugees enjoy the same protections. It is incumbent upon the government to analyze all potential grounds for protection and to issue a well-reasoned decision explaining the rationale for a grant or denial of any individual petition. If a person does not meet the refugee definition, they still may be eligible for complementary protection if they have a well founded fear of torture or their life is in danger in their country of origin.

The Mexican government has indicated to the UN High Commission for Refugees (UNHCR) that it will apply the Cartagena Definition to all Honduran and El Salvadoran asylum seekers. This implies *prima facie* recognition that these countries are plagued by generalized violence and/or massive human rights violations. Therefore, an asylum seeker from these countries only needs to show (1) they are from the country (2) they

 

left due to violence or human rights violations; and (3) they are not excluded for committing a serious crime or human rights violation in their country of origin.

Other relevant laws to know:
1. Law for the Protection of Children:
    a. Outlaws administrative detention of children
    b. Obligates the state to act according to the best interest of the child
2. Immigration Law:
    a. Defines legal statuses, including the humanitarian status
    b. Recognizes rights to free transit, healthcare, and education
    c. Creates immigration detention and deportation process

**What is the Mexican asylum process?**



Agencies:
- COMAR: Mexico's refugee commission, la Comisión Mexicana de Ayuda a Refugiados
- INM: Mexico's immigration institution, el Instituto Nacional de Migración

Petition: Asylum petitions should be presented to either COMAR or INM. COMAR is ultimately responsible for the process and its staff are specially trained in asylum practice. INM acts as an intermediary in the many parts of the country without COMAR offices.

Documentation: Upon application, an asylum seeker should be issued a *constancia*. This document proves legal status, is valid throughout the process and protects against deportation. Constancias should be issued immediately but may take weeks to months because of administrative delays.

3

CLP_PC_020775

 

Consideration: Under law, COMAR has 45 working days to make a decision or 90 working days under exceptional circumstances. Due to backlog, COMAR has recently said that all cases are exceptional and thus subject to the 90-day deadline. This deadline is regularly missed. Consideration can now take 6 months to a year.

Interview: COMAR interviews asylum seekers. The applicant may bring an attorney but is not provided with one. An attorney can help an applicant prepare for the interview, compile evidence and country of origin information, and ensure the interviewer conducts a thorough and legally compliant interview.

Decision: COMAR is required to issue a well-reasoned, written decision, laying out the justification for a grant or denial. If asylum is granted, the applicant becomes a permanent resident. Denials may be appealed administratively and then subjected to judicial review.

**What rights do asylum seekers have during the process?**

While waiting for a final decision, an asylum seeker should be issued a *constancia*, which documents legal status, and an ID called a Clave Único de Registro de Población (CURP) that permits them to access employment, education, and healthcare. Due to administrative issues, many asylum seekers are not issued CURPs, and even those who have them may be denied access to rights. Legal aid significantly improves the chances of an asylum seeker receiving a CURP and/or accessing rights.

**What rights are granted with asylum status?**

If asylum is granted, the asylum seeker becomes a permanent resident with the right to stay indefinitely, access employment, healthcare, and education, and apply for naturalization after four years. The naturalization process is long and expensive, however, and few refugees have, as of this date, availed themselves of this process.

Recognized refugees can pass on derivative beneficiary status to family members with them in Mexico and may file reunification petitions for family members outside the country. Family reunification is available for extended family members (up to 4th-level relatives, including cousins, great-grandparents, great-grandchildren, aunts, uncles, etc.), but the petitioner must show a financially-dependent relationship with the beneficiary.

CLP_PC_020776

 

**What is the grant rate?**

The 2019 asylum grant rates averaged 71%, according to COMAR. This varies by nationality. The grant rate for Guatemalans was only 34% while the rate for Venezualans was 99%. When complementary protection is considered, the grant rate rises to 86%. However, this does not count abandoned cases or people deported without the opportunity to apply for asylum.

**What are the barriers to asylum?**

1. *30-Day Bar*

Mexican law requires that asylum applicants apply within 30 days of entering the country or show good cause for not having done so. COMAR interprets good cause broadly, and has issued waivers based on lack of information about the process, language barriers, detention, incapacity, incompetence, or similar circumstances. Applicants with competent counsel usually receive waivers. Mexico regular deports or coerces "voluntarily return" of pro se asylum seekers subject to the 30 day bar. Asylum Access Mexico is challenging this law in the courts but it is in force currently.

2. *Travel Restrictions*

An asylum seeker must remain in the state where they first applied throughout the pendency of their claim, and must sign a form in the state's COMAR or INM office weekly or biweekly to prove their presence. Violation of this regulation will lead COMAR to deem the application abandoned.

Because most asylum seekers are near the southern and northern borders, this restriction is a significant burden. Mexico's southern border is poorer, has worse infrastructure, and fewer job opportunities than the rest of the country. There is also a significant presence of Central American gangs and other agents of persecution in the southern states. The northern border states are plagued by violent crime, kidnappings, and high presence of drug cartels. In either case, with the current backlog, asylum seekers may be stuck where they apply for over a year.

5

CLP_PC_020777

 

3. *INM processing instead of COMAR*

In many parts of the country, including many of the places refugees are gathered at the northern border, there are no COMAR offices. Therefore, refugees must solicit asylum through INM. This creates substantial problems. INM acts as an intermediary, sending applications to COMAR for issuance of status documents and final decisions, which slows down the process considerably. Moreover, INM officers are not trained to sensitively interact with vulnerable or traumatized populations. Although eligibility interviews are done by COMAR (often by phone), INM officials supervise check-ins, receive and transmit documents, and regularly provide erroneous legal advice to asylum seekers.

4. *Language barriers*

Many refugees in Mexico do not speak Spanish fluently. Some speak indigenous languages, Hatian Creole, or come from African or Asian countries. Mexican law requires that the asylum process be conducted in a language the asylum seeker understands, but this requirement is routinely ignored and translators are rarely provided.

5. *Militarized immigration enforcement*: see below

**How has recent U.S. policy affected asylum in Mexico?**

Recent U.S. policies, including metering, the Migrant Protection Protocols, the third country transit rule and tariff threats, have had substantial effects on the Mexican immigration system, leading to an overburdened system and militarized enforcement.

Overburdening of the Asylum System

U.S. policies have made it much more difficult for refugees to claim asylum at the U.S. border. Under the "metering" system, Customs and Border Patrol allows only a small, unpredictable, number of asylum seekers to approach a border gate in a day. Asylum seekers are required to put their names on informal lists at the border and wait for weeks or months for their number to be called. Under the Migrant Protection Protocols, asylum seekers are required to wait in Mexico for their hearings in U.S. immigration court. Under the Third Country Transit rule, the Trump Administration has announced

CLP_PC_020778

 

the intention to deny asylum to any applicant who passed through a third country on their way to the U.S. border without soliciting asylum there. The combined effect of these policies is to leave tens of thousands of refugees who intended to seek asylum in the U.S. waiting in Mexico. Some of the affected migrants will decide to stay in Mexico.

These policies have contributed to a substantial increase in refugees seeking asylum in Mexico and the Mexican government has not provided a commensurate budgetary increase to process the applications. COMAR is severely under resourced in comparison with current demand. It only has around 48 protection staff deciding the cases of up to 80,000 asylum seekers.



There have been 60,000 asylum petitions so far in 2019 and COMAR estimates there will be 80,000 by the end of the year. In 2015, there were 5,000 claims and the number was increasing linearly before skyrocketing in 2019 due to U.S. policy changes. The 2015 budget was 25 million pesos (est. $1.3M USD), while the 2019 budget was only 20 million pesos (est. $1M USD). The current 2020 budget is 27 million (est. $1.4M USD). Under these circumstances, COMAR cannot hire or train the needed staff or give applications the necessary attention. This new demand has put a huge stress on the Mexican asylum system and led to an enormous backlog in applications, leaving refugees waiting for over a year.



 

Militarized Immigration Enforcement under Tariff Threats

In June 2019, the Trump administration threatened significant tariffs on virtually all Mexican exports unless Mexico acted immediately to curtail migration to the U.S. Mexico responded drastically, deploying 6,000 National Guard troops to the southern border, militarizing the southern states and making it much harder for migrants to travel. It increased detention and deportations. It stopped regularly issuing travel permits for refugees to travel to the U.S. border. It threatened private transportation companies and migrant rights activists with human trafficking prosecutions.

This has had a significant impact on the safety and security of migrants throughout Mexico. Refugees are attempting more dangerous routes and have drowned trying to take boats up the Chiapas coast. Those who are detained are frequently deported without the opportunity to claim asylum.

**Accessing and interpreting Mexican asylum records as a U.S. immigration lawyer**

The Trump Administration's third country transit rule requires U.S. authorities to deny asylum to anyone who passed through another country without seeking asylum there before arriving at the U.S. border. The rule does not apply to anyone who receives a "final judgment" denying protection in a third country. This rule is being challenged in court but the Supreme Court has permitted it to go into effect during litigation. Many U.S. immigration lawyers are attempting to determine how this rule will be applied. Immigration lawyers may need to show that their client has been denied asylum in Mexico or to advise a client to attempt to seek asylum in Mexico prior to entering the U.S. Asylum Access cannot provide an opinion as to how the U.S. government will interpret this rule, but the following sections may help U.S. immigration lawyers to access and interpret Mexican asylum records.

**What does a denial of asylum look like? What are other possible statuses from the Mexican asylum system?**

We do not know how the U.S. immigration system will apply this policy or interpret Mexican law. However, here are some possible scenarios:

1. Denial on the merits: the client's case has been fully adjudicated and found not to meet the criteria for Mexican asylum. The first denial will be issued by COMAR. It

CLP_PC_020780

 

is unclear if US Immigration Judges and Courts will consider this to be a "a final judgment denying the alien protection" under the IFR. As noted, a denial from COMAR can be administratively appealed through a 'Recurso de Revision,' within 15 days of issuance of the decision. It is virtually impossible for an asylum seeker to be successful in this administrative appeal without legal counsel, and *pro se* appeals will likely be denied on procedural grounds. Following administrative denials, an asylum seeker may seek judicial review through an 'Acción de Amparo' (similar to a request of injunction or writ of mandamus). Asylum Access cannot offer any opinion as to how the U.S. government will interpret the term 'final judgment,' and as of this writing, no official guidance has been issued. A redacted example of a final denial is available [here](#).

2. Denial for the 30-day bar: the client's application has been rejected because they applied more than 30 days after entering the country without showing good cause. This denial can also be subject to administrative or judicial review. Their case has not been adjudicated on the merits. Again, it is unclear how this type of denial will be interpreted under the IFR.

3. Abandonment: the client left the state in which they initially applied for asylum, or failed to comply with the signing/registration requirements to prove presence, and COMAR determined the case to be abandoned.

4. Humanitarian status
   a. Asylum seekers are granted temporary humanitarian status during the pendency of their claims.
   b. The document does not mean the application has been accepted or denied. It is not permanent residency.

5. Grant of Complementary Protection: COMAR determines an asylum seeker does not meet the refugee definition but has a well founded fear of torture, cruel, inhuman or degrading treatment, or death in their country of origin. This protection includes a grant of permanent residence, but no family reunification or straightforward path to naturalization.

6. Asylum grant

**How do I get my client's records from the Mexican asylum system?**
There are several options:
1. Go to a Mexican consulate in the U.S. with a written authorization from a client (preferably notarized) and file a formal records request. The consulate will then request the records from COMAR. This is the process COMAR suggests but not all consulates have cooperated consistently.

CLP_PC_020781

 

2. Have your client give power of attorney to a Mexican attorney to request the records from COMAR.
3. Request the records from UNHCR with a privacy waiver from your client.

**How can I get more involved with Asylum Access Mexico?**

Asylum Access Mexico (AAMX) has 7 offices throughout Mexico where we help refugees access their rights through legal services, help them find jobs and cultural opportunities through the Hospitality Route, and advocate for improvements to access to and quality of asylum.

We have a robust volunteer program and are frequently hiring staff. See asylumaccess.org for more information.

Follow Asylum Access Mexico on Twitter @AsylumAccessMX (mostly in Spanish) and Asylum Access global @AsylumAccess (mostly in English).

Any other questions? Email brynne.oneal@asylumaccess.org

**What other resources are available on the Mexican asylum system?**

Mexico's Secretary of Government has collected legal sources on refugee and asylum law: https://www.gob.mx/comar/documentos/marco-juridico-en-materia-de-refugiados

COMAR: https://www.gob.mx/comar

United Nations Refugee Agency Mexico: https://www.acnur.org/mexico.html

CLP_PC_020782



The Jacob Burns Community Legal Clinics

March 27, 2023

Secretary Alejandro Mayorkas
Department of Homeland Security
U.S. Citizenship and Immigration Services
5900 Capital Gateway Drive
Camp Springs, MD 20746

Re: DHS Docket Number USCIS 2022-0016, Circumvention of Lawful Pathways

Dear Secretary Mayorkas,

Thank you for the opportunity to submit this comment regarding the Department of Homeland Security's proposed changes to the asylum regulations. We are both student-attorneys at the George Washington University Law School's Immigration Clinic. As a community legal clinic serving clients in the Washington, D.C. area since 1979, we provide pro bono representation to clients from around the world on immigration law matters, including removal proceedings and petitions for affirmative and defensive asylum, before federal administrative tribunals. Both of us currently represent incredibly brave individuals who escaped unbelievable circumstances and endured grueling hardship to make a new life for themselves in this great country through asylum. One of our clients, E-M-G, is a young woman from El Salvador who faced a vicious gang that murdered her brother and claimed her as their prize before escaping through a coyote and being admitted at our southern border. M-P-M, also a native and citizen of El Salvador, fled her home country because the local gangs and police targeted her on the basis of her identity as a transgender woman and work as a health rights activist. E-M-G now works full-time and cares for her five-year-old daughter as a single mother, and M-P-M has similarly established a new life for herself utilizing the protections afforded to her as an asylum seeker.

Both of these women faced true desperation, entrusted their lives to the benevolence of the United States, and now are already contributing to the country that saved their lives. Simply put, these women represent the purest form of the American Dream. However, the proposed rule perversely denies deserving asylum seekers like them an opportunity to have their cases fairly adjudicated by imposing unrealistic technological, logistical, and evidentiary requirements, exposing migrants to additional harm and serving as a constructive ban on asylum in direct contravention of domestic law and international treaties.

GW | LAW

The Jacob Burns Community Legal Clinics

I.    **The proposed rule violates our legal and moral commitments to asylum seekers.**

Although we commend the Department of Homeland Security for introducing parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela, such an expansion cannot serve as a justification for the proposed restrictions on asylum seekers. In particular, it is unconscionable to restrict asylum pathways at the southwest border to individuals who have either scheduled an appointment to arrive at a port of entry or sought asylum in a third country before entering the United States but were denied. Because those requirements are unrealistic, the proposed rule flies in the face of well-established domestic law which provides that, "*any alien who is physically present in the United States or who arrives in the United States…irrespective of [their] status, may apply for asylum.*"[1] This unambiguous statutory language reflects and implements our international treaty obligations to a widely inclusive definition of "refugee" and the principles of non-discrimination and non-penalization for asylum seekers.[2] The proposed rule, however, would exploit the statutory language of "may apply"[3] to impose a discriminatory condition on asylum seekers' eligibility for protections that penalizes statutorily eligible asylum seekers based on adherence to arbitrary procedural requirements, in clear violation of the letter and spirit of our domestic law and international treaty obligations. If enacted, the proposed rule will fail to serve as any type of fix to a broken immigration system. Rather, it will inevitably impose further harms on migrants simply seeking to exercise a legal right codified under both U.S. and international law.

II.    **The proposed rule denies asylum seekers a meaningful and realistic opportunity to seek protection in the United States.**

Setting aside the parole pathways program, which applies only to nationals of certain countries, the proposed rule requires the broad swath of migrants entering at the southwest border to seek asylum in the United States via one of two burdensome pathways: an appointment to arrive at a port of entry or proof of application and denial of asylum in a third country through which they traveled. The former incorrectly presumes that the average migrant has the means to possess and maintain a fully functioning smartphone on their journey to the United States and the latter disregards the discrimination, including other serious harms, migrants often face in third countries, especially Mexico.

A. The CBP One App imposes unrealistic technological and logistical requirements on asylum seekers.

The proposed rule provides that, "once the Title 42 public health Order is terminated, the United States will expand implementation of the CBP One application…for noncitizens to schedule a time to arrive at ports of entry...to allow an increasing number of migrants who may

---

[1]  8 U.S.C. § 1158(a)(1).
[2]  Protocol on the Status of Refugees art. 31, Jan. 31, 1967, 606 U.N.T.S. 267.
[3]  8 U.S.C. § 1158(a)(1).

**The George Washington University Law School**

2000 G Street, NW | Washington, DC 20052

t 202-994-7463 | f 202-994-4946 | f 202-994-4693 | www.law.gwu.edu/clinics

CLP_PC_021092

wish to claim asylum to request an available time and location to present and be inspected and processed at certain ports of entry."[4] This proposal, based on limited data gathered by Customs and Border Protection officers on December 11, 2022,[5] is impractical. It incorrectly assumes that the average migrant seeking asylum at the southwest border has the financial resources, technological literacy, and access to wireless infrastructure required to regularly access the CBP One application via a smartphone, let alone secure an appointment to arrive at a port of entry. Furthermore, it contradicts data released by U.S. Customs and Immigration Enforcement, which reveals that the Biden Administration issued over 322,000 smartphones to migrants awaiting hearings in immigration court, in FY22, at a cost of approximately $300,000 per day.[6]

Consider the story of our client, M-P-M. A native and citizen of El Salvador, M-P-M fled her home country, leaving behind her friends and family, because the local gangs and police targeted her on the basis of her identity as a transgender woman and work as a health rights activist. Although M-P-M had a cell phone in her possession when she fled El Salvador for Guatemala, it was as functional as a brick cube given that charging stations were few and far between. On the rare occasion that M-P-M was able to charge her cell phone at the various shelters she encountered on her journey to the United States, the charge could not be sustained in between. Moreover, she was required to purchase a SIM card in each country she traveled through on her way to the United States to ensure her cell phone was functional. When she entered Mexico, her cell phone broke. However, M-P-M fortunately had the financial resources to replace her cell phone, such that she entered the United States with a functional smartphone two and a half months after fleeing El Salvador. Her story evinces the fact that even those asylum seekers fortunate enough to frequently have access to a cell phone will encounter problems that make using the CBP One app impractical.

The story of our client E-M-G provides another illustration of the proposed rule's blindness to the reality of asylum seekers' situations and access to the technology and resources required to successfully use the CBP One App. E-M-G had only one practical option to escape the persecution of MS-18, the gang that killed her brother and claimed her as their prize: the services of a coyote. Traveling by group through a coyote ensured E-M-G had a planned route by bus and car and reasonably safe sleeping accommodations in those vehicles, but she and the other migrants had to leave their cellphones behind because of the reality that it would be impossible for everyone in the group to keep their phones charged, putting aside the carrier and SIM card issues inherent to their international journey. E-M-G and the other asylum seekers chose the safest and most affordable option to escape their persecution, but the practical reality is

---

[4] Circumvention of Lawful Pathways, 88 Fed. Reg. 11704 (proposed Feb. 23, 2023) (to be codified at 8 C.F.R. pt. 208).

[5] *Id*.

[6] U.S. Customs and Immigration Enforcement, *Detention Management*, https://www.ice.gov/detain/detention-management (last visited Mar. 14, 2023).

that it necessarily cut off all access to cellphones, a circumstance which would likely be damning for asylum seekers under the proposed rule.

Finally, consider the story of another Immigration Clinic client, M-B-S. A native and citizen of Honduras, she fled her home country to escape abuse at the hands of her Aunt and Uncle, who served as her guardians because her parents moved to the United States when she was young. M-B-S left home with a non-smart cell phone, which only permitted her to make phone calls. Because she could only afford to purchase a cell phone that lacked a built-in camera and did not provide wireless connectivity, she would have been precluded from accessing the CBP one application as a means to gain asylum in the United States. Although M-B-S purchased a non-smart cell phone to call her parents during her journey, she recounted that it was nearly impossible to do so because she struggled to access charging stations along the way. Since coming to the United States, M-B-S has reunited with her parents and continued her education. Given her lack of access to a smartphone, however, this outcome would not have been likely if the proposed rule was in place at the time of her crossing at the southern border.

Even if we ignore the obvious technological access problems that M-P-M, E-M-G, and M-B-S faced, and that countless other asylum seekers face today, the CBP One App's scheduling requirements impose another barrier that will deny many deserving migrants protection, or worse, render them more vulnerable to exploitation during their journey to the United States. M-P-M's and E-M-G's stories evince the impossibility of knowing the exact date and time of arrival at the border: M-P-M's solo journey took approximately three months and was affected by technological and other problems that delayed her, and E-M-G's month-long journey through a coyote still couldn't guarantee any given date of arrival. This uncertainty means that asylum seekers could be forced to spend days waiting in the dangerous area surrounding the border, exacerbating the ongoing humanitarian disaster there.

B. The rebuttable presumption imposes an unrealistic evidentiary burden on asylum seekers.

Our asylum system already forces asylum seekers to play "discretion roulette," but the proposed rule's rebuttable presumption makes asylum seekers take another spin while stacking the odds even further against them. This is because the only way to rebut the presumption requires a showing of an "imminent and extreme threat" present at the time the applicant reached the border,[7] such an unrealistically high evidentiary burden on asylum seekers as to force them to prove the merits of their case twice over or else face automatic denial of their claims.

---

[7] Circumvention of Lawful Pathways, 88 Fed. Reg. 11704 (proposed Feb. 23, 2023) (to be codified at 8 C.F.R. pt. 208).

March 27, 2023

*Submitted via https://www.regulations.gov/commenton/USCIS-2022-0016-0001*

Lauren Alder Reid, Assistant Director
Office of Policy
Executive Office for Immigration Review, Department of Justice
Falls Church, VA

Daniel Delgado, Acting Director
Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security
Washington, D.C.

**RE:    Comment in Opposition to the Joint Notice of Proposed Rulemaking** *Circumvention of Lawful Pathways***, 88 Fed. Reg. 11704 (proposed Feb. 23, 2023).**

Dear Assistant Director Reid and Acting Director Delgado:

The Yale Law School Immigrant Justice Project respectfully submits the following comment to the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS), and the Department of Justice (DOJ), Executive Office for Immigration Review (EOIR) ("the agencies") in response and opposition to the above-referenced Notice of Proposed Rulemaking (NPRM or "the Rule") issued by the agencies on February 23, 2023. We staunchly oppose the Proposed Rule, for the reasons detailed below, and urge the agencies to withdraw the Rule in its entirety.

The Yale Law School Immigrant Justice Project organizes law students in support of immigrant communities within New Haven, Connecticut and beyond. We engage in direct legal services under supervision and advance strategic advocacy to support immigrant justice. On March 17, 2023, our team traveled to Brownsville, Texas in partnership with Project Corazón and Lawyers for Good Government (L4GG) to meet with immigration advocates and stakeholders in the Río Grande Valley and visit migrant camps and shelters in the cities of Matamoros and Reynosa in Mexico. Over the course of several days, we provided Know Your Rights trainings, conducted intake interviews for humanitarian parole requests, fielded questions from migrants and community leaders, and spoke with dozens of migrants about their experiences using the CBP One mobile application. We also documented abhorrent conditions across several migrant camps in Reynosa. Our experiences with migrants and asylum-seekers in Reynosa and Matamoros directly inform our deep opposition to this Rule.

1

CLP_PC_021162

2. **There are accessibility issues with the CBP One application that undermine fairness and due process.** There are significant issues with the implementation of the CBP One application that have serious consequences for access, fairness, and due process. Below, we document several categories of concern that warrant immediate attention and improvement:

    a. **Given the insufficient number of appointments available, wait times and the ensuing delays are unconscionably long.** *See infra* Figures B3-4.

        i. Migrants frequently report that the time to receive an appointment is several months. Though the application has been in use since mid-January, many have reported that they have been unable to obtain a CBP One appointment, despite trying to do so *every single day* since the application has launched. During this time, migrants – including young children –  have been waiting in deplorable conditions without consistent access to running water, food, basic sanitation, or medical care. Interviews with migrants and asylum-seekers in Reynosa, Mex. (Mar. 20, 2023); Interviews with migrants and asylum-seekers in Matamoros, Mex. (Mar. 21, 2023).[1]

        ii. As of March 2023, the majority of migrants currently in Reynosa and Matamoros have already endured these conditions for weeks to months, with no end in sight. Interview with Priscilla Orta, Attorney, L4GG, in Brownsville, Tex. (Mar. 18, 2023). If the Proposed Rule proceeds as written, there is no viable pathway to ending the long-term delay migrants will face at the Southwest border, which will exacerbate the already horrific humanitarian crisis. We can safely assume that these conditions will continue to intensify as months and years pass.

        iii. Further, many migrants are seeking asylum and a safe haven from persecution. As a result, they are particularly vulnerable to violence and extortion by both the individuals they are fleeing from, as well as the local cartels in the areas where they are waiting. Interview with Brendon Tucker, Global Response Medicine, in Reynosa, Mex. (Mar. 20, 2023).

        iv. Migrants report significant psychological impact of the anxiety of waiting and seeking a CBP One appointment. In Matamoros alone, we encountered dozens of individuals who said they had been trying to schedule appointments daily since the application launched in January. We spoke with one Venezuelan applicant who has been trying to secure an appointment for her family of four. She told us that her eldest daughter, a minor, was experiencing severe anxiety and suicidal ideation as a result of living in an encampment for a prolonged, indefinite period of time. Another

---

[1] We omit the names of the migrants and asylum-seekers to protect their safety.

CLP_PC_021167

asylum-seeker, who is a survivor of domestic violence and fleeing her homicidal abuser, reported daily severe migraines and lack of appetite as a result of the stress induced from constantly reloading CBP One in the hopes of securing an appointment and escaping her abuser who had recently identified her location in Matamoros. Interviews with asylum-seekers in Matamoros, Mex. (Mar. 21, 2023).

v.  Appointments are usually gone within minutes of release at 10 AM. *See infra* Figure B4 (showing that by 10:02 AM, all appointments have been reserved). The CBP officials with whom we spoke encouraged migrants to check for appointments throughout the day, in the case of a cancellation. This practice forces migrants to constantly check the application at all hours of the day, increasing anxieties, exacerbating financial inequities of data and battery usage, and straining migrants' feelings of hope. CBP officials likened obtaining an appointment through CBP One to "buying tickets for a really popular concert." Meeting with CBP Officers in Hidalgo, Tex. (Mar. 20, 2023). This sentiment, referring to the capacity of the application, has been echoed by legal service providers in recent news articles. *See* Nick Miroff, *How Biden Officials Aim To Use a Mobile App To Cut Illegal U.S. Entries*, Wash. Post (Feb. 20, 2023), https://www.washingtonpost.com/immigration/2023/02/20/cbpone-boder-app-biden-migrants/.

vi.  Being forced to wait in unsanitary and inhumane camps for months to get an appointment through a glitching, inaccessible application is a significant violation of migrants' right to safety and security under United States' asylum law. *See infra* Part III, Section 2.

b.  **The application's photo requirements discriminate against migrants with darker skin tones.** *See infra* Figure B9.

i.  Many of the migrants currently waiting at the Reynosa and Matamoros ports of entry are Haitian and Venezuelan. These migrants have much darker skin tones than migrants from other countries of origin. The application often fails to recognize the facial features of darker-skinned individuals, and therefore does not allow these users to pass what CBP calls a "liveness check," which requires two photos taken in real-time to verify identity. Interviews with migrants and asylum-seekers in Reynosa, Mex. (Mar. 20, 2023); *see also* Nick Miroff, *How Biden Officials Aim To Use a Mobile App To Cut Illegal U.S. Entries*, Wash. Post (Feb. 20, 2023), https://www.washingtonpost.com/immigration/2023/02/20/cbpone-boder-app-biden-migrants/.

7

CLP_PC_021168

ii.    Migrants frequently report issues with the camera function that requires an initial and final photo to be taken when requesting an appointment, or the "liveness check" discussed above. The initial photo is to be captured during the account creation stage, while the final photo is to be captured during the appointment scheduling stage. Many migrants with darker skin tones report difficulties uploading both of these photos on the application, as the camera function regularly fails to recognize their faces and therefore does not allow them to capture a photo. Interviews with migrants and asylum-seekers in Reynosa, Mex. (Mar. 20, 2023).

iii.    Because of the limited number of appointments available, even the slightest delay in entering the required final photo can impact who is able to schedule their appointment. In the one or two minutes that available appointments are taken each day, many darker-skinned migrants find themselves stuck trying to upload their final photo. Interviews with migrants and asylum-seekers in Reynosa, Mex. (Mar. 20, 2023).

iv.    This issue has particular implications for unequal treatment by race, raising significant concerns for future equal protection discrimination claims by Black and Indigenous migrants who are severely disadvantaged from accessing appointments through the CBP One application.

v.    In light of the changing racial demographics among migrant groups at the border, more systematic data is needed to determine which groups are able to access the application, and which groups are being excluded, through various mechanisms including the CBP One application, from accessing appointments.

c.    **The application has connectivity issues and functions poorly, undermining fair and equal access.** *See infra* Figures B1-2; B5-8.

i.    One hundred percent of the dozens of migrants we spoke with said that the application is glitchy, poorly implemented, and essentially, nonfunctional in the vast majority of cases. In addition to crashing frequently, many users complained that the application operates slowly, that they cannot correct errors, and that it freezes unpredictably, without options to correct the submitted materials. Interviews with migrants and asylum-seekers in Reynosa, Mex. (Mar. 20, 2023); Interviews with migrants and asylum-seekers in Matamoros, Mex. (Mar. 21, 2023).

ii.    Users commonly reported needing to create a new account every day to request appointments. This was due, in part, to the inadequacy of the software and the nonfunctional camera feature. Users state that the application's data validation and error messaging is poorly designed.

8

Oftentimes, error messages are nonsensical and displayed in programming language. Interviews with migrants and asylum-seekers in Reynosa, Mex. (Mar. 20, 2023); Interviews with migrants and asylum-seekers in Matamoros, Mex. (Mar. 21, 2023).

iii. Even when error messages appear properly, they only appear in English and oftentimes do not identify the source of the error. Users also describe difficulties with editing fields to address these errors. These issues lead users to create new accounts daily, as they see no way to correct the errors in their accounts otherwise. *See infra* Figures B5-8.

iv. Individuals also saw themselves forced to create new accounts every day to circumvent the inadequacy of the glitchy application and to resolve issues with the camera feature. As described in the above section, to ensure that their initial and final photos can both be captured and will match, users often create a new account daily in order to capture each photo under similar conditions. Even when attempting to take both photos in one sitting, the facial recognition software continues to lag in recognizing the faces of those with darker skin tones. *See, e.g., infra* Figure B9. Previous queries

**d. The requirement of an application is economically inaccessible for individuals living in poverty, without access to reliable internet and/or smartphones.**

i. Many of the border regions lack sufficient internet infrastructure to support the need in the area to access the internet. One local legal provider noted that even her own premium phone and international service plan does not provide quality service in either Reynosa or Matamoros. Interview with Priscilla Orta, L4GG, in Brownsville, Tex. (Mar. 18, 2023).

ii. During our visit, migrants reported spending all of their savings to buy minutes and access wifi and data, in order to use the CBP One application. Interviews with migrants and asylum-seekers in Reynosa, Mex. (Mar. 20, 2023); Interviews with migrants and asylum-seekers in Matamoros, Mex. (Mar. 21, 2023). We witnessed hundreds of migrants crowded around gas stations, convenience stores, and outside of private homes, as well as waiting in long lines in the street for hours at a time, hoping to get a signal.

iii. Migrants reported that the CBP One application drains their phone batteries. They are then forced to pay businesses and other third parties, including cartels, to charge their phone batteries every day in order to access the application the following day. Interviews with migrants and asylum-seekers in Reynosa, Mex. (Mar. 20, 2023); Interviews with migrants and asylum-seekers in Matamoros, Mex. (Mar. 21, 2023). The requirement to rely on a digital application is financially unsuitable for vulnerable migrants living in

CLP_PC_021170

poverty who are also at significant risk of extortion in order to access the internet.

iv. The above points also presume that the majority of people seeking access to the United States through the Southwest border have smartphones capable of downloading a mobile application. The Rule states that, "A CBP survey of migrants at the Hidalgo and Brownsville Ports of Entry on December 11, 2022, substantiates that observation—finding that 93 of 95 migrants of all ages had smartphones." *Circumvention of Lawful Pathways*, 88 Fed. Reg. at 11720. First and foremost, the Rule provides no information as to how, where, or with whom the study was conducted. Second, based on our observations of the limited technology access in several of the informal migrant encampments in Reynosa, that number is likely a significant overestimate. CBP officials are also aware that, of the migrants who do own smartphones, many own smartphones from brands that are not functionally reliable or compatible with the application. Nonetheless, CBP officials maintain that the application is a tool to advance equity for migrants. Meeting with CBP Officers in Hidalgo, Tex. (Mar. 20, 2023).

v. CBP officials claimed that developing a desktop application would improve issues with accessibility. Meeting with CBP Officers in Hidalgo, Tex. (Mar. 20, 2023). However, this option has yet to be implemented despite repeated requests. *Government Documents Reveal Information About the Development of the CBP One App*, Am. Immigr. Council (Feb. 28, 2023), https://www.americanimmigrationcouncil.org/FOIA/government-documents-reveal-information-about-development-cbp-one-app. There is little clarity as to whether and when such an option would be implemented, despite officials' knowledge of the issue.

vi. In addition, access to desktop computers is nonexistent for the vast majority of migrants and asylum-seekers. Interview with Brendon Tucker, Global Response Medicine, in Reynosa, Mex. (Mar. 20, 2023). The nonprofit organizations who would be expected to provide such services to migrants lack the necessary resources and security to do so. *Id.* Further, NGOs have no governmental support to provide computers or internet access. *Id.*

e. **There are language-access issues within the application and for non-Spanish speakers.**

i. Currently, the application is only written in English and Spanish. Only a few parts are also written in Haitian Kreyòl.

ii. Importantly, many parts of the application are not translated at all. Specifically, the terms of service, error messages, and other crucial

10

CLP_PC_021171



**ROUND TABLE**
of Former Immigration Judges

March 27, 2023

Submitted via: https://www.regulations.gov.

Daniel Delgado
Acting Director
Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security
telephone (202) 447-3459

Lauren Alder Reid
Assistant Director,
Office of Policy, EOIR
U.S. Department of Justice
telephone (703) 305-0289

**Re: Comment on the Proposed Rule by the Department of Homeland Security
(DHS) and the Executive Office for Immigration Review (EOIR) on
Circumvention of Lawful Pathways, CIS No. 2736-22; Docket No: USCIS
2022-0016; A.G. Order No. 5605-2023**

Dear Acting Director Delgado and Assistant Director Alder Reid:

The Round Table of Former Immigration Judges is composed of more than 50 former
Immigration Judges and Appellate Immigration Judges of the Board of Immigration
Appeals. We were appointed by and served under both Republican and Democratic
administrations. We have centuries of combined experience adjudicating asylum

1

CLP_PC_021345

applications and appeals. Our members include nationally-respected experts on asylum law; many regularly lecture at law schools and conferences and author articles on the topic.

Our members issued decisions encompassing wide-ranging interpretations of our asylum laws during our service on the bench. Whether or not we ultimately reached the correct result, those decisions were always exercised according to our "own

understanding and conscience,"[1] and not in acquiescence to the political agenda of the party or administration under which we served.

We as judges understood that whether or not we agreed with the intent of Congress, we were still bound to follow it. The same is true of the Attorney General, Secretary of Homeland Security, and for that matter, the President.

**The 30-Day Comment Period Provides Insufficient Time to Comment on the Rule**

The Biden administration has provided only 30 days for the public to comment on the proposed rule, effectively denying the public the right to meaningfully comment under the notice and comment rulemaking procedures required by the Administrative Procedure Act. This timeframe is insufficient for a sweeping proposed rule that would deny many people access to asylum in violation of U.S. law. On March 1, 2023, 172 organizations wrote to the agencies urging them to provide at least 60 days to comment on the complex 153-page rule that would have enormous implications for asylum access at the border and in USCIS and immigration court asylum proceedings.

Executive Orders 12866 and 13563 state that agencies should generally provide at least 60 days for the public to comment on proposed regulations. A minimum of 60 days is especially critical given the rule's attempt to ban asylum for many refugees in violation of U.S. law and international commitments and return many to death, torture, and violence. While the agencies cite the termination of the Title 42 policy in May 2023 as a justification to curtail the public's right to comment on the proposed rule, this reasoning is specious especially given that the administration itself sought to formally end Title 42 nearly a year ago and has had ample time to prepare for the end of the policy.

---

[1] *See Accardi v. Shaughnessy*, 347 U.S. 260, 266-67 (1954).

2

CLP_PC_021346

Because of the insufficient time frame provided for comments, we will regrettably have to limit our comments to a few specific issues.

**Comments on Specific Issues:**

**The rule creates a bar, and not a rebuttable presumption.**

The proposed rule refers to the bar it seeks to create as a "rebuttable presumption of asylum ineligibility." This term is a misnomer. The rule seeks to create an outright bar to asylum, with three very narrow exceptions that most applicants will not be able to fall within.

The Merriam Webster online dictionary includes as definitions for the word "presumption" "an attitude or belief dictated by probability: Assumption; the ground, reason, or evidence lending probability to a belief; a legal inference as to the existence or truth of a fact not certainly known that is drawn from the known or proved existence of some other fact."[2]

Asylum law does contain actual rebuttable presumptions. For example, 8 C.F.R. § 1208.13(b)(1) creates a presumption that one who has suffered past persecution has a well-founded fear of persecution, while 8 C.F.R. § 1208.13(b)(3)(ii) creates a presumption that where the persecutor is the government or is government sponsored, internal relocation would not be reasonable. These presumptions are logically drawn from established facts. For example, it is logical to presume that where conditions have not changed, one who has already been persecuted might be persecuted again in the future. It is also reasonable to assume a national government's reach is country-wide and cannot be avoided by moving within the country it governs.

However, as to the proposed rule, there is nothing about the fact of arriving at the border without having procured an appointment that would give rise to a logical presumption that one is either not a refugee, or is undeserving of or no longer in need of protection.

The proposed rule is actually akin to the one-year bar found in section 208(a)(2) of the I&N Act. Significantly, that requirement was made by Congress through the legislative process, while the present rule attempts to create an additional bar through regulation alone. Although section 208(2)(D) creates two exceptions (for changed or extraordinary circumstances), we have never heard the one-year bar referred to as a rebuttable presumption; it is rather a bar to asylum.

---

[2] https://www.merriam-webster.com/dictionary/presumption.

3

While it may sound less harsh to refer to the rule as a "rebuttable presumption," the term is misleading and inaccurate. And because the proposed bar conflicts with international law and Congressional intent, and will invariably result in wrongful removals, the rule should be withdrawn in its entirety.

**The proposed bar conflicts with international law.**

In a precedential *en banc* decision, the Board of Immigration Appeals (which at the time included three current members of our Round Table) stated:

> In enacting the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, Congress sought to bring the Act's definition of "refugee" into conformity with the United Nations Convention and Protocol Relating to the Status of Refugees and, in so doing, give "statutory meaning to our national commitment to human rights and humanitarian concerns." See S. Rep. No. 256, 96th Cong., 2d Sess. 1, 4, reprinted in 1980 U.S.C.C.A.N. 141, 144. Such an approach is designed to afford a generous standard for protection in cases of doubt.

*Matter of S-P-*, 21 I&N Dec. 486, 492 (BIA 1998) (en banc) (quoting S. REP. NO. 256, 96th Cong., 2d Sess. 1, 4, reprinted in 1980 U.S.C.C.A.N. 141, 144). *See also Matter of S-M-J-*, 21 I&N Dec. 722 (BIA 1997).

Given the explicit intent of Congress in passing the 1980 Refugee Act of bringing our domestic laws into compliance with international law, it is particularly necessary for the agencies to construe section 208 of the Act in conformity with such law. *See Weinberger v. Rossi*, 456 U.S. 25, 32 (1982) (noting that construing federal statutes to avoid violating international law has 'been a maxim of statutory construction since the decision' in *Charming Betsy*); *Lauritizen v. Larsen*, 345 U.S. 571, 578-79 (1953); *MacLeod v. United States*, 229 U.S. 416, 434 (1913); *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804).

With this goal, for more than 35 years, our courts have sought guidance from UNHCR's Handbook on Procedures and Criteria for Determining Refugee Status in interpreting the 1980 Refugee Act. *See INS. v. Cardoza-Fonseca*, 480 U.S. 421, 438-39 (1987).

We note that paragraph 28 of the UNHCR Handbook states:

4

CLP_PC_021348

> A person is a refugee within the meaning of the 1951 Convention as soon as he fulfils the criteria contained in the definition. This would necessarily occur prior to the time at which his refugee status is formally determined. Recognition of his refugee status does not therefore make him a refugee but declares him to be one. He does not become a refugee because of recognition, but is recognized because he is a refugee.

We therefore ask the agencies to explain how it is consistent with international law (and thus, Congressional intent) to deny the opportunity to even seek recognition and protection to those considered refugees under international law solely because they attempted to enter without first successfully procuring an appointment through a government app.

The proposed rule creates a ban to asylum that does not fall within any of the cessation clauses or exclusion clauses found in Articles 1(C) and 1(F) of the 1951 Refugee Convention. While Congress may have the authority to create additional restrictions (as it did in creating the one-year filing requirement), we question what authority Executive Branch agencies have to create additional bars in the guise of interpreting a statute which Congress sought to be consistent with international law.

**The rule's impact on credible fear determinations contradicts Congressional intent.**

In 1996, Congress created an expedited removal process that denied clearly inadmissible noncitizens access to the immigration court system. However, Congress was careful to create an exception for those with meritorious claims for asylum.

As noted by a U.S. District Court Judge, "it is the will of Congress—not the whims of the Executive—that determines the standard for expedited removal." *Grace v. Whitaker*, 344 F. Supp. 3d 96, 105 (Dist. D.C. 2018).[3]

*Grace* continued to summarize Congress's intent on the subject:

---

[3]  Reversed in part by *Grace v. Barr*, 965 F.3d 883 (D.C. Cir., 2020).

CLP_PC_021349



www.pbwt.com

Muhammad Faridi
Partner
(212) 336-2874
(212) 336-1282 Direct Fax
mfaridi@pbwt.com

March 27, 2023

**Via https://www.regulations.gov**

Lauren Alder Reid
Assistant Director
Office of Policy
Executive Office for Immigration Review
5107 Leesburg Pike, Suite 1800
Falls Church, VA 22041

Daniel Delgado
Acting Director
Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security

> **Re:**  **Comments on "Circumvention of Lawful Pathways," 88 Fed. Reg. 11704 (Feb. 23, 2023)**
>
> *Department of Homeland Security, Docket No. USCIS 2022-0016; RIN 1615–AC83*
>
> *Department of Justice, Executive Office for Immigration Review, A.G. Order No. 5605–2023; RIN 1125–AB26*

Dear Ms. Reid and Mr. Delgado:

We represent the National Citizenship and Immigration Services Council 119 ("Council 119"), and we write on its behalf to provide comments on the above-referenced proposed rule by the Department of Justice ("DOJ") and Department of Homeland Security ("DHS," collectively the "Departments") seeking to make three fundamental changes to our nation's immigration procedures:

Patterson Belknap Webb & Tyler LLP    1133 Avenue of the Americas, New York, NY 10036    T 212.336.2000    F 212.336.2222

CLP_PC_021417

March 27, 2023
Page 5

## II.   Council 119's Interest in the Proposed Rule

Council 119 is a labor organization that represents the interests of over 14,000 bargaining unit employees of United States Citizenship and Immigration Services ("USCIS") throughout the United States and abroad.  Council 119's members are federal employees who are responsible for, among other things, adjudicating affirmative asylum claims, processing refugees overseas, performing "credible fear" and "reasonable fear" screenings, researching conditions in refugee-producing countries and regions, and providing relief for survivors of human trafficking and those who assist law enforcement.

Council 119 has a special interest in the Proposed Rule because its members are at the forefront of interviewing and adjudicating the claims of individuals seeking asylum in the United States.  Council 119's members have firsthand knowledge as to how the Proposed Rule, if adopted, will impact asylum adjudications and pre-screening operations, as well as how it will comport with international and domestic laws concerning the protection of refugees.

This comment relies solely upon information that is publicly available, and it does not rely on any information that is law enforcement sensitive, classified, or protected under the Privacy Act of 1974.  It represents only the views of Council 119 on behalf of its members and does not represent the views of USCIS or USCIS employees in their official capacities.

## III.   The Proposed Rule Undermines Our Nation's Longstanding Commitment of Providing Safe Haven to the Persecuted

The Proposed Rule seeks to eviscerate the longstanding protections afforded to refugees by our country.  Even before our country's founding, its lands served as a safe haven to those fleeing religious persecution in England and Holland.[5]  Although the impact of these refugees' arrival is complex because of their treatment of the First Nations who already lived here,[6] it cannot be denied that they serve as a symbol of America's promise as a safe haven for the persecuted.

---

[5] *See* William Bradford, *Of Plymouth Plantation* (Harold Paget ed. 2006); Jeremy Dupertuis Bangs, Strangers and Pilgrims, Travellers and Sojourners: Leiden and the Foundations of Plymouth Plantation, vii, 7, 605, 614, 630 (2009).

[6] *See*, *e.g.*, David J. Silverman, This Land is Their Land: The Wampanoag Indians, Plymouth Colony, and the Troubled History of Thanksgiving (2019).

March 27, 2023
Page 13

208.33(a)(2)(ii).  The Proposed Rule abandons Congress's criteria for the "safe third country" exception and, as such, is inconsistent with it in several respects.

- ***"Firm resettlement" bar.***  This bar applies only to individuals who have firmly resettled in another country.  But the Proposed Rule applies on the basis that an individual has merely transited through a third country before reaching our southern border.  Again, the Proposed Rule runs afoul of the criteria set forth by Congress for the "firm resettlement" bar to apply.

In sum, the Proposed Rule defies Congress's command that eligibility for asylum is to not be conditioned on whether an asylum seeker arrives at a designated port of arrival.  And it also runs afoul of the careful balance that Congress has struck in the "safe third country" exception and the "firm resettlement" bar, which govern the circumstances in which the potential availability of protection in a third country may lawfully prevent that person from obtaining asylum relief.

The Departments cannot justify this departure from the statutory framework by reference to their authority to "establish additional limitations and conditions, consistent with this section," on asylum eligibility.  8 U.S.C. § 1158(b)(2)(C).  Here, the Proposed Rule bars eligibility for asylum on bases that Congress has either rejected outright (arrival outside a port of entry) or circumscribed far more narrowly than the Proposed Rule (transit through a third country).  The Proposed Rule does not write on a clean slate; instead, it rewrites the statute Congress enacted.  In sum, the Proposed Rule is not "consistent" with our asylum law, and it is therefore void.

## V.    The Proposed Rule Would Yield Increased Injustice and Dysfunction in Credible Fear Screenings

Asylum officers are dedicated public servants who carry out several functions within the asylum system, but their role is limited by statutory and regulatory authority.  Asylum officers are tasked with conducting "credible fear" screening interviews for asylum seekers referred to them by Customs and Border Protection agents.  *See* 8 U.S.C. § 1225(b)(1)(B); 8 C.F.R. § 208.30.  During this screening interview, the asylum officer must determine whether the asylum seeker has a "credible fear of persecution."  8 U.S.C. § 1225(b)(1)(B)(iii).  During the same interview, asylum officers also inquire into the individual's fear of torture, for the purpose of identifying potential bases for protection under the CAT.

Asylum officers do not grant asylum (or any other affirmative relief) during a credible fear screening interview.  If a positive credible fear determination is made with respect to persecution or torture, the asylum seeker may move forward with her claims before an Immigration Judge in a full hearing or is scheduled for an Asylum Merits interview with an asylum officer.  *See* 8 C.F.R. § 208.30(f).  If a negative credible fear determination is made, the asylum seeker is ordered removed.  She may then request review of the asylum officer's finding by an Immigration Judge.  *See* 8 C.F.R. § 208.30(g).

CLP_PC_021429

March 27, 2023
Page 14

Although asylum officers are responsible for noting in an asylum seeker's file that a mandatory bar to eligibility ***may*** apply, the statutory exceptions are not used as a basis to find that the asylum seeker lacks a "credible fear of persecution." *See* 8 C.F.R. § 208.30(e)(5)(i). Indeed, USCIS's website notes that "[a]n Asylum Officer does not make a final decision whether you are subject to a mandatory bar to asylum or withholding of removal in the credible fear determination process. An asylum officer will note in their credible fear decision that a mandatory bar to asylum or withholding of removal may apply in a subsequent Asylum Merits Interview before an asylum officer or in immigration proceedings before an IJ."[45]

But the Proposed Rule creates two exceptions to the general rules governing "credible fear" interviews.

*First*, application of the Proposed Rule's presumption is, absent rebuttal, a mandatory basis for a negative credible fear finding. *See* Proposed Rule § 208.33(c)(1)(i). Thus, even if an asylum seeker subject to the presumption establishes that there is a significant possibility they could prove in a full hearing that they would face persecution in their home country based on a protected characteristic, the Proposed Rule compels the asylum officer to find that they did not have a credible fear of persecution—unless the asylum seeker establishes that "exceptionally compelling circumstances" exist, a difficult hurdle for an unrepresented asylum seeker facing expedited removal, and a standard that apparently does not include the lack of a safe country in which to apply for asylum. *Id*. § 208.33(a)(2).

*Second*, for individuals subject to the Proposed Rule's presumption, and *only* for those individuals, claims for withholding of removal and relief under the CAT must be evaluated in the screening using the more stringent "reasonable possibility"—not "significant possibility"—standard. Proposed Rule § 208.33(c)(2)(i). Prior to the Proposed Rule, asylum officers applied the "reasonable possibility" standard in reasonable fear screenings, which take place only in two specific situations: (1) after the reinstatement of a prior removal order; and (2) after a final administrative removal order, which ensues from certain felony convictions. There is a good reason why this standard was reserved for individuals with prior violations of our nation's laws: Individuals subject to reasonable fear screenings by definition have prior experience with the U.S. immigration system, and many have lived in the United States for extended periods of time. Because it entails a higher burden of proof, it is an inappropriate standard for an initial screening interview following a person's first entry into the United States. But the Proposed Rule requires the application of this standard in the "credible fear" screening process for those individuals who have been found to lack "credible fear of persecution" because they did not apply for and were denied asylum in a third country, did not use CBP One to schedule an appearance at a port of entry, or did not receive prior authorization to travel to the United States to seek parole. To rebut the presumption by a showing of "exceptionally compelling circumstances," the Proposed Rule

---

[45] U.S. Citizenship and Immigration Services, *Questions and Answers: Credible Fear Screening*, https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/questions-and-answers-credible-fear-screening (last visited Mar. 15, 2023).

March 27, 2023
Page 15

requires asylum seekers to meet the even higher preponderance-of-the-evidence standard. Proposed Rule § 208.33(a)(2).

The new procedures set forth by Proposed Rule are a dramatic departure from the screening process that was designed decades ago, and represent a stark re-interpretation of asylum officers' role. Until recently—when this long-standing framework was altered by rulemakings that have now largely been enjoined or rescinded—asylum officers had never been authorized (let alone directed) to make negative credible fear findings based on the applicability of a mandatory bar. The Proposed Rule changes that long-standing approach *only* with respect to asylum seekers entering our country through the southern border who had not applied for and been denied protection in a third country, used CBP One to schedule an appearance at a port of entry, or received prior authorization to travel to the United States to seek parole. *See* Proposed Rule § 208.33(c)(2)(i).[46]

The context of a credible fear screening is poorly suited for the higher burden of proof the Proposed Rule seeks to impose on asylum seekers, and for the stringent "exceptionally compelling circumstances" test required to rebut the presumption of asylum ineligibility. Noncitizens undergoing credible fear screenings often do so mere days after their initial encounter with DHS. They are frequently detained and face inadequate access to counsel. Most have undertaken a long and difficult journey to the U.S. border. Many have recently suffered traumatic events. Certain classes of applicants, such as torture victims, may suffer from severe psychological trauma—such as denial, memory lapses, and inability to communicate. Our country's existing law recognizes the challenges faced by individuals seeking protection under the asylum system or the CAT, and thus requires them to meet the requirements of their claim in proceedings where they are afforded due process rights. The Proposed Rule, however, ignores these realities. It would require asylum seekers to show a reasonable possibility of persecution or torture, or "exceptionally compelling circumstances" by a preponderance of the evidence, at the credible fear screening stage, without the more fulsome procedural protections of a full hearing. It ignores that a credible fear screening is just that—a screening—and is not suited for a full adjudication of an asylum seeker's claim or full consideration of a presumption against eligibility.

The Departments themselves have recently recognized the due process problems with an approach akin to that of the Proposed Rule. In justifying their rescission of the requirement to consider certain mandatory bars to asylum at the credible fear screening stage, the Departments explained that "due to the intricacies of the fact-finding and legal analysis often required to apply mandatory bars, the Departments now believe that individuals found to have a credible fear of persecution generally should be afforded the additional time, procedural protections, and opportunity to further consult with counsel that the Asylum Merits process or section 240

---

[46] To be sure, Council 119 agrees with the Departments that credible fear screenings are generally an inappropriate context for adjudicating mandatory bars, as discussed below. But this only highlights the incongruity of requiring this bar, which has its own legal and factual complexities, to be adjudicated at a credible fear screening, and not the others.

CLP_PC_021431

March 27, 2023
Page 16

removal proceedings provide." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers ("Asylum Processing IFR"), 87 Fed. Reg. 18078, 18094 (Mar. 29, 2022). Here, the Departments propose to impose what amounts to another mandatory bar at the credible fear screening stage—one with its own factual and legal complexities, including whether an asylum seeker was subject to the "exceptionally compelling circumstances" necessary to rebut the presumption.

The new protocol also leads to absurd and irrational results. Under the new regime, an individual who articulates a credible fear of persecution to an asylum officer, but who also admits to terrorism in her home country, will receive a positive credible fear finding if he demonstrates that he applied for and was denied asylum in a third country or if he presents at a port of entry pursuant to a pre-scheduled time and place, because he is not subject to the presumption. But a refugee fleeing political violence in South America who did not apply for asylum and a third country and who crossed the southwest border outside a port of entry and without authorization to request parole will receive an automatic negative credible fear determination, notwithstanding the fact that she faced persecution on account of a protected ground in her home country, unless she meets the narrowly delineated standard for "exceptionally compelling circumstances." *See* 8 C.F.R. § 208.33(a), (b).

Even more, after making a negative credible fear finding based on the Proposed Rule's presumption, asylum officers must then apply a "reasonable possibility" standard to assess the individual's claims for statutory withholding of removal or CAT protection. This higher standard is applied in the screening interview *only* for individuals subject to the Proposed Rule's presumption. *See* Proposed Rule § 208.33(c)(2)(i). It does not apply to those suspected of terrorism, engaging in persecution, or those who present a threat to our national security, so long as they are able to demonstrate that they applied for and were denied asylum in a third country, received authorization to request parole, or presented at a port of entry pursuant to a pre-scheduled time and place. *Id*. § 208.33(a).

Significantly, the Proposed Rule would impose substantial additional burdens on asylum officers performing credible fear screenings. The Proposed Rule tasks asylum officers during the credible fear screening with assessing whether the presumption applies and whether it has been rebutted, and if the presumption applies, with assessing qualification for withholding of removal or CAT protection under the higher "reasonable possibility" standard. It has long been recognized that asylum cases are a cooperative effort. New asylum officers are trained that while the burden of proof is always on the asylum seeker, officers and applicants have a shared responsibility for developing the record, with the officer responsible for effectively eliciting testimony in a non-adversarial interview and researching relevant country conditions.[47] The

---

[47] *See, e.g.,* RAIO Combined Training Program, "Interviewing - Eliciting Testimony" (Dec. 20, 2019), available at: https://www.uscis.gov/sites/default/files/document/foia/Interviewing_-_Eliciting_Testimony_LP_RAIO.pdf (last visited Mar. 25, 2023); RAIO Combined Training Program, "Interviewing - Introduction to the Non-Adversarial Interview" (Dec. 20, 2019), available at: https://www.uscis.gov/sites/default/files/document/foia/Interviewing_-_Intro_to_the_NonAdversarial_Interview_LP_RAIO.pdf (last visited Mar. 25, 2023).


**WOMEN'S REFUGEE COMMISSION**


Instituto para las Mujeres en la Migración A.C.

# Stuck in Uncertainty and Exposed to Violence: The Impact of US and Mexican Migration Policies on Women Seeking Protection in 2021

## Introduction

In 2021, policies on both sides of the US-Mexico border negatively affected women seeking protection. As we head into 2022, marking the first year of the Biden administration, Trump-era restrictive policies remain in place at the US-Mexico border, exacerbating the situation for women forced to wait at Mexico's northern border for the opportunity to seek asylum in the US. In addition, under pressure from the Biden administration, the Mexican government continues to intensify enforcement to deter migrants and individuals seeking protection at Mexico's southern border, worsening the situation for women stuck there.

In the fall of 2021, the Instituto para las Mujeres en la Migración (IMUMI) and the Women's Refugee Commission (WRC) monitored events and carried out interviews with women seeking protection to understand the challenges and the dangers they face in Mexico.[1] This report outlines those challenges and provides recommendations for the US and Mexican governments.

## US Policies in 2021

Early on, the Biden administration committed to building a fair, orderly, and humane immigration system and reversing illegal Trump-era policies that endangered the lives of people seeking protection at the US-Mexico border. In its first few months in office, it made positive strides on several promises, including creating initiatives to provide reparative justice for those harmed by Trump-era policies. In February 2021, President Biden created the Interagency Task Force on the Reunification of Families to reunify the nearly 4,000 children who were separated from their parents under Trump's "zero tolerance" policy, which aimed to criminally prosecute all migrants crossing into the US between ports of entry. That month, the administration also announced the creation of a process—in collaboration with international organizations, regional task forces, and local NGOs—that would allow individuals returned to Mexico under the Trump-era "Remain in Mexico" (RMX) policy to return to the US and continue their immigration cases in the US rather than continuing to wait in Mexico. It also reversed the Trump-era legal decisions that made it nearly impossible for survivors of domestic and gang violence to qualify for asylum.

In addition, the administration's strategies included a focus on protection and a gender lens. In summer 2021, the administration launched a whole-of-government blueprint of strategies to reform the US immigration system. One of the strategies that aimed to address the root causes of migration in Central

---

[1] This report draws on interviews from IMUMI and WRC, cases from IMUMI's legal clinic, as well as media reports and research publications. IMUMI interviewed women in shelters in Mexico City between September and December 2021. On November 2, 2021, WRC staff visited two shelters in Mexico City and interviewed individuals from Haiti, Venezuela, El Salvador, Guatemala, and other countries. On December 3, 2021, WRC staff visited two migrant shelters in Tijuana and interviewed individuals from Mexico, Honduras, El Salvador, Guatemala, Cameroon, and other countries. IMUMI and WRC obtained informed consent from all individuals interviewed.

CLP_PC_021586

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

Case 1:23-cv-01843-TSC     Document 123     Filed 03/23/26     Page 250 of 721



America included a pillar "to combat sexual, gender-based, and domestic violence."[2] Another strategy laid out a comprehensive approach to regional migration management. Yet, in practice, the Biden administration has largely focused on enforcement and deterrence in its engagement with countries in the region. Notably, it reportedly has requested that the Mexican government sign a "safe third country" agreement, requiring most non-Mexican individuals to first seek protection in Mexico before requesting asylum in the US.

The Biden administration's positive actions and strategies have been profoundly overshadowed by its failure to restore access to asylum at the border, including at ports of entry, for most arriving migrants and people seeking asylum. In December 2021, the Biden administration announced the reinstatement (pursuant to a court order) and expansion of RMX[3] and extended the Trump-era Title 42 CDC public health order that summarily blocks and expels people from the US-Mexico border, often repeatedly, to danger in Mexico and countries of origin. Since President Biden took office, people have been expelled more than 1.1 million times, including more than 187,000 expulsions of parents and children,[4] who were denied the opportunity to seek protection. In August 2021, the administration began expulsion flights to southern Mexico, where Mexican authorities forcibly returned people across the border to Guatemala or sent them on buses to Honduras, in an act of chain *refoulement*.[5] In clear violation of *non-refoulement*, the Biden administration also sent individuals on Title 42 expulsion flights directly to back to Haiti, Guatemala, Honduras, and other countries of origin, without screening them for risk of harm upon return or otherwise providing them an opportunity to seek protection.

## Mexican Policies in 2021

Over the course of 2021, under pressure from the White House, the Mexican government took a number of measures to step up its immigration enforcement to deter migrants and asylum seekers from accessing protection at the US-Mexico border. In 2021, authorities from Mexico's National Migration Institute (INM) worked with the Mexican National Guard and security forces to carry out a record number of migrant apprehensions; approximately 30 percent of those apprehended were women, and 27 percent were children. These figures include families and unaccompanied children who were initially apprehended by INM or the National Guard and then referred to state or civil-society shelters, a requirement of Mexico's new children protection reform implemented in 2021. The reform requires that after referral, the protection offices determine the child's best interests, whether that means deportation, remaining in Mexico with humanitarian legal status, or being reunited with family in another country. While this reform is a big step

---

2 In addition to its immigration blueprint, in November 2021, the administration launched the first National Strategy on Gender Equity and Equality. Through this whole-of-government approach, the administration committed to work to build "a fair and humane immigration system that welcomes immigrants [and] keeps families together" and create improved protection pathways for those fleeing persecution, including victims of gender-based violence.

3  The restart of Remain in Mexico was pursuant to a court order; however, prior to the ruling in early August 2021, the Biden administration reportedly was already considering implementing a supposedly more "humane" version of RMX. In August 2021, a Texas judge ordered the administration to restore RMX "in good faith." The administration appealed that order and issued a new memo terminating RMX in October 2021. The Biden administration has committed to ending RMX eventually, but said that it planned to comply with the court's order to restart RMX. In the new iteration, the administration expanded the program to all non-Mexicans from the Western Hemisphere.

4  This includes Customs and Border Protection Title 42 expulsion statistics from February to December 2021.

5  The principle of non-refoulement in international law prohibits countries that are receiving asylum seekers from removing them or returning them to a country where there is reason to believe that they would be at risk of irreparable harm or human rights violations. Chain refoulement occurs when individuals are sent back to a country that will not protect people from the onward transfer in violation of non-refoulement. In this case, the US expelled asylum seekers back to southern Mexico by plane and the Mexican government bussed them to Guatemala. This occurred with Guatemalan, Salvadoran, and Honduran nationals in 2021.

CLP_PC_021587

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021



forward for the rights of families and children, implementation across <u>Mexico has been uneven[6] and many challenges remain</u>, including the need for better funding and training to ensure the best interests of children are consistently upheld.

The Andrés Manuel Lopez Obrador administration also took greater measures to restrict travel by migrants and individuals seeking protection, pushing many people to hire smugglers and risk dangerous travel routes. It also created new <u>travel regulations</u> requiring proof of immigration status to purchase a bus ticket, leading to discrimination and racial profiling of both migrants in transit and Mexicans, especially Indigenous and Afro-descendent Mexicans. In addition, <u>the US requested</u> that the Mexican government put into place new travel requirements to make it more difficult for the citizens of countries who have been arriving at the US southern border in high numbers to transit through Mexico. Since August 2021, the Mexican government announced new requirements that <u>Ecuadorians</u>, <u>Brazilians</u>, and Venezuelans, some of whom are fleeing danger, acquire a visa to travel to Mexico as tourists. Mexican immigration authorities also stepped up <u>restrictive tactics at Mexican airports</u>, where they denied entry to a record 72,895 foreigners in 2021, more than double the number of denials in 2019 (31,008). Officials at airports turned around individuals aiming to seek protection in Mexico, who were unlawfully denied the opportunity to present their claim to COMAR (Mexico's agency responsible for asylum processing and adjudications) and instead <u>detained in isolation for weeks</u>. Furthermore, Mexico continued to coordinate with the US on the Biden administration's expulsions under Title 42, <u>agreeing to receive expelled individuals from Guatemala, Honduras, and El Salvador</u>, and <u>worked with the Biden administration to re-implement and expand RMX</u>.

Meanwhile, as Mexican authorities increased enforcement and US restrictive policies persisted, last year <u>Mexico became one of the top destinations worldwide</u> for individuals seeking protection. In 2021, COMAR received a historic high of <u>131,448 applications</u>, with women representing 41 percent of applicants[7] and children representing 24 percent. This record number of applicants is an 87 percent increase from the prior high of 70,351 applications in 2019. Underfunded despite the critical need, COMAR has been unable to keep up with the increase in claims, leaving many people in southern Mexico—where the vast majority submit their applications[8]—to wait for decisions on their protection claims in precarious conditions for months or even up to two years in some cases. Mexican refugee law requires that applicants remain in the jurisdiction where they applied throughout the adjudication process, which prevents individuals applying for protection from reuniting with family and community networks in safer regions of the country with better employment opportunities.

***Note that the following section of the report contains graphic descriptions of sexual violence.***

## The Impact of US and Mexican Policies on Women

Taken together, the US and Mexican governments' policies and practices forced women seeking protection to wait for extended periods, often in precarious and dangerous circumstances, at Mexico's northern and southern borders. Throughout 2021, IMUMI and WRC carried out interviews with women and monitored events to understand the challenges and dangers they were facing.

---

6  There has been less progress in some Mexican states on the reform implementation than others due to a lack of training, funding, and political will of local authorities. As a result, despite the reform, some children may continue to be detained by immigration authorities or deported without a proper best interest determination. In fall 2021, <u>a panel featuring IMUMI</u> and other civil society organizations discussed some of the challenges with implementation.

7   Since 2016, women have represented approximately 40 percent of applicants to COMAR.

8   Approximately 68 percent of applications were filed in the state of Chiapas and 5 percent in Tabasco.

CLP_PC_021588

# The consequences of US and Mexican immigration policies on the protection of Venezuelan women and LGBTIQ+ individuals in Southwest Mexico

   

CLP_PC_021595

December, 2022

# The consequences of US and Mexican immigration policies on the protection of Venezuelan women and LGBTIQ+ individuals in Southwest Mexico

© 2022 Apoyo a Migrantes Venezolanos, Mexico; Institute for Women in Migration (IMUMI), Mexico; Women's Refugee Commission (WRC), United States; and Center for Democracy in the Americas (CDA), United States.

## Research and Writing
Andrea Virrueta, IMUMI
July Rodriguez, Apoyo a Migrantes Venezolanos
Mara Tissera Luna, consultora independiente para CDA
Savitri Arvey, WRC

## Review
Gretchen Kuhner, IMUMI
María José Espinosa, CDA

## Design
Isaac Ávila
Ramón Arceo

## Acknowledgements
We are deeply grateful to the Venezuelan women and individuals from the LGBTIQ+ community in the Hospitalidad y Solidaridad shelters and Casa Frida in Tapachula who shared their experiences with us. We are also incredibly thankful to all of the women from various countries, accompanied by FOCA, who shared their migratory experience with us in Tuxtla Gutierrez. We obtained consent from all the interviewed individuals to share their testimonies.

In addition, we are also grateful for the time and valuable contributions of the experts and organizations that we interviewed in the following locations:

**Tapachula Chiapas.** Alto Comisionado de las Naciones Unidas para los Refugiados (ACNUR - México); Albergue Hospitalidad y Solidaridad; Casa Frida; Centro de Derechos Humanos Fray Matías de Córdova A.C.; Coalición por los Derechos Humanos de los Inmigrantes (CHIRLA) ; Fermina Rodríguez, experta y consultora para Instituto Nacional de las Mujeres (INMUJERES); Haitian Bridge Alliance; HIAS; International Rescue Committee; Kids in Need of Defense (KIND); Médicos del Mundo Francia; y el  Fondo de las Naciones Unidas para la Infancia (UNICEF - México).

**Tuxtla Gutiérrez, Chiapas.** Formación y Capacitación A.C. (FOCA).

**San Pedro Tapanatepec, Oaxaca.** Médicos Sin Fronteras; y Servicio Pastoral a Migrantes San Martín de Porres (SEPAMI), Diócesis de San Cristóbal de las Casas, A.C.

December, 2022

CLP_PC_021596

potentially lead children to being returned to risk and violence (as it has already occurred to children of other nationalities). Either way, while they await the resolution of their case, they spend many months at *Centros de Asistencia Social* (CAS), residential care institutions. The effects of all these practices negatively impact the well-being of children and families.

## 7. Gender-based violence against women and LGBTIQ+ individuals

During this monitoring trip, it was identified that gender-based violence is present for girls, women, and LGBTIQ+ persons along the entire migratory route. Girls and youth are at heightened risk of gender-based violence because they are the main target in contexts of sexual violence. Sexual violence is a risk already when they cross the Darien Gap, where, since 2019, violence against people on the move has been rising and worsening. The high levels of brutality in the Darien jungle led Doctors Without Borders to publicly demand safe routes between Colombia and Panama, and that governments protect people on the move from violence along the whole route.

During their journey across Mexico, girls, women, and LGBTIQ+ persons are also exposed to different forms of violence, among them sexual violence, when they take alternative countryside routes as a means to avoid the checkpoints on major roads run by the migration officials and security forces. The risk of sexual violence is also very high in the camp and tents where people spent the night in San Pedro, according to NGOs and international agencies, because no age, gender and diversity sensitive protection measures have been applied. Among other risk factors, there's the lack of exclusive spaces for women, children and LGBTIQ+ persons. Toilets are located in a poorly lit area, which leads some to use the street as an alternative, where there's no surveillance.

International agencies and NGOs provided support to sexual violence along the migratory route, including in Mexico. Governments and UN agencies have set up individual case management systems, but the capacity is insufficient and does not provide all the support that the Mexican government must fulfill in order to respect, protect and promote the human rights of survivors. One of the challenges is the lack of capacity to identify survivors of violence.

Another challenge is providing support to women and LGBTIQ+ individuals who prioritize continuing their migratory journey over their physical and psycho-emotional health. One of the reasons for this is fear or uncertainty about changes in immigration policy. There are other challenges for women and the LGBTIQ+ population in accessing comprehensive services and models, including the lack of a gender analysis-informed intersectoral, intersectional approach. There are also obstacles in individual case management systems that hinder access to the justice system for survivors without revictimizing them.

Another expression of gender-based violence is that some women feel they have no option but to start and continue their journey with their main perpetrator, especially in cases of intimate partner violence

16

CLP_PC_021610

(IPV), because they consider their partner/perpetrator their "caretaker" or "protector" from strangers who could be violent towards them. In the case of the LGBTIQ+ population, the most common expressions of gender-based violence are threats to their integrity or life due to their gender identity or sexual orientation and threats of sexual violence, which may have pushed them to embark in secondary or tertiary migrations.

> *"Because of our sexual orientation, [my partner's] coworkers started bullying him [...] he was assaulted [...] There were always many threats, and the decisive factor was when they showed up at the saloon, beat us, and threatened to kill us. And to prevent getting to that point, because their violence was going to continue, we decided to leave. That was when we lost everything [...] In fact, I came out from Venezuela due to a similar situation, I was attacked and stabbed four times. That is, the fact that I'm still alive is a miracle. In my country of origin, I was also assaulted due to my sexual orientation".*

As Fray Matías pointed out, there are individual case management systems, such as the *mesa interinstitucional,* an inter-institutional mechanism where some government bodies participate. There is another individual case management system for survivors of gender-based violence, created by organizations such as Fray Matías, Médicos del Mundo, and Doctors Without Borders, with the support of IOM and UNHCR. However, insufficient coordination between these entities and the specific obstacles faced by survivors on the move all hinder effective assistance. There are current attempts by the above organizations and others to map out services for women on the move. Nevertheless, to access some governmental services for survivors of gender-based violence, women first must file a complaint against their perpetrators, which is challenging due to misinformation, as well as mistrust and fear of the Mexican authorities.

CLP_PC_021611



# SURVIVING DETERRENCE:

## HOW US ASYLUM DETERRENCE POLICIES NORMALIZE GENDER-BASED VIOLENCE

A Report by Oxfam America and the Tahirih Justice Center

CLP_PC_021741

**Oxfam** is an international confederation of 21 organizations, working with its partners and allies, reaching out to millions of people around the world. Together, we tackle inequalities to end poverty and injustice, now and in the long term—for an equal future. For further information visit www.oxfam.org.

**The Tahirih Justice Center** is a national, nonprofit organization that serves immigrant survivors of gender-based violence. Tahirih's interdisciplinary, trauma-informed model of service combines free legal services and social services case management with bridge-building policy advocacy and research-based training and education. Tahirih's programs efficiently and effectively leverage donated professional services from a vast network of attorneys, medical professionals, and other experts to serve as many immigrant survivors as possible. By amplifying the experiences of survivors in communities, courts, and Congress, Tahirih's mission is to create a world in which all people share equal rights and live in safety and with dignity. For further information visit https://www.tahirih.org/.

**Authors:** Sara Duvisac, Research and Policy Advisor, American Council of Learned Societies/Mellon Public Fellow, Oxfam America; and Irena Sullivan, Senior Immigration Policy Counsel, Tahirih Justice Center

CLP_PC_021742

# 4. FINDINGS

## 4.1. HIGH RISK OF EXPOSURE TO GBV AT THE US-MEXICO BORDER

US expulsions, returns, and turnbacks of asylum seekers have exponentially increased the volume of individuals regularly concentrated at the border at any given time. Ninety-two percent of survey respondents have clients who have been expelled under Title 42, while 86 percent have clients who were turned away from the border without being able to make an asylum claim.[28] One estimate suggests that in February 2020, approximately 15,000 people were waiting at the border to begin asylum processes, with some of these individuals already having waited multiple years.[xiv] A recent estimate from April 2022 indicated that between 30,000 to 60,000 migrants were waiting at the US-Mexico border.[xv]

Our data indicate that rates of GBV in border cities in Mexico— where most of our interview respondents work—are very high: respondents estimate that anywhere between 30 percent and 90 percent of their clients experience GBV there. And 75 percent of survey respondents indicate that their clients have faced kidnapping and/or extortion at the border either frequently or about half the time; 68 percent indicate that their clients have been raped and/or sexually assaulted frequently at the border.

While various factors can impact the risk of GBV in any setting, 87 percent of interview respondents (26 out of 30) note that by forcing vulnerable individuals to wait at the border indefinitely, US deterrence policies foster conditions that significantly increase the risk of exposure to GBV. They do so in three specific ways:

1) Border closures[29] and expulsions increasingly force migrants into precarious housing conditions such as severely overcrowded shelters; informal, ad hoc camp settlements; and homelessness. These conditions make migrants more vulnerable to various forms of GBV.

2) Cartels and other organized criminal networks can more easily target migrants for GBV when they wait for prolonged periods of time at the border, are routinely expelled from the US, lack employment opportunities, and also lack secure housing.

3) Waiting at the border in Mexico, rather than being able to access the asylum process within the US, increases the likelihood that persecutors from home whom asylum seekers are fleeing will find and harm them with impunity.

### 4.1.1. OVERCROWDING AND INSECURE LIVING CONDITIONS

As noted above, US policies have closed the border to the majority of asylum seekers for the past three years. As a result, they have had to wait en masse for permission to enter and/or apply for relief for extended periods without access to safe, sustainable housing. According to our survey participants, migrants frequently experience overcrowding in shelters and informal camps, or homelessness after enrollment in RMX or after expulsion from the US under Title 42. Many providers directly tie the existence of the camps and overcrowding at shelters to US policies:

---

28   As a reminder, any time an asylum seeker is denied or blocked from making an asylum claim, it is referred to as a turnback

29   In this section, and throughout the rest of the of the report, we use the term "border closure" to encompass policies that "return" and "turn back" migrants and asylum seekers attempting to enter the US.

CLP_PC_021752

# The Mexican Asylum System in Regional Context

### HELEN KERWIN[†]

## I. INTRODUCTION

This Article examines the functioning and response of Mexico's asylum system to an exponential increase in asylum claims in recent years within the larger countervailing context of an aggressive border enforcement policy, in cooperation with the United States, that limits access to asylum. While scarcity of resources to attend to an ever-growing population of asylum-seekers goes some way toward explaining the existing protection gaps in the system, Mexico's policy of large-scale detention and deportation[1] itself constitutes the greatest barrier to effective access to asylum.

Since the introduction of a new asylum system administered and adjudicated entirely by the Mexican government in 2011, the number of asylum petitions presented annually has skyrocketed by more than 1,000 percent, from 752 in 2011 to 8,788 in 2016;[2] in 2017, asylum

© 2018 Helen Kerwin

[†] Legal Fellow, Inter-American Commission on Human Rights. J.D. The University of Texas School of Law; M.A. International Studies, The University of Oklahoma. The views expressed in this piece are the author's alone and do not reflect those of the Inter-American Commission or any other organization.

1. *E.g.* Jo Tuckman, *Mexico's Migration Crackdown Escalates Dangers for Central Americans*, THE GUARDIAN (Oct. 13, 2015, 8:30 AM), https://www.theguardian.com/world/2015/oct/13/mexico-central-american-migrants-journey-crackdown; *Mexico Deporta más Centroamericanos que EU*, EXCELSIOR (June 18, 2015, 2:45 PM), http://www.excelsior.com.mx/nacional/2015/06/18/1030178; *see infra* Section II.B.i.

2. Mark Manly (@MarkManly), TWITTER (Aug 23, 2017, 9:48 AM), https://twitter.com/MarkManly/status/900399250554662912; Mark Manly (@MarkManly), TWITTER (Sept. 7, 2017, 9:21 AM), https://twitter.com/MarkManly/status/905828381228498944. Manly is the current UNHCR Representative in Mexico.

CLP_PC_021945

2018]    THE MEXICAN ASYLUM SYSTEM IN REGIONAL CONTEXT    291

petitions reached a historic high of 14,596, fueling concerns about growing backlogs.[3] This growth in asylum petitions largely responds to worsening conditions in northern Central America (Honduras, El Salvador, and Guatemala)—where violence associated with gangs (*maras*), drug trafficking, and, in lesser measure, state actors, have caused the highest homicide rates in the world for countries not at war[4]—and Venezuela—where a deepening economic and political crisis has made access to food and medicine precarious.[5] Mexico also receives smaller numbers of Cuban and Haitian asylum-seekers, as well as asylum-seekers from outside the American continent.[6] At the same time, increased awareness of the existence of asylum in Mexico has likely led to a greater number of applications year on year.[7]

Given its proximity to northern Central America, Mexico is a

3.    Comisión Nacional de los Derechos Humanos (CNDH), Press Release: *La CNDH hace un llamado urgente al gobierno federal ante el posible colapso del sistema de protección a refugiados en Mexico* [CNDH urgently calls on the federal government given the possible collapse of the refugee protection system in Mexico], CNDH, February 25, 2018, http://www.cndh.org.mx/sites/all/doc/Comunicados/2018/Com_2018_046.pdf.

4.    *See generally* Kirk Semple, *Fleeing Gangs, Central American Families Surge Toward U.S.*, N.Y. TIMES (Nov. 12, 2016), https://www.nytimes.com/2016/11/13/world/americas/fleeing-gangs-central-american-families-surge-toward-us.html; Emilio González González, *Crisis Humanitaria, Violencia Criminal y Desplazamiento Forzado en el Triángulo Norte de Centroam. . .rica (Humanitarian Crisis and Survival Migration in Central America's Northern Triangle)*, 2 STAN. INT´L POL'Y REV. 27 (2015); *Arrancados de Raiz*, U.N. HIGHER COMMISSIONER ON REFUGEES [hereinafter UNHCR] (2014), http://www.acnur.org/fileadmin/scripts/doc.php?file=fileadmin/Documentos/Publicaciones/2014/9828; *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection*, UNHCR 6 (2016), http://www.unhcr.org/en-us/about-us/background/56fc266f4/children-on-the-run-full-report.html; *Women on the Run: First-Hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico*, UNHCR (2015), http://www.unhcr.org/en-us/publications/operations/5630f24c6/women-run.html.

5.    Meridith Kohut & Isayen Herrera, *As Venezuela Collapses, Children Are Dying of Hunger*, N.Y. TIMES (Dec. 17, 2017), https://www.nytimes.com/interactive/2017/12/17/world/americas/venezuela-children-starving.html?_r=0; Nicholas Casey, *Dying Infants and No Medicine: Inside Venezuela's Failing Hospitals*, N.Y. TIMES (May 15, 2016), https://www.nytimes.com/2016/05/16/world/americas/dying-infants-and-no-medicine-inside-venezuelas-failing-hospitals.html; Nicholas Casey, *Venezuelans Ransack Stores as Hunger Grips the Nation*, N.Y. TIMES (June 19, 2016), https://www.nytimes.com/2016/06/20/world/americas/venezuelans-ransack-stores-as-hunger-stalks-crumbling-nation.html; *see also Operation Portal: Venezuela Situation*, UNHCR (2018), https://data2.unhcr.org/en/situations/vensit (last visited Mar. 24, 2018).

6.    Comisión Mexicana de Ayuda a Refugiados (COMAR), *Estadísticas 2013–2017 (4to semestre)* [Statistics 2013–2017 (4th quarter)], SEGOB SECRETARÍA DE GOBERNACIÓN, https://www.gob.mx/cms/uploads/attachment/file/290340/ESTADISTICAS_2013_A_4TO_TRIMESTRE_2017.pdf (last visited May 12, 2018).

7.    *See*, *e.g.*, Andrea Villaseñor & Elba Coria, *Protection Gaps in Mexico*, FORCED MIGRATION REV. 6–9 (Oct. 2017).

KERWIN - THE MEXICAN ASYLUM SYSTEM FINAL (DO NOT DELETE)                     5/15/2018 12:34 PM

292         MARYLAND JOURNAL OF INTERNATIONAL LAW      [Vol. 33:290

critical country of asylum for persons fleeing violence in Honduras, El Salvador, and Guatemala. But Mexico's immigration policy in recent years has been better characterized by increased immigration enforcement and a heightened number of detentions and deportations, particularly following the so-called "surge" of unaccompanied Central American children who arrived at the United States' southern border in the summer of  2014 and the contemporaneous introduction of Mexico's Plan Frontera Sur ("Southern Border Plan"), first announced in July 2014.[8] Mexico's aggressive border enforcement has decreased access to the US' southern border—including to ports of entry,[9] where asylum-seekers have the right under international law to seek asylum—and correspondingly lowered detentions and deportations of Central Americans.

The logic of aggressive border enforcement dramatically impacts the availability of asylum to people who need it. This is evident, first, in the disparity between the number of deportations of Central Americans and the number of asylum petitions presented by Central Americans during this period—in 2016, less than six percent of the total number of Central Americans detained by Mexican authorities presented asylum petitions.[10] While no comprehensive studies currently exist on the total number of Central American nationals leaving their countries who may be in need of international protection, UNHCR has indicated that up to half of all Northern Triangle nationals leaving their countries could be in need of international protection.[11] The case of unaccompanied children is especially egregious. One study conducted in 2016 indicates that 58 percent of children leaving Central America may need international protection;[12] however, among the tens of thousands of children detained and deported each year, just 229 unaccompanied children presented asylum petitions in 2016.[13] These

8.   *See infra* Section II.B.i.

9.   Caitlin Dickerson & Miriam Jordan, *'No Asylum Here': Some Say U.S. Border Agents Rejected Them*, N.Y. TIMES (May 3, 2017), https://www.nytimes.com/2017/05/03/us/asylum-border-customs.html?_r=1&ref=nyt-es&mcid=nyt-es&subid=article.

10.   *Boletines Estadisticos*, SEGOB SECRETARÍA DE GOBERNACIÓN (Jan. 31, 2018), http://www.politicamigratoria.gob.mx/es_mx/SEGOB/Boletines_Estadisticos (according to government statistics, Mexico carried out 147,370 deportations in 2016 and received 8,788 asylum petitions in the same year).

11.   James Frederick, *Before Migrants Reach U.S., Mexico Deports Central Americans*, NPR (Aug. 26, 2016, 4:29 PM), https://www.npr.org/2016/08/26/491531862/before-migrants-reach-u-s-mexico-deports-central-americans; *see also Children on the Run*, *supra* note 4, at 6; *Women on the Run*, *supra* note 4.

12.   *Children on the Run*, *supra* note 4, at 6.

13.   This represents a slight increase over 138 petitions presented in 2015, and 55 presented in 2013.

CLP_PC_021947

2018]    THE MEXICAN ASYLUM SYSTEM IN REGIONAL CONTEXT        293

data indicate serious gaps in access to protection for those who wish to seek it in Mexico.

This article proceeds in three parts: first, it describes Mexico's substantive asylum law and adjudication in theory and in practice, based partially on interviews with Mexican asylum practitioners;[14] second, it analyzes some of the most serious barriers to asylum in Mexico, loosely classified into issues related to resource constraints and issues related to the policy of massive detention and deportation, signaling in particular the concerning situation of unaccompanied children. Finally, it concludes by considering the importance of both ensuring that Mexico's asylum system provides accessible and effective international protection to those who need it and choose to pursue it, while also recognizing the importance of family unity and effective enjoyment of rights for vulnerable groups, and that the asylum system is not itself a mechanism of border control.

## II. LEGAL FRAMEWORK AND THE ADMINISTRATIVE ASYLUM PROCESS

Mexico's substantive law of asylum offers fairly broad protection based on a variety of international and regional sources, and the administrative asylum process administered by the Mexican Refugee Commission ("COMAR," *Comisión Mexicana de Ayuda a Refugiados*) is designed to be efficient. However, in practice, practitioners express concerns about the application of the law and the celerity and fairness of the administrative process. This section of the Article provides basic information about Mexico's asylum law and administrative asylum process, about which there is little information available in English to date, as well as about the practical application of the law and procedure.

### A. The Substantive Law

Mexico's refugee law, the Law on Refugees, Complementary Protection, and Political Asylum (*Ley sobre Refugiados, Protección Complementaria y Asilo Político*), was passed in 2011 and updated in 2014.[15] The law incorporates four separate forms of international

---

14. Interviews with Representatives from Fray Matías Centro de Derechos Humanos (from Tapachula and Tuxtla Gutierrez, Chiapas), Sin Fronteras (from Mexico City), and Representatives from the Clínica Jurídica de Refugiados "Alaíde Foppa" (from the Universidad Iberoamericana in Mexico City). Interviews took place in Austin, Tx. (May 9, 2017).

15. Ley Sobre Refugiados y Protección Complementaria (Law on Refugees and Complementary Protection), Diario Oficial de la Federación [DOF] 27-01-2011, últimas reformas DOF 30-10-2014 (Mex.).

CLP_PC_021948

300    MARYLAND JOURNAL OF INTERNATIONAL LAW    [Vol. 33:290

information-gathering mechanism.[54]

## III. CURRENT CHALLENGES FOR MEXICO'S ASYLUM SYSTEM

### A. Growing Numbers of Asylum-Seekers Strain COMAR and Civil Society Capacity

The number of asylum claims presented each year in Mexico has skyrocketed since 2011.[55] While the makeup of asylum applications has been fairly constant in recent years, with Honduras consistently in first place and El Salvador in second or third, in 2017, the number of Venezuelan asylum claimants increased significantly.[56]

While these growing numbers likely reflect a growth in the absolute number of persons in need of international protection fleeing Central America, they also undoubtedly indicate an increased knowledge of and access to the asylum system in Mexico, driven by increased outreach efforts by governmental, international, and civil society agencies, and word of mouth. A growth in asylum claims of more than 1000 percent in six years has, unsurprisingly, put serious strain on existing systems for aid and attention to migrants. The following sections examine some of the administrative strains being put on this system.

### 1. COMAR

Undoubtedly the most serious barrier to the effective adjudication of asylum claims in Mexico is COMAR's extremely limited staff and its limited geographic reach. Until late 2016, there were fewer than 20 COMAR officials in the country; there are now reportedly between 30 and 40 officials who hear and decide cases.[57] The statutory 45-day

that COMAR and INM violate the human rights of asylum-seekers], CMDPDH (Oct. 20, 2017), http://cmdpdh.org/2017/10/recomendacion-cndh-reconoce-comar-e-inm-violan-derechos-humanos-solicitantes-asilo/.

54. Interview with Representatives from Sin Fronteras and Clinica Jurídica de Refugiados "Alaíde Foppa," *supra* note 14.

55. *See supra* notes 2, 3 and accompanying text; Kevin Lui, *Mexico's Asylum Application Numbers Are Up by 150% Since the U.S. Election*, TIME (Apr. 19, 2017), http://time.com/4745785/mexico-asylum-applications-trump-election/.

56. Mark Manly, (@MarkManly), TWITTER (Sept. 7, 2017, 9:21 AM), https://twitter.com/MarkManly/status/905828381228498944.

57. Interview with Representatives from Sin Fronteras, Clínica Juridica de Refugiados "Alaíde Foppa," and Fray Matías Centro de Derechos Humanos, *supra* note 14; *see also* Luis Alfredo Arriola Vega, *Policy Adrift: Mexico's Southern Border Program*, JAMES A. BAKER III INSTITUTE FOR PUBLIC POLICY OF RICE UNIVERSITY, 4 (June 2017), https://www.bakerinstitute.org/media/files/files/fa7ac127/MEX-pub-FronteraSur-

CLP_PC_021955

2018]    THE MEXICAN ASYLUM SYSTEM IN REGIONAL CONTEXT        301

period for adjudication is being extended (usually for an additional forty-five days) due to the high numbers of petitions with increasing frequency, reportedly often without advising asylum-seekers—and since the October 2017 earthquake that affected Mexico City, wait times are reportedly even longer.[58] Staff turnover is reported to be very high, making training a constant challenge.[59]

   In this context, practitioners report that decisions by COMAR often demonstrate a lack of legal analysis and reasoning.[60] This is likely a result both of limited training and limited time to spend on cases. Another serious procedural flaw identified by practitioners is that COMAR generally interviews only the person designated as the principal applicant on the petition (usually the male head of household), which is both *machista* and can lead to negative case outcomes when other family members, including wives and adolescent children, have relevant information about the claim but are not given the opportunity to communicate it to adjudicators. Additionally, merits interviews are recorded, but practitioners report that it is more common for COMAR officials to review and use the interview notes (which are not a transcript) for their written decision.[61] Practitioners report that COMAR is regularly performing interviews just a few days before the 45-day window for adjudication runs out, raising concerns that COMAR is writing its decisions largely on the basis of the intake forms, rather than on the interviews.[62] Taken together, these issues present serious concerns about the consistency and fairness of the COMAR adjudication process.[63]

---

062317.pdf.

   58.   Diana Higareda, *México deja a refugiados en el limbo*, EL UNIVERSAL (Apr. 2, 2018), http://www.eluniversal.com.mx/nacion/sociedad/mexico-deja-refugiados-en-el-limbo.

   59.   Interview with Representatives from Fray Matías Centro de Derechos Humanos, Sin Fronteras, Clínica Jurídica de Refugiados "Alaíde Foppa," *supra* note 14.

   60.   *Id.*; *see also Informe Preliminar: La interpretación y aplicación del derecho internacional y nacional de los refugiados en México: Análisis de las resoluciones de primera instancia de la Comisión Mexicana de Ayuda a Refugiados*, COMISIÓN MEXICANA DE AYUDA A REFUGIADOS (2017), http://192.203.177.41/sites/all/themes/ibero/descargables/ibero/pdh/resumen-ejecutivo-informe-asilo.pdf.

   61.   Interview with Representatives from Clínica Jurídica de Refugiados "Alaíde Foppa," Fray Matías Centro de Derechos Humanos, and Sin Fronteras, *supra* note 14.

   62.   *Id.*

   63.   The phenomenon of disparities in asylum adjudication is an issue that would also benefit from further comparative research among countries in the future, in the areas of both procedural due process and substantive guarantees of protection. *See*, *e.g.*, JAYA RAMJI-NOGALES, ANDREW I. SCHOENHOLTZ, & PHILIP G. SCHRAG, REFUGEE ROULETTE: DISPARITIES IN ASYLUM ADJUDICATION AND PROPOSALS FOR REFORM (2009); REBECCA HAMLIN, LET ME BE A REFUGEE: ADMINISTRATIVE JUSTICE AND THE POLITICS OF ASYLUM IN THE UNITED STATES,

KERWIN - THE MEXICAN ASYLUM SYSTEM FINAL (DO NOT DELETE)    5/15/2018 12:34 PM

302    MARYLAND JOURNAL OF INTERNATIONAL LAW    [Vol. 33:290

Because COMAR has brick-and-mortar delegations only in Mexico City, Tapachula, and Acayucan, asylum claims presented in other parts of the country may be adjudicated by the Mexico City office, or by mobile field units.[64] These geographic limitations mean that asylum interviews often take place in general immigration facilities rather than in dedicated asylum offices. They also often take place by telephone under inadequate conditions, including a lack of privacy, though advocacy by practitioners is beginning to change the practice of telephone interviews.[65]

### 2. Civil Society

The increase in asylum-seekers in Mexico has also placed corresponding burdens on civil society actors, including migrant shelters, lawyers, social workers, psychotherapists, food banks, and other providers of humanitarian aid, among others.

The migrant shelter network in Mexico continues to adjust to provide services to asylum-seekers during multi-month stays, rather than to migrant workers during overnight stays, with substantial financial and logistical support from UNHCR.[66] These shelters provide an important point of civil society contact with migrants in Mexico, providing humanitarian aid and information about access to asylum, as well as a point of contact to gather demographic and qualitative data about the situation of irregular migrants in Mexico.[67]

The few NGOs that provide legal representation to asylum-seekers are similarly strained by the growing demand for their services.

---

CANADA, AND AUSTRALIA (2014).

64.  *Oficinas y Delegaciones de la COMAR, supra* note 40.

65.  Interview with Representatives from Fray Matías Centro de Derechos Humanos, Clínica Jurídica de Refugiados "Alaíde Foppa," *supra* note 14.

66.  Alejandro Olayo-Méndez, *La 72: An Oasis Along the Migration Routes in Mexico*, 56 FORCED MIGRATION REV. 10, 10–11 (2017); Víctor Hugo Gutierrez Albertos, *La 72 Como Espacio Intercultural de Emancipación y Resistencia Trans en la Frontera sur de México*, XII No. 2 PENÍNSULA 69, 80 (2017); *Mexican Shelter Provides Safe Space for Central Americans*, UNHCR (Oct. 17, 2017), http://www.unhcr.org/en-us/news/latest/2017/10/59e085fb4/mexican-shelter-provides-safe-space-central-americans.html.

67.  *See*, *e.g.*, REDODEM (Red de Documentación de las Organizaciones Defensoras de Migrantes), MIGRACIÓN EN TRÁNSITO: ROSTRO DE UNA CRISIS HUMANITARIA INTERNACIONAL (2016), https://www.entreculturas.org/sites/default/files/informe_redodem.pdf (report on the situation of irregular migrants in Mexico based on data gathered by a network of migrant shelters across Mexico); CNDH, LOS DESAFÍOS DE LA MIGRACIÓN Y LOS ALBERGUES COMO OASIS: ENCUESTA NACIONAL DE PERSONAS MIGRANTES EN TRÁNSITO POR MÉXICO (2017), http://www.cndh.org.mx/sites/all/doc/Informes/Especiales/Informe-Especial-Desafios-migracion.pdf.

CLP_PC_021957

2018]    THE MEXICAN ASYLUM SYSTEM IN REGIONAL CONTEXT        303

Lawyers additionally report barriers to performing their jobs, including limitations on the scope of representation permitted by COMAR.[68] The availability of psychological services for asylum-seekers and refugees, particularly outside of Mexico City, is similarly limited.[69]

Asylum-seekers often face serious barriers to making ends meet and integrating into Mexican society.[70] Humanitarian assistance and other assistance to asylum-seekers remains limited, and perhaps the most common complaint among asylum-seekers is that it is difficult in practice to find legal work.[71] First, because their legal work authorization is difficult to prove and access, and second, because the lived experience of being an asylum-seeker in Mexico is one of waiting in endless queues: to check in weekly with COMAR and/or INM, and to obtain humanitarian aid, medical care, and food.[72] These realities severely limit the options for stable work.[73] Difficulty finding work, or well-paid work, makes conditions of life difficult for asylum-seekers.[74]

### B. The Larger Context of Aggressive Border Enforcement Limits Access to Asylum

Notwithstanding the serious challenges to accessing asylum in Mexico generated by the context of scarce resources described above, access is much more severely limited by Mexico's wider immigration policy of large-scale detention and deportation. This limits migrants' access to information about asylum as well as access to the proceeding itself, disincentivizes migrants from beginning or completing the process, including due to intolerable detention conditions, and

68. Interview with Representatives from Fray Matías Centro de Derechos Humanos, Clínica Jurídica de Refugiados "Alaíde Foppa," and Sin Fronteras, *supra* note 14.

69. *Id.*; *see also* Comisión Interamericana de Derechos Humanos, *México: Solicitantes de Asilo y Refugiados*, YOUTUBE (Mar. 17, 2017), https://www.youtube.com/watch?v=i8eQaP89u_c; Inter-American Commission on Human Rights (IACHR), *Report on the 161st Session of the IACHR* (Mar. 22, 2017), http://www.oas.org/en/iachr/media_center/PReleases/2017/035A.asp (giving brief summary in English of "Mexico: Solicitantes de asilo y refugiados"); *Situación de los Derechos Humanos de las Personas Solicitantes de Asilo y Refugiadas en México*, 20–26 (Mar. 17, 2017) http://sinfronteras.org.mx/wp-content/uploads/2017/03/InformeAuienciaCIDH_-17_Marzo.pdf (report from above-referenced hearing).

70. Interview with Representatives from Fray Matías Centro de Derechos Humanos, Clínica Jurídica de Refugiados "Alaíde Foppa," and Sin Fronteras, *supra* note 14; *see also* Diana Higareda, *México deja a refugiados en limbo*, EL UNIVERSAL (Apr. 2, 2018), http://www.eluniversal.com.mx/nacion/sociedad/mexico-deja-refugiados-en-el-limbo.

71. *Id.*

72. *Id.*

73. *Id.*

74. *Id.*

CLP_PC_021958

KERWIN - THE MEXICAN ASYLUM SYSTEM FINAL (DO NOT DELETE)                    5/15/2018 12:34 PM

304        MARYLAND JOURNAL OF INTERNATIONAL LAW        [Vol. 33:290

particularly harms unaccompanied children.

    1. Plan Frontera Sur and U.S.-Mexico Border Enforcement
       Cooperation

Mexico's growing asylum system exists within a larger policy context of mass immigration detention, and deportation, carried out largely for the benefit of the United States.[75] The United States has specifically cooperated with and given money to Mexico for border enforcement at least since 2008, within the framework of the Mérida Initiative.[76] Since July 2014, when the so-called "Plan Frontera Sur" ("Southern Border Plan") was first publicly announced,[77] Mexico has substantially increased immigration enforcement across the country, particularly in the southern states.[78] The announcement of the Plan Frontera Sur coincided virtually exactly with the peak of the "surge" of unaccompanied Central American children arriving on the U.S.'s southern border, which provoked heavy media coverage and public concern that the children presented a grave threat to U.S. border security and an unsustainable burden on its immigration system.[79] The Plan Frontera Sur was created to address migration, security, and border enforcement issues, though it has been criticized as "disjointed" and incomplete policy.[80]

While Mexico's southern border with Guatemala—the vast majority of which is composed of the shallow Suchiate River and the Petén rainforest—has traditionally been described with adjectives like

---

    75.   Arriola Vega, *supra* note 57.

    76.   *Id.* at 6.

    77.   CHRISTOPHER WILSON & PEDRO VALENZUELA, WILSON CENTER MEXICO'S SOUTHERN BORDER STRATEGY: PROGRAMA FRONTERA SUR (2014).

    78.   Alejandra Castillo, *The Mexican Government's Frontera Sur Program: An Inconsistent Immigration Policy*, COUNCIL ON HEMISPHERIC AFFAIRS (OCT. 25, 2016), http://www.coha.org/wp-content/uploads/2016/10/The-Mexican-Government%E2%80%99s-Frontera-Sur-Program-An-Inconsistent-Immigration-Policy.pdf.

    79.   Some academics and practitioners have questioned whether this event in fact constituted a "crisis," given that the numbers of women and children who arrived on the U.S.'s southern border that summer constituted neither a historic high in immigration nor an increase in arrivals to the U.S. out of line with recent trends in migration. *See, e.g.,* Arriola Vega, *supra* note 57; Karen Musalo & Eunice Lee, *Seeking a Rational Response to a Regional Refugee Crisis: Lessons from the Summer 2014 "Surge" of Central American Women and Children at the US-Mexico Border*, 5 J. ON MIGRATION AND HUM. SECURITY 137 (2017); William C. Gruben, & Tony Payan, *"Illegal" Immigration on the U.S.-Mexico Border: Is it Really a Crisis?*, BAKER INSTITUTE FOR PUBLIC POLICY (Oct. 17, 2014, 5:46 PM), https://www.bakerinstitute.org/research/illegal-immigration-usmexico-border-it-really-crisis/.

    80.   Arriola Vega, *supra* note 57.

CLP_PC_021959

"porous"[81] (not to say, to a large extent, nonexistent), Plan Frontera Sur has concentrated immigration enforcement operations particularly in southern states like Chiapas, Tabasco, Oaxaca, and Veracruz—sometimes described as a policy of "pushing the U.S. border south" or creating a new "vertical border"[82] within Mexico. This increased border enforcement, with the collaboration and financing of the U.S. government largely via Mérida Initiative funds,[83] has quickly turned Mexico into the country that deports the greatest number of Central Americans; the uptick of deportations from Mexico in recent years corresponds quite closely with a decrease in deportations from the U.S. (see Figure 1). Recently, the Trump Administration has proposed taking border externalization a step further by designating Mexico as a so-called "Safe Third Country," which could prevent tens of thousands of Central American and other asylum-seekers who reach the U.S. via Mexico from effectively accessing asylum in the U.S. if it is determined that they could have requested asylum in Mexico.[84] It has also contributed to a fragmentation of migrant routes through southern Mexico away from the traditional train routes, taking migrants further from the established network of shelters and exposing them to danger at the hands of human traffickers and criminal groups.[85]

81. CLARE RIBANDO SEELKE & KRISTIN FINKLEA, CONG. RESEARCH SERV., RL41349, U.S.-MEXICAN SECURITY COOPERATION: THE MÉRIDA INITIATIVE AND BEYOND, 21 (2017).

82. *Cf.* José Carlos Yee Quintero & Eduardo Torre Cantalapiedra, *Lidiando con la Frontera Vertical: Estrategias Migratorias de los Hondureños en Tránsito por México [Dealing with the vertical border: migration strategies of Hondurans in transit through Mexico]*, 47 REMHU - REV. INTERDISCIP. MOBIL. HUM. 97, 99–100 (2016).

83. SEELKE & FINKLEA, *supra* note 81; Arriola Vega, *supra* note 57, at 6. While the full extent and nature of cooperation in this area is not publicly known, reports indicate that the U.S. additionally provides other kinds of technical assistance and equipment to Mexican authorities as well. ADAM ISACSON, MAUREEN MEYER, & HANNAH SMITH, *Increased Enforcement at Mexico's Southern Border: An Update on Security, Migration, and U.S. Assistance*, WASHINGTON OFFICE ON LATIN AMERICA (WOLA), 2 (2015) https://www.wola.org/files/WOLA_Increased_Enforcement_at_Mexico's_Southern_Border _Nov2015.pdf.

84. HUM. RTS. FIRST, DANGEROUS TERRITORY: MEXICO STILL NOT SAFE FOR REFUGEES, 1 (2017).

85. WASHINGTON OFFICE ON LATIN AMERICA, *Migration through Mexico: A Humanitarian Emergency* (2016), https://www.wola.org/analysis/migration-through-mexico-a-humanitarian-emergency/.

CLP_PC_021960

306        MARYLAND JOURNAL OF INTERNATIONAL LAW        [Vol. 33:290

FIGURE 1[86]



The growth in deportations from Mexico in recent years has been enormous, and almost entirely targeted toward the detention and deportation of nationals of Guatemala, Honduras, or El Salvador ("Northern Triangle nationals").[87] Whereas in 2013, Mexico detained a total of 86,298 individuals and deported 80,902, by 2015 that number peaked at 198,141 detentions and 181,163 deportations—of which 177,949 detentions (89.8 percent) and 175,136 deportations (96.7 percent) were of Northern Triangle nationals.[88] In 2016, Mexico detained 186,216 and deported 159,872 foreigners, of which 150,035 (80.6 percent) and 149,540 (93.5 percent), respectively, were Northern Triangle nationals.[89]

### 2. INM Detention and Deportation Practices

The principal agency in charge of administering Mexico's "deportation machine" is the Instituto Nacional de Migración (INM,

---

86. Department of Homeland Security (DHS) and Secretaría de Gobernación (SEGOB) statistics.

87. *See* RODRIGO DOMINGUEZ VILLEGAS & VICTORIA RIETIG, MIGRATION POLICY INSTITUTE, MIGRANTS DEPORTED FROM THE UNITED STATES AND MEXICO TO THE NORTHERN TRIANGLE, A STATISTICAL AND SOCIOECONOMIC PROFILE, 1 (2015) ("Together, the United States and Mexico have apprehended almost 1 million people who originated from the Northern Triangle of Central America in the past five years, and have deported more than 800,000 of them").

88. UNIDAD DE POLÍTICA MIGRATORIA, BOLETÍN MENSUAL DE ESTADÍSTICAS MIGRATORIAS 2017 (2017).

89. *Id.*

2018]    THE MEXICAN ASYLUM SYSTEM IN REGIONAL CONTEXT    307

National Migration Institute), which carries out the mass detention and deportation of migrants.[90] As an organ of the State, INM is obligated to act to guarantee the State's obligation of non-refoulement by identifying, referring, and, in every case, avoiding the deportation of individuals who may need international protection.[91] However, practitioners, asylum-seekers, and international human rights organizations regularly report that INM creates barriers to accessing the asylum system and sometimes fails to guarantee access even to those who expressly state their desire to seek asylum.[92] Indeed, a recent survey by Amnesty International found that as many as 40 percent of respondents who had been detained by INM gave "solid indications" of having been returned to their home countries despite evidence of a need for international protection, in likely violation of international law.[93]

Asylum-seekers may request asylum before COMAR or INM. While COMAR offices currently exist only in Mexico City; Tapachula, Chiapas; and Acayucan, Veracruz, INM delegations exist throughout the country; the vast majority of potential asylum-seekers are thus more likely to first come into contact with INM than with COMAR. Nonetheless, INM officials and asylum-seekers alike see these delegations as primarily involved in immigration enforcement procedures, including detention and deportation, rather than processing of refugee claims.[94] While any person in immigration detention (*estación migratoria*, EM) has the right to request asylum before the INM officers, reports of poor detention conditions, abusive

90.  *¿Qué hacemos? [What do we do?]*, INSTITUTO NACIONAL DE MIGRACIÓN, https://www.gob.mx/inm/que-hacemos (Mex.).

91.  *Ley de Refugiados*. *See* 1951 Convention Relating to the Status of Refugees, 22 Apr. 1954, 189 U.N.T.S. 150, art. 33; Case of the Pacheco Tineo Family v. Bolivia, Inter-Am. Ct. H.R. (Nov. 25, 2013), http://www.corteidh.or.cr/docs/casos/articulos/seriec_272_ing.pdf; Rights and Guarantees of Children in the Context of Migration and/or in Need of International Protection, Advisory Opinion OC-21/14, Inter-Am. Ct. H.R. (Aug. 19, 2014), http://www.corteidh.or.cr/docs/opiniones/seriea_21_eng.pdf.

92.  *Closed Doors: Mexico's Failure to Protect Central American Refugee and Migrant Children*, HUMAN RIGHTS WATCH, 48 (2016), https://www.hrw.org/report/2016/03/31/closed-doors/mexicos-failure-protect-central-american-refugee-and-migrant-children; Joselin Barja Coria, *Derechos Cautivos: La situación de las personas migrantes y sujetas a protección internacional en los centros de detención migratoria: siete experiencias de monitoreo desde la sociedad civil* (2015); *Facing Walls: USA and Mexico's Violations of the Rights of Asylum-Seekers*, AMNESTY INTERNATIONAL (2017), https://www.amnestyusa.org/reports/facing-walls-usa-mexicos-violation-rights-asylum-seekers/.

93.  *Descarga el informe 'Ignoradas y sin protección', la mortal devolución de personas solicitantes de asilo*, AMNESTY INTERNATIONAL, (Jan. 23, 2018), https://amnistia.org.mx/contenido/descarga-el-informe-ignoradas-y-sin-proteccion-la-mortal-devolucion-de-personas-solicitantes-de-asilo/.

94.  *Closed Doors*, *supra* note 92.

308      MARYLAND JOURNAL OF INTERNATIONAL LAW      [Vol. 33:290

behavior by immigration officials, a lack of adequate information inside detention centers about the existence and availability of asylum, insecurity inside the facilities, and attempts by immigration officials to dissuade migrants from claiming asylum, or to convince migrants that they should accept a voluntary deportation[95] and come back to seek asylum in liberty, are common factors that impede migrants from requesting asylum in detention.[96] Of course, migrants in parts of the country where COMAR is not located are likely to be understandably wary of approaching INM in liberty to request asylum at all, which further limits access to protection.

Conditions in Mexican immigration detention centers are notoriously bad.[97] Asylum-seekers and other individuals who may need international protection detained in INM facilities may request deportation because they cannot endure the prison-like conditions of the detention centers.[98] For example, the Siglo XXI detention center in Tapachula, Chiapas—the largest immigration detention facility in Latin America, with the capacity to hold up to 990 migrants[99]—is badly overcrowded, forcing migrants to sleep on cots or mats in crowded rooms where lights are left on all night.[100] There are separate

[95]. Unlike in the U.S., prior deportations from Mexico do not in general have future immigration consequences, so asylum-seekers should not fear future ineligibility for asylum as a consequence of accepting a deportation. (With the caveat that, if they made a prior asylum claim, a lack of new facts/persecution in a future claim may be a bar to success on the merits, as in the U.S.)

[96]. *See generally Closed Doors*, *supra* note 92; *see also The Cost of Stemming the Tide: How Immigration Enforcement Practices in Southern Mexico Limit Migrant Children's Access to International Protection*, GEORGETOWN LAW HUMAN RIGHTS INSTITUTE, 35 (2015), https://www.law.georgetown.edu/academics/centers-institutes/human-rights-institute/fact-finding/upload/HRI-Fact-Finding-Report-Stemming-the-Tide-Web-PDF_English.pdf; Joselin Barja Coria, *Derechos Cautivos: La situación de las personas migrantes y sujetas a protección internacional en los centros de detención migratoria: siete experiencias de monitoreo desde la sociedad civil* (2015).

[97]. *See, e.g.*, ARDELIO VARGAS FOSADO, COMISIÓN NACIONAL DE DERECHOS HUMANOS, INFORME 7/2016 DEL MECANISMO NACIONAL DE PREVENCIÓN DE LA TORTURA SOBRE ESTACIONES MIGRATORIAS Y ESTANCIA PROVISIONALES EN LOS ESTADOS DE GUERRERO, MICHOACÁN, NUEVO LEÓN, QUINTANA ROO, SONORA Y VERACRUZ (2016) http://www.cndh.org.mx/sites/all/doc/PrevTortura/7_2016.pdf (Mex.); Valeria Fernández, *On the way to the US, children seeking asylum are often put in Mexico's detention centers*, PRI (Jan. 3, 2017), https://www.pri.org/stories/2017-01-03/children-fleeing-violence-central-america-who-don-t-make-it-us-often-end-mexican; *Closed Doors*, *supra* note 92.

[98]. *The Cost of Stemming the Tide*, *supra* note 96, at 35–37; *see also* CENTER FOR GENDER AND REFUGEE STUDIES, NIÑEZ Y MIGRACIÓN EN CENTRO Y NORTE AMERICA: CAUSAS, POLÍTICAS, PRÁCTICAS Y DESAFÍOS, 249–250 (Feb. 2015), http://www.acnur.org/t3/fileadmin/Documentos/Publicaciones/2015/9927.pdf?view=1.

[99]. *See, e.g. The Cost of Stemming the Tide*, *supra* note 96, at 22, n.85.

[100]. *Closed Doors*, *supra* note 92 ("Accounts from children and adults held in Tapachula's Siglo XXI detention center indicate not only that it is overcrowded but also that mattresses are in short supply; moreover, they described conditions that were far less hygienic than those we

CLP_PC_021963

2018]    THE MEXICAN ASYLUM SYSTEM IN REGIONAL CONTEXT    309

areas for men, women, and adolescents, aged 13-17[101] (unaccompanied children are turned over to child protection officials).[102] Families are generally separated,[103] except for mothers with children aged 12 and under, or adolescent daughters.[104] Despite improvements in the use of alternatives to detention, immigration detention continues to be "the rule and not the exception."[105]

The situation of unaccompanied children in detention is especially concerning. By law, unaccompanied child asylum-seekers must be referred to Family Welfare Agency ("DIF") shelters, where they must stay at least until the adjudication of their asylum claims.[106] The DIF shelters are secure facilities—children cannot leave the facility and are not integrated into the community—and so are not completely distinct from detention centers.[107] Furthermore, many unaccompanied adolescent boys and girls, as well as children accompanied by their mothers, may be held in adult immigration detention.[108] Such detention violates the regulations implementing the Law on Children's Rights, which prohibit immigration detention of children, both accompanied and unaccompanied,[109] as well as

saw in the Acayucan immigration detention center."); *The Cost of Stemming the Tide*, *supra* note 96, at 36; Barja Coria, *supra* note 96, at 67.

101.    *The Cost of Stemming the Tide*, *supra* note 96, at 33; Baria Coria, *supra* note 96, at 67.

102.    *The Cost of Stemming the Tide*, *supra* note 96 ("Transfer to DIF is the exception rather than the rule, even though Mexican law calls for the immediate transfer of all unaccompanied children to DIF shelters.")

103.    *Closed Doors*, *supra* note 92, at 86 ("Mexico's INM-run immigration detention centers that are authorized to receive children usually have separate sections for adult men, adolescent boys, and women and girls, meaning that families are generally separated when they are detained"); GEORGETOWN LAW HUMAN RIGHTS INSTITUTE, *The Cost of Stemming the Tide* 33 (2015).

104.    *Closed Doors*, *supra* note 92, at 87("Children under the age of 12 are generally assigned to a detention center's section for women and girls if they have mothers or other family members in that section. Unaccompanied boys under 12 may also be held in the section for women and girls."); Baria Coria, *supra* note 96, at 69 ("Los niños y niñas tienen un tratamiento diferencial según sexo y edad: las niñas de 12 a 17 años permanecen con sus madres en el módulo de mujeres, pero los niños de la misma edad son detenidos en el área específica de adolescentes").

105.    Simón Hernández León, *La política de detención de solicitantes de asilo en Mexico y su impacto en la integridad personal*, NEXOS, February 27, 2018, https://eljuegodelacorte.nexos.com.mx/?p=7777.

106.    Reglamento de la Ley General de los Derechos de Niñas, Niños y Adolescentes [RLGDNNA], Diario Oficial de la Federación [DOF] 02-12-2015.

107.    *See*, *e.g. Closed Doors*, *supra* note 92, at 104.

108.    *See also Facing Walls*, *supra* note 92, at 32–33.

109.    Reglamento de la Ley General de los Derechos de Niñas, Niños y Adolescentes [RLGDNNA], Art. 111, Diario Oficial de la Federación [DOF] 02-12-2015. [T2: Foreign Jurisdictions – Mexico – Regulations] ("Migrant children, whether or not traveling in the company of an adult person, shall at no time be deprived of their liberty in detention centers,

KERWIN - THE MEXICAN ASYLUM SYSTEM FINAL (DO NOT DELETE)                    5/15/2018 12:34 PM

310          MARYLAND JOURNAL OF INTERNATIONAL LAW      [Vol. 33:290

international law.[110]

### 3. Issues Within the Asylum System

The repressive logic of Mexico's migration system is further replicated within aspects of its international protection system, principally in limitations placed on asylum-seekers' freedom of movement during the adjudication process, as well as the treatment of unaccompanied or separated migrant children.

COMAR places a variety of restrictions on asylum-seekers' freedom of movement during the adjudication process with the apparent aim of preventing movement within the country, including northward, during adjudication. Asylum-seekers are not permitted to travel outside of the Mexican state in which they request asylum without prior authorization by COMAR until they receive a positive adjudication of their application;[111] transfers within Mexico are generally permitted only for reasons of personal safety or upon proof of relation to a family member in another part of the country who can demonstrate financial ability to receive the asylum-seeker.[112] COMAR tends to be quite stringent with requests for transfer of asylum-seekers, likely because transfers away from states where it has delegations place administrative burdens on COMAR, and because it tends to be suspicious of requests to relocate further north in Mexico, perhaps considering that individuals will seek to abandon their claims in

---

nor in any other immigration detention facility.")

110.   *Rights and Guarantees of Children in the Context of Migration and/or in Need of International Protection*, Advisory Opinion OC-21/14, Inter-Am. Ct. H.R. ¶ 154 (Aug. 19, 2014), http://www.corteidh.or.cr/docs/opiniones/seriea_21_eng.pdf ("[T]he Court finds that the deprivation of liberty of children based exclusively on migratory reasons exceeds the requirement of necessity, because this measure is not absolutely essential in order to ensure their appearance at the immigration proceedings or to guarantee the implementation of a deportation order … [T]he Court finds that the deprivation of liberty of a child in this context can never be understood as a measure that responds to the child's best interest. …In sum … the deprivation of liberty of a child migrant in an irregular situation, ordered on this basis alone, is arbitrary and, consequently, contrary to both the Convention and the American Declaration."); Comm. on the Rights of the Child, General Comment No. 6: Treatment of Unaccompanied and Separated Children Outside their Country of Origin, ¶ 61, U.N. Doc. CRC/GC/2005/6 (Sept. 1, 2005), http://www.refworld.org/docid/42dd174b4.html; DETENTION GUIDELINES: GUIDELINES ON THE APPLICABLE CRITERIA AND STANDARDS RELATING TO THE DETENTION OF ASYLUM-SEEKERS AND ALTERNATIVES TO DETENTION, UNHCR, Guideline 9.2 (2012), http://www.unhcr.org/505b10ee9.html.

111.   *See generally Facing Walls*, note 92 (making the argument to put in place special mechanisms for vulnerable groups of asylum-seekers, in particular transgender women, that may need to be urgently transferred from border areas to other parts of the country to await the outcome of their asylum proceedings).

112.   Interview with representatives from Fray Matías Centro de Derechos Humanos, Sin Fronteras, Clínica Jurídica de Refugiados "Alaíde Foppa," *supra* note 14.

CLP_PC_021965

2018]    THE MEXICAN ASYLUM SYSTEM IN REGIONAL CONTEXT    311

Mexico and travel on to the United States if they are permitted freedom of movement during the asylum process.[113] Additionally, asylum-seekers may be required to check in ("ir a firmar") weekly with COMAR and/or INM in the place where their asylum claim is being adjudicated to ensure that the person is following through with the asylum application and process.[114]

The situation of unaccompanied or separated children in Mexico is particularly concerning. While estimates indicate that more than half of Central American children in Mexico may be in need of international protection, the number of asylum claims presented yearly by unaccompanied children is shockingly low. In 2015, for example, Mexico detained about 18,000 unaccompanied children, but fewer than 150 of them (less than one percent) lodged asylum claims.[115] While it seems likely that this is attributable in part to the fact that many or most unaccompanied children are seeking to reunite with family members in the United States, the low rate of asylum claims brought by unaccompanied children is also caused by grave problems in Mexico's child protection system.[116]

Unaccompanied children who present asylum claims are housed in Family Welfare Agency (DIF) shelters, which are closed-door facilities.[117] This situation likely leads some youth to abandon potential asylum claims to avoid prolonged detention. Furthermore, if an unaccompanied child is recognized as a refugee and cannot be reunited with family in Mexico, they will be required to live in the care of the State in a DIF shelter until they turn eighteen years old, as they are unlikely to be released into foster care due to lack of family placements.[118] This arrangement may make unaccompanied children understandably wary of seeking asylum in Mexico, particularly if they

---

113.  *Id.* COMAR's role should not be one of policing the U.S. border by preventing asylum-seekers from reaching the United States, or one of obliging individuals to pursue asylum in Mexico only. In reality, an individual may have genuine protection needs but also desire to rejoin family in the United States for needed support during the asylum process and upon recognition of refugee status. Family unity is in fact recognized as fundamental in Mexico's Refugee Law (art. 5), as well as in international law. Problems with delays and inaccessibility of services in Mexico may also contribute to a decision to abandon the process and/or continue on to the United States.

114.  *Id.*

115.  *Estadísticas 2013–2017*, *supra* note 6. The number of unaccompanied children seeking asylum has not increased significantly in subsequent years: COMAR reports that just 141 unaccompanied children sought asylum in 2015; 242 in 2016; and 259 in 2017. *Id*.

116.  *Id.*

117.  *See Closed Doors*, *supra* note 92*.*

118.  *Id.* at 98 (suggesting that foster care is a possibility that should be explored).

CLP_PC_021966

KERWIN - THE MEXICAN ASYLUM SYSTEM FINAL (DO NOT DELETE)                    5/15/2018 12:34 PM

312        MARYLAND JOURNAL OF INTERNATIONAL LAW        [Vol. 33:290

have family in the U.S. who they are seeking to rejoin.[119] Yet they may have no other choice beyond seeking asylum in Mexico in order to avoid deportation back to a country where they may face extreme danger.

## IV. CONCLUSION

The issues facing Mexico's international protection system examined in this Article signal serious challenges for effective access to the asylum system and fair adjudication of asylum claims. Throughout the process, barriers to receiving information about asylum, effectively presenting asylum petitions, receiving access to the rights and guarantees associated with asylum-seeker and refugee status, and integrating into Mexican society limit the effectiveness of international protection in Mexico. This particularly affects those who are detained and deported summarily without appropriate screening and referral for possible international protection needs, but also those who find themselves unable to get by in the country, whether due to procedural delays and inaccessibility of services in Mexico or because they need support from family in other countries with which they have been unable to reunite. This is particularly the case for unaccompanied children. In this regard, continued efforts to improve governmental and non-governmental aid and services available to asylum-seekers and refugees in Mexico are vitally necessary. By the same token, these realities do not relieve Mexico's migration system of the obligation to ensure access to international protection in Mexico to those who pursue it.

---

119.   Though they travel alone, unaccompanied children most often have adults in the country of origin who send them, and adults in the country of destination waiting to receive them. This is evident, for example, in the rate of release of unaccompanied children detained by U.S. border enforcement into private custody, as well as from extensive personal testimonies by parents and children who have made the journey to the U.S. For example, in FY 2016, the U.S. Department of Homeland Security (DHS) reported that it apprehended 59,757 unaccompanied children, who are then transferred to the custody of the Office of Refugee Resettlement (ORR); during the same year, ORR reported that it released 52,147 children (87.2 percent of the total apprehended by DHS) to the custody of family members in the U.S. *DHS Releases End of Year Fiscal Year 2016 Statistics*, DHS (Dec. 30, 2016), https://www.dhs.gov/news/2016/12/30/dhs-releases-end-year-fiscal-year-2016-statistics; *Unaccompanied Alien Children Released to Sponsors by State*, ORR (June 30, 2017), https://www.acf.hhs.gov/orr/resource/unaccompanied-alien-children-released-to-sponsors-by-state. *See also* John Bowden, *Federal officials lose track of nearly 1,500 Migrant Children in US*, THE HILL (Apr. 27, 2018), http://thehill.com/latino/385148-federal-officials-lose-track-of-nearly-1500-migrant-children-in-us. Although there are certainly cases of children, usually orphaned or abandoned, who flee their countries alone because there is no one in the world to care for them, they are in the minority.

CLP_PC_021967



# FRONTERA NORTE

**e-ISSN:** 2594-0260

Revista internacional de fronteras, territorios y regiones / International Journal of Borders, Territories and Regions

FRONTERA NORTE VOL. 33, ART. 7, 2021

https://doi.org/10.33679/rfn.v1i1.2103

### The Mexican Asylum System: Between Protecting and Control

### El sistema de refugio mexicano: entre proteger y contener

Eduardo Torre Cantalapiedra,[1] María Dolores París Pombo[2] and Eduardo Elías Gutiérrez López[3]

ABSTRACT

In a context of restriction of both irregular migration flows and those in need of protection in the global North, the objective of this article is to analyze the implementation of Mexican refuge policies after the legal changes of 2011. Based on the documentary review and the statistics from the administrative records of COMAR, the obstacles encountered by those who require international protection to be granted refugee status, or, in this case, complementary protection (*protección complementaria*), are analyzed. While Mexican legislation is generous in terms of the possibility of granting these legal protections, the analysis of their implementation allows us to account for practices of blocking, deterrence and immobilization that – in the logic of containment –make it difficult, as well as with often prevent, achieve international protection.

*Keywords*:  1. refugees,  2. complementary protection,  3. international protection,  4. Central America, 5. Mexico.

RESUMEN

En un contexto de restricción tanto de los flujos migratorios irregulares como de necesitados de protección en el Norte global, el objetivo de este artículo es analizar la implementación de las políticas de refugio mexicanas tras los cambios legales de 2011. Con base en la revisión documental y las estadísticas de los registros administrativos de la Comisión Mexicana de Ayuda a Refugiados (COMAR), se analizan los obstáculos que encuentran quienes requieren de protección internacional para que se les otorgue la condición de refugiado, o en su caso, protección complementaria. Mientras que la legislación mexicana es generosa en cuanto a la posibilidad de otorgar estas protecciones legales, el análisis de su puesta en marcha permite dar cuenta de prácticas de bloqueo, disuasión e inmovilización que –en la lógica de la contención– dificultan, así como con frecuencia impiden, alcanzar protección internacional.

*Palabras clave*: 1. refugiados, 2. protección internacional, 3. protección complementaria, 4. México, 5. Centroamérica.

Received: April 28th, 2020
Approved: August 14th, 2020
Online publication: April 15th, 2021

[1] El Colegio de la Frontera Norte, Mexico, e.torreca@gmail.com, https://orcid.org/0000-0002-4074-3752

[2] El Colegio de la Frontera Norte, Mexico, mdparis@colef.mx, https://orcid.org/0000-0003-1714-2112

[3] Universidad Autónoma de Baja California, México, elias.gutierrez@uabc.edu.mx, https://orcid.org/0000-0002-9171-8813



Frontera Norte is a yearly digital journal published by El Colegio de la Frontera Norte.
https://fronteranorte.colef.mx

CLP_PC_021968

FRONTERA NORTE VOL. 33, ART. 7, 2021, e-ISSN 2594-0260    9
https://doi.org/10.33679/rfn.v1i1.2103

ANALYSIS OF THE IMPLEMENTATION OF ASYLUM POLICIES:
OBSTACLES FOR REFUGEES

The review of documents and administrative data in COMAR, together with the experience on the field, allow stating that obtaining the refugee status implies overcoming a series of obstacles, which vary according to the nationality of the applicant, from the beginning to the end of the process. Following, we review those we consider most relevant.

*Barriers for applications*

The contention policy carried out by Mexican authorities is the first barrier to grant the right to ask for refuge in Mexico, since it has as an objective to detect foreign people who enter the country irregularly and deport them soon (Kerwin, 2018).

Amnesty International (2018) found out that Mexican authorities had returned asylum seekers and people with credible fear to their countries of origin, thus compromising their lives and physical integrity. By contrast, the same authorities had not duly performed the identification of the prospective refugees, nor had they fully informed them about their right to ask for asylum in the country (Kerwin, 2018; Amnistía Internacional, 2018). Even if they receive the information, at once they are discouraged to apply as they are told the difficulties they will face to successfully proceed (Human Rights First, 2017).

The rule to ask for asylum within 30 working days, counted from the next day after entering the country, has become an impediment for people who deserve this recognition to receive protection (Sin Fronteras I. A. P., 2016). In this regard, UNHCR has pointed out that the best practice is not to set a deadline to ask for asylum (UNHCR Regional Legal Unit cited in Rea Granados, 2016).

*Applications received*

The number of applications for the refugee status grew exponentially from 2013 to 2019, distinguishing the fact that in only four years this figure changed from 3 424 to 70 302 applications (graph1). Figures would possibly be higher if the barriers mentioned above did not exist, and as argued below, if the overall functioning of the asylum program was simpler.

CLP_PC_021976

FRONTERA NORTE VOL. 33, ART. 7, 2021, e-ISSN 2594-0260    13
https://doi.org/10.33679/rfn.v1i1.2103

*Long waits, restrictions for mobility and deprivations of liberty*

During the process substantiation, every individual who requests asylum in Mexico has to face long waits, and as the case may be, restrictions for mobility or deprivations of liberty. For the purpose of clarity, we differentiate between migratory stations' applicants –who are under detention, either for only a part of the process– and office applicants – who are free over the substantiation of the procedure because they started the process directly in a COMAR (or else INM) office.

At least as of 2017, waiting times to have a resolution are longer or much longer than set forth in the law (Human Rights First, 2017; CEAR, 2018). At present, requesting the status of refugee takes months or even longer than a year. With COMAR data obtained via a transparency request, Asylum Access (2020, p. 10) points out "that 13,089 people who asked for the status of refugee in 2018 were still waiting for a resolution on October 25th, 2019, including 6.230 people waiting for more than a year and 662 who had been waiting for more than 18 months so far". In the case of those who submit their request at an INM office, the process takes even longer than usual (Gutiérrez López, 2019). Delays are attributed to the lack of resources of the institutions to address the increasing number of applications made.

For office applicants, the wait begins before starting the process, when the person in need of international protection approaches to COMAR offices. At that moment, they are appointed to fill in the application, which usually takes place several weeks later. On the basis of a survey carried out in Tapachula by CDHMC and El COLEF (2020) among applicants for the refugee status between November 2018 and January 2019, it is estimated that for 181 cases the average waiting time was 24 days per applicant. About a half of the applicants had to wait more than a month to "begin" their process. As in the US, Mexico has a metering system for the number of applications that can be started each day.[10]

Once the application is completed, the individual has to wait for more weeks before receiving the statement of acceptance and begin the process in INM to receive a VCHR, which can take several weeks to process. Thousands of office applicants are forced to desist or abandon the process due to long waiting times and difficulty to obtain resources from labor activities. Consequently, remaining in Mexico irregularly or continuing to travel to the north over increasingly dangerous and uncertain routes implies the risk of being deported to their countries of origin where their life and physical integrity are at risk. Most of these individuals have to look for remunerated activities to earn some resources with which to afford lodging and basic services, which leads them to precarious

---

[10] Even though it is a wait before the process, owing to clarity and as it is a waiting mechanism, it was included in this section.

14    The Mexican asylum system: between protecting and control
      Torre Cantalapiedra, E., París Pombo, M.D. & Gutiérrez López, E. E.

jobs in regions where they are processing their application.[11] The weekly signature in COMAR, or INM, is a grave problem for many applicants who lack economic resources to visit the offices. On the other hand, if applicants find an employment, even an informal one, they may lose it as they miss a day to attend the COMAR office.

This is the case of Armando, who arrived in Mexico with the first migrant caravan by the end of 2018, and accepted the possibility offered by the Mexican government to request the status of refugee. After 20 days in a detention center, he was released and given a *Clave Única de Registro de Población, CURP* [Single Population Registration Number] so that they were able to work and carry on with the process in COMAR under the office modality. This way, Armando tried to remain in Mexico, he stayed a little longer than a week in Tapachula before he dropped the process and retook the initial plan to go to the US. The reason is a mixture of impossibility to earn means for survival and live up in decent conditions and the burdensome process in COMAR:

> I had to get a job in Chiapas, […] I had to sign and be in migration and COMAR, I lost my job, slept for long where the buses are, I slept there a lot, about three nights because I had no money to pay for the hotel (Armando, face-to-face communication, December 31st, 2018).

The spatial immobilization implied by the refugee process in a certain state prevents the applicants from going to other Mexican states, where they may have better opportunities to find employment and better security. Although some obtain a permit from COMAR to attend another office, most of them are forced to look for employment in some of the most impoverished and insecure regions in the country such as Chiapas, Oaxaca and Tabasco.

One of the reasons why it is intended to restrict the applicants' spatial mobility seems to be related to keeping aliens from going to the US, at least until the process finishes. Owing to Mexico's geographic location, it is difficult to distinguish between asylum seekers who want to settle down in Mexico and those who resort to this instrument as a means to carry on traveling toward the United States (Rodríguez Chávez, 2011). In the face of the arrival of two migrant caravans from Central America, in October 2018 (during the administration of Peña Nieto) and January 2020, Mexican authorities expressed the possibility that migrants may stay in Mexico as temporary workers and have promoted refugee status as an option to remain in that region.[12] Within a context of heavy pressures

---

[11] As of 2018, UNHCR provide the applicants with a little income for the first three months, though not every individual access this economic aid. In the city of Tapachula, where almost half of the applications concentrate, such international agency also rents a hotel where families and people in particular vulnerability conditions, such as LGBTQ individuals, are lodged.

[12] In October 2018, the administration of Enrique Peña Nieto fostered the program "You are at home" promoting the insertion of migrant population into temporary employment in Chiapas and Oaxaca, and also the application for the refugee status at COMAR. In

FRONTERA NORTE VOL. 33, ART. 7, 2021, e-ISSN 2594-0260   15
https://doi.org/10.33679/rfn.v1i1.2103

from the US on Mexico to control migration flows, the Mexican government responds trying to retain people in the south of the country with temporary employment programs and making the application at COMAR.

The applicants for the status of refugee who submit their request in a point of entry, or are retained by Mexican authorities before starting the process, have to wait for its substantiation in a migratory station, unless a CSO makes the necessary proceedings to ask for the legal and due transfer to any address and report it to the Mexican migration authorities. As of 2016, the growing number of applicants for the status of refugee can leave the migratory status via a pilot program for "detention alternatives" fostered by UNHCR in collaboration with CSO and shelters. In the context of this program, INM regularly sends the High Commissioner a list of the people who have asked for international protection at a migratory station and have already received their certificate. UNHCR identifies those in vulnerable situation (children, adolescents, pregnant women, LGBTQ+ community,[13] et cetera), communicates with shelters nearby to find out the spaces available and accordingly reports to INM the name of the people who might receive an alternative to detention in equal number as the spaces available (CEAR, 2018). This program has been successively extended, however the increase in asylum seekers has rendered these spaces insufficient (París Pombo, 2019).

Even if the asylum seekers who are at a migratory station may have their basic needs covered, they have their liberty restricted during the substantiation of their processes and frequently face very precarious conditions (sanitary, abuses, and so on) which have led many people in need of international protection to desist and *voluntarily* accept their repatriation (Human Rights First, 2017).

*Withdrawal and abandonment*

The applicants' long waits in detention or in high-vulnerability situations (with no means for survival, lodging, no access to services, etc.) make many of them despair and promote withdrawal. In this sense, COMAR records show that year by year an important percentage of applicants desists via a document in which they express their desire to stop the process, or they drop out of it due to missing the weekly signatures.

Based on data from a transparency request that comprises 90 397 asylum seekers from January 1st, 2018, to October 25th, 2019, Asylum Access México (2020) states that 9 549 applications were dropped, which account for 10.6 percent of the total applications, while the average number of days between applying and dropping out was 149. For their part,

---

January 2020, a very similar program was boosted, once again, promoting the processing of the request at COMAR (SEGOB, 2018, 2020).

[13] LGBT+ refers to lesbian, gay, bisexual, transexual, transgender, transvestite and intersexual.

CLP_PC_021982

532 were withdrawn, which accounts for 0.5 percent of the total requests and with an average time between application and withdrawal of 54 days. The figures above, significant on their own, will be significantly higher, for 70.6 percent of the applicants is still waiting for a resolution.

Another possible explanation for withdrawals and abandonments is the fact that some of the applicants carry out this process with a view to obtaining the documents that enable them to traverse the Mexican territory regularly; thereby, if they receive a VCHR they will drop out of the process to carry on with their journey toward the US.[14] Nevertheless, given the times to receive this sort of documents and its cumbersome processing, it is likely a last resort.

### Deficits against the effectiveness of the due process

A key aspect regarding the due process is having legal assistance, though many asylum seekers have to navigate the complex asylum system on their own (Human Rights First, 2017). In spite of the existence of more than a dozen CSO, considered UNHRC partners, that offer legal advice for applicants,[15] the accelerated increase in requests makes it increasingly difficult to provide legal assistance for most of the applicants.

Various organizations have documented processes and resolutions that incorporated a number of violations to the due process such as failure to meet deadlines, interviews on the phone or with no qualified interpreters, dissuasion to use legal assistance by COMAR staff, short notices for appointments, resolutions with information from other cases, resolutions with no studies following the CP patterns, wrongly substantiated juridical resolutions, resolutions that discriminate women and minors, among others (Rea Granados, 2016; Sin Fronteras I. A. P., 2016; Universidad Iberoamericana Ciudad de México *et al.*, 2017).

### Recognition of international protection

Early in 2020, only 37 076 out of 130 187 applications in COMAR between 2013 and 2019 had been solved (table 2); in Mexico, more than 20 000 individuals received the status of refugee and more than 5 000, CP. Most of the people with a positive resolution comes from Venezuela (8 779), followed by Honduras (6 198), and El Salvador (4 671); very far are Guatemala (539) and Nicaragua (266). As for CP, distinguishable are

---

[14] VCHR allows freely moving without the risk of being detained and deported; it enables, according to personal resources, choosing the safest means of transport (Torre Cantalapiedra & Mariscal Nava, 2020).

[15] *Servicio Jesuita a Refugiados* [Jesuit Service for Refugees], Asylum Access, Sin Fronteras I. A. P., Fray Matías de Córdova Human Rights Center, among others.

CLP_PC_021983

FRONTERA NORTE VOL. 33, ART. 7, 2021, e-ISSN 2594-0260    17
https://doi.org/10.33679/rfn.v1i1.2103

Honduras (2 457) and El Salvador (2 338). These two Central American countries also receive the majority of negative resolutions (5 113 and 3 195, respectively).

Table 2. Resolutions issued by COMAR
by nationality and according to sort of resolution (total for 2013-2019)*

| Country | Refugee Status | CP | Non recognized | Total |
|---|---|---|---|---|
| Honduras | 6 108 | 2 457 | 5 113 | 13 678 |
| El Salvador | 4 671 | 2 338 | 3 195 | 10 204 |
| Guatemala | 539 | 351 | 749 | 1 639 |
| Nicaragua | 266 | 274 | 148 | 688 |
| Venezuela | 8 779 | 15 | 156 | 8 950 |
| Cuba | 131 | 38 | 703 | 872 |
| Haiti | 23 | 13 | 177 | 213 |
| Other | 349 | 63 | 420 | 832 |
| *Total* | 20 866 | 5 549 | 10 661 | 37 076 |

* Preliminary data, including all the resolutions issued within 2013-2019.
Source: own elaboration based on data from UPMRIP, COMAR and SEGOB (2019, 2020).

A large part of the explanation for such figures is in the application of different criteria for the various nationalities. As previously pointed out, Venezuelans were included in the broadest definition of 1984 Cartagena Declaration, which has meant that their applications are almost always given the refugee status (98.1%, graph 2). The rest of the countries are applied a more restrictive definition of the 1951 Geneva Convention, which explains the higher rate of negative resolutions. At the other end, the Cubans and Haitians who concluded the process –very few– have very high rates of rejection, in these two cases over 80 percent. As regards Central Americans, they are at an "intermediate" point; as noticed, the percentage of positive resolutions for this population oscillates between 32.9 percent for Nicaraguans and 44.7 for Hondurans. It is worth underscoring that CP becomes greatly relevant in the international protection given to Central American countries. In the case of Nicaraguans, CP was given more often than the refugee status.

CLP_PC_021984

**AMNESTY INTERNATIONAL**

27 March 2023

**RE: Circumvention of Lawful Pathways (DHS Docket Number USCIS-2022-0016)**

Amnesty International[1] is grateful for the opportunity to submit comments regarding the notice of proposed rulemaking (NPRM) "Circumvention of Lawful Pathways" (DHS Docket Number USCIS 2022-0016).[2]

### I.    Overview

The Department of Homeland Security (DHS) and the Department of Justice are issuing a notice of proposed rulemaking "in anticipation of a potential surge of migration at the southwest border of the United States" following the eventual termination of the Centers for Disease Control and Prevention's Title 42 Public Health Order, which is expected to end on May 11, 2023.[3]

The NPRM imposes a rebuttable presumption of asylum ineligibility for asylum-seekers who enter the United States outside of a "lawful pathway" or without first seeking protection in a third country in the region that they have travelled through.[4]

### II.    The NPRM violates the United States' international human rights obligations

All individuals have the universal human right to seek and enjoy asylum from harm. Under domestic[5] and international law,[6] the United States is obligated to provide access to individualized and fair assessments of all requests for protection by asylum-seekers seeking safety at the border, in a way that does not discriminate based on manner of entry or immigration status. However, the NPRM violates the United States' international human rights obligations.

Under the NPRM, asylum-seekers arriving at the southwest land border of the United States without

---

[1] Amnesty International is a non-governmental, non-profit organization with a global support base of more than ten million members, supporters, and activists in more than 150 countries and territories, and domestic entities set up in more than seventy countries and territories. Amnesty International's vision is of a world in which every person enjoys all of the human rights enshrined in the Universal Declaration of Human Rights and other international human rights instruments. Amnesty International works independently and impartially to promote respect for human rights. It monitors domestic law and practices in countries throughout the world for compliance with international human rights law and international humanitarian law and standards, and it engages in advocacy, litigation, and education to prevent and end human rights violations and to demand justice for those whose rights have been violated. Amnesty International has particular expertise in international law and policies concerning the rights of refugees and asylum-seekers.

[2] Regulations.gov, Proposed Rule, Circumvention of Lawful Pathways, USCIS-2022-0016-0001, https://www.regulations.gov/document/USCIS-2022-0016-0001.

[3] Regulations.gov, Proposed Rule, Circumvention of Lawful Pathways, USCIS-2022-0016-0001, https://www.regulations.gov/document/USCIS-2022-0016-0001.

[4] Federal Register, Department of Homeland Security & Department of Justice, Circumvention of Lawful Pathways, Docket No: USCIS 2022-0016, https://public-inspection.federalregister.gov/2023-03718.pdf.

[5] The U.S. Code safeguards the right to seek asylum in the United States "whether or not at a designated port of arrival". See: 8 U.S.C. § 1158 and §1225, https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1158&num=0&edition=prelim.

[6] The United States is state party to the 1967 United Nations Protocol Relating to the Status of Refugees. Congress passed the Refugee Act in 1980 in a sweeping effort to bring the United States' domestic laws in line with its international obligations and thereby provide additional assurances and protections to asylum-seekers and refugees. See: Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102 (1980), https://www.govinfo.gov/content/pkg/STATUTE-94/pdf/STATUTE-94-Pg102.pdf. See: *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 672 (9th Cir. 2021) ("To … implement the country's new treaty commitments, Congress passed the Refugee Act of 1980"), https://cdn.ca9.uscourts.gov/datastore/opinions/2021/03/24/18-17274.pdf.

1

CLP_PC_022038

authorization after traveling through a third country would be presumed ineligible for asylum unless they, or a member of their family with whom they are traveling, meet at least one of three exceptions:

- They were provided authorization to travel to the United States pursuant to a DHS-approved parole process;
- They used the CBP One application to schedule a time and place to present at a port of entry, or they presented at a port of entry without using the CBP One application and established that it was not possible to access or use the CBP One application due to a language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or
- They applied for and were denied asylum in a third country en route to the United States. [7]

Regarding the first exception, while Amnesty International welcomes the new humanitarian parole program for Cubans, Haitians, Nicaraguans and Venezuelans to apply for protection without having to make the dangerous journey to the border, it must not come at the expense of the fundamental human right to seek asylum. [8] The new policy for Cubans, Haitians, Nicaraguans and Venezuelans was coupled with an expansion of Title 42 for nationals from these countries seeking protections at the border and has resulted in massive deterrence for individuals from these countries to seek protection, deportations from Mexico without adequate protection screenings, and violent pushbacks at the U.S. border. The requirements of these programs disadvantage the most vulnerable, who are unlikely to have passports, support persons in the U.S. or the means to finance their travel to the U.S. Further, these new policies undoubtedly have a disparate impact on Black, Brown and Indigenous asylum-seekers. [9] In fact, Amnesty International previously found that the cruel treatment of Haitians under Title 42 subjected Haitian asylum-seekers to arbitrary detention and discriminatory and humiliating ill-treatment that amounts to race-based torture. [10] The humanitarian parole program cannot be seen as a replacement for asylum, and regardless of its existence, the United States has international obligations to uphold the right of individuals to seek international protection.

With regards to the second exception, Amnesty International and other organizations have received information regarding numerous problems with the CBP One application since its introduction in January 2023 as the way to make asylum claims at a U.S. port of entry. There are accessibility hurdles given that asylum-seekers must be literate, speak either English, Spanish or Haitian Creole, have access to a cell phone with data or internet service, and have basic knowledge of the new system. [11] Members of the U.S. Congress, asylum-seekers and civil society organizations have reported numerous difficulties in obtaining appointments through the application including frequent crashes, looping error messages, facial comparison flaws –which has a disproportionate impact on racialized individuals[12]–, the early morning release times of new appointments and slow internet at shelters. [13] There are also an insufficient number

[7] DHS, Fact Sheet: Notice of Proposed Rulemaking "Circumvention of Lawful Pathways", 21 February 2023, https://www.dhs.gov/news/2023/02/21/fact-sheet-notice-proposed-rulemaking-circumvention-lawful-pathways.

[8] Amnesty International, "Amnesty International condemns Biden Administration's Asylum Ban", 21 February 2023, https://www.amnestyusa.org/press-releases/amnesty-international-condemns-biden-administrations-asylum-ban/.

[9] Amnesty International, "Amnesty International USA condemns Biden Administration's attack on asylum", 5 January 2023, https://www.amnestyusa.org/press-releases/amnesty-international-usa-advocacy-director-for-the-americas-amy-fischer-pathways-to-asylum-seekers/.

[10] Amnesty International, *"They did not treat us like people": Race and migration-related torture and other ill-treatment of Haitians seeking safety in the USA*, 22 September 2022, AMR 36/5973/2022, https://www.amnesty.org/en/documents/amr36/5973/2022/en/.

[11] Robert Strauss Center for International Security and Law at the University of Texas at Austin, *Asylum Processing at the U.S.-Mexico Border: February 2023*, p. 2, https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf.

[12] The Guardian, "Facial recognition bias frustrates Black asylum applicants to US, advocates say", 8 February 2023, https://www.theguardian.com/us-news/2023/feb/08/us-immigration-cbp-one-app-facial-recognition-bias.

[13] Robert Strauss Center for International Security and Law at the University of Texas at Austin, *Asylum Processing at the U.S.-Mexico Border: February 2023*, p. 2, https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf; Immigration Impact, "CBP One is riddled with flaws that make the app inaccessible to many asylum seekers", 28 February 2023, https://immigrationimpact.com/2023/02/28/cbp-

2

CLP_PC_022039

of appointments compared to the number of waiting individuals which has left asylum-seekers stranded at the U.S.-Mexico border. Some asylum-seekers are attempting to secure appointments in other cities which involves security and financial costs.[14] Further, large family groups are experiencing even more difficulties in making appointments, which has resulted in families separating themselves to improve their chances or deciding to send their children as unaccompanied minors across the border.[15] Most significantly, the lack of sufficient appointments means that some asylum-seekers may never be able to make an appointment through the application and thus, under the NPRM, would remain ineligible for asylum in the United States.

Additionally, while one of the stated aims of the NPRM is to avoid migrants and asylum-seekers "waiting in long lines at the border for unknown periods of time in conditions that could put them at risk",[16] the insufficient number of appointments available through the CBP One application is resulting in exactly this, as asylum-seekers find themselves stranded at the border where they face unstable living conditions and security risks.[17] Civil society organizations have reported that Black, Brown, LGBTIQ+ and Indigenous asylum-seekers experience additional challenges and targeted discrimination in Mexican border towns.[18] Amnesty International believes that the use of the CBP One application as the sole means of making an asylum appointment at the southwest border is akin to the previous "metering" policy[19] in that asylum-seekers are now once again forced to sign up for appointments at ports-of-entry to access asylum.

---

one-app-flaws-asylum-seekers/; Congress of the United States, House of Representatives, 13 March 2023, https://chuygarcia.house.gov/sites/evo-subsites/chuygarcia.house.gov/files/evo-media-document/cbponeletter_final.pdf; BBC, "At US border, tech issues plague new migrant applications", 8 March 2023, https://www.bbc.com/news/world-us-canada-64814095; The Washington Post, "Desperate migrants seeking asylum face a new hurdle: Technology", 11 March 2023, https://www.washingtonpost.com/nation/2023/03/11/asylum-seekers-mexico-border-app/?pwapi_token=eyJ0eXAiOiJKV1QiLCJhbGciOiJIUzI1NiJ9.eyJzdWJpZCI6IjM2NDQ2MDUiLCJyZWFzb24iOiJnaWZ0IiwibmJmIjoxNjc4NTEwODAwLCJpc3MiOiJzdWJzY3JpcHRpb25zliwiZXhwIjoxNjc5ODAzMTk5LCJpYXQiOjE2Nzg1MTA4MDAsImp0aSI6ImIzZjE5ODRjLTg5NTItNDY2YS04ZDY0LTkyZDc1OWU1MjZhZiIsInVybCI6Imh0dHBzOi8vd3d3Lndhc2hpbmd0b25wb3N0LmNvbS9uYXRpb24vMjAyMy8wMy8xMS9hc3lsdW0tc2Vla2Vycy1tZXhpY28tYm9yZGVyLWFwcC8ifQ.-3rBQtEghmvmGTbBbGisxERu84Iou1x847eFAmFfu1g.

[14] Robert Strauss Center for International Security and Law at the University of Texas at Austin, *Asylum Processing at the U.S.-Mexico Border: February 2023*, p. 3, https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf; myRGV.com, "Families consider separation to seek asylum as they face limited appointments through CBP app", 21 February 2023, https://myrgv.com/local-news/2023/02/21/families-consider-separation-to-seek-asylum-as-they-face-limited-appointments-through-cbp-app/.

[15] Robert Strauss Center for International Security and Law at the University of Texas at Austin, *Asylum Processing at the U.S.-Mexico Border: February 2023*, p. 3, https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf; myRGV.com, "Families consider separation to seek asylum as they face limited appointments through CBP app", 21 February 2023, https://myrgv.com/local-news/2023/02/21/families-consider-separation-to-seek-asylum-as-they-face-limited-appointments-through-cbp-app/; Congress of the United States, House of Representatives, 13 March 2023, https://chuygarcia.house.gov/sites/evo-subsites/chuygarcia.house.gov/files/evo-media-document/cbponeletter_final.pdf.

[16] Federal Register, Department of Homeland Security & Department of Justice, Circumvention of Lawful Pathways, Docket No: USCIS 2022-0016, p. 33, https://public-inspection.federalregister.gov/2023-03718.pdf.

[17] Robert Strauss Center for International Security and Law at the University of Texas at Austin, *Asylum Processing at the U.S.-Mexico Border: February 2023*, p. 3, https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf; Amnesty International, Amnesty International statement for hearing on "Examining the Human Rights and Legal Implications of DHS's 'Remain in Mexico' Policy", 18 November 2019, https://www.amnestyusa.org/wp-content/uploads/2019/11/11.18.2019-Amnesty-International-Statement-for-House-HSC-Border-Security-Subcommittee-Hearing-on-RIM-1.pdf.

[18] Robert Strauss Center for International Security and Law at the University of Texas at Austin, *Asylum Processing at the U.S.-Mexico Border: February 2023*, p. 3, https://www.strausscenter.org/wp-content/uploads/Feb_2023_Asylum_Processing.pdf.

[19] Under the metering policy, by which tens of thousands of migrants and asylum-seekers were forced to wait in violent border regions in northern Mexico –sometimes for months before they were permitted to request asylum– and without access to adequate accommodations, food, healthcare, legal representation, or physical security from abuses by State and non-State actors. See: Amnesty International, *Americas: Pushback practises and their impact on the human rights of migrants and refugees, Amnesty International Submission to the United Nations (UN) Special Rapporteur on the human rights of migrants, February 2021*, 8 February 2021, AMR 01/3658/2021, https://www.amnesty.org/en/documents/amr01/3658/2021/en/; Amnesty International, *'You Don't Have Any Rights Here': Illegal Pushbacks, Arbitrary Detention, and Ill-treatment of Asylum-Seekers in the United States*, 11 October 2018, AMR 51/9101/2018, p. 11, https://www.amnesty.org/en/documents/amr51/9101/2018/en/; Amnesty International, *Facing Walls: USA and Mexico Violations of the Rights of Asylum-seekers*, 15 June 2017, AMR 01/6426/2017, https://www.amnesty.org/en/documents/amr01/6426/2017/en/.

3

CLP_PC_022040

Under its international human rights obligations, the United States is prohibited from "refusing to process claims for asylum or unduly prolong[ing] them"[20] and must mandate "access to the territory and fair and efficient asylum procedures".[21] Using the CBP One application as the sole manner of making asylum claims and the limited number of appointments available through the application are contrary to these obligations. While the NPRM does include exemptions for individuals who are not able to use the application due a language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle, it is unclear how this will be determined at the border and if border agents will have discretion in these decisions. Further, it is deeply concerning that there are no similar exemptions for vulnerable populations such as people with medical or mental health conditions, LGBTQI+ individuals, or others such as Black, Brown and Indigenous populations that may face particular risk waiting in Mexico.

The last exception, which requires individuals who travel through a third country before arriving to the southwest border to apply for asylum in that country, infringes on the rights of these individuals to seek asylum. Amnesty International has documented that countries throughout the Americas through which asylum-seekers are likely to travel prior to reaching the southwest border of the United States are failing in their treaty obligations to protect those who are in need of international protection, as well as repeatedly violating the principle of *non-refoulement*.[22] In a report published in 2018 based on 500 responses from migrants and asylum-seekers interviewed during their journey through Mexico, Amnesty International documented 120 statements containing strong indications that there had been *refoulement*. This represented 24% of the total number of responses and 40% of responses from former National Migration Institute (INM) detainees. These statements detailed how detainees who expressed fear for their lives in their countries of origin were nonetheless returned to these countries without consideration of their asylum requests.[23] Amnesty International has also documented the particular challenges experienced by Haitian asylum-seekers, fueled by racism, which demonstrate that multiple states across the region are failing to provide them with protection.[24] The documented deficiencies in asylum systems throughout the Americas and repeated violations of the principle of *non-refoulement* by these states make it unreasonable for the United States to request that asylum-seekers make asylum claims in these countries in order to be eligible for asylum in the U.S. People in vulnerable situations are once again the most impacted by such requirements.

The requirements set out in the NPRM will also likely result in asylum-seekers resorting to more dangerous routes to attempt to arrive in the United States. While the NPRM "seeks to mitigate the role of would-be smugglers by incentivizing intending asylum-seekers to utilize lawful, safe, and orderly pathways for seeking protection in the United States or elsewhere",[25] the NPRM will likely result in smugglers attempting to take asylum-seekers via more dangerous routes. Further, the NPRM's exceptions favor one community seeking refuge over another by providing rights if a person arrives by plane instead of on foot.

---

[20] U.N. Committee Against Torture, *General Comment No. 4 (2017) on the Implementation of Article 3 of the Convention in the context of article 22*, CAT/C/GC/4, 4 September 2018, para. 14, http://www.ohchr.org/Documents/HRBodies/CAT/CAT-C-GC-4_EN.pdf.

[21] UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations Under the 1951 Convention Relating to the Status of Refugees and Its 1967 Protocol*, 26 January 2007, para. 8, https://www.unhcr.org/4d9486929.pdf.

[22] Amnesty International, *Overlooked, under-protected: Mexico's deadly refoulement of Central Americans seeking asylum*, 23 January 2018, AMR 41/7602/2018, https://www.amnesty.org/en/documents/amr41/7602/2018/en/; Amnesty International, *Americas: Pushback practises and their impact on the human rights of migrants and refugees, Amnesty International Submission to the United Nations (UN) Special Rapporteur on the human rights of migrants, February 2021*, 8 February 2021, AMR 01/3658/2021, https://www.amnesty.org/en/documents/amr01/3658/2021/en/.

[23] Amnesty International, *Overlooked, under-protected: Mexico's deadly refoulement of Central Americans seeking asylum*, 23 January 2018, AMR 41/7602/2018, https://www.amnesty.org/en/documents/amr41/7602/2018/en/;

[24] Amnesty International, *Not safe anywhere: Haitians on the move need urgent international protection*, 28 October 2021, AMR 36/4920/2021, https://www.amnesty.org/en/documents/amr36/4920/2021/en/.

[25] Federal Register, Department of Homeland Security & Department of Justice, Circumvention of Lawful Pathways, Docket No: USCIS 2022-0016, p. 30, https://public-inspection.federalregister.gov/2023-03718.pdf.

4

CLP_PC_022041

These types of restrictions are systematically designed to favor wealthy and mainly white individuals, and leave mostly Black, Brown and Indigenous asylum-seekers out of the asylum process.[26]

In accordance with the NPRM, asylum-seekers who do not meet one of the three exceptions set out above would be ineligible to apply for asylum in the United States. Nevertheless, the United States has domestic and international obligations to ensure that asylum-seekers are able to request protection either at official U.S. ports-of-entry or after they cross irregularly into the country.[27]

The turning away of asylum-seekers violates the principle of *non-refoulement*, which is binding on all countries as a principle of customary and non-derogable international law and is integrated into U.S. legislation. The principle of *non-refoulement,* as it applies to people who may be refugees and are in search of recognition as such, prohibits states from returning or turning away people to territories where their "life or freedom" would be threatened.[28]

The United Nations Refugee Agency (UNHCR) has described *non-refoulement* as encompassing "any measure attributable to a State which could have the effect of returning an asylum-seeker or refugee to the frontiers of territories where his or her life or freedom would be threatened," or where an asylum-seeker or refugee would risk persecution. This includes rejection at the border, interception and indirect *refoulement*, whether of an individual seeking asylum or in situations of mass influx.[29] In an authoritative advisory opinion on state obligations under refugee law,[30] UNHCR held that the principle of *non-refoulement* is violated in situations of non-admission at the border and applies to returns not only to countries-of-origin, but also to "any other place" where a person has reason to fear for their life.[31] Most importantly, it holds that "States will be required to grant individuals seeking international protection access to the territory and to fair and efficient asylum procedures."[32] The United Nations Convention Against Torture (CAT), which the United States has also ratified and incorporated into domestic law, similarly forbids *refoulement*.[33]

---

[26] Amnesty International, "Immigrants' rights organizations rally in D.C., demand the Biden Administration not ban asylum or lock up families", 16 March 2023, https://www.amnestyusa.org/press-releases/immigrants-rights-demand-biden-not-lock-up-families/.

[27]    8    U.S.C.    §1158–Asylum,    https://uscode.house.gov/view.xhtml?req=granuleid%3AUSC-prelim-title8-section1158&num=0&edition=prelim#:~:text=To%20establish%20that%20the%20applicant%20is%20a%20refugee%20within%20the,reason%20for%20persecuting%20the%20applicant.;UNGA, UNGA, Convention Relating to the Status of Refugees (1951), 189 UNTS 137, http://www.unhcr.org/3b66c2aa10. Although the United States never ratified the 1951 Convention itself, it acceded to the 1967 Protocol, by which it became bound by Articles 2 to 34 of the 1951 Convention; UNGA, Protocol relating to the Status of Refugees (1967), 606 UNTS 267, https://www.refworld.org/docid/3ae6b3ae4.html.

[28] Article 33 of the 1951 Convention codifies the principle of non-refoulement by prohibiting returning an asylum-seeker "in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." In recent decades, the principle has further developed in other areas of international human rights law and now applies to all individuals subjected to a transfer of jurisdiction, whether or not they claim international protection or are entitled to it.

[29] UNHCR, *Note on International Protection*, 13 September 2001, A7AC.96/951, para. 16, https://www.refworld.org/docid/3bb1c6cc4.html.

[30] The legal status of Advisory Opinions of the UNHCR is explained in the Statute of the Office of the UNHCR: UNGA, Statute of the Office of the United Nations High Commissioner for Refugees, General Assembly Resolution 428(v) of 14 December 1950, http://www.unhcr.org/4d944e589.pdf. These Advisory Opinions are generally considered to be guidance for compliance with the 1951 Convention.

[31] UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations Under the 1951 Convention Relating to the Status of Refugees and Its 1967 Protocol*, 26 January 2007, para. 7, https://www.unhcr.org/4d9486929.pdf.

[32] UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations Under the 1951 Convention Relating to the Status of Refugees and Its 1967 Protocol*, 26 January 2007, para. 8, https://www.unhcr.org/4d9486929.pdf.

[33] Article 3 of the U.N. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment: "No State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." UNGA, Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, UNGA Resolution 39/46, 10 December 1984, https://www.ohchr.org/en/instruments-mechanisms/instruments/convention-against-torture-and-other-cruel-inhuman-or-degrading.

5

CLP_PC_022042

Individuals who fail to rebut the presumption of ineligibility proposed in the NPRM would not have access to fair and efficient asylum procedures and thus, could be returned to places where they are at risk, contrary to the United States' domestic and international obligations. Further, asylum-seekers waiting in Mexico to make an appointment through the CBP One application could be subjected to systematic *refoulement* back to their countries of origin. Amnesty International observed that systematic *refoulement* occurred under previous U.S. migration policies, including the Migrant Protection Protocols (MPP) and Title 42 expulsions. Specifically, migrants pushed back into Mexico under MPP and Title 42 faced rampant kidnapping and physical and sexual violence.[34] As mentioned above, Mexico is also routinely failing to protect migrants in the country including by refouling individuals seeking safety without protection screenings, to Guatemala, Haiti and Venezuela, among other countries.[35]

Overall, the NPRM violates the United States' international human rights obligations and runs contrary to the principle of *non-refoulement*.

### III.    The NPRM will result in family separation and the exploitation of unaccompanied minors

Amnesty International believes that the NPRM will fuel the indirect separation of families. The fact that the proposed rule does not apply to unaccompanied minors, compounded with the difficulties that families are experiencing in making appointments through the CBP One application, as outlined above, will likely push families to make an impossible choice, send their children across the border alone to seek safety or stay together as a family in danger.

Amnesty International previously documented that border policies, including the MPP and Title 42 expulsions, fueled the indirect separation of families. In an interview with Amnesty International in April 2021, and documented in the report, "Pushed Into Harm's Way: Forced Returns of Unaccompanied Migrant Children To Danger By the USA and Mexico," a government employee described the demographics of the unaccompanied children being held at an emergency intake site in Texas and confirmed that many of the thousands of children crossing into the United States to seek safety had separated from their asylum-seeking families who were still stranded in northern Mexico due to Title 42.[36] It is likely that the NPRM will also result in family separation, which can lead to multiple human rights violations.

Further, a recent investigation by the New York Times found that unaccompanied migrant children are increasingly working in dangerous and exploitative labor conditions in the United States.[37] The NPRM, by indirectly fueling family separation, is likely to exacerbate this trend.

### IV.    Alleged capacity constraints do not absolve the United States of its international human rights obligations

---

[34] Amnesty International, Amnesty International statement for hearing on "Examining the Human Rights and Legal Implications of DHS's 'Remain in Mexico' Policy", 18 November 2019, https://www.amnestyusa.org/wp-content/uploads/2019/11/11.18.2019-Amnesty-International-Statement-for-House-HSC-Border-Security-Subcommittee-Hearing-on-RIM-1.pdf.

[35] Amnesty International, *Americas: Pushback practises and their impact on the human rights of migrants and refugees, Amnesty International Submission to the United Nations (UN) Special Rapporteur on the human rights of migrants, February 2021*, 8 February 2021, AMR 01/3658/2021, https://www.amnesty.org/en/documents/amr01/3658/2021/en/; Amnesty International, *Pushed Into Harm's Way: Forced Returns of Unaccompanied Migrant Children To Danger By the USA and Mexico*, 11 June 2021, AMR 51/4200/2020, https://www.amnesty.org/en/documents/amr51/4200/2021/en/.

[36] Amnesty International, *Pushed Into Harm's Way: Forced Returns of Unaccompanied Migrant Children To Danger By the USA and Mexico*, 11 June 2021, AMR 51/4200/2020, https://www.amnesty.org/en/documents/amr51/4200/2021/en/.

[37] The New York Times, "Alone and exploited, migrant children work brutal jobs across the U.S.", 28 February 2023, https://www.nytimes.com/2023/02/25/us/unaccompanied-migrant-child-workers-exploitation.html.

6

As indicated above, one of the rationales behind the NPRM is the assumption that border encounters could rise following the lifting of the Title 42 public health order and that DHS allegedly "does not have the infrastructure, personnel or funding to sustain the processing of migratory flows of this magnitude in a safe and orderly manner over time".[38] Nevertheless, from 2018 to the present, U.S. Customs and Border Protection (CBP), which is a component of DHS, has employed more than 60,000 workers and officials in the United States, with the number of personnel steadily increasing each year.[39] The NPRM also states that DHS has taken "a series of extraordinary steps" to respond to the accelerated increase in encounters along the southwest border since January 2021.[40]

Amnesty International emphasizes that, regardless of these alleged capacity constraints, the United States has both domestic and international obligations to provide access to individualized and fair assessments of all requests for protection by asylum-seekers seeking safety at the border. Further, even in situations of mass influx, the right to seek asylum and the principle of *non-refoulement* –including non-rejection at the border– cannot be suspended.[41]

## V.      Recommendations

The NPRM is indisputably intended to deter asylum-seekers from requesting protection in the United States. Not only is it contrary to the United States' domestic and international human rights obligations, it also violates the rights of individuals to seek asylum. For these reasons, Amnesty International calls on the Biden Administration to immediately abandon the proposed rule. Instead, Amnesty International urges the Biden Administration to end Title 42 and invest in systems to process asylum-seekers at the border without delay and provide them with support to pursue their asylum claims in U.S. communities with access to housing, social services, and legal supports.

Once again, we are grateful for the opportunity to provide these recommendations. For more information, please contact Amy Fischer, Amnesty International USA's Americas Advocacy Director, at (202) 768-4082 or afischer@aiusa.org.

Sincerely,
Amy Fischer
Americas Advocacy Director
Amnesty International USA

---

[38] Federal Register, Department of Homeland Security & Department of Justice, Circumvention of Lawful Pathways, Docket No: USCIS 2022-0016, https://public-inspection.federalregister.gov/2023-03718.pdf.
[39] U.S. Customs and Border Protection, "On a typical day is Fiscal Year 2022, CBP...", https://www.cbp.gov/newsroom/stats/typical-day-fy2022.
[40] Federal Register, Department of Homeland Security & Department of Justice, Circumvention of Lawful Pathways, Docket No: USCIS 2022-0016, https://public-inspection.federalregister.gov/2023-03718.pdf.
[41] UNHCR, Protection of Asylum-Seekers in Situations of Large-Scale Influx, No. 22 (XXXII) - 1981, 21 October 1981, https://www.unhcr.org/excom/exconc/3ae68c6e10/protection-asylum-seekers-situations-large-scale-influx.html.

7

CLP_PC_022044



# OVERLOOKED,

# UNDER-PROTECTED

MEXICO'S DEADLY *REFOULEMENT* OF CENTRAL AMERICANS SEEKING ASYLUM

I WELCOME

AMNESTY
INTERNATIONAL

CLP_PC_022500

Amnesty International is a global movement of more than 7 million people who campaign for a world where human rights are enjoyed by all.

Our vision is for every person to enjoy all the rights enshrined in the Universal Declaration of Human Rights and other international human rights standards.

We are independent of any government, political ideology, economic interest or religion and are funded mainly by our membership and public donations.



© Amnesty International 2018
Except where otherwise noted, content in this document is licensed under a Creative Commons (attribution, non-commercial, no derivatives, international 4.0) licence.
https://creativecommons.org/licenses/by-nc-nd/4.0/legalcode
For more information please visit the permissions page on our website: www.amnesty.org
Where material is attributed to a copyright owner other than Amnesty International this material is not subject to the Creative Commons licence.

First published in 2018 by Amnesty International Ltd
Peter Benenson House, 1 Easton Street, London WC1X 0DW, UK

Index: AMR 41/7602/2018
Original language: English

*Cover photo:*
*Illustration by Joaquín Castro Caceres for Amnistía Internacional*
*© Amnesty International / Joaquín Castro Caceres*

**amnesty.org**

CLP_PC_022501

# CONTENTS

GLOSSARY                                                                          4

**1. EXECUTIVE SUMMARY**                                                          **5**

1.1 Methodology                                                                   **6**

**2. FALLING THROUGH THE CRACKS: FAILURES IN SCREENING PROCESSES**               **8**

2.1 First stage of screening by INM field agents                                **10**

2.2 Falling through the cracks: Second stage of screening in detention centres  **11**

**3. LEGAL LIMBO AND HASTY RETURNS**                                            **14**

3.1 Voluntary return papers                                                     **14**

3.2 The failure to fully inform individuals about their casefile                **16**

3.3 Failures of INM information systems                                          **16**

**4. ILL-TREATMENT OF MIGRANTS AS PART OF THE DEPORTIONS MACHINE**              **18**

4.1 Arbitrary detention of asylum seekers and its impact on *refoulement*       **20**

**5. RECOMMENDATIONS**                                                          **22**

CLP_PC_022502

# GLOSSARY

| TERM | DESCRIPTION |
| --- | --- |
| REFUGEE | A refugee is a person who has fled from their own country because they have a well-founded fear of persecution and their government cannot or will not protect them. Asylum procedures are designed to determine whether someone meets the legal definition of a refugee. When a country recognizes someone as a refugee, it gives them international protection as a substitute for the protection of their home country. |
| ASYLUM-SEEKER | An asylum-seeker is someone who has left their country seeking protection but has yet to be recognized as a refugee. During the time that their asylum claim is being examined, the asylum-seeker must not be forced to return to their country of origin. Under international law, being a refugee is a fact-based status, and arises before the official, legal grant of asylum. |
| MIGRANT | A migrant is a person who moves from one country to another to live and usually to work, either temporarily or permanently, or to be reunited with family members. **Regular migrants** are foreign nationals who, under domestic law, are entitled to stay in the country. **Irregular migrants** are foreign nationals whose migration status does not comply with the requirements of domestic immigration legislation and rules. They are also called "undocumented migrants". The term "irregular" refers only to a person's entry or stay. **Amnesty International does not use the term "illegal migrant."** |
| UN REFUGEE CONVENTION AND PROTOCOL | The 1951 Convention Relating to the Status of Refugees is the core binding international treaty that serves as the basis for international refugee law. The 1967 Protocol relating to the Status of Refugees retakes the entire content of the 1951 Convention and simply adds an extension on its application to all refugees, not just those arising from specific time bound conflicts in the 1940s and 50s. Mexico has ratified both the Convention and the Protocol while the USA has ratified the Protocol, which gives it identical obligations. This treaty, along with the International Covenant on Civil and Political Rights of 1966, ratified by both USA and Mexico, provide a series of fundamental rights to be enjoyed by all humans. |
| REFOULEMENT | *Refoulement* is the forcible return of an individual to a country where they would be at real risk of serious human rights violations (the terms "persecution" and "serious harm" are alternatively used). Individuals in this situation are entitled to international protection; it is prohibited by international law to return refugees and asylum-seekers to the country they fled – this is known as the principle of non-*refoulement*. The principle also applies to other people (including irregular migrants) who risk serious human rights violations such as torture, even if they do not meet the legal definition of a refugee. Indirect *refoulement* occurs when one country forcibly sends them to a place where they at risk of onwards *refoulement*; this is also prohibited under international law. |
| MARAS | Colloquial name commonly given to organized groups from the Northern Triangle of Central America that are characterized by violent criminal activities and generally associated with territorial control. |

CLP_PC_022503

# 1. EXECUTIVE SUMMARY

Mexico is witnessing a hidden refugee crisis on its doorstep. For a number of years, citizens from nearby countries who formerly passed through Mexico in search of economic opportunities have been leaving their countries due to fear for their lives and personal liberty. This briefing analyses the results of a survey carried out by Amnesty International with 500 responses from migrants and people seeking asylum travelling through Mexico. The information presented demonstrates that the Mexican government is routinely failing in its obligations under international law to protect those who are in need of international protection, as well as repeatedly violating the *non-refoulement* principle[1], a binding pillar of international law that prohibits the return of people to a real risk of persecution or other serious human rights violations. These failures by the Mexican government in many cases can cost the lives of those returned to the country from which they fled.

The so-called "Northern Triangle" countries of Guatemala, El Salvador and Honduras continue to experience generalized violence, with homicide rates four to eight times higher than what the World Health Organization considers "epidemic" homicide levels.[2] Nearly all of the respondents to Amnesty International's survey came from these three Central American countries.[3] Of those detained by Mexican authorities, 84% (263 out of 310 that answered the question) did not desire to be returned to their country. Of these, 54% (167 out of 310) identified violence and fear as a principal reason for not wanting to go back to their country, and 35% (108 out of 310) identified direct personal threats to their life back home as the reason for not wanting to return.

Violations by Mexican authorities of the *non-refoulement* principle directly affect human lives and deny protection to those most at need. One man who came to Mexico seeking asylum after fleeing death threats in Honduras told Amnesty International he wept in desperation to try to stop his deportation, yet officials did not listen to him or inform him of his right to lodge an asylum claim, and simply deported him back to his country. This testimony echoes dozens collected by Amnesty International and contrasts with the official responses received from Mexican authorities, who informed Amnesty International that *refoulement* cases were rare.

Amnesty International analysed the 500 responses received and found 120 testimonies that gave solid indications that a *refoulement* had occurred, which is 24% of the total set of responses, and equates to 40% of the responses provided by those individuals who had been detained by the National Institute of Migration (INM). These testimonies involved people explicitly seeking asylum or expressing fear for their lives in their country of origin, yet nevertheless being ignored by the INM and deported to their country.

In addition, Amnesty International found that 75% of those people detained by the INM were not informed of their right to seek asylum in Mexico, despite the fact that Mexican law expressly requires this and public officials assured Amnesty International that the requirement is complied with. Amnesty International also found evidence of a number of procedural violations of the rights that people seeking asylum should be afforded in line with international human rights law. These violations effectively deny them the possibility to challenge their deportation and to obtain protection in Mexico.

---

1. Article 33 of the 1951 UN Convention Relating to the Status of Refugees provides that states must not return persons to territories where their "life or freedom" would be threatened. The *non-refoulement* principle is also considered a binding principle of international customary law.
2. The World Health Organization (WHO) considers a murder rate of more than 10 per 100,000 inhabitants to be an epidemic level. However, in 2016, the murder rate in El Salvador was recorded as 81.2 per 100,000 inhabitants (National Civil Police), in Honduras 58.9 per 100,000 (SEPOL) and in Guatemala 27.3 per 100,000 (National Civil Police). 2017 figures from these same sources noted 60 per 100,000 for El Salvador, 42.8 per 100,000 for Honduras, and 26.1 per 100,000 for Guatemala.
3. Of the 385 people interviewed, 208 people were from Honduras, 97 from El Salvador, 59 from Guatemala, and a series of other countries represented less than five cases each

CLP_PC_022504

# UNPROTECTED IN ECUADOR

VENEZUELAN REFUGEE WOMEN SURVIVORS OF GENDER-BASED VIOLENCE



CLP_PC_022583

Amnesty International is a movement of 10 million people which mobilizes the humanity in everyone and campaigns for change so we can all enjoy our human rights. Our vision is of a world where those in power keep their promises, respect international law and are held to account. We are independent of any government, political ideology, economic interest or religion and are funded mainly by our membership and individual donations. We believe that acting in solidarity and compassion with people everywhere can change our societies for the better.

© Amnesty International 2022
*Except where otherwise noted, content in this document is licensed
under a Creative Commons (attribution, non-commercial, no derivatives,
international 4.0) https://creativecommons.org/licenses/by-nc-nd/4.0/legalcode
  For more information please visit the permissions page on our website:
https://www.amnesty.org/en/about-us/permissions/.
Where material is attributed to a copyright owner other
than Amnesty International this material is not subject to the Creative
Commons licence.
First published in 2022
by Amnesty International Ltd.
Peter Benenson House, 1 Easton Street. London WC1X 0DW, UK*



*Cover photo: **Venezuelan woman in Huaquillas, Ecuador, interviewed** by Amnesty International on 6
September 2022.
© Ana María Buitrón | Amnesty International*

**Index number: AMR 28/6137/2022**
**Original language: Spanish**

**amnesty.org**



CLP_PC_022584

# CONTENTS

**1. EXECUTIVE SUMMARY**      **4**

**2. METHODOLOGY**      **8**

**3. VIOLENCE IN MULTIPLE SPACES**      **4**

**4. LACK OF ACCESS TO MIGRATION DOCUMENTATION**      **16**

4.1. DIFFICULTIES IN OBTAINING RECOGNITION OF REFUGEE STATUS      16

4.2. OBSTACLES TO REGULARIZATION OF MIGRATION STATUS      19

**5. OBSTACLES TO VENEZUELAN WOMEN'S ACCESS TO PROTECTION MECHANISMS**      **21**

5.1. "WE DON'T EVEN KNOW WHERE TO GO"      21

5.2. FEAR AND DISTRUST OF THE AUTHORITIES      23

**6. SHORTCOMINGS IN THE STATE RESPONSE TO GENDER-BASED VIOLENCE**      **26**

6.1. SHORTCOMINGS IN FRONTLINE SERVICES TO IDENTIFY AND RESPOND TO CASES OF GENDER-BASED VIOLENCE      26

6.2. SHORTCOMINGS IN THE JUSTICE SYSTEM      34

**7. CONCLUSIONS AND RECOMMENDATIONS**      **37**

CLP_PC_022585

# 1. EXECUTIVE SUMMARY

Ecuador is the third host country for Venezuelans in the world, after Colombia and Peru, with 502,214 Venezuelan refugees in its territory. Of these, about half are women. Gender-based violence is a systemic and prevalent problem in Ecuador: two out of three women experience some form of gender-based violence during their lives.[1] In this context, Venezuelan refugee women are at even greater risk of physical, psychological, sexual, patrimonial, gynaecological-obstetric and cyber violence in public and private spaces, both along their migration route and at their destination.

This report documents the response of the Ecuadorian state, including access to justice and protection mechanisms for Venezuelan refugee women survivors of gender-based violence in Ecuador. While an effective judicial response is essential in order to obtain justice and redress for violations of women's right to live a life free from violence, a precondition for this is an effective protection system in other areas.

The gender-based violence faced by Venezuelan women in Ecuador often remains hidden because most survivors do not turn to the state for protection. This research shows that the Ecuadorian state is failing to guarantee the rights of Venezuelan refugee women at different levels. The authorities are failing to provide Venezuelan women with information on the protection mechanisms available and the institutions that provide care pathways for survivors of gender-based violence.

In addition, Amnesty International found that, although some efforts have been initiated, the Ecuadorian state is not ensuring that Venezuelans have effective access to the procedures to determine refugee status and alternative forms of regularization. The failure to disseminate information on the refugee determination procedure is worrying, as is the low level of people recognized as in need of protection, according to the Cartagena Declaration, despite Ecuador's obligations. This research also highlights the practical difficulties Venezuelans face in meeting the requirements of migration regularization programmes. In both cases, Amnesty International noted that the institutions implementing these procedures do not have appropriate standardized protocols that take into account the specific needs of survivors of gender-based violence.

These obstacles, which restrict Venezuelan people's access to regular migration status, also exacerbate the lack of protection for Venezuelan women survivors of gender-based violence. The information gathered shows that their irregular migration status is one of the factors that discourage women from turning to the protection and justice services because they fear being expelled from the country or criminalized.

Amnesty International found that the Ecuadorian authorities do not provide adequate care and support to the few Venezuelan women who, despite the above, do seek the services of frontline institutions dealing with gender-based violence or the system for the administration of justice. Amnesty International identified structural problems in both types of institutions, linked for example to the prevalence among staff of gender stereotypes and discrimination and xenophobia against Venezuelan women, which constitute a further form of violence against women.

---

[1] National Institute for Statistics and Censuses (Instituto Nacional de Estadística y Censos, INEC), National Survey of Family Relations and Gender-Based Violence against Women (Encuesta Nacional sobre Relaciones Familiares y Violencia de Género contra las Mujeres, ENVIGMU) November 2019, www.ecuadorencifras.gob.ec//violencia-de-genero/ (Spanish only).

This is compounded by a lack of human and material resources to enable services to function properly, the shortage of shelters and the failure to institutionalize good practices, which, although they affect all women survivors of gender-based violence in the country, have a disproportionate impact on the situation of Venezuelan women due to the particular circumstances they face as refugees, often without access to support networks.

In practice, this combination of obstacles renders access to justice and reparation for Venezuelan women little more than a utopia. Moreover, it violates their right to a life free of violence, which the state has an obligation to guarantee to all women, without discrimination. Amnesty International believes that the failures and shortcomings of the state response to gender-based violence against Venezuelan refugee women in the country constitute a failure by the Ecuadorian authorities to fulfil their duty of due diligence in addressing gender-based violence.



*Venezuelan woman in Machala, 8 September 2022 © Ana María Buitrón | Amnesty International*

## KEY RECOMMENDATIONS

Based on the research set out in this report, Amnesty International has formulated a series of general **recommendations for all state institutions responsible for addressing the needs of Venezuelan refugee women in Ecuador:**

- Strengthen and expand the dissemination of information on the rights of people on the move in Ecuador, with a gender perspective, as well as information for women on care pathways for survivors of gender-based violence, with a focus on people on the move, throughout the country, paying particular attention to border areas, far from the capital. This information must be accompanied by strategies and messages aimed at addressing and overcoming the fear of approaching institutions to initiate these procedures because of the risk of detention and deportation to Venezuela.

- Ensure that all institutions that support survivors of gender-based violence have effective protocols for dealing with cases of gender-based violence that address the particular needs of refugee and migrant women survivors of gender-based violence, incorporating intersectionality and the duty of non-discrimination.

The Venezuelan women interviewed agreed that, when faced with a situation of violence, they have gone or would go first to international and civil society organizations to seek help. Most of the Venezuelan women interviewed who indicated that they knew where to turn in cases of gender-based violence had obtained this information through the services of international or civil society organizations[81] or digital media.

# 5.2. FEAR AND DISTRUST OF THE AUTHORITIES

As noted above, due to Venezuelans' limited access to international protection and alternative forms of migration regularization, the majority of Venezuelan women in Ecuador are in an irregular migratory situation. For women survivors of gender-based violence, the lack of regular migration status is also a significant obstacle in seeking protection from the authorities.

In its concluding observations on Ecuador's most recent report of November 2021, the CEDAW Committee noted with concern that women asylum seekers and migrants, in particular those in an irregular situation, who suffer gender-based violence, including domestic violence and rape, refrain from accessing victim support services out of fear of the immigration authorities.[82]

The Venezuelan women, in an irregular migratory situation, interviewed for this research nine months later also reported being afraid to approach state institutions to ask for help or report acts of violence for fear that they will be given economic fines that they cannot pay or even be expelled from the country.[83]

Although one of the grounds for deportation established in law is entering Ecuadorian territory through an unauthorized crossing, this in principle is not applicable to people subject to international protection, such as Venezuelans.[84] Ecuadorian legislation guarantees the non-refoulement of individuals to countries where their lives or those of their relatives are at risk and prohibits the expulsion of groups of foreign nationals.[85] Despite this, in 2019, for example, the Ecuadorian authorities carried out mass expulsions of Venezuelans to Colombia. The Constitutional Court noted that these practices violate the rights to migrate, to freedom of movement and to due process as well as the prohibition of collective expulsion.[86]

However, since they had not received information about their rights, many Venezuelan women were unaware that Ecuadorian law allowed them to seek protection or lodge a complaint with the Attorney General's Office, even if they did not have an identity document. Amnesty International believes it is essential that the Ecuadorian authorities take prompt measures to strengthen the dissemination of information to refugees and migrants on the response to gender-based violence, ensuring that dissemination strategies address people's fear of going to institutions because they do not have regular migration status.

Amnesty International noted that the fear of going to the authorities is compounded by other factors, such as widespread perceptions of impunity and the ineffectiveness of the justice system, which discourage women, both local and foreign, from reporting this violence.[87]

> **"We often meet women who tell us 'I'm not going to report', because they've lost confidence in the state, because they're not sure that their situation will be examined and their rights restored. They are afraid, on the contrary, that this system will end up persecuting them, criminalizing**

---

[81] Women's Focus Group in Quito, 4 August 2022.
[82] CEDAW Committee, Concluding observations on the tenth periodic report of Ecuador, CEDAW/C/ECU/CO/10, November 2021, para. 47a.
[83] Cis Women's Focus Group in Quito, 4 August 2022. See also: Inter-American Court of Human Rights, Migraciones irregulares y derecho internacional: Gestión de los flujos migratorios, devolución de extranjeros en situación administrativa irregular y Derecho Internacional de los Derechos Humanos, 2012 https://www.corteidh.or.cr/tablas/r31009.pdf
[84] Organic Law on Human Mobility, Art. 143, 2017. www.registrocivil.gob.ec/wp-content/uploads/downloads/2018/03/ley_org%C3%A1nica_de_movilidad_humana.pdf.A1nica_de_movilidad_humana.pdf (Spanish only)..
[85] Constitution of the Republic of Ecuador, 20 October 2008, Art. 66, www.oas.org/juridico/pdfs/mesicic4_ecu_const.pdf and Organic Law on Human Mobility, Art. 2, 2017. www.registrocivil.gob.ec/wp-content/uploads/downloads/2018/03/ley_org%C3%A1nica_de_movilidad_humana.pdf.A1nica_de_movilidad_humana.pdf (Spanish only)..
[86] Constitutional Court of Ecuador, Judgment: No. 639-19-JP/20, 2020 [http://portal.corteconstitucional.gob.ec:8494/FichaRelatoria.aspx?numdocumento=639-19-JP/20 Spanish only].
[87] Cis Women's Focus Group in Quito, 4 August 2022 and Cis Women's Focus Group 1 in Machala, 8 September 2022. International organization official interviewed on 13 July 2022.

CLP_PC_022605

> **them and returning them to their country and putting their lives and security at risk."[88]**
>
> Representative of an international organization

This perception is shared by several civil society organizations.[89]

> **"After filing a complaint, it comes to nothing. I don't know of a single case where there's been any action other than just the report. There is never any follow-up by the justice system. At the shelter, we always persuade women that it is best to file a complaint, but the reality is that it is not the best thing. Those processes crush their self-esteem and are a thorn in their sides when they want to move on."[90]**
>
> Shelter staff member

According to Plan International, 71% of Venezuelan women in Ecuador believe that cases of violence against women are not usually reported, compared to 29% who said they are. And 27% mentioned mistrust of public institutions as the main reasons for not reporting.[91]

It should be noted that many Venezuelan refugee women who experience violence come from previous contexts of violence, both in their country of origin and along the migration route. In the case of Ecuador, most Venezuelans have arrived in the country after travelling through Colombia, and in many cases, having settled there for some time, or after having lived in Peru.[92] In the report *Unprotected: Gender-Based Violence against Venezuelan Refugee Women in Colombia and Peru*, Amnesty International documented significant gaps in access to justice in Colombia and Peru. In both countries, there are high levels of impunity for gender-based violence against Venezuelan refugee women.[93]

Some women who have travelled through countries where the state did not respond adequately when they filed a complaint have stated that they prefer not to approach Ecuadorian institutions for fear of a repetition of similar experiences.



### LISETH
### VENEZUELAN TRANS WOMAN INTERVIEWED IN MACHALA[94]

*"I have no faith in any state institution, I am traumatized since Colombia. In Colombia I did try to make a complaint at the Attorney General's Office and they told us, 'And why the complaint?' Because we need to be supported, because [experiencing violence] is not right. They told us, 'Yes, but is it right for you to be here?' So then I left that institution."*

---

[88] Representative of an international organization interviewed on 13 July 2022.
[89] Civil society organization representative in Machala, interviewed on 2 August 2022. Representative of community organization in Quito, interviewed on 5 August 2022. Representative of civil society organization in Quito, interviewed on 9 August 2022. Staff at a shelter, interviewed on 29 August 2022. Representative of civil society organization in Machala, interviewed on 8 September 2022. Representative of civil society organization in Quito, interviewed on 12 September 2022.
[90] Staff at a shelter, interviewed on 29 August 2022.
[91] Plan Internacional, *Estudio sobre violencia basada en género hacia las mujeres migrantes y/o refugiadas en los países receptores de Perú y Ecuador*, August 2021, p. 11, www.r4v.info/es/document/Plan_International_Estudio_Binacional_VBG_Feb22
[92] Representative of a civil society organization in Quito, interviewed 8 August 2022.
[93] According to the Corporación Sisma Mujer report on violence against women of in Colombia, in 2021, 82.92% of the complaints of domestic violence were at the investigation stage, which indicates a high level of impunity because only 16.09% of these cases were at trial stage and only 0.8% at sentencing stage. With regard to sexual offences, the report states that during the same period, 88.19% of cases of sexual offences against women were at the investigation stage. Only 6.85% of cases reached trial and in only 0.13% of cases were sentences imposed. The Peruvian Ombudsperson's Office, in a statement on the urgent need for effective action by the justice system in the face of an increase in cases of feminicide, noted that in 2020 in only six out of 138 cases of feminicides (that is, 4%) were the perpetrators convicted of aggravated feminicide. See also Amnesty International, *Unprotected: Gender-based violence against Venezuelan refugee women in Colombia and Peru*, 12 July 2022, https://www.amnesty.org/en/documents/amr01/5675/2022/en
[94] Liseth, Venezuelan trans woman in Machala, interviewed on 8 September 2022.

CLP_PC_022606

In the case of trans women, these feelings of distrust are further reinforced by the experience of discrimination that, as a community, they have suffered at the hands of institutions such as the police. One of the Venezuelan trans women interviewed explained that, in the event of incidents of gender-based violence, her "response is to try to resolve things internally and not pass it to [state institutions] because there is more abuse there. The police instead of being a friend is an enemy, because there is a lot of this discrimination at the hands of officials."[95]



*Antonella, Venezuelan trans woman interviewed in Quito, 16 September 2022 © Ana María Buitrón | Amnesty International*

These factors result in women survivors of gender-based violence not going to the authorities and therefore not getting access to protection. According to Ecuador's Judicial Council, 90% of women who have experienced gender-based violence in Ecuador do not report it.[96] For Venezuelan refugee women, these statistics are likely to be even more pronounced because of the situation of vulnerability they face.

---

[95] Antonella, Venezuelan trans woman in Quito, interviewed on 16 September 2022.

[96] Plan Internacional, *Estudio sobre violencia basada en género hacia las mujeres migrantes y/o refugiadas en los países receptores de Perú y Ecuador*, August 2021, p. 11, www.r4v.info/es/document/Plan_International_Estudio_Binacional_VBG_Feb22

# " THERE IS A TARGET ON US "

## The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border



CLP_PC_022632

# ABOUT THE AUTHORS AND ACKNOWLEDGMENTS

**PRIMARY INVESTIGATOR & AUTHOR**
S. Priya Morley, Arthur Helton Global Human Rights Fellow, NYU School of Law

**CO-INVESTIGATOR**
Molly Goss, Transnational Family Case Manager, IMUMI

**CONTRIBUTING AUTHORS & RESEARCHERS**
Yusuf Abdulkareem, Legal Intern, IMUMI
Tsion Gurmu, Legal Director, BAJI
Katherine La Puente, Volunteer, IMUMI

**El Instituto para las Mujeres en la Migración, A.C.** ("Institute for Women in Migration" or "IMUMI") is a Mexican NGO that advocates for women migrants and their families within the region of Mexico, the U.S., and Central America. IMUMI addresses issues important to migrant women through legal strategies, research, communication, and advocacy. IMUMI collaborates with other civil society organizations, academic institutions, and governments to advocate for gender-specific migration and human rights policies.

**The Black Alliance for Just Immigration** ("BAJI") is a racial justice and migrant rights organization which engages in legal representation, advocacy, community organizing, education, and cross-cultural alliance-building in order to end the racism, criminalization, and economic disenfranchisement of African American and Black immigrant communities. BAJI was founded in Oakland, CA by veteran civil rights activists and clergy who were concerned about a wave of unjust immigration enforcement laws. BAJI subsequently expanded its mission to include advocacy on behalf of all Black immigrants and refugees, and today has offices and/or staff members in New York, NY; Los Angeles, CA; Oakland, CA; Atlanta, GA; Miami, FL; Washington, DC; Minneapolis, MN; and Houston, TX.

IMUMI is grateful for the *pro bono* legal research provided by Moreen Barzic, Gina Girak, and Anna Pregartner of the DeForest Abogados law firm.

The Authors appreciate the advice and assistance provided by Yamel Athie Guerra, Dianela Angulo Vázquez, Lorena Cano Padilla, Nora Caro, Marcela Daumas Posada, Elizabeth Fulton, Helen Kerwin, Gretchen Kuhner, Pamela Maas Pérez, Valeria Scalisse García, Berenice Valdez Rivera, and Diana Villamar Ramírez.

Cite checking support was provided by: Victor Adame.

Formatting and publication by: Eva Islas Ramos and Miriam González Sánchez.

IMUMI's design and publication work on this Report would not have been possible without the generous support of Open Society Foundations, Heinrich Böll Foundation and Foundation for a Just Society.

CLP_PC_022635

## B. MEXICO'S RESTRICTIVE IMMIGRATION ENFORCEMENT SINCE 2019

After President Andrés Manuel López Obrador took office in December 2018, there was a brief period of time in which his Administration claimed to adopt a more permissive, human rights-based approach to immigration than his predecessor.[235] For example, in early 2019, in response to migrant caravans arriving to the Mexico-Guatemala border, immigration authorities increased the number of TVRH cards being issued on public interest/humanitarian bases.[236] During these six months, Mexico's deportation rates were low compared with recent years.[237]

However, in response to economic pressure exerted by the United States, President López Obrador's Administration quickly adopted a hard-line approach to immigration enforcement in southern Mexico.[238] In late May 2019, U.S. President Donald Trump threatened to impose tariffs on imported Mexican goods if Mexico did not prevent undocumented migrants from entering the United States through the Mexico-U.S. border.[239] In response, Mexico deployed thousands of National Guard officers to conduct immigration enforcement at its southern border – to curb the flow of migrants into Mexico.[240] The National Guard is mandated to be a civilian-led security force that addresses crime and public security.[241] In reality, it has been staffed in part by Mexican military officers and federal police officers. This militarization of public security, which violates international law, has been condemned by international human rights groups.[242] While the National Guard was mentioned in the Mexican Constitution of 1917, it was not created or mobilized until the current Administration. Under the current Administration, the National Guard has been given significant powers to exercise its public security functions in the context of migration.[243] Mexican civil society groups, including IMUMI, argue that this is unconstitutional and frames migration as a national security – rather than a human rights – issue.[244]

The deployment of the National Guard resulted in a significant increase in the apprehension and detention of migrants. There was a surge of detentions in June, with an estimated 31,416 migrants detained that month alone, reflecting "the highest monthly total in all publicly available data going back to 2001."[245] In the state of Chiapas, in which Tapachula is located, 66 percent more migrants were apprehended between January and September 2019 than over the same period in 2018.[246] This caused extreme overcrowding in immigration detention centers, including at *Siglo XXI* ("21st Century") detention center in Tapachula.[247] In addition, as outlined in Chapter 6, the INM in Tapachula stopped issuing *oficios de salida del país* that allowed African and other migrants to travel north.

Due to their skin color, African and other Black migrants are often more visible to immigration authorities when travelling without documentation.[248] They are afraid to challenge officials, and are also easy targets for local gangs.[249] Some attempt to evade apprehension by travelling north by boat off Mexico's Pacific Coast, but this journey is dangerous and has proved fatal. For example, in October 2019, a small boat carrying Cameroonian migrants sank off the coast of Chiapas, killing two of the men on board.[250]

CLP_PC_022665

## C. ANTI-BLACK RACISM IN TAPACHULA

In 2019, while African migrants were camped outside of *Siglo XXI* as described above, BAJI traveled to Tapachula and spoke with 20 Black migrants – from Angola, Cameroon, Congo, DRC, Eritrea, Ethiopia, Ghana, Guinea, Haiti, and Sierra Leone – about their experiences since arriving in Mexico. These migrants raised a number of concerns, specifically about the discrimination they faced from immigration authorities, police, and other government officials. In addition, the migrants described the poor conditions they were living in and their experiences of racism in the contexts of employment, housing, and education. This section summarizes the findings from the interviews.[285]

### Racism in Detention Facilities

After the INM in Tapachula stopped facilitating the onward migration of African migrants by issuing *oficios de salida del país*, many were detained in immigration detention centers (like *Siglo XXI*) either while waiting to be processed in the immigration system or after attempting to leave Tapachula without documentation and being apprehended by immigration authorities. Abdul, a Sierra Leonean migrant, said about his experience in detention: "The Mexican immigration officials tell Black people that detention is a necessary part of seeking status in Mexico, but this is not the case for non-Black migrants." He observed, "All Black people are detained for at least 21 days, including babies, children, and sick people. Also, if we attempt to leave Tapachula, then we are detained again. Some people have been detained up to five or six times." Abdul concluded from his experience that, "Mexican officials are much harsher inside the detention centers than they are outside in public."

The interviewees shared multiple accounts of anti-Black racism within immigration detention centers. In some cases, the interviewees were denied the basic necessities of water and access to medical care. Dauda, who is from Sierra Leone, noted the frequency of illness in detention and stated,

> "When Black migrants require medication, we are only given pain relievers and not proper medication like other migrants. [One week before the date of the interview], a Black migrant from Mauritania almost died in detention because he was not given medication. While we were in detention together, he collapsed and they gave him the same tablets."

The poor conditions in detention fostered the spread of illnesses, such as flus and fevers. As Adamo, a migrant from Cameroon, stated, "Black people are dying in detention and the Mexican officials do not even care enough to allow us access to proper medical care."

Further, interviewees described a stark difference in the quality of food provided to Black migrants in detention relative to other detainees. Manu, who is from Cameroon, summarized the food disparities: "Black people are the last to eat and severely mistreated. If you are Black, you are not able to access the same food in detention. Black people are only given rice to eat while in detention, while other detainees are given rice and chicken." Prison officials went so far as to change the food once they saw Black migrants approaching, giving more nutritious food to other detainees. Mohamed, a migrant from Guinea, recalled officials making statements such as, "You are African, so you cannot eat that." In all aspects, the interviewees expressed that they were treated as subhuman.

CLP_PC_022671

Finally, interviewees described the ways in which systems of segregation played out inside the detention facilities. Mohamed stated, "When an Ethiopian man attempted to enter a line designated for Honduran detainees, he was beat up by all of the Hondurans while the Mexican officials watched the attack take place and did not stop it."

**Police Violence**

Even after being released from detention and living in informal housing settlements, the interviewees were still subjected to racism and abuse from state actors. Patrick, a Cameroonian migrant, cited the constant presence of police and frequent arrests:

> "We have many experiences of being harassed and attacked by the Mexican police and immigration officials who bully those of us who are living here in the makeshift camp. Once, the officers stopped a Black man who was walking back to the camp. He was stopped, harassed, forced into a car, and robbed by the police – the people who are supposed to be protecting us. We do not feel safe walking around in Tapachula."

Most interviewees recalled several instances of local police harassing, robbing, and physically attacking Black migrants. Rui, a migrant from Angola, recalled one particularly gruesome attack:

> "At around 7 or 8pm one evening, an Angolan man was coming back to the *Siglo XXI* area. One of the municipal police cars blocked him, and the police came out and pointed a gun at him. While pointing a gun at him, another officer used his baton to choke the man. They beat him up and took all of his money and possessions. Then they put him in the car and left him in the forest. Eventually, the man came to and returned to the *Siglo XXI* area beaten and bloody. We took him to the hospital and discovered that he had internal bleeding and could not walk for a few days…
> After seeing the abuse and violence inflicted by immigration officials and police on Black people, [Mexico] is not a place where we feel safe. We left home with hopes of a better future, but here we have less safety and access to basic needs than we did in our home countries."

The interviewees identified significant fear of police and said there was no accountability for this type of police violence. Thierno, an Angolan migrant stated, "Whenever we see police cars at night, we must run because we know that no one will protect us from their abuse." Even when police violence was reported, there were no consequences or increased protections for Black migrants. As Emmanuel, a migrant from the DRC, described, "The municipal police are also extremely violent and attack Black migrants. We reported this to the federal police…but there was no consequence for this violence."

**Language Barriers**

Many of the interviewees believed that the United States would be a safer country in which to seek protection as a refugee than Mexico, due to the discrimination that Black migrants experience in Mexico and the barriers to integration in Mexican society. However, many of the interviewees felt that

CLP_PC_022672

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 308 of 721

A

# Mexico seeks to curb 'abuse' of asylum system by migrants who do not plan to stay



[1/2] Migrants rest outside the Siglo XXI migrant detention center as they seek humanitarian visas to cross the country and reach the U.S., in Tapachula, Chiapas state, Mexico, January 11, 2023. REUTERS/Jacob Garcia

Read more

1

2

MEXICO CITY, Feb 13 (Reuters) - Mexico's overwhelmed asylum agency is strengthening efforts to weed out high numbers of applicants who "abuse" the system while passing through Mexico to reach the United States, Mexico's top asylum official said on Monday.

Mexico has the world's third highest number of asylum applications after the United States and Germany, reflecting growing numbers of refugee seekers that have strained resources at the Mexican Commission for Refugee Assistance (COMAR).

Advertisement · Scroll to continue

CLP_PC_022810

Mexico seeks to curb abuse of asylum system by migrants who do not pledge stay - Reader Mode

Once migrants request asylum, they are exempt from deportation and are eligible to seek work, motivating many to file applications even without the intent to stay in Mexico, said Andres Ramirez, COMAR's director.

"It's an abuse of the asylum system," he told reporters at COMAR's busy Mexico City office. "Treating COMAR like a kind of travel agency."

The agency recently began a pilot in the southern city of Tapachula near the Guatemala border, where it has its biggest load of applicants, geared at quickly rejecting cases that do not merit asylum, Ramirez added.

Advertisement · Scroll to continue

He noted some applicants falsely believe COMAR distributes permits allowing travel within Mexico. In reality, asylum seekers typically must stay in the state where they began their cases.

"This has put us in a situation of near-breakdown," Ramirez told a news conference.

COMAR received close to 119,000 applications last year, slightly fewer than the year before.

This January, the number more than doubled from the same month in 2022. The claims included 430 from Afghans - a soaring increase from past years.

Yet Ramirez noted many Afghans are unlikely to see out their cases in Mexico, where so many aspects of daily life from religion to food are so different than home.

"Many Afghans do not necessary want to stay in Mexico," he said. "In the United States, there's a much bigger Afghan community than what we have here."

Advertisement · Scroll to continue

CLP_PC_022811

Reporting by Lizbeth Diaz and Daina Beth Solomon; Editing by Lincoln Feast.

CLP_PC_022812

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 311 of 721

## FRAGOMEN

# Costa Rica: Special Permit for Cuban, Nicaraguan and Venezuelan Refugees Will Reopen

December 19, 2022

## Country / Territory

    Costa Rica

On March 1, 2023, for 12 months, the General Immigration Directorate will re-open applications for the special humanitarian permit for eligible Cuban, Nicaraguan and Venezuelan nationals to reside and work in Costa Rica for up to two years initially. Applicants must meet the following criteria to qualify for the permit:

- Must have filed for refugee status between January 1, 2010 and September 30, 2022 and their application has either been denied or is pending;

- Remained in Costa Rica since they filed their refugee status application;

- Must not hold any approved visa or legal status in Costa Rica; and

- Have a clean criminal record.

Applicants must register with the General Immigration Directorate within 90 days of receiving the resolution approving their permit. The permit may be renewed if the holder has not entered or exited Costa Rica illegally after receiving it. Interested applicants should contact their immigration professional for more information and case-specific advice.

*This alert is for informational purposes only. If you have any questions, please contact the global immigration professional with whom you work at Fragomen or send an email to lar@fragomen.com.*

CLP_PC_022823

BELIZE IMMIGRATION | Ministry of Foreign Affairs, Foreign Trade & Immigration

Home    The Ministry ⌄    Forms

Contact Us



Passport ⌄        Citizenship ⌄        Residence ⌄        Permits ⌄        Visa ⌄        Refugees

Other Services ⌄        🔍

## AMENSTY MENU

ESPAÑOL



Background Information

Who Qualify?

What Documents You Need?

How To Apply?

What is the Cost?

FAQs

Forms

## Who Qualify?

**Qualifying criteria for migrants who are residing in Belize**

1. Registered as asylum seekers with the Department of Refugees (must have been registered before 31 March 2020).
2. Residing in Belize before 31st December 2016.
3. Have at least one (1) child born in Belize on or before 31st December 2021.
4. Completed primary, secondary and or tertiary education in Belize.
5. Married to a citizen of Belize for at least one (1) year.
6. In common-law union with a citizen of Belize for at least five (5) years.
7. Referrals by the Department of Human Services (minors/adolescence and victims of human trafficking).
8. Maintained gainful employment in Belize for five (5) years.

**SERVICES MENU**

Passport

Citizenship

Residence

Visa

**TOP MENU**

Home

The Ministry          ›

Forms

Contact Us

Search…        🔍

**DESIGNED AND MAINTAINED BY**

CLP_PC_022825



Permits

Refugees

CSME Skilled Certificate

Border Crossing Card

Copyright © 2023. Government of Belize | Ministry of Foreign Affairs, Foreign Trade & Immigration | All Rights Reserved.

f

CLP_PC_022826



FACT SHEET: NOVEMBER 2018

# Is Mexico Safe for Refugees and Asylum Seekers?

President Trump has repeatedly falsely asserted that the United States can turn away asylum seekers who have crossed through Mexico without seeking asylum there first—even though there is no legal basis for this claim. Secretary of Homeland Security Kirstjen M. Nielsen has also incorrectly stated that asylum seekers must "seek protections in the first safe country they enter, including Mexico."

Despite this rhetoric, **many refugees face deadly dangers in Mexico. For many, the country is not at all safe.** Mexico falls far short of meeting the legal requirements that would permit U.S. officials to treat it as a "safe third country" for the purpose of turning back asylum seekers. And since there is no safe third country agreement in place, the president and members of his administration have no legal basis to state that asylum seekers must apply for asylum in Mexico.

Rather than returning refugees to a country that is currently unable to provide them safety, the United States should strengthen support to build an effective refugee protection system in Mexico. This factsheet explains the concept of safe third country agreements under U.S. law and why Mexico does not meet the legal requirements.

## What is a "safe third country"?

Under a "safe third country" agreement, the United States and another country recognize that both countries effectively protect refugees seeking asylum. With an agreement in place, asylum seekers who request protection in the United States after first passing through the "safe" country may be returned there and given an opportunity to request protection in that other country.

**Canada is the only country that has a safe third country agreement with the United States.** The Canada-U.S. Safe Third Country Agreement was signed on December 5, 2002 and came into effect on December 29, 2004. As a result, asylum seekers who enter the United States after passing through Canada will be returned and permitted to request asylum there unless they qualify for an exception to the agreement.

Congress has spelled out three requirements that must be met before U.S. officials and agencies can block refugees from asylum on these grounds. **Specifically**, **to be a safe third country, the** Immigration and Nationality Act **requires that the country must:**

- ☑ **Guarantee asylum seekers protection from persecution:** The country must be a place where the refugee's "life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion."

- ☑ **Provide access to "full and fair" procedures to assess asylum requests:** The country must afford "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection."

- ☑ **Agree to be designated a safe third country:** The country must have entered into a bilateral or multilateral safe third country agreement with the United States.

CLP_PC_022851

## Mexico does not meet "safe third country" legal requirements

As Human Rights First has long underlined [documented], given the deadly dangers in Mexico and the deficiencies in its refugee protection system, Mexico falls far short of meeting "safe" country standards under U.S. law:

### Refugees are not adequately protected in Mexico.

As detailed in Human Rights First's 2017 report and updated in a 2018 fact sheet, **refugees and migrants face acute risks of kidnapping, disappearance, sexual assault, trafficking, and other grave harms in Mexico**. Refugees in Mexico are targeted due to their inherent vulnerabilities as refugees but also on account of their race, nationality, gender, sexual orientation, gender identity, and other reasons. Certain groups—"including the LGBTQ community, people with indigenous heritage, and foreigners in general"—face consistent persecution in Mexico and are often forced to seek protection outside of the country. Gay men and transgender women, for example, flee discrimination, beatings, attacks, and a lack of protection by police in Mexico. **Some refugees have been trafficked into forced labor**, while women and girls have been trafficked to Mexico's southern border where they have been exploited in bars and night clubs that cater to police, military, and other forces. Doctors Without Borders reported that 68% of refugees and migrants it interviewed had been exposed to violence and almost one third of refugee and migrant women had been sexually assaulted. Additionally, Amnesty International reports that criminal investigations of massacres and crimes against migrants remain "shrouded by impunity."

### Many refugees are left unprotected due to lack of access to full and fair procedures

**Deficiencies, barriers, and flaws in Mexico's asylum system leave many refugees unprotected** and Mexican authorities continue to improperly return asylum seekers to their countries of persecution. A 2018 Amnesty International report found that Mexican migration officials routinely turn back Central American asylum seekers and that **75 percent of migrants and asylum seekers surveyed were not informed of their right to seek asylum** by migration officers in detention facilities, even though this is required by Mexican law. Less than one percent of unaccompanied children apprehended in Mexico receive international protection, as detailed by Human Rights Watch.

Despite progress since launching an asylum system, barriers persist, leaving many refugees unprotected. The system for seeking legal protection lacks national reach and capacity. COMAR—"The Mexican Commission for Refugee Aid"—has only four offices around the country, leaving many refugees without access to the system. After halting its processing of asylum applications in 2017, Mexico only reopened its system in 2018 after a successful lawsuit by the Mexican Commission for the Defense and Protection of Human Rights. Refugee processing in Mexico remains plagued by backlogs and understaffing. In addition, **refugees are blocked from protection under an untenable 30-day filing deadline, denied protection by COMAR officers who claim that refugees targeted by groups with national reach can safely relocate within their countries, and lack an effective appeal process** to correct wrongful denials of protection. Finally, declining and disparate asylum recognition rates for Central Americans raise concerns that individuals from those countries remain unprotected.

### Mexico has not agreed to be a safe third country.

Mexico and the United States do not have a "safe third country" agreement.

CLP_PC_022852

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 316 of 721



**H U M A N**
**R I G H T S**
**W A T C H**

**JUNE 6, 2022**

# Mexico: Asylum Seekers Face Abuses at Southern Border

## Improve Conditions, Procedures; US Should End Pressure to Block Arrivals
Published in

(Los Angeles) – Migrants and asylum seekers who enter <u>Mexico</u> through its southern border face abuses and struggle to obtain protection or legal status as a result of policies aimed at preventing them from reaching the US, Human Rights Watch said today. As leaders meet in Los Angeles for the Summit of the Americas, they should commit to ending abusive anti-immigration policies and to ensuring people seeking protection are received humanely in the US, Mexico, and elsewhere.



A Mexican Marine orders a group of migrants from Bangladesh, India and Pakistan off a bus at an immigration checkpoint outside the town of Viva Mexico, near Tapachula, in Chiapas state, Mexico, June 21, 2019.

© 2019 AP Photo/Oliver de Ros

Refugee <u>status applications</u> and <u>migrant apprehensions</u> in Mexico have risen dramatically as US President Joe Biden has continued <u>restricting access to asylum</u> at the US southern border, and <u>pushed Mexican</u> President Andrés Manuel López Obrador to heavily regulate travel to and within Mexico in order to prevent non-Mexican migrants from <u>reaching the US</u>. Those who cross Mexico's southern border fleeing violence and persecution struggle to obtain protection, face serious abuses and delays, and are often forced to wait for months in inhumane conditions near Mexico's southern border while struggling to find work or housing.

"Outsourcing US immigration enforcement to Mexico has led to serious abuses and forced hundreds of thousands to wait in appalling conditions to seek protection," said <u>Tyler Mattiace</u>, Americas researcher at Human Rights Watch. "The Summit of the Americas is an opportunity for regional leaders, including presidents Biden and López Obrador, to commit to a regional migration agreement that moves away from heavy-handed enforcement policies and towards protection and human rights."

CLP_PC_022853

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 317 of 721

Leaders from the Western Hemisphere are expected to sign a regional declaration on migration and protection during the Summit of the Americas, hosted by President Biden in Los Angeles. Any agreement signed should include commitments by leaders to restore and expand access to protection across the continent, to end heavy-handed enforcement policies that have led to abuses.

Mexico apprehended 307,569 migrants in 2021, the highest number ever recorded. A record 130,863 people also applied for refugee status in Mexico in 2021, the third-highest number in the world according to the United Nations refugee agency UNHCR. A decade ago, just a few thousand applied per year.

Most of those entering the southern border are Black, brown, and Indigenous people from Central America and the Caribbean who lack visas to enter Mexico. Nearly half of all asylum applicants in Mexico in 2021 were Haitians. Most enter near the city of Tapachula, in Chiapas state. Around 70 percent of those who apply for refugee status in Mexico do so in Tapachula.

Human Rights Watch interviewed more than 100 migrants, asylum seekers, representatives of migrants' rights groups and UN agencies, and officials from Guatemala, Honduras, and Mexico, between August 2021 and April 2022, in person and by phone, in Tapachula and Mexico City, and in Tecun Uman, Guatemala, near the main border crossing.

**Video, Israel, 24, Nicaragua**

Most asylum seekers enter Mexico undocumented. Most said they came fleeing violence or persecution in their home countries but did not attempt to request protection at an official border crossing, fearing agents from Mexico's immigration authority, the National Migration Institute (INM) would deport them. Most applied for refugee status once in Mexico. A few said they sought protection at the border and were turned away by INM agents or security guards. Many said INM agents dissuaded them from seeking refugee status in Mexico and pressured them to accept voluntary returns to their countries.

"I thought they would help us when we got to Mexico, but when we came to the border bridge and asked for protection they turned us away," said one man who fled forced gang recruitment in Honduras. "I never thought I would have to leave my country. Now, I know if I went back, I wouldn't last very long alive. If you don't obey the gangs there, they force you to – or they kill you."

In 2021, nearly 90,000 people applied for refugee status in Tapachula, equivalent to a quarter of the city's population. Most wait many months for their applications to be reviewed and to receive documents proving their legal status and allowing them to leave. They often face discrimination, and struggle to find work and housing. Support programs by UNHCR and the Mexican government are insufficient. Some interviewees said they felt unsafe in Tapachula because it is close to the Guatemalan border, where the criminal groups they had fled were operating.

CLP_PC_022854

Mexico's refugee system has been overwhelmed by the enormous growth in applicants. The budget for the refugee authority, the Mexican Commission for Refugee Assistance (COMAR), which is separate from the INM, has not kept pace, and it has a growing backlog of refugee status applications. In 2021, it received more than 130,000 but only processed 38,005. UNHCR pays for many basic operating costs, including two-thirds of staff's salaries. UNHCR contributed $4.5 million in 2021. The federal government contributed just over $2 million. State governments provide free space for some offices and refugee centers.

Most asylum seekers said they were fleeing death threats, extortion, and forced recruitment by gangs or drug cartels in Honduras, Guatemala, or El Salvador – or political persecution and generalized human rights abuses in Cuba, Nicaragua, and Venezuela.



Senior INM officials said they do not believe most people seeking refugee status in Mexico have legitimate claims, either because they do not believe they are truly fleeing violence and persecution or because they believe most would prefer to seek asylum in the US. Mexican Foreign Relations Secretary Marcelo Ebrard has expressed similar sentiments publicly.

COMAR is able to review only some of the refugee status applications it receives. It grants protection to nearly all Hondurans, Salvadorans, and Venezuelans whose cases it reviews. But it rejects most applicants from Haiti, saying they do not qualify as refugees. COMAR officials have acknowledged that Haitians cannot be safely returned due to the severe security crisis there. The INM issued temporary "humanitarian" visas to about 50,000 Haitians in 2021. In 2022 it began a pilot program to allow 200 Haitian families who do not qualify as refugees to apply for residency in Mexico.

US President Joe Biden has continued many of former president Donald Trump's abusive anti-immigration policies, including pressuring Mexico to stop migrants from reaching the US and blocking access to asylum at the US southern border through policies like Title 42 and Remain in Mexico. President Andrés Manuel López Obrador has deployed almost 30,000 soldiers alongside National Migration Institute (INM) agents to apprehend undocumented migrants throughout Mexico.

Both the Biden and López Obrador administrations have a role in improving access to asylum procedures and the processing of refugee status applications in Mexico, Human Rights Watch said. The US should restore access to asylum at its border and stop pressuring Mexico to crack down on migration. Mexico should ensure

CLP_PC_022855

that COMAR is properly funded and that asylum seekers are able to make claims at border crossings and from detention centers. Mexico should streamline processing of residence visas for those who have been recognized as refugees. And it should ensure that Haitians have access to protection and legal status.

"President López Obrador has often portrayed Mexico as a champion of migrants and asylum seekers," Mattiace said. "If that is true, he should demonstrate it by ensuring asylum seekers in southern Mexico get a humane welcome."

**For additional information on the findings, recommendations, and a selection of cases, please see below. Unless noted otherwise, the cases are based on the direct testimony of interviewees.**

Human Rights Watch interviewed 80 migrants and asylum seekers in Tecun Uman, Guatemala, and Tapachula, Mexico, primarily in August and September 2021, with additional interviews conducted into May 2022, with 28 representatives of UN bodies, the Mexican, Guatemalan, and Honduran governments, the Chiapas state prosecutor's office, and migrants' rights organizations. Human Rights Watch also reviewed documents, photos, videos, text messages, and voice notes that supported and often directly corroborated individual case accounts and received information from the Mexican federal and the Chiapas state government.

The findings are consistent with previous Human Rights Watch work, conducted in 2015 and 2020, which found that the immigration agency pressured migrants not to claim refugee status or to abandon claims and illegally expelled some, including children, who feared for their lives in their home countries.

**Stepped Up Immigration Enforcement**

President López Obrador has intensified immigration restrictions and enforcement efforts in response to US pressure. He imposed new visa requirements, making it harder for Brazilians, Venezuelans, and Ecuadorians to travel to Mexico. He has also imposed new restrictions on domestic travel, including requiring proof of immigration status for domestic bus trips and regular immigration status checks on domestic flights.

The INM has a significant presence across Mexico and operates one of the largest immigration detention systems in the world, with over 6,000 staff in 499 locations, including 194 points of entry and 66 immigration detention centers. Soldiers and immigration agents conduct "control and verification" operations nationwide to apprehend undocumented migrants. They operate checkpoints on major roads and conduct patrols and surprise inspections on buses and airplanes, at hotels, along the northern and southern borders, and in public spaces like parks. They regularly publicize these efforts. The Mexican Supreme Court recently ruled these checkpoints unconstitutional. Congress will need to amend the law for the ruling to take effect.

CLP_PC_022856

In some cases, efforts to apprehend undocumented migrants have led to serious violence and even deaths. In October 2021, National Guard troops <u>opened fire on a truck</u> carrying migrants, in an apparent attempt to detain them, killing two. According to news reports, survivors alleged that the troops tried to <u>cover up</u> the killings by planting a weapon on one of the victims and claiming they had shot in self defense. This is a



common and <u>well-documented practice</u> by soldiers. In March 2021, soldiers <u>shot and killed a Guatemalan man</u> who failed to stop at a checkpoint. In September, immigration agents were <u>filmed kicking and beating</u> families in a migrant caravan.

**Mexico's Refugee System**

Under Mexican and international law, anyone has the right to apply for refugee status and have their claim heard by appropriate authorities. Officials are prohibited from returning people to a country where their life would be threatened or they would be at risk of torture or cruel, inhuman, or degrading treatment, regardless of whether they intend to apply for refugee status in Mexico.Mexico's refugee system is overseen by COMAR, a much smaller agency than the INM, which oversees all other immigration issues, including enforcement. COMAR receives and decides refugee status claims at its nine offices throughout the country. It has no permanent presence at airports or border crossings.

Mexican law recognizes anyone fleeing generalized violence, internal conflict, or massive human rights abuses that seriously disturb public order, among others, as a refugee. COMAR has determined that Salvadorans, Hondurans, and Venezuelans come from countries where these conditions are prevalent. As long as their reason for fleeing is connected to the disturbance of public order, COMAR nearly always presumes they are refugees and grants them protection.

But applicants from other countries where Human Rights Watch has documented similarly dangerous conditions, <u>such as Cubans</u> and <u>Haitians</u>, are not given this treatment, and are much less likely to receive protection. COMAR officials say most Haitians do not qualify as refugees, since many previously had legal status in Chile or Brazil and do not cite disturbed public order as a reason for leaving Haiti.

COMAR can also grant a legal status called "complementary protection" to anyone who does not qualify as a refugee but cannot be safely returned to a home country. COMAR officials have acknowledged Haitians

CLP_PC_022857

cannot be safely returned, but COMAR rarely grants complementary protection to any applicants, including Haitians.

COMAR provides applicants a certificate confirming their status as a refugee status applicant. They can use it to apply to the INM for a temporary "humanitarian" visa, valid until their claim is resolved, which they can show to avoid being detained if stopped by INM agents. COMAR also provides applicants a temporary national ID number, needed to work and access services.

Applicants are not allowed to leave the state while their application is pending, even if they have a "humanitarian" visa. Those found to have done so by immigration agents are considered to have "abandoned" their application and can be detained and deported.

Once someone is recognized as a refugee, their temporary "humanitarian" visa is no longer valid. They must apply to the INM for a permanent residence visa. Without it, they cannot travel within Mexico and may be detained and considered undocumented if they reach a checkpoint. Recognized refugees are exempt from visa application fees.

**Barriers to Protection for Detained Migrants**

Human Rights Watch interviewed 19 people who had been held in immigration detention centers. Most said they were detained after entering the country undocumented, before applying for asylum.

Some said immigration agents tried to dissuade them from applying for refugee status and pressured them to agree to voluntary return, even when they said they would be at risk of violence and persecution in their home countries. Some said they were instructed to sign voluntary return documents without reading them. Others said agents used poor conditions in detention as a deterrent, saying they would spend months in detention if they sought refugee status.

Immigration officials said that their agents always inform detained migrants of their right to seek refugee status. However, COMAR rarely receives refugee status claims from apprehended migrants, according to official statistics. Of the over 130,000 refugee status applications received by COMAR in 2021, only 4,177, about 3 percent, came from people apprehended by the immigration agents at the border.

All asylum seekers are identified by pseudonyms for their protection. The following are some of their accounts:

*They detained me on Friday. On Monday, the immigration agent arrived. She took us up to the second floor. She told us "You have two options here: deportation or COMAR. The best thing for you to do is request voluntary deportation, because if you request COMAR you could be here from 90 days to three years waiting*

CLP_PC_022858

*for a decision. And apart from that you need to wait for your visa. You're going to waste a lot of time that way. Why don't you just go back to your countries?* **-Emiliano, 51, Venezuela**

## Video, Emiliano, 51, Venezuela

*The day after I was detained, the immigration agent came and said we all had to sign our deportation papers. I told him "I don't want to be deported. I want asylum." He asked me my name. Then he turned to the group and said "Julio is talking about asylum. You should all know that if you request asylum, you will be here for six months." The others said they didn't want to be in detention for six months, so they signed the papers and were sent back. I was the only one who refused to sign.* **-Julio, 29, Honduras**

*They never said to me "Do you want COMAR? Do you want to request COMAR or do you want deportation?" They didn't say anything to me. I didn't know anything about that. And they brought me to talk to the consul. They asked for my personal information, my age. And then, two days after talking with the consul, they came with my deportation papers, and they didn't let me read anything. They said: "sign quickly, fingerprint quickly," and you couldn't read what you were going to sign.* **-Juana, 21, Honduras**

## Video, Juana, 21, Honduras

*When you enter that place, you lose your human rights. I asked a guard if I could have my phone back to tell my family where I was. He told me "No one here gets to talk with their family." There were so many of us, we slept one on top of the other. We were even sleeping on the bathroom floor – like a prison. Lots of us had fever, flu, or a cough. They didn't give you any medicine. I was coughing, but they told me "You're not dying yet. Come back when you're dying." Half of us had Covid-19 symptoms. I was afraid I would die.* **-Emiliano, 51, Venezuela**

## Difficulties Accessing Protection at the Border

Migrants and asylum seekers should be able to request protection from immigration agents at border crossings or after entering Mexico, under Mexican and international law. The agents are legally prohibited from turning away anyone with a refugee status claim or anyone whose life would be at risk upon return to their home country. They are required to allow them into Mexico and to forward their requests to COMAR.

But most enter Mexico irregularly, even those intending to seek refugee status. Nearly every interviewee said they had entered Mexico irregularly, taking a raft or wading across the Suchiate River, which separates Mexico and Guatemala. They had not gone through an official border crossing, fearing immigration agents would detain and deport them when they attempted to enter the country or request protection, they said.

## Video, Israel, 24, Nicaragua

CLP_PC_022859

Immigration officials said asylum seekers rarely enter at official crossings, but if they do, the policy is to take adults into custody and transfer them to an immigration detention center – and to transfer children and families to a shelter – where they wait to speak to a COMAR representative and make a refugee status claim.



A raftsman prepares to take passengers across the Suchiate river from Ciudad Hidalgo, Mexico to Tecun Uman, Guatemala, August 12, 2021.

© 2021 Tyler Mattiace

But the interviews suggest the situation is more complicated. Experiences varied, suggesting immigration agents and private security guards on the Rodolfo Robles border bridge, connecting Tecún Uman, Guatemala and Ciudad Hidalgo, Mexico, at times decide on their own how to respond. Human Rights Watch also spoke to the Human Rights Monitoring and Observation Collective for Southwest Mexico (COMDHSM), a collective of migrants' rights groups that helped some of the migrants.

COMDHSM said they helped 87 asylum seekers enter legally between February and June 2021. They stopped doing so, they said, after receiving phone calls from an immigration official who threatened them with a criminal investigation on human trafficking charges. Immigration agents often harassed the COMDHSM staff at the border, they said, attempting to prevent them from entering the immigration office or speaking to asylum seekers.

Once, as they accompanied a family of asylum seekers, National Guard troops and two Suchiate municipal police officers arrived, threatening to detain them, they said. They reported the incident to the National Human Rights Commission, which urged the immigration agency to ensure their safety. The agency later sent the groups a letter saying it had instructed staff at the border to follow its code of conduct.

Nine people interviewed said that they or their families attempted to enter the country by telling agents on the Rodolfo Robles border bridge that they wished to seek refugee status in Mexico.

**Video, Francisco, 28, Honduras**

**Video, Ximena, 31, Honduras**

CLP_PC_022860

*My husband was in jail for 12 years, from age 14 to 26. In jail, you have to join a gang if you want to survive. He didn't want to do it, but they made him. A few years before he was released, he told the gang he was going to quit. That night, someone broke into his mother's house and shot her. We knew that as soon as he got out of jail it could happen to us too. The Red Cross told us we could go to Tecún Uman and request asylum in Mexico. The whole family went – seven of us. On the bridge, the Mexican immigration agents made us wait for hours. Finally, they said only the two children and one adult could enter. The rest of our family would have to stay in Guatemala. We said "it's all of us or no one." In Guatemala, they gave us the contact of a Mexican organization. The next week, they met us at the bridge and talked with the immigration agents, who finally let us cross.* **-Ana, 30, Guatemala**

*When we got to Tecun Uman, people told us: to avoid problems on the bridge, just cross on a raft. But I don't do things like that. Take a raft across the river with my two kids? Cross a border illegally? No. We're supposed to rely on the authorities to protect us. We went to the bridge. But they kept telling me to leave. They wouldn't look at my papers until someone from the human rights group came and helped us.* **-Ximena, 31 Honduras**

**Forced to Wait in Poor Conditions in Tapachula**

People applying for refugee status can wait for months in Tapachula – a month or more for the initial COMAR appointment; then from a month to more than a year for review, depending on the complexity of the case; and, upon approval, three to six months for an appointment for a residence visa. Without a visa, they are usually not allowed to travel. The immigration agency operates checkpoints throughout Chiapas, including on roads leading out of town and throughout the state, and at bus stations and airports.

While neither government officials nor migrants' rights groups know how many migrants are waiting in Tapachula, a city of just over 350,000, the 90,000 refugee status applications made there in 2021 suggest the number is high. Interviewees said that living conditions in shelters are often abysmal, jobs are difficult or impossible to get, they have difficulty obtaining medicine, and many receive little or no support while they wait.

**Video, Israel, 24, Nicaragua**

**Video, Ximena, 31, Honduras**

The Danish Refugee Council conducts regular surveys of migrants in Tapachula, asking about access to work, housing, and services. Seventy-five percent of the 438 families they surveyed for their January 2022 report said nobody in their family had worked in the past three months. Eighty-one percent said their children were

CLP_PC_022861

Case 1:23-cv-01843-TSC Document 123 Filed 03/23/26 Page 325 of 721

not enrolled in schools, as they did not intend to stay in Tapachula. Around half said they could not afford to buy medicines and 40 percent said they did not know how to access medical treatment. About 70 percent said they did not have a national ID number, which is required to be seen at public hospitals.

The Chiapas secretary of education confirmed that just over 1,000 non-North American students were enrolled in Tapachula public schools in the 2020-2021 school year. The secretary of health keeps no record of the nationality of patients at public clinics.

Financial support programs provided by UNHCR and the government for refugee status applicants fail to reach many who need help. UNHCR short-term cash assistance for vulnerable people, of US $100-300 per month for up to three months, reaches about 100 households each week. In a federal welfare program for refugee status applicants, most of the approximately 1,500 participants a week plant trees or do farm work, officials said. They receive US $130 every two weeks. Human Rights Watch saw hundreds of people lined up every morning seeking to enroll in both programs.

*I can't leave Tapachula. I have to stay here. With regards to work, it's difficult. People don't feel comfortable giving work to a foreigner, and it has been really hard being in a country that is not yours. I've gone through lots of situations that I've never had to deal with before. Like being on the street without a single cent. Not having anything to eat. Not having anything to drink. It's really hard.* **-Israel, 24, Nicaragua**

*We left Honduras because a drug cartel kicked us off our farm. But here, in the shelter, a woman came up to me and said her family is with the same cartel. She knew about us. She threatened us. I just want to leave Chiapas and be somewhere safer. –* **Carla, 27, Honduras**

Some said landlords and employers refuse to rent to or hire non-Mexicans. Signs posted outside some businesses advertised jobs for Mexicans only.



A worker clears forest to make space to plant fruit trees as part of a Mexican government program providing temporary jobs to refugee status applicants, August 25, 2021.

© 2021 Nelson González

CLP_PC_022862

*It's hard to find someplace to live here. The shelters are awful; I don't feel safe there with my children. I recently found an apartment. The landlord told me the building doesn't allow foreigners; it's written in the lease. He told me if the neighbors hear my accent or figure out I'm Honduran, he'll evict me.* **-Ximena, 31, Honduras**

A sign posted outside a storefront in downtown Tapachula, Mexico advertises a vacancy for a job as a cashier, specifying "Mexican nationality" as a requirement to apply, August 15, 2021.

© 2021 Tyler Mattiace

*I was a taxi driver in Honduras. MS-13 came and demanded a "tax." I ignored it. Then they came to my house. They said if I didn't pay they would kill us. But they wanted more money than I earned; I had no way to pay. I have some friends in Monterrey [in northern Mexico], so we wanted to go there. But right now we can't leave Tapachula. When we got here, we didn't know what to do. At first, we slept in the park, me, my wife, and my two kids. Then, we found a shelter. They say we have to wait here for months. But I can't get work here. I don't know what we'll do.* **-Joel, 20, Honduras**

**Difficulties Leaving Tapachula**

Most people interviewed said they were desperate to leave Tapachula, either because they felt unsafe or could not find housing or work. Some said they had family or friends in other parts of Mexico who could help. Officials and migrants' rights groups confirmed that as a common complaint.

COMAR allows refugee status applicants to transfer their case to an office in another state, but officials said they only approve requests in exceptional cases, such as when applicants demonstrate they are being threatened or are otherwise in danger in Tapachula.

As waiting time for humanitarian visas and residence visas has grown, those waiting in Tapachula have begun to protest delays and difficulties. They have organized hunger strikes, sewn their mouths shut, burned tires, attacked immigration offices, and clashed with soldiers and police. They have organized frequent pedestrian "caravans," trying to pass checkpoints. In some cases, immigration agents and the National Guard have violently broken up caravans.

The INM response has been disorganized and opaque, and Tapachula migrants' rights groups say it has caused "confusion and tension." In November and December, when large numbers of Haitian asylum seekers were

CLP_PC_022863

waiting in Tapachula, the agency circulated messages on social media encouraging those who wished to leave to come to the city's football stadium for the opportunity to transfer to another state. Tens of thousands came.

Conditions in the stadium were crowded, disorganized, and unsanitary, with people waiting in the sun and sleeping on the ground, no garbage facilities or drinking water, and dirty, overused toilets, said Refugees International, which visited in December. Soldiers patrolled the stadium. The INM said it transferred 42,000 people to other states in December, mostly Haitians.

Since then, the agency has expedited humanitarian visas or provided transfers for those who protest or form caravans, seemingly to avoid the unwanted international media attention that these often draw. Others continue to wait months for appointments in Tapachula. As of April, the INM said it had transferred more than 50,000 people since November 2021 to 24 states.

In May, the INM told us it had more than doubled its capacity in Chiapas in an effort to reduce wait times and could now receive 1,110 applications per day, up from 468.

UNHCR operates an integration program that relocates recognized refugees from southern Mexico to 10 cities in central and northern Mexico and helps them find housing and work. The program has relocated over 18,000 since it began in 2016.

The International Organization for Migration began a pilot program in 2022 to help families in Tapachula who do not qualify as refugees obtain legal status, relocate to central Mexico, and find work and housing there. It had relocated 60 families as of May and plans to relocate 200 by the end of 2022.

**Overwhelmed Refugee System**

Refugee status applications in Mexico have soared as the US has restricted access to asylum and Mexico has stepped up immigration enforcement, making it harder to reach the US. Many interviewees said they had left home hoping to reach the US but, upon realizing the challenges, would accept staying in Mexico.

COMAR funding has not kept pace. While refugee status applications increased 174-fold over the past decade, government funding for COMAR increased just 2.5-fold, to 44 million pesos (US $2.2 million) in 2021.

| Year | Refugee Status Applicants | COMAR Funding (USD) |
|------|---------------------------|---------------------|
| 2011 | 752 | $1,369,899 |

CLP_PC_022864

| | | |
|---|---|---|
| 2012 | 811 | $1,551,517 |
| 2013 | 1,296 | $1,805,209 |
| 2014 | 2,137 | $1,866,070 |
| 2015 | 3,423 | $1,637,955 |
| 2016 | 8,796 | $1,207,568 |
| 2017 | 14,619 | $1,346,249 |
| 2018 | 29,574 | $1,343,380 |
| 2019 | 70,327 | $1,083,855 |
| 2020 | 40,962 | $2,221,224 |
| 2021 | 130,863 | $2,190,278 |



Mexican Federal Government Funding (in USD) for the Mexican Commission for Refugee Assistance (COMAR), 2011 – 2021

COMAR officials said existing funding is insufficient even for basic operational expenses; they rely heavily on outside support. UNHCR provided US $4.5 million in 2021, twice as much as the Mexican government. UNHCR pays for the buildings COMAR uses in some cities and covers office supplies like paper and printer ink. Until recently, UNHCR employed 230 of COMAR's 361 staff through an outsourcing agency. This caused problems since outsourced staff cannot perform some basic tasks like signing official documents.

CLP_PC_022865



**HUMAN RIGHTS WATCH**

# WORLD REPORT
## 2023
### EVENTS OF 2022

CLP_PC_022869

CLP_PC_022870

**HUMAN RIGHTS WATCH**

350 Fifth Avenue
New York, NY 10118-3299
www.hrw.org

# WORLD REPORT 2023

EVENTS OF 2022

This 33rd annual World Report summarizes human rights conditions in over 100 countries and territories worldwide in 2022.

It reflects extensive investigative work that Human Rights Watch staff conducted during the year, often in close partnership with domestic human rights activists.

Mission in Mali (MINUSMA). In August, it renewed the Mali Panel of Experts, which monitors the 2017 travel bans and asset freezes imposed on individuals obstructing implementation of a 2015 peace agreement.

Throughout the year, Malian authorities imposed operational constraints including no-fly zones on MINUSMA, obstructed investigations into alleged human rights abuses by state security forces, hindering MINUSMA's ability to fulfil its mandate and straining relationships with troop-contributing countries. In July, Malian authorities arrested 49 Ivorian soldiers working for a MINUSMA contractor and days later expelled the UN spokesperson for comments made about their arrests. The soldiers were charged in August with "undermining state security."

# Mexico

Since the beginning of the "war" on organized crime in 2006, rates of violent crime have skyrocketed in Mexico, reaching historic highs under the administration of current President Andrés Manuel López Obrador, who took office in December 2018. Although authorities often blame this violence on criminal groups, most crimes are not investigated and those responsible are never identified or prosecuted.

Since 2007, successive governments have deployed the military domestically to fight organized crime and conduct law enforcement tasks. Soldiers, police, and prosecutors have committed serious, widespread human rights violations, including torture, enforced disappearances, and extrajudicial killings, with near total impunity. Efforts to reform police and prosecutors' offices have been ineffective. Congress, controlled by López Obrador's party, disbanded the Federal Police in 2019. It formally transferred police functions to the Ministry of Defense in 2022.

Thousands of people continue to disappear every year. Over 105,000 were officially considered missing as of September. Most disappeared after 2006.

Mexico is one of the deadliest countries in the world for journalists and human rights defenders.

President López Obrador has collaborated with the US government in anti-immigration policies aimed at preventing migrants from travelling through Mexico to reach the United States.

## *Violence and Impunity*

Levels of violent crime have reached historic highs under President López Obrador. The homicide rate was 28 homicides per 100,000 in 2021.

Around 90 percent of crimes are never reported, a third of reported crimes are never investigated, and just under 16 percent of investigations are "resolved," (either in court, through mediation, or through some form of compensation), meaning authorities resolved just over 1 percent of all crimes committed in 2021, according to the national statistics agency.

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 331 of 721

CLP_PC_023079

## Criminal Justice System

Police, prosecutors, and soldiers commonly use torture to obtain confessions, and engage in other abuses against those accused of crimes. The justice system regularly fails to ensure due process.

Judges are legally required to order pretrial detention for those accused of many offenses, without evaluating the circumstances of the case, violating international human rights standards. Around 85 percent of those sent to prison in 2020 had not been convicted of any crime, according to an analysis of official data by human rights organization Intersecta. Congress, controlled by López Obrador's party, expanded the list of crimes requiring mandatory pretrial detention in 2019.

Prisons are notoriously unsanitary and overcrowded. Prosecutors continue to use arraigo detention, a mechanism allowing them to obtain judicial authorization to detain anyone for up to 40 days without charge, in violation of international human rights standards.

## Torture

Torture is widely practiced by police, prosecutors, and soldiers to obtain confessions and extract information. In the most recent survey of incarcerated people conducted by Mexico's national statistics office in July 2021, nearly half of respondents said that, after they were detained, police or soldiers had subjected them to physical abuse. Among those who had confessed to a crime, 38 percent said they did so only because authorities had beaten or threatened them.

The use of evidence obtained through torture in criminal trials is prohibited. However, many defendants face barriers and delays to proving they were tortured, limiting the effectiveness of the prohibition. A 2017 law required the attorney general to create a registry to track torture complaints. As of September 2022, the registry had yet to be created.

## Military Abuses

Soldiers and marines have been deployed for law enforcement and to fight organized crime for decades, leading to widespread human rights violations. From 2007 through September 2022, the army killed 5,335 civilians, according to government data. Since 2018, the number of human rights commission complaints against the Army and National Guard has steadily increased. In 2021, the commission received 940 such complaints, the highest number in eight years.

President López Obrador has greatly expanded the budget, autonomy, and responsibilities of the armed forces, deploying them for hundreds of tasks traditionally conducted by civilian authorities, such as law enforcement, customs enforcement, controlling irregular immigration, running social programs, and administering public works projects. The military can legally detain civilians, take charge of crime scenes, and preserve evidence. Charging the military with these tasks has in the past contributed to human rights abuses.

In October, an investigation by human rights groups and journalists reported that the military had purchased the spyware Pegasus in 2019 and used it to illegally spy on human rights defenders, journalists, and opposition party politicians despite promises by President López Obrador that the government no longer spied on civilians.

Abuses by members of the military against civilians are supposed to be prosecuted in civilian, not military, courts, but those responsible are rarely brought to justice. In 2022, Congress passed a reform to ensure that soldiers assigned to carry out civilian policing activities are subject to the Military Code of Justice rather than to civilian law.

Emails obtained by journalists as part of "Guacamaya Leaks" suggest senior military officials have obstructed the investigation of abuses possibly committed by soldiers and that the secretary of defense may have pressured civilian authorities not to pursue an investigation into an army officer implicated in the Ayotzinapa case.

As of September, there were seven cases before the Supreme Court, filed by human rights groups and opposition parties, challenging the use of the military for law enforcement as unconstitutional.

CLP_PC_023080

### Disappearances

At least 105,000 people are missing in Mexico, according to official statistics. Authorities believe the true number is likely higher. Nearly 90,000 of them have disappeared since the beginning of the "war" on organized crime in 2006. Thousands continue to disappear every year. More than 36,000 have disappeared since President López Obrador took office.

Authorities believe many of the disappeared have been buried in common graves by state and local officials after forensic services declared them "unidentified" or "unclaimed." From 2006 to 2020, at least 50,000 bodies passed through the custody of state and local forensic medical services without being properly identified, according to freedom of information requests by activists. Others may have been killed and buried in hidden graves by police, the military, or criminal groups. From 2006 to 2021, authorities reported having found at least 4,000 such graves across the country.

When families report disappearances, prosecutors and police rarely investigate. Families of the disappeared have formed more than 130 "search collectives" to investigate disappearances, including, frequently, by digging up mass graves.

In 2019, a well-respected human rights defender was appointed to head the government's National Search Commission (CNB). Since then, the CNB has taken steps to update the official missing persons' registry by requesting information from state and local officials and it has created an online platform to report disappearances anonymously and show real-time numbers of those disappeared, excluding personally identifying information. It has also begun creating a series of Human Identification Centers to exhume bodies from mass graves and attempt to identify them using the registry.

In April, the United Nations Committee on Enforced Disappearances presented the report on its visit to Mexico—its first visit to any country. The committee criticized Mexican officials for their "passive attitude" towards disappearances and expressed concern over "near total impunity" for these crimes. At the time the report was released, just 36 people had been convicted for involvement in enforced disappearances.

### Attacks on Journalists and Human Rights Defenders

Journalists and human rights defenders—particularly those who criticize public officials or expose the work of criminal cartels—often face attacks, harassment, and surveillance by government authorities and criminal groups.

Mexico is one of the most dangerous countries in the world for journalists. From January to September 2022, 15 journalists were killed. In the first half of 2022, Article 19 recorded 331 threats, attacks, or other forms of aggression against journalists. Many journalists self-censor.

Authorities routinely fail to investigate crimes against journalists adequately. The federal Special Prosecutor's Office to investigate crimes against journalists had opened 1,552 investigations and obtained 32 convictions, including seven for homicide, from its creation in 2010 through September 2022. The vast majority of convictions have been obtained since the current special prosecutor was appointed in 2017.

Mexico is also one of the most dangerous countries in the world for human rights defenders. In the first six months of 2022, 12 human rights defenders were killed, according to the human rights groups Comité Cerezo. As with journalists, violence against human rights defenders is rarely investigated or prosecuted.

In 2012, the federal government established the Protection Mechanism for Human Rights Defenders and Journalists, which provides bodyguards, armored cars, and panic buttons, and helps beneficiaries temporarily relocate in response to serious threats. The mechanism lacks sufficient staff and funding and struggles to coordinate with state and local officials, leaving it sometimes unable to meet protection needs. Eight journalists and two human rights defenders have been killed under the program's protection, seven of them since President López Obrador took office.

### Women's and Girls' Rights

A wave of states legalized abortion in 2022. As of November, eleven states allowed abortion for any reason up to at least 12 weeks of pregnancy. All states allow abortion in cases of rape. Despite legalization, people continue to face many barriers when trying to access abortion.

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 333 of 721

CLP_PC_023081

The Supreme Court ruled in 2021 that absolute criminalization of abortion is unconstitutional, and that people should not be criminally prosecuted for undergoing the procedure; that state governments do not have the authority to legislate that life begins at conception; and that medical staff's right to conscientiously object to performing abortions is subject to limits.

In 2021, the government reported around 3,700 killings of women, a quarter of which were considered femicides—killings of women because of their gender. Women's rights groups say femicide is likely under-reported.

Mexico officially ratified the International Labour Organization Convention on Violence and Harassment (C190) in July 2022. The treaty obligates Mexico to provide comprehensive protections to ensure a world of work free from violence and harassment, including gender-based violence and sexual harassment.

## Migrants and Asylum Seekers

Criminal cartels, common criminals, and sometimes police and migration officials prey upon people migrating through Mexico, although crimes against migrants are rarely reported, investigated, or punished.

President López Obrador has intensified efforts to prevent migrants from traveling through Mexico to reach the US. He has deployed nearly 30,000 soldiers for immigration enforcement.

Soldiers and immigration agents operate immigration checkpoints throughout the country. Often, they target Black, brown, or Indigenous people. In May, the Supreme Court ruled these checkpoints unconstitutional, saying they disproportionately affect Indigenous and Afro-Mexican people.

Mexico detained more than 307,000 migrants in 2021—the highest number ever. Mexico's immigration detention centers are notoriously overcrowded and unsanitary. Staff there often pressure migrants to agree to "assisted return" to their countries and discourage them from applying for asylum even when they say their life could be in danger if sent back.

The López Obrador administration has imposed stricter visa rules and other new entry requirements on travelers from Venezuela, Ecuador, Brazil, and Colombia. News media reported the US had pressed the administration to tighten entry requirements and prevent migrants from flying through Mexico to reach the US. Since the visa requirement for Venezuelans was put in place in January, the number making the dangerous trip through the Darien Gap, between Colombia and Panama, has skyrocketed.

Mexico's asylum system is severely overstretched. Since 2013, the number of new applications has nearly doubled every year, but funding has not kept pace. Mexico's refugee agency relies heavily on funding and other support from the Office of the UN High Commissioner for Refugees (UNHCR). Mexico received more than 130,000 asylum applications in 2022, a record high and the third highest number in the world in 2021, according to UNHCR, but processed just 40,000, including many from previous years. From January to September 2022, it received more than 86,000 applications.

## Sexual Orientation and Gender Identity

A wave of states voted to legalize same-sex marriage in 2022. As of November, it was available in all 32 states. In five states (Nuevo León, Aguascalientes, Chiapas, Chihuahua, and Guanajuato), the governor has decided officials should perform same-sex marriages although the state legislature has not reformed the civil code to recognize the practice.

Twenty states have passed laws creating a procedure permitting transgender people to change their names and gender markers on birth certificates through a simple administrative process. In 2019, the Mexican Supreme Court issued a landmark ruling with clear guidelines on legal gender recognition, holding that it must be an administrative process that "meets the standards of privacy, simplicity, expeditiousness, and adequate protection of gender identity" set by the Inter-American Court of Human Rights. In March, the court expanded the right to legal gender recognition to include children and adolescents.

## Disability Rights

Under the López Obrador administration, serious gaps remain in protecting the rights of people with disabilities. They lack access to justice, education, legal standing, legal capacity, protection from domestic violence, and informed consent in health decisions. In 2019, Human Rights Watch documented cases of

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 334 of 721

CLP_PC_023082

state-run hospitals and private individuals who shackled people with disabilities. Women with disabilities suffer disproportionate violence.

In many states, people with disabilities have no choice but to depend on their families for assistance or to live in institutions, which is inconsistent with their right to live independently and be included in the community under the Convention on the Rights of Persons with Disabilities (CRPD).

In October 2021, following a CRPD committee recommendation, the government publicly apologized to a man with intellectual and psychosocial disabilities who had been imprisoned for four years after a judge had found him unfit to stand trial.

In 2021 the Supreme Court ruled that guardianship was unconstitutional, but federal and state legislatures still need to legislate to ensure legal capacity and supported decision-making for people with disabilities.

In May, Congress passed amendments to the General Health Act prohibiting forced psychiatric treatment and any restraints, including shackling. The reform mandates community-based services and conversion of psychiatric hospitals to general hospitals.

## Climate Policy and Impacts

As one of the world's top 15 emitters of greenhouse gases, Mexico is contributing to the climate crisis that is taking a growing toll on human rights around the globe. In 2021, a judge annulled the López Obrador administration's climate action plan because it did not increase emissions reductions targets in violation of Mexican law. In November 2022, the government announced its intention to present a new more ambitious plan.

The López Obrador administration attempted to reform the constitution to favor the distribution of energy from state-owned fossil-fuel power plants over renewable energy providers, but Congress rejected his proposal in April. In parallel, it has pursued a policy of investment in fossil fuels, acquiring an oil refinery in the US and fast-tracking the construction of another in Dos Bocas, Tabasco. In 2022, more than 70 percent of the federal budget under "climate change mitigation

and adaptation effects" was allocated to the transport infrastructure of fossil gas.

## Key International Actors and Foreign Policy

Mexico's foreign policy regarding human rights under the López Obrador administration has been based on the principle of "non-intervention." In June 2021, Mexico criticized other countries in the region that had condemned the jailing of critics and opposition candidates in Nicaragua, saying that they were intervening in Nicaragua's internal affairs.

In June 2020, Mexico was elected as a non-permanent member of the UN Security Council for 2021 to 2022. Mexico highlighted that one of its priorities on the council would be the protection of children. Mexico endorsed the Safe Schools Declaration in May 2021.

In October 2020, Mexico was re-elected to the UN Human Rights Council. Mexico did not support a decision to discuss a report by the UN High Commissioner for Human Rights on possible crimes against humanity in Xinjiang, China, nor a resolution to renew the independent fact-finding mission to investigate possible crimes against humanity in Venezuela.

In 2020, Mexico appointed itself as one of 23 "Champion countries" of the Global Compact for Safe, Orderly and Regular Migration.

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 336 of 721



COMMENTARY / LATIN AMERICA & CARIBBEAN    04 NOVEMBER 2022

# Ecuador's High Tide of Drug Violence

*Ecuador's proximity to major cocaine producers, dollarised economy and corruptible state institutions, as well as COVID-19's devastating impact, have turned the country into Latin America's latest hotbed of drug trafficking and other violent crime.*



**Related Tags**

GENDER AND CONFLICT

ECUADOR

Events in Ecuador's most populous city, Guayaquil, have taken a dark and lethal turn. Widely known by an evocative moniker, the "pearl of the Pacific", the port town has become the country's murder capital, a place where criminal violence is almost routine. In a particularly gruesome display on 14 August, gunfire and an explosion – what authorities described as a "declaration of war on the state" by organised crime – killed five people and injured twenty more in the city. According to the local press, Ecuador tallied no fewer than 145 bomb attacks in the year to mid-August; half of them occurred in Guayaquil.

In an open letter addressed to President Guillermo Lasso, Guayaquil's mayor wrote that "criminal gangs have become a state within a state". According to local media, the 14 August blast is connected to a hit that

CLP_PC_023232

took place in the city earlier that month, with one revenge killing following another in a seemingly interminable battle for supremacy among various criminal organisations.

Though Ecuador has seen killing sprees before, it previously had no notable history of guerrilla or cartel activity; it has also in recent years been seen as one of the safer countries in Latin America. That, however, appears to have changed. Today, Ecuador has become the latest country to suffer a vicious escalation in violent crime. Homicides have risen at a startling rate, increasing by 180 per cent from 2020 to 2021, and reaching a total of 3,538 this year until the end of October - already the highest tally ever recorded in the country. Police attribute 80 per cent of these murders to clashes among criminal groups vying to control the distribution and export of drugs, primarily cocaine. As gang warfare has worsened, headline-grabbing acts of brutality have littered the news: not just car bombs but decapitations, hanging of corpses from bridges and drones dropping explosives on prisons. Jailhouse violence of all kinds has soared. The most recent data show that prison murders jumped from 46 in 2020 to over 300 in 2021.



As of 17 August, Ecuador had recorded 2,593 homicides in 2022 compared to 2,471 in all of 2021. Around 38 per cent of the murders occurred in Guayaquil.

**Life and Death in Guasmo**

Guasmo, a working-class neighbourhood in southern Guayaquil, sits close to the seaport, which handles 85 per cent of Ecuador's non-oil exports. Subdivided by invisible borders drawn by organised crime, it is subject to incessant violence. The criminal groups are battling for turf near the port, which they reportedly use to hide cocaine in cargo

CLP_PC_023233

# Laying the Foundation for Regional Cooperation

## Migration Policy and Institutional Capacity in Mexico and Central America

Andrew Selee
Ariel G. Ruiz Soto
Andrea Tanco
Luis Argueta
Jessica Bolter

**Migration Policy Institute**

April 2021

CLP_PC_023303

Another significant institutional development with important implications for Mexico's humanitarian protection landscape was the passage of a series of hallmark legislative reforms to the country's migration and asylum laws. In September 2020, after years of advocacy from civil-society organizations,[30] the Mexican Congress prohibited the detention of migrant children and their adult companions by migration agencies.[31] Since the law entered force on January 11, 2021, when INM encounters migrant children, it must immediately notify the branch of the Federal Prosecutor's Office for the Protection of Children and Adolescents (PPNA) in the state where the encounter occurred and transfer the children and any accompanying adults to the state's DIF delegation until the PPNA determines what is in the best interest of the child.[32]

> *In September 2020, after years of advocacy from civil-society organizations, the Mexican Congress prohibited the detention of migrant children and their adult companions by migration agencies.*

The implementation of these reforms has brought additional administrative requirements for INM and significant new responsibilities for DIF and its state delegations. INM must contact the consulate of the minor's country of origin, suspend deportation processes for any adults caring for the child, and issue a provisional humanitarian visa for them, which allows them access to basic services until a determination is made in the child's case.[33] Meanwhile, DIF state delegations have become responsible for conducting intake evaluations, providing housing and social assistance to migrant children and accompanying adults, and coordinating with civil-society organizations working to protect their human rights.

Combined, these four key policy changes and mandates had already set a new migration paradigm in place within the first two years of the López Obrador administration's six-year tenure. With relatively little opposition, but not without controversy (as will be discussed in Section 2.D.), the administration has defended and presented these changes as means to promote safe, legal, and orderly migration.

## C.    *Assessing the Capacity of Mexican Migration Institutions*

At the institutional level, these changes under the López Obrador administration have laid bare the capacity and limitations of Mexico's four main agencies involved in migration enforcement and humanitarian protection. The effects of these policies and mandates have manifested differently across these institutions and led to increases in operational capacity for some more than others. To identify areas where further

---

30    Human Rights Watch, "Puertas cerradas: El fracaso de México en la protección de niños refugiados y migrantes de América Central," updated March 31, 2016.

31    Though the reforms were passed in September, they were published in the federal register in November to take effect in January 2021. See SEGOB, "Decreto por el que se reforman diversos artículos de la Ley de Migración y de la Ley sobre Refugiados, Protección Complementaria y Asilo Político, en materia de Infancia Migrante," *Diario Oficial de la Federación*, November 11, 2020.

32    Asylum Access Mexico, Center for Gender and Refugee Studies, Kids in Need of Defense, Latin America Working Group, Women Refugee Commission, Instituto para las Mujeres en la Migración, and International Detention Coalition, "Implementation of the Mexican Legal Reforms that Prohibit Detention of Accompanied and Unaccompanied Migrant Children," updated March 2021; DIF, "Sistema Nacional DIF ¿Qué hacemos?," accessed February 15, 2021.

33    SEGOB, "Decreto por el que se reforman diversos artículos de la Ley de Migración y de la Ley sobre Refugiados, Protección Complementaria y Asilo Político, en materia de Infancia Migrante."

CLP_PC_023316

expansions of capacity may be merited, the following subsection assesses the existing capacity of INM, the National Guard, COMAR, and DIF.

## The National Institute of Migration

Policy changes under the López Obrador administration have left perhaps the most significant imprint on the capacity and responsibilities of INM, the primary government agency responsible for migration management, control, and services. It managed 65 detention centers and temporary shelters with capacity to house approximately 9,000 migrants as of April 2020, and it employed approximately 4,000 active agents as of October 2019.[34] The INM annual budget had been falling steadily until 2020, when it was raised in light of the increase in mixed migration (see Table 2). For 2021, budget allocations for INM again increased moderately, to 1.6 billion Mexican pesos, but this is still below the levels seen prior to 2018—including in 2014–15, the previous period of heightened migration enforcement.

The majority of INM detention centers were constructed between 2000 and 2010, and they range in holding capacity from less than 20 to more than 1,000 migrants each, according to Mexico's National Human Rights Commission (CNDH).[35] From July through December 2019, INM invested 336 million pesos to rehabilitate the 15 detention centers that housed the largest migrant populations, as part of broader efforts to remodel these premises.[36]

TABLE 2

**Budget of Mexico's National Institute of Migration, 2014–21**

| Year | National Institute of Migration Budget |
|------|----------------------------------------|
| 2014 | MX $2,102,000,000 |
| 2015 | MX $1,979,000,000 |
| 2016 | MX $1,810,000,000 |
| 2017 | MX $1,743,000,000 |
| 2018 | MX $1,732,000,000 |
| 2019 | MX $1,331,000,000 |
| 2020 | MX $1,487,000,000 |
| 2021 | MX $1,603,000,000 |

Note: Budget amounts are shown in unadjusted Mexican pesos.
Source: MPI analysis of 2014–21 data from the Mexican Ministry of Finance and Public Credit, "Presupuesto de egresos de la federación: Resumen en clasificación económica por unidad responsable, funcional y programas presupuestarios" (national budget documents, multiple years).

Further steps to raise INM institutional capacity were taken in August 2020, when SEGOB announced a multistep initiative to modernize INM infrastructure and reduce corruption.[37] Among the most important objectives, the initiative seeks to upgrade the agency's processing system to enable it to conduct the majority of its migration services digitally, including storage of applicants' biometric information, and to reduce customer wait times to one day for select documentation services. It also aims to integrate different record systems to create a National Migration Registry to track operations and requests by migrants, immigrants, and Mexican citizens.

---

34    For the latest estimate of detention center capacity, see SEGOB, "Actúa INM con responsabilidad ante la contingencia por COVID-19" (press release, April 26, 2020). Note that 78 percent of the 4,100 active INM agents had passed their confidence exams as of October 2019; see Ministry of Security and Citizen Protection and Executive Secretariat of the National Public Security System, *Consejo Nacional de Seguridad Pública XLV Sesión Ordinaria: Informe de Actividades, 2º Semestre 2019* (Mexico City: Executive Secretariat of the National Public Security System, 2019).

35    Mexico's National Human Rights Commission (CNDH), "Informe especial: Situación de las estaciones migratorias en México, hacia un nuevo modelo alternativo a la detención" (executive summary, CNDH, Mexico City, 2019).

36    In December 2019, Mexico's Agency for International Development Cooperation (AMEXCID) also supported the rehabilitation of ten detention centers using funds from the Infrastructure Fund for Mesoamerican Countries and the Caribbean. See INM, "Invierte INM 336 millones de pesos para rehabilitar las 15 estaciones y estancias migratorias de mayor flujo de personas" (press release, December 9, 2019); Alberto Pradilla, "Gasto en cooperación con Centroamérica fue para rehabilitar centros de detención y trasladar migrantes: ASF," Animal Político, February 22, 2021.

37    SEGOB, "Supervisa secretaria de Gobernación modernización administrativa del INM" (press release, August 14, 2020).

CLP_PC_023317

The same initiative also seeks to reduce corruption at INM, amplifying ongoing efforts to identify and terminate staff and agents found to collaborate with human smugglers, among other offenses. At the same time, INM has created institutional professionalization efforts and invested in agents' capacity, including through trainings and courses that reach several hundred agents each year.[38]

Facing heightened migration levels with limited resources, INM has leveraged interinstitutional efforts to increase its operational capacity. In July 2019, INM launched a temporary voluntary return program for migrants who were enrolled in MPP and were waiting in Ciudad Juárez, Chihuahua, and who wanted to return to Guatemala, El Salvador, or Honduras via bus. The program, which is intended to expand to Tijuana and Mexicali, Baja California, was established with the support of the Foreign Ministry, IOM, Grupos Beta (INM-run groups of government officials who provide assistance to migrants and defend their human rights),[39] and Casa del Migrante (a civil-society shelter).[40]

Yet, the single most important effort to increase INM operational capacity over the last five years has been the authority in gained in 2019 to request support from the newly created National Guard to assist in migration operations. Since then, National Guard support has significantly bolstered INM operational capacity in the field, especially following a period of heightened enforcement in the summer of 2019.

*The single most important effort to increase INM operational capacity over the last five years has been the authority in gained in 2019 to request support from the newly created National Guard.*

With assistance from the National Guard, INM established 50 migration checkpoints in northern and southern Mexico in August 2019 alone and increased its presence to 90 checkpoints by January 2020. These checkpoints have led to more than 25,000 apprehensions of irregular migrants.[41] Between September 2019 and August 2020, INM also received custody support from the National Guard in nearly 2,500 instances, primarily to transfer irregular migrants between detention centers and to assist with returns. INM also conducted 150 enforcement operations along train routes and stations during the same period with the support of the National Guard, establishing checkpoints to inspect trains and verify migrants' immigration status.[42]

Increases in operational capacity and the support now provided by the National Guard have equipped INM to respond more quickly to unauthorized migration, including containing the movement of migrant caravans during the pandemic. For instance, following reports in October 2020 of a large number of Honduran and Guatemalan migrants planning to travel through the country, INM utilized drones to monitor known migration routes along the Mexico-Guatemala border.[43] INM also deployed 500 agents across the same border in preparation for the arrival of another migrant caravan in January 2021 to verify that only

---

38    Between September 2019 and July 2020, this included four iterations of the Program for Federal Migration agents and 22 capacity-building courses on migrant children and adolescents. See SEGOB, *2 Informe de Labores*.

39    For more information on Grupos Bega, see INM, "Grupos Beta de Protección a Migrantes," updated August 27, 2019.

40    INM, "Inicia Instituto Nacional de Migración Programa Temporal de Retorno Voluntario" (press release, July 2, 2019).

41    SEGOB, *2 Informe de Labores*.

42    *El Universal*, "Viajar en el lomo de 'la bestia' dejó de ser opción," *El Universal*, July 7, 2019; *Excelsior*, "Guardia Nacional asegura a 30 migrantes tras operativo en 'La Bestia'," *Excelsior,* July 7, 2019; SEGOB, *2 Informe de Labores*.

43    Agencia EFE, "México opta por drones para vigilar frontera sur con caravana partida," Agencia EFE, October 5, 2020.

CLP_PC_023318

those with proper documentation entered the country.[44] In the Mexican interior, INM conducted more than 50 enforcement operations along train routes and stations in January and February 2021 alone, resulting in more than 1,000 migrant apprehensions, 30 percent of which were of children.[45]

## The National Guard

While its primary function is to oversee public order and safety, the National Guard was given at its inception in March 2019 the authority to serve as an auxiliary agency to support INM. It cannot perform any immigration control, verification, or review functions independently.[46] But at the explicit request of INM, the National Guard can inspect migration entry and exit documents, guard detention centers and detained migrants, transport migrants, and conduct border and immigration controls.[47] With this authority, the National Guard has played a crucial role in supporting INM enforcement and migration control operations.[48]

Shortly after the United States and Mexico signed the U.S.-Mexico Joint Declaration on migration cooperation in June 2019,[49] the Mexican government deployed 6,500 National Guard troops to the border with Guatemala[50] and an additional 14,000 troops (combined with Army and Navy forces) to the U.S.-Mexico border.[51] Since the summer of 2019, the National Guard has been deployed on numerous occasions to different border crossings to manage influxes of mixed migration, primarily Central American migrants traveling in caravans. By February 2021, there were approximately 7,000 National Guard troops stationed permanently at the Mexico-Guatemala border.[52] It has also conducted migration control operations in the interior, including the southern cities of Ciudad Hidalgo and Tapachula in Chiapas and the northern cities of Piedras Negras in Coahuila and Tijuana in Baja California.

The National Guard's financial and operational capacity has expanded significantly over the last two years. Compared to other government institutions whose budgets have been reduced sharply by austerity measures under the López Obrador administration, funding for the National Guard has increased dramatically: from 6 billion pesos in 2020 to 64 billion pesos in 2021.[53] Although it was intended to be composed of civilian police officers, as of December 2020, 70 percent of the National Guard's approximately 100,000 members had been transferred from the armed forces.[54] Reflecting its leaders' experience in the

---

44    Elio Henríquez, "Despliega Inami 500 agentes en frontera sur ante avance de migrantes," *La Jornada*, January 14, 2021; INM, "Mantiene INM vigilancia en la frontera sur" (press release, January 14, 2021).

45    INM, "Rescata INM a personas migrantes en operativos a trenes de carga" (press release, February 16, 2021).

46    Government of Mexico, *Ley de Migración*, Articles 18 and 96.

47    SEGOB, "Decreto por el que se expide la Ley de la Guardia Nacional," *Diario Oficial de la Federación*, May 05, 2019.

48    The National Guard was established to replace Mexico's Federal Police Force, and it is part of the Ministry of Security and Citizen Protection. For more information, see SEGOB, "Decreto por el que se expide la Ley de la Guardia Nacional."

49    Ruiz Soto, *One Year after the U.S.-Mexico Agreement*.

50    Dave Graham, "México despliega 15,000 efectivos en norte del país, mientras busca frenar migración a EEUU," Reuters, June 24, 2019.

51    Anthony Esposito, "Mexico's New National Guard Was Created to Fight Crime, but Now It's in a Face-Off with Migrants," Reuters, July 7, 2019.

52    Jacobo García, "México militariza la frontera sur ante la llegada de la primera caravana de la era Biden," *El Pais*, January 18, 2021.

53    The figures cover the budget allocated to the structure and operations of the National Guard. For more details, see Ministry of Finance and Public Credit, "Presupuesto de Egresos de la Federación 2020" (budget tables, January 2020); Ministry of Finance and Public Credit, "Presupuesto de Egresos de la Federación 2021" (budget tables, January 2021).

54    Mary Beth Sheridan, "Losing Control: As Mexico's Security Deteriorates, the Power of the Military Grows," *Washington Post*, December 17, 2020.

CLP_PC_023319

Army and Navy, trainings and workshops primarily draw from models set by these two branches of the military.[55]

## Mexico's Commission for Refugee Assistance

In addition to increasing its enforcement capabilities, the Mexican government has also focused on strengthening COMAR. The agency, which is responsible for receiving and processing requests for humanitarian protection, has seen its capacity quickly expand since 2019. In reaction to a sharp increase in the number of asylum requests that overwhelmed its operational capacity throughout 2019, the López Obrador administration more than doubled COMAR's budget, from 20.8 million pesos in 2019 to 47.4 million pesos in 2020 (see Table 3). Furthermore, the administration intends to integrate Mexico's Southern Border Commission (Comisión de Frontera Sur) into COMAR in 2021, raising COMAR's allocated budget from 44.4 million pesos to 97.4 million pesos once the commission's funds are transferred over. Technical and financial support from UNHCR Mexico has also added significant capacity and training at COMAR, with these resources made available following the signing of collaboration agreements between SEGOB and UNHCR.[56]

These significant increases to COMAR's budget, complemented by UNHCR assistance, have magnified its geographical presence and operational capacity. By January 2020, COMAR had increased its presence from four to seven offices across strategic migrant hubs in Mexico: Tapachula and Palenque, Chiapas; Tenosique, Tabasco; Acayucan, Veracruz; Mexico City; and the northern cities of Tijuana, Baja California and Monterrey, Nuevo León.[57] It also added a registration center in Tapachula to augment its intake capacity by 120 requests per day and to provide applicants with a same-day receipt they could use to apply for a temporary humanitarian visa at INM offices while awaiting the resolution of their request for humanitarian protection.[58] COMAR also intends to open two additional offices in Guadalajara, Jalisco and Saltillo, Coahuila in 2021.[59]

COMAR operations have continued during the pandemic, adopting health precautions and new institutional measures to accept and process asylum requests. However, in April 2020 it suspended its 45-day timeline

**TABLE 3**

**Budget of Mexico's Commission for Refugee Assistance, 2014–21**

| Year | COMAR Budget |
|------|--------------|
| 2014 | MX $24,800,000 |
| 2015 | MX $26,000,000 |
| 2016 | MX $22,500,000 |
| 2017 | MX $25,400,000 |
| 2018 | MX $25,800,000 |
| 2019 | MX $20,800,000 |
| 2020 | MX $47,400,000 |
| 2021* | MX $97,400,000 |

* COMAR's budget for 2021 includes 53 million pesos transferred from Mexico's Southern Border Commission.
Note: Budget amounts are shown in unadjusted Mexican pesos.
Source: MPI analysis of 2014–21 data from the Mexican Ministry of Finance and Public Credit, "Presupuesto de egresos de la federación."

---

55    Sheridan, "Losing Control."
56    SEGOB, *2 Informe de Labores*.
57    COMAR offices were temporarily established in Palenque, Chiapas; Tijuana, Baja California; and Monterrey, Nuevo León in 2019. By February 2021, the offices in Palenque and Tijuana had become permanent. See SEGOB, "AVISO por el que se da a conocer el domicilio oficial de la Oficina de Representación en Palenque, Chiapas, de la Coordinación General de la Comisión Mexicana de Ayuda a Refugiados," *Diario Oficial de la Federación*, February 10, 2021; SEGOB, "AVISO por el que se da a conocer el domicilio oficial de la Oficina de Representación en Tijuana, Baja California, de la Coordinación General de la Comisión Mexicana de Ayuda a Refugiados," *Diario Oficial de la Federación*, February 10, 2021; COMAR, "COMAR: oficinas, presencia y acciones," updated January 10, 2020.
58    SEGOB, *2 Informe de Labores*.
59    Author interview with Andrés Alfonso Ramírez Silva, COMAR General Coordinator, March 1, 2021.

CLP_PC_023320

for returning a decision on protection requests until further notice, given limited processing capacity. The agency also paused its requirement that asylum seekers provide weekly in-person signatures to certify they remain in the state where they submitted their application.[60]

To reduce growing processing delays and expedite protection determinations, COMAR has also amplified its hiring efforts, with significant UNHCR assistance. In 2021, COMAR intends to employ 175 agents itself, and UNHCR has pledged financial support to help the agency hire nearly 200 additional temporary agents. While hiring remains in progress and could be delayed by the ongoing pandemic, as of March 2021, COMAR employed approximately 140 agents. This is a stark contrast to the 48 agents it employed in 2019.[61]

The López Obrador administration has also invested in efforts to develop internal technical capacity at COMAR. Under the National Plan of Technical Capacity, COMAR offers agents trainings on protection standards, and through the Regional Asylum Capacity Building Initiative, COMAR staff exchange best practices with counterparts from the United States and Canada.[62] Unfortunately, evaluations of these trainings are not publicly available, making it difficult to ascertain their progress.

> *The López Obrador administration has also invested in efforts to develop internal technical capacity at COMAR.*

## The National System for Integral Family Development

DIF is a decentralized public institution responsible for coordinating public assistance efforts among the three government branches, public institutions, and public and private organizations involved in the provision of social assistance services to families.[63] At the national level, DIF coordinates and establishes the operation guidelines to be followed by DIF state and municipal systems.

Even though the federal government allocates annual funds to DIF's national system, some of these funds are channeled to specific national programs or are used to cover a portion of overhead costs at the state and local levels.[64] However, as much as 97 percent of DIF funding comes from state and municipal government budgets.[65]

DIF state and local branches provide essential support services, including educational instruction; day care; legal, psychological, social, and health services; and employment workshops and trainings. They also provide permanent shelter for minors and temporary shelter for elders. The range of services provided by local and state DIF branches, as well as the size of the shelters DIF runs, vary from municipality to municipality. DIF has a presence in all 32 states and in 1,500 of the 2,414 municipalities in Mexico.[66] DIF services are available to all families in the country, including migrants.

---

60   Ruiz Soto, *One Year after the U.S.-Mexico Agreement.*
61   Author interview with Andrés Alfonso Ramírez Silva, COMAR General Coordinator, March 1, 2021. See also Ruiz Soto, *One Year after the U.S.-Mexico Agreement.*
62   SEGOB, *1 Informe de Labores* (Mexico City: SEGOB, 2019).
63   DIF, "Sistema Nacional DIF ¿Qué hacemos?"
64   Ministry of Finance and Public Credit, "Analíticos del Presupuesto de Egresos de la Federación 2021: Análisis por Unidad Responsable," accessed February 15, 2021.
65   Elieth Blázquez Bonilla, "La asistencia social en México: Una mirada desde el SNDIF," *Ánfora* 24, no. 43 (2017): 189–212; Author interview with Yamileth Herrera Díaz, Director of the Welfare Agency, DIF Municipal Office, Veracruz, February 20, 2021.
66   Blázquez Bonilla, "La asistencia social en México."

CLP_PC_023321

As in Panama, Colombian migrants arrived in large numbers in the 1990s and early 2000s, and because of family ties and the shared border, some continue to arrive today. The largest recent influx of immigrants, however, has been of Venezuelans. More than 120,000 now live in Panama, making it the country that has received the seventh largest number of Venezuelan migrants and refugees.[178] The number of Nicaraguan migrants who have arrived in Panama has also increased since the crackdown on protests began in 2018, with more than 6,000 applications for asylum as of October 2019.[179]

## B.     *Migration Laws and Institutions*

Migration institutions and policies have been evolving in both countries as immigration has increased in recent years. In the case of Costa Rica, these changes build on a solid foundation of laws, policies, and institutions that have been developed over many decades, while Panama is building its capacity to manage migration on less well-established foundations.

### Costa Rica

Costa Rica's institutional system for managing migration has developed over the years as the country has attracted migration from around the world. Officially, the National Migration Council helps the president set migration policies and includes a wide range of ministers and agency directors whose portfolios touch on migration issues. In reality, the Governance Ministry and the Foreign Ministry play particularly important roles in day-to-day policymaking, with the vice minister of governance as the main point person for migration affairs in the country.[180]

The General Directorate of Migration and Immigration, part of the Governance Ministry, oversees the day-to-day operations of migration management. It is responsible for issuing visas within Costa Rica, while the Consular Service, within the Foreign Ministry, is responsible for the issuance of visas at embassies and consulates abroad.

Within the General Directorate, the Professional Migration Police is tasked with border and interior enforcement, including staffing official border crossing points, managing transit migration, and investigating and dismantling smuggling networks. The Migration Police has its own police academy and career path separate from the National Police.

The General Directorate also includes the Unit of Refugee, Consular, and Restricted Visas, which oversees the asylum process and the issuance of visas to nationals of a specific set of countries from which the government has designated visa applications as requiring further review.[181] The unit staffs the Commission

---

178  For regularly updated figures on Venezuelan nationals living abroad, see R4V Coordination Platform for Refugees and Migrants from Venezuela, "Response for Venezuelans."

179  OAS, "CIDH y su MESENI realizan visita a Panamá para monitorear la situación de personas migrantes y refugiadas nicaragüenses" (press release, October 25, 2019).

180  Analysis of legal framework is based on in-depth mapping of migration institutions and laws in Costa Rica; see María Sol Pikielny and María Jesús Mora, "Institutional and Legal Migratory Framework of the Republic of Costa Rica" (working paper, MPI, Washington, DC, prepared February 2021). See also IOM, *Perfil de gobernanza sobre migración* (Geneva: IOM, 2019).

181  Government of Costa Rica, President of the Republic and Minister of Government and Police and Public Safety, "Reglamento para el otorgamiento de visas restringidas Nº 32245," February 22, 2005.

CLP_PC_023347

on Restricted Visas and Refuge, which makes determinations on asylum applications and which includes representatives of the Ministries of Labor, Foreign Affairs, and Governance and Public Security.

Costa Rica also has an Administrative Tribunal of Immigration, an autonomous body made up of three interdisciplinary regular judges and three alternate ones appointed for six-year periods who receive and decide on appeals to asylum and visa decisions. The tribunal is located in and staffed by the Governance Ministry, but its decisions are made by the judges—a model that could hold promise for other countries (re)designing their asylum systems. The tribunal's decisions are the final step in the administrative appeals process, though applicants can appeal tribunal decisions to courts in the judicial system.[182] This is a pioneering system in Latin America as it is the first one designed to solve appeals administratively.[183]

Several other ministries also deal with migration issues, including the Ministries of Labor, Health, and Education and the Costa Rican Social Security Fund. Each of these has designated vice ministers or general directors responsible for coordinating on migration issues.

> *Throughout the 20th century, the Costa Rican state developed relatively strong institutional structures, laws, and policies.*

Costa Rica is one of the few countries in Latin America that has a history of investing in its migration institutions. This is partly because of Costa Rica's long-standing role as a recipient of immigrants and refugees, but it also reflects the greater institutionalization of the state in Costa Rica overall compared to other countries in the region.[184] Throughout the 20th century, the Costa Rican state developed relatively strong institutional structures, laws, and policies, and this process accelerated after the abolition of the military in 1948.

However, today these institutions are under severe stress because of the rapid arrival of around 80,000 to 100,000 Nicaraguans and almost 30,000 Venezuelans, as well as growing numbers of migrants from Cuba, El Salvador, and Honduras, in only a few years. An analysis of government finances suggests that the overall budget of the migration-related agencies went up slightly from 2017 to 2019 but then experienced significant cuts in 2020 and 2021, due to budget tightening measures and then the pandemic-related economic downturn, leaving these agencies considerably less resourced than in recent years.[185] So, while the demand for services, including asylum applications, has expanded substantially, the actual resources available to meet this demand have not kept pace.

---

182  Costa Rican Administrative Tribunal of Immigration, "Legal Nature and Characteristics of the Tribunal," accessed March 3, 2021.

183  Author interviews with Costa Rican government official, August 2019.

184  On the institutionalization of the Costa Rican state in the 20th century, see Jeffery M. Paige, *Coffee and Power: Revolution and the Rise of Democracy in Central America* (Cambridge, MA: Harvard University Press, 1998). See also Hector Perez-Brignoli, *A Brief History of Central America* (Berkeley, CA: University of California Press, 1989).

185  In particular, the budget of the General Directorate of Migration and Immigration decreased from 35 billion colones (roughly USD 58 million) in 2020 to 20.7 billion colones (USD 34 million) in 2021, therefore showing a 41 percent decrease from last year. The Governance Ministry had a decline in resources too, from 61 billion colones (USD 100 million) in 2020 to 43.8 billion colones (USD 72 million) in 2021. The Administrative Tribunal and the Social Migration Fund, which reinvests part of the fees generated by visas and other administrative processes related to migration back into the migration agencies and integration efforts, also saw decreases in funding. Based on figures available from Costa Rica's Treasury Ministry and data shared by the Governance Ministry with MPI in February 2021. See Costa Rican Treasury Ministry, "Ley de Presupuesto 2020," accessed February 15, 2021; Costa Rican Treasury Ministry, "Ley de Presupuesto 2021," accessed February, 2021. There was also a 24 percent decreased in appropriations from 2019 to 2020. See Costa Rican Ministry of the Interior and Police, "Mociones al presupuesto 2021 afectarían servicios al usuario y operatividad del MGP" (news reléase, October 19, 2020).

CLP_PC_023348

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 347 of 721

# Mexico's Asylum System: Good in Theory, Insufficient in Practice

By Arturo Castellanos-Canales | March 15, 2023

On February 23, 2023, the Biden administration published a notice of proposed rulemaking[1] that would severely restrict U.S. asylum eligibility for most migrants crossing the U.S.'s southwest border. Among its provisions, the proposed rule would create a presumption of asylum ineligibility — with limited exceptions — for migrants who travel through a third country unless they apply for and are denied asylum before reaching the United States. Considering that most asylum seekers travel through Mexico to reach the United States, this paper explores Mexico's asylum system to determine whether it is an efficient, functional, and viable alternative for migrants to apply for asylum.

Mexico is a country whose asylum legal framework, in theory, is among the world's most inclusive and protective of asylum seekers. In recent years, Mexico has made significant legislative improvements to adapt to the new hemispheric migration patterns.[2] In addition, around 70% of asylum applications in Mexico are resolved favorably, granting refugee status to most applicants.[3] However, despite the good intentions of Mexican legislators and the high approval rate of asylum applications, the administrative authorities in charge of reviewing asylum applications are underfunded and face a growing number of asylum applications.

In addition, Mexico's economic and demographic circumstances are not ideally positioned to absorb large numbers of refugees. Finally, Mexico itself has systemic problems with gang and gender-based violence, undermining it as a destination country for asylum seekers fleeing gang and gender-based violence.

## Mexico's Asylum System

Skip to content

CLP_PC_023385

1. Travel to Mexico;

2. Apply for asylum before the Mexican Commission for Refugee Help (COMAR); and

3. Wait 45 business days for COMAR to resolve their case.

## Step 1: Travel to Mexico

Except for political figures[4] and family members of refugees — who can apply for asylum abroad[5] — asylum seekers must travel to Mexico to apply for asylum.[6] Once in Mexico, migrants are eligible for asylum regardless of how they enter the country:

1. By commercial flight;

2. By land or sea at ports of entry; or

3. Between ports of entry.

Traveling commercially to Mexico can be fairly easy for nationals of some countries and very difficult for citizens of others.[7] Mexico does not require visas for citizens or permanent residents of the United States, Canada, Japan, the United Kingdom, the European Union, and the Schengen Area. In addition, nationals from any country member of the Pacific Alliance — namely Colombia, Chile, and Peru[8] — as well as Argentina, Australia, Bahamas, Belize, Bolivia, Costa Rica, Hong Kong, Iceland, Israel, Jamaica, Monaco, New Zealand, Panamá, Paraguay, and Uruguay can enter Mexico without a visa.[9] Moreover, individuals with valid visas from the United States, regardless of their nationality, do not require Mexican visas.[10]

Those who do not meet the criteria listed above must obtain a Mexican visa before traveling to Mexico through a commercial flight or cruise. In order to get a Mexican visa, foreign nationals must demonstrate their economic solvency by showing a bank account statement with an average balance of around $3,200 USD over the last three months. [11] They must also show proof of employment, with approximately $1,000 USD monthly earnings for the previous three months.[12]

If migrants are denied Mexican visas, they can travel by land or sea to Mexico — either through ports of entry or between them — and apply for asylum.

## Step 2: Apply for asylum before the Mexican Commission for Refugee Help (COMAR)

Once in Mexico, all migrants can apply for asylum at no cost within 30 days[13] of their arrival at any of

Skip to content

CLP_PC_023386

due to their race, religion, nationality, gender, membership of a particular social group, or political opinion.[16] In addition, asylum seekers are eligible for refuge in Mexico if they demonstrate that their liberty or life could be placed in danger by armed conflicts, systemic violence, or substantial human rights violations in their countries of origin.[17] The latter criterion makes Mexico's definition of refugee one of the most inclusive in the world and in line with the Cartagena Declaration on Refugees.[18]

## Step 3: Wait for COMAR's resolution

Once migrants apply for asylum, COMAR provides applicants with a certificate that demonstrates that their asylum process is ongoing.[19] COMAR will also assign a Refugee Unique Code (CUR) that will allow applicants to access all public services, including healthcare and education.[20] With the certificate and the CUR, asylum seekers can obtain a Visitor Card for Humanitarian Reasons (TVRH), which allows them to work while the application is processed. [21] As a general rule, COMAR must complete the asylum process and notify the applicant within 45 business days from the date the process started.[22] However, due to backlogs related to the Covid-19 pandemic and an increasing number of asylum applications, some COMAR resolutions are taking up to 100 days.[23]

If COMAR denies asylum, applicants have 15 business days to appeal the decision.[24] If, after the appeal, COMAR denies asylum again, the agency must consider whether the applicant is eligible for complementary protection.[25] Complementary protection – equivalent to "withholding from removal"[26] in the United States – provides relief from deportation to asylum seekers who have failed in their claim for refugee status but whose lives would be in danger if sent back to their countries of origin.[27] The status of complementary protection grants access to all public services in the country.

## Rights of Refugees in Mexico

If COMAR grants asylum, the applicant immediately becomes a refugee.[28] Refugees in Mexico[29] have the right to apply for refugee status for their family members abroad.[30] Even after Mexico recognizes the refugee status of an individual, they have the right to apply for asylum in another country. In that case, Mexico suspends their refugee status while the process in a third country is under consideration. However, that refugee status can resume when they return to Mexico.[31]

## Access to public benefits and right to travel

Refugees in Mexico have the right to access all public benefits, including free healthcare and education.[32] They also have the right to settle anywhere in the country as long as they notify COMAR

Skip to content

CLP_PC_023387

## *Specific protections for migrant children*

Notably, the Mexican asylum framework has specific provisions that protect migrant children, regardless of whether they are unaccompanied or traveling with a legal guardian.[34] All children who arrive in the country as migrants, and their legal guardians, are automatically granted humanitarian parole.[35] Once they are granted humanitarian parole, they can apply for asylum. Mexican law forbids the separation of migrant families when children are involved.[36] Moreover, the law forbids the detention of migrant children for reasons related to their migration status.[37]

## Obstacles to the Asylum Process in Mexico

While the asylum system in Mexico seems easy to navigate on paper, there are multiple obstacles hindering the asylum process in the country:

**There are only 10 locations of COMAR across the country:** Asylum seekers can only apply for asylum before COMAR authorities. However, there are only 10 locations across the country, and most have been overwhelmed by the growing number of petitions in recent years.[38]

**As a general rule, asylum seekers must remain in the state where they filed their asylum application:** Asylum seekers must present themselves every week at the COMAR location where they filed their application. The asylum process automatically ends if the applicant fails to appear before COMAR for two consecutive weeks.[39] Among the many problems derived from the lack of sufficient locations is that many of COMAR's offices are situated in some of the country's poorest states where labor opportunities are scarce. For instance, the busiest COMAR location is the one in Tapachula, Chiapas — Mexico's poorest state, where 76% of the population lives in precarious conditions below the poverty line.[40]

**COMAR is overwhelmed with the growing number of applications it receives:** Between 2014 and 2019, Mexico registered a 5,325% increase in the number of asylum applications — from 1,296 in 2014 to 70,314 in 2019. Asylum applications decreased in 2020 due to the Covid-19 pandemic, falling to 40,914. However, the number skyrocketed in 2021 to 129,791 applications, dipping slightly to 118,478 in 2022.[41] According to recent estimates, COMAR has been expecting a similar number of asylum applications in 2023. However, it is expected that the Biden administration's proposed rule will significantly increase the number of asylum applications filed in Mexico. Because applicants would be required to show an asylum denial in third countries they have transited through, thousands of migrants will presumably file for asylum in Mexico just to receive an initial denial permitting them to head north to the U.S.

Skip to content

CLP_PC_023388

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 351 of 721

**COMAR is an underfunded agency with a massive backlog:** Due to the increasing number of asylum applications, COMAR's annual budget has increased from $1.1 million USD in 2017[42] to $10.3 million USD in 2023.[43] However, that budget remains insufficient to provide adequate asylum services and handle the massive increase in the number of people applying for asylum. [44]

**Mexico's economic and demographic circumstances are not well-situated to absorb large numbers of refugees:** Mexico has the 15th-largest economy in the world, with a GDP of $1.2 trillion USD.[45] Compared to the United States' $23.3 trillion USD economy, Mexico's capacity to absorb refugees is limited. In addition, unlike America's aging population, Mexico's younger population generates excess workers[46] leading a considerable portion of its population to seek labor opportunities abroad.[47] These realities pose challenges to Mexico as it now attempts to absorb thousands of asylum seekers into its workforce.

**Mexico has a systemic problem of gang and gender-based violence:** Gender-based violence in Mexico is systemic. Over 70% of women in Mexico have experienced gender-based violence, [48] with an average of 6 women being disappeared every day in the country.[49] Moreover, gang violence in Mexico took the lives of over 26,000 people in 2022 in Mexico.[50] Asylum seekers in Mexico have increasingly been victimized by gang violence and are regularly targeted by cartels and other transnational criminal organizations who take advantage of their vulnerability, with scores of those seeking protection being extorted, robbed, assaulted, and even killed.[51] The threat of violence makes Mexico an unsuitable option for many, particularly the thousands of asylum seekers fleeing violence in their countries of origin.

# Conclusion

In recent years, Mexico's asylum system has made significant legislative improvements to adapt to the new hemispheric migration patterns. The country's definition of 'refugee' is among the world's most inclusive, and its asylum agency – COMAR – has made real progress in recent years. As a consequence, the approval rate of asylum applications has improved considerably. However, problems remain – Mexico's asylum system is overwhelmed and underfunded.

Despite some recent strides, Mexico's asylum system is struggling to keep up with the massive uptick in hemispheric migration over the past half-decade, and Mexican economic and demographic numbers pose challenges to absorbing large numbers of asylum seekers. Persistent struggles with domestic violence and gang violence also pose a challenge in serving as refuge for those fleeing similar violence in their countries of origin.

Skip to content

CLP_PC_023389

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 352 of 721

Across the U.S.-Mexico border, the Biden administration's newly proposed rule that would force many U.S. asylum seekers to first apply for asylum in Mexico will only further strain the Mexican asylum system. The expected new surge of applications would likely overwhelm a system that is already struggling to operate under less-than-optimal conditions. While Mexico's asylum system has demonstrated progress and may eventually serve as an important hemispheric receiving country for those fleeing danger, it currently is not ready for the likely influx of asylum seekers it faces in the coming months and years.

## Sources:

[1] Homeland Security Department and the Executive Office for Immigration Review; Notice of Proposed Rulemaking: Circumvention of Lawful Pathways; Federal Register. February 23, 2023. Available at  https://www.federalregister.gov/documents/2023/02/23/2023-03718/circumvention-of-lawful-pathways

[2] See transitory articles of Ley de Migracion. Available at https://www.diputados.gob.mx/LeyesBiblio/pdf/LMigra.pdf

[3] Comisión Mexicana de Ayuda a Refugiados (COMAR); La COMAR en numeros: Estadistica enero 2023. February 16, 2023. Available at https://www.gob.mx/comar/articulos/la-comar-en-numeros-327441?idiom=es

[4] Political asylees are public figures who have a reasonable fear of persecution due to their opinions expressed in their role. See Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 2-I.

[5] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 61.

[6] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 11.

[7] Viajeros en Ruta; Paises que necesitan visa para Mexico; https://www.viajerosenruta.com/paises-necesitan-visa-mexicana/; Last Updated January 4, 2023.

[8] Alianza del Pacifico; Available at https://alianzapacifico.net/

[9] Consulado General de Mexico en Atlanta; Personas exentas de presentacion de visa para viajar a Mexico; Available at https://consulmex.sre.gob.mx/atlanta/index.php/visafee/247-personas-exentas-de-presentacion-de-visa-para-viajar-a-

Skip to content

CLP_PC_023390





**September 2022**

# Colombia's Support for Venezuelan Migrants and Refugees: President Petro reaffirms commitment to integration, but continued progress requires more international support

**About the Author**

Nate Edwards is a Program Associate at the NYU Center on International Cooperation.

This paper explores the commendable policy efforts made by successive Colombia administrations to pursue economic and social integration of Venezuelan migrants and refugees in the face of crisis. Compared to other humanitarian situations, however, Colombia is notably underfunded. The global community hopes Colombia will provide a new model for migration and refugee response. To do so, it needs more international support.

*"Venezuelans who want to remain in Colombia should enjoy rights, not simply immigration protection, but the right to health, education, childcare, validation of a title...all of this must be established."—Colombian President Gustavo Petro[1]*

There are over six million Venezuelan migrants and refugees globally, more than 1.8 million of whom live in neighboring Colombia.[2,3,4] These individuals have fled a country suffering from years of economic hardship and political strife. And still today, the situation in Venezuela continues to deteriorate leading to projections that emigration will continue, with Colombia receiving an

---

[1] Ahrens, Jan Martínez and Juan Diego Quesada, "Gustavo Petro: "Si fracaso, las tinieblas arrasarán con todo,'" *El Pais,* June 27, 2022, https://elpais.com/america-colombia/elecciones-presidenciales/2022-06-28/gustavo-petro-si-fracaso-las-tinieblas-arrasaran-con-todo.html.
[2] Interview data used in this article was collected in the Fall of 2020 in collaboration with Lucía Espinal Solórzano, Bren Flanigan, Sami Sternberg, and Xin Tong as part of the course, Migration and Human Development taught by Professor Daniel Naujoks at the School of International and Public Affairs, Columbia University.
[3] UNHCR USA, "Venezuela situation," *UNHCR USA,* https://www.unhcr.org/en-us/venezuela-emergency.html.
[4] Inter-Agency Coordination Platform for Refugees and Migrants from Venezuela, "RMRP 2022 Colombia," December 7, 2021, https://www.r4v.info/en/document/colombia-two-pager.

1 |

CLP_PC_023395

outsized proportion of migrants.[5] Just this year, over 753,000 Venezuelans have left home.[6]

Distinct from most migrant and refugee stories in recent years, Colombia has responded to this influx with a suite of policies aimed at integrating Venezuelans, rather than deterring them.[7,8] This has been roundly welcomed by the global migrant and refugee protection communities, which now wait in hope for signs that the Colombia model will not only succeed but prove replicable elsewhere.[9]

That said, Colombia's migration and refugee policy, which the United Nations High Commissioner for Refugees has rightfully lauded as, "the most important humanitarian gesture" in decades,[10] is facing challenges from all sides. Recent years of **escalating border violence, growing poverty and food insecurity, strained social systems, domestic discontent, and heightened xenophobia**—all aggravated by the global pandemic and an unprecedented economic shock—have given rise to a new constellation of hardship. While Colombia has remained committed to its integration policy, it has not received adequate international funding. As the Petro administration settles in, international support is urgently needed both to enable Colombia's sustained commitment to Venezuelan migrants and refugees, and to signal to the world that such a rights-based act of solidarity does not only rely on national efforts but will also garner international backing.

## Colombia's Policy Response

Colombia's commitment to a progressive migration policy response has remained consistent, even as contexts have changed, and presidents have transitioned. The Venezuelan exodus into Colombia began to increase during the Colombian presidency of Juan Manuel Santos (2010-2018). After instituting the Peace Accords that ended decades of conflict with the paramilitary group, the Revolutionary Armed Forces of Colombia—People's Army (FARC), Santos' government turned its attention to expanding regularization pathways for Venezuelan migrants fleeing deteriorating conditions in the north of Venezuela. In 2017, Colombia instituted the Permiso Especial de Permanencia (Special

> **International support is urgently needed both to enable Colombia's sustained commitment to Venezuelan migrants and refugees, and to signal to the world that such a rights-based act of solidarity does not only rely on national efforts but will also garner international backing**

---

[5] The IMF predicts that the Venezuelan population in Colombia could reach 3.5 million by 2024. International Monetary Fund, "Colombia: 2020 Article IV Consultation-Press Release; Staff Report; and Statement by the Executive Director for Colombia," *International Monetary Fund,* April 16, 2020, https://www.imf.org/en/Publications/CR/Issues/2020/04/16/Colombia-2020-Article-IV-Consultation-Press-Release-Staff-Report-and-Statement-by-the-49331.

[6] Pietsch, Bryan and Hari Raj, "Venezuela refugee crisis similar to Ukraine in size, but not aid," *The Washington Post,* September 4, 2022, https://www.washingtonpost.com/world/2022/09/04/venezuela-refugee-crisis-ukraine-syria.

[7] Hernandez, Camila, "Colombia is pioneering a new model for integrating migrants and refugees, Will it work?" *Atlantic Council*, February 19, 2021, https://www.atlanticcouncil.org/blogs/new-atlanticist/colombia-is-pioneering-a-new-model-for-integrating-migrants-and-refugees-will-it-work/.

[8] (Interview, 2020)

[9] As the director-general of the International Organization for Migration (IOM) put it, Colombia's approach "serves as an example to the world." UNHCR USA, "UNHCR and IOM welcome Colombia decision to regularize Venezuelan refugees," *UNHCR-IOM Joint Press Release,* February 8, 2021, https://www.unhcr.org/en-us/news/press/2021/2/60214cf74/unhcr-iom-welcome-colombias-decision-regularize-venezuelan-refugees-migrants.html.

[10] UNHCR, the UN Refugee Agency Twitter Post, February 8, 2021, https://twitter.com/refugees/status/1358889128578973703?lang=en.

CLP_PC_023396

These initiatives were already notable at a time of rising anti-refugee and anti-migrant sentiments worldwide, and then Colombia went even further

Permit of Permanence or PEP), which provides two years of regular migration status to Venezuelans while also opening access to the labor market and social services.[11] Not without its limitations, this policy offers a pathway to temporary regular status for migrants and refugees.

In 2018, the presidency transitioned to Iván Duque, who chose to maintain national efforts to prioritize integration, rather than deterrence. A 2019 decision to grant full citizenship to roughly 30,000 children of Venezuelan migrants and refugees born in-country is a key example of Colombia's sustained commitment to integration and social protection.[12] In the same year, the United Nations Development Programme (UNDP) supported the government in developing the Income Generation Strategy for Migrants from Venezuela and Host Communities (IGS).[13] This strategy underpins the country's efforts to create integration pathways through the labor market which also opens access to social services, education, and healthcare.[14] Such a strategy reflects a long-term view on migration policy—recognizing that migrants and citizens alike benefit from facilitated integration rather than ad hoc holdover policy responses.

Alongside PEP and the income generation strategy, Colombia offers an assortment of accompanying programs to fill in gaps in coverage. The Border Mobility Card, for example, enables circular migration patterns for residents who live along the Venezuelan-Colombian border and regularly cross over to purchase food, access medical care, or study.[15] For unsuccessful refugee applicants, there exists a Special Complementary Permanence Permit (PECP), a legal avenue to work and conduct activities in Colombia for 90 days at a time.[16] Meanwhile the Special Permanence Permit for the Promotion of Regularization facilitates employment as a means towards regular status.[17] In addition to these policies, Colombia adopted a COVID-19 six-point plan for supporting Venezuelan migrants that includes COVID-19 health service access, humanitarian corridors, cooperation programs, targeted assistance in high-risk areas, a focus on protecting the most vulnerable groups, and coordination with multi-level government and non-governmental stakeholders.[18]

These initiatives were already notable at a time of rising anti-refugee and anti-migrant sentiments worldwide, and then Colombia went even further. In February 2021, the government expanded regularization pathways via a statute

[11] Villamil, Stephanie López and Helen Dempster, "Why Colombia Granted Full Rights to its 1.7 Million Venezuelans, and What Comes Next," January 26, 2021, https://www.cgdev.org/blog/why-colombia-granted-full-rights-its-17-million-venezuelans-and-what-comes-next.

[12] Barchfield, Jenny, "Colombia gives Venezuela newborns a start in life," *UNHCR USA*, October 14, 2019, https://www.unhcr.org/en-us/news/stories/2019/10/5da42be64/colombia-gives-venezuela-newborns-start-life.html.

[13] (Interview, 2020)

[14] (Interview, 2020)

[15] Government of Colombia, n.d. in https://www.unicef.org/lac/media/22271/file/Social_protection_and_Venezuelan_migration.pdf

[16] Ibid.

[17] Ibid.

[18] UNHCR Global Compact on Refugees Digital Platform, "Colombia's 6-point plan for Venezuelan migrants during COVID-19," *UNHCR,* August 12, 2020, https://globalcompactrefugees.org/article/colombias-6-point-plan-venezuelan-migrants-during-covid-19.

CLP_PC_023397

> There is a growing consensus among experts that migrants and refugees constitute an economic benefit, not a burden, when they are included in the social and economic life of their host country. If successful, the strategy could provide a model for progressive, "win-win" migration and refugee policies elsewhere in the world

that created ten-year regularization status for existing undocumented Venezuelan migrants, estimated at one million people,[19] called the Estatuto Temporal de Protección para Migrantes Venezolanos (ETPV), and enabled access to formal work and healthcare services.[20,21] This policy also opened a pathway for those with legal status to extend their stay, and still today, it continues to benefit those who enter the country legally until January 31, 2023.[22] The statute has been considered, "perhaps the most generous amnesty program to undocumented immigrants in modern history."[23]

This multilayered migration approach, if successful, will not only benefit Venezuelans who seek haven and opportunity, but also Colombia and its citizens. There is a growing consensus among experts that migrants and refugees constitute an economic benefit, not a burden, when they are included in the social and economic life of their host country.[24] If successful, the strategy could provide a model for progressive, "win-win" migration and refugee policies elsewhere in the world.

## Challenges to Successful Policy Outcomes

However, the strategy is not a panacea. Colombia faces many entrenched challenges that predate the Venezuelan migration crisis, and now intersect with it. The country is still recovering from decades of conflict with lasting societal divisions, battling high levels of inequality, and struggling in its progress towards holistic political incorporation, to name a few. Such issues are often intricately linked with migration policy, either directly or indirectly (by encompassing migrants in their broader impacts). The strategy is also unlikely to resolve all the challenges facing mobility. **While the current approach provides a strong foundation for successful integration, it needs to be accompanied by equally inclusive and holistic responses in other domains.**

There is reason to think this will happen. President Gustavo Petro, in his first interview to an international newspaper, commented on the importance of ensuring the rights of migrants as well as supporting economic integration and

[19] IRC Press Release, "International funding necessary to support Colombia's policy to welcome Venezuelan migrants, says IRC," *International Rescue Committee/Reliefweb,* April 15, 2021, https://reliefweb.int/report/colombia/international-funding-necessary-support-colombia-s-policy-welcome-venezuelan.
[20] Hernandez, "Colombia is pioneering."
[21] Treisman, Rachel, "Colombia Offers Temporary Legal Status To Nearly 1 Million Venezuelan Migrants," *NPR,* February 9, 2021, https://www.npr.org/2021/02/09/965853031/colombia-offers-temporary-legal-status-to-nearly-1-million-venezuelan-migrants.
[22] Ibid.
[23] Bahar, Dany and Meagan Dooley, "Venezuelan refugees and their receiving communities need funding, not sympathy," *Brookings Institute,* February 26, 2021, https://www.brookings.edu/blog/up-front/2021/02/26/venezuelan-refugees-and-their-receiving-communities-need-funding-not-sympathy/.
[24] Otis, John, "Venezuelan Migrants Providing Crucial Labor in South America," *The Wall Street Journal,* February 23, 2021. https://www.wsj.com/articles/venezuelan-migrants-providing-crucial-labor-in-south-america-11614091553; Bahar, Dany, Meagan Dooley, and Cindy Huang, "Integrating Venezuelans into the Colombia labor market," *Brookings Institution,* December 3, 2018, https://www.brookings.edu/research/integrating-venezuelans-into-the-colombian-labor-market.

CLP_PC_023398

Growing pressure on social services, a large internally displaced population requiring more government support, rising food insecurity, informal migration made more perilous by conflict along the Colombian-Venezuelan border, and escalated xenophobia are all challenges that Colombia must overcome to achieve sustainable integration

education programs.[25] Upon taking office he has also signaled policy priorities with implicit but important implications for Venezuelans—such as tackling hunger and poverty—as well as explicit policies such as reestablishing diplomatic relations with Venezuela and reopening the border.[26] While commentators have noted an early emphasis on return as part of Petro's migration strategy, which has caused unease, Petro has affirmed a commitment to providing refuge and asylum to those who need it.[27,28]

As the Petro administration looks to institute an ambitious agenda, it will face a range of challenges that hold important implications for the integration of migrants and refugees. Growing pressure on social services, a large internally displaced population requiring more government support, rising food insecurity, informal migration made more perilous by conflict along the Colombian-Venezuelan border, and escalated xenophobia are all challenges that Colombia must grapple with to achieve sustainable integration. International support will be important to help address these, not least to ensure that the new government has the policy and fiscal space to live up to Colombia's continued commitment to migrant and refugee rights.

**Among the key challenges facing the new administration are:**

*Social services are buckling under the pressure of immigration and economic hardship.* Colombia's economy contracted 6.8 percent in 2020, marking the worst recession in decades, before recovering swiftly in 2021, nearing pre-pandemic levels by June.[29] Still, Colombia is battling a fiscal deficit.[30] It is struggling to fund programs targeting livelihoods, food security, health, education, and protection—programs that are vital amidst competing humanitarian challenges.[31] In 2019, of the 12 percent of Venezuelans in Colombia with any health insurance, 9 percent used subsidized public coverage.[32] In 2020-21, 21 percent of Venezuelan migrants and refugees utilized subsidized coverage.[33] **Finding ways to resource social services at adequate levels and expand coverage will be imperative as**

[25] Ahrens and Quesada, "Gustavo Petro."

[26] Ibid.

[27] Gutiérrez  Juliana Gil, "¿Qué pasará con los 2,4 millones de venezolanos en Colombia en el gobierno Petro?" *el Colombiano,* July 19, 2022, https://www.elcolombiano.com/colombia/migrantes-venezolanos-en-colombia-en-gobierno-de-gustavo-petro-PA18092629; Casas, Sebastián, "Gobierno de Gustavo Petro buscará retorno voluntario de migrantes y refugiados venezolanos," *RCN Radio,* July 14, 2022, https://www.rcnradio.com/politica/gobierno-de-gustavo-petro-buscara-retorno-voluntario-de-migrantes-y-refugiados-venezolanos.

[28] Política," Gobierno de Gustavo Petro buscará retorno voluntario de venezolanos," *El Tiempo,* July 15, 2022, https://www.elheraldo.co/colombia/agenda-migratoria-ausente-de-las-prioridades-de-petro-934849.

[29] The World Bank, "The World Bank in Colombia," *The World Bank,* https://www.worldbank.org/en/country/colombia/overview.

[30] Ibid.

[31] Graham, Jimmy and Martha Guerrero Ble, "The Impact of COVID-19 on the Economic Inclusion of Venezuelans in Colombia, *Center for Global Development and Refugees International,* October 2020, https://static1.squarespace.com/static/506c8ea1e4b01d9450dd53f5/t/5f997364f4ef54001a174ff9/1603892069536/impact-of-covid-on-venezuelans-in-colombia.pdf.

[32] Chaves-González, Diego, Jordi Amaral, and María Jesús Mora, "Socioeconomic Integration of Venezuelan Migrants and Refugees," *IOM, DTM, And Migration Policy Institute,* July 2021, https://www.migrationpolicy.org/sites/default/files/publications/mpi-iom_socioeconomic-integration-venezuelans_2021_final.pdf.

[33] Ibid.

CLP_PC_023399

**additional migrants and refugees arrive and obtain regular status, and thus secure access to services.** Meanwhile, Colombian citizens also rely on these systems in increasing numbers due to economic hardship and growing poverty.

*Internal displacement has continued to grow, placing further pressure on social policy to deliver.* In 2016, the government of Colombia signed a peace agreement with the FARC. Despite this, from 2017 to March 2022, the country has continued to witness increases in internally displaced populations (IDPs).[34] In May of 2022, there were 734,375 IDPs currently in Colombia.[35] This places further strain on existing social service systems already enduring limited resources to keep up with growing migrant populations.

*Food insecurity is rising globally, affecting Venezuelan migrants and Colombians alike.* Food insecurity has become ever more pervasive globally as food prices rise, economies struggle, and climate impacts grow.[36] Those most vulnerable are taking the brunt of these changes. 345 million people around the world are food insecure.[37] Over 40 percent of the population in Latin America and the Caribbean experienced moderate to severe food insecurity just last year.[38] Neither Venezuelan migrants nor resident Colombians have escaped this growing global challenge. 50 percent of the Colombian-based Venezuelan migrants reported moderate food insecurity in August of 2021, while 14 percent experienced severe food insecurity.[39] Addressing food insecurity for both citizens and migrants further balloons social service costs. The food crisis is acute and the sooner it can be addressed, the better positioned Colombia will be to prevent compounding crises down the road.

*Informal migration increases risks and limits policy effectiveness.* Border closures do not stop migration from occurring, but rather force migrants to take informal, and often precarious, routes—further exposing themselves to high-risk environments. (This is why international refugee law makes clear that refugees merit protection regardless of how they entered a country). Upon entry to Colombia, integration policy is only as effective as migrants' and refugees' ability to access it. As of January 31, 2021, ten-year regulatory status is only available to new migrants who cross the border legally.[40] Without a secure

---

[34] Operational Data Portal: Refugee Situations, "Desplazamientos Masivos - Enero a marzo 2022," *UNHCR, May 3, 2022,* https://data.unhcr.org/en/documents/details/92416.

[35] Operational Data Portal: Country View, "Colombia Data Portal," *UNHCR,* https://data.unhcr.org/en/country/col.

[36] World Food Programme, "A global food crisis – 2022: A Year of Unprecedented Hunger," *World Food Programme,* https://www.wfp.org/hunger-catastrophe#:~:text=2022%3A%20a%20year%20of%20unprecedented,to%20345%20million%20%2D%20since%202019.

[37] Ibid.

[38] Press release, "In one year, 4 million people were thrust into hunger in Latin America and the Caribbean," *Food and Agricultural Organization of the United Nations*, June 7, 2022, https://www.fao.org/americas/noticias/ver/en/c/1585479.

[39] World Food Programme, "Food Security Update: Venezuelan Migrants in Colombia, Ecuador and Peru," *World Food Programme,* August 2021, https://www.r4v.info/sites/default/files/2021-11/WFP_Remote_Assessment_Migrants_August%202021%2005102021.pdf.

[40] "Colombia/Venezuela: Border Area Abuses by Armed Groups," *Human Rights Watch,* March 28, 2022, https://www.hrw.org/news/2022/03/28/colombia/venezuela-border-area-abuses-armed-groups.

CLP_PC_023400

The international community should support the government in living up to its commitments—but the reality is that Colombia has been starkly under-supported when it comes to humanitarian aid

pathway, migrants are at heightened risk before they even access Colombia's policy benefits. Not to mention, escalations in conflict along the Colombia-Venezuelan border, such as those that took place in early 2022,[41] that further threaten secure migration for those crossing the border informally. President Petro is working with Venezuela to reopen the border.[42] As this occurs, it will be important to ensure that all migrants and refugees, even those who do not arrive via official border crossings, can reach Colombia safely and access the rights and benefits to which they are entitled.

*Xenophobia has been persistent in civil society and represents a key challenge for social integration.* According to a 2020 poll, only about 20 percent of Colombians approve of the government's approach to migration, and nearly 70 percent view Venezuelan migrants unfavorably, believing (against the evidence)[43] that they raise crime rates and steal jobs.[44] Hate messages and misinformation infiltrated the public discourse following the ten-year regularization statute in 2021.[45] Increasing public spending on migrants is politically harder when xenophobic sentiments are present. As in all countries, xenophobia among segments of the population is a key barrier to social integration. Colombia will need public support to continue its progressive policies and garner international support. **Changing public sentiments and aligning normative support with policy shifts will be critical if Colombia's inclusive migration and refugee policy is to succeed.**

## Inadequate International Support

Colombia is demonstrating a unique commitment to the Global Compact on Refugees and the Global Compact on Migration alike.[46] As discussed above, however, the country is faced with several cross-cutting humanitarian and development challenges. The international community should support the government in living up to its commitments—but the reality is that Colombia has been starkly under-supported when it comes to humanitarian aid.

---

[41] Ibid.

[42] Polanco, Anggy and Nelson Bocanegra, "Colombia, Venezuela working to coordinate border reopening, minister says," *Reuters,* August 18, 2022, https://www.reuters.com/world/americas/colombia-venezuela-working-coordinate-border-reopening-minister-says-2022-08-18.

[43] Knight, Brian and Ana María Tribín-Uribe, "Immigration and Violent Crime: Evidence from the Colombia-Venezuela Border," *Banco de la Republica Colombia,* 2020, https://repositorio.banrep.gov.co/bitstream/handle/20.500.12134/9880/be_1121.pdf?sequence=1. As the IMF recently found, "the informal labor market has absorbed most migrants, with little evidence of local worker displacement in either the formal or informal sectors," Press Release, "Colombia 2020 Article;" Bahar, Dany, Meagan Dooley, and Andrew Selee, "Venezuelan Migration, Crime, and Misperceptions," *Migration Policy Institute and the Global Economy and Development at Brookings,* September 2020, https://www.brookings.edu/wp-content/uploads/2020/09/migration-crime-latam-eng-final.pdf.

[44] Guzmán, Sergio and Juan Camilo Ponce, "Hate against Venezuelans in Colombia is a ticking time bomb," *Global Americans,* November 10, 2020, https://theglobalamericans.org/2020/11/hate-against-venezuelans-in-colombia-is-a-ticking-time-bomb/.

[45] The Crisis Group, "Hard Times in a Safe Haven: Protecting Venezuelan Migrants in Colombia," *Crisis Group,* August 9, 2022, https://www.crisisgroup.org/latin-america-caribbean/andes/colombia/094-hard-times-safe-haven-protecting-venezuelan-migrants-colombia.

[46] The Global Compact on Refugees (2018) and the Global Compact for Safe, Orderly, and Regular Migration (2018) are international agreements through which signatories affirm their commitment to uphold collective principles for refuge and migration.

CLP_PC_023401



**REFUGEES INTERNATIONAL**

A New Way Forward: Strengthening the Protection Landscape in Mexico

Rachel Schmidtke (/reports?author=5e7d46f0854e1012be95c57a)  ·  November 12, 2020 (/reports/2020/11/9/a-new-way-forward-strengthening-the-protection-landscape-in-mexico)

## Summary

Mexico plays a unique role in North America as a sending, transit, destination, and return country for many migrants, including asylum seekers and other forcibly displaced people. In recent years, Mexico has increasingly become a destination for asylum seekers. The Mexican asylum system has improved, but for many seeking asylum in Mexico, gaining access to a fair and timely process is still not a guarantee. Mexico's asylum system is generous on paper, but in practice it faces several challenges that undermine its effectiveness. Coupled with these issues is increased pressure from the United States to adopt an enforcement-centered approach to managing migration flows. But as more people turn to Mexico to seek international protection, it is increasingly important for Mexico to provide a more holistic and human-rights-centered approach to migration management, and in particular to focus its attention on improving its international protection system. Strengthening the protection system would serve the dual purpose of providing a more fair and transparent process for asylum seekers and enabling Mexico

CLP_PC_023428

to better manage the increasing number of asylum applications it receives. This is particularly important as migration from Central America and other regions is likely to be the norm for years to come, and trends indicate asylum claims in Mexico will only increase.

Mexico's National Migration Institute (INM) and the Mexican Commission for Refugee Assistance (COMAR) are the two Mexican institutions with key responsibilities for asylum seekers and other migrants. The INM (https://consulmex.sre.gob.mx/reinounido/index.php/es/contenido/75-general-information-on-visas-and-migratory-documents) is the authority in charge of regulating the entry, stay, and exit of foreign and Mexican citizens in Mexico, and the COMAR (https://www.gob.mx/comar) is responsible for processing refugee status recognition applications. Both INM and COMAR can mitigate current and future problems by promptly implementing several improvements that could have lasting impacts. By implementing these fixes, the INM would improve access to asylum for migrants in detention and at airports and improve the issuance of key documents. If implemented, the recommendations we make would also enable COMAR to reduce its backlog and provide better screenings for asylum seekers. Asylum seekers would enjoy improved ability to exercise their economic, social, and cultural rights during their wait for their claims to be resolved. We also offer recommendations designed to enable the UN Refugee Agency (UNCHR) to better meet the goal of assisting the Mexican government through the Comprehensive Regional Protection and Solutions Framework (https://globalcompactrefugees.org/mirps-en) (known as MIRPS by its Spanish acronym), and to enable the United States to be a more effective regional partner as Mexico seeks to provide more effective migration management.

# Background

Mexico's international protection system is generous on paper. Mexico is party to the 1951 Convention Relating to the Status of Refugees, and the Mexican Constitution guarantees the right of people to seek and receive asylum. Mexico also among the governments that adopted the 1984 Cartagena Declaration, which broadened the grounds for asylum. Mexico's 2011 Law of Refugees, Political Asylum, and Complementary Protection (http://www.diputados.gob.mx/LeyesBiblio/pdf/LRPCAP_301014.pdf) provides protection to asylum seekers who meet the requirements of the 1951 Convention or the Cartagena Declaration. In practice, Mexico applies these standards to asylum seekers from certain countries, especially Venezuelans, 98 percent of whom (https://www.jornada.com.mx/2019/03/24/politica/015n1pol) are granted protection. Asylum seekers who are granted refugee status through the COMAR become permanent residents with the right to stay indefinitely, access to employment, healthcare, and education. They can apply for naturalization after four years. If the asylum seeker is not granted refugee status, the person may be granted Complementary Protection due to risk of torture, cruel or inhumane treatment. Complementary Protection provides access to many of the same rights that refugee status entails, save for family reunification.

The asylum process is composed of four to five key stages, outlined below:

CLP_PC_023429

**Simplified Mexican Asylum Procedure**

| Asylum request submitted before COMAR or INM within the 30 working days after the entrance to the Mexican territory | Admission of the asylum request and issuance of a Certificate showing the status as asylum seeker (Constancia) | Elegibility Interview | Final Resolution | Appeal Proceedings |
|---|---|---|---|---|
| The exception to this rule applies only in cases where it was **materially impossible** to submit the asylum claim within the 30 days period. | This Constancia is the only document that will prove that the asylum seeker is **engaged in an asylum procedure before COMAR.** | The most relevant stage of the procedure. The elegibility interview analyzes the **reasons why the asylum seeker left his/her country of origin** . | The final resolution can have **one of three results:** <br> i) the person is **recognized as refugee** under the 1951 Refugee Convention or the Cartagena Declaration of 1984; | If the final resolution amounts to denial of any type of international protection, the person can choose between filing a **motion before COMAR** for it to reconsider its decision (Recurso de Revisión) or to file a **lawsuit against COMAR** before a Federal court (Juicio de Nulidad or Juicio de Amparo). |
| In states where there are **no local offices of COMAR,** asylum requests have to be submitted before **INM,** who will submit the claim to the COMAR, and will act a intermediary between COMAR and the asylum seeker during the asylum procedure. | The Constancia is required by INM to grant asylum seekers a **humanitarian visa,** and **a social security number (CURP);** thus, the Constancia has an instrumental role for the access to **social, economic and cultural rights.** | The final resolution is **based** primarily on the **testimony** given by the asylum seeker during this interview. <br> In states where COMAR has **no local offices,** interviews are conducted by **telephone.** | ii) the person is granted **Complementary Protection** due to his/her risk of being subject of torture, cruel or inhumane treatment; <br> iii) **no international protection is granted.** | If a **detained** person decides to not seek recourse, he/she will be likely **deported.** |

Source: Mexico's 2011 Law of Refugees, Political Asylum, and Complementary Protection

Yet, this system has serious problems that undermine its generosity and effectiveness—challenges that are exacerbated by the severe lack of funding for COMAR. For years, COMAR suffered from a woefully low budget (https://www.reuters.com/article/us-usa-immigration-mexico/mexicos-refugee-agency-turns-to-u-n-amid-asylum-surge-funding-cuts-idUSKCN1SS06N) that contributed to a mounting backlog of unresolved claims. Thankfully, from 2019 to 2020, the Mexican government increased COMAR's budget (https://www.pef.hacienda.gob.mx/work/models/PEF2020/docs/04/r04_afpe.pdf) from 20,843,364 Mexican pesos (roughly $1,010,175 USD) to 47,360,858 pesos (roughly $2,295,348 USD)—an increase of 127.7 percent. However, the budget for 2021 decreased by 14.3 percent (https://www.ppef.hacienda.gob.mx/work/models/PPEF2021/docs/04/r04_reurgfpp.pdf), despite the overwhelming need to increase funding. Coupled with a reduced budget is a growing xenophobia (https://www.youtube.com/watch?v=JBIUmYxasYM) in Mexico, particularly in northern states where the U.S.-imposed Migrant Protection Protocols (https://www.hrw.org/news/2020/01/29/qa-trump-administrations-remain-mexico-program) (MPP) have exacerbated tensions. Even the INM chief is on record making xenophobic comments (https://www.milenio.com/politica/francisco-garduno-asi-sean-de-marte-regresaran-a-su-lugar-de-origen) against migrants. These sentiments influence the political will of the Mexican government to enact reforms.

The United Nations High Commissioner for Refugees (UNHCR) supports the COMAR's work, largely through the Comprehensive Regional Protection and Solutions Framework (https://globalcompactrefugees.org/mirps-en) (or MIRPS), a state-led regional application of the Global Compact on Refugees. In particular, the MIRPS is designed (https://reliefweb.int/report/honduras/what-mirps-comprehensive-regional-protection-solutions-framework-address-forced) to strengthen pro...

CLP_PC_023430

promote solutions for affected persons, and address the underlying causes of forced displacement by promoting a stable environment that ensures security, economic development, and prosperity. Belize, Costa Rica, El Salvador, Guatemala, Honduras, Mexico, and Panama constitute the members of the MIRPS, and they work together to strengthen protection and develop solutions for refugees, asylum seekers, internally displaced people, and returnees with international protection needs. In Mexico, the MIRPS action plan calls to improve the procedure for the applications for asylum, including the registration phase, attention to specific needs, and the refugee status determination.

It is important to note that Mexico's policy decisions around its migration and international protection systems do not exist in a vacuum; the United States exerts a great deal of pressure and influence on the direction of Mexico's policy choices. In 2019, the United States threatened to impose 5 percent tariffs on all Mexican imports (https://www.reuters.com/article/us-usa-trade-mexico/trump-threatens-more-tariffs-on-mexico-over-part-of-immigration-deal-idUSKCN1TB182) if the Mexican government did not increase its northern border enforcement efforts. Following these threats, the United States and Mexico signed a migration deal (https://www.wilsoncenter.org/article/will-the-us-mexico-migration-deal-work-here-are-the-6-things-you-need-to-know)that would drastically alter the course of Mexico's migration enforcement. The Mexican government deployed thousands of National Guard members to its northern and southern borders. Since the deployment of the National Guard, the number of detained migrants has increased substantially. The following month after the United States and Mexico signed the agreement, the INM held over 30,000 migrants in detention, which is the highest number of detentions (https://www.animalpolitico.com/2019/06/migrantes-record-detenidos-trump/) made in a month in the last 13 years.

The increased enforcement in Mexico has been accompanied by a set of interlocking policies enacted by the United States government to virtually end asylum (https://www.refugeesinternational.org/reports/2020/7/28/a-primer-on-the-trump-administrations-most-ambitious-effort-to-end-asylum) at the U.S.-Mexico border. Taken together, these factors have resulted in a sharp increase in the number of people seeking asylum in Mexico.  In particular, U.S. policies including "metering (https://www.americanimmigrationcouncil.org/research/policies-affecting-asylum-seekers-border)" and the so-called Migrant Protection Protocols (https://www.hrw.org/news/2020/01/29/qa-trump-administrations-remain-mexico-program) (MPP) along Mexico's northern border push many asylum seekers who have had hopes to for asylum in the United States to apply in Mexico instead as they grow tired of long waits in unsafe conditions. In addition, others are applying for asylum in southern states of Mexico as a way to gain safe transit through the country in an increasingly enforcement-heavy environment. And while the number of  asylum claims had grown every year between 2013 and 2019, claims rose far more sharply after the U.S.-Mexico migration deal and implementation of restrictive U.S. policies. According to official statistics, 80 percent of the more than 150,000 asylum requests (https://www.gob.mx/cms/uploads/attachment/file/576939/CIERRE_AGOSTO_2020___01-SEPT_-2020_.pdf) received by COMAR between 2013 and 2020 had been filed within the last three years.

CLP_PC_023431

While U.S. actions may have accelerated the increase in asylum claims, other factors have also been at play. More people have been on the move than ever before. Furthermore, many asylum seekers now view Mexico as a viable place to seek asylum, and as conditions worsen in their home countries, Mexico can provide relative safety and prosperity. And although 2020 has seen a reduction of claims due to the pandemic, in 2019 the number reached its historic peak with more than 70,000 claims, which represents an increase of more than 5,000 percent of asylum requests submitted before COMAR since 2013.



Source: COMAR. Official statistics. Retrieved here (https://www.gob.mx/cms/uploads/attachment/file/576939/CIERRE_AGOSTO_2020___01-SEPT_-2020_.pdf).

This increase has placed a significant strain on Mexico's protection system, particularly as funding, staffing, and institutional capacity for this system is inadequate to respond to such high numbers of claims. With a Biden administration starting in January of 2021, there may be new opportunities for both countries to work together on migration reform. Of course, the United Sates must change its current draconian asylum policies, but regardless of the election outcome and subsequent U.S. policies, it is Mexico's best interest to strengthen its asylum system to respond to the increasing number of asylum claims, as people will continue to seek asylum under any circumstances.

The COVID-19 pandemic has also created challenges for asylum seekers looking to access international protection. Although the COMAR continued to accept asylum applications during the COVID-19 pandemic, restrictions on movement severely limited those with international protection concerns from accessing the Mexican asylum system because they could not travel. Now, a new challenge is on the horizon: as borders reopen, more people may seek to cross into Mexico in large numbers to seek asylum or safe transit through the country. Examples of this are already occurring: in September 2020, a caravan (https://www.vice.com/en/article/bv89yz/a-massive-migrant-caravan-headed-for-the-us-just-got-dismantled-in-guatemala) of thousands of people set out from San Pedro Sula with the intention of reaching the United States. Although the caravan was mostly halted in Guatemala, Mexican officials were eager to clamp down (https://www.proceso.com.mx/651113/el-inm-amaga-con-carcel-si-caravana-migrante-ingresa-a-mexico-sin-medidas-sanitarias) on the movement of people to and through the country—particularly considering U.S. pressure and the pandemic.

CLP_PC_023432

COMAR budget cuts, xenophobia, U.S. measures that have compounded Mexican migration challenges, and a likely increase in migration flows in the coming year all create formidable obstacles to progress. But none of these obstacles should stand in the way of a range of improvements that the Mexican government can implement to address the gaps in protection and provide a fair and humane asylum process that upholds the rights of the forcibly displaced.

# Barriers to International Protection

## INSTITUTO NACIONAL DE MIGRACIÓN (INM)

The INM handles enforcement, issues humanitarian visas, and performs a variety of other immigration functions. The INM has offices in all 32 states in Mexico (https://www.gob.mx/inm/acciones-y-programas/horario-y-oficinas-del-inm) and is in charge of receiving asylum requests from asylum seekers in states where the COMAR is not present. In recent years, the INM has come under fire for corruption allegations. In August of 2020, 1,040 INM agents were fired (https://www.eluniversal.com.mx/nacion/seguridad/inami-separan-de-su-cargo-mil-40-servidores-publicos-por-corrupcion) for coercing migrants to pay up to 300 pesos to process their immigration documents. The INM has also been criticized for prohibiting access for civil society organizations (https://www.amnesty.org/en/latest/news/2020/01/mexico-amnistia-exige-claridad-sobre-acceso-ongs-estaciones-migratorias/) in migration stations. In general terms, the INM lacks an independent oversight mechanism to ensure transparency in the agency. Beyond these broad and large-scale problems, Refugees International has specific concerns related to INM practices on detentions and deportations, humanitarian visas, and protection from return.

**Detentions and Deportations:** Migrants in Mexico who fled persecution and violence are often detained in migration stations and deported before they have the option to seek asylum. Not only are would-be asylum seekers detained and often rapidly deported, but reports (https://www.amnesty.org/en/documents/amr41/0492/2019/en/) note that many would-be asylum seekers are at high risk of detention. Asylum seekers who may be arbitrarily detained in the custody of the INM do not have the ability to question the legality of their detention (http://www.diputados.gob.mx/LeyesBiblio/pdf/LRPCAP_301014.pdf)before any other administrative or judicial authority.

Migrants who may qualify for asylum are often unaware they can seek asylum while in detention because INM staff may have failed (https://www.cndh.org.mx/sites/default/files/documentos/2019-11/Informe-Estaciones-Migratorias-2019.pdf) to disclose this option to those detained. In some cases, INM officials have openly discouraged migrants (https://www.amnestyusa.org/reports/overlooked-under-protected-mexicos-deadly-refoulement-of-central-americans-seeking-asylum/) from applying for asylum. Asylum seekers who are detained may grow tired of extended periods in detention and opt to be returned voluntarily to their home countries instead of completing the asylum process. Although

CLAP_PG_023433

detentions rates have reduced during the COVID-19 pandemic because the INM agreed to release migrants for public health reasons, stakeholders disclosed to Refugees International that those deportations that are taking place are occurring more rapidly than before the pandemic, leaving even less time and resources for migrants to apply for asylum.

**Visitor Card for Humanitarian Reasons:** Migrants with a high risk of vulnerability, such as asylum seekers, stateless people, or those who flee because of public-interest or force majeure reasons, are entitled by law to request a "humanitarian visa (https://www.gob.mx/tramites/ficha/regularizacion-migratoria-por-razones-humanitarias/INM791)," whether at a Mexican point of entry or inside Mexican territory. This legal document is viable for six months to one year, and it can be renewed if the reason for its issuance persists beyond its expiration date. The humanitarian visa contains a social security number called CURP, (https://www.gob.mx/tramites/ficha/obtencion-de-la-curp/SEGOB173) for its acronym in Spanish, which facilitates the access to education, public health services, and a formal job in Mexico. Thus, the humanitarian visa has pivotal role in the access of asylum seekers to social, economic, and cultural rights.

Yet, individuals who enter Mexico for the reasons previously mentioned are less likely to receive a humanitarian visa at the border when travelling individually, than those who enter in large groups. In this respect, there are no approval rates, nor official figures of the total of requests of humanitarian visas submitted at the border. However, considering the large amount of Central American people crossing into Mexico and the reasons they flee their countries of origin, it would be expected to find higher figures of humanitarian visas granted at a point of entry. Nonetheless, between 2015 and September 2020 only 0.06 percent of the total registered entries into Mexico were for humanitarian reasons (http://www.politicamigratoria.gob.mx/es/PoliticaMigratoria/Boletines_Estadisticos). Although there has been a notable increase of registered entries for humanitarian reasons since 2019 (http://www.politicamigratoria.gob.mx/es/PoliticaMigratoria/CuadrosBOLETIN?Anual=2019&Secc=1), data suggests this increase is due to the entrance of migrant caravans and Mexican immigration policies to address them. (http://www.gobernacion.gob.mx/work/models/SEGOB/Resource/2909/1/images/MaD184.pdf) In fact, an alarmingly low number of humanitarian visas (http://www.politicamigratoria.gob.mx/es/PoliticaMigratoria/Boletines_Estadisticos) were granted at an entry point in the years where there were not large caravans, suggesting that access to a humanitarian visa at the border is more likely to be guaranteed in contexts of large, collective entries like in the case of caravans. Although the issuance of humanitarian visas in these cases can be regarded as a protective measure since the humanitarian visa facilitates access to government services, migrants with a lower profile face more obstacles when accessing the humanitarian visa at a point of entry, which could also indicate legal and practical barriers in its access, and a lack of protection policies for vulnerable but less prominent migrants.

Furthermore, not all asylum seekers are issued a humanitarian visa. According to Article 52 Section V of the Mexican Immigration Law (http://www.diputados.gob.mx/LeyesBiblio/pdf/LMigra_130420.pdf), asylum seekers engaged in an asylum procedure are entitled to request a humanitarian visa. Although there is

CLP_PC_023434

no official data on the total of requests for a humanitarian visa made by asylum seekers, it calls our attention that the total of humanitarian visas granted between 2015 and September 2020 represents 55 percent of the total of <u>asylum requests</u> (https://www.gob.mx/cms/uploads/attachment/file/576939/CIERRE_AGOSTO_2020___01-SEPT_-2020_.pdf) submitted in the same period. The disparity between the humanitarian visas issued and the asylum claims submitted before COMAR certainly would suggest that thousands of asylum seekers have not had access to the humanitarian visa.

Finally, through interviews with international and local NGO's, Refugees International found that detained asylum seekers are not granted this visa upon release from detention. In these cases, along with the exit permit that allows them to leave the detention center, INM grants them <u>another type of legal permit</u> (https://centroprodh.org.mx/sididh_2_0_alfa/?p=57540) that is not in accordance with the Mexican Immigration Law, and has significantly fewer benefits than the humanitarian visa, such as its short duration (45 days), and its format (a piece of paper rather than a formal card).

**Protection from Return:** For migrants who arrive by air**,** the INM operates a migration station within the Mexico City airport commonly referred to as <u>"La Burbuja</u> (https://www.animalpolitico.com/2020/10/migrante-faarooq-lleva-un-mes-encerrado-aicm/)<u>."</u> If the INM identifies inconsistencies in an individual's paperwork, an INM official will conduct an interview with the migrant to determine if the person is allowed to enter Mexico or be issued a <u>"rechazo"—a</u> (https://www.elimparcial.com/mexico/Aumenta-rechazo-de-extranjeros-que-buscan-ingresar-a-Mexico-20190803-0002.html)rejection, which results in return to their country of departure or to another country where the person would be admitted. A *rechazo* is different from a deportation, since the latter implies entry of the person into Mexican territory, whereas with a *rechazo* the person is not considered to have entered Mexico. According to the <u>Regulations of the Airports Law</u> (http://www.sct.gob.mx/JURE/doc/regl-ley-aeropuertos.pdf), the access to these spaces is restricted, and only authorities and airline officers are allowed to enter. Therefore, oversight of the INM functions in this space is difficult to achieve. As a result, the INM does not need to provide good cause or justification for this interview, which raises concerns about discrimination and arbitrariness. Unless the individual has a network in Mexico that can contest the *rechazo,* migrants are often rapidly returned before having the chance to apply for asylum. In cases where an individual wishes to apply for asylum but is scheduled to be returned, a judge can issue a halt to this return under Mexico's protection law, the <u>Ley de Amparo</u> (http://www.diputados.gob.mx/LeyesBiblio/pdf/LAmp_150618.pdf). Although a judge can halt this return, there is no immediate notification system communicating the judge's ruling to INM officials in the airport. A court representative must physically go to the airport to deliver the paperwork. Lawyers told Refugees International that, in some cases, migrants have been returned before the court representative could deliver the paperwork.

CLP_PC_023435

# Mexico rethinks asylum initiative after controversial US announcement | CNN

Migrants from Venezuela, Cuba, Haiti and Afghanistan wait outside the Mexican Commission for Refugee Assistance (COMAR) in Mexico City on January 24, 2023.

Daniel Cardenas/Anadolu Agency/Getty Images

*CNN*

—

Mexico is rethinking its approach toward asylum seekers after the Biden administration unveiled a controversial new proposal to limit asylum eligibility in the United States.

Mexico's refugee assistance agency, known as COMAR, launched a pilot program in southern Mexico on Monday to explore expediting asylum denials to those it deems likely to travel onward to the US.

The aim is to deter those migrants from accessing temporary documents issued by COMAR while their cases are being evaluated, which they might use to travel north – a common phenomenon, according to COMAR's head Andrés Ramírez.

ADVERTISING

But after the Biden administration announced its proposed new asylum rules on Tuesday, COMAR plans to abandon the strategy and use what it learned from the pilot program to come up with a different solution, Ramírez said.

The US proposal – which has been panned by human rights advocates and immigration experts – largely bars migrants who have not taken a legal pathway and instead traveled through other countries on their way to the US southern border from applying for asylum in the US. It would take effect in May.

CLP_PC_023442

Among its proposed new conditions on eligibility for US asylum: being denied protection in a third country through which they traveled.

Ramírez now worries that accelerating asylum denials could actually increase Mexico's attractiveness as a pit stop for those ultimately aiming to request asylum in the US.

"The new policy that was recently announced [by the United States] changes the whole thing. We need to rethink it," Ramírez said.

Migrant numbers at the US-Mexico border have been on the rise since last year, with increasing numbers of people from Venezuela, Cuba, Nicaragua and Colombia – many fleeing repressive government and stark economic pressures.

## Passing through Mexico

Though the one-week pilot program did not include actually issuing swift denials, it studied behaviors of individuals from nationalities deemed by COMAR most likely to be traveling for economic reasons rather than for international protection – Senegalese and Angolan migrants in particular, according to Ramírez.

By Mexican law, asylum seekers are required to stay in the state where they filed for asylum to see the process through.

Once registered with COMAR, asylum seekers are provided with deportation protection, access to the public health care system and work eligibility.

Ramírez says that his agency recently noticed that many migrants who began the asylum process in the city of Tapachula, in southern Mexico, later abandoned the process. They used a preliminary COMAR document to travel within the country toward its northern border.

"They are abusing the system," said Ramírez. "That shows us that many of these people are not really interested in (Mexico's) refugee

CLP_PC_023443

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 370 of 721

system and the asylum procedure."

He estimated that in Tapachula, Mexico about 70% of the individuals from countries other than Haiti were abusing the system.

Haitians, he said, have been continuing with the local asylum process there at a higher rate.

## A record number of applications

Mexico has received a surge of asylum applications in recent years, Ramírez says.

In January 2023, nearly 13,000 people signed up to seek asylum in Mexico, according to COMAR data. That's more than double the number of asylum registrations from one year ago in January 2022, the data shows.

If applications continue at this pace, 2023 could be on track to becoming the refugee agency's busiest year ever.

The record for most applications ever was set in 2021, he said, when COMAR received nearly 130,000 asylum applications.

"We were at the risk of collapsing. It was terrible," Ramírez said.

His priority now is to figure out a way to prevent the asylum system in Mexico from being overwhelmed, he says.

After the results of this week's experiment documenting the behaviors of individuals who likely qualified for expedited denials is analyzed, his team will submit proposals with new solutions to combat what they see as abuses of the system – an approach that Ramírez says will ultimately allow COMAR to prioritize asylum seekers who intend to make Mexico home.

"For us it's very important to take care of the asylum system in Mexico," Ramírez said. "If the asylum system is collapsed, then we're

CLP_PC_023444

done."

CLP_PC_023445



DONATE                                    DO YOU NEED HELP?

# Number of displaced Nicaraguans in Costa Rica doubles in less than a year

*This is a summary of what was said by UNHCR spokesperson Boris Cheshirkov – to whom quoted text may be attributed – at today's press briefing at the Palais des Nations in Geneva.*

25 March 2022  |  Español  |  Français

We use cookies and other identifiers to help improve your online experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

**Accept**

CLP_PC_023473

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 373 of 721

A UNHCR staff member assists Nicaraguan asylum seekers in Upala, near Costa Rica's border with Nicaragua. © UNHCR/Kai Odio

The number of Nicaraguan refugees and asylum seekers in Costa Rica has doubled in the last eight months, reaching more than 150,000, according to the latest figures available to UNHCR, the UN Refugee Agency. This represents a full 3 per cent of Costa Rica's total population of five million.

These figures, as of February 2022, confirm more Nicaraguans are currently seeking protection in Costa Rica than all the refugees and asylum seekers combined during Central America's civil wars in the 1980s, when Costa Rica was a sanctuary for those fleeing violence.

UNHCR is concerned that this trend could seriously strain Costa Rica's already stretched asylum system and overwhelm support networks in the country.

The sharp rise in the number of asylum seekers from Nicaragua corresponds with major sociopolitical events in the country, including the November presidential elections.

Nicaraguans are also increasingly seeking protection further afield. During the first two months of 2022, the number of asylum seekers from Nicaragua arriving in Mexico is nearly one-third of the asylum claims by Nicaraguans in all of 2021.

Throughout the COVID-19 pandemic, the Government of Costa Rica has kept its borders open for those seeking international protection.

UNHCR's border monitoring in Costa Rica reveals that many of the new asylum seekers are finding employment in the seasonal coffee harvest. However, their economic security could be compromised once the harvest is over, increasing the pressure on response institutions and UNHCR programmes.

Costa Rica is experiencing a high level of unemployment due to the pandemic-induced economic crisis. In this context, the individual support networks that provide shelter and economic opportunities to Nicaraguans are weakened, increasing the need for support from UNHCR and its partners.

UNHCR supports the Government of Costa Rica and host communities in welcoming asylum seekers and refugees through registration, legal aid, cash assistance, and donations of hygiene and cleaning kits, food and mattresses. It also provides psychosocial support, emergency shelter, vocational training, and activities to promote peaceful coexistence between refugees and the communities that host them.

At a moment when the crisis in Ukraine is making daily headlines, these figures highlight the

We use cookies and other identifiers to help improve your online experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

**Accept**

CLP_PC_023474

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 874 of 721

**Media contacts:**

- In San Jose, Diego Perez Damasco, perezdam@unhcr.org, +506 8882 8169
- In Mexico, Sibylla Brodinsky, brodzins@unhcr.org .  +52 55 80485054
- In Panama (regional), William Spindler, spindler@unhcr.org,  +507 6382-7815
- In Geneva, Boris Cheshirkov, cheshirk@unhcr.org, +41 79 433 7682

| Share on Facebook | Share on Twitter |
|---|---|

# Related news and stories

view more

**NEWS RELEASES**

## UN Assistant High Commissioner for Refugees calls for joint action to address shifting challenges of mixed movements in the Americas

**STORIES**

## Former 'nature beginner' is now on the front lines of the fight against climate change

We use cookies and other identifiers to help improve your online experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

**Accept**

CLP_PC_023475





* The data for the latest year (2022) is available up until the mid-year, except IDMC data on Internally Displaced People which is available until end-2021.



**Query permalink**

www.unhcr.org/refugee-statistics/download/?url=D2dAH7    Copy link

**Share**

Facebook    Twitter    Email

**Download**

Query data    All data

Line chart

Bar chart

| Year ↧ | Country of Origin | Country of Asylum | Authority | Stage of Procedure | Cases / Persons | Recognized | Complementary protection | Rejected | Other clo |
|---|---|---|---|---|---|---|---|---|---|
| 2000 | - | Belize (BLZ) | G | FI | P | 0 | 0 | 0 | |
| 2001 | - | Belize (BLZ) | G | FI | P | 0 | 0 | 0 | |
| 2002 | - | Belize (BLZ) | U | FI | P | 0 | 0 | 13 | |
| 2003 | - | Belize (BLZ) | G | FI | P | 0 | 0 | 0 | |
| 2004 | - | Belize (BLZ) | G | FI | P | 0 | 0 | 0 | |
| 2005 | - | Belize (BLZ) | G | FI | P | 0 | 0 | 0 | |
| 2006 | - | Belize (BLZ) | G | FI | P | 0 | 0 | 0 | |
| 2009 | - | Belize (BLZ) | G | FI | P | 0 | 5 | 0 | |
| 2010 | - | Belize (BLZ) | G | FA | P | 0 | 0 | 0 | |
| 2012 | - | Belize (BLZ) | G | FI | P | 0 | 0 | 33 | |
| 2013 | - | Belize (BLZ) | J | FI | P | 0 | 0 | 0 | |
| 2013 | - | Belize (BLZ) | G | FI | P | 0 | 0 | 0 | |
| 2014 | - | Belize (BLZ) | J | FI | P | 0 | 0 | 0 | |
| 2015 | - | Belize (BLZ) | J | FI | P | 34 | 0 | 0 | |
| 2018 | - | Belize (BLZ) | G | FI | P | 29 | 0 | 70 | |
| 2019 | - | Belize (BLZ) | G | FI | P | 0 | 0 | 33 | 1,6 |
| 2020 | - | Belize (BLZ) | G | FI | P | 0 | 0 | 0 | |
| 2021 | - | Belize (BLZ) | G | FI | P | 0 | 56 | 15 | |
| 2022* | - | Belize (BLZ) | G | FI | P | 0 | 5 | 27 | |
| | | | | | | 63 | 66 | 191 | 2,0 |

CLP_PC_023478



CLP_PC_023479



CLP_PC_023480



## UNHCR
The UN Refugee Agency

Share this page:  f  y    Search   Menu

- Population figures
  UNHCR data on displacement.
- Asylum applications
  Asylum claims submitted.
- ● Asylum decisions
  Decisions taken on asylum claims.
- Solutions
  Solutions for refugees and IDPs.
- Internally displaced persons
  Internal displacement due to conflict and violence.
  (Source: IDMC)
- Palestine refugees under UNRWA's mandate
  Registered Palestine refugees (Source: UNRWA)

**Next ↓**

Display type
Totals

Population types
All

Year
1951 - 2022*

Country of Origin
Do not display

Country of Asylum
GUA

Query permalink

www.unhcr.org/refugee-statistics/download/?url=w0Auu0   Copy link

Share

Facebook   Twitter   Email

Download

Query data   All data

Line chart

Bar chart

| Year ↓↑ | Country of Origin | Country of Asylum | Authority | Stage of Procedure | Cases / Persons | Recognized | Complementary protection | Rejected |
|---|---|---|---|---|---|---|---|---|
| 2000 | - | Guatemala (GTM) | U | FI | P | 15 | 0 | 38 |
| 2001 | - | Guatemala (GTM) | U | FI | P | 15 | 0 | 33 |
| 2002 | - | Guatemala (GTM) | U | FI | P | 5 | 0 | 15 |
| 2003 | - | Guatemala (GTM) | G | FI | P | 0 | 0 | 5 |
| 2004 | - | Guatemala (GTM) | G | FI | P | 0 | 0 | 0 |
| 2005 | - | Guatemala (GTM) | G | FI | P | 5 | 0 | 0 |
| 2006 | - | Guatemala (GTM) | G | FI | P | 5 | 0 | 0 |
| 2007 | - | Guatemala (GTM) | G | FI | P | 0 | 0 | 22 |
| 2008 | - | Guatemala (GTM) | G | FI | P | 5 | 0 | 5 |
| 2009 | - | Guatemala (GTM) | G | FI | P | 0 | 0 | 0 |
| 2010 | - | Guatemala (GTM) | G | FI | P | 5 | 0 | 0 |
| 2011 | - | Guatemala (GTM) | G | FI | P | 5 | 0 | 0 |
| 2012 | - | Guatemala (GTM) | G | FI | P | 15 | 0 | 0 |
| 2013 | - | Guatemala (GTM) | G | FI | P | 5 | 0 | 0 |
| 2014 | - | Guatemala (GTM) | G | FI | P | 15 | 0 | 0 |
| 2015 | - | Guatemala (GTM) | G | FI | P | 62 | 0 | 0 |
| 2016 | - | Guatemala (GTM) | G | FI | P | 72 | 0 | 5 |
| 2017 | - | Guatemala (GTM) | G | FI | P | 60 | 0 | 10 |
| 2018 | - | Guatemala (GTM) | G | FI | P | 20 | 0 | 0 |
| 2019 | - | Guatemala (GTM) | G | FI | P | 33 | 0 | 20 |
| | | | | | | 660 | | 527 |

‹ Previous   1   2   Next ›

CLP_PC_023483



## UNHCR
The UN Refugee Agency

DONATE   **DO YOU NEED HELP?**

Media centre    Refworld    Data    Supply Chain    Careers


Search


Global (EN) ⌄

ABOUT US        EMERGENCIES        WHAT WE DO        NEWS AND STORIES        OUR PARTNERS        GET INVOLVED

# Refugee Data Finder

Key Indicators    Data Finder    Methodology    Data Insights

\* The data for the latest year (2022) is available up until the mid-year, except IDMC data on Internally Displaced People which is available until end-2021.

**Dataset**

○ **Population figures**
UNHCR data on displacement.

○ **Asylum applications**
Asylum claims submitted.

◉ **Asylum decisions**
Decisions taken on asylum claims.

○ **Solutions**
Solutions for refugees and IDPs.

○ **Internally displaced persons**
Internal displacement due to conflict and violence. (Source: IDMC)

○ **Palestine refugees under UNRWA's mandate**
Registered Palestine refugees (Source: UNRWA)

[ Next ↓ ]

**Display type**
Totals

**Population types**
All

**Year**
1951 - 2022\*

**Country of Origin**
Do not display

**Country of Asylum**
GUA

**Query permalink**

www.unhcr.org/refugee-statistics/download/?url=w0Auu0   [ Copy link ]

**Share**

[ Facebook ]   [ Twitter ]   [ Email ]

**Download**

[ Query data ]   [ All data ]

**Line chart**

**Bar chart**

| Year ↓↑ | Country of Origin | Country of Asylum | Authority | Stage of Procedure | Cases / Persons | Recognized | Complementary protection | Rejected |
|---|---|---|---|---|---|---|---|---|
| 2020 | - | Guatemala (GTM) | G | FI | P | 137 | 0 | 63 |
| 2021 | - | Guatemala (GTM) | G | FA | P | 38 | 0 | 49 |
| 2022\* | - | Guatemala (GTM) | G | FA | P | 143 | 0 | 262 |
| | | | | | | 660 | | 527 |

‹ Previous    1    2    Next ›

CLP_PC_023484





Share this page: f y  Search  Menu



**Query permalink**

www.unhcr.org/refugee-statistics/download/?url=eu79IV   Copy link

**Share**

Facebook   Twitter   Email

**Download**

Query data   All data

| Year ↧ | Country of Origin | Country of Asylum | Authority | Stage of Procedure | Cases / Persons | Recognized | Complementary protection | Rejected |
|---|---|---|---|---|---|---|---|---|
| 2000 | - | Honduras (HND) | G | FI | P | 0 | 0 | 12 |
| 2001 | - | Honduras (HND) | G | FI | P | 5 | 0 | 26 |
| 2002 | - | Honduras (HND) | G | FI | P | 10 | 0 | 54 |
| 2003 | - | Honduras (HND) | G | FI | P | 5 | 0 | 46 |
| 2004 | - | Honduras (HND) | G | FI | P | 0 | 0 | 15 |
| 2005 | - | Honduras (HND) | G | FI | P | 10 | 0 | 0 |
| 2006 | - | Honduras (HND) | G | FI | P | 0 | 0 | 25 |
| 2007 | - | Honduras (HND) | G | FI | P | 0 | 0 | 0 |
| 2008 | - | Honduras (HND) | G | FI | P | 5 | 0 | 0 |
| 2009 | - | Honduras (HND) | G | FI | P | 5 | 0 | 0 |
| 2010 | - | Honduras (HND) | G | FI | P | 0 | 0 | 0 |
| 2011 | - | Honduras (HND) | U | FI | P | 5 | 0 | 0 |
| 2012 | - | Honduras (HND) | G | FI | P | 0 | 0 | 0 |
| 2013 | - | Honduras (HND) | G | FI | P | 0 | 0 | 0 |
| 2014 | - | Honduras (HND) | G | FA | P | 15 | 0 | 0 |
| 2015 | - | Honduras (HND) | G | FA | P | 10 | 0 | 0 |
| 2016 | - | Honduras (HND) | G | FA | P | 0 | 0 | 0 |
| 2017 | - | Honduras (HND) | G | FI | P | 10 | 0 | 0 |
| 2018 | - | Honduras (HND) | G | FI | P | 5 | 0 | 0 |
| 2019 | - | Honduras (HND) | G | FI | P | 45 | 0 | 0 |
| | | | | | | 234 | | 178 |

‹ Previous   1  2   Next ›

CLP_PC_023485

# UNHCR
The UN Refugee Agency

DONATE **DO YOU NEED HELP?**

Media centre    Refworld    Data    Supply Chain    Careers

Search    Global (EN) ∨

ABOUT US    EMERGENCIES    WHAT WE DO    NEWS AND STORIES    OUR PARTNERS    GET INVOLVED

## Refugee Data Finder

Key Indicators    Data Finder    Methodology    Data Insights

\* The data for the latest year (2022) is available up until the mid-year, except IDMC data on Internally Displaced People which is available until end-2021.

### Dataset

○ **Population figures**
UNHCR data on displacement.

○ **Asylum applications**
Asylum claims submitted.

⦿ **Asylum decisions**
Decisions taken on asylum claims.

○ **Solutions**
Solutions for refugees and IDPs.

○ **Internally displaced persons**
Internal displacement due to conflict and violence.
(Source: IDMC)

○ **Palestine refugees under UNRWA's mandate**
Registered Palestine refugees (Source: UNRWA)

**Next ↓**

**Display type**
Totals

**Population types**
All

**Year**
1951 - 2022*

**Country of Origin**
Do not display

**Country of Asylum**
HON

**Query permalink**

www.unhcr.org/refugee-statistics/download/?url=eu79IV    Copy link

**Share**

Facebook    Twitter    Email

**Download**

Query data    All data

Line chart          Bar chart

| Year ⬇ | Country of Origin | Country of Asylum | Authority | Stage of Procedure | Cases / Persons | Recognized | Complementary protection | Rejected |
|---|---|---|---|---|---|---|---|---|
| 2020 | - | Honduras (HND) | G | FI | P | 12 | 0 | 0 |
| 2021 | - | Honduras (HND) | G | FI | P | 81 | 0 | 0 |
| 2022* | - | Honduras (HND) | G | FI | P | 11 | 0 | 0 |
| | | | | | | 234 | | 178 |

‹ Previous    1    **2**    Next ›

✉ Feedback

© UNHCR 2001-2023

Media centre
Refworld
Privacy policy
Report misconduct or abuse
Frequently Asked Questions

Careers
Contact us
Data
Terms & conditions of use

Sign up for email updates

Follow: 🐦 f ▶ 📷 ♪ in

CLP_PC_023486

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528



October 29, 2021

MEMORANDUM TO:     Tae D. Johnson
                   Acting Director
                   U.S. Immigration and Customs Enforcement

                   Troy A. Miller
                   Acting Commissioner
                   U.S. Customs and Border Protection

                   Ur M. Jaddou
                   Director
                   U.S. Citizenship and Immigration Services

                   Robert Silvers
                   Under Secretary
                   Office of Strategy, Policy, and Plans

FROM:              Alejandro N. Mayorkas
                   Secretary

SUBJECT:           **Termination of the Migrant Protection Protocols**

On January 25, 2019, then-Secretary of Homeland Security Kirstjen Nielsen issued a memorandum entitled "Policy Guidance for Implementation of the Migrant Protection Protocols." On February 2, 2021, President Biden issued Executive Order (EO) 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border.* In this Executive Order, President Biden directed the Secretary of Homeland Security "to promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols." After completing a comprehensive review as directed by EO 14010, I concluded that the Migrant Protection Protocols (MPP) should be terminated and, on June 1, 2021, issued a memorandum to that effect (the "June 1 memo").

1

CLP_PC_023691

On August 13, 2021, the U.S. District Court for the Northern District of Texas determined that the June 1 memo was not issued in compliance with the Administrative Procedure Act (APA) because it failed to address all the relevant considerations. *See Texas v. Biden*, No. 2:21-cv-067, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021). As a result, the District Court vacated the June 1 memo in its entirety and remanded the matter to the Department for further consideration. *Id.* at *27. The District Court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA." *Id.* (emphasis in original). The Department is fully complying with the District Court's order. At the same time, the Department has filed a notice of appeal and continues to vigorously contest several of the District Court's conclusions.

Pursuant to the District Court's remand and in continuing compliance with the President's direction in EO 14010, I have once more assessed whether MPP should be maintained, terminated, or modified in a variety of different ways. In conducting my review, I have studied multiple court decisions, filings, and declarations related to MPP; considered relevant data regarding enrollments in MPP, encounters at the border, and outcomes in removal proceedings; reviewed previous Departmental assessments of MPP, as well as news reports and publicly available sources of information pertaining to conditions in Mexico; met with a broad and diverse array of internal and external stakeholders, including officials from across the federal government working on border management, state and local elected officials from across the border region, border sheriffs and other local law enforcement officials, and representatives from nonprofit organizations providing legal access and humanitarian aid across the southwest border; and considered the impact of other Administration initiatives related to immigration and the southern border. I also examined considerations that the District Court determined were insufficiently addressed in the June 1 memo, including claims that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, cause the Department to fail to comply with alleged detention obligations under the Immigration and Nationality Act, impose undue costs on states, and put a strain on U.S.-Mexico relations.

After carefully considering the arguments, evidence, and perspectives presented by those who support re-implementation of MPP, those who support terminating the program, and those who have argued for continuing MPP in a modified form, I have determined that MPP should be terminated. In reaching this conclusion, I recognize that MPP likely contributed to reduced migratory flows. But it did so by imposing substantial and unjustifiable human costs on the individuals who were exposed to harm while waiting in Mexico. The Biden-Harris Administration, by contrast, is pursuing a series of policies that disincentivize irregular migration while incentivizing safe, orderly, and humane pathways. These policies—including the ongoing efforts to reform our asylum system and address the root causes of migration in the region—seek to tackle longstanding problems that have plagued our immigration system for decades and achieve systemic change. Once fully implemented, I believe these policies will address migratory flows as effectively, in fact more effectively, while holding true to our nation's values.

To reiterate what the President has stated previously, the United States is a nation with borders and laws that must be enforced. It is also a nation of immigrants. This Administration is, as a result, committed to the twin goals of securing our borders and offering protection to those fleeing persecution and torture. MPP is neither the best, nor the preferred, strategy for achieving

2

either of these goals. Significant evidence indicates that individuals awaiting their court hearings in Mexico under MPP were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited by exploiting migrants' vulnerabilities. It is possible that such humanitarian challenges could be lessened through the expenditure of significant government resources currently allocated to other purposes. Ultimately, however, the United States has limited ability to ensure the safety and security of those returned to Mexico. Other significant issues with MPP, including the difficulties in accessing counsel and traveling to courts separated by an international border, are endemic to the program's design.

In reaching my determination, I have carefully considered what I deem to be the strongest argument in favor of retaining MPP: namely, the significant decrease in border encounters following the determination to implement MPP across the southern border. Of course, correlation does not equal causation and, even here, the evidence is not conclusive. I have nonetheless presumed, for the sake of this review, that MPP resulted in a significant decrease in irregular border crossings and persons approaching the U.S. border to pursue non-meritorious asylum claims. I still conclude that the benefits do not justify the costs, particularly given the way in which MPP detracts from other regional and domestic goals, foreign-policy objectives, and domestic policy initiatives that better align with this Administration's values.

Importantly, the effective management of migratory flows requires that we work with our regional partners to address the root causes that drive migrants to leave their countries and to tackle this challenge before it arrives at our border. This is a shared responsibility of all countries across the region. MPP distracts from these regional efforts, focusing resources and attention on this singular program rather than on the work that is needed to implement broader and more enduring solutions.

Efforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration. This was true under the previous implementation of MPP, and it is even more true today given the shared belief that the program should not be implemented without, at the very least, significant improvements. Notably, Mexico has made clear that it will not agree to accept those the United States seeks to return to Mexico under MPP unless substantial improvements are made to the program. But these much-needed efforts to enhance humanitarian protections for those placed in MPP are resource-intensive, exacerbating one of the flaws of the program: the concentration of resources, personnel, and aid efforts on the northern border of Mexico rather than on broader regional assistance efforts that would more effectively and systematically address the problem of irregular migration and better protect our border.

Moreover, the personnel required to adequately screen MPP enrollees to ensure they are not returned to persecution or torture in Mexico, process them for court hearings, and manage their cases pulls resources from other priority efforts, including the ongoing efforts to implement effective, fair, and durable asylum reforms that reduce adjudication delays and tackle the immigration court backlog. Both the Dedicated Docket, designed so that immigration judges can adjudicate cases within 300 days, and the proposed Asylum Officer Rule, which would transfer the initial responsibility for adjudicating asylum claims from immigration judges to USCIS asylum officers to produce timely and fair decision-making, are expected to yield transformative

3

and lasting changes to the asylum system.  MPP, which can require unproductive, redundant screenings per case given the many different times individuals are returned to Mexico during the pendency of a single removal proceeding, diverts asylum officers and immigration judges away from these priority efforts.  MPP not only undercuts the Administration's ability to implement critically needed and foundational changes to the immigration system, but it also fails to provide the fair process and humanitarian protections that all persons deserve.

Having assessed the benefits and costs of the previous implementation of MPP, including how the program could potentially be improved, I have concluded that there are inherent problems with the program that no amount of resources can sufficiently fix.  Others cannot be addressed without detracting from key Administration priorities and more enduring solutions.

It is, as a result, my judgment that the benefits of MPP are far outweighed by the costs of continuing to use the program on a programmatic basis, in whatever form.  For the reasons detailed more fully in the attached memorandum, the contents of which are adopted and incorporated into the decision contained here, I am hereby terminating MPP.  Effective immediately, I hereby supersede and rescind the June 1 memorandum, Secretary Nielsen's January 25, 2019 memorandum, and any other guidance or other documents prepared by the Department to implement MPP.  The Department will continue complying with the *Texas* injunction requiring good-faith implementation and enforcement of MPP.  But the termination of MPP will be implemented as soon as practicable after a final judicial decision to vacate the *Texas* injunction.

4

CLP_PC_023694

**Belize**
Belize

✕

*Last Update: Reissued with updates to health information.*

Exercise increased caution in Belize due to **crime**.  Some areas have increased risk.  Please read the entire Travel Advisory.

**Country Summary**: Violent crime – such as sexual assault, home invasions, armed robberies, and murder – are common even during daylight hours and in tourist areas. A significant portion of violent crime is gang related. Due to high crime, travelers are advised to exercise caution while traveling to the south side of Belize City. Local police lack the resources and training to respond effectively to serious criminal incidents. Most crimes remain unresolved and unprosecuted.

Read the country information page for additional information on travel to Belize.

If you decide to travel to Belize:

Read the Department of State's COVID-19 page before planning any international travel, and read the Embassy COVID-19 page for country-specific COVID-19 information.

- Be aware of your surroundings.
- Avoid walking or driving at night.
- Do not physically resist any robbery attempt.
- Be extra vigilant when visiting banks or ATMs.
- Do not display signs of wealth, such as wearing expensive watches or jewelry.
- Enroll in the Smart Traveler Enrollment Program (STEP) to receive Alerts and make it easier to locate you in an emergency.
- Follow the Department of State on Facebook and Twitter.
- Review the Country Security Report for Belize.
- Prepare a contingency plan for emergency situations. Review the Traveler's Checklist.
- Visit the CDC page for the latest Travel Health Information related to your travel.

**Belize City – Level 3: Reconsider Travel**

U.S. citizens should avoid traveling to Belize City. Historically much of the violent crime in Belize occurs in the Southside of Belize City and is gang related. This area (south of Haulover Creek Canal and continuing south to Fabers Road) does not overlap the typical tourism areas.  All visitors

CLP_PC_023726

should maintain an elevated level of due diligence and reduce their exposure to crime-related risks by practicing good safety and security practices.

Embassy Messages    Alerts

Weather Alert – U.S. Embassy Belmopan, Belize November 2, 2022    Wed, 02 Nov 2022

Weather Alert – U.S. Embassy Belmopan, Belize November 1, 2022    Wed, 02 Nov 2022

Fact Sheet: Joined by Allies and Partners, the United States Imposes Devastating Costs on Russia    Thu, 24 Feb 2022

Statement by President Biden on Russia's Unprovoked and Unjustified Attack on Ukraine    Thu, 24 Feb 2022

View Alerts and Messages Archive

## Quick Facts

**PASSPORT VALIDITY:**

Length of stay

**BLANK PASSPORT PAGES:**

One page per stamp

**TOURIST VISA REQUIRED:**

Not required for stays of 30 days or less

**VACCINATIONS:**

None

**CURRENCY RESTRICTIONS FOR ENTRY:**

$5,000

**CURRENCY RESTRICTIONS FOR EXIT:**

$5,000

CLP_PC_023727

Case 1:23-cv-01843-TSC     Document 123     Filed 03/23/26     Page 388 of 721

**ALL +/—**

Embassies and Consulates ⊕

Destination Description ⊕

Entry, Exit and Visa Requirements ⊕

Safety and Security ⊖

Belize is rated high for crime and has one of the highest per capita murder rates in the world. Gang members and other criminals use violent means to resolve disputes. Visitors should exercise caution throughout Belize, particularly in the south side of Belize City and remote areas along Belize's borders due to high crime.

Crime: Crime may occur anywhere in Belize, and criminals frequently target tourists, including those at resorts and on the roads and river ways. Crime, including sexual assault, armed robbery, and murder remains high and is distributed evenly throughout the country. Sexual harassment and/or assault of persons traveling alone or in small groups have been reported.

Most crimes remain unresolved and unprosecuted. A lack of capacity, resources, and training impedes the ability of local police to effectively investigate crime and apprehend offenders.

Thefts of cash and credit cards happen frequently in some areas of Belize. It is believed several credit card fraud rings are currently active in Belize, particularly in San Pedro.

Scams occur in Belize, especially in resort areas. Tourists, in general, are particularly vulnerable to these crimes, resulting in visitors being pick-pocketed, robbed and/or extorted. See the Department of State and the FBI  pages for information on scams.

Victims of Crime: Report crimes to the local police by dialing 911 and contact the U.S. Embassy at 822-4011. Remember that local authorities are responsible for investigating and prosecuting crimes. While the Embassy stands ready to assist the Belize authorities with any requests for technical assistance, the Embassy is not a law enforcement agency, cannot provide U.S. citizens with protection or investigate crimes against U.S. citizens, and has no jurisdiction to intervene in police or judicial processes. See our

CLP_PC_023728

webpage on help for U.S. victims of crime overseas.

We can:

- help you find appropriate medical care
- assist you in reporting a crime to the police
- contact relatives or friends with your written consent
- explain the local criminal justice process in general terms
- provide a list of local attorneys
- provide our information on victim's compensation programs in the U.S.
- provide an emergency loan for repatriation to the United States and/or limited medical
- support in cases of destitution
- help you find accommodation and help arrange flights home
- replace a stolen or lost passport

**Domestic Violence:** U.S. citizen victims of domestic violence may contact the U.S. Embassy in Belize for assistance.

**Tourism:** The tourism industry is unevenly regulated, and safety inspections for equipment and facilities may not commonly occur. Hazardous areas/activities are not always identified with appropriate signage, and staff may not be trained or certified either by the host government or by recognized authorities in the field. In the event of an injury, appropriate medical treatment is typically available only in/near major cities. First responders are generally unavailable outside of major cities to provide urgent medical treatment. U.S. citizens are encouraged to purchase medical evacuation insurance. See our webpage for more information on insurance providers for overseas coverage.

## Local Laws & Special Circumstances



## Health

## Travel and Transportation

## Fact Sheet

Please see Fact Sheet for this country/area.

CLP_PC_023729

## For additional travel information

- Enroll in the Smart Traveler Enrollment Program (STEP) to receive security messages and make it easier to locate you in an emergency.
- Call us in Washington, D.C. at 1-888-407-4747 (toll-free in the United States and Canada) or 1-202-501-4444 (from all other countries) from 8:00 a.m. to 8:00 p.m., Eastern Standard Time, Monday through Friday (except U.S. federal holidays).
- See the State Department's travel website for the Worldwide Caution and Travel Advisories.
- Follow us on Twitter and Facebook.
- See traveling safely abroad for useful travel tips.

## International Parental Child Abduction

Belize was cited in the State Department's 2022 Annual Report to Congress on International Child Abduction for demonstrating a pattern of non-compliance with respect to international parental child abduction. Review information about International Parental Child Abduction in Belize. For additional IPCA-related information, please see the International Child Abduction Prevention and Return Act (ICAPRA) report.

Last Updated: February 28, 2023

CLP_PC_023730

# Colombia Travel Advisory

Travel Advisory
January 4, 2023

Colombia - Level 3: Reconsider Travel



*Reissued with updates to high-risk areas.*

Reconsider travel due to **crime** and **terrorism**. Exercise increased caution due to **civil unrest** and **kidnapping**. Some areas have increased risk. Read the entire Travel Advisory.

**Do Not Travel to**:

- Arauca, Cauca (excluding Popayán), and Norte de Santander departments due to **crime** and **terrorism**.

- The Colombia-Venezuela border region due to **crime, kidnapping**, and risk of detention when crossing into Venezuela from Colombia.

**Country Summary**: Violent crime, such as homicide, assault, and armed robbery, is widespread. Organized criminal activities, such as extortion, robbery, and kidnapping, are common in some areas.

The National Liberation Army (ELN), Revolutionary Armed Forces of Colombia - People's Army (FARC-EP), and Segunda Marquetalia terrorist organizations continue operating and launching attacks in Colombia. They may attack with little or no warning, targeting tourist locations, transportation hubs, markets/shopping malls, local government facilities, police stations, military facilities, hotels, clubs, restaurants, places of worship, parks, major sporting and cultural events, educational institutions, airports, and other public areas. While terrorists have not specifically targeted U.S. citizens, the attacks could result in unintended victims.

Demonstrations occur regularly throughout the country. Large public demonstrations can take place for a variety of political and economic issues

CLP_PC_023780

for a variety of political and economic issues. Demonstrations can shutdown roads and major highways, often without prior notice or estimated reopening timelines. Road closures may significantly reduce access to public transportation and may disrupt travel both within and between cities. Nationwide protests in 2021 resulted in fatalities and injuries.

U.S. government employees must adhere to the noted restrictions:

- U.S. government employees are not permitted to travel by road between most major cities.

- Colombia's land border areas are off-limits to U.S. government personnel unless specifically authorized.

- U.S. government employees may not use motorcycles

- U.S. government employees may not hail street taxis or use public transportation.

Read the country information page for additional information on travel to Colombia.

If you decide to travel to Colombia:

- Read the Department of State's COVID-19 page before planning any international travel, and read the Embassy COVID-19 page for country-specific COVID-19 information.

- Avoid protest areas and crowds.

- Monitor local media for breaking events and adjust your plans based on new information.

- Keep a low profile.

- Be aware of your surroundings.

- Enroll in the Smart Traveler Enrollment Program (STEP) to receive Alerts and make it easier to locate you in an emergency.

- Follow the Department of State on Facebook ☐ and Twitter ☐.

- Review the Country Security Report for

CLP_PC_023781

- Review the <u>Country Security Report</u> for Colombia.

- Prepare a contingency plan for emergency situations. Review the <u>Traveler's Checklist</u>.

### Arauca, Cauca, and Norte de Santander Departments – Level 4: Do Not Travel

Violent crime, including armed robbery and homicide, is widespread.

Terrorist groups are active in some parts.

The U.S. government has limited ability to provide emergency services to U.S. citizens as U.S. government-personnel travel to these areas is severely restricted due to security concerns.

### Colombia - Venezuela Border – Level 4: Do Not Travel

U.S. citizens are advised not to travel to the border of Colombia and Venezuela.  U.S. citizens are at risk of detention when crossing into Venezuela from Colombia. The Colombia-Venezuela border is not clearly marked, and U.S. citizens should not go near the border due to the risk of crossing into Venezuela accidentally. U.S. citizens attempting to enter Venezuela without a visa have been charged with terrorism and other serious crimes and detained for long periods.   For more information, see the Venezuela Travel Advisory.

Visit our website for <u>Travel to High-Risk Areas</u>.

CLP_PC_023782

CLP_PC_023828

# Ecuador Travel Advisory

| | | |
|---|---|---|
| Travel Advisory November 4, 2022 | Ecuador - Level 2: Exercise Increased Caution |  |

*Last Update:  Reissued with updates to security situation in Guayaquil.*

Exercise increased caution in Ecuador due to **civil unrest** and **crime**.  Some areas have increased risk. Read the entire Travel Advisory.

Reconsider travel to:

- Guayaquil **north** of Portete de Tarquí Avenue due to **crime**.

Do not travel to:

- Carchi, Sucumbíos, and the northern part of Esmeraldas provinces, including Esmeraldas city, due to **crime**.
- Guayaquil, **south** of Portete de Tarquí Avenue, due to **crime**.

**Country Summary**: Crime is a widespread problem in Ecuador. Violent crime, such as murder, assault, express kidnapping, and armed robbery, is common. Transnational criminal organizations and gangs operate in Carchi, Sucumbíos, and the northern part of Esmeraldas provinces, as well as in Guayaquil, south of Portete de Tarquí Avenue.

Demonstrations occur regularly throughout the country. Public demonstrations can take place for a variety of political and economic issues. Demonstrations can cause the shutdown of local roads and major highways, often without prior notice or estimated reopening timelines.  Road closures may significantly reduce access to public transportation and airports and may disrupt travel both within and between cities.

Read the country information page for additional

CLP_PC_023829

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 396 of 721

Read the Country Information page for additional information on traveling to Ecuador.

If you decide to travel to Ecuador:

- Read the Department of State's COVID-19 page before planning any international travel, and read the Embassy COVID-19 page for country-specific COVID-19 information.

- Enroll in the Smart Traveler Enrollment Program (STEP) to receive Alerts and make it easier to locate you in an emergency.

- Follow the Department of State on Facebook ☑, Twitter ☑, and Instagram ☑

- Review the Country Security Report for Ecuador.

- Prepare a contingency plan for emergency situations. Review the Traveler's Checklist.

- Visit the CDC page for the latest Travel Health Information ☑ related to your travel.

## Carchi, Sucumbíos, and northern Esmeraldas Provinces – Level 4: Do Not Travel

Transnational crime groups operating in Esmeraldas province have engaged in violent crime and killed local citizens in addition to carrying out bombings targeting Ecuadorian military and law enforcement.

The U.S. government is limited in its ability to provide emergency services to U.S. citizens in the Colombian border area, as U.S. government personnel cannot travel to the provinces of Esmeraldas, Carchi, and Sucumbíos without permission from the Embassy's security office. However, U.S. government personnel are permitted to travel to the northern bank of the Napo River in Sucumbíos, an area approximately four miles wide, and the portion of Esmeraldas province that is south of Esmeraldas city.

## Guayaquil, north of Portete de Tarquí Avenue – Level 3: Reconsider Travel

Transnational criminal groups and local gangs operating in Guayaquil have carried out a series of

CLP_PC_023830

violent crimes in the city, to include several murders, targeted assassinations, armed robberies, bombings, and assaults. Criminals have conducted indiscriminate attacks without warning on public spaces across the city. U.S. government personnel have been directed to exercise extreme caution and maintain increased vigilance when traveling in and around Guayaquil.

### Guayaquil, south of Portete de Tarquí Avenue – Level 4: Do Not Travel

Due to a sustained high level of violent crime in Guayaquil south of Portete de Tarqí Avenue, U.S. government personnel cannot travel to this area without permission from the Embassy's security office. The U.S. government is limited in its ability to provide emergency services to U.S. citizens in Guayaquil south of Portete de Tarquí Avenue.

Visit our website for Travel to High-Risk Areas.

CLP_PC_023831

**El Salvador**
Republic of El Salvador

Reconsider travel to El Salvador due to crime.

... [READ MORE]

Embassy Messages    Alerts

Information for U.S. Citizens and Lawful Permanent Residents    Mon, 13 Mar 2023

Travel Advisory: El Salvador Updated Travel Advisory- Level 3 (Reconsider Travel)    Mon, 06 Mar 2023

Weather (Volcano) Alert – U.S. Embassy San Salvador, El Salvador (November 28, 2022)    Mon, 28 Nov 2022

Travel Alert – U.S. Embassy San Salvador, El Salvador (November 17, 2022)    Thu, 17 Nov 2022

View Alerts and Messages Archive

## Quick Facts

**PASSPORT VALIDITY:**

Passport must be valid at time of entry.

**BLANK PASSPORT PAGES:**

At least one blank page.

**TOURIST VISA REQUIRED:**

A visa is not required for stays under 90 days, but you must purchase a tourist card for 12 USD upon arrival. The card is valid for 90 days. If your U.S. passport shows you were born

**VACCINATIONS:**

None, check recommendation in Health Section.

**CURRENCY RESTRICTIONS FOR ENTRY:**

Currency in excess of 10,000 USD must be declared.

**CURRENCY RESTRICTIONS FOR EXIT:**

Currency in excess of 10,000 USD must be declared.

CLP_PC_023874

in El Salvador, you do not need
the tourist card.

ALL **+/−**

## Embassies and Consulates   ⊕

## Destination Description   ⊕

## Entry, Exit and Visa Requirements   ⊕

## Safety and Security   ⊖

The crime threat level in El Salvador is critical and our Travel Advisory warns U.S. citizens of the high rates of crime and violence. See below for additional information on crime.

Dial 911 for emergency assistance in El Salvador.

**Protests:** Demonstrations, sit-ins, and protests may occur at any time or place, but are most frequent in and around the capital San Salvador. Avoid demonstrations, because even apparently peaceful ones may turn violent. Follow local news media reports or contact the U.S. Embassy for up-to-date information.

**Crime:** El Salvador has a high level of homicides and crimes such as extortion, assault, and robbery are common.

Typical crimes in El Salvador include extortion, mugging, highway assault, home invasion, and car theft. Gangs have traditionally controlled a majority of the space in El Salvador, even if their presence is not visible to outsiders, and exist by extorting money from businesses, travelers, residents and others living in or passing through their territory. Non-compliance or resistance to gang demands often results in violence. This activity can occur even in wealthy and relatively peaceful areas. Home invasions and/or burglaries of residences during broad daylight occur in areas of San Salvador; in some cases, gangs simply expel residents from their homes

CLP_PC_023875

and take over the property for criminal use. U.S. citizens who visit El Salvador for extended periods may be at higher risk for extortion demands.

El Salvador has tens of thousands of known gang members from several gangs including Mara Salvatrucha (MS-13) and 18th Street (M18). Gang members have been known to frequently engage in violence or use deadly force if resisted. The gangs, or "maras," customarily have concentrated on extortion, violent street crime, carjacking, narcotics and arms trafficking, and murder for hire. Extortion is a common crime in El Salvador.

Many suspected gang members have been detained since March 27, 2022 under a State of Exception. Reported crimes have reduced since that time, but crime in El Salvador remains at critical levels.

U.S. Embassy personnel are advised to walk only in known, lit, well-secured locations. Criminals may be active even in popular parks with a security presence.

Exercise caution at all times and practice good personal security procedures throughout your stay.

- Always travel in groups.
- Avoid remote or isolated locations.
- Avoid displaying or carrying valuables in public places.
- Avoid stopping at tourist overlooks, which may be targeted by criminals.
- Never leave passports and other important documents in vehicles.
- In public, remain alert and avoid the use of cell phones and earphones. These reduce your self-awareness and provide easy targets for crimes of opportunity.
- Do not travel on public transportation, especially buses.
- Use only radio-dispatched taxis, taxis stationed in front of major hotels, or internet-based rideshare services.
- Choose banks or ATMs inside secure, guarded areas and remain alert.
- Remain vigilant even in well-known restaurants, hotels, and retailers within San Salvador.
- Credit card cloning and similar fraud can occur; keep your card in sight.
- Be aware of your surroundings when traveling by car. Navigation apps seeking the quickest routes may direct you off safer routes into dangerous areas.
- Drive with your doors locked and windows raised.
- Avoid travel outside of major metropolitan areas after dark and on unpaved roads at all times because of hazardous road conditions and criminal activity.
- Criminals who threaten violence typically use violence without hesitation if victims do not comply instantly. Conversely, the Embassy has no reports of serious injury or worse among victims who comply.

CLP_PC_023876

who comply.

Armed robberies of climbers and hikers in El Salvador's national parks can occur. Engage the services of a local guide certified by the national or local tourist authority when hiking in back-country areas and within the national parks. The tourist police force (POLITUR) provides security and assistance to tourists. Officers are located in 19 tourist destinations. Beware of hikes and guides in locations without an official guide service or police presence, regardless of advice found on the Internet.

A majority of serious crimes in El Salvador are never solved. The Government of El Salvador lacks sufficient resources to properly investigate and prosecute cases and to deter violent crime.

Do not purchase counterfeit and pirated goods, even if they are widely available. Not only are counterfeit goods subject to seizure upon entry in the United States, but if you purchase them, you may also be exposed to legal liability in El Salvador.

**Victims of Crime:** If you or someone you know becomes a victim of crime, report it to the local police by calling 911 and to the U.S. Embassy. Local authorities are responsible for investigating and prosecuting the crime.

The U.S. Embassy can:

- Replace a stolen or lost passport
- Help you find appropriate medical care
- Guide you on how to report a crime to police
- Contact relatives or friends with your written consent
- Explain the local criminal justice process in general terms
- Provide a list of local attorneys
- Provide information on victim's compensation programs in the U.S.
- Provide an emergency loan for repatriation to the United States and/or limited medical support in cases of destitution
- Help you find accommodation and arrange flights home

**Domestic Violence:** U.S. citizen victims of domestic violence may contact the U.S. Embassy for assistance. If you are in immediate danger, call 911.

**Tourism:** The tourism industry is unevenly regulated, and safety inspections for equipment and facilities do not commonly occur. Hazardous areas/activities are not always identified with appropriate signage, and staff may not be trained or certified either by the host government or by recognized authorities in the field. In the event of an injury, appropriate medical treatment is typically available only in/near major cities. First responders are generally unable to access areas outside of major cities and to provide urgent medical treatment. U.S. citizens are encouraged to purchase medical evacuation insurance. See our webpage for more information on insurance providers for overseas coverage.

CLP_PC_023877

**Watersports:** Strong undertows and currents make swimming at El Salvador's Pacific Coast beaches extremely dangerous even for experienced swimmers. Government lifeguards are generally present at most public beaches but are not always present at private beaches. Follow all instructions of any lifeguard, and do not enter the water at any location at which red warning flags are displayed to signify dangerous conditions. In addition, El Salvador's search and rescue capabilities are limited, and access to medical resources in beach areas is inadequate. Carefully assess the potential risks of recreational water activities and consider your physical capabilities and skills. Be aware that drinking alcohol and swimming can be a deadly combination.

## Local Laws & Special Circumstances       ⊕

## Health       ⊕

## Travel and Transportation       ⊕

## Fact Sheet

Please see Fact Sheet for this country/area.

## For additional travel information

- Enroll in the Smart Traveler Enrollment Program (STEP) to receive security messages and make it easier to locate you in an emergency.
- Call us in Washington, D.C. at 1-888-407-4747 (toll-free in the United States and Canada) or 1-202-501-4444 (from all other countries) from 8:00 a.m. to 8:00 p.m., Eastern Standard Time, Monday through Friday (except U.S. federal holidays).
- See the State Department's travel website for the Worldwide Caution and Travel Advisories.
- Follow us on Twitter⧉ and Facebook⧉.
- See traveling safely abroad for useful travel tips.

## International Parental Child Abduction

CLP_PC_023878

Review information about International Parental Child Abduction in El Salvador.  For additional IPCA-related information, please see the International Child Abduction Prevention and Return Act (ICAPRA) report.

Last Updated: October 6, 2022

CLP_PC_023879



Overseas Security Advisory Council
Bureau of Diplomatic Security
U.S. Department of State

8/15/2022 | 🗎 Country Security Report
👁 4102 all time - 155 last 7 days

# Guatemala Country Security Report

## Travel Advisory

The current U.S. Department of State Travel Advisory at the date of this report's publication assesses that travelers should reconsider travel to Guatemala due to crime. Review OSAC's report, Understanding the Consular Travel Advisory System.

The Institute for Economics & Peace Global Peace Index 2021 ⧉ ranks Guatemala 111 out of 163 worldwide, rating the country as being at a medium state of peace.

## Crime Environment

The U.S. Department of State has assessed Guatemala City as being a critical-threat location for crime directed at or affecting official U.S. government interests.

The U.S. Department of State has included a Crime "C" Indicator on the Travel Advisory for Guatemala, indicating that there may be widespread violent crime and/or organized crime present in the country, and/or that local law enforcement may have limited ability to respond to serious crimes.

The crime emergency lines in Guatemala are **110** and **120**. Review the State Department's Crime Victims Assistance brochure.

## Crime: General Threat

Crime in Guatemala stems from many sources, its impact magnified by corruption, an inadequate justice system, and the prevalence of gang and narcotrafficking activity across the country. The most common crimes against expatriates and foreigners include petty theft and armed robbery.

Be vigilant of surroundings and report any crime incidents promptly to the police. Theft and armed robbery are the most common crimes committed against U.S. travelers. Members of the expatriate community can fall victim to these crimes due to a perceived display of affluence, or by not following sound personal security practices. However, one emerging criminal threat is violence stemming from gang rivalries and extortion occurring in areas controlled by gangs.

A common trend in the commission of armed robberies is the use of motorcycles. Typically, two men on a motorcycle accost the driver of a car or pedestrian and demand valuables and cell phones. Often, a second pair of armed individuals accompany the assailants, functioning as lookouts. If the assailants encounter any resistance, they escalate the situation through extreme violence (e.g., stabbings, shootings). The use of motorcycles allows the assailants to flee quickly; police rarely apprehend them. Additionally, pickpockets and purse-snatchers are active in all cities and tourist sites. Petty criminals frequently target high-traffic tourist areas for petty crime. Markets, national parks, crowded venues, and shopping areas are all major areas of operation for criminals.

Guatemala has historically had one of the highest violent crime rates in Central America. By the end of 2021 the rate was 16.6%, an 8.5% increase over 2020's rate of 15.3%, more than double that of the United States. The police reported 2,839 homicides in 2021, a figure slightly higher than the 2,574 homicides reported for 2020. The number of reported missing persons also increased, with a total of 2,597 reported cases compared to 1,825 the year prior. Note: police do not record crimes as homicides if the victim left the crime scene alive but subsequently died from injuries elsewhere.

Despite the historical downward trend in homicides, Guatemala remains among the most dangerous countries in the world. Endemic poverty, an abundance of weapons, a legacy of societal conflict, and the presence of organized criminal gangs like Barrio 18 (18th Street) and Mara Salvatrucha (MS13) all contribute to violent crime. Guatemala's high murder rate is driven by narcotrafficking activity, gang-related violence, a heavily armed population, and a law enforcement and judicial system unable to hold criminals accountable.

The two primary gangs in Guatemala terrorize businesses and private citizens through targeted extortion attempts. Such crimes are common and affect all sectors of society, with public bus and taxi drivers being the most common victims. However, local small businesses, the U.S. private sector, and local national employees of the U.S. Embassy were all frequent targets. The gangs also target schoolchildren, street vendors, and local residents. Although in recent years the number of reported extortions has increased, most incidents go unreported and there is uncertainty about the true magnitude of the problem. Further complicating the widespread issue of extortion is the presence of persons who imitate gang members to threaten and receive extortion payments, despite not belonging to gangs. Gang members usually punish non-compliant victims with violent assault or murder and victimize their family members as punishment.

Extortion tactics have expanded using social media in recent years. Gang members and imitators will use various types of social media to threaten their targets and receive extortion payments. The police reported 15,293 cases of extortion in 2021, slighlty more than the 15,051 in 2020 but less than the 16,733 in 2019.

Home invasions by armed groups continue to occur in upscale neighborhoods. There were 590 reported residential robberies in 2021 compared to 517 in 2020, a 14.1% increase. Generally speaking, crime tended upwards in 2021 as the country emerged from the COVID-19 shutdowns of 2020. Thieves gain access by enticing a resident to open the door for a delivery or rushing in when family or staff open the door. Household staff may also sometimes be complicit in home invasions, acting as insider threats and informants to criminals.

CLP_PC_024105

# PANAMA 2021 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Panama is a multiparty constitutional democracy.  In 2019 voters chose Laurentino Cortizo Cohen as president in national elections that international and domestic observers considered generally free and fair.

The country has no military forces.  The Panama National Police is principally responsible for internal law enforcement and public order, and the National Border Service handles border security.  The country also has a National Aeronaval Service that is responsible for carrying out naval and air operations.  Civilian authorities maintained effective control over the security forces.  There were credible reports that members of security forces committed some abuses.

Significant human rights issues included credible reports of:  serious problems with the independence of the judiciary; serious restrictions on free expression and media, including censorship and the existence of criminal libel laws; and serious government corruption.

Impunity among security forces existed due to weak and decentralized internal control mechanisms for conduct and enforcement.  Corruption was a serious problem in the executive, judicial, and legislative branches as well as in the security forces.  The law provides criminal penalties for corruption by officials, but the government generally did not implement the law effectively.

## Section 1. Respect for the Integrity of the Person

### a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were no reports the government or its agents committed arbitrary or unlawful killings.

CLP_PC_024113

## f. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to refugees, asylum seekers, stateless persons, and other persons of concern.

International organization and NGO partners reported that there continued to be barriers to integration of asylum seekers and refugees, including, but not limited to, lack of work opportunities and barriers preventing children in these populations from attending school.

**Access to Asylum:** The law provides for asylum or refugee status, and the government has established a system for providing protection to refugees. Despite the lifting of movement restrictions, the Panamanian National Office for Attention to Refugees (ONPAR) received a significantly reduced number of asylum and refugee applications. ONPAR reduced its backlog of asylum cases from nearly 20,000 to 11,000, but most cases were dismissed or asylum seekers had left the country. Admission and approval rates for asylees remained extremely low during the year (less than 1 percent). ONPAR processed initial asylum applications. Once a case is approved for consideration, the application is referred to the National Commission for Refugees, an interagency committee that decides the final status of every case. This committee meets only a few times a year and adjudicates fewer than 50 cases annually. The entire process could take up to three years. Those initially admitted into the process by ONPAR may obtain work authorization, but the waiting period also normally took a year and did not guarantee final approval.

The government approved and implemented a protocol for identification, referral, and attention for minors requiring international protection; however, the institutional protocol for protecting minors who migrate was pending implementation approval.

The government continued to manage camps in the Darien and Chiriqui Provinces that provide food, shelter, and medical assistance to migrants. Conditions in the camps remained difficult. At least one camp did not have regular access to potable

CLP_PC_024122

water and at times had unsanitary conditions due to the unprecedented increase of refugees, asylum seekers, and migrants.  Authorities reported continued migration from Brazil, Chile, Cuba, Haiti, Venezuela, as well as from South Asia and Africa. Nearly all the migrants entered by foot through the Darien Gap, a roadless expanse of jungle on the eastern border with Colombia.  International organizations reported an increase in acts of violence against migrants during their trek through the Darien Gap, including sexual assaults, robberies, and killings, prompting authorities to permanently assign three Public Ministry officials to document criminal complaints from migrants.

ONPAR did not have a permanent presence at migrant camps in the Darien region; persons who wished to request asylum had to approach the National Border Service, an international organization, or an NGO to request protection and then meet with an ONPAR representative, creating barriers to access and delays.

According to UNHCR and its NGO implementing partners, thousands of persons in the country needed international protection.  These included persons in the asylum and refugee process, persons denied refugee status, and persons who did not apply for refugee status due to lack of knowledge or fear of deportation.

**Employment:**  Refugees recognized by authorities have the right to work, but recognized refugees complained that they faced discriminatory hiring practices. To prevent such discrimination, ONPAR removed the word "refugee" from recognized refugees' identification cards.  By law ONPAR continued to assist applicants admitted to the refugee process with obtaining temporary work permits. Temporary work permits are valid for one year but may be renewed as many times as needed, until the National Commission for Refugees issues a final resolution on a case.

**Access to Basic Services:**  Education authorities sometimes denied refugees access to education and refused to issue diplomas to others if they could not present complete certified school records from their country of origin.  The Ministry of Education continued to enforce the government's 2015 decree requiring schools to accept students in the asylum process at the grade level commensurate with the applicants' prior studies.  A UNHCR survey conducted during the year found that school-age refugee children often did not have the

CLP_PC_024123

# Asylum Processing at the U.S.-Mexico Border: February 2023

**BY STEPHANIE LEUTERT AND CAITLYN YATES**



The University of Texas at Austin

Strauss
C E N T E R
for International Security and Law

# INTRODUCTION

Since November 2018, the Robert Strauss Center for International Security and Law at the University of Texas at Austin—at times in collaboration with the Center for U.S.-Mexico Studies at the University of California San Diego and the Migration Policy Centre at the European University Institute—has documented asylum processing at U.S. border ports of entry through quarterly reports. These reports began in November 2018 when U.S. Customs and Border Protection (CBP) officers stationed at the international border's dividing line started informing arriving asylum seekers that U.S. ports of entry were full. Simultaneously, CBP officials only accepted a specified number of asylum seekers each day, in a process known as metering. As metering became standardized at U.S. ports of entry, individuals, groups, and government officials began forming waitlists to organize growing queues of asylum seekers in Mexican border cities.[1]

From November 2018 through November 2022, the Robert Strauss Center's quarterly reports documented asylum waitlists in Mexican border cities. During the Covid-19 pandemic, CBP stopped processing asylum claims at ports of entry under a Center for Disease Control's (CDC) regulation referred to as Title 42 authority. This authority allowed Border Patrol agents to immediately expel apprehended individuals of certain nationalities, including asylum seekers, to the nearest Mexican city or to their home countries. It also blocked asylum seekers from making claims at U.S. ports of entry.[2] Under Title 42, many of the asylum waitlists along the border were frozen—meaning that list managers did not allow any new individuals to add their names—or they were dissolved.[3]

Beginning in mid-2022, the United States began processing Title 42 exceptions along the border. These exceptions allowed vulnerable individuals in Mexican border cities to enter the United States and request asylum. However, the number of vulnerable individuals was larger than the number of Title 42 exception slots, which led to Title 42 exception waitlists in certain cities. These lists were similar to the previous metering waitlists. Although, Mexican government entities, civil society organizations, and lawyers all kept different Title 42 exception waitlists, and there were often multiple lists in each city. The Robert Strauss Center's August 2022 and November 2022 asylum processing updates included Title 42 exception waitlists in their official counts of individuals waiting along the border.

On January 12, 2023, CBP implemented a new Title 42 exception process at the border. This process requires asylum seekers to use a mobile application known as CBP One to make a claim at a U.S. port of entry. Through this application, individuals located in Central and Northern Mexico can submit certain biographic information in advance, attest that they meet vulnerability criteria, and schedule an appointment at a U.S. port of entry. Since this process allows asylum seekers to make appointments directly with CBP, list managers dissolved all remaining metering and Title 42 exception waitlists.

Initially, CBP opened two weeks of appointments to fill the first days, and then—a week later—the agency began releasing daily appointments each morning at 9:00 am ET (6:00 am PT). These appointments are for one day at a time and are scheduled two weeks out. Asylum seekers in one area of the border may obtain appointments in other locations. To travel through northern Mexico, individuals with a CBP One appointment can obtain a temporary transit pass from Mexico's National Migration Institute (*Instituto Nacional de Migración*, INM).[4] The CBP One application is currently available in English, Spanish, and Haitian Creole.

CLP_RC_024900

Between January 18, 2023 and January 31, 2023, 9,902 individuals were processed at ports of entry through CBP One application appointments.[5]

In February 2023, not all ports of entry were processing CBP One appointments. Figure 1 shows the status of CBP One applications by city. Green circles indicate cities with CBP One appointments and red circles indicate cities without CBP One appointments.

**Figure 1: Ports of Entry Offering CBP One Appointments (February 2023)**



*Author's elaboration. Data collected from February 17, 2023 to February 21, 2023.*

The CBP One rollout and switch to asylum appointments has come with a series of challenges. The first are accessibility hurdles, as asylum seekers need to be literate, speak one of the application's three languages, have access to a cell phone with cell or internet service, and have basic knowledge of the new system.[6] If these hurdles are surmounted, the next set of challenges center around the application's registration process, with asylum seekers' reporting crashes, looping error messages, and facial comparison flaws (some of which have been addressed in subsequent application updates).[7] To obtain appointments, civil society organizations have also flagged concerns, such as the early morning release times of new appointments and slow internet at shelters, which prevents asylum seekers' phones from connecting quickly enough to make an appointment. Conversely, this means that individuals with strong Wi-Fi or the ability to pay for SIM cards may be more likely to obtain appointments.

However, the most pressing issue is the insufficient number of appointments compared to the number of waiting individuals. Each day, many asylum seekers try to obtain an appointment but are unable to secure a spot. This can be a bigger challenge for larger families, particularly in cities with few appointment slots.[8] In an attempt to improve their odds, some families have made decisions to separate themselves into smaller family groups or have sent their children to the United States as unaccompanied minors. Additionally, individuals may attempt to secure appointments in cities beyond where they are living, requiring journeys that can expose them to security risks and added costs.[9]

This report provides an update to asylum processing along the U.S.-Mexico border by focusing on the CBP One appointment process, waiting asylum seekers, and migrant shelters. Overall, asylum seekers continue to face unstable living conditions and security risks in Mexican border cities. Many shelters are full, and along the border, a number of individuals are renting rooms, staying in hotels, or sleeping on the street. In Matamoros, another tent camp has sprung up with thousands of occupants living along the Rio Grande. Certain groups of asylum seekers also continue to experience additional challenges. Civil society organizations report that Black, LGBTQ+, and Indigenous asylum seekers have faced targeted discrimination while waiting in Mexican border cities.

The February 2023 metering update draws on phone and WhatsApp interviews with asylum seekers, government officials, civil society organizations, and legal service providers on both sides of the border from February 17, 2023 through February 21, 2023. It also relies on local news articles to fill in any gaps.

CLP_RG_024902

**Asylum Processing at the Border Waitlists: February 2023**

| Mexican City | CBP One Appointments | # of CBP One Appointments | City Conditions |
|---|---|---|---|
| **Matamoros, Tamaulipas** | Open | ~200 people per day | Each day, an estimated 200 individuals cross in Matamoros with Title 42 exception appointments via CBP One. Local civil society organizations estimate that there are around 3,500 to 4,000 people living in the city and attempting to obtain these appointments.[10] An estimated 2,500 people live in a tent camp along the Rio Grande.[11] Most of these individuals are from Venezuela and Haiti, with fewer numbers from Cuba and Nicaragua.<br><br>In late January 2023, a number of asylum seekers from Russia and Ukraine arrived in Matamoros. Unlike other nationalities, these individuals stayed in hotels in Matamoros's city center. By mid-February 2023, these individuals were no longer in the city.<br><br>From January 1, 2023, to January 31, 2023, 5,929 people entered the United States through Matamoros as Title 42 exceptions.[12] |
| **Reynosa, Tamaulipas** | Open | ~120 people per day | In Reynosa, there are around 120 CBP One appointments every day. The city's shelters are full and there are an estimated 5,000 to 9,000 people waiting in the city. Currently the majority of these individuals are from Venezuela and Haiti, with fewer numbers from Mexico (Oaxaca, Guerrero, and Chiapas), Honduras, Guatemala, and El Salvador. Individuals with appointments cross in three shifts: 7:00 am, 9:00 am, and 12:00 pm.[13]<br><br>Black migrants in Reynosa have reported that the CBP One application does not always accept photos of their faces. In response, these individuals set up bright construction lights for taking selfies. However, they noted that this technique did not work for children under the age of six.[14] |

CLP_PC_024003

**Asylum Processing at the Border Waitlists: February 2023 (continued)**

| Mexican City | CBP One Appointments | # of CBP One Appointments | City Conditions |
|---|---|---|---|
| **Reynosa, Tamaulipas** *(continued)* | | | Individuals who have been unable to secure a spot in shelters are renting rooms or waiting directly outside of the port of entry. Local shelter officials estimate that fewer than 10 percent of the migrants waiting in the city have managed to secure an appointment using the CBP One application.<br><br>From January 1, 2023, to January 31, 2023, 4,235 people entered the United States through Reynosa as Title 42 exceptions.[15] |
| **Nuevo Laredo, Tamaulipas** | Open | ~40 people per day | There are approximately 40 CBP One appointments available each day in Nuevo Laredo.<br><br>Over the past month, an increasing number of asylum seekers have arrived in the city. This is partly because Title 42 exception processing has resumed after being suspended in mid-2022.[16] Additionally, many of the individuals arriving in Nuevo Laredo already have CBP One appointments. These people were previously living in another border city or waiting in Mexico City, Guadalajara, or Monterrey.[17] For example, the majority of people at Casa Nazareth are recently arrived individuals with CBP One appointments.[18] Fewer people have been able to successfully obtain appointments while staying at local shelters. In fact, these shelters report that only a handful of their residents were entering the United States via CBP One appointments each week.<br><br>Nuevo Laredo's shelters are not at capacity and civil society organizations estimate that the city has a much smaller migrant population than either Reynosa or Matamoros. The majority of migrants in the city are from Honduras, Haiti, Mexico, Venezuela, and Cuba.<br><br>From January 1, 2023, to January 31, 2023, 606 people entered the United States through Nuevo Laredo as Title 42 exceptions.[19] |

CLP_RC_024004

**Asylum Processing at the Border Waitlists: February 2023 (continued)**

| Mexican City | CBP One Appointments | # of CBP One Appointments | City Conditions |
|---|---|---|---|
| **Piedras Negras, Coahuila** | Open | ~40 people per day | Each day, an estimated 40 individuals cross in Piedras Negras with Title 42 exception appointments via CBP One. This includes people who were waiting in Piedras Negras and Haitians and Venezuelans who are arriving with CBP One appointments after waiting in other cities.<br><br>In Piedras Negras, shelters are completely full. Local officials estimate that there are roughly 900 migrants waiting in shelters with another 1,000 to 1,500 migrants renting rooms, staying in abandoned houses, and sleeping on the streets. Currently, the majority of the migrants in Piedras Negras are from Honduras, Venezuela, Haiti, Ecuador, and Cuba.<br><br>From January 1, 2023, to January 31, 2023, 1,650 people entered the United States through Piedras Negras as Title 42 exceptions.[20] |
| **Ciudad Acuña, Coahuila** | Closed | N/A | There is no Title 42 exception processing via CBP One in Ciudad Acuña.<br><br>Civil Protection (*Protección Civil*) continues to maintain two asylum waitlists—one for single adults and one for families—but the local agency is not adding any new individuals to the lists. Many of the people who were waiting on the two lists are no longer in the city. |
| **Ciudad Juárez, Chihuahua** | Open | ~80 people per day | Each day, an estimated 80 individuals cross in Ciudad Juárez with Title 42 exception appointments via CBP One.<br><br>There are estimated to be more than 2,200 people in Ciudad Juarez's shelters and even more people living outside of these shelters.[21] Most of these individuals are from Venezuela, Nicaragua, Colombia, Guatemala, Ecuador, Peru, and El Salvador. |

CLR_PC_024005

**Asylum Processing at the Border Waitlists: February 2023 (continued)**

| Mexican City | CBP One Appointments | # of CBP One Appointments | City Conditions |
|---|---|---|---|
| **Ciudad Juárez, Chihuahua** *(continued)* | | | On February 8, 2023, a WhatsApp rumor circulated within Ciudad Juárez that suggested CBP had buses waiting across the border to take migrants to Canada. In response, around 1,500 people went to the Rio Grande and 500 people crossed the river and turned themselves in to U.S. authorities. The U.S. National Guard used megaphones to tell the remaining 1,000 migrants on the Mexican side of the Rio Grande that there were no buses nor transport to Canada.[22] The remaining individuals dispersed.<br><br>From January 1, 2023, to January 31, 2023, 2,168 people entered the United States through Ciudad Juárez as Title 42 exceptions.[23] |
| **Agua Prieta, Sonora** | Closed | N/A | There is no Title 42 exception processing via CBP One in Agua Prieta. To date, no one waiting in Agua Prieta's shelter has been able to obtain a CBP One appointment. Most migrants waiting in Agua Prieta are from southern Mexico and Guatemala.<br><br>Agua Prieta also continues to receive between 100 and 150 lateral Title 42 expulsions per day. The city's shelter is at capacity, with people sleeping on the city's streets or renting rooms. At night, the temperature has dipped below freezing, leading to potentially dangerous conditions for migrants expelled into the city without shelter. |
| **Nogales, Sonora** | Open | ~40 people per day | Every day, approximately 40 CBP One appointments are available in Nogales.<br><br>The individuals waiting in Nogales are mostly families from Mexico, particularly from Guerrero. However, there have also been individuals from Haiti who arrive from Reynosa or Matamoros with CBP One appointments. |

CLR_RC_024006

**Asylum Processing at the Border Waitlists: February 2023 (continued)**

| Mexican City | CBP One Appointments | # of CBP One Appointments | City Conditions |
|---|---|---|---|
| **Nogales, Sonora** *(continued)* | | | When the CBP One application first opened two weeks of slots on January 12, 2023 some migrants in Nogales were able to obtain appointments. Since then, the Kino Border Initiative reports that almost none of the individuals receiving their services have successfully obtained an appointment. <br><br> From January 1, 2023, to January 31, 2023, 800 people entered the United States through Nogales as Title 42 exceptions.[24] |
| **San Luis Río Colorado, Sonora** | Closed | N/A | There is no Title 42 exception processing via CBP One in San Luis Río Colorado. <br><br> Since the CBP One appointment process began, only two people from the Casa del Migrante La Divina have been able to obtain appointments in Nogales. The majority of the people attempting to get appointments are from Central America, Cuba, and Mexico. The shelter is now completely open, after being partially closed for almost three years due to Covid-19. |
| **Mexicali, Baja California** | Open | ~20 people per day | In Mexicali, there are approximately 20 CBP One appointments per day. However, shelter officials report that the majority of the individuals obtaining appointments in Mexicali are based in Guadalajara or Mexico City. These people are primarily from Venezuela, Afghanistan, and Haiti. <br><br> Shelters estimate that there are between 1,600 and 1,800 migrants in the city. Most people waiting in the city are from Mexico (Michoacán), Honduras, and El Salvador. All shelters in the city are completely full and individuals who are unable to access shelters are renting rooms and sleeping on the streets. During the past two months, there have been multiple rescues of migrants living without shelter amid extremely cold temperatures.[25] |

CLR_RC_024907

**Asylum Processing at the Border Waitlists: February 2023 (continued)**

| Mexican City | CBP One Appointments | # of CBP One Appointments | City Conditions |
|---|---|---|---|
| **Mexicali, Baja California** *(continued)* | | | From January 1, 2023, to January 31, 2023, 668 people entered the United States through Mexicali as Title 42 exceptions.[26] |
| **Tijuana, Baja California** | Open | ~200 people per day | Each day, an estimated 200 individuals cross with Title 42 exception appointments via CBP One. <br><br> On the first day with open appointments, Tijuana's Office of Migrant Services set up a Wi-Fi zone outside of their offices to provide internet and support to asylum seekers. However, the officials only managed to assist three families before the appointments were all filled.[27] Many of the individuals who received the first appointments were from Russia.[28] <br><br> In January 2023, city officials reported that there were 181 percent more migrants in the city than during the previous month.[29] Many of the new arrivals are from the Mexican states of Michoacán and Guerrero. Shelters in the city continue to be completely full. In recent months, there has been an increase in threats and violence targeting migrants and migrant shelters in Tijuana.[30] <br><br> From January 1, 2023, to January 31, 2023, 5,825 people entered the United States through Tijuana as Title 42 exceptions.[31] |

*The numbers should be interpreted as a general range rather than an exact figure.*

CLR_PC_024908

# ENDNOTES

1   Department of Homeland Security Office of the Inspector General, "CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry," October 27, 2020, https://www.oig.dhs.gov/sites/default/files/assets/2020-10/OIG-21-02-Oct20.pdf.

2   U.S. Department of Health and Human Services, "Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes," March 24, 2020, https://www.federalregister.gov/documents/2020/03/24/2020.-06238/control-of-communicable-diseases-foreign-quarantine-suspension-of-introduction-of-persons-into.

3   U.S. Department of Health and Human Services, "Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes," March 24, 2020, https://www.federalregister.gov/documents/2020/03/24/2020.-06238/control-of-communicable-diseases-foreign-quarantine-suspension-of-introduction-of-persons-into.

4   Reynaldo Lara, "Les dan cita en otra ciudad, migrantes buscan permiso en Ciudad Juárez," *TV Azteca*, February 13, 2023, https://www.tvazteca.com/aztecanoticias/migrantes-permiso-juarez-vcp.

5   U.S. Customs and Border Protection, "CBP Releases January 2023 Monthly Operational Update," February 10, 2023, https://www.cbp.gov/newsroom/national-media-release/cbp-releases-january-2023-monthly-operational-update.

6   Melissa del Bosque, "Facing Bias: CBP's Immigration App Doesn't Recognize Black Faces, Barring Thousands from Seeking Asylum," *The Border Chronicle*, February 7, 2023, https://www.theborderchronicle.com/p/facing-bias-cbps-immigration-app.

7   Taylor Ardrey, "'It's a failure for us': Migrants at the Southern US border are reportedly frustrated with the mobile app that's supposed to speed up asylum appointments," *Business Insider*, January 28, 2023, https://www.businessinsider.com/migrants-frustrated-with-cbp-asylum-appointment-app-2023-1; Melissa del Bosque, "Facing Bias: CBP's Immigration App Doesn't Recognize Black Faces, Barring Thousands from Seeking Asylum," *The Border Chronicle*, February 7, 2023, https://www.theborderchronicle.com/p/facing-bias-cbps-immigration-app.

8   Santiago Caicedo, "Migrant families continue struggling with CBP One app registration," *KRGV*, February 16, 2023, https://www.krgv.com/news/migrant-families-continue-struggling-with-cbp-one-app-registration/.

9    Sandra Sanchez, "CBP One app gives cash-strapped asylum-seekers interviews hundreds of miles away," *Border Report*, January 18, 2023, https://www.borderreport.com/immigration/cbp-one-app-gives-cash-strapped-asylum-seekers-interviews-hundreds-of-miles-away/.

10   Alfredo Guevara, "Con la CBP One disminuye la migracion en Tamaulipas," *El Diario*, February 13, 2023, https://eldiariomx.com/2023/02/13/con-la-cbp-one-disminuye-la-migracion-en-tamaulipas/.

11   Esteban Montaño Vásquez, "Migrantes en Matamoros la vida en suspenso a la espera de un clic," *Newsweek*, February 3, 2023, https://newsweekespanol.com/2023/02/migrantes-matamoros-vida-en-suspenso/.

12   State of Louisiana, et al. v. Centers for Disease Control & Prevention, "Defendants' Monthly Report for the Month of January 2023 Pursuant to the Court's Preliminary Injunction," February 16, 2023.

13   Dolores Cerda, "Se normalizan aplicación CBP One para solicitar asilo político," *Notigape*, February 8, 2023, https://www.notigape.com/se-normalizan-aplicacion-cbp-one-para-solicitar-asilo-politico-/258558.

14   Melissa del Bosque, "Facing Bias: CBP's Immigration App Doesn't Recognize Black Faces, Barring Thousands from Seeking Asylum," *The Border Chronicle*, February 7, 2023, https://www.theborderchronicle.com/p/facing-bias-cbps-immigration-app.

15   State of Louisiana, et al. v. Centers for Disease Control & Prevention, "Defendants' Monthly Report for the Month of January 2023 Pursuant to the Court's Preliminary Injunction," February 16, 2023.

16   Julian Resendiz, "Nuevo Laredo church leaders say most new asylum seekers are Haitians with CBP One appointments," *Border Report*, February 15, 2023, https://www.borderreport.com/immigration/migrant-arrivals-increase-twofold-at-texas-tamaulipas-border/.

17   Gastón Monge, "Aumentan población de migrantes a refugios; la mayoría son de Haití," *En Linea Directa*, February 14, 2023, https://enlineadirecta.info/2023/02/14/aumentan-poblacion-de-migrantes-a-refugios-la-mayoria-son-de-haiti/.

CLP_PG_024909

18  "Casa del Migrante Nazareth envia a cuarentena a los enfermos," *Vox Populi*, February 17, 2023, https://voxpopulinoticias.com.mx/2023/02/casa-del-migrante-nazareth-envia-a-cuarentena-a-los-enfermos/.

19  State of Louisiana, et al. v. Centers for Disease Control & Prevention, "Defendants' Monthly Report for the Month of January 2023 Pursuant to the Court's Preliminary Injunction," February 16, 2023.

20  Ibid.

21  Martín Orquiz, "Pasean a Ken Salazar por lugares de atención a migrantes," *Norte Digital*, February 16, 2023, https://nortedigital.mx/pasean-a-ken-salazar-por-lugares-de-atencion-a-migrantes/.

22  Hérika Martínez Prado, "Juegan falsos rumores con su sueño americano," *El Diario de Juárez*, February 10, 2023, https://diario.mx/juarez/juegan-falsos-rumores-con-su-sueno-americano-20230210-2022725.html.

23  State of Louisiana, et al. v. Centers for Disease Control & Prevention, "Defendants' Monthly Report for the Month of January 2023 Pursuant to the Court's Preliminary Injunction," February 16, 2023.

24  Ibid.

25  Antonio Heras, "Rescatan en zona desértica de Mexicali a tres migrantes sudamericanos," *La Jornada*, January 5, 2023, https://www.jornada.com.mx/notas/2023/01/05/estados/rescatan-en-zona-desertica-de-mexicali-a-tres-migrantes-sudamericanos/.

26  State of Louisiana, et al. v. Centers for Disease Control & Prevention, "Defendants' Monthly Report for the Month of January 2023 Pursuant to the Court's Preliminary Injunction," February 16, 2023.

27  Kate Morrissey, "Asylum seekers in Tijuana are scrambling through mobile app error messages for few appointments into the U.S.," *The San Diego Union-Tribune*, January 22, 2023, https://www.sandiegouniontribune.com/news/immigration/story/2023-01-22/cbp-one-app-asylum-tijuana.

28  Ibid.

29  Cinthya Gómez, "'Creemos que CBP One ha fomentado la migración': Aumenta 181% llegada de migrantes a Tijuana en búsqueda de asilo en EEUU," *Telemundo*, February 1, 2023, https://www.telemundo20.com/noticias/local/creemos-que-cbp-one-ha-fomentado-la-migracion-aumenta-181-llegada-de-migrantes-a-tijuana-en-busqueda-de-asilo-en-eeuu/2275056/.

30  Adam Isacson and Ana Lucia Verduzco, "Tijuana's migrant shelters under increased attack, as the U.S. sends hundreds of migrants per day," Washington Office on Latin America, January 31, 2023, https://www.wola.org/analysis/tijuanas-migrant-shelters-under-increased-attack-as-the-u-s-sends-hundreds-of-migrants-per-day/.

31  State of Louisiana, et al. v. Centers for Disease Control & Prevention, "Defendants' Monthly Report for the Month of January 2023 Pursuant to the Court's Preliminary Injunction," February 16, 2023.

CLR_RG_024910

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 420 of 721





**ENGLISH**

*(AP Photo/Sandra Sebastian)*

✏ **23 MAR 2021 | COMMENTARY**

## Key Issues on Access to Asylum in Mexico, Protections for Migrant Children, and U.S. Cooperation

*The Washington Office on Latin America (WOLA), Asylum Access, and the Institute for Women in Migration (IMUMI) have prepared a summary of the status of access to asylum in Mexico, protections for migrant children, and U.S. cooperation. Here are our key findings:*

### Mexico as a destination country for asylum seekers

- Asylum requests have increased dramatically in Mexico in recent years. Requests more than doubled between 2015 to 2016 (3,424 to 8,796) and increased by more than 700 percent between 2016 and 2019. More than 125,000 people have requested protection in Mexico since President Lopez Obrador took office in December 2018, including over 13,500 requests in January and February 2021.

- Unlike the United States, Mexico's refugee agency COMAR continued to accept asylum requests during the pandemic, receiving a total of 41,329 requests for 2020. Although COMAR closed its offices for a period during the pandemic, it processed 14,638 cases during the year, providing protection in 79 percent of the cases. The top nationalities receiving protection in Mexico are from Honduras, Venezuela, Cuba, El Salvador and Guatemala although Mexico has also seen an uptick in asylum request from Haitians and other extra-continental migrants.

- Mexico's legal definition of who can qualify for protection is broader than the United States, including "persons who have fled their country because their lives, security or freedom have been threatened by generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances which have seriously disturbed public order," as well as people persecuted on account of their race, religion, nationality, gender, political opinions or belonging to a particularly social group.

### Obstacles for accessing protection in Mexico

- While Mexico has improved its reception and processing capacity, asylum seekers continue to face significant obstacles to access protection. This includes a 30 day limit from first entry into the country to request asylum; the requirement to stay in the state where the asylum request was made while it is being processed (with some exceptions for grave security concerns); inadequate access to a humanitarian visa which would enable work authorization and facilitate access to health and education; and long delays in resolving claims.

- Currently, asylum agents from COMAR do not have a presence at the ports of entry. Asylum seekers presenting a claim at the border will generally be detained for at least a few days by Mexico's National Migration Institute (INM). To avoid detention, many asylum seekers try to travel undetected to towns close to the border to present themselves at a COMAR office or shelter. On this journey they are often victims of crimes including kidnapping, sexual assault, and robbery.

- For asylum seekers who are held in detention, lack of services, poor food and healthcare, and overcrowding has resulted in numerous asylum seekers dropping their claims in order to be released. A program to provide alternatives

CLP_PC_025089

to detention, started in 2016, is currently being severely curtailed by the INM.

- Many migrants who are detained by the INM are not adequately informed of their right to seek protection in Mexico. A monitoring mission carried out by the INM's citizen council of migrant detention centers in 2016 found that the primary focus of INM agents is on the detection, detention, and deportation of migrants. The majority of the detainees interviewed at the centers reported never having received information about their right to apply for asylum or that the information was not clear.

**Is Mexico safe for asylum seekers?**

- Some parts of Mexico, in particular the several northern border cities where many asylum seekers have been returned or expelled to from the US, are among the most dangerous areas in the world and are not considered safe for asylum seekers. This is particularly the case in the state of Tamaulipas. Mexico's southern border states' proximity to Central America means that agents of persecution may be present there, and asylum seekers may face similar dangers from which they fled from their countries of origin.

- While asylum seekers may be at risk in certain areas, other asylum seekers have been able to successfully integrate. In particular, areas with relatively lower crime rates and more economic opportunities, including several states in central Mexico, can host significant numbers of refugees.

- Support for Mexican institutions, shelters, civil society organizations, and refugee-led organizations that promote sustainable and dignified integration would help expand the spaces in which asylum seekers can live in safety.

**Strengthening Mexico's capacity to receive asylum seekers**

- In spite of important measures undertaken during Lopez Obrador's administration, COMAR's resources have not increased sufficiently to meet demand, leading to a backload of cases. While the agency's budget for 2021 is likely to be $4.85 million, more than double its $2.35 million budget for 2020, more investment is needed to address staffing limitations and expand its presence beyond the 8 cities where it currently has offices.

- UNHCR has dramatically expanded its presence in Mexico in recent years and provided important technical and infrastructure support to COMAR. Apart from assisting COMAR, the UNHCR has supported the construction of shelters for asylum seekers and refugees, it provides assistance to civil society organizations offering legal and other services to asylum seekers and cash support for asylum seekers waiting for their claims to be processed, amongst other activities.

**Legal reforms that prohibit detention for migrant children and their families in Mexico**

- In January 2021, legal reforms went into effect prohibiting immigration detention for unaccompanied and accompanied migrant children in Mexico. Immigration cases will be resolved according to the best interest of the child to be determined by Child Protection Officers, instead of the INM. Unaccompanied children and children with families should be referred to shelters to await interviews and a resolution that could instruct INM to repatriate the migrants, to refer them to COMAR to apply for refugee status, or to provide immigration documents for residence in Mexico. In some cases, Child Protection Officers will determine that it is in the child's best interest to be reunified with family members in another country.

- The new procedures will help guarantee protection for migrant children, increase access to the asylum system and decrease the use of smugglers and extortion by INM and other authorities in Mexico.

**U.S. cooperation on access to protection in Mexico**

- The United States continues to be the largest donor for UNHCR in Mexico, providing an estimated $42 million in assistance in 2020. In the past, additional support to COMAR and international organizations operating in Mexico was provided through the State Department's Bureau of Population, Refugees and Migration. Apart from appropriating additional financial support, and upholding its own international commitments for refugees and asylum seekers, the U.S. government should consider developing procedures with the Mexican government to provide access to protection in the U.S. for individuals who would face persecution in Mexico and unaccompanied children from Central America when the best interest determination is that they should be united with the U.S.-based family members.

- In order to strengthen implementation of the new reforms that prohibit the detention of migrant children, the U.S. government should consider supporting the child protection system in Mexico and work with the Mexican government to create a regional protection system for migrant children.

CLP_PC_025090

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 422 of 721

U.S. assistance to Mexico's immigration enforcement efforts has primarily focused on supporting the construction of communications towers in southern Mexico as well as the installation of biometric equipment in all of Mexico's 52 long- and short- term migrant detention centers. No new areas of assistance have been announced since Lopez Obrador took office in December 2018. While in January 2021 the Mexican government reported it had deployed over 7,300 members of the National Guard to assist in immigration enforcement on the southern and northern borders, the United States is currently not providing any training, equipment, or support to this force and it should refrain from doing so given the militarized nature of the National Guard and documented cases of abuse against migrants and asylum seekers.

| f  SHARE | 𝕏  TWEET |
|---|---|

**SIGN UP TO GET THE LATEST ON ANALYSIS & POLICY**

SIGN UP



UNITED STATES

## PUTTING THE U.S.-MEXICO 'BORDER CRISIS' NARRATIVE INTO CONTEXT

**17 MAR 21    COMMENTARY**

**Related Content**

**WOLA and Temple Law School Present a New Series of Resources for Asylum Attorneys**

**28 FEB 23    NEWS**

CLP_PC_025091

# GUATEMALA 2022 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Guatemala is a multiparty constitutional republic.  The country last held national and local elections in 2019.  Voters elected Alejandro Eduardo Giammattei Falla as president for a four-year term beginning January 2020.  International observers considered the presidential election as generally free and fair.

The National Civil Police, which is overseen by the Ministry of Government and headed by a director general appointed by the minister, is responsible for law enforcement.  The Ministry of National Defense oversees the military, which focuses primarily on operations in defense of the country, but the government also used the army to support the National Civil Police in internal security operations, as permitted by the constitution.  Civilian authorities maintained effective control over the security forces.  There were reports that members of security forces committed some abuses.

Significant human rights issues included credible reports of:  harsh and life-threatening prison conditions; arbitrary arrest and detention; transnational repression against individuals in another country, including threats, harassment, surveillance, coercion, and misuse of international law enforcement tools; serious problems with the independence of the judiciary; serious restrictions on free expression and media, including threats of violence against journalists and unjustified arrests or prosecutions against journalists; serious government corruption; lack of investigation of and accountability for gender-based violence; crimes involving violence or threats of violence targeting members of Indigenous groups; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons; crimes involving violence or threats of violence targeting persons with disabilities; and significant restrictions on workers' freedom of association, including violence and threats against union leaders.

Impunity, including by high-level officials, continued to be widespread. Corruption, efforts by organized criminal actors to secure impunity, and

CLP_PC_025128

local inhabitants fighting over territorial claims.  The state of siege was lifted after 60 days and the President's Commission for Dialogue, the Ministry of Government, and the Presidential Commission on Human Rights entered talks to end the violence.  As of September, the conflict had not been resolved.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other international organizations in providing protection and humanitarian assistance to refugees, returning refugees, and asylum seekers, as well as other persons of concern.

**Access to Asylum:**  The law provides for the granting of asylum or refugee status, and the government established a system for receiving and adjudicating asylum claims to grant refugee status to qualifying individuals.  Identification and referral mechanisms for potential asylum seekers are inadequate, and requirements to travel to Guatemala City for parts of the process continued to limit access.  There were gaps and shortcomings in the procedures for implementing the legal framework.

Asylum claims are processed by the Department of Refugee Status Determination of the Guatemalan Migration Institute.  Recommendations on recognition are formulated by an interministerial process, whose complexity contributed to major delays on final case decisions and an increased backlog.

**Access to Basic Services:**  Documentation for refugees to access government services, including health care, was expensive in some cases and remained time-consuming to complete.  Access to education for refugees was difficult due to the country's onerous requirements for access to formal education, including documentation from the country of origin.

## f. Status and Treatment of Internally Displaced Persons

The government does not officially recognize the existence of internally displaced persons (IDPs) within its borders, except for those displaced by climate change and natural disasters.  Organizations that monitor and support IDPs stated this lack of recognition stifled efforts to manage and address the movement of persons within

CLP_PC_025143

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:**  The law criminalizes rape of men or women, including spousal rape, and sets penalties between five and 50 years in prison.  The law establishes penalties for femicide at 25 to 50 years in prison without the possibility of reducing the sentence; however, femicide remained a significant problem.

Police had minimal training and capacity to investigate sexual crimes or assist survivors of such crimes, and the government did not enforce the law effectively.  Rape, other sexual offenses, and gender-based violence remained widespread and serious problems.

The government took steps to combat femicide and gender-based violence.  The judiciary operated a 24-hour court in Guatemala City to offer services related to gender-based violence including sexual assault, exploitation, and trafficking of women and children.  The judiciary operated specialized courts for gender-based violence throughout the country, but not in every department.  The Public Ministry maintained a 24-hour victim service center to provide medical, psychosocial, and legal support to survivors, including issuing restraining orders for their immediate protection.  The ministry also maintained a national alert system for finding disappeared women.

The Public Ministry maintained a public website titled "the Women's Observatory," with statistics regarding crimes against women and children.  According to that website, 31 percent of criminal complaints as of October were filed for crimes against women and children, and 44 percent of those complaints resulted in investigation and successful resolution of the complaint.

Gender-based violence, including sexual and domestic violence, remained widespread and serious.  The law establishes penalties of five to eight years in prison for gender-based violence, including physical, economic, and psychological violence.

On January 24, a High-Risk Court Tribunal of three judges sentenced five former

CLP_PC_025150

militia members to 30 years in prison each for crimes against humanity for involvement in the sexual assaults of 36 Indigenous Achi women in 1981-85 during the internal armed conflict.  The court also mandated that the government provide monetary reparations and other conciliatory measures.  The National Prosecutor General, the cabinet-level federal government office that acted as the legal representative of the government, filed an appeal to prevent the payout of these reparations, and as of year's end, the appeal was not resolved.

Women with disabilities and members of the LGBTQI+ community with disabilities remained at greater risk of being victims of continued sexual violence.  Most persons with disabilities, especially women, did not report situations of violence and abuse because the reporting processes were complex and discriminated against them.

**Sexual Harassment:**  Although several laws refer to sexual harassment, no single law, including laws against sexual violence, addresses sexual harassment directly.  The law does not prohibit sexual harassment in the private sector workplace.  Human rights organizations reported sexual harassment was widespread.

**Reproductive Rights:**  Forced sterilization was purportedly common for persons with disabilities but reporting on these abuses was rare, according to an international human rights organization that tracks disability rights.  There were no official reports during the year of coerced abortion or involuntary sterilization on the part of government authorities.

Cultural, geographic, and linguistic barriers hampered access to reproductive health care, including contraceptives, particularly for Indigenous women in rural areas, where contraceptives were also least likely to be available locally.  The prevalence of modern contraceptive use remained low among Indigenous women compared with all other women, and a lack of culturally sensitive reproductive and maternal health-care service providers deterred some Indigenous women from accessing reproductive health-care services.

The government provided medical services through the Ministry of Health for survivors of sexual violence.  The services provided victims with access to emergency contraceptives and antiviral medicines to prevent sexually transmitted

CLP_PC_025151

# HONDURAS 2022 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Honduras is a constitutional, multiparty republic. The most recent national and local elections were held in November 2021. Voters elected Xiomara Castro of the LIBRE Party as president for a four-year term beginning in January. International observers generally recognized the elections as free and fair.

The Honduran National Police maintain internal security and report to the Secretariat of Security. The armed forces, which report to the Secretariat of Defense, are responsible for external security but also exercise some domestic security responsibilities in support of the national police and other civilian authorities. Some larger cities have police forces that operate independently of the national police and report to municipal authorities. The Military Police of Public Order report to military authorities but conduct operations sanctioned by civilian security officials as well as by military leaders. The National Interinstitutional Security Force coordinates the overlapping responsibilities of the National Police, Military Police of Public Order, National Intelligence Directorate, and Public Ministry during interagency operations. Civilian authorities maintained effective control over security forces. There were reports that members of the security forces committed some abuses.

Significant human rights issues included credible reports of: unlawful or arbitrary killings, including extrajudicial killings; torture and cases of cruel, inhuman, or degrading treatment or punishment by government agents; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious restrictions on freedom of expression and media, including threats to media members by criminal elements; serious government corruption; lack of investigation of and accountability for gender-based violence; and crimes involving violence or threats of violence against Indigenous and Afro-descendant communities, and against lesbian, gay, bisexual, transgender, queer, and intersex persons.

The government prosecuted some officials who committed human rights abuses or engaged in corruption, but a weak judicial system and corruption were major

CLP_PC_025171

freedom of movement because of criminal activity and a lack of significant government presence.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees and other humanitarian organizations in providing protection and assistance to refugees, returning refugees, and asylum seekers, as well as other persons of concern.

**Access to Asylum:**  The law provides for granting asylum or refugee status.  The government had a nascent system to provide legal protection to refugees.  Its operations to receive and process cases relied on substantial support from UNHCR.  Its support focused on providing training to officers of the National Institute for Migration, ensuring support to deal with the backlog of asylum claims submitted during the COVID-19 lockdown, and supporting the improvement of reception conditions for asylum seekers.

**Abuse of Migrants and Refugees:**  Transiting migrants, forcibly displaced populations, and asylum seekers with pending cases were vulnerable to abuse and sexual exploitation by criminal organizations.  Women, children, and LGBTQI+ individuals were especially vulnerable to abuse.  Transiting migrants, refugees, and other vulnerable populations continued to face acute security risks in border zones.

## f. Status and Treatment of Internally Displaced Persons

The Internal Displacement Monitoring Center estimated there were approximately 247,000 internally displaced persons (IDPs) due to violence in the country as of 2021.  Gang activity, including attacks on and exploitation of nonmembers, was the primary contributor to violence-related internal displacement.  In addition, the monitoring center estimated approximately 937,000 individuals were forcibly displaced by 2020 natural disasters.  Official data on forced displacement, especially displacement due to violence, was limited in part because gangs controlled many of the neighborhoods where individuals were forced from their homes and communities (see section 6, Displaced Children).  NGOs reported IDPs were at increased risk of victimization and exploitation by criminal groups.

CLP_PC_025181

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 429 of 721

≡          *The San Diego Union-Tribune*          SUBSCRIBE      LOG IN      🔍

IMMIGRATION

# Asylum seekers in Tijuana are scrambling through mobile app error messages for few appointments into the U.S.



A Tijuana official assists a migrant woman with the CBP One app at Palacio Municipal on the first morning that the mobile application was available for migrants. (Alejandro Tamayo/The San Diego Union-Tribune)

## CBP One is the new and only way for asylum seekers to request to enter the United States through official ports of entry, but not everyone has been able to use it successfully

BY KATE MORRISSEY

CLP_PC_025454

Case 1:23-cv-01843-TSC Document 123 Asylum seekers in Tijuana are scrambling through mobile app error messages for new appointments amid a... Filed 03/23/26 The San Diego Union-Tribune Page 430 of 721

JAN. 22, 2023 6 AM PT

TIJUANA —  On a recent morning, a woman from central Mexico held a phone up to her face outside of the Tijuana municipal building and took a picture. It was the first day that a U.S. government phone app offered port of entry appointments to migrants hoping to request asylum.

Error, the app said.

A city official rushed to help her. Together, they took another photo close to her face. Error again.

The official moved her to spot where the splotchy shadows from the trees didn't reach her face. They took another picture. Another error.

The woman's experience was similar to that of many migrants across the city who have been trying to use the app, called CBP One, now the only way to walk into a port of entry to request protection in the United States. The facial recognition technology used to submit a photo to the app has been particularly prone to error since it launched on Jan. 12, and it is one of many issues that migrants and their advocates have noted since the app's rollout.

CLP_PC_025455



During an event to pay tribute to the victims of the 2010 earthquake in Haiti, Jean Jeef Nelson of Haitian Bridge Alliance shares information about the CBP One app. (Alejandro Tamayo/The San Diego Union-Tribune)

CBP One is part of a series of border policy changes that continue to shift the United States away from the international norm of migrants being allowed to apply for asylum once they're on the soil of the country where they plan to seek protection. Many of these changes, including CBP One, have meant that those with more resources have easier access to asylum screenings while many of the most vulnerable cases are left out.

Lack of reliable Internet and limited digital savvy, as well as language barriers, are among the issues that are already separating who can get appointments in the new process and who cannot.

The application is now the only way for migrants to request exemptions to Title 42, a policy that blocks asylum seekers and other undocumented migrants from coming onto U.S. soil and instructs border officials to expel those who do so without

CLP_PC_025456

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 432 of 721

permission, skipping the generally legally-required screening to see if they qualify for protection.

The exemptions are supposed to be for particularly vulnerable migrants, such as those who have immediate medical or safety concerns while waiting in Mexico. Asylum seekers have to attest that they meet at least one vulnerability category when they submit their applications, but they do not know until they get to CBP at the port of entry whether they will be accepted.

## No more appointments



A Tijuana official shows information about the CBP One application to a woman from Michoacán. (Alejandro Tamayo/The San Diego Union-Tribune)

On the first day that migrants could request appointments in the CBP One app, Tijuana's Office of Migrant Services set up a Wi-Fi zone outside of the municipal

CLP_PC_025457

building with officials ready to help migrants submit their information to Customs and Border Protection.

A small number of migrants found the support tent, and officials walked them through the process. Officials even took their height and weight measurements to be as accurate as possible.

By mid-afternoon, the officials had managed to finish the process for three families, a total of nine people, according to Enrique Lucero, the head of the office.

But the appointments quickly filled.

A 22-year-old woman who had fled the Mexican state of Michoacán started the process with city officials that morning, but by the time they had gotten the application to accept photos for her and all of her three children, there were no more appointments, she said.

Over a week later, she still hadn't been able to book one. She said that in the shelter where she's staying, the app moves very slowly, likely a result of poor Internet quality.

CLP_PC_025458

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 434 of 721



The city of Tijuana has turned the Unidad Deportiva Reforma, a sports complex, into a temporary migrant shelter.
(Alejandro Tamayo/The San Diego Union-Tribune)

When it launched the app as a way for migrants to request entry, CBP said that it would offer two weeks of appointments at a time. That means that every morning at 6 a.m., one more day of appointments opens up.

There are 200 appointments per day at the San Ysidro Port of Entry, according to CBP. The agency declined to say how many were available borderwide.

Further complicating matters, as appointments on the app filled up, some migrants only saw available slots at far away ports of entry, according to Marcos Tamariz, deputy head of mission in Mexico for Doctors Without Borders. That meant that some of the Tijuana appointments were booked by migrants in Matamoros, a city on the eastern end of the border across from Brownsville, Texas.

CLP_PC_025459

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 435 of 721

Routes along the border from Matamoros to Tijuana are among the most dangerous in Mexico, he said, "so asking them to move from one place to another is not as easy as it seems."

"There is lots of frustration behind this and not sufficient guidance or information that would allow people to make the best decision," he said.

# Inequity and Internet



A child plays with a plastic toy outside the migrant shelter at Templo Embajadores de Jesus. His mother fled Michoacán with him to request asylum in the United States. (Alejandro Tamayo/The San Diego Union-Tribune)

The use of the app, especially when coupled with the quick disappearance of appointments, has led to disparities.

CLP_PC_025460

People who have weak Internet connections struggle to get the app to work. While the city of Tijuana reinforced the Wi-Fi network at a city-run shelter it opened up late last year to receive expelled Venezuelans, migrants in other shelters or on the street often have little access to reliable Internet. Some don't have cellphones.

The first appointments offered by the app were Thursday.

On that morning, the Union-Tribune observed mostly groups of Russians showing up for appointments as migrants arrived at El Chaparral plaza on the south side of the port of entry and walked up to the special entrance for CBP One processing.

Russian asylum seekers tend to have the financial resources to stay in hotels in Tijuana rather than shelters, meaning they have access to better Internet.

As the Russians walked by, a man, his wife and four children who had recently fled Michoacán sat on the sidewalk. The man held two phones, trying to navigate the app. The first several pages were in English.

Once he managed to get past those, he still struggled even though the rest of the app was in Spanish. After missing the link to create an account for several minutes, he finally managed to input an email address. He waited for the confirmation email, but it never came. He tried again, still no email. It was not clear what the man needed to do differently.

That same day, at Templo Embajadores de Jesus migrant shelter, where well over 1,000 migrants are waiting to request asylum in the United States, only one of the people interviewed by the Union-Tribune had heard of the app — and only because she had been at the city building.

The shelter had had more immediate issues to deal with besides the app. The rains that flooded much of San Diego and Tijuana shortly after the app's launch had

CLP_PC_025461

destroyed the road leading up to the canyon shelter.



Recent rains washed over the main road leading to the migrant shelter at Templo Embajadores de Jesús, destroying water pipes and cutting off vehicle access to the shelter. (Alejandro Tamayo/The San Diego Union-Tribune)

Those storms also created more difficult conditions for the migrants waiting inside. New arrivals to the Embajadores shelter sleep on mats on the floor until beds open up. They shared stories of the building flooding, soaking them and their bedding. Many had gotten sick as a result.

Since then, none of those interviewed by the Union-Tribune have succeeded in booking appointments. They try every morning at 6 a.m., but it is always full.

The app is even more complicated for those who don't speak English or Spanish. Even though Haitians are one of the nationalities recently included in expulsions, the app is not available in Haitian Creole.

CLP_PC_025462

"We are already seeing rampant misinformation and scams around this program, and the lack of equity around language access is opening yet another avenue for the exploitation of Haitian migrants who are left confused, frustrated and in limbo," said Guerline Jozef, executive director of Haitian Bridge Alliance. "We are extremely disappointed that once again the system continues to fail Black migrants in search of protection."

Erika Pinheiro, executive director of legal services nonprofit Al Otro Lado, said she was concerned about reports from migrants in Tijuana that those with darker skin, including both Black and Indigenous migrants, were having a particularly hard time getting the photo portion of the app to work.

Studies of facial recognition software have shown that the technology tends to have more errors when screening these demographic groups.

# Expelled and waiting

CLP_PC_025463

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 439 of 721



Jesús, an asylum seeker from Cuba who was recently expelled, is hoping to enter the United States soon through a CBP One appointment. (Alejandro Tamayo/The San Diego Union-Tribune)

Jesús, a Cuban man who asked not to be fully identified because of his ongoing vulnerable situation, is waiting anxiously for his CBP One appointment.

Jesús fled Cuba in December and was expelled from the United States in early January.

He left because of government surveillance and harassment and the effect that had on his business fixing washing machines, he said.

"I'll summarize it in one sentence — there is no freedom," he said of Cuba. "There is no freedom for anything."

He said Border Patrol agents made him throw away his belongings except for his documents when they apprehended him after he crossed in the Mexicali area. Then

CLP_PC_025464

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 440 of 721

they put him on a bus and, without telling him where he was going, sent him to the border where he was expelled to Tijuana.

"My world fell," he said in Spanish. "I made so many sacrifices. To be returned is something really hard."

He's been staying at the shelter run by the city of Tijuana converted from a sports complex. He filled out the CBP One application on the first morning it was available, he said, and was able to get an appointment. His friend who tried later in the day was not.

Still, he's fearful that CBP could reject him.

*Los Angeles Times staff writer Andrea Castillo contributed to this report.*

 Kate Morrissey

Copyright © 2023, The San Diego Union-Tribune | CA Notice of Collection | Do Not Sell or Share My Personal Information

CLP_PC_025465





**The only women-founded, women-led nonprofit newsroom in Arizona.**

## Glitchy CBP One app turning volunteers into Geek Squad support for asylum-seekers in Nogales

"Is anybody else trying to figure out how to get an email?" she asks.

Six hands go up.

"Is anybody having trouble simply downloading the app?"

Eight hands.

"Anybody have trouble understanding what the app is asking you?"

Five hands.

"Anyone struggling to take a photo?"

Nine hands.

"The application no está bien hecha," Gia says. It's not well-built.

She suggests trying to close it and restart, but admits that doing so will require you to fill out everything again. With the patience and equanimity of a schoolteacher, after further general announcements and answers, Gia begins a series of circles around the tables, leaning over shoulders, swiping across screens, and trying to answer and troubleshoot specific issues.

A person migrating attempts to take a photo of her son using the CPB One app during a waiting session hosted by the Kino Border Initiative in Nogales, Sonora on Friday, Feb. 3, 2023. People migrating for safety have struggled to use the app because of various bugs and frequent crashing. Credit: Michael McKisson

### 'Virtual border walls'

"There's things that we anticipated that are even worse than what we thought, especially the racially-disparate access," said Erika, from Al Otro Lado.

Asylum-seekers from Haiti face particular difficulties. When the app was first expanded in January to be used by asylum-seekers, it didn't have an option for Haitian Creole speakers. As of March 16, the app's Haitian Creole website is a nearly illegible word jumble. It's not the only instance of CBP websites not being accessible to Haitians.

Laura Wagner, the Haitian Creole Team Lead at Respond Crisis Translation, said that some of CBP's websites are clearly just using Google translation services.

"Haitian migrants are faced not only with glitchy web platforms that don't work well, display error messages in English, and often fail to recognize people with darker skin," Wagner said, "but also with poorly-translated Kreyòl — when those websites or platforms are translated at all."

Jean Jeef Nelson, a case manager for Haitian Bridge Alliance, explained that even when the Haitian Creole translations do work on the app, they only do so for the first steps of trying to book an appointment. Then the app switches back to English or Spanish. All of the error messages, he noted, are in English.

"We have folks who are illiterate who were compelled to pay as much as $500 dollars for help filling out the app," Nelson said, describing the situation with Haitian asylum-seekers in Tijuana.

Jake Wiener, an attorney at Electronic Privacy Information Center, or EPIC, a DC-based organization that focuses on privacy and freedom of expression, worries that "an app that functions poorly can deter people from applying for asylum or spread mistrust of programs that are designed to protect and benefit asylum-seekers."

When CBP pushes migrants to use an app like CBP One, they are asking migrants to trust them to handle their data safely and use it responsibly.

Jake worries about the new technology "creating virtual border walls."

"Any tech should be used to solve real problems and improve access to services," Jake added, "not to expand surveillance and discourage migrants."

Reliance on new technology can be frustrating for anyone. When it's a matter of life or death, the frustration takes on a new dimension.

"It can also be traumatizing to have your family's safety come down to luck with an app," said Chelsea Sachau, managing attorney of the Florence Immigrant & Refugee Rights Project's Border Action Team.

"Many of the people we serve have told us they feel powerless to protect their kids and families when they aren't able to get an appointment despite trying every morning."

Kino Border Initiative staff member Gia Del Pino helps people navigate the CPB One app during a waiting session hosted by the Kino Border Initiative in Nogales, Sonora on Friday, Feb. 3, 2023. People migrating for safety have struggled to use the app because of various bugs and frequent crashing. Credit: Michael McKisson

### Dangers for asylum-seekers in México

The problems asylum-seekers are facing with the app are more than just technical. The app's failures have repercussions beyond the frustration familiar to anyone who deals with modern technology.

Asylum-seekers are, by definition, fleeing for their lives. And while many of them may have left the most pressing dangers far behind them — in South America, the Caribbean, or elsewhere — northern México has repeatedly proven itself to be dangerous, even deadly, for migrants.

Over the past years, as successive U.S. administrations have sought to block asylum-seekers from accessing U.S. territory, various organizations have extensively documented a host of abuses against migrants, including intimidation, extortion, kidnapping, rape, enslavement, and murder.

Omar, 22, has been struggling with the CBP One app for a month. He is terrified of what may become of him.

Originally from El Salvador, Omar was forced to flee after a gang in his hometown gave him an ultimatum: either join their ranks, or, they said to him, "we'll deal with you."

He knew what dealing with him meant: almost certain death. So he and his family collected all the money they could, about $700 dollars, and he headed north.

Soon after crossing the border from Guatemala into México, he says he was kidnapped by armed men in police uniforms. He suspects they were not actual police officers, but isn't sure. After three days of threats, and watching a fellow migrant beaten to the precipice of death, he escaped.

His travails in México were not over.

As he continued north by bus, he was robbed by police, who forced him to pay a bribe to continue traveling. And once he arrived in Nogales, a group of young men, recognizing that he wasn't a local, told him he'd have to start paying a fee to live in Nogales.

A few days after first trying to schedule his appointment on the app and find safety across the border, with no luck, his cellphone broke. That meant he was out of the game for nearly two weeks as he struggled to raise the money to buy a new phone. He eventually got a Samsung Galaxy S10e, which cost him more than $300.

After staying for a bit more than a week at the KBl shelter, Omar was now sharing a small apartment, and had even landed a job. But after more than a month of struggling with the app, he still hasn't found an appointment.

Omar says that he's dealing with discrimination in Nogales. He's paid less at the laundromat than his coworkers who are Mexican, and he's scared to ask for more. With hundreds of publicized cases of asylum-seekers being extorted, kidnapped, or murdered, he's trying as much as possible to maintain a low profile.

"I'm scared something will happen to me here. I wasn't going to stay in El Salvador to die, and I don't want to stay here and die either," Omar says.

People migrating for safety use maps and papers to write down important pieces of information when filling out the required information in the CPB One app during a waiting session hosted by the Kino Border Initiative in Nogales, Sonora on Friday, Feb. 3, 2023. Credit: Michael McKisson

### 'I want to cry'

"The stress is killing us," says Rafael, another asylum seeker from Peru. He continues fussing at his phone, showing screen-grabs of error messages. He holds the phone up and a CBP seal, ringed by a blue line continuously circling.

"No carga, no carga, no carga, no carga," Rafael says, complaining about the app not loading.

"It's like they're making fun of us," he says. And then adds, "I want to cry."

A man next to Rafael has a torn off bit of a candy box with his email and password scratched onto it. He's quiet and patiently waiting for help.

Another man was standing against a wall for at least twenty minutes, staring at the blonde woman's face and trying to break through the facial recognition: "No me sale," he says. It's not coming out.

Omar says, "I remember when Biden, before he became president, said he'd help migrants, but he's doing the opposite."

"Just give us a chance," he says, getting choked up behind his mask. "We're not coming because we want to, but we have to, it's our destiny. We're not trying to do anything bad, we just want to live."

He pulls his cap down low, trying to hide his tears. That's the constant predicament asylum-seekers in northern México deal with: hide or blend in so as not to become targets of crime at the same time they need to make their faces visible to a CBP algorithm that, in many cases, refuses to recognize them.

**Related**

**Despite Border Patrol leader's promise to stop, Congress members call out agents still confiscating Sikh asylum-seekers' turbans**

**Whistleblowers say Arizona Border Patrol practice of trashing Sikh turbans is widespread**

**Border Patrol has new orders not to trash Sikh turbans but isn't sharing guidance publicly, advocates say**

TAGGED: Immigration

JOHN WASHINGTON

John Washington is an investigative journalist based in Tucson with a focus on immigration and borders, as well as criminal justice and literature. His first book, "The Dispossessed: A Story of Asylum... More by John Washington

Arizona Luminaria

P.O. Box 1595, Tucson, AZ 85702

Email: info@azluminaria.org

About us
Quiénes somos
Privacy policy
Code of conduct policy
Membership
My account

© 2025 AZ Luminaria    Proudly powered by Newspack by Automattic

Privacy policy

## EXPERT DECLARATION OF DR. ERIC HERSHBERG

I, Eric Hershberg, under penalty of perjury declare that the following information is true and correct:

1. This comprehensive declaration explains the conditions that are causing families and individuals to flee Guatemala as well as the conditions that non-Guatemalan asylum seekers would face upon removal to Guatemala under the Asylum Cooperative Agreement. The "Findings" are organized into six sections. Sections I through II address overall country conditions regarding levels of violence in the country, the presence of transnational gangs, and the modus operandi of the gangs and organized criminal actors. Section III concerns the persecution of migrants within the country. Section IV through VI, address the inadequacies of state protection of the population and the lack of resources available to assist migrants in Guatemala.

2. I am a recognized expert on, among other things, the interplay between various forms of violence in Guatemala and the resulting emigration of youth, families, and other Guatemalan citizens targeted by transnational street gangs and organized crime groups and unprotected by the state. I have been credentialed as an expert and have submitted approximately sixty affidavits supporting asylum claims on behalf of petitioners from Guatemala and neighboring Central American countries, including El Salvador and Honduras.

## Professional Qualifications

3. I hold a PhD in political science (1989) from the University of Wisconsin, Madison.

4. I am currently employed as Director of the Center for Latin American & Latino Studies (CLALS) and Professor of Government at American University in Washington, DC. From 2007 to 2009, I was Professor of Political Science and Director of Latin American Studies at Simon Fraser University (SFU) in Canada. Prior to these appointments, I served as the Program Director overseeing Latin American initiatives at the Social Science Research Council in New York City for fifteen years. In addition to my professorships at SFU and American, I have taught at Columbia University, New York University, Princeton University, the University of Wisconsin-Madison and Southern Illinois University. I have also served as a consultant to many development and education agencies, including the Ford Foundation, the Rockefeller Brothers Fund, the World Bank, and the Swedish International Development Agency.

5. In my capacity as a professor and director of Latin American and Latino Studies at American University, I work closely with scholars, think tanks, and policy makers in understanding human rights conditions in various countries in Latin America. Among other topics, my current research projects include an analysis of social exclusion and state failure in contemporary Central America. Over the past twenty-five years I have traveled frequently to Guatemala, both to conduct research and to meet with academic colleagues and officials from various government and international development agencies. I have a deep understanding of the social, economic and political factors that determine the realities faced by the diverse

1

CLP_PC_026149

segments of Guatemalan society. Under my supervision, American University has recently completed a multiyear, Department of Justice-funded study on the transnational criminal MS-13 gang, which has a substantial presence in Guatemala. In January 2020, CLALS published an exhaustive report on the work of the United Nations-sponsored International Commission Against Impunity in Guatemala (CICIG) and the troubling implications for accountability and democratic governance of the government's disbanding the commission.[1]

6. I have published extensively on the comparative politics of Latin America and the politics of development. I have authored over forty peer-reviewed articles and book chapters, and I have edited a dozen academic volumes. Other non-peer-reviewed publications total over sixty. In addition, I have co-authored study of the circumstances driving the surge of unaccompanied child migrants from Central America to the United States, which I published in November 2014.[2] Issues raised in that study were among the foci of a September 2018 academic seminar at which I was an invited participant at the Universidad Rafael Landivar, in Guatemala City, and I again discussed these issues with Guatemalan scholars and think tank officials during a three-day visit in January, 2020.

**Summary of Findings**

7. Guatemala cannot provide the protection and resources to afford even minimal levels of safety and well-being of asylum seekers sent to the country under the Asylum Cooperative Agreement. The country suffers from high levels of violence, which particularly impact vulnerable groups of women, the LGBTQ community, indigenous people, and human rights leaders.[3] The country has long been plagued with corruption at all levels of government, which has prevented the state from providing basic services and protections to its own citizens.[4] Moreover, economic and political conditions leave much of the Guatemalan population underemployed, undernourished, poorly housed and underprotected by state agencies. These factors explain why more than two million Guatemalan citizens have fled the country over the past quarter century, and underscore how extraordinarily implausible it is to suppose that the country is in condition to accommodate asylum seekers from third countries.

8. Migrants relocated to Guatemala will be especially vulnerable to serious harm. Deposited into a country with extraordinary levels of violence and a dysfunctional state, they are unlikely to have access to local family and social networks that provide some degree of protection to longstanding residents. Nor will they have nuanced understanding of the

---

[1] Charles T. Call and Jeffrey Hallock, "¿Una iniciativa demasiado exitosa? El legado y las lecciones de la Comisión Internacional contra la Impunidad en Guatemala", (*Center for Latin American and Latino Studies*, January 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3516753#%23

[2] Dennis Stinchcomb and Eric Hershberg, "Unaccompanied Migrant Children from Central America: Context, Causes, and Responses" (Working Paper Series No. 7, American University Center for Latin American & Latino Studies, Washington, DC, November 2014), https://ssrn.com/abstract=2524001.

[3] Adriana Beltran, "Guatemala is No Safe Third Country: Why the Asylum Deal is a Mistake", (*Foreign Affairs*, September 25, 2019), https://www.foreignaffairs.com/articles/guatemala/2019-09-25/guatemala-no-safe-third-country

[4] *Id.*

2

CLP_PC_026150

landscape in which criminal gangs and drug trafficking organizations operate throughout much of the national territory, or the degree to which illicit actors interact with local populations and state authorities with whom they are often allied.

**Findings**

### I.      Epidemic Homicide Rates

9. High levels of societal violence carried out by street gangs and organized crime groups, often in alliance with state security forces and quasi-state actors such as the Security Commissions, have earned Guatemala the distinction of being one of the most dangerous countries in the world. The U.S. Department of State rates the level of violent crime in the country as "critical," citing an abundance of weapons, a legacy of societal violence, and weak law enforcement and judicial systems as key contributing factors.[5]

10. Since peaking in 2009, Guatemala's homicide rate has been on the decline. However, despite falling to 26.1 per 100,000 inhabitants in 2017, the country's murder rate is still nearly five times the global average and is the sixth highest in the Western Hemisphere, surpassed only by neighboring El Salvador and Honduras, and by Venezuela, Jamaica, and Brazil.[6] Guatemala ended 2018 with a homicide rate of 22.4 per 100,000 people, a slight decrease from 2017, but still a remarkable rate.[7] Moreover, the Guatemalan non-profit group Diálogos has expressed serious doubts about the reliability of homicide statistics kept by the national police.[8] This echoes similar findings by *Insight Crime* – a journalism foundation dedicated to investigating organized crime in Latin America –which found crime records handled by a "creaky, antiquated 20th century bureaucratic machine" that frequently loses data crucial for solving, tracking, and analyzing criminal behavior.[9]

11. A recent study from Vanderbilt University found that "the toll of insecurity on daily life in Central America is widespread and significant," with the behavioral impact of insecurity in the Northern Triangle region of Guatemala, Honduras, and El Salvador most strongly felt in

---

[5] U.S. Department of State, Overseas Security Advisory Council, "Guatemala 2018 Crime & Safety Report" (May 9, 2018), https://www.osac.gov/pages/ContentReportDetails.aspx?cid=24030.

[6] Tristan Clavel, "InSight Crime's 2017 Homicide Round-Up" (January 19, 2018),

https://www.insightcrime.org/news/analysis/2017-homicide-round-up; Claire McEvoy and Gergely Hideg, *Global Violent Deaths 2017: Time to Decide* (December 2017), http://www.smallarmssurvey.org/fileadmin/docs/U-Reports/SAS-Report-GVD2017.pdf.

[7] Chris Dalby and Camilo Carranza, "InSight Crime's 2018 Homicide Round-up", (*InSight Crime*, January 2019), https://www.insightcrime.org/news/analysis/insight-crime-2018-homicide-roundup/

[8] Tristan Clavel, "Report Analyzes Guatemala's Shaky Murder Data, Urges Improvements" (*InSight Crime*, August 18, 2017), https://www.insightcrime.org/news/brief/report-analyzes-guatemala-shaky-murder-data-urges-improvements.

[9] Steven Dudley, "Homicides in Guatemala: Collecting the Data (*InSightCrime*, April 20, 2017), http://www.insightcrime.org/investigations/homicides-in-guatemala-collecting-the-data.

CLP_PC_026151

<u>Declaration of Claudia Paz y Paz Bailey</u>

I, Claudia Paz y Paz Bailey, make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

<u>Background</u>

1. I was born in 1966 in Guatemala City, Guatemala.  In 1992, I earned my law degree from Rafael Landivar University in Guatemala and in 2006, I earned my doctorate in Human Rights and Criminal Law from Salamanca University in Spain. In 2015, I was awarded an honorary doctorate in law by Georgetown University in the United States.

2. I gained the majority of my professional experience specializing in criminal law and justice issues in Guatemala. I served as a judge in the department of Sacatepequez from 1991 to 1992. From 1993 to 1995 I worked with the United Nations High Commissioner for Refugees (UNHCR) as the director of legal services where I was responsible for processing requests for refugee status given that Guatemala did not have a national asylum system at that time. In 1994, I founded the Institute for Comparative Criminal Studies of Guatemala, to promote restorative justice and protect human rights during criminal proceedings. In parallel, I worked with the UN Mission on Historical Clarification. In 2002, I assumed the direction of the Institute for Comparative Criminal Studies and served as professor in criminal law at San Carlos University. In 2008, I accepted a position to direct the master's program in criminal procedure at Rafael Landivar University, a role I held until 2010. From December 2010 until May 2014, I served as Attorney General of Guatemala.

3. As Attorney General of Guatemala, I worked against corruption in my country. My office brought charges and collected evidence against numerous high ranking government officials, including former President Effrain Rios Montt, as well as the structures that enabled the taking of public funds for personal benefit. We also rigorously prosecuted leaders of organized criminal groups. Additionally, I reorganized the Office of the Attorney General, creating a special division dedicated to human trafficking in order to more efficiently combat those crimes.  In 2013, I was nominated for the Nobel Peace Prize based on my leadership as Attorney General.

4. In recent years, I have expanded my professional activities in the international sphere. Beginning in 2014, I have been part of the Group of Independent Experts tasked by the Inter-American Commission on Human Rights with investigating the disappearance of 43 students in Ayotzinapa, Mexico, and in 2018, I was part of the Group of International Experts assigned to investigate violence in Nicaragua in the wake of mass protests. I also served as a senior fellow at the Washington Office on Latin America from 2016 to 2017. From 2017 to 2019, I was the Secretary for Multidimensional Security at the Organization of American States. As of 2019, I am the Director of the

1

CLP_PC_026234

Mesoamerica Program at the Center for Justice and International Law, a regional organization dedicated to defending human rights, in San Jose, Costa Rica.

Purpose of the Declaration

5.  The present declaration reflects my professional opinion of Guatemala's asylum system with respect to the recent agreement signed between the United States and my country which, as I understand, have resulted in the transfer of persons seeking asylum in the United States to Guatemala so that they might seek that international protection in Guatemala. This declaration is based on my direct knowledge of the Guatemalan context and particularly the functioning of Guatemalan government institutions, including the asylum system, as well as my familiarity with corruption and other systemic issues that plague the rule of law in Guatemala. Additionally, in the preparation of this declaration, I have reviewed the laws and regulations relevant to asylum, as well as pertinent publications on this subject.

Guatemalan Asylum System

6.  Asylum in Guatemala has been historically neglected by the government. In 1983 Guatemala ratified the 1951 Refugee Convention and its 1967 Protocol, but did not establish any mechanisms to give effect to those international obligations. Although the right to seek asylum is guaranteed by the Constitution, which dates to 1985 and was amended in 1993, there was no effort to bring these issues into national law until 2001. Although the asylum system was functional for a number of years, it was effectively suspended after the adoption of the Migration Code in 2016, and new implementing regulations were not adopted until 2019. Consequently, between October 2016 and March 2019, there was no regulatory framework to apply for asylum in Guatemala and the processing of all claims under the new framework was put on hold, leading to temporary suspensions of asylum processing[1]. The fact that Guatemala allowed many years to pass before creating a national asylum system and that it very recently allowed the system to be temporarily suspended for multiple years reflects the lack of importance that government agencies and officials place on this issue. This confirms that the international obligation to maintain an effective system for claiming refugee status has not been and currently is not a priority for the Guatemalan government.

7.  Guatemala's asylum system is also immature and inexperienced. The country has received very few requests for asylum throughout its history and consequently has very little experience evaluating those requests.  UNHCR reports that from 2002 through 2017 a total of 868 requests had been

---

[1] Procurador de Derechos Humanos de Guatemala. *Informe Anual Circunstanciado de Actividades y de la Situación de los Derechos Humanos* (Annual Report on Activities and the Human Rights Situation), p. 273, 2018.

2

CLP_PC_026235

presented, and that more than half of those requests were presented between 2014 to 2017.[2] This means that the Guatemalan agencies in charge of reviewing these requests have had very little time to develop their criteria for interpreting and applying the refugee definition in line with international law and very limited exposure to the factual scenarios presented in asylum cases. This translates to lessened capacity to resolve asylum requests which are often fact-intensive exercises that require a weighing of testimony and any other evidence, and the application of complex legal standards. Additionally, the fact that new institutions and laws came into effect in 2019 with the recent regulatory reform means that those officials responsible for implementing the law have had a very limited amount of experience with these new frameworks and very little technical expertise.

8. The newness of the asylum system in Guatemala also means that there is a lack of jurisprudence, administrative precedent or other specific guidelines to standardize the interpretation of asylum laws. It is very clear from the experience of the US and other developed asylum systems in the region that the interpretation of the refugee definition is a very complex legal task that can produce widely differing results. Issues such as credibility, the severity of harm that amounts of persecution and the definition of particular social groups are fundamental to asylum eligibility and must be standardized across an asylum system in order to guarantee that similar cases reach similar results. However, beyond the regulations that give effect to the asylum system, there are no other sources of domestic law or guidance on how to interpret these issues. This can produce drastically disparate results on asylum applications.

9. In addition to these institutional deficiencies, there are important barriers in terms of access to the procedure. For example, the 2019 regulation establishes that applications for asylum can be presented at a migration checkpoint, such as those in border areas. Recently, however, with the crossing of migrant caravans through Guatemala, it became clear that there was no identification mechanism being employed by the Guatemalan authorities in order to screen for individuals in need of international protection. Instead, at Guatemala's southern border, uniformed U.S. immigration agents have assisted Guatemalan officials with breaking up caravan groups and facilitating their expulsion from the country, without ever providing information or orientation about the possibility of applying for asylum in Guatemala.[3] Within Guatemala, there is little to no awareness of the asylum procedures amongst government agencies and very little technical capacity even within the Guatemalan Migration Institute, making it effectively impossible that these

---

[2] UNHCR and the Government of Guatemala. *Sistema Nacional de Protección de Refugiados en Guatemala: Segunda edición* (National System for Refugee Protection in Guatemala: Second Edition), p. 2, 2018.

[3] *See* The Guardian. 'US agents aid in Guatemalan crackdown on hundreds of migrants headed north', January 16, 2020; Reuters. 'U.S. agents at Guatemala checkpoints see holes in border security', November 1, 2019.

CLP_PC_026236

Case 1:20-cv-00116-EGS Document 38-7 Filed 02/28/20 Page 4 of 16

agencies can orient migrants in the country about the possibility of seeking asylum. This is compounded by the fact that the transfer of functions and budgetary resources from the prior Migration Directorate to its successor Migration Institute has been slow and incomplete. At the end of 2019, the Guatemalan Migration Institute still did not have its own budget[4]. I understand that Guatemalan government agents have dissuaded individuals who request information about asylum from applying in my country and that, in some cases, the screening of asylum seekers is conducted by civil society organizations without any participation by the government. Additionally, as I will discuss below, migrants are extremely vulnerable to violence, extortion and other abuses in Guatemala. This context is inherently coercive and impedes that asylum seekers in Guatemala can freely decide whether or not to solicit international protection in that country. Taken together, the lack of access to the procedure and these conditions effectively prevent voluntary and informed decisions as to the presentation of an asylum application.

10. There are also structural deficiencies in the asylum law and regulations which undermine due process rights. After an asylum application has been received by the Guatemalan Migration Institute, the National Commission for Refugees (CONARE, by its Spanish acronym) conducts an interview and evaluates the application, making a recommendation to the National Migration Authority, which ultimately issues the eligibility decision. Under this framework, the decision maker has no interaction with the asylum seeker which seriously undermines the due process right to be heard. Moreover, the same National Migrant Authority is responsible for reviewing appeals from adverse eligibility determinations made in the first instance. The procedures do not contemplate the possibility of independent or impartial review, as the same agency that decided to deny the request is tasked with reviewing its own decision. While theoretically an asylum seeker could have recourse to the constitutional remedy of an *amparo*, similar to an injunction, in order to challenge an adverse refugee status decision, this is a general remedy for administrative actions that has hardly been applied to immigration-related issues. Consequently, it is unclear what criteria the courts would apply to decide whether to issue an *amparo* and if such decision would suspend a deportation. It is, however, highly likely that only highly sophisticated asylum seekers or those with access to counsel, would be able to access the *amparo* remedy.

11. CONARE has little to no independence from the National Migration Authority. Prior to the 2016 Migration Code and the subsequent regulatory reforms, CONARE was the entity responsible for deciding requests for the recognition of refugee status. Within its non-voting members, UNHCR could participate

[4] Procurador de los Derechos Humanos de Guatemala. *Informe Anual Circunstanciado de Actividades y de la Situación de los Derechos Humanos* (Annual Report on Activities and the Human Rights Situation), p. 305, 2019.



CLP_PC_026237

to voice its position with respect to asylum applications. Following the change in law, however, CONARE now only makes recommendations to the newly formed National Migration Authority which makes a final decision. However, the National Migration Authority now includes the Vice President of Guatemala amongst its members and excludes UNHCR from systematically voicing its observations in individual cases. This suggests that decision-making in asylum cases has become more politicized.

12. The Guatemalan asylum system is also inefficient and has generated a tremendous backlog of cases pending resolution. According to the Office of the Human Rights Ombudsman for Guatemala (*Procurador de Derechos Humanos*, in Spanish, or PDH) at the end of 2019 there were 632 asylum applications pending resolution[5]. When considered against the figure of 494 new asylum applications presented in 2019, it becomes clear that the system is not capable of attending to the relatively low number of applications that it receives annually, even in the absence of the recent agreement with the United States. This inefficiency is due in part to the fact that the CONARE does not operate on a full-time basis, but instead utilizes at least two sessions each month to carry out its responsibilities[6].

13. The backlog of cases before the Guatemalan asylum system contributes to prolonged processing times. Although the 2016 Migration Code (Article 189) establishes that the processing of applications should not take more than 90 days, the reality is different. Recent information from reported by the PDH indicate that more than 172 asylum seekers have been awaiting a decision on their applications since 2017[7]. Additionally, civil society organizations have denounced the failure to decide cases of LGBTI asylum seekers since 2018[8].

14. Additionally, neither the Migration Code or the Regulation guarantees the right to legal assistance in refugee status determination procedures, despite the fact such assistance is required under international law as a critical component of due process rights. In practice, the government does not provide for free legal representation in asylum processes. Unlike in the United States or in other countries with developed asylum systems, there is a complete lack of specialized civil society organizations in Guatemala with the technical and human capacity to fill this uncovered need. The absence of specialized organizations is consistent with the fact that there have historically been relatively few cases presented to the Guatemalan asylum system.

---

[5] Procurador de los Derechos Humanos de Guatemala. *Defensoría de las Personas Migrantes* (Office for the Defense of Migrants). Presentation – 2019.

[6] Government of the Republic of Guatemala. *Acuerdo de Autoridad Migratoria Nacional* (Agreement of National Migratory Authority)*, No. 02-2019.* Art. 16, 2019.

[7] Procurador de los Derechos Humanos de Guatemala. *Informe Anual Circunstanciado de Actividades y de la Situación de los Derechos Humanos* (Annual Report on Activities and the Human Rights Situation), p. 332, 2019.

[8] *Id.*

5

CLP_PC_026238

15. The administrative detention of asylum seekers is also a concern, given the lack of screening measures and the credible reports of the use of immigration detention in the country. A 2013 report from the International Detention Coalition (IDC) demonstrates that immigration authorities in Guatemala systematically apply detention measures, including in some cases, to asylum seekers.[9] This reflects the lack of individualized determination procedures as required by international law and suggests that individuals in need of international protection might suffer arbitrary detention in Guatemala.

16. Additionally, official statistics from 2019 reflect that in that year, a total of 26 applications for asylum were approved, suggesting a low asylum grant rate[10]. This raises concerns as to the quality of the interpretation of the refugee definition by the Guatemalan asylum institutions, and highlights the effects of the lack of official guidance as well as of the absence of organizations that can provide legal representation.

17. Moreover, despite having been urged by the Inter-American Commission on Human Rights to bring the Migration Code in line with international law, the Guatemalan law retains a provision (Article 50) which establishes sanctions for irregular entry into Guatemala, including return to country of origin. This provision, however, makes no exception for refugees and suggests the possibility of *refoulement* in violation of international law.

18. As a structural matter, the failure of the Guatemalan state to publish information on the functioning of its asylum system and readily available statistics undermines the transparency of the process as well as the opportunity to refine refugee processing in the country. There is a total lack of quantitative data concerning the number of applications denied and the corresponding processing times as qualitative data regarding the basis for denying applications for refugee status as well as of the criteria applied when those denials are reviewed. Similarly, there is a lack of clear and accessible information about how to access asylum, particular at border offices.[11] This has rendered the asylum system invisible in public debates and discourse and has exacerbated other structural problems around the asylum system.

Vulnerability of asylum seekers in Guatemala

19. Other conditions in Guatemala make it difficult for asylum seekers to access protection in the country, including the inability of the Guatemalan state to provide humanitarian assistance to cover basic needs. Guatemala is plagued

---

[9] International Detention Coalition. *¿Qué esperamos del futuro? Detención migratoria y alternativas a la detención en las Américas* (What do we hope for the future? Immigration Detention and Alternatives to Detention in the Americas), 2017.

[10] Government of the Republic of Guatemala. *Informe Anual (Cuantitativo) – Refugio,* (Annual report (Quantitative) – Asylum. 2019.

[11] Procurador de los Derechos Humanos de Guatemala. *Informe Anual Circunstanciado de Actividades y de la Situación de los Derechos Humanos* (Annual Report on Activities and the Human Rights Situation), p. 332-33, 2019.

CLP_PC_026239

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 452 of 721



**HUMAN RIGHTS WATCH**

Deportation with a Layover

     DONATE NOW

May 19, 2020

# Deportation with a Layover
## Failure of Protection under the US-Guatemala Asylum Cooperative Agreement

Available In   English   Español



Two asylum seekers, one from El Salvador, one from Honduras, wait inside a migrant house in Guatemala City after being sent to Guatemala from the United States on Tuesday, December 3, 2019, under an "asylum cooperative agreement" between the two countries. © 2019 AP Photo/Oliverde Ros

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept     **Other options**

CLP_PC_026308

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 453 of 721



**Deportation with a Layover**

     DONATE NOW

Guatemala without allowing them to lodge asylum claims in the United States, but also leaves them without access to effective protection in Guatemala. As a result, they are effectively compelled to abandon their asylum claims, and some who have a well-founded fear of persecution appear to be returning to their home countries where they are at real risk of serious harm.

Guatemala does not meet the standard required in US law for a "safe third country" – the ability to provide "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection."[1] Guatemala's asylum system is hamstrung by a limited legal framework that only allows high level officials to approve claims, which causes massive bottlenecks in a system that has only recently begun to function at all. At the end of March 2020 there was a backlog of 713 cases,[2] including every one of the few asylum applicants among ACA transferees;[3] the interministerial committee that decides asylum cases had not met from the time Covid-19 restrictions went into place in mid-March through the time of writing this report in late April.[4]

Prior to the suspension of the ACA on March 16, 2020, local nongovernmental partners for the UN High Commissioner for Refugees (UNHCR) had interviewed a portion of the people transferred under the ACA and found that about two-thirds of those interviewed had international protection concerns. [5] However, only a small proportion of those who expressed fear of return to their home countries applied for asylum in Guatemala, UNHCR said. Many also told UNHCR's partners they were unwilling to stay in Guatemala, citing their inability to support themselves there, distrust of the authorities, and Guatemala's proximity to their home countries, fearing that their persecutors could still reach them.[6]

Refugees International and Human Rights Watch conducted research on the impact of the ACA in Guatemala in February 2020, investigating the vulnerabilities of transferees and the lack of support for them in Guatemala, as well as their access to the Guatemalan asylum system and its capacity to provide protection to those needing it.

All 30 of the ACA transferees Refugees International and Human Rights Watch interviewed described abusive conditions at the US border, including receiving inedible frozen food, having no access to showers for several days at a time, being unable to sleep because lights were constantly left on, being

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

CLP_PC_026309

3/13/23, 8:04 PM
Deportation with a Layover: Failure of Protection under the US-Guatemala Asylum Cooperative Agreement | HRW

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 454 of 721



**Deportation with a Layover**

     DONATE NOW

to support their claims of fear of return.

The ACA transferees also gave accounts showing that their registration and processing at the Guatemalan airport was inadequate, lacking in both humanitarian reception care and access to information. Transferees, including small children, waited hours on the tarmac with no food, water, or adequate medical attention.[7] The actual registration process took a cursory two-to-three minutes, during which transferees were not provided any information regarding what would happen to them in Guatemala.[8]

Transferees under the ACA were thrust into a high-pressure situation in which they lacked adequate time and resources to make truly informed, voluntary choices about what to do. Once transferees were registered at the airport, they had 72 hours to make the decision about whether they would remain in Guatemala, return to the countries they fled, or try to find refuge elsewhere.[9] The Guatemalan government's 72-hour time limit is arbitrary and coercive, giving transferees insufficient time to make such monumental decisions.

Only one person out of the 30 people subject to the ACA interviewed by Refugees International and Human Rights Watch said they were applying for asylum in Guatemala. Several said they had no family or support networks in Guatemala and that they feared for their safety in Guatemala. Many indicated they would return to El Salvador and Honduras despite continuing to express a fear of persecution there.

The United States transferred 939 Honduran and Salvadoran asylum seekers, the vast majority of them women and children, to Guatemala under the US-Guatemala ACA between November 21, 2019 and March 16, 2020.[10] Only 20 of the 939 transferees – about 2 percent – applied for asylum in Guatemala even though many of them had well-founded fears of persecution in their home countries.[11]

Our interviews indicate that the ACA has been implemented in a way that effectively compels transferees to abandon their claims. In Guatemala, transferees have an unreasonably short time frame to make a decision whether to apply for asylum in Guatemala, which has a cumbersome and ineffectual

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

CLP_PC_026310

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 455 of 721



**Deportation with a Layover**

      DONATE NOW

obligations by not examining the asylum claims of asylum seekers it is forcibly sending to Guatemala.

Transfers under the ACA were temporarily suspended in mid-March in response to the Covid-19 pandemic.[12] Refugees International and Human Rights Watch call on the US and Guatemalan governments to rescind the Guatemalan ACA completely, rather than plan for its resumption. The United States should also halt plans to begin transferring asylum seekers to El Salvador and Honduras under asylum cooperative agreements that have been signed but are not yet implemented.[13]

## Related Content



**May 19, 2020**  |  News Release

## US: Abusive Transfers of Asylum Seekers to Guatemala

Agreement Denies Hondurans, Salvadorans Effective Protection

## Methodology

In February 2020, Human Rights Watch and Refugees International interviewed 30 Hondurans and Salvadorans whom the United States had removed or "transferred" to Guatemala under the ACA. The interviews began when the policy was still new, but also when transfers under the policy hit their peak.

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

CLP_PC_026311

Justsecurity.org

# Biden's Embrace of Trump's Transit Ban Violates US Legal and Moral Refugee Obligations

by Karen Musalo

*February 8, 2023*

The Biden administration is poised to resurrect a Trump-era policy, the transit ban, which in its most recent form was repeatedly struck down by the courts as unlawful. The new transit ban, the subject of a notice of proposed rulemaking, would create a "rebuttable presumption of asylum ineligibility" for individuals arriving at the southern border who have not sought "protection in a country through which they traveled" on their journey, "unless they meet exceptions that will be specified." The announcement of the imminent policy change drew quick condemnation in a letter from members of Congress, as well as in separate letters from faith-based and civil rights and human rights organizations.

The new transit ban would violate the United States' protection obligations to refugees, which are long-standing and solidly based in both international and domestic law. The United States acceded in 1968 to the Refugee Protocol, which incorporates the substantive provisions of the 1951 Refugee Convention. With congressional passage of the Refugee Act in 1980, the United States aligned its federal immigration statute with the provisions of the Refugee Convention and Protocol. The cornerstone of both international and domestic law is the principle of non-refoulement, the prohibition against returning refugees to any country where their lives or freedom would be threatened.

Although the U.S. refugee statute does permit the denial of asylum to those who pass through a "safe third country" en route to the United States and do not apply for protection there, the law sets forth two non-negotiable requirements – the country of transit must not be one where the asylum seeker's life or freedom would be threatened on account of their race, religion, nationality, membership in a particular social group, or

CLP_PC_029159

political opinion, and the asylum seeker must have access to a "full and fair" procedure for determining claims to protection. (The United States must also have a formal agreement with the third country.)  These conditions are not met in the countries most asylum seekers travel through on their way to the United States.

The Biden administration will undoubtedly argue that because the proposed rule imposes only a rebuttable presumption instead of an outright prohibition, it is distinguishable from Trump's legal ban and will pass legal muster. But the facts on the ground do not support even a presumption of safety and access to a full and fair procedure.

Furthermore, if the presumption of ineligibility is applied during credible fear screening interviews at the border, as part of the deeply flawed expedited removal process, it will be very difficult for asylum seekers to clear the hurdle it presents. The majority of asylum seekers navigate expedited removal without an attorney, and do not possess detailed knowledge of human rights conditions and asylum procedures in each of the countries they transited in order to make the case that they qualify for an exception. The United Nations High Commissioner for Refugees (UNHCR) has specifically recommended that "exclusion" decisions, which would include decisions such as those made on the applicability of the transit ban, not be made in accelerated procedures such as expedited removal.

All migrants arriving at the southern border have transited Mexico, and depending on their country of origin and route, they may have traveled through Guatemala, El Salvador, Honduras, Nicaragua, Costa Rica, or Panama before arriving to Mexico. With the possible exception of Costa Rica, none of these countries of transit offer the safety or access to a refugee protection system which would justify imposition of the ban.

Pervasive violence against migrants in Mexico, carried out by state as well as non-state actors, has been well-documented. The most recent U.S. State Department country conditions report noted the "targeting and victimization" of migrants, and in striking down the Trump transit ban in July 2020, the Ninth Circuit Court of Appeals cited the high levels of violence, including sexual violence, against asylum seekers in Mexico.

CLP_PC_029160

Even if Mexico were safe, which it is not, U.S. policies, such as Title 42, have overwhelmed its refugee system, preventing meaningful access to a "full and fair" procedure. A little over a decade ago – in 2011 – a  total of 752 claims for refugee protection were lodged; in 2021 the number had soared to over 130,000. Funding has not kept pace, and the Mexican Commission for Refugee Assistance (COMAR) lacks resources for its core operations.

The four Central American countries south of Mexico – Guatemala, El Salvador, Honduras, and Nicaragua – are even less able to pass the safe third country test. Significant human rights abuses, including extrajudicial killings, torture, and disappearances, prevail at high levels in each country. Honduras, El Salvador, and Guatemala have the highest rates of femicides (gender-motivated killings) in the world, as well as extreme violence against LGBTQ+ individuals, while the brutal suppression of political opponents to the authoritarian regime in Nicaragua is well-documented.

Furthermore, not one of the four countries has anything approaching an adequate refugee protection system. Guatemala's system has been described as "inadequate" and cumbersome, and El Salvador's as having "major regulatory and operational gaps." The system in Honduras is "nascent," and those individuals who try to access it, especially women, children, and LGBTQ+ individuals, are especially vulnerable to abuse and sexual exploitation. Nicaragua is even more of an outlier, having ceased any cooperation with the UNHCR; in 2015 it suspended meetings of its refugee determination body, the National Commission for Refugees.

This leaves Costa Rica, a country with a population of five million, and Panama, a country of four million, as remaining countries of transit for the majority of asylum seekers arriving to the United States. Although they have human rights records far superior to any of the countries discussed above, access to protection is complicated by the unique circumstances in each.

Costa Rica, with its admirable human rights record, well-established asylum framework, and history of welcoming refugees, has long been viewed as a destination country for those seeking protection. In recent years, however, it has been swamped by claims for protection; in 2021 and 2022, it was among the top four countries globally for asylum

CLP_PC_029161

claims registered. In the beginning of 2022, the UNHCR reported just under 1.44 million asylum seekers in the United States — a country of 332 million — and 204,730 applications in Costa Rica, a country of 5 million; in other words, Costa Rica is already taking approximately 10 times as many refugees per capita as the United States. The rising numbers have overwhelmed Costa Rica's systems, resulting in delays, difficulty accessing protection, and a rise in "xenophobic, racist, and discriminatory" attitudes. This has also led to the adoption of restrictive asylum policies, including its own "safe third country" ban, and rules that limit the right to work and freedom of movement.

In contrast to Costa Rica, a country of destination, Panama has been seen as a country of transit. Migrants enter via the Isthmus of Darién, which straddles the border of Panama and Colombia. They then travel north on the infamously dangerous route known as the Darién Gap. Panama has also experienced a dramatic rise in numbers. In the seven years from 2013 to 2020, just over 100,000 migrants entered Panama through the Darién, while in 2021 alone, the number rose to 140,000.

Panama has a refugee protection system, but the process is difficult to access. The country applies its refugee laws in an extremely narrow manner, leading Panama to have an asylum approval rate of only 1 percent, and a record of having only granted asylum to 2,500 refugees since it began hearing claims. In-country experts consider refugee status to be "the single most difficult pathway" to obtain legal status in Panama. Even those who are recognized as refugees find it difficult to integrate due to laws which prohibit non-citizens from a broad range of professions. Human rights groups have proposed and advocated for migration reform so that ultimately Panama can become a "safe harbor for . . . refugees." However, that day has yet to arrive.

The Biden administration could be forgiven if it were totally unaware of the conditions in the countries of transit – which are either patently unsafe, or beyond capacity.  But lack of knowledge is not the case, making the administration's actions all the more deplorable. With the planned implementation of his own version of a transit ban, Biden stands willing to outsource U.S. protection obligations to countries such as Costa Rica, which are already overwhelmed by a disproportionately high rate of asylum applications per capita, or in the alternative, to return those fleeing persecution to situations as violent as those they have fled.

CLP_PC_029162

But beyond the legal folly of resurrecting the ban is the shame that this administration should feel when it repudiates its international and domestic obligations, tries to offload its responsibilities to smaller countries with far less resources, and abandons not only refugees seeking protection, but its own moral high ground. One can only hope that the Biden administration will heed the call of lawmakers, faith leaders, and community groups to reconsider its plan to impose a transit ban. If it does not, it can anticipate a sustained critique throughout the notice and comment period, and beyond.

*IMAGE: US President Joe Biden speaks with El Paso Mayor Oscar Leeser as he visits the US-Mexico border in El Paso, Texas, on January 8, 2023. (Photo by JIM WATSON/AFP via Getty Images)*

## About the Author(s)

## Karen Musalo

Karen Musalo (@KarenMusalo) is a law professor and founding director of the Center for Gender & Refugee Studies at the University of California, Law, San Francisco. She is the principal author of "Refugee Law and Policy: A Comparative and International Approach," and has litigated major landmark cases in gender asylum over the past 25 years, including as lead counsel in Matter of Kasinga and Matter of R-A- and co-counsel in Matter of A-B- and Matter of A-C-A-A-.

 **U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Unit**

# Guatemala: Treatment of Non-Guatemalan Migrants
November 15, 2019

> *Do you have any information on the treatment of non-Guatemalan migrants in Guatemala?*

This query originated from Asylum Headquarters, RAIO, USCIS.

For this response, per the request of Asylum Headquarters, relevant text from Spanish-language sources has been translated into English.

The following sources discuss the treatment of non-Guatemalan migrants in Guatemala:

- [Trump wants border-bound asylum seekers to find refuge in Guatemala instead. Guatemala isn't ready.](#), The Washington Post, Aug. 16, 2019.

- [Paradoxes of Protection: Compassionate Repression at the Mexico–Guatemala Border](#), Journal on Migration and Human Security, 2019, Vol. 7(3), p. 62-78 (in particular, see p. 69-70, 74).

- [Informe Anual Circunstanciado de Actividades y de la Situación de los Derechos Humanos 2018](#) [Annual Report of Actions and Situation of Human Rights 2018], Procurador de los Derechos Humanos [Guatemala's Human Rights Ombudsman], Jan. 2019. (see "Migrants in Transit through Guatemala," p. 292-294; "Migrants in Guatemala as a Destination Country," p.294-297; "Refugees" p.297-299).

  **Migrants in Transit through Guatemala**

  The Guatemalan State has visualized the migrant population from another region as a problem that threatens national security. They have also faced communication barriers for speaking languages other than Spanish or English; the application of arbitrary criteria to allow them to enter Guatemalan territory by representatives of the Guatemalan Institute of Migration applied especially to people of extra-continental origin (Congo, Cameroon, India, among others); institutional abandonment to find themselves stranded in the international area of Aurora International Airport; in some cases, there are not even consulates of their countries in Guatemala; actions to prevent them from accessing shelter, among others.

  Among the situations that have afflicted Central American migrants are abuses and mistreatment by the PNC [National Civil Police]; extortion, theft, and assault by migratory authorities; lack of information on the possibility of accessing the processes of international protection according to their needs; discrimination and

CLP_RC_029447
USCIS000041



stigmatization due to origin and belonging to the LGBTI community; kidnapping; extortion, as well as victims of trafficking. […]

During the institutional intervention, several risk factors during the route and in the shelters, especially for children and adolescents, were identified; lack of capacity of the State to attend to the migration population in transit; the absence of the work that the migration authorities must carry out under the Code of Migration was notorious, as well as that of other state actors related to the issue; repressive actions by security forces were observed.  On the other hand, the assistance from civil organizations, particularly individuals and even companies, was essential for the humanitarian assistance. (p.292-294)

- Situation of Human Rights in Guatemala, Inter-American Commission on Human Rights (IACHR), Dec. 31, 2017 (see p.123, paragraph 235).

- Concluding observations on the second periodic report of Guatemala, UN Committee on Migrant Workers, May 2, 2019.

- Country Reports on Human Rights Practices for 2018 – Guatemala, U.S. Department of State, Mar. 2019.

- Concluding observations on the seventh periodic report of Guatemala, UN Committee against Torture, Dec. 26, 2018 (see p. 11, paragraph 34).

- Annual report of the United Nations High Commissioner for Human Rights on the activities of the Office of the High Commissioner in Guatemala, OHCHR, Feb. 9, 2018 (see p.8, paragraph 36).

- Migrantes hondureños baleados en el Periférico: no sabemos por qué nos atacaron [Honduran migrants shot on the Periférico: we don't know why they attacked us], Prensa Libre (Guat.), Apr. 20, 2019.

    The Honduran migrants who were attacked while traveling as a group on April 11 on the Peripheral Ring try to recover, not only from their physical injuries, but also emotionally.  They agree on one thing: they have no idea why they were shot. […]

    The migrant even denies the version given by some neighbors and merchants in the area that they would have been confused with criminals since, at the time of the attack, he says, none of the group talked or tried to approach someone, they simply walked along the Peripheral. […]

    The migrants were part of a group of approximately one thousands Hondurans who had left by caravan from San Pedro Sula on April 9. […]

    Of the group of 10 who were attacked on the Peripheral Ring, the four who were wounded were taken to the San Juan de Dios General Hospital, of which, last

CLP_RC_029448
USCIS000042

| | |
|---|---|
| From: | Salcedo, Viviana |
| To: | Mazzochi, Sarah |
| Subject: | Fwd: Asylum staffing in NCA countries |
| Date: | Friday, October 4, 2019 2:21:11 PM |

Here you go!

Get Outlook for iOS

**From:** Katie Tobin ███████████████
**Sent:** Tuesday, October 1, 2019 11:01 AM
**To:** Salcedo, Viviana
**Subject:** Asylum staffing in NCA countries

Hi Viviana,

I thought this info may be of interest to you too, especially with your meeting with USCIS today…

Cheers,

Katie

**From:** Giovanni Bassu ███████████████
**Sent:** Monday, September 30, 2019 3:38 PM
**To:** Coine, Glenn ██████████████
**Cc:** Samuelson, Andrea L ██████████████████████; Chiara Cardoletti-Carroll ██████████████████;
Katie Tobin ████████████████
**Subject:** RE: URGENT PRM request for information

Dear Glenn

This is what we know, although the question of budget is not easy for us to check.

- Guatemala:
  - Currently, the Office of International Migration Relations has a team of 7 full-time employees. Before the month of February there were only 4, the 3 additional people have been integrated in the last few months. The CONARE has 4 officials (one of them from the National Migration Institute (IGM)). The Migration Authority is composed of 9 institutions in total, 4 of which are attending the CONARE meetings .

CLP_PC_029465
DHSFF1253

We do not have information on the National Migration Authority or the National Refugee Commission annual budgets

- El Salvador:
  - CODER does not have its own budget, nor does it have staff dedicated exclusively to tasks of the organization. They are employees of the Ministry of Foreign Affairs whose duties include those related to the CODER

- Honduras:
  - The National Migration Institute, Human Rights Management has a team of 12 employees (amongst which 3 people are eligibility officers, and 1 staff is dedicated to collecting COI).
  - The Commission for the Analysis, Revision, and Dictum on the Status of Refugees is composed of 3 members of the Ministry of Justice, Governance and Decentralization and 3 members of the INM. Additionally, 2 eligibility officers assist the human rights manager in the presentation of cases during the commission.
  - We do not have information on their annual budgets

Best

Giovani

CLP_PC_029466
DHSFF1254

# UNPROTECTED

## GENDER-BASED VIOLENCE AGAINST VENEZUELAN REFUGEE WOMEN IN COLOMBIA AND PERU



CLP_PC_029603

Amnesty International is a movement of 10 million people which mobilizes the humanity in everyone and campaigns for change so we can all enjoy our human rights.

Our vision is of a world where those in power keep their promises, respect international law and are held to account.

We are independent of any government, political ideology, economic interest or religion and are funded mainly by our membership and individual donations.

We believe that acting in solidarity and compassion with people everywhere can change our societies for the better.

© Amnesty International 2020
Except where otherwise noted, content in this document is licensed under a Crea-tive Commons (attribution, non-commercial, no derivatives, international 4.0) licence.
https://creativecommons.org/licenses/by-nc-nd/4.0/legalcode
For more information please visit the permissions page on our website: www.amnesty.org
Where material is attributed to a copyright owner other than Amnesty International this
material is not subject to the Creative Commons licence.

First published in 2020
by Amnesty International Ltd
Peter Benenson House, 1 Easton Street
London WC1X 0DW, UK

Index: AMR 01/5675/2022
Original language: Spanish



*Cover photo:*
*© Fernanda Pineda*
*Cover design:*
*© Sergio Ortiz*

**amnesty.org**



CLP_PC_029604

# 1. EXECUTIVE SUMMARY

> **"We are a population at risk, we did not come here for pleasure or on a whim, we came here to escape from a regime that does not allow us to live a decent life… because if you work it's in order to be able to have a decent livelihood. We came here looking for a better future. To be respected as women... But it seems that... you don't want us here."** Mariela, a Venezuelan woman in Colombia

Mariela was forced to leave Venezuela in 2018 because of the lack of access to food, education and healthcare for herself and her children and the high levels of inflation in the country. For her, as for many refugee and migrant women, the decision to leave was not an easy one and when she arrived in Colombia and later Peru, the two main host countries for Venezuelan refugees, she faced various forms of gender-based violence. Mariela told Amnesty International about the different abuses she has experienced in Colombia as a Venezuelan woman.

UN Women has described gender-based violence in Latin America as "the shadow pandemic".[1] For refugee and migrant women, their migration status increases the risks they face, exposing them to gender-based violence on the migration route and in the cities in which they decide to settle. Despite high levels of under-reporting, existing data show that gender-based violence against refugee women has increased in recent years in Colombia and Peru, the two countries that are the focus of Amnesty International's research in this report. The number of reported cases has risen in Colombia from 2,430 to 4,165 between 2018 and 2020[2], and in Peru from 1,384 in 2019 to 1,818 in 2021.[3]

Xenophobia and myths about the security issues caused by migration in cities; prejudices related to the perceived sexuality of women (branded as people who "steal husbands" or as sex workers); changes in gender roles in partner or family relationships during the migration process; and the challenge to pre-established gender roles in society, are some of the underlying causes of violence against Venezuelan women.

## Violence in all spaces

As Amnesty International has documented, violence occurs in all contexts. Women are repeatedly subjected to attacks and sexual violence in public spaces, both in the host cities where they live and along the migration route. Irregular border crossings are spaces where Venezuelan refugee women experience violence by organized armed groups, while some are recruited in Venezuela for the purpose of labour or sexual exploitation.

As regards the workplace, it is per se a violent space for Venezuelan refugee women in both countries. Venezuelan women face compound stereotypes in their search for decent work, denied the opportunity to access work because they are Venezuelan, as well as discriminatory factors such as age. In the absence of support networks, childcare spaces for their young children and real opportunities for inclusion in the workforce in decent conditions, many Venezuelan women are forced to resort to work in the informal sector, as street vendors, often with their children in tow, where they are exposed to various forms of violence and labour exploitation, including being co-opted for work for the purpose of sexual exploitation. Given this precarious work context, some women have chosen to engage in sex work. Compound stereotypes also create an environment in which Venezuelan women experience gender-based violence in the workplace when they do manage to access one.

---

1 UN Women, The Shadow Pandemic: Violence against women during COVID-19, https://www.unwomen.org/en/news/in-focus/in-focus-gender-equality-in-covid-19-response/violence-against-women-during-covid-19

2 Colombian Ministry of Health, National Observatory on Gender-Based Violence, https://www.sispro.gov.co/observatorios/onviolencias-genero/Paginas/home.aspx (filter: General indicators and Venezuelan women), (Spanish only).

3 Figures from the Women's Emergency Centre (Centro Emergencia Mujer, CEM) records on sexual violence, for the years 2019, 2020 and 2021. Cases of sexual violence – Rape, indecent assault, sexual harassment and sexual assault in public places, https://portalestadistico.aurora.gob.pe/formas-de-la-violencia-2019/ and CEM records (Spanish only).

## Absence of state protection

Although both countries have legal frameworks designed to address and punish gender-based violence, Amnesty International believes that the Colombian and Peruvian states are major absences when it comes to guaranteeing, protecting and respecting in practice the rights to a life free of violence for Venezuelan refugee women and access to justice for women survivors of gender-based violence. The organization's research reveals that Venezuelan women refugees do not have effective access to international protection and migration regularization processes because many do not receive information on this from the states. This creates a first and significant obstacle to the protection of their rights.

Furthermore, Venezuelan women face multiple obstacles in accessing justice and health services without discrimination. The general perception of widespread impunity and a lack of effectiveness in the way the justice systems function in general – both for their nationals and foreign nationals – are factors that discourage many women from reporting gender-based violence in both countries. But Venezuelan refugee women also face specific challenges: the fact that their migration status is not regularized leads them to believe that they do not have the same rights as the rest of the population and that, therefore, they cannot turn to institutions to demand these rights, or that if they do so, they would risk being deported to Venezuela. Added to this is the gap in access to information on care pathways for survivors of gender-based violence; Venezuelan women report that they do not know what these are, which institution to go to or what mechanisms exist.

Officials responsible for providing services for survivors of gender-based violence are not aware of the rights and needs of refugee and migrant women in terms of access to existing pathways and protection measures. In addition, on many occasions they have internalized compound stereotypes, in which male violence is combined with xenophobic prejudices against Venezuelans. This results not only in a denial of access to justice for these women, but also in new forms of violence and discrimination against them by those who have a duty to support and protect them.

Amnesty International identified other shortcomings in state responses in both countries, such as the lack of availability of and access to temporary shelters for survivors of gender-based violence, which particularly affects Venezuelan women, who do not have support networks, and the failure to collect adequate statistical information that would facilitate the development of public policies that address the differentiated impact of these forms of violence on Venezuelan women.

In addition, the absence of effective campaigns to challenge the compound stereotypes that foster this violence, and so prevent it, contributes to and exacerbates the continuing violence against Venezuelan women in these countries.

As regards healthcare services, in Colombia and Peru the law establishes that, in the case of survivors of gender-based violence, these services fall under the category of emergency services, so no one can be denied them. However, Amnesty International found that, in practice, the absence of a clear definition by healthcare systems of what is considered an emergency in cases of gender-based violence, including sexual violence, results in frontline public officials interpreting it in different ways, which restricts Venezuelan refugee women's access to health services.

Amnesty International calls on the Colombian and Peruvian authorities to take measures to ensure that all women can enjoy a life free from violence and free from discrimination on the basis of gender, nationality, migration status or any other grounds. In the case of Venezuelan refugee women, this requires immediate measures to challenge the entrenched compound stereotypes that foster and perpetuate violations of their human rights.

CLP_PC_029609



**HUMAN RIGHTS WATCH**

MAY 31, 2022

# US: LGBT Asylum Seekers in Danger at the Border

Biden Should Immediately Safeguard At-Risk Groups, Restore Asylum Access
Published in



### Ari Sawyer
US Border Researcher, US Program

🐦 **AriMSawyer**

(Ciudad Juárez) – Lesbian, gay, bisexual and transgender (LGBT) people and other asylum seekers fleeing persecution in their home countries experience abusive and dangerous conditions in Mexico when not allowed to cross the border to seek asylum, Human Rights Watch said today.

Two policies implemented by the administration of former President Donald J. Trump – the Migrant Protection Protocols, commonly known as "Remain in Mexico," and the Title 42 summary expulsion policy – continue to be used under the Biden administration to block access to the asylum system for most people who try to cross into



At a rally in Tijuana, Mexico, people hold placards reading "Stand for Asylum" and "Stop Title 42 Now." The US policy often called "Title 42" allows border agents to expel people summarily to Mexico or their countries of origin with no opportunity to apply for asylum.

© 2022 Aimee Melo/picture-alliance/dpa/AP Images

the US to seek safety. This includes people at a greater risk of harm in Mexico because of their particular conditions or identities, including gender identity or expression, disability, and age who should be entitled to an exception from expulsion. US authorities should stop sending asylum seekers to Mexico or expelling them to their countries of origin and should quickly process people waiting at the border to seek asylum who are at particular risk of abuse.

CLP_PC_029700

"The United States should restore access to asylum for all, but so long as Biden is blocked from doing so, he should at the very least immediately use existing exceptions for at-risk asylum seekers, including LGBT people," said Ari Sawyer, US border researcher at Human Rights Watch. "Continuing to summarily expel LGBT and HIV-positive asylum seekers to Mexico or their country of origin places their lives at serious risk."

US government protocols include exceptions for asylum seekers at a greater risk, and President Joe Biden has promised US agents will apply them. But border agents have broad discretion to grant or deny exceptions, and there are no clear consequences for agents who fail to do so or checks to ensure that exceptions are being handled properly, Human Rights Watch found.

Despite a recognition by the US Department of Homeland Security (DHS) that LGBT people may face "increased risk of harm in Mexico due to their sexual orientation or gender identity," Human Rights Watch documented cases in which border officials returned LGBT asylum seekers, including those with HIV, to Mexico under both abusive anti-asylum policies.

Human Rights Watch conducted 29 interviews with asylum seekers, migrants' rights groups, and United Nations agency officials in April and May 2022, in person and by phone, in Ciudad Juárez and Mexico City, and in El Paso, Texas. Human Rights Watch undertook research in coordination with Casa de Colores, a US-Mexican organization working to provide shelter and legal services to LGBT asylum seekers.

LGBT asylum seekers told Human Rights Watch they had been expelled even after expressing their fear of returning and telling border agents they identified as LGBT, had HIV, or had experienced abuse related to their gender identity, gender expression, or sexual orientation. They also described serious abuse during their journeys to the border, including by Mexican officials.

One woman interviewed fled to the United States from Honduras, where she previously faced targeted violence for living openly as a lesbian woman, including one incident when someone cut her face, leaving a large scar. Near the US border, people she believed to be members of a Mexican cartel kidnapped her and forcibly took nude photos of her.

She said that when she explained to US border officials that she was a lesbian seeking asylum from Honduras and that she had also experienced abuse in Mexico, agents laughed at her. She said one agent told her, "I don't care what's happening to you." She was expelled to Honduras, and immediately fled again to the US border, this time afraid to seek asylum for fear of being returned to Honduras again.

Previous Human Rights Watch research has highlighted the risk of illegal and arbitrary arrest, torture, extrajudicial execution, sexual assault, and enforced disappearance for LGBT people in Central America.

Although the Biden administration has moved to terminate both Title 42 and Remain in Mexico, several US state officials have filed suits in federal court, resulting in orders to keep the programs in place during litigation

CLP_PC_029701

litigation.

A federal district court judge has temporarily blocked the Biden administration from ending the expulsion policy, which was first issued at the start of the Covid-19 pandemic against the recommendation of top public health experts. There is no evidence that people seeking asylum pose a public health threat to the United States, and the expulsion policy cannot be justified on public health grounds.

Though the initial Title 42 was issued without "notice and comment" procedures, allowing a period for the public to comment, the judge found that the Biden administration should have gone through these administrative consultation processes to end Title 42. Some US lawmakers have proposed legislation that would keep summary expulsions in place until pandemic public health measures are terminated.

Asylum seekers and other migrants sent to Mexico are often unable to support themselves or access basic services such as shelter, food, water, safe transportation, or health care, and have no meaningful recourse for abuses from criminal cartels or Mexican authorities. In the Mexican state of Tamaulipas, Human Rights Watch found that asylum seekers and other migrants are systematically targeted for kidnapping, extortion, rape, and other violence, by both government officials and criminals.

LGBT people constitute one particularly at-risk group of asylum seekers, among others, including people with disabilities and chronic health conditions, Black and Indigenous asylum seekers, asylum seekers who do not speak Spanish as a first language, and families traveling with children.

LGBT asylum seekers and asylum seekers with HIV described additional discrimination and abuse as well as barriers to accessing essential services, including life-saving antiretroviral therapy and gender-affirming health care, services that include medical and mental health services, continuation of hormonal treatment, and other services for transgender and nonbinary people that are crucial to their health and well-being.

### National Institute of Migration Response to HRW 5.31.22

Human Rights Watch asked Mexico's National Migration Institute for more information on allegations made against immigration agents. The agency responded on May 31 and said they were unaware of any reports of such abuses, were not able to investigate them, and that the Mexican constitution prohibits such behavior.

The United States has an obligation to protect refugees from returning to a threat of persecution, ill-treatment, and threats to life and safety, Human Rights Watch said. President Biden should ensure that the United States complies with its domestic and international legal obligations to respect the right to seek asylum.

"LGBTQ+ and HIV-positive asylum seekers face grave risks to their health and safety from the time they flee their countries, often after years of targeted abuse, to when they arrive at the US border," said Susana Coreas,

CLP_PC_029702

director of Casa de Colores. "Biden has rightly committed to protecting LGBTQ+ refugees. He should follow through on that promise and ensure all asylum seekers are welcomed with dignity at the border."

## Abuse at the US Border

Human Rights Watch spoke with 20 LGBT asylum seekers in Ciudad Juárez, Mexico, who hoped to cross into the United States and be allowed to seek protection. Nearly all reported they were not approaching the border or trying to ask US officials for asylum because they feared they would be expelled to Mexico or their country of origin. They said they preferred to wait for the Biden administration to restore access to asylum or for legal aid to make a request for exemption from the expulsion policy. Four asylum seekers reported that they had previously been expelled to Mexico or their country of origin without an asylum screening.

When Adolfo H. and Gerardo C., a gay couple fleeing Cuba and El Salvador, respectively, who like others interviewed are not identified by their real names for their protection, tried to seek asylum at the US border in February 2022, they were expelled by US Customs and Border Protection (CBP) agents to Mexico. They had previously experienced extortion several times by Mexican immigration agents, who stopped them at various points along their journey and demanded payment to continue. At the time, they were not yet married. US officials told the couple that Adolfo could stay and seek asylum in the United States because he is from Cuba but that his partner would be expelled, even though border officials had the authority to allow both men in. Instead, they gave them the option of being separated or of being expelled together. They said that while they were in custody, US officials told them to stop holding hands or touching one another. Faced with the prospect of being separated again, they got married in Mexico, hoping that given another chance, they would be allowed to seek asylum together.

- José M., a gay man who fled death threats in Honduras based on his sexual orientation, said he had tried to cross the border in March 2021. He was afraid to stay in Mexico, where he said he has experienced extortion and violence at the hands of Mexican police and discrimination at shelters. On his way to the border, Mexican immigration agents stopped the bus he was on and made everyone get off, he said, forcing each migrant to pay a bribe of about US$25 each or be expelled from the country. He also said that because of his gender expression and sexual orientation, some shelters did not allow him to stay there, leaving him to sleep on the streets. In Ciudad Juarez, the shelter operators told him it was a sin to be gay and said that if he and other LGBT asylum seekers didn't go to religious service, they would be forced to leave. He said he had told US border officials that he is gay and that he was afraid to be sent to Mexico, but hours later CBP agents sent him to Mexico. Before expelling him, US officials made him throw away everything he had, including the few clothes he had. US border agents typically throw away migrants' possessions, including items such as medicine, baby blankets, important identity documents, documents needed to prove an asylum claim, and memorabilia that hold sentimental value, claiming the practice is for health and safety reasons.

CLP_PC_029703

The Biden administration has also recently placed some LGBT people in the Remain in Mexico program, officials with the International Organization of Migration (IOM) told Human Rights Watch, sending them to Ciudad Juárez despite the exemption for LGBT people and others at particular risk of abuse. IOM operates a shelter for newly expelled or returned asylum seekers to test them for Covid-19 and provide quarantine before they move on to other shelters. IOM officials said LGBT asylum seekers had been sent to Mexico even after they explicitly told US border agents about their gender identity or sexual orientation.

**Abuses in Country of Origin**

LGBT asylum seekers interviewed reported serious abuses in their countries of origin, including rape, assault, death threats, extortion, and forced disappearances or killings of romantic partners and friends.

- Juan C., a transgender man, fled Honduras after he received death threats related to his gender identity and activism in an LGBT rights organization. He said that several LGBT people he has known have been killed or disappeared there. He said that the police detained him without charges on several occasions. In 2021, two men raped him and his girlfriend after saying, "Who is the man and who is the woman in the relationship?" and saying that the couple were transgender and lesbian only because they had not had sex with a man. "They said, 'We are going to make you women,'" Juan said.

- Eduardo O., a gay man from Honduras, said he fled the country shortly after gang members beat his romantic partner to death. Gang members had previously threatened to kill Eduardo. Then in June 2021, the same gang members attacked him and his partner while they were together. While Eduardo was able to escape, he said, his partner could not. He said he reported his partner's murder to the police, who did not investigate.

- Kayla R., a transgender woman from Guatemala, said she had to flee and seek asylum after the gangs who were extorting the business where she worked beat her when she and the store owner couldn't pay, leaving prominent scars on her face. On another occasion, gang members beat her in the street while using anti-LGBT slurs. They left a large gash and scar on her head.

**Discrimination and Abuse in Mexico**

Human Rights Watch also documented serious abuse and discrimination against LGBT asylum seekers in Mexico. Several LGBT asylum seekers said that Mexican immigration agents, police, and National Guard soldiers targeted them for extortion. Other asylum seekers experienced kidnapping, sexual assault, robbery, and other physical violence by both Mexican government officials and criminals.

- Brenda F., a transgender woman, fled El Salvador in 2017 after gang members who wanted her to sell drugs beat and threatened to kill her. After applying for protection and living for a few years in Mexico, she said she was riding a bus from Monterrey to Matamoros in the Mexican state of Tamaulipas in May 2020 when, at a checkpoint, immigration agents pulled her off the bus and took her into an office about

CLP_PC_029704

25 meters away. While another immigration agent stood watch outside the office, the agent questioned her about her destination and reason for traveling, she showed him an order from a doctor for laboratory tests. He accused her of lying and of wanting to cross into the United States and grabbed his genitalia, saying if she wouldn't "give me what I want," he could have two police officers expel her to Guatemala. Afterward, he told her that if she reported him, he had already taken a photo of her identification and would come after her. She said she knows other trans women who have experienced sexual assault at the hands of Mexican immigration agents.

- Mariana L., a lesbian woman who fled Honduras in 2021, said she was kidnapped for ransom in January 2021 and held for over a week near the US-Mexico border by people she believed to be cartel members. They took her to a house in Reynosa, Tamaulipas, where she saw several other kidnapped migrants. She said they stole her passport and forcibly photographed her naked until her sister managed to pay a ransom of US$3,000. Her kidnappers would hit her to make her cry when they called her sister for the ransom money.

- When Erika L., a lesbian woman, and Samuel B. and Martin G., gay brothers from El Salvador, arrived at the Mexico-Guatemala border in January 2022, a group of men kidnapped them. On the Mexican side of the border, the men raped Erika while beating her friends and forcing them to watch. They went to the Mexican Commission for Refugee Assistance (COMAR), Mexico's refugee authority, in Tapachula, Chiapas, where they applied for asylum in Mexico. COMAR gave them a document confirming that they were in the process of seeking asylum in Mexico, giving them legal status in Mexico. An immigration agent apprehended them outside the COMAR office as they left. When he saw their application documents, he tore them up, saying they were meaningless and sent them to a detention center. They were released and then took a bus to the US-Mexico border. They said Mexican immigration agents periodically stopped the bus and boarded it to extort them and other migrants, saying they had to pay if they wanted to continue their journey to the US border.

- Kayla R., the transgender woman who fled Guatemala, said that in July 2021 Mexican state police in Piedras Negras robbed her and beat her with batons so badly that she was ultimately hospitalized and vomited blood. The police detained her and another transgender woman she was traveling with for two days without food and water and then turned them over to immigration agents, who sent them to an immigration detention facility. There, she said, a Mexican immigration agent told her she should report the crime, which would make her eligible for a one-year humanitarian visa, giving her legal status in Mexico. She said she would like to do so, and that the agent took down her information but never gave her any paperwork or began any immigration process. Instead, after she reported the crime, Mexican immigration agents returned her to Guatemala, where she had experienced brutal violence. She immediately fled again. While she was making her way back to the US border in March 2022, criminals threatened her with a machete and robbed her.

CLP_PC_029705

Six asylum seekers and migrant rights workers reported that some of the shelters in Ciudad Juárez that accepted LGBT asylum seekers subjected them to discriminatory treatment, including the shelter where LGBT asylum seekers were forced to go to Christian religious services. Shelters in Ciudad Juárez are at capacity, meaning they would be homeless if they did not agree to go to the service. Some migrant shelters in Ciudad Juárez would not accept LGBT asylum seekers at all, migrant rights workers there said.

Accessing lifesaving health care for asylum seekers with HIV or other chronic illnesses was also difficult, asylum seekers said. All five HIV-positive asylum seekers interviewed, and one asylum seeker with diabetes and hypertension, said they had gone periods ranging from a few weeks to four months, without their necessary medication because they did not have any money or support.

- Mari R., a transgender woman who is HIV positive and who fled Honduras after she refused to sell drugs for a gang whose members had raped and threatened to kill her, went without her antiretroviral medication in Mexico for four months. In April, with the support of Derechos Humanos Integrales en Acción (DHIA), a local migrant rights organization, she was finally able to see a doctor, who told her that her condition had significantly worsened. The day after Human Rights Watch spoke to her, she was hospitalized.

Four transgender asylum seekers, as well as IOM officials and a local trans rights organization called Red Solidaria Trans, said that transgender asylum seekers have not had access to gender-affirming health care in Ciudad Juárez.

- Brenda F., a transgender woman who fled after facing an attempted gang recruitment and death threats in El Salvador, said she had previously been taking hormones but that in Ciudad Juárez, she has not been able to access to gender-affirming hormone care, though she has repeatedly tried. "They always say they don't offer that care, they can't, or they don't know how," she said. Transgender people who take hormones to develop secondary sex characteristics consistent with their gender identity and expression experience a reversal of these physical traits when hormone therapy is stopped, which can cause distress among other symptoms. Brenda said she hasn't had access to hormone care since October 2021 and that she is suffering from depression as a result. "I have asked for help getting my hormones and they have said they don't offer that kind of support here [in Ciudad Juárez]," she said. "We are suffering marginalization in that way – hormone treatment is necessary, and they are denying us."

**Recommendations**

**To the Biden Administration**

- Continue and redouble efforts to end the Remain in Mexico program and Title 42 summary expulsions, including by initiating a "notice and comment" rulemaking process to end Title 42.

CLP_PC_029706

- While these abusive policies remain in place, ensure that border agents do not to return at-risk asylum seekers under the Remain in Mexico program or expel them under the Title 42 summary expulsion policy. People at particular risk of harm include LGBT asylum seekers; those with HIV, disabilities, and chronic health conditions; Black and Indigenous asylum seekers; those who do not speak Spanish as a first language; and families traveling with children.

- Take immediate steps to parole into the United States all LGBT asylum seekers and other asylum seekers at particular risk of harm who have previously been subjected to the Remain in Mexico program or the Title 42 summary expulsion policy.

- Review regulations, Board of Immigration Appeals and Attorney General decisions, and policies and other guidance, rescinding or amending as appropriate to ensure consistency with the right to seek asylum and the right to protection from return to harm or threat of harm as defined in the Refugee Convention, the Convention against Torture, and the International Covenant on Civil and Political Rights.

- Continue to increase the number of appropriately trained personnel – asylum officers, doctors, child-care specialists, mental health services professionals and other first responders – at the border using funds currently allocated toward immigration enforcement and detention.

- Beyond initial screening of migrants, transfer humanitarian reception, including migrant processing and asylum functions, from CBP to a separate government agency, such as the Federal Emergency Management Agency (FEMA), or groups with trauma-informed training and whose mission is to perform humanitarian services.

- Take steps to ensure that LGBT asylum seekers and asylum seekers with HIV feel safe enough to self-identify while in the custody of CBP, including by ensuring that US officials affirmatively explain a policy of nondiscrimination and ask each migrant if they would like to share their gender identity and sexual orientation.

- Investigate and discipline US border agents who wrongfully send LGBT asylum seekers and other particularly at-risk asylum seekers to Mexico or their countries of origin.

- Work with Mexico and other governments to implement a holistic regional plan for access to protection and safe and dignified migration.

## To the US Congress

- Reject proposed legislation introduced by Sens. James Lankford (R-Oklahoma) and Kyrsten Sinema (D-Arizona) to keep Title 42 in place until after the government's Covid-19 emergency declaration is terminated.

- Enact legislation to end the Title 42 summary expulsion and Remain in Mexico policies.

## To the Mexican Government

CLP_PC_029707

3/15/23, 4:16 PM
US LGBT Asylum Seekers in Danger at the Border
Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 477 of 721

- End the practice of accepting non-Mexican nationals sent to Mexico by US authorities under the Remain in Mexico and Title 42 summary expulsion policies.
- Investigate abuses by Mexican immigration agents, including reports of extortion at immigration checkpoints, and take disciplinary action against any found to have been involved in such conduct.
- Ensure that Mexican immigration agents do not expel people who may need international protection without due process and screening for fear of return to potential harm.

# Related Content

US Immigration Enforcement and US Obligations Under the International Convention on the Elimination of Racial Discrimination (ICERD) Leaders of Human Rights Groups Urge Biden to Safeguard Asylum Access in the US US Will Protect Cameroonians from Dangerous Deportations Asylum Seekers Face Real Harm from US Border Policy
"They Treat You Like You Are Worthless"
"Like I'm Drowning"

Region / Country

- Mexico
- United States
- Immigration

Topic

- LGBT Rights
- Refugees and Migrants
- Asylum Seekers

**Source URL:** *https://www.hrw.org/news/2022/05/31/us-lgbt-asylum-seekers-danger-border*

CLP_PC_029708





---

# Stuck in Uncertainty and Exposed to Violence: The Impact of US and Mexican Migration Policies on Women Seeking Protection in 2021

## Introduction

In 2021, policies on both sides of the US-Mexico border negatively affected women seeking protection. As we head into 2022, marking the first year of the Biden administration, Trump-era restrictive policies remain in place at the US-Mexico border, exacerbating the situation for women forced to wait at Mexico's northern border for the opportunity to seek asylum in the US. In addition, under pressure from the Biden administration, the Mexican government continues to intensify enforcement to deter migrants and individuals seeking protection at Mexico's southern border, worsening the situation for women stuck there.

In the fall of 2021, the Instituto para las Mujeres en la Migración (IMUMI) and the Women's Refugee Commission (WRC) monitored events and carried out interviews with women seeking protection to understand the challenges and the dangers they face in Mexico.[1] This report outlines those challenges and provides recommendations for the US and Mexican governments.

## US Policies in 2021

Early on, the Biden administration committed to building a fair, orderly, and humane immigration system and reversing illegal Trump-era policies that endangered the lives of people seeking protection at the US-Mexico border. In its first few months in office, it made positive strides on several promises, including creating initiatives to provide reparative justice for those harmed by Trump-era policies. In February 2021, President Biden created the Interagency Task Force on the Reunification of Families to reunify the nearly 4,000 children who were separated from their parents under Trump's "zero tolerance" policy, which aimed to criminally prosecute all migrants crossing into the US between ports of entry. That month, the administration also announced the creation of a process—in collaboration with international organizations, regional task forces, and local NGOs—that would allow individuals returned to Mexico under the Trump-era "Remain in Mexico" (RMX) policy to return to the US and continue their immigration cases in the US rather than continuing to wait in Mexico. It also reversed the Trump-era legal decisions that made it nearly impossible for survivors of domestic and gang violence to qualify for asylum.

In addition, the administration's strategies included a focus on protection and a gender lens. In summer 2021, the administration launched a whole-of-government blueprint of strategies to reform the US immigration system. One of the strategies that aimed to address the root causes of migration in Central

---

[1] This report draws on interviews from IMUMI and WRC, cases from IMUMI's legal clinic, as well as media reports and research publications. IMUMI interviewed women in shelters in Mexico City between September and December 2021. On November 2, 2021, WRC staff visited two shelters in Mexico City and interviewed individuals from Haiti, Venezuela, El Salvador, Guatemala, and other countries. On December 3, 2021, WRC staff visited two migrant shelters in Tijuana and interviewed individuals from Mexico, Honduras, El Salvador, Guatemala, Cameroon, and other countries. IMUMI and WRC obtained informed consent from all individuals interviewed.

CLP_PC_029738

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 479 of 721



America included a pillar "to combat sexual, gender-based, and domestic violence."[2] Another strategy laid out a comprehensive approach to regional migration management. Yet, in practice, the Biden administration has largely focused on enforcement and deterrence in its engagement with countries in the region. Notably, it reportedly has requested that the Mexican government sign a "safe third country" agreement, requiring most non-Mexican individuals to first seek protection in Mexico before requesting asylum in the US.

The Biden administration's positive actions and strategies have been profoundly overshadowed by its failure to restore access to asylum at the border, including at ports of entry, for most arriving migrants and people seeking asylum. In December 2021, the Biden administration announced the reinstatement (pursuant to a court order) and expansion of RMX[3] and extended the Trump-era Title 42 CDC public health order that summarily blocks and expels people from the US-Mexico border, often repeatedly, to danger in Mexico and countries of origin. Since President Biden took office, people have been expelled more than 1.1 million times, including more than 187,000 expulsions of parents and children,[4] who were denied the opportunity to seek protection. In August 2021, the administration began expulsion flights to southern Mexico, where Mexican authorities forcibly returned people across the border to Guatemala or sent them on buses to Honduras, in an act of chain *refoulement*.[5] In clear violation of *non-refoulement*, the Biden administration also sent individuals on Title 42 expulsion flights directly to back to Haiti, Guatemala, Honduras, and other countries of origin, without screening them for risk of harm upon return or otherwise providing them an opportunity to seek protection.

## Mexican Policies in 2021

Over the course of 2021, under pressure from the White House, the Mexican government took a number of measures to step up its immigration enforcement to deter migrants and asylum seekers from accessing protection at the US-Mexico border. In 2021, authorities from Mexico's National Migration Institute (INM) worked with the Mexican National Guard and security forces to carry out a record number of migrant apprehensions; approximately 30 percent of those apprehended were women, and 27 percent were children. These figures include families and unaccompanied children who were initially apprehended by INM or the National Guard and then referred to state or civil-society shelters, a requirement of Mexico's new children protection reform implemented in 2021. The reform requires that after referral, the protection offices determine the child's best interests, whether that means deportation, remaining in Mexico with humanitarian legal status, or being reunited with family in another country. While this reform is a big step

---

2 In addition to its immigration blueprint, in November 2021, the administration launched the first National Strategy on Gender Equity and Equality. Through this whole-of-government approach, the administration committed to work to build "a fair and humane immigration system that welcomes immigrants [and] keeps families together" and create improved protection pathways for those fleeing persecution, including victims of gender-based violence.

3  The restart of Remain in Mexico was pursuant to a court order; however, prior to the ruling in early August 2021, the Biden administration reportedly was already considering implementing a supposedly more "humane" version of RMX. In August 2021, a Texas judge ordered the administration to restore RMX "in good faith." The administration appealed that order and issued a new memo terminating RMX in October 2021. The Biden administration has committed to ending RMX eventually, but said that it planned to comply with the court's order to restart RMX. In the new iteration, the administration expanded the program to all non-Mexicans from the Western Hemisphere.

4  This includes Customs and Border Protection Title 42 expulsion statistics from February to December 2021.

5  The principle of non-refoulement in international law prohibits countries that are receiving asylum seekers from removing them or returning them to a country where there is reason to believe that they would be at risk of irreparable harm or human rights violations. Chain refoulement occurs when individuals are sent back to a country that will not protect people from the onward transfer in violation of non-refoulement. In this case, the US expelled asylum seekers back to southern Mexico by plane and the Mexican government bussed them to Guatemala. This occurred with Guatemalan, Salvadoran, and Honduran nationals in 2021.

CLP_PC_029739

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021



forward for the rights of families and children, implementation across Mexico has been uneven[6] and many challenges remain, including the need for better funding and training to ensure the best interests of children are consistently upheld.

The Andrés Manuel Lopez Obrador administration also took greater measures to restrict travel by migrants and individuals seeking protection, pushing many people to hire smugglers and risk dangerous travel routes. It also created new travel regulations requiring proof of immigration status to purchase a bus ticket, leading to discrimination and racial profiling of both migrants in transit and Mexicans, especially Indigenous and Afro-descendent Mexicans. In addition, the US requested that the Mexican government put into place new travel requirements to make it more difficult for the citizens of countries who have been arriving at the US southern border in high numbers to transit through Mexico. Since August 2021, the Mexican government announced new requirements that Ecuadorians, Brazilians, and Venezuelans, some of whom are fleeing danger, acquire a visa to travel to Mexico as tourists. Mexican immigration authorities also stepped up restrictive tactics at Mexican airports, where they denied entry to a record 72,895 foreigners in 2021, more than double the number of denials in 2019 (31,008). Officials at airports turned around individuals aiming to seek protection in Mexico, who were unlawfully denied the opportunity to present their claim to COMAR (Mexico's agency responsible for asylum processing and adjudications) and instead detained in isolation for weeks. Furthermore, Mexico continued to coordinate with the US on the Biden administration's expulsions under Title 42, agreeing to receive expelled individuals from Guatemala, Honduras, and El Salvador, and worked with the Biden administration to re-implement and expand RMX.

Meanwhile, as Mexican authorities increased enforcement and US restrictive policies persisted, last year Mexico became one of the top destinations worldwide for individuals seeking protection. In 2021, COMAR received a historic high of 131,448 applications, with women representing 41 percent of applicants[7] and children representing 24 percent. This record number of applicants is an 87 percent increase from the prior high of 70,351 applications in 2019. Underfunded despite the critical need, COMAR has been unable to keep up with the increase in claims, leaving many people in southern Mexico—where the vast majority submit their applications[8]—to wait for decisions on their protection claims in precarious conditions for months or even up to two years in some cases. Mexican refugee law requires that applicants remain in the jurisdiction where they applied throughout the adjudication process, which prevents individuals applying for protection from reuniting with family and community networks in safer regions of the country with better employment opportunities.

***Note that the following section of the report contains graphic descriptions of sexual violence.***

## The Impact of US and Mexican Policies on Women

Taken together, the US and Mexican governments' policies and practices forced women seeking protection to wait for extended periods, often in precarious and dangerous circumstances, at Mexico's northern and southern borders. Throughout 2021, IMUMI and WRC carried out interviews with women and monitored events to understand the challenges and dangers they were facing.

---

6  There has been less progress in some Mexican states on the reform implementation than others due to a lack of training, funding, and political will of local authorities. As a result, despite the reform, some children may continue to be detained by immigration authorities or deported without a proper best interest determination. In fall 2021, a panel featuring IMUMI and other civil society organizations discussed some of the challenges with implementation.

7   Since 2016, women have represented approximately 40 percent of applicants to COMAR.

8   Approximately 68 percent of applications were filed in the state of Chiapas and 5 percent in Tabasco.

CLP_PC_029740

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021



1. **Women seeking protection experience violence in Mexico that exacerbates prior traumas that forced them to flee their countries of origin in the first place.** A 2015 UN report found that approximately 60 percent of surveyed women seeking asylum from Honduras, Guatemala, and El Salvador were fleeing gender-based violence, which includes any form of sexual, physical, mental, and economic harm directed at an individual due to their gender. A recent 2021 report by Kids in Need of Defense (KIND) found that violence against women in Central America drastically increased during the COVID-19 pandemic due to lockdowns that confined women with their perpetrators and to gangs gaining greater control over local communities.

   The violence that women seeking protection experience in transit in Mexico and while waiting at Mexico's northern border cities—including kidnapping, rape, trafficking, and other forms of harassment—compounds their previous traumatic experiences. For example, a Guatemalan woman, Liliana,[9] shared with IMUMI that after fleeing from a violent relationship with her husband who served in the military, she was kidnapped by a group of men in Tijuana. While she was being held by her kidnappers, she heard the men making arrangements on the phone to sexually exploit her. This experience was so traumatizing that after Liliana was released, she decided to travel to Mexico City to seek asylum while staying in a safe shelter instead of waiting to request asylum at the US-Mexico border.

2. **Women seeking protection do not feel safe in Mexico's southern and northern border cities and worry that they can be tracked down by their persecutors.** IMUMI documented various cases of Central American women who have been tracked down by their perpetrators in Mexico. A Guatemalan woman, Cristina, traveling with her husband and three children, described to WRC staff the "terror of being forced to wait in Tijuana where our persecutors can find us." In southern Mexico, a Honduran woman, Sara, described to IMUMI that she and her family were kidnapped by members of the Mara Salvatrucha gang. After Sara fled Honduras, one of the perpetrators found her in Tapachula, Chiapas, forcing her and her family to flee to another city and give up their asylum claim in Mexico.

3. **Women seeking protection are subjected to violent gender-based crimes in Mexico, including rape and sexual assault, and face heightened barriers to report these crimes and receive support services**. Women who are returned to Mexico alone or with their families experience many types of violent attacks. A 2017 Doctors Without Borders survey found that 31.4 percent of women seeking protection had been abused during their transit through Mexico. Some women are kidnapped and raped by their captors, often in front of their children. Many assaults involve Mexican authorities. A Honduran woman, Jessica, in the Mexico City detention center described to IMUMI how she and a friend were detained by the National Guard in Ciudad Juarez after being expelled from the US. The agents sexually abused both women, who remained in detention in Ciudad Juarez for two months before being transferred to the Mexico City detention center. The women were deported from Mexico before they had the chance to file a complaint against the agents.

   In another case documented by IMUMI, a Honduran woman was offered a job in Chiapas, Mexico, that turned out to be a ploy to traffic her. After six months of being routinely sexually abused, she escaped, but despite her reporting the crime, authorities did not protect her or investigate the crime, forcing her to leave the state and look for protection on her own.

   Many sexual violence crimes are not reported or investigated in Mexico. According to the National Survey for Urban Public Security, between July and December 2020, 98.6 percent of sexual crimes were

---

9   All names have been changed to protect the privacy of the women interviewed.

CLP_PC_029741

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 482 of 721



not reported or not investigated. Women who lack migration status and those detained face additional risks of being the victim of a sexual crime and heightened barriers to accessing justice and support services, including psychological support and medical care.

4. **Women seeking protection are separated from their children as a result of restrictive policies**. In some cases, parents are victims of crimes, such as kidnapping, and their children are left alone to cross to safety into the US. Several months after being returned to Mexico, Sandra, a Black woman from Honduras, went to look for a job in downtown Piedras Negras, where she was kidnapped and held for three days. Her four children crossed the border on their own because they did not know what had happened to their mother and were frightened. In other cases, due to the danger in Mexican border cities, coupled with US policies preventing many families and adults from seeking asylum, parents are forced to make the heartbreaking decision to send their children alone to safety in the US.

5. **Women continue to wait in squalid conditions in Mexican northern and southern border cities.** Limited shelter capacity in Mexico's northern border cities has left many women sleeping on the streets and in precarious conditions, including at the informal tent encampments in Tijuana and Reynosa. WRC staff spoke with a Honduran woman, Eleana, in Tijuana who tried to secure accommodations in Tijuana shelters after being expelled from the US, but was turned away due to limited capacity. She was forced to stay in squalid conditions in a house far away from the city center. A mere 15 days after Eleana and her family attempted to seek protection after crossing into the US and were expelled by Border Patrol to the streets of Tijuana, a rabid dog attacked and killed her 20-month-old toddler. In Tapachula, Chiapas, women asylum seekers and their families waited months for their Mexican asylum cases to be resolved while living in shelters, rented rooms on the outskirts of the city, or camped in the city's central plaza, with limited access to bathrooms or showers.

6. **Women seeking protection struggle to find child care and enroll their children in school in Mexico.** According to Mexican law, all children—regardless of their immigration status—should be able to enroll in public school. However, many barriers to enrollment in schools remain, such as discrimination and misinformation from local school administrators. One woman, Karina, recounted to WRC how she had not been able to enroll her two young children in local public schools because administrators (falsely) told her she would have to pay a sizable enrollment fee for each child. Women asylum seekers in Tapachula, Chiapas, told IMUMI that some schools require certified translations of birth certificates and vaccination records, making it impossible to enroll their children as they either do not have the documents, or cannot afford to have them translated.

Child care responsibilities and barriers enrolling children in school made it difficult for women to find part- or full-time work, while they wait to access asylum in the US or in Mexico. A number of women expressed to WRC fear of leaving their children alone due to the dangers in border cities, and worries over being unable to support themselves and their families since they could not work.

7. **Women seeking protection struggle to access vital health services, including reproductive health services.** Mexico's 2011 Migration Law guarantees access to health services to people regardless of their immigration status in Mexico. Despite this, pregnant people expelled to Mexico by US authorities under Title 42 have been turned away by local hospitals and denied medical care. A Salvadoran woman, Brenda, told WRC she was denied prenatal care in Tijuana, where local hospital workers told her, "We can't help you because you aren't Mexican." A Honduran woman, Marina, represented by IMUMI, was turned away from a public hospital because she did not have the required documents to prove financial

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021




need. A lawyer resolved the situation, but shared with IMUMI that almost all of her clients require legal assistance to access basic reproductive health services in Mexico.

8.  **LGBTQI+, Black, Indigenous, and non-Spanish speaking women seeking protection face additional dangers in Mexico.** In particular, Black asylum seekers face anti-Black racism, discrimination, and targeting from Mexican authorities. Several Haitian asylum seekers in Mexico City told WRC that they did not even try to look for employment opportunities because of the discrimination they were certain they would face by employers. Restrictive US border policies force individuals to wait in Mexico where they often are vulnerable to the same risks, discrimination, and dangers that they fled in their countries of origin. For example, Laura, a trans woman who fled Honduras due to death threats and her house being burned down, told WRC she was threatened at gunpoint by Mexican authorities during her journey to Tijuana. She did not feel safe in Mexico and struggled to secure housing due to discrimination. A Guatemalan asylum seeker in Mexico City, Karen, described to IMUMI staff that a teacher discriminated against her daughter for being "darker" and wearing Indigenous clothing.

9.  **Due to Mexico's increased enforcement and travel restrictions, women seeking protection are forced to look for ways to evade immigration and military checkpoints by traveling in caravans for safety or relying on smugglers.** In 2021, the situation was particularly harrowing in Tapachula, Chiapas, where 89,668 asylum seekers (approximately 68 percent of all applicants) awaited adjudication of their protection claims. Many families attempted to move from Tapachula to other cities with better job opportunities and safer conditions. However, INM and National Guard checkpoints and increased enforcement in southern Mexico made transit difficult.

    One Honduran woman, Veronica, told IMUMI that she and her family decided to join a migrant caravan in August 2021. INM officials stopped them, told them that the letter proving their pending asylum application was not valid, and tore up the documents. When she tried to film the incident with her telephone, agents took it away from her. During a press conference in September 2021, a Haitian woman in Tapachula described how Haitians are racially profiled by Mexican authorities and removed from buses. "We can barely get around Tapachula even though we are asylum seekers with a letter from COMAR. It is practically impossible to get on a bus to go to another city without paying smugglers a fee to get through the checkpoints."

    In the bus terminals in Tapachula and throughout Mexico, private bus companies began checking immigration status as a prerequisite for buying a bus ticket. Two women in the Mexico City detention center told IMUMI in September 2021 that they had been detained in a Mexico City bus station even though they had letters proving their immigration status.[10]

10. **Women seeking protection are subjected to use of force and violence by Mexican and US authorities.** In August 2021, Mexican immigration authorities and the Mexican National Guard were filmed kicking migrants, violently pushing women and children into vehicles, and threatening family separation as tactics to break up large groups. In one video, a woman who had been detained could be seen screaming that she had been separated from her two-year-old son during the raid. While she screamed and tried to get out of the INM van, an agent could be seen pushing her on the breasts back into the van. In October 2021, a Haitian woman was found dead along a highway in Chiapas. Her clothes had

---

10  Since bus ticket agents have neither the authority nor the training to verify immigration status, they have begun sending anyone they deem suspicious to talk to INM officials stationed in the bus stations, who would then detain the individual.

CLP_PC_029743

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

Case 1:23-cv-01843-TSC     Document 123     Filed 03/23/26     Page 484 of 721



been removed and she had been raped and strangled. Four municipal police officers were detained in relation to the crime. In September 2021, armed US Border Patrol agents in Del Rio, Texas were photographed abusing Black migrant families and driving them back across the border to Mexico.

**Many women seeking protection who transit through Mexico are subjected to more than one of the above risks during their stay, which often lasts months or even years due to restrictive policies**. A Honduran woman, Mariana, recounted to IMUMI her misfortunes over the past two years waiting in Mexico, and how the Biden administration's policies—following on the Trump administration's attacks on the asylum system—have resulted in her ongoing inability to seek asylum in the US:

*"I fled Honduras with my two children in 2019 because my husband beat us and he was involved in a criminal gang that protected him. After several months in Mexico, we arrived at the US-Mexico border to request protection and we were sent back under [Remain in Mexico] through Nuevo Laredo. Since I had my two small children, we made our way to Monterrey, Mexico [a city several hours to the south], where we were living on the street. I was raped and became pregnant.*

*"A kind Mexican woman took us in and allowed us to live with her until the baby was born in October 2020. My kids didn't go to school in all of 2020. I still had a dream to live with my sister in the US and be safe, but things were really difficult. Then in April 2021, I learned that I could sign up for the [RMX wind-down process] even though I had never had my hearing, so I signed up for Conecta.[11] I got help to register my baby so he would have a birth certificate. Then I got an email stating that Conecta had closed and that I would have to wait again.*

*"I don't understand what I am supposed to do, where I am supposed to go. I have been trying for two years to follow the rules, but my kids are two years older now, I have a baby, and I don't know what to do. I can't go back to Honduras, I am afraid to be in Mexico, and I'm not allowed to request protection at the border. I feel lost."*

## Conclusion and Recommendations

Both President Biden and President Andrés Manuel López Obrador recognize that many women are fleeing gender-based violence and persecution in their countries of origin and need access to protection in both countries. IMUMI and WRC are deeply concerned about practices by both governments that normalize human rights violations, including the violation of the right to request asylum. Instead of restrictive policies and enforcement actions that put women and children seeking protection in harm's way, the US and Mexican governments should strengthen asylum systems in both countries and broaden complementary pathways for protection. We urge the Biden and López Obrador administrations to implement the following recommendations to ensure that the rights of women—including the right to access protection—are upheld.

---

11  Conecta was a web platform run by the United Nations High Commissioner for Refugees (UNHCR) where individuals who were subjected to the first iteration of RMX could enroll to access the RMX wind-down process and continue their immigration cases within the US. This platform was operational between February and August 2021. It was suspended due to the court order regarding the reinstatement of RMX.

CLP_PC_029744

Trump allies target DeSantis      Ted Lasso's last season?      Honda recall      March Madness news & results

By MOISES CASTILLO and CHRISTOPHER SHERMAN

U.S. News      World New

   

SAN JOSE, Costa Rica (AP) — After four years of trying to continue his studies in Nicaragua, Elton Rivera finally reached the same conclusion as thousands of his countrymen. The government shuttered his university, its director told him he was going into exile and warned that the police were coming for Rivera too.

Rivera surveyed the various safe houses he had used after his arrest in 2018 and realized that no one who had sheltered him was left. "The only option is to go to Costa Rica, which is what I have closest and where I have the most contacts," he said. He snuck out of Nicaragua along a trail over a mountain in February and was soon on a bus to San Jose.

Rivera immediately sought asylum. The Costa Rican government gave him an appointment to formalize his request — in 2030.

Since the summer of 2021, when Nicaragua President Daniel Ortega locked up dozens of political opponents ahead of November's presidential elections, Nicaraguans have been seeking asylum in Costa Rica at the highest levels since Nicaragua's political crisis exploded in April 2018.

The exodus of Nicaraguans fleeing political repression has neighboring Costa Rica's asylum system teetering under the weight of applications that exceed even the 1980s when civil wars ravaged Central America.

Asylum seekers now account for 4% of Costa Rica's population. Despite having only 5 ...lion citizens, Costa Rica trailed only the United States, Germany and Mexico in the ...mber of asylum applications it received last year, according to the United Nations High Commissioner for Refugees.

CLP_PC_030102

3/16/23, 11:38 AM
Case 1:23-cv-01843-TSC
Document 123
Filed 03/23/26
Page 486 of 721
Fleeing Nicaraguans strain Costa Rica's asylum system | AP News

Trump allies target DeSantis      Ted Lasso's last season?      Honda recall      March Madness news & results

U.S. News     World New

The asylum seekers are added pressure for the new administration of President Rodrigo Chaves who is trying to jump-start an economy hit hard by the COVID-19 pandemic.

"That has been an incredible increase," said Allan Rodríguez, deputy director of Costa Rica's immigration agency, which also oversees the asylum system. "It has put the capacities of the administration to the test. It has made us reinvent ourselves not only in the reception process, but also in how to resolve this issue."

Rodríguez said that the system has been bolstered in terms of its ability to take asylum applications -- the U.N. refugee agency contracted 50 people to help -- but that remaining challenges include resolving the cases quickly and integrating asylees into Costa Rican society.

Rivera, 28, was in the final year of studying medicine at Nicaragua's largest public university and not particularly interested in politics when protests broke out in April 2018 in response to changes to the social security system. Senior citizens who took to the streets were roughed up by police, so university students came out in support of the pensioners.



CLP_PC_030103

Trump allies target DeSantis    Ted Lasso's last season?    Honda recall    March Madness news & results

U.S. News     World New



Nicaraguans wait for their first interviews in their application for asylum outside the Refugee Service Center in San Jose, Costa Rica, Monday, Aug. 29, 2022. (AP Photo/Moises Castillo)

Rivera went to do his rounds at a hospital the next day and saw wounded students flooding in. On the second day of protests, police beat him and tossed him in a filthy cell for six hours before releasing him. The arrest made him a leader among other medical students, which eventually got him expelled.

He later enrolled in a private university as a political science major because it did not have a medical school and was a few classes short of finishing his degree when Ortega's government shut down the school, and a number of other private universities in February.

Rivera is now trying to continue his studies outside Nicaragua. Even with his asylum appointment eight years off, he said: "I've been calm about it because I know the quantity of Nicaraguans there are here and Costa Rica is a very small country."

CLP_PC_030104

Trump allies target DeSantis    Ted Lasso's last season?    Honda recall    March Madness news & results

U.S. News    World New

Xaviera Molina, 27, has already been granted asylum because she left Nicaragua in one of the early waves in July 2018.

Molina, a marketing major, was a single mother at the time in the second year of her degree track. She had never been involved in activism, but when students expanded the protest against Ortega's government she got involved, first distributing food and then helping provide medical care to wounded students.



N... n Xaviera Molina, center, who was granted asylum in Costa Rica, listens to Ruth Blass Lopez who is applying for asy... at a diner that serves traditional Nicaraguan food ownd by a Nicaraguan asylum-seeker in San Jose, Costa Rica, Friday, Aug. 26, 2022. (AP Photo/Moises Castillo)

CLP_PC_030105

Trump allies target DeSantis　　Ted Lasso's last season?　　Honda recall　　March Madness news & results

throughout Nicaragua, Molina went into hiding and then decided she had to leave the

U.S. News　　World New

Molina fled across the border to Costa Rica in July 2018, requested asylum and received it last October. She went 1 ½ years without seeing her daughter who remained with her parents in Nicaragua.

She said the process was slow, but she was able to work, opened her own catering business and brought her daughter to Costa Rica.

"I know people who have been here four years like me and they still haven't accepted that they have to stay," Molina said. "They still haven't bought a bed because they feel like at any moment they're going to go back."

This March, U.S. Homeland Security Secretary Alejandro Mayorkas met with officials in Costa Rica. The Biden administration was interested in seeing Costa Rica and Mexico, two countries with relatively robust asylum systems, continue taking as many asylum seekers as possible.

ADVERTISEMENT

In his State of the Union Address that month, Biden said, "We're securing commitments and supporting partners in South and Central America to host more refugees and secure their own borders."

go Pérez, a spokesman for the U.N. High Commissioner for Refugees in Costa Rica, said that with the COVID-19 pandemic, Costa Rica's asylum system no longer "has the same capacity to absorb or integrate (asylum seekers), including in the labor market."

CLP_PC_030106

Trump allies target DeSantis    Ted Lasso's last season?    Honda recall    March Madness news & results

U.S. News    World New

process and finally how many are ultimately recognized," Nuñez said.

Now some worry that the years-long wait for an appointment is leading more Nicaraguans to look north -- to Mexico or the United States -- than at any point in their country's four-plus year political crisis.

Through July of this year, 5,335 Nicaraguans have sought asylum in Mexico, four times as many as all of 2021. In many cases, applying for asylum in Mexico is just a way for asylum seekers to reach the U.S. border.

ADVERTISEMENT



Last year, U.S. border agents encountered Nicaraguans more than 50,000 times at the southwest border. Through the first 10 months of the 2022 fiscal year, they have encountered Nicaraguans 134,000 times.

For most however, Costa Rica remains the top choice for Nicaraguans seeking safety, due to its proximity, familiarity and possible existing family ties.

CLP_PC_030107



March 27, 2023
Submitted via: https://www.regulations.gov.

Daniel Delgado
Acting Director, Border and Immigration Policy
Office of Strategy, Policy, and Plans, U.S. Department of Homeland Security

Lauren Alder Reid
Assistant Director, Office of Policy,
Executive Office for Immigration Review, U.S. Department of Justice

Re: Comment on the Proposed Rule by the Department of Homeland Security (DHS) and the
Executive Office for Immigration Review (EOIR) on Circumvention of Lawful Pathways, CIS
No. 2736-22; Docket No: USCIS 2022-0016; A.G. Order No. 5605-2023

I submit this comment as an historian of United States asylum law and procedures and as
Director for the Americas and Europe at Refugees International, an independent
non-governmental organization that advocates for lifesaving assistance, human rights, and
protection for displaced people. Over the past five years, I have published several academic
articles and research reports on the history of U.S. asylum law and policy, their relationship to
international law, and approaches to effectively sharing the responsibility to protect refugees. I
have witnessed and monitored access to asylum and protection pathways at the U.S.-Mexico
border and, with my colleagues at Refugees International and partner organizations, in other
countries in the region, including Colombia, Costa Rica, Guatemala, and Mexico.

In light of the tremendous numbers of forcibly displaced people in the hemisphere and around
the world, Refugees International supports the creation of additional legal pathways to the United
States as a supplement to—rather than as a substitute for—access to asylum at the U.S.-Mexico
border. U.S. and international refugee law require universal access to asylum and uniform
procedures for the consideration of asylum claims regardless of nationality and mode of transit or
entry, which also do not serve as proxies for the merits of claims. Denying eligibility for asylum
to those who transit other countries or enter between ports of entry not only will lead to
refoulement but also undermines the ability of other countries to handle the many asylum claims
they already have. Indeed, many of the features of the proposed rule undermine the rule's own
stated goals, and reveal that it will do more to undermine overall access to protection in the
Americas than bolster it. For these reasons, further elaborated below, Refugees International
urges the agencies to withdraw the proposed rule (hereafter referred to as NPRM).

### 1) The Proposed Rule violates U.S. law.

The United States acceded to the UN Protocol to the 1951 Convention Relating to the Status of
Refugees in 1968 but, for the next dozen years, U.S. law did not comply with the Convention.

The United States lacked a clear procedure whereby people could seek asylum during exclusion proceedings and, if a person in deportation proceedings proved they would be persecuted for their political opinions if returned to their home country, the Attorney General could still deport the person as a matter of discretion. The Refugee Act of 1980 changed this.The law was intended not only to ensure that the United States abided by the Convention's prohibition on non-refoulement. As I have argued elsewhere and as has been recently affirmed in federal court, the Refugee Act of 1980 was also a Congressional mandate to create uniform procedures for the handling of asylum claims whether a person arrived at a land border or airport, whether a person did or did not have documentation, whether a person asked for asylum after crossing a land border without authorization or at a port or entry.[1] Congress did this because lack of uniformity in the handling of claims led, in the 1970s, to discrimination based on nationality and race. This will likewise be the effect of the proposed rule's barring of access to asylum to those who do not make use of a parole process or the CBP One app to make an appointment at a port of entry. Parole programs are only available to people from certain nationalities who have passports and sponsors in the United States and who have not recently entered unauthorized into Mexico or Panama. CBP One is not universally accessible—it is only available in a few languages to people with certain types of phones and wifi—and it is unclear how an asylum seeker would prove to an officer that they could not get an appointment using it so as to be eligible for asylum at the border. (It is also unclear how asylum seekers would prove to CBP officers that that they were facing an imminent threat of rape or were a victim of a severe form of trafficking to be excepted from ineligibility). This NPRM creates different rules for people at the southern border without documents and for people who arrive in airports with visas, reverting back to the lack of uniformity that existed before 1980. The NPRM insists that, despite establishing a broad presumption of ineligibility that will preclude access to the asylum system for many asylum seekers, it is compliant with the UN Refugee Convention because these asylum seekers would continue to be eligible for withholding of removal. But withholding of removal offers less robust protection and has a more onerous standard of proof than the "well founded fear" standard in the Convention. To comply with the Convention, the United States must have a uniform and fair procedure to determine eligibility for refugee status as defined in Article 1 of the Refugee Convention and incorporated in the 1980 Refugee Act.

When Congress amended the asylum statute in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), it reaffirmed its prior explicit authorization of access to asylum for anyone "who is physically present in the United States or who arrives in the United States," "whether or not" they arrive "at a designated port of arrival." In 1995, the year before passing IIRIRA, Congress considered and rejected an amendment which would have barred asylum to those who, "before arriving at the United States, passed through another country"—and even then, only if "the Secretary of State ha[d] identified [the transit country] as providing asylum or safe haven to refugees."[2] Instead, in IIRIRA Congress mandated that a person was barred from asylum eligibility when coming from a country with which the United States had a safe third country agreement or when the asylum seeker had been firmly resettled in a third country. 8 U.S.C. §1158(d)(5)(B) provides that the administration may not issue

---

[1] Brief of Amicus Curiae Refugees International and Yael Schacher, *Immigration Defenders Law Center et. al. v. Chad Wolf et. al.* (District Court for the Central District of California, 2020); Decision by Judge Bernal, *Immigration Defenders Law Center et. al. v. Mayorkas et. al.,* (District Court for the Central District of California, 2023).
[2] H.R. 2182, 104th Cong. § 1(a) (1995).

regulations that are inconsistent with these provisions. When the agencies promulgated regulations in 1997 to implement IIRIRA, they included the provision that an individual "asylum application may be denied in the discretion of the Attorney General if the alien can be removed to a third country which has offered resettlement and in which the alien would not face harm or persecution."[3]

The NPRM, at 88 Fed. Reg. 11735-11741, nonetheless argues that Congress gave the agencies the authority to presume ineligible for asylum all people who come to the southwest border after transiting through other countries where they have not been rejected for asylum and who ask for asylum after crossing between ports of entry or at a port of entry without a CBP One appointment. The NPRM does this by making a few unconvincing arguments. First it claims that the "text and the structure" of IIRIRA—namely that section 1158 splits asylum applications and eligibility into two subsections—indicate that Congress meant to have whole categories of asylum seekers apply for asylum for no purpose since they could never be granted asylum, i.e, Congress called for the creation of an application process to nowhere and wanted the agencies to spend their time rejecting applications by people ineligible for asylum. This argument not only, in the words of Judge Richard Paez, "borders on absurdity."[4] It also does not seem to be made in good faith given the emphasis throughout the NPRM on the need to improve the efficiency of the asylum system.

Indeed, the agencies also argue that, because they have the discretionary authority to consider transit through third countries and manner of entry in adjudicating *individual* asylum cases, Congress meant to give them the authority to do this "across a category of similarly situated" asylum seekers in the name of the "overall efficiency of the system" and to "encourage other countries in the region to share in the protection of migrants" (88 FR 11737). In administering the bars on asylum eligibility detailed in the NPRM, the agencies will not assess whether the individual asylum seeker could safely stay in a transit country and effectively secure protection there. They will not assess the merits of an individual asylum claim, but instead assume the claim is less meritorious because the claimant did not seek asylum in a transit country. (Even if, for example, the asylum seeker had a close relative in the United States.) This approach to asylum fundamentally clashes with the case-by-case asylum adjudication system delineated by Congress in the Refugee Act of 1980, IIRIRA, and the Real ID Act of 2005. Departure from this approach and authority to handle categories of asylum seekers in a certain way must be explicitly articulated by Congress, as it did in 1996 not only in establishing the one year asylum application filing deadline but also when it mandated that all people forced to abort a pregnancy or to undergo involuntary sterilization, or persecuted for failure or refusal to undergo such a procedure, would be considered to have been persecuted on account of political opinion.

---

[3] 62 Fed. Reg. 10342.

[4] "Explicitly authorizing a refugee to file an asylum application because he arrived between ports of entry and then summarily denying the application for the same reason borders on absurdity. The consequences of denial at the application or eligibility stage are, to a refugee, the same. Had Congress intended to allow DOJ and DHS to override this provision, it could have said so in…the statutory provisions governing asylum applications. And Congress signaled its desire that any eligibility limitations be consistent with application requirements; limitations promulgated under the eligibility subsection of the statute must be consistent with this section—meaning the entirety of section 1158—not just consistent with this subsection." (East Bay Sanctuary Covenant et. al. v. Biden et.al., 993 F.3d 640 (9th Circuit, 2021) 43-44.)

As discussed below, it is truly questionable whether the NPRM's utilitarian and foreign policy (rather than human rights) approach to asylum will lead, as is assumed in the NPRM, to increased overall access to protection in the hemisphere, to "increasing the percentage of meritorious claims that are considered" by the agencies, and (in some way not specified) to advancement of the "broader public interest"  (88 Fed Reg 11737).

2) **The Proposed Rule does not accurately portray conditions for migrants and access to asylum in other countries in the region.**

Refugees International has done extensive recent reporting on the experiences of migrants in the Americas, especially in Peru, moving from Colombia to Panama through the Darien Gap, in Costa Rica, Guatemala, and Mexico. Though these countries have made commitments to humanely manage migration by signing the L.A. Declaration, migrants traveling through them over the past few months have experienced rising insecurity, xenophobia, and human-rights violating migration enforcement measures. Further, as former leaders of Costa Rica and Colombia have written, access to protection in other countries will only be undermined by the proposed rule's cutting off access to protection in the United States and sending asylum seekers into orbit throughout the hemisphere.[5] This proposed rule is shifting responsibility for protection to other countries that may just follow the United States' lead, leading to chain refoulement rather than increased protection.

The NPRM notes that every country in the hemisphere has seen large increases in migration and that countries like Colombia and Peru are hosts to millions of Venezuelans. It also asserts that imposition of Title 42 upon, and the creation of parole programs for, Venezuelans, Cubans, Haitians, and Nicaraguans, effectively reduced encounters at the U.S. border and "changed migratory patterns" (88 Fed. Reg. 11711). But, 50,000 migrants crossed the Darien Gap in January and February of 2023, five times the number in the first two months of 2022, and an increasing percentage of them were Haitians and Ecuadorans.[6] The NPRM lauds Ecuador and Peru for providing temporary permits to asylum seekers. But a lack of long-term integration and increasing political instability and insecurity there have made it harder for displaced people to access work and services there and has driven them to migrate, along with Peruvians and Ecuadorans as well.[7] None of these individuals, currently traveling through the Darien Gap and northward without visas, will be eligible to apply for parole programs.

The NPRM's assertion that Mexico "is the third highest recipient of asylum claims in the world" says nothing about how Mexico is handling these claims and whether it is a safe country to which to return asylum seekers (88 Fed. Reg. 11720). As the Refugees International report on the

---

[5]Juan Manuel Santos, "Time for the Americas tp step up (afain) on migration"  *El Pais*, March 6, 2023, https://english.elpais.com/opinion/2023-03-06/time-for-the-americas-to-step-up-again-on-migration.html
Carlos Alvarado Quesada, "What Biden's deeply troubling asylum limit means for the economy," *The Hill,* March 8, 2023,https://thehill.com/opinion/immigration/3889578-what-bidens-deeply-troubling-asylum-limit-means-for-the-economy/
[6] Evan Dyer, "Migrant numbers at jungle crossing point to a record-breaking year for irregular migration in North America," CBC, March 19, 2023, https://www.cbc.ca/news/politics/migrants-panama-darien-gap-haiti-1.6783199
[7]https://efectococuyo.com/venezuela-migrante/la-incertidumbre-nunca-se-va-asi-viven-los-venezolanos-la-crisis-que-sacude-el-peru/

Mexican asylum system cited in the NPRM (footnote 147) points out, Mexico applies the Cartagena standard to some nationalities and not others, particularly Haitians who spent 2021 and 2022 in precarious limbo.[8] On several trips to Mexico over the last year, I have spoken to dozens of migrants (from El Salvador, Honduras, Haiti, Nicaragua and Venezuela) who have fallen prey to gang violence in Ciudad Juarez and Reynosa and to dozens of others who have been terribly mistreated by Mexican police and immigration authorities in many different parts of the country – from Tapachula to Coahuila. Xenophobia and anti-immigrant sentiment has only worsened in Mexico since U.S. Homeland Security Secretary Alejandro Mayorkas recognized the "extreme violence and insecurity" experienced by migrants and asylum seekers during the Remain in Mexico program.[9] Underfunded and already overwhelmed by asylum applications, the Mexican Commission for Refugee Assistance (COMAR) is worried about the impact of the new rule on the Mexican asylum system. Once the new regulation goes into effect, will thousands of asylum seekers put forward weak claims in Mexico in order to be rejected and so eligible for asylum in the United States?[10] What kind of documentation will Mexico immigration authorities give all the asylum seekers the United States will deport to Mexico via expedited removal? Will it be possible for them to formally work in Mexico, almost impossible for them to do now? Will Mexico bus these asylum seekers to the south or send them to their home countries as it has done with those expelled under Title 42? The United States making secret agreements with Mexico to accept deported Cubans, Haitians, Nicaraguans, and Venezuelans with no concern about what happens to them after deportation does not comply with the non-refoulement obligation of the UN Refugee Convention.

The NPRM lauds progress that Guatemala has made to improve its asylum system over the last two years. Having visited Guatemala with Refugees International colleagues and spoken to representatives of the UN Refugee Agency (UNHCR) and to migrants there in early 2020 and late 2022, I question the extent of this progress.[11] Salvadorans sent from the U.S. border under the previous administration's "asylum cooperative agreement" and Venezuelan families migrating northward in October 2022 could not find safety in Guatemala and were at risk of refoulement. Indeed, the rule of law situation in Guatemala has deteriorated over the last year, during which Guatemalan migration authorities barred 15,593 Venezuelans from entering from

---

[8]Yael Schacher and Rachel Schmidtke, "Pushed into the Shadows: Mexico's Reception of Haitian Migrants," Refugees International,  April 28, 2022, https://www.refugeesinternational.org/reports/2022/4/25/pushed-into-the-shadows-mexicos-reception-of-haitian-migrants

[9]Termination of the Migrant Protection Protocols, October 29, 2021, https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-memo.pdf

[10] Rosa Flores, "Mexico Rethinks asylum initiative after controversial U.S. announcement," CNN, Feb. 24, 2023, https://www.cnn.com/2023/02/24/americas/mexico-asylum-policy-intl-latam/index.html; see also: https://twitter.com/giolepri/status/1629874741204127745?s=48&t=bnPnoVLl6sJblKyIuK3Pgg https://twitter.com/andresrsilva_/status/1629903734225481729?s=48&t=LCanSKQ_XTQAov0OGKsFeg

[11] Ariana Sawyer, Yael Schacher, and Rachel Schmidtke, "Deportation with a Layover: Failure of Protection under the U.S.-Guatemala Asylum Cooperative Agreement," May 19, 2020, https://www.refugeesinternational.org/reports/2020/5/8/deportation-with-a-layover-failure-of-protection-under-the-us-guatemala-asylum-cooperative-agreement

Rachel Schmitdke, " Pushbacks of Venezuelans on the Guatemalan Border,"  October 31, 2022, Refugees International, https://www.refugeesinternational.org/reports/2022/10/31/refugees-international-eyewitness-pushbacks-of-venezuelans-on-the-guatemalan-border

CLP_PC_030641

Honduras.[12] Meanwhile, there are only 708 refugees and 1,472 asylum claims in Guatemala, where high level officials, including the Vice President, still need to approve every claim.[13]

The NPRM presents a very partial picture of the situation in Costa Rica, which, since November 2022, has been adopting stricter asylum and migration deterrence policies, pointing to U.S. policies as the reason for doing so.[14] The Costa Rican government issued a decree stipulating that, if an asylum seeker transited another country, their claim would be deemed inadmissible unless the asylum seeker had evidence of inability to apply.[15] Costa Rica also no longer automatically provides work permits to asylum seekers and requires that people apply for asylum within one month of arriving. These measures limit asylum seekers' right to work and push them into precarious working situations. According to Refugees International partner organization the Institute on LGBTQI Migration and Refuge for Central America, the decree ignores the different needs and socioeconomic realities of LGBTQI+ refugee applicants and has been accompanied with a resurgence of xenophobic and discriminatory discourse about migrants and asylum seekers.[16]

### 3) The Proposed Rule is premised on assumptions and minimal proof.

The NPRM argues it must make migrants arriving at the border ineligible for asylum because most of those who pass credible fear screenings and who cross between ports of entry mostly do not have meritorious claims. No data is provided by the NPRM to prove the latter. The statistics cited in the NPRM (https://www.justice.gov/eoir/page/file/1062976/download) only show that there is a backlog of claims; that of adjudicated claims, the asylum grant rate is higher than the denial rate; and that the rate of people who have failed to apply for asylum after passing credible fear has halved since 2013. There is no system in place to ensure that those who arrive in the United States through the parole programs or through CBP One have credible asylum claims, let alone that they are more likely to be granted asylum on the merits. Simply making people who cross between ports of entry ineligible for asylum will not raise asylum grant rates or even necessarily lessen the work of the immigration courts and asylum office, which, as the NPRM concedes, will still need to spend "significant additional time" assessing whether claimants meet the three exceptions to presumed ineligibility and, if not, the reasonable fear standard (88 Fed. Reg. 11744). A surer way to close the gap between those who pass credible fear and those granted asylum would be to provide asylum seekers access to counsel and to clarify the standard

---

[12] Roman Gressier, "Guatemala, Crossroads of the Venezuelan Exodus, El Faro, Feb. 27, 2023, https://elfaro.net/en/202302/centroamerica/26709/Guatemala-Crossroads-of-the-Venezuelan-Exodus.htm

[13] https://data.unhcr.org/fr/documents/details/96323

[14] Alonso Martinez, "Rodrigo Chaves: Costa Rica cambiará reglas para pedir asilo político por falta de ayuda internacional" [Rodrigo Chaves: Costa Rica to change rules for requesting political asylum due to lack of international aid], *Delfino*, November 16, 2022, https://delfino.cr/2022/11/rodrigo-chaves-costa-rica-cambiara-reglas-para-pedir-asilo-politico-por-falta-de-ayuda-internacional.

[15] http://www.pgrweb.go.cr/scij/Busqueda/Normativa/Normas/nrm_texto_completo.aspx?param1=NRTC&param2=1&nValor1=1&nValor2=98356&nValor3=133735&strTipM=TC&lResultado=2&nValor4=1&strSelect=sel

[16] Statement From IRCA CASABIERTA and Refugees International Regarding the Recent Executive Decrees 43809-Mgp/43810-Mgp, December 28, 2022, https://www.refugeesinternational.org/reports/2022/12/28/statement-from-irca-casabierta-and-refugees-international-regarding-the-recent-executive-decrees-43809-mgp43810-mgp

that should be used to adjudicate claims of persecution based upon membership in a particular social group. The best way to reduce the fiscal strain on states and localities receiving asylum seekers is to more promptly authorize asylum seekers to work so that they can support themselves and pay taxes. It is also worth pointing out that the average time it takes to adjudicate asylum claims—4 years—is identical to the average time it takes for the United States to process refugees through the United States Refugee Admissions Program. To make refugee adjudication fairer and faster, the United States must clarify and make uniform the standards it uses to adjudicate claims and invest in increased staffing and other resources for adjudication.

The proposed rule's primary goal is to address a predicted surge in migrants at the border in the spring of 2023 and to combat reliance on smuggling. The rule assumes that, in the spring of 2023, the existence of legal pathways will keep encounters low. But, as mentioned above, legal pathways are not available to all asylum seekers. The demand for CBP One appointments vastly outstrips supply and, as of February 2023, Refugees International's discussions with port officers and migrants in El Paso indicated that sending advance information to CBP through the app did not increase processing speed through ports of entry. If the legal pathways could sufficiently and less expensively serve all those who need to seek asylum, there would be no need to bar asylum seeking between ports of entry as no asylum seeker would pay a smuggler for what was so readily accessible and less dangerous. The "stick" of the bar not only penalizes asylum seekers in a way that is contrary to U.S. and international law but also betrays the reality that the legal pathways are not, in fact, true substitutes for access to asylum at the border. For Ukrainians, the United States offered only carrots, but for the mostly Black and brown asylum seekers at the border, carrots and sticks.

Last, the proposed rule claims it will not separate families. But the NPRM exempts unaccompanied minors and not their families from presumed ineligibility for asylum if they cross between ports of entry. Limiting those fleeing harm to withholding of removal or Convention Against Torture (CAT) protection will result in family separation because neither of these forms of protection provide derivative status. If only one member of a family is granted withholding or CAT, the rest of the family will be ordered removed or will be unable to come to the United States.

Overall, the NPRM re-orients the processing of asylum claims at the southwest border away from a uniform approach geared to providing refuge to individuals that meet the asylum standard. The regulation will have a disparate impact on certain nationalities and minorities and does the opposite of leading by humanitarian example in the hemisphere. Refugees International, like many Americans, believes the public interest is best served when the United States adheres to its own and international refugee law and champions human rights. For these reasons, Refugees International recommends that the rule be withdrawn.

Yael Schacher
Director for the Americas and Europe
Refugees International
yael@refugeesinternational.org

CLP_PC_030643

**Human Rights First Comment on**
**Department of Homeland Security & Department of Justice, "Circumvention of Lawful Pathways,"**
**88 FR 11704**

Human Rights First submits these comments in response to the Department of Homeland Security (DHS) and the Department of Justice (DOJ) (collectively, the "agencies") request for public comment regarding the Notice of Proposed Rulemaking (NPRM) published in the Federal Register on February 23, 2023.[1]

**Overview of Comment**

The agencies propose to implement a new rule (the "asylum ban") at the southern border that would return to persecution refugees who qualify for asylum under U.S. law and leave others in limbo in the United States without permanent status, a pathway to citizenship, or the ability to reunite with their families. Human Rights First urges the agencies to withdraw the unlawful proposed rule in its entirety, rescind similar Trump administration bans, and take immediate steps to restore access to asylum and comply with U.S. law and treaty obligations.

The agencies request comments on whether the proposed rule would provide "a meaningful and realistic opportunity to seek protection."[2] It would not. The proposed rule would bar refugees from asylum based on their manner of entry into the United States and their transit through third countries, factors that do not relate to their persecution or fear of return. It would apply only to refugees who enter at the southwest border, the vast majority of whom are people of color. If the agencies proceed with this ban, it will illegally punish and ban refugees fleeing political, religious, race-based, gender-based, anti-LGBTQI+, and other persecution, including Black and Indigenous people, LGBTQI+ asylum seekers, women, children, and people with disabilities. The agencies would apply the ban not only in full asylum adjudications but also in preliminary screenings at the border, which would result in mass deportations of refugees without a hearing.

As detailed in this comment, the proposed asylum ban would:

- violate U.S. law and international law, including treaties binding on the United States;
- improperly use safe pathways to deny access to asylum, undermine the Los Angeles Declaration on Migration and Protection, and subvert refugee law globally while discouraging other countries from upholding asylum;
- deny asylum to refugees who qualify for it under U.S. law;
- return refugees to their countries of persecution or to dangers in Mexico and other unsafe transit countries, where refugees are targeted for bias-motivated attacks, torture, kidnappings, and other violence;[3]

---

[1] Department of Homeland Security and Department of Justice, "Circumvention of Lawful Pathways," 88 FR 11704, February 23, 2023 (https://www.federalregister.gov/documents/2023/02/23/2023-03718/circumvention-of-lawful-pathways)

[2] 88 FR 11704 at 11708.

[3] In the proposed rule, the agencies indicate that the U.S. government is in consultation with the Government of Mexico, as well as other foreign partners to accept the returns of non-Mexicans under Title 8 authorities (such as people ordered removed through expedited removal or through full asylum adjudications). 88 FR 11704 at 11711.

1

CLP_PC_030801

As Senator Leahy explained in Congress in 2000, "people who flee their countries to escape serious danger should be able to have asylum hearings in the United States without having to navigate the procedural roadblocks established by expedited removal."[160] In a 2001 Congressional hearing, Senator Edward Kennedy described "shameful examples of the deplorable treatment that individuals have received under the expedited removal process" and warned that many "have been deported, and sent back to situations where they could well be subjected to torture, and even death."[161] Senator Sam Brownback also noted the "flawed results" of expedited removal, which deprived asylum seekers of the right to a full hearing on their asylum claim.[162]

Decades of research have underscored the unfixable flaws of expedited removal and the devastating consequences of wielding it against asylum seekers.[163] Refugees wrongly deported through expedited removal have been persecuted, tortured, and murdered after being returned by the United States to the country they had fled.[164] UNHCR has warned that "the credible fear pre-screening within expedited removal has, since its inception, diverged from international standards for accelerated procedures."[165]

Though it has become clear that expedited removal is fatally flawed, at the time of its creation Congress included safeguards in the process that were intended to comply with the Refugee Convention and ensure that people seeking refugee protection in the United States had an opportunity to apply for asylum and were not summarily deported to persecution or torture. One of these fundamental safeguards was a low screening standard — a "significant possibility" of establishing asylum eligibility. Congress considered and rejected a higher screening standard in a House bill that would have required asylum seekers to show both a significant possibility of

[160] Id.

[161] Senate Judiciary Committee Hearing, "An Overview of Asylum Policy," May 3, 2001 (https://www.govinfo.gov/content/pkg/CHRG-107shrg77386/pdf/CHRG-107shrg77386.pdf)

[162] Id.

[163] U.S. Commission on International Religious Freedom, "Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal," (https://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf) ; Human Rights Watch, "Deported to Danger: United States Deportation Policies Expose Salvadorans to Death and Abuse," February 5, 2020 (https://www.hrw.org/report/2020/02/05/deported-danger/united-states-deportation-policiesexposesalvadorans-death-and); American Civil Liberties Union, "American Exile: Rapid Deportations That Bypass the Courtroom," December 2014 (https://www.aclu.org/sites/default/files/field_document/120214-expeditedremoval_0.pdf); Kate Morrissey, "A Legitimate Fear of Death Doesn't Always Matter in the U.S. Asylum System," San Diego Union Tribune, October 11, 2020 (https://www.sandiegouniontribune.com/news/immigration/story/2020-10-11/us-asylum-system-gang-violencehonduras); Human Rights First, "Pretense of Protection: Biden Administration and Congress Should Avoid Exacerbating Expedited Removal Deficiencies," August 2022 (https://humanrightsfirst.org/wp-content/uploads/2023/01/PretenseofProtection-21.pdf).

[164] Human Rights First, "Biden Administration Move to Eliminate Requests for Reconsideration Would Endanger Asylum Seekers, Deport Them to Persecution and Torture," September 2021 (https://humanrightsfirst.org/library/biden-administration-move-to-eliminate-requests-for-reconsideration-would-endanger-asylum-seekers-deport-them-to-persecution-and-torture/)

[165] UNHCR, "Comment Submitted by UNHCR on Asylum Interim Final Rule," June 1, 2022 (https://www.regulations.gov/comment/USCIS-2021-0012-5305)

35

CLP_PC_030835

asylum eligibility *and* a substantial likelihood that their statements were true.[166] The lower standard that was ultimately adopted was "intended to be a low screening standard for admission into the usual full asylum process."[167] By requiring asylum seekers only to show a "significant possibility" of asylum eligibility, a far lower standard than the "well-founded fear" standard for a full asylum hearing, Congress sought to ensure that there would be "no danger that a non-citizen with a genuine asylum claim will be returned to persecution."[168] Under this system, anyone with "some characteristic" that would qualify them as a refugee would be entitled to a full adjudication of their asylum claim. [169] If an asylum seeker met the "significant possibility" threshold, the government would be required to treat them "the same as any other" asylum seeker and provide an opportunity to present their case in a full adjudication.[170]

The agencies now seek to eliminate these minimum statutory safeguards in order to carry out the mass deportation of refugees without hearings, weaponizing an already deficient process. The proposed rule would erect a new barrier during the credible fear process that is completely separate from, and incompatible with, the "significant possibility" of success standard that Congress created. During a credible fear interview, asylum officers would first have to determine whether an asylum seeker is subject to the presumption of ineligibility created by the ban. If they are presumed ineligible, asylum seekers would be required to establish by a *preponderance of evidence* that they qualify for an exception. Only asylum seekers determined to have successfully rebutted the rule's presumption of ineligibility would be screened for a "significant possibility" of establishing eligibility for asylum, while asylum seekers who cannot rebut the presumption would be subject to a higher screening standard and deported if they cannot meet it. Requiring asylum seekers to prove by a preponderance of evidence (more than 50 percent) that they are not subject to the new asylum ban is incompatible with the significant possibility standard and creates an even higher barrier than the well-founded fear standard (10 percent chance of persecution) for asylum.

This approach revives the Trump administration's attempts to rig the credible fear process by applying the transit ban in credible fear interviews to block refugees from a full hearing on their claim. In fact, the proposed ban would create an even greater hurdle than the Trump administration's version, which required asylum seekers to show a significant possibility (rather than a preponderance of evidence) that they were not subject to the ban. Both versions are illegal and inconsistent with Congressional intent, but the Biden administration's version creates an even more insurmountable barrier at this stage.

The proposed rule would require refugees in expedited removal to meet a standard that is drastically higher than the credible fear standard and much higher than even the standard for

---

[166] S11491 Cong. Rec., "Asylum and Summary Exclusion Provisions," September 27, 1996 (https://www.congress.gov/crec/1996/09/27/CREC-1996-09-27-pt1-PgS11491.pdf)

[167] *Id.*

[168] House Judiciary Committee, "Immigration in the National Interest Act of 1005 Hearing," March 4, 1996 (https://www.congress.gov/congressional-report/104th-congress/house-report/469/1)

[169] *Id.*

[170] *Id.*

36

CLP_PC_030836

asylum. It would perpetuate the same mass due process and human rights violations that resulted from the Trump administration's application of its transit ban during credible fear interviews, including[171]:

- In November 2019, DHS ordered the deportation of an asylum seeker from the Democratic Republic of Congo who was determined to have failed her screening interview due to the transit ban. She had been beaten by police in her country when she sought information about her husband, who had been jailed and tortured due to his political activity. Citing the transit ban, the DHS officer determined she was ineligible for asylum and could not meet the (artificially elevated) screening standard. She was ordered deported to Congo without an asylum hearing.

- In late March 2020, DHS applied the transit ban to a 16-year-old girl who fled attempts by a Salvadoran gang, which exercises control over large swaths of the country, to traffic and sexually exploit her. The DHS officer determined that she did not meet the unduly high fear screening standard applied by DHS under the transit ban.

- An Indigenous Guatemalan asylum seeker who was sexually assaulted because of her ethnicity was summarily deported in February 2020 without being allowed to apply for asylum. She was subjected to a higher screening standard due to the transit ban and ordered deported when she was found not to meet the higher threshold.

- A Central American woman fleeing domestic violence by an abuser who killed one of her children was deported in February 2020 after being subjected to a heightened screening standard due to the transit ban and denied an opportunity to apply for asylum.

The agencies have already assessed and rejected the Trump administration's illegal approach of rigging the credible fear process against asylum seekers, yet in a sudden reversal have decided to resurrect and exacerbate this deadly approach. Less than a year ago, the agencies condemned and reversed the Trump administration's attempts to apply bars to asylum during the credible fear process. In its Asylum Processing Rule, the Biden administration provided that bars to asylum eligibility would not be considered during credible fear interview, explaining that this change would "ensure due process" for asylum seekers.[172] The agencies noted that applying bars to asylum at the credible fear stage was inconsistent with Congressional intent in creating the expedited removal process. They further stated that the "complicated process requiring full evidence gathering and determinations to be made on possible bars to eligibility is incompatible with the function of the credible fear interview as a screening mechanism designed to quickly identify potentially meritorious claims deserving of further consideration in a full merits hearing."[173] Due to the complexity of adjudicating bars to asylum, the agencies concluded that individuals "should be afforded the additional time, procedural protections, and opportunity to

---

[171] Human Rights First, "Asylum Denied, Families Divided: Trump Administration's Illegal Third-Country Transit Ban," July 2020 (https://humanrightsfirst.org/wp-content/uploads/2022/10/AsylumDeniedFamiliesDivided.pdf)
[172] Dept. of Homeland Security and Dept. of Justice, "Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers," 87 FR 18078, 18135, March 29, 2022 (https://www.federalregister.gov/documents/2022/03/29/2022-06148/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat).
[173] Id.

37

further consult with counsel" that full adjudications provide.[174] **Having already concluded less than a year ago that applying asylum bars during the credible fear screening is inconsistent with Congressional intent and threatens asylum seekers' due process rights, it is arbitrary and inhumane for the agencies to fabricate a new asylum bar with no statutory basis and apply it during the credible fear process.**

The agencies also considered and rejected higher screening standards inconsistent with the "significant possibility" standard when terminating the Remain in Mexico policy, noting that "rather than using a screening standard familiar to asylum officers" such as the significant possibility standard, non-refoulement interviews for people subjected to Remain in Mexico "applied a more restrictive 'more likely than not' standard" under the Trump administration.[175] Secretary Mayorkas concluded that this standard, which required people to prove that it was more likely than not that they would be persecuted or tortured in Mexico, was "a higher substantive standard than they would ultimately have had to establish to secure asylum."[176] Now the agencies plan to impose an equally high standard through the proposed rule — requiring asylum seekers covered by the ban to prove it is more likely than not that they faced an acute medical emergency, an imminent and extreme threat to life or safety, etcetera. Like the non-refoulement screening standard condemned by Secretary Mayorkas, the standard proposed by the agencies would impose a "more likely than not" screening standard that far exceeds even the standard for an asylum grant.

The deficient non-refoulement screenings carried out during Remain in Mexico, which did not protect asylum seekers from being returned to grave dangers, foreshadow the perils that asylum seekers will face if the asylum ban is implemented in expedited removal. The vast majority of asylum seekers subjected to these sham screenings were returned to Mexico, despite medical vulnerabilities or past attacks many had suffered, even after the Biden administration implemented a lower standard of proof (a reasonable possibility) rather than the higher preponderance of evidence standard required by the proposed rule. These included a Nicaraguan man who had been kidnapped and beaten by Mexican police, an Afro-Dominican man who had been kidnapped and threatened at gunpoint in Tijuana, and a Nicaraguan woman who had been kidnapped, tied up, and robbed by cartel members.[177] DHS data showed that only 18.6 percent of people who had fear screenings under the Biden administration's Remain in Mexico policy were found to have a fear of return to Mexico, despite extensive documentation of the grave harms faced by returned asylum seekers forced to wait in Mexico.[178] This low rate was strikingly similar to Remain in Mexico fear screenings conducted during the Trump administration.[179] Imposing the asylum ban in credible fear screenings and requiring asylum seekers to prove that it

---

[174] Id. at 18094.

[175] Dept. of Homeland Security, "Explanation of the Decision to Terminate the Migrant Protection Protocols," October 29, 2021 (https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-justification-memo-508.pdf)

[176] *Id.*

[177] Human Rights First, "Fatally Flawed: "Remain in Mexico" Policy Should Never be Revived," September 2022 (https://humanrightsfirst.org/wp-content/uploads/2022/10/FatallyFlawed.pdf)

[178] *Id.*

[179] *Id.*

CLP_PC_030838

# HUMAN RIGHTS STAIN, PUBLIC HEALTH FARCE



**Evasion of Asylum Law
and Title 42 Abuse Must End—
and Never Be Revived**

December 2022

CLP_PC_030900

2

**Introduction**

For nearly two years, the Biden administration has wielded the Trump administration's Title 42 policy to block people from seeking asylum at official ports of entry, expel to grave dangers asylum seekers and migrants who cross the border, and evade the due process and refugee protection provisions of U.S. immigration and asylum law. Though efforts to force continuation of this cruel and counterproductive policy continue, after a federal district court in Washington DC vacated it in November for violating U.S. law, it is scheduled to end on December 21, 2022.

The misuse of Title 42 has been a public health, border management and human rights fiasco. Human Rights First has, as of the date this report was issued, tracked over 13,480 reports of murder, torture, kidnapping, rape, and other violent attacks on migrants and asylum seekers blocked in or expelled to Mexico under Title 42 since President Biden took office. It is a staggering number that will continue to mount every day that Title 42 or similar policies that evade refugee law are in place.

The Centers for Disease Control and Prevention (CDC) attempted to end the Title 42 policy in May 2022, but in the wake of a court order issued by a federal judge in Louisiana forcing the policy's continuation in a case brought by state attorneys general aligned with the former Trump administration, the Department of Homeland Security (DHS) continued to use it. In October 2022, in a disturbing step backwards, the Biden administration announced it would expand use of the policy to expel Venezuelans seeking refuge at the southern U.S. border without allowing them to apply for asylum, attempting to justify this abrogation of asylum law by pairing it with a limited parole program available to some Venezuelans. Since then, DHS has expelled thousands of Venezuelans to dangerous conditions in Mexico where they are also at risk of *refoulement, i.e.* illegal return, to persecution in Venezuela. In response to the October parole announcement, the U.N. Refugee Agency (UNHCR), IOM and UNICEF immediately warned that such efforts "cannot come at the expense of the fundamental human right to seek asylum."

The targeted, expanded use of Title 42 against Venezuelans again confirms that this policy has no basis in public health. As medical and public health experts have repeatedly affirmed and recently-revealed Congressional testimony of a top CDC scientist confirms, the Title 42 policy has no scientific basis. It was adopted at the behest of Stephen Miller and other Trump administration officials as yet another discriminatory effort to restrict immigration and block asylum. As leading epidemiologists and public health experts warned President Biden in November, the continued and expanded use of Title 42 is "a travesty" that manipulates, misuses and undermines trust in public health, and "feeds and propagates racially-based tropes that falsely paint migrants as vectors of disease, fostering stigma and heightening the vulnerability of already marginalized groups in a manner that is antithetical to the tenets of good public health practice."

CLP_PC_030901

3

Some members of Congress have attempted to force continuation of Title 42 or a similar suspension of asylum at the border – a codification of failed Trump policy that would eviscerate U.S. refugee law and subvert international refugee law globally. At the same time, the Biden administration is considering replacing Title 42 with other inhumane Trump policies or versions of them, including an asylum transit ban – an illegal policy that, when in effect, turned refugees away to danger and deprived other refugees of a path to family reunification, stability and citizenship, as Human Rights First detailed in a 2020 report.

Senior Biden administration officials are reportedly planning to impose other harsh policies as Title 42 ends, as well as use the notorious migrant detention center at Guantánamo Bay or other third country detention facilities to hold Haitians interdicted at sea. The United States recently returned 180 men, women and children – who had attempted to reach safety in the United States by boat – to Haiti despite multiple U.N. authorities' calls for states to halt returns to Haiti given the life-threatening conditions there.

A ruling by the U.S. Court of Appeals for the D.C. Circuit that took effect in May 2022 prohibits DHS from using Title 42 to return asylum-seeking families "to places where they will be persecuted or tortured." As the policy's scheduled end date approaches, DHS retains clear authority, consistent with the various court rulings, to except individuals from Title 42. It also remains obligated under U.S. refugee law and binding treaty commitments, and a November D.C. Circuit Court decision, not to return anyone—family, adult, or child—to persecution or torture, consistent with the legal rationale of the D.C. Circuit Court. In his November ruling concluding that the Title 42 policy violated the Administrative Procedure Act, the D.C. District Court judge who vacated the Title 42 policy cited Human Rights First's prior research documenting violent attacks against people impacted by the policy and emphasized the "harms Plaintiffs face if summarily expelled to countries [where] they may be persecuted or tortured" as well as the earlier finding by the Court of Appeals for the D.C. Circuit that "the record is replete with stomach-churning evidence of death, torture, and rape." The Trump-aligned state attorneys general who initiated the Louisiana litigation are now seeking to intervene in the separate case before the D.C. District Court and also seeking to stay that court's November ruling requiring the Title 42 policy to end on December 21. Their stay request is now pending before the D.C. Circuit Court after the District Court denied it.

It is far past time to end this illegal, inhumane, and ineffective policy and all attempts to force its continuation. After nearly two years in office, the Biden administration should institute a more effective and humanitarian response to the reception, identification, and processing of refugees seeking protection in the United States – a response that upholds U.S. refugee and immigration laws, as Human Rights First has outlined in its recommendation papers. The Biden administration should not replace one failed and illegal Trump policy with another by embracing, supporting or employing the ineffective, inhumane, xenophobic and racist immigration policies of the prior administration.

This report is based on in-person interviews Human Rights First conducted with asylum seekers in Tijuana in September 2022 and Ciudad Juárez in December 2022; and interviews by telephone and in-person with attorneys, other humanitarian workers, and additional asylum seekers in Mexico conducted from October to December 2022; reports of attacks drawn from an ongoing

CLP_PC_030902

4

survey of asylum seekers in Mexico conducted by Al Otro Lado between mid-June and early November 2022; open-source information identified by students from the University of California Network for Human Rights and Digital Fact Finding (Berkeley, Santa Cruz, Los Angeles); review of U.S. government data; and media and other human rights reporting.

Human Rights First published prior research on the Title 42 policy in June 2022, April 2022 (with Al Otro Lado and Haitian Bridge Alliance), March 2022, February 2022, January 2022, December 2021, November 2021 (with Florence Immigrant and Refugee Rights Project), October 2021, August 2021, July 2021 (with Hope Border Institute), June 2021, May 2021 (with RAICES and Interfaith Welcome Coalition), April 2021 (with Al Otro Lado and Haitian Bridge Alliance), December 2020, and May 2020.

## Key Findings

- **The use of the Trump-initiated Title 42 policy over the nearly two years since President Biden took office, its forced continuation through court order, and its recent expansion by the administration have inflicted terrible human rights abuses.** Human Rights First has tracked 13,480 reports of murder, kidnapping, rape, torture, and other violent attacks against people blocked in or expelled to Mexico due to Title 42 since January 2021. These numbers are likely just the tip of the iceberg as many victims have not spoken with investigators, journalists, or attorneys. Some recent examples include: Mexican officers kidnapped a Guatemalan family with two young children after DHS expelled them to Nuevo Laredo, and turned them over to a cartel that held them hostage for three months and tortured them; a Honduran asylum seeker and her four-year-old daughter were kidnapped, the daughter beaten and the mother raped in front of her daughter as they waited in Tijuana due to Title 42; a 13-year-old girl was nearly abducted at gunpoint in Juárez after her family fled political persecution in Venezuela but was expelled under Title 42; and a Guatemalan lesbian trans woman was raped by Mexican police in Piedras Negras after CBP turned her away from protection at the Eagle Pass port of entry. Black and Indigenous asylum seekers continue to be targets of bias-motivated violence and discrimination while stranded in Mexico.

- **The Biden administration's expansion of Title 42 to Venezuelans in October 2022 has denied thousands access to the U.S. asylum process in flagrant violation of U.S. refugee law. The expansion has stranded adults, families, and children in dangerous Mexican border cities where they are targets of kidnapping, torture, and brutal attacks. It has subjected others to onward** *refoulement* **to persecution and torture. It has also separated many families.** In some cases, this expansion has resulted in the separation of married couples and the delivery of mothers, wives, teenage daughters, and other family members to grave dangers in Mexico. CBP has subjected many Venezuelans to "lateral expulsions," transporting them to areas far from where they entered the United States and to locations where they have no knowledge of the specific dangers or local refugee shelters. In many cases, asylum seekers appear to have been transported to cities that lack shelter capacity.

- **Mexican asylum seekers fleeing persecution and torture have been trapped in or expelled by CBP to the very country they are trying to flee without access to the U.S. asylum process in violation of U.S. law and non-refoulement legal obligations**. They include: a woman who was decapitated by the cartel that had threatened her after DHS, citing Title 42, would not let her

CLP_PC_030903

seek asylum; a lesbian women who had suffered multiple attacks, rape, and threats due to her sexual orientation and was refused the right to seek asylum at the San Ysidro port of entry; a gay man who had suffered beatings, sexual assaults, and an attempted kidnapping due to his sexual orientation and was turned away from asylum at the El Paso port of entry; and an Indigenous woman who had been attacked by police, threatened, and her family members murdered for her activism defending her Indigenous community was turned away from seeking asylum with her three children at the San Ysidro port of entry in September 2022 and subsequently suffered sexual abuse by Mexican police.

- **Faith-based, humanitarian, and legal workers assisting asylum seekers stranded in Mexico by the Title 42 policy face acute and mounting threats and attacks from violent cartels that exercise widespread control over territory in Mexico.** Recent threats and attacks include the June 2022 kidnapping and November 2022 threats against a Baptist pastor in Nuevo Laredo, the armed raiding of a shelter in Ciudad Juarez in late November 2022, the forced closure of a Nuevo Laredo shelter after threats demanding that the shelter pay a "protection fee," and the robbery at gunpoint of a staff member of a legal organization in a Tijuana plaza near the San Ysidro port of entry while the staff member accompanied asylum seekers instructed by CBP to appear at 6 a.m. to be processed for a Title 42 exemption.

- **CBP and Border Patrol officers continue to use Title 42 to expel migrants and asylum seekers in ways that make them even more vulnerable to harm in Mexico and undermine their ability to seek asylum in the United States** – including by sometimes expelling asylum seekers in the middle of the night, depriving them of necessary medical care, or taking their passports or other identity documents, religious items, medical items, or other documents necessary for their asylum cases. Many were expelled to deplorable conditions without secure housing, leaving some sleeping on the streets. Mexican authorities transported some expelled Venezuelans to other parts of Mexico, abandoning them in cities where migrant shelters are full beyond capacity.

- **The Title 42 policy has continued to inflict disorder at the border, triggering multiple border crossings, artificially inflating CBP border statistics,** pushing dangerous crossings away from ports of entry, and facilitating exploitation. With Title 42 spurring dangerous attempts to cross into the United States outside of ports of entry, at least 853 asylum seekers and migrants have died in border crossings in FY 2022, making it the deadliest year since the U.S. government began record keeping on border crossing deaths in 1998.

---

## Recommendations

- **Congress:** Reject any efforts to codify or legislatively extend the Title 42 policy or similar policies that suspend refugee law or improperly block refugees from seeking asylum, direct sufficient appropriations for asylum adjudications and to community-based, non-profit organizations providing temporary housing, transportation, and other assistance to people seeking refuge at the border, and continue to conduct oversight of the disorder and human rights abuses caused by the Title 42 policy and any similar policies that deny access to asylum.

**Comments Submitted by American Gateways RE: Joint Notice of Proposed Rulemaking (NPRM) by U.S. Citizenship and Immigration Services, Department of Homeland Security; the Executive Office for Immigration Review, Department of Justice: Circumvention of Lawful Pathways; RIN 1615-AC83 / 1125-AB26 / USCIS Docket No. 2022-0016/ A.G. Order No. 5605-2023 (published in the Federal Register on February 23, 2023).**

American Gateways provides much needed legal representation for indigent immigrants in Central Texas. Our mission is to champion the dignity and human rights of immigrants, refugees, and survivors of persecution, torture, conflict, and human trafficking through exceptional legal services at low or no cost, education, and advocacy. Our agency began in 1987 as the Political Asylum Project of Austin and was founded to provide legal representation to Central American immigrants fleeing persecution and seeking asylum in the United States. Over the past thirty-three years, American Gateways has become an indispensable legal services provider for low-income asylum seekers and immigrants in Central Texas.

American Gateways opposes the notice of proposed rulemaking regarding Circumvention of Lawful Pathways (the "Proposed Rule"), published by the Department of Homeland Security (DHS) and Department of Justice (DOJ) (collectively, the "Departments") on February 23, 2023, and requests that the Departments promptly rescind the Proposed Rule. American Gateways describes below how some of the proposed changes will impact our organization and our clients, and the reasons for our opposition. Omission of any proposed change from these comments should not be interpreted as tacit approval. American Gateways opposes all aspects of the Proposed Rule that would erode the due process rights of asylum seekers or otherwise impede—in any way—the ability of individuals who have suffered persecution to access humanitarian protection in the United States. At the same time, American Gateways expresses heightened concern regarding the disproportionate harms that will befall certain asylum seekers—namely, detained and *pro se* asylum seekers—if the Proposed Rule is not withdrawn. The Departments propose to implement a presumption of ineligibility for asylum upon certain noncitizens arriving at the U.S. southern border who (1) did not seek asylum in a country of transit or (2) did not obtain an appointment to present at the border using a mobile phone application known as "CBP One." The proposed changes will prevent current and future asylum seekers from accessing protection they merit under domestic and international law, result in the return of many asylum seekers to harm, without allowing them their legal right to seek protection under the asylum law. The proposed rule also leaves others in the United States without stable protection. Rather than "align with the [Immigration and Nationality Act] and Congress's general intent to create an asylum and protection system that adjudicates claims both expeditiously and fairly," 88 Fed. Reg. 11704, 11746, the Proposed Rule would only result in lower rates of representation, poorly prepared filings, due process violations, higher denial rates, and the more rapid deportation of refugees back to the persecution from which they fled.

## I.    GENERAL COMMENTS

**A. The shortened comment period does not provide adequate time for meaningful participation in the rulemaking process.**

1

CLP_PC_031497

would undermine reliance interests and add to the uncertainty while the inevitable litigation pends. At the very least, the Departments should specify to whom each of the new provisions would apply so that all individuals who might be impacted by the Proposed Rule are on notice of the Departments' intentions and can, as appropriate, challenge any attempt at retroactive application.

## II.    SPECIFIC COMMENTS

### A.  The Proposed Rule's introduction of a presumption of asylum ineligibility for certain noncitizens emphasizes efficiency at the expense of due process.

American Gateways acknowledges that Immigration Courts are faced with a tremendous backlog of cases and that the Departments endeavor to increase the speed and efficiency of proceedings. Yet, in several respects, the Proposed Rule prioritizes efficiency over fairness, thereby threatening the due process rights of asylum seekers.

"'It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.'" *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). Indeed, for over a century, the Supreme Court has repeatedly affirmed that the "Due Process Clause applies to all persons within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 679 (2001). As early as 1896, the Court held that due process rights applied to an individual detained for unauthorized entry into the United States. *See Wong Wing v. United States*, 163 U.S. 228, 238 (1896). Less than a decade later, the Court reaffirmed that immigrants in removal proceedings are guaranteed due process rights, including the right "to be heard upon the questions involving [the] right to be and remain in the United States." *Yamataya v. Fisher*, 189 U.S. 86, 101 (1903); *see also Mathews v. Diaz*, 426 U.S. 67, 77 (1976) (Fifth Amendment protects all persons "from deprivation of life, liberty, or property without due process of law") (citations omitted); *Plyler v. Doe*, 457 U.S. 202, 210 (1982) (same).

It is similarly well settled that due process requires: (1) notice and (2) an opportunity to be heard. *See, e.g.*, *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) ("'The fundamental requisite of due process of law is the opportunity to be heard.' This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest.") (internal citations omitted). In the immigration context, due process requires that "[a]n alien who faces deportation is entitled to a full and fair hearing of his claims." *Agyeman v. INS*, 296 F.3d 871, 877 (9th Cir. 2002) (internal quotation marks and citation omitted); *see also Colmenar v. INS,* 210 F.3d 967, 971 (9th Cir. 2000) ("[A]n alien who faces deportation is entitled to a full and fair hearing of [her] claims and a reasonable opportunity to present evidence on [her] behalf."); *Bah v. Keisler*, 249 F. App'x 876, 879 (2d Cir. 2007) ("Due process in the asylum context requires that an applicant receive a full and fair hearing that provides a meaningful opportunity to be heard.") (citing *Li Hua Lin v. U.S. Dep't of Justice*, 453 F.3d 99, 104-05 (2d Cir. 2006)); *Cano-Merida v. INS*, 311 F.3d 960, 964 (9th Cir. 2002) (failure to allow the petitioner to present oral testimony constitutes a denial of right to due process).

The civil rather than criminal nature of removal proceedings does not diminish this due process right:

8

> Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom. That deportation is a penalty . . . cannot be doubted. Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness.

*Bridges v. Wixon*, 326 U.S. 135, 154 (1945). Procedural due process rights have also animated statutory rights that apply to immigration proceedings. Section 240 of the Immigration and Nationality Act (INA) delineates the contours of a fair hearing and enumerates the rights that apply to persons in removal proceedings. The INA provides that an "Immigration Judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1). Moreover, "the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine the witnesses presented by the Government." *Id*. § 1229a(b)(4)(B). The INA's implementing regulations also require a hearing. The BIA has acknowledged that "[a]t a minimum, . . . the regulations require that an applicant for asylum and withholding take the stand, be placed under oath, and be questioned as to whether the information in the written application is complete and correct." *Matter of Fefe*, 20 I. & N. Dec. 116, 118 (BIA 1989).

It is critical that asylum seekers be given an opportunity to understand the procedure they are facing, to obtain counsel, and to present all evidence in support of their claim in a full merits hearing. Under the Proposed Rule, asylum seekers could be deported without an asylum hearing if they do not pass their fear screenings. *See generally* 88 Fed. Reg. 11704, 11724-25. The Proposed Rule will be implemented during the expedited removal process, where asylum seekers are swiftly deported without a day in court if they do not pass their fear screenings. *Id*. ("Although the rebuttable presumption would apply to any noncitizen who is described in proposed 8 CFR 208.33(a)(1), it would most frequently be relevant for noncitizens who are subject to expedited removal under section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1).").

During the threshold fear interview, asylum seekers will be required to show that the ban does not apply to them or, if it does, that they can rebut the presumption of ineligibility by proving they fall within one of the Rule's exceptions. *Id*. This will be impossible for many given that these screenings typically occur over the phone while asylum seekers are detained, with little or no access to counsel. Language barriers, abusive and dangerous conditions of confinement, acute trauma, and lack of knowledge of the requirements of this complex rule would make it extremely challenging for asylum seekers to overcome this ban in preliminary screenings. Many would be unable to prove to an asylum officer that they should not be banned from the right to apply for asylum by the rule. Those who cannot rebut the presumption will then be forced to meet a "more likely than not" standard just to be able to present a claim to lesser protections in the form of withholding of removal or CAT protection. *Id.*

For those forced to undergo this credible fear screening while in detention, the obstacles to due process are so high as to render success unachievable for most, regardless of the merits of their asylum claim. Asylum seekers will be forced through their fear interviews while in government

9

custody in notoriously difficult and abusive conditions,[6] without prior knowledge as to the rule's details or workings, and only a few hours or days away from the dangers and horrors of their flight. Even if legal service providers are able to obtain the ability to provide brief orientation or consultation services prior to a credible fear interview, there will be no meaningful access to representation for asylum seekers navigating this complex process.

The severe consequences asylum seekers would face as a result of implementation of the Proposed Rule's presumption of asylum ineligibility, especially at the expedited removal stage, cannot be understated. American Gateways has witnessed the problems with credible fear interviews firsthand. Indeed, American Gateways has observed several credible fear interview denials where the asylum officer did not follow the law, cut off the applicant's answers to questions, mocked the applicant, or had an interpreter in a language the applicant did not fully understand. Given the reality that Immigration Judges routinely rubberstamp asylum officers' determinations, there is an unacceptable chance that justice will be miscarried. Further, while asylum applicants who reach the Immigration Judge review stage have a right to counsel, Immigration Judges often limit the participation of legal counsel at the review hearing. Often, Immigration Judges do not allow attorneys to ask additional clarifying questions or make legal arguments to support asylum seekers' claims. Most Immigration Judge reviews last less than five minutes, and in many instances the Immigration Judges do not ask for any clarification or additional testimony from applicants.

For example, Ms. C was a detained asylum seeker who was fleeing persecution based on the murder of her husband who was a police officer. He was targeted because he was a police officer who investigated gang activity. After he was killed, Ms. C began to receive threats and was attacked. She fled because she feared that she would be killed if she remained in her home country. She was given a negative credible fear interview finding. She requested an Immigration Judge review. The review before the Immigration Judge took minutes. He affirmed the decision of the asylum officer. American Gateways intervened and requested a reinterview for Ms. C based on the legal error in the asylum officer's decision and the cursory and insufficient review by the Immigration Judge. The Asylum Office granted Ms. C an additional interview where she was represented by American Gateways. She was interviewed for nearly two hours and her attorney was able to provide legal arguments on her behalf. Because of this additional advocacy and

---

6 *See, e.g.*, Catherine E. Shoichet, "The Death Toll in ICE Custody Is the Highest It's Been in 15 Years," CNN, September 30, 2020, https:// www.cnn.com/2020/09/30/us/ice-deaths-detention-2020/index.html; Joel Rose, "ACLU Calls on DHS to Close ICE Detention Centers, Citing High Cost of Empty Beds," NPR, April 28, 2021, https://www.npr.org/2021/04/28/991679868/aclu-calls-on-dhs-toclose-ice-detention-centers-citing-high-cost-of-empty-beds; Laura Wilson, "Violence Against Women and Girls in ICE Custody," Global Rights for Women, September 21, 2020, https://globalrightsforwomen.org/featured/violence-against-women-and-girlsice-custody; Caitlin Dickerson, Seth Freed Wessler, and Miriam Jordan, "Immigrants Say They Were Pressured into Unneeded Surgeries," New York Times, September 29, 2020, https://www.nytimes.com/2020/09/29/us/ice-hysterectomies-surgeries-georgia. html; Ian Urbina, "The Capricious Use of Solitary Confinement against Detained Immigrants," Atlantic, September 6, 2019, https:// www.theatlantic.com/politics/archive/2019/09/ice-uses-solitary-confinement-among-detained-immigrants/597433; and Noah Lanard, "Guards Pepper-Spray Protesting Asylum Seekers at an ICE Detention Center," Mother Jones, June 25, 2020, https://www. motherjones.com/politics/2020/06/guards-pepper-spray-protesting-asylum-seekers-at-an-ice-detention-center.

CLP_PC_031506

representation, the Asylum Office overturned its initial decision in Ms. C's credible fear interview and allowed her to move forward with her asylum claim.

In another instance, a detained American Gateways client was given a negative credible fear interview determination for lack of nexus between her feared harm and a protected ground. Due to American Gateways' representation during the request for review by an Immigration Judge, the client was able to prove up nexus on at least two protected grounds and was issued a notice to appear. She ultimately prevailed in her case. In several other instances, American Gateways' attorneys have helped clients overcome adverse credibility findings during their interview that were largely the result of poor interpretation, false assumptions, or missed questions. In other instances, American Gateways' staff have been able to overturn negative credible fear interview determinations where the asylum officer did not evaluate the applicant for eligibility for protection under the Convention Against Torture.

These due process violations would be magnified if the administration pursues its reported plan to conduct credible fear interviews within days of asylum seekers' arrival in Customs and Border Protection (CBP) custody, where dire conditions and lack of access to counsel would exacerbate the due process nightmare. The Trump administration similarly conducted credible fear interviews in CBP custody through the Prompt Asylum Claim Review (PACR) and Humanitarian Asylum Review Process (HARP) programs, which the Biden administration ended.[7] Resurrecting this policy and imposing the asylum ban in these fear screenings would be a due process fiasco.

Asylum seekers detained in CBP custody have frequently reported[8] being provided insufficient or inedible food and water; lack of access to showers and other basic hygiene; and inability to sleep because of overcrowding, lack of adequate bedding, cold conditions, and lights that are kept on all night. For asylum seekers subjected to PACR and HARP, positive credible fear determinations plummeted[9]: according to a January 2021 United States Government Accountability Office report,

7 "Executive Order on Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border." The White House. The United States Government, February 4, 2021. https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/02/executive-order-creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration-throughout-north-and-central-america-and-to-provide-safe-and-orderly-processing/.

8 *See, e.g.,* Human Rights Watch. "'They Treat You Like You Are Worthless': Internal DHS Reports on Abuses by US Border Officials." Human Rights Watch, 21 Oct. 2021, https://www.hrw.org/report/2021/10/21/they-treat-you-you-are-worthless/internal-dhs-reports-abuses-us-border-officials; Human Rights First. "Family Detention at Berks County Residential Center." Human Rights First, 1 Dec. 2022, https://humanrightsfirst.org/wp-content/uploads/2022/12/Final-Berks-Factsheet-12.1.2022_FINAL-1.pdf; Human Rights Watch. "'The Freezer' Abusive Conditions for Women and Children in US Immigration Holding Cells." Human Rights Watch, 28 Feb. 2018, https://www.hrw.org/report/2018/02/28/freezer/abusive-conditions-women-and-children-us-immigration-holding-cells.

9 Human Rights First. "A Pretense of Protection: The Dangerous Impact of the U.S. 'Remain in Mexico' Policy." Human Rights First, Jan. 2023, https://humanrightsfirst.org/wp-content/uploads/2023/01/PretenseofProtection-21.pdf.

CLP_PC_031507

only 18 percent of individuals in PACR and 30 percent in HARP passed their screenings, as shown in the figure below.[10]



**Outcomes of Screenings Under Expedited Fear Screening Pilot Programs, October 2019 through March 2020 (as of August 11, 2020)**

Expedited Fear Screening Programs combined

| 69% | 23% | 9% |
|---|---|---|

Prompt Asylum Claim Review

| 73% | 18% | 9% |
|---|---|---|

Humanitarian Asylum Review Process

| 62% | 30% | 9% |
|---|---|---|

Negative    Positive    Administrative closure (e.g. withdrawals)

Source: GAO analysis of USCIS data.  |  GAO-21-144

Note: Percentages do not total 100 due to rounding.

_____ **United States Government Accountability Office** [11]

This is compared to 40 percent nationwide (excluding HARP and PACR) during the same period.[12]

The following examples from the American Gateways experience highlight the impacts of detention on asylum seekers and the ways in which the Proposed Rule would lead to magnified due process violations for detained asylum seekers in particular:

- American Gateways has worked with a number of indigenous Kichwa speakers from Ecuador at the Hutto detention center. After months of difficulty in locating an interpreter that the detained women needed, American Gateways was able to locate **one** interpreter who speaks the correct dialect, which the women could understand. Coordinating a time when the interpreter is available that also corresponds to the rigid schedule at the detention center (so as not to conflict with numerous counts and other meetings at the facility) has often been difficult. Many of these women have family and community support in the U.S. and would be able to find representation and interpretation services much more easily if they were not detained and each of these women are asylum seekers who have suffered a great deal of trauma. Detention has exacerbated their trauma and also made them feel more isolated, due to the inability to communicate effectively with American Gateways, with ICE, with the Asylum Office, and with the Immigration Court.

- American Gateways represented an unaccompanied minor, Miss K, from Sierra Leone who had been incorrectly placed in adult detention at Hutto. She was 17 years old and spoke only Krio. Finding an appropriate interpreter was incredibly difficult and it also became clear that ICE and the contractors at the detention center were communicating (or attempting to communicate) with her in English despite the fact that she did not understand English. Several medical authorizations and other documents were explained to Miss K in English. Despite not understanding what she was signing, she did so out of fear. Once American Gateways was able to obtain a Krio interpreter (of which there are very limited

---

10 U.S. Government Accountability Office. "Central America: Regional Development Plan Includes Strategies to Address Migration, but Implementation Challenges Remain." GAO-21-144, U.S. Government Accountability Office, Feb. 2021, https://www.gao.gov/assets/gao-21-144.pdf.
11 *Id.*
12 *Id.*

CLP_PC_031508

numbers), American Gateways was able to review the documents she signed with her and discovered that she did not understand that she had consented to medical procedures, including a dental exam. Detention made communicating with Miss K more difficult because there were limited options for Krio interpreters. American Gateways had to prepare her asylum case via a phone interpreter when that interpreter was available. She should have been released, and correctly identified as an unaccompanied minor thus limiting her detention, but the language barrier was something that prevented this in the first place.

- American Gateways became very involved in the asylum cases of several women from East Africa because Immigration Judges were requiring proof of female genital mutilation (FGM) in order to grant these women asylum. However, the medical staff at Hutto would not perform the exams needed to prove FGM. American Gateways had to coordinate with an outside clinic and ICE to get the exams performed, but this proved to be burdensome. Detention only creates substantial barriers to these types of efforts, and *pro se* respondents would have little to no chance of prevailing on FGM-based claims when detention facilities refuse access to necessary medical exams.

Detention thus severely raises the hurdles asylum seekers already face in obtaining legal counsel, locating interpreters who speak the asylum seeker's language or dialect, or even collecting any other resources—such as documents or medical proof—that could assist the asylum seeker with overcoming the presumption of asylum ineligibility during credible fear screenings. It is undeniable that these barriers raise grave due process concerns under the Fifth Amendment.

Furthermore, American Gateways emphasizes that the Proposed Rule fails to recognize the significant due process concerns raised by the various parole processes that have already been implemented and from which the Departments claim to draw "lessons" in drafting the Proposed Rule—*i.e.*, the Uniting for Ukraine ("U4U") and Venezuela parole processes, as well as the processes for Cubans, Haitians, and Nicaraguans, under which DHS imposed new consequences for those who cross the border without authorization in the form of returns to Mexico. 88 Fed. Reg. 11704, 11706. These parole programs have been criticized as allowing only small numbers of migrants into the United States, and having a disproportionately negative impact on low-income individuals who may not be able to find sponsors as required under the programs. For example, up to 30,000 "qualifying nationals" per month from Cuba, Nicaragua, Haiti and Venezuela have been allowed "to reside legally in the United States for up to two years and to receive permission to work here during that period" pursuant to the parole process created for migrants of those nationalities.[13] But as the Departments themselves acknowledge, the number of *daily* encounters prior to announcement of these processes was 928 for Cuban, Haitian, and Nicaraguan nationals alone, and over 1,100 for Venezuelan nationals—on average more than *740,220 per year*, or *61,685 per month. See* 88 Fed. Reg. 11704, 11706. Moreover, the parole process for Haitians

---

13 Lavers, M. K. (2023, January 6). *Advocacy groups criticize new Biden immigration policies*. Washington Blade: LGBTQ News, Politics, LGBTQ Rights, Gay News. https://www.washingtonblade.com/2023/01/05/advocacy-groups-criticize-new-biden-immigration-policies/.

CLP_PC_031509

ignores the fact that Haiti lacks a functioning government, creating severe obstacles for Haitian migrants attempting to obtain passports in the first instance.[14]

### B. The Proposed Rule's exceptions to the "rebuttable presumption" will be impossible to navigate for *pro se* asylum seekers.

The Proposed Rule creates a complex system to bypass the rebuttable presumption, which includes demonstrating by the "preponderance of the evidence" that "exceptionally compelling circumstances exist." 88 Fed. Reg. 11704, 11723. The Proposed Rule specifically lists a number of "per se grounds for rebuttal" of the presumption: acute medical emergency, imminent and extreme threat to life or safety (such as rape, kidnapping, torture, or murder), and satisfying the legal definition of a "victim of a severe form of tracking in persons." *Id.*

Navigating this added layer to our already complex asylum system will be particularly problematic given the application of the rebuttable presumption to the credible fear interview stage. Under this Proposed Rule, the asylum officer determines whether the asylum seeker has rebutted this presumption. *Id.* at 11724 ("For each noncitizen referred to an asylum officer for a credible fear interview, the asylum officer would first determine if the noncitizen is covered by and fails to rebut the presumption of ineligibility"). If they have not, they receive a negative fear determination for their asylum claim. *Id.* The asylum officer will then determine whether the asylum seeker established a "reasonable possibility" of persecution or torture—a standard that is higher than the credible fear standard and more difficult to meet.[15] They will likely navigate this rebuttable presumption alone, as asylum seekers very rarely have attorney representation at this stage.

Asylum seekers face a difficult time obtaining representation for their initial asylum office "hearing." Legal representation rates among noncitizens in removal proceedings generally are low. As of 2016, only 37% of individuals appearing before immigration courts secured legal representation.[16] Immigrants in detention were the least likely to obtain representation—only 14% had legal counsel.[17] Access to counsel is often outcome-determinative. Represented detainees are ten-and a-half times more likely than their *pro se* counterparts to win their cases.[18] The disparities are similarly high for asylum seekers (both detained and non-detained). In Fiscal Year (FY) 2020,

---

14 "Passport rush blamed on US policy stalls adoptions in Haiti." Associated Press, February 10, 2023, https://apnews.com/article/biden-politics-united-states-government-caribbean-haiti-f98a84e03e56e2702fb6880ec1825f0f (noting that the "U.S. policy change has unleashed a rush for passports at Haiti's main immigration office," and that "the ensuing demand for Haitian passports has overwhelmed Haiti's passport office in the capital, Port-au-Prince, where people with appointments cannot squeeze through the aggressive crowd or secure new appointments.").

15 American Immigration Council. "Asylum in the United States." Accessed March 26, 2023. https://www.americanimmigrationcouncil.org/research/asylum-united-states.

16 Ingrid Eagly & Steven Shafer, *Access To Counsel In Immigration Court*, Am. Immigration Council (Sept. 28, 2016), https://www.americanimmigrationcouncil.org/research/access-counsel-immigration-court.

17 Eagly, https://www.americanimmigrationcouncil.org/research/access-counsel-immigration-court. Since 2000, representation rates for detained individuals have ranged between roughly 10% and 30%. According to some estimates, the rates leveled off between 2015 and 2017 at about 30%. *See* TRAC Immigration, *Who Is Represented in Immigration Court?* (Oct. 16, 2017), https://trac.syr.edu/immigration/reports/485/.

18 Eagly, https://www.americanimmigrationcouncil.org/research/access-counsel-immigration-court.

14

CLP_PC_031510

March 27, 2023

*Submitted via: https://www.regulations.gov.*

| | |
|---|---|
| Daniel Delgado | Lauren Alder Reid |
| Acting Director | Assistant Director, |
| Border and Immigration Policy | Office of Policy, EOIR |
| Office of Strategy, Policy, and Plans | U.S. Department of Justice |
| U.S. Department of Homeland Security | telephone (703) 305-0289 |
| telephone (202) 447-3459 | |

**Re: Comment on the Proposed Rule by the <u>Department</u> of <u>Homeland Security</u> (DHS) and the <u>Executive Office for Immigration Review</u> (EOIR) on Circumvention of Lawful Pathways, CIS No. 2736-22; Docket No: USCIS 2022-0016; A.G. Order No. 5605-2023**

Dear Acting Director Daniel Delgado and Assistant Director Lauren Alder Reid;

The Florence Immigrant & Refugee Rights Project (Florence Project) respectfully submits this comment in response to the Department of Homeland Security (DHS) and Department of Justice (DOJ)'s proposed rule – which, given that seeking asylum is indeed a legal and protected pathway, is somewhat disingenuously titled "Circumvention of Lawful Pathways" – and hereafter referred to as the "proposed rule," that was published in the Federal Register on February 23, 2023. The proposed rule would change the face of asylum as we know it, directly contravening clear statutory language mandating that any non-citizen who is physically present in the U.S. or arrives in the U.S., *whether or not at a designated port of arrival and irrespective of the noncitizen's status*, may apply for asylum. This proposed rule would presumptively bar many refugees from critical asylum protection in the United States, certain to result in the unlawful refoulement of people fleeing persecution and violence. It also will force many people fleeing persecution and violence to try to remain in unsafe conditions in countries with dysfunctional and ineffective asylum systems and will deprive refugees who otherwise would have been eligible for asylum of their right and ability to reunite with their families and have access to a path to citizenship in the U.S.

The proposed rule is a new version of similar asylum and transit bans promulgated under the Trump administration that were repeatedly struck down by federal courts as unlawful. The Florence Project strongly urges the agencies to withdraw this proposed rule in its entirety and stop pursuing border and asylum policies that seek to circumvent U.S. law and treaty obligations to refugees, particularly those like this proposed rule that will disproportionately discriminate against Black, Brown, and Indigenous asylum seekers at our southern border. The administration should instead uphold its promise to rescind Trump administration entry and transit bans in their entirety, uphold refugee law, and restore full access to asylum at the border. This must include ensuring fair and humane asylum adjudications by ending the reliance on and proposed expansion of expedited removal procedures and properly funding USCIS to conduct full and fair

1

CLP_PC_031520

adjudications as well as legal service providers and NGOs who provide welcoming services to support refugees as they move through the legal process.

## I. Florence Project Is Well-Positioned to Offer Meaningful Feedback on the Many Harms of This Proposed Rule

The Florence Project is a 501(c)(3) non-profit organization that provides free legal and social services to the thousands of adults and children detained in immigration custody in Arizona on any given day. The Florence Project was founded in 1989 to provide free legal services to asylum seekers and other migrants in a remote immigration detention center in Florence, Arizona where people had no meaningful access to counsel. We have expanded significantly since that time and now provide free legal and social services to thousands of detained adults and unaccompanied children throughout Arizona. This includes providing services to thousands of people seeking asylum, withholding of removal, and Convention Against Torture protections each year, including hundreds of individuals who are going through the expedited removal credible fear or a reasonable fear screening process.

Additionally, in 2017, the Florence Project partnered with the Kino Border Initiative ("KBI"), a binational organization, to provide legal services to asylum seekers at the U.S.-Mexico border. Through that partnership, the Florence Project's Border Action Team now provides regular group and individual legal orientations and representation to asylum seekers in Heroica Nogales, Sonora, Mexico (hereafter referred to as Nogales, Sonora), just across the border from the Port of Entry into Nogales, Arizona. As the only 501(c)(3) non-profit organization in Arizona dedicated to providing free legal and social services to people in immigration detention, our vision is to ensure that every person facing removal proceedings has access to counsel, understands their rights under the law, and is treated fairly and humanely.

In 2021, the Florence Project provided legal case assistance over 4,000 times and provided over 8,600 legal educational packets to adults detained in Arizona. Our services include legal orientation services to detained pro se asylum seekers in Eloy and Florence to empower them to represent themselves in bond and removal proceedings. In 2021, our attorneys also represented 249 adults before the EOIR, including 115 people who were appointed counsel after an Immigration Judge found them incompetent to represent themselves pursuant to *Franco-Gonzalez v. Holder*. Our Border Action Team provided legal orientations to 2,600 people passing through KBI's humanitarian aid center in Nogales, Mexico; these services directly impacted 4,200 people when considering the accompanying family members. Finally, in 2021, our Social Service Team provided lifesaving social services to 628 people.

## II. The 30-Day Comment Period Provides Insufficient Time to Comment on the Rule

Providing only 30 days for the public to comment on the proposed rule effectively denies the public the right to meaningfully engage in the notice and comment process, forcing both organizations and individuals to quickly draft comments under extreme and unnecessary time-pressure. This dramatically abbreviated comment window is not

CLP_PC_031521

cost $3,000 - $5,000 pesos in Mexico ($163 - $271 USD), the equivalent of ten days' work.  The real cost is much higher, however, when you factor in the cost of food and shelter while a person attempts to find work to raise the money for the phone – those ten days can stretch to weeks when a migrant must juggle basic survival needs with purchasing a smartphone. To make matters worse, both Florence Project staff and our partners at the Kino Border Initiation have observed that certain features of the app, including facial recognition, operate better on brand-new, more expensive devices. For migrants waiting in Nogales, Sonora while trying to obtain an appointment, KBI has tried to support by providing food and shelter so they can save money for a phone. The organization has also tried to gather donations of smartphones for asylum seekers to use, but only a few phones have been donated. Absent the needed donations, KBI has encouraged the community of asylum seekers to share their phones with one another to help schedule appointments. While asylum seekers are trying to support one another in this manner, it is clear from this information that it is erroneous to assume asylum seekers arrive at the border with a smartphone and unreasonable for the proposed rule to rely upon this assumption.

Additionally, while the proposed rule cites to an extremely limited survey of how many people at one port of entry on one day had smart phones as evidence of the prevalence of smartphone ownership to justify reliance on the CBPOne app, the mere possession of a smartphone does not guarantee people access to CBPOne. First, because the application requires certain bandwidth and other technological features, not all smartphones are actually able to access the CBPOne app. Second, the mere possession of a smartphone does not obviate the significant barriers that remain for individuals with limited literacy or who speak languages in which CBPOne is not provided.

It is also a large hurdle for migrants trapped at the border to obtain a secure WiFi connection. The information being input into CBPOne contains personally identifiable information, which could be a safety risk for asylum seekers if the WiFi connection they are on is not private. Seeking out a WiFi connection can also put asylum seekers at risk if they are forced to leave a secure location and go out into public. Additionally, some shelters have limitations on hours and spaces in which migrants may access their phones which can force some migrants to have to decide between having safe shelter for the night or being able to access the app. Ultimately, as has been documented, not being able to access a smartphone or a wifi connection could lengthen their journey through unsafe areas and delay asylum seekers' opportunity to submit their fear claim.

> **b. CBPOne Is Discriminatory In Terms of Both Language Access and Literacy Concerns**

In addition to the technological access barriers, there are serious language access barriers with CBPOne. The app is currently only available in a limited number of languages that does not include the Indigenous languages many of our clients speak. Additionally, key advisals regarding the terms and conditions of use and the repercussions of fraud or willful misrepresentation are provided exclusively in English. The discriminatory impact of language access in the use of the CBPOne app came into stark relief on January 5, 2023, when the Departments announced a limited parole program for Cubans, Haitians, and Nicaraguans premised on use of the app, yet

CLP_PC_031530

somewhat remarkably did not provide access in any language commonly spoken in Haiti. Indeed, CBPOne was not available in Haitian Creole until late January, causing unfair delays for a specific language group and nationality. Asylum processing must be equitable and accessible to all and cannot unfairly discriminate against specific countries or language groups. Moreover, most, if not all, error messages in the CBPOne application are in English only, discriminating against anyone who does not have at least a basic grasp of English to decipher those error messages.

The Florence Project Border Action Team has submitted requests on behalf of five different families who speak indigenous languages, and those requests have been pending for nearly four weeks at the time of comment submission. Without assistance from an NGO like the Florence Project, these families would have no mechanism to access the CBPOne app because it is simply unavailable in languages that they speak. In order to get the information necessary to properly make a request on behalf of an indigenous family, our team must spend an estimated 3 to 4 hours with each family and an independent interpreter. Our staff members must review current border policy, asylum basics, the unaccompanied minor process in case of family separation, and the substance of their fear claim. We have submitted requests on behalf of five families (totaling 12 people, including minor children) so far and have five more indigenous families (totaling 28 persons, including minor children) scheduled for the coming week. In total, these 40 persons speak six different indigenous languages from southern Mexico and Guatemala. This is yet another example of the government offsetting the work of asylum processing to nongovernmental organizations such as our own and requires a large amount of time and resources.

Another glaring issue is requiring literacy to obtain an appointment to express a fear claim.  Many asylum seekers have not had the opportunity to attend formal schooling or otherwise have very limited literacy. The issue of literacy combined with language access creates an even bigger problem – many indigenous language speakers cannot read in their language nor in Spanish, and literacy among indigenous language speakers drops to only the 20th or 30th percentile. Therefore, translating the app into new languages does not resolve the issue of access and any proposed system that effectively requires literacy as a prerequisite for the person seeking protection is doomed to failure. An asylum system that relies on CBPOne or any other app as a singular point of entry into processing will unfairly discriminate against certain groups and will rely upon nongovernmental organizations to do the labor of helping asylum seekers submit valid fear claims.

c. **CBPOne, Like Most Facial Recognition Software, is Racially Discriminatory**

The CBPOne App has demonstrated racial bias in the facial recognition technology it relies upon. The reliance on this app is inherently harmful to Black asylum seekers who have been prevented from scheduling an appointment due to the flawed technology. The facial recognition feature has been unable to process images with a darker skin tone, effectively blocking Black migrants from access to our asylum system. Black asylum seekers are already more vulnerable while waiting for an appointment in Mexico, with widespread reports of harassment, racially targeted violence, and abuse by Mexican

CLP_PC_031531

authorities. In yet another example of nongovernmental organizations working overtime to compensate for the flaws of the government's system, some advocacy groups have brought in construction lights to brighten the faces of asylum seekers so the app will recognize them. In Nogales, while we have not had to bring in construction lights, we routinely witness the additional difficulties faced by migrants with darker skin tones in getting the app to recognize and detect their faces and we have witnessed people holding the phone to their faces for 15 minutes before the app was able to recognize their features. This is difficult, but not insurmountable when it comes to adults, but can pose even greater hurdles when dealing with children.

The proposed rule's plan to utilize CBPOne as a singular access point for asylum seekers when the government is aware of the inherent racial bias of the app is discriminatory and unjust. It works in direct opposition to the Biden administration's stated commitment to advance racial equity. The United States asylum system must be equitable and accessible to all, regardless of race. The proposed rule cannot achieve that while relying upon an app that has clear, unresolved racial bias.

### d. CBPOne Requires Asylum Seekers to Obtain Unnecessary Information That They May Not Have Access To

While DHS maintains that CBPOne only requires asylum seekers to provide basic biographical information, there are many presumptions about what information is considered "basic". In reality, this results in certain groups of asylum seekers being privileged over others. One of the required fields for asylum seekers to complete in the CBPOne application is their height and weight. While this may be standard practice within the U.S., it is not universal knowledge, particularly for asylum seekers from more remote communities that lack access to medical care or other agencies where they may have been able to weigh and measure themselves. To wit, KBI estimates that approximately 70% of the asylum seekers who were displaced in its' shelter in the Fall of 2022 had never had access to a primary care doctor. Therefore, when the CBP One application became publicly accessible for the Title 42 exemptions process, KBI has had to place two different scales as well as a height ruler on the wall so that migrants can measure and weigh themselves. Florence Project staff witness persons routinely using these devices in order to complete the CBPOne requisite information. However, if an asylum seeker does not have access to an NGO such as KBI, and they do not know their height and weight, they would not be able to complete the CBPOne application. This means they would first have to seek out a medical clinic or other system by which they could weigh and measure themselves. Access to asylum should not be predicated on this information that can be – and is still – routinely gathered by CBP officers at the Port of Entry.

### e. Reliance on CBPOne as the Sole Access Point to Asylum Causes Delays That Force Asylum Seekers to Wait in Unsafe Conditions

While CBPOne's implementation was intended to expedite processing, the reliance on it as the singular way to obtain an appointment causes delays and leaves people in danger.

CLP_PC_031532

For example, a 17-year-old Cuban child was murdered in Mexico while waiting for an appointment. Unfortunately, we have also seen such a tragic result in Nogales, Sonora as well. Another legal service provider in Nogales, Sonora represented a young man who – in addition to fleeing harm in his country of origin and seeking asylum with his family – was suffering organ failure. The legal service provider had escalated the case to the Tucson Office of Field Operations (OFO), requesting that the man receive an urgent exemption from Title 42 and/or humanitarian parole. The legal service provider explained to Tucson OFO that, due to the exigent circumstances, the family could not wait even more weeks or months for an appointment via the CBP One application. Tucson OFO failed to address their request, and sadly the young man died.

Additionally, over-reliance on the app as the sole access point for asylum forces many people to expose themselves to further danger when they are only able to obtain an appointment at a distant port of entry. This is what happened to one Venezuelan family who were kidnapped, tortured and extorted during a 1,200 mile journey to another port after there was no appointment available where they were. Their kidnappers threatened to murder them if they did not cross. When they were apprehended, they informed Border Patrol about the threat to their life but were expelled back to unsafe conditions in Mexico.

Many of the asylum seekers we serve in Nogales, Sonora who do not yet have a scheduled appointment are ultimately unable to obtain an appointment to present at the Nogales Port of Entry and instead must travel to one of the other ports of entry that are hundreds of miles away. This is deeply concerning, as the Sonora state is designated by the U.S. State Department as one in which people should "reconsider travel due to crime and kidnapping." The U.S. State Department recognizes that Sonora is a key location used by the international drug trade and human trafficking networks. Violent crime is widespread. And, U.S. government employees are prohibited from traveling within large parts of Sonora, yet, these are the very highways and routes that asylum seekers must travel to access ports of entry along the Texas/Mexico border. Moreover, in other parts of Sonora, U.S. government employees are only permitted to travel directly into certain cities, but are not permitted to go outside of the city limits due to the aforementioned dangers of kidnapping and crime. Yet, the highways in the northern and western parts of the state that are outside the city limits of many of the named cities in Sonora are the exact highways that asylum seekers must travel to access ports of entry along the California/Mexico border.

Moreover, the time and efficiency savings of the CBPOne app are dramatically overstated. In fact, after an asylum seeker requests an appointment via CBPOne, they still have to fill out paperwork containing much of the same biometric and biographical information at their appointment. As recently as last week, our Border Action Team staff members saw the form and confirmed that it is the exact same information as the CBP One app gathers. Because some of the information provided can change over time, it must be checked against the information originally provided in the app. As such, the CBPOne process is actually slower than having applicants provide their biographical information one time, whenever they are encountered and processed by border officials be that at a port of entry or otherwise. This most neatly aligns with what is clearly contemplated in U.S. asylum law and with international norms.

CLP_PC_031533



March 27, 2023

Daniel Delgado, Acting Director
Border and Immigration Policy
Office of Strategy, Policy, and Plans
Department of Homeland Security

Lauren Alder Reid, Assistant Director Office of Policy
Executive Office for Immigration Review
Department of Justice

*Submitted via www.regulations.gov*

**Public comment on notice of proposed rulemaking on Circumvention of Lawful Pathways - RIN 1615-AC83 / USCIS Docket No. 2022-0016; RIN 1615-AC83 / A.G. Order No. 5605-2023**

Dear Mr. Delgado and Ms. Alder Reid:

We are writing on behalf of Oxfam America ("Oxfam") to critique the new Rule adopted by the Departments of Justice and Homeland Security, which seeks to narrow the lawful pathways to receive asylum and to implement third-country transit bans. As explained below, the plan violates the federal government's obligations under U.S. law (see Section II) and international law (see Section III). Oxfam respectfully submit that the Rule should be rejected and that any new approach to asylum align with existing legal obligations under the Immigration and Nationality Act (INA), the Administrative Procedure Act (APA), the Refugee Convention, and the prohibition against *non-refoulment*.

Oxfam is a global organization that fights inequality to end poverty and injustice. We work in more than 80 countries, including the United States, to offer lifesaving support in times of crisis and advocate for economic justice, gender equality, and climate action. A centerpiece of this work involves supporting the world's most vulnerable communities, including refugees and other forcibly displaced populations. Oxfam supports displaced communities by tackling the drivers of migration, providing emergency humanitarian aid to those fleeing persecution, and advocating that governments respect the human rights of migrants through litigation, public campaigns, and other avenues. Oxfam respectfully submits that the Rule will lead the U.S. government to violate the human rights of migrants, exacerbate ongoing humanitarian crises throughout the region, and put lives at risk.

CLP_PC_031825

The U.N. High Commission for Refugees confirms that States may not "condition access to asylum procedures on regular entry" under the Refugee Convention and Protocol.[143] The Commission emphasizes that the key factor to determine refugee status under the Refugee Convention and the Protocol is the "*well founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion.*"[144] The Commission also observes that "asylum should not be refused solely on the ground that it could be sought from another State."[145] And the Commission recognizes that while "it is reasonable, in order to distribute the burden, to create agreements that allow the readmission of refugees in another country where they will have the responsibility to determine their status," a "condition" is that the "agreement gives the refugees some kind of protection and the certainty that their problems will be solved."[146]

The Proposed Rule's presumption against asylum and limited possibility of rebutting it in only a few extraordinary circumstances is a burdensome condition that violates the right to seek asylum. The Proposed Rule does not provide asylum-seekers a meaningful opportunity to seek protection or even an opportunity to exercise their right under international laws. Nor does it include agreements with other States. Instead, the Proposed Rule seeks to deny asylum-seekers for failing to apply for asylum in transited countries, even though those States are unsafe and cannot provide asylum-seekers adequate protections to seek asylum. The Proposed Rule's third-country transit presumption thus violates the right to seek asylum under international law.

## B.     THE PROPOSED RULE VIOLATES THE PRINCIPLE OF NON-REFOULEMENT

Under international human rights law, the principle of non-refoulement guarantees that no person should be returned to a country where they would face torture, cruel, inhuman or degrading treatment or punishment and other irreparable harm. As the U.N. Office of the High Commissioner for Human Rights notes, "This principle applies to all migrants at all times, irrespective of migration status" and "forms an essential protection under international human rights, refugee, humanitarian and customary [international] law."[147] The prohibition of non-refoulement is enshrined in many human rights instruments, including:

---

[143] UNCHR, *The Principle of Non-Refoulement as a Norm of Customary International Law. Response to the Questions Posed to UNHCR by the Federal Constitutional Court of the Federal Republic of Germany in Cases 2 BvR 1938/93, 2 BvR 1953/93, 2 BvR 1954/93*, 31 Jan 1994.

[144] UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees*, HCR/IP/4/Eng/REV.1 Reedited, Geneva, January 1992.

[145] UNHCR, conclusion No 6 (XXVIII) and No. 125 of 1977 and Executive Committee conclusion No 15 (XXX) of 1979. https://www.unhcr.org/en-us/excom/exconc/3ae68c960/refugees-asylum-country.html

[146]      Id.

[147]      OHCHR,     *The     Principle     of     Non-refoulement     Under     International     Human     Rights     Law*, https://www.ohchr.org/sites/default/files/Documents/Issues/Migration/GlobalCompactMigration/ThePrincipleNon-RefoulementUnderInternationalHumanRightsLaw.pdf.

CLP_PC_031849

- **The Refugee Convention**: As the cornerstone of the Convention, Article 33(1) prohibits the return of a person to a territory where he or she may face persecution:

  > "No Contracting State shall expel or return ("*refouler*") a refugee *in any manner whatsoever* to the frontiers of territories where his [or her] life or freedom would be threatened on account of his [or her] race, religion, nationality, membership of a particular social group or political opinion."  (emphasis added).

- **The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment ("CAT")**: Article 3 contains an absolute prohibition on deporting a person to a country where he or she would be at risk of torture:

  > "No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he [or she] would be in danger of being subjected to torture"

- **The International Covenant on Civil and Political Rights ("ICCPR")**: Article 7 of the ICCPR provides:

  > "No one shall be subjected to torture or to cruel, inhuman, or degrading treatment or punishment."

The U.N. Human Rights Committee – the treaty body tasked with monitoring the implementation of the ICCPR – has interpreted Article 7 to encompass the principle of non-refoulement:

> "In the view of the Committee, States parties must not expose individuals to the danger of torture or cruel, inhuman or degrading treatment or punishment upon return to another country by way of their extradition, expulsion or refoulement."[148]

The Human Rights Committee has also interpreted Article 2 of the ICCPR, together with Articles 6 (right to life) and 7 (above), as an indirect prohibition on refoulement:

> "[T]he article 2 obligation requiring that States Parties respect and ensure the [ICCPR] rights for all persons in their territory and all persons under their control entails an obligation not to extradite, deport, expel or otherwise remove a person from their territory, where there are substantial grounds for believing that there is a real

---

[148] U.N. Human Rights Committee (HRC), *CCPR General Comment no. 20: Article 7 (Prohibition of Torture, or Other Cruel, Inhuman or Degrading Treatment or Punishment),* Mar. 10, 1992, https://www.refworld.org/docid/453883fb0.html.

CLP_PC_031850

> risk of irreparable harm, such as that contemplated by articles 6 and 7 of the [ICCPR], either in the country to which removal is to be effected or in any country to which the person may subsequently be removed."[149]

International human rights treaties, therefore, prohibit returning a person to a State where (i) there are "substantial grounds for believing" that they would be in danger of being subjected to torture (CAT) or (ii) there is a real risk of irreparable harm to protected rights (ICCPR). These treaty-based prohibitions are widespread (173 State parties each[150]) and constrain State behavior in line with the Refugee Convention's non-refoulement obligation.

The principle of non-refoulement is a peremptory norm, the most critical protection under international law, and therefore does not permit derogation. The Executive Committee of the U.N. High Commissioner for Refugees has repeatedly reaffirmed the fundamental and non-derogable character of the principle of non-refoulement in many conclusions and advisory opinions.[151] So has the International Criminal Court,[152] the Committee against Torture (the treaty body tasked with monitoring the implementation of the CAT),[153]  and the U.N. General Assembly.[154]

The prohibition on refoulement applies to *any* form of forcible removal, as evident from the wording of Article 33(1) of the Refugee Convention ("in any manner whatsoever"). The

---

[149] U.N. Human Rights Committee (HRC), *General Comment no. 31 [80], The Nature and General Legal Obligation Imposed on States Parties to the Covenant,* May 26, 2004, CCPR/C/21/Rev.1/Add.13, https://www.refworld.org/docid/478b26ae2.html.

[150] U.N. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment  (adopted Dec. 10, 1984, entered into force Jun. 26, 1987) 1465 UNTS 85, (status of signatories available at: https://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg_no=IV-9&chapter=4&clang=_en) (accessed: March 20, 2023); U.N. International Covenant on Civil and Political Rights (adopted Mar. 23, 1976, entered into force Mar. 23, 1976) 999 UNTS 171, (status of signatories available at: https://treaties.un.org/Pages/ViewDetails.aspx?chapter=4&clang=_en&mtdsg_no=IV-4&src=IND) (accessed March 20, 2023).

[151] *See e.g.,* UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol*, Jan. 26, 2007, https://www.unhcr.org/4d9486929.pdf; *See also* Executive Committee, Conclusion No. 6 (XXVIII),  para. (c), https://www.unhcr.org/en-my/578371524.pdf (reaffirming "the fundamental humanitarian principle of non-refoulement has found expression in various international instruments adopted at the universal and regional levels and is generally accepted by States."); Conclusion No. 17 (XXXI) "*Problems of extradition affecting refugees*" (1980), para. (b), https://www.unhcr.org/en-my/578371524.pdf (reaffirming "the fundamental character of the generally recognized principle of nonrefoulement."); Conclusion No. 79 (XLVIII) "*General*" (1996), para. (j), https://www.unhcr.org/en-my/578371524.pdf (reaffirming "the fundamental importance of the principle of non-refoulement"); Conclusion No. 103 (LVI) "*Provision of International Protection Including Through Complementary Forms of Protection*" (2005), para. (m), https://www.unhcr.org/en-my/578371524.pdf (calling upon States "to respect the fundamental principle of non-refoulement").

[152] *Prosecutor v. Katanga*, ICC-01/04-01/07-34-05-tENg, Decision on the Application for the Interim Release of Detained Witnesses, Trial Chamber II, International Criminal Court, ¶30. (Oct. 1, 2013).

[153] UN Committee Against Torture (CAT), *General Comment No. 4 (2017) on the Implementation of Article 3 of the Convention in the Context of Article 22*, Feb. 9, 2018, ¶ 9, https://www.refworld.org/docid/5a903dc84.html (finding that the principle of non-refoulement is, like the prohibition on torture itself, non-derogable).

[154] *See e.g.*, G.A. Res. 51/75, para. 3 (Feb. 12, 1997), https://www.refworld.org/docid/3b00f3484.html  ("Reiterates that everyone, without distinction of any kind, has the right to seek and to enjoy in other countries asylum from persecution, and calls upon all States to uphold asylum as an indispensable instrument for the international protection of refugees and to respect scrupulously the fundamental principle of non-refoulement, which is not subject to derogation;"); G.A. Res. 52/132,  para. 12, (Dec. 12,  1997), preambular para. 12, https://documents-dds-ny.un.org/doc/UNDOC/GEN/N98/770/17/PDF/N9877017.pdf?OpenElement ("recalling that the principle of non-refoulement is not subject to derogation").

CLP_PC_031851

principle applies "not only in respect of return to the country of origin . . . *but also to any other place* where a person has reason to fear threats to his or her life or freedom related to one or more grounds set out in the [Refugee] Convention, or from where he or she risks being sent to such a risk."[155]  And "the obligation to guarantee the principle of non-refoulement applies to all forms of forced returns, indirect or 'chain' refoulement, deportation, expulsion, extradition, informal transfer or surrender, and other types of return."[156]  It bears underscoring, in view of the Proposed Rule, that the principle is violated when a State knows or ought to know that the receiving State has inadequate asylum procedures ("indirect refoulement").[157]  The U.N. High Commissioner has repeatedly determined that indirect refoulement constitutes refoulement under the Refugee Convention.[158]

The third-country transit presumption against asylum in the Proposed Rule violates the principle of non-refoulement. Given the government's own warnings of danger, as alluded to above, the United States knows that the most commonly transited countries for those arriving at the southwest border are unsafe and have inadequate asylum procedures. In *Huisha-Huisha*, the U.S. Court of Appeals for the District of Columbia Circuit explained that the Administration "has played up the same injuries from expulsions it plays down here. In defending its repeal of the 'Remain in Mexico' policy, [for example,] the Executive recently said that sending similarly situated aliens to dangerous places 'exposes migrants to unacceptable risks' of 'extreme violence.' It cited 'persecution, abuse, and other harms.' And it stated that a policy enabling those injuries

---

[155] UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol* (Jan. 26, 2007) https://www.unhcr.org/4d9486929.pdf.

[156] Press Release, *The IACHR Expresses Concern about the Expulsion of People in a human mobility context from the United States and Mexico and calls on States to Ensure the Effective Protection of Their Rights*, OAS (Sept. 17, 2021), available at https://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2021/243.asp.

[157] Moira Sy, *UNHCR and Preventing Indirect Refoulement in Europe,* 27 INT'L J. REFUGEE L. 457, 457-480 (2015).

[158] *See* UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol,* at ¶ 8 ("[W]here States are not prepared to grant asylum to persons who are seeking international protection on their territory, they must adopt a course that does not result in their removal, directly or indirectly, to a place where their lives or freedom would be in danger on account of their race, religion, nationality, membership of a particular social group or political opinion"); *see also* UNHCR, *Position on Readmission Agreements, 'Protection Elsewhere and Asylum Policy* (Aug. 1, 1994), http://www.unhcr.org/refworld/docid/3ae6b31cb8.html ("Article 33 of the 1951 Convention . . . requires, that refugees be protected - at all stages of the examination of their claim - against direct or indirect return to a place where their life or freedom might be threatened for reasons mentioned in the 1951 Convention."); *see also* UN High Commissioner for Refugees (UNHCR), *UNHCR Note on the Principle of Non-Refoulement*, (Nov. 1997) available at: https://www.refworld.org/docid/438c6d972.html ("Whenever refugees - or asylum-seekers who may be refugees - are subjected, either directly or indirectly, to such measures of return, be it in the form of rejection, expulsion or otherwise, to territories where their life or freedom are threatened, the principle of *non-refoulement* has been violated."); *see also Note on International Protection*, High Comm'r's Programme, Exec. Comm., 49th sess., ¶14, U.N. Doc. A/AC.96/898 (July 3, 1998) ("In some cases, the refoulement was indirect, for example, the asylum-seeker was removed to a third country from where that person was further removed to his or her country of origin, and was the unfortunate result of the inappropriate application of the so-called "safe third country" notion. If the removal of the asylum-seeker to a third country is carried out without a proper evaluation of safety conditions in that country and without sufficient assurances that the country will admit the person to its territory and will consider the asylum claim, there must always be a clear risk that the asylum-seeker will eventually be returned to the country of origin").

CLP_PC_031852

does not 'align with' its 'values.'[159] The Departments are aware of the dangers of using a third-country transit presumption to refoul asylum-seekers.

By expecting asylum-seekers to first apply for asylum in unsafe countries with inadequate asylum systems, and by raising the threshold-screening standard, the Proposed Rule enables the refoulement of bona fide asylum-seekers to countries where they would face a serious risk of torture, cruel, inhuman or degrading treatment or punishment and other irreparable harm. In a recent investigation, for example, the U.N. High Commissioner for Refugees found that more than 80 percent of women from El Salvador, Guatemala, Honduras, and Mexico screened on arrival at the U.S. border "were found to have a significant possibility of establishing eligibility for asylum or protection under the [CAT]."[160] Under the Proposed Rule, many of these women – among other asylum-seekers with credible claims – would be denied the right to seek asylum and sent to dangerous countries. As detailed above in Sections II.A.2 and II.A.3.b, the third-country transit presumption against asylum and the heightened screening standard violate the fundamental principle of non-refoulement.

1. **The third-country transit presumption contravenes international safe third-country principles**

The "safe-third-country" concept is closely linked to the principle of non-refoulement and the U.N. High Commissioner for Refugees has long expressed concerns that safe-third-country measures or agreements may violate the principle if States do not take appropriate safeguards.[161] Indeed, "[o]ne of the problems that may arise in applying the safe third country concept to asylum seekers is the difficulty of determining whether another country in which an asylum seeker can reasonably be expected to request asylum will, in fact, accept responsibility for examining his or her request and, if appropriate, granting asylum."[162] The High Commissioner notes:

> The agency "is aware of a number of instances where asylum-seekers have been refused admission and returned to a country through which they had passed, only to be summarily sent onwards from there, without an examination of their claim, either to their country of origin or to another, clearly unsafe country…. Without the prior consent and the co-operation of the country to which an asylum-seeker is returned, there is a grave risk that an asylum-seeker's claim may not receive a fair

---

[159] *Huisha-Huisha v. Mayorkas*, 456 U.S. App. D.C. 101, 117, 27 F.4th 718, 734 (2022).
[160] UNHCR, *Women on the Run* (Oct.r 2015), https://www.unhcr.org/5630f24c6.html.
[161] UNHCR, *UNHCR Note on the Principle of Non-Refoulement* (Nov. 1997), available at: https://www.refworld.org/docid/438c6d972.html; *see also* ExCom Conclusion 71 (XLIV), *Conclusions on International Protection of Refugees adopted by the Executive Committee* (Dec. 2009), available at: https://www.unhcr.org/en-my/578371524.pdf ("[S]uch procedures, measures and agreements must include safeguards adequate to ensure in practice that persons in need of international protection are identified and that refugees are not subject to refoulement[.]").
[162] UNHCR, *UNHCR Note on the Principle of Non-Refoulement* (Nov. 1997), available at: https://www.refworld.org/docid/438c6d972.html.

CLP_PC_031853

March 27, 2023

*Submitted via https://www.regulations.gov/commenton/USCIS-2022-0016-0001*

Lauren Alder Reid, Assistant Director
Office of Policy
Executive Office for Immigration Review,
Department of Justice
Falls Church, VA

Daniel Delgado, Acting Director
Border and Immigration Policy,
Office of Strategy, Policy, and Plans,
U.S. Department of Homeland Security
Washington, D.C.

**RE:    Comments in Opposition to the Joint Notice of Proposed Rulemaking entitled** *Circumvention of Lawful Pathways;* **RIN: 1125-AB26 / 1615-AC83** **/ Docket No: USCIS 2022-0016 / A.G. Order No. 5605-2023**

Dear Assistant Director Reid and Acting Director Delgado:

I am submitting the following comments to the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS), and the Department of Justice (DOJ), Executive Office for Immigration Review (EOIR) ("the agencies") in response and opposition to the above-referenced Notice of Proposed Rulemaking ("NPRM" or "the Rule") issued by the agencies on February 23, 2023. I strongly oppose the Proposed Rule, which will prevent current and future asylum seekers from accessing protection they merit under domestic and international law, result in the return of many refugees to harm, and leave others in the United States without stable protection. I urge EOIR and DHS to withdraw the Rule in its entirety and ensure that a full and fair asylum system is made accessible to all those who seek refuge in the United States.

I am an immigration attorney and consultant who has worked for years to protect the rights of people seeking asylum at the southern border. As part of my work, I have represented and provide legal information to thousands of individuals and families who were subject to the "Remain in Mexico" program, Title 42, and PACR/HARP. I have extensive experience working with people held in immigration detention—including in Family Detention—and with people placed in expedited removal and subjected to credible fear interviews and so-called "non-refoulement" interviews, and I have a deep understanding of how the expedited removal process works on the ground and of the numerous serious problems with that process. Currently, I mentor attorneys who represent people seeking asylum at the border, and in that capacity, I have attempted to resolve many problems with the CBP One app.

**Concerns regarding the CBP One app and making asylum access contingent on access to technology**

CLP_PC_031895

The proposed Rule introduces an entirely new concept into the U.S. asylum system – it renders asylum at the southern border contingent on peoples' ability to access and properly utilize a mobile phone app prior to their arrival. All people attempting to enter the United States to seek asylum will be ineligible for asylum unless they made an advance appointment to present at the port of entry using the CBP One app.

Requiring access to technology to secure asylum access fails to account for gaps in technology, language access, and economic disparities between groups of migrants attempting to use the app while fleeing harm. The result will be an asylum system that leaves behind those with fewer resources, often those in the greatest need.

On the technology side, the CBP One app does not work on all smartphones. For example, it does not work on Huawei brand cellphones from China, where are very common in Mexico and Central America. Other people have found that the app will not work on their phones because their device is too old and their operating system is too out of date. I have heard from multiple partners that the app seems to work better on cellular data versus on Wi-Fi, meaning that individuals need to use a resource they pay for (data) instead of Wi-Fi they could potentially access for free. And, the app is quite data-intensive, making it expensive for people to use. In addition, border areas do not always have high-speed data access, even for those individuals who are able to buy data plans.

The CBP One app requires two-factor identification when logging in. Most people opt to do the two-factor process via text message. But it is not made clear to users that in order to use the text message option, they must have a Mexican cell phone number and SIM card. Many individuals have purchased a plan that allows them to use their third-country phone in Mexico for data purposes (primarily used to access alternate messaging platforms such as WhatsApp, Messenger, and Telegram) but does not change their phone number. As a result, they cannot receive SMS messages on their phones, so the code they need to use for two-factor authentication never arrives.

While there are other options for the two-factor authentication, they are not very practical for most users. The first requires a physical security key device, the second requires that they download and use a separate app, and the last provides a set of 10 one-time-use codes made up of around 12 letters and numbers. The user is required to save and keep track of those codes and enter a new one each time they use the app, which becomes an onerous task considering that users must log-in to the CBP One app on a daily basis to try and secure limited appointments.

CLP_PC_031896

Beyond these threshold access issues, the CBP One app in its limited roll-out has already proven extremely flawed[1]: users have reported[2] frequent glitches and appointments that fill up before they can access them; and the facial recognition technology is racially disparate in application, often rejecting photos[3] of migrants with darker skin.

As part of my work, I have (with the assistance of partners) made and maintained user guides intended to help people in migration navigate the process of using the CBP One app[4]. These guides have become very popular teaching tools for assisting migrants with using the app among nongovernmental organizations operating in Mexico, and can be directly-accessed by migrants using hyperlinks that are shared widely on WhatsApp, Telegram, and other social media and updated when possible based on user-feedback. While the following statistics likely undercount the true distribution of the guides considering that some users share the PDFs directly rather than using the hyperlinks, my TinyURL dashboard reports the following click rates as on March 27, 2023:

|  | Total Human Clicks |
|---|---|
| Spanish | >10,000 |
| Haitian Kreyol | >4,200 |
| Russian | >1,600 |
| English | 954 |

**Top Referrer Sources for Spanish CBP One Guide**



---

[1] *See* Raul Pinto, "CBP One Is Riddled With Flaws That Make the App Inaccessible to Many Asylum Seekers," IMMIGRATION IMPACT (February 28, 2023), available at https://immigrationimpact.com/2023/02/28/cbp-one-app-flaws-asylum-seekers/.

[2] *See* Kate Morrissey, "Asylum seekers in Tijuana are scrambling through mobile app error messages for few appointments into the U.S.," THE SAN DIEGO UNION-TRIBUNE (January 22, 2023), available at https://www.sandiegouniontribune.com/news/immigration/story/2023-01-22/cbp-one-app-asylum-tijuana.

[3] *See* Melissa del Bosque, "Facial recognition bias frustrates Black asylum applicants to US, advocates say," THE GUARDIAN (February 8, 2023), available at https://www.theguardian.com/us-news/2023/feb/08/us-immigration-cbp-one-app-facial-recognition-bias.

[4] These guides are attached and are also available at:
https://tinyurl.com/CBPOneENGLISH
https://tinyurl.com/CBPOneESPANOL
https://tinyurl.com/CBPOneKreyol
https://tinyurl.com/CBPOneRUSSIAN

CLP_PC_031897

The widespread use of my guides demonstrates that there is a serious amount of confusion among migrants regarding how to use CBP One, and that the official guides produced by DHS are insufficient.

In making my CBP One Guides, I have also discovered a number of language-related issues with the process. In order to use the app, individuals have to first make an account on the website login.gov. This website is only available in English, Spanish, and French, even though the CBP One app is available in English, Spanish, and Creole. This makes the entire process very difficult for speakers of other languages who are also attempting to seek asylum at the southern border, including Russians, Ukrainians, and Afghans.

Additionally, the existing translated versions login.gov are inconsistent. For example, while using the website in French, one screen had information that was partially in French and partially in Spanish.



This section is properly translated into French.

This button is translated into Spanish instead of French.

There are also translation issues on the app itself. For example, when users must select their primary language, the drop-down menu options are only in English, meaning users must select

CLP_PC_031898

"Spanish" instead of "Espanol," "Creole" instead of "Kreyol," and "French" instead of "Francais," etc. Similarly, users must use drop-down menus to enter their gender, hair color, eye color, and marital status. When using the app in Spanish or Kreyol, the drop-down options provided to answer these questions are all only in English, and this "glitch" has still not been fixed, despite months of complaints:

### SCREENSHOTS TAKEN MARCH 27, 2023 FROM CBP ONE APP



CLP_PC_031899

Other questions are unnecessarily vague and difficult for people to answer. Users are asked whether they have a "travel document" but are not given any explanation of what documents this would include. Users are asked for their "Country of Residence" but are unsure if this means lawful residence, domicile, or current physical location. Under the section for Emergency Contact information, users are asked to fill in a blank box only with the word "Description." There is no further guidance; presumably this is meant for users to describe their relationship to their Emergency Contact, but even attorneys such as myself are confused as to what the question is asking.

The limited language options on offer make this app difficult or impossible to access for large groups of people in migration. One large group of individuals that this applies to is indigenous people from Guatemala who often speak little to no Spanish. Literacy is a significant obstacle to using this app as well. I have worked with numerous clients with limited to no literacy. They have learned to navigate using a cell phone but use it exclusively to send voice messages (or in the case of deaf individuals, video messages) over apps such as WhatsApp, Messenger, and Telegram. However, the CBP One app requires a high level of literacy and is not a practical option for these individuals. I also recently consulted with an attorney who was trying to assist an elderly Russian asylum seeker. Although the client had a phone, the combination of the language barrier and age-related technology struggles made it impossible for her to use the app.

The photo requirement of the CBP One app is difficult to use and buggy. Users are required to take their own picture every morning and the picture is checked for what is called "liveness" and for "comparison" to their previously provided picture. Users frequently receive an error message that the picture they provide is not the same person that registered for the app even though this is incorrect. People with darker skin tones consistently have the most difficult time getting this feature to work. Individuals have to be in very good light and sometimes have to try a variety of different lighting set ups or backgrounds. Some clients have found that the app only registers them as being the right person if they are wearing the exact same shirt they wore when the first picture was taken. Until recently, it was almost impossible for young children to use this feature because they did not register sufficient "liveness." Although I have heard that "liveness" is no longer being required for children five and under, people continue to have difficulties.

I have heard of numerous instances of people being charged by someone in Mexico promising to "teach" them how to use the CBP One app. Private attorneys, fake attorney "*notarios*," and other individuals have been charging anywhere from $250 to $2000 (US dollars) for this service. In practice, often all they do is send a YouTube tutorial about the app. I also heard of individuals attempting to sell the guides I created along with other advocates, even though this guide is intended to be free. The fact that these services exist, and people are willing to pay for them, demonstrates that the app is not user-friendly and people do not feel able to use it without assistance. There are also numerous instances of fraudulent appointment notices, where individuals

CLP_PC_031900

receive an email telling them that they have received an appointment but are required to pay a certain amount in order to attend the appointment.

To the extent that people are able to successfully navigate all of these obstacles and use the app as intended, they frequently find that the app crashes due to too many people attempting to access it. The available appointments fill up within around two minutes every morning. There simply is not enough capacity available to meet the need.

**Challenges faced by asylum-seekers while waiting in Mexico**

The many issues with the CBP One app in practice mean that asylum seekers are forced to wait in Mexico for an extended time while they attempt to get an appointment. I have extensive experience working with individuals forced to wait in Mexico under past policies, including the Migrant Protection Protocols, metering, and Title 42. In my experience, Mexico is horrifically unsafe for migrants.

Migrant families are extremely vulnerable in Mexico because, among other things, they are routinely (1) targeted for kidnapping, rape, trafficking, and extortion; (2) denied medical care even for serious illnesses; (3) displaced, homeless, and often forced to sleep on the street or in a plaza; (4) discriminated, harassed, and attacked based on race, gender, and sexual orientation; (5) assaulted by a combination of police and private actors; and (6) prevented from accessing basic services and legal protection due to language barriers.

Between 20 and 40 percent of my own clients faced kidnapping or attempted kidnapping while in Mexico. In addition, for the past several years, I have consulted with other attorneys on one to two migrant kidnappings in Mexico every week. My colleagues now recognize me as an expert in how to handle kidnapping situations. It is that common. <u>I have heard of numerous instances of people who are finally able to get an appointment through CBP One being kidnapped on the way to the bridge.</u>

One of my female clients from El Salvador, who had been expelled three times under Title 42, was kidnapped by two men who put a wet rag over her mouth, causing her to lose consciousness. When she awoke, she was alone, mostly naked, dumped in the desert, and had been raped. She walked until she found a woman who gave her pants and some money for a bus ride. My client went to the municipal police to report the rape, and the police officers told her that they were not going to accept her complaint because she was a migrant and "migrants liked to be raped." She later realized that she was pregnant as a result of the rape and went to the public hospital for prenatal care. At the hospital, a doctor, without informing my client or obtaining her consent, forcibly induced an abortion. As a Christian, my client does not believe in abortion and wanted to keep her baby, who was innocent, despite being the product of rape.

CLP_PC_031901

  

**Making a Mockery of Asylum: The Proposed Asylum Ban, Relying on the CBP One App for Access to Ports of Entry, Will Separate Families and Deny Protection**

*March 27, 2023*

Since passage of the 1980 Refugee Act, individuals fleeing persecution and torture have been legally authorized to seek asylum protection at the U.S.-Mexico border at or between official ports of entry (POEs). Recognizing that asylum seekers often leave their homes in haste with nothing but the proverbial shirt on their back, U.S. domestic law—in conformity with treaty obligations—does not penalize individuals for not having proper entry documents. On this point, the asylum statute is clear: any noncitizen "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival...), irrespective of [their] status, may apply for asylum." 8 U.S.C. § 1158(a)(1). The Refugee Convention, to which U.S. law conforms, is equally unequivocal, prohibiting states from imposing penalties on refugees for their manner of entry. Article 31(1). Moreover, U.S. law does not require asylum seekers to make an advanced appointment to make their claim for protection. Nor does it require they apply for protection in a transit country without ensuring that country is capable of providing safe haven.

For the last three years, starting with the Trump administration and continuing with President Biden, the U.S.-Mexico border has been closed to asylum seekers under the pretext of the COVID-19 pandemic (through a policy known as Title 42). During its tenure, Title 42 has caused untold harms and death, forcing hundreds of thousands of asylum seekers to wait at the border for months and even years in vulnerable and violent conditions, only to expel most of them back to the very dangers they escaped to countries such as Haiti and Cameroon with no fear screening whatsoever. A series of other draconian measures further attempted to deter individuals from exercising their legal right to seek asylum even prior to Title 42. While these policies may have reduced the numbers of individuals seeking protection at the U.S.-Mexico border, it has not resolved the root causes of refugee flight—instead only offshoring the suffering to our neighbors to the south.

With Title 42's impending end, scheduled for May 11, 2023, the Biden administration recently announced a proposed rule to restrict asylum. Misleadingly called the Circumvention of Lawful Pathways rule, the proposed rule makes a mockery of asylum by all but eliminating critical pathways to safety in the United States. If adopted in its current form, the rule would

CLP_PC_032310

bar individuals and families from seeking asylum at the U.S.-Mexico border if they traveled through Mexico or another country and did not apply for, and receive a denial of, asylum there. This restriction is predicated neither on the actual safety of asylum seekers nor on those countries' capacity to hear asylum seekers' claims. It is, rather, a thinly veiled attempt at total deterrence, and yet another abrogation of the United States' duty to those fleeing harm.

One of the only exceptions to the ban—which has nothing to do with the individual's claim for protection—is having made an appointment on a newly released smartphone app, CBP One. But, as described herein, making an appointment on CBP One sits out of reach for most asylum seekers languishing in northern Mexico border towns. Beyond requiring access to a smartphone and adequate Wi-Fi or cell service, the app has been riddled with tech glitches since its inception. The administration has done little to nothing to ensure that the affected communities can navigate the app; the factsheet on the Department of Homeland Security's website is wholly inadequate. Families have been forced to separate to obtain one of a very limited number of appointment slots. And many suffer harms in Mexico while they wait.

The information in this report was compiled from interviews conducted by students from the University of California College of the Law, San Francisco's Haiti Justice Partnership, in collaboration with attorneys and advocates from the Center for Gender & Refugee Studies (CGRS), the Haitian Bridge Alliance (HBA), and the École Supérieure Catholique de Droit de Jérémie (ESCDROJ). Over the course of four days—March 4-5 and 11-12, 2023—the delegation spoke with 194 individuals and family units living in shelters or other informal housing arrangements in Tijuana regarding their experiences using the app as well as protections (un)available to them in Mexico and other transit countries en route to the United States.

All names have been changed in this report to protect the identity of the interviewees.

**Table of Contents**

I.    **The CBP One App is Too Flawed to Fix** ........................................................................3
  A.   **Limited Appointments Cause Stress and Confusion** ....................................................3
  B.   **Families are Forced to Separate to Exercise Their Rights** ...........................................4
  C.   **Limited Language Access** ...............................................................................6
  D.   **Individuals Face a Glitchy App** .......................................................................6
    1.   Geolocation inaccuracies..............................................................................7
    2.   Photo confirmation issues.............................................................................7
    3.   Freezing and other system errors......................................................................7
  E.   **Mexican Asylum Seekers Have Little Hope of Escaping Danger** ..........................................9
II.   **Asylum Seekers Have Not Been Able to Find Safety in Transit Countries** .................10
III.  **The U.S. Should Withdraw the Proposed Rule and Restore Asylum** ..........................12
IV.   **Appendix**.................................................................................................13

CLP_PC_032311

- *Angeline*, a Haitian woman, is at a shelter in Tijuana with her three-year-old autistic child. She and her husband decided to separate in the hopes it would be easier for her and the child to get an appointment for two instead of three. Her husband entered using CBP One and she has yet to be successful with the app.



### C.  Limited Language Access

The app is currently only available in English, Spanish, and Haitian Creole. Although the Haitian Creole version—which notably was not available for several weeks after the app first launched—indicates it is also in "French," delegation members observed this is not the case and no French version exists. While certain words overlap between the languages, they are completely distinct.

> *Agnes* fled Togo after her sisters died from complications as a result of female genital cutting and her uncle threatened her with the same fate. She never learned to read and write because patriarchal norms denied many girls an education. While making the treacherous journey through the notorious Darién Gap, she was sexually assaulted on multiple occasions. Some fellow travelers took her under their wing and helped her reach Tijuana where she is now renting a small room in a temporary housing complex with help from extended family in the United States. When researchers met Agnes, she had yet to download the CBP One app on her phone because she is illiterate. Since getting set up on the app, she has tried to schedule an appointment daily to no avail and continues to report confusion at the error messages she cannot read.

### D.  Individuals Face a Glitchy App

Whether individuals attempted to secure appointments alone or with their families, nearly all interviewees encountered problems with the app. From faulty facial recognition to constant glitches, CBP One is riddled with software issues that block individuals from attempting to get appointments on a daily basis.

CLP_PC_032315

### 1.  Geolocation inaccuracies

At least one individual reported that the app would not schedule an appointment because they were not close enough to the border. However, they were in Tijuana at the time they tried to make the appointment.

### 2.  Photo confirmation issues

To confirm a selected appointment, individuals must take a photo to secure their calendar slot. Because the CBP One app requires photo confirmation at the calendar stage, families struggle to take pictures of all family members within the short confirmation window. Not only is it challenging to get the app to accept photos of all family members, but families also reported waking their young children up as early as one o'clock in the morning to do so. By the time everyone had taken a photo, all of the calendar slots were taken.

In addition to these difficulties, the app's facial recognition software often does not recognize dark skinned people. Many interviewees were unable to get past the photo confirmation stage because the app failed to recognize their faces. Individuals had to make multiple attempts to get the app to accept their photos, which frequently were never accepted. As a result of the delay, they would lose their opportunity to get an appointment for the day.

### 3.  Freezing and other system errors

The CBP One app suffers from a variety of software issues that prevent individuals from using the app. Nearly all interviewees reported that the app freezes at various stages of the process, shutting them out during the short time period within which they can attempt to get an appointment before all the available slots are filled. In an attempt to circumvent the constant system errors they experienced, interviewees shared that they have uninstalled and reinstalled the app, updated the app, or removed all other apps from their phone aside from the CBP One app. Despite this, the software issues persist.



7

CLP_PC_032316

Some common issues encountered with CBP One included:



- The app froze just before an individual could take their photo. Typically, a spinning wheel appeared on the page, preventing them from progressing further.

- The app froze on the calendar slot page. A large CBP logo appeared on top of the calendar, preventing individuals from selecting the calendar date and continuing to use the app.

- The app froze entirely, without the CBP logo blocking the calendar, but individuals still could not progress to confirm an appointment.

- The app prevented families from adding their family members under one profile. Parents could add their own information, but the app would freeze or shut down after they did so, preventing them from adding their children and progressing further in the appointment process.



Overall, because pervasive system errors with the CBP One app were not resolved before launching, it fails to serve its stated purpose of enabling individuals at the border to effectively apply for daily appointments.

Moreover, the app seemed to work better for people with higher quality smartphones and strong internet connectivity. Several Haitian interviewees were using new phones when they finally received an appointment, and others had tried up to six different phones before they could secure an appointment. Some interviewees who obtained appointments had spent upwards of $500 on their phones, thus creating a system that privileges those with more resources, all but shutting out those who cannot afford a new phone or strong internet.



8

CLP_PC_032317

# MEXICO 2022 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Mexico is a multiparty federal republic with an elected president and bicameral legislature.  Andrés Manuel López Obrador of the MORENA party won the presidential election in generally free and fair multiparty elections in 2018.  In the June 2021 midterm elections, citizens voted for all members of the Chamber of Deputies, 15 governors, state legislators, and mayors across the country.  The elections were generally free and fair.

The National Guard and state and municipal police are responsible for enforcing the law and maintaining order.  The National Guard, which began operations in 2019, is a largely military institution reporting to the Secretariat of National Defense.  In 2019 the government disbanded the Federal Police, and in 2020 all remaining assets and personnel transferred to the National Guard.  A 2022 constitutional amendment grants the president the authority to continue to use the armed forces for internal security through 2028.  Personnel seconded from the military form the majority of the National Guard.  The National Guard was formally transferred to the Secretariat of National Defense on September 16, effectively making it a branch of the military.  The Secretariat of National Defense and Secretariat of the Navy also play a role in domestic security, particularly in combating criminal groups.  The National Migration Institute, under the authority of the Interior Secretariat, is responsible for enforcing migration law.  Although authorities generally maintained effective control over the security forces, there were instances in which security force elements acted independently of civilian control.  There were reports that members of security forces committed some abuses.

Significant human rights issues included credible reports of:  unlawful or arbitrary killings by police, military, and other governmental officials; forced disappearance by government agents; torture or cruel, inhuman, degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention; restrictions on free expression and media, including violence against journalists; serious acts of government corruption; insufficient

CLP_PC_032428

rights to equality and nondiscrimination, since it had a disproportionate impact on Indigenous and Afro-Mexican persons.  It also found the law violates the constitutional right to freedom of movement.

There were numerous instances of armed groups limiting the movements of migrants, including by threats and acts of kidnapping, extortion, and homicide.  Criminal groups dominated migrant smuggling operations and often kidnapped, threatened, and extorted migrants to pay a fee for facilitating northbound travel.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR), International Organization for Migration, and other humanitarian organizations in providing protection and assistance to refugees, asylum seekers, and other persons of concern.

**Access to Asylum:**  Federal law provides for granting asylum, refugee status, or complementary protection to those fleeing persecution or facing possible threats to their life, security, or liberty in their country of origin; this right was generally respected.  The government has an established procedure for determining refugee status and providing protections.  The government worked with UNHCR to improve access to refugee status determinations, to improve shelter and reception conditions for vulnerable migrants and asylum applicants and support local integration programs (including access to school, work, and other social services) for those approved for refugee and complementary protection status.

**Abuse of Migrants and Refugees:**  The press, international organizations, and NGOs reported targeting and victimization of migrants and asylum seekers by criminal groups and in some cases by police, immigration officers, and customs officials, including at land borders and airports.  There were numerous instances of criminal armed groups extorting, threatening, or kidnapping asylum seekers and other migrants.  In many parts of the country, human smuggling organizations wielded significant power, and media alleged frequent collusion among local authorities.  There were credible reports of gender-based violence against migrants while migrating in and through the country.  There were also credible reports of recognized asylum seekers being denied movement across the country and

CLP_PC_032446

detained by migration authorities. Civil society groups reported migration authorities did not provide information regarding access to request asylum and migratory regularization and, in some cases, dissuaded migrants from pursuing such alternatives. Rather, they encouraged migrants to accept voluntary return to their countries of origin.

The government did not detain migrating children and generally exempted accompanying adults from detention to preserve family unity. Between January and June, children constituted 15 percent of irregular migrant flows identified by authorities; 26 percent of the children were unaccompanied. Child protection authorities lacked sufficient capacity to shelter and process migrant children and families, and the government announced efforts to strengthen infrastructure for migrating children. Between September 2021 and June, the National System for Integral Family Development transferred 1.57 billion pesos ($78.5 million) to 28 states to strengthen their capacity to respond to child migration.

The government increased efforts to target human smuggling organizations with limited results. In July the Prosecutor Attorney General's Office arrested five alleged smugglers in Nuevo León. Authorities accused the suspects of smuggling 81 migrants, of whom 19 were minors.

Obstacles to accessing international protection related most closely to capacity limitations and lack of coordination between the relevant agencies, as opposed to official government policy. The Interior Secretariat reaffirmed its commitment to protect refugee applicants even as the country experienced an unprecedented number of applicants.

The MNPT issued precautionary measures calling on the Institute of Migration and National Guard authorities to protect two migrants whom immigration agents tortured in migratory stations. In April MNPT representatives toured the migratory station in Guadalupe, Nuevo León, where they learned of a Honduran who was tortured by migratory authorities after trying to escape. In June the MNPT received a report from the NGO Asylum Access indicating a Honduran migrant was tortured by immigration and National Guard agents in a migratory station in Piedras Negras, Coahuila.

CLP_PC_032447



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

*Submitted via www.regulations.gov*

Daniel Delgado, Acting Director
Border and Immigration Policy, Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security

Lauren Alder Reid, Assistant Director
Office of Policy
Executive Office for Immigration Review

March 27, 2023

**Re:   DHS RIN 1615-AC83/EOIR RIN 1125-AB26 or DHS Docket No. USCIS 2022-0016/A.G. Order No. 5605-2023 Comments in Opposition to Proposed Rule: Circumvention of Lawful Pathways**

Dear Acting Director Delgado and Assistant Director Reid,

The Young Center for Immigrant Children's Rights (Young Center) writes to comment on the above-referenced proposed rule, titled "Circumvention of Lawful Pathways," published on February 23, 2023, by the U.S. Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR), U.S. Department of Justice (DOJ).[1]

The Young Center serves as the federally-appointed independent Child Advocate, akin to best interests guardian ad litem, for trafficking victims and other vulnerable unaccompanied children in government custody, as authorized by the Trafficking Victims Protection Reauthorization Act (TVPRA).[2] The Young Center is the only organization authorized by ORR to serve in that capacity. The role of the Child Advocate is to advocate for the best interests of the child. A child's best interests are determined by considering the child's safety, expressed wishes, right to family integrity, liberty, developmental needs, and identity. Since 2004, ORR has appointed Young Center Child Advocates for thousands of unaccompanied children in ORR custody, many of whom are seeking asylum and/or another form of legal protection in the United States. In the past few years, we have been increasingly appointed to children who have been separated from their family as a result of harmful immigration policies that deny or limit access to asylum at the southern border of the U.S.

At the Young Center, we understand the particular vulnerability of immigrant children who have fled unimaginable violence or threats in their countries. They have traveled hundreds if not thousands of miles to the United States. Some travel to the border alone, while others travel with family or in the company of strangers. Regardless, they are all entitled under U.S. law to seek the

---

[1] *See* 88 Fed. Reg. 11704 (Feb. 23, 2023).
[2] William Wilberforce Trafficking Victims Protection Reauthorization Act, 8 U.S.C. § 1232(c)(6)(A) (hereafter TVPRA).

CLP_PC_032747



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

**VI.    By targeting asylum-seekers at the U.S. southern border, the proposed rule is discriminatory and would disproportionately harm Latinx, Indigenous, Black, and LGBTQ asylum-seekers, including many children**

The proposed rule, which applies only to people who seek protection at the southern border, will disproportionately harm Black, Indigenous, and Latinx people, who represent the vast majority of asylum-seekers seeking protection at the southern border.[112] Many Black, Indigenous, and Latinx children and families will be barred from accessing asylum after fleeing danger and violence and making difficult and dangerous journeys, over days, weeks, and even months, to arrive at the southern border. During the period that the Trump Administration's transit ban was implemented, immigration court asylum denial rates surged for many Black, Brown, and Indigenous asylum-seekers requesting safety at the southern border.[113] For instance, asylum grant rates declined by 45 percent for Cameroonian asylum applicants, 32.4 percent for Cubans, 29.9 percent for Venezuelans, 17 percent for Eritreans, 12.9 percent for Hondurans, 12 percent for Congolese (DRC), and 7.7 percent for Guatemalans from December 2019 to March 2020, compared to the year before the third-country transit asylum ban began to affect refugee claims, according to data analyzed by Syracuse University's Transactional Records Access Clearinghouse.[114]

Moreover, the presumption of ineligibility and heightened standards which asylum-seekers will be required to meet for withholding of removal and CAT protection under this proposed rule will open the door for greater racial bias and disparities in fear screenings. During the Trump Administration, as a result of attempts to alter the credible fear standard by heightening credibility requirements which are susceptible to subjective, racial and other biases, DHS officers increasingly issued negative credible fear determinations based on a purported lack of credibility.[115] A 2021 Report by Human Rights First found that between 2016 and 2020, negative credible determinations rose by 1450 percent, and that this increase fell disproportionately on non-European asylum-seekers.[116] The percentage of negative CFI determinations rose most steeply for asylum-seekers from the Caribbean, Central and South America, the Middle East/North Africa and Sub-Saharan Africa, while asylum-seekers from Europe experienced the lowest increase.[117]

The proposed rule also perpetuates nationality-based discrimination in access to asylum, as it largely bans asylum for people who do not enter the United States via limited parole initiatives or previously scheduled appointments at ports of entry while simultaneously only affording limited access to parole initiatives for certain nationalities. For instance, while there are currently limited parole initiatives for some nationalities, there are no similar parole initiatives for people from Guatemala, Honduras, and El Salvador.

---

[112] Adam Isacson, *Migration, Country by Country, at the U.S. -Mexico Border,* WOLA, (Nov. 23, 2022), https://www.wola.org/2022/11/migration-country-by-country-at-the-u-s-mexico-border/.

[113] Human Rights First, *Biden Administration Plan to Resurrect Asylum Ban Advances Trump Agenda* 4 (2023), https://humanrightsfirst.org/wp-content/uploads/2023/01/AsylumBanFactsheet_final2.pdf.

[114] *Id.*, at 4-5.

[115] *Pretense of Protection*, *supra* n. 35, at 30-31.

[116] *Id.*, at 31.

[117] *Id.*

CLP_PC_032769



www.theyoungcenter.org
Chicago, IL | Harlingen, TX | Houston, TX | Los Angeles, CA
New York, NY | Phoenix, AZ | San Antonio, TX | Washington, DC

The risk of danger, violence, persecution, and even death to asylum-seeking children and families that would be caused by the sweeping restrictions on asylum access imposed by this proposed rule can not be overstated. The persecution, violence, and other human rights conditions causing refugees to flee these countries have been well-documented in the US. government's own reports, as well as by international human rights organizations.[118] For instance, in 2021, in designating Haitians in the United States for Temporary Protected Status, DHS stated that Haiti is "currently grappling with a deteriorating political crisis, violence, and a staggering increase in human rights abuses[,]" including "reported arbitrary arrests and detentions."[119] Government reports for Guatemala in 2020 and 2021 documented widespread violence against women, trafficking in persons, violent attacks against LGBTQ persons, and gang recruitment of displaced children.[120] In 2022, Human Rights Watch reported significant human rights abuses in El Salvador, including the forcible recruitment of children and sexual abuse of women, girls, and LGBTQ people.[121]

LGBTQ+ refugees including children fleeing these countries would also be disparately impacted by the proposed rule. LGBTQ+ identities are criminalized and face high rates of violence in Central America and the Caribbean.[122] Parents of LGBTQ+ children who experience bullying and abuse in school receive inadequate support from government agencies.[123] Due to widespread anti-LGBTQ+ sentiment, LGBTQ+ children and their families who flee persecution in their countries of origin encounter police violence in their search for safety in neighboring countries and face systemic barriers to essential services they need to survive.[124] In Mexico, LGBTQ+ youth have experienced high incidents of discrimination and reported high rates of suicidal ideation, according

---

[118] *Pretense of Protection*, *supra* n. 35, at 25-27, 28-30.

[119] USCIS, DHS, Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41864 (Aug. 3, 3032), https://www.govinfo.gov/content/pkg/FR-2021-08-03/pdf/2021-16481.pdf.

[120] *Pretense of Protection*, *supra* n. 35, at 30.

[121] *World Report 2022: El Salvador*, HUMAN RIGHTS WATCH (last accessed Mar. 26, 2023), https://www.hrw.org/world-report/2022/country-chapters/el-salvador.

[122] Human Rights Watch, *"Every Day I Live in Fear": Violence and Discrimination Against LGBT People in El Salvador, Guatemala, and Honduras, and Obstacles to Asylum in the United States* (Oct. 7, 2020) https://www.hrw.org/report/2020/10/07/every-day-i-live-fear/violence-and-discrimination-against-lgbt-people-el-salvador; Human Rights Watch, *"I Have to Leave to Be Me": Discriminatory Laws Against LGBT People in the Eastern Caribbean* (March 21, 2018), https://www.hrw.org/report/2018/03/21/i-have-leave-be-me/discriminatory-laws-against-lgbt-people-eastern-caribbean.

[123] Daniel Politi, *Mothers of LGBTQ Children Join Forces in Latin America*, AP NEWS, (Nov. 20, 2022), https://apnews.com/article/religion-violence-caribbean-discrimination-gay-rights-b7d7c8c728a7978ab541faf0f9972217.

[124] Diana Baptista, *In Mexico, Displaced LGBTQ+ People Push for Equal, Safe Jobs*, OPENLY NEWS, (Dec. 12, 2022), https://www.openlynews.com/i/?id=ad53f28a-1ee6-4ac3-84e8-492a760a184d; Oscar Lopez, *LGBT+ Migrants Face Abuse in Mexican Border City: Activists*, REUTERS, (Nov. 14, 2018), https://www.reuters.com/article/us-mexico-lgbt-migrants/lgbt-migrants-face-abuse-in-mexican-border-city-activists-idUSKCN1NJ1MV.

24

CLP_PC_032770



to the Mexican National Council to Prevent Discrimination.[125] Transgender and Gender-Non-Conforming youth have been disproportionately targeted and experience the highest rates of police violence and self-harm.[126]

## VII.    Conclusion

As a federal court recently stated in litigation challenging harm caused to asylum-seekers as a result of the U.S. government's Remain in Mexico policies, **"Although a grant of asylum is discretionary, the right to apply is not."**[127] United States and international law codify the right of children to seek asylum and have begun to create procedures to ensure fair access to that protection. Barring children in families from seeking asylum would roll back decades of work and undermine children's right to seek safety and protection in clear contravention of U.S. law and the best interests of children. The Young Center opposes the adoption of any rule that bars or in any way limits children's access to legal relief that protects their safety and well-being, significantly risks returning them to danger and violence, and fails to treat children as children. We strongly urge DHS and DOJ to rescind the proposed rule in its entirety.

Respectfully,

Jane Liu
Director of Policy and Litigation
Young Center for Immigrant Children's Rights

jliu@theyoungcenter.org

---

[125] Shawna Chen and Oriana Gonzalez, *Trevor Project Expands Digital Crisis Services to LGBTQ Youth in Mexico*, AXIOS, (Mar. 9, 2022), https://www.axios.com/2022/03/09/lgbtq-youth-mexico-trevor-project, citing Consejo Nacional para Prevenir la Discriminacion, *Encuesta sobre Discriminacion por Motivos de Orientacion Sexual e Identidad de Genero* (National Council for the Prevention of Discrimination, *Study on Discrimination on the Basis of Sexual Orientation and Gender Identity*) (2018), https://www.conapred.org.mx/userfiles/files/Presentacioon_ENDOSIG_16_05_2019.pdf.

[126] Transgender Law Center and Cornell University Law School LGBT Clinic, *Report on Human Rights Conditions of Transgender Women in Mexico*, (May 2016), https://transgenderlawcenter.org/wp-content/uploads/2016/05/CountryConditionsReport-FINAL.pdf.

[127] Order (1) Granting in Part and Denying in Part Defendants' Motion to Dismiss (Dkt. No. 189); and (2) Granting Plaintiffs' Motion for Class Certification (Dkt. No. 205) in Chambers at 7, *Immigrant Defs. L. Ctr. v. Mayorkas*, No. 2:20-cv-09893-JGB-SHK, ECF No. 261 (C.D. Cal. Mar. 15, 2023).

CLP_PC_032771

# Asylum Defense Project

March 27, 2023

*Submitted via: https://www.regulations.gov.*

Daniel Delgado
Acting Director
Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security
telephone (202) 447-3459

Lauren Alder Reid
Assistant Director,
Office of Policy, EOIR
U.S. Department of Justice
telephone (703) 305-0289

**Re: Comment on the Proposed Rule by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) on Circumvention of Lawful Pathways, CIS No. 2736-22; Docket No: USCIS 2022-0016; A.G. Order No. 5605-2023**

Dear Acting Director Daniel Delgado and Assistant Director Lauren Alder Reid;

The Asylum Defense Project (ADP) submits this comment in response to the Department of Homeland Security (DHS) and Department of Justice (DOJ)'s proposed rule published in the Federal Register on February 23, 2023, that would ban many refugees from asylum protection in the United States and deprive refugees of the ability to reunite with their families and pursue a path to citizenship. The proposed rule is a new version of similar asylum bans promulgated by the Trump administration that were repeatedly struck down by federal courts as unlawful.

The asylum ban attempts to cut off access to asylum for many refugees at the southern border, discriminates against Black, Brown, and Indigenous asylum seekers, and seeks to circumvent U.S. law and treaty obligations to refugees. ADP strongly urges the agencies to withdraw the proposed rule in its entirety and stop pursuing asylum bans that advance the Trump administration's agenda and have been welcomed by anti-immigrant hate groups. The administration should instead uphold refugee law, restore full access to asylum at ports of entry, ensure fair and humane asylum adjudications, and rescind the Trump administration entry and transit bans in their entirety.

**The Asylum Defense Project and its Interest in the Issue**

The Asylum Defense Project (ADP) is a nonprofit legal service project based in Southern Texas. The project provides pro bono legal assistance to families and individual noncitizens seeking

1

CLP_PC_032943

These mistakes are understandable, given the Asylum Office's resource constraints and the daunting intricacy of the law. But these mistakes have serious consequences for the asylum-seekers whose lives these officers hold in their hands. It has been apparent to legal practitioners at the border for a long time that our asylum system is deeply broken, not simply because it is backlogged, but because it so frequently reaches wrong decisions. For example, between 2015 and 2018, ADP represented nearly every single one of the asylum seekers at IJ review who had received negative fear decisions while detained at the South Texas Family Residential Center. Each year, Immigration Judges vacated between 60% and 70% of all negatives represented by ADP, due to procedural and legal errors by the Asylum Office at their original interviews.[2] Of the remaining negatives that were affirmed, a majority of those negative determinations were then subsequently reversed by the Asylum Office itself based on Requests for Reconsideration submitted by ADP.

II.  **The new rule will make CFI adjudication more complex, more resource-intensive, and more adversarial, and will make it even more difficult for applicants to prevail on meritorious claims.**

As previously mentioned, the credible fear interview is intended to be a non-adversarial process. Given that the expedited removal process, itself, represented a significant limitation on the right to seek protection in the United States, Congressional legislators deemed it important to ensure that asylum-seekers were given a fair opportunity to prevail on their credible fear claims. As Republican representative Chris Smith of New Jersey noted during the 1996 congressional hearings surrounding the creation of the credible fear standard, "[O]ur asylum officers will need to be very careful in applying the credible fear standard. In a close case, they must give the benefit of the doubt to the applicant." 142 Cong. Rec. H3605, H3616 (1996).

The proposed rule attempts to unlawfully circumvent the credible fear screening standard established by Congress, which was intended to be a low screening threshold. The government is required to refer asylum seekers in expedited removal for full asylum adjudications if they can show a "significant possibility" that they could establish asylum eligibility in a full hearing. The proposed rule attempts to eviscerate this standard by first requiring asylum seekers to prove to an asylum officer by a preponderance of evidence that they can rebut the presumption of asylum ineligibility, and then requiring those who cannot overcome the presumption to meet a higher fear standard before being permitted to seek protection.

Raising the legal and evidentiary standards of an already-complex adjudication will inherently tend to make the interview process adversarial, regardless of Asylum Officers' intentions. For example, asylum applicants who are subject to the transit ban rule and who enter the United States without an appointment through the CBP One app are presumed to be ineligible for asylum, and have the burden to rebut the presumption of ineligibility—by demonstrating that an imminent, serious danger or a technological failure prevented them from making an appointment for a "lawful" entry—by a *preponderance* of the evidence. This is an extremely high evidentiary

---

[2] Nationally, from Fiscal Years 2018 to 2021, over a quarter of credible fear determinations were reversed through immigration court review. These numbers consist largely of *pro se* individuals. Were more asylum-seekers represented by counsel at their IJ review proceedings, as Dilley detainees were, this percentage would not doubt be much higher.

CLP_PC_032947

standard to demand of detained, unrepresented asylum-seekers, who may have lost their belongings crossing the river, had them confiscated or thrown away by Border Patrol, or who reasonably never possessed corroborating evidence in the first place. Nor does the rule provide any concrete information as to how Asylum Officers are meant to assess whether an applicant has satisfied this high standard. The Ninth Circuit has noted, in the context of *reasonable* fear interviews for individuals in reinstatement proceedings—a process with a higher evidentiary standard than credible fear proceedings, but also stronger procedural protections, such as the right to counsel and to circuit court review— "[n]on-citizens in reinstatement proceedings who express a fear of returning to their home country typically appear for a reasonable fear interview within a short time of their apprehension by immigration authorities" and cannot realistically be expected to present the kind of "evidence that would be introduced during a merits hearing before an immigration judge"; in addition, such a requirement would not be "consistent with the purpose of a reasonable fear interview…." *Alvarado-Herrera v. Garland*, 993 F.3d 1187, 1189 (9th Cir. 2021).

In addition, if the applicant fails to overcome this presumption and is deemed to be ineligible for asylum—a discretionary form of relief—this rule proposes that the evidentiary standard should then *also* be raised for assessing threshold eligibility for withholding of removal and CAT protection—which are non-discretionary forms of relief. The rule acknowledges that raising the burden of proof from "significant possibility" to a "reasonable possibility" will require a much greater outlay of time by Asylum Officers.[3] During the Trump-era transit ban, which similarly raised the evidentiary standard for interviews, ADP frequently witnessed credible fear interviews that ran anywhere from 4 to 8 hours. Although an extremely short interview may not always be sufficient to elicit important testimony about an individual's claim, a marathon interview of this kind is inherently interrogation-like and adversarial, especially for asylum-seekers who are detained and significantly traumatized.

As discussed above, Asylum Officers trying to apply the lower "significant possibility" standard in credible fear interviews already make frequent procedural and legal errors. These errors seem only likely to increase as Asylum Officers are asked to apply the more onerous "reasonable possibility" standard. The sheer complexity of this new proposed rule, layered onto an already complex interview process, virtually guarantees that Asylum Officers will err with greater frequency.

Also alarming is the fact that, even as the burden of proof for asylum-seekers is being raised, the rule does not offer *more* oversight, but *less*. The rule significantly curtails opportunities to seek review and quality control in erroneous AO decisions. Under the proposed rule, IJ review would be available only to individuals who affirmatively request it, a hurdle that stands to disproportionately harm individuals with disabilities, PTSD, illness, or unidentified language barriers, who may not understand the significance of requesting such review. Raising the standard for a positive decision, while reducing quality control oversight over negative decisions,

---

[3] "As noted, the Departments recognize that operationalizing the lawful pathways condition would require more resources to implement because the credible fear interviews for those subject to the condition will take some additional time. Specifically, asylum officers would have to inquire into the applicability of any exceptions or rebuttal circumstances for the condition and then apply the higher 'reasonable possibility' standard to determine the likelihood of persecution or torture for those whose asylum claims are precluded by the lawful pathways condition."

CLP_PC_032948

doubly disadvantages asylum-seekers, and greatly increases the likelihood that vulnerable individuals with meritorious claims will be refouled to persecution and torture.

Moreover, individuals subjected to the rule are now stripped completely of any ability to file a Request for Reconsideration with the Asylum Office. Since January 30, 2023, Proyecto Dilley has assisted 34 asylum seekers in filing a pro se Request for Reconsideration with the Houston Asylum Office. Of those individuals, the Asylum Office determined that they had in fact established a significant possibility of prevailing on an application for asylum, withholding of removal, and protection under CAT leading the Asylum Office to reverse and rescind the initial negative credible fear determination for seven asylum seekers. But for the pro se Request for Reconsideration, those seven individuals would have been returned to countries in which their lives were in danger. As a last review of the case, a Request for Reconsideration proves to be a crucial stop-gap for asylum seekers with particular vulnerabilities, such as undiagnosed PTSD, comprehension difficulties, speaking a rare language, etc.

### III.    Contrary to what new rule asserts, there is not a "lawful pathway" for entry meaningfully available to the vast majority of asylum-seekers

The new rule repeatedly asserts that the ban will only be applied to those who fail to avail themselves of "safe, lawful pathways" to enter the U.S. to request asylum, that those who fail to use such pathways are less likely to have meritorious claims, and that therefore it is fundamentally fair to prioritize the claims of those who enter lawfully. The reality, however, is that the vast majority of asylum-seekers do not have access to any safe and lawful pathway to request asylum, besides presenting themselves to U.S. immigration officials at or near the border. The new parole process for Cubans, Venezuelans, Haitians, and Nicaraguans is currently capped at 30,000 applications per month and is rumored to already have a multi-year backlog of applications. This is not a viable timeframe for asylum-seekers from Cuba, Venezuela, Haiti, and Nicaragua in danger of persecution and torture. Moreover, no new parole program has been set up for individuals from other countries, particularly the Northern Triangle, which previously sent the largest share of asylum-seekers to the southern border prior to the implementation of Title 42.

All other non-CHNV nationalities will have no option but to make the dangerous journey to a location at or close to the U.S.-Mexico border in order to request an appointment through CBP One. CBP One is impossible for many asylum seekers to access or use, including those who do not have the resources to obtain a smartphone or ability to navigate the app. The app is not available in most languages–including Indigenous languages–and all error messages are in English, barring many asylum seekers from using the app.  It also disparately harms Black asylum seekers due to racial bias in its facial recognition technology, which has prevented many from obtaining an appointment. Asylum seekers who can access and navigate the app are still often unable to schedule appointments due to extremely limited slots and are forced to remain in danger indefinitely. The likelihood of obtaining an appointment has no relationship to how long ago an individual registered their information in CBP One, but is instead a matter of luck, technology skills, and whether the person has the resources to secure safe shelter in Mexico in a

7



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

March 27, 2023

***Via Electronic Submission***
Lauren Alder Reid, Assistant Director
Office of Policy
Executive Office for Immigration Review, Department of Justice
Falls Church, VA

Daniel Delgado, Acting Director
Border and Immigration Policy,
Office of Strategy, Policy, and Plans,
U.S. Department of Homeland Security
Washington, D.C.

**RE: Comments in Opposition to the Joint Notice of Proposed Rulemaking entitled *Circumvention of Lawful Pathways;* RIN: 1125-AB26 / 1615-AC83 / Docket No: USCIS 2022-0016 / A.G. Order No. 5605-2023**

Dear Assistant Director Reid and Acting Director Delgado:

The Texas Civil Rights Project (TCRP)[1] submits this comment to the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS), and the Department of Justice (DOJ), Executive Office for Immigration Review (EOIR) ("the Departments") in response and opposition to the above-referenced Joint Notice of Proposed Rulemaking ("NPRM" or "the Rule") issued by the agencies on February 23, 2023. This Rule will deny current and future asylum seekers from accessing protections under U.S. federal and international law, will result in the return of many refugees to harm, will leave others in the United States without stable protection, and will lead to family separations. A fair and equitable asylum system must be available for all those seeking refuge in this country – and this Rule denies them one. TCRP urges the Departments to rescind the Rule in its entirety.

The Texas Civil Rights Project is a 501(c)(3) legal advocacy organization with offices across Texas. TCRP is dedicated to defending the rights and dignity of all those in Texas in the courtroom, in partnership with our communities, and with meaningful policy changes. Since our founding in 1990, TCRP has fought for the rights of immigrants. We are lawyers and advocates for Texas communities, boldly serving the movement for equality and justice.

More specifically, TCRP's Beyond Borders Program is dedicated to advancing human dignity, protecting freedom of movement, and advocating on behalf of Texas border communities, in

---

[1] *See About TCRP*, TEXASCIVILRIGHTS.ORG (2019), https://txcivilrights.org/about-us/.

1

CLP_PC_032968



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

asylum seekers will have to wait in Mexico – either while registering for CBP One, as well as confirming and then waiting for one of the few available appointments – the pattern that we have seen play out for months under CBP One's Title 42 processing. And while asylum seekers have had to wait for an appointment in Mexico using the current glitch-y CBP One system, they have been robbed, assaulted, extorted, kidnapped, and killed.[11]

Since President Biden took office in January 2021, Human Rights First has tracked more than 13,480 reports of violent attacks on individuals blocked in or expelled to Mexico, including murder, kidnapping and rape.[12] Even U.S. citizens are not immune from the violence endemic to Mexican border towns,[13] while asylum seekers are expected to wait for weeks, months, or years in those same dangerous conditions. Many of the families with whom we have spoken in the Reynosa and Matamoros areas have been forced to seek shelter in open air encampments patrolled and preyed upon by cartels; they have suffered from lack of medical care, and have traveled with minors at risk for human trafficking. These asylum seekers have shared their experiences of having their children kidnapped, trafficked, threatened, and physically and sexually assaulted – and these threats continue every day they are denied access to our asylum system. Adults also reported being robbed, extorted, threatened, and being subjected to physical and sexual violence. These families have witnessed people disappear or die, both at home and in Mexico. This Rule incorrectly assumes that an asylum seeker has the time and safety necessary to register themselves and their family, and also confirm an appointment.

As noted above, this Rule's reliance on access to technology inherently creates inequitable access to our asylum system and places asylum seekers in direct danger – and no technological updates will change that.

### a. Asylum seekers do not have equitable access to technology.

Currently, CBP One is used throughout the southwest border to process Title 42 exemptions and, even in this limited roll out, the app has already proven extremely flawed.[14] Since its inception,

---

[11] Jack Herrera, "*Fleeing For Your Life? There's An App For That*." TEX. MONTHLY (Mar. 2, 2023), https://www.texasmonthly.com/news-politics/cbp-app-asylum-biden-administration.

[12] Julia Neusner, Kennji Kizuka, & Eleanor Acer, *Evasion of Asylum Law and Title 42 Abuse Must End – and Never Be Revived*, HUM. RTS. FIRST (Dec. 15, 2022), https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/.

[13] Natalie Kitroeff, Maria Abi-Habib, Jack Nicas & Jacey Fortin, *A Trip to Mexico Ends in a Kidnapping and the Deaths of 2 Americans*, THE N.Y. TIMES (Mar. 7, 2023), https://www.nytimes.com/2023/03/07/world/americas/americans-kidnapped-mexico.html.

[14] Raul Pinto, *CBP One Is Riddled With Flaws That Make the App Inaccessible to Many Asylum Seekers,* IMMIGR. IMPACT (Feb. 28, 2023), https://immigrationimpact.com/2023/02/28/cbp-one-app-flaws-asylum-seekers/?emci=c9fe0b55-bcb7-ed11-a8e0-00224832e811&emdi=43e52f43-37b8-ed11-a8e0-00224832e811&ceid=10978806.

CLP_PC_032972



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

TCRP has been working with our on the ground partners to monitor and advocate against CBP One's harms, especially as evidenced in the Hidalgo port of entry, and the Brownsville port of entry – which processes the largest exemption numbers.[15]

Through this monitoring, we have identified many systemic issues already present with the CBP One App – and these harms have been most evidenced in the most vulnerable populations. Reliance on CBP One for Title 42 exemptions has resulted in the most economically disadvantaged populations being excluded from the exemption process. For example, this Rule assumes all individuals have access to a cell phone to use the app, but we have systematically come across asylum seekers who do not have cell phones or whose cell phones are somehow incompatible with the CBP One app – like those with older phones or phones from manufacturers not used in the U.S. These individuals have asked to borrow phones from other asylum seekers to create their separate accounts – but this is difficult because those asylum seekers who do own compatible phones are constantly on the app trying to secure the elusive appointments themselves.

Through its current usage, we have seen economic disadvantages further impact all asylum seekers – including those who have cell phones compatible with the app – a problem which will continue through implementation of this Rule because the inequities persist. Having a cell phone does not, on its own, mean that an individual has wifi connectivity or cell phone minutes. Most asylum seekers do not have cell phone plans like we do in the U.S. – in fact, most countries from which asylum seekers originate do not have access to unlimited talking or data plans. Most asylum seekers TCRP has encountered at the busy Hidalgo and Brownsville ports only have access to purchasing a finite number of cell phone minutes or data usage at a time. Many times, they are forced to spend what little money they have to ensure cell phone connectivity instead of food or medication. The data usage they buy is usually used up in one day because asylum seekers will stay on the app all day long, refreshing the app – hoping that new appointments will show up in case there is a cancellation. All of the above assumes that asylum seekers are in an area where they actually have a stable cell service, which is spotty across Mexico and especially along the Texas – Mexico border.

Furthermore, access to wifi is similarly tenuous and expensive, and individuals are faced with the choice of having to spend limited money on wifi or other basic needs. Connectivity issues have already led to the exploitation of these vulnerable individuals in many instances – most recently, individuals in Mexico charged asylum seekers a thousand dollars for access to stable wifi to register and confirm appointments via CBP One – and exploitation like this is par for the course when deterrence measures are in place. Since CBP One's inception, the Departments have stated

---

[15] *supra*, n.10.

CLP_PC_032973



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

there will be a desktop version of the CBP One app available for asylum seekers. However, a desktop version of the app will not solve these basic accessibility issues and further lends itself to asylum seekers being preyed upon to access this technology.

This Rule also assumes that individuals have some awareness of how to navigate apps, but as we have witnessed with CBP One, many of the asylum seekers have no knowledge on how to use the app and have relied on advocates to successfully register and/or confirm appointments for them. Even those individuals who are somewhat tech savvy have also had problems navigating the app and confirming appointments – especially due to the app's frequent and new technical glitches. A general unfamiliarity with app usage has further restricted many individuals' willingness to lend their cell phones to other individuals, which in the past has led to glitches and to the cell phone owner's CBP One application being deleted due to this lack of technological savvy.

To bridge this technological gap, our partners on the ground have had to teach individuals how to navigate the CBP One app, which has proven to be cumbersome and ripe with new glitches that appear daily. Our partners have had to support asylum seekers in registering themselves, their families, and with confirming appointments. However, advocates on the ground are limited and are not always able to assist the many individuals in need of support. Because of this pronounced need, many advocates, TCRP included, have put together training materials for individuals trying to access this app.[16] As part of this work, advocates are continually identifying, troubleshooting, and reporting new glitches in the app, as well as addressing external harms created by the required use of this app.

However, training materials and advocate support cannot fix the overall economic disadvantages impacting individuals' ability to access our immigration system. They do not resolve the technological divide that is inherent among economically marginalized populations, they do not resolve the fact that the app is only available in a few languages also inaccessible to many vulnerable individuals, and they do not address the literacy gaps that exist within economically disadvantaged individuals – all of which will impermissibly impact a person's ability to use the app and access our asylum system.

Further evidence of the particular harm technology-based requirements impose on particularly vulnerable individuals was presented on the first day of CBP One processing at the Brownsville port of entry. When it initially launched for Title 42 processing, the app was only available in English and Spanish – leaving out a large percentage of vulnerable populations who have no access

---

[16] *Know Your Rights*, TEX. CIV. RIGHTS PROJECT, https://www.txborderrights.org/english (last visited Mar. 23, 2023).

CLP_PC_032974



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

to English or Spanish. This led to many Black and Indigenous asylum seekers in line at the port of entry who did not have CBP One appointments, and, many were confused and unaware that CBP One even existed – they simply saw many of their fellow asylum seekers in line. Although the app later became available in Kreyol, that doesn't cure the initial inequity and exclusion experienced by these individuals or any subsequent harm – nor does it remedy the harms still being enacted due to ongoing exclusion. The app continues to be inaccessible to many indigenous language speakers, as well as many others, given that CBP One is available only in a handful of languages. Just asylum reforms would consider these baseline factors and provide protections ensuring the most vulnerable are safe. However, reforms like this Rule have instead focused on creating punitive systems that prioritize removals and "efficiency" over humane treatment and due process.

### b. *CBP One's tech problems demonstrate that access to asylum should not be conditioned on access to technology.*

Even those with access to the app encounter a whole host of new problems once they have access. Users have reported[17] frequent glitches, including new glitches that pop up daily. These glitches prevent asylum seekers from completing their or their family's registration and prevent them from confirming one of the few available appointments. Even in Brownsville, the port of entry with the most available appointments per day, one day missed in confirming an appointment translates to at least a few extra weeks in Mexico – assuming the individual is later able to confirm appointments.

As noted, new glitches pop up in the app frequently, sometimes daily. These glitches result in error messages and in the app crashing, freezing or timing out for people – leading to failed registrations and failed appointment confirmations. Individuals accessing the app in Reynosa and Matamoros have also had frequent issues with the app's geolocation technology. In these two regions, many asylum seekers are forced to live in open air encampments right along Mexico's northern border with the U.S., but the app's geolocation technology frequently erroneously tags their location as being in the U.S. or somehow being outside of the geographic range permitted by the app. This problem has been a constant since the app's inception and continues to be a problem today, as evidenced by the screenshot of error messages received by asylum seekers just days before the deadline for filing of this comment.

---

[17] Kate Morrissey, *Asylum seekers in Tijuana are scrambling through mobile app error messages for few appointments into the U.S.*, THE SAN DIEGO UNION-TRIBUNE (Jan. 22, 2023), https://www.sandiegouniontribune.com/news/immigration/story/2023-01-22/cbp-one-app-asylum-tijuana.

CLP_PC_032975



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

| Cannot be programmed | SUBMITTED – NOT SCHEDULED |
|---|---|
| You are too close to the Mexico border to schedule an appointment at the port of entry. | Don't forget to check back later for available timeslots to present at the port of entry! |





These technological problems are not just concerning in terms of access, they also put asylum seekers through a stressful process that leads to deflated hopes at the end of every single day that these individuals and their families are unable to confirm an appointment.

Some recent examples of glitches we've encountered include problems with the photograph requirements of the app. Through various stages of CBP One's use for Title 42 exemptions, asylum seekers have had to take various versions of either a "live" photograph or submit a regular photograph to register in the app, access the app, and/or confirm appointments. New and emerging problems with the photograph requirements are constant.

9

CLP_PC_032976



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

Since its inception, asylum seekers have had difficulty taking a photo that is acceptable to the app. For example, even when asylum seekers were successful in registering for the app, the app has required that a separate photo be captured in order for that individual to access the app and/or confirm appointments. However, there have been numerous instances where the app prevented an asylum seeker from even logging on – translating to delays in being able to confirm an appointment and seek safety. Many of the asylum seekers in Reynosa and Matamoros, and throughout the U.S. – Mexico border, live in open-air encampments with minimal light or cell and wifi connectivity. The app has consistently failed to capture the asylum seeker because there is not enough lighting where the asylum seekers is standing – but they have no access to appropriate lighting. This restricts their ability to access the app to certain daylight hours. However, we also identified difficulties with asylum seekers' photos being captured appropriately during cloudy days – where the CBP One app did not "recognize" the asylum seeker trying to access their account, or did not recognize an asylum seeker trying to register for an account. Again, these delays result in individuals being unable to register or confirm appointments, leading to longer waiting times in dangerous conditions.

The problems with CBP One's photo capturing technology are far more common for individuals with darker skin tones, especially Black asylum seekers.[18] Technology requiring forms of facial identification has proven to be inherently flawed and biased and should not be used for "serious decisions that have such major consequences on people's lives."[19] Along the U.S. – Mexico border, it is common for Black and other darker-skinned asylum seekers to spend hours trying to capture a photograph acceptable to the app. This has led to an economic burden and exclusion, as many have to continually pay for cellular data and/or wifi in order to connect to CBP One. This additional time spent also means time and days lost to not being able to get an appointment for themselves or their families – which translates to additional weeks of having to remain in dangerous conditions in Mexico.

Another recent issue, illustrative of the many varied issues that routinely pop up – the CBP One app failed to recognize asylum seekers trying to access their account unless they were wearing the exact shirt they wore when they first registered with CBP One. Although this problem appeared to be momentary, it is indicative of the many issues within the app that drive inequity. Fortunately, in this case, these asylum seekers still had access to the clothes they wore when they registered for the app, but not all do. Many individuals' clothes are stolen or taken/thrown by the Mexican government if they clear out asylum seekers encampments. Many other asylum seekers are

---

[18] Bernd Debusmann Jr., *At US border, tech issues plague new migrant applications*, BBC NEWS (Mar. 8, 2023), https://www.bbc.com/news/world-us-canada-64814095.
[19] *Id.*

10

CLP_PC_032977



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

kidnapped or harmed in other ways that cause them to lose their clothing or the phones they use for CBP One.

Furthermore, because of these many varied issues, requiring the use of CBP One to access asylum will lead to asylum seekers being targeted for fraud. Asylum seekers have already received fraudulent emails supposedly confirming appointments, and requiring payments as part of the process. These fraudulent emails look official and advocates have had to confirm directly with CBP whether the information contained therein is true or not.  Instances of fraud will continue because the Rule does not address the underlying problems already identified under CBP One.



With regards to the application sent via electronic mail, we are notifying [NAME], of the following communication, requiring the following payment amounts:

$1,000 USD Thursday 23 of March 2023

$950 USD Thursday 23 of March 2023

It is important to note that this communication was granted based on your good character as a person not nationalized within United States territory.

This communication requires strict compliance please comply and notify.

11

CLP_PC_032978



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

### c. *Reliance on technology like CBP One leads to separation of families.*

The use of CBP One for Title 42 processing has led to families being separated. First, the app's photo requirements have proven difficult for families, many of whom have been unable to capture an acceptable photograph of their children in the app, especially newborn or young children. This has led to delays in families being able to register themselves and their children, which then leads to further delays in their scheduling and confirming appointments, which leads to them being in Mexico longer under dangerous conditions.

The Rule states the Departments have determined that implementation of the "proposed rule would not impose a negative impact on family well-being or the autonomy of the family as an institution."[20] CBP One has already shown the Departments that this statement is inaccurate. In the Reynosa and Matamoros areas, which feed into the Hidalgo and Brownsville ports of entry, many families have been forced to separate in order to access our immigration system. Unable to complete registration or confirm appointments, these families – fearing for their children's safety and lives in Mexico – conclude that having their children present alone at the port of entry or otherwise cross the border alone is a safer option than having them continue to wait in Mexico.

In trying to secure CBP One appointments, families face a unique disadvantage. If an asylum seeker passes the first test and successfully registers every family member under one lead family member, they still face the challenge of having to secure appointments for every single member – as is required by CBP One for Title 42 exemptions, and as will be required under the Rule. However, because there are not enough appointments available to meet the demand, securing an appointment for a family of four or five (or more) members, as required by the Rule, is sometimes impossible. And, this Rule does not guarantee that the Departments will ensure enough appointment availability at all times to meet demand. So, as has happened during CBP One's use during the Title 42 exemption process, families have struggled, and will continue to struggle in order to obtain the required appointments for each family member. This, coupled with the constant threat of violence they face in Mexico, has led to families sending their children across, or in some cases, children making that impossible decision on their own to avoid their parents having to decide. These families' separations were the predicate for them to access our asylum system under CBP One – a trend that will inevitably continue due to this Rule's technology and appointment-based requirements.

---

[20] Circumvention of Lawful Pathways, 88 Fed. Reg. 11704, 11749 (proposed Feb. 23, 2023)(to be codified at 8 C.F.R. pt. 208).

CLP_PC_032979



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org



Furthermore, although the rule offers possibilities for an asylum seeker subject to the Rule to not be separated from their family – the Rule itself does not guarantee family unity. In addition to the family separation risks inherent in simply trying to access an app-based asylum system, asylum seekers face additional family separation risks once within the asylum system set out by the Rule. Asylum seekers subject to the Rule who are unable to rebut the presumption, but who are ultimately successful in Convention Against Torture (CAT) or Withholding of Removal claims, would be unable to bring their families simply because they lacked access to this technology. Reliance on CBP One will absolutely lead to permanent family separations, as well as families stranded in harm's way.

Again, the inequity and tech problems encountered through the CBP One app are aggravated by the fact that there are simply not enough appointments to meet the need – and that is likely to continue with this Rule. Not having enough appointments inherently creates inequity because experience has shown that an individual's inability to confirm an appointment has been due to factors beyond their control – economic disadvantage, language ability, race, disability, being targeted in transit and/or in Mexico due to immutable characteristics, or being part of a family. These are the exact factors that warrant asylum protections under domestic and international law.

### III.    Recent history shows the Rule's implementation will lead to due process violations and other harms.

As written, the Rule requires asylum seekers to go through its new asylum processing while in CBP custody – a practice first implemented by the Trump Administration under the Prompt Asylum Claim Review (PACR) and Humanitarian Asylum Review Process (HARP). By requiring this, the Departments are not only further entrenching this Trump era shift, but are also ignoring the long history of documented CBP abuse. Abuses by CBP officers, horrific conditions of

13

CLP_PC_032980



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

detention in CBP jails, CBP's overall lack of accountability, and asylum seeker's lack of access to counsel,[21] are the norms underlying the operationalization of this Rule.

For those forced to undergo this screening while in detention, the obstacles to due process are so high as to render success unachievable for most, regardless of the merits of their asylum claim. In its review of PACR/HARP, the Department of Homeland Security Office of Inspector General noted that PACR/HARP are inconsistent with CBP detention standards and design.[22] The Government Accountability Office also issued reports highly critical of PACR/HARP, and included data showing that before PACR/HARP, 74% of individuals passed an initial asylum screening interview, compared to 19-29% who passed under PACR/HARP.[23] In a system where reducing the number of people is the priority, the Departments may laud these decreased passage rates, but the cost of this decrease is borne by real human beings with valid asylum claims who were denied an opportunity because their lives are not the policy priority.

Under the Rule, asylum seekers will be forced to have their fear interviews while in government custody in notoriously difficult[24] and abusive[25] conditions, with no prior knowledge as to the Rule's details or workings, and without ever having spoken to an attorney. CBP is notorious for denying asylum seekers access to attorneys, and also specifically denying attorneys access to asylum seekers.[26]

Data revealed in a congressional hearing showed that out of more than 4,700 asylum seekers placed into PACR and HARP, just 31 people managed to get a lawyer.[27] During PACR/HARP, TCRP attorneys were able to speak with only a handful of asylum seekers – all of whom underwent their credible fear interview without access to an attorney, and all of whom required medical attention. During our attempts to intervene on their behalf, TCRP experienced many obstacles in representing and even just speaking with our detained clients placed in the program. TCRP was only able to speak with asylum seekers over the phone, and we experienced difficulties in coordinating calls.

---

[21] *"They Treat You Like You Are Worthless" Internal DHS Reports of Abuses by US Border Officials*, HUM. RTS. WATCH (Oct. 21, 2021), https://www.hrw.org/report/2021/10/21/they-treat-you-you-are-worthless/internal-dhs-reports-abuses-us-border-officials#_ftn53.

[22] *See* DHS OIG, *DHS Has Not Effectively Implemented the Prompt Asylum Pilot Programs*, OIG-21-16 (2021), https://www.oig.dhs.gov/sites/default/files/assets/2021-01/OIG-21-16-Jan21.pdf.

[23] Am. Immigr. Council, *Asylum Is In Danger After Court Upholds Rushed Screening Process at the Border*, IMMIGR. IMPACT (Dec. 14, 2020), https://immigrationimpact.com/2020/12/14/asylum-pacr-harp-court-decision/.

[24] *Challenging Unconstitutional Conditions in CBP Detention Facilities*, AM. IMMIGR. COUNCIL, https://www.americanimmigrationcouncil.org/litigation/challenging-unconstitutional-conditions-cbp-detention-facilities (last visited Mar. 26, 2023).

[25] *supra*, n. 21.

[26] *Id.*

[27] *supra*, n. 22.

CLP_PC_032981



Oficina Legal del Pueblo Unido, Inc.
P.O. Box 219
Alamo, TX 78516
(956) 787-8171
texascivilrightsproject.org

Furthermore, asylum seekers confirmed they were uncomfortable detailing certain parts of their experience (as necessary for their asylum claims) over the phone because CBP officers, or other asylum seekers, were within hearing distance. In a few occasions, asylum seekers noted that CBP officers were standing immediately next to them as they were attempting to have confidential conversations with their attorneys, and the asylum seekers felt intimidated. As previously noted, instances of abuse are not uncommon for CBP officers, and yet these same officers will be the only ones with access to asylum seekers while they're undergoing the Rule's processes.

This Rule's prioritization of efficiency means that the number of individuals with access to our asylum system will plummet. But, TCRP's experience on the ground tells us what those numbers mean. Those are asylum seekers with valid claims who were simply unable to navigate the bureaucracy. They included indigenous people fleeing persecution, as well as individuals fleeing political and religious persecution – including a mother and her young child, a sexual abuse survivor, who fled their home due to persecution experienced for speaking up against sexual violence against children. All of them were deported under PACR/HARP while TCRP attorneys attempted to intervene on their behalf – an example of the cost of "efficiency."

The harms of this Rule will be further exacerbated because the Rule provides no guarantees that it will not be coupled with other harmful policies, like this Administration's fast tracked asylum screenings[28] or the Interim Final Rule.[29] On the contrary, it is likely that many individuals will be submitted to the Kafkaesque interplay of these punitive policies, further leading to individuals with valid asylum claims being denied access to our system and sent to harm's way.

## IV.    Conclusion

TCRP strongly opposes the proposed Rule because it violates the existing statutory framework and mandate of the Departments to protect and provide a fair process to asylum seekers. Our goal should be to uphold and  strengthen our asylum laws and truly offer protection for those seeking refuge. President Biden's Executive Order No. 14012 underscored our supposed character as a "nation of opportunity and welcome."[30] To ensure we are a nation of welcome, we should readily

---

[28] *Human Rights First Condemns Administration Plan to Fast-Track Asylum Screenings*, HUM. RTS. FIRST (Jan. 27, 2023), https://humanrightsfirst.org/library/human-rights-first-condemns-administration-plan-to-fast-track-asylum-screenings/.

[29] Rebecca Gendelman, *Rushed Timelines, Inadequate Access to Legal Representation Impede Meaningful Opportunity to Seek Asylum Under New Asylum Processing Rule*, HUM. RTS. FIRST (Oct. 21, 2022), https://humanrightsfirst.org/library/rushed-timelines-inadequate-access-to-legal-representation-impede-meaningful-opportunity-to-seek-asylum-under-new-asylum-processing-rule/.

[30] *See Exec. Ord. No. 14012*, 86 Fed. Reg. 23, 8277 (Feb. 2, 2021) (stating "it is essential to ensure that our laws and policies encourage full participation by immigrants . . ." and "that immigration processes and other benefits are delivered effectively and efficiently). *But see* Julia Neusner & Kennji Kizuka, *A Shameful Record: Biden Admin.'s Use of Trump Policies Endangers People Seeking Asylum*, HUM. RTS. FIRST (Jan. 13, 2022),

CLP_PC_032982



March 27, 2023

Merrick Garland
Attorney General
U.S. Department of Justice

Alejandro Mayorkas
Secretary of Homeland Security
Department of Homeland Security

<div align="center">

**RE:     Comment to Proposed DHS/DOJ Regulation**
***Circumvention of Lawful Pathways*, 88 FR 11704**

</div>

Dear Attorney General Garland and Secretary Mayorkas:

Please accept this letter, submitted by Frente Accion Latinx de Minnesota (FALM), as a comment to the proposed regulation by the U.S. Department of Homeland Security (DHS) and U.S. Department of Justice (DOJ), *Circumvention of Lawful Pathways*, published in the Federal Register at 88 FR 11704 on February 23, 2023. FALM, the organization submitting this comment to the proposed DHS/DOJ regulation, is a medical-legal coalition comprised of medical professionals and healthcare providers, immigration lawyers and legal services organizations and community organizations. FALM, as an umbrella medical-legal coalition group, is engaged in various activities to eliminate structural barriers negatively impacting health outcomes for immigrants and other marginalized communities. FALM's activities have included one-day medical-legal clinics, providing legal consultations and healthcare services to community members in the Twin Cities and Greater Minnesota, co-hosting a medical-legal symposium, *La Triste Frontera,* raising awareness of medical-legal issues at the U.S. border, and advocacy to support law and policy advancing health equity.

As a Medical-Legal Coalition, FALM envisions and works towards creating a society where all individuals achieve their highest potential for health. FALM opposes the proposed DHS/DOJ regulation in its entirety because it runs counter to this goal. The proposed rule negatively affects the health of asylum seekers, a vulnerable population fleeing harmful conditions and if put into place as proposed, this rule will put both the health and lives of asylum seekers at grave risk. Accordingly, FALM submits this comment in opposition to the proposed DHS/DOJ regulations

<div align="center">1</div>

CLP_PC_032996

air or oxygen, hypoxia sets in quickly, causing brain damage and death.[23] To think that children as young as a few months old are being sent to their watery graves in this manner is appalling to say the least.

Death by heat stroke, suffered by migrants who attempt to cross through the desert, is equally horrific. Migrants who cross the border through the desert are ravaged by extreme temperatures – the sweltering heat of the day and bitter cold at night. With not enough potable drinking water available, they are often severely dehydrated. Dehydration starts as dry mouth. Dry mouth turns to dry heaving. The veins constrict and muscles begin to cramp. The body will stop sweating and begin seizing - signs of heat stroke. When a heat stroke occurs, body temperature can rise to 106 degrees or higher within 10 to 15 minutes. As the body's internal temperature continues to rise above 110 degrees, the body's cells to break down and the sheaths of blood vessels begin leaking, causing hemorrhaging throughout the body and multi-system organ failure, effectively boiling to death in their own body.[24]

Those who died from hypothermia while attempting to cross the northern border also suffered a painful death. Death from hypothermia occurs when your body loses heat faster than it can produce heat, causing the body's internal temperature to plunge. The first symptom of hypothermia is shivering, when the body begins to shake in an attempt to warm itself. As the body's internal temperature drops, which can happen in a matter of minutes when exposed to sub-zero temperatures, the heart, nervous system, and other organs are not able to work properly. Eventually, a person's heart will stop beating and they will die.[25]

Should the proposed DHS/DOJ rule go into effect as written, it is certain to result in more people suffering unimaginably painful deaths, spending their final moments on earth in agony.

**B.** **The proposed DHS/DOJ rule, creating a rebuttable presumption of ineligibility for asylum for the majority of migrants who enter unlawfully between ports of entry, will disproportionately harm those most in need of protection.**

One especially punitive provision in the proposed DHS/DOJ regulation is the asylum transit ban language, imposing a rebuttable presumption of ineligibility for asylum for any migrant apprehended by CBP after unlawful entry if they did not seek asylum or protection in any third country, they travelled through enroute to the U.S. This rebuttable presumption of ineligibility for asylum, if implemented, will severely restrict access to asylum and effectively punish the most vulnerable who are left with no choice but to cross the border unlawfully to reach safety in the U.S. DHS and DOJ have argued that the proposed rule does include safeguards to rebut the presumption of ineligibility for asylum, for example, if the asylum seeker can demonstrate by preponderance of the evidence, they were unable to access the CBP One App to make an

---

[23] *The Science of Drowning: What Happens to the Body Underwater?,* American Academy of CPR and First Aid, https://www.onlinecprcertification.net/blog/the-science-of-drowning-what-happens-to-the-body-underwater/

[24] A. Ragsdale, P. Stark, *What it Feels Like to Die From Heatstroke,* Outside, June 18, 2019, https://www.outsideonline.com/health/wellness/heat-stroke-signs-symptoms/

[25] *Hypothermia: Overview,* The Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/hypothermia/symptoms-causes/syc-20352682#:~:text=When%20your%20body%20temperature%20drops,or%20immersion%20in%20cold%20water.

CLP_PC_033002

appointment. However, rebutting the presumption of ineligibility for asylum under the rule is a technically complex process that will be extremely difficult for asylum seekers to navigate without the assistance of a lawyer.

Additionally, asylum seekers who are survivors of trauma will face additional challenges rebutting and overcoming the presumption of ineligibility for asylum. Asylum seekers often have experienced significant trauma and have complex physical and mental health needs that should be treated with medical care. Asylum status, if granted, is a form of lawful status granting the right to stay in the U.S. indefinitely, with a path to permanent residence and citizenship, and entitlement to government funded healthcare programs, like Medicaid.  By eliminating the possibility of even being allowed to apply for asylum for most applicants, a form of status that grants access to healthcare benefits, the proposed rule denies access to crucial health services (leading to untreated mental health needs and trauma), increased emergency service use, lower immunization rates, and increased likelihood of deportation, resulting in re-traumatization and worsening of health problems.

The Proposed Rule also perpetuates uncertainty for asylum seekers and exacerbates their trauma and mental anguish. Migrants seeking asylum often are fleeing traumatic experiences stemming from past persecution that forced them to flee their home country and seek asylum in the U.S. In fact, one of the requirements for seeking asylum in the United States is that the individual must demonstrate a well-founded fear of persecution if forced to return, which is typically established by showing they suffered past persecution in their home country.[26] The Proposed Rule will compound the trauma and vulnerabilities that asylum seekers already face by punishing them, denying them access to asylum and deporting them back to the harm that caused them to flee and seek safety in the U.S. in the first place.

**C. Requiring asylum seekers to schedule an appointment through the CBP One Smartphone App before they can seek asylum will result in catastrophic health consequences.**

Under the proposed DHS/DOJ rule, asylum seekers are required to secure an appointment through the CBP One App before being allowed to request asylum at a port of entry. For a number of reasons, this requirement is impractical and will deny many seeking protection on the southern border access to asylum.

This requirement under the proposed rule is incredibly burdensome and requires asylum seekers to have access to a smartphone and reliable internet to download the CBP One App. Assuming they have access to a smartphone and are able to download the CBP One App and register, the asylum seeker must then attempt to schedule an appointment through the app's glitchy, often impossibly difficult lottery-based scheduling process. As a result, thousands of people will be trapped waiting for weeks or months at a time in dangerous conditions in Northern Mexico while they try to navigate the CBP One App, schedule an appointment, and then wait for said appointment to take place. It is unknown how many appointments are available each day. Advocates estimate that in camps in Reynosa and Matamoros, there are as many as 10,000 migrants at any given time competing for likely fewer than 500 appointments made available in

---

[26] *See* 8 U.S.C. § 1158(b), INA § 208(b)

CLP_PC_033003

those cities each day.[27] According to a CBP official, 200,000 profiles had been created on the app. Of those 200,000 profiles, only 35,000 profiles had scheduled appointments as of Feb 22.[28] While the number of active users is unknown, it is evident many who have created a profile have not been able to successfully schedule an appointment and remain waiting indefinitely for their chance to request asylum at a port of entry in dangerous conditions in Northern Mexico with no safe or healthy housing.

From a medical perspective, the proposed CBP One App appointment requirement is concerning for a number of reasons. First, the health dangers and harm resulting from acts of violence, rape, and murder that many asylum seekers are subjected to in Northern Mexico while waiting for an appointment are inherent. Second, the lottery process is indifferent toward, (and in many cases disadvantages) the most vulnerable, including those with medical needs seeking protection through asylum. Third, the impact of CBP One's "Liveness Check" facial recognition technology has a discriminatory impact on Black people and indigenous or mestizo people with dark skin, which causes additional harms to the mental and physical health of asylum seekers most likely to face discrimination. Fourth, the dangerous circumstances, violence, and uncertainty asylum seekers will endure while waiting to for an open slot through the CBP One App will have significant mental and physical health implications, especially for adolescents.

    **i.**    **The frequent crime, violence, rape, and murder asylum seekers are exposed and susceptible to while waiting in dangerous areas near the border in Northern Mexico are an obvious threat to the health and safety asylum seekers.**

The border communities in Northern Mexico are not safe for asylum seekers to stay while waiting to secure an appointment to request asylum through the CBP One App. On March 3, 2023, four U.S. citizens visiting Mexico for medial tourism were kidnapped by armed men connected to the cartels in Matamoros, Mexico (directly across the border from McAllen, Texas) because the gunman reportedly mistook them for Haitian drug traffickers.[29] Unfortunately, two of the four were murdered and another victim of the kidnapping suffered serious injuries.[30] Asylum seekers are especially vulnerable in border towns where they are regularly victims of murders, shootings, rapes, extortions, kidnappings, and human trafficking. They are often targeted on account of their race, nationality, refugee status, sexual orientation, gender identity, and other factors.[31] Migrants waiting for an asylum appointment, particularly Black and dark-skinned migrants, are also at risk of deportation by Mexican migration officers from Instituto Nacional de Migracion (INM), Mexico's immigration enforcement agency. Further, "Mexican police, immigration officers, and other government authorities continue to be responsible, often in collusion with cartels, for brutal

---

[27] B. Wermond, E. Trovall, *Biden's New CBP One App Panned for Trapping Asylum Seekers in Daily Lottery System,* Houston Chronicle, February 26, 2023, https://www.houstonchronicle.com/politics/texas/article/users-pan-biden-s-new-cbp-one-app-asylum-seekers-17796732.php

[28] Id.

[29] M. Halpert, W. Grant, *Two Dead, Two Alive After Americans Kidnapped in Mexico,* BBC, March 8, 2023, https://www.bbc.com/news/world-latin-america-64878721

[30] Id.

[31] Barred at the Border: Wait "Lists" Leave Asylum Seekers in Peril at Texas Ports of Entry, Human Rights First, April 2019, https://humanrightsfirst.org/wp-content/uploads/2022/10/BARRED_AT_THE_BORDER.pdf

CLP_PC_033004

attacks on migrants and asylum seekers after they are returned to, or while they are passing through Mexico."[32]

### ii.    The CBP One App disadvantages the most vulnerable people.

The proposed rule includes exceptions for those who can't access the app because of technical issues, illiteracy, no access to a phone, or language barriers. There are also exceptions for unaccompanied children and those with serious medical conditions. However, the individual bears the burden of proving by preponderance of the evidence (i.e., greater than a 50% chance) that they were unable to use the app, and it is unclear how officers would judge whether a person has established they meet an exception. Further, families with young children and infants, the elderly, and pregnant women are given no priority when scheduling appointments or exemptions from the CBP One App appointment requirement. Instead of a triage system that prioritizes appointments based on need and vulnerability, the CBP One App appointment scheduling process is a lottery where securing an appointment seems to be a matter of luck or chance. In fact, it tends to disadvantage the most vulnerable groups such as children and infants travelling with a parent, elderly people, and people with disabilities, and those in poverty who cannot afford a smartphone or access to the internet.

a.    <u>Pregnant women and families with children are disadvantaged by the CBP One App scheduling process.</u>

Pregnant women nearing their due dates have the same chance of getting an appointment as the thousands of other asylum seekers attempting to secure a slot from the excessively limited pool. The proposed rule also imposes difficulty on children and their parents because it requires each child to have a separate appointment versus allowing family units to schedule a single appointment to request asylum together. This has proven challenging given the surplus of people seeking appointments, and the deficiency in appointment slots available each day. Further, the CBP One App requires facial recognition for young children (and at one point required it for infants) before the app will allow an appointment to be scheduled on behalf of the child. For anyone who has interacted with a toddler or young child, it is clear that requiring a young child to sit still on command to complete a facial recognition "liveness check" is before being allowed to use an app which is their only legal avenue to request asylum is inherently unreasonable. There is also at least one report of facial software rejecting an identical twin mistakenly receiving it as an already-existing user.[33]

---

[32] Id.

[33] N. Miroff, *How Biden Officials aim to use a Mobile App to cut Illegal U.S. Entries,* Washington Post, February 20, 2023, https://www.washingtonpost.com/immigration/2023/02/20/cbpone-boder-app-biden-migrants/

10

b.  <u>People with disabilities, elderly people, those living in poverty, and people who speak languages other than English, Spanish, or (recently) Haitian Creole, are disadvantaged by the CBP One App Process.</u>

The accessibility of the CBP One App for users with disabilities is questionable at best. There is at least one report of a person who was blind having difficulty accessing the app.[34] Many people have reported difficulty understanding and using the complicated app. Only those who can read and write in Spanish, English, or Haitian Creole are able to use the app since these are the only language options the CBP One App provides. Further, the most isolated and economically distressed are left with no means to request an appointment because they do not have a smartphone. Similarly, many struggle accessing the CBP One App and securing an appointment with outdated phones and bad Wi-Fi connections. In practice, the people in the gravest danger with the least resources have and will continue to be excluded from the opportunity to seek asylum because of the CBP One App requirement.[35]

### iii.   The CBP One App's "Liveness Check" facial recognition discriminates against Black people and people with dark skin, which perpetuates racism and carries negative health ramifications.

The CBP One App has excluded thousands of people from the asylum process based on the color of their skin. There are numerous reports that the CBP One "liveness check" requirement routinely rejects the photos of Black and dark-skinned migrants, leaving these individuals with no recourse to access asylum appointments at ports of entry. At least one study found that facial recognition technology encounters its greatest rates of error for Black women.[36] Another study found facial recognition has an error rate of over 30% for women with darker skin tones.[37]

It is now well-established that racism is a Public Health issue. Whether intentional or not, the CBP One App, especially the "Liveness" facial recognition requirement, has a discriminatory impact on asylum seekers based on the color of their skin and darkness of their complexions. These asylum seekers have already experienced racial discrimination, which comes with health implications.

Racism is linked with higher stress, which can result in high blood pressure, weakened immune system, and other long-term health effects. (*See more discussion about stress' impact on health in Section iv, below*). A recent study found physiological functioning in midlife and sleep is impaired in people of color who have experienced unfair discrimination over their lifetime.[38] Another recent

---

[34] Houston Chronicle, *supra* note 27

[35] Washington Post, *supra* note 33

[36] *NIST Study Evaluates Effects of Race, Age, Sex on Facial Recognition Software,* National Institute of Standards and Technology, U.S. Department of Commerce, December 19, 2019, https://www.nist.gov/news-events/news/2019/12/nist-study-evaluates-effects-race-age-sex-face-recognition-software

[37] A. Najibi, *Racial Discrimination in Face Recognition Technology,* Harvard University, October 24, 2020, https://sitn.hms.harvard.edu/flash/2020/racial-discrimination-in-face-recognition-technology/

[38] A.D. Ong, D.R. Williams, *Lifetime Discrimination, Global Sleep Quality, and Inflammation Burden in Multi-Ethnic Sample of Middle-Aged Adults,* American Psychological Association, 2019, https://psycnet.apa.org/doiLanding?doi=10.1037%2Fcdp0000233

CLP_PC_033006

research review found associations between reports of racial discrimination, and physical and mental health conditions.[39] These conditions included cardiovascular disease, coronary artery calcification, mental health disorders, obesity, hypertension, alcohol use and misuse, poor sleep, cortisol dysregulation, engagement in high-risk behaviors, and inflammation.[40] Inability to access asylum protections because of the immutable characteristic of being Black or having dark skin preventing proper use of the necessary CBP One App is a severe form of racism that could exacerbate racial health disparities.

> iv. **Asylum seekers waiting to schedule an appointment through the CBP One App experience uncertainty, stress, trauma, adverse childhood experiences, sexual and physical abuse, and inadequate housing. All these hardships negatively impact health.**

In addition to the discriminatory impact of the CBP One App appointment requirement described in the previous section above, this requirement will cause many additional harms negatively impacting health outcomes.

> a. The CBP One App appointment process makes many asylum seekers experience uncertainty and stress.

Asylum seekers desperately waiting in Northern Mexico for weeks or months to secure an asylum appointment live in a perpetual state of uncertainty over their futures. This uncertainty caused by not knowing if or when they will be able to secure an appointment through CBP One App is likely a long-term stressor that may negatively impact health for years to come. Further, an asylum seeker's stress is compounded by the stress of living in dangerous conditions where crimes, violence, robberies, kidnappings, rapes, and threats against migrants are common.

This is especially troubling since asylum seekers have typically already endured trauma from past persecution they suffered, which forms the basis of their asylum claims. "Before being forced to flee, refugees may experience imprisonment, torture, loss of property, malnutrition, physical assault, extreme fear, rape and loss of livelihood."[41] Those who have experienced persecution or economic distress in their home country, and the resulting trauma from these incidents, need timely access to assistance from medical and mental health professionals. At the very least, they need to be in a more secure and safe environment versus the extreme danger they face while vulnerably waiting "in limbo" near the border. Tortured refugees have significant challenges for emotional and sometimes physical healing that must be carefully assessed and treated[42] and this healing cannot begin until asylum seekers reach safety and stability inside the U.S.

---

[39] D.R. Williams, J.A. Lawrence, B.A. Davis, *Racism and Health: Evidence and Needed Research*, Annual Review of Public Health, April 2019, https://www.annualreviews.org/doi/pdf/10.1146/annurev-publhealth-040218-043750

[40] *What are the Effects of Racism on Health and Mental Health?,* Medical News Today, last reviewed on December 14, 2022, https://www.medicalnewstoday.com/articles/effects-of-racism#summary

[41] *Traumatic Experiences of Refugees,* Refugee Health Technical Assistance Center https://refugeehealthta.org/physical-mental-health/mental-health/adult-mental-health/traumatic-experiences-of-refugees/

[42] Id.

12

CLP_PC_033007



1500 E. Yandell Dr. El Paso, TX 79902
P: (915) 544-5126 | F: (915) 544-4041
www.las-americas.org

*Submitted via: https://www.regulations.gov.*

Daniel Delgado
Acting Director
Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security
Telephone: (202) 447-3459

Lauren Alder Reid
Assistant Director,
Office of Policy, EOIR
U.S. Department of Justice
Telephone: (703) 305-0289

**Re: Comment on the Proposed Rule by the <u>Department</u> of <u>Homeland Security</u> (DHS) and the <u>Executive Office for Immigration Review</u> (EOIR) on Circumvention of Lawful Pathways, CIS No. 2736-22; Docket No: USCIS 2022-0016; A.G. Order No. 5605-2023**

Dear Acting Director Daniel Delgado and Assistant Director Lauren Alder Reid;

Las Americas Immigrant Advocacy Center (Las Americas, LAIAC, or we) submits this comment in response to the Department of Homeland Security (DHS) and Department of Justice (DOJ)'s proposed rule published in the Federal Register on February 23, 2023, that would ban thousands of refugees from asylum protection in the United States and deprive them of the ability to reunite with their families and pursue a path to citizenship in this country. Upon a close read of the proposed rule and its intended application, we find that the new rule operates similarly to the asylum bans promulgated by the Trump administration in 2018 and 2019 that were repeatedly struck down by federal courts as unlawful. As the details below will underscore, we ask that the Departments bring themselves into compliance with U.S. immigration law by withdrawing the proposed rule and working together with advocacy organizations instead to create human-centered and effective asylum and border crossing case management that legitimately provides migrants a meaningful and realistic opportunity to seek protection.

1 of 20 - LAIAC Comment

CLP_PC_033168

Our organization's experience assisting individuals with the CBP One app over the last two months highlights its many shortcomings and should be analyzed by the Departments and weighed seriously against any perceived benefits of "reducing" the number of individuals seeking asylum at the U.S.-Mexico border. Ignoring reality on the ground will not lead to fruitful results.

Through our work with COESPO, we see about 100 people per day waiting in line for access to services that are available to migrants stranded on the Mexico side of the U.S. border. People are waiting for wifi-enabled safe spaces for families to use to try to register the application on their phones, loaner phones supporting the technology required by the app, information about the legal implications of using the application to make an appointment, information about the legal implications of entering the United States via a Title 42 exception, and individualized legal advice for families separated or otherwise stranded at the border.

In theory, the app should immediately show a scheduled date for the applicant to cross the border as soon as the applicant has registered. This is not the case: Appointments fill up early each day.[8] After registering, migrants have to go back into the app on a daily basis and keep checking every day until they can find an open appointment for them to cross the border.[9] LAIAC knows of migrants who have waited in Mexicali and Ciudad Juarez, Mexico, for weeks — sometimes months — trying to get an appointment. Sometimes, migrants who are able to travel between border cities can access appointments much faster.[10] This generates additional frustration and mistrust, leading migrants to rely on people who fraudulently charge money for appointments or who fill out the app with incorrect information, which can cause the applicants to face credibility issues down the line. Overall, even for technically savvy or educated migrants, the CBP One process comes across as arbitrary and confusing, which undermines trust in the integrity of the U.S. asylum system overall.

The system is even more obscure and difficult to access for particularly vulnerable migrants. First, because the app is available in English, Spanish, and Haitian Creole only,[11] it particularly inhibits speakers of indigenous languages, asylum seekers who only speak a little Spanish, or those who speak less common languages or dialects by requiring these individuals to spend many more hours with the app and in search of translation assistance. Even for applicants who speak Creole, they must first create an account through login.gov, which is only available in French,

---

[8] Jack Herrera, *Fleeing for Your Life? There's An App for That.*, Texas Monthly (Mar. 2, 2023) https://www.texasmonthly.com/news-politics/cbp-app-asylum-biden-administration/.

[9] Stephanie Leutert & Caitlyn Yates, ROBERT STRAUSS CENTER FOR INTERNATIONAL SECURITY AND LAW, ASYLUM PROCESSING AT THE U.S.-MEXICO BORDER, 1-3 (Feb. 2023) https://www.strausscenter.org/publications/asylum-processing-at-the-u-s-mexico-border-february-2023/.

[10] *Id.* at 3.

[11] *Id.* at 2-3.

CLP_PC_033174

Spanish, and English. Once a login.gov account is created, the initial registration page for CBP One is only available in English, meaning that an applicant must agree to a long page of terms and conditions about the privacy of their information — *in English* — before they can get to the portions of the app that are translated. Most importantly, when entering information into the app, all answers must be in English. So even Spanish and Haitian Creole speakers need assistance filling in their answers to the app's forms.

Because it can take up to a week to find interpretation for the indigenous languages, it is difficult to access translation of the questions, and even more difficult to be able to translate responses to the questions. These questions and answers must be entered before applicants are able to request an appointment at a port of entry. Our staff has put many resources over the last two months toward helping people try to get appointments. Attorneys, caseworkers, and other aid workers conduct interviews with the people who speak indigenous or rare languages, using interpreters to gather the information the app requires. In our experience, the appointment slots are usually filled by 8:00 A.M., Mountain Time, each day. Because it takes more time to enter the information using interpreters, people who speak languages other than English, especially languages other than Spanish and Haitian Creole, find it very difficult to obtain an appointment using CBP One.

The use of the app to administer the Venezuelan parole program is not a good indicator of how it will work with people from countries that are not as wealthy or educated. In our experience, the Venezuelan population generally has better access to newer phones, thus enabling them to have easier access to appointments through CBP One. And many Venezuelan migrants had sufficient technological experience and expertise to be able to fill out the applications and navigate the app quickly without significant assistance. Venezuelan migrants are more likely to have a college degree and are often younger than immigrants from other countries.[12] In our experience, non-Venezuelan migrants require more assistance with the app, especially those who are older or less educated.

When looking at all of the migrants we have worked with, the CBP One app often requires cell phone capabilities that theirs don't have. Some brands of cell phones, such as Huawei, fail to load the app effectively, and for those who are able to load it, frequent and mandatory updates are often required. Many people do not have the required operating system or memory for the CBP One app to function properly on their phone. So when they try to register for an appointment through the app, the system kicks them out before they are able to complete the process. As mentioned above, by the time people have traveled all the way to the border, their cell phones are already very damaged (if not already stolen from them), and their touch screen

---

[12] Ari Hoffman & Jeanne Batalova, *Venezuelan Immigrants in the United States*, MIGRATION POLICY INST. (Feb. 15, 2023) https://www.migrationpolicy.org/article/venezuelan-immigrants-united-states.

CLP_PC_033175

capability does not match what is necessary to answer the questionnaire in the app. As a result, it can be difficult to take, save, then upload the photograph of the traveler. Once a technical issue arises, individuals are forced to start the registration process all over again from the beginning.

Additionally, not all migrants have economic resources to pay for roaming data on their cell phone. It often falls to people assisting migrants to share data from their personal cell phones so that people can access the CBP One app. About two weeks ago, the Mexican government offices started sharing the internet so that migrants could access the app. But there are often capacity restrictions, and the wifi reception is not always accessible throughout this specific Mexican government building.

In our experience, the CBP One process is equally untenable for families, as well. First, the sign up process is cumbersome and time-consuming because each individual family member is required to submit their own application. Second, families often have trouble finding an appointment time before the slots fill up because their appointment cannot be scheduled unless there are enough slots for every member of the family available.  Because the appointments fill up in a matter of minutes, it is often impossible for a family to submit multiple applications fast enough. This results in families waiting in Mexico for longer periods, and puts them in danger of harm. For example, we worked with one family that had two disabled children. They were unable to stay in the shelter they had found and in the meantime, the CBP One appointments kept filling up before they could get an appointment. After some weeks, the family reported to LAIAC staff that they went directly to CBP to request that they be allowed to pursue asylum without the app. They were denied entry and told they had to use the app, which meant they ended up forced to wait longer in Mexico in unstable conditions without access to healthcare for their children. In another instance, a family of seven from Venezuela, traveling with a disabled father, has been attempting to access an appointment with CBP One for two months and as of March 27, 2023, are still waiting.

Las Americas' data shows that when put in this situation, most families have not been able to present and enter via CBP One because of how long it is taking to actually get an appointment. When we raised this issue with CBP earlier this month (March 2023), we were told this is not a technical issue or an error on the part of CBP, but rather evidence of fraudulent appointments created by criminal groups to lure information and funds from asylum seekers seeking entry to the United States. **In other words, though the government touts CBP One as a means of avoiding dangerous exploitation en route to the United States, it is well aware that the very app that it created to do so is creating yet another avenue for such exploitation.** When presented with this concerning pattern in March 2023, CBP did not offer any alternative methods for individuals subjected to fraud in Mexico to find relief other than to continue trying to get an appointment via the app.

CLP_PC_033176

In fact, it is nearly impossible for a family to predict how long they will need to wait for appointments through CBP One - we have seen some families wait more than four weeks once they are actually able to make it through to the end of the application and complete registration. However, the wait time overall is neither predictable or reliable. That uncertainty creates additional stress and difficulty. Some families have tried to speed up the process by registering with the app more than once. For example, they will create a family account and an individual account. Or they will send their children alone ahead of them.[13] Others will register just one member of the family and then be denied entry when they show up with their family members — Las Americas encountered at least one single mother traveling with her 12-year old son who was denied entry by CBP after she showed up to her appointment with the child, stating it was because she did not register her son with CBP One. This occurs despite the fact that all ports of entries are equipped and well-trained on running in-person processing of families and had done so without the use of CBP One up until January 2023.

Once families obtain appointments, they are not always guaranteed the ability to cross the border. We have heard from families who have been turned back from the border, even though they are on time for a valid appointment. In other circumstances, we have also come across people who are granted appointments at a different port of entry far from where they are physically located, despite the app's purported use of geolocational technology. As a result, these individuals are forced to risk travel within Mexico, leaving them exposed to dangerous highway routes where migrants face a significant risk of violence and extortion by gangs and cartels within Mexico. Mexican authorities do not consistently issue and renew temporary humanitarian visas (known in Mexico as "FMMs") to migrants, despite the fact that these visas are required to access bus and airline travel.

When encountering particularly vulnerable families impacted by CBP One, Las Americas has attempted to work with the El Paso port of entry authorities to find a solution, however these efforts have not proved successful. Officers at the port of entry in El Paso often refuse to exercise their discretion to grant port parole in a reasonable manner, even under the Title 42 policy. We have attempted to flag at least two separate cases to CBP Port authority via email in which we explained that there were exceptional circumstances interrupting our clients' access to CBP One. In one case, we raised that our client had been kidnapped in Juarez. In another case, our client had an infant living with a serious disability, and as a result, the app was unable to recognize the child's face. In both cases, CBP refused entry on the basis that DHS policy requires all access to

---

[13] This practice of sending children ahead represents another way in which the proposed rule exacerbates a problem that it is purporting to solve. The proposed rule exempts unaccompanied children from the presumptions against asylum access, but in doing so the Departments are asking families to make the impossible choice of deciding to enter together using the app, which will expose them to danger as they wait and might be impossible in the end, or sending children along alone so that they can access protection faster while parents struggle to navigate the app.

CLP_PC_033177

ports be done via the app. These are examples of the sorts of unreviewable (and erroneous) exercises of discretion that will become the norm for anyone trying to invoke an exception to the proposed rule's requirement to use CBP One.

The overall result is that large groups of people must wait in Mexico for extended periods of time, left in precarious positions and unable to plan ahead as to how long their wait will be and what resources they need. This wait will force them to rely on limited and often over-encumbered migrant spaces. Every person forced to wait in Mexico is faced with a risk of kidnapping, exploitation by criminal groups and government officials looking to exploit their desperation, as well as other issues caused by living in temporary conditions without security. And each day that a person waits puts them at further risk for kidnapping. Criminal elements in Mexico will kidnap people and hold them for ransom, draining already limited resources and putting lives in danger. Many of the conditions that led people to flee their homes are replicated at the border. Las Americas has observed domestic abuse victims being abused again, while waiting to be allowed to enter the United States. And some clients of Las Americas were robbed in broad daylight by Mexican police officers while they were in Juarez. Forcing people to wait before entering the United States only increases their vulnerability and the likelihood that they will face the same persecution from which they are fleeing.

The fact that the proposed rule seems to contemplate the use of the CBP One app earlier in an individual's migration journey, i.e. from locations other than the U.S.-Mexico border, will not alleviate the risk of violence that migrants face. For one thing, at least at the moment, the app seems to only function within Mexico. Even though the proposed rule seems to contemplate expanding access, successful use of the app would require a person to show up at a specified time and date at the border for their appointment, a task that would not be possible for someone making an appointment before completing their journey to the border. Further, even if such issues could be resolved, expecting people to use the CBP One app from locations other than the U.S. border means that when technical issues using the app inevitably arise, migrants will not have access to U.S.-based organizations like Las Americas to help them troubleshoot that process.

Additionally, we commonly see asylum seekers with health problems that make it even more untenable for them to wait in Mexico, particularly when they are forced to live in shelters, in camps, or on the street. All of these situations serve to exacerbate pre-existing conditions such as asthma, cerebral palsy, leukemia and other cancers, and other serious illnesses, including mental health concerns related to trauma experienced on the journey north. Access to medical care on the Mexican side of the border is limited for migrants. While community organizations help migrants access initial consultations with doctors, in most cases, these are general check-ups. When a referral to a specialist is necessary, access to that specialist is either cost-prohibitive, unavailable in the area, or not available to non-residents. In most situations, migrants are not

CLP_PC_033178

afforded access to the medicine they need. The wait times at the border make it more likely that people living with illnesses will run out of life-saving medications and be unable to access refills.

The CBP One app has consistently excluded many of the most vulnerable asylum seekers fleeing persecution, whom the United States has a legal obligation to protect. Migrants who do not speak one of the languages available on the app, migrants who are not cell phone savvy, do not have data or wifi sufficient to apply, who do not have smartphones, who may not read or write, who have to apply for an entire family, and who may have physical or mental health limitations are just some of the people that this rule will knowingly exclude. The Departments seek to propose a rule that "appropriately provides migrants a meaningful and realistic opportunity to seek protection" and yet if this rule goes into effect, it will only provide a small number of **certain** migrants that opportunity, and will *exclude* many others entirely from ever even initiating the asylum. The Departments will no doubt then measure the putative success of this program based on the number of people who do use the app, once again failing to account for those excluded from the process entirely, rather than measuring fair, sustainable, and equitable access and adjudication.

IV.    **Resurrecting Illegal Policies Used By the Last Administration to Ban Asylum Seekers will separate families and unfairly deny protection to meritorious asylum claims**

The proposed rule is a new iteration of similar asylum bans the Trump administration attempted to advance. Those bans, which similarly barred refugees from asylum protection based on manner of entry and transit, were repeatedly struck down by federal courts as unlawful.[14] The Trump administration's transit ban, which was in effect for a year before it was vacated, inflicted enormous damage including deportation of refugees to harm, separation of families, and prolonged detention. This proposed rule would similarly deny refugees access to asylum by blocking access to the system entirely for some and rapidly deporting others without access to asylum hearings, resulting in the same horrific harms.

Despite the Biden administration's attempts to distinguish its proposed rule from the previous administration's, it would similarly operate as an asylum ban for refugees based on factors that do not relate to their fear of return and would result in asylum denials for all who are unable to establish that they qualify for the extremely limited exceptions. Its use in expedited removal will require asylum seekers — many of whom have suffered persecution and violence and underwent

---

[14] *See O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) *appeal pending sub nom O.A. v. Biden*, No. 19-5272 (D.C. Cir.) (vacating prior rule); *East Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1121 (N.D. Cal. 2018) *affirmed by East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) (enjoining rule); *see also Al Otro Lado, Inc. v. Mayorkas*, No. 17-CV-02366-BAS-KSC, 2021 WL 3931890, at *20 (S.D. Cal. Sept. 2, 2021) (enjoining the practice of metering for violating the due process rights of those subject to the policy).

CLP_PC_033179

# ASYLUM IN MESOAMERICA

## ACCESSING INTERNATIONAL PROTECTION IN MEXICO AND GUATEMALA







CLP_PC_033392

I. Introduction

II. Availability of International Protection in Mexico
    A. Overview of the Mexico Legal System for International Protection
        1. Legal Framework
        2. Applying for Refugee Status
        3. Detention
        4. Protection-Seeker Rights and Implementation Inadequacies
            a. Confidentiality, Documentation, and Access to Legal
              Representation
            b. Family Unity and Access to Benefits, Education,
              and Employment
    B. Systemic Barriers to Asylum and Refugee Status
        1. Limited application of the Cartagena Declaration
        2. Backlog of Cases before the COMAR
        3. Additional Barriers for Child Protection-Seekers
        4. Discrimination in Access to Rights
        5. Restrictions on Residence and Movement
        6. Violence and Torture Against Protection-Seekers, Human
            Rights Activists, and Journalists
    C. Conclusion

III. Availability of International Protection in Guatemala
    A. Overview of the Guatemalan System for International Protection
        1. Applicable Legal Framework
        2. Procedures for Accessing Refugee Status
    B. Refugee and Protection-Seeker Rights: Assessing Barriers
      to International Protection
        1. Access to Refugee Application Process
        2. Right to Identity Documents and Right to Travel
        3. Right to Work and to Non-discrimination
        4. Confidentiality, Access to Counsel, and Interpretation
        5. Temporary Care and Shelter, Detention, and Non-Refoulement
        6. Right to Education and Family Reunification
        7. Deterioration of the Rule of Law
    C. Conclusion

IV. Overall Conclusions

2

CLP_PC_033393

## About the Authors

**The Center for Justice and International Law (CEJIL)** is an international non-governmental organization specialized in the use of international human rights law. CEJIL along with partner organizations, represents victims of human rights violations in the Americas, and takes cases to the Inter-American Commission and the Inter-American Court of Human Rights so that damages can be repaired and policy or legal reforms can be carried out so these violations do not occur again. CEJIL meets, discuss, generates and shares information in order to raise awareness about endemic human rights problems and finds solutions, with the goal of fostering the creation of public policies that respect human rights throughout the region.

**The International Human Rights Law Clinic ("IHRLC")** is one of twelve law clinics within the Clinical Program at the American University, Washington College of Law. IHRLC offers student attorneys the opportunity to represent non-U.S. citizens and organizations working to defend the human rights of non-U.S. citizens in a broad range of settings, including regional and international bodies, U.S. federal and state courts, and immigration court. The collaboration with the co-author in producing this report exemplifies IHRLC's commitment to giving students the opportunity to represent non-U.S. citizens and non-profit organizations working to defend the human rights of foreign nationals in the U.S. and abroad.

## Acknowledgements

This report is a collaborative effort of CEJIL and IHRLC. The following IHRLC students contributed substantially to this report: Lucia Canton, Raymond Navarro, Juliana Carvajal Yepes, Andrew Johnson, Amanda Grau, Jaclyn Lahr, Lauren LaVare, and Alexis Rossetti. Professors Anita Sinha, Director of the IHRLC, Anne Schaufele, IHRLC Practitioner-in-Residence, and Lindsay M. Harris, Visiting Professor with the IHRLC in Fall 2020, supervised these students and along with Gabriela Oviedo-Perhavec and Kavita Kapur, staff of CEJIL, who made significant contributions to this report.

The team adapted to the unprecedented challenges of COVID-19 to bring this research to the public at a critical time. We hope that this report is a resource to those who seek to understand the asylum systems of Mexico and Guatemala, and use it to lend support to migrants in need of protection.

CLP_PC_033394

## 2. Applying for Refugee Status and Asylum

Every foreign person in the national territory has the right to seek recognition as a refugee, which must be submitted to COMAR or INM. The right can only be asserted within thirty days of entering the country.[75]

COMAR is the primary agency mandated to implement Mexico's refugee response.[76] It was created through a presidential decree in 1980; combining representation from multiple sections of government.[77] By statute, COMAR has about three months to analyze each application for refugee status and if the application is denied, may take an additional two weeks to assess whether the applicant qualifies for complementary protection.[78] COMAR's asylum officers are responsible for the review of these applications.[79]

Applicants may also file with the relevant offices of the INM.[80] The INM is a decentralized part of the federal administration whose mission is to protect the rights of migrants and foreigners.[81] Regardless of which office the individual files their application with, applications must be submitted within thirty days, counted from the date of entry into the country.[82] With respect to sur place claims for protection, the thirty-day period is counted from the date that the applicant learns of the facts that renders them eligible for such status.[83] If the applicant is unable to present the application in the relevant time period, then the time will run from when it became "materially possible" to submit the application to either authority.[84]

However, filing through COMAR or INM is fraught with procedural deficiencies. Merely accessing a COMAR office is a  barrier for protection seekers.[85] Given that COMAR offices are only in a handful of states, so claims outside of those areas have to be initially presented to the INM.  From there, they are transferred to the COMAR Mexico City office or adjudicated by mobile field units.[86] This slows down application processing for

---

[75]Procedimiento para ser Reconocido come Refugiado en México, Comisión Mexicana de Ayuda a Refugiados (COMAR),  (Feb. 29, 2016), https://www.gob.mx/comar/acciones-y-programas/procedimiento-para-ser-reconocido-como-refugiado-en-mexico.

[76]Schmidtke, supra note 23.

[77]La Creacion de COMAR, COMAR, http://www.comar.gob.mx/es/COMAR/La_creacion_de_la_COMAR (last visited Sept. 8, 2021).

[78]Reglamento de la Ley de Migración [Regulations of the Immigration Law] art. 45, Diario Oficial de la Federación [DOF] 28-09-2012, últimas reformas DOF 23-05-2014. (Mex.); see also, Sergio Alejandro Rea Granados, "Retos Actuales en la Implementación de la Ley Sobre Refugiados y Protección Complementaria En México: Identificación, Admisión y Acceso Al Procedimiento de Asilo," [Current Challenges in the Implementation of the Law on Refugees and Complementary Protection in Mexico: Identification, Admission, and Access to the Asylum Procedure] Anuario Mexicano de Derecho Internacional, vol. XVI, pp. 373–400 (2016), https://www.sciencedirect.com/science/article/pii/S1870465417300119.

[79]Marco Normativo en Materia de Refugiados, COMAR Gobierno de México, http://www.gob.mx/comar/documentos/marco-juridico-en-materia-de-refugiados (consultado en Sept. 11, 2021).

[80]Procedimiento para ser Reconocido como Refugiado en México, COMAR Gobierno de México, https://www.gob.mx/comar/acciones-y-programas/procedimiento-para-ser-reconocido-como-refugiado-en-mexico (consultado en  Sept. 11, 2021).

[81]¿Qué  Hacemos?, INM Gobierno de México, https://www.gob.mx/inm/que-hacemos (consultado en Sept. 11, 2021).

[82]Law on Refugees, Complementary Protection and Political Asylum art. 18; see also, Guia del proceso de solicitud de refugio en COMAR, COMAR Gobierno de México,  https://www.gob.mx/comar/es/videos/guia-del-proceso-de-solicitud-de-refugio-en-comar (last visited Sept. 11, 2021).

[83]Law on Refugees, Complementary Protection and Political Asylum art. 18 (Mex.).

[84]Id.; see also Regulations of the Law on Refugees, Complementary Protection and Political Asylum art. 19 (Mex.).

[85]Kerwin, supra note 11, at 293-295.

[86]See id. at 297-299.

CLP_PC_033406

refugee status.[87] Unless they are lucky enough to be located near a COMAR office, applicants must have their eligibility interviews by telephone, making it challenging for an applicant to effectively address complex case issues.[88]

INM officials, a critical component of check-ins and receiving and transmitting documents, regularly provide erroneous legal advice to protection-seekers because of lack of training.[89] As an immigration enforcement agency, INM's role is inherently prejudiced.[90] Its agents refuse to initiate refugee status determination procedures or process humanitarian visa requests for applicants.[91] Worse still, NGOs report that INM officials deceitfully inform applicants that they must be physically present at a COMAR office to be recognized as a refugee.[92]

The law also recognizes the possibility for verbal requests for refugee status, including with the assistance of an interpreter, if necessary, in the event that a written application is impossible.[93] However, verbal requests for recognition of refugee status and all related manifestations by the applicant must be recorded in a written record.[94] The written application for asylum, typically submitted while in detention, must state the reasons for the application with complete and true identifying information and supporting evidence.[95]

If there are derivative beneficiaries, the application should include documentary evidence of the family relationship.[96] In the case of children under eighteen, the applicant must demonstrate the family link by presenting birth certificates.[97] The applicant may submit supporting evidence at any point before the Ministry of the Interior issues its decision.[98] Additionally, the applicant may refuse to request the cooperation of their country of origin, including requesting the certification or legalization of documents by those authorities.[99]

---

[87] Asylum Access, Mexican Asylum System for U.S. Immigration Lawyers FAQ, (2019), https://asylumaccess.org/wp-content/uploads/2019/11/Mexican-Asylum-FAQ-for-US-Immigration-Lawyers.pdf.

[88] Alto Comisionado de las Naciones Unidas para los Refugiados (ACNUR), Diagnóstico sobre el acceso al procedimiento para el reconocimiento de la condición de refugiado en Mexico, 36 (2014), https://www.acnur.org/fileadmin/Documentos/Publicaciones/2015/9898.pdf.

[89] Id.

[90] Amnesty Int'l, supra note, at 8.

[91] Sin Fronteras, Evolución y Retos del Asilo en México 59 (2016), https://sinfronteras.org.mx/wp-content/uploads/2018/12/InformeAsilo_2016_WEB_02.pdf.

[92] ACNUR, supra note 89, p. 35-37.

[93] Law on Refugees, Complementary Protection and Political Asylum art. 18 (Mex); see also, Regulations of the Law on Refugees, Complementary Protection and Political Asylum art. 17 (Mex.) (adding that if someone is unable to submit their application in written form then they are entitled to a competent public servant who will function as an interpreter or translator).

[94] Law on Refugees, Complementary Protection and Political Asylum art. 18 (Mex).

[95] Id. Art. 23.

[96] Id. Art. 12.

[97] Id.

[98] Id. Art. 23.

[99] Id. Art. 57.

16

Once a written application is filed, the applicant proceeds to an interview.[100] The initial interview takes place upon submission of the application, and requires the principal and derivative applicants to the reasons for requesting protection and other qualifying information.[101]

The second interview is a more detailed personal interview with the applicant, who may be accompanied by a legal representative.[102] The purpose of the interview is to gather information that facilitates the analysis of the application.[103] During the interview, the Ministry of the Interior considers the social and cultural context of the applicant's origins, as well as his or her age, gender, and other particular circumstances.[104] The law provides for access to a interpreter as well as other specialists necessary to facilitate communication with the applicant in cases in which that support is necessary.[105]

There are serious due process concerns with the interview process. Some are recorded, but it is far more common for COMAR officials to merely review the interview notes they take themselves.[106] Officers rely on memory, rather than a transcript, as the basis for their final decision.[107] COMAR regularly performs interviews just a few days before the forty-five day window for adjudication runs out, leading experts to believe that COMAR is reaching its eligibility decisions largely on the basis of the intake forms, rather than on the interviews themselves.[108]

According to the 2011 Migratory Act, the Ministry of the Interior must issue an individualized, reasoned and justified decisions within forty-five days of receiving the application.[109] That period may be renewed once, for an additional forty-five days, if:

1.  There is a lack of information of facts that the application is based on;

2.  A lack of translators or other specialists to facilitate communication with the applicant;

3.  The impossibility of conducting interviews due to the health of the applicant;

---

[100]Id. Art. 41; Regulations of the Law on Refugees, Complementary Protection and Political Asylum art 27.
[101]ACNUR, ¿Como solicitar ser refugiado en
Mexico?, https://help.unhcr.org/mexico/como-solicitar-la-condicion-de-refugiado-en-mexico/ (consultado en Sept. 8, 2021).
[102]Law on Refugees, Complementary Protection and Political Asylum art. 21.
[103]Id. art. 23.
[104]Id.
[105]Law on Refugees, Complementary Protection and Political Asylum art. 29 (Mex.); Regulations of the Law on Refugees, Complementary Protection and Political Asylum art. 27 (Mex.).
[106]Kerwin, supra note 11, at 301.
[107]Id.
[108]Id..
[109]Law on Refugees, Complementary Protection and Political Asylum art. 45.

CLP_PC_033408

4. Request by the applicant to provide additional information that supports the application; or

5. Any other circumstance caused by chance or force majeur that makes it impossible for the Ministry of the Interior to adequately conduct the procedure.[110]

The Migration Act requires that the decision must be communicated to the applicant in writing and the authorities should ensure that the applicant understands the decision.[111] However, as this Report details infra section 3, this is rarely the case in practice.

Additionally, if the relevant authorities determine that the applicant does not meet the definition of a refugee, they must evaluate the case for eligibility for complementary protection.[112] A decision to grant complementary protection should be communicated in the same decision reached in the refugee status determination procedure.[113] In this sense, it is the government's burden to analyze all the potential grounds for protection and to issue a well-reasoned decision explaining the rationale for a grant or denial of any individual petition in a manner the applicant can understand.[114]

As part of its evaluation of each application, the relevant authorities must request information from the Ministry of External Relations as to the prevailing conditions in the country of origin, as well as other information from other government agencies.[115] However, the Ministry of External Relations and other relevant agencies have only fifteen days to respond, and their failure to do so is construed as a lack of opinion or information.[116]

If the decision is favorable to the applicant, the Ministry of the Interior issues the migration document that regularizes the status of the applicant.[117] It automatically confers to the individual the status of permanent resident.[118] If the application is denied, the individual has fifteen days from receiving the notice of the decision to present an administrative appeal.[119] If an appeal for review is granted, COMAR has ninety calendar days to adjudicate the appeal.[120] If COMAR denies the appeal, the applicant has the right to present a judicial appeal before a judge.[121]

---

[110]Id. Art. 24.
[111]Id. Art. 25.
[112]Id. Art. 29.
[113]Id. Art. 30.
[114]Asylum Access, Mexican Asylum System for U.S. Immigration Lawyers FAQ, (2019), https://asylumaccess.org/wp-content/uploads/2019/11/Mexican-Asylum-FAQ-for-US-Immigration-Lawyers.pdf, supra note 87, at 2.
[115]Law on Refugees, Complementary Protection and Political Asylum art. 24.
[116]Id.
[117]Id. art. 25.
[118]Id.
[119]Id.
[120]ACNUR, supra note 102.
[121]Id.

18

Throughout the determination process, the applicant may proceed pro se or with legal representation.[122] The application for refugee status is free of charge.[123] While in typical circumstances adjudication of protection claims is an individual process, Mexican law permits the Ministry of the Interior to make group determination of refugee status in cases of the arrival en masse of a group of persons where it concludes the entire group meets the requirements of the status.[124]

While the application is pending, the applicant must physically appear before a COMAR office on a weekly basis to sign a register which serves to guarantee that they remain in the locality where the procedure was initiated.[125] If an applicant fails to appear for two consecutive weeks, the application is considered abandoned.[126]

---

[122]Law on Refugees, Complementary Protection and Political Asylum art. 21 (Mex.).
[123]Id.Art. 18.
[124]Id. Art. 26.
[125]Id. Art. 21.
[126]Id.

CLP_PC_033410

Article 46 of the 2016 Migration Code enshrines the right to non-refoulement. A refugee applicant therefore cannot be returned to the country of origin when there is a "well-founded reason" that a person's life, physical safety, and freedom would be seriously endangered should the person be returned.[488] Guatemala is bound to a similar standard under the 1951 Convention on the Status of Refugees to not return refugees to any country where their life or liberty would be threatened because of their "race, religion, nationality, membership of a particular social group or political opinion."[489] Additionally, before a person who has had their application for refugee status denied is returned, Guatemala must guarantee that the Office of the United Nations High Commissioner for Refugees (UNHCR) is aware of that person's situation.[490]

The legal protections against non-refoulement, however, are not adequately enforced. The U.S. embassy in Guatemala reported in 2019 that Guatemala "does not provide sufficient safeguards against refoulement."[491] Between November 21, 2019, and March 16, 2020, while the Asylum Cooperative Agreement (ACA) between the United States and Guatemala was in effect, 939 protection-seekers from El Salvador and Honduras were deported from the United States to Guatemala to seek protection there.[492] Those transferred pursuant to the ACA reported having only 72 hours to decide whether to remain in Guatemala or leave the country.[493] Of the 939 transferred protection-seekers, only 20 pursued an application for refugee status in Guatemala because their fear of persecution and lack of economic opportunities in Guatemala.[494]

In early 2021, Central American migrants primarily from Honduras began their journey to the United States to seek safety and escape life-threatening poverty. Instead of being permitted to continue to Mexico into the United States, the migrants were met with violence and force at the hands of Guatemalan police and security forces.[495] The immigration chief was reported as saying "we invite you to return to your country of origin, you will not pass."[496] In a matter of days, 2,300 migrants had been returned to Honduras.[497] This mass deportation deprived migrants of their right to individualized review and likely led to violations of the prohibition on non-refoulement. Migrants who may have wanted to seek asylum in Guatemala rather than be returned to Honduras did not have that chance.

---

[488]Immigration Code, art. 46.

[489]Refugee Convention, supra note 2, art. 34.

[490]Immigration Code, art. 46.

[491]The U.S. Sent Central American Asylum Seekers to Guatemala to Seek Refuge. None Were Granted Asylum, Report Says, The Washington Post (Jan. 16, 2021), https://www.washingtonpost.com/world/the_americas/asylum-migrants-trump-guatemala/2021/01/15/aeae4b84-56bc-11eb-a08b-f1381ef3d207_story.html.

[492]UN Human Rights Council, supra note 467, para. 44.

[493]Refugees Int'l & Human Rights Watch, supra note 343, at 25.

[494]UN Human Rights Council, supra note 505.

[495]BBC News, Migrant Caravan: Guatemala Blocks Thousands Bound for US, (Jan. 18, 2021), https://www.bbc.com/news/world-latin-america-55699540.

[496]Global Detention Project, Guatemala: Overview, (Jan. 18, 2021), https://www.globaldetentionproject.org/countries/americas/guatemala.

[497]Large Migrant Caravan Dissolves in Guatemala, AP News (Jan. 19, 2021), https://apnews.com/article/joe-biden-honduras-gangs-coronavirus-pandemic-immigration-c381b8ac9f22291188a403b7bbeb1d51.

CLP_PC_033450

## Travel.State.Gov

U.S. DEPARTMENT of STATE — BUREAU of CONSULAR AFFAIRS

Search

Legal Resources    U.S. Passports    U.S. Visas    **Intercountry Adoption**    **International Parental Child Abduction**    **Replace or Certify Documents**

Travel.State.Gov > Travel Advisories > Mexico Travel Advisory

Print    Email    Facebook    Twitter    More

# Mexico Travel Advisory

| Travel Advisory October 5, 2022 | See State Summaries Ⓒ Ⓚ |
| --- | --- |

**Last Updated: Reissued with updates to health information**

See state summaries and advisory levels below for information on your specific travel destination. Some areas of Mexico have increased risk of crime and kidnapping.

**Country Summary**: Violent crime – such as homicide, kidnapping, carjacking, and robbery – is widespread and common in Mexico. The U.S. government has limited ability to provide emergency services to U.S. citizens in many areas of Mexico, as travel by U.S. government employees to certain areas is prohibited or restricted. In many states, local emergency services are limited outside the state capital or major cities.

U.S. citizens are advised to adhere to restrictions on U.S. government employee travel. State-specific restrictions are included in the individual state advisories below. U.S. government employees may not travel between cities after dark, may not hail taxis on the street, and must rely on dispatched vehicles, including app-based services like Uber, and regulated taxi stands. U.S. government employees should avoid traveling alone, especially in remote areas. U.S. government employees may not drive from the U.S.-Mexico border to or from the interior parts of Mexico, except daytime travel within Baja California and between Nogales and Hermosillo on Mexican Federal Highway 15D, and between Nuevo Laredo and Monterrey on Highway 85D.

Read the country information page for additional information on travel to Mexico.

**Do Not Travel To:**

- Colima state due to **crime** and **kidnapping**.

## Travel Advisory Levels



## Information for Vaccinated Travelers

The CDC's latest guidance on international travel for vaccinated people can be found here .

## Assistance for U.S. Citizens

U.S. Embassy Mexico City Paseo de la Reforma 305 Colonia Cuauhtemoc 06500 Ciudad de

CLP_PC_033467

- Guerrero state due to **crime**.
- Michoacan state due to **crime** and **kidnapping**.
- Sinaloa state due to **crime** and **kidnapping**
- Tamaulipas state due to **crime** and **kidnapping.**
- Zacatecas state due to **crime** and **kidnapping**.

**Reconsider Travel To:**

- Baja California state due to **crime** and **kidnapping**.
- Chihuahua state due to **crime** and **kidnapping**.
- Durango state due to **crime**.
- Guanajuato state due to **crime** and **kidnapping**.
- Jalisco state due to **crime** and **kidnapping**.
- Morelos state due to **crime**.
- Sonora state due to **crime** and **kidnapping**.

**Exercise Increased Caution When Traveling To:**

- Aguascalientes state due to **crime**.
- Baja California Sur state due to **crime**.
- Chiapas state due to **crime**.
- Coahuila state due to **crime**.
- Hidalgo state due to **crime**.
- Mexico City due to **crime**.
- Mexico State due to **crime**.
- Nayarit state due to **crime.**
- Nuevo Leon state due to **crime** and **kidnapping**.
- Oaxaca state due to **crime**.
- Puebla state due to **crime** and **kidnapping**.
- Queretaro state due to **crime**.
- Quintana Roo state due to **crime** and **kidnapping**.
- San Luis Potosi state due to **crime** and **kidnapping**.
- Tabasco state due to **crime**.
- Tlaxcala state due to **crime**.
- Veracruz state due to **crime**.

**Exercise Normal Precautions When Traveling To:**

- Campeche state
- Yucatan state

Visit our website for Travel to High-Risk Areas.

If you decide to travel to Mexico:

- Review the U.S. Embassy's webpage on COVID-19.
- Visit the CDC's web page on Travel and COVID-19.
- Keep traveling companions and family back home informed of your travel plans. If separating from

Mexico
Mexico

Telephone

Emergency
U.S. Citizen Services:
From Mexico 800-681-9374 or 55-8526-2561.
From the United States 1-844-528-6611

Fax

Email
Contact Form

Website
U.S. Embassy Mexico City

## Mexico Map

View Larger Map

### Search for Travel Advisories

Country or area

CLP_PC_033468

your travel group, send a friend your GPS location. If taking a taxi alone, take a photo of the taxi number and/or license plate and text it to a friend.

- Use toll roads when possible and avoid driving alone or at night. In many states, police presence and emergency services are extremely limited outside the state capital or major cities.

- Exercise increased caution when visiting local bars, nightclubs, and casinos.

- Do not display signs of wealth, such as wearing expensive watches or jewelry.

- Be extra vigilant when visiting banks or ATMs.

- Enroll in the Smart Traveler Enrollment Program (STEP) to receive Alerts and make it easier to locate you in an emergency.

- Follow the Department of State on Facebook and Twitter.

- Follow the U.S. Embassy on Facebook and Twitter.

- Review the Country Security Report for Mexico.

- Mariners planning travel to Mexico should check for U.S. maritime advisories and alerts, which include instructions on reporting suspicious activities and attacks to Mexican naval authorities.

- Prepare a contingency plan for emergency situations. Review the Traveler's Checklist.

- Visit the CDC page for the latest Travel Health Information related to your travel.

## Aguascalientes state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Aguascalientes state.

## Baja California state – Reconsider Travel

Reconsider travel due to crime and kidnapping.

Transnational criminal organizations compete in the border area to establish narco-trafficking and human smuggling routes. Violent crime and gang activity are common. Travelers should remain on main highways and avoid remote locations. Of particular concern is the high number of homicides in the non-tourist areas of Tijuana. Most homicides appeared to be targeted; however, criminal organization assassinations and territorial disputes can result in bystanders being injured or killed. U.S. citizens and LPRs have been victims of kidnapping.

U.S. government employees must adhere to the noted restrictions:

- **Mexicali Valley:** U.S. government employees should avoid the Mexicali Valley due to the heightened possibility of violence between rival

CLP_PC_033469

cartel factions. The boundaries of the restricted area are: to the east, the Baja California/Arizona and Baja California/Sonora borders; to the south, from La Ventana (on Highway 5) due east to the Colorado River; to the west, Highway 5; and to the north, Boulevard Lazaro Cardenas/Highway 92/Highway 1 to Carretera Aeropuerto, from the intersection of Highway 1 and Carretera Aeropuerto due north to the Baja California/California border, and from that point eastward along the Baja California/California border.

Travelers may use Highways 2 and 2D to transit between Mexicali, Los Algodones, and San Luis Rio Colorado during daylight hours. Travelers may also use Highways 1 and 8 to transit to and from the Mexicali Airport during daylight hours. Travel on Highway 5 is permissible during daylight hours.

There are no other travel restrictions for U.S. government employees in Baja California state. These include high-traffic tourism areas of border and coastal communities, such as **Tijuana**, **Ensenada**, and **Rosarito**.

### Baja California Sur state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Baja California Sur state, which includes tourist areas in: **Cabo San Lucas, San Jose del Cabo,** and **La Paz**.

### Campeche state – Exercise Normal Precautions

Exercise normal precautions.

There are no restrictions on travel for U.S. government employees in Campeche state.

### Chiapas state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Chiapas state, which includes tourist areas in: **Palenque, San Cristobal de las Casas,** and **Tuxtla Gutierrez**.

### Chihuahua state – Reconsider Travel

Reconsider travel due to crime and kidnapping.

Violent crime and gang activity are common. Most homicides are targeted assassinations against members of criminal organizations. Battles for territory between criminal groups have resulted in violent crime in areas frequented by U.S. citizens and U.S. government employees, including restaurants and malls during daylight hours. Bystanders have been injured or killed in shooting incidents. U.S. citizens and LPRs have been victims of kidnapping.

CLP_PC_033470

U.S. government employee travel is limited to the following areas with the noted restrictions:

- **Ciudad Juarez:** U.S. government employees may travel to the area of Ciudad Juarez bounded to the east by Bulevar Independencia; to the south by De los Montes Urales/Avenida Manuel J Clouthier/Carretera de Juarez; to the west by Via Juan Gabriel/Avenida de los Insurgentes/Calle Miguel Ahumada/Francisco Javier Mina/Melchor Ochampo; and to the north by the U.S.-Mexico border. Direct travel to the Ciudad Juarez airport (officially called Abraham Gonzalez International Airport) and the factories located along Bulevar Independencia and Las Torres is permitted. Travel to San Jeronimo is permitted only through the United States via the Santa Teresa U.S. Port of Entry; travel via Anapra is prohibited.

U.S. government employees may only travel from Ciudad Juarez to Chihuahua City during daylight hours via Federal Highway 45, with stops permitted only at the Federal Police station, the Umbral del Milenio overlook area, the border inspection station at KM 35, and the shops and restaurants on Federal Highway 45 in the town of Villa Ahumada.

- **Chihuahua City:** U.S. government employees may travel at any time to the area of Chihuahua City bounded to the north by Avenida Transformación; to the east by Avenida Tecnológico/Manuel Gómez Morin; to the west by the city boundary; and to the south by Route 16/Calle Tamborel.

- **Nuevo Casas Grandes Area (including Nuevo Casas Grandes, Casas Grandes, Mata Ortiz, Colonia Juarez, Colonia LeBaron, and Paquime):** U.S. government employees may only travel to the Nuevo Casas Grandes area during daylight hours through the United States, entering Mexico at the Palomas U.S. Port of Entry on New Mexico Route 11 before connecting to Mexico Federal Highway 2, and subsequently Federal Highway 10, to Nuevo Casas Grandes. Employees are permitted to stay overnight in the cities of Nuevo Casas Grandes and Casas Grandes only.

- **Ojinaga:** U.S. government employees must travel to Ojinaga via U.S. Highway 67 and enter through the U.S. Port of Entry in Presidio, Texas.

- **Palomas:** U.S. government employees must travel to Palomas via U.S. highways through the U.S. Port of Entry in Columbus, New Mexico.

U.S. government employees may not travel to other areas of Chihuahua, including **Copper Canyon**.

**Coahuila state – Exercise Increased Caution**

Exercise increased caution due to crime.

Violent crime and gang activity occur in parts of Coahuila state.

CLP_PC_033471

U.S. government employees must adhere to the following travel restrictions:

- **Zaragoza, Morelos, Allende, Nava, Jimenez, Villa Union, Guerrero, and Hidalgo municipalities**: U.S. government employees may not travel to these municipalities.
- **Piedras Negras and Ciudad Acuña:** U.S. government employees must travel directly from the United States and observe a curfew from midnight to 6:00 a.m. in both cities.

There are no other restrictions on travel for U.S. government employees in Coahuila state.

### Colima state – Do Not Travel

Do not travel due to crime and kidnapping.

Violent crime and gang activity are widespread. Most homicides are targeted assassinations against members of criminal organizations.  Shooting incidents between criminal groups have injured or killed bystanders.  U.S. citizens and LPRs have been victims of kidnapping.

Travel for U.S. government employees is limited to the following areas with noted restrictions:

- **Manzanillo:**  U.S. government employee travel is limited to the tourist and port areas of Manzanillo.
- Employees traveling to Manzanillo from Guadalajara must use Federal Toll Road 54D during daylight hours.

U.S. government employees may not travel to other areas of Colima state.

### Durango state – Reconsider Travel

Reconsider travel due to crime.

Violent crime and gang activity are common in parts of Durango state.

U.S. government employees must adhere to the following travel restrictions:

- **West and south of Federal Highway 45:** U.S. government employees may not travel to this region of Durango state.

There are no other restrictions on travel for U.S. government employees in Durango state.

### Guanajuato state – Reconsider Travel

Reconsider travel due to crime and kidnapping.

Gang violence, often associated with the theft of petroleum and natural gas from the state oil company and other suppliers, occurs in Guanajuato, primarily in the south and

CLP_PC_033472

central areas of the state. Of particular concern is the high number of murders in the southern region of the state associated with cartel-related violence. U.S. citizens and LPRs have been victims of kidnapping.

U.S. government employees must adhere to the following travel restrictions:

- **Areas south of Federal Highway 45D:** U.S. government employees may not travel to the area south of and including Federal Highway 45D, Celaya, Salamanca, and Irapuato.

There are no other restrictions on travel for U.S. government employees in Guanajuato state, which includes tourist areas in: **San Miguel de Allende**, **Guanajuato City**, and **surrounding areas.**

**Guerrero state – Do Not Travel**

Do not travel due to crime.

Crime and violence are widespread. Armed groups operate independently of the government in many areas of Guerrero. Members of these groups frequently maintain roadblocks and may use violence towards travelers. U.S. citizens and LPRs have been victims of kidnapping in previous years.

Travel for U.S. government employees is limited to the following area with the noted restrictions:

- **Taxco:** U.S. government employees must use Federal Highway 95D, which passes through Cuernavaca, Morelos, and stay within downtown tourist areas of Taxco. Employees may visit Grutas de Cacahuamilpa National Park during the day with a licensed tour operator.

U.S. government employees may not travel to other areas of the state of Guerrero, including to tourist areas in **Acapulco**, **Zihuatanejo**, and **Ixtapa**.

**Hidalgo state – Exercise Increased Caution**

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Hidalgo state.

**Jalisco state – Reconsider Travel**

Reconsider travel due to crime and kidnapping.

Violent crime and gang activity are common in parts of Jalisco state. In Guadalajara, territorial battles between criminal groups take place in tourist areas. Shooting incidents between criminal groups have injured or killed innocent bystanders. U.S. citizens and LPRs have been victims of kidnapping.

U.S. government employees must adhere to the following travel restrictions:

CLP_PC_033473

- **Jalisco-Michoacan border and Federal Highway 110:** U.S. government employees may not travel to the area between Federal Highway 110 and the Jalisco-Michoacan border, nor travel on Federal Highway 110 between Tuxpan, Jalisco, and the Michoacan border.
- **Federal Highway 80:** U.S. government employees may not travel on Federal Highway 80 south of Cocula.
- **State Highway 544:** U.S. government employees may not travel on State Highway 544 between Mascota and San Sebastian del Oeste.

There are no other restrictions on travel for U.S government employees in Jalisco state which includes tourist areas in: **Guadalajara Metropolitan Area**, **Puerto Vallarta (including neighboring Riviera Nayarit)**, **Chapala**, and **Ajijic**.

## Mexico City (Ciudad de Mexico) – Exercise Increased Caution

Exercise increased caution due to crime.

Both violent and non-violent crime occur throughout Mexico City. Use additional caution, particularly at night, outside of the frequented tourist areas where police and security patrol more routinely. Petty crime occurs frequently in both tourist and non-tourist areas.

There are no restrictions on travel for U.S. government employees in Mexico City.

## Mexico State (Estado de Mexico) – Exercise Increased Caution

Exercise increased caution due to crime.

Both violent and non-violent crime occur throughout Mexico State. Use additional caution in areas outside of the frequented tourist areas, although petty crime occurs frequently in tourist areas as well.

There are no restrictions on travel for U.S. government employees in Mexico State.

## Michoacan state – Do Not Travel

Do not travel due to crime and kidnapping.

Crime and violence are widespread in Michoacan state. U.S. citizens and LPRs have been victims of kidnapping.

Travel for U.S. government employees is limited to the following areas with the noted restrictions:

- **Federal Highway 15D:** U.S. government employees may travel on Federal Highway 15D to transit the state between Mexico City and Guadalajara.
- **Morelia:** U.S. government employees may travel by air and by land using Federal Highways 43 or 48D

CLP_PC_033474

from Federal Highway 15D.

- **Lazaro Cardenas:** U.S. government employees must travel by air only and limit activities to the city center or port areas.

U.S. government employees may not travel to other areas of the state of Michoacan, including the portions of the **Monarch Butterfly Reserve** located in Michoacan.

## Morelos state – Reconsider Travel

Reconsider travel due to crime.

Violent crime and gang activity are common in parts of Morelos state.

There are no restrictions on travel for U.S. government employees in Morelos state.

## Nayarit state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout Nayarit state.

- There are no restrictions on travel for U.S government employees in Nayarit state, including tourist areas in: **Riviera Nayarit** (including **Nuevo Vallarta**, **Punta Mita**, **Sayulita**, and **Bahia de Banderas**), and **Santa Maria del Oro**.

## Nuevo Leon state – Exercise Increased Caution

Exercise increased caution due to crime and kidnapping.

Criminal activity and violence may occur throughout the state. U.S. citizens and LPRs have been victims of kidnapping.

There are no restrictions on travel for U.S. government employees in Nuevo Leon state.

## Oaxaca state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence occur throughout the state.

U.S. travelers are reminded that U.S. government employees must adhere to the following travel restrictions:

- **Isthmus region:** U.S. government employees may not travel to the area of Oaxaca bounded by Federal Highway 185D to the west, Federal Highway 190 to the north, and the Oaxaca-Chiapas border to the east. This includes the cities of Juchitan de Zaragoza, Salina Cruz, and San Blas Atempa.
- **Federal Highway 200 northwest of Pinotepa:** U.S. government employees may not use Federal Highway 200 between Pinotepa and the Oaxaca-Guerrero border.

There are no restrictions on travel for U.S. government

CLP_PC_033475

employees to other parts of Oaxaca state, which include tourist areas in: **Oaxaca City**, **Monte Alban**, **Puerto Escondido,** and **Huatulco**.

### Puebla state – Exercise Increased Caution

Exercise increased caution due to crime and kidnapping.

Criminal activity and violence may occur throughout the state. U.S. citizens and LPRs have been victims of kidnapping.

There are no restrictions on travel for U.S. government employees in Puebla state.

### Queretaro state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Queretaro state.

### Quintana Roo state – Exercise Increased Caution

Exercise increased caution due to crime and kidnapping.

Criminal activity and violence may occur in any location, at any time, including in popular tourist destinations. Travelers should maintain a high level of situational awareness, avoid areas where illicit activities occur, and promptly depart from potentially dangerous situations. U.S. citizens and LPRs have been victims of kidnapping.

While not directed at tourists, shootings between rival gangs have injured innocent bystanders. Additionally, U.S. citizens have been the victims of both non-violent and violent crimes in tourist and non-tourist areas.

There are no restrictions on travel for U.S. government employees in Quintana Roo state, which include tourist areas in: **Cancun**, **Cozumel, Isla Mujeres, Playa del Carmen**, **Tulum**, and **the Riviera Maya**. However, personnel are advised to exercise increased situational awareness after dark in downtown areas of Cancun, Tulum, and Playa del Carmen, and to remain in well-lit pedestrian streets and tourist zones.

### San Luis Potosi state – Exercise Increased Caution

Exercise increased caution due to crime and kidnapping.

Criminal activity and violence may occur throughout the state.  U.S. citizens and LPRs have been victims of kidnapping.

There are no restrictions on travel for U.S. government employees in San Luis Potosi state.

### Sinaloa state – Do Not Travel

Do not travel due to crime and kidnapping.

Violent crime is widespread. Criminal organizations are based in and operating in Sinaloa. U.S. citizens and LPRs have been

CLP_PC_033476

victims of kidnapping.

Travel for U.S. government employees is limited to the following areas with the noted restrictions:

- **Mazatlan:** U.S. government employees may travel to Mazatlan by air or sea only, are limited to the Zona Dorada and historic town center, and must travel via direct routes between these destinations and the airport and sea terminal.

- **Los Mochis and Topolobampo:** U.S. government employees may travel to Los Mochis and Topolobampo by air or sea only, are restricted to the city and the port, and must travel via direct routes between these destinations and the airport.

U.S. government employees may not travel to other areas of Sinaloa state.

**Sonora state – Reconsider Travel**

Reconsider travel due to crime and kidnapping.

Sonora is a key location used by the international drug trade and human trafficking networks. Violent crime is widespread. U.S. citizens and LPRs have been victims of kidnapping.

U.S. government employees must adhere to the following travel restrictions:

- **Travel between Hermosillo and Nogales:** U.S. government employees may travel between the U.S. Ports of Entry in Nogales and Hermosillo during daylight hours via Federal Highway 15 only. Travelers should exercise caution and avoid unnecessary stops as security incidents, including sporadic, armed carjackings, have been reported along this highway during daylight hours.

- **Puerto Peñasco:** U.S. government employees may travel between Puerto Peñasco and the Lukeville-Sonoyta U.S. Port of Entry during daylight hours via Federal Highway 8 only.

- **San Luis Rio Colorado, Cananea, and Agua Prieta**: U.S. government employees may travel directly from the nearest U.S. Port of Entry to San Luis Rio Colorado, Cananea, and Agua Prieta but may not go beyond the city limits.

- **Triangular region near Mariposa U.S. Port of Entry:** U.S. government employees may not travel to the triangular region west of the Mariposa U.S. Port of Entry, east of Sonoyta, and north of Altar municipality.

- **Nogales:** U.S. government employees may not travel to the area north of Avenida Tecnologico, west of Bulevar Luis Donaldo Colosio (Periferico), and east of Federal Highway 15D (Corredor Fiscal) and the residential areas to the east of Plutarco Elias Calles. U.S. government employees may not use taxi services in Nogales.

- **Eastern and southern Sonora (including San Carlos Nuevo Guaymas and Alamos):** U.S.

CLP_PC_033477

government employees may not travel to areas of Sonora east of Federal Highway 17, the road between Moctezuma and Sahuaripa, and State Highway 20 between Sahuaripa and the intersection with Federal Highway 16. U.S. government employees may travel to San Carlos Nuevo Guaymas and Alamos; travel to Alamos is only permitted by air and within city limits. U.S. government employees may not travel to areas of Sonora south of Federal Highway 16 and east of Federal Highway 15 (south of Hermosillo), as well as all points south of Guaymas, including Empalme, Guaymas, Obregon, and Navojoa.

U.S. government employees may travel to other parts of Sonora state in compliance with the above restrictions, including tourist areas in: **Hermosillo**, **Bahia de Kino**, and **Puerto Penasco**.

**Tabasco state – Exercise Increased Caution**

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Tabasco state.

**Tamaulipas state – Do Not Travel**

Do not travel due to crime and kidnapping.

Organized crime activity – including gun battles, murder, armed robbery, carjacking, kidnapping, forced disappearances, extortion, and sexual assault – is common along the northern border and in Ciudad Victoria. Criminal groups target public and private passenger buses, as well as private automobiles traveling through Tamaulipas, often taking passengers and demanding ransom payments.

Heavily armed members of criminal groups often patrol areas of the state and operate with impunity particularly along the border region from Reynosa to Nuevo Laredo. In these areas, local law enforcement has limited capacity to respond to incidents of crime. Law enforcement capacity is greater in the tri-city area of Tampico, Ciudad Madero, and Altamira, which has a lower rate of violent criminal activity compared to the rest of the state.

U.S. citizens and LPRs have been victims of kidnapping.

Travel for U.S. government employees is limited to the following areas with the noted restrictions:

- **Matamoros and Nuevo Laredo:** U.S. government employees may only travel within a limited radius around and between the U.S. Consulates in Nuevo Laredo and Matamoros, their homes, the respective U.S. Ports of Entry, and limited downtown sites, subject to an overnight curfew.
- **Overland travel in Tamaulipas:** U.S. government employees may not travel between cities in Tamaulipas using interior Mexican highways. Travel

CLP_PC_033478

between Nuevo Laredo and Monterrey is limited to Federal Highway 85D during daylight hours with prior authorization.

U.S. government employees may not travel to other parts of Tamaulipas state.

**Tlaxcala state – Exercise Increased Caution**

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Tlaxcala state.

**Veracruz state – Exercise Increased Caution**

Exercise increased caution due to crime.

Violent crime and gang activity occur with increasing frequency in Veracruz, particularly in the center and south near Cordoba and Coatzacoalcos. While most gang-related violence is targeted, violence perpetrated by criminal organizations can affect bystanders. Impromptu roadblocks requiring payment to pass are common.

There are no restrictions on travel for U.S. government employees in Veracruz state.

**Yucatan state – Exercise Normal Precautions**

Exercise normal precautions.

There are no restrictions on travel for U.S. government employees in Yucatan state, which include tourist areas in: **Chichen Itza**, **Merida**, **Uxmal**, and **Valladolid**.

**Zacatecas state – Do Not Travel**

Do not travel due to crime and kidnapping.

Violent crime, extortion, and gang activity are widespread in Zacatecas state. U.S. citizens and LPRs have been victims of kidnapping.

Travel for U.S. government employees is limited to the following areas with the noted restrictions:

- **Zacatecas City**: U.S. government employee travel is limited to Zacatecas City proper, and employees may not travel overland to Zacatecas City.
- U.S. government employees may not travel to other areas of Zacatecas state.

Travel.State.Gov

Popular Links

Stay Connected

**Travel.State.Gov**
**U.S. Passports**

**Home**
**Travel Advisories**

CLP_PC_033479

![CGRS | Center for Gender & Refugee Studies]

March 27, 2023

Via Federal e-Rulemaking Portal
https://www.regulations.gov

Daniel Delgado
Acting Director, Border and Immigration Policy
Office of Strategy, Policy, and Plans
Department of Homeland Security

Lauren Alder Reid
Assistant Director, Office of Policy
Executive Office for Immigration Review
Department of Justice

**Re: *Request for Comments: Circumvention of Lawful Pathways,* 88 Fed. Reg. 11704
(February 23, 2023)**

**DHS Docket No. USCIS-2022-0016**

Dear Mr. Delgado and Ms. Reid:

The Center for Gender & Refugee Studies (CGRS) submits this comment in response
to DHS Docket No. USCIS-2022-0016, *Request for Comments: Circumvention of Lawful
Pathways (February 23, 2023)* (hereinafter "Proposed Rule" or "Rule"). We include the
following outline to guide your review.

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................... 5

II.     EXPERTISE OF THE CENTER FOR GENDER & REFUGEE STUDIES...................................... 5

III.    THE COMMENT PERIOD OF 30 DAYS IS INSUFFICIENT GIVEN THE IMPORTANCE OF
        THE RULE AND THE SWEEPING CHANGES IT MAKES TO ASYLUM LAW AND
        PROCEDURE ............................................................................................... 6

     A. The Departments Had Ample Time to Prepare for This Policy Change Yet Failed to
        Issue the Notice of Proposed Rulemaking in a Timely Manner...................................... 7

     B. The Departments Appear Not to Have Engaged in Consultation and Planning
        Directed by Executive Order Prior to Publishing the Notice of Proposed Rulemaking,

procedures were *in fact* available to him in any country he passed through."[276] However, the Rule considers none of these factors to excuse an individual's failure to apply for asylum and have that application denied in a country of transit. By requiring proof that an asylum seeker not only applied for asylum but also waited around for a decision, without any consideration of safety or adequacy of existing asylum procedures, the Rule runs afoul of *Matter of Pula*[277] and will subject these individuals to harm, discrimination, and racism by civil society and governments in those countries, as well as additional exploitation and harm by the transnational criminal organizations it purports to undermine.

### 2. The Rule's lack of any exception for individuals who were granted asylum in a transit country underscores its arbitrariness and illegality

Additionally, the Rule inexplicably makes no exception for individuals who applied for and were granted asylum in a transit country. For the reasons just explained there are numerous reasons outside of availability of asylum that might cause a person to leave a transit country. This is no less true even if that person has been granted asylum there. U.S. asylum law allows individuals with an asylum grant in another country (even one with a safe third country agreement) to seek asylum in the United States, though they may need to demonstrate that they are not subject to the firm resettlement bar.[278] Under the Proposed Rule, if that same individual arrived at the boarder without an appointment or entered the U.S. without inspection, they would be ineligible for asylum unless they could rebut the presumption. That preposterous result reflects not only the unreasonableness but the utter illegality of the Rule.

### IX. PROCEDURES FOR ASSESSING APPLICATION OF THE PRESUMPTION AND ANY FACTORS IN REBUTTAL VIOLATE EXISTING LAW AND INCREASE THE RISK OF *REFOULEMENT*

### A. Applying Heightened Standards to Screen for Credible Fear is Contravenes to U.S. Asylum Law, Thwarts Congressional Intent, and Will Lead to *Refoulement*

The Departments previously took the position, in the Asylum Processing Rule, that asylum eligibility bars should not be applied at the initial fear screening stage and that the "significant possibility" standard should be applied when screening for all protection claims,

---

[276] 19 I&N Dec. at 473–74.

[277] *Id.*; *see also* Section VIII.A, *supra.*

[278] *See* 8 U.S.C. 1158(b)(2)(A)(v). Indeed, as discussed in section VII, *supra*, the Rule is inconsistent with the firm resettlement and safe third country agreement provisions.

73

i.e., asylum, withholding of removal, and CAT protection.[279] In a stark reversal, DHS now proposes to apply the new bar and, if not rebutted, apply the heightened "reasonable possibility" standard at the credible fear interview stage. Rule 11744–46.

Alarmingly, in order to overcome the bar, asylum seekers will need to prove by a "preponderance of the evidence" that they fall into one of the narrow exceptions or meet one of the rebuttal criteria, heightening the screening standard even further. Rule 11720, 11723. The Rule's proposed procedures and standards conflict with U.S. asylum law and Congress's intent.

### 1. Application of eligibility bars at the initial fear screening is unjustified

Determination of whether or not a bar applies at the initial screening stage is inappropriate given the limited nature of the credible fear interview, which is not suited for the complicated legal and factual issues that arise with exclusion from refugee status. The Departments conceded as much in the Asylum Processing Rule, where they concluded that "[r]equiring asylum officers to apply the mandatory bars during credible fear screenings would [make those] screenings less efficient, undermining congressional intent that the expedited removal process be truly expeditious," and further that "procedural fairness" considerations counseled against applying the bars at the initial screening stage.[280] Nevertheless, they now attempt to justify their about face in this Rule by claiming this process is necessary to *ensure* efficiency, the quick removal of individuals lacking meritorious claims, and to deter people from seeking protection at the southern border. Rule 11744–45. Notably, the Departments' concerns regarding procedural fairness have melted away.[281]

First, the Departments' assertion that these measures are necessary to weed out nonmeritorious claims is baseless. Indeed, the Departments acknowledge that the ban "would likely decrease the number of asylum grants" undermining any suggestion that this ban has anything to do with the relative merits or lack thereof of protection claims. Rule

---

[279] *Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 87 Fed. Reg. 18078, 18080, 18084, 18091–92 (March 29, 2022); 8 C.F.R. §§ 208.30(b) and (e).

[280] 87 Fed. Reg. 18078

[281] *Cf.* 87 Fed. Reg. 18094 ("Upon review and reconsideration, due to the intricacies of the fact-finding and legal analysis often required to apply mandatory bars, the Departments now believe that individuals found to have a credible fear of persecution generally should be afforded the additional time, procedural protections, and opportunity to further consult with counsel that the Asylum Merits process or section 240 removal proceedings provide.").

74

CLP_PC_033933

11748. Moreover, the purpose of credible fear screenings is to ensure that people with potentially meritorious claims will not be removed without having an opportunity to present those claims, i.e., to minimize the risk of *refoulement*. The Departments are abusing that process—not to screen out nonmeritorious claims—but to screen out *all* asylum claims. That is clear from the fact that the bar and its exceptions have absolutely nothing to do with the underlying claims of persecution.

Second, the Departments' other stated purpose of deterrence is also an impermissible basis for barring asylum eligibility on grounds wholly unrelated to likelihood of persecution. And, as discussed in Section X.B, below, the Departments have not demonstrated that it will have any effect on the number of people fleeing persecution and seeking protection in the United States.

Finally, as discussed *supra*, the Proposed Rule's exceptions and rebuttal grounds are wholly inadequate to ensure that individuals with valid claims will not be returned to persecution or torture.

### 2. Applying a heightened standard to asylum applicants who are not statutorily ineligible to seek asylum violates the plain language of the statute and Congressional intent

The Rule proposes to deny credible fear review under the statutorily required "significant possibility" standard to asylum seekers who cannot demonstrate that they entered via parole or the CBP One app except in certain circumstances described above. Instead, it would treat individuals who cannot rebut the presumption as if they were statutorily ineligible to apply for asylum at the time of entry by applying the heightened "reasonable possibility" standard. This would require asylum seekers who may have otherwise meritorious asylum claims to prove the claims under the ultimate well-founded fear standard at the initial screening stage[282]—i.e., 10% chance of persecution[283]—likely in detention and without access to counsel. As above, the Departments' assertion that this is permissible in order to expedite matters and weed out nonmeritorious claims is unsupportable.

First, Congress already settled on the "significant possibility" standard to strike a balance between weeding out nonmeritorious claims and curbing the likelihood of *refoulement*. Before Congress finalized the IIRIRA amendments, the U.S. House of Representatives

---

[282] USCIS, *Questions and Answers: Reasonable Fear Screenings,* https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/questions-and-answers-reasonable-fear-screenings, (June 18, 2013).
[283] *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987); *Al-Harbi v. INS,* 242 F.3d 882, 888 (9th Cir. 2001).

75

CLP_PC_033934

# EL SALVADOR 2022 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

El Salvador is a constitutional multiparty republic with a democratically elected government. In 2019 voters elected Nayib Bukele as president for a five-year term. The election was generally free and fair, according to international observers. Municipal and legislative elections took place in February 2021 and also were considered largely free and fair by observers.

The National Civilian Police, overseen by the Ministry of Justice and Public Security, is responsible for maintaining public security. The Ministry of Defense is responsible for maintaining national security. Although the constitution separates public security and military functions, it allows the president to use the armed forces "in exceptional circumstances" to maintain internal peace and public security "when all other measures have been exhausted." The military is responsible for securing international borders and conducting joint patrols with the civilian police. Civilian authorities maintained effective control over security forces. There were reports that members of the security forces committed abuses.

On March 27, the Legislative Assembly declared a state of exception in response to the dramatic rise in homicides committed by gangs over the weekend of March 25-27. Under the state of exception, which must be renewed monthly, security forces were empowered to arrest anyone suspected of belonging to a gang or providing support to gangs. In addition, the state of exception suspended the rights to be informed immediately of the reason for detention, to legal defense during initial investigations, to privacy in conversations and correspondence, and to freedom of association. Numerous reports of arbitrary arrests, invasion of homes, unfair judicial procedures, and deaths of detainees followed the declaration. More than 52,000 persons were arrested in the first six months of the state of exception, leading to allegations of overcrowding and inhuman treatment in the prisons.

Significant human rights issues included credible reports of: unlawful or arbitrary killings, forced disappearances; torture and cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions;

CLP_PC_034188

arbitrary arrest and detention; serious problems with the independence of the judiciary; arbitrary or unlawful interference with privacy; serious restrictions on free expression and media, including censorship and threats to enforce criminal laws to limit expression; serious government corruption; lack of investigation and accountability for gender-based violence; significant barriers to accessing sexual and reproductive health services; and crimes involving violence against lesbian, gay, bisexual, transgender, queer, and intersex individuals.

Impunity persisted in the security forces, other executive branch offices, and justice system. In some cases, authorities investigated and prosecuted persons accused of committing crimes and human rights abuses.

Criminal groups, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes. They committed killings, acts of extortion, kidnapping, human trafficking, intimidation, and other threats and violence. They directed these acts against police, judicial authorities, the business community, journalists, women, and members of vulnerable populations. Authorities investigated and prosecuted such actions.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were reports that the government or its agents committed arbitrary or unlawful killings, largely stemming from deaths of detainees while in prison during the state of exception. The Attorney General's Office investigates whether security force killings were justifiable and pursues prosecutions. The National Civilian Police (PNC) reported that as of August, no police officers had been accused of homicide.

On August 15, the Human Rights Ombudsman's Office (PDDH) stated it had opened 28 investigations of prisoner deaths during the state of exception. Human Rights Ombudsman Apolonio Tobar said the investigations were based on complaints from persons who attributed the deaths of their relatives to the state of exception. The investigations aimed to examine the culpabilities of the Attorney

CLP_PC_034189

## d. Freedom of Movement and the Right to Leave the Country

The constitution provides for freedom of internal movement, foreign travel, emigration, and repatriation.  In many areas, the government could not assure freedom of movement due to criminal gang activity.  Under the state of exception, security forces restricted movement around and into certain, mostly low-income, neighborhoods with a history of gang activity.

**In-country Movement:**  Prior to the implementation of the state of exception, major gangs controlled access to their specific territories.  Gang members did not allow persons living in another gang's area to enter their territory, even when travelling via public transportation.  Gangs forced persons to present government-issued identification cards (which contain a person's address) to determine their residence.  If gang members discovered that a person lived in a rival gang's territory, that person risked being killed, beaten, or denied entry to the territory.  Bus companies paid bribes to operate within gang territories, often paying numerous fees for the different areas in which they operated.  As gang activity decreased under the state of exception, freedom of movement increased.

Although the text of the decree of the state of exception did not mention restrictions on movement, President Bukele warned a day before its approval that the measure included focused and temporary closures in some areas.  Starting on March 28, security forces regulated entry to and exit from low-income communities with a high level of gang activity.  Police checked residents' identification documents and allowed passage only to persons whose documents showed they resided in the communities.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees and other humanitarian organizations in providing protection and some assistance to refugees, returning refugees, or asylum seekers, as well as other persons of concern, although this was often difficult in gang-controlled neighborhoods.

**Access to Asylum:**  The law provides for granting asylum or refugee status, and

CLP_PC_034205

the government has established a system for providing protection to refugees, but it has major regulatory and operational gaps.  The Commission for the Refugee Status is responsible for refugee status determinations but does not have its own budget.  The legal framework requires persons with international protection needs to file their claim within five days of entering the country.  The criteria for case decisions are unclear, and the appeals process is also decided by the commission.

## f. Status and Treatment of Internally Displaced Persons

The Internal Displacement Monitoring Center estimated there were 175,000 new internally displaced persons due to violence in 2021 (most recent data available), noting the causes included threats, extortion, and killings perpetrated by criminal gangs.  The center reported 550 internally displaced persons due to floods in 2021.

# Section 3. Freedom to Participate in the Political Process

The constitution provides citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

## Elections and Political Participation

**Recent Elections:**  The most recent legislative and municipal elections occurred in February 2021.  Nuevas Ideas, the party affiliated with President Bukele, won 56 of 84 seats in the Legislative Assembly and 152 of 262 mayorships.  The elections were generally considered free and fair; the election reports published by the Organization of American States and the EU electoral mission noted the elections generally met international standards.

**Participation of Women and Members of Minority Groups:**  No laws limit participation of women or members of minority groups in the political process, and they did participate.  Some transgender persons, however, reported difficulties registering to vote and voting because their gender identities did not match the gender stated on their identification cards (see section 6, Acts of Violence, Criminalization, and Other Abuse Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics).

CLP_PC_034206

# COLOMBIA 2022 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Colombia is a constitutional, multiparty republic. Presidential and legislative elections were held in 2022. Voters elected Gustavo Petro president in a second round of elections that observers considered free and fair and the most peaceful in decades. President Petro was inaugurated on August 7.

The Colombian National Police force is responsible for internal law enforcement and is under the jurisdiction of the Ministry of Defense. The Migration Directorate, part of the Ministry of Foreign Affairs, is the immigration authority. The Colombian National Police shares law enforcement investigatory duties with the Attorney General's Corps of Technical Investigators. In addition to its responsibility to defend the country against external threats, the army shares limited responsibility for law enforcement and maintenance of order within the country. For example, military units sometimes provided logistical support and security for criminal investigators to collect evidence in high-conflict or remote areas. Civilian authorities generally maintained effective control over security forces. There were reports that members of the security forces committed some abuses.

Significant human rights issues included credible reports of: unlawful or arbitrary killings; torture and arbitrary detention by government security forces and armed groups; serious abuses in a conflict; criminalization of libel; serious government corruption; violence against and forced displacement of Afro-Colombian and Indigenous persons; violence against lesbian, gay, bisexual, transgender, queer, and intersex persons; and killings of and other violence against trade unionists.

The government generally took steps to investigate, prosecute, and punish officials who committed human rights abuses, although most cases experienced long delays. Many investigations included cases stemming from throughout the armed conflict in the country starting in the 1960s. The government generally implemented laws criminalizing official corruption.

CLP_PC_034224

On September 10, armed actors killed Sibares Lamprea Vargas, secretary of administrative affairs of the Oil Workers Union (*Union Sindical Obrera*) in Barrancabermeja. Labor groups stated more needed to be done to address impunity for perpetrators of violence and threats against trade unionists. The National Union School (ENS), a labor rights NGO and think tank, reported 10 trade unionists were killed through August, seven of whom were members of the Colombian Federation of Educators. The ENS and other labor groups stated that focusing on killings alone masked the true nature and scope of the violence against labor activists. Labor groups noted that in some regions, nonlethal violations continued to increase. Through August, the ENS reported 55 death threats, three abductions, and two cases of harassment.

The government and employers generally respected freedom of association and collective bargaining, but unions cited multiple instances in which companies fired employees who formed or sought to form new unions. Some employers continued to use temporary contracts, temporary service agencies, and other forms of subcontracting, including cooperatives, to limit worker rights and protections. Labor confederations and NGOs reported that business owners in several sectors used "simplified stock corporations" (SASs), union contracts, foundations, or temporary-service agencies in attempts to circumvent legal restrictions on cooperatives. In some cases, the SAS had little or no control over the conditions of employment. The Ministry of Labor stated that an SAS, like any corporate structure, may be fined for labor violations. Labor confederations and NGOs reported these enforcement actions did not address the scope of abusive subcontracting and illegal labor intermediation.

The port workers' labor union reported Buenaventura port operators engaged in abusive subcontracting through SASs and that Ministry of Labor inspections and adjudication of cases at the Buenaventura port were ineffective in safeguarding the rights to freedom of association and collective bargaining.

## b. Prohibition of Forced or Compulsory Labor

The law prohibits all forms of forced or compulsory labor. The government did not effectively enforce the law in all cases, and there were reports that such practices occurred. The International Labor Organization noted the law permits

CLP_PC_034262

military conscripts to be compelled to undertake work beyond that of a military nature, such as activities to protect the environment or natural resources.

There were reports ELN guerrillas, FARC dissidents, and criminal gangs used forced labor, including forced child labor, in coca cultivation and illegal mining in areas outside government control, and used forced criminality, such as extortion, in urban areas.

Forced begging and forced labor in other sectors, including mining, agriculture (especially near the coffee belt and in floriculture), cattle herding, crop harvesting, forced recruitment by armed persons, and domestic servitude, remained a serious problem. Afro-Colombians, Indigenous persons, Venezuelan migrants, and inhabitants of marginalized urban areas were at the highest risk of forced labor, domestic servitude, forced begging, and forced recruitment. Authorities did not make efforts to investigate cases or increase inspections of forced labor. There was impunity for forced labor, and unidentified victims remained without protection in critical sectors such as agriculture, coffee production, floriculture, and extractive industries.

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings.

## d. Discrimination with Respect to Employment and Occupation

The law prohibits discrimination with respect to employment or occupation based on race, ethnicity, sex, religion, political preference, national origin or citizenship, gender, disability, age, language, sexual orientation or gender identity, HIV-positive status or infection with other communicable diseases, or social status. Complaints of quid pro quo sexual harassment were filed with criminal courts, not with the Ministry of Labor. There are legal restrictions against women being employed in the construction sector. The government did not effectively enforce the law in all cases. Penalties were not commensurate with laws related to civil

CLP_PC_034263

rights, such as election interference. Penalties were rarely applied against violators.

Unemployment disproportionately affected women, who faced hiring discrimination and received salaries that generally were not commensurate with their education and experience. Media reported that, on average, women earned 12 percent less than men for the same work. In a previous year, a senior government official estimated that 85 percent of persons with disabilities were unemployed. Afro-Colombian labor unions reported discrimination in the port sector.

## e. Acceptable Conditions of Work

**Wage and Hour Laws:** The legal minimum monthly wage is approximately twice the amount of the poverty line; however, almost half of the total workforce earned less than the minimum wage.

The law provides for a regular workweek of 48 hours and a minimum rest period of eight hours within the week. Exceptions to this may be granted by the Ministry of Labor and were frequently granted in the mining sector. The law stipulates that workers receive premium compensation for nighttime work, hours worked in excess of 48 per week, and work performed on Sundays. The law permits compulsory overtime only in exceptional cases where the work is considered essential for the company's functioning.

**Occupational Safety and Health:** The law provides for workers' occupational safety and health (OSH) in the formal sector. The legal standards were generally up to date and appropriate for the main formal industries. The law does not cover informal-sector workers, including many mining and agricultural workers. In general, the law protects workers' rights to remove themselves from situations that endanger health or safety without jeopardy to their employment, although some violations of this right were reported during the year. In cases of formal grievances, authorities generally protected employees in this situation.

Nonunion workers, particularly those in the agricultural and port sectors, reportedly worked under hazardous conditions because they feared losing their jobs through subcontracting mechanisms or informal arrangements if they reported abuses. Some unionized workers who alleged they suffered on-the-job injuries

CLP_PC_034264

# ECUADOR 2022 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Ecuador is a constitutional, multiparty republic with an elected president and unicameral legislature. In April 2021, voters elected President Guillermo Lasso Mendoza from a center-right alliance of the Creating Opportunities Movement, the Social Christian Party, and other selected members of the National Assembly in elections that observers deemed free and fair.

The National Police maintains internal security and law enforcement and is under the authority of the Ministry of Interior. The military is under the authority of the Ministry of Defense. Police and military forces share responsibility for border enforcement, with the military also having limited domestic security responsibilities. The military may complement police operations to maintain and control public order when expressly mandated. Migration officers are civilians and report to the Ministry of Interior. Civilian authorities maintained effective control over the security forces. There were reports that members of the security forces committed some abuses.

Social and Indigenous movements' opposition to government economic policies led to widespread street protests and a shutdown of major city roads and provincial highways that lasted for 18 days in June, the most protracted protests in the country's history. Protest leaders ended the demonstrations on June 30 after reaching a peace agreement with the government that addressed some of their demands and agreeing to a 90-day dialogue period to resolve remaining matters. The protests paralyzed the country, significantly disrupting economic activity and medical services. Attacks by nongovernmental armed groups against security forces during the protests, and police and military responses to those attacks and protests, resulted in deaths and injuries among security forces and civilians.

Significant human rights issues included credible reports of: torture and abuse by police officers and prison guards; harsh and life-threatening prison conditions; serious restrictions on freedom of expression and media, including violence against journalists and the existence of criminal libel laws; serious government corruption;

CLP_PC_034267

lack of investigation of and accountability for violence against women and children; and restrictions on workers' freedom of association.

The government took steps to investigate and prosecute officials who committed human rights abuses or engaged in corruption.

Members of criminal gangs in prisons committed acts of torture and killed their rivals during prison disturbances. There were incidents of violence and threats of violence against politicians, journalists, prosecutors, and judges likely perpetrated by nongovernment actors. Members of society engaged in crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons. The government investigated these crimes, and prosecutions were pending.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were no reports that the government or its agents committed arbitrary or unlawful killings. Human rights organizations, however, blamed excessive force by security forces for the deaths of some of the six protesters who died during the June demonstrations. Ministry of Interior officials indicated the causes of death of at least two protesters were due to "circumstance or accident" and had no direct relation with security force actions. Several national and international human rights organizations reported Byron Guatatuca Vargas was killed by a tear gas canister fired at close range, penetrating his skull. Government officials stated Guatatuca died from handling explosives. On June 22, the Attorney General's Office opened an ex officio investigation of the case. The Internal Affairs Unit of the National Police investigates police killings and refers cases to the Attorney General's Office to pursue prosecutions.

On November 23, the Ombudsman's Office presented its report and concluded security forces used "disproportionate force during the social protests." According to the report, the most serious abuses were the deaths of eight persons, including an armed forces officer. The report also called for the creation of a truth commission

CLP_PC_034268

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

The law provides for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these related rights.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees, the International Organization for Migration, and other humanitarian organizations in providing protection and assistance to refugees, returning refugees, asylum seekers, and other vulnerable persons of concern.  In addition, the human mobility law codifies protections granted to migrants in the constitution, advances the protection of refugees and asylum seekers, and provides for nonrefoulement, noncriminalization of irregular migration, and equal treatment before the law for migrants.

**Access to Asylum:**  The law provides for the granting of asylum or refugee status, and the government has established a system for providing protection to refugees.

**Abuse of Migrants and Refugees:**  Migrants and refugees, especially women, children, and lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) individuals, sometimes experienced sexual and gender-based violence and human trafficking, according to UN agencies and local NGOs.  Authorities reported an increase in forced labor, sex trafficking, and the forced recruitment of migrants and refugees into criminal activity, such as drug trafficking and robbery, on the northern and southern borders, particularly by transnational criminal organizations and criminal groups that also operated in Colombia.  Migrant and refugee arrivals at irregular crossings amid continued border closures complicated the government's ability to address and prevent abuses against migrants and refugees.

**Access to Basic Services:**  The law provides for protection and access to health care, education, and other services to all individuals irrespective of their migration

CLP_PC_034282

status.  Nonetheless, some Venezuelan migrant and refugee children remained out of the school system, according to official government statistics.  According to NGOs, barriers to the enrollment and retention of refugee and migrant children in school included a lack of information regarding the right to access to education, hidden costs of schooling such as uniforms, lack of classroom space, and, in some instances, xenophobic attitudes towards Venezuelans.  According to UN agencies and NGOs, refugees encountered discrimination in employment and housing.  Recognized refugees received national identification cards that facilitated access to education, employment, banking, and other public services; however, refugees and migrants reported that at times employers did not recognize government-issued documents that establish their right to work.

**Durable Solutions:**  The government accepted refugees for resettlement and offered naturalization to refugees but recognized very small numbers of Venezuelan refugees.  Discrimination and limited access to formal employment and housing affected refugees' ability to assimilate into the local population.

**Temporary Protection:**  On September 1, the Ministry of Interior opened the registration process to Venezuelan migrants who entered the country regularly, as well as all unaccompanied minors, regardless of nationality or migration status.  Registration for an estimated 100,000 non-Venezuelans who entered the country regularly opened on November 16.  Registration for an estimated 350,000 Venezuelans who entered the country irregularly was scheduled to open on February 16, 2023.  Registration produces a certificate, which acts as a temporary residence permit and protects the holder from deportation on migration-related grounds or from incurring migration-related fines while the regularization process is underway.  Registration, scheduled to continue through 2025, must be completed before an applicant can start the regularization process to receive a visa.  Those who complete registration and receive a registration certificate may apply for a temporary residency visa from the Ministry of Foreign Affairs.

## Section 3. Freedom to Participate in the Political Process

The law provides citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

CLP_PC_034283

# AP



## Online system to seek asylum in US is quickly overwhelmed

By ELLIOT SPAGAT January 28, 2023



A migrant from Michoacan, Mexico, uses the CBPOne app Tuesday, Jan. 24, 2023, in Tijuana, Mexico. A mobile app for migrants to seek asylum in the United States has been oversaturated since it was introduced this month in one of several major changes to the government's response to unprecedented migration flows. Hoping to get lucky when a new appointments are made available daily, migrants are increasingly frustrated by a variety of error messages. (AP Photo/Gregory Bull)

CLP_PC_034909

TIJUANA, Mexico (AP) — Hours before sunrise, migrants at one of Mexico's largest shelters wake up and go online, hoping to secure an appointment to try to seek asylum in the U.S. The daily ritual resembles a race for concert tickets when online sales begin for a major act, as about 100 people glide their thumbs over phone screens.

New appointments are available each day at 6 a.m., but migrants find themselves stymied by error messages from the U.S. government's CBPOne mobile app that's been overloaded since the Biden administration introduced it Jan. 12.

Many can't log in; others are able to enter their information and select a date, only to have the screen freeze at final confirmation. Some get a message saying they must be near a U.S. crossing, despite being in Mexico's largest border city.

At Embajadores de Jesus in Tijuana, only two of more than 1,000 migrants got appointments in the first two weeks, says director Gustavo Banda.

"We're going to continue trying, but it's a failure for us," Erlin Rodriguez of Honduras said after another fruitless run at an appointment for him, his wife and their two children one Sunday before dawn. "There's no hope."

Mareni Montiel of Mexico was elated to select a date and time for her two children — then didn't get a confirmation code. "Now I'm back to zero," said Montiel, 32, who has been waiting four months at the shelter, where the sound of roosters fill the crisp morning air at the end of a rough, dirt road.

CBPOne replaced an opaque patchwork of exemptions to a public health order known as Title 42 under which the U.S. government has denied migrants' rights to claim asylum since March 2020. People who have come from other countries find themselves in Mexico waiting for an exemption or policy change — unless they try to cross illegally into the U.S.

If it succeeds, CBPOne could be used by asylum-seekers even if Title 42 is lifted as a safe, orderly alternative to illegal entry, which reached the highest level ever recorded in the U.S. in December. It could also discourage large camps on Mexico's side of the border, where migrants cling to unrealistic hopes.

But a range of complaints have surfaced:

— Applications are available in English and Spanish only, languages many of the migrants don't speak. Guerline Jozef, executive director of the Haitian Bridge Alliance, said authorities failed to take "the most basic fact into account: the national language of Haiti is Haitian Creole." U.S. Customs and Border Protection says it plans a Creole version in February; it has not announced other languages.

Some migrants, particularly with darker skin, say the app is rejecting required photos, blocking or delaying applications. CBP says it is aware of some technical issues, especially when new

CLP_PC_034910

appointments are made available, but that users' phones may also contribute. It says a live photo is required for each login as a security measure.

The issue has hit Haitians hardest, said Felicia Rangel-Samponaro, director of The Sidewalk School, which assists migrants in Reynosa and Matamoros, across from Texas' Rio Grande Valley. Previously, about 80% of migrants admitted to seek asylum in the area were Haitian, Rangel-Samponaro said. On Friday, she counted 10 Black people among 270 admitted in Matamoros.

"We brought construction lights pointed at your face," she said. "Those pictures were still not able to go through. ... They can't get past the picture part."

— A requirement that migrants apply in northern and central Mexico doesn't always work. CBP notes the app won't work right if the locator function is switched off. It's also trying to determine if signals are bouncing off U.S. phone towers.

But not only is the app failing to recognize that some people are at the border, applicants outside the region have been able to circumvent the location requirement by using virtual private networks. The agency said it has found a fix for that and is updating the system.

— Some advocates are disappointed that there is no explicit special consideration for LGBTQ applicants. Migrants are asked if they have a physical or mental illness, disability, pregnancy, lack housing, face a threat of harm, or are under 21 years old or over 70.

Still, LGBTQ migrants are not disqualified. At Casa de Luz, a Tijuana shelter for about 50 LGBTQ migrants, four quickly got appointments. A transgender woman from El Salvador said she didn't check any boxes when asked about specific vulnerabilities.

The U.S. began blocking asylum-seekers under President Donald Trump on the grounds of preventing the spread of COVID-19, though Title 42 is not applied uniformly and many deemed vulnerable are exempted.

Starting in President Joe Biden's first year in office until last week, CBP arranged exemptions through advocates, churches, attorneys and migrant shelters, without publicly identifying them or saying how many slots were available. The arrangement prompted allegations of favoritism and corruption. In December, CBP severed ties with one group that was charging Russians.

For CBPOne to work, enough people must get appointments to discourage crossing the border illegally, said Leon Fresco, an immigration attorney and former aide to Senate Majority Leader Chuck Schumer, a Democrat.

"If these appointments start dragging out to two or three or four months, it's going to be much harder to keep it going," he said. "If people aren't getting through, they won't use the program."

CBP, which schedules appointments up to two weeks out, declines to say how many people are getting in. But Enrique Lucero, director of migrant affairs for the city of Tijuana, said U.S.

CLP_PC_034911

authorities are accepting 200 daily in San Diego, the largest border crossing. That's about the same as the previous system but well below the number of Ukrainians processed after Russia's invasion last year.

Josue Miranda, 30, has been staying at Embajadores de Jesus for five months and prefers the old system of working through advocacy groups. The shelter compiled an internal waiting list that moved slowly but allowed him to know where he stood. Banda, the shelter director, said 100 were getting selected every week.

Miranda packed his suitcases for him, his wife and their three children, believing his turn was imminent until the new online portal was introduced. Now, the Salvadoran migrant has no idea when, or if, his chance will come. Still, he plans to keep trying through CBPOne.

"The problem is that the system is saturated and it's chaos," he said after another morning of failed attempts.

CLP_PC_034912

# Fiscal Year 2020 Refugees and Asylees Annual Flow Report

March 8, 2022

OFFICE OF IMMIGRATION STATISTICS

Ryan Baugh



CLP_PC_039827

The United States provides protection to certain persons who have been persecuted or have a well-founded fear of persecution through two programs: a refugee program for persons outside the United States and their eligible relatives, and an asylum program for persons physically present or arriving in the United States and their eligible relatives.[1] The *2020 Refugee and Asylees Annual Flow Report*, authored by the Office of Immigration Statistics (OIS) in the Department of Homeland Security (DHS), presents information on persons admitted to the United States as refugees, those who applied for asylum in the United States, and those granted asylum in the United States in Fiscal Year (FY) 2020.[2,3]

Summary

A total of 11,840 persons were admitted to the United States as refugees during 2020, including 5,142 as principal refugees and 6,698 as derivative refugees.[4] The leading countries of nationality for refugees admitted during this period were the Democratic Republic of the Congo (Congo), Burma, and Ukraine. The United States provided protection to an additional 31,429 individuals who were granted affirmative or defensive asylum during 2020,[5] including 16,864 individuals who were granted asylum affirmatively by DHS,[6] and 14,565 individuals who were granted asylum defensively by the U.S. Department of Justice (DOJ). An additional 1,530 individuals received derivative asylum or refugee status while residing in the United States based on a relative's refugee or asylum grant,[7] and 2,528 individuals who approved for derivative asylum abroad and were issued travel documents that allow their travel to the United States.[8] The leading countries of nationality for persons granted either affirmative or defensive asylum were the People's Republic of China (China), Venezuela, and El Salvador.

---

[1] Additionally, U.S. law bars removing individuals to a country where their "life or freedom would be threatened ... because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." INA § 241(b)(3)(A); 8 U.S.C. 1231(b)(3)(A). This is known as statutory withholding of removal. See 8 CFR § 208.16(a)-(b). Pursuant to the Convention Against Torture, the United States is obligated to provide protection to individuals where there are substantial grounds to believe they would be in danger of being subjected to torture. Individuals may seek withholding or deferral of removal under the regulations implementing the Convention Against Torture. See 8 CFR §§ 208.13(c)(1), 208.16, 208.17.

[2] In this report, a year refers to a fiscal year (October 1 to September 30).

[3] The *2020 Yearbook of Immigration Statistics* and other OIS reports contain additional context. Not all numbers reported are contained in this report's tables.

[4] Refugee data in this report may differ slightly from numbers reported by the Department of State (DOS). DOS refugee numbers include Amerasians (children born in Cambodia, Korea, Laos, Thailand, or Vietnam after December 31, 1950, and before October 22, 1982, and fathered by a U.S. citizen), whereas DHS reports Amerasians as lawful permanent residents.

[5] These asylum grants were based upon a principal asylum applicant's application, which may also include an accompanying spouse and unmarried children under 21 years of age. They do not include individuals who were approved for follow-to-join asylum status while residing in the United States or abroad.

[6] Affirmative asylum data for fiscal year 2020 were retrieved by OIS in December 2020. Data in this report may differ slightly from fiscal year-end 2020 numbers retrieved and reported at different times by DHS's U.S. Citizenship and Immigration Services (USCIS) Asylum Division.

[7] Of these, 1,490 were based on a relative's asylum grant, and 40 were based on a relative's refugee grant.

[8] OIS does not currently collect data on how many of those issued travel documents reach the United States and actually receive asylum.

2

CLP_PC_039828

all immigrants. Of the almost 525,000 adults who obtained LPR status from 2000 to 2014 based on the prior grant of asylum (affirmative or defensive), 56 percent naturalized within 6 years.[28]

FOR MORE INFORMATION Visit the Office of Immigration Statistics web page at http://www.dhs.gov/immigration-statistics.

Breakout text box:

DHS and DOJ published an interim final rule on July 16, 2019 to add a new bar to eligibility for asylum for a noncitizen who enters or attempts to enter the United States across the Southern Border, but who transited through a third country *en route* to the United States and did not apply for protection there. A court ordered the Departments to cease implementation of the interim final rule in June 2020. A total of 6,911 noncitizens were subject to the bar in Fiscal Year 2019,[29] and 18,247 were subject to the bar in Fiscal Year 2020. Of the 18,247 individuals subject to the bar in 2020, 344 were exempted from the bar because they were victims of severe trafficking or applied for protection in a third country. As of May 6, 2021, another 6,672 individuals subject to the asylum bar in 2020 had established eligibility to apply for statutory withholding of removal or protection under the Convention Against Torture.

In addition, the United States signed Asylum Cooperative Agreements (ACAs) in 2019 with Guatemala, Honduras, and El Salvador. In general, these ACAs allowed DHS to transfer asylum claimants to one of these three countries (other than the country of the noncitizen's nationality) to seek protection there. The agreement with Guatemala was operational between November 21, 2019 and March 16, 2020 and resulted in 61 removal flights with a total of 948 individual removals to Guatemala. Agreements with El Salvador and Honduras were never implemented as a result of the COVID-19 pandemic.

Consistent with Executive Order 14010, "Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border," issued on February 2, 2021, on February 6, 2021, the Secretary of State announced the suspension of all three ACAs. DOS terminated the U.S.-Guatemala ACA in early May 2021 and terminated the other two ACAs in early August 2021.

---

[28] The data were restricted to individuals who were at least 18 years old when LPR status was obtained. More recent cohorts, with less time spent in LPR status, tend to have lower cumulative naturalization rates.

[29] This updates previously published information. In 2019, 77 were exempted from the bar because they were victims of severe trafficking or applied for protection in a third country. As of January 29, 2021, another 4,049 individuals subject to the asylum bar in 2019 had established eligibility to apply for statutory withholding of removal or protection under the Convention Against Torture.

24

CLP_PC_039850

# AMERICAN EXILE
## Rapid Deportations That Bypass the Courtroom

**December 2014**



CLP_PC_055579

# AMERICAN EXILE
## Rapid Deportations That Bypass the Courtroom

© 2014 ACLU Foundation



American Civil Liberties Union
125 Broad Street
New York, NY 10004
www.aclu.org



Cover, interior, and back photographs: Sam Frost

*Cover and interior images:* Tijuana, Mexico, March 2014. Men standing on the beach look across the border to California as U.S. Border Patrol officers arrest two migrants.
*Back cover image:* The U.S. fence separating California and Mexico, expanded and fortified in 2011 and jutting 30 feet into the Pacific Ocean.

CLP_PC_055580

# CONTENTS

Executive Summary................................................................................................2
Key Recommendations..........................................................................................8
Methodology ..........................................................................................................9
I.  Summary Deportation Procedures: An Introduction ...................................10
    **A.** Expedited Removal..................................................................................15
    **B.** Reinstatement of Removal......................................................................19
    **C.** Administrative Voluntary Departure/Voluntary Return ..........................23
    **D.** Administrative Removal Under INA § 283b............................................26
    **E.** Stipulated Orders of Removal................................................................29
II.  Who Is Getting Deported Without a Hearing?............................................31
    **A.** Asylum Seekers Returned to Danger ...................................................32
        **1.** Expedited Removal and the Impediments for Asylum Seekers........33
        **2.** Language and Information Barriers....................................................34
        **3.** Failure to Refer Asylum Seekers to an Asylum Officer.....................37
        **4.** Asylum Seekers with Prior Removal Orders......................................40
    **B.** People Lawfully in the United States Who Are Deported Without a Hearing.......44
        **1.** U.S. Citizens Deported Through Summary Procedures ...................44
            a.  U.S. Citizens with Mental Disabilities........................................48
            b.  U.S. Residents with Valid Status................................................50
        **2.** Expedited Removal of Tourists and Business Visitors.......................54
    **C.** Longtime Residents Removed Without a Hearing..................................59
        **1.** Deportations at the Border................................................................60
        **2.** Apprehended and Deported in the Interior of the United States.......63
            a.  Voluntary Return.........................................................................63
            b.  Administrative Removal Under 238b............................................66
    **D.** Children Arriving Alone..........................................................................69
        **1.** Legal Background..............................................................................69
        **2.** Accessing the Protections of the System ........................................71
        **3.** Mexican Children and the TVPRA.....................................................73
        **4.** The TVPRA in Practice......................................................................73
III.  After Deportation: The Aftermath of an Unfair Removal...........................80
    **A.** Erroneous Deportations and the Lack of Oversight...............................80
    **B.** Reinstatement of Removal......................................................................83
    **C.** Prosecution for Returning......................................................................87
    **D.** American Families Living in the Shadows...............................................94
IV.  International Law and Restrictions on Summary Removals........................97
    **A.** Access to Justice and the Right to a Fair Hearing .................................97
    **B.** The Right to Apply for Asylum and Right to Protection from Persecution.......99
    **C.** Special Protections for Children............................................................100
    **D.** Limitations on Detention.......................................................................102
    **E.** The Right to Family Unity......................................................................102
Recommendations..............................................................................................104
Glossary of Terms...............................................................................................118
Acknowledgements.............................................................................................122
Endnotes.............................................................................................................123

CLP_RC_055581

# EXECUTIVE SUMMARY

Hilda, a 35-year-old woman from Honduras, arrived in Texas in 2013, fleeing gang threats and domestic violence that had just resulted in the miscarriage of her twin babies. She was still bleeding when she was arrested by a Border Patrol officer with her two young surviving children. "I was caught crossing the river," recalls Hilda:

> It was 8 p.m. at night. They took me and my kids to a cell … They started to ask us to sign a lot of papers. The problem was I didn't understand anything he was asking me. Since he saw that I didn't understand, [the officer] would just write and write and just tell me, "Sign." … He would just put [the form] in front of me and say, "Sign, next one, sign." . . . I was afraid [to ask for help]. Everyone there was afraid. [The officers] don't let you even talk to them. . . . The fear they instill in you doesn't let you ask for help.[1]

Hilda and her two-year-old and 12-year-old sons were issued deportation orders by an immigration enforcement agent. Hilda never saw the deportation order; she did not know what language it was in.

In 2013, the United States conducted 438,421 deportations.[2] In more than 363, 279[3] of those deportations—approximately 83 percent—the individuals

## FIGURE 1

### FY 2013 Removal Figures by Deportation Process



Department of Homeland Security, Office of Immigration Services, Annual Report, Immigration Enforcement Actions: 2013, September 2014, available at http://www.dhs.gov/sites/default/files/publications/ois_enforcement_ar_2013.pdf. *Note:* Total may not equal 100% because of rounding.

# In FY 2013, 83 percent of deportation orders came from immigration officers, not judges.

did not have a hearing, never saw an immigration judge, and were deported through cursory administrative processes where the same presiding immigration officer acted as the prosecutor, judge, and jailor. Some of those expelled without a hearing had lived in the United States for many years, have U.S. citizen children, and were never afforded the opportunity to say goodbye to relatives or call an attorney before being wrenched from their lives rooted in American communities. Some of those deported were fleeing violence, persecution, or torture and were turned back to danger. Others had lawful status in the United States, including U.S. citizenship, but were erroneously deported.

Deportation has incalculable consequences for the individual removed[4] and the family left behind in the United States, so the decision to deport should be arrived at with care by a judge trained in immigration law and considering the facts and circumstances of each case. Instead, in the current system, U.S. law enforcement officers make complicated decisions about a person's rights, with catastrophic results when they are wrong. In many cases, individuals have been coerced to sign forms they do not understand and were threatened or lied to about their rights. In this coercive environment, it is inevitable that individuals with the right to be in the United States may abandon those rights. They were told to sign a form, and then they were gone.

Summary removal procedures[5] are a short-circuited path to deportation. At the U.S. border, a Mexican national can be deported almost instantly. The speed of a summary removal may be attractive, but it has also resulted in devastating and predictable errors, leading to the banishment and, in some cases, death of people who had a right to be in the United States. And while these orders, including mistaken ones and their severe penalties, are quickly delivered, they cannot easily be undone.

CLP_PC_055582

# Yazan S., a 19-year-old from Syria with a congenital heart defect, tried to request asylum but was deported at the airport instead.

It is essential that this language is read to all arriving immigrants because most asylum seekers arriving in the United States are unlikely to have a sophisticated or even rudimentary understanding of U.S. asylum law and procedures, and may not even know they exist. As attorney Kaveena Singh observes, "A lot of our clients don't know they are eligible for asylum when they arrive; they are just trying to escape danger. Some—probably the most deserving—are so traumatized they are reluctant to share their stories, even with us. They aren't getting an orientation at the border about their rights."[188]

Asylum seekers are dependent upon the border officials who arrest, detain, and interrogate them to also explain their rights and refer them to an asylum officer. In many cases documented by the ACLU and others, border officers are not providing necessary information in the language spoken by the asylum seeker—if at all—and sometimes fail to refer individuals for a CFI even when those individuals are able to articulate a fear of returning to danger.[189] For asylum seekers who may be traumatized from the harm they fled, their dangerous journey, and finally, arrival into a detention center, claiming and adequately communicating that fear of being removed may be extremely challenging. But it is not only reticence or post-traumatic stress that prevents individuals who risked their lives to seek protection from asking for asylum: systemic failures and, in some instances, abuse and coercion by the screening border officer prevent some asylum seekers from ever requesting assistance when they reach the United States.

## 2. Language and Information Barriers

Most of the individuals interviewed by the ACLU stated that they were given forms to sign in English, which most did not speak or read, and often were not interviewed by an immigration officer who fluently spoke their language or through an interpreter. The asylum protections in place can be activated only when a person is informed of those rights, and the consequences if they waive them, in a language they understand. Because many officers may not speak languages other than English fluently, there is a fundamental breakdown in their ability to communicate with individuals about their rights and ask the critical questions about fear of returning.

Yazan S., a 19-year-old Syrian with a congenital heart defect and attention deficit hyperactivity disorder, speaks Arabic and very little English. He came to the United States alone in October 2013 after shelling devastated his neighborhood in Damascus. Shortly after the conflict started, his family says, Yazan—who is Christian—was stabbed on the street by Islamic extremists, severing his pacemaker; he came to the United States to seek both medical care and protection from the violence. En route to his uncle in California, Yazan transferred through Detroit, where CBP officers interrogated him for hours and detained him at a local police department overnight. Although Yazan's uncle Manaf hired a lawyer, DHS officials refused to let either the attorney or Manaf speak with Yazan. A CBP officer did call Manaf to confirm Yazan's identity: "I repeatedly asked to speak to my nephew. Finally the agent just hung up on me. I called back [and] I told them, this guy has been through a lot of trauma. . . . The officer said to me, 'You guys come here and take advantage of our system.'" Yazan told his uncle that six officers were standing around him, telling him to sign a form and that they would not provide him with an interpreter or the chance to call his uncle until he signed. In his limited English, Yazan tried to tell officers that he was afraid to return to Syria but was nevertheless deported through expedited removal.[190]

Hilda, a 35-year-old from Honduras, fled death threats from gangs and domestic violence perpetrated by her husband. In 2013, after a severe beating, Hilda miscarried the twins she was pregnant with and fled to the United States, still bleeding daily. "We never want to return," says

CLP_PC_055614



<span style="color:#4a90a4">Spencer Platt/Getty</span>

A woman and her child walk past gang graffiti in a neighborhood with heavy gang violence on July 20, 2012, in Tegucigalpa, Honduras. Honduras now has the highest per capita murder rate in the world and its capital city, Tegucigalpa, is plagued by violence, poverty, homelessness, and sexual assaults.

Hilda. "All you're going to find in Honduras is death." She took her two-year-old and 14-year-old children with her, arriving in Texas in November 2013. "I was caught crossing the river," recalls Hilda:

> It was 8 p.m. at night. They took me and my kids to a cell. . . . They started to ask us to sign a lot of papers. The problem was I didn't understand anything he was asking me. Since he saw that I didn't understand, [the officer] would just write and write and just tell me, "Sign." … He would just put [the form] in front of me and say "Sign, next one, sign." . . . I was bleeding when I arrived. I was afraid [to ask for help]. Everyone there was afraid. [The officers] don't let you even talk to them. . . . The fear they instill in you doesn't let you ask for help. . . . I needed help and it just felt horrible to be rejected like that.[191]

# "All you're going to find in Honduras is death."

Hilda and both her children were given expedited removal orders, and Hilda says they were never asked about fear of returning to Honduras.[192]

Ana N. R., a 47-year-old from El Salvador with two U.S. citizen kids, had gone back to El Salvador to see family when a gang burned down her family's beauty salon and raped an employee. Her children were going to petition for her to join them in the United States, but given the danger, she could not wait. Arriving in McAllen, Texas, in March 2014, Ana said the officers asked about her fear of being returned but said if she claimed fear, she would be detained for a year:

> I said I would prefer one year in jail alive to death. They wanted me to sign papers after I told them about my fear. But I wouldn't sign. The officer said "Sign or I'm going to sign for you." They slammed the door in my face because I wouldn't sign. The papers were in English. I asked what they were for and said I would sign if they were in Spanish. I saw people saying no, they wouldn't sign, and the officers just signed for them. They called us pigs and said we smelled like fish. There were 10 kids lying on the floor. They would insult us all the time. I thought, maybe this isn't the U.S. Maybe this is Cuba. After all the years I spent in the U.S., I had such a good impression of it. I was really shocked.[193]

Carlos C. Z., an asylum seeker from El Salvador, was moved from *hielera* ("icebox," a term commonly used to refer to CBP holding cells) to *hielera* when he first arrived in the United States. He came to the United States fleeing violence from the Mara Salvatrucha gang ("MS-13"), which left him with scarring and deformed fingers. Although he told a Spanish-speaking officer by phone at the first holding facility that he was afraid to go back to El Salvador, Carlos says that another officer who spoke very little Spanish then came into the room and gave him forms to sign. Carlos does

## Hieleras—"Ice Boxes"

In many cases, individuals are afraid to talk to CBP officers because of the conditions in which they are held. An investigation by Americans for Immigrant Justice found that individuals apprehended by CBP were held for up to 13 days in freezing cells with no blankets, little food, no showers, no privacy for using the restroom, and little space.[197] Almost everyone interviewed by the ACLU described inhumane detention conditions while in CBP custody, citing verbal abuse, freezing conditions, inadequate food, lack of adequate medical care, and overcrowding. For some individuals fleeing violence, the experience of being detained and in inhumane conditions is traumatizing, and as a result, some individuals with strong asylum claims nevertheless decide to abandon them and accept deportation rather than remain in detention.

not read or speak English and refused to sign the forms.[194] At that point, as detailed in Carlos's declaration, the officer became angry and "slapped [Carlos] across the face with the forms. At that point, [Carlos] asked to speak to a judge, to which he recalls the officer replied, 'Here, I'm the judge, the attorney, and the one who is going to deport you.' A different officer then wrote on every page of the forms that [Carlos] refused to sign. [Carlos] did not learn what the form stated until another immigrant translated it for him at a different detention facility in Pennsylvania weeks later."[195]

At seven years old, Karen R. L., now a 21-year-old from El Salvador, was coerced into joining the gang that murdered her mother; the gang members, Karen said, "told me I had to finish paying the accounts of my mom."[196] When she tried to leave the gang, she says, she was sexually assaulted by gang members and threatened with death. Arriving in South Texas, Karen recalls, the officers initially gave her forms to sign in English: "I started asking what they were but [the officers] just said, 'Sign here, sign here,' really loudly. When I found out what I was signing, I said, 'But I'm afraid and I can't go back to my country.'"[198] Karen was finally given a CFI, which she passed.

For individuals who do not know about the asylum process, it may not occur to them to raise their fear if they are never asked. Ponchita, a 33-year-old woman from Mexico, said she was not asked and did not mention the domestic violence she was fleeing because "in Mexico we are just used to no one asking about it."[199]

Many asylum seekers interviewed for this report said they were unaware of the existence of asylum; generally, the only individuals who were aware of the right to apply for asylum were persons who, after receiving an expedited removal order from CBP, were taken to an ICE facility to await a plane to take them back to their country of origin. While in detention, they learned for the first time from ICE officers, legal services organizations, and sometimes other detainees about the existence of the asylum process.

Many individuals told the ACLU that the only information CBP officers gave them was that they would be detained a long time—and probably deported anyway—unless they immediately signed a removal order. Moreover, many said the environment in which they were detained suggested that they had no rights.

Few people recalled CBP ever telling them of the existence of asylum, but several were given misinformation by CBP officials. Nydia R., a transgender woman from Mexico, said she told border officials that she had been attacked in Mexico and wanted help, but she was not referred for a CFI; she later successfully entered the United States without being apprehended, applied for and was granted asylum. "I didn't know the immigration agents could have helped me," Nydia said, recalling her previous attempts to enter the United States. "They had known all the reasons I was trying to come back to the U.S. and even knowing them, they sent me back."[200]

Cesar, who had been in the United States for 14 years when he was arrested by CBP, says he was not asked anything about his fear of returning to Mexico: "They didn't ask me anything. They were just mocking me. They asked why would I come into their land. I was trying to explain that there is a lot of violence in Mexico, and I don't want to die. . . . I asked to call my family, my sister or my wife, but they said they only give Central Americans, the elderly and kids that privilege." Cesar was deported to Reynosa, where he

still has some family: "I didn't last long because there were a lot of shootings."[201]

Felipe R., a 32-year-old Mexican, left the United States and his two U.S. citizen children to attend his father's funeral in Michoacán, Mexico, where he was kidnapped and held for ransom. He escaped and was caught by border officers when he attempted to reenter the United States in Laredo, Texas. Although he told the officers what had happened, Felipe said, "Border Patrol said I didn't have the right to claim asylum because the U.S. doesn't give asylum to Mexicans." He has tried multiple times to return to his children but says he has never been asked about fear of returning to Mexico.[202]

## 3. Failure to Refer Asylum Seekers to an Asylum Officer

While the majority of individuals interviewed by the ACLU said they were never asked about their fear of being deported, some did attempt to tell border officials that they were in danger and needed assistance, but they were still not referred to an asylum officer.

The regulation requiring border officers to refer a person to an asylum officer if they fear persecution or torture if returned to their country says nothing about the identity of the perpetrator; however, our interviews and a recently leaked UNHCR report indicate some border officers incorrectly think that violence from non-state actors, such as gangs or a family member, can never be the basis of an asylum claim and refuse to refer these asylum seekers for an interview.[203] In fact, if a government is unable or unwilling to protect an individual who otherwise satisfies the eligibility requirements for asylum, a perpetrator's non-state identity does not foreclose asylum.[204]

Nydia R., a transgender woman who had already been granted asylum in

the United States, was issued an expedited removal order when she arrived at the U.S. border after being attacked and raped by a gang; the gang had also tried to cut out her breast implants, and the wounds were fresh when she explained her story to CBP. CBP nevertheless deported her. Nydia returned, and although DHS records available to and in fact procured by the officers showed she had asylum status, DHS officers reinstated her removal order and deported her once again. In Mexico, she was raped, kidnapped by Los Zetas, and repeatedly attacked by gangs and other men because of her transgender status until she could return, without inspection, to the United States.[205]

Roberto Lopez-Gutierrez, a Mexican national, was kidnapped in Mexico and held for ransom in caves on the U.S.-Mexico border; when he escaped, he was arrested by CBP and referred for illegal entry prosecution. Although the CBP agent did ask if he was afraid of returning to Mexico and he said yes, the agent wrote that he said no, explaining in subsequent testimony that she wrote he had no fear because "he was afraid of kidnappers, not of government persecution."[206] The agent later admitted in court testimony that she was not trained in asylum law and that the regulation was silent on whether the violence needed to come from the government for a person to



After being attacked by a gang in Mexico, Nydia returned to the United States, where she had asylum status. Immigration officers ordered her deported.

CLR_RG_055017

# A Culture of Cruelty

**ABUSE AND IMPUNITY IN SHORT-TERM
U.S. BORDER PATROL CUSTODY**

**NO MORE DEATHS
NO MÁS MUERTES
2011**

CLP_PC_056155

# Table of Contents

**4 EXECUTIVE SUMMARY**
4 Introduction
5 Border Patrol Short-Term Custody Conditions
5 Border Patrol's Apprehension Methods & Border Deaths
6 Changing Demographics
7 Existing Standards for Custody and Repatriation
8 Recommendations & Conclusions
**10 PREFACE**
**11 INTRODUCTION**
**13 PART ONE: DOCUMENTATION FINDINGS & METHODOLOGY**
13 Documentation Methodology
14 Demographics and Characteristics of Sample
15 Areas of Concern
15 Psychological abuse
17 Failure to Provide and the Denial of Water in the Field and Processing Centers
19 Failure to Provide and the Denial of Food in the Field and Processing Centers
20 Failure to Provide Medical Treatment and Access to Medical Professionals
21 Inhumane Processing Center Conditions
24 Verbal Abuse
25 Physical Abuse
26 Dangerous Transportation Practices
28 Separation of Family Members
29 Dangerous Repatriation Practices
29 Failure to Return Personal Belongings
32 Due Process Concerns
33 Impact of Deportation on Those Who Have Lived in the U.S. for Many Years

No More Deaths / No Más Muertes

CLR_RC_056156

*clockwise from top left*

Memorial for Carlos La Madrid, age 19, shot four times and killed by Border Patrol on March 21, 2011.

Knee injury sustained from a fall while being chased by Border Patrol, subsequently denied medical care. This man was deported having only received newspapers to bandage what agents called "just a scratch" to mock him, laughing.

Slashed water bottles left by No More Deaths for people crossing the desert, demonstrating the destruction of life-saving aid supplies.

Photo from November, 2009 in Naco, Sonora. Injuries sustained when a Border Patrol agent shoved this man several times into the side of a vehicle.






33 Border Patrol Apprehension Methods and Border Deaths
33 Intentional funneling of migrants to deadly regions and the dispersal of groups as a tactic to apprehend migrants
34 Undermined Search and Rescue Efforts
34 Interfering with medical professionals who are providing aid to patients
**38 PART TWO: EXISTING STANDARDS AND POLICIES FOR BORDER PATROL CUSTODY**
39 Hold Rooms & Short-Term Custody Memorandum, U.S. Customs and Border Protection, June 2, 2008
40 Memorandum of Understanding Regarding Local Arrangement for Repatriation of Mexican Nationals April 2, 2009
40 Conclusion
41 Current Border Patrol Custody Policies: Shortcomings and Violations
**42 PART THREE: THE POLITICAL AND INSTITUTIONAL CONTEXT OF BORDER PATROL ABUSE**
42 Policies that Contribute to Border Patrol Abuse
42 Border Militarization and the Failure of Deterrence
42 The Criminalization of Immigrants
43 Recipe for Abuse: The Economic Incentives for Border Militarization
44 Weak Oversight Mechanisms and an Institutional Culture Hostile to Accountability
44 Border Patrol Resistance to Accountability
45 Limitations of the Office of Civil Rights and Civil Liberties (CRCL)
46 Conclusion
**47 PART FOUR: RECOMMENDATIONS AND CONCLUSION**
47 Overall Standards Regulating Short-Term Custody
50 Independent, Non-Governmental Oversight
50 Conclusion
**51 GLOSSARY**
**53 ACKNOWLEDGEMENTS**
**54 APPENDIX**
**70 ENDNOTES**

CLP_PC_056157

# A Culture of Cruelty

## ABUSE AND IMPUNITY IN SHORT-TERM U.S. BORDER PATROL CUSTODY

### EXECUTIVE SUMMARY

*"We were held with another woman who was coughing so badly that she threw up violently, over and over. The others in the cell called for help. An officer came over and said, 'Que se muera!' - 'Let her die!'"*
January 29, 2011 with three women in Nogales, Sonora

*"They treated me like a dog...They asked if [I] wanted water, but when [I] responded 'yes,' they wouldn't give [me] any."*
February 16, 2010, with a 16 year-old boy from Guatemala

## INTRODUCTION

In 2006, in the midst of humanitarian work with people recently deported from the United States to Nogales, Sonora, No More Deaths began to document abuses endured by individuals in the custody of U.S. immigration authorities, and in particular the U.S. Border Patrol. In September 2008 No More Deaths published *Crossing the Line* in collaboration with partners in Naco and Agua Prieta, Sonora. The report included hundreds of individual accounts of Border Patrol abuse, as well as recommendations for clear, enforceable custody standards with community oversight to ensure compliance. Almost three years later, *A Culture of Cruelty* is a follow-up to that report—now with 12 times as many interviews detailing more than 30,000 incidents of abuse and mistreatment, newly obtained information on the Border Patrol's existing custody standards, and more specific recommendations to stop the abuse of individuals in Border Patrol custody.

The abuses individuals report have remained alarmingly consistent for years, from interviewer to interviewer and across interview sites: individuals suffering severe dehydration are deprived of water; people with life-threatening medical conditions are denied treatment; children and adults are beaten during apprehensions and in custody; family members are separated, their belongings confiscated and not returned; many are crammed into cells and subjected to extreme temperatures, deprived of sleep, and threatened with death by Border Patrol agents. By this point, the overwhelming weight of the corroborated evidence should eliminate any doubt that Border Patrol abuse is widespread. Still the Border Patrol's consistent response has been flat denial, and calls for reform have been ignored.

We have entitled our report *"A Culture of Cruelty"* because we believe our findings demonstrate that the abuse, neglect, and dehumanization of migrants is part of the institutional culture of the Border Patrol, reinforced by an absence of meaningful accountability mechanisms. This systemic abuse must be confronted aggressively at the institutional level, not denied or dismissed as a series of aberrational incidents attributable to a few rogue agents. Until then we can expect this culture of cruelty to continue to deprive individuals in Border Patrol custody of their most fundamental human rights.

CLR_RC_056158

## BORDER PATROL SHORT-TERM CUSTODY CONDITIONS

Our documentation from Fall 2008 to Spring 2011 includes **4,130 interviews** with **12,895 individuals** who were in Border Patrol custody, including 9,562 men, 2,147 women, 533 teenagers (ages 13-18), and 268 children (ages 0-12). The majority of interviews were conducted in Naco (3,201), followed by Nogales (834), and Agua Prieta (62). Based on these interviews we have identified 12 areas of concern, and in the full report provide prevalence statistics and case examples for each denial of or insufficient water; denial of or insufficient food; failure to provide medical treatment or access to medical professionals; inhumane processing center conditions; verbal abuse; physical abuse; psychological abuse; dangerous transportation practices; separation of family members; dangerous repatriation practices; failure to return personal belongings; and due process concerns. Our findings include the following:

• Border Patrol agents denied food to **2,981 people** and gave insufficient food to **11,384 people**. Only 20 percent of people in custody for more than two days received a meal.

• Agents denied water to **863 people** and gave insufficient access to water to **1,402 additional people**. Children were more likely than adults to be denied water or given insufficient water. Many of those denied water by Border Patrol were already suffering from moderate to severe dehydration at the time they were apprehended.

• Physical abuse was reported by **10 percent** of interviewees, including teens and children. The longer people were held in custody, the more likely they were to experience physical abuse.

• Of the 433 incidents in which emergency medical treatment or medications were needed, Border Patrol provided access to care in only 59 cases—**86 percent** were deported without necessary medical treatment.

• The most commonly reported forms of inhumane processing center conditions were overcrowding (5,763 reports), followed by unsanitary conditions (3,107), extreme cold (2,922), and extreme heat (2,349).

• We recorded **2,926 incidents** of failure to return personal belongings: 398 cases of failure to return shoes or shoelaces, 211 cases of failure to return money, 201 cases of failure to return identification, 191 cases of failure to return important documents, and 125 cases where *no personal belongings were returned at all*. People deported without money or key personal belongings are at heightened risk of exploitation and physical harm.

• Border Patrol deported **869 family members** separately, including **17 children** and **41 teens**. Family separation frequently involved "lateral repatriation," or deportation through ports of entry that are distant from the location of apprehension. It is a costly practice that increases the risk of physical harm to those who are repatriated to unfamiliar or dangerous locations.

• **1,051 women**, **190 teens**, and **94 children** were repatriated after dark in violation of the Memorandum of Understanding between the Mexican Consulate and U.S. Customs and Border Protection and, in the case of children, the Trafficking Victims Protection Reauthorization Act (TVPRA) of 2008.

• Increasing reports of psychological abuse included threatening detainees with death; depriving them of sleep; keeping vehicles and cells at extremely hot or cold temperatures; playing traumatizing songs about people dying in the desert (*migracorridos*) loudly and continuously; and forced holding of strenuous or painful positions for no apparent reason other than to humiliate.

It is clear that instances of mistreatment and abuse in Border Patrol custody are not aberrational. Rather, they reflect common practice for an agency that is part of the largest federal law enforcement body in the country. Many of them plainly meet the definition of torture under international law.

## BORDER PATROL'S APPREHENSION METHODS & BORDER DEATHS

In 2009-2010 alone, at least 253 people died attempting to cross the border through southern Arizona. No More Deaths volunteers who patrol the region on a daily basis providing food, water, and medical aid, have identified three Border Patrol practices that further increase the risk of death in the desert and constitute their own forms of abuse:

> It is clear that instances of mistreatment and abuse in Border Patrol custody are not aberrational. Rather, they reflect common practice for an agency that is part of the largest federal law enforcement body in the country. Many of them plainly meet the definition of torture under international law.

CLP_PC_056159

### *March 15, 2010 with Jorge, 27, from Guatemala*

Six Border Patrol agents, including some on horses and motorcycles, surrounded his group of 10. He was thrown onto the ground face first and an agent hit him on the side with the butt of a gun while agents yelled insults. Jorge was held for three days in the Tucson processing center. When he repeatedly asked to see a doctor, he was denied. Agents threw out any food the detainees had and provided none even when it was requested; over the course of three days, they received only packets of crackers. Jorge now suffers chronic stomach pain as a result of going so long without eating. Border Patrol also took everyone's clothes except a t-shirt and pants and then turned on the air conditioning. Jorge says his belongings, including his birth certificate and $100 U.S. currency, were confiscated and not returned. Jorge has a cousin and father who live in Santa Monica, Calif., where he lived for 10 years before being deported. He was apprehended by Border Patrol as he attempted to return to them.

*Intentionally funneling migrants to deadly regions and the dispersal of groups as an apprehension tactic*

The Border Patrol implements a border strategy that intentionally pushes migrants into the deadliest corridors of the desert in a failed and inhumane policy of "deterrence." When Border Patrol finds migrants in the desert, the practice of "dusting"—using helicopters, vehicles, dogs, and horses to rush at and separate groups, apprehending some individuals while leaving others behind—makes those who have been scattered more likely to become disoriented and lost in the desert.

*Impeding search and rescue efforts*

Volunteers attempting to form search and rescue missions for people lost in the desert –including "dusting" victims– report agents withholding critical information about where an individual might be and responding to reports of missing persons inadequately, if at all. Volunteers also report Border Patrol agents interfering with medical professionals attempting to provide emergency aid.

*Vandalizing life-saving resources such as food, water, and blankets*

Life-saving humanitarian supplies left on migrant trails are frequently removed or destroyed. A high percentage of water bottles are slashed and food is often dumped out on the trail. Volunteers have witnessed Border Patrol agents pouring water out of bottles, and have come upon destroyed humanitarian resources immediately after seeing Border Patrol agents leave an area.

### Changing Demographics

No More Deaths interviews are conducted in a rapidly changing political and economic context. Border Patrol abuse can be seen as a predictable consequence of a national political climate that vilifies immigrants through a dizzying array of state and federal measures. While border-crossing attempts have purportedly dropped, there has been a sharp increase in deportations of those who have lived in the U.S. for many years. To better understand this shift in demographics, we began a

separate "Deportation Impact" survey to identify the top concerns of this population. From over 100 interviews, the average length of time living in the U.S. before deportation was 14.4 years. Interviewees had, on average, 2.5 children in the United States, and 46.6 percent reported that all of their children living in the U.S. were U.S. citizens.



Notably, 69.3 percent of those interviewed answered that they would continue to try to cross the border to reunite with family in the U.S. Individuals who named rejoining family as their number one reason to cross again were also more likely to report that their family was dependent on their income, that their youngest child in the U.S. was less than 5 years old, and that they were married or in a relationship. For many in this situation, with no other way to see their children, spouse or home again, no amount of personal risk or inhumane treatment will ever be an effective "deterrent." These individuals may be subjected to Border Patrol abuse on multiple occasions as they seek to return home.

CLR_RC_056160

# DETAINED BEYOND THE LIMIT

## Prolonged Confinement by U.S. Customs and Border Protection along the Southwest Border



By Guillermo Cantor, Ph.D.

CLP_PC_056275

SPECIAL REPORT | AUGUST 2016

## About the Cover

The cover photo is among the video stills submitted as exhibits in litigation filed against Border Patrol by the American Immigration Council, the National Immigration Law Center, the ACLU of Arizona, the Lawyers' Committee for Civil Rights of the San Francisco Bay Area, and Morrison & Foerster LLP. It depicts individuals wrapped in Mylar sheets sleeping on a concrete floor and benches in a cell so crowded there is no room to move around. This is a sample of conditions in Border Patrol's "short-term" detention facilities in the Tucson Sector. This and the other photos were released to the public on August 18, 2016.

## About the Author

Guillermo Cantor, Ph.D., is the Deputy Director of Research at the American Immigration Council, where he leads the Council's research efforts and manages the research team. He has authored numerous publications on immigration policy and immigrant integration and regularly appears in English and Spanish-language media. He also currently teaches sociology of migration at Georgetown University. Cantor holds a Ph.D. in Sociology from the University of Maryland, College Park.

## About the American Immigration Council

The American Immigration Council's policy mission is to shape a rational conversation on immigration and immigrant integration. Through its research and analysis, the American Immigration Council provides policymakers, the media, and the general public with accurate information about the role of immigrants and immigration policy in U.S. society. We are a non-partisan organization that neither supports nor opposes any political party or candidate for office.

Visit our website at *www.AmericanImmigrationCouncil.org* and our blog at *www.ImmigrationImpact.com*.

CLP_PC_056276

**CONTENTS**

**1**    Introduction

**3**    Border Patrol and CBP Standards Governing Detention

**4**    Overview of Detention Patterns in All Border Patrol Sectors
         in the Southwest Border Region

**10**   Conclusion

**11**   Endnotes

CLP_PC_056277

# INTRODUCTION

For some time now, U.S. Customs and Border Protection (CBP) has been in the spotlight for its questionable practices regarding the treatment of migrants. One such practice concerns the manner in which the Border Patrol—a component of CBP—operates its holding facilities near the U.S.' southern border. Each year, hundreds of thousands of individuals are held in these facilities, which are meant to hold individuals for a short time while they undergo initial processing and until a decision is made about the appropriate next step in their case. The holding cells, which are often referred to as "hieleras" (Spanish for "freezers" or "iceboxes"), are typically small concrete rooms with concrete benches and no beds.  They are not designed for overnight custody, and yet they are routinely used in this way. Government records analyzed in this report, which contain information on length of detention for all Border Patrol sectors along the U.S.' southwest border, reveal that individuals are frequently held for days and sometimes even months in such facilities.

As numerous reports, media accounts, and documented complaints of former detainees have previously shown, these facilities remain wholly inadequate for **any** overnight detention. Moreover, the conditions are reprehensible—as consistently reported by many who were held in them—even with respect to truly short-term detention. In addition to the fact that there are no beds in the holding cells, these facilities are extremely cold, frequently overcrowded, and routinely lack adequate food, water, and medical care.[1]

This report, which is based on never-before-released government data and documents obtained by the American Immigration Council through the Freedom of Information Act (FOIA), examines length of detention in nine Border Patrol sectors: Big Bend, Texas; Del Rio, Texas; El Centro, California; El Paso, Texas; Laredo, Texas; Rio Grande Valley, Texas; San Diego, California; Tucson, Arizona; and Yuma, Arizona. Between September 1, 2014 and August 31, 2015, 326,881[2] individuals were held in CBP facilities across the southwest border. Of the cases analyzed, which include only cases with complete data (326,728), 69,016 (21.1 percent) are women. Mexican nationals represent the largest share (57.1 percent) of those detained in CBP facilities during this period, followed by Guatemalans (16.9 percent), Salvadorans (12.7 percent), and Hondurans (9.8 percent).

CLP_PC_056278



Looking at all sectors combined, the data reveals that a shocking 217,485 individuals (or 67 percent of the total number detained during this period) were held in CBP facilities for 24 hours or more; 93,566 (29 percent) for 48 hours or more; and 44,202 (14 percent) for 72 hours or more.[3] The average number of hours that individuals were detained shows some variation, ranging from 65 hours at its lowest point in July 2015 to 104 hours at its peak in October 2014.

Length of detention varies considerably across border sectors. For example, lengthy detention is remarkably frequent in the Laredo, Rio Grande Valley, Tucson, Yuma, and El Centro sectors.  Laredo in particular shows the most disturbing numbers; 54 percent (19,000) of the 35,494 individuals held in detention facilities in Laredo were detained for at least 72 hours.

A recent report by the U.S. Government Accountability Office (GAO) raises questions about the possible existence of irregularities in the way Border Patrol officers capture information on length of detention. Consequently, the data presented here should be interpreted with caution.[4] However, the findings of our analysis are consistent with those reported in previous publications by the American Immigration Council. For example, according to a report released in May 2015, 58,083 individuals—or over 80 percent of people detained by the Border Patrol in its Tucson Sector between January 1, 2013 and June 30, 2013—were held for over 24 hours, and 10.9 percent (7,839 individuals) were held for 72 hours or more.[5] Another report which focused on the Rio Grande Valley Sector showed that during the months of August, September, October, and December of 2013, the share of individuals detained for over 72 hours ranged from 2.3 percent of all detainees at its lowest point to 42.5 percent at its peak.[6]

Lengthy detention is especially problematic given the inhumane conditions that characterize these holding facilities. The findings presented in this report document a troublesome reality: lengthy detention is not just a random occurrence that happens to a few individuals in one or two Border Patrol sectors; it is, instead, a systemic practice that affects, to varying degrees, all the sectors along the southwest border.

CLP_PC_056279

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 2/16/2021 | threats | 2 | A Honduran woman and her 4-year-old son, who had been returned to Mexico under MPP, were threatened by her ex-partner who is member of MS-13 in January and February 2021. He told her the gang is looking for her in Mexico. He threatened to kill her and kidnap her son. In late February 2021, CBP denied the family parole and refused to provide them an MPP fear of Mexico screening interview. | Human Rights First communication with Margaret Cargioli, Immigrant Defenders Law Center |
| 2/16/2021 | attempted kidnapping, assault | 3 | In February 2021, an asyulum-seeking family returned to Mexico under MPP were attacked while buying diapers by men who tried to kidnap their 2-year-old child. The father managed to hold on to the son, and the kidnappers drove off. The father went to report the kidnappig to the police, but an officer told them not be out that late at night. | Human Rights First communication with Margaret Cargioli, Immigrant Defenders Law Center |
| 2/26/2021 | kidnapping | 2 | DHS expelled a Guatemalan woman and her son to Ciudad Juarez in mid-February 2021, where they had been kidnapped soon after arriving in early February. They had been held in a house for days without food or water. | Human Rights First interview with asylum seeker |
| 3/5/2021 | kidnapping | 2 | Un niño y su madre fueron privados de la libertad en el campamento migrante instalado en las inmediaciones del cruce fronterizo El Chaparral, acusó José Luis Pérez Canchola, director de Atención al Migrante en el ayuntamiento de Tijuana. | https://www.milenio.com/estados/reportan-secuestro-mujer-hijo-migrantes-campamento-tijuana |
| 3/22/2021 | kidnapping, rape | 1 | A woman expelled by DHS to Reynosa in February 2021, "who had tried to take a taxi to a friend's house [was] kidnapped and raped." | https://www.latimes.com/world-nation/story/2021-03-22/hundreds-of-migrants-cross-this-stretch-of-the-rio-grande-nightly |
| 3/23/2021 | assault, robbery | 1 | A Honduran asylum seeker who has been blocked in Tijuana with his family for months unable to seek protection at the port of entry was assault and robbed in Tijuana in February 2021. | Human Rights First interview with asylum seeker |
| 3/23/2021 | assault | 1 | A Haitian asylum seeker blocked from seeking asylum due to the Title 42 policy reported that he had been assaulted by a group of Meixcan men in late January 2021. The men asked him for money and when he told them that he was a migrant and had no work, they beat him. | Human Rights First interview with asylum seeker |
| 3/23/2021 | assault | 3 | Dos menores de edad y un adulto, que viajaban como migrantes, resultaron heridos tras una agresión a balazos en la entrada a la ciudad de Reynosa, Tamaulipas, cuando iban de aventón en una camioneta. | https://www.excelsior.com.mx/nacional/atacan-a-balazos-a-migrantes-en-reynosa/1439435 |
| 3/26/2021 | kidnapping | 4 | DHS expelled a Salvadoran asylum-seeking family with two little girls to Tijuana after they crossed the border near Reynosa to seek asylum even though the family had previously been kidnapped in Mexico in early March 2021. The kidnappers threatened to kill the children and sell their organs, if they failed to pay the ransom demanded. | Human Rights First interview with asylum seeker |
| 3/27/2021 | kidnapping | 37 | Policías Estatales de Tamaulipas rescataron a 37 migrantes en Matamoros, que llevaban secuestrados 15 días. Entre los rescatados se encuentran 30 adultos y 7 niños, cuyas nacionalidades no fueron especificadas aunque todas son diferentes. | https://www.reporteindigo.com/reporte/rescatan-a-37-migrantes-secuestrados-en-tamaulipas/ |
| 4/2/2021 | threat, robbery | 1 | A Haitian asylum seeker in the Tijuana tent encampment waiting for asylum processing to be restored at U.S. ports of entry reported that in late March 2021, a man threatened to hit with a rock and tried to steal a backpack of his personal belongings. | Human Rights First interview with asylum seeker |
| 4/3/2021 | assault | 1 | A Honduran asylum seeker in the Tijuana tent encampment waiting for asylum processing to be restored at U.S. ports of entry reported that Mexican men he'd believed to be gang members had asked him to sell drugs in the camp and had beat him up when he refused. | Human Rights First interview with asylum seeker |
| 4/5/2021 | threats | 1 | An African asylum seeker in the Tijuana tent encampment waiting for asylum processing to be restored at U.S. ports of entry reported that in response to the African asylum seeker speaking out about racism against Black migrants in the camp, a Mexican man took pictures of him and made threatening remarks to him on several occasions. | Human Rights First interview with asylum seeker |
| 4/6/2021 | threats | 1 | A Honduran asylum seeker in the Tijuana tent encampment waiting for asylum processing to be restored at U.S. ports of entry reported that Mexican men he'd believed to be gang members threatened him multiple times; telling him they had "eyes on him," to "watch his back," and warning him not to talk to anyone outside the camp. | Human Rights First interview with asylum seeker |
| 4/8/2021 | kidnapping | 1 | Denuncia migrante de origen centroaméricano secuestro de polleros en PN. Escapó de una casa de seguridad que polleros tienen en la zona centro de Piedras Negras | https://www.facebook.com/565075333903260/posts/1137379356672852 |

CLP_PC_076248

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 4/8/2021 | rape, kidnapping, assault, extortion | 423 | Asylum seekers from Colombia, Cuba, El Salvador, Guatemala, Haiti, Jamaica, Nicaragua, Peru, Venezuela, and Yemen blocked from seeking U.S. asylum due to Title 42 reported having been the victim of an attack or attempted attack in Mexico in the last month in a survey by Al Otro Lado conducted between February 21 and April 8, 2021. | Human Rights First review of Al Otro Lado survey data |
| 4/8/2021 | kidnapping, threats | 2 | A Honduran asylum seeker and her 6-year-old child were expelled to Mexico by CBP in March 2021 even though the family had been kidnapped in Mexico in early March 2021. They managed to escape the kidnappers but were purused by a man in a car after the escaped who threatened to kill them. | Human Rights First interview with asylum seeker |
| 4/9/2021 | kidnapping | 2 | Wilton and his mother, Meylin, 30, crossed the border into Texas last month to seek asylum after fleeing their native Nicaragua. But they were immediately sent back to Mexico under Title 42, a pandemic-era policy that expels migrants who cross the border without allowing them to apply for protection. Hours after being expelled to northern Mexico, they were kidnapped, according to Misael Obregon, Meylin's brother, who lives in Miami. Misael received a call from the kidnappers. They wanted $10,000 to release Meylin and Wilton. "They threaten to hurt them both, or worse," Misael Obregon said. "These people are capable of anything." Misael could come up with only $5,000. He sent the cash through a money transfer company. The kidnappers agreed to release Wilton, but not his mother. The smugglers then abandoned Wilton after leading him across the border, leaving him to wander through the arid farmland of South Texas looking for assistance, until he found the Border Patrol agent who recorded his encounter with the boy. Meylin remains in the custody of kidnappers. She called Misael Obregon on Friday morning, crying after seeing the video of her bleary-eyed son. The Nicaraguan government on Friday identified Wilton as being the boy in the video, but it did not mention the kidnapping. It said Nicaraguan police had interviewed the boy's father, who confirmed that Meylin had told him in their last conversation that she and Wilton were preparing to cross the border together because they were "in danger." | https://www.washingtonpost.com/world/2021/04/09/migrant-boy-found-wandering-alone-texas-had-been-deported-kidnapped/ |
| 4/18/2021 | threats | 1 | In one recent case, a man who turned up at the shelter said he had been pressured by drug traffickers to carry a load across the border. "The drug cartel was trying to force him to carry drugs, and he refused," Williams said. "He wanted to give the Border Patrol information." According to Williams, the man was told that would take too much time because it involved filing a police report. He was expelled. | https://theintercept.com/2021/04/18/biden-border-patrol-asylum-title-42/ |
| 4/18/2021 | assault, robbery, threats | 1 | Esmerelda was not a new arrival. She and her family came to Nogales in November 2019, fleeing violence and persecution in their home state of Guerrero... In the past couple months, la mafia has assaulted her husband twice, she told me, robbing him, stealing his phone, telling him that if speaks up he will be murdered. | https://theintercept.com/2021/04/18/biden-border-patrol-asylum-title-42/ |
| 4/20/2021 | kidnapping | 3 | Nine- and fourteen-year-old Honduran children were kidnapped with their asylum-seeking mother in Monterrey in March 2021 after CBP expelled them three times since December 2020. The family had relocated to Monterrey in hope of finding assistance while they waited to be able to seek asylum in the United States. Instead, they were kidnapped, held for ransom for days with other kidnapping victims who appeared to have been drugged, and eventually released near the border. Border Patrol agents, who found the family near McAllen, detained them for four days before transferring them to California where they were expelled to danger for a fourth time. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | rape | 1 | In February 2021, a Guatemalan woman who had been expelled by CBP to Mexicali after attempting to seek asylum was raped in Tijuana. The woman, who was fleeing severe domestic violence with her six-year-old daughter, had relocated to Tijuana to attempt to seek asylum at the San Ysidro port of entry, which she found closed to asylum seekers due to the Trump and Biden administrations' misuse of Title 42. The woman reported to Human Rights First that Border Patrol agents told her that "the new president isn't taking anyone" and that she should present herself "legally" even though ports of entry were, and remain, closed to asylum seekers in violation of U.S. law, which guarantees access to asylum to individuals who cross the border away from a port of entry. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 3 | In late February 2021, a Guatemalan family with a six-year-old child was abducted at a bus station in Piedras Negras shortly after Border Patrol agents expelled them to Mexico. They were held by their captors for five days while their family members in Guatemala and the United States were extorted. The couple had fled Guatemala with their child after the husband was attacked and nearly killed, according to an academic researcher who spoke with Human Rights First. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 4/20/2021 | kidnapping, assault | 3 | In February 2021, a Honduran man and two other expelled migrants were abducted at gunpoint, forced into a cemetery, and attacked immediately after the Border Patrol expelled them to Nogales at 11pm. According to Kino Border Initiative, the men were searching for shelter for the night when they were attacked. They had been expelled by the Border Patrol with a group of more than 40 people from Central America and Mexico. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 1 | Multiple asylum seekers reported that a woman flown from Texas and expelled to Mexico was kidnapped in March 2021 just outside of a shelter in Tijuana housing hundreds of expelled families. The pastor running the shelter has instructed families not to leave the shelter for their safety. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 2 | CBP expelled a 15-year-old Guatemalan boy and his asylum-seeking mother to Ciudad Juárez where they had been kidnapped in February 2021. The woman told Human Rights First researchers that when she tried to explain the danger she faced, U.S. immigration officers told her that they didn't care because "the president is not giving political asylum to anyone." CBP expelled the family to dangerous Ciudad Juárez at night during a snowstorm after they were held in CBP custody for days without food or water. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping, assault | 1 | A Honduran asylum seeker was expelled by CBP to Mexico in March 2021 even though he had just been kidnapped in Piedras Negras by masked men who brutally beat, drugged, and threatened him with decapitation. Two Honduran migrants were also abducted and beaten along with the man. One of them sought protection in the United States days after being released by the kidnappers, but was expelled by CBP, according to an academic researcher who spoke with Human Rights First. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 5 | In April 2021, CBP expelled a Honduran asylum-seeking family, including three children under the age of five, to Mexico even though they had been abducted in Reynosa by Mexican police officers who sold them to a cartel. While being held for ransom, a cartel member held a gun to the mother's head and demanded phone numbers of family members to pay the ransom. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 4 | In late March 2021, CBP expelled a Honduran asylum-seeking family with five- and six-year-old children to Tijuana where one of the men who kidnapped them in Reynosa has been prolling outside of their shelter. The family fears that a woman who had been kidnapped with them has been abducted again after she disappeared days after they were expelled together. They are terrified to leave the shelter. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping, robbery | 1 | In March 2021, Border Patrol expelled a Honduran asylum seeker at 2 a.m. even though he explained that he had been kidnapped and robbed in Mexicali after CBP turned him away from requesting asylum at the port of entry. The man had fled Honduras after authorities violently attacked him and tried to yank out his eye for filming illegal government acts. Border Patrol agents threw out the evidence he had brought with him in support of his asylum claim, according to Kino Border Initiative. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping, rape, torture | 1 | In February 2021, a young woman who was kidnapped in Mexico, held hostage for weeks, repeatedly raped and tortured by her captors, trafficked into the United States, and then dumped in Phoenix, was not found to have a fear of Mexico under the Title 42 torture screening. CBP expelled the woman to Mexico after she was taken to a hospital for evaluation of the sexual trauma she suffered, according to the Florence Immigrant and Refugee Rights Project. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | assault, threats | 1 | A Guatemalan asylum seeker who has been blocked from requesting asylum at a U.S. port of entry was attacked while pregnant in Tijuana in January and February 2021 by the gang that threatened to kill and dismember her in Guatemala if she refused their sexual demands. The woman narrowly escaped the gang while they ransacked the place in Tijuana where she had been staying and beat her partner, who subsequently disappeared, according to Margaret Cargioli, a lawyer with the Immigrant Defenders Law Center. The woman suffered a miscarriage in March 2021 because she was too terrified to leave her home to seek prenatal care after the attack. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | assault | 2 | In March 2021, a group of Jamaican LGBT asylum seekers in Tijuana were attacked while being thrown out of a restaurant; one man had his face cut with a broken bottle. In addition, an LGBT Jamaican man was assaulted in Cancun in front of his 8-year-old son. Both attacks were motivated by anti-LGBTQ and anti-Black prejudice. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |

CLP_PC_076250

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 4/20/2021 | kidnapping | 1 | CBP expelled an 18-year-old Salvadoran asylum seeker, who attempted to cross into the United States after twice being kidnapped in Mexico, after he fell from the border wall and suffered a severe back injury. The young man was expelled in the middle of the night to dangerous Ciudad Juárez in a hospital nightgown, barely ambulatory, and in pain after spinal surgery. His mother and brother, who had also been kidnapped twice in Mexico, were separated from him and expelled to Mexico, leaving the young man alone in hospital, according to his lawyer Kenneth Mayeaux. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 8 | In April 2021, multiple asylum seekers informed Human Rights First that members of a violent gang that operates throughout Central America and Mexico forcibly abducted at least 8 individuals from the encampment in recent days, including some pulled from their tents at night. They remain missing. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | kidnapping | 4 | A Mexican asylum seeker told Human Rights First that she witnessed a group of men kidnap a Salvadoran woman and her three children near the tent encampment in mid-March 2021. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | attempted kidnapping | 1 | A Salvadoran asylum seeker reported that in March 2021, her daughter was nearly kidnapped from the Tijuana encampment by a man who grabbed the girl and ran several blocks before the girl's uncle could stop him. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | assault | 1 | In February 2021, a man with a baton severely beat a Haitian asylum seeker in Tijuana in front of Mexican police, who did not intervene, according to a Haitian asylum seeker who witnessed the incident. She told Human Rights First: "We felt like we couldn't say anything because we don't have any power here and we were afraid for our own lives. Haitians are targeted here . . . the police don't care. We have to protect ourselves and look out for one another." | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | assault | 1 | In February 2021, a pregnant asylum seeker was brutally beaten by a Mexican official in retaliation for having filed a complaint against him for an immigration scam and suffered a miscarriage as a result of the attack. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/20/2021 | threats | 1 | In January 2021, a Haitian asylum seeker in Tijuana who confronted a hotel owner about money stolen from his room was threatened at gunpoint by the owner's son, a Mexican police officer. | https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum |
| 4/21/2021 | kidnapping | 1 | Teresa, a Honduran woman, was kidnapped after DHS expelled her to Nuevo Laredo. The Mexican immigration officers who received Teresa turned her over to a cartel , who held her for ransom. | https://www.breitbart.com/border/2021/04/21/exclusive-mexican-immigration-office-turned-me-over-to-a-cartel-says-migrant/ |
| 4/21/2021 | kidnapping | 25 | Agentes de la unidad especializada en el combate al secuestro de la fiscalía de justicia del Estado de Tamaulipas,  rescataron a una 25 personas migrantes entre ellos ocho menores de edad. | https://www.krgv.com/news/rescatan-a-25-migrantes-secuestrados-en-reynosa-tamaulipas/ |
| 4/23/2021 | kidnapping | 1 | La madre hondureña Patricia Estrada, radicada en Estados Unidos, denunció este viernes el secuestro de su hijo de 25 años en Nuevo Laredo, México. Detalló que los captores le solicitan 10 mil dólares (224 mil lempiras), los cuales no tiene, que serían entregados en dos pagos. | https://proceso.hn/madre-hondurena-denuncia-secuestro-de-hijo-en-mexico-piden-10-mil-para-su-liberacion/ |
| 4/27/2021 | kidnapping | 3 | One Honduran woman who reached the U.S. with her husband and one-year-old daughter was sent to Nuevo Laredo on April 6 under Title 42, and kidnapped the same day. "My daughter cried all night long and I think that's what saved us," she wrote in a text message. "They asked us if we had family in the U.S. and we said no. At 7 a.m. they let us go and dropped us off in front of the shelter. We are terrified of leaving here." | https://www.vice.com/en/article/k78abz/biden-is-still-sending-thousands-of-migrants-back-to-dangerous-border-cities-and-kidnappers |
| 4/27/2021 | kidnapping, extorsion | 4 | Desde que fue habilitado el gimnasio Kiki Romero como albergue migrante el pasado 5 de abril, se han reportado cuatro personas migrantes que sufrieron secuestro y extorsión por parte de los llamados "polleros" antes de llegar al albergue, quienes les pidieron sumas de dinero para dejarlos en libertad. | https://www.elsoldemexico.com.mx/republica/sociedad/migrantes-sufren-extorsiones-y-secuestros-por-polleros-en-juarez-noticias-ciudad-juarez-coronavirus-chihuahua-6647749.html |

CLP_PC_076251

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 4/29/2021 | attempted kidnapping | 4 | Two Central American asylum-seeking migrant families including two young children were kidnapped while traveling by van from Ciudad Juarez to Tijuana, along with two service providers who were guiding them. They managed to escape their kidnappers. Another Salvadoran asylum seeker who was staying at the same Tijuana shelter told Human Rights First that the familes had recalled the traumatic kidnapping incident to her after they had arrived there. | Human Rights First interview with asylum seeker |
| 4/29/2021 | kidnapping | 2 | Suspected gang members kidnapped two families from their tents in the Tijuana encampment near the San Ysidro port of entry, where some 2000 migrants and asylum seekers blocked from requesting U.S. protection due to Title 42 had been living, according to a Honduran asylum seeker living in the tent encampment who witnessed the kidnappings. | Human Rights First interview with asylum seeker |
| 4/29/2021 | kidnapping | 2 | On March 26, an advocate was contacted by a family member of a pregnant woman who was expelled under Title 42 with her 4-year-old son to Nuevo Laredo. Upon being expelled, they were kidnapped by one of the cartels in the area that was extorting their family member for over $20,000. The family reported that the 4-year-old had a fever and was vomiting for several days while they were kidnapped. | https://www.latimes.com/politics/story/2021-04-28/biden-title-42-policy-fueling-kidnappings-of-migrant-families-at-border-and-extortion-of-u-s-relatives |
| 4/29/2021 | assault | 2 | A Honduran asylum seeker told Human Rights First that on the night of April 28, 2021, suspected gang members set fire to the tent of a family they had specifically targeted in the Tijuana encampment near the San Ysidro port of entry, where some 2000 migrants and asylum seekers blocked from requesting U.S. protection due to Title 42 are living, and that nearby residents evacuated their tents and ran from the encampment in a panic. | Human Rights First interview with asylum seeker |
| 4/29/2021 | assault | 1 | A Central American child was assaulted outside the San Ysidro port of entry in Tijuana. A witness told Human RIghts First that the child had been part of a group of asylum seekers and migrants protesting Title 42 border closures at the port of entry, and that the assailant was a vendor in the area. The video shows the man punching the child. | Video shared with Human Rights First by asylum seeker; https://zetatijuana.com/2021/05/comerciantes-de-la-linea-atacan-a-migrantes-que-se-plantaron-en-san-ysidro/ |
| 5/1/2021 | kidnapping | 9 | Un total de nueve migrantes que estaban secuestrados y encerrados en una casa de la colonia Insurgentes fueron rescatados por elementos de la Policía de Investigación, quienes detuvieron a dos mujeres que los custodiaban, reportó la Agencia Estatal de Investigaciones (AEI). | https://diario.mx/juarez/rescatan-a-9-migrantes-secuestrados-20210430-1789881.html |
| 5/3/2021 | kidnapping | 2 | Un niño y su madre fueron privados de la libertad en el campamento migrante instalado en las inmediaciones del cruce fronterizo El Chaparral. | https://www.milenio.com/estados/reportan-secuestro-mujer-hijo-migrantes-campamento-tijuana |
| 5/8/2021 | kidnapping | 17 | Fueron rescatados 17 migrantes procedentes de diferentes nacionalidades, que se encontraban secuestrados por presuntos narcos del Cártel del Golfo (CDG) quienes les exigían $2,000 dólares mientras los retenían en un domicilio en el municipio de Reynosa en el estado fronterizo de Tamaulipas en México. | https://laopinion.com/2021/05/08/rescatan-a-17-migrantes-secuestrados-por-cartel-del-golfo-les-pedian-2000-dolares-para-liberarlos/ |
| 5/10/2021 | kidnapping | 5 | Cinco migrantes estuvieron encerrados en una casa por casi dos semanas en Tamaulipas, ya que las personas que los llevarían a Estados Unidos, les pedían 8 mil dólares para cruzarlos y si no pagaban, serían entregados a integrantes de la delincuencia organizada. | https://www.milenio.com/policia/tamaulipas-migrantes-secuestrados-exigen-dinero-liberarlos |
| 5/12/2021 | kidnapping, assault, robbery | 3 | Dos de las cinco niñas inmigrantes que aparecieron solas cerca de la frontera sur de Estados Unidos el pasado domingo, habrían sido secuestradas en México junto a su madre y tuvieron que pagar miles de dólares para ser liberadas antes de lograr pasar hacia EEUU...Los encerraron en un cuarto sin ropa y les daban de latigazos...el rescate costó alrededor de 3,000 dólares y, una vez libre, Daisy decidió cruzar hacia EEUU, pero relató que en la frontera encontraron a policías que, a punta de pistola, le quitaron todo el dinero que llevaba. | https://www.univision.com/noticias/inmigracion/dos-de-las-cinco-ninas-que-aparecieron-en-la-frontera-habian-sido-secuestradas |
| 5/13/2021 | kidnapping | 4 | A family with two young daughters that had been expelled to Tijuana after crossing into Texas in March 2021 was kidnapped in Tijuana in April 2021 by armed men who lined them up against a wall and told them they'd have to pay $1000 to be released. The family managed to escape when a police officer approached. | Human Rights First communication with asylum seeker |
| 5/15/2021 | kidnapping | 22 | La Policia Estatal rescatan a 22 migrantes secuestrados en Tamaulipas. | https://www.elmanana.com/rescatan-a-22-migrantes-secuestrados-en-vivienda-autoridades-delitos-investigan/5346257 |

CLP_PC_076252

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 5/17/2021 | kidnapping | 2 | Maribel shares a tent in Reynosa's main square with her teenage son and 10 other people. She left El Salvador to prevent her son from being recruited by criminal gangs. But her nightmare caught up with her at a hotel in Reynosa a few weeks ago. "We were kidnapped for five days. They took our phones and the money we had," she said. They were locked up in a house in one of the city's more humble neighborhoods along with about 90 other migrants, all Central Americans. | https://www.nbcnews.com/news/latino/kidnapping-onerous-fees-central-americans-returned-mexico-are-targets-rcna929 |
| 5/17/2021 | kidnapping, sexual assault | 3 | One family — a mother, father and their 12-year-old son from Honduras — recently came to Sister Horan for help. They said that a gang recently held them for ransom in a dark room for hours. The mother was sexually assaulted. | https://www.pri.org/stories/2021-05-17/many-asylum-seekers-are-returned-us-mexico-border-under-title-42-advocates-call |
| 5/18/2021 | kidnapping, assault | 4 | Two Honduran fathers and their young sons were expelled to Ciudad Juarez on the night of March 14, 2021. With churches and service providers closed for the night, they wandered the streets looking for a place to stay. A man who offered them a room kidnapped and assaulted them, and demanded $2000 ransom from their families for their release. | Human Rights First interview with asylum seeker |
| 5/18/2021 | kidnapping | 1 | Desde Honduras, una madre suplica a los secuestradores de su hijo en México que no lo lastimen y les pide un tiempo para pagar los 3,000 dólares que solicitaron a cambio de su liberación. | https://www.telemundo.com/noticias/noticias-telemundo-mediodia/inmigracion/video/les-pido-que-me-lo-regresen-con-vida-el-drama-de-la-madre-de-un-migrante-secuestrado-en-tmvo9828421 |
| 5/18/2021 | kidnapping | 1 | "Me decía que 'la señora' me iba a dar cuello", recuerda "Alejandro", un migrante mexicano originario de Guerrero, quien la semana pasada llegó a Ciudad Juárez en busca de asilo político en Estados Unidos, pero fue interceptado en la central camionera y secuestrado durante tres días. | https://www.eldiariodechihuahua.mx/estado/me-decia-que-la-senora-me-iba-a-dar-cuello-narra-migrante-como-lo-secuestraron-en-juarez-20210518-1796317.html |
| 5/18/2021 | kidnapping | 2 | Maribel, también salvadoreña y de 47 años, se refugia en la misma plaza junto a su hijo adolescente. Comparten una carpa con otras 10 personas. Salió de El Salvador para evitar que su hijo fuera reclutado por las pandillas criminales. Pero su pesadilla la alcanzó cuando estaban en un hotel de la misma ciudad, Reynosa, unas semanas atrás. "Fuimos secuestrados durante cinco días. Nos quitaron los teléfonos y el dinero que llevábamos", asegura. | https://www.telemundo.com/noticias/noticias-telemundo/inmigracion/secuestros-de-3000-coyotes-que-se-aprovechan-y-violaciones-los-traficantes-abusan-de-los-tmna3882927 |
| 5/19/2021 | assault | 1 | A Haitian man living in the Tijuana encampment near the San Ysidro port of entry, where some 2000 migrants and asylum seekers blocked from requesting U.S. protection due to Title 42 are living, was attacked by men who hit him repeatedly, knocking him onto a tent and destroying it. While he was on the ground, one of the attackers attempted to strike his head with a large rock, but the Haitian man moved out of the way in time to avoid being hit, according to a Honduran asylum seeker who witnessed the attack. | Human Rights First interview with asylum seeker |
| 5/19/2021 | kindapping | 3 | "El grupo de padres lleva más de una semana caminando en medio del monte con el objetivo de volverse a reunir con las pequeñas que fueron abandonadas en un rancho en Texas. Los inmigrantes aseguran que fueron secuestrados luego de que sus hijas atravesaron la frontera. 'A las niñas las cruzaron primero y luego el balsero regresó por nosotros, pero ya nos tenían agarrados del lado mexicano', contó Daisy Sánchez, la madre de las dos menores guatemaltecas de 5 años y 11 meses." | https://www.univision.com/shows/noticiero-univision/es-algo-muy-dificil-el-drama-que-viven-los-padres-de-cuatro-de-las-cinco-ninas-abandonadas-en-la-frontera-video |
| 5/21/2021 | kidnapping | 2 | "Griselda a 23-year-old woman traveling with her 5-year-old daughter left Guatemala where she was extorted by gangs that demanded part of her paycheck for allowing her to work at a grocery store. She refused. They threatened to kidnap her young daughter. . . . In Mexico, she encountered the very same thing she was running away from. She said she was kidnapped by cartel gangs posing as police and was given three days to pay $6,000 or they threatened to kill her. Her family back in Guatemala had to scramble to get the money to free her." | https://www.nbcdfw.com/news/local/migrants-turned-away-at-el-paso-border-due-to-covid-19-concerns/2638893/ |

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 646 of 721

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 6/1/2021 | kidnapping, attempted, kidnapping, forced disappearance, human trafficking | 7 | At least 10 migrants and asylum seekers interviewed in Ciudad Juárez in March 2021 were victims of violent crimes in Mexico. | https://sjmmexico.org/wp-content/uploads/2021/11/Juarez_2021.pdf |
| 6/2/2021 | kidnapping | 2 | "On May 25, Anna and her 7-year-old son, Walter, sat sobbing on the curb. Anna and Walter, of El Salvador, had once again been caught by the Border Patrol trying to enter the U.S. undetected, and they feared a repeat of what happened the last time they were caught. In April, U.S. border agents had sent them back into the Mexican city of Nuevo Laredo, where, Anna said, they were kidnapped and held for $10,000 ransom." | https://www.nbcnews.com/politics/immigration/under-biden-crossing-u-s-border-has-become-lottery-migrants-n1269263 |
| 6/2/2021 | sexual assault | 1 | A trans woman from Honduras was sexually assaulted and then stalked and threatened with death by the attacker in Chiapas in May 2021. She had fled Honduras due to physical and verbal abuse on the basis of her sexual orientation and gender identity. | Human Rights First phone interview with asylum seeker |
| 6/3/2021 | kidnapping | 1 | A LGBTQ asylum seeker from Honduras was kidnapped in Nuevo Laredo in February 2021 after fleeing discrimination in his home country. He was held captive at gunpoint for 15 days with 23 other kidnapped people. He was forced to call his father at gunpoint and tell his father to pay a ransom. | Human Rights First phone interview with asylum seeker |
| 6/4/2021 | assault, robbery | 1 | A trans woman from Guatemala was assaulted and robbed in Piedras Negras in April 2021 while waiting for U.S. asylum processing to resume. | Human Rights First interview with asylum seeker |
| 6/7/2021 | assault, attempted kidnapping | 1 | In May 2021, a gay Honduran man who had fled death threats in his home country escaped a kidnapping attempt in a park in Piedras Negras, Mexico. The Honduran asylum seeker had been walking in a park when a man pulled his car up to him and demanded that the Honduran man get into his car and provide sexual services. When the Honduran man refused, the assailant jumped out of the car and grabbed him from behind, stabbing him in the arm, and tried to force him into the car. | Human Rights First interview with asylum seeker |
| 6/7/2021 | kidnapping, rape | 1 | A Honduran trans asylum seeker, who'd fled Honduras after she was attacked by the gang for her sexual orientation and her brother was beheaded, was raped multiple times in Mexico in Nuevo Laredo and Piedras Negras. In Piedras Negras, she was kidnapped and raped in May 2021 and had to escape her kidnappers by jumping out a window. She landed on a cactus plant and got thorns stuck all over her body. | Human Rights First phone interview with asylum seeker |
| 6/7/2021 | kidnapping, assault, rape, threats | 1 | In April 2021, an 18-year-old trans woman from El Salvador who'd fled death threats in her home country was assaulted and robbed in a border city by men who told her they'd planned to "disappear" her. The woman managed to escape and remained in the same city as her assailants, blocked from requesting U.S. asylum due to Title 42 and terrified to leave her shelter. | Human Rights First phone interview with asylum seeker |
| 6/7/2021 | rape | 1 | An Indigenous Guatemalan transgender woman who had been trafficked for sexual exploitation was raped by Mexican police in Tijuana in early 2021 after having waited nearly a year to request U.S. asylum. | Human Rights First communication with Nicole Ramos, attorney at Al Otro Lado |
| 6/7/2021 | assault | 1 | In late May 2021, a Mexican lesbian couple was attacked and beaten for their sexual orientation while waiting in Tijuana for U.S. asylum processing to resume. | Human Rights First communication with Hollie Webb, attorney at Al Otro Lado |
| 6/8/2021 | kidnapping | 6 | Felicia Rangel-Samponaro runs Sidewalk School, a nonprofit that offers classroom instruction for asylum-seeking children in six cities across the border. She said two weeks ago at least six people were kidnapped from the plaza. Gang members "come into the plaza," Rangel-Samponaro said. "They drag a person away. You hear the person screaming for help. Everyone stands around and watches, which is understandable. No one wants to die." | https://www.nbcnews.com/news/latino/vp-harris-visits-mexico-city-migrant-tent-camp-grows-border-town-rcna1145 |
| 6/10/2021 | kidnapping | 2 | A woman fleeing with her seven-year-old daughter from violence in Honduras attempted to cross into the U.S. and ask for asylum several times. The first few times, she was hastily returned to Nogales, Sonora. On her final attempt, she and her daughter were kidnapped by their smuggler and held and tortured for over two weeks until her family could pay their ransom. | Communication from Kino Border Initiative |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 6/10/2021 | kidnapping | 1 | In Mexico, with nowhere to go and few funds, she slept on the street and was kidnapped, according to a request to the U.S. government for a humanitarian exception to the order seen by Reuters. The kidnappers wanted to extort money from her family, Jasibi said.<br><br>Jasibi - who asked Reuters not to publish her surname for fear of reprisals - called migrant advocate Ariana Sawyer at Human Rights Watch daily to check on her application for the exemption. But when Sawyer tried to call her last month with the good news that she would be allowed into the United States, she couldn't reach her – Jasibi had been kidnapped again. | https://www.reuters.com/world/americas/bruised-by-border-politics-some-biden-officials-cling-trump-restrictions-2021-06-10/ |
| 6/10/2021 | kidnapping | 140 | Un total de 140 migrantes, entre ellos cuatro menores, fueron rescatados este miércoles de una vivienda de Ciudad Juárez, México, donde estaban secuestrados y hacinados en cuartos de madera. Los migrantes proceden, en su mayoría, del Triángulo Norte de Centroamérica: Guatemala, El Salvador y Honduras, según informó la Agencia Efe. | https://www.univision.com/noticias/inmigracion/rescatan-en-mexico-a-140-migrantes-centroamericanos-secuestrados |
| 6/11/2021 | rape, sexual assault, kidnapping, human trafficking, armed robbery, beatings | 2,314 | Asylum seekers from Colombia, Cuba, El Salvador, Guatemala, Haiti, Nicaragua, Peru, and Venezuela blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack or attempted attack in Mexico in the last month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review survey data received by Al Otro Lado between April 9 and June 11, 2021. |
| 6/13/2021 | kidnapping | 249 | "Como fue previamente reportado, el primer resguardo sucedió el pasado miércoles 9 de junio, 140 personas fueron encontradas en una carpintería ubicada en las calles Caballos y Potros de la colonia Felipe ángeles, entre ellas 99 originarias de Guatemala, 17 de Nicaragua, 11 de El Salvador, 6 de Ecuador, 5 de Honduras y 2 mexicanos. De este grupo de migrantes, 117 son hombres, 12 mujeres y 11 menores de edad, quienes iba a ser ingresados de manera ilegal al vecino país por presuntos "polleros" . Ese mismo día, se realizó la segunda intervención, en donde se localizaron a 66 migrantes de Honduras, Guatemala y Ecuador en una vivienda ubicada en el cruce de las calles Sinaloa y Cananea, en la colonia Ampliación Fronteriza." | https://www.elheraldodechihuahua.com.mx/local/juarez/rescatan-en-juarez-a-249-migrantes-secuestrados-noticias-de-ciudad-juarez-chihuahua-inseguridad-delincuencia-policiaca-6837679.html |
| 6/13/2021 | kidnapping, assault | 2 | "Rubi and her husband, Jorge left Honduras with their daughters in October after shuttering their business because they could not afford to pay taxes to gangs..she brought with her the death certificates of her murdered brothers, who were persecuted by criminal gangs, she said, to bolster their protection request. Their disappointment at the Eagle Pass, Tex., port of entry in January motivated the family to swim across the swift currents of the Rio Grande a few days later from Piedras Negras, Mexico. Rubi's two daughters, 9 and 5, made it. But as her husband came to help her, she was overtaken by attackers. He was beaten. Cartel members held Rubi for ransom for days, she said, but no one in her family had money to pay her captors. She went into labor shortly after her release. The birth was difficult and the baby was born with birth defects and an intestinal inflammation." | https://www.washingtonpost.com/immigration/fewer-migrant-families-being-expelled-at-border-under-title-42-but-critics-still-push-for-its-end/2021/06/13/422c702c-c7cc-11eb-81b1-34796c7393af_story.html |
| 6/14/2021 | kidnapping | 4 | "Familiares de cuatro hondureños de una misma familia que buscaban llegar a Estados Unidos (EEUU) fueron secuestrados por grupos criminales en México, según denunciaron familiares de las los migrantes." | https://proceso.hn/cuatro-miembros-de-una-misma-familia-secuestrados-en-mexico-denuncian-sus-familiares/ |
| 6/14/2021 | attempted kidnapping | 5 | A Honduran family waiting in Nuevo Laredo for U.S. asylum processing to resume was kidnapped by a cartel and managed to escape. | Human Rights First interview with asylum seeker |
| 6/17/2021 | rape | 1 | An Indigenous Guatemalan transgender woman who had been trafficked for sexual exploitation was raped by Mexican police in Tijuana in early 2021 after having waited nearly a year to request U.S. asylum. | Human Rights First communitcation with Las Americas Immigrant Advocacy Center |
| 6/24/2021 | kidnapping | 20 | "la Secretaría de Seguridad Pública de Tamaulipas realizó en Río Bravo la liberación de 20 personas en condición de migrante que se hallaban en una casa de seguridad. De las 20 personas, 15 son de Honduras y cinco de México, uno del Estado de México, dos de Guerrero y dos de Tabasco. Entre los migrantes había una mujer y una menor de 2 años." | https://www.excelsior.com.mx/nacional/rescatan-a-20-migrantes-en-rio-bravo-tamaulipas/1456534 |
| 7/1/2021 | assault | 1 | A Mexican man fleeing gang threats was attacked and beaten in Tijuana in June 2021 by someone who grabbed him from inside a taquería while he was waiting with his family for the opportunity to request U.S. asylum. | Human Rights First interview with asylum seeker |

CLP_PC_076255

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 7/4/2021 | kidnapping | 53 | "Este sábado fueron rescatadas 53 personas indocumentadas en la colonia Rancho Anapra, Ciudad Juárez, en el estado de Chihuahua. Dentro de estas personas se encontraban dos menores de edad." | https://www.infobae.com/america/mexico/2021/07/04/en-chihuahua-rescataron-a-53-migrantes-centroamericanosque-estaban-secuestrados/ |
| 7/4/2021 | kidnapping | 24 | "El rescate de los migrantes, se realizó tras un operativo derribado a un llamado al teléfono comunitario de la Estación de Policía del Distrito Valle, en donde reportaron que en una vivienda ubicada en el cruce de las calles Cordillera de Taurus y Monte Aragón, se encontraban encerrados varias personas de origen centroamericano. Al legar, los agentes localizaron a 24 personas de origen hondureño, siendo 15 adultos y nueve adolescentes, quienes manifestaron tener varios días alojados en dicho sitio a la espera de ser internados de manera ilegal al vecino país." | https://www.elsoldeparral.com.mx/local/rescatan-24-migrantes-secuestrados-en-juarez-noticias-polleros-inseguridad-frontera-6924248.html |
| 7/8/2021 | kidnapping, attempted rape | 26 | A Central American asylum seeker and her six-year-old son had nowhere to sleep when DHS expelled them to Ciudad Juárez in April 2021. A man waiting near the port of entry who offered them a ride and place to stay for the night instead imprisoned them for two weeks and attempted to rape the woman. The family has been hiding for weeks at a migrant shelter in the city after managing to escape through a bathroom window in the house where they were held with other abducted women. | https://www.humanrightsfirst.org/sites/default/files/DisorderlyandInhumane.pdf |
| 7/8/2021 | kidnapping | (counted in Human Rights First/Hope Border Institute report total) | Armed men kidnapped a Honduran asylum seeker and her seven-year-old daughter just blocks from the port of entry while they were searching for a place to sleep for the night just after DHS expelled them via a lateral expulsion flight, discussed below, in April 2021. Mexican migration officials at the State Population Council (COESPO) of Chihuahua had told the woman that shelters were full and that the family had to find housing on their own. Held captive for two months in a house with dozens of other kidnapping victims, the woman and her daughter survived on potatoes and eggs. They managed to escape while being transported to another location but remain in danger in a Juárez migrant shelter, experiencing nightmares and difficulty sleeping due to the trauma they suffered. | https://www.humanrightsfirst.org/sites/default/files/DisorderlyandInhumane.pdf |
| 7/8/2021 | kidnapping | (counted in Human Rights First/Hope Border Institute report total) | In June 2021, DHS expelled a Salvadoran woman and her two children immediately after they had escaped from kidnappers who had forcibly held them for 10 days, extorted her sister for thousands of dollars, and fired shots at the family as they ran away. U.S. immigration officers mocked the woman as she begged them not to return the family to Ciudad Juárez just hours after they crossed the border to ask for protection in the United States. On their return, Mexican immigration officers robbed the woman of her cell phone, and her sister continues to receive threatening messages from the kidnappers. | https://www.humanrightsfirst.org/sites/default/files/DisorderlyandInhumane.pdf |
| 7/8/2021 | kidnapping | (counted in Human Rights First/Hope Border Institute report total) | An Indigenous Guatemalan woman from the Q'eqchi' community was held with her two young children in a hielera (freezing-cold cell) for three days after they crossed the border near Reynosa before U.S. immigration officials expelled them via lateral flight to Ciudad Juárez in April 2021. The woman's husband and 4-year-old daughter were kidnapped in Nuevo Laredo and held for ransom for more than a month. | https://www.humanrightsfirst.org/sites/default/files/DisorderlyandInhumane.pdf |
| 7/8/2021 | assault | (counted in Human Rights First/Hope Border Institute report total) | A Guatemalan asylum seeker who was transferred with her eight-year-old daughter from Yuma, Arizona to El Paso for expulsion in March 2021 was subsequently beaten and abused in Ciudad Juárez. | https://www.humanrightsfirst.org/sites/default/files/DisorderlyandInhumane.pdf |
| 7/14/2021 | assault, robbery | 1 | A Honduran woman fleeing domestic violence in Honduras to seek U.S. asylum was robbed and assaulted on a train near Piedras Negras in March 2021 | Human Rights First telephonic interview with asylum seeker. |

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 649 of 721

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 7/15/2021 | kidnapping | 1 | "She says that after being kidnapped on the streets of Reynosa, Tamaulipas, in late February, the days started to blur together. Estefani's 8-year-old daughter Ashly was able to run away while men snatched Estefani off the streets—that much Estefani knew—but while the 27-year-old from El Salvador was held, she didn't know that Ashly had crossed the border into the U.S., where the government classified her as an unaccompanied minor along with thousands of other children and teens who have been processed into the U.S. since the start of the Biden Administration." | https://time.com/6073384/title-42-expel-mexico-kidnapping/ |
| 7/16/2021 | kidnapping | 4 | Antonia Machado González se mantiene postrada en una cama desde que se enteró que su hijo Julio Ampié Machado fue secuestrado presuntamente por un cártel en México, junto a su esposa y sus dos hijos, desde hace más de una semana, mientras intentaba buscar asilo en Estados Unidos. Julio Ampié fue secuestrado el 3 de junio en la ciudad fronteriza de Reynosa, en México cuando pretendía llegar a Estados Unidos de forma irregular y pedir asilo. Según relatan los familiares, unos hombres irrumpieron en el apartamento donde esperaban ser cruzados al país vecino. | https://100noticias.com.ni/nacionales/108796-secuestros-nicaraguenses-nueva-oleada-migratoria/ |
| 7/19/2021 | kidnapping, threats | 1 | A Honduran man traveling alone was kidnapped in Monterrey in June 2021. His family in Honduras sold all their belongings to pay the ransom. When he was released, the kidnappers told him they'd kill him if they saw him again. | Human Rights First telephonic interview with asylum seeker. |
| 7/20/2021 | assault, robbery | 3 | A Honduran family was assaulted and robbed by an armed man in Tijuana in May 2021 while awaiting the opportunity to request US asylum. | Human Rights First telephonic interview with asylum seeker. |
| 7/20/2021 | kidnapping | 31 | "Dos personas fueron detenidas luego que Carabineros rescatara a 31 ciudadanos extranjeros, entre los que había 8 menores de edad, que se encontraban secuestradas en un domicilio en Pozo Almonte, en la Región de Tarapacá." | https://www.t13.cl/noticia/nacional/rescatan-migrantes-secuestrados-domicilio-pozo-almonte-20-07-2021 |
| 7/22/2021 | kidnapping | 37 | "En Tamaulipas se han liberado a 141 migrantes, se han rescatado a 37 personas privadas de su libertad y se han asegurado media tonelada de mariguana, cocaína, piedra y metanfetamina." | https://www.milenio.com/policia/tamaulipas-rescatan-141-migrantes-liberan-37-personas-secuestro |
| 7/26/2021 | kidnapping | 2 | A Honduran mother and her 9-year-old son were kidnapped in Reynosa in June 2021 and held for 10 days until the mother's sister paid ransom. | Human Rights First telephonic interview with asylum seeker. |
| 7/27/2021 | kidnapping | 43 | "En Chihuahua, fueron rescatados 43 centroamericanos que estaban presuntamente secuestrados en un domicilio ubicado en el municipio de Aldama. La Unidad de Secuestros de la Agencia Estatal de Investigación (AEI) realizó un operativo en el lugar, donde encontró a 38 hombres y cinco mujeres, entre ellos cuatro menores." | https://www.milenio.com/estados/en-chihuahua-rescatan-a-43-migrantes-secuestrados |
| 7/28/2021 | kidnapping | 3 | Three Mexican migrants intending to enter the United States were kidnapped and held hostage in Mexicali | https://www.elimparcial.com/mexicali/policiaca/Imputaran-secuestro-agravado-a-involucrados-en-caso-de-militar-20210727-0028.html |
| 7/29/2021 | kidnapping | 15 | "La Fiscalía General de Justicia del Estado (FGJE) de Tamaulipas a través de la Unidad Especializada en el Combate al Secuestro (UECS) realizó el rescate de 15 migrantes procedentes de Centroamérica, así lo informó la dependencia por medio de un comunicado este jueves 29 de julio." | https://www.infobae.com/america/mexico/2021/07/29/en-condiciones-deplorables-fiscalia-de-tamaulipas-rescato-a-15-migrantes-en-reynosa/ |
| 7/29/2021 | kidnapping | 1 | "Su huida al norte empezó en autobús para cruzar hasta Honduras y luego a Guatemala. Luego caminó tres días por las vías del tren con sus pies ampollados, hasta llegar a México, donde fue secuestrado por narcotraficantes. Tras pagar un rescate de 6.500 dólares que juntaron sus familiares, fue liberado tres días después. Cruzó el Río Bravo, que separa a Estados Unidos de México, y se entregó a la Patrulla Fronteriza en junio diciendo que quería pedir asilo." | https://www.latimes.com/espanol/eeuu/articulo/2021-07-29/perseguidos-nicaraguenses-huyen-eeuu-migrantes |
| 8/1/2021 | kidnapping | 18 | "A casi mes y medio de la presunta desaparición de 18 migrantes haitianos en Tampico, el Comité Ciudadano en Defensa de los Naturalizados y Afromexicanos teme hayan caído en manos de la delincuencia de Tamaulipas." | https://www.milenio.com/policia/haitianos-desaparecidos-en-tampico-pueden-estar-secuestrados |
| 8/4/2021 | kidnapping | 4 | A Nicaraguan family of four, intending to request U.S. asylum, was kidnapped in Reynosa and held for 29 days until they paid a $30,000 ransom | https://www.laprensa.com.ni/2021/08/04/nacionales/2860496-yo-tuve-ideas-de-escaparme-el-relato-de-la-familia-nica-que-viajaba-hacia-estados-unidos-y-fue-secuestrada-en-mexico/ |

CLP_PO_076257

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/5/2021 | kidnapping | 3 | "Rescatan a mujer y dos menores migrantes hondureños de un domicilio en Reynosa." | https://www.hoytamaulipas.net/notas/464770/Rescatan-a-mujer-y-dos-menores-migrantes-de-un-domicilio-en-Reynosa.html |
| 8/6/2021 | kidnapping | 1 | "A su paso por México, Barralaga fue secuestrado. Así fue como conoció a José. Para que los liberaran, sus familiares en Estados Unidos tuvieron que pagar alrededor de 5,000 dólares por cada uno. Y aun así, cuenta el tío, tuvieron que escapar después de más de tres meses de captividad pues los secuestradores no los dejaban ir." | https://www.telemundo.com/noticias/noticias-telemundo/inmigracion/este-inmigrante-escapo-de-la-miseria-en-honduras-y-de-sus-secuestradores-en-mexico-pero-la-tmna3900466?cid=linknoticias |
| 8/7/2021 | kidnapping | 1 | "En redes sociales circula un video que muestra a un migrante (todo indica sudamericano) quien fue secuestrado presuntamente por narcotraficantes del Cártel del Noreste (CDN) en el municipio de Nuevo Laredo en el estado de Tamaulipas en México." | https://www.msn.com/es-us/noticias/estados-unidos/video-c%C3%A1rtel-del-noreste-secuestra-a-migrante-tienes-que-pagar-7-000-d%C3%B3lares-si-quieres-ver-a-tu-hermano-vivo/ar-AAN1oU2?amp%3Bocid=iehp |
| 8/10/2021 | kidnapping | 1 | A Honduran asylum seeker was kidnapped in Monterrey and held captive for four days in July 2021. | Human Rights First telephonic interview with asylum seeker. |
| 8/12/2021 | assault | 2 | "After moving to Nogales in October 2020, my client and his partner were constantly taunted for being gay by a group of men who regularly hung out outside a convenience store located near their home. In February 2021, the same group of men donned ski masks and chased after my client, who narrowly escaped into a nearby taxi." | https://www.aclu.org/legal-document/declaration-chelsea-sachau |
| 8/12/2021 | kidnapping, rape | 2 | "In February 2021 a Honduran woman and her young daughter were kidnapped immediately after DHS expelled her to Reynosa by armed men who grabbed them from the street, covered the mother's face with a black hat, and forced them into a car. The mother was raped multiple times in captivity and begged the kidnappers not to harm her daughter, who was released a month before the mother managed to escape. The mother did not know where her daughter was until a U.S. shelter eventually contacted her." | https://www.aclu.org/legal-document/declaration-savitri-arvey/ Human Rights First communication with Savitri Arvey, a lawyer with the Women's Refugee Commission. |
| 8/19/2021 | kidnapping | 2 | In February 2021, a Salvadoran mother and her eight-year-old daughter were expelled to Reynosa after attempting to seek asylum. Armed, masked men immediately pursued the family as they tried to run away. The mother was abducted, but the child managed to escape and eventually enter the United States, where she remained in ORR custody, deeply traumatized and believing for more than a month that her mother had been killed. | Human Rights First communication with Kate Lincoln-Goldfinch, an attorney assisting the family. |
| 8/12/2021 | kidnapping | (counted in Al Otro Lado survey data above) | "In Reynosa, one of our clients who had previously tried to seek asylum at the border but who was expelled under Title 42 was kidnapped shortly thereafter with her young son. The mother and child were held for days without food until they finally escaped." | https://www.aclu.org/legal-document/declaration-erika-pinheiro |
| 8/12/2021 | kidnapping | (counted in Al Otro Lado survey data above) | "In Nuevo Laredo, a client was waiting to be able to cross with her U.S. citizen daughter when they were kidnapped by armed men while walking down the street. The men took them to a house, shaved their heads, and beat them severely. The U.S. citizen daughter's face was slashed with a knife on both sides. She lost so much blood from her injuries that she had to be hospitalized. " | https://www.aclu.org/legal-document/declaration-erika-pinheiro |
| 8/12/2021 | rape, extortion | 2 | "In one case received by our organization, a mother and her 5-year-old daughter were expelled to Mexico from the United States after fleeing sexual assault and domestic violence in Guatemala. After being expelled to Ciudad Juarez this mother was raped. The family also faced ongoing extortion and death threats from smugglers in Mexico following their expulsion." | https://www.aclu.org/legal-document/declaration-linda-rivas |
| 8/11/2021 | kidnapping, rape | 2 | "I represented a Black Honduran family consisting of a mother and her 8-year-old daughter and 6-year-old son. The family was kidnapped in Mexico. The mother told me that she was "lucky" because even though the kidnappers gang-raped her repeatedly, they always did it in a separate room so that her children did not have to watch." | https://www.aclu.org/legal-document/declaration-taylor-levy |

CLP_PC_076258

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/11/2021 | kidnapping, assault | 2 | "I represented a Hinduran mother, father, and children ages 8 and 1. The mother was kidnapped and held for month before finally being released after her family in the U.S. paid a ransom. Later, the father was approached by the cartel in Nuevo Laredo who demanded that he work for them. He refused, and they beat him so badly that they broke his hip and told him that he was going to have to start working for him once he healed. The family was so terrified by this threat that they hid out in the migrant shelter rather than taking the father to the hospital; as such, he can no longer walk unassisted." | https://www.aclu.org/legal-document/declaration-taylor-levy |
| 8/11/2021 | kidnapping | 3 | "I represented a father, mother, and their 6-year-old child seeking asylum from Honduras. They were kidnapped in Mexico and the mother was raped by the kidnappers. They also threatened to rape the 6-year-old, but stopped just before the actual rape." | https://www.aclu.org/legal-document/declaration-taylor-levy |
| 8/11/2021 | kidnapping | 4 | "I represented a Honduran family consisting of a mother, father, and children ages 12 and 1. The family had been kidnapped and brutalized on three occasions by the same cartel. After escaping, they went to a migrant shelter in Nuevo Laredo. The cartel arrived at the shelter looking for them, and the pastors were able to help them narrowly-escape through a back door." | https://www.aclu.org/legal-document/declaration-taylor-levy |
| 8/11/2021 | kidnapping | 1 | "I represented a father, mother, and their 12 and 11-year-old children seeking asylum from Honduras. The father was kidnapped by the cartel one day while he was working in Mexico. He was eventually able to escape, but lost part of his hand during the escape." | https://www.aclu.org/legal-document/declaration-taylor-levy |
| 8/11/2021 | kidnapping | 2 | "Another client family, consisting of a mother and her seven-year-old son from El Salvador,were expelled into Mexico on several occasions trying to seek asylum in the United States. On their final attempt, they were kidnapped immediately upon expulsion to Nuevo Laredo and held for eightdays while their family gathered the money to pay their ransom. The mother reported that her son did not eat anything during the entire kidnapping and was deeply traumatized." | https://www.aclu.org/legal-document/declaration-taylor-levy |
| 8/11/2021 | attempted kidnapping | 1 | ..."They crossed the river, but U.S. officials sent them straight back under Title 42, despite the grandmother's frailty. The grandmother fell gravely ill back in Reynosa, but the family, like so many other migrants, had a very hard time getting her admitted to a hospital given the local anti-migrant sentiments. She died shortly thereafter. C suffered a kidnapping attempt while she was with her mother at the hospital." | https://www.aclu.org/legal-document/declaration-jennifer-k-harbury |
| 8/11/2021 | kidnapping, robbery | 1 | ..."She fled north and tried to cross to Texas but was immediately sent back under Title 42 by U.S. officials.  Mexican immigration officials stole $500 from her as she returned. She then tried to take a taxi at the foot of the bridge, but the driver kidnapped her. When she ran, he dragged her back by her hair, but she was later able to escape and make it to a shelter. Her shoulder then became badly infected, putting her life at risk." | https://www.aclu.org/legal-document/declaration-jennifer-k-harbury |
| 8/11/2021 | murder | 1 | "A mother ("A") tried to save her young daughter when the gangs arrived to rape her.  The gangs beat A and kidnapped the girl, who did not return for nearly a year. When the mother received still more threats, she fled north with her mentally disabled 15-year-old son.  The son had the functional development of a 5-year-old. The trip was terrifying. The family tried twice to cross the river, but U.S. officials sent them back both times under Title 42. In Reynosa, the mother realized she could not keep her son safe from the endless kidnappings and assaults going on around her.  If she tried to cross with her son again, they would both be sent back. If he crossed alone, he would be sent to her family in the United States because Title 42 did not apply to unaccompanied minors. Like so many other desperate parents, she finally sent him across again, this time on his own. He was found dead shortly thereafter. Initial reports suggest torture and mutilation. Based on my experience, I suspect the gangs approached the boat in which he was a passenger and asked for "claves," or passwords each traveler gets once they have paid the proper crossing "fees" to the gangs. If anyone attempts to cross without such payment, they are killed. Had the gangs asked this young man for his password, he would have been unable to answer and therefore killed." | https://www.aclu.org/legal-document/declaration-jennifer-k-harbury |
| 8/11/2021 | assault, rape | 1 | "A young Trans woman ("F") went through hellish persecution in her homeland. The gangs beat her so severely that she fled in early 2019. She made it to Reynosa, but U.S. officials sent her back under the MPP program. F tried to go back to the border for her immigration court appointment in Laredo, but the local gangs pulled over the bus and dragged everyone off. Eventually she got away, but she had missed her hearing. A few months ago, she tried again to cross the Rio Grande but was sent back to Mexico. This time the gangs beat her and raped her. Worse yet, she now has HIV from her assailants." | https://www.aclu.org/legal-document/declaration-jennifer-k-harbury |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/17/2021 | rape, sexual assault, kidnapping, human trafficking, armed robbery, beatings | 2,511 | Asylum seekers from Cameroon, Colombia, Cuba, El Salvador, Guatemala, Haiti, Jamaica, Nicaragua, Peru, Venezuela and other countries who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack or attempted attack in Mexico in the last month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between June 12 and August 17, 2021. |
| 8/18/2021 | kidnapping | 7 | Un grupo de secuestradores autodenominado "cartel del noroeste" se grabó exigiendo el rescate de guatemaltecos secuestrados en su intento de llegar a Estados Unidos. En el vídeo, los plagiarios exigen US$7 mil a cambio de liberar a seis guatemaltecos y un hondureño, a quienes tienen encañonados con armas de fuego. | https://diariohoydexela.com/mundo/las-imagenes-de-guatemaltecos-secuestrados/ |
| 8/19/2021 | kidnapping | 2 | "La madre y las esposas de dos jóvenes hondureños clamaron este jueves por ayuda para lograr liberar a sus hijos, secuestrados en México por bandas criminales cuando ellos buscaban cruzar tierras aztecas en su ruta hacia los Estados Unidos." | https://proceso.hn/denuncian-secuestro-de-otros-dos-hondurenos-en-mexico/ |
| 8/20/2021 | attempted kidnapping | 1 | We had a Guatemalan client that we assisted in entering the US via the Huisha process back in April. Our client was a single mother, and she had previously been expelled from the United States. During the expulsion she had been followed by a man who attempted to kidnap her and force her into sexual slavery, but she was able to get away from him, thankfully. | Human Rights First communication with Ella Rawls, Attorney with Arizona Justice for our Neighbors |
| 8/20/2021 | kidnapping | 4 | In March 2021, a family of four fleeing Honduras after experiencing attempted kidnappings and death threats were immediately expelled to Mexico after attempting to seek safety in the U.S. Once returned to Mexico, a taxi driver kidnapped the family and held them in a secluded house. After managing to escape, the family stayed at an encampment in a plaza in Reynosa where the family feared for their young daughters' safety due to threats of sexual violence. Men, including police officers, would photograph their daughters--- a typical tactic used by human traffickers. | Human Rights First communication with Karla Vargas, an attorney with the Texas Civil Rights Project. |
| 8/20/2021 | attempted beatings, threats | 1 | In May 2021, a 22-year-old asylum seeker who fled Guatemala after facing intense discrimination based on his sexuality was immediately expelled to Mexico after attempting to seek safety in the U.S. Once in Mexico, he faced ongoing death threats, homophobic slurs and attempted beatings. His sexuality made him a target for the cartel and other criminal entities. | Human Rights First communication with Karla Vargas, an attorney with the Texas Civil Rights Project. |
| 8/20/2021 | threats, extortion | 2 | In March 2021, a 38-year-old mother and her 8-year-old daughter were expelled after attempting to seek safety in the US because they received threats against their lives and threats to kidnap the daughter. Once in Mexico, they were targeted for extortion and were stalked by men in vehicles--- a typical tactic used by human traffickers. | Human Rights First communication with Karla Vargas, an attorney with the Texas Civil Rights Project. |
| 8/21/2021 | kidnapping, extortion | 15 | "El pasado lunes 16 de agosto, dos mujeres y un menor de 10 meses fueron liberados, tras permanecer privados de su libertad desde principios de este mes en un auto hotel ubicado sobre la autopista Córdoba-Orizaba...Un día después (el martes 17), 12 migrantes procedentes de Cuba y Haití fueron rescatados en la zona rural de Coatzacoalcos por elementos de Protección Civil, denunciaron ser víctimas de extorsión y abusos por parte de elementos policíacos, quienes los despojaron del dinero que traían consigo para intentar cruzar la frontera con Estados Unidos." | https://veracruz.lasillarota.com/estados/sur-de-veracruz-zona-mas-peligrosa-para-migrantes-en-veracruz-/551887 |
| 8/23/2021 | kidnapping, assault | 1 | A Cameroonian asylum seeker, who was kidnapped in Cancun, beaten, and nearly raped by her abductors, is currently stranded in Reynosa. Because of the Biden administration's expulsion policy, she is blocked from seeking asylum at the Hidalgo port of entry. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault, extortion | 1 | A gay Haitian asylum seeker was assaulted and extorted in Tijuana while waiting for the opportunity to request U.S. asylum. The man became severely depressed and attempted suicide in July 2021. As of mid-August 2021, he remains in danger in Tijuana. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |

CLP_PC_076260

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/23/2021 | attempted kidnapping | 1 | A Venezuelan man who was forced to flee Venezuela after refusing orders to harm protestors is waiting in dangerous Nuevo Laredo to request asylum at the Laredo port of entry after CBP officers turned him away in early August 2021. The man was nearly kidnapped at the Nuevo Laredo bus terminal when he arrived in the city. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 2 | Unable to find a shelter to assist them, a Honduran asylum-seeking couple are sleeping on a riverbank near Piedras Negras hiding from the men who kidnapped them and hoping for a chance to request protection in the United States. In August 2021, the couple were released by kidnappers who beat them so severely that the woman suffered a miscarriage. In addition, Coahuila state police robbed the couple of their belongings. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 1 | A teenage Mexican asylum seeker, who was turned away with her family by CBP officers at the San Ysidro port of entry in July 2021, was assaulted by a group of men in the Tijuana tent encampment. The girl and her family had fled deaths threats in Michoacan. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | rape, assault | 1 | A lesbian asylum seeker who has been sleeping on the streets in Ciudad Acuña with her partner waiting to request asylum at the Del Rio port of entry told Human Rights First researchers in August 2021 that she has been raped and repeatedly attacked in Mexico. The young woman's broken arm was still in a cast and bruises visible on her face from an attack in which men beat her to steal the sweets she sells on the street to survive. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | attempted kidnapping, rape | 3 | A Honduran woman, her husband, and brother-in-law remain trapped in Ciudad Acuña where they have suffered repeated kidnapping attempts, unable to request U.S. protection. On one occasion in June 2021, they were forced to jump into a river to escape kidnappers. In addition, the woman was raped in Monterrey while in transit to seek asylum. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | robbery, attempted kidnapping | 1 | In July 2021, a Guatemalan man stranded with his 7-year-old child at the tent encampment in Reynosa hoping to seek U.S. asylum was assaulted, robbed, and nearly kidnapped when he went to a store to purchase medicine for his sick child. An armed man assaulted the asylum seeker and forced him into a car. The kidnappers released the man when they learned his son was ill, but the family remains in danger in Reynosa. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 1 | A Honduran asylum seeker has been waiting for months in danger to seek U.S. protection after she was kidnapped and trafficked in Mexico. The abductors trafficked her for sexual exploitation and showed her graphic videos of migrants being tortured to intimidate her. The woman managed to escape in April 2021 but remains in hiding in a shelter, terrified to go outside. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | In July 2021, armed, hooded men kidnapped a 13-year-old Honduran boy and his asylum-seeking mother in Reynosa and kept them captive for three days without food until family members paid a ransom. The traumatized boy has nightmares and has been unable to sleep. The family remains in danger in Reynosa, where they are living in a tent in the encampment. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, assault | 1 | A Honduran asylum seeker stranded in Ciudad Acuña waiting for an opportunity to request asylum has been repeatedly kidnapped in Mexico. In early August 2021, he was kidnapped in Piedras Negras and jumped from a moving car to escape. He took a bus to Ciudad Acuña to avoid the kidnappers, but police officers dragged him off the bus to extort him, pulled him by his hair, and hit him in the face causing him to lose several teeth. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | A 13-year-old Honduran boy and his asylum-seeking mother, who were kidnapped in Reynosa in April 2021, are homeless in Piedras Negras waiting to request U.S. asylum. The family was held captive in horrendous conditions, sleeping the floor and barely fed for two months while desperate family members gathered ransom money. The kidnappers threatened to traffic the son, if they failed to pay. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 3 | A Salvadoran couple and their adult daughter who were repeatedly kidnapped in Mexico are trapped in the encampment near the San Ysidro port of entry. The family fled El Salvador after a gang that control large parts of the country raped and beat the daughter, causing her to suffer a miscarriage, according to attorney Luis Gonzalez with Jewish Family Service of San Diego. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, assault | 5 | A Honduran family with three children was kidnapped and severely beaten immediately after DHS expelled them to Nuevo Laredo in June 2021. Shortly after they managed to escape, the family witnessed people they believed to be gang members drag a boy from a house and shoot him in the street. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |

CLP_PC_076261

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/23/2021 | kidnapping | (counted in Al Otro Lado survey data above) | In July 2021, CBP expelled a Honduran asylum seeker in the middle of the night to Nuevo Laredo, where gang members immediately kidnapped him and forced his family to pay a ransom. Shortly after his release a cartel kidnapped him again. He remains missing and his family has not heard from him since, according to the migrant legal services organization Al Otro Lado. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | In June 2021, an indigenous Honduran asylum seeker and his six-year-old son were kidnapped immediately after DHS expelled them to Reynosa. The kidnappers separated the family and trafficked the father for labor. When they were released, they again sought U.S. protection in the Rio Grande Valley, but this time DHS transferred them by bus for expulsion in Nuevo Laredo, where they narrowly escaped another kidnapping attempt, according to Taylor Levy, an attorney assisting the family. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 1 | In August 2021, a Salvadoran man told Human Rights First that after Border Patrol agents expelled him to Piedras Negras at midnight he was threatened and attacked. With migrant shelters closed by the city, he was forced to sleep in an abandoned house, but men – one armed with a bat – threatened to beat him and other stranded migrants, if they didn't leave. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | attempted kidnapping, assault | 2 | A Honduran father and son seeking U.S. asylum were shot during a kidnapping attempt after DHS expelled them to Reynosa in April 2021. The father suffered multiple bullet wounds, including a bullet that became lodged in his arm for months while he was unable to access medical care in Mexico, according to Karla Vargas, an attorney with the Texas Civil Rights Project. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, assault | 1 | In June 2021, CBP officers turned away a Guatemalan man who tried to request protection at the international bridge to the Laredo port of entry even though he was covered in blood from having been tortured by the cartel that abducted him. The man had been held for days and repeatedly beaten by cartel because he could not provide the phone number of a family member in the United States to extort. The man told Human Rights First, "If I return to my country, I'll be killed. If I stay here, I'll be killed. I want an opportunity, for someone to consider my case." | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, rape | 2 | A Central American mother fleeing gang threats was expelled to Reynosa in spring 2021 with her minor daughter, who has an intellectual disability, even though they had been kidnapped in Mexico and the mother raped. After escaping the family crossed the Rio Grande to ask for U.S. protection but were immediately expelled, according to Jennifer Harbury, an attorney assisting the family. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 1 | In July 2021, Border Patrol agents expelled a Honduran asylum seeker to Mexico just one day after he received surgery for injuries he suffered while escaping a kidnaping in Piedras Negras. The man was pushed from the train he climbed aboard to escape the kidnappers who had held and beat him for days. He explained to Border Patrol agents who took him to a hospital for surgery on his severely broken leg that he had fled a near-fatal beating by the gang extorting his clothing business in Honduras as well as the abduction in Mexico, but they returned him to Mexico in a hospital gown, barely able to walk with his leg in a heavy brace. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 1 | DHS twice expelled a Honduran asylum seeker to Mexico even though he had been kidnapped near Reynosa in March 2021 by a cartel that continues to hold his mother five months later. The man escaped the kidnappers but continues to receive videos and photos of his mother being tortured by her captors who are demanding a $10,000 ransom. The man told Human Rights First that cartel members are searching for him in Reynosa and that he fears that they will kill him for escaping. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, extortion | 1 | In August 2021, an LGBT Venezuelan asylum seeker who had been kidnapped in Nuevo Laredo managed to enter the Laredo port of entry and attempted to request protection but was immediately turned back to Mexico by CBP officers. The day before attempting to seek protection, he had been kidnapped and extorted by a taxi driver while trying to find a place to stay. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, rape | 1 | In February 2021, DHS expelled a young Honduran woman who had been kidnapped in Mexico, held captive for weeks and repeatedly raped, and abandoned by her traffickers in Arizona. After she was treated in a US hospital for her injuries, the woman was expelled to Nogales, Mexico, according to Chelsea Sachau, an Equal Justice Works Fellow with the Florence Immigrant & Refugee Rights Project. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/23/2021 | kidnapping | 1 | In late May 2021, DHS expelled a 23-year-old Honduran asylum seeker who was seven-months pregnant after escaping kidnappers who planned to sell her unborn child. The kidnappers had told her that "newborns are extremely expensive in Mexico." The woman was malnourished in captivity and experienced severe bleeding that made her fear for the health of her unborn child, according to Karla Vargas, an attorney with the Texas Civil Rights Project. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 3 | In July 2021, a Mexican asylum seeker from Michoacán and two Nicaraguan asylum seekers disappeared from the shelter where they were staying in Tijuana while waiting for the opportunity to request U.S. asylum. All three men had been traveling alone. Another asylum seeker staying at the shelter reported concerns that the men had been kidnapped by Mexican cartel members. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 1 | In June 2021, a transgender Honduran woman blocked from requesting protection was kidnapped in Tijuana by a man who had promised her a place to stay. He locked her inside a house with other captive migrants for two days before she managed to escape out of a window. As of July 2021 she was hiding at a Tijuana shelter, terrified to go outside for fear of reencountering the kidnapper, according to Emem Maurus, a lawyer with the Transgender Law Center. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 2 | In August 2021, a Honduran woman stranded in Ciudad Acuña unable to request protection was offered shelter by a man who violently beat her after she and her 11-year-old son moved in with him. The man forced the child to watch as he attacked his mother, including beating her with a machete. They eventually managed to escape and sought help at a shelter. The shelter supervisor told Human Rights First that this man had previously convinced other desperate migrant women to move in with him and then abused them as well. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | An asylum-seeking mother and her 15-year-old son were kidnapped almost immediately after being expelled by DHS to Reynosa. They were forced into a van at gunpoint where they were held for two weeks, denied food, and threatened with being killed, until family members paid ransom. According to the woman's attorney, Taylor Levy, the woman has developed severe anxiety and panic attacks as a result. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | Asylum seekers at a shelter in Nuevo Laredo told Human Right First in August 2021 that a family apparently attempting to reach the shelter had been kidnapped just outside the shelter's security wall. They reported hearing the screams of children as the family was abducted. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | Asylum seekers at a local government-run shelter in Ciudad Acuña reported that a family had been forced into a car outside the shelter in early August 2021. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | robbery, assault | 2 | A Honduran woman fleeing domestic violence with her eight-year-old son was repeatedly abused by her employer in August 2021 after being expelled by DHS to Reynosa and accepting an offer to work and live with a local family out of desperation. After suffering abuse at the hands of the employer, she escaped to live in the encampment, where she and her son remain in danger. The mother and son had been previously robbed of all their belongings in Mexico before they requested U.S. protection. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 23 | Two Nicaraguan women reported that 23 Nicaraguan asylum seekers who had been traveling with them were kidnapped in Reynosa in July 2021. Police at a checkpoint handed the group, which included the women's partners, over to a cartel extorting family members in the United States for ransom. Some of the group remain kidnapped, while at least one of the kidnapped asylum seekers has gone missing after his family paid ransom to secure his release. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 5 | Mexican police officers attacked a group of five Jamaican LGBTQ asylum seekers in downtown Tijuana in June 2021. They threw three of the asylum seekers to the ground and tased one of them. The asylum seekers reported that the police targeted them because of their race, sexual orientation, and gender identity, according to Emem Maurus, a lawyer with the Transgender Law Center. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 1 | In Ciudad Acuña, Coahuila state police beat an Afro-Honduran asylum seeker, who had been expelled to Mexico by DHS, so severely that he is now blind in one eye. He said that the officers hit him in the head with a branch and stole all of his belongings. He did not attempt to report the incident to authorities for fear of further retaliation. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/23/2021 | kidnapping, rape | 2 | Reynosa police refused to help a Black Honduran mother and her seven-year-old son after the family was kidnapped and the mother severely beaten and raped in spring 2021 in Reynosa. Instead, police taunted the mother, asking how much she would charge them for sex, according to Taylor Levy, an attorney assisting the family. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 1 | In May 2021, Mexican police detained and beat a 16-year-old Salvadoran boy for more than ten hours in Saltillo, Coahuila. His mother told Human Rights First that the officers beat and robbed him. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault, robbery | 1 | In August 2021, Coahuila police assaulted and robbed a Honduran woman who was waiting in Piedras Negras for an opportunity to request U.S. asylum. When she told the officers she would report them, they said, "that won't get you anything here. We are the law." | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | robbery, threats | 2 | In August 2021, Mexican police robbed and threatened a Guatemalan family outside a grocery store in Reynosa. The family is afraid to return to the store to buy medicine for their sick child for fear of encountering the police again. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 1 | A Honduran asylum seeker expelled to Ciudad Acuña by DHS was beaten by Coahuila state police in early August 2021. The man still had a bruise on his forearm a week after being pistol whipped by officers who had stopped him as he walked to a store to buy food just blocks from the shelter where he is staying. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 1 | A Honduran woman remains separated from her eight-year-old daughter, who crossed alone into the United States after the woman was kidnapped following the family's expulsion by DHS to Reynosa. The woman, who was fleeing death threats after witnessing a murder in Honduras, had left her daughter with a friend to beg for money to buy food when she was kidnapped just steps from the encampment in Reynosa. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | armed threats, extortion | 1 | A Honduran woman sent her nine-year-old son across the border alone after the family was threatened at gunpoint by the owners of the house in Ciudad Acuña where they had rented a room. The owners asked for phone numbers of their U.S. family members in order to extort them and tried to prevent the family from leaving. After they managed to escape, the woman sent her son to the United States to protect him from harm and fled to Piedras Negras, where she was sleeping on the street as of August 2021. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault, robbery | 1 | A pregnant Afro-Honduran woman decided to send her six-year-old son across the border alone after DHS expelled the family in April 2021. The mother spent months in Monterrey waiting for the opportunity to request U.S. asylum and reunite with her son. Mexican police violently raided and robbed the apartment she shared with other migrants on multiple occasions. She suffered a miscarriage due to the stress of her living conditions and her son was deeply traumatized by the separation, according to Taylor Levy, an attorney assisting the family. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | robbery, attempted kidnapping | 2 | After DHS expelled a Central American family seeking U.S. protection twice in April 2021, the family decided to send their minor son, a human trafficking survivor, across the border alone to protect him from violent crime in Ciudad Juárez, where the adult family members were robbed by Mexican police officers and narrowly escaped a kidnapping attempt. After crossing alone, the child experienced severe psychological trauma in ORR custody worrying about his family's safety, according to Taylor Levy, an attorney assisting the family. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | attempted kidnapping | 2 | A Honduran mother sent her nine-year-old son, who had fled forcible gang recruitment in Honduras, over the border alone after the family narrowly escaped a kidnapping attempt in Mexico. As of August 2021, the boy remained in ORR custody without a sponsor, soon to be transferred to foster care, according to Taylor Levy. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault, threats | 1 | Fearing for her teenage son's life, a Honduran mother sent him along across the border in May 2021 after gang members in Monterrey threatened, beat, and robbed him. The family had previously been turned away when they attempted to request asylum at the Eagle Pass port of entry, and relocated to Monterrey in search of work while they waited for U.S. asylum processing to resume. For months after the attack, gang members continued to appear outside the place where the family was staying in Monterrey, where the mother remains in danger. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |

CLP_PC_076264

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/23/2021 | kidnapping | (counted in Al Otro Lado survey data above) | A Mexican asylum seeker remains missing after he attempted to cross the border between ports of entry in April 2021 because CBP turned him away from requesting asylum at the San Ysidro port of entry. His family told Al Otro Lado that they not heard from him since he attempted to cross the border and believe he was likely kidnapped by a cartel. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault | 2 | In June 2021, men armed with a bat and knives waiting near the border attacked a Honduran couple as they attempted to cross the border in Piedras Negras to request asylum – beating the husband with a bat and stabbing the wife in the stomach. The couple had fled attacks and death threats by gangs in Honduras and the woman had previously suffered a miscarriage on the traumatic trip through Mexico. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, assault | 3 | Kidnappers waiting near the border in Ciudad Acuña abducted a Honduran woman and her two young children in May 2021 as they approached the U.S. border to seek protection in the United States. The kidnappers beat and robbed the woman but released the family after they were unable to contact any of her family members to extort. The woman had previously survived an attack by gang members in Honduras that left her with a fractured skull. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, assault, robbery | (counted in Al Otro Lado survey data above) | In August 2021, Mexican immigration officials deported a Honduran asylum seeker to Guatemala. The man and his family had been approved for an exemption to the expulsion policy after having been kidnapped, assaulted, and robbed in Mexico. But Mexican immigration officials stopped and detained him in Ciudad del Carmen as he was traveling to join his family in Tijuana, where they were scheduled for an exemption appointment on August 19, according to Ginger Cline, an attorney with Al Otro Lado. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | In August 2021, asylum seekers in Nogales, Mexico attempting to request U.S. asylum were tricked into entering the vehicles of kidnappers promising to drive them to the Kino Border Initiative, which was helping asylum seekers access exemptions, according to accounts related to the Kino Border Initiative. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | attempted kidnapping | 1 | A Mexican woman told the Kino Border Initiative that people pretending to be her attorneys arranged a meeting to discuss the asylum process, but when she and her son arrived at the arranged location, a group of men attempted to kidnap her son. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, sexual assault | 3 | A Mexican family that had been approved for an exemption from the expulsion policy was kidnapped by a taxi driver who was supposed to drive them from their shelter to the Brownville port of entry for their parole appointment in August 2021. The driver sexually assaulted the mother, who has epilepsy and other serious medical issues, in front of her two young sons, then abandoned the family on a road far outside of Matamoros, according to Charlene D'Cruz, an attorney assisting the family. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | attempted kidnapping, threats | 3 | A Guatemalan asylum seeker told Human Rights First that when she intervened to stop the kidnapping of a young boy and his father, a man threatened to come back and cut her and her child into pieces. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | assault, threats | 1 | Another asylum seeker said that in July 2021 a man who has been harassing and threatening her tried to set her tent on fire while she slept inside. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping | 2 | A traumatized nine-year-old Honduran boy who was kidnapped with his mother and held captive in horrendous conditions for 10 days is suffering from the poor conditions in the encampment and has become lethargic and malnourished. His mother, who has an ovarian cyst, was in severe pain, but as of July 2021, neither could access medical care in Reynosa. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 8/23/2021 | kidnapping, assault | (counted in Al Otro Lado survey data above) | According to Al Otro Lado, the burn and stab wounds of a Central American asylum seeker, who had been kidnapped and tortured, became infected due to poor sanitation and lack of medical treatment in the encampment in spring 2021. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |

CLP_PC_076265

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 8/23/2021 | kidnapping | 1 | In April 2021, DHS expelled a 38-week pregnant woman diagnosed with multiple infections who had fled Guatemala after her abusive partner severely beat her to try to abort her pregnancy. The woman had entered the United States to ask for protection immediately after escaping armed traffickers who had kidnapped her in Nogales and held her captive for 10 days without enough to eat. Border Patrol agents transported her to an Arizona hospital where she had a contraction, which the doctor determined had been triggered by stress. He also diagnosed her with a urinary and a vaginal infection. The woman provided details about her traumatic kidnapping during a highly limited Title 42 fear screening, but DHS expelled her to Mexico. She gave birth several days later to a sick child who nearly died in the hospital, according to Chelsea Sachau, a fellow with the Florence Immigrant & Refugee Rights Project. | https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers |
| 9/2/2021 | abuse | 1 | Un médico calificador de Nogales, Sonora, fue denunciado ante la Fiscalía General de Justicia del Estado (FGJE) por el delito de abusos deshonestos en contra de un migrante Centroamericano, de 24 años de edad. | https://eldiariodesonora.com.mx/notas.php?nota=170414 |
| 9/3/2021 | kidnapping | 2 | Honduran migrant Lesly Pineda, a factory worker, said she and her 11-year-old son Joan were kidnapped with eight other migrants in July and released only after she paid a $2,000 ransom. | https://www.latimes.com/world-nation/story/2021-09-03/biden-vowed-to-close-a-border-migrant-camp-then-under-his-watch-a-worse-one-emerged |
| 9/3/2021 | kidnapping | 1 | Torres and the half a dozen migrants in his group were rescued by Border Patrol agents, who later expelled them to Reynosa, he said. He had crossed the border after being kidnapped at a local shop where he had gone to buy food and was held with scores of others for a month until he paid $4,000 ransom. | https://www.latimes.com/world-nation/story/2021-09-03/biden-vowed-to-close-a-border-migrant-camp-then-under-his-watch-a-worse-one-emerged |
| 9/7/2021 | kidnapping | 489 | En el norte del país, en Ciudad Camargo, estado de Tamaulipas, el 5 de septiembre, autoridades federales rescataron a 162 migrantes que estuvieron abandonados durante cinco días, sin alimentos, en una bodega. . . . En Cadereyta, estado de Nuevo León, el 31 de agosto de 2021, el INM y policías estatales "rescataron a 327 personas migrantes, entre ellos, 120 menores de edad que permanecían hacinados y en condiciones insalubres al interior de una casa de seguridad", según informó el canciller. | https://actualidad.rt.com/actualidad/403151-mexico-anunciar-rescate-750-migrantes-centroamericanos |
| 9/11/2021 | kidnapping | 6 | "Rescatan de un taxi a seis migrantes secuestrados." | https://www.elmanana.com/rescatan-de-un-taxi-a-6-migrantes-secuestrados/5418719 |
| 9/13/2021 | rape, sexual assault, kidnapping, human trafficking, armed robbery, beatings | 363 | Asylum seekers from Cameroon, Colombia, Cuba, El Salvador, Guatemala, Haiti, Honduras, Nicaragua, and Venezuela who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack or attempted attack in Mexico in the last month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between August 18 and September 13, 2021. |
| 9/16/2021 | extortion | 4 | A Salvadoran asylum-seeking family was extorted by police in Tijuana who threatened them with deportation in August 2021. The same officers stopped the family and asked them for money on 5 separate occasions. | HRF communication with asylum seeker |
| 9/16/2021 | kidnapping | 1 | A Honduran man was kidnapped in Reynosa in May 2021 while awaiting the opportunity to request U.S. asylum. | HRF communication with asylum seeker |
| 9/16/2021 | attempted kidnapping | 2 | "Carolina (pseudonym) and her family fled southern Mexico and arrived in Nogales recently after a criminal group murdered two boys in their town, one of whom was a friend of Carolina's brother. After the murders, armed people entered Carolina's home and kidnapped her brother. She still hasn't heard anything from or about him. She continues receiving threatening phone calls, even after having changed her phone number. When they arrived in Nogales, they got into a taxi and soon noticed that the driver was not taking them where he was supposed to and was asking them intrusive questions. They managed to escape the taxi and called another one that took them to Kino." | Kino Border Initiative report |
| 9/16/2021 | threats | 3 | "A woman and her two children decided to leave their home to escape her abusive partner, whom she had just learned was involved in organized crime. She fled first to Tijuana, but noticed she was being followed by a mysterious car. Her partner sent her a message saying he had people everywhere following her. She quickly fled Tijuana and came to Nogales. On their first night in a local shelter, she saw a man standing outside the door of the shelter all night, and the shelter staff did not know who he was. She is afraid to stay in Nogales." | Kino Border Initiative report |

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 659 of 721

CLP_PC_076266

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/20/2021 | kidnapping | 2 | "Chihuahua.- Dos personas migrantes de 14 y 15 años de edad, fueron rescatados por agentes de seguridad pública estatal y municipal, de dos captores adultos los cuales son de origen extranjero." | https://diario.mx/estado/rescatan-a-dos-menores-migrantes-secuestrados-por-hondurenos-20210920-1843378.html |
| 9/20/2021 | kidnapping | 3 | "El reporte de migrantes privados de la libertad, movilizó a elementos policiacos quienes confirmaron la situación y sitiaron el domicilio donde estaban las víctimas. Trascendió que tres migrantes, al parecer de nacionalidad guatemalteca, fueron secuestrados desde la semana pasada y los tenían en contra de su voluntad en casa de lámina y cartón. Dos de las víctimas eran menores de 14 años de edad." | http://tiempo.com.mx/noticia/rescatan_a_tres_migrantes_secuestrados_tras_operativo_en_la_aeropuerto_noticias_chihuahua/ |
| 9/21/2021 | kidnapping, torture | 1 | An Ecuadoran man was kidnapped in Ciudad Juarez after the U.S. government expelled him under Title 42. The kidnappers sent family members a video of the man blindfolded with his hands and feet bound while someone holds a knife to the man's face. After the Ecuadoran man's family sent ransom money, they never heard from the kidnappers or the Ecuadoran man again and he remains missing. | https://www.elcomercio.com/actualidad/seguridad/testimonio-azuayo-secuestrado-frontera-eeuu-mexico.html |
| 9/24/2021 | kidnapping | 1 | Ecuadoran migrant Jose Luis Palate, 42, father of 2, disappeared in May 2021 after informing his family he intended to cross the U.S.-Mexico border near Ciudad Juarez. As of September 2021 he remains missing. | https://quenoticias.com/noticias/jose-luis-palate-migrante-desaparecido-frontera-mexico-estados-unidos/ |
| 9/27/2021 | kidnapping | 340 | 340 migrants, including 17 minors, who had been kidnapped and held captive in Chihuahua, Mexico were rescued by police on September 17, 2021 | https://lasillarota.com/estados/esto-suenan-algunos-de-los-340-migrantes-secuestrados-en-chihuahua/564724 |
| 9/27/2021 | kidnapping | 1 | "La Fiscalía de Distrito Zona Norte obtuvo una vinculación a proceso dictada en contra de Roberto M. A., quien fue detenido en términos de la flagrancia como probable responsable del secuestro de una mujer [ecuatoriana] cometido la tarde del pasado 14 de septiembre en Ciudad Juárez. " | http://puentelibre.mx/noticia/vinculacion_proceso_secuestro_migrante_ecuador_ciudad_juarez/ |
| 9/28/2021 | kidnapping | 2 | "That is what happened to Jorge Geovanni Diaz and his son hours after they were expelled from the U.S. to Tamaulipas…First, an armed group entered a warehouse where the coyotes kept them. "They attacked 182 people, they took us to the mountains, and there we were kidnapped for a month and 14 days," Díaz said. Once his family spent $6,000 and Díaz managed to get out, he fell into the hands of the taxi driver who had to return him to the Reynosa bus station. "They were connected to the taxi driver. They traded me to another cartel in Matamoros," he said. He suffered a double kidnapping and had to pay $6,000 more." | https://www.nbcnews.com/news/latino/migrants-returned-mexico-describe-horror-kidnappings-torture-rape-rcna2300 |
| 9/28/2021 | kidnapping | 2 | "Months ago, during a sudden downpour, a Honduran man and his son disappeared [from the Reynosa tent encampment]. 'A man said that when he came out of the bathroom, he saw a truck stop, a man get out, pull them in and take them away,' " | https://www.nbcnews.com/news/latino/migrants-returned-mexico-describe-horror-kidnappings-torture-rape-rcna2300 |
| 9/29/2021 | kidnapping | 2 | David Sanabria huyó de Honduras después de que lo perdió todo tras el paso de los huracanes Iota y Eta, pero nunca se imaginó que en su camino a Estados Unidos el coyote lo entregaría al crimen organizado en Reynosa, Tamaulipas. Aquí su historia. | https://www.telemundo.com/shows/hoy-dia/crimen-y-violencia/video/puro-machete-los-desmembraban-dice-un-migrante-que-sobrevivio-un-secuestro-en-mexico-tmvo10139046 |
| 9/30/2021 | kidnapping, assault | 2 | "...Del otro lado de la línea, unos hombres le dijeron que tenían retenidos a su hermano David, de 32 años, y a su sobrina Ximena, de 4. Si quería volver a verlos con vida debía enviarles 7 mil 500 dólares en un plazo de ocho días...Cada vez que Denis decía que no tenía dinero, David se ganaba una golpiza. La niña, según el papá, lloraba al verle sangrando en el piso. David cuenta que cuando se cumplía el plazo y nadie pagaba los rescates de sus compañeros migrantes, los asesinaban ahí mismo, a un lado del campamento. " | https://www.heraldousa.com/migracion/2021/9/30/secuestros-mutilaciones-este-es-el-infierno-que-viven-los-migrantes-en-camino-eu-8920.html |
| 10/1/2021 | kidnapping | 1 | "Un migrante fue secuestrado por personas desconocidas y sus familiares fueron extorsionados con engaños de que había cruzado la frontera y estaba en Phoenix, Arizona, cuando era privado de su libertad en una vivienda de la colonia Romanza de esta ciudad." | https://www.expreso.com.mx/seccion/sonora/358210-levantan-a-un-migrante-y-extorsionan-a-su-familia-en-nogales.html |
| 10/1/2021 | sexual assault | 2 | "Reports of sexual assault on young girls at the encampment reached Pastor Hector Silva, who allows migrant families living at the plaza to move into Senda de Vida when room is available." | https://myrgv.com/featured/2021/10/01/lights-out-electricity-shut-down-at-reynosa-migrant-encampment/ |
| 10/2/2021 | kidnapping | 2 | "Dos migrantes michoacanos fueron liberados en un operativo policiaco realizado en una casa de seguridad de Tijuana donde se logró la captura de cuatro secuestradores, entre ellos un adolescente." | https://www.jornada.com.mx/notas/2021/10/02/estados/liberan-a-migrantes-michoacanos-secuestrados-en-baja-california/ |

CLP_PC_076267

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/2/2021 | kidnapping | 3 | "La Fiscalía de Distrito Zona Centro obtuvo la vinculación a proceso de dos hombres originarios de Honduras acusados por el delito de secuestro agravado, cometido en perjuicio de tres inmigrantes de nacionalidad guatemalteca y hondureña, uno de ellos menor de edad." | https://www.elheraldodechihuahua.com.mx/policiaca/hondurenos-secuestraron-a-tres-migrantes-y-pedian-20-mil-dolares-extorsion-secuestro-migracion-vinculados-a-proceso-7286687.html |
| 10/4/2021 | kidnapping | 13 | "Autoridades mexicanas buscan a 13 migrantes que habrían desaparecido cerca de la frontera con Estados Unidos, después de haber sido retenidos por traficantes de personas, informó este lunes en un comunicado la fiscalía del estado norteño mexicano de Chihuahua." | https://www.eleconomista.com.mx/politica/Autoridades-mexicanas-buscan-a-13-migrantes-cerca-de-frontera-con-Estados-Unidos-20211004-0129.html |
| 10/6/2021 | Kidnapping | 1 | A Salvadoran migrante, Luis David "N", was held hostage and tortured in Mexicali by kidnappers demanding ransom from his family. He managed to escape. | https://www.elimparcial.com/mexicali/policiaca/Rescatan-a-migrante-salvadoreno-secuestrado-20211006-0025.html |
| 10/7/2021 | kidnapping | 5 | "Cinco extranjeros en estado de migrante fueron rescatados en la ciudad de Reynosa, Tamaulipas, por elementos de la policía estatal y en la acción detuvieron a dos individuos que los llevaban secuestrados." | https://www.excelsior.com.mx/nacional/liberan-a-cinco-migrantes-nicaraguenses-secuestrados-en-reynosa/1475840 |
| 10/7/2021 | kidnapping, robbery | 1 | I.B. is a 35-year-old man from Ghana. He fled his home after an armed criminal group entered his home and murdered his uncle; I.B. had previously reported the criminal group to the police. I.B. fled to South America, ultimately journeying to Mexico. In Mexico, I.B. was kidnapped and held for three days. Mexican police have stopped and searched I.B. on two occasions and have stolen his wallet. I.B. has had difficulty finding a job in Mexico on account of his race and nationality, and he has been the victim of racist comments. | https://www.humanrightsfirst.org/sites/default/files/PrecautionaryMeasuresRequestUnitedStatesTitle42.pdf |
| 10/7/2021 | kidnapping | 4 | N.I.C.B. is a 34-year-old mother from El Salvador.10 N.I.C.B. fled gang violence in El Salvador with her husband, J.J.B.B., and two children, K.I.B.C., who is 12 years old, and A.E.B.C., who is 8 years old. Gang members threatened to kill her and her family, and they beat her and her husband. In March 2021, the family tried to enter the United States from Reynosa, Mexico, to seek asylum. When they encountered U.S. officials at the border, the officials called N.I.C.B., her husband, and her children "a bunch of criminals." The officials expelled the family into Mexico in the middle of the night. They were kidnapped almost immediately after and kept in a locked storage room with insufficient food for 20 days. The kidnappers sexually harassed N.I.C.B. constantly. | https://www.humanrightsfirst.org/sites/default/files/PrecautionaryMeasuresRequestUnitedStatesTitle42.pdf |
| 10/7/2021 | assault, attempted kidnapping | 3 | N.M.M.M. is a 35-year-old mother from Guatemala.11 She fled Guatemala with her 11-year-old son, C.A.M.M. and four-year-old daughter, D.L.M.M., due to threats made against her family by organized criminal gangs. N.M.M.M. has been the victim of crime in Mexico as well. Three men broke into the home where she was staying and assaulted her. Her son was the victim of an attempted kidnapping. | https://www.humanrightsfirst.org/sites/default/files/PrecautionaryMeasuresRequestUnitedStatesTitle42.pdf |
| 10/9/2021 | kidnapping | 1 | He never intended to leave El Salvador – he lived "peacefully" in his home country and even had his own business. But everything changed for Martin when he was raped. "I am from the LGBTQ community, I am gay," Martin said. "And in my country, I suffered discrimination and violent because of that. "So, at that moment I had no choice but to take the savings I had and try to flee to a more liberal place, where they don't push you aside, where they don't see you badly."He left El Salvador on 5 March and managed to make it to Monterrey, Mexico – but his plans quickly disintegrated. He tried to cross into the United States on three separate occasions. Each time, he was sent to Reynosa in Mexico. "Then the last time, I was kidnapped as I was leaving the bridge," Martin said. "Someone told me that he could help me, made me get into a car and took me to a house where they locked me up for several days. | https://www.pinknews.co.uk/2021/10/09/el-salvador-doctors-without-borders-gay-refugee/ |
| 10/14/2021 | kidnapping | 3 | The vehicle in which four migrants and their alleged smuggler were traveling from Chihuahua City to Juarez was cut off by two other cars. A shooting in which the driver died, and a Honduran was injured, ensued; the assailants commandeered the migrants and drove away with them, according to the reports. | https://www.borderreport.com/hot-topics/border-crime/expert-worries-mexican-gangs-may-be-stealing-each-others-human-cargo-putting-migrant-lives-at-risk/ |

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 661 of 721

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/21/2021 | kidnapping | 1 | In mid-October 2021, DHS expelled a Honduran asylum seeker who had sought protection near McAllen, Texas immediately after escaping kidnappers who had abducted him outside a grocery store in Reynosa, Mexico while he was buying tortillas and avocados for his wife. DHS turned him over to Mexican immigration authorities, who flew him to Villahermosa then bused him into Guatemala, where he remains stranded. He told Human Rights First he is sick with fear and desperate to reunite with his wife, who is still in the Reynosa tent encampment where the couple had been waiting together for U.S. asylum processing to resume at the port of entry. | https://www.humanrightsfirst.org/resource/illegal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | kidnapping | 1 | A young Honduran woman who attempted to request asylum at a U.S. port of entry in July 2021 was kidnapped immediately after DHS turned her away. Members of a criminal organization who repeatedly raped her and trafficked her for sexual exploitation for three months, according to a humanitarian aid worker assisting her. She remains in danger in Mexico. | https://www.humanrightsfirst.org/resource/illegal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | kidnapping, torture | 2 | A Central American couple blocked from seeking asylum at a U.S. port of entry was kidnapped and tortured in Tijuana in summer 2021. The kidnappers raped the wife repeatedly, beat the husband, and demanded ransom from their family members. The couple managed to escape but remains in danger in Tijuana as of mid-October 2021, when Human Rights First last spoke with them. | https://www.humanrightsfirst.org/resource/illegal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | assault | 2 | A 13-year-old Honduran girl and her asylum-seeking father were assaulted and robbed by gang members after DHS expelled them under Title 42. The family was forced to hide in a mountainous area for several days afraid of encountering the kidnappers who targeted them and other migrants on a train. They remain in danger in Mexico, according to Shoshana Kushner, an attorney with Immigrant Defenders Law Center. | https://www.humanrightsfirst.org/resource/illegal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | attempted kidnapping | 2 | Armed men tried to kidnap a Guatemalan asylum seeker and his three-year-old daughter immediately after DHS expelled them to a Mexican border city in August 2021. The family managed to escape, but others who had been expelled with them did not, according to a humanitarian aid worker assisting the family. | https://www.humanrightsfirst.org/resource/illegal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/19/2021 | kidnapping | 1 | A 59-year-old asylum-seeking grandmother from Honduras was kidnapped soon after DHS expelled her to Piedras Negras in summer 2021. When Human Rights First researchers last spoke to her in October 2021, she remained in danger in Mexico unable to request asylum. | https://www.humanrightsfirst.org/resource/illegal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | rape, kidnapping | 1 | An unaccompanied child who was unable to access the U.S. asylum process due to Title 42 was raped and kidnapped from the hostel where she was waiting to request protection by men who told her they were going to kill her, according to Las Americas Immigrant Advocacy Center. | https://www.humanrightsfirst.org/resource/illegal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | rape | 1 | An asylum seeker fleeing gender-based violence as was raped at gunpoint in front of her son, causing her to develop an infection, after DHS expelled her under Title 42. She remains in danger in Mexico, according to Las Americas Immigrant Advocacy Center. | https://www.humanrightsfirst.org/resource/illegal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | kidnapping, rape | 1 | An INM officer kidnapped and raped a Honduran asylum-seeking woman near the border in Ciudad Juárez and sold her to a cartel that held her captive. Though she managed to escape, the woman has been unable to request U.S. asylum due to the Title 42 policy and remains in danger in Mexico, terrified the cartel members, who have photos of her, will find her again, according to Las Americas Immigrant Advocacy Center. | https://www.humanrightsfirst.org/resource/illegal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | robbery | 3 | Three Nicaraguan political dissidents, whom DHS twice expelled to Mexico in August 2021, have been strip-searched and robbed by Mexican government officials on multiple occasions. In mid-August 2021, DHS turned them over to INM officers who verbally abused them and deprived them of food in detention, forced them to strip naked, and stole their money and valuables. In late August 2021, Mexican police boarded a bus that the three were riding near the border with Yuma, Arizona, forced them off the bus, strip-searched them, adn stole their money. The dissidents remain in danger in Mexico, unable to access the U.S. asylum process, according to Anaís Catalina, an advocate assisting them. | https://www.humanrightsfirst.org/resource/illegal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 662 of 721

CLP_PC_076270

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/21/2021 | rape | 1 | INM officers extorted and raped a Honduran asylum seeking-woman immediately after the U.S. government expelled her to Reynosa in August 2021. She told Human Rights First that INM officers demanded payment from her and the others with whom she was expelled, threatening them with deportation, then locked the women in a separate room, forced them to remove their clothes, and raped them. "We did what they asked of us out of fear because they threatened to turn us over to a human trafficking network," she said. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | kidnapping | 3 | An INM officer in Tijuana kidnapped a Honduran family of three who had made multiple attempts to request U.S. asylum. The officer offered the family a ride then held them at gunpoint demanding money and information about U.S. family members. The officer handed the family over to men who held them captive, sexually abused and beat them so severely that one family member lost consciousness. They managed to escape but remain in danger in Mexico, according to Las Americas Immigrant Advocacy Center. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | extortion | 3 | Since August 2021, police officers in Tijuana have repeatedly extorted and threatened a Salvadoran asylum-seeking family blocked from seeking U.S. protection because of Title 42. The family told Human Rights First that they are terrified of encountering the officers, who have also threatened to deport them. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | rape, sexual assault, beatings | (counted in Al Otro Lado survey data above) | In September and October 2021, CBP has denied more than 15 humanitarian parole requests submitted by Al Otro Lado on behalf of its clients to the Del Rio, Eagle Pass, and San Ysidro ports of entry. These requests include: a Honduran woman who was raped by Mexican police, sex trafficked, and forced to work in massage parlor; a Central American asylum seeker who was beaten by Mexican police … Mexican LGBTQ+ siblings who were sexually assaulted …. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | kidnapping | 1 | A Mexican asylum-seeking woman committed suicide in October 2021 while stranded in Tijuana, unable to request U.S. asylum due to Title 42. Desperate for protection from cartels that had kidnapped, beaten, and tortured her in southern Mexico, the woman had attempted to cross the U.S. border between ports of entry twice, but was kidnapped near the border both times, according to Nicole Ramos, an attorney with Al Otro Lado. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | rape | 1 | A Central American child was raped in the Reynosa tent encampment in September 2021, according to Charlene D'Cruz, an attorney with Lawyers for Good Government. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | rape | 1 | A 14-year-old girl was raped in the Tijuana tent encampment in summer 2021. A Honduran asylum seeker who witnessed the rape told Human Rights First she had to flee the encampment because of further threats by the rapist. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | beating, attempted kidnapping | 3 | In late July 2021, armed men broke into the Tijuana shelter where a Honduran family was staying, beat the family, and attempted to kidnap the children. The family had fled death threats in Honduras by gang members who had violently raped the pregnant mother, causing her to miscarry. The family escaped but found that other shelters in Tijuana were full. They are now paying to rent a room and told Human Rights First they are terrified to go outside for fear of encountering the kidnappers. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/21/2021 | kidnapping | 1 | An asylum-seeking woman from Honduras was denied medical attention in Matamoros after injuring her leg escaping kidnappers and contracting gangrene that was so severe that a bone in her leg was visible. A doctor at a volunteer-run clinic had informed the woman that her leg would need to be amputated or she would die, but a hospital in Matamoros turned her away, claiming they lacked sufficient bedspace, according to Charlene D'Cruz, an attorney with Lawyers for Good Government. | https://www.humanrightsfirst.org/resource/ille gal-and-inhumane-biden-administration-continues-embrace-trump-title-42-policy-attacks |
| 10/27/2021 | kidnapping | 4 | Cuatro ciudadanos nicaragüenses fueron secuestrados por supuestos integrantes de la organización criminal Los Zetas en México. Los nicas pretendían cruzar la frontera con los Estados Unidos. Según información de medios oficialistas los nicas son originarios del municipio de Corinto, en Chinandega. | https://radio-corporacion.com/blog/archivos/119723/cuatro-nicaraguenses-secuestrados-por-organizacion-criminal-los-zetas/ |

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/28/2021 | threats, assault | 3 | One family from Honduras arrived at KBI recently after attempting to unsuccessfully cross the border between Reynosa and McAllen. They were being followed by gang members in Honduras and could no longer stay. The mother and daughter were expelled separately from the father, and the father was beaten and robbed by alleged agents of Mexican immigration when he was expelled back into Reynosa. He was later threatened by the local mafia for walking in the wrong area. The family fled into southern Mexico because it was too dangerous for them to wait at the border. While they were there, they received threats from local organized crime and had to move again. They arrived in Nogales hoping to be able to stay safe here. They do not have the option to return, as they recently received news that the father's mother had been killed in Honduras after they had escaped, and several other family members had been threatened. | Communication from Kino Border Initiative |
| 10/31/2021 | kidnapping | 25 | Mexican military personnel liberated 25 kidnapped migrants from a house in Matamoros. | https://www.hoytamaulipas.net/notas/474405/Rescatan-a-25-migrantes-en-Matamoros.html |
| 11/8/2021 | kidnapping | 4 | In spring 2021, armed men kidnapped a group of Honduran women and children who had been waiting in Nogales for the opportunity to request U.S. asylum, forcing them into cars. One mother and her three-year-old daughter managed to escape and ran into a convenience store. Someone in the store escorted the family to a taxi, but the kidnappers followed the family until they arrived at the Kino Border Initiative office. | https://www.humanrightsfirst.org/sites/default/files/BorderRestrictionsLift%2CBlockingAsylumSeekersContinues.pdf |
| 11/8/2021 | kidnapping, assault | 1 | A Guatemalan asylum-seeker was kidnapped soon after DHS expelled him and his seven-year-old daughter near the Lukeville port of entry at night in spring 2021. When the man went to buy food for his daughter, four men covered his face with a cloth, beat him, and held him captive for 15 days, during which time his daughter was forced to enter the United States alone. | https://www.humanrightsfirst.org/sites/default/files/BorderRestrictionsLift%2CBlockingAsylumSeekersContinues.pdf |
| 11/8/2021 | attempted kidnapping, assault | 5 | A Mexican asylum-seeking family with three young daughters, ages eight, five, and two, who remain blocked from protection due to Title 42, narrowly escaped an attempted kidnapping in Nogales in October 2021. Three men dressed in black in a truck rushed the family, threatening to take the children. The mother and children managed to flee to a hotel while the father fought off the attackers, sustaining neck and back injuries for which he required hospital treatment. | https://www.humanrightsfirst.org/sites/default/files/BorderRestrictionsLift%2CBlockingAsylumSeekersContinues.pdf |
| 11/8/2021 | kidnapping, assault | 1 | In fall 2021, for instance, an asylum-seeking teenage child told Florence Project that members of an organized criminal group had kidnapped and tortured him near Nogales. | https://www.humanrightsfirst.org/sites/default/files/BorderRestrictionsLift%2CBlockingAsylumSeekersContinues.pdf |
| 11/8/2021 | assault, robbery | 2 | Florence Project has also assisted several Mexican teenagers who had been assaulted, beaten, and robbed in Nogales after CBP officers turned them away from the port of entry. | https://www.humanrightsfirst.org/sites/default/files/BorderRestrictionsLift%2CBlockingAsylumSeekersContinues.pdf |
| 11/9/2021 | kidnapping | 49 | El Instituto Nacional de Migración Reynosa, de México, informó que rescataron a 49 migrantes secuestrados. Estaban en una casa a ocho kilómetros (km) de EE.UU. La Marina de México informó que localizó el lugar del secuestro gracias a una denuncia anónima. Había tres menores. | https://twitter.com/Sanchezmendieta/status/1458141287941492737 |
| 11/12/2021 | kidnapping | 2 | Cada segundo que pasa, incrementa la angustia en la familia Pravia Ruiz en la ciudad de Matagalpa, Nicaragua, porque Flor de María Pravia Ruiz y su sobrino Lesther Daniel Mejía Pravia, dos matagalpinos que están secuestrados en México y sus captores dieron un plazo de 72 horas, que vence este sábado 13 de noviembre, para que les envíen 13,000 dólares para liberarlos. | https://mosaicocsi.com/angustia-por-matagalpinos-secuestrados-en-mexico/ |
| 11/15/2021 | kidnapping, assault | 1 | Fabiola del Socorro Picado Cruz, a Nicaraguan woman, was kidnapped and held for ransom in Reynosa | https://www.facebook.com/113979780345137/posts/430756748667437 |
| 11/17/2021 | kidnapping | 54 | En Nogales, Sonora, una denuncia anónima permitió rescatar a medio centenar de migrantes originarios de Honduras, Guatemala y Nicaragua. En total fueron 54 los migrantes rescatados. | https://noticieros.televisa.com/ultimas-noticias/rescatan-migrantes-centroamericanos-secuestrados-en-nogales-sonora/ |

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 664 of 721

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 11/18/2021 | kidnapping | 2 | Policías de Investigación adscritos a la Fiscalía de Distrito Zona Norte, llevaron a cabo un operativo para rescatar a dos personas originarias de Guatemala que supuestamente estaban privadas de la libertad, en una vivienda de la colonia Galeana | https://diario.mx/juarez/liberan-a-migrantes-secuestrados-y-torturados-en-la-galeana-arrestan-a-dos-20211118-1863976.html  https://actualidad.rt.com/actualidad/410836-policia-mexicana-rescata-ciudad-juarez-migrantes-secuestrados |
| 11/18/2021 | rape | 1 | A mother and her daughter fled El Salvador after being abused by a public official. When the mother reported the crimes, her abuser attempted to imprison her, but she managed to escape and flee the country. With no access to asylum at ports of entry, she attempted to cross without inspection between Reynosa, Tamaulipas and McAllen, Texas so that she could turn herself in to imigration agents and request asylum while in their custody. She was kidnapped by her smugglers, held for several days without food, and raped before she was rescued by police. She managed to cross into the U.S. where she attempted to request asylum but was ignored. She was expelled into Nogales, Sonora and had no social support, putting her and her daughter in a state of homelessness while they waited for the border to open. | Communication from Kino Border Initiative |
| 11/19/2021 | kidnapping | 27 | Rescatan a 27 migrantes secuestrados en un hotel de Ciudad Juárez | https://www.telemundo.com/noticias/noticias-telemundo-en-la-noche/inmigracion/video/rescatan-27-migrantes-secuestrados-en-un-hotel-de-ciudad-juarez-tmvo10300754 |
| 11/19/2021 | kidnapping | 12 | Policías municipales de Ciudad Juárez y agentes de la Fiscalía de Chihuahua rescataron a 12 migrantes las últimas 24 horas, incluidas dos mujeres y un menor de edad, en tres operativos distintos en un hotel, una casa de seguridad y en la zona desértica entre los municipios del Valle de Juárez y Ojinaga colindante al río Bravo. | https://www.jornada.com.mx/notas/2021/11/19/estados/rescatan-a-12-migrantes-en-tres-operativos-en-chihuahua/ |
| 11/20/2021 | kidnapping | 3 | Ana Gabriela Nicaragua Lopez, a Nicaraguan political dissident, was kidnapped with her husband and son by the Cartel de Juarez. | https://noticieros.televisa.com/ultimas-noticias/liberan-a-opositora-de-nicaragua-secuestrada-en-mexico/ |
| 11/21/2021 | kidnapping, extortion | 12 | Julio Ampié, who had been a political prisoner in Nicaragua, was kidnapped in Reynosa with his wife and two children in July 2021. INM had previously extorted him for $600 in El Guasaule. Mexican police entered the hotel room where they were staying in Reynosa, loaded them into a van, and brought them to a small house where there were more migrants, then sold them to a cartel for $3,000.  In October 2021, 7 Nicaraguan victims, including Gerlenis Jimenez and Maria Teresa Delgadillo, were freed after $70,000 of ransom was paid to the kidnappers.  Melvin Francisco Martinez was kidnapped at the end of August 2021 and managed to escape after 10 days. | https://www.laprensa.com.ni/2021/11/21/suplemento/la-prensa-domingo/2913189-nicas-secuestrados-cuando-el-sueno-americano-se-convierte-en-pesadilla |
| 11/22/2021 | kidnapping | 5 | Al arribar al lugar del reporte, escucharon gritos de auxilio de varias personas provenientes de una de las habitaciones de la casa; procedieron al rescate de cinco indocumentados, quienes manifestaron que los propietarios de la vivienda los tenían privados de su libertad desde hacía más de cinco días, por lo que fueron resguardados y puestos a salvo. | https://diario.mx/juarez/liberan-a-migrantes-secuestrados-20211121-1865181.html |
| 12/3/2021 | kidnapping | 3 | Tras un reporte de personas privadas de su libertad en un domicilio ubicado en el cruce de las calles Isla Jasu y Ramón Aranda, en la colonia Chihuahua, elementos policiacos arribaron al lugar. Al llegar los oficiales escucharon gritos de ayuda provenientes del domicilio, por lo que de inmediato ingresaron y encontraron a tres hombres quienes argumentaron ser migrantes y que tenían una semana retenidos en contra de su voluntad en dicho inmueble, por dos sujetos, los cuales les pidieron dinero a sus familiares a cambio de su libertad, acumulando un total de 15 mil dólares. | https://www.arnoticias.com.mx/pub/28734?utm_source=dlvr.it&utm_medium=twitter |
| 12/3/2021 | kidnapping | 2 | La Policía Municipal de Tijuana detuvo a Eduardo "N", pollero que mantuvo secuestrados a dos migrantes con engaños, prometiendo que los cruzaría a Estados Unidos sin documentos. | https://www.facebook.com/104805888231365/posts/305058074872181 |

CLP_PC_076272

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 666 of 721

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/3/2021 | rape, sexual assault, kidnapping, human trafficking, armed robbery, beatings | 679 | Asylum seekers from Cuba, El Salvador, Guatemala, Haiti, Honduras, Nicaragua, Venezuela and other countries who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack or attempted attack in Mexico in the last month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between September 14 and December 2, 2021. |
| 12/5/2021 | kidnapping | 5 | Cinco migrantes procedentes de Guatemala y del estado de Veracruz fueron secuestrados por un chofer de taxi en el aeropuerto internacional Abraham González de Ciudad Juárez, estuvieron retenidos en una vivienda de la colonia Villas de Alcalá durante cinco días, hasta que policías municipales concretaron su rescate, informó este lunes la Secretaría de Seguridad Pública Municipal (SSPM). | https://www.jornada.com.mx/notas/2021/12/13/estados/autoridades-de-juarez-liberan-a-5-migrantes-de-guatemala-secuestrados/ |
| 12/7/2021 | kidnapping | 2 | Dos nicaragüenses más fueron secuestrados en México por uno de los carteles considerados como los más peligrosos: Los Zetas. Se trata de Bismarck José Contreras y Erling Francisco Tinoco, originarios de Estelí. Ambos huían del asedio. | https://nicaraguainvestiga.com/nacion/68655-cartel-mexicano-secuestra-a-nicas-que-huian-de-persecucion-politica/ |
| 12/9/2021 | kidnapping | 2 | A Nicaraguan asylum seeker and his adult son were kidnapped in December 2021 and held for 7 days until their family paid ransom after CBP expelled them to San Luis Colorado, Mexico under Title 42, according to the man's nephew, who is also seeking asylum. | HRF interview with asylum seeker |
| 12/11/2021 | kidnapping | 3 | La Fiscalía de Distrito zona Norte obtuvo la auto de vinculación a proceso en contra de Brayan Jasiel R.C., al acreditar su posible participación en el delito de secuestro, cometido en agravio de tres personas migrantes en Ciudad Juárez. Durante la audiencia inicial, el agente del Ministerio Público expuso ante el órgano jurisdiccional que el imputado realizó actos de violencia física y moral en contra de tres masculinos de origen extranjero, quienes fueron retenidos y amenazados para que familiares depositaran importantes cantidades de dinero a cambio de su libertad. | https://www.elheraldodejuarez.com.mx/policiaca/procesan-a-imputado-por-secuestro-de-tres-personas-migrantes-ciudad-juarez-7596616.html |
| 12/12/2021 | kidnapping | 50 | Los municipales encontraron a 50 centroamericanos: 34 adultos y 16 menores de edad, entre ellos un bebé de un año y seis meses. En total, 35 hombres y 15 mujeres. | https://jornadabc.com.mx/region/liberan-a-50-en-nl/ |
| 12/18/2021 | kidnapping | 1 | La Fiscalía de Distrito Zona Norte en Chihuahua obtuvo un auto de vinculación a proceso en contra de los imputados José 'R' y Adaniber 'C' por el delito de secuestro agravado de una persona migrante, a quien mantuvieron en cautiverio en un domicilio de la colonia Del Carmen en Ciudad Juárez. | https://www.milenio.com/estados/chihuahua-vinculan-proceso-responsables-secuestro-migrante |
| 12/20/2021 | kidnapping/potential murder | 13 | Trece migrantes que fueron secuestrados en Chihuahua pudieron haber sido asesinados durante una guerra territorial entre cárteles de drogas, un señal más de un conflicto cada vez más violento entre bandas rivales por las rutas de contrabando en este estado del norte de México que colinda con Texas, según fuentes mexicanas y estadounidenses. | https://www.dallasnews.com/espanol/al-dia/inmigracion/2021/12/20/temen-que-13-migrantes-hayan-sido-asesinados-por-carteles-en-la-frontera-entre-texas-y-chihuahua/ |
| 12/21/2021 | kidnapping, extortion | 2 | Two migrants were held captive against their will in Tijuana by a man demanding ransom for their release. | https://www.facebook.com/104805888231365/posts/305058074872811 |
| 12/21/2021 | kidnapping | 1 | De acuerdo a la información proporcionada por la víctima de origen peruano, los referidos detenidos lo mantuvieron en cautiverio en un domicilio de las calles Níquel y Joaquín Terrazas de la colonia Del Carmen, de donde logró escapar. | https://www.elheraldodejuarez.com.mx/policiaca/migrante-secuestrado-se-escapa-y-encuentra-a-policias-arrestan-2-polleros-7638283.html |
| 12/21/2021 | kidnapping | 5 | Dos hombres fueron vinculados a proceso por el secuestro de cinco migrantes en la colonia Villas de Alcala, informo la Fiscalia Zona Norte. De acuerdo con el report, Juan de Dios H.S. y Jamie Daniel C.M. amenazaron a las victimas con un arma y las mantuvieron en cautiverio, exigiendo a los familiares despositos dinero a cambio de su liberacion. | https://netnoticias.mx/juarez/los-vinculan-a-proceso-por-secuestrar-a-migrantes/ |
| 12/27/2021 | kidnapping | 27 | Noviembre no fue el mejor mes para intentar cruzar a Estados Unidos. Unos 27 nicaragüenses sufrieron secuestro, al menos cinco familias enteras entre ellos y sus familiares en el país en vez de recibir remesas tal y como lo esperaban al despedirlos, se vieron obligados a buscar dinero para salvar sus vidas. | https://nicaraguainvestiga.com/nacion/70633-nacion-al-menos-27-nicas-secuestrados-en-30-dias/ |

CLP_PC_076273

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 1/1/2022 | murder | 1 | Un hombre haitiano, identificado como Casseus Franck, fue asesinado el fin de semana en Tijuana, Baja California, y su cuerpo identificado por el Servicio Médico Forense (Semefo), pero hasta ahora ningún familiar ha reclamado su cuerpo. Franck fue asesinado cerca de las 15:00 horas del sábado, cuando el o los agresores le dispararon en la cabeza al migrante. El ataque ocurrió en el puente peatonal "México", entre la calle Miguel Negrete y vía Rápida Poniente, en la zona centro de Tijuana. | https://www.reforma.com/aplicacioneslibre/preacceso/articulo/default.aspx?__rval=1&urlredirect=/identifican-a-haitiano-asesinado-nadie-lo-reclama/ar2325510?referer=--7d616165662f3a3a6262623b726760657a6770737a6778743b767a783a-- |
| 1/4/2022 | kidnapping | 4 | Familiares de cuatro nicaragüenses que fueron secuestrados a mediados de diciembre de 2021 por una banda criminal en México, pagaron 12 mil dólares para lograr la liberación de los jóvenes que salieron del país para cumplir el sueño americano. | https://ipnicaragua.com/pagaron-12-mil-dolares-para-liberar-a-migrantes-nicaraguenses-secuestrados-en-mexico/ |
| 1/4/2022 | kidnapping | 30 | Alberto Xicoténcatl, director de la Casa del Migrante informó en el año 2021 se registraron alrededor de 15 secuestros de migrantes, sobre todo en municipios fronterizos como Acuña y Piedras Negras. No obstante, en cada uno de estos casos, hubo más de una víctima de secuestro. | https://www.elsiglodetorreon.com.mx/noticia/2022/en-2021-hubo-alrededor-de-15-secuestros-de-migrantes-en-coahuila.html |
| 1/10/2022 | kidnapping | 1 | A Honduran asylum seeker was kidnapped near the Reynosa tent encampment by men who forced him into a van and held him captive until his employer negotiated for his release. DHS had expelled the man to Reynosa under Title 42 in October 2021 after he had requested U.S. asylum. | HRF communication with asylum seeker |
| 1/13/2022 | kidnapping | 1 | In January 2022, a 19-year-old Honduran woman was kidnapped from an informal tent encampment in Reynosa while blocked from seeking asylum due to the Title 42 policy, according to Charlene D'Cruz, an attorney with Lawyers for Good Government. | https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-s-use-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 1 | DHS used Title 42 to expel to Mexico an 18-year-old Nicaraguan political dissident who had twice been kidnapped there, leaving him stranded in danger. In November 2021, in the Mexican border city of Nogales, the young man managed to escape the second kidnapping and flee across the border to request asylum. But DHS officers expelled him back to Nogales using Title 42, where he remains in hiding from his kidnappers, according to KBI | https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-s-use-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 1 | A Honduran asylum seeker is stranded in danger in Tijuana where Mexican immigration agents turned him over to a cartel that held him hostage in horrendous conditions for days following his expulsion under Title 42 to Mexico. He told Human Rights First that the kidnappers beat other migrants in front of him, killing one, and that he was only released after his family paid ransom. The man had fled threats in Honduras by gang members who murdered his father | https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-s-use-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping, assault | 2 | A transgender Honduran woman, who was expelled by DHS to Mexico under Title 42 even though she had been kidnapped there with another transgender woman who remains missing, is stranded in danger in Mexico. The woman managed to escape after being kidnapped in Ciudad Juárez in summer 2021 with her friend. When the woman, who had fled torture and threats in Honduras due to her gender identity, attempted to request asylum at the border, a DHS officer told her "the border is closed" and that the United States is "not giving asylum." After being expelled to Mexico, the woman was immediately beaten and robbed, and a Mexican police officer refused to take her complaint. She told Human Rights First that she does not know if her friend, who was unable to escape the kidnapping, is still alive | https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-s-use-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 2 | A Central American asylum-seeking woman and her children, who were kidnapped and held for ransom for eight days in August 2021, remain in danger in Reynosa due to Title 42 restrictions on asylum at the border. The woman told Human Rights First that uniformed men she believed to be Mexican police officers had forced her family off a bus and turned them over to the cartel that held them captive. | https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-s-use-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | attemtpted kidnapping | 2 | In November 2021, a Honduran woman and her five-year-old son escaped a kidnapping attempt by armed men who chased them soon after DHS returned the family to Reynosa under Title 42. The woman told Human Rights First that she had entered the United States to seek asylum after fleeing death threats by gang members who killed her relatives in Honduras. | https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-s-use-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping, rape, assult | (counted in Al Otro Lado survey data above) | A Haitian man reported in late November 2021 that he and his family were kidnapped, beaten, and robbed in Mexico, and his wife raped in front of their child. The man provided his account in a survey conducted by Al Otro Lado of migrants and asylum seekers stranded in Mexico due to current policies restricting access to asylum in the United States. | https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-s-use-trump-policies-endangers-people-seeking-asylum |

CLP_PC_076274

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 1/13/2022 | assault, robbery | (counted in Al Otro Lado survey data above) | 196 Haitians reported abuse by Mexican police within the past month. A Haitian migrant wrote, "The police have threatened me at gunpoint many times, abused me, and stolen money from me and because of this I am afraid to walk in the street in Mexico." Other Haitian migrants targeted by Mexican authorities include a man robbed at gunpoint by Mexican police, a migrant robbed by knife-wielding police officers, and a migrant who could not afford food for days after uniformed Mexican officers robbed him. | https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-s-use-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 1 | A 19-year-old Honduran woman with a high-risk pregnancy who was initially denied humanitarian parole in December 2021 went missing by the time CBP reconsidered its faulty decision. The woman who was eight-months pregnant and experiencing severe bleeding, had been denied medical treatment in Ciudad Acuña and attempted three times to enter the United States to seek protection. Each time she was expelled by DHS to Ciudad Acuña under Title 42. By the time CBP reversed its initial parole denial following advocacy by Charlene D'Cruz, an attorney with Lawyers for Good Government, the woman had disappeared and remains missing as of January 2022. | https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-s-use-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 1 | In December 2021, a Nicaraguan asylum seeker who was kidnapped and tortured by electrocution and beatings for three weeks in Reynosa in November 2021 did not pass a RMX non-refoulment interview and was returned to Ciudad Juárez by CBP under RMX. The man reported to Human Rights First that photos and audio recordings of the kidnappers beating him were sent to his aunt in the United States, demanding a $5,000 ransom and threatening to "cut him to pieces," if she did not pay. | https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-s-use-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 1 | A Nicaraguan asylum seeker, who had been kidnapped and held for ransom in Mexico after being expelled there under Title 42, did not pass an RMX non-refoulment interview and was returned to Ciudad Juárez by CBP in December 2021. The man told the asylum officer conducting the fear interview that he had been kidnapped near the border after being expelled by DHS under Title 42, held captive for eight days, and denied food for more than 24 hours until his family paid a $3,000 ransom. "They said, 'If you don't pay, we'll kill you,'" he told Human Rights First. Mexican police had also twice extorted the man. On one occasion, the Mexican police officers, who extorted and threatened him and other migrants on a bus, abducted two migrant girls. | https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-s-use-trump-policies-endangers-people-seeking-asylum |
| 1/13/2022 | kidnapping | 2 | A Honduran asylum seeker and her son, who were subjected to RMX 1.0, were kidnapped for a second time in Mexico in summer 2021 while waiting to be removed from the program and held in horrific conditions for months. The woman developed a painful neurological condition in captivity that caused half of her face to become paralyzed. The family had previously been kidnapped and held for ransom immediately after the Trump administration returned them to Mexico under RMX in 2019. | https://www.humanrightsfirst.org/resource/shameful-record-biden-administration-s-use-trump-policies-endangers-people-seeking-asylum |
| 1/17/2022 | rape, kidnapping, human trafficking, armed robbery, beatings | 271 | Asylum seekers from Colombia, El Salvador, Guatemala, Haiti, Honduras, Nicaragua, Venezuela and other countries who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack in Mexico in the past month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between December 3, 2021 and January 7, 2022. |
| 1/17/2022 | kidnapping | 120 | Law enforcement in Mexico discovered 120 migrants bound and blindfolded in a cartel stash house in Ciudad Victoria, Tamaulipas. On Sunday, authorities searched the house after receiving a tip from the Embassy of Guatemala. The migrants were determined by authorities to be mostly from Nicaragua, Guatemala, and El Salvador. | https://www.breitbart.com/border/2022/01/17/120-kidnapped-migrants-rescued-by-mexican-authorities/ |
| 1/22/2022 | murder | 13 | Mexican police participated in a massacre last month that left 19 people dead, including at least 13 who appear to have been Guatemalan migrants on their way to the United States, a state prosecutor said late Tuesday. The victims were killed Jan. 22 in Camargo, close to the Texas border. | https://www.washingtonpost.com/world/the_americas/mexico-tamaulipas-police-migrant-killing/2021/02/03/32c22274-65c7-11eb-8468-21bc48f07fe5_story.html |
| 2/3/2022 | kidnapping, attempted kidnapping | 2 | A Honduran man who came through KBI two weeks ago had passed through a city in the Mexican border state of Coahuila and was renting a room with other Honduran migrants when Mexican police entered their room and attempted to capture them. He managed to escape through a window, but one of his companions was taken. | Communication from Kino Border Initiative |

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 668 of 721

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 669 of 721

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 2/3/2022 | kidnapping | 1 | Manuel,* a Nicaraguan man fleeing political persecution, was kidnapped by Mexican police officers in two different cities while traversing the country. He was held in a police station for over 24 hours until the police received a $500 USD ransom payment from his family. With no regard for the fact that Manuel suffered two separate kidnappings by Mexican authorities, CBP expelled him back to Mexico without ever screening him for fear of return. | Communication from Kino Border Initiative |
| 2/7/2022 | assault, robbery | 2 | Un grupo de pandilleros despojaron de sus pertenencias a dos migrantes, a uno lo hirieron con un machete y a otro con arma de fuego, por lo que tuvieron que ser trasladados de emergencia a un hospital en las primeras horas del lunes. | https://eldiariodecoahuila.com.mx/2022/02/07/asaltan-con-violencia-a-migrantes/ |
| 2/10/2022 | kidnapping | 2 | El Ejército Mexicano rescató en Nuevo Laredo, Tamaulipas, a quince personas que se encontraban privadas de su libertad en una casa de seguridad y entre los cuales había mexicanos, estadounidenses y centroamericanos. En total fueron 15 los rescatados de los cuales 12 son mexicanos, 2 hondureños y un americano. | https://www.milenio.com/estados/tamaulipas-ejercito-rescata-15-migrantes-laredo |
| 2/10/2022 | sexual violence | 2 | La Comisión de Derechos Humanos del Estado de Tamaulipas (Codhet) pidió apoyo a las autoridades del DIF estatal para que se investigue los casos de presunta violencia sexual contra las niñas que están en el campamento de migrantes en Reynosa. | https://www.milenio.com/politica/comunidad/investigan-presunta-violencia-sexual-ninas-migrantes-reynosa |
| 2/12/2022 | kidnapping | 5 | La Fiscalía de Distrito Zona Norte, ejerció acción penal en contra de María Lucero C. H. y Manuel C. C., por su presunta responsabilidad penal en el delito de secuestro cometido en perjuicio de cinco personas de origen guatemalteco y hondureño cometido en Ciudad Juárez. | https://www.elheraldodejuarez.com.mx/policiaca/vinculan-a-pareja-por-secuestro-de-cinco-migrantes-en-juarez-7855937.html |
| 2/14/2022 | kidnapping | 18 | Juárez- Dos sujetos fueron detenidos durante el rescate de 18 migrantes a los que tenían privados de la libertad... además de portar armas y cartuchos. . Siendo en ese momento que del interior del domicilio se escucharon gritos de auxilio por lo que al realizar una inspección localizaron a 18 migrantes, siendo 15 hombres y tres mujeres provenientes de El Salvador, Guatemala y del Estado de Chiapas, a quienes tenía retenidos en contra de su voluntad. | https://www.elheraldodejuarez.com.mx/policiaca/rescatan-a-18-migrantes-y-detienen-a-dos-sujetos-con-armas-y-cartuchos-7861674.html |
| 2/16/2022 | kidnapping | 3 | El ejercito en coordinación con migración rescataron a varias personas migrantes de diferentes nacionalidades que estaban privadas de su libertad por estás personas pedían la cantidad de 5 y 10 mil dólares por cada una,estos hechos fueron reportados por vecinos ya que mediante una llamada anónima hicieron saber ala autoridades que habían personas secuestradas en una casa en Tamaulipas. | https://www.facebook.com/permalink.php?story_fbid=125634653321796&id=107636665121595 |
| 2/17/2022 | extortion, threats | 1 | One person reported that her bus was stopped at a checkpoint outside of Altar, Sonora, ... and a Mexican police officer threatened to take her kids unless she paid him. | Communication from Kino Border Initiative |
| 2/17/2022 | attempted kidnapping | 2 | El domingo pasado un hombre que se identificó como esposo y padre de una familia intentó raptar a dos menores de edad de un albergue de Tijuana. | https://www.elimparcial.com/tijuana/tijuana/Temen-migrantes-denunciar-crimenes-20220216-0028.html |
| 2/28/2022 | kidnapping | 33 | Treinta y tres personas migrantes originarios de Guatemala, Nicaragua, Cuba y Panamá, fueron localizados y rescatados por agentes de la Fiscalía General del Estado, ya que se encontraban en condiciones inhumanas en una vivienda de la colonia Zaragoza, Chihuahua. | https://www.elsoldemexico.com.mx/republica/sociedad/rescatan-a-33-migrantes-que-estaban-encerrados-en-vivienda-7926650.html |
| 2/28/2022 | kidnapping | 2 | Esta banda criminal se caracterizó por ofrecerles a migrantes en Tijuana cruzarlos ilegalmente a EEUU, para luego secuestrarlos y exigirles a sus familiares que pagara los rescates en tiendas de California. Del 29 de marzo al 1 de junio de 2021, estos criminales utilizaron secciones específicas en Walmart y otras tiendas para reunirse con los familiares para cobrar los rescates. Los pagos oscilaron entre 12,000 y 30,000 dólares en efectivo. | https://www.univision.com/noticias/criminalidad/secuestro-migrantes-tijuana-frontera-rescates-mexico |
| 3/1/2022 | assault, robbery | 2 | A Mexican train worker was arrested in Piedras Negras for robbing migrants at gunpoint | https://www.facebook.com/permalink.php?story_fbid=1162879317802204&id=177665452990267 |
| 3/1/2022 | kidnapping | 150 | Más de 150 migrantes, víctimas de secuestro, abandonados por los "coyotes" o en espera de cruzar a Estados Unidos, han sido detectados en Ciudad Juárez durante 2022 por los elementos de la Secretaría de Seguridad Pública Municipal (SSPM) y la Fiscalía General del Estado (FGE). | https://diario.mx/juarez/liberaron-a-156-migrantes-en-dos-meses-20220228-1903248.html |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 3/5/2022 | kidnapping | 13 | Un grupo de 13 migrantes originarios de Guatemala, El Salvador, Nicaragua, Chiapas y Chihuahua fueron asegurados por elementos de la Secretaría de Seguridad Pública Municipal, luego de que fueron encontrados en condiciones insalubres en una vivienda en la colonia Infonavit Jurado. | https://www.elsoldeparral.com.mx/local/juarez/encuentran-a-13-migrantes-en-condiciones-insalubres-en-ciudad-juarez-7951919.html |
| 3/7/2022 | kidnapping | 2 | Un migrante hondureño fue rescatado de las garras de un grupo de secuestradores en Piedras Negras, Coahuila, México, durante un operativo policial. Al llegar al lugar lograron rescatar a varios migrantes | https://www.elheraldo.hn/hondurenosenelmundo/rescatan-hondureno-secuestrado-traficantes-personas-coyote-mexico-piedras-negras-AF6272727 |
| 3/7/2022 | kidnapping | 3 | Una mujer extranjera embarazada, quien llegó a la Central Camionera, en donde se le acercó una persona que le ofreció una vivienda y cruzarla a Estados Unidos. "La llevaron a una colonia en donde la tuvieron un mes secuestrada, le hablaron a su familia y les pidieron 10 mil dólares"..."Hace días dos menores centroamericanos, de aproximadamente 14 años de edad, llegaron a la Casa del Migrante, temblando, sin zapatos, sin camisa. Se les atendió y nos dicen: nosotros habíamos estado secuestrados, se les pagó desde equis lugar para traernos aquí, pero aquí nos tenían secuestrados desde hace un mes, nos pudimos escapar y nosotros queremos comida y poder comunicarnos con nuestra familia" | https://diario.mx/juarez/enganchan-a-migrantes-desde-redes-sociales-20220307-1905766.html |
| 3/9/2022 | kidnapping | 6 | A Nicaraguan family of 6 with 2 young daughters was kidnapped in Reynosa, Mexico en route to the United States, where they'd planned to turn themselves in to U.S. immigration authorities. | http://radioabcstereo.com/nota/21030_familia-jinotegana-es-secuestrada-en-mexico-los-delincuentes-piden-30-mil-dolares-para-liberarlos |
| 3/9/2022 | robbery, assault | 4 | A Honduran mother, her sister, and her two children were robbed and beaten in Piedras Negras while awaiting the opportunity to request U.S. asylum. | HRF communication with asylum seeker |
| 3/10/2022 | assault | 1 | A 62-year-old Colombian woman was shot near the Río Colorado at the border between Baja California and Sonora. | https://www.elsoldecuernavaca.com.mx/republica/sociedad/guardia-nacional-presuntamente-disparan-contra-mujer-migrante-en-san-luis-rio-colorado-7973571.html |
| 3/13/2022 | kidnapping, assault | 2 | Kidnappers abducted and tortured a pregnant Nicaraguan woman, Claudia Castro Andino, and her husband the day they were set to attempt to enter the United States in late February 2022. The woman was so severely beaten that she lost her baby. The couple remain in captivity. Castro Andino's husband sent an audio recording begging the family to meet the kidnappers demand for a $15,000 ransom: "If we don't pay, they're going to kill us." Castro Andino pled, "mommy, don't let me die." | https://www.despacho505.com/joven-de-diriamba-secuestrada-en-mexico/ |
| 3/14/2022 | rape, kidnapping, human trafficking, armed robbery, beatings | 534 | Asylum seekers from Colombia, Cuba, El Salvador, Ghana, Guatemala, Haiti, Honduras, Nicaragua, Venezuela, and other countries who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack in Mexico in the past month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between January 7 and March 13, 2022 . |
| 3/16/2022 | kidnapping, rape | 2 | Junior Almendarez, un inmigrante hondureño de 23 años, fue engañado por malas amistades en Los Ángeles y sin saberlo terminó involucrado con una banda de secuestradores de Tijuana que tuvo en cautiverio a varias personas que esperaban cruzar sin autorización a California…Las víctimas de estos secuestros quedarán traumatizadas toda su vida… al menos dos mujeres víctimas fueron brutalmente violadas mientras estaban cautivas", describe un memorando de sentencia. "La conspiración de secuestro fue brutal y violenta, y se aprovechó de una población vulnerable". | https://www.univision.com/noticias/criminalidad/secuestro-migrantes-tijuana-frontera-rescates-mexico |
| 3/17/2022 | kidnapping, sexual assault | 1 | A humanitarian aid worker told Isacson that DHS had expelled to Nuevo Laredo a migrant woman even though she had previously been kidnapped and repeatedly sexually abused in captivity. | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |

CLP_PC_076277

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 3/17/2022 | robbery, assault | (counted in Al Otro Lado survey data above) | An LGBTQ asylum seeker stranded due to Title 42 in Ciudad Acuña reported through the Al Otro Lado survey in late February 2022 that police had stopped her and a female friend who were holding hands on the street, robbed, and groped them, threatening to rape them saying it would "take the lesbian out of them." | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |
| 3/17/2022 | kidnapping, rape | (counted in Al Otro Lado survey data above) | A Honduran man blocked from seeking asylum because of Title 42 reported to the Al Otro Lado survey in January 2022 that Mexican migration officials in Reynosa sold him and his wife to a cartel for $500 each and that cartel members raped his wife. | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |
| 3/17/2022 | assault, robbery, threats | (counted in Al Otro Lado survey data above) | In late January 2022, a Haitian woman in Matamoros reported to Al Otro Lado that Mexican police threatened to kill her and her five-year-old daughter, beat her husband, and stole the family's money. The police left the wounded man on the street and dumped the woman and her daughter in another city at night. | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |
| 3/17/2022 | assault, robbery, rape | (counted in Al Otro Lado survey data above) | A Black transgender asylum seeker reported through the Al Otro Lado survey in late January 2022 that Mexican police officers beat, robbed, and raped him, and jailed him for three days without food. | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |
| 3/17/2022 | attempted kidnapping, abuse | (counted in Al Otro Lado survey data above) | Asylum seekers from the Afro-Honduran Garifuna ethnic group reported to the Al Otro Lado survey multiple incidents of kidnappings and racist attacks by Mexican police while stranded in Mexico due to Title 42 including, a Garifuna Honduran man who recounted that he was nearly kidnapped in Piedras Negras and that police had attacked and racially abused him. | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |
| 3/17/2022 | kidnapping | (counted in Al Otro Lado survey data above) | A Salvadoran asylum seeker reported to Al Otro Lado in January 2022 that when she attempted to cross the border near Piedras Negras with a group of other asylum seekers, men kidnapped the woman and her four-year-old daughter separating them from the woman's nine-year-old son who managed to reach safety in the United States. | https://www.humanrightsfirst.org/sites/default/files/TwoYearsofSuffering.pdf |
| 3/17/2022 | assault, extortion | 2 | A young Haitian man who arrived in Nogales with his girlfriend last week reported that on the bus ride northbound through Mexico, an organized crime group stopped them and ordered all Haitians to get off the bus. They then held them captive and ordered each one to pay $3,000 to be released and continue north. When he refused to pay, members of the organized crime group beat him. | Communication from Kino Border Initiative |
| 3/21/2022 | kidnapping | 1 | "Mexican immigration [in Nuevo Laredo] turned us over to some men who supposedly were going to help us but who instead kidnapped us. They took us to a hotel of theirs, supposedly of the cartel. They called my family for a deposit of $5,000... During this time I was held in a small house... It was horrible. In two rooms we were about 50 people with one bathroom. The rooms were about three or four meters squared. They required us to lay down like we were sleeping the whole time, not walking or stretching, because they were afraid we would run. They gave us to eat only sometimes, around one time a day a burrito. There were days when they didn't give us anything. There were three to four armed guards at all times." | Communicaion from Migrant Center for Human Rights |
| 3/21/2022 | kidnapping | 1 | Statement of an asylum seeker who was pregnant and sick when Border Patrol expelled her to Tamaulipas where the Mexican police turned her over to the cartel. The cartel kidnapped her for 20 days during which she and her unborn baby nearly died. | https://twitter.com/AriMSawyer/status/1505993814112018434?t=qQNZw3i1an1iDL6-PFLLzw&s=09 |
| 3/26/2022 | kidnapping | 2 | Recupero aquí la historia narrada por una mujer con su hijo menor de edad, venidos de Guatemala, quienes llegaron a México en una de las varias caravanas de migrantes centroamericanos durante el año 2021. La solicitud de asilo de la mujer fue rechazada por el gobierno de Estados Unidos, por lo que ella decide aventurarse a cruzar de manera no documentada; posteriormente ella y su hijo fueron devueltos a México a través de la frontera tamaulipeca donde: "En Nuevo Laredo, de ahí en el puente dos fuimos secuestrados tres meses yo y mi hijo…Mi hermana pagó y [los malos] nos encerraron en una bodega, no comíamos casi nada, días que sí comíamos, días que no y nos gritaba de cosas, nos trataba muy mal y a mi hijo igual" | https://www.milenio.com/opinion/varios-autores/corredor-fronterizo/la-violencia-que-no-vemos-contra-los-migrantes |

CLP_PC_076278

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 672 of 721

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 3/28/2022 | attempted kidnapping | 2 | Ramiros and her family were among the people taken on a bus to a shelter from the camp. But after the bus arrived, she was told that the shelter was already full, she said. Someone gave her enough money to get to a park near downtown Tijuana, where she lived for a week until someone tried to kidnap her 2-year-old daughter...Pancho, a 21-year-old from Honduras…has been expelled from the United States 11 times after trying to cross to seek asylum along the Texas border, he said. The last time he tried, he ended up kidnapped for weeks before he was let go and made his way to Tijuana. | https://www.sandiegouniontribune.com/news/immigration/story/2022-03-27/asylum-seekers-tijuana-tent-camp |
| 3/29/2022 | kidnapping | 7 | Solamente en 2021, al menos unos 30 jóvenes de Lucerna emprendieron viaje rumbo a Estados Unidos, según los lugareños, y siete de esos migrantes fueron secuestrados en el norte de México. | https://www.agenciaocote.com/blog/2022/03/29/el-temor-al-secuestro-no-detiene-el-exodo-de-un-pais-atormentado/ |
| 3/29/2022 | kidnapping | 3 | Tres migrantes originarios de Nicaragua, presuntamente fueron secuestrados cuando intentaban cruzar de manera irregular hacia los Estados Unidos (EE. UU.), por la frontera norte de México en el estado de Coahuila, por el Río Bravo. | https://trincheradelanoticia.com/2022/03/29/reportan-secuestro-de-tres-migrantes-nicaraguenses-en-la-frontera-norte-mexico-ee-uu/ |
| 3/31/2022 | rape | 1 | Border Patrol expelled a young Guatemalan woman to Nogales, Mexico last week despite the fact that she had been repeatedly raped by the guides that brought her across the border into the US. Her attackers threatened her life if she went to the authorities. One Border Patrol agent insinuated that the woman was lying about the attack, and tried to convince her not to undergo a forensic examination that would verify the abuse. When she showed paperwork from the hospital examination to a Border Patrol agent as proof of the attack, asking that he not send her back to Mexico, the Border Patrol agent confiscated the paperwork and did not return it to her. | Communication from Kino Border Initiative |
| 4/3/2022 | rape | 1 | Alrededor de las 14:00 horas del martes una mujer hondureña ingresó al hospital asegurando haber sido victima de 6 hombres, a quienes identificó como migrantes que esperaban para cruzar el Río Bravo y alcanzar el sueño americano. De acuerdo a lo mencionado por la mujer afectada, quien asegura tener siete meses de embarazo, se encontraba con un grupo de migrantes esperando por cruzar cuando seis de ellos decidieron atacarla; tras escapar se dirigió de inmediato al nosocomio para su valoración médica y de su bebé. | https://noticiasnrt.com/2022/04/03/seis-hombres-la-atacaron-denuncia-migrante-hondurena-abuso-sexual-en-piedras-negras/ |
| 4/7/2022 | assault, robbery, attempted kidnapping | 20 | Once Haitians arrive in Tijuana, they continue to experience violence, harassment, and racism. 16.3% (20 total) of interviewees shared experiences of violence in Mexico, including robbery at knife point, assault, and attempted kidnapping. At least two individuals witnessed other asylum seekers murdered in front of them...Peterson was beaten in Brazil and in Mexico. In Brazil, his ear was bitten off after someone attacked him. In Tijuana, he called the police one day when he thought he was in danger, but when the police arrived, they beat him and knocked out his bottom teeth. | https://cgrs.uchastings.edu/sites/default/files/Tijuana%20Factsheet_2022.04.07%20FINAL%20v2_0.pdf |
| 4/18/2022 | armed threats | 1 | Reynosa, México -- Los migrantes están ansiosos por que termine el Título 42...Un niño de 8 años le dijo a su madre que se quería morir, semanas después de que lo salvó de un pandillero armado. | https://www.dallasnews.com/espanol/al-dia/dallas-fort-worth/2022/04/18/aumentan-campamentos-de-migrantes-en-reynosa-a-semanas-de-fin-de-titulo-42/ |
| 4/19/2022 | rape, kidnapping, human trafficking, armed robbery, beatings | 265 | Asylum seekers from Colombia, El Salvador, Guatemala, Haiti, Honduras, Nicaragua, and Venezuela who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack in Mexico in the past month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between March 14, 2022 and April 18, 2022. |
| 4/20/2022 | rape | 2 | "Yesterday I spoke to a trans man from Honduras who has been waiting in MX for Biden to restore asylum in the US. While POTUS kept the border closed to asylum seekers, he and his girlfriend were raped by men who targeted them for their queerness and gender expression. Before raping them, the men taunted the couple by asking "who is the man and who is the woman." They asked my new acquaintance, "What are you?" Then they said they were going to teach them how to be women." | https://twitter.com/AriMSawyer/status/1516784901860720642 |
| 4/20/2022 | attempted kidnapping, extortion | 2 | A Central American woman and her 5-year-old daughter escaped an attempted kidnapping by a taxi driver in Piedras Negras while awaiting the opportunity to seek U.S. asylum. Cauhuila police also beat and extorted her, threatening her with deportation. | Human Rights First communication with asylum seeker |

CLP_PC_076279

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 4/25/2022 | assault, extortion | 1 | A gay asylum seeker fleeing Honduras told Human Rights Watch he was extorted by Mexican immigration officials several times. The Mexican police also once beat him while using anti-gay slurs. When he tried to seek asylum in March of 2021, he affirmatively told border agents that he is gay and was afraid to be returned to Mexico and his country of origin. They nonetheless expelled him in a matter of hours to Palomas, Chihuahua, a small town about two hours from Ciudad Juarez. | Human Rights First communication with Ari Sawyer, Human Rights Watch researcher |
| 4/25/2022 | kidnapping | 1 | A Honduran asylum seeker was kidnapped in mid-March 2022 in Piedras Negras by men in a vehicle that approached him on the street. He was held with other kidnapping victims and later released. | Human Rights First communication with Joy Olson of WOLA. |
| 4/25/2022 | kidnapping, rape | (counted in Al Otro Lado survey data above) | A lesbian asylum seeker from El Salvador, who is stranded in Tijuana due to Title 42, was kidnapped and repeatedly raped after DHS expelled her to Mexico. She reported the attack to Al Otro Lado in late March 2022. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | armed robbery | 1 | Because Title 42 is blocking access to asylum at ports of entry, a Haitian asylum seeker is stranded in danger with his wife and two-year-old child in Tijuana, where he was robbed at gunpoint in February 2022. He told Human Rights First that he is afraid to ask for asylum while Title 42 is still in place because afraid to be returned to Haiti, where he was shot at by an organized criminal group that been hired to kill him. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | kidnapping, threats | (counted in Al Otro Lado survey data above) | A Nicaraguan asylum seeker was raped in Reynosa by men who had kidnapped her and her four-year-old daughter and threatened to harm the girl. The woman reported to Al Otro Lado in April 2022 that she is not safe in Ciudad Juárez where police have repeatedly robbed and extorted her when she leaves the shelter where the family stays to purchase food. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | kidnapping, sexual abuse | (counted in Al Otro Lado survey data above) | An asylum-seeking woman from Guatemala and her six-year-old son were kidnapped by police in Ciudad Juárez who held them at gunpoint and sexually abused the woman. The family reported to Al Otro Lado in March 2022 that they remain stranded there unable to seek asylum due to Title 42, according to Al Otro Lado. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | kidnapping | 4 | A Honduran family expelled to Mexico under Title 42, where they had been kidnapped at knifepoint, remains in danger in Tijuana unable to request asylum. After DHS returned the family to Mexico under Title 42 in January 2022, the woman saw armed men watching her daughters. Fearing they planned to kidnap the girls, the family fled the area and now remains in hiding in a Tijuana shelter, terrified of going outside. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | kidnapping | (counted in Al Otro Lado survey data above) | A Salvadoran woman and three-year-old son, who are unable to seek asylum due to Title 42, were twice abducted in Mexico, denied food, and both were beaten by the kidnappers. The family reported through the Al Otro Lado survey that they remain stranded in Ciudad Juárez. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | assault | 1 | A Haitian man who had fled death threats in Haiti remains in danger in Tijuana, where he was attacked with a bat in February 2022 outside the Tijuana shelter where he is staying with his teenage daughter. The man told Human Rights First that people in the streets in Tijuana have made racist remarks to him and his daughter, including calling them "monkeys" and telling them to go back to their country. The family was previously expelled to Haiti under Title 42 in December 2021 and fears seeking U.S. asylum while Title 42 remains in place. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 4/25/2022 | robbery, extortion, threats | 2 | In March 2022 a Salvadoran mother and daughter, who had been expelled to Tijuana by DHS under Title 42 the prior month, were robbed, extorted, and threatened by Mexican officers in black uniforms. The woman told Human Rights First that the officers threatened to turn the family over to a cartel, if they refused to pay the extortion demand. | https://www.humanrightsfirst.org/resource/ext ending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination |
| 5/10/2022 | kidnapping | 5 | An asylum-seeking family of five from Colombia was kidnapped and held for ransom in Reynosa by men who had promised to bring them to the United States. | https://www.debate.com.mx/migracion/El-Hueco-el-sitio-que-usan-los-migrantes-para-cruzar-de-Mexico-a-Estados-Unidos-20220510-0222.html |
| 5/11/2022 | kidnapping | 3 | 3 young Guatemalan women intending to enter the U.S. disappeared in Ciudad Juárez after leaving the shelter where they were staying. | https://lasillarota.com/estados/buscan-a-3-migrantes-adolescentes-salieron-de-un-albergue-en-cd-juarez-y-no-regresaron/648134 |

CLP_PC_076280

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 5/20/2022 | shooting | 1 | In late May 2022, Ana, a 25-year-old Mexican asylum seeker, was hit in the neck by a stray bullet while shielding her children during a shootout near the shelter where she had been stranded due to Title 42. They reportedly had fled Michoacán to seek asylum in the United States after family members were kidnapped and killed. | https://www.elimparcial.com/tijuana/policiaca/Migrante-resulta-lesionada-por-bala-perdida-en-Tijuana-20220520-0013.html |
| 5/25/2022 | kidnapping | 2 | A Cuban man and his mother were kidnapped, tortured, and extorted by an organized criminal group in Ciudad Juárez. When they attempted to seek U.S. asylum, they were returned to Mexico under Title 42. | https://www.cnn.com/videos/spanish/2022/05/25/migrantes-secuestro-seguridad-violencia-perspectivas-mexico-titulo-42-caravana-crisis-migratoria-rey-rodriguez-pkg.cnn |
| 5/25/2022 | asault | 1 | A Honduran asylum seeker reported that he witnessed police in Piedras Negras punch another asylum seeker in the face until his nose was bleeding | Human Rights First interview with asylum seeker |
| 5/25/2022 | kidnapping | 1 | "A Salvadoran man fleeing a gang that threatened to kill him because he had reported them to the police in El Salvador is stranted in Piedras Negras due to Title 42 where he was nearly kidnapped one night by men in a black truck who tried to grab him as he approached a shelter." | https://twitter.com/KennjiKizuka/status/1529611514885308419 |
| 5/25/2022 | assault | 1 | "Nearly every asylum seeker I spoke w/in Piedras Negras reported threats, beatings & extortion by local police. An older woman said she was thrown in a police car & hit in the back w/ a police stick." | https://twitter.com/KennjiKizuka/status/1529611517943025664 |
| 5/26/2022 | armed robbery | 2 | A Colombian asylum-seeking woman and her two daughters were robbed of their money and luggage at gunpoint in Ciudad Acuña in May 2022. | Human Rights First interview with asylum seeker |
| 5/28/2022 | kidnapping, threats | 2 | A Cuban woman and her son were expelled to Mexico under Title 42 after an organized criminal group had kidnapped them in Ciudad Juárez in April 2022, held them captive, and tortured them for 26 days until their family members paid a $30,000 ransom. "They pointed a gun at my neck and they kneeled him in front of me, and if I didn't say what they told me to say, they would kill my son in front of me," the mother told CNN. | https://cnnespanol.cnn.com/video/migrantes-secuestro-seguridad-violencia-perspectivas-mexico-titulo-42-caravana-crisis-migratoria-rey-rodriguez-pkg/ |
| 5/30/2022 | kidnapping, rape | 17 | Irene, a Salvadoran asylum seeker, was kidnapped and raped with her 9-year-old daughter in Ciudad Juárez in spring 2022 along with 15 other Central American migrants. When Mexican municipal police arrived at the house where the family was being held captive for more than a month, Irene thought she was being rescued. Instead, police transported the family to another house, where the same organized criminal group continued to hold them captive. After a month in captivity, Irene and her daughter managed to escape the kidnappers and cross the border to seek U.S. asylum. DHS expelled them back to Ciudad Juárez under Title 42, where they were kidnapped for a second time. | https://piedepagina.mx/mama-por-que-nos-van-a-matar-el-infierno-del-secuestro-de-migrantes-en-mexico/ |
| 5/31/2022 | assault, kidnapping | 1 | One woman interviewed fled to the United States from Honduras, where she previously faced targeted violence for living openly as a lesbian woman, including one incident when someone cut her face, leaving a large scar. Near the US border, people she believed to be members of a Mexican cartel kidnapped her and forcibly took nude photos of her. he said that when she explained to US border officials that she was a lesbian seeking asylum from Honduras and that she had also experienced abuse in Mexico, agents laughed at her. She said one agent told her, "I don't care what's happening to you." She was expelled to Honduras, and immediately fled again to the US border, this time afraid to seek asylum for fear of being returned to Honduras again. | https://www.hrw.org/news/2022/05/31/us-lgbt-asylum-seekers-danger-border |
| 5/31/2022 | assault, kidnapping | 1 | Mariana L., a lesbian woman who fled Honduras in 2021, said she was kidnapped for ransom in January 2021 and held for over a week near the US-Mexico border by people she believed to be cartel members. They took her to a house in Reynosa, Tamaulipas, where she saw several other kidnapped migrants. She said they stole her passport and forcibly photographed her naked until her sister managed to pay a ransom of US$3,000. Her kidnappers would hit her to make her cry when they called her sister for the ransom money. | https://www.hrw.org/news/2022/05/31/us-lgbt-asylum-seekers-danger-border |
| 5/31/2022 | assault, kidnapping | 1 | Kayla R., the transgender woman who fled Guatemala, said that in July 2021 Mexican state police in Piedras Negras robbed her and beat her with batons so badly that she was ultimately hospitalized and vomited blood...after she reported the crime, Mexican immigration agents returned her to Guatemala, where she had experienced brutal violence. She immediately fled again. While she was making her way back to the US border in March 2022, criminals threatened her with a machete and robbed her. | https://www.hrw.org/news/2022/05/31/us-lgbt-asylum-seekers-danger-border |
| 6/3/2022 | murder | 1 | Jocelyn Anselme, a 34-year-old Haitian asylum seeker, was murdered during an attempted assault and robbery in Tijuana in May 2022 while blocked from seeking asylum due to Title 42. | https://www.latimes.com/world-nation/story/2022-06-12/haitian-migrants-tijuana |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 6/8/2022 | assault | 1 | Mario Álvarez González, un periodista que huyó de Guatemala tras amenazas, personifica las crisis de migración y de libertad de prensa en México, donde ha afrontado un secuestro y agresiones mientras espera en Ciudad Juárez que Estados Unidos le dé asilo. | https://lasillarota.com/nacion/periodista-trabajo-para-reuters-cnn-ahora-vivio-abusos-en-mexico-como-migrante/657510 |
| 6/10/2022 | kidnapping | 14 | 14 migrantes indocumentados que estaban retenidos contra su voluntad por crimínales fueron rescatados en un escondite, como resultado de una operación conjunta de diferentes corporaciones de seguridad en El Paso. | https://www.elheraldodejuarez.com.mx/local/el-paso/rescatan-a-14-migrantes-secuestrados-en-el-paso-8416230.html |
| 6/10/2022 | kidnapping | 3 | In early June 2022, a Nicaraguan couple and their nine-year-old son were kidnapped in Reynosa, according to family members in Nicaragua who are reportedly currently fundraising the $25,500 ransom demanded by the cartel that abducted them. | https://www.laprensani.com/2022/06/10/nacionales/3005629-cartel-mexicano-secuestra-a-familia-nicaraguense-y-parientes-salen-a-las-calles-con-alcancias-para-pagar-su-rescate |
| 6/12/2022 | kidnapping, rape | 2 | "I went to Reynosa, in Mexico across the border from McAllen, Texas. One mother and daughter I met from Honduras: The daughter is 15. She was leaving class one day when she was kidnapped and raped by a local gang. Once girls hit their teens, they're not really safe; they're seen as fair game for these attacks. This mother and daughter, once they got to Mexico, were kidnapped again, probably by cartel members, and sexually assaulted for days before they escaped. It's devastating." | https://www.nytimes.com/2022/06/12/briefing/us-mexico-border-immigration.html |
| 6/15/2022 | assault | 2 | Coahuila state police detained and beat two Honduran asylum seeking women, one of whom was pregnant, while they were washing clothes at a river in Ciudad Acuña. Police turned the women over to Mexican immigration authorities, who deported them to Honduras, according to another Honduran woman who had been with them at the river and managed to escape. | Human Rights First interview with asylum seeker |
| 6/16/2022 | kidnapping | 1 | In May 2022, a Honduran asylum seeker witnessed a friend kidnapped from a store in Piedras Negras where the pair had gone after DHS expelled them to Mexico at 2 a.m. Men with their faces covered with ski masks who searched the women's phones for contacts in the United States abducted the other woman. The Honduran asylum seeker told Human Rights First that more than two weeks later the Honduran asylum seeker had not heard from her friend. | https://www.humanrightsfirst.org/resource/nightmare-continues-title-42-court-order-prolongs-human-rights-abuses-extends-disorder-us |
| 6/16/2022 | kidnapping | 2 | In May 2022, DHS expelled a Guatemalan woman fleeing death threats by her abusive ex-husband and her five-year-old daughter to Nuevo Laredo, where a taxi driver immediately kidnapped them. She reported to Human Rights First that the driver delivered the family to the same organized criminal group that had previously kidnapped them and had held them captive for nearly a month until the woman's relatives sold their car to pay the $9,000 ransom demanded by the kidnappers. | https://www.humanrightsfirst.org/resource/nightmare-continues-title-42-court-order-prolongs-human-rights-abuses-extends-disorder-us |
| 6/16/2022 | sexual assault | 1 | In late May 2022, a Honduran woman was sexually assaulted in a Nuevo Laredo shelter after she and her children were turned away under Title 42 at the Laredo port of entry where they had attempted to seek asylum. She told Human Rights First she has been unable to sleep in the week since the attack, terrified the assailant would return. | https://www.humanrightsfirst.org/resource/nightmare-continues-title-42-court-order-prolongs-human-rights-abuses-extends-disorder-us |
| 6/16/2022 | sexual assault | 1 | In May 2022, a Coahuila state police officer sexually assaulted a 12-year-old Honduran girl in Ciudad Acuña near the public plaza where her family sleeps because they are blocked from seeking asylum due to Title 42. The girl's mother told Human Rights First that a police officer on a motorcycle stopped the girl and groped her as she was returning from a nearby store. | https://www.humanrightsfirst.org/resource/nightmare-continues-title-42-court-order-prolongs-human-rights-abuses-extends-disorder-us |
| 6/16/2022 | kidnapping | 1 | Coahuila state police kidnapped a Honduran asylum seeker in Piedras Negras in March 2022 and turned him over to an organized criminal group that held him captive for 15 days. His family were forced to sell their house to pay the $15,000 ransom. The man told Human Rights First that police had also stolen his money and cell phone in a separate incident after the kidnapping. | https://www.humanrightsfirst.org/resource/nightmare-continues-title-42-court-order-prolongs-human-rights-abuses-extends-disorder-us |
| 6/16/2022 | kidnapping | 3 | Coahuila state police kidnapped a Honduran asylum-seeking woman, her husband, and their young daughter in Piedras Negras in May 2022 while they were blocked from seeking U.S. asylum due to Title 42. The woman reported to Human Rights First that police held her family captive for three days with 15 other migrants and demanded an $800 ransom. | https://www.humanrightsfirst.org/resource/nightmare-continues-title-42-court-order-prolongs-human-rights-abuses-extends-disorder-us |
| 6/14/022 | kidnapping | 80 | 2 buses carrying 80 migrants, including women and children, were kidnapped by a criminal group near the northern border of Coahuila, Mexico. | https://www.debate.com.mx/migracion/Queremos-que-nos-atienda-el-Gobernador-Reportan-secuestro-de-migrantes-en-Coahuila--20220614-0177.html |

Case 1:23-cv-01843-TSC    Document 123    Filed 03/23/26    Page 675 of 721

CLP_PC_076282

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

Case 1:23-cv-01843-TSC   Document 123   Filed 03/23/26   Page 676 of 721

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 6/20/2022 | kidnapping | 2 | El Instituto Nacional de Migración (INM) desmientió esta mañana que dos personas de nacionalidad salvadoreña hayan sido secuestradas de la estancia provisional de Ciudad Juárez, Chihuahua. | https://www.lacapital.com.mx/noticia/90980-Desmiente_INM_secuestro_de_dos_migrantes |
| 6/21/2022 | beating | 1 | Kenia Herrera Castillo, una mujer migrante originaria de nicaragüense y que fue internada en el Hospital General de Allende, resultó lesionada al arrojarse junto a otros familiares de una patrulla en movimiento cuando era trasladada con otros extranjeros hacia el sur del estado de Coahuila por presuntos elementos de seguridad del municipio de Nava. | https://www.elsiglodetorreon.com.mx/noticia/2022/migrante-senala-presunta-desaparicion-por-la-policia-de-6-de-sus-familiares-en-nava.html |
| 7/7/2022 | assault | 1 | "Rodrigo* left his native Colombia over a year ago. After he participated in marches in opposition to President Márquez's policies, the Colombian police detained and tortured him. Although he escaped, several of his friends who had also participated in the marches disappeared. Since the border was closed to travel, Rodrigo walked for five days through the Damien, the most dangerous jungle in the world, on foot. When he arrived in Mexico, he was detained by immigration officials and attempted to seek humanitarian protection, but was denied. As he traveled north through Mexico, he faced extortion at the hands of Mexican police at numerous checkpoints and at one point was assaulted by a group of armed men who stole everything he had. He arrived in Nogales hoping to cross to safety and live with family members in the US." | Communication from Kino Border Initiative |
| 7/7/2022 | kidnapping | 2 | "Belén,* a young Guatemalan mother, arrived with her four-year-old son after the two of them had been kidnapped for days in Nogales. Belén had crossed into the US to seek protection after she fled threats from her son's father. When she and her son were deported to Nogales, Mexico, a man approached them offering help. Since she did not know the area or have any support, she went with him. He kidnapped the two of them and held them for four days until her partner paid extortion fees. She then fled with her son to a church where they recommended they come to Kino." | Communication from Kino Border Initiative |
| 7/11/2022 | rape | 1 | The situation of the migrant population on the northern edge of Mexico is distressing. As the immediate removals under Title 42 continue, hundreds of people continue to arrive from the south in search of entering the United States or to begin their asylum application processes from there. Testimony of Yaneth, a migrant from Honduras  "When they threw me to Reynosa, they raped me. They didn't care that I was pregnant, that affected me a lot, it affected my pregnancy. I looked for my husband in Monterrey, I felt very bad about my pregnancy, my delivery was early and my baby was born prematurely, with many health problems . | https://www.msf.org.ar/actualidad/mexico-mientras-continuan-expulsiones-desde-eeuu-se-agrava-situacion-personas-migrantes-frontera-norte_ |
| 7/21/2022 | kidnapping | 4 | "Under Title 42, Border Patrol also expels families directly into the hands of criminal groups. Mari*, her husband and her 2 sons, ages 7 and 9, fled Guatemala after her husband was beaten and threatened for his refusal to join the gang. Mari and her family tried to enter the US through Nuevo Laredo, Mexico, but were deported. Once in Mexico, the INM (National Migration Institute of Mexico) said they would take them to a shelter, but instead, turned them over directly to the cartel, los Zetas. Mari and her family were kidnapped and held hostage by los Zetas for 3 months, where they faced physical torture. They watched others who tried to escape be killed and were only able to leave after paying an extortion. " | Communication from Kino Border Initiative |
| 9/1/2022 | kidnapping | 3 | Juan* and his family fled from organized crime in Guerrero, Mexico. When they arrived in Nogales to attempt to seek asylum in the US, they were riding in a taxi when the mafia kidnapped the taxi driver, Juan and his entire family. The kidnappers shut Juan and his family in a room in a house, and they still don't know what happened to the taxi driver. The kidnappers said they had to pay 500,000 pesos per person to leave. They spent all day in the room until the person watching the door briefly left his post and they escaped, leaving all of their items behind. They arrived at Kino fearing for their lives. | Communication from Kino Border Initiative |
| 9/8/2022 | sexual assault | 1 | "Dona Murphey, a neurologist based in Houston, remembers a case of a disabled child with epilepsy living in an encampment with his mother after being ejected. When they were moved to a shelter, the boy was sexually assaulted there."...He "stopped eating, was exhibiting depressive symptoms, was crying all the time and not engaging any more," Murphey said, which in addition made him more at risk of a fatal seizure." | https://www.theguardian.com/us-news/2022/sep/08/title-42-covid-policy-migrants-mexico-us |
| 9/9/2022 | assault | 1 | Its director said that some migrants have received threats due to the context of violence from which they are fleeing. He recalled that a couple of months ago a woman was injured by a bullet that came from outside, and a week ago they demonstrated in front of C2 because two armed men entered the shelter. | https://www.elsoldetijuana.com.mx/local/se-extiende-violencia-contra-albergues-de-migrantes-y-piden-seguridad-8804316.html |

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 9/13/2022 | kidnapping | 4 | "La nicaragüense Kathy Smith Molina, de 26 años, su hermano Ricky Smith, y sus pequeños hijos Kyle y Danisha Smith, de 4 y un año respectivamente, fueron secuestrados por miembros de una banda criminal en México quienes están exigiendo 20 mil dólares a cambio de su liberación." | https://www.radiolavozdelnorte.com/2022/09/cartel-en-mexico-exige-20-mil-dolares.html |
| 9/13/2022 | kidnapping, extortion | 2 | "Dos migrantes fueron rescatados de la banda de secuestradores que privaron de la libertad a un dentista en Mexicali y que fue rescatado hace un par de semanas" | https://kvma.com/https-kvma-com-noticias-3/2022/09/13/operativo-antisecuestro-logro-rescate-de-dos-migrantes-en-mexicali-2/ |
| 9/14/2022 | kidnapping | 5 | "Elementos de la Fiscalía General del Estado en Ciudad Juárez, lograron liberar a cinco personas que se estaban privadas de la libertad en un domicilio...Los agentes lograron ubicar a cuatro personas de nacionalidad guatemalteca, dos mujeres y dos hombres de 39, 29, 27 y 19 años así como a un mexicano de 22 años" | https://www.elheraldodechihuahua.com.mx/local/juarez/liberan-a-cinco-migrantes-secuestrados-en-juarez-8890922.html |
| 9/16/2022 | kidnapping | 2 | When López discovered that they had been kidnapped, she felt helpless. The kidnappers harassed her several times a day on WhatsApp asking her for $10,000 in ransom. "I told them that she was a single mother, that she lived in a house that was not mine, that I have a disability, that I am in a wheelchair. Where was she going to get the money from?" she relates. | https://www.eldiario.es/desalambre/secuestros-riesgo-enfrentan-migrantes-hondurenos-camino-eeuu_1_9266660.amp.html |
| 9/15/2022 | kidnapping, rape | 14 | Elementos de la Agencia de Investigación de Chihuahua rescataron a 14 migrantes que se encontraban secuestrados en una vivienda de Ciudad Juárez, entre ellos, al menos una persona oriunda de Ixmiquilpan, que recientemente se reportó como desaparecida junto a otros habitantes del municipio. | https://criteriohidalgo.com/regiones/rescatan-hidalguense-migrante-secuestrado-chihuahua |
| 9/26/2022 | kidnapping | 4 | "Una semana, 16 mil dólares y mucha incertidumbre tuvo que pasar una familia de migrantes venezolanos secuestrada en México para ser liberada y estar a salvo. Claudia Rivero y Carlos Ospina viajaron a Estados Unidos junto a sus dos hijas, Victoria de 12 años y Carla de 10, con la intención de solicitar asilo en la frontera y luego reencontrarse con familiares en Georgia." | https://eltiempolatino.com/2022/09/26/inmigracion/liberan-a-migrantes-venezolanos-secuestrados-en-mexico-despues-de-pagar-miles-de-dolares/ |
| 9/28/2022 | Kidnapping | 200 | "los llevaron a una bodega de Reynosa donde había casi 200 personas que también esperaban cruzar el río. Pero, de repente, unos hombres armados entraron y se los llevaron a todos violentamente. Para este padre y su niño, empezó un duro secuestro de 44 días." | https://www.telemundo.com/noticias/noticias-telemundo/inmigracion/asi-secuestran-a-los-migrantes-capturas-mujeres-violadas-y-muerte-rcna2367 |
| 10/2/2022 | kidnapping | 399 | "In relation to migrants who suffer deprivation of their liberty by "polleros" and then request rescue, the Municipal Public Security Secretariat reported that from January to September 2022, 399 people have been rescued, detailing that: There are 171 from Guatemala, 30 from Ecuador, 105 from Venezuela, 68 from Mexico and 25 from Honduras." | https://www.elheraldodechihuahua.com.mx/policiaca/han-abierto-11-carpetas-de-investigacion-por-secuestro-este-ano-en-juarez-8972383.html |
| 10/16/2022 | kidnapping | 13 | "Ciudad Juárez.- A través de un comunicado la Subsecretaría de Despliegue Policial Zona Norte de la Secretaría de Seguridad Pública del Estado (SSPE) informó la localización y aseguramiento de 13 personas migrantes que estaban retenidas contra su voluntad dentro de una vivienda en Ciudad Juárez." | https://netnoticias.mx/juarez/rescatan-a-13-migrantes-secuestrados-en-juarez/ |
| 10/20/2022 | kidnapping, armed robbery, attempted kidnapping | 62 | "'Flavio', un venezolano de 33 años de edad, quien fue liberado durante la madrugada de ayer después de que su familia pagó un rescate a sus secuestradores, narró que antes de llegar a la estación de camiones en donde serían dejados, ya dentro de la ciudad, el camión en el que viajaba fue detenido por un grupo de hombres armados...Eran unas 50 personas las que detuvieron, era el camión completo", relató. Dijo que en el camión de turismo viajaban sólo migrantes, quienes al ser privados de la libertad fueron separados, y él fue trasladado a una casa, junto a un grupo de personas en donde antes de ser liberado vio llegar a otro grupo de cuatro migrantes secuestrados de Ecuador y Cuba. (54)... "Veníamos de Ciudad de México, en una guagua, en un camión, y cuando llegamos a Ciudad Juárez, después de que pasamos la revisión de Migración, en el segundo semáforo, estaba lloviendo esa noche, y se montaron dos jóvenes armados, pararon el camión en el que veníamos y pararon la guagua y había siete vehículos abajo esperando. Le quitaron el teléfono a todo el que venía, madres con sus hijos, su esposo, venían como tres o cuatro familias con niños pequeños y les quitaron los teléfonos, les quitaron el dinero que tenían y los obligaron a bajar del bus y a montarse en los vehículos que tenían ellos abajo", narró otra mujer migrante." (8) | https://diario.mx/juarez/narran-sudamericanos-secuestros-en-carreteras-20221020-1984034.html |

CLP_PC_076284

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 10/20/2022 | kidnapping | 1 | In October 2022, Mexican police turned over Jenny, a Venezuelan woman, and other migrants to a cartel that abducted and forced Jeny into labor . Police had stopped Jeny and other migrants near Ciudad Juárez and turned them over to the cartel, which demanded ransom payment for their freedom. Because Jeny was unable to pay due to several previous extortions, the cartel forced her to cook and clean—an experience she describes as "hell," explaining that she feared she would be killed. | https://www.elheraldodejuarez.com.mx/local/juarez/narra-migrante-venezolana-secuestro-vivido-en-su-camino-a-la-frontera-9060560.html |
| 10/21/2022 | shooting | 1 | "Pese a que el Hospital General 'Dr. Salvador Chavarría Sánchez' de Piedras Negras es una unidad médica de segundo nivel, durante la tarde del miércoles se llevó a cabo una cirugía de emergencia y de suma dificultad; que en teoría solo debería practicarse en hospitales de tercer nivel y con la cual, lograron salvarle la vida al migrante originario de Venezuela herido de bala por un policía municipal." | https://www.elsiglodetorreon.com.mx/noticia/2022/salvan-vida-de-migrante-venezolano-herido-de-bala-en-piedras-negras.html?v=20221021152420 |
| 10/27/2022 | kidnapping | 53 | 2 Venezuelan men were kidnapped when they arrived at the border and held captive for three days. One said he was released when the kidnappers discovered he had no money. Another Venezuelan man was kidnapped in Ciudad Juarez along with 50 other migrants. He was held captive for two weeks and released after his family paid an $8,000 ransom payment. The man said that those who were unable to pay are still being held captive. | https://cnnespanol.cnn.com/video/venezolanos-migrantes-ciudad-juarez-estados-unidos-rey-rodriguez-conclusiones-perspectivas-mexico/ |
| 10/30/2022 | assault | 1 | After being turned away from a migrant shelter in Piedras Negras, a Honduran migrant was assaulted and severely injured by three attackers, requiring the migrant to be hospitalized. | https://rancherita.com.mx/noticias/detalles/130162/golpean-y-dejan-grave-a-migrante-en-asalto-en-el-centro-de-piedras-negras-.html |
| 10/31/2022 | kidnapping | 15 | En un rancho del ejido "El Centinela", al norte del municipio de Piedras Negras, policías investigadores y estatales rescataron a grupo de 15 migrantes, la mayoría centroamericanos de Venezuela y Cuba, y al parecer algunos mexicanos, quienes estaban secuestrados y los polleros exigían por teléfono a sus familiares 10 mil dólares por cada uno para liberarlos. | https://www.eluniversal.com.mx/estados/rescatan-15-migrantes-centroamericanos-secuestrados-en-piedras-negras-coahuila |
| 11/1/2022 | kidnapping | 2 | "Piedras Negras, Coah.- La Policía de Investigación Criminal realizaba las indagaciones en torno a la privación ilegal de la libertad en su modalidad de secuestro agravado. Estos sujetos exigían cantidades hasta los 10 mil dólares por la liberación de los centroamericanos que estaban en la casa de seguridad" | https://superchannel12.com/607067/Investigan-secuestro-de-migrantes--ped%C3%ADan-10-mil-d%C3%B3lares-de-rescate-por-cada-uno |
| 11/2/2022 | kidnapping | 4 | A Venezuelan family with two young daughters was kidnapped by two hooded, armed men from a hotel in Ciudad Juarez as they awaited the opportunity to seek U.S. asylum. The kidnappers held the family captive for 12 days until their relatives managed to pay a $30,000 ransom. | https://cnnespanol.cnn.com/video/migrante-venezolana-secuestro-mexico-asilo-hijos-frontera-eeuu-dusa-roa/ |
| 11/3/2022 | rape, attempted sexual assault, kidnapping, attempted kidnapping, armed robbery, beatings | 2,123 | Asylum seekers from Brazil, Colombia, Cuba, El Salvador, Guatemala, Guinea, Haiti, Honduras, Iran, Nicaragua, Syria, and Venezuela who were expelled or blocked from seeking U.S. asylum due to Title 42 reported having been the victim of a violent attack in Mexico in the past month in an ongoing electronic survey conducted by Al Otro Lado. | Human Rights First review of survey data received by Al Otro Lado between June 14, 2022 and November 3, 2022. |
| 11/6/2022 | kidnapping | 1 | En Tamaulipas, un hombre de origen ruso fue rescatado por la policía estatal en el municipio de Reynosa, tras ser secuestrado por sujetos desconocidos. | https://www.jornada.com.mx/2022/11/06/politica/010n2pol |
| 11/7/2022 | kidnapping | 6 | Six migrants who had been kidnapped were rescued in Ciudad Juárez. | https://www.debate.com.mx/policiacas/Rescata-FGE-a-seis-migrantes-privados-de-la-libertad-en-Ciudad-Juarez-20221107-0002.html |
| 11/9/2022 | kidnapping | 23 | 23 migrantes were rescued after they were kidnapped in Piedras Negras. 15 migrantes were from Honduras, 4 from El Salvador, 3 from Guatemala, 1 from Colombia. | https://noticiasnrt.com/2022/11/09/rescatan-a-23-migrantes-en-piedras-negras-estaban-secuestrados/ |

CLP_PC_076285

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 11/10/2022 | kidnapping, extortion, attempted kidnapping | 5 | Service providers assisting migrants at the border reported to the Center for Gender and Refugee studies between July and September 2022 that 1) a mother and daughter whom DHS had expelled under Title 42 were kidnapped in Juárez and held captive or two days and their family members extorted; 2) A mother and daughter whom DHS expelled under Title 42 had been kidnapped in Ciudad Juárez and held captive for 22 days; 3) a migrant woman reported that someone attempted to kidnap her son in Mexico before the family was expelled under Title 42. | Communication from UC Hastings Center for Gender and Refugee Studies |
| 11/20/2022 | kidnapping | 85 | 85 migrants, including at least 4 Venezuelans, were kidnapped and held for ransom while riding a bus near Ciudad Juárez. | https://100noticias.com.ni/migracion/119927-migrantes-nicas-bus-secuestro-mexico/ |
| 11/29/2022 | kidnapping | 2 | Asimismo, se registró un intento de secuestro en un albergue de migrantes ubicado en el bordo del Río Bravo, en el estado de Chihuahua. El hecho violento se presentó en las primeras horas de este martes. "Eran tres vehículos de reciente modelo, en cada uno venían tres hombres que dijeron que nos pondrían en carros diferentes, en uno a mujeres, en otro a niños y en otro a hombres", dijo a EFE un migrante que por cuestiones de seguridad pidió permanecer en el anonimato. Añadió que llenaron su cara con aceite, los empezaron a separar en fila. Sin embargo, los delincuentes se marcharon porque aparentemente se dieron cuenta de que llegarían las autoridades. | https://es-us.noticias.yahoo.com/crimen-organizado-ataca-albergues-campos-014332029.html |
| 12/7/2022 | attempted kidnapping | 1 | A Venezuelan man who fled political persecution and is stranded in Juárez due to Title 42 said he rode the "bestia" train through Mexico, where he could not sleep for days for fear of being targeted by criminals. He watched armed men rob another Ecuadorian man and throw him off the train, causing one of his legs to be run over and severed. 2 Venezuelan men and 1 woman he was with were raped on the train. When he arrived in Juarez, his phone was stolen at gunpoint. He has no money to buy a new one and without a phone, doesn't know how to contact legal services providers who might help him access the Title 42 exemption process. | Human Rights First interview with asylum seeker |
| 12/8/2022 | kidnapping | 23 | Policías de México rescataron a 23 migrantes, en su mayoría venezolanos, que habían sido secuestrados cuando se dirigían a la frontera con Estados Unidos, en una operación en la que fueron detenidos dos hombres, informaron este jueves las autoridades. | https://www.france24.com/es/minuto-a-minuto/20221208-rescatan-en-m%C3%A9xico-a-23-migrantes-secuestrados-en-su-mayor%C3%ADa-venezolanos |
| 12/8/2022 | attempted kidnapping | 1 | A Venezuelan asylum seeker stranded in Ciudad Juárez due to Title 42 said he began to get followed by cartel members who want to recruit him into their group because they learned about his training and familiarity with weapons. The Cartel tried to abduct him during daylight while he worked at a local car wash. He managed to escape but was forced to leave his employment and now fears to leave the shelter. | Human Rights First interview with asylum seeker |
| 12/14/2022 | kidnapping, extortion | 2 | Juarez, Mexico. The family of siblings Heysell Lineth Martinez and Julmer Martinez are desperately looking to raise $16,000 to pay the ransom demanded by a Mexican cartel that has been holding the young men hostage since last Saturday. "Please, dad, help us, get the money. If not, they are going to kill us. Get the money for both of us because if not, he says they are going to kill us or else they will cut off our fingers", pleads young Heysell Martinez, crying, in a video recorded by the kidnappers, where the brothers are seen seated and with a gun pointed at their heads. | http://www.borderlandbeat.com/2022/12/ciudad-juarez-chihuahua-siblings.html |
| 12/15/2022 | robbery, attempted kidnapping | 1 | **In November 2022, a Venezuelan police investigator fleeing death threats for investigating cases of disappeared people was assaulted and robbed by armed men who bashed his head with the back of a gun, ordered him off the bus he was riding near Ciudad Juárez, and tried to kidnap him**. He managed to escape, but when he arrived in Ciudad Juárez, police stopped him and stole his money. The man told Human Rights First he is terrified to stay in Juárez, where he remains stranded due to Title 42, because the cartel hunting him in Venezuela also operates there. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |

CLP_PC_076286

Human Rights First Tracker of Reported Attacks Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico Due to Title 42 Since January 2021

| Date reported | Type of Incident | No. of victims | Description | Source |
|---|---|---|---|---|
| 12/15/2022 | sexual assault, robbery | 1 | In November 2022, a gay Venezuelan man was sexually assaulted and robbed in the public plaza where he had been sleeping in Ciudad Juárez. The man told Human Rights First that he had been staying in a makeshift tent encampment near the El Paso port of entry while blocked from seeking U.S. asylum due to Title 42 and moved to the plaza where he was attacked after Mexican authorities had forced him to leave the encampment. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | attempted kidnapping | 1 | A 13-year-old girl was nearly abducted at gunpoint in Juárez after her parents and sibling, who had fled political persecution in Venezuela, were denied the right to seek asylum and expelled to danger in Mexico in November by CBP under the Title 42 Venezuelan expansion. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | rape | (counted in Al Otro Lado survey data above) | In October 2022, a Guatemalan lesbian trans woman was violently raped by Mexican police officers in Piedras Negras soon after CBP officers turned her away from protection at the Eagle Pass port of entry. The woman reported to Al Otro Lado that she had sought protection due to her gender and sexual orientation. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | armed robbery | 1 | A Haitian asylum seeker, whom DHS had previously expelled to Haiti under Title 42, was robbed at gunpoint in Tijuana in summer 2022 while unable to seek U.S. asylum at a port of entry due to the continuation of Title 42. The armed assailants pulled the man's pants down and groped him looking for money, according to his cousin, another asylum seeker who spoke with Human Rights First. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | kidnapping | 2 | In October 2022, cartel members kidnapped a Honduran asylum seeker and her four-year-old daughter as they waited stranded in Tijuana due to Title 42. The kidnappers raped the woman in front of her daughter, beat the daughter, and held the family captive without sufficient food for 22 days. The woman, who remains stranded in Tijuana due to Title 42 as she awaits an opportunity to seek U.S. protection, reported the incident to Al Otro La | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | kidnapping | 3 | In August 2022, a Salvadoran woman and her two children were held captive for hours by members of an armed group who forced them to strip and robbed them of all their belongings, including their clothing, shoes, and water. The family had been attempting to enter the United States near Calexico to seek asylum when the armed group approached them. "They were asking their boss what to do with us…I thought they were going to kill us," the woman told Human Rights First. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | sexual assault | (counted in Al Otro Lado survey data above) | Juárez police sexually assaulted a Honduran mother and her four-year-old daughter after the family was blocked from seeking protection in Ciudad Juárez in August 2022, then turned them over to cartel members who held the family captive for 22 days, raped the mother in front of the daughter, and physically attacked the daughter. The mother reported the incident to Al Otro Lado. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | attempted kidnapping | (counted in Al Otro Lado survey data above) | A Mexican family of five was nearly kidnapped after DHS turned them away from seeking asylum at the San Ysidro port of entry in November of 2022. The mother reported to Al Otro Lado that her husband and son had been kidnapped, beaten and held for ransom in their home state in southern Mexico. After the expulsion, the family continued to receive death threats. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | sexual abuse | (counted in Al Otro Lado survey data above) | An indigenous Triqui woman from Oaxaca who had been beaten by police, threatened, and her family members murdered for her activism defending her indigenous community was turned away from seeking asylum with her three children at the San Ysidro port of entry in September 2022 in Tijuana. She shared with Al Otro Lado that after the family was turned away, she sexually abused my Mexican police in Tijuana. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| 12/15/2022 | assault, kidnapping, threats | 1 | In 2022 DHS expelled to Mexico a young Honduran man who had been living in the United States for nine years and had a pending immigration court hearing in Houston, Texas scheduled for December 2022, as his attorney reported to Human Rights First. After being expelled to Mexico, the man was beaten by Mexican police officers, kidnapped by a cartel, and threatened at gunpoint. He was only able to reenter the United States with assistance from his attorney. | https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/ |
| Total victims of attacks: | | 13,480 | | |

CLP_PC_076287

**From:** PII
**To:** Immigration Prosecution & Custody OPS
**Subject:** Fwd: Post T42 Priority Processing and Current Updates
**Date:** Thursday, May 11, 2023 4:43:37 PM
**Attachments:**
image001.png
image002.png
image003.png
EER.doc
Week Of May 15 2023 - May 21 2023.xlsx
Week Of May 8 2023 - May 14 2023 (003).xlsx
Post Title 42 Impact Reporting distro memo_MPsigned.pdf
CBP Watch Post Title-42 Impact Reporting and Enhanced Posture (CBP wide) (005).pdf

FYSA

Sent via the Samsung Galaxy S20 FE 5G, an AT&T 5G smartphone
Get Outlook for Android

**From:** PII
**Sent:** Thursday, May 11, 2023 4:31:19 PM
**To:** BP Field Deputies LEP >; BP Field Chiefs LEP >
**Cc:** PII LEOD-OPS-CELL LEP OPS LEOD ACC LEP >; OPS EAST SECTOR LEP
OPSCENTRALSECTORS LEP ; OPS WEST SECTORS LEP PII

**Subject:** Post T42 Priority Processing and Current Updates

Good afternoon,

Truly appreciate your patience and flexibility as we move towards the end of Title 42.  To that end, listed below are several key points and an update on detention numbers.

As a reminder, at 11:59 (EST) on 5/11/23, Title 42 is expected to terminate. All individuals will be processed under T8 after that time.

Sectors are reminded to prioritize processing pathways, consistent with the law and policy, as follows
- Withdrawals of amenable individuals to Mexico
- ER turned over to ERO (see attached targets)
- EER (ER/CFI)
- NTA/OR (No CAS referral required)
- All other dispositions, including where appropriate Parole with Conditions

Please note that the consultation period for ER/CFIs is now 24-hours, as opposed to 48-hour period.

**Please see the attached for the further guidance on withdrawals and EER.**

Friendly reminder regarding *Parole with Conditions*  If a sector or CPC reaches ▆Law E▆ capacity, then Parole with Conditions should not be utilized in that sector and other Title 8 Processing pathways should be utilized.  Once a sector or CPC is at ▆Law E▆ capacity, the concerns regarding health and safety of noncitizens in short-term custody are more likely mitigated for the reasons discussed below.

The CBP Watch Post Title 42 Reporting and Enhance Posture memorandum is also attached for your reference.

**Update/Current Status:**
The USBP has had its highest 3-day encounter rate in history over the last three days

- Monday, May 8, 2023, there were 10,051 encounters.
- Tuesday, May 9, 2023, there were 10,711 encounters.
- Wednesday, May 10, 2023, there were 10,174 encounters.

Last 7-day Encounters**: 59,978**

**Sector Encounters 5/10/2023**



**Current in Custody:** ▆Law Enforc▆



**In Custody numbers from 4/27 – 5-11:**



**VP Processing for 5/10/23:** 1,151

Thanks!

PII
Acting Deputy Chief
Law Enforcement Operations Directorate
U.S. Border Patrol Headquarters
Cell PII

CBP_Removals_AR_000002



**Title: Updated guidance**
**Date: 05/10/2023**

On May 11, 2023, at 23:59 ET, the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order is anticipated to be terminated. After that time all individuals must be processed under Title 8. Moreover, no individual may be expelled from the United States after that time under Title 42.

Effective May 12, 2023 at 00:01 ET, individuals from *Cuba, Haiti, Nicaragua, and Venezuela* (CHNV) may be considered, in the exercise of discretion, amenable for voluntary withdrawal of their application for admission and go back to Mexico or, under specific circumstances, be removed to Mexico directly from USBP custody consistent with this guidance. In the exercise of discretion of the agent and based on the facts and circumstances known to the agent, such individuals may be offered the opportunity to voluntarily withdraw (WD) their application for admission and return to Mexico in lieu of removal proceedings, provided that such withdrawal would be their first with CBP, whether Border Patrol or Office of Field Operations (OFO), after either January 9, 2023 (for Cubans, Haitians, and Nicaraguans), or December 20, 2022 (for Venezuelans).

The withdrawal must first be offered to the noncitizen and may only be permitted based on a voluntary decision by the noncitizen, and the option to withdraw is only available where the agent determines offering withdrawal is appropriate. Agents are reminded that individuals who pose a threat to public safety or national security should not be considered for withdrawal and withdrawals should not be considered until all appropriate record checks are complete. Prior to permitting any individual to withdraw his or her application for admission, the attached statement must be read in its entirety in a language understood by the CHNV noncitizen prior to permitting any withdrawal.

If an individual is provided the opportunity to withdraw and declines, agents should consider the appropriate processing pathway, including whether expedited removal is appropriate, though agents should consider the particular facts and circumstances of each case, for instance a particular humanitarian reason to process for another pathway.

**Process Flow**

- If amenable, subjects will be offered a WD (see annex for script). Mexican nationals may only be permitted to voluntarily return (VR) consistent with current policy/procedure.
  - Subjects are only amenable to WD a single time (after the applicable date listed above) to remain eligible for the CHNV processes.

- If the individual accepts the WD, serve and add Form I-826 in A-file and annotate in the Form I-213 narrative that the individual accepted WD. Permit the individual to go back to Mexico.

1

CBP_Removals_AR_000003



**Title: Updated guidance**
**Date: 05/10/2023**

- If the individual is offered WD and declines, agents should generally consider processing the individual for ER, though agents should also consider the particular facts and circumstances of each case, for instance a particular humanitarian reason to process for another pathway.

- Individuals processed under ER will be given an opportunity to designate a country to be removed to, and the designated country will be recorded via the Removal Designation Form, within e3 Processing Next Generation (NG). This form is currently enabled if the CDS code of EER is selected.
  - Noncitizens, including those USBP processes under ER, must be given an opportunity to designate a country to be removed to. 8 U.S.C. § 1231(b)(2)(A)(i). The government must generally remove the noncitizen to the designated country of removal, *see* 8 U.S.C. § 1231(b)(2)(A)(ii). However, DHS can disregard that designation for several reasons, including if that country is unwilling to (or does not indicate if it will) accept the individual into the country. 8 U.S.C. § 1231(b)(2)(C).
  - Noncitizens must be asked about fear regarding return to country of origin and to the country identified as the potential country of removal on the Removal Designation Form.

- If the individual claims fear either on the Form I-867A/B **or** the Removal Designation Form, refer the individual to U.S. Citizenship and Immigration Services (USCIS) for a Credible Fear Interview (CFI), and USCIS must be made aware of the designated country of removal and provided a copy of the Removal Designation Form.

- Thus, if the individual indicates a fear of return to the designated country or, where appropriate, the country determined to be appropriate consistent with the Removal Designation Form, the individual will be referred to USCIS. This referral is mandatory in addition to any individual who claims fear on the Form I-867A/B.

During the CFI processing, USCIS will again offer the individual a WD.
  - If the individual accepts WD, serve and add Form I-826 in A-file and annotate in the Form I-213 narrative that the individual accepted WD.
  - Permit the individual to go back to Mexico.

- Negative CFI determination issued by USCIS.
  - Individual declines Immigration Judge (IJ) review, serve Form I-860, Form I-296, and remove the individual to the identified country of removal, including, where applicable, Mexico.

- EOIR IJ Review

2

CBP_Removals_AR_000004



**Title: Updated guidance**
**Date: 05/10/2023**

- IJ affirms negative decision, USBP removes the individual to the identified country of removal, including, where applicable, Mexico.
  - Serve and sign Form I-860, Form I-296 and remove to Mexico.

- IJ vacates negative decision, USBP issues NTA and paroles from custody on a case-by-case basis.

3

CBP_Removals_AR_000005



**Title: Updated guidance**
**Date: 05/10/2023**

<u>Annex two</u>

**Withdrawal of Application for Admission Advisal Statement**

You may withdraw your application for admission to the United States and return to Mexico instead of being placed in removal proceedings. It is a voluntary decision. You are not required to withdraw your application for admission and depart, and you may instead decide to remain in the United States to be placed in removal proceedings and seek relief or protection from removal, including asylum, if appropriate.

The United States currently offers parole processes that allows *Cuba, Haiti, Nicaragua, and Venezuela* nationals and their immediate family members to come to the United States. Those parole processes provide a safe and orderly way for Cuba, Haiti, Venezuela, or Nicaragua nationals who lack documents sufficient for admission to the U.S. to be considered, on a case-by-case basis, for advance authorization to travel and a temporary period of parole into the United States for up to 2 years. Participants in such processes must have a supporter in the United States, pass certain security checks, and fly to an interior location in the United States. To seek participation in one of these processes, however, you must be outside the United States. You may choose to depart the United States voluntarily a single time and still be eligible for the parole process. You are being given an opportunity now to withdraw your application for admission and return to Mexico so that you remain eligible for that parole process.

4

CBP_Removals_AR_000006



**Title: Prioritization of Processing Pathways/Coordinating Instructions for VZ/NC Plan**
**Date: 12/19/22**

## Post Title 42 Processing and Prioritization Plan

The U.S. Border Patrol (USBP) is on pace to surpass the 2.1 million encounters recorded in Fiscal Year 2022. The anticipated lifting of the Centers for Disease Control and Prevention's Title 42 (T42) public health Order is expected to lead to a further surge in migrants, with number of encounters predicted at an average of 12,000-14,000 days. This will require significant decompression efforts and renewed efforts to expeditiously process, return or repatriate individuals those who do not have a lawful basis to stay, in order to safeguard the health and safety of our workforce and those in our custody.

As a part of these efforts, individuals who can be repatriated or individuals permitted to go back to Mexico directly from USBP custody should remain in short-term holding facilities pending such repatriation or permitting individuals to go back. All such individuals should be given an opportunity to withdraw their application for admission; those who do not request to withdraw their application for admission should be placed into expedited removal, to the greatest extent possible.

Other nationalities who will not be able to go to Mexico should be transferred to U.S. Immigration and Customs Enforcement (ICE) for expedited removal or an alternative appropriate pathway.

Priority pathways include direct USBP repatriation options either via the land border or repatriation flights.
- Voluntary Return (VR)/Withdrawal of Application for Admission
- Expedited Removal (ER) – For all amenable subjects
  - This includes subjects who can be removed through the Electronic Nationality Verification (ENV) program
- Reinstatement of Prior Order of Deport (REINST) – For all amenable subjects

Remaining nationalities and demographics unable to be repatriated, who cannot go back to Mexico, or transferred to ICE will be prioritized for transfer out of USBP short-term holding facilities to prevent over-crowding.
- Notice to Appear (WA/NTA and NTA/OR)
- Parole + Alternative to Detention (P+ATD)

In all cases, Sectors must balance consequence delivery with safeguarding national security, the workforce, and individuals in custody. Any person encountered who poses a threat to the homeland, national security risk or public safety threat should be prioritized for prosecution, to the extent legally permissible, in coordination with the U.S. Attorney's Office and should be referred for detention and removal in coordination with ICE.

1

CBP_Removals_AR_000013



**Title: Prioritization of Processing Pathways/Coordinating Instructions for VZ/NC Plan**
**Date: 12/19/22**

**Triage for prioritization of processing pathway**
- Prioritization of processing pathways
  - Unaccompanied Children (UC)
    - UCs will be prioritized for Voluntary Return or WA/NTA processing for expeditious transfer out of custody, in accordance with all existing policies and procedures. As a reminder only Mexican UCs may be permitted to withdraw and then only when consistent with all existing policies and procedures.
  - Family Units (FMU)
    - FMU processing for immediate repatriation pathway when applicable
    - FMU from Venezuela and Nicaragua (VZ/NC) may first be offered the Withdrawal of Application for Admission (WD); they are then generally processed for ER though agents should consider the particular facts and circumstances of each case, for instance a particular humanitarian reason to process for another pathway (See further coordinating instructions below)
    - FMUs without an immediate repatriation mechanism should be prioritized for decompression and release
  - Single Adults (SA)
    - SAs prioritized for immediate repatriation pathway when applicable
    - SAs from Venezuela and Nicaragua (VZ/NC) may first be offered the Withdrawal of Application for Admission (WD); they are then generally processed for ER though agents should consider the particular facts and circumstances of each case, for instance a particular humanitarian reason to process for another pathway (See further coordinating instructions below)
      - A certain number of Nicaraguan, Cuban and Haitian migrants

LEP

      - When USBP is determining the above three nationalities who are referred to ERO, USBP should consider those who re-entered after being removed to Mexico, if the migrant elected to return to Mexico voluntarily and re-entered, as well as time in custody and if the migrant has travel documents
    - SAs from Northern Triangle (NT) countries generally should be processed for Expedited Removal for ENV though agents should consider the particular facts and circumstances of each case, for instance a particular humanitarian reason to process for another pathway

2

CBP_Removals_AR_000014



**Title: Prioritization of Processing Pathways/Coordinating Instructions for VZ/NC Plan**
**Date: 12/19/22**

- When operationally feasible based on short-term holding capacity, NT processed for ENV who do not claim fear will be transferred to ▮▮▮LEP▮▮▮ for holding for removal flights
- When short-term holding capacity is impacted, ENV NT should be referred to ICE ERO for detention and removal



- Upon initial coordination, USBP should aim to refer approximately ▮LEP▮ migrants processed for ER/CF SWB-wide to ERO on a daily basis
- Local communication and coordination will be essential to maximize ER/CF processing for transfer to ERO
- USBP can coordinate with local ERO for transfer to detention for ERO lateral movement for ER/CF adjudication
- When there is no immediate ability to transfer to ERO for detention, USBP will either process this nationality for a pathway that permits release, including, if ER processing is already complete, release on ER Parole
  - SAs from countries with no immediate repatriation mechanism will be processed for decompression pathways.

**Venezuelan and Nicaraguan WD/ER Plan**

Under the VZ/NC Plan, USBP will endeavor to have ▮LEP▮ VZ and NC SAs go to Mexico daily, whether by voluntary withdrawal or following a removal order. All agents are reminded that withdrawal must first be offered to the noncitizen and may only be done based on a voluntary decision by the noncitizen. Processing and, as appropriate, repatriations or permitting individuals to go back to Mexico, will occur at five locations across the SWB ▮▮▮LEP▮▮▮ ▮▮▮LEP▮▮▮ Concurrently, the Department of Homeland Security (DHS) will implement a process under which certain noncitizens from VZ/NC may seek advance authorization to travel to the United States to seek parole at a port of entry.

**Phase I December 21 through January 10**

Upon initial execution, all SWB sectors will offer amenable VZ/NC SAs the opportunity to withdraw and go back to Mexico. Agents are reminded that even with the below numbers, individual determinations must be made for each noncitizen, including the appropriate processing disposition.

3



**Title: Prioritization of Processing Pathways/Coordinating Instructions for VZ/NC Plan**
**Date: 12/19/22**

**LEP** will endeavor to enroll **LEP** VZ/NC SAs into ER or ER/CF per day primarily transferred from **LEP** As additional phone booths come online, RGV will aim to increase enrollments per day.

**LEP** will endeavor to enroll **LEP** VZ/NC SAs into ER or ER/CF per day primarily transferred from **LEP**

**LEP** will endeavor to enroll **LEP** VZ/NC SAs into ER or ER/CF per day each from local encounters.

**Phase II January 11 through February 3**
Updated as booths come online

**Phase III February 4 and beyond**
Updated as booths come online

**Critical Assumptions**
- USBP's short-term holding has been consistently at/over capacity
- USBP has encountered 7,000-8,000 migrants per day across the SWB for the month of December
- USBP's ability to process ER and ER/CF
- Decompression efforts and support to increase/maximize throughput to maintain custody levels in short-term holding to execute this initiative
- VZ encounters have decreased since the implementation of the Venezuelan Parole Process (VPP)
  o Large masses of VZs are potentially waiting for the end of T42 to make an entry
- Supply chain issues with installing phone booths at the five Sectors
- **LEP**
- Similar to VPP, once the initial flow of illegal entrants slowed, significant lateral movement were required to move migrants to the five locations for removal
  o This severally impacted **LEP** ability to decompress
- By focusing this initiative on SAs, FMU encounters of these nationalities will increase
- The Government of Mexico logistical challenges when they reach capacity or change who they will accept for repatriation
- DHS led foreign messaging campaign needs to start immediately to mitigate entries

4



**Title: Prioritization of Processing Pathways/Coordinating Instructions for VZ/NC Plan**
**Date: 12/19/22**

**Process Flow**

- Identity determined
- Medical checks
- Records checks
- If amenable, VZ/NC will be offered a WD (see annex for script). Mexican nationals may only be permitted to VR consistent with current policy/procedure
  - VZ/NC are only amenable to WD a single time to remain eligible for the new parole process
- If the migrant accepts the VR/WD, they will be permitted to go to Mexico.

  - Process I-213 (Record of Deportable/Inadmissible Alien)
  - Serve I-826 (Notice of Rights and Request for Disposition)
  - Provide fact sheet about the Venezuela and Nicaragua parole process
    - (see annex)
  - Repatriate in accordance with local repatriation agreements (LRA)

- Execute lateral sector-to-sector movement if applicable

- If migrant declines WD, in general consider processing migrant for ER, though agents should consider the particular facts and circumstances of each case, for instance a particular humanitarian reason to process for another pathway
  For those who are processed for NTA/OR or Parole+ATD process normally.
  For those who are processed under ER:
  - Complete ER processing
  - I-213 (Record of Deportable/Inadmissible Alien)
  - I-860 (Notice and Order of Expedited Removal)
    - Do not serve I-860 if migrant claims fear
  - I-296 (Notice to Alien Ordered Removed/Departure Verification)
  - I-867A/B (Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act)
  - Country Designation form (see annex)
    - Noncitizens, including those USBP subjects to ER, must be given an opportunity to designate a country to be removed to. 8 U.S.C. § 1231(b)(2)(A)(i). The government must generally remove the noncitizen to that country, *see* 8 U.S.C. § 1231(b)(2)(A)(i). However, DHS can disregard that designation for a number of reasons including if that country is unwilling to (or does not indicate if it will) permit the noncitizen to return to that country or removal to that country would be prejudicial to U.S. interests. 8 U.S.C. § 1231(b)(2)(C).
  - If migrant claims fear either on the I-867A/B **or** the Country Designation, refer to U.S. Citizenship and Immigration Services (USCIS) for Credible Fear Interview (CFI)

5

CBP_Removals_AR_000017



**Title: Prioritization of Processing Pathways/Coordinating Instructions for VZ/NC Plan**
**Date: 12/19/22**

- Issue M-444 (Information on Credible Fear Review)
  - No lateral movements can occur once M-444 is issued
  - Once M-444 issued, migrant has 24-hour consultation period

- 24-hour Consultation Period
  - List of Legal Services
  - Phone booths require updated List of Legal Services in each phone booth that is being utilized for legal consultation
  - Sectors will provide an allotment of phone booths which allow for legal orientation on a 24-hour basis

- Schedule CFI with USCIS
  - Transmit ER documents to USCIS and schedule CFI
    - Provide USCIS with I-860, I-296, I-876A/B, Country Designation Form, and M-444
    - USCIS will review and notify if corrections are needed
  - Bulk scheduling of phone booths for CFIs
    - Each Sector must establish personnel (does not need to be a BPA) who schedule and move migrants between phone booths and holding areas for various uses
    - Phone booths can be scheduled for bulk use on a ratio of 3 CFIs per day per booth

- USCIS conducts CFI
  - During CFI, USCIS offers migrant WD
    - If migrant accepts WD, serve and add I-826 in A-file and annotate in the I-213 narrative that the migrant accepted WD
    - Return to Mexico based on LRA
  - Positive CFI, USCIS provides decision packet with Notice to Appear (NTA)
    - USBP will serve bulk decisions of positive CFI and issue NTAs for release
  - Negative CFI, USCIS provides negative decision to migrant via phone booth
    - Migrant has opportunity for Immigration Judge (IJ) to review negative finding
      - USBP must coordinate with USCIS to schedule individual negative decision CFIs
      - USBP would schedule a block of phone booths for negative fear services
      - Each negative decision service will take approximately 8-10 minutes per service
    - Migrant declines IJ review, serve I-860, I-296, and removal to Mexico

6

CBP_Removals_AR_000018



**Title: Prioritization of Processing Pathways/Coordinating Instructions for VZ/NC Plan**
**Date: 12/19/22**

- o  Migrant request IJ appeal, Executive Office for Immigration Review (EOIR) schedules IJ review
    - ▪ Communication mechanism to schedule EOIR adjudication review

- EOIR IJ Review
    - o  If migrant elects to have an EOIR review, USBP must schedule a time for IJ interview
        - ▪ Phone booths will need to be set aside for EOIR review and scheduled
    - o  Email coordination to receive EOIR decision
        - ▪ Sectors will establish email mailboxes to receive IJ adjudication email
    - o  IJ affirms negative decision, USBP removes to Mexico
        - ▪ Serve and sign I-860 and remove to Mexico based on LRA
    - o  IJ vacates negative decision, USBP issues NTA and releases
        - ▪ USBP serves and signs I-862 and releases.
        - ▪ I-213 will be updated with NTA as disposition and blurb in narrative indicating IJ vacated negative decision and migrant was released on NTA-Parole

**Phone Booth Scheduling and Usage**
- Consultation
    - o  Each sector must establish a percentage of their phone booths to be available for legal consultation
- CFI
    - o  Bulk scheduling of CFIs and blocked set of booths in order to schedule high number of CFIs
- Negative decision service
    - o  Phone booths are required for negative decision
    - o  CIS will notify USBP when negative decisions will be served
- IJ Review
    - o  Pending response from EOIR on how to schedule IJ reviews

7

CBP_Removals_AR_000019



**Title: Prioritization of Processing Pathways/Coordinating Instructions for VZ/NC Plan**
**Date: 12/19/22**

## Annex 1

### New Parole Process for Cubans, Haitians, Nicaraguans, and Venezuelans

The United States has established a process for certain Cuban, Haitian, Nicaraguan, and Venezuelan nationals who are outside the United States to seek advance authorization to travel by air to seek a discretionary grant of parole into the United States.

To be eligible, Cubans, Haitians, Nicaraguans, and Venezuelans must:

- have a supporter in the United States who will provide financial and other support;
- pass biometric and biographic national security and public safety screening and vetting;
- complete vaccinations and other public health requirements; and
- demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons and that a favorable exercise of discretion is otherwise merited.

Cubans, Haitians, Nicaraguans, and Venezuelans are ineligible if they:

- fail to pass national security and public safety vetting or are otherwise deemed not to merit a favorable exercise of discretion;
- have been ordered removed from the United States in the previous five years or are subject to a bar based on a prior removal order;
- have crossed the SWB between the ports of entry after the publication of the relevant Federal Register Notice describing the process for the country's nationals, except individuals permitted a single instance of voluntary departure pursuant to INA section 240B, 8 U.S.C. 1229c or withdrawal of their application for admission pursuant to INA section 235(a)(4), 8 U.S.C. 1225(a)(4) will remain eligible;
- have irregularly entered Mexico or Panama after the publication of the relevant Federal Register Notice for the country's nationals;
- are a permanent resident or dual national of, or holds refugee status in, another country, unless DHS operates a similar parole process for the country's nationals (immediate family members are excluded from this requirement);
- have not completed vaccinations and other public health requirements; or
- are under 18 and not travelling through this process accompanied by a parent or legal guardian.

Applications for the process are free.  Neither you nor your supporter is required to pay the U.S. Government a fee for the application.
For further information on this process you can go to https://www.uscis.gov/venezuela



8



**Title: Prioritization of Processing Pathways/Coordinating Instructions for VZ/NC Plan**
**Date: 12/19/22**

**Annex 2**

**Withdrawal of Application for Admission Advisal Statement**

You may withdraw your application for admission to the United States and return to Mexico instead of being placed in removal proceedings. It is a voluntary decision. You are not required to withdraw your application for admission and depart, and you may instead decide to remain in the United States to be placed in removal proceedings and seek relief or protection from removal, including asylum, if appropriate.

The United States currently offers a parole process that allows Venezuelan or Nicaraguan nationals and their immediate family members to come to the United States. That parole process provides a safe and orderly way for Venezuela or Nicaragua nationals who lack sufficient U.S. entry documents to be considered, on a case-by-case basis, for advance authorization to travel and a temporary period of parole into the United States for up to 2 years. Participants in that process must have a supporter in the United States, pass certain security checks, and fly to an interior location in the United States. To seek participation in that process, however, you must be outside the United States. You may choose to depart the United States voluntarily a single time and still be eligible for the parole process. You are being given an opportunity now to withdraw your application for admission and return to Mexico so that you remain eligible for that parole process.

9

CBP_Removals_AR_000021



**Title: Prioritization of Processing Pathways/Coordinating Instructions for VZ/NC Plan**
**Date: 12/19/22**

### Annex 3

#### Designation of Country of Removal under INA § 241(b)(2)(A)-(E)
#### THIS FORM MAY ONLY BE USED FOR AN INADMISSIBLE NON CITIZEN WHO ENTERS BETWEEN THE PORTS OF ENTRY

1. If ordered removed, to which country would you like to be removed[1]?

   _____

   a. If the noncitizen states MEXICO

      i. Are you a citizen/national/native of Mexico? ☐ Yes ☐ No (If No – go to step ii.; if Yes – go to Step 7)

      ii. Have you lived in Mexico[2]? ☐ Yes ☐ No (If No – go to step 3; if Yes do steps ii. 1-4)

         1. Did you rent or buy a place to live? ☐ Yes ☐ No
         2. Did you receive any government-issued documents? ☐ Yes ☐ No
         3. Did you get a job? ☐ Yes ☐ No
         4. Did you receive lawful status? ☐ Yes ☐ No
            a. (If No to all of ii. 1-4 – go to step 3, if Yes to any ii. 1-4, consider Guidance to determine if the noncitizen lived in Mexico. If Yes – go to Step 7; if No – go to step 3)

      iii. Guidance: An individual who has stopped temporarily in a location ordinarily did not "reside" or "live" there. However, if the noncitizen provides answers that indicates that he or she had lawful status, identity documents, employment or a place to live that they were able to rent for a period of time, all of those point to "living" or "residing" in that location. Being present in a stash house, a location provided by a smuggler, or staying in a shelter on the way north does not meet these requirements. *See* INA 101(a)(33) ("The term "residence" means the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent.")

2. Is the country that the migrant designated on the current list of countries that do not accept or place limits on the acceptance of its citizens? ☐ Yes ☐ No (If Yes – go to step 3, if No STOP, designate the country chosen by the noncitizen as the country of removal and go to FINAL STEP)

3. CITIZENSHIP

---

[1] Declines to answer step 3, country other than Mexico, step 2.

[2] Determine whether the noncitizen's answer complies with Guidance demonstrating that they lived in Mexico or any country (if No – go to step 2; Yes – go to step 9). Being present in a stash house, a location provided by a smuggler, or staying in a shelter on their travel to the U.S., does not meet these requirements.

10

CBP_Removals_AR_000022



**Title: Prioritization of Processing Pathways/Coordinating Instructions for VZ/NC Plan**
**Date: 12/19/22**

  a. What countries[3] are you a citizen/national of? _____

  b. Is the country the migrant is a citizen/national of on the current list of countries that do not accept its citizens? ☐ Yes ☐ No (If Yes – go to step 4, if No STOP and designate country of citizenship as country of removal and go to FINAL STEP)

4. OTHER COUNTRIES OF RESIDENCE

  a. What countries did you travel through to arrive to the United States?

   _____

  b. Did you live in any of those countries? ☐ Yes ☐ No

  c. If yes, which country and for how long? _____

  d. Did you rent or buy a place to live? ☐ Yes ☐ No

  e. Did you receive any government-issued documents? ☐ Yes ☐ No

  f. Did you get a job? ☐ Yes ☐ No

  g. Did you receive lawful status? ☐ Yes ☐ No

5. Based on the questions under #4 and the guidance, did the noncitizen reside in a foreign country prior to arriving in the U.S.? ☐ Yes ☐ No

  Guidance: An individual who has stopped temporarily in a location ordinarily did not "reside" there. However, if the noncitizen provides answers that indicates that he or she had lawful status, identity documents, employment or a place to live that they were able to rent for a period of time, all of those point to "residing" in that location. Being present in a stash house, a location provided by a smuggler, or staying in a shelter on the way north does not meet these requirements. *See* INA 101(a)(33) ("The term "residence" means the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent.")

  a. Document country of removal as country where noncitizen resided _____ If a country is designated, and it is not on the list of countries that do not accept their citizens, go to FINAL STEP.  If the country is on the list, go to step 6. Or, if there is no country designated, go to step 6.

6. Where were you born[4]? _____

  a. Is that country on the list of countries that does not accept their citizens? If yes, go to step 6(b).  If no, go to FINAL STEP.

  b. Is that country on the list of NO SOVERIGNTY CHANGE list? If yes, go to Step 7. If no, designate that country and go to FINAL STEP.

7. Designate Mexico as the likely country of removal. _____

FINAL STEP FOR ALL NONCITIZENS: Ask whether the individual has a fear of return to the country of designation. Refer the noncitizen who says yes to a fear of removal to the country

---

[3] If any of the countries of citizenship/nationality accepts its citizens for removal, the noncitizen should be removed to their country and stop.
[4] If country of birth is different than those countries already considered, determine if that country accepts its citizens for removal. If yes STOP and go to FINAL STEP.

11

CBP_Removals_AR_000023



**Title: Prioritization of Processing Pathways/Coordinating Instructions for VZ/NC Plan**
**Date: 12/19/22**

designated to USCIS. This referral is mandatory in addition to any individual who claims fear on the I-867A/B.

12

CBP_Removals_AR_000024



**U.S. Department of Homeland Security**
Washington, DC 20528

May 10, 2023

ADVISORY MEMORANDUM

FROM:                          Blas Nuñez-Neto
                                   Assistant Secretary for Border and Immigration Office of
                                   Strategy, Policy, and Plans

TO:                             Troy Miller
                                   Acting Commissioner
                                   U.S. Customs and Border Protection

                                   Tae Johnson
                                   Senior Official Performing the Duties of the Director
                                   U.S. Immigration and Customs Enforcement

SUBJECT:  Process for Determining Country of Removal for Nationals of Cuba, Haiti, Nicaragua, and Venezuela

Purpose

This memorandum describes current U.S. capacity to conduct removal flights to Cuba, Haiti, Nicaragua, and Venezuela. It is meant to inform U.S. Customs and Border Protection (CBP) determinations in making referrals to U.S. Immigration and Customs Enforcement (ICE) based on (1) population in ICE Enforcement and Removal Operations (ERO) custody by nationality, and (2) removal flight capacity both to third countries and countries of origin, and to advise CBP concerning processes that comport with DHS's authority to remove noncitizens to third countries.

This memorandum, which relates to a foreign affairs function of the United States, does not establish binding standards and it is not intended to, shall not be construed to, may not be relied upon to, and does not create any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

Background

The Immigration and Nationality Act (INA) establishes the authority to remove noncitizens with final orders of removal to countries other than the country designated by the noncitizen or their country of citizenship in certain circumstances.  If removal to each of the countries identified in the statute as potential additional removal countries (including country of birthplace) is **impracticable,**

**inadvisable, or impossible**, the noncitizen may be removed to a third country that will accept the noncitizen.

CBP should work through the framework set forth at INA § 241(b)(2), 8 U.S.C. § 1231(b)(2), to determine the appropriate country of removal for noncitizens who enter the United States between the ports of entry.  Under the statute, the analysis begins by the noncitizen designating one country to which they want to be removed (noncitizens may not designate Mexico, Canada, or an adjacent island unless they are a national, citizen, or resident thereof).  Next, if that government is not willing to accept the noncitizen, CBP should then determine whether the noncitizen may be removed to their country of citizenship or nationality (if this was not the country designated by the noncitizen).  Last, if the noncitizen is not removed to the country designated or the country of citizenship or nationality, CBP should then consider removal to a country where the noncitizen resided before they entered the country from which they entered the United States, the country where they were born, or the country that had sovereignty over the noncitizen's birthplace when they were born.[1]  If it is determined that it is impracticable, inadvisable, or impossible to remove the noncitizen to any of the countries described in the previous sentence, DHS may remove the noncitizen to any other country that will accept the noncitizen.



For removal to a third country to be an available option based on impracticability, inadvisability, or impossibility, CBP should refer enough Cuban, Haitian, Nicaraguan, and Venezuelan nationals to ICE-ERO to meet current removal flight capacity under ICE's country removal guidelines.  If the number of removable noncitizens of a given nationality in ERO custody exceeds monthly flight capacity to country of origin, CBP should pursue a process to identify third countries as the country of removal for such noncitizens pursuant to INA § 241(b)(2), 8 U.S.C. § 1231(b)(2).

Protection Screening
Screening for fear of removal to the designated third country should be conducted in accordance with the procedures set forth in 8 C.F.R. §§ 208.30, 208.33, and 235.3, as amended by the Circumvention of Lawful Pathways final rule, and accompanying guidance.

---

[1] This memorandum relates only to noncitizens who have entered the United States between ports of entry and not to arrivals at ports of entry.  Therefore, the listing of alternate countries of removal in this memorandum does not include the following additional removal countries per the statute:  the country from which the noncitizen traveled to be admitted to the United States, and the country in which is located the foreign port from which the noncitizen left for the United States or for a foreign territory contiguous to the United States.

CBP_Removals_AR_000322

Current Removal Flight Capacity

| Country | Agreement | Max Removal Capacity / Flight | Max Removals / Month |
|---|---|---|---|
| Cuba | ████████ | █ | █ |
| Haiti | ████████ | █ | ████████ |
| Nicaragua | ████████ | █ | █ |
| Venezuela | ████████ | ████████ | ████████ |

CBP_Removals_AR_000323

Appendix 1: Country Conditions

Below, DHS PLCY characterizes U.S. Government bilateral negotiations with Cuba, Haiti, Nicaragua, and Venezuela in relation to removal flights, and where applicable, diplomatic efforts to increase the number or cadence of removal flights to those four countries.

***Cuba.*** Formal diplomatic relations have been reestablished with the Cuban government. In April 2022, the U.S. Government and Government of Cuba agreed to restart bilateral Migration Talks, and in January 2023, the two countries restarted the bilateral Law Enforcement Dialogue.  Both these engagements are important lines of communication, allowing DHS and other U.S. Government departments to continue cooperating with Cuban counterparts on matters related to migration, removals, migrant smuggling, and other areas.

Following the April 2022 Migration Talks, the Cuban government agreed to resume removal charter flights in accordance with the Migration Accords; the first flight took place in April 2023.  Following the April 2023 Migration Talks, the Cuban government agreed to provide approval, within 10 working days, of the list of nationals nominated for removal, and approval for the U.S. to send a flight manifested with those nationals later than three days before the date of departure.  The Cuban government also agreed to allow removals via commercial flights. ███████████ ████████████████████████████████████████████████████████████████████ ████████████████

In FY 2022, despite best efforts, DHS repatriated or expelled only about 2.5 percent of Cuban encounters.  More than 97% of Cubans encountered at the border in FY2022 were ultimately conditionally released into the interior of the United States.[2]

***Haiti.*** The United States and Haiti have full diplomatic relations.  After six months of operating with limited capacity, as of April 27, 2023, the GoH and the International Organization for Migration (IOM) repatriation support actors reported their operations had normalized.  U.S. Embassy Port Au Prince assessed, based on information from GoH and IOM, that they have capacity to repatriate up to 450 migrants across three separate repatriation events in Port-au-Prince or Cap-Haitien on any given day.  This is due to improved capabilities in identifying, responding to, and mitigating day-to-day challenges with communications, logistics, site infrastructure, fuel access, and insecurity.  The Embassy also analyzed the potential of alternative repatriation locations but found no other locations are currently viable.[3] ██████████████████████████████████ ███████████████████████████████████████

In FY 2022, DHS repatriated 28% of Haitian encounters.  72% of Haitian nationals encountered at the SWB in FY2022 were conditionally released into the U.S.[4]

***Nicaragua.*** ████████████████████████████████████████ █████████████████████████████████████████ ██████████████████████████████████████████████ █████████████████████████████████████████

---

[2] DHS Office of Immigration Statistics (OIS) analysis of historic CBP data.
[3] "Haiti: Migrant Repatriation Capacity Improves." U.S. State Department cable, Embassy Port Au Prince, April 27, 2023.
[4] DHS Office of Immigration Statistics (OIS) analysis of historic CBP data.

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████

██████████████████████████████████████████████████████████ In FY 2022, DHS repatriated 2,538, and expelled 4,159 (a total of 6,890) Nicaraguans, or 4.4 percent of Nicaraguan encounters.  More than 95 percent of Nicaraguans encountered at the SWB were conditionally released into the United States in FY2022.[5]

***Venezuela.*** ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[5] DHS Office of Immigration Statistics (OIS) analysis of historic CBP data.

INFORMATION MEMORANDUM

TO:        Andrew Davidson
           Acting Deputy Director

THROUGH:   Ted Kim, Associate Director          TED H KIM  Digitally signed by TED
           Refugee, Asylum and International Operations Directorate          H KIM
                                                                            Date: 2023.05.10
                                                                            15:17:15 -04'00'

FROM:      John L. Lafferty, Chief    JOHN L    Digitally signed by JOHN L
           Asylum Division                      LAFFERTY
                                      LAFFERTY  Date: 2023.05.10 14:50:46
                                                -04'00'

SUBJECT:   Scheduling of Credible Fear Interviews

DATE:      May 10, 2023

---

**Purpose:** To inform you that, consistent with the applicable statutory and regulatory provisions, the Asylum Division will schedule credible fear interviews to take place no earlier than 24 hours after the noncitizen's acknowledgement of receipt of the Form M-444, Information about Credible Fear Interview.

**Background:** The Immigration and Nationality Act (INA) authorizes the expedited removal of certain noncitizens seeking admission who are determined to be inadmissible under certain grounds of inadmissibility. INA Sec. 235(b)(1). If noncitizens in expedited removal proceedings indicate an intention to apply for asylum or express a fear of persecution or torture or of return to their country, they are referred to a USCIS asylum officer for a credible fear interview, INA Sec. 235(b)(1)(A)(ii), 8 C.F.R. § 235.3(b)(4); and generally will be detained throughout the credible fear screening process, INA Sec. 235(b)(1)(B)(iii)(IV), 8 C.F.R. § 235.3(b)(4)(ii).

The INA requires that the noncitizen be given information about the credible fear interview and provides the right for noncitizens in the credible fear process to consult with a person or persons of their choosing prior to the interview, so long as the consultation is conducted "according to regulations prescribed by [DHS]." INA Sec. 235(b)(1)(B)(iv). Under those regulations, if the noncitizen is represented, the representation shall be at no expense to the government, and consultations "shall be made available in accordance with the policies and procedures of the detention facility where the [noncitizen] is detained, and [...] shall not unreasonably delay the process." 8 C.F.R. § 235.3(b)(4)(ii). The applicable regulations further require that noncitizens be provided a Form M-444, *Information About Credible Fear Interview*, that explains the credible fear interview process, and "be given time to contact and consult with any person or persons of the [noncitizen's] choosing" after being referred to USCIS for a credible fear interview. 8 C.F.R. § 235.3(b)(4)(i)-(ii). The regulations do not require that the noncitizen be allowed a particular

amount of time to consult with the person or persons of their choosing.  Prior to the interview, the noncitizen can request access to a phone and seek to consult with someone.  *See* Form M-444.

Under the current policy, credible fear interviews have generally taken place at least 48 hours after the time of the noncitizen's arrival at the detention facility, unless the noncitizen specifically requests to be interviewed more quickly.  That policy originated with the initial implementation of the expedited removal process by the former Immigration and Naturalization Service in 1997 but was not mandated by statute and is not set forth in the regulations.[1]

**Considerations:**  Between the time a noncitizen arrives at a DHS holding or detention facility and the credible fear screening takes place, USCIS must receive the documents referring the noncitizen for a credible fear screening from the DHS component holding the noncitizen, schedule a time and date for an available asylum officer to conduct the credible fear interview, and request that the DHS component with custody make the noncitizen available to participate in the scheduled interview.  While these steps are being taken to schedule the credible fear interview, the noncitizen can make use of available phone lines to consult with a person or persons of their choosing in advance of the interview.

As noted in the April 27, 2023 Fact Sheet that accompanied the announcement of the multiple actions being taken to manage regional migration with the upcoming end of the CDC's Title 42 public health Order, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration | Homeland Security (dhs.gov), DHS is returning to the use of Title 8 immigration authorities to expeditiously process and remove noncitizens who cross the U.S. border unlawfully and have no basis to legally remain in the United States, generally processing them in a matter of days.  To support expeditious processing, DHS is increasing its holding capacity, expanding capabilities and technologies across the expedited removal process continuum, and installing hundreds of additional phone lines and privacy booths to provide increased opportunities for noncitizens to consult with the person or persons of their choice prior to their credible fear interviews and for credible fear interviews to be conducted in an expeditious manner.  Completing immigration proceedings at the border in a safe, orderly, and humane manner is necessary in order to maximize the number of noncitizens who can be processed using this increased holding capacity.

To support this effort, USCIS has been closely working with our government partners to establish a streamlined process for receiving credible fear referral documents, scheduling interviews, and issuing decisions on credible fear claims.  In addition, USCIS is increasing its capacity by training and preparing additional staff to conduct credible fear interviews and support the processing of

---

[1] USCIS reduced the credible fear consultation period to 24 hours in 2019.  Memorandum for the Acting Secretary from Ken Cuccinelli II, *Reduction of Credible Fear Consultation Period* (July 2, 2019).  But that policy was set aside in 2020 as *ultra vires* under the Federal Vacancies Reform Act of 1998, 5 U.S.C. § 3348(d)(1), and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), because the court concluded that Mr. Cuccinelli was not lawfully appointed to serve as the acting Director of USCIS.  *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 37 (D.D.C. 2020).

these cases, including scheduling credible fear interviews as soon as, but no earlier than, 24 hours after the noncitizen's acknowledgement of receipt of the Form M-444.  Once it has received a complete credible fear referral document package from either U.S. Immigration and Customs Enforcement (ICE) or U.S. Customs and Border Protection (CBP), USCIS will schedule the interview as soon as possible and ensure the noncitizen has no less than 24 hours for consultation before the credible fear interview.

The number of migrants expected to travel without authorization to the United States is expected to significantly increase after the end of the CDC's Title 42 public health Order.[2]  To ensure DHS's continued ability to safely, humanely, and effectively enforce and administer the immigration laws, USCIS must make changes to reduce the amount of time noncitizens who do not have a legal basis to remain in the United States spend in DHS custody before being removed.  This change in the consultation period is being made in alignment with the April 27, 2023 announcement regarding the whole-of-government approach to managing regional migration.  This change will enable the United States to expeditiously process and remove individuals who arrive at the Southwest border and do not have a legal basis to remain in the United States.  In order to effectively implement the change to the consultation period, USCIS is also establishing a new policy of requiring extraordinary circumstances warranting approval of a request to reschedule so that USCIS can ensure, consistent with the statute and regulations, that the consultation period does not unreasonably delay the overall process.

USCIS is also taking all necessary steps to ensure that noncitizens understand the credible fear process, have been given at least 24-hours to seek consultation prior to the interview, and are given a full and fair opportunity to have their claims for protection or fear of return heard by a fully trained USCIS officer, and, to the extent it applies, consistent with the Americans with Disabilities Act.  In practice, this means noncitizens will have longer than 24 hours to consult depending on when they acknowledge receipt of the Form M-444.  USCIS will continually assess the feasibility of scheduling credible fear interviews as soon as 24 hours after the noncitizen's acknowledgement of the Form M-444 and may determine, in its discretion, that a return to a 48-hour period prior to the scheduled credible fear interview is appropriate.

The approach described in this memorandum is an internal general policy that USCIS is pursuing in order to improve procedural efficiency and ensure appropriate disincentives for irregular migration after the end of the CDC's Title 42 public health Order.  It does not set or modify any binding standard.  It is not intended to, shall not be construed to, may not be relied upon to, and does not create any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

---

[2] *See, e.g.*, Secretary Mayorkas Remarks at a Press Conference on New Regional Migration Management Measures (Apr. 28, 2023), https://www.dhs.gov/news/2023/04/28/secretary-mayorkas-remarks-press-conference-april-27-2023.

## Sargordan, Neda

| | |
|---|---|
| **From:** | Asylum Chief |
| **Sent:** | Wednesday, May 10, 2023 3:29 PM |
| **To:** | RAIO - Asylum Field Office Staff; RAIO - Asylum Field Office Managers; RAIO - Asylum HQ |
| **Subject:** | Updated Guidance on Consultation Period and Reschedules - CFPM III.D.1.a. and III.E.4.b. |
| **Attachments:** | CFPM III.D.1 and III.E.4 - 5.10.2023.pdf; F. Waiver of the Consultation Period - 5.10.2023.docx; Form M-444 - 5.10.2023.pdf |

**FOR INTERNAL USE ONLY**

Good afternoon,

In support of the Department's goal to more quickly provide relief to those who are eligible while more quickly removing those who are not, the Asylum Division has updated CFPM section III.D.1., which contains procedures on the credible fear consultation period, and III.E.4., which contains procedures for rescheduling a credible fear interview based on consultant availability. The Asylum Division has also updated Form M-444 and the Waiver of the Consultation Period. The updated Form M-444, Waiver, and CFPM guidance are effective **May 11, 2023**.

The updated English Form M-444 has been provided to CBP and ICE for use in all new credible fear referrals effective **May 11, 2023**.

The updated CFPM guidance, English M-444, and Waiver are attached for reference. The Asylum Knowledge Center and ECN will be updated to reflect these changes.

We are working with the interpreter vendors to translate the updated M-444 and will distribute the translations when they are available.

If you have any questions about the updated guidance, Form M-444, or Waiver, please raise them up through your chain of command to the Asylum Operations Branch.

Thank you,

John Lafferty
Chief, Asylum Division

Attachments (3):
1. CFPM III.D.1. and III.E.4 – 5.10.2023
2. Form M-444 - 5.10.2023
3. Waiver of the Consultation Period – 5.10.2023

**FOR INTERNAL USE ONLY**

USCIS_24-Hour_AR_000026

## Sargordan, Neda

| | |
|---|---|
| **From:** | Lafferty, John L |
| **Sent:** | Wednesday, May 10, 2023 2:47 PM |
| **To:** | RAIO - Asylum HQ; RAIO - Asylum Field Office Managers; # ALL ZNY STAFF; #ZAR-ALL; #ZBO Everyone; #ZCH EMPLOYEES; #ZHN-All; #ZHN-FRC-All; #ZLA All Employees; #ZNK Everyone; #ZOL-All; Altman, Yudelkys B; Munoz, Carrie K; Smith, Yolanda D (OEOI); USCIS Events; ZGA-All-Users; ZMI STAFF; ZSF STAFF - CIS; ZTB Employees |
| **Subject:** | Preparation Strategies for Return to Title 8 Processing |

Asylum Colleagues,

At 11:59pm ET on May 11, 2023, the Centers for Disease Control and Prevention's Title 42 public health Order will end, and at 12:00am ET on May 12, 2023, DHS will return to processing migrants solely under Title 8 authorities. A little over a week ago, I let you know about some of the work we were doing to ensure we have as many asylum officers as possible to conduct credible fear interviews. As May 11th draws closer, I want to highlight some more of the strategies we have, or will be, implementing:

- **Improvements to document processing between USCIS, ICE, and CBP:**
  - o Asylum IDEA has spent the past few months working closely with CBP and ICE to develop an innovative way for information to be passed back and forth between our agencies for intake, scheduling, service of documents, and other communications.
  - o They have traveled to the border several times to test the new systems and collaborate with CBP and ICE, and recently sent out a training to operations staff on how to utilize this system. They also held two sets of office hours for asylum office staff to ask questions and will be available to answer questions going forward.

- **CBP Sector and ICE Facility Lead Asylum Office Structure:**
  - o To help alleviate pressure from asylum offices that normally cover areas along the border, we have created a "lead office" and "supporting office" structure for coverage of credible fear interviews conducted with noncitizens who are being detained in CBP facilities, as well as continuing to process those being detained in ICE detention facilities.
  - o The Asylum Division will interview noncitizens located in five different CBP sectors along the border. One asylum office has been assigned as the "lead office" for each sector, with one to three other asylum offices having been assigned as "supporting offices." The "lead office" serves as the operational point of contact for CBP in that sector. The lead-supporting office structure is as follows:
    - RGV – ZHN (lead office), ZBO, ZAR and ZMI
    - Laredo – ZNK (lead office) and ZTB
    - El Paso – ZCH (lead office) and ZGA
    - Yuma – ZSF (lead office) and ZNY
    - San Diego – ZLA (lead office) and ZNO
  - o The goal is to provide better collaboration and faster communication between the asylum offices and CBP.
  - o Each asylum office will also continue to be responsible for processing credible and reasonable fear cases at ICE detention facilities that fall under their normal jurisdiction.

- **24-hour Minimum Period Between M-444 Acknowledgement and Credible Fear Interview:**
  - o In support of the Department's goal to more quickly provide relief to those who are eligible while more quickly removing those who are not, effective immediately the minimum time between the noncitizen's acknowledgement of receipt of the Form M-444, Information about Credible Fear Interview, and the credible fear interview will be 24 hours.

USCIS_24-Hour_AR_000027

- Additionally, all noncitizens who request to reschedule their credible fear interview will need to demonstrate extraordinary circumstances warranting approval of the request so as not to unreasonably delay the overall process.
- USCIS will continually assess the feasibility of this 24-hour period and may determine, in its discretion, that a return to a 48-hour period is appropriate.
- Additional guidance on this is forthcoming.

- <span style="color:red">DELIBERATIVE PROCESS</span>



As I said in my previous email, I know many of you may feel uncertain about what a full return to Title 8 processing will mean for our division and our work. I appreciate those who submitted their questions and concerns. We are working to provide answers to them in what will be a "living" FAQ document. You are welcome to submit additional questions as they arise to the Asylum Chief Mailbox and we will update this document with more information as things develop.

Thanks,
John

2

(2) either be translated into a language the noncitizen understands or have a completed interpreter certification. The Asylum Division cannot proceed with a credible fear interview of a noncitizen unless the credible fear referral packet includes a completed Form M-444.

Once the asylum office receives the above forms and verifies that the asylum office has jurisdiction to conduct a credible fear interview and make a credible fear determination, asylum office staff accept the credible fear referral and enter the case into Global. The "Clock-in Date" field on the Entry tab is the date the asylum office receives a complete referral from CBP or ICE. Asylum office staff must enter the credible fear case into Global within one (1) business day of receiving a complete referral packet.

## III.D. ASYLUM OFFICE SCHEDULES INTERVIEW

| Reviewed, No Substantive Changes since 03/31/2023 | Will be Updated, Changes Pending Review | Finalized Updates |
|---|---|---|
| Sections: | Sections: | Sections: III.D.1.b. |

### 1. Consultation Period (previously titled "48-Hour Hiatus")

It is a policy of the Asylum Program to allow a minimum of 48 hours to transpire between the arrival of an alien at a detention site and any credible fear interview.  This 48-hour period provides an alien an opportunity to rest, collect his or her thoughts, and contact a relative, representative, attorney, or friend whom the alien may want to act as a consultant during the credible fear interview.

If DHS transfers an alien to a new detention site, the 48-hour period begins anew from the alien's arrival at the new detention location.

### a. Waiver of Consultation Period (previously titled "Waiver of 48-Hour Period")

Although an asylum office must wait at least 48 hours from the alien's arrival at a detention site before interviewing the alien, an alien may, at his or her request, waive the 48-hour period before a credible fear interview.  The asylum office should make every effort to interview the alien as soon as possible after receiving such a request.

If the interview takes place within the 48-hour period, the APSO asks the alien to sign a *Waiver of the 48-Hour Period*. Appendix F: Waiver of the 48-Hour Period.

### b. Orientation

Before beginning the substantive part of the credible fear interview, the asylum officer must verify that the noncitizen received Form M-444 and understands the credible fear determination process (see 8 CFR 208.30(d)(2)). The asylum officer should remind the noncitizen of the date that they received Form M-444 based on the date the noncitizen signed the form and ask the noncitizen if they have any questions relating to the credible fear process. If the noncitizen indicates that they do not understand the credible fear process, the asylum officer should read verbatim the below explanation to the noncitizen, include the below explanation verbatim in the interview notes, and document in the interview notes that the explanation was read to the noncitizen. The asylum officer does not need to re-

read the full M-444 where there is an M-444 in the referral packet signed by the noncitizen or where there is a notation that the noncitizen refused to sign. Note, the asylum officer must provide and read the full M-444 in cases where the noncitizen is eligible for a credible fear interview following a Safe Third Country Agreement Threshold Screening.

> You have been placed in expedited removal proceedings because the U.S. Department of Homeland Security (DHS) believes that you may not have the right to stay in the United States. However, you indicated that you fear return to your country, so I will interview you for credible fear. At the credible fear interview, I will ask you questions about the reasons you fear return to your country. It is important that you tell me about any harm you may have suffered in the past or any harm you fear in the future. To demonstrate a credible fear of persecution or torture, you must show that you have a credible fear of being persecuted because of your race, religion, nationality, membership in a particular social group or political opinion, or a credible fear of being tortured in your country.

> You may request an officer of a specific gender. You may also ask to speak to me separately from your family. You may have a consultant of your choice with you at your interview, or present telephonically. If you need additional time before your credible fear interview to contact someone, let me know and explain the reason you need more time. I will determine whether your circumstances merit providing you with additional time. DHS will provide an interpreter for the interview if you require one. The interpreter will be sworn to keep the information you discuss confidential. You may request another interpreter if you are not comfortable or if you do not understand them.

> If I determine that you have a credible fear of persecution or torture, you will either receive a charging document for a hearing in immigration court or you will be scheduled for an Asylum Merits Interview with a USCIS asylum officer. At the immigration court hearing or USCIS Asylum Merits Interview, the immigration judge or asylum officer will determine whether to grant you asylum or whether you are eligible for other protection from removal. You will receive information about the date, time, and location of this hearing or interview. If I determine that you do not have a credible fear of persecution or torture, you may ask to have an immigration judge review the negative determination. If you decline this review, or after immigration judge review, you are still found to not have a credible fear of persecution or torture, you may be removed from the United States.

> Do you have any questions about what I just explained?

> Do you understand the credible fear determination process?

The asylum officer should answer questions posed by the noncitizen to ensure understanding of the credible fear process.

If ICE transfers a detained noncitizen who has already been referred to the Asylum Division to a detention facility located in another asylum office's jurisdiction, asylum office personnel at the new asylum office should ensure the noncitizen receives a list of legal service providers for the new location.

USCIS_24-Hour_AR_000058

**Updated Credible Fear Procedures Manual**

## III.D. ASYLUM OFFICE SCHEDULES INTERVIEW

### 1. Consultation Period

USCIS policy is that the credible fear interview will occur no earlier than 24 hours after the noncitizen's acknowledgement of receipt of the Form M-444.  This consultation period provides the noncitizen an opportunity to contact a relative, representative, attorney, or friend whom the noncitizen may want to act as a consultant during the credible fear interview.

All noncitizens who request to reschedule their credible fear interview will need to demonstrate extraordinary circumstances so as not to unreasonably delay the process. Extraordinary circumstances may include, but are not limited to:

- serious illness or mental or physical disability of the noncitizen, a member of the noncitizen's immediate family, or the noncitizen's consultant; or
- serious facility issues that prevent the noncitizen from contacting a consultant.

By regulation and upon supervisory concurrence, the AO may also exercise discretion to reschedule a credible fear interview when circumstances warrant the reschedule but the noncitizen did not expressly make a reschedule request. Circumstances may include, but are not limited to, instances where the officer determines that the noncitizen is unable to participate effectively in the interview because of illness or serious medical condition, fatigue or other impediments.

### a. Waiver of Consultation Period

Although USCIS policy is that the credible fear interview will occur no earlier than 24-hours after the noncitizen's acknowledgement of receipt of the Form M-444, a noncitizen may, at their request, voluntarily waive the consultation period.  The asylum office should make every effort to interview the noncitizen as soon as possible after receiving such a request.

If the interview takes place within the consultation period, the AO asks the noncitizen to sign a *Waiver of the Consultation Period*. Appendix F: Waiver of the Consultation Period May 10 2023.

## III.E. APSO CONDUCTS A CREDIBLE FEAR INTERVIEW

### 4. Consultants

#### b. Failure of Consultant to Attend Interview

If the noncitizen made previous arrangements with a consultant to appear at the interview, and the consultant does not appear, the AO may continue with the credible fear interview, with the noncitizen's consent.  The AO records the noncitizen's consent to proceed with the interview in the interview notes.

All requests by a noncitizen to reschedule the interview because the consultant is unable to appear must be handled on a case-by-case basis.  The noncitizen must demonstrate extraordinary circumstances relating to the consultant's inability to appear, so as not to unreasonably delay the process. Extraordinary circumstances may include, but are not limited to:

- serious illness or mental or physical disability of the consultant; or
- serious facility issues that prevent the noncitizen from contacting a consultant.

An SAO may deny a request to reschedule an interview if the asylum office has documented chronic problems with a particular consultant who consistently submits rescheduling requests or fails to attend credible fear interviews.

Rev. 5/10/2023

File No. _____

### Information About Credible Fear Interview

You have been placed in expedited removal proceedings because the U.S. Department of Homeland Security (DHS) believes that you may not have the right to stay in the United States. You have also indicated that you intend to apply for asylum, you fear persecution or torture, or you fear returning to your country of nationality or designated country of removal. This notice explains what will happen while the U.S. Government is considering your case, what rights you have, and what may happen to you as a result of statements you make.

**PLEASE READ THIS NOTICE CAREFULLY**.

### What is a Credible Fear Interview?

Before DHS can remove you, DHS must interview you to determine if you have a fear of persecution or torture that the U.S. Government needs to consider further. A specially trained USCIS asylum officer will interview you. The credible fear interview is not a formal asylum or withholding of removal hearing or interview. The credible fear interview is a screening to determine if you are eligible for a hearing before an immigration judge or an Asylum Merits Interview with a USCIS asylum officer.

You may be detained both before and after the credible fear interview if DHS determines that it is appropriate. The interview will occur no earlier than 24-hours after you receive and acknowledge receipt of this form.

### What Happens At Your Credible Fear Interview

At your credible fear interview, you will have an opportunity to discuss your background and experiences in your country and any other country where you fear harm and explain to the USCIS asylum officer the reasons you are pursuing an asylum claim. The officer will take written notes. This may be your only opportunity to provide information about your claim, so it is very important that you tell the USCIS asylum officer about any harm you may have suffered in the past and any harm you fear in the future. You also may be asked about conditions in your country. **To demonstrate a credible fear of persecution or torture, you must show the officer that you have a credible fear of being persecuted because of your race, religion, nationality, membership in a particular social group, or political opinion, or a credible fear of being tortured in your country.**

You may request a female or male USCIS asylum officer, if this would make it easier for you to speak about information that is very personal or difficult to discuss. You also have the right to speak with the USCIS asylum officer separately from your family.

It is very important that you:

- **Tell the truth during your credible fear interview**. Your statements may be used in this or in any future immigration case.

- **Tell the officer any reasons why you fear returning to your home country or designated country of removal**. U.S. law has strict rules to prevent the government from telling others about what you say in your credible fear interview. For example, the U.S. Government will not disclose to your government any information that you provide, except in exceptional circumstances.

### Possible Use for Asylum Application

It is also possible that the record from your credible fear interview may be considered your asylum application if you are found to have a credible fear of persecution or torture and are scheduled and appear for an Asylum Merits Interview with a USCIS asylum officer.

Form M-444 (Rev. 5/10/2023)
USCIS_24-Hour_AR_000065

File No. _____

## Whom You May Consult

While you wait for your credible fear interview, you may use this time to prepare and consult with a person of your choice as long as it does not unreasonably delay the interview process. The U.S. Government does not provide you with an attorney or representative, but you may choose to hire an attorney or representative at your expense. You may have a consultant of your choice with you at your interview or participate by telephone.

If you need additional time before your credible fear interview to contact someone, inform a DHS officer about your circumstances and explain the reason you need more time. In order to avoid unreasonably delaying the process, you will need to demonstrate that extraordinary circumstances necessitate that your credible fear interview be delayed or rescheduled. USCIS will decide whether your circumstances merit providing you with additional time. You may also request to have the interview earlier if you are prepared to discuss your case immediately.

A list of representatives who may be able to speak to you for free is attached to this notice. Representatives of the United Nations High Commissioner for Refugees (UNHCR) also may be able to assist you with information regarding the credible fear process:

> United Nations High Commissioner for Refugees
> 1800 Massachusetts Avenue N.W., Suite 500, Washington, D.C. 20036
> *Telephone*: 202-296-5191 *Email*: usawa@unhcr.org *Web site*: www.unhcr.org

You may call UNHCR toll-free by dialing #566 or 1-888-272-1913 on Mondays, Wednesdays, and Fridays, 2 p.m. - 5 p.m. (Eastern Time).

If you want to call someone, ask a DHS officer for assistance. You may also use the telephone while you are in detention to call a relative, representative, attorney, or friend in the United States. You or the person you call must pay for the phone call, if charges apply.

## Interpreters

If you do not speak English well or if you want to be interviewed in a language of your choosing, DHS will provide an interpreter for the interview. The interpreter will be sworn to keep the information you discuss confidential. You may:

- Request another interpreter if the interpreter is not interpreting correctly or you do not feel comfortable with the interpreter.

- Request a female or male interpreter, if this would make it easier for you to speak about information that is very personal or difficult to discuss. DHS will provide them if they are available.

## Biographic and biometric checks

Applicants for asylum are subject to biographic and biometric checks of all appropriate records and other databases. USCIS may use your biometrics that were collected by DHS, including biometrics collected by U.S. Customs and Border Protection (CBP) or U.S. Immigration and Customs Enforcement (ICE), to check criminal history records, verify identity, determine eligibility, or any purpose authorized by the Immigration and Nationality Act. The privacy notices in this document provide information about the collection and use of this information.

## After Your Credible Fear Interview

After your credible fear interview, the USCIS asylum officer will make a determination on your initial screening case. If the asylum officer determines that you have a credible fear of persecution or torture, you will either

File No. _____

receive a charging document for a hearing in immigration court or you will be scheduled for an Asylum Merits Interview with a USCIS asylum officer. At the immigration court hearing or USCIS Asylum Merits Interview, the immigration judge or asylum officer will determine whether to grant you asylum or whether you are eligible for other protection from removal. You will receive information about the date, time, and location of this hearing or interview.

If the USCIS asylum officer determines that you do not have a credible fear of persecution or torture, you may ask to have an immigration judge review the asylum officer's negative determination. If you decline this review, you may be removed from the United States.

**Immigration Judge Review of a Negative Credible Fear Determination**

If you request that an immigration judge review the USCIS asylum officer's negative credible fear determination, the immigration judge's review will usually happen no later than 7 days from the date that you receive your negative credible fear determination. The review will be in person, by telephone, or by video connection. You may consult with a person of your choice before the review as long as it does not cause unreasonable delay. You will receive a copy of the USCIS asylum officer's determination before the immigration judge review. If any of the information is incorrect, you should tell the immigration judge.

At the review, the immigration judge will decide either that:

- You do not have a credible fear of persecution or torture. You may then be removed from the United States.

  OR

- You have a credible fear of persecution or torture, and you are eligible for further proceedings in immigration court or an Asylum Merits Interview with an asylum officer where you can apply for asylum or other protection from removal. At any further proceedings in immigration court or during an Asylum Merits Interview, the immigration judge or USCIS asylum officer will determine whether to grant you asylum or whether you are eligible for other protection from removal. If you are ordered removed, you may not be allowed to reenter the United States for 5 years or longer.

**After a Positive Credible Fear Determination by an Asylum Officer or Immigration Judge**

If you receive a charging document for proceedings in immigration court and wish to apply for asylum, you must file Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589 and instructions on where to file the Form can be found at www.uscis.gov/i-589. Failure to file Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to INA § 208(a)(2)(B).

If you receive a document called "Information About Your Asylum Merits Interview," you will receive a notice with the time, date, and location of the Asylum Merits Interview.  You will not be required to file a Form I-589 if you are scheduled and appear for an Asylum Merits Interview with a USCIS asylum officer, as the record of the credible fear interview and your credible fear determination will be considered your asylum application.

**DHS Privacy Notice**

Authorities: The acquisition, preservation, and exchange of information in connection with a credible fear interview and any potential associated asylum adjudication is collected under the Immigration and Nationality Act sections 103, 208, 235 and 241(b)(3), and 8 CFR sections 103, 208, 235, and 1208.

Purpose:  The primary purpose for providing the requested information is to determine eligibility for asylum in the United States or other protection from removal.

Form M-444 (Rev. 5/10/2023)
USCIS_24-Hour_AR_000067

File No. _____

Disclosure: The information you provide is voluntary. However, failure to provide the requested information, and any requested evidence, may delay a final decision or result in the denial of a benefit request.

Routine Uses: DHS may share the information you provide with other federal, state, local, and foreign government agencies and authorized organizations. DHS follows approved routine uses described in the associated published system of records notices [DHS/USCIS-001 – Alien File, Index, and National File Tracking, DHS/USCIS-010 – Asylum Information and Pre-Screening and DHS/USCIS-018 Immigration Biometric and Background Check] and the published privacy impact assessment [DHS/USCIS/PIA-027 USCIS Asylum Division which you can find at www.dhs.gov/ along with EOIR-001, Records Management Information System, 69 Fed. Reg 26, 179 (May 11, 2004) or its successors. DHS may also share the information as appropriate, for law enforcement purposes or in the interest of national security.

**FBI Privacy Notice**

USCIS may use your biometrics to check the criminal history records of the FBI, for identity verification, to determine eligibility, to create immigration documents (e.g., Green Card, Employment Authorization Document, etc.), or any purpose authorized by the Immigration and Nationality Act. You may obtain a copy of your own FBI record using the procedures outlined within Title 28 C.F.R., Section 16.32. For information, please visit: https://www.fbi.gov/services/cjis/identity-history-summary-checks. For Privacy Act information, please visit https://www.fbi.gov/services/cjis/compact-council/privacy-act-statement.

**Noncitizen Acknowledgment of Receipt**

I acknowledge that I have been given notice concerning my credible fear interview. I understand that I may consult with anyone I choose before the interview as long as it does not unreasonably delay the process and is at no expense to the U.S. Government.

_____          _____

Noncitizen Signature                    Date of Signature (mm/dd/yyyy)

**Interpreter Certification**

Interpreter was placed under oath and read the form in entirety to the noncitizen in the _____ language. The noncitizen confirmed that they understood every instruction on the form.

☐ Telephonic interpreter used

_____

Service/ID if available

OR

_____          _____

Interpreter Signature                    Date of Signature (mm/dd/yyyy)

Form M-444 (Rev. 5/10/2023)
USCIS_24-Hour_AR_000068



**Homeland Security**

U.S. Department of Homeland Security

# Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration

**Release Date:** April 27, 2023

**En español**

Today, the Department of State (State) and Department of Homeland Security (DHS) are announcing sweeping new measures to further reduce unlawful migration across the Western Hemisphere, significantly expand lawful pathways for protection, and facilitate the safe, orderly, and humane processing of migrants.

Like many other COVID-era public health measures, the CDC's temporary Title 42 public health order will also come to an end. But the lifting of the Title 42 order does not mean the border is open. When the Title 42 order lifts at 11:59 PM on May 11, the United States will return to using Title 8 immigration authorities to expeditiously process and remove individuals who arrive at the U.S. border unlawfully. These decades-old authorities carry steep consequences for unlawful entry, including at least a five-year ban on reentry and potential criminal prosecution for repeated attempts to enter unlawfully. The return to processing under Title 8 is expected to reduce the number of repeat border crossings over time, which increased significantly under Title 42. Individuals who cross into the United States at the southwest border without authorization or having used a lawful pathway, and without having scheduled a time to arrive at a port of entry, would be presumed ineligible for asylum under a new proposed regulation, absent an applicable exception.

The measures announced today will be implemented in close coordination with regional partners, including the governments of Mexico, Canada, Spain, Colombia, and Guatemala. They draw on the success of recent processes that have significantly reduced unlawful border crossings through a combination of expanded lawful pathways and swift removal of those who fail to use those lawful pathways.

Importantly, these measures do not supplant the need for congressional action. Only Congress can provide the reforms and resources necessary to fully manage the regional migration challenge. Since taking office, President Biden has continually called on Congress to pass legislation to update and reform our outdated immigration system. State and DHS are taking action with the tools and resources available under current law, but Congress's failure to pass and fund the President's plan will increase the challenge at the southwest border.

The measures announced today include:

## Imposing Stiffer Consequences for Failing to Use Lawful Pathways

The transition back to Title 8 processing for all individuals encountered at the border will be effective immediately when the Title 42 order lifts. Individuals who unlawfully cross the U.S. Southwest border:

- will generally be processed under Title 8 expedited removal authorities in a matter of days
- will be barred from reentry to the United States for at least five years if ordered removed; and
- would be presumed ineligible for asylum under the proposed Circumvention of Lawful Pathways regulation, absent an applicable exception

To avoid these consequences, individuals are encouraged to use the many lawful pathways the United States has expanded over the past two years. Today, the United States is announcing additional lawful pathways, including:

- **Expanded Access to the CBPOne App to Appear at a U.S. Port of Entry.** When the Title 42 order lifts, migrants located in Central and Northern Mexico will have access to the CBPOne mobile application to schedule an appointment to present themselves at a port of entry rather than trying to enter between ports. CBPOne will make additional appointments available, and the use of this tool will enable safe, orderly, and humane processing.
- **New Family Reunification Parole Processes.** DHS is creating new family reunification parole processes for El Salvador, Guatemala, Honduras and Colombia. The agency is also modernizing existing family reunification parole processes for Cuba and Haiti. These processes, once finalized, will allow vetted individuals with already approved family-based petitions to be paroled into the United States, on a case-by-case basis. The U.S. Government will deliver timely and efficient authorization for those approved and vetted to travel. Individuals paroled into the U.S. under these processes would be eligible to apply for work authorization.

USCIS_24-Hour_AR_000070

8/23/23, 10:56 AM
Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration | Homeland Security

Case 1:23-cv-01843-TSC    Document 123    Filed 03/28/26    Page 719 of 721

- **Double Number of Refugees from Western Hemisphere.** The United States will commit to welcoming thousands of additional refugees per month from the Western Hemisphere – with the goal of doubling the number of refugees the United States committed to welcome as part of the Los Angeles Declaration on Migration and Protection. To achieve this goal, the United States is building on processing efficiencies achieved over the last two years and further increasing resources and staffing to the U.S. Refugee Admissions Program in this region.

In addition, the United States will continue to accept up to 30,000 individuals per month from Venezuela, Nicaragua, Cuba, and Haiti as part of the expanded parole processes announced earlier this year. Encounters at the border for these nationalities plummeted when DHS expanded the parole programs. The United States will also continue to utilize available authorities to continue to strengthen and expand additional lawful pathways.

## Humanely Managing Migration Flows with Regional Partners

A border-only approach to managing migration is insufficient. From day one, the Biden-Harris Administration has approached migration as a regional challenge – rebuilding relationships with key partners across the Western Hemisphere, bringing 20 world leaders together through the Los Angeles Declaration on Migration and Protection to jointly manage migration flows, and securing commitments from across the Western Hemisphere to expand lawful pathways, address root causes, and step up enforcement.

Building on these efforts, the United States is joining forces with partners across the Western Hemisphere to:

- **Open Regional Processing Centers Across the Western Hemisphere to Facilitate Access to Lawful Pathways.** In a historic move, the United States alongside other countries of the Los Angeles Declaration today announced they will establish Regional Processing Centers (RPCs) in key locations throughout the Western Hemisphere to reduce irregular migration and facilitate safe, orderly, humane, and lawful pathways from the Americas. The first centers will be established in several countries, including Colombia and Guatemala, in the region. Individuals from the region will be able to make an appointment on their phone to visit the nearest RPC before traveling, receive an interview with immigration specialists, and if eligible, be processed rapidly for lawful pathways to the United States, Canada, and Spain.
- **Launch an Aggressive Anti-Smuggling Campaign Targeting Criminal Networks in the Darien.** Panama, Colombia and the United States reached an historic agreement to launch a 60-day surge campaign to address the unprecedented migration through the dangerous Darien corridor. The campaign officially launched on April 20 and is focused on disrupting criminal networks that facilitate the illicit movement of people and increasing state presence in the jungle. As the authorities reclaim control of this region and root out criminal actors, migrants are urged to wait and avail themselves of safe, orderly lawful pathways, including new pathways announced today.
- **Increase Removals of Those Without a Lawful Basis to Stay.** The United States, in coordination with our regional partners, has dramatically scaled up the number of removal flights per week. That includes flights to Cuba, which resumed this week following a pause due to COVID-19. The number of weekly flights will double or triple for some countries. With this increase in removal flights, migrants who cross the U.S. border without authorization and who fail to qualify for protection should expect to be swiftly returned with at least a five-year bar to returning. The United States is also collaborating with foreign partners to crack down on criminal networks that charge enormous fees to migrants to facilitate migration by air. Individuals who arrive at international airports in the region with the intent to cross the U.S. border unlawfully should expect to be turned around and subject to consequences. DHS has also made those who attempt to migrate irregularly to the U.S. via dangerous maritime means ineligible for the parole processes announced in January.
- **Combat Smuggler Misinformation.** Smugglers are already ramping up misinformation campaigns to profit off of vulnerable migrants ahead of the return to Title 8 processing. To combat this misinformation, State's diplomatic missions across the hemisphere are broadcasting accurate information about U.S. migration laws and engaging with a wide spectrum of regional audiences to counter smuggler narratives. It will be incumbent upon all elected leaders and stakeholders – regardless of political affiliation – to work to counter smuggler misinformation and propaganda, not contribute to it.

## Facilitating Safe, Orderly, and Humane Processing of Migrants

The measures announced today aim to change the incentive structure that drives individuals to flee their countries and seek unlawful immigration pathways. They facilitate safe and orderly access to lawful pathways throughout the Western Hemisphere so that fewer migrants are putting their lives at risk to arrive directly at the Southwest border.

To facilitate the safe, orderly, and humane processing of migrants who arrive at the Southwest border, the United States will:

- **Expeditiously Process and Remove Individuals Who Arrive at the Southwest Border and Don't Have a Legal Basis to Remain.** Individuals in expedited removal proceedings and who express a fear of persecution in their country of nationality or designated country of removal will be referred to a U.S. Citizenship and Immigration Services officer with specialized asylum training for a credible fear interview. Interviews of single adults, as well as any immigration judge review of a negative determination, will take place while the noncitizen is in DHS custody, either in a U.S. Border Patrol or U.S. Immigration and Customs Enforcement facility. By expediting review of these asylum claims, DHS will be able to provide relief more quickly to those who are eligible and to more quickly remove those who are not. To support faster processing, DHS is

USCIS_24-Hour_AR_000071

increasing its holding capacity, expanding capabilities and technologies, installing hundreds of phone lines and privacy booths to conduct credible fear interviews (CFIs) and increase access to counsel, and schedule CFI interviews within 24 hours. DHS and the Department of Justice (DOJ) are also surging asylum officers and immigration judges, respectively, to complete immigration proceedings at the border more quickly. Like single adults, families will be placed in removal proceedings, which will include expedited removal.  DHS is currently focused on utilizing its Alternatives to Detention program for families, including GPS monitors and enhanced supervision, such as curfews, and expanding case management services.  More stringent measures may be used for those who do not comply. Like single adults, families with final orders of removal will be removed.

- **Surge Additional Resources.** DHS is significantly scaling up its air and ground transportation capabilities to quickly remove migrants when warranted or transport migrants to less-congested border sectors for further immigration enforcement proceedings. DHS is also making an additional $15 million available for its Case Management Pilot Program to provide voluntary case management and other services to noncitizens to increase compliance with court dates and accelerate processing times. Services will be made available to certain noncitizens enrolled in DHS's Alternatives to Detention program, which is an important tool used by DHS for individuals and families as they await the outcome of immigration proceedings.
- **Manage Resource Needs.** The initial actions announced today are necessary to prepare the return to Title 8 processing and increased encounters along the Southwest Border but are not in and of themselves sufficient to address the resources requirements DHS will incur after Title 42 is lifted. DHS notified Congress of its intent to reprogram funds within its budget to support other emerging requirements across DHS. The reprograming of existing funds to address the immediate shortfalls in border operations should not be interpreted as adequate for the longer term needs of securing our border and enforcing our laws. The Administration requested $4.9 billion for these functions but received only $2.7 billion in the Omnibus passed in December, which is not an adequate level to address both the anticipated short-term surge following the end of Title 42 on May 11 and the longer-term constraints of operating within a broken immigration system that Congress has not updated for decades. While the Department is prudently utilizing the limited funding Congress has provided to prepare for the post-Title 42 environment, this notification of repurposing existing funds is only a fraction of what DHS will ultimately need.
- **Reduce Impacts on Border Communities.** DHS has awarded more than $135 million to communities to date this fiscal year and will award an additional $290 million in the coming weeks.  The Administration is also ramping up coordination between state and local officials and other federal agencies to provide resources, technical assistance and support, including through regular information sessions with stakeholders to ensure that the program is broadly understood and the funds are accessible. The Administration will continue to mobilize faith-based and non-profit organizations supporting migrants, including those providing temporary shelter, food, transportation, and humanitarian assistance as individuals await the outcome of their immigration proceedings.

The Biden-Harris Administration has been preparing for the eventual lifting of the Title 42 public health order for well over a year. In addition to working to combat misinformation and coordinating with local communities and NGOs, DHS began contingency planning efforts to prepare for the eventual lifting of Title 42. In February 2022, DHS formally stood up the Southwest Border Coordination Center, which leads the planning and coordinating of a whole of government response to the anticipated increase in border encounters. In April 2022, Secretary Mayorkas issued the DHS Plan for Southwest Border Security and Preparedness, laying out a six-pillar plan to manage an increase in encounters once Title 42 is no longer in effect, and updated the plan in December 2022.

Notwithstanding these efforts, we expect the days following the end of Title 42 public health order will be challenging and that encounters will increase for a time, as smugglers will seek to spread disinformation to capitalize on this change. Through the approach described above and the work of our outstanding personnel, the Biden-Harris Administration will do everything within its authority to manage this challenge, but until and unless Congress delivers on the immigration reform measures President Biden requested on his first day in office, the United States' immigration system will remain broken.

## Topics

BORDER SECURITY (/TOPICS/BORDER-SECURITY)      CITIZENSHIP AND IMMIGRATION SERVICES (/TOPICS/CITIZENSHIP-AND-IMMIGRATION-SERVICES)

IMMIGRATION AND CUSTOMS ENFORCEMENT (/TOPICS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT)

## Keywords

BORDER SECURITY (/KEYWORDS/BORDER-SECURITY)      CUSTOMS AND BORDER PROTECTION (CBP) (/KEYWORDS/CUSTOMS-AND-BORDER-PROTECTION-CBP)

ENFORCEMENT AND REMOVAL OPERATIONS (ERO) (/KEYWORDS/ENFORCEMENT-AND-REMOVAL-OPERATIONS-ERO)

FAMILY REUNIFICATION (/KEYWORDS/FAMILY-REUNIFICATION)      HUMAN SMUGGLING (/KEYWORDS/HUMAN-SMUGGLING)      IMMIGRATION (/KEYWORDS/IMMIGRATION)

IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)

INTERNATIONAL PARTNERSHIP (/KEYWORDS/INTERNATIONAL-PARTNERSHIP)      LAWFUL PATHWAYS (/KEYWORDS/LAWFUL-PATHWAYS)      MIGRATION (/KEYWORDS/MIGRATION)

PORT OF ENTRY (POE) (/KEYWORDS/PORT-ENTRY-POE)      REFUGEE (/KEYWORDS/REFUGEE)      REMOVAL (/KEYWORDS/REMOVAL)

SOUTHWEST BORDER (/KEYWORDS/SOUTHWEST-BORDER)      TRANSNATIONAL CRIMINAL ORGANIZATION (TCO) (/KEYWORDS/TRANSNATIONAL-CRIMINAL-ORGANIZATION-TCO)

Last Updated: 05/11/2023

USCIS_24-Hour_AR_000072

Case 1:23-cv-01843-TSC    Document 123    Filed 03/28/26    Page 721 of 721

USCIS_24-Hour_AR_000073